**E-FILED**
Monday, 31 December, 2007 01:57:04 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, | ) ) ) ) ) | |
| | ) | |
| Plaintiff/Cross-Complainant, | ) ) | |
| | ) | Case No.: 06-CV-3177 |
| v. | ) | |
| | ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation,, | ) ) ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## TSA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, Defendant TSA Stores, Inc., ("TSA," "Tenant," or "Defendant") by its attorneys, Hinshaw & Culbertson LLP, moves that summary judgment be entered in its favor on all claims on the grounds that there is no genuine issue as to any material fact and that TSA is entitled to judgment as a matter of law. In support hereof, TSA states as follows:

1.     This action concerns a dispute between TSA, as Tenant, and Plaintiff, SWPlaza III, as Landlord, to a lease of retail space in Springfield, Illinois.

2.     A provision of that lease allowed TSA to terminate the lease within 60 days of a casualty if that casualty caused damage to the leased premises, the cost of repair of which equaled or exceeded 35% of the then-total cost of reconstruction.

3.     On March 12, 2006, the leased premises were struck by a tornado, causing substantial damage to the leased premises.

4.     Based upon reliable estimates of the cost of repairs and the then-total reconstruction cost, TSA properly concluded that the damage exceeded the contractual threshold.

60169293v1 868372

5.     Plaintiff has no relevant or competent evidence showing that the damages did not equal or exceed 35% of the then-total reconstruction costs.

6.     The following materials are submitted in support of this motion:

a)     the declaration of Michael R. Mavelle, marked as Exhibit A (referred to as "Mavelle Declaration");

b)     the declaration of Cynthia Cashman, marked as Exhibit B (referred to as "Cashman Declaration");

c)     the deposition of Mark Alan Sorensen, taken in this cause on October 22, 2007, marked as Exhibit C (referred to as "Sorensen Deposition");

d)     the deposition of Jeffrey B. Wolford, taken in this cause on October 30, 2007, marked as Exhibit D (referred to as "Wolford Deposition"); and

e)     relevant portions of TSA's answers to Interrogatories, marked as Exhibit E (referred to as "TSA's Answer to Interrogatory).

7.     A memorandum of law in support of this Motion is lodged herewith.

Dated:  December 31, 2007

Respectfully submitted,

TSA Stores, Inc, as successor to Gart Bros.
Sporting Goods Company, A Delaware Corp.

BY:  /s/Charles R. Schmadeke
       J. William Roberts, No. 2351714
       Charles R. Schmadeke, No. 2489813
       Hinshaw & Culbertson LLP
       400 S. 9th St., Suite 200
       Springfield, IL 62701
       Phone: 217-528-7375
       Fax: 217-528-0075
       E-mail: broberts@hinshawlaw.com
       E-mail:cschmadeke@hinshawlaw.com
       Attorneys for TSA Stores, Inc.

60169293v1 868372

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2007, I electronically filed the TSA's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system that will send notification of such filing(s) to the following:

David A. Rolf          Email:  darolf@sorlinglaw.com
R. Lee Allen           Email:  rlallen@sorlinglaw.com


/s/Charles R. Schmadeke
J. William Roberts, No. 2351714
Charles R. Schmadeke, No. 2489813
Hinshaw & Culbertson LLP
400 S. 9th St., Suite 200
Springfield, IL 62701
Phone: 217-528-7375
Fax: 217-528-0075
E-mail: broberts@hinshawlaw.com
E-mail: cschmadeke@hinshawlaw.com
Attorneys for TSA Stores, Inc.

60169293v1 868372

**E-FILED**
Monday, 31 December, 2007  01:58:29 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, <br><br> Plaintiff/Cross-Complainant, <br><br> v. <br><br> TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation,, <br><br> Defendant/Counter-Plaintiff. | Case No.: 06-CV-3177 |

## DECLARATION OF MICHAEL R. MAVELLE

I, MICHAEL R. MAVELLE, declare, certify, verify, and state:

1.     I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could competently testify thereto.

2.     I am presently the Vice President-Risk Managment for TSA Stores, Inc. ("TSA"), and have held such position since August 4, 2003 . I am 50 years old, and presently reside in the State of Colorado.

3.     I have earned a baccalaureate degree in Criminal Justice from Michigan State University in the year of 1980.

4.     Prior to serving as Vice President-Risk Managment for TSA, I was employed as follows:

| COMPANY | POSITION | TIME |
|---|---|---|
| May Department Stores | Director of Security and various positions in the Company. | 8-1980 to 5-1993 |

**EXHIBIT A**

60169270v1 868372

5.      As Vice President-Risk Managment for TSA, my principal duties are:

    a.      Place all P&C and property insurance policies;

    b.      Direct all Safety Programs for TSA;

    c.      Direct all Work Comp and general liability claims for TSA; and

    d.      Work all property related claims for TSA.

6.      TSA is a Delaware corporation, headquartered in Englewood, Colorado.

7.      TSA is one of the largest full line sporting goods retailers in the United States.  In its 2005 fiscal year, TSA had 398 stores in 45 states with 32 of those stores located in Illinois.

8.      TSA is a wholly-owned subsidiary of The Sports Authority, Inc., formerly known as Gart Sports Company.

9.      On the basis of my position with TSA and background, I have general knowledge of the construction process of TSA retail stores and the general costs thereof.

10.      On April 2, 2001, TSA's predecessor, Gart Bros. Sporting Goods Company ("Gart") entered into a lease with the Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020 ("Trustee-Landlord"), for the rental of space in a shopping center in Springfield, Illinois, from which to operate a retail sporting goods store.  A true and correct copy of such Lease is attached hereto as Exhibit A.

11.      Gart had tendered a proposed lease agreement for the space to the prospective landlord, but that proposal was rejected.   In turn, the Trustee-Landlord submitted its own proposal.  The lease ultimately executed by the parties, including Section 15(b), was primarily drafted by the landlord.

12.      Gart took possession of the leased premises on December 18, 2001.

13.     On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the lease.

14.     In response to the tornado, TSA took action to protect persons in and around the leased premised and its property.

15.     Part of TSA's response included the retention of Cotton USA, a nationally known company specializing in disaster recovery services.  TSA's charge to Cotton USA was to stabilize and safeguard the TSA leased premises, including the structure, its systems, and the fixtures therein.

16.     On March 13 to March 15, 2006, I visited TSA's leased premises in Springfield, Illinois.  I observed damage to those premises as follows:

      a.     Various holes in the roof;

      b.     The wall with the South tenant was bowed;

      c.     Front glass to the store, including doors blown into store;

      d.     Water entered the store from the ceiling holes and front doors; and

      e.     All power was lost until Cotton hooked up the building with a generator.

17.     On March 21, 2006, David Frieder, Vice President of Construction for TSA, visited TSA's leased premises and observed damage to these premises.

18.     On March 23, 2006, TSA by Mr. Frieder, sent a letter to Arthur Seppi, Charles E. Robbins, and R. Lee Allen.  A true and correct copy of that letter is attached as Exhibit B.

19.     Thereafter, TSA received a letter, dated March 29, 2006, from David Rolf, the Landlord's attorney, which included an estimate of damage prepared by the Landlord's contractor, Jones-Blythe Construction Company, also dated March 29, 2006.  True and correct copies of that letter and estimate are attached as Exhibits C and D, respectively.

60169270v1 868372

20.    Also as part of TSA's response, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs of TSA's store in Springfield, Illinois.

21.    In April 2006, TSA received a budget estimate of the reconstruction costs of TSA's leased premises in Springfield, Illinois from Mr. Wolford (*see* page 2 of Exhibit E).    Mr. Wolford's budget estimate was incorporated into a Summary of Replacement and Repair Costs prepared by TSA.    A true and correct copy of that Summary of Replacement and Repair Costs is attached hereto as Exhibit E.

22.    TSA, by Mr. Frieder, estimated the then-total building replacement cost to be $1,960,067.00.    This figure was calculated based upon the original cost of construction in 2001 and adjusted for inflation by using tables prepared by The Associated General Contractors of America.    Thirty-five percent of the then-total replacement cost of TSA's leased premises in Springfield was calculated at $686,023.00.

23.    TSA received a bill from Cotton USA for its services relating to the leased premises in the amount of $319,428.00; said bill has been paid in full by TSA.

24.    Among the services provided by Cotton USA at the leased premises and paid for by TSA were the following:

(a)    drying of premises;

(b)    cleaning and removing debris;

(c)    removing standing water;

(d)    removing sheet rock;

(e)    removing all rubberized aisles with scrapers and flooring material;

(f)    removing and discarding effected insulation;

4

(g)    removing and discarding all commercial glued-down carpet; and

(h)    scraping remaining glue from floor slab.

25.    Including the Cotton USA fees, TSA estimated that the repair or reconstruction costs of the leased premises was $1,046,701.00 or 53.4% of the then-total replacement costs.

26.    On that basis, TSA determined that its termination rights under Section 15(b) of the Lease were triggered and elected to terminate the Lease.

27.    TSA by Mr. Frieder, sent a letter, dated May 3, 2006, to Arthur Seppi, Charles E. Robbins, and R. Lee Allen, providing notice of TSA's election to terminate the Lease  A true and correct copy of said letter is attached hereto as Exhibit F.

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on December 31, 2007.

_Mull R Mulle_

MICHAEL R. MAVELLE

5

# SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

## LEASE
### between

## GART BROS. SPORTING GOODS COMPANY,

### A Colorado Corporation

### as Tenant

### and

## ILLINOIS NATIONAL BANK, TRUSTEE,

### under Trust Agreement dated November 6, 2000

### and known as Trust No. 00-0020

### as Landlord

### dated April 2, 2001

### SOUTHWEST PLAZA III SHOPPING CENTER

### EXHIBIT A

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

I.  FUNDAMENTAL LEASE TERMS

A.  Parties.

Landlord:   Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

Tenant:   Gart Bros. Sporting Goods Company, a Colorado Corporation

B.  Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

C.  Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.

D.  Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

494160.4 JDSTER 03/29/1 8:44 AM                           2

| | | | |
|---|---|---|---|
| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.13 |

E.   **Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

F.   **Addresses (paragraph 34)**

If to Tenant:

GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:

GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701
Facsimile: (217) 522-3173

1.    **The Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between **Exhibit "A"** and **Exhibit "B"**, **Exhibit "A"** shall control. The "Shopping Center" includes the land described on **Exhibit "A"**, all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as **Exhibit "B"**. The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with **Exhibit "B"**.

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of: (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.    <u>Completion and Delivery of the Premises and Shopping Center</u>. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as **Exhibit "C"** (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as **Exhibit "B"** including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached **Exhibit "C"**, made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law.   All heating, ventilating and air-conditioning equipment servicing the Premises will be new.  Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord.  The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows:  The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3.    **Lease Term.** Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4.    **Rent.**

(a)    **Base Rent.** During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i)　　**First Five Years**. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)　　**Reduction in Base Rent**. Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)　　**Increases in Base Rent**. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)　　**Co-Tenancy Requirement; Alternate Rent**. Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

5.    **Development of Shopping Center by Landlord.**  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements.  All such parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises.  In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities.  Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference).  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    **Easements.**  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

      (a)    **Utility Easements.**  During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

      (b)    **Common Area Easement.** During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.   Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

      (c)    **Non-Dedication.** None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    **Common Areas and Common Area Maintenance.**

      (a)    **Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

     (b)   **CAM Charges.** For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

        (1)   real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

        (2)   any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

        (3)   maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

        (4)   repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

        (5)   amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)     amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)     repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)     interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)     management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)     amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)     other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)     **Tenant Payments.**   Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    **Examination of Landlord's Records.** Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    **Signs and Communications Equipment.**

(a)    **Signs.** Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of **Exhibit "D"** are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    **Taxes.**

(a)    **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    **Payment Following Appeal.** Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)    **Multiple Building Tax Parcel.** In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

10.    **Maintenance, Repairs and Replacements.**

(a)    Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)    Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.    **Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.    **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13. **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14. **Insurance**.

(a) **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)    <u>Liability Insurance</u>. During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    <u>Workers' Compensation Insurance</u>.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)    <u>Rental Loss Insurance</u>.  Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease.  Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period.  All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable.  The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation – statutory limits;
2) Employers Liability - $500,000; and
3) Comprehensive General and Comprehensive Auto Liability as follows:
   a) Bodily Injury - $1,000,000 per occurrence;
   b) Property Damage - $1,000,000 per occurrence;
   c) Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;
   d) Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;
   e) "XCU" Hazard Endorsement, if applicable;
   f) "Broad Form" Property Damage Endorsement;
   g) "Personal Injury" Endorsement; and
   h) "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)    **Policy Provisions.**  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)    **Waiver of Right of Recovery and Subrogation.**    To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises of the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)    **Evidence of Insurance.**  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)    **Indemnities.**  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.    **Damages by Fire or Other Casualty.**

(a)    **Less Than Thirty Five Percent (35%).**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Thirty Five Percent (35%) or More.**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

   (c)    **Landlord's Termination Rights**.  If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above).  Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

   16.    **Condemnation**.  If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

   Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17.  **Assignment and Subletting.**  Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18.  Use.

(a)   Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)   Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.    **Warranties and Representations.**

(a)    Landlord represents, warrants and covenants to Tenant that:

(I)    **Quiet and Peaceful Enjoyment.**  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    **Title.**  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.  Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage.  This representation and warranty is a material inducement to the Tenant's execution of this Lease.  Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA").  Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)    **Certificate of Authority.**  Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust.  Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)    **No Litigation**.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    **Hazardous or Toxic Materials**.  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    **Tenant's Exclusive Use**.  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii) **Zoning and Subdivision.** The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii) **Prohibited Activities.** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A)     a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)     a bowling alley;

(C)     a billiard or bingo parlor;

(D)     a flea market;

(E)     a massage parlor;

(F)     a funeral home;

(G)     a facility for the sale of paraphernalia for use with illicit drugs;

(H)     a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)     an off-track betting parlor;

(J)     a carnival, amusement park or circus;

(K)     a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

(L)     a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)     a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)     a skating rink;

(O)     an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)     a banquet hall, auditorium or other place of public assembly;

(Q)     a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R) a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center..

(ix)    **Site Covenants**. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    **Prohibited Uses in Common Areas**. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B)    **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C)    **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D)    **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)   **Restaurant Use**.  Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)   Tenant represents, warrants and covenants to Landlord that:

(i)   **Tenant's Authority**.  Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)   **Tenant's Warranty as to Hazardous or Toxic Materials**. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)   In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.   **Estoppel Certificates**.  Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    **Subordination of Lease.** At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22.    **Change of Landlord.** Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.    **Tenant's Financing.** Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

**24.** **Tenant's Property and Waiver of Landlord's Lien.** All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

**25.** **Memorandum of Lease: Commencement Date Agreement.** Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

**26.** **Expiration of Term and Holding Over.** All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

**27.** **"For Rent" Signs.** Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    **Force Majeure.** Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.    **Events of Tenant's Default.** Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    **Failure to Pay Rent: Breach.** (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Bankruptcy.** Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.    **Landlord's Remedies.** After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant. Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

(a)    **Reimbursement of Landlord's Costs in Exercising Remedies.** Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

**(b)    Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.    **Events of Landlord's Default: Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

32.    **Waiver.** If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    **Compliance with Applicable Laws**. During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    **Notices**.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:    Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois  62704

494160.4 JDSTER 03/29/1 8:44 AM

Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.  **Brokers.** Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark Commercial Real Estate Services LLC; which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial Real Estate Services, LLC shall be solely responsible for any commissions due and payable to Leonard W. Sapp or any related person or entity. Except for the amounts due Edgemark Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom the indemnifying party either has or is purported to have dealt.

36.  **Miscellaneous.**

(a)  **Headings and Gender.** All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)  **Construction.** The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)  **Relationship of Landlord-Tenant.** Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)  **Entire Agreement; Merger.** This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)  **Attorneys' Fees**.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)  **Partial Invalidity**.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)  **Consents**.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)  **Holidays**.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)  **Applicable Law**.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)  **Successors and Assigns**.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)  **Counterparts**.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)  **Trademarks and Trade Names**.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.  **Effectiveness of Lease: Tenant's Right to Terminate**.  Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)     Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)     Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)     Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)     Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.    **Confidentiality.**  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.    **Liability of the Trustee and the Beneficiary.**  This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank.  It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof.  It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises.  This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof.  Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.    **Liability of Directors and Shareholders.**  Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    **EXHIBITS**

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

**LANDLORD**

ILLINOIS NATIONAL BANK, TRUSTEE, under Trust Agreement dated November 6, 2000, known as Trust Number 00-0020

By: _____

Its _SVP & TD_

**ATTEST:**

By: _____

Its _VP & Controller_

**TENANT**

GART BROS. SPORTING GOODS COMPANY, a Colorado Corporation

By: _____

Its _____

**ATTEST:**

By: _____

Its _____

**Nesa E. Hassanein**
**Senior** Vice President
**and General** Counsel

0294793.005      3/29/01 RLA

# COC__IBE - BLOXDORF, P.C.

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477  •  Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



Exhibit "C"

CONSTRUCTION PROVISIONS

1.　Definitions:　For purposes of this Lease:

(i)　"Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(ii)　"Site Work Start Date" means April 15, 2001;

(iii)　"Building Shell Start Date" means May 15, 2001;

(iv)　"Scheduled Possession Date" means October 1, 2001;

(v)　"Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

(vi)　"Agreed Modifications" means the following changes, additions and modifications to the Program Drawings: None.

2.　General Requirements.

2.1　Code Compliance.　Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

2.2　General Conditions.　Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

(i)　Liability and builder's risk insurance;

(ii)　Costs for permits, sewer and water connection fees, etc.;

C-1

495779.1 JOSTER 03/30/01 11:31 AM

(iii)     Sales and use taxes;

(iv)     Temporary field offices, toilet facilities, supplies and equipment;

(v)     Miscellaneous equipment rentals;

(vi)     Trash removal and clean-up;

(vii)     Survey, staking and layout;

(viii)     Job site field supervision;

(ix)     Mobilization;

(x)     Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)     Quality assurance, including materials testing, inspections and special inspections; and

(xii)     Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

     2.3     <u>Warranties</u>. Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date. At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain. Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

     2.4     <u>Engineering</u>. All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

     2.5     <u>Permits</u>. Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

     3.     <u>Construction of Site Work</u>. Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage.    Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete.    Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping.    Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving.    Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities.    Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone.    Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting.    Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage.    Per paragraph 8(a) of the Lease and the Final Plans.

3.9 <u>Cost Responsibility</u>. All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4. <u>Construction of Building Shell</u>. Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this <u>Exhibit C</u>.

4.1 <u>Utilities</u>. Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2 <u>Cost Responsibility</u>. All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3 <u>Bids</u>. On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5. <u>Construction of Leasehold Improvements</u>. Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this <u>Exhibit C</u>.

5.1    Scope of Work.    The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property.    Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor.    The Leasehold Improvements will also include:    all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring.    All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.    The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.    Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord.    Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant.    Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid.    Acceptance and awarding of the contract will be the decision of both Landlord and Tenant.    Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant.    No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld.    Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.    Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    Leasehold Improvements Plans. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

6.3    Deviation from Final Plans. Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4 <u>Change Orders</u>. Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7. <u>Construction Costs</u>.

7.1 <u>Included Costs</u>. As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this <u>Exhibit C</u>, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2　　Excluded Costs.　In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3　　Payment of Construction Costs.　The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease).　Landlord will pay for all Construction Costs up to the Construction Cap.　In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.　　Construction Timing and Completion.

8.1　　Outside Dates.　If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date.　Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date.　Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work.　Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2　　Tenant's Option to Terminate.　If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder. Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3　　Inspection and Access.　During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on <u>Exhibit B</u> of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

        8.4.2   <u>Notice of the Possession Date</u>.  Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date"). If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

        8.5   <u>Condition of Premises at Delivery</u>.  Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

        8.6   <u>Indemnity by Landlord</u>.  Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

**EXHIBIT E**
Permitted Encumbrances

1. Real Estate Taxes for years 2000 and 2001.

2. Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3. Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4. Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

   NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5. Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6. Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7. Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8. Utility and drainage easements as shown by plat of subdivision.

9. 20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10. Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11.  Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12.  Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13.  Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14.  Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001      3/29/01 RLA

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

## RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $ _____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.     Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.     In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.      In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.      If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.      This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.      This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.      The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.      IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST


By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____

_____

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

## ACKNOWLEDGMENTS

### <u>LANDLORD</u>

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

### <u>LENDER</u>

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>TENANT</u>

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ and by _____ as _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:        _____

Exhibit G

## MEMORANDUM OF LEASE

Demise.  Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease.  Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease.  April 2, 2001.

Name and Address of Landlord.  ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois  62704, Attention:  Property Management.

Name and Address of Tenant.  GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado  80203, Attention: President.

Description of Premises.   Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

Term of Lease.  Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

Options to Extend.  The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

Restrictions on Construction.  The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B," and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive. So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this ____ day of _____, 2001.

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

## ACKNOWLEDGMENTS

<u>TENANT</u>

STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:        _____

<u>LANDLORD</u>

STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:        _____

**Exhibit A**

## LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

# CO MBE - BLOXDORF, P.C

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477  •  Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



| Post-it® Fax Note | 7671 | Date 12/12 | #of pages ► 1 |
| To Lee Ath | | From a | |
| Co./Dept. | | Co. maxco | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |



# SPORTS AUTHORITY.

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

SENT VIA FEDERAL EXPRESS

March 23, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701

Re: Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods
Company ("Tenant"), and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Thank you very much for meeting with me during my trip to Springfield this week. As you know, the
Tenant has the option to terminate the Lease pursuant to Paragraph 15(b) of the Lease if the repair and
reconstruction cost resulting from the recent tornado is 35% or more of the then-total reconstruction cost of
the Premises and Common Areas. Based on our initial review of the extensive damage to the Premises and
Common Areas, we believe that this threshold will be met, and as a result, Tenant has the right to elect to
terminate the lease within 60 days from the date of the casualty. Although the Lease provides that the
Tenant has 60 days in which to notify the Landlord of its election to terminate the Lease, we want the
Landlord to be aware that we are considering terminating the Lease, and accordingly, any repairs or
reconstruction to our Premises are at the Landlord's risk.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne

 

**EXHIBIT B**



## SORLING
NORTHRUP HANNA
CULLEN & COCHRAN, LTD.
ATTORNEYS AT LAW

REPLY TO:

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

David A. Rolf
Attorney at Law

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo

Elizabeth A. Urbance
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fathauer
Brian D. Jones

Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson

Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catros and Hardin
1944-1975

March 29, 2006

<u>VIA FEDERAL EXPRESS & FACSIMILE (720-475-2967)</u>
Mr. David Frieder
Vice President – Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

Re:     Lease, dated April 2, 2001, between TSA Stores, Inc., as
        successor to Gart Bros. Sporting Goods Company ("Tenant"),
        and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Frieder:

I am writing in response to your March 23, 2006 letter to Arthur Seppi,
Charles Robbins, and my partner, R. Lee Allen (in Mr. Allen's absence
from the office this week). I appreciate your courtesy in advising the
Landlord that you were considering terminating the Lease. We have now,
however, received an estimate from our contractor, Jones-Blythe
Construction Company, providing an opinion as to the extent of the
damage to the Premises leased to Sports Authority. As you can see from
this estimate, the damage does not exceed the 35% threshold referred to in
Paragraph 15(b) of the Lease. Pursuant to Paragraph 15(a) of that Lease,
the Landlord will be proceeding with repair and restoration of the
Premises, and expects that Sports Authority will abide by its continuing
obligations pursuant to that Lease.

Yours truly,

David A. Rolf

DAR/mah
Enclosure
cc:     Mr. William L. Hall, L.J. Shaw & Company
        Mr. Arthur Seppi
        Mr. Charles Robbins

{S05043372 3/29/2006 DAR MAH}

## EXHIBIT C

Via Fax 525-0545

**JONES-BLYTHE**
CONSTRUCTION CO.

March 29, 2006

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn:  Art Seppi

Re:    Sports Authority
       Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased
to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheat metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall). |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the
overall damage to the structure will not exceed 30% of the total replacement cost of the
premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen

**EXHIBIT D**

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**
**#618  Springfield**                                         5/1/2006

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | |
|---|---|
| Shell Costs | $889,295 Includes all grading, foundation and slab |
| TI Costs | $716,593 |
| Sub-Total | $1,605,888 |
| | |
| *3% estimate for original project changes | $48,177 |
| Sub-Total | $1,654,065 |
| | |
| **18.5% estimated 5 year cost increase | $306,002 |
| | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 |
| | |
| 35% threshold as defined by the lease | $686,023 |
| Estimated Repair costs (detail attached) | $1,046,701 |

\* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
\*\*Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis  of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

**EXHIBIT E**

# BUDGET ESTIMATE

**Sports Authority**
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Colton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $16,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' H Bar Joist & Deck | | 4960sq ft | $57,500 |
| Masonry- Beam Pockets etc. | Colm Line E | | $10,500 |
| Replace 124' Structural masonry wall | | 1 elevation | $21,500 |
| Roofing and Insulation | | 18k sq ft  $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,800 |
| HVAC repair existing units | | | $9,800 |
| Drywall Finish Taping Perimeter 4'7 U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT's- T-Bar Replacement | | 4,000 sf | $6,900 |
| Electrical- Sale off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,950 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring Installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $8,700 |
| Millwork | | Materials | $25,000 |
| Install Toilet Partitions/ Accessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $5,200 |
| Contingency | | 4% | $25,500 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $938,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| List itemizations below: (#25 – Gen Cond.) | | | |
| Misc. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

.001   T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL.

Date: 7-26-01
Contractor: VAVOIL CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|------|----------|-------|--------------|-------|---|
| | | BID BREAKDOWN | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | | |
| 3. Bond | | | | | |
| 4. Concrete | | | | 10,500 | X |
| 5. Carpentry | | | | 1,452 | |
| 6. Studs and Drywall | | | | 17,427 | X |
| 7. Storefront Glass | | | | 109,440 | X |
| 8. Interior Mirrors | | | | 0 | |
| 9. Acoustical Ceiling | | | | 1500 | |
| 10. Store Fixtures | | | | 11,850 | |
| 11. Painting | | | | 36,038 | X |
| 12. Carpet Installation | | | | 18,640 | |
| 13. Vinyl Tile and Base | | | | 105,885 | X |
| 14. Plumbing | | | | Above | |
| 15. Sprinklers | | | | 37,534 | |
| 16. Electrical | | | | 30,025 | |
| 17. Fire Alarm System | | | | 134,000 | |
| 18. HVAC/Ventilation | | | | 9800 | |
| 19. Dumpster | | | | 115000 | X |
| 20. Insurance  BUILDERS RISK | | | | 895 | X |
| 21. Supervision | | | | | |
| 22. General Conditions (Itemize) | | | | 14,402 | SUPERVISION |
| 23. Other (Itemize below) | | | | 20,255 | |
| SUBTOTAL | | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 38,000 | X |
| 25. Taxes (Sales/State/Local) | | | | 3950 | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 |
| List itemizations below: (#22 – Gen Cond.) | | | | | |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List itemizations below: (#23 – Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 | |
| 2. TOILET PARTITIONS | | | | 2230 | |
| 3. CONCRETE SEALING | | | | 2340 | |
| 4. | | | | | |

$22.18 ▢

736,848
$22.80 A

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: 0 wks. |
| UNION  /  NON-UNION | Amount of time for construction: 0 wks. |
| % of Union Increase:    % | |

Qualifications to be listed on separate sheet

7-26-01

Sheet3

Springfield
#618
Vancil Contracting
Shell Bid
2001

| Division | Title | | Sportmart No. 618 | Cost |
|---|---|---|---|---|
| 1000 | General Requirements | | | $28,829 |
| 2000 | Excavate and Grade | | | $60,642 |
| 3000 | Concrete Foundations and slabs | | | $174,482 |
| 4000 | Masonry and Foam Insulation | | | $168,251 |
| 5000 | Structural, Joists, and Deck | | | $177,827 |
| 6000 | Rough Carpentry | | | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | $95,393 |
| 8100 | Doors, Frames | | | $2,949 |
| 8300 | Overhead Doors | | | $1,540 |
| 8400 | Storefronts | | | $21,450 |
| 8460 | Auto Doors | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | $24,840 |
| 9900 | Exterior Painting | | | $13,255 |
| 11100 | Dock Equipment | | | $5,804 |
| 15400 | Plumbing Rough In | | | $6,992 |
| 15700 | HVAC Curbs | | | $3,122 |
| 16100 | Electrical Rough In | | | $22,495 |
| | | | | $831,117 |
| | Overhead and Profit | | | $58,178 |
| | | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

~~$55~~

LEASE AGREEMENT = $ $\frac{55.00}{27.53}$ /SQ FT

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

$1,777 total
2 to

Page 1

*Storefiles*



**National Disaster Recovery Services**

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | | |
| City, State, Zip | Springfield, IL 62704 | Insurance Co: | Liberty Mutual Property |
| Tel: | (217) 546-0132 | Insurance Adj: | Ton Tiernan |
| Fax: | (217) 546-1073 | Claim #: | X69A-003155-00 |

| | |
|---|---|
| Re: | Tornado Damages in Springfield, IL  #618 |
| Re: | **Final Bill With Not To Exceed Amount:** |

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

All expenses received after final billing will be invoiced at a later date

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77040

03/31/06

**Please include the invoice number on check**



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. (See Chart 1(Page 2) and Table 1 (Page 7).)

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.



The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.



In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

*Reported by AGC Chief Economist Ken Simonson (March 2006)*



In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

**Chart 2**



- -◆- Nonresidential Buildings     —○— Highway & Street Construction     —▲— Other Heavy Construction
- —■— Multi-Unit Residential     —+— Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.



Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



**Chart 3**

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

**Chart 4**



Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.



## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.



Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.



The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



( simonsonk@agc.org) became Chief Economist of General Contractors of America (AGC), the leading national for the construction industry, on September 10th,

years of experience analyzing, advocating and communicating economic and tax issues. Before joining AGC, he spent three economic advisor in the Office of Advocacy of the U.S. administration and 13 years as vice president and chief American Trucking Associations. He also worked with Commission on Industrial Competitiveness, the U.S. commerce, the Federal Home Loan Bank Board, and an consulting firm.

nearly one-page email newsletter that summarizes the latest economic is co-author of AGC's monthly Construction Tax News, a federal and state tax developments affecting the industry.

the University of Chicago and an MA in economics from a board member of the National Association for Business



## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 6.0 | 5.0 | 1.5 |
| Construction materials | | -3.2 | 3.4 | 24.3 | 3.7 | 0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| Nonresidential buildings | -0.5 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.6 | 1.0 | 2.5 | 10.9 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.8 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 6.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction inputs

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| Iron ore | 1.5 | -1.3 | 1.5 | 6.7 | 16.5 | 3.7 |
| Iron and steel scrap | -5.5 | 27.6 | 64.9 | 50.6 | -19.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.6 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Capper ores | -19.6 | 3.6 | -37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.6 | 11.8 | 29.6 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.6 | -0.5 | 9.9 | 6.9 | 4.6 |
| Structural, architectural, pre-engineered metal prods. | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | 0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.6 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.6 | 7.8 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.6 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.5 | 9.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.6 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.8 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 8.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.6 | -0.2 | 6.2 | 3.8 | 0.8 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 6.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.6 | 9.2 | 6.4 | 28.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -26.6 |
| Asphalt | N/A | N/A | 10.0 | 18.3 | 17.6 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 18.5 | 8.6 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 5.7 | 5.6 | 17.6 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 6.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.6 |
| Gypsum products | 0.4 | 3.4 | 2.6 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | 1.7 |



## Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/sopre/06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance |
|---|---|---|---|
| 122005 | | Materials and components for construct | 122636  122648 |
| | | Nonwovens and felt goods | .005  .003 |
| | | Industrial and other special product | .001  .002 |
| | | | .001  .001 |
| | | Other inorganic chemicals | .013  .013 |
| | | Architectural coatings | .007  .007 |
| | | General purpose coatings, and marine | .003  .004 |
| | | Alkyd and miscellaneous paint product | .004  .004 |



| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c. | .011 | .011 |
| 072106 | Plastic construction products | .958 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding, and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .235 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083301 | Softwood veneer, incl veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .146 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul, ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodical circulation/adverti | — | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stai | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

| Code | Description | Value 1 | Value 2 |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elec., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107406 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107501 | Heat exchangers and condensers | .048 | .048 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farms | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab b | .016 | .016 |
| 108102 | Externally thread. fasteners, ex. airc | .005 | .005 |
| 108103 | Internally thread. fasteners, ex. airc | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .093 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

| | | | |
|---|---|---|---|
| 117102 | Noncurrent carrying | .204 | .203 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect & monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132204 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .094 | .091 |
| 133301 | Ready-mixed concrete | .866 | .865 |
| 133405 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134202 | Glazed brick struct, hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 135201 | Clay refractories | .024 | .024 |
| 135301 | Refractories, non-clay | .025 | .025 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category—Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 ship-ment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.



# SPORTS AUTHORITY.

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

SENT VIA FEDERAL EXPRESS

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131


Re: Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation. To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001. As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

  SPORTMART    OSHMAN'S

**EXHIBIT F**

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, <br><br> Plaintiff/Cross-Complainant, <br><br> v. <br><br> TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, <br><br> Defendant/Counter-Plaintiff. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: 06-CV-3177 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF CYNTHIA CASHMAN

I, CYNTHIA CASHMAN, declare, certify, verify, and state:

1.    I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could competently testify thereto.

2.    I am presently the Director of Real Estate for TSA Stores, Inc. ("TSA"), and have held such position since January 1998.  I am 44 years old, and presently reside in the State of Colorado.

3.    I have earned a baccalaureate degree in Finance from DePaul University in the year of 1989.

4.    Prior to my present position, I was employed as follows:

| **COMPANY** | **POSITION** | **TIME** |
|---|---|---|
| Sportmart, Inc. | Various positions | October 1993-January 1998 |

5.    As Director of Real Estate for TSA, my principal duties are:

a.    Property management;

60169278v1 868372

**EXHIBIT B**

      b.      Lease administration/compliance; and

      c.      Excess property.

6.      On April 2, 2001, TSA's predecessor, Gart Bros. Sporting Goods Company ("Gart") entered into a lease with the Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020 ("Trustee-Landlord"), for the rental of space in a shopping center in Springfield, Illinois, from which to operate a retail sporting goods store. A true and correct copy of such Lease is attached hereto as Exhibit A.

7.      Gart had tendered a proposed lease agreement for the space to the prospective landlord, but that proposal was rejected. In turn, the Trustee-Landlord submitted its own proposal. The lease ultimately executed by the parties, including Section 15(b), was primarily drafted by the landlord.

8.      Gart took possession of the leased premises on December 18, 2001.

9.      On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the lease.

10.      In response to the tornado, TSA took action to protect persons in and around the leased premised and its property.

11.      Mike Mavelle, Vice President of Risk Management for TSA, visited TSA's leased premises in Springfield, Illinois from March 13, 2006 through March 15, 2006 to view the damage.

12.      On March 16, 2006, I sent a letter to Charles E. Robbins and R. Lee Allen addressing an action plan and time table for reconstruction and TSA's assessment of the damage. A true and correct copy of that letter is attached hereto as Exhibit B.

13.      On March 21, 2006, David Frieder, Vice President of Construction for TSA,

60169278v1 868372

visited TSA's leased premises and observed damage to these premises.

14.     Also as part of TSA's response, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs of TSA's leased premises in Springfield, Illinois.

15.     In April 2006, TSA received a budget estimate of the reconstruction costs of TSA's leased premises in Springfield, Illinois from Mr. Wolford (*see* page 2 of Exhibit C). Mr. Wolford's budget estimates was incorporated into a Summary of Replacement and Repair Costs prepared by TSA. A true and correct copy of that Summary of Replacement and Repair Costs is attached hereto as Exhibit C.

16.     TSA, by Mr. Frieder, estimated the then-total building replacement cost to be $1,960,067.00. This figure was calculated based upon the original cost of construction in 2001 and adjusted for inflation by using tables prepared by The Associated General Contractors of America. Thirty-five percent of the then-total replacement cost of TSA's leased premises in Springfield was calculated at $686,023.00.

17.     Including the Cotton USA fees, TSA estimated that the repair or reconstruction costs of the leased premises was $1,046,701.00 or 53.4% of the then-total replacement costs.

18.     On that basis, TSA determined that its termination rights under Section 15(b) of the Lease were triggered and elected to terminate the Lease.

19.     On behalf of TSA, by Mr. Frieder, sent a letter, dated May 3, 2006, to Arthur Seppi, Charles E. Robbins, and R. Lee Allen, providing notice of TSA's election to terminate the Lease. A true and correct copy of said letter is attached hereto as Exhibit D.

60169278v1 868372

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 31, 2007.

CYNTHIA J. CASHMAN

4

# SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

## LEASE
between

## GART BROS. SPORTING GOODS COMPANY,

A Colorado Corporation

**as Tenant**

**and**

## ILLINOIS NATIONAL BANK, TRUSTEE,

under Trust Agreement dated November 6, 2000

and known as Trust No. 00-0020

**as Landlord**

**dated April 2, 2001**

SOUTHWEST PLAZA III SHOPPING CENTER

**EXHIBIT A**

494160.4 JDSTER 03/29/1 8:44 AM

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

I.     FUNDAMENTAL LEASE TERMS

A.     Parties.

Landlord:     Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

Tenant:     Gart Bros. Sporting Goods Company, a Colorado Corporation

B.     Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

C.     Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.

D.     Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per-sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

494160.4 JDSTER 03/29/1 8:44 AM

| | | | |
|---|---|---|---|
| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.15 |

**E.**    **Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

**F.**    **Addresses (paragraph 34)**

If to Tenant:

> GART BROS. SPORTING GOODS COMPANY
> 1000 Broadway
> Denver, Colorado 80203
> Attention: President
> Facsimile: (303) 863-2243

With a copy to:

> GART BROS. SPORTING GOODS COMPANY
> 1000 Broadway
> Denver, Colorado 80203
> Attention: Legal Department
> Facsimile: (303) 864-2188

If to Landlord:

> Charles E. Robbins, Realtor
> 2144 South MacArthur Boulevard
> Springfield, Illinois 62704
> Attention: Property Management
> Facsimile: (217) 525-0545

With a copy to:

> R. Lee Allen, Attorney
> Sorling, Northrup, Hanna, Cullen & Cochran
> 620 East Adams, Suite 800
> Springfield, Illinois 62701
> Facsimile: (217) 522-3173

1.    **The Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

> The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between **Exhibit "A"** and **Exhibit "B"**, **Exhibit "A"** shall control. The "Shopping Center" includes the land described on **Exhibit "A"**, all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as **Exhibit "B"**. The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with **Exhibit "B"**.

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.    **Completion and Delivery of the Premises and Shopping Center**. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as **Exhibit "C"** (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as **Exhibit "B"** including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached **Exhibit "C"**, made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3.    **Lease Term.** Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4.    **Rent.**

(a)    **Base Rent.** During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i)    **First Five Years**. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)    **Reduction in Base Rent**. Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    **Increases in Base Rent**. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)    **Co-Tenancy Requirement: Alternate Rent**. Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

5. **Development of Shopping Center by Landlord**. Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises. In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities. Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference). Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6. **Easements**. In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    **Utility Easements.**  During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)    **Common Area Easement.** During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.  Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)    **Non-Dedication.** None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    **Common Areas and Common Area Maintenance.**

(a)    **Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    **CAM Charges**. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)    repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)    management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    **Tenant Payments.**    Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d) **Examination of Landlord's Records.** Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8. **Signs and Communications Equipment.**

(a) **Signs.** Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of **Exhibit "D"** are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)     **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.     **Taxes.**

(a)     **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)     **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)     **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)  **Payment Following Appeal.** Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)  **Multiple Building Tax Parcel.** In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

10.  <u>Maintenance, Repairs and Replacements.</u>

(a)  Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)     Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.     **Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.     **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Tenant, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    **Insurance**.

(a)    **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b) **Liability Insurance**. During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c) **Workers' Compensation Insurance**. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d) **Self-Insurance**. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e) **Rental Loss Insurance**. Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease. Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period. All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable. The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f) **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction**. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)  Workers' Compensation – statutory limits;
2)  Employers Liability - $500,000; and
3)  Comprehensive General and Comprehensive Auto Liability as follows:
    a)  Bodily Injury - $1,000,000 per occurrence;
    b)  Property Damage - $1,000,000 per occurrence;
    c)  Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;
    d)  Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;
    e)  "XCU" Hazard Endorsement, if applicable;
    f)  "Broad Form" Property Damage Endorsement;
    g)  "Personal Injury" Endorsement; and
    h)  "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)    **Policy Provisions**.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)    **Waiver of Right of Recovery and Subrogation**.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)    **Evidence of Insurance**.  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)    **Indemnities**. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.     **Damages by Fire or Other Casualty**.

(a)     **Less Than Thirty Five Percent (35%)**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)     **Thirty Five Percent (35%) or More**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c) **Landlord's Termination Rights**. If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above). Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation**. If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17. **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18. **Use**.

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.    **Warranties and Representations**.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    **Quiet and Peaceful Enjoyment**.    Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    **Title**.    Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease. Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA"). Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)    **Certificate of Authority**.    Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)    **No Litigation.**  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    **Hazardous or Toxic Materials.**  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    **Tenant's Exclusive Use.**  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    **Zoning and Subdivision.** The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    **Prohibited Activities.** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    a banquet hall, auditorium or other place of public assembly;

(Q)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R) a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

(ix) **Site Covenants**. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A) **Prohibited Uses in Common Areas**. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B) **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C) **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D) **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E) **Restaurant Use.** Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b) Tenant represents, warrants and covenants to Landlord that:

(i) **Tenant's Authority.** Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) **Tenant's Warranty as to Hazardous or Toxic Materials.** As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c) In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20. **Estoppel Certificates.** Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.   **Subordination of Lease**.  At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22.   **Change of Landlord**.  Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.   **Tenant's Financing**.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

**24.    Tenant's Property and Waiver of Landlord's Lien.**  All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

**25.    Memorandum of Lease: Commencement Date Agreement.**  Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

**26.    Expiration of Term and Holding Over.**  All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

**27.    "For Rent" Signs.**  Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.   **Force Majeure.** Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.   **Events of Tenant's Default.** Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

   (a)   **Failure to Pay Rent; Breach.** (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

   (b)   **Bankruptcy.** Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.   **Landlord's Remedies.** After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant. Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

   (a)   **Reimbursement of Landlord's Costs in Exercising Remedies.** Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

   **(b)** **Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

  31. **Events of Landlord's Default:  Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following:  (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

  32. **Waiver**.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.     **Compliance with Applicable Laws.** During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.     **Notices.** Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:     GART BROS. SPORTING GOODS COMPANY
                  1000 Broadway
                  Denver, Colorado 80203
                  Attention: President
                  Facsimile: (303) 863-2243

With a copy to:   GART BROS. SPORTING GOODS COMPANY
                  1000 Broadway
                  Denver, Colorado 80203
                  Attention: Legal Department
                  Facsimile: (303) 864-2188

If to Landlord:   Charles E. Robbins, Realtor
                  2144 South MacArthur Boulevard
                  Springfield, Illinois  62704

Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.    **Brokers**. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark Commercial Real Estate Services LLC, which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial Real Estate Services, LLC shall be solely responsible for any commissions due and payable to Leonard W. Sapp or any related person or entity. Except for the amounts due Edgemark Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom the indemnifying party either has or is purported to have dealt.

36.    **Miscellaneous.**

(a)    **Headings and Gender**. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    **Construction**. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)    **Entire Agreement; Merger**. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

34

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    **Attorneys' Fees**.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)    **Partial Invalidity**.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    **Consents**.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)    **Holidays**.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)    **Applicable Law**.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)    **Successors and Assigns**.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)    **Counterparts**.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)    **Trademarks and Trade Names**.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    **Effectiveness of Lease: Tenant's Right to Terminate**.  Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)    Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)    Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)    Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.   **Confidentiality.**   The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.   This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.   The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.   Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.   It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.   **Liability of the Trustee and the Beneficiary.**   This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank.   It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof.   It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises.   This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof.   Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.   **Liability of Directors and Shareholders.**   Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    **EXHIBITS**

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

**LANDLORD**

ILLINOIS NATIONAL BANK, TRUSTEE, under Trust Agreement dated November 6, 2000, known as Trust Number 00-0020

By: _____

Its  _SVP & TO_

**ATTEST:**

By: _____

Its  _VP & Controller_

**TENANT**

GART BROS. SPORTING GOODS COMPANY, a Colorado Corporation

By: _____

Its  _____

**ATTEST:**

By: _____

Its  _____

**Nesa E. Hassanein
Senior Vice President
and General Counsel**

0294793.005    3/29/01RLA

# COCHRANE - BLOXDORF, P.C.

## Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477   ◆   Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



## Exhibit "C"

### CONSTRUCTION PROVISIONS

1.  Definitions: For purposes of this Lease:

    (i)   "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

    (ii)  "Site Work Start Date" means April 15, 2001;

    (iii) "Building Shell Start Date" means May 15, 2001;

    (iv)  "Scheduled Possession Date" means October 1, 2001;

    (v)   "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

    (vi)  "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings: None.

2.  General Requirements.

    2.1   Code Compliance. Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

    2.2   General Conditions. Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

    (i)   Liability and builder's risk insurance;

    (ii)  Costs for permits, sewer and water connection fees, etc.;

E-FILED
Monday, 31 December, 2007  01:59:41 PM
Clerk, U.S. District Court, ILCD

(iii)    Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment;

(v)     Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)   Survey, staking and layout;

(viii)  Job site field supervision;

(ix)    Mobilization;

(x)     Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)   Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3    Warranties.  Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date.  At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain.  Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4    Engineering.   All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5    Permits.  Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.     Construction of Site Work.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage.  Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete.  Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping.  Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving.  Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities.  Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone.  Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting.  Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage.  Per paragraph 8(a) of the Lease and the Final Plans.

3.9 <u>Cost Responsibility.</u> All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4. <u>Construction of Building Shell.</u> Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this <u>Exhibit C.</u>

4.1 <u>Utilities.</u> Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2 <u>Cost Responsibility.</u> All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3 <u>Bids.</u> On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5. <u>Construction of Leasehold Improvements.</u> Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this <u>Exhibit C.</u>

5.1    Scope of Work.    The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property.    Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor.    The Leasehold Improvements will also include:  all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring.    All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.    The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.    Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord.    Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant.    Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid.    Acceptance and awarding of the contract will be the decision of both Landlord and Tenant.    Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant.    No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld.    Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.  Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    Leasehold Improvements Plans. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

6.3    Deviation from Final Plans. Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

    6.4   <u>Change-Orders</u>. Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

    If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.   <u>Construction Costs</u>.

    7.1   <u>Included Costs</u>. As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this <u>Exhibit C</u>, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2    Excluded Costs.  In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3    Payment of Construction Costs.  The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease).  Landlord will pay for all Construction Costs up to the Construction Cap.  In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.    Construction Timing and Completion.

8.1    Outside Dates.  If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date.  Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date.  Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work.  Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2    Tenant's Option to Terminate.  If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder. Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3    Inspection and Access.  During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on <u>Exhibit B</u> of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

8.4.2    <u>Notice of the Possession Date</u>.    Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date"). If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

8.5    <u>Condition of Premises at Delivery</u>.    Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

8.6    <u>Indemnity by Landlord</u>.    Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

**EXHIBIT E**
**Permitted Encumbrances**

1.    Real Estate Taxes for years 2000 and 2001.

2.    Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3.    Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4.    Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

      NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5.    Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6.    Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7.    Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8.    Utility and drainage easements as shown by plat of subdivision.

9.    20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10.   Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11.    Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12.    Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13.    Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14.    Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
       NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001       3/29/01RLA

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

## RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1. Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2. In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.    In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.    If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.    This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.    This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.    The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.    IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____

_____


By: _____
Name: _____
Title: _____


ATTEST


By: _____
Name: _____
Title: _____

[SEAL]


**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation


By: _____
Name: _____
Title: _____


ATTEST


By: _____
Name: _____
Title: _____

[SEAL]

## ACKNOWLEDGMENTS

<u>LANDLORD</u>

STATE OF _____ )
                                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:     _____


<u>LENDER</u>

STATE OF _____ )
                                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:     _____

<u>TENANT</u>

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:    _____

Exhibit G

MEMORANDUM OF LEASE

Demise. Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease. April 2, 2001.

Name and Address of Landlord. ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois 62704, Attention: Property Management.

Name and Address of Tenant. GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado 80203, Attention: President.

Description of Premises. Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

Term of Lease. Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

Options to Extend. The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

Restrictions on Construction. The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B," and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive. So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this _____ day of _____, 2001.

**TENANT**

**GART BROS. SPORTING GOODS COMPANY,**
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

# ACKNOWLEDGMENTS

## TENANT

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## LANDLORD

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## Exhibit A

### LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

# COMBE-BLOXDORF, P.C

## Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.





# SPORTS AUTHORITY

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

March 16, 2006

<u>VIA FEDERAL EXPRESS NEXT DAY DELIVERY</u>

Mr. Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, IL 62704
Attention: Property Manager

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P.O. Box 5131
Springfield, IL 62705-5131

Re:     Lease Agreement, dated as of April 2, 2001, by and between Illinois National Bank,
        Trustee under Trust Agreement dated November 6, 2000 known as Trust No. 00-0020
        ("Landlord") and TSA Stores, Inc. as successor to Gart Bros. Sporting Goods Company,
        a Delaware corporation ("Tenant"), regarding the "Premises" located in the Southwest
        Plaza III Shopping Center, located at 3211 S. Veterans Parkway, Springfield, Illinois.
        <u>TSA Store No. 618</u>

Dear Mr. Robbins:

Thank you for taking the time today to briefly talk about the damage to our Premises from the
recent tornado at the above-referenced location. I appreciate that you are taking all necessary
steps to ensure that we re-open our business as soon as possible. However, we would appreciate
a more detailed conversation with an agreed upon action plan and timetable. With that in mind,
we request that you do not enter or restore anything in the Premises until we can fully assess our
damage. As further discussed, we expect assessment reports from our insurance agent, structural
engineer, and others shortly. Additionally, our Vice President of Construction, David Frieder,
will be on-site Tuesday, March 21, 2006, to also make an evaluation of our damage. He would
like to meet with you there at 2:30 pm. David can be contacted at 303-909-1739.

We look forward to coordinating efforts between both parties.



**EXHIBIT B**

TSA RULE 26 DISCLOSURES
.0093

05/08/2006 15:39 FAX 3038842102          GART SPORTS          Ø 026

Mr. Charles E. Robbins, Realtor
R. Lee Allen, Attorney
March 16, 2006
Page 2

Sincerely,

Cynthia J. Cashman
Director of Real Estate

Cc:    Missy Mayne
       Michelle Riggins
       David Frieder
       Lease file

H:\STORES\Store 618 Springfield IL\Tornado\Ltr to LL.doc

TSA RULE 26 DISCLOSURES
0094

## SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**                                                          5/1/2006
**#618  Springfield**

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority.  3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction.  Increase based on analysis   of Chief Economist Ken Simonson.  Associated General Contractors of America, March 2006.  See attached.

**EXHIBIT  C**

# BUDGET ESTIMATE

**Sports Authority**
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|------|----------|-------|-------|
| Emergency Response from Colton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $6,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' H Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | | $10,800 |
| Replace 124' Structural masonry wall | | 1 elevation | $21,500 |
| Roofing and Insulation | | | |
| Replace Existing Storefront & Glass | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Sprinkler- Rework Existing- Damaged | | | $24,000 |
| Fire Alarm- Minor Device Replacement | | | $26,200 |
| Ductwork- Remove and replace | | | $2,950 |
| HVAC repair existing units | | | $7,600 |
| Drywall/ Finish Taping Perimeter 4'/ U/S of Deck | | 4' up at Perim | $9,600 |
| Minor ACT a- T-Bar Replacement | | 4,000 sf | $31,600 |
| Electrical- Safe off- Curcuit Verification | | | $5,500 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $8,200 |
| Light fixtures | 50 Fixtures | Materials | $18,500 |
| Paint to match at lower levels | | | $4,850 |
| Floor Prep & Adhesive Removal | | .40 per ft | $5,600 |
| Entire Flooring Installation | | | $10,042 |
| Flooring materials | | Materials | $49,500 |
| RR- Plumbing Re-Installation | | Install Only | $68,500 |
| Entire New Premier Millwork Installation | | Install Only | $1,200 |
| Millwork | | Materials | $5,700 |
| Install Toilet Partitions/ Accessories | | | $28,000 |
| Final Cleaning- Deodorizing | | Union | $3,550 |
| Dumpsters | | 10 X $410.00 | $11,000 |
| Barricades- Dismantling of Existing | | | $4,100 |
| Protection of finish materials | | | $2,100 |
| Misc. Rental Equipment | | | $12,500 |
| Contingency | | 4% | $8,200 |
| General Conditions (Itemize) | | | $25,600 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,550 |
| City Required Fire Watch | | | $21,375 |
| Permit | | | $2,200 |
| SUBTOTAL | | | $4,000 |
| Allowances | | N/A | $998,745 |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $98,875 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,048,701 |
| List Itemizations below: (#25 - Gen Cond.) | | | |
| Misc. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

:001    T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL.

Date: 7-26-01
Contractor: VALON CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|---|---|---|---|---|---|
| **BID BREAKDOWN** | | | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | | |
| 3. Bond | | | | | |
| 4. Concrete | | | | 10,500 | X |
| 5. Carpentry | | | | 1,452 | |
| 6. Studs and Drywall | | | | 17,427 | X |
| 7. Storefront Glass | | | | 109,440 | X |
| 8. Interior Mirrors | | | | 0 | X |
| 9. Acoustical Ceiling | | | | 1,500 | |
| 10. Store Fixtures | | | | 11,850 | |
| 11. Painting | | | | 36,038 | X |
| 12. Carpet Installation | | | | 18,640 | |
| 13. Vinyl Tile and Base | | | | 105,885 | |
| 14. Plumbing | | | | above | |
| 15. Sprinklers | | | | 37,534 | X |
| 16. Electrical | | | | 30,025 | |
| 17. Fire Alarm System | | | | 34,000 | X |
| 18. HVAC/Ventilation | | | | 9,800 | X |
| 19. Dumpster | | | | 115,000 | X |
| 20. Insurance  BUILDERS RISK | | | | 895 | |
| 21. Supervision | | | | | |
| 22. General Conditions (itemize) | | | | 14,402 | SUPERVISION |
| 23. Other (itemize below) | | | | 20,255 | X |
| SUBTOTAL | | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 35,000 | X |
| 25. Taxes (Sales/State/Local) | | | | 3,950 | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 |
| List itemizations below: (#22 – Gen Cond.) | | | | | $22.18 |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List itemizations below: (#23 - Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 | |
| 2. TOILET PARTITIONS | | | | 2,230 | |
| 3. CONCRETE SEALING | | | | 2,340 | 736,848 |
| 4. | | | | | $22.80 A |

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: 0 wks. |
| **UNION** /  NON-UNION | Amount of time for construction: 0 wks. |
| % of Union increase:        % | |

Qualifications to be listed on separate sheet

7-26-01

Sheet3

Springfield
#618
Vancil Contracting
Shell Bid
2001

| Division | Title | | | | Sportmart No, 618 | |
|---|---|---|---|---|---|---|
| | | | | | | Cost |
| 1000 | General Requirements | | | | | $28,829 |
| 2000 | Excavate and Grade | | | | | $60,642 |
| 3000 | Concrete Foundations and slabs | | | | | $174,482 |
| 4000 | Masonry and Foam Insulation | | | | | $168,251 |
| 5000 | Structural, Joists, and Deck | | | | | $177,827 |
| 6000 | Rough Carpentry | | | | | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | | | $95,393 |
| 8100 | Doors, Frames | | | | | $2,949 |
| 8300 | Overhead Doors | | | | | $1,540 |
| 8400 | Storefronts | | | | | $21,450 |
| 8460 | Auto Doors | | | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | | | $24,640 |
| 9900 | Exterior Painting | | | | | $13,255 |
| 11100 | Dock Equipment | | | | | $5,804 |
| 15400 | Plumbing Rough In | | | | | $5,992 |
| 15700 | HVAC Curbs | | | | | $3,122 |
| 16100 | Electrical Rough In | | | | | $22,495 |
| | | | | | | $831,117 |
| | Overhead and Profit | | | | | $58,178 |
| | | | | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

LEASE AGREEMENT = $ $\frac{55.00}{27.53}$ /SQFT

AMOUNT REMAINING FOR T.I = $27.47 SQFT.

$1,777 total
2 bo

Page 1

*Store files*



**National Disaster Recovery Services**

| | | | | |
|---|---|---|---|---|
| **Name** | Mike Mavelle | | **Date:** | 03/31/06 |
| **Company** | Sports Authority | | **Invoice #:** | 1408722 |
| **Address** | 1050 W. Hampton Ave. | | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-3285 | | | |
| **Fax:** | (720) 475-3285 | | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | | |
| **City, State, Zip** | Springfield, IL 62704 | | |
| **Tel:** | (217) 546-0132 | **Insurance Co:** | Liberty Mutual Property |
| **Fax:** | (217) 546-1073 | **Insurance Adj:** | Ton Tiernan |
| | | **Claim #:** | X69A-003155-00 |
| **Re:** | Tornado Damages in Springfield, IL   #618 | | |
| **Re:** | **Final Bill With Not To Exceed Amount:** | | |

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |
| **SUBTOTAL**                    *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

*Any queries regarding this invoice should be sent to us within ten days of receipt of this*

*invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.*

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77040

03/31/06                              **Please include the invoice number on check**



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced
## Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.



The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



- ◆ - CPI-U  —○— PPI for Finished Goods  —▲— Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001–03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up 

about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 8.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.



In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

**Chart 2**



## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.



Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).

**Chart 3**



Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

**Chart 4**



Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.



## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.



Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.



The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



...simonsohn@agc.org) became Chief Economist of ...Contractors of America (AGC), the leading national ...for the construction industry, on September 10th,

...30 years of experience analyzing, advocating and communicat-...economic and tax issues. Before joining AGC, he spent three ...economic advisor in the Office of Advocacy of the U.S. ...istration and 13 years as vice president and chief ...American Trucking Associations. He also worked with ...Commission on Industrial Competitiveness, the U.S. ...Commerce, the Federal Home Loan Bank Board, and an ...consulting firm.

...a weekly one-page email newsletter that summarizes the latest eco-...He is co-author of AGC's monthly Construction Tax News, a ...federal and state tax developments affecting the industry.

...from the University of Chicago and an MA in economics from ...is a board member of the National Association for Business



## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| CPI-U | 1.9 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse-construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 8.9 | 5.0 | 1.5 |
| Boiler construction | | 3.2 | 3.4 | 2.4 | 3.7 | 0.3 (Sept.–Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| Nonresidential building | -0.5 | 0.7 | 2.3 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.5 | 1.0 | 2.5 | 10.5 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.8 | 13.4 | 8.8 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 6.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 8.3 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.6 | 6.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.6 | 27.5 | 54.9 | 50.6 | -10.9 | 2.9 |
| Steel mill products | -8.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Copper ores | -19.6 | 3.6 | -37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.5 | 11.6 | 29.9 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.9 | -0.5 | 9.9 | 6.8 | 4.6 |
| Structural, architectural, pre-engineered metal prods | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.6 | -3.3 | -0.1 | 20.0 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.8 | 0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.6 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.6 | 0.6 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.6 | 2.4 | 4.3 | 7.5 | 2.3 |
| Concrete products | 2.9 | -0.3 | 1.5 | 7.6 | 9.9 | 3.5 |
| Concrete block and brick | 2.3 | 1.6 | 3.2 | 4.7 | 8.1 | 2.5 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.6 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.6 | -0.2 | 6.2 | 3.8 | 2.6 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 6.0 |
| Crude petroleum (domestic production) | -42.4 | 60.5 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.6 | 9.2 | 6.4 | 28.5 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.6 |
| Asphalt | N/A | N/A | 10.0 | 18.3 | 17.8 | -8.1 |
| Paving mixtures and blocks | 0.5 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.5 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 18.5 | 6.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 5.7 | 5.6 | 17.6 | 36.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 6.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.8 | 3.9 | 6.3 | 9.2 | 2.6 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 16.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | -1.7 |



## Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/sopral06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance | |
|---|---|---|---|---|
| 32206 | | Materials and components/for construct | 12.935 | 12.648 |
| | 08 | Softwoods and fir lumber | 003 | 003 |
| | | Plywood and other/prefabricated products | 504 | 058 |
| | | | 001 | 001 |
| | | | 519 | 513 |
| | | Architectural coatings | 18 | 17 |
| | | Special purpose coatings, incl marine | 008 | 004 |
| | | Aircraft and misc/fabricated/metal produc | 014 | 004 |



| Code | Description | | |
|------|-------------|------|------|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding, and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083105 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083301 | Softwood veneer, incl veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | — |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and o | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .148 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insel, ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | — | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Grey & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stel | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

| | | | |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elec., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107406 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & v | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farm | .131 | .132 |
| 107902 | Other prefab. & portable metal buildi | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab b | .016 | .016 |
| 108102 | Externally thread. fasteners, exc met | .005 | .005 |
| 108103 | Internally thread. fasteners, exc, met | .001 | .001 |
| 108104 | Nonthreaded fasteners, exc met, aircraf | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional, or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .060 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

| 117102 | Noncurrent carrying | .204 | .203 |
|---|---|---|---|
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect & monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132201 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .091 | .091 |
| 133301 | Ready-mixed concrete | .868 | .865 |
| 133401 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134202 | Glazed brick,struct, hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 136201 | Clay refractories | .025 | .024 |
| 135301 | Refractories, non clay | .032 | .032 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category--Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.



**SPORTS AUTHORITY.**

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

SENT VIA FEDERAL EXPRESS

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re: Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation. To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001. As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

 

**EXHIBIT D**

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

E-FILED
Monday, 31 December, 2007 01:59:55 PM
Clerk, U.S. District Court, ILCD

1

2

3

IN THE UNITED STATES DISTRICT COURT
4      FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION
5

6

7   SWPLAZA III, LLC, an Illinois    )
limited liability company, as    )
8   successor to Illinois National   )
Bank, as Trustee under Trust     )
9   Agreement dated November 6, 2000 )
and known as Trust No. 00-0020,  )
10   an Illinois banking institution,)
)
11              Plaintiff    )
)
12       -vs-             )NO.06-CV-3177
)
13   TSA STORES, INC., as successor   )
to Gart Brothers Sporting Goods )
14   Company, a Delaware corporation,)
)
15              Defendant     )

16

17

18       Deposition of MARK A. SORENSEN taken at

19   the instance of the Defendant, on the 22nd day

20   of October, 2007, at 607 East Adams Street,

21   Suite 800, Springfield, Illinois, before

22   Sandra K. Haines, CSR and Notary Public,

23   pursuant to notice.

24

                              CSR NO. 084-002423

**EXHIBIT C**

```
 1                    APPEARANCES

 2

 3      SORLING, NORTHRUP, HANNA, CULLEN
        AND COCHRAN, LTD.
 4      Attorneys at Law
        Suite 800
 5      Illinois Building
        P.O. Box 5131
 6      Springfield, Illinois 62705
        (217)544-1144
 7

 8           BY:  MR. DAVID A. ROLF
                  Appearing on behalf of the Plaintiff
 9

10      HINSHAW & CULBERTSON
        Attorneys at Law
11      400 South Ninth Street
        Suite 200
12      Springfield, Illinois 62701

13           BY:  MR. CHARLES R. SCHMADEKE
                  Appearing on behalf of the Defendant
14

15

16      POSEGATE & DENES, P.C.
        Attorneys at Law
17      111 North Sixth Street
        Suite 200
18      Springfield, Illinois 62701
        (217)522-6152

19           BY:  MS. CAROL POSEGATE
                  Appearing on behalf of Jones-Blythe
20

21

22

23

24
```

1

2

INDEX

3

Direct Examination by Mr. Schmadeke .  4 - 70
Cross Examination by Mr. Rolf ....... 70 - 74

4

5

6

EXHIBITS

7

8

Deposition Exhibit Number 1 .........    14
Deposition Exhibit Number 2 .........    26
Deposition Exhibit Number 3 .........    32
Deposition Exhibit Number 4 .........    38
Deposition Exhibit Number 5 .........    42
Deposition Exhibit Number 6 .........    60

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

|    |                                              |
|----|----------------------------------------------|
| 1  | MARK A. SORENSEN                             |
| 2  | called as a witness herein, at the instance of |
| 3  | the Defendant, having been first duly sworn on |
| 4  | his oath, was examined and testified as      |
| 5  | follows, to-wit:                             |
| 6  | DIRECT EXAMINATION                           |
| 7  | BY MR. SCHMADEKE:                            |
| 8  | Q.   Mr. Sorensen, my name is Charles       |
| 9  | Schmadeke, and I represent TSA or also called |
| 10 | the Sports Authority in this litigation, and |
| 11 | I am going to be asking you a series of      |
| 12 | questions about what you have done with      |
| 13 | respect to the premises out at the Southwest |
| 14 | Plaza III.  I want to forewarn you since I   |
| 15 | have been in grade school I have been told   |
| 16 | that I speak very fast.  So, please if you   |
| 17 | don't understand what I am saying, don't     |
| 18 | hesitate to slow me down, or stop me, or     |
| 19 | whatever.                                    |
| 20 | A.   Okay.                                   |
| 21 | Q.   Fair enough.  Would you tell me your    |
| 22 | full name, please.                           |
| 23 | A.   Mark Alan Sorensen.                     |
| 24 | Q.   What is your current business          |

1    address?

2        A.    1030 West Reynolds, Springfield,

3    Illinois.

4        Q.    That's with Jones-Blythe?

5        A.    Jones-Blythe.

6        Q.    Can you please tell me your date of

7    birth?

8        A.    1-18-61.

9        Q.    What's your present occupation?

10       A.    I am a project manager estimator for

11   Jones-Blythe Construction Company.

12       Q.    In a nutshell can you tell me what

13   the duties of that job or the different

14   functions of that are?

15       A.    It is really two-fold.  Jones-Blythe

16   kind of takes a cradle to grave approach for

17   their projects.  So, the engineers estimate

18   the job, bid the job, and then when they are

19   successful in that job, then they manage that

20   through completion.  So, you're basically

21   responsible for the entire project from start

22   to finish.  I work as an estimator and

23   obviously manager.

24       Q.    An estimator you mean specifically?

1          A.    Quantity take off, detailed work

2     pricing, put the bids together on bid day,

3     submitting the proposal, preparing the

4     proposal.

5          Q.    Could you give me a rundown of your

6     educational background?

7          A.    I have a Bachelor's Degree from Iowa

8     State University in construction engineering

9     1984.  That's essentially it.

10         Q.    Any other specialized training in the

11    field that you're currently employed?

12         A.    Other than routine updates on safety

13    qualifications, OSHA type training for field

14    work, no.

15         Q.    Did you serve any apprenticeships

16    anyplace?

17         A.    I worked as a, I was a co-op student

18    while attending college.  I worked for Oak

19    View Construction Company out of Red Oak,

20    Iowa, worked there for three years on a

21    project, and only attended school one semester

22    out of the year.  It was really a way for me

23    to pay for college.

24         Q.    Does your profession require any

1    professional licenses?

2      A.   No.

3      Q.   Are you a member of any professional

4    organizations, associations, societies?

5      A.   No.  I do have, I mean when I

6    graduated from Iowa State I did take the

7    engineering training exam so I could get my

8    professional license if I ever desired, but I

9    have not taken the professional license exam.

10      Q.   How long have you been employed by

11    Jones-Blythe?

12      A.   Twenty-three years.

13      Q.   Do you have any ownership interest in

14    the company?

15      A.   No.

16      Q.   How long have you been serving as a

17    project manager estimator?

18      A.   That entire time.  Obviously they

19    start you out on smaller projects, and you

20    progress to larger projects.

21      Q.   Any prior employment experiences

22    before Jones-Blythe?

23      A.   Just Oak View Construction where I

24    served my co-op, and then other non-related

1  construction project jobs.

2      Q.    Have you ever done any work for Mr.

3  Robbins, Mr. Seppi, or any of their business

4  entities other than this particular project?

5      A.    No.   This is our first project with

6  them.

7      Q.    Your first project for you or for

8  Jones-Blythe?

9      A.    For Jones-Blythe and me.

10     Q.    You rendered some opinions in this

11  matter, is that correct to say, fair to say?

12     A.    Yes.

13     Q.    Were you informed by anybody what

14  opinion would be most favorable?

15          MR. ROLF:  I will object to -- I am

16  not sure I understand the question.

17     Q.    If you understand, you can answer.

18  If you don't, I would be glad to explain it

19  further.

20     A.    Explain further, please.

21     Q.    Did anybody tell you what would be

22  the most favorable opinion as far as they were

23  concerned before you formed your opinion?

24     A.    My initial opinion I was asked to

1    walk through the structure, and evaluate what

2    percentage I thought of damage was done.

3         Q.    I am going to get back to that

4    particular thing.  In the report that you

5    provided you stated that, and I believe that

6    you were not being paid any more than what you

7    did for the project?

8         A.    That's correct.

9         Q.    Is that still the case?

10        A.    This is still the case.

11        Q.    Did you do anything to prepare for

12   your testimony today?

13        A.    Yes.

14        Q.    What did you do?

15        A.    I have reviewed the documents, went

16   back and kind of refreshed my memory as far as

17   what all had happened.

18        Q.    What documents have you reviewed?

19        A.    I reviewed, of course, the statements

20   that I made, went back and looked at our job

21   cost reports for the project, prepared some

22   back-up information that was requested in the

23   letter for the deposition, made sure that we

24   had all that covered.  That's really I

1    guess -- I went back through e-mails and stuff

2    just refreshing myself.  It has been awhile.

3        Q.    Did you speak with anybody about your

4    preparation for the testimony?

5        A.    Yes.

6        Q.    Can you tell me who you spoke with?

7        A.    Yes, Carol Posegate, and then also

8    David Rolf.

9        Q.    What back-up information did you

10    prepare or bring with you that hasn't

11    previously been given, if you know?

12        A.    That would be this packet of the,

13    basically defines the cost as far as certified

14    payroll, lien waivers, all of the things that

15    were noted there on the letterhead.  I think

16    that also might even have copies, yes, it has

17    copies of all of our billings.

18        Q.    Thank you.

19        A.    That's actually your copy, if you

20    want it.

21        Q.    Appreciate that.  Now, you mentioned

22    earlier that you were asked to do a walk

23    through to give, review the structural damage

24    of the premises.  Is that basically correct?

```
 1            A.    Yes.

 2            Q.    Who asked you to do that?

 3            A.    Art Seppi.

 4            Q.    And do you remember when he contacted

 5     you?

 6            A.    No, I do not.

 7            Q.    Did he contact you, or did somebody

 8     else from Jones-Blythe ask you to do it?

 9            A.    No, he contacted me.  Actually I was

10     out at the site.  Reconstruction had already

11     started, and he asked me to walk through and

12     look at it.

13            Q.    Who was doing the reconstruction at

14     the site?

15            A.    We had started preparations to do the

16     reconstruction, although Cotton was also

17     working on site at the same time doing

18     whatever they were doing for Sports Authority.

19            Q.    Getting to the reconstruction, that

20     had already started before you went to view

21     the premises?

22            A.    Well, sorry.

23            Q.    Please.

24            A.    I was on site from day one that we
```

1    started work.  So, but we had already been

2    under way before I was asked to review the

3    structure for the overall project.

4         Q.    Did you make any estimates before you

5    started reconstruction?

6         A.    No, it was an emergency project, and

7    they just asked us to come out and get going,

8    because we didn't know at the time what the

9    extent of damage was.  So, until we got in and

10   started sorting through things we really

11   couldn't put together an estimated bid.

12        Q.    Were you serving as project manager

13   on that reconstruction?

14        A.    I was serving as everything, yes,

15   project manager, estimator.

16        Q.    Do you remember after the tornado of

17   March 12, 2006 when did you first visit the

18   Southwest Plaza?

19        A.    I believe it was March 14th.

20        Q.    Can you tell me what you observed?

21        A.    Yes.  Oh, boy, I actually have it in

22   a report, but if you want I could actually

23   give you a copy of this also, but you want me

24   to -- I documented daily when I was out there

1    what I was observing, and the process that was

2    under way.

3         Q.    What I would like you to do is just

4    tell me what you remember, and then we can go

5    through your report.

6         A.    What I remember was, and of course,

7    we were working both in Gordmans, Bed Bath And

8    Beyond, and Sports Authority.  At Sports

9    Authority there was a lot of activity when I

10   first arrived on site, which was with Cotton

11   dealing with whatever they were dealing with

12   inside, lot of merchandise.  They had some

13   trailers and stuff there.  I assume that they

14   were putting material in, wasn't really my

15   main concern.  In Sports Authority one small

16   section of the roof structure had collapsed.

17   There was some lights hanging from the

18   ceiling.  There was obviously water damage.

19   Some of the glass was missing out of the front

20   entry.  There was some ceiling structural

21   damage, some ceiling grid and tile that had

22   fallen kind of off over on the right-hand

23   side.  There was just a lot of activity by

24   Cotton.

1      Q.    What kind of activity did you observe

2    that Cotton was engaged in at that time?

3      A.    Looks like they were removing

4    merchandise for the most part.  They were also

5    cleaning up water, other debris.

6      Q.    If I understand it correctly, Mr.

7    Seppi asked you to do a walk through for the

8    purpose of estimating the damage?

9      A.    Not at that time.  It was at a later

10   date.

11     Q.    Do you remember when that was?

12     A.    Not exactly, it is on my report

13   though.

14           MR. SCHMADEKE:  Let's mark that as

15   One.

16     (Whereupon said document was duly marked,

17     for purposes of identification, as

18     Deposition Exhibit Number One, as of this

19     date.)

20     Q.    I have given you a copy of what has

21   been marked as Exhibit One.  Do you recognize

22   this document?

23     A.    Yes.

24     Q.    Can you tell me what it purports to

1    be?

2        A.    It is my summary of the extended

3    damage at the building, at Sports Authority

4    building.

5        Q.    It is dated March 29, 2006, is that

6    correct?

7        A.    Yes, that's correct.

8        Q.    When you formed, when you prepared

9    this report, did you have an opinion as to the

10   total replacement cost of the premises on the

11   date of the report?

12       A.    No.

13       Q.    Now, go through this, and you do have

14   a copy?

15       A.    Yes.

16       Q.    I would like to -- it is two columns,

17   building component and then the percent of

18   damage, is that correct?

19       A.    Correct.

20       Q.    The foundation system, you observed

21   if I am reading this properly, there was no

22   damage to that, is that correct?

23       A.    Correct.

24       Q.    Same with the floor slab?

```
 1         A.    Correct.

 2         Q.    The bearing walls, could you explain

 3    what that means, what's written next to the

 4    bearing walls?

 5         A.    Yes, there were -- I was looking at

 6    the overall.  There was a certain, 124 foot of

 7    bearing wall was damaged, and it needed to be

 8    repaired, replaced, whatever.  At that point

 9    we weren't sure of, but there was a total of

10    97 lineal feet, I believe, in the whole

11    building.  So, I took -- that was just really

12    a percentage, and that bearing wall half of

13    that is Gordmans.

14         Q.    So, the way you got the 7 percent is

15    970 divided by two?

16         A.    124.

17         Q.    50 percent for Gordmans, and 50

18    percent for Sports Authority?

19         A.    Yes.  It is a common wall, and then

20    same for the roof structure was really just a

21    matter of square footage.

22         Q.    And the roof membrane, explain to me

23    what you observed there.

24         A.    The roof membrane at the time it
```

1    didn't appear -- it was still raining after

2    the storm there, and it didn't appear to be

3    leaking.  But with roof damage it is sometimes

4    hard to tell where, if it is damaged initially

5    because the water gets down into the

6    insulation, runs down the metal deck, and

7    may all be dripping out at the end of the

8    building.  At this time we didn't really

9    observe any major leaking except for the

10   obvious small hole in the front of the store.

11   So, we didn't know what the extent of the roof

12   patching was.  The roofing contractor had not

13   been up and done an evaluation of it yet.

14       Q.   Explain to me about the glass and

15   glazing, which you have estimated at this time

16   to be 83 percent, what did you observe about

17   that?

18       A.   The majority of the store front glass

19   was broken, although the anodized aluminum

20   frames and operators and everything seemed to

21   be okay.  It was a matter of the glass itself

22   that was broke.

23       Q.   The notation you made next to the 83

24   percent says minimum glass cost overall?

1      A.    Overall cost of the project, the cost

2    of the glass and glazing, the minimal for the

3    envelope that we are talking about.  So, even

4    though it is a high percentage number, the

5    component is a very small cost in the overall

6    package.

7      Q.    So, when you observed that 83 percent

8    was damaged of the glass and glazing, is it

9    fair to say then that 17 percent was not

10   damaged?

11     A.    Yes.

12     Q.    And can you tell me where that 17

13   percent would have been located?

14     A.    I don't recall.

15     Q.    The automatic doors you estimated at

16   10 percent damage, is that correct?

17     A.    Yes.

18     Q.    What did you observe about them that

19   made you come up with this estimate?

20     A.    I observed that there was still a lot

21   of debris in the area in the process of being

22   cleaned up, and I thought that even though

23   they may not need to be replaced, there is

24   going to have to be some cost associated with

1    refurbishing them possibly, or having a

2    specialty company come in and rework them, and

3    make sure they work properly.  They are

4    sliding glass doors.

5         Q.    What did you observe about the studs

6    and dry wall to lead you to believe that 25

7    percent of them were damaged?

8         A.    There is basically four walls in the

9    building.  124 foot of the one wall was

10   damaged structurally.  I knew that from the

11   Gordmans side.  So, basically 25 percent of

12   the dry wall is one whole wall of that

13   building.

14        Q.    Tell me what you observed about the

15   painting, which made you estimate it less than

16   30 percent, please.

17        A.    It was really just lot of the -- it

18   didn't appear that the upper portions of the

19   walls were damaged.  The paint would be fine,

20   and it was just down wherever the dry wall

21   patching was going to need to be repaired.

22   So, I knew where you're going to replace 25

23   percent of the dry wall that entire wall would

24   get repainted, and then I threw another 5

1    percent in there to cover other miscellaneous

2    patching.

3         Q.   And the HVAC, what did you observe

4    about that?

5         A.   Well, the power was off in the

6    building.  So, they really couldn't be tested,

7    but the units appeared to be all intact, but

8    until you could really get the gas back on and

9    the power back on, we really couldn't make an

10   evaluation of what the status of those units

11   are.

12        Q.   RTU stands for what?

13        A.   Roof top unit.

14        Q.   So, the notation meaning RTU 20K each

15   if replaced, that's if they needed to be

16   replaced, that would be the replacement cost?

17        A.   That's about what they cost, yes.  I

18   was really just trying to give Art an idea of

19   what that component is.

20        Q.   Did they look to be damaged to you at

21   all?

22        A.   They did not appear to be damaged.

23        Q.   And tell me what you observed about

24   the electrical to come up with your estimate.

1        A.    At the very front of the store there

2    was a ceiling grid system that some of it had

3    tile in it, some of it didn't, and where this

4    one section of the roof had collapsed that

5    ceiling grid came down with the roof

6    structure, and those light fixtures were

7    damaged.

8        Q.    Did you observe anything else about

9    the Sports Authority premises at that time

10   that's not listed on this particular letter?

11       A.    As far as pertaining to the damage of

12   the envelope you mean?

13       Q.    Yes, let's start with that.

14       A.    I would say no.  I mean there were

15   some light poles in the parking lot that had

16   gotten knocked over, but I wasn't sure.  I was

17   only told to look at the Sports Authority

18   envelope.  So, obviously there is related

19   parking and stuff, I guess.  So, there could

20   be some light poles that were knocked down.

21       Q.    Going back to your notation on the

22   bearing walls, if I am reading this properly

23   it says 7 percent.  That's a physical

24   component that's damaged, is that correct?

1      A.    That's correct.

2      Q.    And do you have a cost estimate as to

3  what that would have been to repair on the

4  date of March 29th?

5      A.    No.

6      Q.    And the same for the roof structure

7  at 13 percent, that's physical damage of 13

8  percent, is that correct?

9      A.    That's correct.

10      Q.    Do you have a cost estimate on, dated

11  March 29, 2006, what that would have cost?

12      A.    No.

13      Q.    Going to the glass and glazing at 83

14  percent, that's a physical portion that you

15  have estimated to be damaged?

16      A.    Yes.

17      Q.    Did you make a cost estimate as to

18  what that would be at that time?

19      A.    No, no.

20      Q.    What about the automatic doors again,

21  that's 10 percent physical damage that you

22  observed?

23      A.    Not so much physical damage there as

24  I am not, the automatic doors are kind of a

1   specialty item.  I knew there was going to be

2   some repair required.  So, to say that it was

3   10 percent damage, I do not know that.  I did

4   not prepare an estimate at that time though.

5   I didn't have a specialty company come in and

6   look at them and ask what it is going to cost

7   to refurbish them.

8        Q.   Is 10 percent then just you thought

9   there was some damage, so you ascribed 10

10  percent to it?

11       A.   Yes.  Knowing about what they cost,

12  and what it costs for a technician to come

13  down for a couple days and go through them,

14  that's what I based it on.

15       Q.   Same with the studs and dry wall that

16  you estimated at 25 percent of the studs and

17  dry wall was damaged?

18       A.   Yes.

19       Q.   Did you have a cost estimate to

20  repair those at that particular time --

21       A.   No.

22       Q.   -- March 29?  With regard to the

23  painting less than 30 percent, again that's

24  the physical portion of it that was damaged?

1     A.   Yes.

2     Q.   Did you prepare a cost estimate or

3  have one --

4     A.   No.

5     Q.   -- as to what it would cost to

6  repair?  The sprinkler system you estimated

7  that's a 10 percent physical percentage?

8     A.   Yes, physical percentage.

9     Q.   Did you prepare cost estimate as to

10  what that would be?

11     A.   No.

12     Q.   And finally the electrical less than

13  10 percent, did you prepare a cost estimate

14  what it would cost?

15     A.   No.

16     Q.   I want to refer you then to your

17  second to last sentence, which begins with the

18  majority of the major building components

19  being undamaged.  You rendered an opinion.

20  Would you mind reading that sentence, the

21  entire sentence?

22     A.   With the majority of major building

23  components being undamaged, in my opinion, the

24  overall damage to the structure will not

1     exceed 30 percent of the total replacement

2     cost of the premises.

3        Q.   On what basis did you form that

4     opinion?

5        A.   It was really just a gut feel from

6     experience in doing this for 23 years, knowing

7     that certain components of a structure or of a

8     project usually costs a certain percentage of

9     the value of that structure, and just having a

10    feel for that in my opinion it was not going

11    to exceed that amount.

12       Q.   Did you consult a structural engineer

13    about the damage to the facility at all?

14       A.   At this time, no.

15       Q.   Did you subsequently?

16       A.   No, the owner, Art Seppi, had Hanson

17    Engineers, they hired them directly, and they

18    were doing all of the structural engineering

19    review for us or for the project.  So, they

20    were the ones making the determinations as to

21    what needed to be replaced, and to what extent

22    it needed to be replaced.

23          MR. SCHMADEKE:  Mark that as Two.

24

```
 1              (Whereupon said document was duly marked,

 2              for purposes of identification, as

 3              Deposition Exhibit Number Two, as of this

 4              date.)

 5         Q.   Mr. Sorensen, have you seen this

 6    document previously?

 7         A.   I don't know.  I haven't seen it.

 8         Q.   I am sorry, I apologize.

 9         A.   I haven't seen it yet.  I really

10    don't recall.  I don't know who these people

11    are.

12         Q.   I would ask you then to read the

13    letter, if you would, please.

14         A.   Okay.

15         Q.   I want to direct your attention to

16    the second sentence, and if you don't mind, I

17    will just read it.  During the inspection,

18    instability was observed in the load-bearing

19    masonry wall between the Sports Authority

20    and Gordmans tenants spaces and in the

21    load-bearing masonry wall between Gordmans and

22    Bath and Body Works tenant spaces.

23         A.   Okay.

24         Q.   Would you agree with that assessment?
```

1          A.    Yes.

2          Q.    Could you tell me what instability

3     there was that you observed?

4          A.    At the Sports Authority and Gordmans

5     tenant space common wall the wall was knocked

6     out of plumb.  It had actually been moved over

7     slightly.  As a result it had been moved over

8     enough that the joists on the Gordmans side of

9     the facility had fallen off of their bearing,

10    and fell into the store.  On the Bed Bath And

11    Beyond there was just damage to the masonry.

12    It had cracked, and we subsequently went in

13    and shored those joists up through the

14    masonry, and did the repairs at a later date

15    so it was safe for them to reopen.

16         Q.    Referring to the same letter, the

17    last sentence in the second paragraph, and I

18    will read it, instability was also observed at

19    the ends of the bar joists supported by the

20    common walls.  Would you agree with that

21    statement?

22         A.    Yes, that's why they fell into the

23    Gordmans space.

24         Q.    So, these two observations about

1    instability are related?

2        A.    Yes.   We actually did some temporary

3    shoring work to remove that instability so it

4    was safe to work in that space.

5        Q.    Are these items of instability, are

6    they reflected in your March 29, 2006 letter?

7        A.    Again I am not sure I understand the

8    question.

9        Q.    You agreed --

10       A.    Obviously I saw that that bearing

11   wall was damaged, and that the roof structure,

12   of course, bears on the bearing wall.  So, I

13   guess in a sense, yes.

14       Q.    Let me rephrase that.  I want you to

15   correct me, or please feel free to make me

16   elaborate if you need to.  You have agreed

17   that this letter is accurate in terms of

18   observed instability?

19       A.    Yes.

20       Q.    The cost of repairing or damage, the

21   damage caused by that instability is that

22   reflected in your letter of March 29th?

23       A.    Yes.

24       Q.    That would be where?

1          A.     That would be in the bearing walls

2     and the roof structure items.

3          Q.     You said Hanson Engineers was later

4     retained?

5          A.     I am not sure.  I later got involved

6     with Hanson Engineers because they were

7     retained by Southwest Plaza.  So, I don't know

8     at what point they got involved.  I assume

9     they were involved from day one, but I did not

10    initially -- they may have been involved

11    before I actually was in contact with them.

12         Q.     Do you know if they issued any

13    opinions about the structural soundness of the

14    structure?

15         A.     Yes.

16         Q.     Did they do that in writing?

17         A.     I don't know the answer to that.

18         Q.     Do you know when those opinions were

19    issued?

20         A.     Basically as we were going through

21    the repair process uncovering items that

22    needed possible repair, we would contact Dave

23    Goetz with Hanson Engineers.  He would come

24    out.  They would review it and render an

1    opinion on which way we go next.  There was

2    not a lot of, due to the emergency nature of

3    it there was not a lot of effort put into

4    making documents, et cetera, et cetera, going

5    through the proper channels.  It was here is

6    what we need to do, get it done, let's move

7    forward.

8         Q.   So, they would come out on an ongoing

9    basis to review certain projects as you needed

10   them?

11        A.   Certain tasks on the job, yes.

12   Pretty much any time we ran into something

13   that was of a structural nature, we contacted

14   Hanson Engineers.

15        Q.   Do you know if they issued any

16   opinion as to the amount of damage to the

17   premises?

18        A.   I don't know.

19        Q.   Do you know if they issued any

20   opinion about the total cost of repair of the

21   premises?

22        A.   I have no knowledge of that.

23        Q.   And do you know if they issued any

24   opinion regarding the structural needs, cost

1    of the structural repairs of the premises?

2        A.    Again as far as cost goes I have no

3    knowledge of that.   They obviously rendered

4    opinions on the needs because they are the

5    ones that we looked to to give us direction as

6    to how to do the repairs.

7        Q.    Now, going back to Exhibit One, which

8    is your letter of March 29th, you reference

9    that the structure will not exceed 30 percent

10   of the total replacement cost?

11       A.    Right.

12       Q.    Were you told before you rendered

13   this opinion as to what percentage was

14   critical in this?

15       A.    Art had asked me, he says do you

16   think this structure has been damaged beyond

17   30 percent of the replacement cost.   That's

18   where I got that.   That's why this document

19   was prepared.

20       Q.    Did you review the lease at all

21   before this?

22       A.    No.

23       Q.    Have you reviewed the lease since?

24       A.    Only a very small portion of it, but

1    again not being a lease expert I just, it

2    didn't matter to me.

3         Q.    I understand.

4              MR. SCHMADEKE:   Mark that as Three.

5         (Whereupon said document was duly marked,

6         for purposes of identification, as

7         Deposition Exhibit Number Three, as of

8         this date.)

9         Q.    I am going to hand you what has been

10   marked as Exhibit Number 3.   Have you seen

11   this document before?

12        A.    No.

13        Q.    Well, this purports to be the lease

14   between the parties to this lawsuit, and ask

15   you tell me what portion you may have

16   reviewed?

17        A.    Is it okay to look in my documents?

18        Q.    By all means, by all means.

19        A.    What I have, let's see here.   Boy, I

20   am not sure I have that.   Yes, it is right

21   here.

22        Q.    Take your time.

23        A.    No, that's not it.   Somewhere -- I

24   actually did not see a portion of the lease.

```
 1      I saw a document basically trying to define
 2      what it was that they were after here late in
 3      the project.
 4          Q.   When you say what they were after?
 5          A.   That's all I saw as far as the lease.
 6      It was a paragraph out of it trying to explain
 7      to me what was going on, because I really
 8      didn't understand at that point what they were
 9      after.
10          Q.   Could the record show that this is a
11      letter dated May 10th, 2006 from R. Lee Allen
12      to the witness.  Going back to Exhibit Three,
13      which you have in front of you, I am aware
14      that you haven't read this before, the first
15      part that has a yellow tab on there, which I
16      have taken the liberty of designating, that's
17      titled completion and delivery of the premises
18      and shopping center.  Do you see that?
19          A.   Uh-huh.
20               MR. ROLF:  Is that a yes?
21          A.   Yes, sorry.
22          Q.   Could you read the first sentence of
23      this paragraph to me?
24          A.   Landlord agrees to complete the
```

1    following work in accordance with the

2    construction provisions attached hereto as

3    Exhibit C on or before October 1st, 2001.

4        Q.    That's good enough.  Were you aware

5    of this before you undertook the work of

6    reconstructing the premises?

7        A.    No.

8        Q.    Were you, and I assume by that then

9    you weren't aware of the construction

10   provisions when you rendered your opinion on

11   March 29th, 2006, is that correct?

12       A.    That's correct.

13       Q.    If you go to the second tab, please,

14   take a minute to review it, please, as long as

15   you would like.

16       A.    You want me to review the entire

17   Exhibit C?

18       Q.    Well, what I am asking for is if you

19   were aware of these construction provisions?

20       A.    No.

21       Q.    Is this the first time that you have

22   seen this document labeled Exhibit C?

23       A.    Yes.

24       Q.    Had anybody told you about any tenant

1    specifications for reconstruction of the

2    premises?

3        A.    No.

4        Q.    So, any tenant specifications would

5    not have been taken into account in your March

6    29th, 2006 letter?

7        A.    Correct.

8        Q.    They weren't taken into account

9    during the reconstruction or refurbishing

10   process, is that correct?

11       A.    That is correct.  The only item that

12   I am still uncertain of is the flooring

13   materials.  At one point I was told that

14   Sports Authority was going to provide the

15   flooring materials to us.  They put me in

16   contact with David Freeters, who was their

17   employee in charge of construction.  We had a

18   couple of e-mails back and forth.  I was

19   trying to keep him up-to-date as to when we

20   were going to need the materials, and it came

21   down to mid May, and he advised me that they

22   would not be supplying the materials as their

23   lease was they weren't moving back in.

24       Q.    Jones-Blythe did the actual

1      reconstruction work of the premises from the

2      March 12, 2006 tornado, is that correct?

3          A.    Yes.

4          Q.    You served as the general contractor?

5          A.    Yes.

6          Q.    You hired a series of subcontractors?

7          A.    And self performed the majority of

8      the work.

9          Q.    When did the reconstruction work

10     begin?  Do you remember what date that was?

11         A.    Would have been March 14th or March

12     15th.  As soon as we reviewed it we were

13     immediately on site doing some work to try to

14     minimize the loss to the tenants' merchandise.

15     We put up a bunch of temporary walls with

16     tarps.

17         Q.    Have you completed the reconstruction

18     of the premises?

19         A.    Yes.

20         Q.    What date were they completed?

21         A.    We had originally scheduled -- well,

22     let me back up.  We had originally scheduled

23     to complete it prior to June 1 for tenant move

24     in.  However, once Art had learned that they

1    weren't going to move back in, we did not

2    proceed with putting the new flooring

3    materials in.  Other than the flooring

4    materials and tenant improvements it was ready

5    for a tenant to move in.  Gordmans next door

6    moved in as scheduled.

7        Q.   When was the day of completion other

8    than the flooring materials and the tenant

9    improvements?

10       A.   I don't know of that exact date.

11       Q.   Can you give me a reasonable

12   estimate?

13       A.   Would have been last week of May

14   probably, maybe the second to last week of

15   May.  Sports Authority it kind of fell off the

16   map because everybody knew they weren't moving

17   back in, and there was no point in rushing to

18   get it done.  So, at that point we were

19   essentially done anyway.  So, we didn't worry

20   about it too much.

21       Q.   So, the last week or the second to

22   last week of May of 2006?

23       A.   Correct.

24       Q.   Do you know if all certificates of

1    occupancy have been issued?

2         A.   I do not know that.

3         Q.   Do you know if any have been?

4         A.   For Sports Authority there was some

5    issue.  Since we did not finish the project

6    there was an issue I know with the electrical

7    where it came out of the floor for the teller

8    counters, and that was causing a problem on

9    the final certificate of occupancy because

10   they were open-ended wires and stuff there

11   that weren't terminated.

12             MR. SCHMADEKE:  Mark that as Four.

13        (Whereupon said document was duly marked,

14        for purposes of identification, as

15        Deposition Exhibit Number Four, as of this

16        date.)

17        Q.   I hand you what has been marked as

18   Exhibit Number Four.  Have you ever seen this

19   before?

20        A.   Yes.

21        Q.   When did you see it?

22        A.   I don't know.  I mean -- I don't

23   recall.  They send these out.  It was really

24   an issue with the fact that we weren't

1    authorized by Art Seppi to continue with the

2    work.  So, they couldn't finalize the

3    certificate of occupancy.

4        Q.    This is -- could you tell me what

5    this document is?

6        A.    This is a notice to us that we can't

7    issue your certificate of occupancy because

8    there are certain deficiencies.

9        Q.    What's the date of this document?

10       A.    September, September 22nd, 2006.

11       Q.    And could you -- the problems that

12   they observed could you tell me what they are

13   referring to, please.

14       A.    Electrical, blank or trim out power

15   at the cash counters, 110.27 is the section of

16   the code that they are referencing as to where

17   the problem is, but it obviously won't allow

18   you to have an open-ended wire without a

19   termination.

20       Install junction box cover in the storage

21   area ceiling southwest corner, blank or trim

22   out floor boxes.

23       Q.    What are floor boxes?

24       A.    Floor boxes are electrical items

1  turned up, and they are mounted on the floor

2  for them to plug displays in, or really tenant

3  type improvement items.

4          Q.    Onto the plumbing.

5          A.    On the plumbing there was no hot

6  water.

7          Q.    Why was that?

8          A.    I believe it was just never turned

9  on.  I mean the hot water heater was there.

10  The system was intact.  I am not sure why that

11  is there.

12          The urinal not installed at that point, we

13  had to salvage, we salvaged the toilets and

14  stuff to go back in the bathrooms that were

15  disposed of previously, and I believe the

16  urinal was damaged, and once Art had realized

17  that they weren't moving back in, he just

18  pretty much stopped all work, and never did

19  want to buy new fixtures and stuff to finish

20  it.

21          Mechanical they gave us a certificate of

22  occupancy.

23          Q.    For the fire safety?

24          A.    Fire safety, ceiling panels missing,

1    that's where there was a fairly large ceiling

2    grid.  It was kind of a specialty thing.  It

3    was store specific.  They had an area up in

4    the front of the store that had lay in ceiling

5    in it, and they didn't replace the ceiling

6    panels because obviously if they weren't going

7    to move in, the next tenant was not going to

8    want that ceiling structure there.

9        Fire extinguishers were missing.

10       Extinguishers out of date.

11       Open wiring, again which I assume was

12   related to the cash counters.

13       Fire alarm testing was never completed.

14       Maintain fire alarm records on site is

15   usually a clerical type item.

16       Q.  Go back to fire alarm testing, if you

17   will, why was that never completed?

18       A.   I don't know the answer to that.

19   That was not something that was part of our

20   contract.

21       Q.   Okay.  Then number seven you were

22   talking about?

23       A.   Maintain fire alarm records on site,

24   that's really like a clerical item.  However,

1    nobody was in the building so, and the fire

2    alarm testing had never been done.  So,

3    obviously there could be no records on site.

4        Then ID doors to the sprinkler, fire

5    alarm, and electrical rooms.

6        Q.    Have any of these items been

7    completed, finished, altered since the date of

8    this notice?

9        A.    I have no knowledge of that.  We have

10   not been back to finish any work there.

11       Q.    I believe you testified that you

12   don't know if the certificate of occupancy has

13   been issued at this point?

14       A.    Correct.

15           MR. SCHMADEKE:  Could you mark that,

16   please.

17       (Whereupon said document was duly marked,

18       for purposes of identification, as

19       Deposition Exhibit Number Five, as of this

20       date.)

21       Q.    Mr. Sorensen, Exhibit Number Five,

22   have you seen that document before?  I presume

23   you have.

24       A.    Yes.

1    Q.    What is that document?

2    A.    This is my statement of, for this

3    case.

4    Q.    It is your report of your opinions,

5    is that correct?

6    A.    Right.

7    Q.    Going to the third page in that

8    group, that's your signature on the bottom of

9    that?

10    A.    Yes, it is.

11    Q.    If you want to take a minute or two

12    to look at the whole thing, I want to make

13    sure you agree that this is a true and

14    complete copy of the report as far as you can

15    tell.

16    A.    Yes.

17    Q.    I want to refer you to Page 2,

18    paragraph three, the last sentence begins

19    accepting the total replacement costs of

20    $1,960,067.00, do you see that?

21    A.    Yes.

22    Q.    Did you form an opinion as to the

23    total replacement cost as that number?

24    A.    Not as that number.  That was

1   basically agreeing to Mr. Wolford's number, I

2   believe.

3        Q.   Did you believe Mr. Wolford's

4   replacement cost estimate was reasonable?

5        A.   It was reasonable, yes.

6        Q.   You didn't prepare your own estimate

7   of the total repair costs?

8        A.   We didn't need to because we had the

9   actual cost.

10        Q.   Actual costs of what?

11        A.   Actual cost of reconstruction, I am

12   sorry, of the replacement cost.  No, we

13   actually took, Mr. Wolford used the AGC's

14   source, and the method he used we were fine

15   with.  We use a similar method on this type of

16   an application.  We used the ENR source using

17   their factors and basically came up with

18   approximately the same number.  So, we just

19   decided that that number was acceptable.

20        Q.   When you say we did that, who are you

21   referring to?

22        A.   Jones-Blythe.

23        Q.   Did you do it for Jones-Blythe, or

24   somebody else?

1    A.    I did it with support by Steve Read.

2    Q.    Can you spell his last name.

3    A.    R-E-A-D.

4    Q.    What's his position?

5    A.    He is the vice president.

6    Q.    Is he your superior?

7    A.    My superior.  I just basically

8    bounced it off him as a sounding board.

9    Q.    Going to Page 3, paragraph six, do

10   you see that?

11   A.    Yes.

12   Q.    Take a second to review it, if you

13   would like, please.

14   A.    Okay.

15   Q.    So, you are saying that most of the

16   work performed by Cotton was to protect or

17   salvage TSA's personal property, is that

18   correct?

19   A.    Yes, that was my observation.

20   Q.    Was all of it all of the Cotton work?

21   A.    Most of the work.

22   Q.    But not all of it?

23   A.    Correct, most of the work.

24   Q.    Right.  What percent of Cotton's

E-FILED
Monday, 31 December, 2007 02:00:08 PM
Clerk, U.S. District Court, ILCD

1    work that you observed was related to

2    reconstruction?

3        A.    They removed a certain portion of dry

4    wall that would later have to be replaced.

5        Q.    Anything else?

6        A.    They also, let's see, they also

7    removed flooring materials, but at the time I

8    guess I wasn't sure exactly whose

9    responsibility that was.

10       Q.    Did you observe anything else that

11   they did which would be considered part of the

12   reconstruction?

13       A.    Obviously they did just general

14   cleanup, but for the most part the area where

15   the major structure damage was we partitioned

16   off to keep their employees out of just due to

17   its instability.

18       Q.    In paragraph six you note that the

19   removal of the flooring was not necessary.

20       A.    Yes.

21       Q.    Why did you make that conclusion?

22       A.    Well, it really is more of an overall

23   feeling on the way Cotton approached the whole

24   project.  They were in there moving so fast

1    that nobody really had an opportunity to

2    review really whether the removal was

3    necessary, or if it was damaged to the extent

4    that it needed to be removed and be replaced.

5    The same happened on the dry wall.

6         Q.    So, is it your view that it may have

7    been needed, but you didn't have a chance to

8    review it first?

9         A.    Yes.

10         Q.   What about the bathroom partitions

11   and fixtures, you say that was not necessary.

12   Is that the same situation where it happened

13   so quickly?

14         A.    Yes.

15         Q.    So, it may have been necessary, but

16   you just didn't have a chance to make a

17   conclusion?

18         A.    I would say that is correct.

19   However, we ended up reusing the partitions

20   and fixtures after they were removed.

21         Q.    Cotton is called the emergency

22   disaster recovery service.  Have you ever

23   dealt with such a company before?

24         A.    No.

1      Q.    Have you ever had any experience with

2   Cotton before?

3      A.    No.

4      Q.    It was your first experience?

5      A.    First experience.

6      Q.    Do you know what the function of an

7   emergency disaster recovery service is?

8      A.    Generally, yeah.

9      Q.    What is your understanding of them?

10      A.    They come in and basically clean up

11   the mess, vacuum up the water, try to salvage

12   whatever merchandise might be there, secure

13   the building possibly, try to limit the loss.

14      Q.    I have taken the liberty of putting a

15   yellow tag on a page in your report near the

16   end.  It is marked Exhibit C.  Do you notice

17   that?

18      A.    Yes.

19      Q.    Have you reviewed this particular

20   document before?

21      A.    Yes.

22      Q.    I assume you have.  What is this

23   particular page?

24      A.    This is a page where I was asked to

1    compare our actual cost on an item by item

2    basis against the estimated cost of

3    replacement.

4        Q.    Whose estimated cost?

5        A.    Not of replacement, of repair.

6        Q.    And whose estimate were you

7    comparing?

8        A.    Would have been Jeff Wolford, I

9    believe is the name.

10       Q.    Just to explain this, the first

11   column is the type of work we are talking

12   about?

13       A.    Yes.

14       Q.    And then the second column is what?

15       A.    That is a breakdown that was prepared

16   by Jeff Wolford as to the reconstruction cost.

17       Q.    And the third column is what?

18       A.    Our actual incurred cost to do the

19   reconstruction.

20       Q.    And the fourth column labeled owner,

21   what does that refer to?

22       A.    Those were items that I wasn't really

23   involved in, but I know the owner was, the

24   owner had contracted directly like with the

1    engineer for items of work that we did not do,

2    but we knew there was a cost associated with

3    it that reflected the overall reconstruction

4    cost.

5        Q.    So, I want to refer then to the first

6    item, which is emergency response from Cotton

7    USA.

8        A.    Right.

9        Q.    Mr. Wolford put in $319,428.00.

10        A.    Uh-huh.

11        Q.    And you put owner?

12        A.    Right.

13        Q.    Meaning what?

14        A.    It was the owner's responsibility.  I

15    didn't know what the owner was responsible

16    for, some or if -- I wasn't responsible for

17    that.  The emergency response stuff was

18    essentially the owner's responsibility.

19        Q.    So, that part of the work of Cotton

20    USA that you would consider to be part of

21    construction or reconstruction wasn't put in

22    here?

23        A.    Could you rephrase that, please.

24        Q.    The part of the work performed

1    by Cotton USA that you would consider

2    reconstruction was not put in this chart?

3        A.    The part of the work -- yes.

4        Q.    The architectural and engineering, so

5    if I am reading this properly, Mr. Wolford

6    estimated it to be $8,000.00, but you

7    determined that it was actually $9,510.00?

8        A.    That's correct.  That was the

9    engineering fees that the owner paid Hanson

10    Engineers.

11        Q.    So, then shoring stabilizing Mr.

12    Wolford estimated at 18,500, and the actual

13    cost was $14,439.00?

14        A.    Correct.

15        Q.    I want to skip down to where it says

16    masonry beam pockets, et cetera.

17        A.    Okay.

18        Q.    Do you see that?

19        A.    Yes.

20        Q.    First of all, what does that mean?

21    What are masonry beam pockets, et cetera?

22        A.    Beam pockets are typically a bearing

23    location where a bar joist or a beam is going

24    to come into a masonry wall, and it is a place

1    for it to pick up its bearing.  The reason I

2    say below is those two items go together.  You

3    don't do the beam pockets without redoing the

4    walls.  So, they are related.  So, you really

5    have to look at those two numbers to compare

6    to the 29,218 that it actually cost.

7         Q.   So, if I read this properly, and I

8    don't mean to put words in your mouth, if

9    those two items are related, Mr. Wolford's

10   estimate would have been 32,000?

11        A.   Correct.

12        Q.   And yours was actual cost was

13   $29,218.00?

14        A.   That's correct.

15        Q.   Fairly close?

16        A.   Fairly close.

17        Q.   Roofing insulation Mr. Wolford

18   estimated at 39,500, but the actual cost as

19   far as you were told was 86,038?

20        A.   Correct.

21        Q.   Where did you learn that number?

22        A.   I contacted the roofing contractor

23   that did the work, and he told me what the

24   amount was.  The same with the store front and

1    glass.

2         Q.    Going down to the item labeled duct

3    work, remove and replace, okay, do you see

4    that item?  Mr. Wolford put $7,600.00.  You

5    have put in HVAC.  What do you mean by that?

6         A.    That's in the heating, ventilation,

7    and air conditioning work, and it is HVAC

8    repair right below it, HVAC repair existing

9    units 16,426.

10        Q.    And the item right above that which I

11   missed, fire alarm minor device replacement,

12   you put in electrical.  Where were you

13   referring to?

14        A.    That would be down below.  There

15   should be an electrical item.  I guess it

16   would be in these electrical costs.  I

17   basically took our entire electrical contract

18   with B & B Electric.  Am I just missing it

19   here?  It has to be in the light fixtures

20   money, those two items, the 25,322 and the

21   10,678.  Give me one moment, please.

22        Q.    Take your time.

23        A.    Yes, that's where it is at.

24   Basically in general contractor terms those

1    are all electrical items, and that was the

2    only real breakdown I had from the

3    electrician, and the other things were thrown

4    in as just ancillary items.

5        Q.    Going down further to the item

6    labeled floor prep and adhesive removal --

7        A.    Yes.

8        Q.    -- you put NIC.

9        A.    Not in contract, it was just a

10   general contractor term that I used, and we

11   did not have, we did not contract for the

12   flooring materials for this project.  I had

13   secured bids on it, and then once TSA decided

14   not to move back into the space, we stopped

15   construction on all flooring materials.

16       Q.    So, the word below means what there?

17       A.    Below means right below here you go

18   to flooring materials, the 114,800, that was

19   the bid I got for flooring replacement, and

20   that included floor prep and adhesive removal.

21       Q.    Was that a bid amount, or was the

22   114,800, was that actually paid, do you know?

23       A.    No, it was not.

24       Q.    That's an estimate?

1          A.    The work was never done.  I had

2    secured a bid in anticipation of the work

3    being done, and then it was canceled before

4    the materials were ordered.

5          Q.    That was canceled because of what,

6    why?

7          A.    Because of TSA, because of the

8    situation with TSA not moving back in.  It was

9    a special -- their space utilizes several

10   special floorings, rubber and stuff that

11   normal tenants wouldn't use.  So, Art didn't

12   want to spend the money on all the special

13   flooring materials if they weren't going to

14   move back in.

15         Q.    But for the reconstruction purposes

16   that would have been something, if you were

17   going to complete the reconstruction that

18   would have been a figure that you would have

19   included?

20         A.    Absolutely, that's why it is included

21   in that column.

22         Q.    Going back to final cleaning,

23   deodorizing, Mr. Wolford estimated 11,000.  Do

24   you see that?

```
 1          A.    I am not sure where you're at.

 2          Q.    It is about two thirds of the way

 3    down.

 4          A.    Right here, final cleaning, okay.

 5          Q.    You put the word below.

 6          A.    Below, it would have been just down

 7    here in our general cleanup, construction

 8    laborers cleanup 4,634 down at the very

 9    bottom, second number up, no, bottom number

10    actually, I guess.

11          Q.    And then continuing going down

12    protection of finish materials Mr. Wolford had

13    put 12,500.  You put below.

14          A.    Protection of finish materials, yes,

15    again I guess it must just be some of these

16    items, this is Mr. Wolford's list of

17    activities that he thought may or may not be

18    done, or may need to be done, and some of

19    this, I mean there really was no protection of

20    things, but it was required.  So, when I say

21    below, it is in our total cost below.  If

22    there was any protection required, if we had

23    to hang Visqueen over some stuff to keep it

24    from getting further damaged, or some other
```

1  work going on in the area, that it is in

2  there.

3      Q.   Going two lines lower contingency you

4  had 25,600, and you put N/A.  Does that mean

5  not applicable?

6      A.   Yes.

7      Q.   Why is it not applicable?

8      A.   We are working there on a time and

9  material basis.  We have no contingencies

10  built in.

11      Q.   Continuing lower, city required fire

12  watch, $2,200.00 estimated by Mr. Wolford, do

13  you see that?

14      A.   Yes.

15      Q.   Again you said not applicable, what

16  does that mean there?

17      A.   Again fire watch was not required.

18  Our fire watch is in our crew when we are

19  doing the work.

20      Q.   So, then if I am reading correctly

21  taking your actual costs column, which is the

22  middle column of the number, your total is

23  $321,384.00, correct?

24      A.   Yes.

1          Q.    That's where you come up with that

2     particular number for the basis of your

3     opinion in paragraph three on Page 2 of your

4     report, correct?

5          A.    Yes.

6          Q.    Which says the actual repair cost,

7     construction costs are 321 dollars and 384

8     cents?

9                MR. ROLF:    Incorrect.

10         Q.    I am sorry, 300 --

11         A.    $321,384.00.

12         Q.    Correct?

13         A.    Yes.

14         Q.    That doesn't include the items in the

15    owner column on Exhibit C, correct?

16         A.    Wait a minute, let me back up here.

17    Yes, that $321,384.00 is our actual costs

18    only.  I could not attest to what the other

19    actual costs may or other costs may be.

20         Q.    I want to go back then to Exhibit C

21    and the column labeled owner.

22         A.    Okay.

23         Q.    If I remember properly, you already

24    testified that the $114,800.00 estimate for

1    flooring materials would have been a proper

2    cost of reconstruction?

3        A.    Yes.

4        Q.    Would the architectural and

5    engineering costs of $9,510.00 be a proper

6    cost for reconstruction?

7        A.    Yes.

8        Q.    The $8,638.00 that you have there for

9    roofing insulation, is that an estimate or

10   actual cost?

11       A.    $86,038.00.

12       Q.    I am sorry, I apologize, again I am

13   talking too fast.

14       A.    Yes, that was actual cost.

15       Q.    And that would be considered a part

16   of a repair cost, reconstruction cost?

17       A.    That was actual full replacement

18   cost.  They chose to replace the roof instead

19   of repair the roof.

20       Q.    The next item, replace existing store

21   front and glass, $18,506.00 --

22       A.    Yes.

23       Q.    -- is that an actual cost or an

24   estimate?

1      A.    That was actual cost.

2      Q.    And should that properly be

3   considered a reconstruction cost?

4      A.    Yes, however again that was

5   replacement of the entire store front instead

6   of just repairing what was there.

7      Q.    So, when you add up the total owner's

8   column, that's 228 dollars, excuse me,

9   $228,854.00?

10     A.    Yes.

11     Q.    So, is it fair and reasonable to

12   say that from your opinion that the actual

13   reconstruction costs were, the actual cost to

14   you was $321,384.00 plus the $228,854.00?

15     A.    Yes.

16          MR. SCHMADEKE:  Mark that as Six.

17     (Whereupon said document was duly marked,

18          for purposes of identification, as

19          Deposition Exhibit Number Six, as of this

20          date.)

21     Q.    Exhibit Six, have you seen this

22   before?  Take a moment to look at it.

23     A.    If it wasn't this exact document, it

24   was one similar to it.

1        Q.    Can you tell me what this purports to

2   be?

3        A.    It looks like Cotton's review of

4   services needed for the project.

5        Q.    Review of services or scope of

6   services?

7        A.    Scope of work.

8        Q.    I would like to review some of

9   these things, and see what your opinion is,

10  whether they should be considered part of

11  reconstruction or not.

12       A.    Okay.

13       Q.    Do you understand what I am asking?

14       A.    Yes.  I guess the only question is

15  when you say part of reconstruction --

16       Q.    Of the premises.

17       A.    Just solely reconstruction of the

18  premises?  Obviously Cotton was there doing

19  more than that.

20       Q.    Well, let me put it this way.  There

21  is no dispute from our perspective that some

22  Cotton costs should not be attributed to being

23  part of the reconstruction because it was

24  taking care of its own product, of the

```
1    tenant's product or equipment.

2        A.   Okay.

3        Q.   I am looking for not that, what you

4    consider to be part of reconstruction of the

5    premises.  Does that make sense to you?

6        A.   That makes sense.

7             MR. ROLF:  I guess the objection I

8    would have is to the extent reconstruction of

9    the premises being used as a term within the

10   lease, he is not, as he has testified reviewed

11   that or making opinions on that.

12            MR. SCHMADEKE:  I understand.  I am

13   not asking for legal opinions.  I am asking

14   for your opinion as the Plaintiff's expert in

15   this as to what reconstruction of the premises

16   entailed.

17            MR. ROLF:  I would further object to

18   the extent that he may or may not know what

19   Cotton is referring to in their scope of work.

20       Q.   And if you don't understand, it is

21   certainly acceptable to say you don't know.

22       A.   Okay.

23       Q.   So, I believe we should most properly

24   start at the first boxed item in the lower
```

1    third of the page where it says Cotton will

2    provide safety meeting daily, do you see that?

3        A.    Yes.

4        Q.    There is a lot of materials here, and

5    I really don't want to belabor this any more

6    than we have to, but if you would read through

7    those, and tell me which ones you would think

8    would be properly considered part of

9    reconstruction as we defined it.

10       A.    Obviously the first few items are

11   really just internal to their company.  I mean

12   whether they are working on reconstruction, or

13   working there to salvage tenant's material, I

14   mean they are responsible to provide that

15   stuff for their own employees.  That's their

16   deal not really related to the reconstruction

17   cost.  I think you get down to the bottom, I

18   guess I am not really sure that any of that

19   stuff is related to reconstruction.

20       Q.    Very good.  Feel free to go to the

21   next page.  If you would do the same thing,

22   read and tell me what you believe would

23   properly be considered part of reconstruction.

24       A.    Well, again I don't know that I can

1    make an opinion as far as what is, as far as

2    the relationship with the lease as far as what

3    constitutes reconstruction.  Obviously at some

4    point before you can rebuild the thing, you

5    need to get it dried out.  Whether that is the

6    contractor's responsibility, or that's the

7    emergency guy's responsibility, or he is

8    drying it out for the contents, I don't know

9    that I can make a judgment there.

10       Q.    Let me put it this way.

11   Hypothetically if Cotton didn't do the dry

12   out, you or a subcontractor of yours would

13   have been required to do so?

14       A.    Yes.

15       Q.    Continue, please.

16       A.    That takes care of that whole first

17   paragraph basically.  More of the same, I mean

18   air movers.  Up until such time as the

19   permanent power came back on, which was only a

20   matter of a few days, generators would be

21   required to run the equipment, and lights, et

22   cetera.

23       Q.    Where do you see that?

24       A.    Installing the following at the

1    back of the store, and install the following

2    at the front of the store, and they make a

3    mention of generators.  Clean all of the

4    debris, obviously you have to clean it up

5    before you could put new flooring down, you

6    know.  There is items here that we actually

7    did.  Cotton will build a barrier in the

8    exercise area to help eliminate the moisture.

9    We actually built those temporary partitions.

10   Cotton didn't.  Cotton to help seal off

11   the hole in the corner of the roof for

12   climitization purposes.  We did all that work.

13   They did not perform that.

14        Q.   Have you moved onto the next page?

15        A.   Oh, yes, I am sorry, I am on the next

16   page.  Cut down all hanging debris, actually

17   we removed all electrical items, lights that

18   were hanging with the electrical contractor.

19   They didn't have qualified people to do that.

20        Q.   They didn't do any of it?

21        A.   No.  Well, not to my knowledge.  My

22   observation was, and I was out there on a

23   daily basis, that our electricians from B & B,

24   we went over there with a lift, and we removed

1    the light fixtures so it was a safe situation.

2       Q.    B & B?

3       A.    B & B Electric, they were our

4    subcontractor, the same with the sprinkler

5    lines.

6       Q.    Let me go back.  If Cotton did do the

7    cut down of the hanging debris, fluorescent

8    lights, and so forth, would that properly be

9    considered part of the reconstruction?

10       A.    I think it would have to be because

11    you have to take down the damaged stuff before

12    you can put the new stuff back up.

13       Q.    Very good, please continue.

14       A.    Wet vac all standing water, tarp

15    corner of department to help seal off the

16    outside elements, that's something we did.

17    Remove all saturated sheet rock and any

18    additional sheet rock that will allow

19    assessment of potentially damaged cinder block

20    wall that is common to the Gordmans Department

21    Store.

22       Q.    What was your point about that item?

23       A.    That you would have to take that

24    wall, you would have to remove that sheet rock

1   in order to see the extent of damage so you

2   would know what to reconstruct.

3       Q.   That would have been considered part

4   of reconstruction?

5       A.   Yes.  You know, talking about

6   removing all rubberized aisles with scrapers

7   and flooring material, obviously again if you

8   are going to replace the flooring, you have to

9   take the old flooring up.

10      Q.   If I may go back a couple, what about

11  the remove and discard all effected

12  insulation?

13      A.   Yes, but if there is insulation

14  there, it would have to come out.  I am just

15  trying to think.  He is talking about the in

16  wall insulation, probably behind the dry wall,

17  I don't know.

18      Q.   If you don't know, that's fine.

19      A.   That's fairly vague.

20      Q.   Now, the item there listed

21  disassemble all racks and relocate to other

22  areas, that would not be --

23      A.   That would not be part of the

24  reconstruction.  Obviously inventory counting

1    not part of reconstruction.  Manipulating

2    exercise equipment away from the damaged area

3    not part of reconstruction.  Remove and

4    discard all commercial glued down carpet would

5    definitely be part of reconstruction, and

6    scrape all remaining glue from the slab.

7         Q.   I am sorry, where did you see that?

8         A.   Sorry, right here, fourth line down.

9         Q.   Thank you.

10        A.   The second grouping, obviously

11   disassemble all of the racks and relocate to

12   other areas of the store is not part of

13   reconstruction.  Those are all tenant

14   improvements.  Remove all saturated sheet rock

15   to a height of four feet from the floor to

16   allow quicker replacement, that is part of

17   reconstruction.

18        Q.   Where is that?

19        A.   That's about the sixth item down.

20        Q.   I am sorry.

21        A.   Again remove and discard all

22   insulation, that's kind of an item that when

23   you take the dry wall off, the insulation is

24   going to come with it.  So, when you do the

1    one, you're going to take the other with it.

2    Obviously none of the work with the salvage

3    company to manipulate the contents, that is

4    not part of reconstruction.  It looks like

5    they keep going through the same items over

6    and over.  I am not sure what the blocked out

7    sections are.

8        Q.    I am sorry for the quality of the

9    print.

10          MR. ROLF:  The blocked out sections,

11    I believe, are the different departments in

12    the store.  One would be golf.  One would be

13    outdoor.

14        A.    It looks like they are just repeating

15    the same thing over and over again as to what

16    they are going to do.  You want me to continue

17    each blocked out section as to what we have

18    just talked about?

19        Q.    If you could look at them and see if

20    there is some item that we haven't talked

21    about.

22        A.    Okay.  I don't see, I don't really

23    see any other items.  It looks like it just

24    repeats over and over again.  So, I don't see

1    any other items that would be considered

2    reconstruction.

3        Q.    Other than the items that you have

4    described?

5        A.    Right.  Basically removing the dry

6    wall and damaged insulation, possibly damaged

7    flooring, drying the place out.

8            MR. SCHMADEKE:  I have no further

9    questions.

10            MR. ROLF:  Okay, I have a few

11    follow-up remarks.  I just want to make sure

12    we are clear.

13

14            CROSS EXAMINATION

15            BY MR. ROLF:

16        Q.    You mentioned upon your arrival that

17    there was some work going on, or there were

18    people cleaning up.  That didn't in any way

19    interfere or prevent you from assessing the

20    damage as you did in Exhibit Number One, did

21    it?

22        A.    No.

23        Q.    In fact, you had firsthand knowledge

24    from day one as to what the damage was even

1    though this Exhibit Number One is March 29 and

2    some repairs or things had already been done?

3         A.   Yes.

4         Q.   You saw it from day one?

5         A.   Yes, it was probably day two.

6         Q.   March 14th?

7         A.   March 14th.

8         Q.   With respect to the opinions from

9    Hanson on the structural you did what they

10   directed needed to be done in terms of shoring

11   up any walls or things like that?

12        A.   Yes.

13        Q.   So, the cost of anything they

14   directed is within your cost estimate you have

15   provided?

16        A.   Yes, it is in our actual cost.

17        Q.   Right?

18        A.   Yes.

19        Q.   With regard to the rubberized

20   flooring, water alone wouldn't damage

21   rubberized flooring, would it?

22        A.   In theory, no, I mean it is a rubber

23   product.

24        Q.   Okay.

1       A.    Again not really.  Nobody ever had

2   the opportunity to ever look at it because it

3   was all gone before anybody had a chance.

4       Q.    When you said the partitions were

5   reused, these are the rest-room partitions?

6       A.    Yes.

7       Q.    Were they back in the same place they

8   were when they were removed?

9       A.    We put them all back in the exact

10  same locations, yes.

11      Q.    So, in terms, it wasn't that they

12  were replaced somewhere else, or the removal

13  of the partitions would have been necessary,

14  they ended up being right where they were?

15      A.    Yes.

16      Q.    On Exhibit Number Five, which is your

17  report, Exhibit C to it which was the three

18  column, four column table, with regard to the

19  A and E expenses up at the top there is a

20  parenthetical to the side of that.  It says

21  entire plaza.

22      A.    Yes.

23      Q.    Could you explain that?

24      A.    That was their fee actually for

1    structural review at both Sports Authority,

2    Gordmans, and Bed Bath And Beyond.

3        Q.   So, you didn't make any effort to

4    break out, reduce that just as to Sports

5    Authority?

6        A.   I did not.  The problem with that was

7    we were working on a common wall.  I mean the

8    majority of a common wall that both sides

9    beared on.  So, whether they did the analysis

10   for one side or both sides, they still had to

11   go through the analysis.  So, it would have

12   cost about the same.

13       Q.   Fair enough, but the entire, all of

14   their work is in there?

15       A.   All of their work is in there.

16       Q.   With respect to the other cost in

17   that fourth column which were borne by the

18   owner directly, you did observe the damage

19   that was being repaired?

20       A.   Yes.

21       Q.   You did observe that the, as the

22   repairs were being done, that they did take

23   place other than the flooring?

24       A.   Right.  The flooring was an estimate

1   that they pulled the plug on it before it was

2   started.

3      Q.   With regard to the companies that

4   performed that work, the roofing company, and

5   the glass company, as well as the person you

6   got the bid from, you're familiar with those

7   contractors or suppliers?

8      A.   Yes.

9      Q.   You made a direct inquiry as to the

10   actual costs on this job?

11      A.   Yes.

12      Q.   Those numbers, and is it your opinion

13   that those are customary and reasonable

14   numbers for that type of work?

15      A.   Yes, and they are good contractors

16   that we deal with, and have dealt with for 20

17   plus years.

18        MR. ROLF:  I don't think I have

19   anything else.

20        MR. SCHMADEKE:  Signature?

21        MR. ROLF:  We will go ahead and read

22   it.

23        (Witness Excused)

24

1    STATE OF ILLINOIS   )
                             ) SS

2    COUNTY OF CHRISTIAN)

3

4        I, Sandra K. Haines, a Notary Public and

5    Certified Shorthand Reporter, associated with

6    Haines Court Reporting, do hereby certify that

7    prior to the taking of the deposition herein,

8    and on the 22nd day of October, 2007, the

9    Deponent, MARK A. SORENSEN was, by me, duly

10    sworn to testify to the truth in relation to

11    the matter in controversy herein.  That on

12    said date the foregoing deposition was taken

13    down stenographically by me and afterwards

14    reduced to typewritten form by me, and that

15    the foregoing transcript contains a true and

16    accurate translation of all such shorthand

17    notes.

18        Given under my hand and seal this 25th

19    day of October, 2007 at Taylorville, Illinois.

20

21

22                  Notary Public and CSR

23

24

OFFICIAL SEAL
SANDRA K HAINES
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/07/09

```
 1     SWPLAZA III, LLC, an Illinois    )
       limited liability company, as   )
 2     successor to Illinois National  )
       Bank, as Trustee under Trust    )
 3     Agreement dated November 6, 2000)
       and known as Trust No. 00-0020, )
 4     an Illinois banking institution,)
                           Plaintiff   )
 5        -vs-                          )NO.06-CV-3177
       TSA STORES, INC., as successor   )
 6     to Gart Brothers Sporting Goods )
       Company, a Delaware corporation,)
 7                         Defendant    )

 8


 9          I, MARK A. SORENSEN, do hereby certify
       that I have read the foregoing transcript of
10     my testimony given in the above entitled
       matter on the 22nd day of October, 2007, and
11     that the same fully and accurately sets forth
       my testimony as given on said date, except as
12     I have indicated to the contrary on this page
       below my signature.
13
       DATE_____ SIGNATURE_____
14     _____
       Page  Line       Change           Reason
15     No.   No.                          For change
16     _____
       _____
17     _____
       _____
18     _____
       _____
19     _____
       _____
20     _____
       _____
21     _____
       _____
22     _____
       _____
23     _____
       _____
24     _____
       _____
```

| | | | |
|---|---|---|---|
| **$1,960,067.00** [1] 43:20 | [1] 34:1 | [2] 3:10 | [2] 54:6 54:20 |

$1,960,067.00
[1] 43:20
$114,800.00
[1] 58:24
$14,439.00
[1] 51:13
$18,506.00
[1] 59:21
$2,200.00
[1] 57:12
$228,854.00
[2] 60:9 60:14
$29,218.00
[1] 52:13
$319,428.00
[1] 50:9
$321,384.00
[4] 57:23 58:11 58:17 60:14
$7,600.00
[1] 53:4
$8,000.00
[1] 51:6
$8,638.00
[1] 59:8
$86,038.00
[1] 59:11
$9,510.00
[2] 51:7 59:5

**0**

00-0020
[2] 1:9 76:6
084-002423
[1] 1:24

**1**

1
[2] 3:8 36:23
1-18-61
[1] 5:8
10
[7] 18:16 22:21 23:3 23:8 23:9 24:7 24:13
10,678
[1] 53:21
1030
[1] 5:2
10th
[1] 33:11
11,000
[1] 55:23
110.27
[1] 39:15
111
[1] 2:16
114,800
[2] 54:18 54:22
12
[2] 12:17 36:2
12,500
[1] 56:13
124
[3] 16:6 16:16 19:9
13
[2] 22:7 22:7
14
[1] 3:8
14th
[4] 12:19 36:11 71:6 71:7
15th
[1] 36:12
16,426
[1] 53:9
17
[2] 18:9 18:12
18,500
[1] 51:12
1984
[1] 6:9
1st

**2**

2
[3] 3:9 43:17 58:3
20
[1] 74:16
200
[2] 2:11 2:17
2000
[2] 1:8 76:5
2001
[1] 34:3
2006
[10] 12:17 15:5 22:11 28:6 33:11 34:11 35:6 36:2 37:22 39:10
2007
[4] 1:19 75:9 75:20 76:18
20K
[1] 20:14
217) 522-6152
[1] 2:18
217) 544-1144
[1] 2:6
228
[1] 60:8
22nd
[4] 1:18 39:10 75:9 76:18
23
[1] 25:6
25
[4] 19:6 19:11 19:22 23:16
25,322
[1] 53:20
25,600
[1] 57:4
25th
[1] 75:19
26
[1] 3:9
29
[5] 15:5 22:11 23:22 28:6 71:1
29,218
[1] 52:6
29th
[5] 22:4 28:22 31:8 34:11 35:6

**3**

3
[3] 3:9 32:10 45:9
30
[5] 19:16 23:23 25:1 31:9 31:17
300
[1] 58:10
32
[1] 3:9
32,000
[1] 52:10
321
[1] 58:7
38
[1] 3:10
384
[1] 58:7
39,500
[1] 52:18

**4**

4
[2] 3:3 3:10
4,634
[1] 56:8
400
[1] 2:11
42
[1] 3:10

**5**

5

50
5131
[1] 25

**6**

6
60
607
[1] 119
62701
62705
[1] 26

**7**

7
70
74
[1] 13

**8**

800
83
86,038

**9**

97
970

**A**

Absolutely
Acceptable
Accepting
Accordance
Account
Accurate
Accurately
Activities
Activity
Actual
Adams
Add
Additional
Address
Adhesive

Advised
[2] 54:6 54:20
Afterwards
[1] 35:21
AGC's
[1] 75:14
Agree
[1] 44:13
Agreed
[3] 26:24 27:20 43:13
Agreeing
[2] 28:9 28:16
Agreement
[1] 44:1
Agrees
[2] 1:8 76:5
Ahead
[1] 33:24
Air
[1] 74:21
Aisles
[2] 53:7 64:18
Alan
[1] 67:6
Alarm
[1] 4:23
Allen
[7] 41:13 41:14 41:16 41:23 42:2 42:5 53:11
Allow
[1] 33:11
Alone
[3] 39:17 66:18 68:16
Altered
[1] 71:20
Aluminum
[1] 42:7
Amount
[1] 17:19
Analysis
[4] 25:11 30:16 52:24 54:21
Ancillary
[2] 73:9 73:11
Anodized
[1] 54:4
Answer
[1] 17:19
Anticipation
[3] 8:17 29:17 41:18
Anyplace
[1] 55:2
Anyway
[1] 6:16
Apologize
[1] 37:19
Appear
[2] 26:8 59:12
APPEARANCES
[4] 17:1 17:2 19:18 20:22
Appeared
[1] 2:1
Appearing
[1] 20:7
Applicable
[3] 2:8 2:13 2:19
Application
[3] 57:5 57:7 57:15
Appreciate
[1] 44:16
Apprenticeships
[1] 10:21
Approach
[1] 6:15
Approached
[1] 5:16
Architectural
[1] 46:23
Area
[2] 51:4 59:4
[7] 18:21 39:21 41:3 46:14 57:1 65:8 68:2

## Areas
**Arrival**
[1] 70:16
**Arrived**
[1] 13:10
**Art**
[8] 11:3 20:18 25:16 31:15 36:24 39:1 40:16 55:11
**Ascribed**
[1] 23:9
**Assessing**
[1] 70:19
**Assessment**
[1] 26:24 66:19
**Associated**
[3] 18:24 50:2 75:6
**Associations**
[1] 7:4
**Assume**
[5] 13:13 29:8 34:8 41:11 48:22
**Attached**
[1] 34:2
**Attended**
[1] 6:21
**Attending**
[1] 6:18
**Attention**
[1] 26:15
**Attest**
[1] 58:18
**Attorneys**
[3] 2:4 2:10 2:16
**Attributed**
[1] 61:22
**Authority**
[16] 4:10 11:18 13:8 13:9 13:15 15:3 16:18 21:9 21:17 26:19 27:4 35:14 37:15 38:4 73:1 73:5
**Authorized**
[1] 39:1
**Automatic**
[3] 18:15 22:20 22:24
**Aware**
[4] 33:13 34:4 34:9 34:19
**Awhile**
[1] 10:2

## B
**Bachelor's**
[1] 6:7
**Back-up**
[2] 9:22 10:9
**Background**
[1] 6:6
**Bank**
[2] 1:8 76:4
**Banking**
[1] 9:7 76:7
**Bar**
[2] 27:19 51:23
**Barrier**
[1] 65:7
**Based**
[1] 23:14
**Basis**
[6] 25:3 30:9 49:2 57:9 58:2 65:23
**Bath**
[4] 13:7 26:22 27:10 73:2
**Bathroom**
[1] 47:10
**Bathrooms**
[1] 40:14
**Beam**
[5] 51:16 51:21 51:22 51:23 52:3
**Beared**
[1] 73:9
**Bearing**

**Bears**
[1] 28:12
**Bed**
[3] 13:7 27:10 73:2
**Begin**
[1] 36:10
**Begins**
[2] 26:17 43:18
**Behalf**
[3] 2:8 2:13 2:19
**Behind**
[1] 67:16
**Belabor**
[1] 63:5
**Below**
[12] 52:2 53:8 53:14 54:16 54:17 54:17 56:5 56:6 56:13 56:21 56:21 76:22
**Between**
[3] 26:19 26:21 32:14
**Beyond**
[4] 13:8 27:11 31:16 73:2
**Bid**
[7] 5:18 6:2 12:11 54:19 54:21 55:2 74:6
**Bids**
[2] 6:2 54:13
**Billings**
[1] 10:17
**Birth**
[1] 5:7
**Blank**
[2] 39:14 39:21
**Block**
[1] 66:19
**Blocked**
[3] 69:6 69:10 69:17
**Blythe**
[1] 44:23
**Board**
[1] 45:8
**Body**
[1] 26:22
**Borne**
[1] 73:17
**Bottom**
[4] 43:8 56:9 56:9 63:17
**Bounced**
[1] 45:8
**Box**
[2] 2:5 39:20
**Boxed**
[1] 62:24
**Boxes**
[3] 39:22 39:23 39:24
**Boy**
[2] 12:21 32:19
**Break**
[1] 73:4
**Breakdown**
[2] 49:15 54:2
**Bring**
[1] 10:10
**Broke**
[1] 17:22
**Broken**
[1] 17:19
**Brothers**
[2] 1:13 76:11
**Build**
[1] 65:7
**Building**
[13] 2:5 15:3 15:4 15:17 16:17 16:18 19:19 19:13 20:6 24:18 24:22 42:1 48:13
**Built**
[2] 57:10 65:9
**Bunch**
[1] 36:15

**[13]** 16:2 16:4 16:7 16:12 37:22 26:24 26:3 27:9 10 28:12 29:1 51:2 52:1

## Business
[2] 4:24 8:3
**Buy**
[1] 40:19

## C
**Canceled**
[2] 55:3 55:5
**Care**
[2] 61:24 64:16
**Carol**
[2] 2:19 10:7
**Carpet**
[1] 68:4
**Case**
[3] 9:9 9:10 43:3
**Cash**
[2] 39:15 41:12
**Caused**
[1] 28:21
**Causing**
[1] 38:8
**Ceiling**
[11] 13:18 13:20 13:21 21:2 21:5 39:21 40:24 41:1 41:4 41:5 41:8
**Center**
[1] 33:18
**CENTRAL**
[1] 1:4
**Cents**
[1] 58:8
**Certain**
[7] 16:6 25:7 25:8 30:9 30:11 39:8 46:3
**Certainly**
[1] 62:21
**Certificate**
[5] 38:9 39:3 39:7 40:21 42:12
**Certificates**
[1] 37:24
**Certified**
[2] 10:13 75:6
**Certify**
[2] 75:7 76:15
**Cetera**
[5] 30:4 30:4 51:16 51:21 64:22
**Chance**
[3] 47:7 47:16 72:3
**Change**
[2] 76:14 76:15
**Channels**
[1] 30:5
**Charge**
[1] 35:17
**Charles**
[2] 2:13 4:8
**Chart**
[1] 51:2
**Chose**
[1] 59:18
**CHRISTIAN**
[1] 75:3
**Cinder**
[1] 66:19
**City**
[1] 57:11
**Clean**
[3] 48:10 65:3 65:4
**Cleaned**
[1] 18:22
**Cleaning**
[4] 14:5 55:22 56:4 70:18
**Cleanup**
[3] 46:14 56:7 56:8
**Clear**
[1] 70:12
**Clerical**
[2] 41:15 41:24
**Climitization**

## Business
[1] 65:12
**Close**
[2] 52:15 52:16
**Co**
[1] 7:24
**Co-op**
[2] 6:17 7:24
**COCHRAN**
[1] 2:3
**Code**
[1] 39:16
**Collapsed**
[2] 13:16 21:4
**College**
[2] 6:18 6:23
**Column**
[13] 49:11 49:14 49:17 49:20 55:21 57:21 57:22 58:15 58:21 60:8 72:18 72:18 73:17
**Columns**
[1] 15:16
**Commercial**
[1] 68:4
**Common**
[6] 16:19 27:5 27:20 66:20 73:7 73:8
**Companies**
[1] 74:3
**Company**
[14] 1:7 1:13 5:11 6:19 7:14 19:2 23:5 47:23 63:11 69:3 74:4 74:5 76:2 76:12
**Compare**
[2] 49:1 52:5
**Comparing**
[1] 49:7
**Complete**
[3] 33:24 36:23 43:14 55:17
**Completed**
[5] 36:17 36:20 41:13 41:17 42:7
**Completion**
[3] 5:20 33:17 37:7
**Component**
[4] 15:17 18:5 20:19 21:24
**Components**
[3] 24:18 24:23 25:7
**Concern**
[1] 13:15
**Concerned**
[1] 8:23
**Conclusion**
[2] 46:21 47:17
**Conditioning**
[1] 53:7
**Consider**
[3] 50:20 51:1 62:4
**Considered**
[9] 46:11 59:15 60:3 61:10 63:8 63:23 66:9 67:3 70:1
**Constitutes**
[1] 64:3
**Construction**
[13] 5:11 6:8 6:19 7:23 8:1 34:2 34:9 34:19 35:17 50:21 54:15 56:7 58:7
**Consult**
[1] 25:12
**Contact**
[4] 11:7 29:11 29:22 35:16
**Contacted**
[4] 11:4 11:9 30:13 52:22
**Contains**
[1] 75:16
**Contents**
[2] 64:8 69:3
**Contingencies**
[1] 57:9
**Contingency**
[1] 57:3
**Continue**

**[4]** 39:1 64:15 66:13 69:16
**[2]** 56:11 57:11

**Contract**
**[4]** 41:20 53:17 54:9 54:11

**Contracted**
**[1]** 49:24

**Contractor**
**[6]** 17:12 36:4 52:22 53:24
54:10 65:18

**Contractor's**
**[1]** 64:6

**Contractors**
**[2]** 74:7 74:15

**Contrary**
**[1]** 76:21

**Controversy**
**[1]** 75:12

**Copies**
**[2]** 10:16 10:17

**Copy**
**[5]** 10:19 12:23 14:20 15:14
43:14

**Corner**
**[3]** 39:21 65:11 66:15

**Corporation**
**[2]** 1:13 76:12

**Correct**
**[37]** 8:11 9:8 10:24 15:6 15:
7 15:18 15:19 15:22 15:23
16:1 18:16 21:24 22:1 22:8
22:9 28:15 34:11 34:12 35:
7 35:10 35:11 36:2 37:23
42:14 43:5 45:18 45:23 47:
18 51:8 51:14 52:11 52:14
52:20 57:23 58:4 58:12 58:
15

**Correctly**
**[2]** 14:6 57:20

**Cost**
**[64]** 9:21 10:13 15:10 17:24
18:1 18:1 18:5 18:24 20:16
20:17 22:2 22:10 22:11 22:
17 23:6 23:11 23:19 24:2
24:5 24:9 24:13 24:14 25:2
28:20 30:20 30:24 31:2 31:
10 31:17 43:23 44:4 44:9
44:11 44:12 49:1 49:2 49:4
49:16 49:18 50:2 50:4 51:
11 52:6 52:12 52:18 56:21
58:6 59:2 59:6 59:10 59:14
59:16 59:16 59:18 59:23 60:
1 60:3 60:13 63:17 71:13
71:14 71:16 73:12 73:16

**Costs**
**[15]** 23:12 25:8 43:19 44:7
44:10 53:16 57:21 58:7 58:
17 58:19 58:19 59:5 60:13
61:22 74:10

**Cotton**
**[21]** 11:16 13:10 13:24 14:2
45:16 45:20 46:23 47:21 48:
2 50:6 50:19 51:1 61:18 61:
22 62:19 63:1 64:11 65:7
65:10 65:10 66:6

**Cotton's**
**[2]** 45:24 61:3

**Counters**
**[3]** 38:8 39:15 41:12

**Counting**
**[1]** 67:24

**COUNTY**
**[1]** 75:3

**Couple**
**[3]** 1:13 35:18 67:10

**Course**
**[3]** 9:19 13:6 28:12

**Court**
**[2]** 1:3 75:7

**Cover**
**[2]** 20:1 39:20

**Covered**
**[1]** 9:24

**Cracked**
**[1]** 27:12

**Cradle**
**Crew**
**[1]** 57:18

**Critical**
**[1]** 31:14

**Cross**
**[2]** 3:3 70:14

**CSR**
**[3]** 1:21 1:24 75:23

**CULBERTSON**
**[1]** 2:10

**CULLEN**
**[1]** 2:3

**Current**
**[1]** 4:24

**Customary**
**[1]** 74:13

**Cut**
**[2]** 65:16 66:7

**D**

**Daily**
**[3]** 12:24 63:2 65:23

**Damage**
**[29]** 9:2 10:23 12:9 13:18
13:21 14:8 15:3 15:18 15:
22 17:3 18:16 21:11 22:7
22:21 22:23 23:3 23:9 24:
24 25:13 27:11 28:20 28:21
30:16 46:15 67:1 70:20 70:
24 71:20 73:18

**Damaged**
**[24]** 16:7 17:4 18:8 18:10
19:7 19:10 19:19 20:20 20:
22 21:7 21:24 22:15 23:17
23:24 28:11 31:16 40:16 47:
8 56:24 66:11 66:19 68:2
70:6 70:6

**Date**
**[19]** 5:6 14:10 14:19 15:11
15:24 26:4 27:14 32:8 36:10
36:20 37:10 38:16 39:9 41:
10 42:7 42:20 60:20 75:13
76:20

**DATE**
**[1]** 76:24

**Dated**
**[5]** 1:8 15:5 22:10 33:11 76:
5

**Dave**
**[1]** 29:22

**David**
**[3]** 2:7 10:8 35:16

**Days**
**[2]** 23:13 64:20

**Deal**
**[2]** 63:16 74:16

**Dealing**
**[2]** 13:11 13:11

**Dealt**
**[2]** 47:23 74:16

**Debris**
**[5]** 14:5 18:21 65:4 65:16
66:7

**Decided**
**[2]** 44:19 54:13

**Deck**
**[1]** 17:6

**Defendant**
**[5]** 1:14 1:18 2:13 4:3 76:13

**Deficiencies**
**[1]** 39:8

**Define**
**[1]** 33:1

**Defined**
**[1]** 63:9

**Defines**
**[1]** 10:13

**Definitely**
**[1]** 68:5

**Degree**
**[1]** 6:7

**Delaware**
**[2]** 1:13 76:12

**Delivery**
**[1]** 33:17

**DENES**
**[2]** 1:15

**Deodorizing**
**[2]** 55:23

**Department**
**[2]** 66:15 66:20

**Departments**
**[2]** 69:11

**Deponent**
**[1]** 75:10

**Deposition**
**[16]** 1:17 3:8 3:9 3:9 3:10
3:10 3:11 3:12 14:18 26:3
32:7 38:15 42:19 60:19 75:
8 75:13

**Described**
**[1]** 70:4

**Designating**
**[1]** 33:16

**Desired**
**[1]** 7:8

**Detailed**
**[1]** 6:1

**Determinations**
**[1]** 25:20

**Determined**
**[1]** 51:7

**Device**
**[1]** 53:11

**Different**
**[2]** 5:13 69:11

**Direct**
**[4]** 3:3 4:6 26:15 74:9

**Directed**
**[2]** 71:10 71:14

**Direction**
**[1]** 31:5

**Directly**
**[3]** 25:17 49:24 73:18

**Disassemble**
**[2]** 67:21 68:11

**Disaster**
**[2]** 47:22 48:7

**Discard**
**[3]** 67:11 68:4 68:21

**Displays**
**[1]** 40:2

**Disposed**
**[1]** 40:15

**Dispute**
**[1]** 61:21

**DISTRICT**
**[2]** 1:3 1:4

**Divided**
**[1]** 16:15

**DIVISION**
**[1]** 1:4

**Document**
**[18]** 14:16 14:22 26:1 26:6
31:18 32:5 32:11 33:1 34:
22 38:13 39:5 39:9 42:17
42:22 43:1 48:20 60:17 60:
23

**Documented**
**[1]** 12:24

**Documents**
**[4]** 9:15 9:18 30:4 32:17

**Dollars**
**[2]** 58:7 60:8

**Done**
**[16]** 4:12 8:2 9:2 17:13 30:
6 37:18 37:19 42:2 55:1 55:
3 56:18 56:18 71:2 71:10
73:22

**Door**
**[1]** 37:5

**Doors**
**[5]** 18:15 19:4 22:20 22:24

**42:4**

**Down**
**[25]** 4:18 17:5 17:6 19:20
21:5 21:20 23:13 35:21 51:
15 53:2 53:14 54:5 56:3 56:
6 56:8 56:11 63:17 65:5 65:
16 66:7 66:11 68:4 68:8 68:
19 75:14

**Dried**
**[1]** 64:5

**Dripping**
**[1]** 17:7

**Dry**
**[12]** 19:6 19:12 19:20 19:23
23:15 23:17 46:3 47:5 64:
11 67:16 68:23 70:5

**Drying**
**[2]** 64:8 70:7

**Duct**
**[1]** 53:2

**Due**
**[2]** 30:2 46:16

**Duly**
**[8]** 4:3 14:16 26:1 32:5 38:
13 42:17 60:17 75:10

**During**
**[2]** 26:17 35:9

**Duties**
**[1]** 5:13

**E**

**E-mails**
**[2]** 10:1 35:18

**East**
**[1]** 1:19

**Educational**
**[1]** 6:6

**Effected**
**[1]** 67:11

**Effort**
**[2]** 30:3 73:3

**Elaborate**
**[1]** 28:16

**Electric**
**[2]** 53:18 66:3

**Electrical**
**[13]** 20:24 24:12 38:6 39:14
39:24 42:5 53:12 53:15 53:
16 53:17 54:1 65:17 65:18

**Electrician**
**[1]** 54:3

**Electricians**
**[1]** 65:23

**Elements**
**[1]** 66:16

**Eliminate**
**[1]** 65:8

**Emergency**
**[7]** 12:6 30:2 47:21 48:7 50:
6 50:17 64:7

**Employed**
**[2]** 6:11 7:10

**Employee**
**[1]** 35:17

**Employees**
**[2]** 46:16 63:15

**Employment**
**[1]** 7:21

**End**
**[2]** 17:7 48:16

**Ended**
**[2]** 47:19 72:14

**Ends**
**[1]** 27:19

**Engaged**
**[1]** 14:2

**Engineer**
**[2]** 25:12 50:1

**Engineering**
**[6]** 6:8 7:7 25:18 51:4 51:9
59:5

**Engineers**
**[5]** 5:17 25:17 29:3 29:6 29:

23 30:14 51:10

**Entailed**
[1] 44:16

**Entire**
[2] 62:16

**Entire**
[9] 5:21 7:18 19:23 24:21 34:16 53:17 60:5 72:21 73:13

**Entities**
[1] 8:4

**Entitled**
[1] 76:17

**Entry**
[1] 13:20

**Envelope**
[3] 18:3 21:12 21:18

**Equipment**
[3] 62:1 64:21 68:2

**Essentially**
[3] 6:9 37:19 50:18

**Estimate**
[23] 5:17 18:19 19:15 20:24 22:2 22:10 23:2 23:4 23:19 24:2 24:9 24:13 37:12 44:4 44:6 49:6 52:10 54:24 58:24 59:9 59:24 71:14 73:24

**Estimated**
[13] 12:11 17:15 18:15 22:15 23:16 24:6 49:2 49:4 51:6 51:12 52:18 55:23 57:12

**Estimates**
[1] 52:4

**Estimating**
[1] 14:8

**Estimator**
[5] 5:10 5:22 5:24 7:17 12:15

**Et**
[5] 30:4 30:4 51:16 51:21 64:21

**Evaluate**
[1] 9:1

**Evaluation**
[2] 17:13 20:10

**Exact**
[3] 37:10 60:23 72:9

**Exactly**
[2] 14:12 46:8

**Exam**
[2] 7:7 7:9

**Examination**
[4] 3:3 3:3 4:6 70:14

**Examined**
[1] 4:4

**Exceed**
[3] 25:1 25:11 31:9

**Except**
[2] 17:9 76:20

**Excuse**
[1] 60:8

**Excused**
[1] 74:23

**Exercise**
[2] 65:8 68:2

**Exhibit**
[29] 3:8 3:9 3:9 3:10 3:10 3:11 14:18 14:21 26:3 31:7 32:7 32:10 33:12 34:3 34:17 34:22 38:15 38:18 42:18 42:21 48:16 58:15 58:20 60:19 60:21 70:20 71:1 72:16 72:17

**EXHIBITS**
[1] 3:6

**Existing**
[2] 53:8 59:20

**Expenses**
[1] 72:19

**Experience**
[4] 25:6 48:1 48:4 48:5

**Experiences**

**F**

**Facility**
[2] 25:13 27:9

**Fact**
[2] 38:24 70:23

**Factors**
[1] 44:17

**Fair**
[5] 4:21 8:11 18:9 60:11 73:13

**Fairly**
[4] 42:1 52:15 52:16 67:19

**Fallen**
[2] 13:22 27:9

**Familiar**
[1] 74:6

**Far**
[11] 8:22 9:16 10:13 21:11 31:2 33:5 43:14 52:19 64:1 64:1 64:2

**Fast**
[3] 4:16 46:24 59:13

**Favorable**
[2] 8:14 8:22

**Fee**
[1] 72:24

**Fees**
[1] 51:9

**Feet**
[2] 16:10 68:15

**Fell**
[3] 27:10 27:22 37:15

**Few**
[3] 63:10 64:20 70:10

**Field**
[2] 6:11 6:13

**Figure**
[1] 55:18

**Final**
[3] 38:9 55:22 56:4

**Finalize**
[1] 39:2

**Finally**
[1] 24:12

**Fine**
[3] 19:19 44:14 67:18

**Finish**
[6] 5:22 38:5 40:19 42:10 56:12 56:14

**Finished**
[1] 42:7

**Fire**
[13] 40:23 40:24 41:9 41:13 41:14 41:16 41:23 42:1 42:4 53:11 57:11 57:17 57:18

**First**
[17] 4:3 8:5 8:7 12:17 13:10 33:14 33:22 34:21 47:8 48:4 48:5 49:10 50:5 51:20 62:24 63:10 64:16

**Firsthand**
[1] 70:23

**Five**
[3] 42:19 42:21 72:16

**Fixtures**
[6] 21:6 40:19 47:11 47:20 53:19 66:1

**Floor**
[9] 15:24 38:7 39:22 39:23

**Flooring**
[22] 35:12 35:15 37:2 37:3 37:8 46:7 46:19 54:12 54:15 54:18 54:19 55:13 59:1 65:5 67:7 67:8 67:9 70:7 71:20 71:21 73:23 73:24

**Floorings**
[1] 55:10

**Fluorescent**
[1] 66:7

**Fold**
[1] 5:15

**Follow-up**
[1] 70:11

**Following**
[3] 34:1 64:24 65:1

**Follows**
[1] 4:5

**Foot**
[2] 16:6 19:9

**Footage**
[1] 16:21

**Foregoing**
[3] 75:13 75:16 76:16

**Forewarn**
[1] 4:14

**Form**
[3] 25:3 43:22 75:15

**Formed**
[2] 8:23 15:8

**Forth**
[3] 35:18 66:8 76:19

**Forward**
[1] 30:7

**Foundation**
[1] 15:20

**Four**
[6] 19:8 38:12 38:15 38:18 68:15 72:18

**Fourth**
[3] 49:20 68:8 73:17

**Frames**
[1] 17:20

**Free**
[2] 28:15 63:20

**Freeters**
[1] 35:16

**Front**
[10] 13:19 17:10 17:18 21:1 33:13 41:4 52:24 59:21 60:5 65:2

**Full**
[2] 4:22 59:17

**Fully**
[1] 76:19

**Function**
[1] 48:6

**Functions**
[1] 5:14

**G**

**Gart**
[2] 1:13 76:11

**Gas**
[1] 20:8

**General**
[5] 36:4 46:13 53:24 54:10 56:7

**Generally**
[1] 48:8

**Generators**
[2] 64:20 65:3

**Given**
[5] 10:11 14:20 75:19 76:17 76:20

**Glad**
[1] 8:18

**Glass**
[12] 13:19 17:14 17:18 17:21 17:24 18:2 18:8 19:4 22:13 53:1 59:21 74:5

**Glazing**

**Glue**
[1] 68:6

**Glued**
[1] 68:4

**Goetz**
[1] 29:23

**Golf**
[1] 69:12

**Goods**
[2] 1:13 76:11

**Gordmans**
[12] 13:7 16:13 16:17 19:11 26:20 26:21 27:4 27:8 27:23 37:5 66:20 73:2

**Grade**
[1] 4:15

**Graduated**
[1] 7:6

**Grave**
[1] 5:16

**Grid**
[4] 13:21 21:2 21:5 41:2

**Group**
[1] 43:8

**Grouping**
[1] 68:10

**Guess**
[10] 10:1 21:19 28:13 46:8 53:15 56:10 56:15 61:14 62:7 63:18

**Gut**
[1] 25:5

**H**

**Haines**
[3] 1:21 75:5 75:7

**Half**
[1] 16:12

**Hand**
[4] 13:22 32:9 38:17 75:19

**Hang**
[1] 56:23

**Hanging**
[4] 13:17 65:16 65:18 66:7

**HANNA**
[1] 2:3

**Hanson**
[7] 25:16 29:3 29:6 29:23 30:14 51:9 71:9

**Hard**
[1] 17:4

**Heater**
[1] 40:9

**Heating**
[1] 53:6

**Height**
[1] 68:15

**Help**
[1] 65:8 65:10 66:15

**Hereby**
[2] 75:7 76:15

**Herein**
[3] 4:2 75:8 75:12

**Hereto**
[1] 34:2

**Hesitate**
[1] 4:18

**High**
[1] 18:4

**HINSHAW**
[1] 2:10

**Hired**
[2] 25:17 36:6

**Hole**
[2] 17:10 65:11

**Hot**
[2] 40:5 40:9

**HVAC**
[4] 20:3 53:5 53:7 53:8

**Hypothetically**
[1] 64:11

**I**

ID
[1] 42:4

Idea
[1] 20:18

Identification
[6] 14:17 26:2 32:6 38:14 42:18 60:18

III
[3] 1:6 4:14 76:1

Illinois
[15] 1:4 1:6 1:7 1:9 1:20 2:5 2:6 2:12 2:17 5:13 75:1 75:20 76:1 76:3 76:7

Immediately
[1] 36:13

Improvement
[1] 40:3

Improvements
[3] 37:4 37:9 68:14

INC
[2] 1:12 76:10

Include
[1] 58:14

Included
[5] 54:20 55:19 55:20

Incorrect
[1] 58:9

Incurred
[1] 49:18

INDEX
[1] 3:1

Indicated
[1] 76:21

Information
[2] 9:22 10:9

Informed
[1] 8:13

Initial
[1] 8:24

Inquiry
[1] 74:9

Inside
[1] 13:12

Inspection
[1] 26:17

Instability
[9] 26:18 27:2 27:18 28:1 28:3 28:5 28:18 28:21 46:17

Install
[2] 39:20 65:1

Installed
[1] 40:12

Installing
[1] 64:24

Instance
[2] 1:18 4:2

Instead
[2] 59:18 60:5

Institution
[2] 1:9 76:7

Insulation
[9] 17:6 52:17 59:9 67:12 67:13 67:16 68:22 68:23 70:6

Intact
[2] 20:7 40:10

Interest
[1] 7:13

Interfere
[1] 70:19

Internal
[1] 63:11

Inventory
[1] 67:24

Involved
[5] 29:5 29:8 29:9 29:10 49:23

Iowa
[3] 6:7 6:20 7:6

Issue

[4] 38:5 38:6 38:24 39:7
[7] 29:12 29:19 30:15 30:19 30:23 38:1 42:13

Item
[19] 23:1 35:11 41:15 41:24 49:1 49:1 50:6 53:2 53:4 53:10 53:15 54:5 59:20 62:24 66:22 67:20 68:19 68:22 69:20

Items
[22] 28:5 29:2 29:21 39:24 40:3 42:6 49:22 50:1 52:2 52:9 53:20 54:1 54:4 56:16 58:14 63:10 65:6 65:17 69:5 69:23 70:1 70:3

Itself
[1] 17:21

**J**

Jeff
[2] 49:8 49:16

Job
[7] 5:13 5:18 5:18 5:19 9:20 30:11 74:10

Jobs
[1] 8:1

Joist
[1] 51:23

Joists
[3] 27:8 27:13 27:19

Jones
[1] 44:23

Jones-Blythe
[13] 2:19 5:4 5:5 5:11 5:15 7:11 7:22 8:8 8:9 11:8 35:24 44:22 44:23

Judgment
[1] 64:9

Junction
[1] 39:20

June
[1] 36:23

**K**

Keep
[4] 35:19 46:16 56:23 69:5

Kind
[8] 5:16 9:16 13:22 14:1 22:24 37:15 41:2 68:22

Knocked
[3] 21:16 21:20 27:5

Knowing
[2] 23:11 25:6

Knowledge
[5] 30:22 31:3 42:9 65:21 70:23

Known
[2] 1:9 76:6

**L**

Labeled
[5] 34:22 49:20 53:2 54:6 58:11

Laborers
[1] 56:8

Landlord
[1] 33:24

Large
[1] 41:1

Larger
[1] 7:20

Last
[8] 24:17 27:17 37:13 37:14 37:21 37:22 43:18 45:2

Late
[1] 33:2

Law
[3] 2:4 2:10 2:16

Lawsuit
[1] 32:14

Lay
[1] 41:4

Lead

[1] 19:6

Leaking
[2] 17:3 17:9

Learn
[1] 52:21

Learned
[1] 36:24

Lease
[9] 31:20 31:23 32:1 32:13 32:24 33:5 35:23 62:10 64:2

Lee
[1] 33:11

Legal
[1] 62:13

Less
[3] 19:15 23:23 24:12

Letter
[10] 9:23 21:10 26:13 27:16 28:6 28:17 28:22 31:8 33:11 35:6

Letterhead
[1] 10:15

Liability
[2] 1:7 76:2

Liberty
[2] 33:16 48:14

License
[2] 7:8 7:9

Licenses
[1] 7:1

Lien
[1] 10:14

Lift
[1] 65:24

Light
[5] 21:6 21:15 21:20 53:19 66:1

Lights
[4] 13:17 64:21 65:17 66:8

Limit
[1] 48:13

Limited
[2] 1:7 76:2

Line
[2] 68:8 76:14

Lineal
[1] 16:10

Lines
[1] 57:3 66:5

List
[1] 56:16

Listed
[2] 21:10 67:20

Litigation
[1] 4:10

LLC
[2] 1:6 76:1

Load
[2] 26:18 26:21

Load-bearing
[2] 26:18 26:21

Located
[1] 18:13

Location
[1] 51:23

Locations
[1] 72:10

Look
[10] 11:12 20:20 21:17 23:6 32:17 43:12 52:5 60:22 69:19 72:2

Looked
[2] 9:20 31:5

Looking
[2] 16:5 62:3

Looks
[5] 14:3 61:3 69:4 69:14 69:23

Loss
[2] 36:14 48:13

Lower
[3] 57:3 57:11 62:24

LTD
[1] 2:3

**M**

Main
[1] 13:25

Maintain
[2] 41:14 41:23

Major
[1] 17:9 24:18 24:22 46:15

Majority
[5] 17:18 24:18 24:22 36:7 73:8

Manage
[1] 5:19

Manager
[5] 5:10 5:23 7:17 12:12 12:15

Manipulate
[1] 69:3

Manipulating
[1] 68:1

Map
[1] 37:16

March
[17] 12:17 12:19 15:5 22:4 22:11 23:22 28:6 28:22 31:8 34:11 35:5 36:2 36:11 36:11 71:1 71:6 71:7

Mark
[11] 1:17 4:1 4:23 14:14 25:23 32:4 38:12 42:15 60:16 75:10 76:15

Marked
[10] 14:16 14:21 26:1 32:5 32:10 38:13 38:17 42:17 48:16 60:17

Masonry
[7] 26:19 26:21 27:11 27:14 51:16 51:21 51:24

Material
[4] 13:14 57:9 63:13 67:7

Materials
[17] 35:13 35:15 35:20 35:22 37:3 37:4 37:8 46:7 54:12 54:15 54:18 55:4 55:13 56:12 56:14 59:1 63:4

Matter
[7] 8:11 16:21 17:21 32:2 64:20 75:12 76:18

Mean
[17] 5:24 7:15 21:12 21:14 38:22 40:9 51:20 52:8 53:5 56:19 57:4 57:16 63:11 63:14 64:17 71:22 73:7

Meaning
[2] 20:14 50:13

Means
[5] 16:3 32:18 32:18 54:16 54:17

Mechanical
[1] 40:21

Meeting
[1] 63:2

Member
[1] 7:3

Membrane
[2] 16:22 16:24

Memory
[1] 9:16

Mention
[1] 65:3

Mentioned
[2] 10:21 70:16

Merchandise
[4] 13:12 14:4 36:14 48:12

Mess
[1] 48:11

Metal
[1] 17:6

Method
[2] 44:14 44:15

Mid

**[1]** 35:21
**[1]** 57:22

**Might**
**[2]** 10:16 48:12

**Mind**
**[2]** 24:20 26:16

**Minimal**
**[1]** 18:2

**Minimize**
**[1]** 36:14

**Minimum**
**[1]** 17:24

**Minor**
**[1]** 53:11

**Minute**
**[3]** 34:14 43:11 58:16

**Miscellaneous**
**[1]** 20:1

**Missed**
**[1]** 53:11

**Missing**
**[4]** 13:19 40:24 41:9 53:18

**Moisture**
**[1]** 65:8

**Moment**
**[2]** 53:21 60:22

**Money**
**[2]** 53:20 55:12

**Most**
**[8]** 8:14 8:22 14:4 45:15 45:
21 45:23 46:14 62:23

**Mounted**
**[1]** 40:1

**Mouth**
**[1]** 52:8

**Move**
**[7]** 30:6 36:23 37:1 37:5 41:
7 54:14 55:14

**Moved**
**[4]** 27:6 27:7 37:6 65:14

**Movers**
**[1]** 64:18

**Moving**
**[5]** 35:23 37:16 40:17 46:24
55:8

**Must**
**[1]** 56:15

---

**N**

**N/A**
**[1]** 57:4

**Name**
**[4]** 4:8 4:22 45:2 49:9

**National**
**[2]** 1:7 76:3

**Nature**
**[2]** 30:2 30:13

**Near**
**[1]** 48:15

**Necessary**
**[5]** 46:19 47:3 47:11 47:15
72:13

**Need**
**[8]** 18:23 19:21 28:16 30:6
35:20 44:8 56:18 64:5

**Needed**
**[10]** 16:7 20:15 25:21 25:22
29:22 30:9 47:4 47:7 61:4
71:10

**Needs**
**[2]** 30:24 31:4

**Never**
**[6]** 40:8 40:18 41:13 41:17
42:2 55:1

**New**
**[4]** 37:2 40:19 65:5 66:12

**Next**
**[9]** 16:3 17:23 30:1 37:5 41:
7 59:20 63:21 65:14 65:15

**NIC**
**[1]** 54:8

**Ninth**
**[2]** 1:2.11

**NO.06-CV-3177**
**[2]** 1:21 76:9

**Nobody**
**[3]** 42:1 47:1 72:1

**Non**
**[1]** 7:24

**Non-related**
**[1]** 7:24

**None**
**[1]** 69:2

**Normal**
**[1]** 55:11

**North**
**[1]** 2:16

**NORTHRUP**
**[1]** 2:3

**Notary**
**[3]** 1:21 75:5 75:23

**Notation**
**[3]** 17:23 20:14 21:21

**Note**
**[1]** 46:18

**Noted**
**[1]** 10:15

**Notes**
**[1]** 75:18

**Notice**
**[4]** 1:22 39:6 42:8 48:16

**November**
**[2]** 1:8 76:5

**Number**
**[30]** 3:8 3:9 3:9 3:10 3:10
3:11 14:18 18:4 26:3 32:7
32:10 38:18 38:18 41:21 42:
19 42:21 43:23 43:24 44:1
44:18 44:19 52:21 56:9 56:
9 57:22 58:2 60:19 70:20
71:1 72:16

**Numbers**
**[3]** 52:5 74:12 74:14

**Nutshell**
**[1]** 5:12

---

**O**

**Oak**
**[3]** 6:18 6:19 7:23

**Oath**
**[1]** 4:4

**Object**
**[2]** 8:15 62:17

**Objection**
**[1]** 62:7

**Observation**
**[2]** 45:19 65:22

**Observations**
**[1]** 27:24

**Observe**
**[10]** 14:1 17:9 17:16 18:18
19:5 20:3 21:8 46:10 73:18
73:21

**Observed**
**[14]** 12:20 15:20 16:23 18:7
18:20 19:14 20:23 22:22 26:
18 27:3 27:18 28:18 39:12
46:1

**Observing**
**[1]** 13:1

**Obvious**
**[1]** 17:10

**Obviously**
**[18]** 5:23 7:18 13:18 21:18
28:10 31:3 39:17 41:6 42:3
46:13 61:18 63:10 64:3 65:
4 67:7 67:24 68:10 69:2

**Occupancy**
**[6]** 38:1 38:9 39:3 39:7 40:
22 42:12

**Occupation**
**[1]** 5:9

**October**
**[5]** 1:19 34:3 75:9 75:20 76:

**18**

**Old**
**[1]** 67:9

**Once**
**[3]** 36:24 40:16 54:13

**One**
**[23]** 6:21 11:24 13:15 14:15
14:18 14:21 19:9 19:12 21:
4 24:3 29:9 31:7 35:13 53:
21 60:24 69:1 69:12 69:12
70:20 70:24 71:1 71:4 73:10

**Ones**
**[3]** 25:20 31:5 63:7

**Ongoing**
**[1]** 30:8

**Op**
**[1]** 7:24

**Open**
**[1]** 41:11

**Open-ended**
**[2]** 38:10 39:18

**Operators**
**[1]** 17:20

**Opinion**
**[22]** 8:14 8:22 8:23 8:24 15:
9 24:19 24:23 25:4 25:10
30:1 30:16 30:20 30:24 31:
13 34:10 43:22 58:3 60:12
61:9 62:14 64:1 74:12

**Opinions**
**[8]** 8:10 29:13 29:18 31:4
43:4 62:11 62:13 71:8

**Opportunity**
**[2]** 47:1 72:2

**Order**
**[1]** 67:1

**Ordered**
**[1]** 55:4

**Organizations**
**[1]** 7:4

**Originally**
**[2]** 36:21 36:22

**OSHA**
**[1]** 6:13

**Outdoor**
**[1]** 69:13

**Outside**
**[1]** 66:16

**Overall**
**[8]** 12:3 16:6 17:24 18:1 18:
5 24:24 46:22 50:3

**Own**
**[3]** 44:6 62:24 63:15

**Owner**
**[10]** 25:16 49:20 49:23 49:
24 50:11 50:15 51:9 58:15
58:21 73:18

**Owner's**
**[3]** 50:14 50:18 60:7

**Ownership**
**[1]** 7:13

---

**P**

**P.C.**
**[1]** 2:15

**P.O.**
**[1]** 2:5

**Package**
**[1]** 18:6

**Packet**
**[1]** 10:12

**Page**
**[13]** 43:7 43:17 45:9 48:15
48:23 48:24 51:3 63:1 63:
21 65:14 65:16 76:21 76:14

**Paid**
**[3]** 9:6 51:9 54:22

**Paint**
**[1]** 19:19

**Painting**
**[2]** 19:15 23:23

**Panels**
**[2]** 40:24 41:6

**Paragraph**
**[8]** 27:17 33:6 33:23 43:18
45:9 46:18 58:3 64:17

**Parenthetical**
**[1]** 72:20

**Parking**
**[2]** 21:15 21:19

**Part**
**[25]** 14:4 33:15 41:19 46:31
46:14 50:19 50:20 50:24 51:
3 59:15 61:10 61:15 61:23
62:4 63:8 63:23 66:9 67:3
67:23 68:1 68:3 68:5 68:12
68:16 69:4

**Particular**
**[7]** 8:4 9:4 21:10 23:20 48:
19 48:23 58:2

**Parties**
**[1]** 32:14

**Partitioned**
**[1]** 46:15

**Partitions**
**[6]** 47:10 47:19 65:9 72:4
72:5 72:13

**Patching**
**[3]** 17:12 19:21 20:2

**Pay**
**[1]** 6:23

**Payroll**
**[1]** 10:14

**People**
**[3]** 26:10 65:19 70:18

**Percent**
**[31]** 15:17 16:14 16:17 16:
18 17:16 17:24 18:7 18:9
18:13 18:16 19:7 19:11 19:
16 19:23 20:1 21:23 22:7
22:8 22:14 22:21 23:3 23:8
23:10 23:16 23:23 24:7 24:
1 25:1 31:9 31:17 45:24

**Percentage**
**[7]** 9:2 16:12 18:4 24:7 24:
8 25:8 31:13

**Perform**
**[1]** 65:13

**Performed**
**[4]** 36:7 45:16 50:24 74:4

**Permanent**
**[1]** 64:19

**Person**
**[1]** 74:5

**Personal**
**[1]** 45:17

**Perspective**
**[1]** 61:21

**Pertaining**
**[1]** 21:11

**Physical**
**[8]** 21:23 22:7 22:14 22:21
22:23 23:24 24:7 24:8

**Pick**
**[1]** 52:1

**Place**
**[4]** 51:24 70:7 72:7 73:23

**Plaintiff**
**[1]** 1:10 2:8 76:8

**Plaintiff's**
**[1]** 62:14

**Plaza**
**[4]** 4:14 12:18 29:7 72:21

**Plug**
**[2]** 40:2 74:1

**Plumb**
**[1]** 27:6

**Plumbing**
**[2]** 40:4 40:5

**Plus**
**[2]** 60:14 74:17

**Pockets**
**[4]** 51:16 51:21 51:22 52:3

**Point**
**[10]** 16:8 29:8 33:8 35:13
37:17 37:18 40:12 42:13 64:

**[2]** 21:15 21:20

**Portion**
**[6]** 22:14 23:24 31:24 32:15 32:24 46:3

**Portions**
**[1]** 19:18

**Posegate**
**[3]** 2:15 2:19 10:7

**Position**
**[1]** 45:4

**Possible**
**[2]** 29:22

**Possibly**
**[3]** 19:1 48:13 70:6

**Potentially**
**[1]** 66:19

**Power**
**[4]** 20:5 20:9 39:14 64:19

**Premises**
**[19]** 4:13 10:24 11:21 15:10 21:9 25:2 30:17 30:21 31:1 33:17 34:6 35:2 36:1 36:18 61:16 61:18 62:5 62:9 62:15

**Prep**
**[2]** 54:6 54:20

**Preparation**
**[1]** 10:4

**Preparations**
**[1]** 11:15

**Prepare**
**[7]** 9:11 10:10 23:4 24:2 24:9 24:13 44:6

**Prepared**
**[4]** 9:21 15:8 31:19 49:21

**Preparing**
**[1]** 6:3

**Present**
**[1]** 5:9

**President**
**[1]** 45:5

**Presume**
**[1]** 42:22

**Pretty**
**[2]** 30:12 40:18

**Prevent**
**[1]** 70:19

**Previously**
**[3]** 10:11 26:6 40:15

**Pricing**
**[1]** 6:2

**Print**
**[1]** 69:9

**Problem**
**[3]** 38:8 39:17 73:6

**Problems**
**[1]** 39:11

**Proceed**
**[1]** 37:2

**Process**
**[4]** 13:1 18:21 29:21 35:10

**Product**
**[3]** 61:24 62:1 71:23

**Profession**
**[1]** 6:24

**Professional**
**[4]** 7:1 7:3 7:8 7:9

**Progress**
**[1]** 7:20

**Project**
**[22]** 5:10 5:21 6:21 7:17 8:1 8:4 8:5 8:7 9:7 9:21 12:3 12:6 12:12 12:15 18:1 25:8 25:19 33:3 38:5 46:24 54:12 61:4

**Projects**
**[4]** 5:17 7:19 7:20 30:9

**Proper**
**[3]** 30:5 59:1 59:5

**Properly**
**[11]** 15:21 19:3 21:22 51:5

---

52:7 58:23 60:2 62:23 63:8 63:23 65:24

**Property**
**[1]** 45:17

**Proposal**
**[2]** 6:3 6:4

**Protect**
**[1]** 45:16

**Protection**
**[4]** 56:12 56:14 56:19 56:22

**Provide**
**[3]** 35:14 63:2 63:14

**Provided**
**[2]** 9:5 71:15

**Provisions**
**[3]** 34:2 34:10 34:19

**Public**
**[3]** 1:21 75:5 75:23

**Pulled**
**[1]** 74:1

**Purports**
**[3]** 14:24 32:13 61:1

**Purpose**
**[1]** 14:8

**Purposes**
**[8]** 14:17 26:2 32:6 38:14 42:18 55:15 60:18 65:12

**Pursuant**
**[1]** 1:22

**Put**
**[23]** 6:2 12:11 30:3 35:15 36:15 50:9 50:11 50:21 51:2 52:8 53:4 53:5 53:12 54:1 8 56:5 56:13 56:13 57:4 61:20 64:10 65:5 66:12 72:9

**Putting**
**[3]** 13:14 37:2 48:14

---

**Q**

**Qualifications**
**[1]** 6:13

**Qualified**
**[1]** 65:19

**Quality**
**[1]** 69:8

**Quantity**
**[1]** 6:1

**Questions**
**[2]** 4:12 70:9

**Quicker**
**[1]** 68:16

**Quickly**
**[1]** 47:13

---

**R**

**Racks**
**[2]** 67:21 68:11

**Raining**
**[1]** 17:1

**Ran**
**[1]** 30:12

**Read**
**[12]** 26:12 26:17 27:18 33:14 33:22 45:11 45:3 52:7 63:6 63:22 74:21 76:16

**Reading**
**[5]** 15:21 21:22 24:20 51:5 57:20

**Ready**
**[1]** 37:4

**Real**
**[1]** 54:2

**Realized**
**[1]** 40:16

**Really**
**[31]** 5:15 6:22 9:24 12:10 13:14 16:11 16:20 17:8 19:17 20:6 20:8 20:9 20:18 25:5 26:9 33:7 38:23 40:2 41:24 44:22 47:1 47:2 49:22 52:4 56:19 63:5 63:11 63:16 63:18 69:22 72:1

**Reason**

---

**[2]** 52:1 76:14

**Reasonable**
**[5]** 37:11 44:4 44:5 60:11 74:13

**Rebuild**
**[1]** 64:4

**Recognize**
**[1]** 14:21

**Reconstruct**
**[1]** 67:2

**Reconstructing**
**[1]** 34:6

**Reconstruction**
**[49]** 11:10 11:13 11:16 11:19 12:5 12:13 35:1 35:9 36:1 36:9 36:17 44:11 46:2 46:12 49:16 49:19 50:3 50:21 51:2 55:15 55:17 59:2 59:6 59:16 60:3 60:13 61:11 61:15 61:17 61:23 62:4 62:8 62:15 63:9 63:12 63:16 63:19 63:23 64:3 66:9 67:4 67:24 68:1 68:3 68:5 68:13 68:17 69:4 70:2

**Record**
**[1]** 33:10

**Records**
**[3]** 41:14 41:23 42:3

**Recovery**
**[2]** 47:22 48:7

**Red**
**[1]** 6:19

**Redoing**
**[1]** 52:3

**Reduce**
**[1]** 73:4

**Reduced**
**[1]** 75:15

**Refer**
**[4]** 24:16 43:17 49:21 50:5

**Reference**
**[1]** 31:8

**Referencing**
**[1]** 39:16

**Referring**
**[5]** 27:16 39:13 44:21 53:13 62:19

**Reflected**
**[3]** 28:6 28:22 50:3

**Refreshed**
**[1]** 9:16

**Refreshing**
**[1]** 10:2

**Refurbish**
**[1]** 23:7

**Refurbishing**
**[2]** 19:1 35:9

**Regard**
**[4]** 23:22 71:19 72:18 74:3

**Regarding**
**[1]** 30:24

**Related**
**[9]** 7:24 21:18 28:1 41:12 46:1 52:4 52:9 63:16 63:19

**Relation**
**[1]** 75:11

**Relationship**
**[1]** 64:2

**Relocate**
**[2]** 67:21 68:11

**Remaining**
**[1]** 68:6

**Remarks**
**[1]** 70:11

**Remember**
**[7]** 11:4 12:16 13:4 13:6 14:11 36:10 58:23

**Removal**
**[5]** 46:19 47:2 54:6 54:20 72:12

**Remove**
**[8]** 28:3 53:3 66:17 66:24 67:11 68:3 68:14 68:21

---

**Removed**
**[7]** 1:6 14:7 47:4 47:20 65:17 65:24 72:8

**Removing**
**[3]** 14:3 67:6 70:5

**Render**
**[1]** 29:24

**Rendered**
**[5]** 8:10 24:19 31:3 31:12 34:10

**Reopen**
**[1]** 27:15

**Repainted**
**[1]** 19:24

**Repair**
**[14]** 22:3 23:2 23:20 24:6 29:21 29:22 30:20 44:7 49:5 53:8 53:8 58:6 59:16 59:19

**Repaired**
**[3]** 16:8 19:21 73:19

**Repairing**
**[2]** 28:20 60:6

**Repairs**
**[5]** 27:14 31:1 31:6 71:2 73:22

**Repeating**
**[1]** 69:14

**Repeats**
**[1]** 69:24

**Rephrase**
**[2]** 28:14 50:23

**Replace**
**[6]** 19:22 41:5 53:3 59:18 59:20 67:8

**Replaced**
**[9]** 16:8 18:23 20:15 20:16 25:21 25:22 46:4 47:4 72:12

**Replacement**
**[16]** 15:10 20:16 25:1 31:10 31:17 43:13 43:23 44:4 44:12 49:3 49:5 53:11 54:19 59:17 60:5 68:16

**Report**
**[11]** 9:4 12:22 13:5 14:12 15:9 15:11 43:4 43:14 48:15 58:4 72:17

**Reporter**
**[1]** 75:6

**Reporting**
**[1]** 75:7

**Reports**
**[1]** 9:21

**Represent**
**[1]** 4:9

**Requested**
**[1]** 9:22

**Require**
**[1]** 6:24

**Required**
**[7]** 23:2 56:20 56:22 57:11 57:17 64:13 64:21

**Respect**
**[3]** 4:13 71:8 73:16

**Response**
**[2]** 50:6 50:17

**Responsibility**
**[5]** 46:9 50:14 50:18 64:6 64:7

**Responsible**
**[4]** 5:21 50:15 50:16 63:14

**Rest-room**
**[1]** 72:5

**Result**
**[1]** 27:7

**Retained**
**[2]** 29:4 29:7

**Reused**
**[1]** 72:5

**Reusing**
**[1]** 47:19

**Review**
**[15]** 10:23 12:2 25:19 29:24

Reviewed
[8] 9:15 9:18 9:19 31:23 32:
16 36:12 48:19 62:10

Rework
[1] 19:2

Reynolds
[1] 5:2

Right-hand
[1] 13:22

Robbins
[1] 8:3

Rock
[4] 66:17 66:18 66:24 68:14

Rolf
[13] 2:7 3:3 8:15 10:8 33:
20 58:9 62:7 62:17 69:10
70:10 70:15 74:18 74:21

Roof
[15] 13:16 16:20 16:22 16:
24 17:3 17:11 20:13 21:4
21:5 22:6 28:11 29:2 59:18
59:19 65:11

Roofing
[5] 17:12 52:17 52:22 59:9
74:4

Rooms
[1] 42:5

Routine
[1] 6:12

RTU
[2] 20:12 20:14

Rubber
[2] 55:10 71:22

Rubberized
[3] 67:6 71:19 71:21

Run
[1] 64:21

Rundown
[1] 6:5

Runs
[1] 17:6

Rushing
[1] 37:17

## S

Safe
[3] 27:15 28:4 66:1

Safety
[4] 6:12 40:23 40:24 63:2

Salvage
[5] 40:13 45:17 48:11 63:13
69:2

Salvaged
[1] 40:13

Sandra
[2] 1:21 75:5

Saturated
[2] 66:17 68:14

Saw
[4] 28:10 33:1 33:5 71:4

Scheduled
[3] 36:21 36:22 37:6

Schmadeke
[13] 2:13 3:3 4:7 4:9 14:14
25:23 32:4 38:12 42:15 60:
16 62:12 70:8 74:20

School
[2] 4:15 6:21

Scope
[3] 61:5 61:7 62:19

Scrape
[1] 68:6

Scrapers
[1] 67:6

Seal
[3] 65:10 66:15 75:19

Second
[10] 24:17 26:16 27:17 34:
13 37:14 37:21 45:12 49:14
56:9 68:10

Section
[3] 42:16 42:18 42:20

Sections
[2] 69:7 69:10

Secure
[1] 48:12

Secured
[2] 54:13 55:2

See
[20] 32:19 32:24 33:18 39:
21 43:20 45:20 45:6 51:18
53:15 54:23 57:13 61:9 63:2
64:23 67:4 68:7 68:19 69:
22 69:23 69:24

Self
[1] 35:7

Semester
[1] 6:21

Send
[1] 38:23

Sense
[2] 28:13 62:5 62:6

Sentence
[7] 24:17 24:20 24:21 25:16
27:27 73:4 22 43:18

Seppi
[5] 8:3 71:3 14:7 26:16 39:1

September
[2] 39:10 39:10

Series
[2] 4:11 35:6

Serve
[1] 6:25

Served
[2] 7:24 35:4

Service
[2] 47:22 48:7

Services
[3] 61:4 61:5 61:6

Serving
[3] 7:16 12:12 12:14

Sets
[1] 76:9

Seven
[1] 41:21

Several
[1] 55:9

Sheet
[4] 66:27 65:18 66:24 69:14

Shopping
[1] 33:18

Stored
[1] 27:23

Shoring
[3] 28:9 51:10 71:10

Shorthand
[2] 75:6 75:7

Show
[1] 33:20

Side
[5] 13:23 19:11 27:6 72:20
73:00

Sides
[2] 73:6 73:10

Signature
[2] 43:8 74:20 76:22

SIGNATURE
[1] 76:24

Similar
[2] 44:15 60:24

Site
[5] 11:10 11:24 11:17 11:24
13:10 36:13 41:14 41:23 42:
3

Situation
[3] 47:12 55:8 66:1

Six
[5] 45:9 46:18 60:16 60:19
60:21

Sixth
[2] 2:16 68:19

Skip

Slab
[2] 15:24 68:6

Sliding
[1] 19:4

Slightly
[1] 27:7

Slow
[1] 4:18

Small
[4] 13:15 17:10 18:5 31:24

Smaller
[1] 7:19

Societies
[1] 7:4

Solely
[1] 61:17

Sometimes
[1] 17:3

Somewhere
[2] 32:23 72:12

Soon
[1] 36:12

Sorensen
[8] 1:17 4:1 4:8 4:23 26:5
42:21 75:10 76:15

SORLING
[1] 2:3

Sorry
[13] 11:22 26:8 33:21 44:2
58:10 59:12 65:15 68:7 68:
8 68:20 69:8

Sorting
[1] 12:10

Sounding
[1] 45:8

Soundness
[1] 29:13

Source
[2] 44:14 44:16

South
[1] 2:11

Southwest
[4] 4:13 12:18 29:7 39:21

Space
[5] 27:5 27:23 28:4 54:14
55:9

Spaces
[2] 26:20 26:22

Special
[3] 55:9 55:10 55:12

Specialized
[1] 6:10

Specialty
[4] 19:2 23:1 23:5 41:2

Specific
[1] 41:3

Specifically
[1] 5:24

Specifications
[2] 35:1 35:4

Spell
[1] 45:2

Spend
[1] 55:12

Sporting
[2] 1:13 76:11

Sports
[16] 4:10 11:18 13:8 13:8
13:15 15:3 16:18 21:9 21:
17 26:19 27:4 35:14 37:15
38:4 73:1 73:4

Springfield
[6] 1:4 1:20 2:6 2:12 2:17
5:2

Sprinkler
[3] 24:6 42:4 66:4

Square
[1] 16:21

SS
[1] 75:2

Stabilizing

Slab
[1] 51:11

Standing
[1] 66:14

Stands
[1] 20:12

Start
[4] 5:21 7:19 21:13 62:24

Started
[7] 11:11 11:15 11:20 12:1
12:5 12:10 74:2

State
[3] 6:8 7:6 75:1

Statement
[2] 27:21 43:2

Statements
[1] 9:19

STATES
[1] 1:3

Status
[1] 20:10

Stenographically
[1] 75:14

Steve
[1] 45:1

Still
[6] 9:9 9:10 17:1 18:20 35:
12 73:10

Stop
[1] 4:16

Stopped
[2] 40:18 54:14

Storage
[1] 39:20

Store
[14] 17:10 17:18 21:1 27:10
41:3 41:4 52:24 59:20 60:5
65:1 65:6 66:21 68:12 69:12

STORES
[2] 1:12 76:10

Storm
[1] 7:2

Street
[3] 1:19 2:11 2:16

Structural
[10] 10:23 13:20 25:12 25:
18 29:13 30:13 30:24 31:1
71:9 73:1

Structurally
[1] 19:10

Structure
[16] 9:1 12:3 13:16 16:20
21:6 22:6 24:24 25:7 25:9
28:11 29:2 29:14 31:9 31:
16 41:8 46:15

Student
[1] 6:17

Studs
[3] 19:5 23:15 23:16

Stuff
[13] 10:1 13:13 21:19 38:10
40:14 40:19 50:17 55:10 56:
23 63:16 63:19 66:11 66:12

Subcontractor
[2] 64:12 66:4

Subcontractors
[1] 36:6

Submitting
[1] 6:3

Subsequently
[2] 25:15 27:12

Successful
[1] 5:19

Successor
[4] 1:7 1:12 76:3 76:10

Suite
[4] 1:20 2:4 2:11 2:17

Summary
[1] 15:2

Superior
[2] 45:6 45:7

Suppliers
[1] 74:7

**Supplying**
[1] 45:1
**Support**
[1] 45:11
**Supported**
[1] 27:19
**Sworn**
[2] 4:3 75:11
**SWPLAZA**
[2] 1:6 76:1
**System**
[4] 15:20 21:2 24:6 40:10

**T**

**Tab**
[2] 33:15 34:13
**Table**
[1] 72:18
**Tag**
[1] 48:15
**Tarp**
[1] 66:14
**Tarps**
[1] 36:16
**Tasks**
[1] 30:11
**Taylorville**
[1] 75:20
**Technician**
[1] 23:12
**Teller**
[1] 38:7
**Temporary**
[3] 28:2 36:15 65:9
**Tenant**
[11] 26:22 27:5 34:24 35:4
36:23 37:4 37:5 37:8 40:2
41:7 68:13
**Tenant's**
[2] 62:1 63:13
**Tenants**
[2] 26:20 55:11
**Tenants'**
[1] 36:14
**Term**
[2] 54:10 62:9
**Terminated**
[1] 38:11
**Termination**
[1] 39:19
**Terms**
[4] 28:17 53:24 71:10 72:11
**Tested**
[1] 20:6
**Testified**
[4] 4:4 42:11 58:24 62:10
**Testify**
[1] 75:11
**Testimony**
[4] 9:12 10:4 76:17 76:20
**Testing**
[3] 41:13 41:16 42:2
**Theory**
[1] 71:22
**Third**
[3] 43:7 49:17 63:1
**Thirds**
[1] 56:2
**Three**
[8] 6:20 7:12 32:4 32:7 33:
12 43:18 58:3 72:17
**Threw**
[1] 19:24
**Thrown**
[1] 54:3
**Tile**
[2] 13:21 21:3
**Titled**
[1] 33:17
**To-wit**
[1] 4:5

**Today**
[1] 9:12
**Together**
[3] 6:2 12:11 52:2
**Toilets**
[1] 40:13
**Took**
[3] 16:11 44:13 53:17
**Top**
[2] 20:13 72:19
**Tornado**
[2] 12:16 36:2
**Total**
[11] 15:10 16:9 25:1 30:20
31:10 43:19 43:23 44:7 56:
21 57:22 60:7
**Trailers**
[1] 13:13
**Training**
[3] 6:10 6:13 7:7
**Transcript**
[2] 75:16 76:16
**Translation**
[1] 75:17
**Trim**
[2] 39:14 39:21
**True**
[2] 43:13 75:16
**Trust**
[4] 1:8 1:9 76:4 76:6
**Trustee**
[2] 1:8 76:4
**Truth**
[1] 75:11
**Try**
[3] 36:13 48:11 48:13
**Trying**
[5] 20:18 33:1 33:6 35:19
67:15
**TSA**
[6] 1:12 4:9 54:13 55:7 55:
8 76:10
**TSA's**
[1] 45:17
**Turned**
[2] 40:1 40:8
**Twenty**
[1] 7:12
**Twenty-three**
[1] 7:12
**Two**
[14] 5:15 15:16 16:15 25:23
26:3 27:24 43:11 52:2 52:5
52:9 53:20 56:2 57:3 71:5
**Two-fold**
[1] 5:15
**Type**
[6] 6:13 40:3 41:15 44:15
49:11 74:14
**Typewritten**
[1] 75:15
**Typically**
[1] 51:22

**U**

**Uncertain**
[1] 35:12
**Uncovering**
[1] 29:21
**Undamaged**
[2] 24:19 24:23
**Under**
[5] 1:8 12:2 13:2 75:19 76:4
**Undertook**
[1] 34:5
**Unit**
[1] 20:13
**UNITED**
[1] 1:3
**Units**
[3] 20:7 20:10 53:9
**University**

[1] 6:8
**Up**
[22] 14:5 17:13 18:19 18:22
20:24 27:13 36:15 36:22 40:
23 41:3 44:17 47:19 48:10
48:11 52:1 56:9 58:1 58:16
60:7 64:18 65:4 66:12 67:9
70:18 71:11 72:14 72:19
**Up-to-date**
[1] 15:19
**Updates**
[1] 6:12
**Upper**
[1] 19:18
**Urinal**
[2] 40:12 40:16
**USA**
[3] 50:7 50:20 51:1
**Utilizes**
[1] 55:9

**V**

**Vac**
[1] 66:14
**Vacuum**
[1] 48:11
**Vague**
[1] 67:19
**Value**
[1] 25:9
**Ventilation**
[1] 53:6
**Vice**
[1] 45:5
**View**
[4] 6:19 7:23 11:20 47:6
**Visit**
[1] 12:17
**Visqueen**
[1] 56:23
**Vs**
[2] 1:11 76:9

**W**

**Wait**
[1] 58:16
**Waivers**
[1] 10:14
**Walk**
[4] 9:1 10:22 11:11 14:7
**Wall**
[29] 16:7 16:12 16:19 19:6
19:9 19:12 19:12 19:20 19:
23 19:23 23:15 23:17 26:19
26:21 27:5 27:5 28:11 28:
12 46:4 47:5 51:24 66:20
66:24 67:16 67:16 68:23 70:
6 73:7 73:8
**Walls**
[10] 16:2 16:4 19:8 19:19
21:22 27:20 29:1 36:15 52:
4 71:11
**Watch**
[3] 57:12 57:17 57:18
**Water**
[8] 13:18 14:5 17:5 40:6 40:
9 48:11 66:14 71:20
**Week**
[4] 37:13 37:14 37:21 37:22
**West**
[1] 5:2
**Wet**
[1] 66:14
**Whole**
[5] 16:10 19:12 43:12 46:23
64:16
**Wire**
[1] 39:18
**Wires**
[1] 38:10
**Wiring**
[1] 41:11
**Wit**

[1] 4:5
**Witness**
[3] 4:2 33:12 74:23
**Wolford**
[11] 44:13 49:8 49:16 50:9
51:5 51:12 52:17 53:4 55:
23 56:12 57:12
**Wolford's**
[4] 44:1 44:3 52:9 56:16
**Word**
[2] 54:16 56:5
**Words**
[1] 52:8
**Works**
[1] 26:22
**Worry**
[1] 37:19
**Writing**
[1] 29:16
**Written**
[1] 16:3

**Y**

**Year**
[1] 6:22
**Years**
[4] 6:20 7:12 25:6 74:17
**Yellow**
[2] 33:15 48:15

E-FILED
Monday, 31 December, 2007 02:00:?? PM
CLERK, U.S. District Court, ILCD

Via Fax 525-0545

March 29, 2006

**JONES-BLYTHE**
CONSTRUCTION CO.
1330 W. THE LYNCH JUMP TEFT
POST OFFICE BOX 5118
SPRINGFIELD, ILLINOIS 62705
TELEPHONE 217.787.1040
FAX NUMBER 217.787.1888

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn: Art Seppl

Re: Sports Authority
Tornado damage

Dear Mr. Seppl,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Wall is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 0% |
| Studs & drywall | | 25% |
| Painting | | 30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen

EXHIBIT
1
SH 10-22-07



**EFI** Global

Complex Issues . Solid Solutions

455 West Kehoe Blvd.
Suite 106
Carol Stream, IL 60188
Tf: 800-899-2088
Tel: 630-462-6898
Fax: 630-462-6951
www.efiglobal.com

Jeff Krone
5432-A West Crenshaw Street
Tampa, Florida 33634
813-887-3942 Phone
813-887-7489 Cell

Reference:  Sports Authority Tenant Space
            3211 South Veterans Parkway
            Springfield, Illinois 62704
            EFI Job No:  95500-00015

Mr. Krone:

This letter is a follow up to our conversation regarding the above referenced property.

An inspection was performed on the above referenced building on March 14, 2006.  During the inspection, instability was observed in the load-bearing masonry wall between the Sports Authority and Gordman's tenant spaces and in the load-bearing masonry wall between the Gordman's and Bath and Body Works tenant spaces.  The walls separate the tenant spaces and support the ends of the bar joists in the roof bays adjacent to these walls.  Instability was also observed at the ends of the bar joists supported by the common walls.

Because of the observed instability, we recommend that the two walls between the spaces be braced and the bar joists in the roof bays adjacent to these walls be shored.  The building owner should be responsible for the design and construction of the bracing and shoring.

The bracing and shoring should be installed prior to any occupancy of the tenant spaces by the employees of the tenants and the public in general.



EXHIBIT
2
SH 10-22-07

If you have any questions or wish to discuss our investigation in greater detail, please call.

Respectfully submitted,

EFI Global

Quentin Scott Ragan, P.E.
Structural Engineer

Reviewed by:

John H. Owen, S.E., P.E.
Structural and Civil Engineer
Illinois Structural Engineering License No. 081-003361
Expires 11/30/2006

QSR/pac

7

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## I. FUNDAMENTAL LEASE TERMS

### A. Parties.

Landlord:    Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

Tenant:    Gart Bros. Sporting Goods Company, a Colorado Corporation

### B. Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

### C. Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.



EXHIBIT

3

SH 10-22-07

### D. Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per sq. ft. |
| --- | --- | --- | --- |
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

| | | | |
|---|---|---|---|
| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.15 |

E.     **Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

F.     **Addresses (paragraph 34)**

If to Tenant:                    GART BROS. SPORTING GOODS COMPANY
                                 1000 Broadway
                                 Denver, Colorado 80203
                                 Attention: President
                                 Facsimile: (303) 863-2243

With a copy to:                  GART BROS. SPORTING GOODS COMPANY
                                 1000 Broadway
                                 Denver, Colorado 80203
                                 Attention: Legal Department
                                 Facsimile: (303) 864-2188

If to Landlord:                  Charles E. Robbins, Realtor
                                 2144 South MacArthur Boulevard
                                 Springfield, Illinois 62704
                                 Attention: Property Management
                                 Facsimile: (217) 525-0545

With a copy to:                  R. Lee Allen, Attorney
                                 Sorling, Northrup, Hanna, Cullen & Cochran
                                 620 East Adams, Suite 800
                                 Springfield, Illinois 62701
                                 Facsimile: (217) 522-3173

1.     **The Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between **Exhibit "A"** and **Exhibit "B"**, **Exhibit "A"** shall control. The "Shopping Center" includes the land described on **Exhibit "A"**, all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as **Exhibit "B"**. The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with **Exhibit "B"**.

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of: (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.     Completion and Delivery of the Premises and Shopping Center. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as Exhibit "C" (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as Exhibit "B" including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornados, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached Exhibit "C", made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

    **3.**    <u>Lease Term</u>. Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

    In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

    The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

    **4.**    <u>Rent</u>.

    **(a)**    <u>Base Rent</u>. During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i)     **First Five Years.** During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)     **Reduction in Base Rent.** Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)     **Increases in Base Rent.** Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)     **Co-Tenancy Requirement; Alternate Rent.** Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance charges on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

   5.    **Development of Shopping Center by Landlord**. Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises. In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities. Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference). Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

   6.    **Easements.** In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)   **Utility Easements.**   During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)   **Common Area Easement.** During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.   Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)   **Non-Dedication.** None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.   **Common Areas and Common Area Maintenance.**

(a)   **Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    **CAM Charges.** For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)     amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)     repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)     interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)    management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)     **Tenant Payments.**   Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

**(d)** **Examination of Landlord's Records**. Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    **Signs and Communications Equipment**.

**(a)** **Signs**. Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of **Exhibit "D"** are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    **Taxes.**

(a)    **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    **Payment Following Appeal.** Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)    **Multiple Building Tax Parcel.** In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

10.    **Maintenance, Repairs and Replacements.**

(a)    Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)     Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.     **Payment of Utility Bills**.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.     **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13. **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14. **Insurance**.

(a) **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)    Liability Insurance.  During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    Workers' Compensation Insurance.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    Self-Insurance.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)    Rental Loss Insurance.  Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease.  Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period.  All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable.  The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation – statutory limits;
2) Employers Liability - $500,000; and
3) Comprehensive General and Comprehensive Auto Liability as follows:
    a) Bodily Injury - $1,000,000 per occurrence;
    b) Property Damage - $1,000,000 per occurrence;
    c) Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;
    d) Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;
    e) "XCU" Hazard Endorsement, if applicable;
    f) "Broad Form" Property Damage Endorsement;
    g) "Personal Injury" Endorsement; and
    h) "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)   **Policy Provisions.**  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)   **Waiver of Right of Recovery and Subrogation.**   To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)   **Evidence of Insurance.**  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)   **Indemnities.**  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.    **Damages by Fire or Other Casualty.**

(a)    **Less Than Thirty Five Percent (35%).** In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Thirty Five Percent (35%) or More.** In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty. In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    **Landlord's Termination Rights.** If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above). Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation.** If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17. **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18. __Use__.

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.  **Warranties and Representations.**

    (a)      Landlord represents, warrants and covenants to Tenant that:

        (i)     **Quiet and Peaceful Enjoyment.**  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

        (ii)    **Title.**  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.  Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage.   This representation and warranty is a material inducement to the Tenant's execution of this Lease.  Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA").  Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

        (iii)   **Certificate of Authority.**  Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)    No Litigation.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    Tenant's Exclusive Use.  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    **Zoning and Subdivision**. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    **Prohibited Activities**. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

    (A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

    (B)    a bowling alley;

    (C)    a billiard or bingo parlor;

    (D)    a flea market;

    (E)    a massage parlor;

    (F)    a funeral home;

    (G)    a facility for the sale of paraphernalia for use with illicit drugs;

    (H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (I)    an off-track betting parlor;

    (J)    a carnival, amusement park or circus;

    (K)    a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

    (L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

    (M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

    (N)    a skating rink;

    (O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

    (P)    a banquet hall, auditorium or other place of public assembly;

    (Q)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R)    a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

(ix)    **Site Covenants.** With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    **Prohibited Uses in Common Areas.** Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B)    **Interference with Tenant's Reception/Transmission.** Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C)    **Notices Affecting the Premises.** Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D)    **Constructive Trust.** Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)    **Restaurant Use.** Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    **Tenant's Authority.** Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials.** As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    **Estoppel Certificates.** Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21. **Subordination of Lease**. At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22. **Change of Landlord**. Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23. **Tenant's Financing**. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    **Tenant's Property and Waiver of Landlord's Lien.**  All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    **Memorandum of Lease: Commencement Date Agreement.**  Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    **Expiration of Term and Holding Over.**  All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    **"For Rent" Signs.**  Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    Force Majeure.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.    Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.    Landlord's Remedies.  After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant.  Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

(a)    Reimbursement of Landlord's Costs in Exercising Remedies.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(b)     <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.     <u>Events of Landlord's Default: Tenant's Remedies</u>.  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

32.     <u>Waiver</u>.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    **Compliance with Applicable Laws.** During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    **Notices.** Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:    Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois  62704

Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party
in accordance with this paragraph.

35.    **Brokers**. Landlord and Tenant each covenant that they have not dealt with any real
estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark
Commercial Real Estate Services LLC; which shall be paid a commission by Landlord pursuant to
their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial
Real Estate Services, LLC shall be solely responsible for any commissions due and payable to
Leonard W. Sapp or any related person or entity. Except for the amounts due Edgemark
Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all
damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all
levels of proceedings), resulting from any claims that may be asserted against the other party by any
real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom
the indemnifying party either has or is purported to have dealt.

36.    **Miscellaneous**.

(a)    **Headings and Gender**. All paragraph headings, titles or captions contained
in this Lease are for convenience only and shall not be deemed a part of this Lease and shall
not in any way limit or amplify the terms and provisions of this Lease. The masculine,
feminine or neuter gender and the singular or plural number shall be deemed to include the
others whenever the context so requires or indicates.

(b)    **Construction**. The parties hereto agree that all the provisions hereof are to
be construed as covenants and agreements as though the words importing such covenants and
agreements were used in each separate paragraph hereof.

(c)    **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall
be deemed or construed by the parties hereto or by any third person to create the relationship
of principal and agent, partnership, joint venture, or any other association between Landlord
and Tenant other than the landlord-tenant relationship described herein.

(d)    **Entire Agreement: Merger**. This Lease, including all exhibits hereto
(which are hereby incorporated herein by reference for all purposes), contains the full and
final agreement of every kind and nature whatsoever between the parties hereto concerning
the subject matter of this Lease, and all preliminary negotiations and agreements of
whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    **Attorneys' Fees.**  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)    **Partial Invalidity.**  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    **Consents.**  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)    **Holidays.**  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)    **Applicable Law.**  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)    **Successors and Assigns.**  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)    **Counterparts.**  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)    **Trademarks and Trade Names.**  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    **Effectiveness of Lease; Tenant's Right to Terminate.**  Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)    Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)    Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)    Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.   Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.   This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.   Liability of the Trustee and the Beneficiary.  This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank.  It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof.  It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises.  This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof.  Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.   Liability of Directors and Shareholders.  Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

37

## II.   EXHIBITS

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

**LANDLORD**

ILLINOIS NATIONAL BANK, TRUSTEE, under Trust Agreement dated November 6, 2000, known as Trust Number 00-0020

By: _____

Its _____ SVP & TO _____

ATTEST:

By: _____

Its _____ VPl & Controller _____

**TENANT**

GART BROS. SPORTING GOODS COMPANY, a Colorado Corporation

By: _____

Its _____

ATTEST:

By: _____

Its _____

**Nesa E. Hassanein**
**Senior** Vice President
**and General** Counsel

0294793.005     3/29/01 RLA

38

E-FILED
Monday, 31 December, 2007  02:00:54 PM
Clerk, U.S. District Court, ILCD

## COC IBE - BLOXDORE, P.C.

Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704                    (217) 544-8477  •  Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



<u>Exhibit "C"</u>

CONSTRUCTION PROVISIONS

1.  <u>Definitions</u>:  For purposes of this Lease:

(i)  "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this <u>Exhibit C</u>, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(ii)  "Site Work Start Date" means April 15, 2001;

(iii)  "Building Shell Start Date" means May 15, 2001;

(iv)  "Scheduled Possession Date" means October 1, 2001;

(v)  "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

(vi)  "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings:  None.

2.  <u>General Requirements</u>.

2.1  <u>Code Compliance</u>.  Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes.  Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies.  If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws.  This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease.  The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

2.2  <u>General Conditions</u>.  Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

(i)  Liability and builder's risk insurance;

(ii)  Costs for permits, sewer and water connection fees, etc.;

C-1

(iii)    Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment;

(v)    Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)    Survey, staking and layout;

(viii)    Job site field supervision;

(ix)    Mobilization;

(x)    Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3    <u>Warranties</u>.    Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date.  At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain.  Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4    <u>Engineering</u>.    All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5    <u>Permits</u>.  Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.    <u>Construction of Site Work</u>.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage. Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete. Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping. Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving. Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities. Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone. Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting. Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage. Per paragraph 8(a) of the Lease and the Final Plans.

3.9   Cost Responsibility.   All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4.   Construction of Building Shell.   Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this Exhibit C.

4.1   Utilities.   Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2   Cost Responsibility.   All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3   Bids.   On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5.   Construction of Leasehold Improvements.   Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this Exhibit C.

5.1    Scope of Work.  The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property.   Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor.  The Leasehold Improvements will also include:  all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring.  All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.  The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.   Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord.   Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant.  Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid. Acceptance and awarding of the contract will be the decision of both Landlord and Tenant. Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant.   No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld. Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.  Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

      6.2    Leasehold Improvements Plans. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

      6.3    Deviation from Final Plans. Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4    Change-Orders. Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.    Construction Costs.

7.1    Included Costs. As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this Exhibit C, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2    Excluded Costs. In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3    Payment of Construction Costs. The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease). Landlord will pay for all Construction Costs up to the Construction Cap. In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.    Construction Timing and Completion.

8.1    Outside Dates. If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date. Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date. Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work. Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2    Tenant's Option to Terminate. If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder. Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3    Inspection and Access. During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

8.4.2   Notice of the Possession Date.   Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date"). If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

8.5     Condition of Premises at Delivery.   Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

8.6     Indemnity by Landlord.   Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

## EXHIBIT E
### Permitted Encumbrances

1. Real Estate Taxes for years 2000 and 2001.

2. Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3. Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4. Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

   NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5. Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6. Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7. Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8. Utility and drainage easements as shown by plat of subdivision.

9. 20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10. Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11. Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12. Storm Water Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13. Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14. Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001        3/29/01RLA

Exhibit F

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

### RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $ _____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease; such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then-remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.    In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.    If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.    This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.    This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.    The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.    IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____
_____

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

## ACKNOWLEDGMENTS

### LANDLORD

STATE OF _____ )
                     ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

### LENDER

STATE OF _____ )
                     ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of _____, a _____

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>TENANT</u>

STATE OF _____ )
                                                              ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ and by _____ as _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

Exhibit G

## MEMORANDUM OF LEASE

**Demise.** Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

**Effective Date of Lease.** April 2, 2001.

**Name and Address of Landlord.** ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois 62704, Attention: Property Management.

**Name and Address of Tenant.** GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado 80203, Attention: President.

**Description of Premises.** Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

**Term of Lease.** Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

**Options to Extend.** The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

**Restrictions on Construction.** The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B" and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses.  There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking.  Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive.  So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this ____ day of _____, 2001.

TENANT

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

G-3

## ACKNOWLEDGMENTS

### TENANT

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:    _____

### LANDLORD

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:    _____

Exhibit A

## LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

3:06-cv-03177-JES-CHE

Exhibit A

# COOMBE-BLOXDORF P.C

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704     (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



Post-it® Fax Note   7671    Date 3/2/   pages 1 of 1
To Lee Al/en    From E. Coombe
Co./Dept.    Co.
Phone #    Phone #
Fax #    Fax #

EXHIBIT





RECEIVED
OCT 09 2006
REAL ESTATE



## BUILDING AND ZONING DEPARTMENT
### CITY OF SPRINGFIELD, ILLINOIS
### STATUS OF CERTIFICATE OF OCCUPANCY

**ADDRESS:** **3211 Veterans**
USE:            Repair Storm Damage-Sports Authority
**OWNER:**      **Sports Authority**
PERMIT
NUMBER:         BP-2006-0613

DATE:           September 22, 2006

<div style="border:1px solid">2nd Notice</div>

**STATUS:**
**BUILDING: Certificate of Occupancy**

**ELECTRICAL: Dustin Roberts, Inspector-Temporary Certificate of Occupancy**
1. Blank or trim out power at cash counters, 110.27
2. Install J-box cover in storage area ceiling southwest corner, 314.41
3. Blank or trim out floor boxes, 110.27

**PLUMBING: Russ Anders, Inspector-Failed**
1. No hot water, IPC 890.630 e
2. Urinal not installed, IPC 890.150

**MECHANICAL:  Certificate of Occupancy**

**FIRE SAFETY: Failed**1. Building work incomplete
2. Ceiling panels missing/holes in walls, 703.1
3. Extinguishers missing, 906.1
4. Extinguishers out of date, 906.2
5. Open wiring, 605.6
6. Fire alarm testing, 907.20.1
7. Maintain F/A records on site, 901.6.2
8. ID doors to sprinkler, fire alarm, and electrical rooms, 94.31K

**Please note that occupancy of the building is not authorized per section 110.1 Int. Bldg Code, 2003 edition until a temporary or final certificate of occupancy is issued.**

### TO ARRANGE INSPECTIONS, CONTACT
### SANDY
### 217-789-2171.

CC: Jones Blythe Construction Company,  B & B Electric Inc.

<div style="border:2px solid">
EXHIBIT
4
SH 10-22-07
</div>

304 MUNICIPAL CENTER WEST ♦ SPRINGFIELD, ILLINOIS 62701 ♦ (217) 789-2171 ♦ FAX (217) 789-2048

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited )
liability company, as successor to )
Illinois National Bank, as Trustee under )
Trust Agreement dated November 6, 2000 )
and known as Trust No. 00-0020, )
an Illinois banking institution, )
)
      Plaintiff, )
)
v. )     Case No.: 06-CV-3177
)
TSA STORES, INC., as successor to Gart )
Brothers Sporting Goods Company, )
a Delaware corporation, )
)
      Defendant. )

RECEIVED

APR 0 2 2007

Hinshaw & Culbertson
*SPRINGFIELD*

## RULE 26(a)(2) EXPERT WITNESS REPORT OF MARK SORENSEN

The Terms used herein are those as defined in the Lease which is the subject of this action.

    1.    The repair and reconstruction costs to the Premises and/or Common Areas resulting from the March 12, 2006 tornadic event in Springfield, Illinois were less than 35% of the then total replacement costs of the Premises and/or Common Area.

    2.    Upon initial inspection of the damages to the Premises and/or Common Areas, a fair and reasonable estimate of the percentage of damage to the Premises and/or Common Area based on the component parts is as set forth in **Exhibit A** hereto, a letter dated March 29, 2006 to Mr. Seppi. Based on the percentage of damage to the components of the Premises, and the relation of the components to the total Premises, it was reasonable to estimate that the repair and reconstruction costs to the Premises and/or Common Areas were less than 35% of the then total replacement costs of the Premises and/or Common Area.

**EXHIBIT**

*5*

SH 10-22-07

3.    The actual repair and reconstruction costs, which includes contractors mark-up for overhead and profit of the Premises and/or Common Areas as a result of the damage from the March 12, 2006 tornadic event in Springfield, Illinois was as set forth in **Exhibit B** hereto, and supported by the attachments thereto, specifically $321,384. This figure includes $14,439 for studs and tarps installed solely to protect TSA's merchandise, and for TSA's insurer paid one-half. To that number should be added roofing and insulation ($86,038), storefront and glass ($18,506) and flooring materials ($114,800) as provided by Owner, and a portion of A&E ($9,510). Accepting the total replacement costs of $1,960,067, the actual repair and reconstruction costs of the Premises and/or Common Areas was less than 35% of the then total replacement costs of the Premises and/or Common Areas.

4.    Attached as **Exhibit C** is a spreadsheet comparing TSA's estimate of the repair and replacement costs with the actual costs for the items included within said estimate. The estimate for the repair and replacement costs provided by TSA is excessive in a number of regards, as reflected in the exhibit.

5.    The actual costs incurred in the repair and replacement of the Premises as shown in Exhibit B were actually higher than they would have been if the owner had proceeded on a non-expedited basis. Specifically, if the project proceeded on a customary schedule as for new construction, more competitive bids would have been sought and received. In addition, the roof membrane could have been repaired as only 7,000 square feet of it required repair. In order to expedite the repairs and replacements the entire roof membrane was replaced at a cost of $86,038. Further, the store front could have been repaired at a cost of less than the actual cost of $18,506. Further, the front wall of the premises could have been repaired at a cost less than the

total replacement of $17,518. In addition, the entire facility was repainted which would not have been required.

6.      Most of the work performed by Cotton U.S.A. was to protect and/or salvage TSA's personal property, and not a cost attributable to repair or replacement of the Premises. Some work by Cotton U.S.A. was not necessary and unnecessarily increased the cost of repair. For example, Cotton U.S.A. removed all of the flooring when that was not necessary for the rubber flooring. In addition, Cotton U.S.A. removed the bathroom partitions and fixtures which was not necessary. Jones-Blythe recovered the partitions and fixtures from the scrap and reused them. The cost Cotton U.S.A. charged for removal of drywall was excessive, based on the total cost incurred by Jones-Blythe to replace all the drywall that was necessary.

The basis for my opinions are my experience in the industry, actual physical inspection of the damage to the Premises and/or Common Area, the actual supervision of the repair and reconstruction to the Premises and/or Common Areas, Lease dated April 2, 2001, the ENR Cost Index, and review of the documents provided by TSA Bates stamped SWPLAZA III Initial Rule 26 Production, 11/26/06, Pages 89-104.

My qualifications are set forth in the attached Curriculum Vitae.

I have authored no publications in the last ten years.

I am not being compensated for my work on this project other than as an employee of Jones-Blythe, the contractor on the job.

I have not testified as an expert at trial or by deposition within the preceding four years.

*Mark A. Sorensen*
_____
MARK SORENSEN

Subscribed and sworn to before me this 30th day of ___March___, 2007.

_____
Notary Public

OFFICIAL SEAL
DAVID A. ROLF
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3-26-2008

Via Fax 525-0545

March 29, 2006

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn:   Art Seppi

Re:   Sports Authority
       Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

*Mark C.*

Mark A. Sorensen

JONES-
BLYTHE
CONSTRUCTION CO.
1030 NORTH MACARTHUR
POST OFFICE BOX 5118
SPRINGFIELD, ILLINOIS 62705
TELEPHONE 217-787-1140
FAX NUMBER 217-787-1895

EXHIBIT

A

Date :  June 26, 2006

Charles E. Robbins Realtor
2144 S. Macarthur Blvd
Springfield, IL 62704

JONES-BLYTHE CONSTRUCTION CO.
1030 WEST REYNOLDS STREET
P. O. BOX 5113
SPRINGFIELD, IL 62705

*[handwritten, circled: Paid 8/22/06 370,309 –]*

Phone:  217-787-1640                          Fax: 217-787-1666

Re:   Southwest Plaza III Shopping Center
Progress Billing #3, Final Bill
Tornado Damage Repair

Gordmans
| | | |
|---|---|---|
| Labor | 50,554 | |
| Labor Burden | 40,026 | |
| Material | 36,592 | |
| Subcontractor | 300,734 | |
| Equipment | 12,747 | |
| Cost subtotal | | 440,653 |

*[handwritten: 115,351 + 30,859 146,210 ✓]*

Sports Authority
| | | |
|---|---|---|
| Labor | 46,227 | |
| Labor Burden | 37,500 | |
| Material | 28,753 | |
| Subcontractor | 143,961 | |
| Equipment | 11,379 | |
| Cost subtotal | | 267,820 |

*[handwritten: 178662 18575.40 191,177.40 ✓]*

Bed Bath & Beyond
| | | |
|---|---|---|
| Labor | 7,081 | |
| Labor Burden | 5,974 | |
| Material | 4,549 | |
| Subcontractor | 13,665 | |
| Equipment | 172 | |
| Cost subtotal | | 31,441 |

*[handwritten: 14578 12343.60 26921.60 ✓]*

| | |
|---|---|
| | 739,914 |
| Overhead @ 10% | 73,991 |
| Profit  @ 10% | 73,991 |

Total Cost to Date...................................................$ 887,896
Previous Payments...............................................($ 517,587)

Total Due..............................................................$ 370,309



EXHIBIT

B

| | | | Actual Cost | | Owner |
|---|---|---|---|---|---|
| Emergency Response from Cotton USA | | $319,428 | Owner | | 9,510 (Entire Plaza) |
| Architectural and Engineering | | $8,000 | Owner | | |
| Shoring-Stabilizing | | $18,500 | 14,439 | | |
| Selective Demolition-Balance of Damage | | $57,400 | 32,128 | | |
| Structural-124'lf Bar Joist & Deck | | $57,600 | 46,951 | | |
| Masonry-Beam Pockets etc. | | $10,500 | below | | |
| Replace 124' Structural masonry wall | | $21,500 | 29,218 | | |
| Roofing and Insulation | | $39,500 | Owner | | 86,038 |
| Replace Existing Storefront & Glass | | $24,000 | Owner | | 18,506 |
| Sprinkler-Rework Existing-Damaged | | $28,200 | 9,247 | | |
| Fire Alarm - Minor Device Replacement | | $2,950 | In electrical | | |
| Ductwork- Remove and Replace | | $7,600 | In HVAC | | |
| HVAC repair existing units | | $9,600 | 16,426 | | |
| Drywall/Finish Taping Perimeter 4'/U/S of Deck | | $31,600 | 18,205 | | |
| Minor ACT's - T-Bar Replacement | | $5,900 | 2,570 | | |
| Electrical-Safe off-Circuit Verification | | $6,200 | In Electrical | | |
| Light Fixture Installation Only | | $18,500 | 25,322 | | |
| Light Fixtures | | $4,850 | 10,678 | | |
| Paint to match at lower levels | | $9,800 | 27,812 | | |
| Floor Prep & Adhesive Removal | | $10,042 | NIC | below | |
| Entire Flooring Installation | | $49,500 | 1,105 | | |
| Flooring Materials | | $68,500 | NIC | | 114,800 |
| RR-Plumbing Re-installation | | $1,200 | 4,096 | | |
| Entire New Premier Millwork Installation | | $5,700 | NIC | | |
| Millwork | | $26,000 | 1,777 | | |
| Install Toilet Partitions/Accessories | | $3,550 | 545 | | |
| Final Cleaning-Deodorizing | | $11,000 | below | | |
| Dumpsters | | $4,100 | 5,616 | | |
| Barricades-Dismanteling of Existing | | $2,100 | 1,005 | | |
| Protection of finish materials | | $12,500 | below | | |
| Misc. Rental Equipment | | $8,200 | 7,908 | | |
| Contingency | | $25,600 | N/A | | |
| General Conditions (Itemize) | | $21,550 | 7,742 | | |
| Supervision | | $21,375 | 4,841 | | |
| City Required Fire Watch | | $2,200 | N/A | | |
| Permit | | $4,000 | 189 | | |
| SUBTOTAL | | $938,745 | 267,820 | | 228,854 |
| Allowances | n/a | | N/A | | |
| SUBTOTAL | | | | | |
| Insurance | 1.50% | $14,081 | in OH&P | | |
| Profit & Overhead | 10% | $93,875 | 26,782 | | |
| Premium for expedited work | 5% | $46,937 | 26,782 | | |
| TOTAL | | $1,093,638 | 321,384 | | 228,854 |
| | | | | | |
| List Itemizations below:( #25 Gen Cond) | | | | | |
| Misc. Construction Materials | | $2,400 | 3,108 | | |
| PM Travel-Misc Office & Field Costs | | $6,100 | 3,108 | | |
| Temp Phone-Cell Ph., etc. | | $2,200 | | | |
| Construction Laborer's & Clean-Up | | $7,500 | 4,634 | | |
| intendent ravel | | $1,800 | | | |

EXHIBIT

C

540175

| Administration Time | | | | $1,550 | | |

(entire Plaza)

```
s 06/27/06  On:06/27/06  (JC.B)                                          Time: 13:27  Page: 1
                                    ** Cost Detail Report **
                                    Job Number: 51094 GORDMANS REPAIR
                                    From: 01/01/2002  Thru: 06/30/2006
                                         Open Jobs Only
```

```
ustomer:                          Contr. Date:             .00     Contr Billings: 388274.00
ontr No:                          Est. Compl.:             .00     T & M Billings:      .00
rj Mgr :'MS MARK SORENSEN         Last Actvty: 06/27/06   Total Contr :    .00     Total Billed : 388274.00
ob Type: TM T/M FOR SMALL JOBS    Last Billed: 05/25/06   Pending CO'S:    .00     Retainage Amt.:      .00
```

| Task Code | Prd Type | Source Code | I.D.# | Name/Description | --Transaction-- Date- | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| 1- 1000 TIME & MATERIAL | | | | | | | | | |
| 03/06 MAT | AP PJ-143-032306 | 3968 | CARVER'S WESTSIDE PWR.E | 03/14/06 | 143939 | .00 | 3.19 | |
| 03/06 MAT | AP CR-393-033106 | 4208 | CITY OF SPRINGFIELD | 03/15/06 | GORDMANS | .00 | 306.40 | PERMIT |
| 03/06 L/F | PR DJ-763-031606 | 1065 | HARVEY A HAMILTON | 03/16/06 | PAYROLL | 1.50 | 103.18 | |
| 03/06 L/F | PR DJ-763-031606 | 3105 | GREGORY J GIDDINGS | 03/16/06 | PAYROLL | 7.00 | 333.87 | |
| 03/06 L/F | PR DJ-763-031606 | 4095 | JOHN X WEISS | 03/16/06 | PAYROLL | 5.00 | 222.06 | |
| 03/06 L/F | PR DJ-763-031606 | 5630 | WILLIAM G MCKEE | 03/16/06 | PAYROLL | 8.00 | 377.81 | |
| 03/06 L/F | PR DJ-763-031606 | 5776 | MARTIN B SMITH | 03/16/06 | PAYROLL | 9.50 | 502.07 | |
| 03/06 L/F | PR DJ-764-032006 | 5376 | DONNIE L LUCAS | 03/20/06 | PAYROLL | 18.00 | 752.79 | |
| 03/06 L/F | PR DJ-764-032006 | 5630 | WILLIAM G MCKEE | 03/20/06 | PAYROLL | 17.00 | 817.14 | |
| 03/06 MAT | AP PJ-140-032306 | L336 | MARK SORENSEN | 03/20/06 | ARMBRUSTER | .00 | 582.63 | |
| 03/06 L/F | PR DJ-765-032106 | 1894 | MIKE G SPRINKEL | 03/21/06 | PAYROLL | 12.00 | 581.32 | |
| 03/06 L/F | PR DJ-764-032206 | 5376 | DONNIE L LUCAS | 03/22/06 | PAYROLL | 1.00 | 51.97 | |
| 03/06 L/F | PR DJ-764-032206 | 5630 | WILLIAM G MCKEE | 03/22/06 | PAYROLL | 1.00 | 61.51 | |
| | | | | | Labor | 80.00 | 1992.66 | |
| | | | | | Fringe | | 1811.06 | |
| | | | | | Material | | 902.22 | |
| | | | | Period 03/06 Total | | 80.00 | 4705.94 | |
| 04/06 MAT | AP PJ-151-041006 | 3560 | CAPITOL BLUEPRINT CO. | 03/31/06 | 06109 | .00 | 15.56 | |
| 04/06 MAT | AP PJ-152-041306 | L1065 | HARVEY HAMILTON | 04/12/06 | ICE | .00 | 3.83 | |
| | | | | | Material | | 19.39 | |
| | | | | Period 04/06 Total | | .00 | 19.39 | |
| 05/06 MAT | AP PJ-163-051006 | 16392 | VERIZON WIRELESS | 04/28/06 | 3676754583 | .00 | 51.65 | |
| | | | | | Material | | 51.65 | |
| | | | | Period 05/06 Total | | .00 | 51.65 | |
| 06/06 LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | |
| 06/06 FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2171.00- | |
| 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | JEA |
| 06/06 MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | |
| | | | | | Labor | .00 | 2389.00- | |
| | | | | | Fringe | | 2171.00- | |
| | | | | Period 06/06 Total | | .00 | 4560.00- | |
| | | | | Task Code 1- 1000 Total | | 80.00 | 216.98 | |

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| | | | |
|---|---|---|---|
| Customer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| Cntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CD'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1102 SUPERVISION | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 1065 | HARVEY A HAMILTON | 04/28/06 | PAYROLL | 8.00 | 382.31 | |
| | | | | | | | Labor | 8.00 | 216.00 | |
| | | | | | | | Fringe | | 166.31 | |
| | | | | | | Period 04/06 Total | | 8.00 | 382.31 | |
| | | | | | | Task Code 1- 1102 Total | | 8.00 | 382.31 | |
| 1- 1104 SURVEY | | | | | | | | | | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 4.00 | 191.13 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 4.00 | 201.52 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 3.00 | 133.04 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 3.00 | 133.04 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 95.59 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1950 | STEVEN W WELLS | 03/30/06 | PAYROLL | 3.00 | 140.16 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1950 | STEVEN W WELLS | 03/30/06 | PAYROLL | 3.00 | 140.16 | |
| | | | | | | | Labor | 25.00 | 643.12 | |
| | | | | | | | Fringe | | 534.89 | |
| | | | | | | Period 03/06 Total | | 25.00 | 1178.01 | |
| | | | | | | Task Code 1- 1104 Total | | 25.00 | 1178.01 | |
| 1- 1150 HOISTING | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 4.00 | 181.58 | |
| | 04/06 | L/F | PR DJ-771-042706 | 3105 | GREGORY J GIDDINGS | 04/27/06 | PAYROLL | 2.00 | 90.80 | |
| | 04/06 | L/F | PR DJ-771-042706 | 3160 | JOE W KAUFFMAN | 04/27/06 | PAYROLL | 1.50 | 71.86 | |
| | 04/06 | L/F | PR DJ-771-042706 | 3160 | JOE W KAUFFMAN | 04/27/06 | PAYROLL | 8.50 | 414.75 | |
| | 04/06 | L/F | PR DJ-772-042806 | 3105 | GREGORY J GIDDINGS | 04/28/06 | PAYROLL | 2.00 | 90.79 | |
| | | | | | | | Labor | 18.00 | 471.77 | |
| | | | | | | | Fringe | | 378.01 | |
| | | | | | | Period 04/06 Total | | 18.00 | 849.78 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/24/06 | 98313 | .00 | 30.36 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/26/06 | 98504 | .00 | 41.92 | |
| | 05/06 | L/F | PR DJ-776-052506 | 3105 | GREGORY J GIDDINGS | 05/25/06 | PAYROLL | 4.00 | 188.58 | |
| | 05/06 | L/F | PR DJ-776-052506 | 3105 | GREGORY J GIDDINGS | 05/25/06 | PAYROLL | 8.00 | 377.17 | |
| | | | | | | | Labor | 12.00 | 318.60 | |
| | | | | | | | Fringe | | 247.15 | |
| | | | | | | | Material | | 72.28 | |
| | | | | | | Period 05/06 Total | | 12.00 | 638.03 | |

** Cost Detail Report **
Job Number: 51094 GOERMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| | | |
|---|---|---|
| **astomer:** | | |
| **ontr No:** | | |
| **rj Mgr : MS MARK SORENSEN** | | |
| **ob Type: TM T/M FOR SMALL JOBS** | | |

| | | |
|---|---|---|
| Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| Est. Compl.: | Changeorders: .00 | T & M Billings: |
| Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | L/F | PR DJ-779-060806 | 3105 | GREGORY J GIDDINGS | 06/08/06 | PAYROLL | 2.50 | 117.83 | |
| | 06/06 | MAT | AP PJ-205-062106 | 9229 | W.A. LASCODY TRUCKING,I | 06/08/06 | 41773 | .00 | 199.50 | |
| | | | | | | | Labor | 2.50 | 66.38 | |
| | | | | | | | Fringe | | 51.45 | |
| | | | | | | | Material | | 199.50 | |
| | | | | | | Period 06/06 Total | | 2.50 | 317.33 | |
| | | | | | | Task Code 1- 1150 Total | | 32.50 | 1805.14 | |

1- 1151 CLEANUP

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KEMAL | 04/13/06 | PAYROLL | 1.00 | 42.47 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 5.00 | 201.31 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2348 | ROBERT W KEMAL | 04/27/06 | PAYROLL | 8.00 | 339.77 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 3.00 | 132.25 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 4.00 | 161.06 | |
| | | | | | | | Labor | 23.00 | 532.71 | |
| | | | | | | | Fringe | | 424.67 | |
| | | | | | | Period 04/06 Total | | 23.00 | 957.38 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2800 | LEON TABER SR. | 05/04/06 | PAYROLL | 4.00 | 167.46 | |
| | 05/06 | L/F | PR DJ-774-050406 | 2348 | ROBERT W KEMAL | 05/04/06 | PAYROLL | 4.00 | 176.72 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 3.00 | 125.60 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 6.00 | 274.10 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 8.00 | 365.47 | |

Jonas-Blythe Construction Company
** Cost Detail Report **
Job Number: 51094 GORDONS REPAIR
From: 01/01/2002 Thru 06/30/2006
Open Jobs Only

| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 3B8274.00 |
|---|---|---|---|---|---|
| ontr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : | 3B8274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR | DJ-775-051806 | 2200 HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 4.00 | 182.75 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 2200 HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 8.00 | 365.47 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 2200 HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 8.00 | 365.47 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 2200 HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 2200 HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 6.00 | 274.10 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 2200 HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 5.00 | 228.42 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 5.00 | 228.42 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2800 LEON TABER SR. | 05/31/06 | PAYROLL | 3.00 | 125.59 | |
| | | | | | | | Labor | 143.00 | 3723.58 | |
| | | | | | | | Fringe | | 2691.70 | |
| | | | | | | | Period 05/06 Total | 143.00 | 6415.28 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 16239 TRIAD INDUSTRIAL SUPPLY | 05/25/06 | 144138 | .00 | 1239.53 | |
| | 06/06 | MAT | AP | PJ-204-061506 | 10090 MATHIS-KELLEY CONSTRUCT | 05/04/06 | 398899 | .00 | 145.56 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 2200 HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 8.00 | 365.47 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 2200 HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 6.00 | 274.10 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 2200 HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 6.00 | 274.10 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 2200 HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 7.00 | 319.79 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 2200 HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 7.00 | 319.79 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 1065 HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 2200 HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 3.00 | 137.05 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 3105 GREGORY J GIDDINGS | 06/15/06 | PAYROLL | 1.00 | 47.15 | |
| | | | | | | | Labor | 43.00 | 1160.74 | |
| | | | | | | | Fringe | | 825.93 | |
| | | | | | | | Material | | 1385.09 | |
| | | | | | | | Period 06/06 Total | 43.00 | 3371.76 | |
| | | | | | | | Task Code 1- 1151 Total | 209.00 | 10744.42 | |

1- 1190 SMALL TOOLS

| | 03/06 | MAT | AP | PJ-147-033106 | 6195 FASTENAL COMPANY | 03/16/06 | 96516 | .00 | 27.70 | |
| | 03/06 | MAT | AP | PJ-147-033106 | 8702 JAMES MACHINERY, INC. | 03/23/06 | 266396 | .00 | 363.12 | |

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| 1stomer: | | |
| 2ntr No: | Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| 1 Mgr : MS MARK SORENSEN | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Material | | 390.82 | |
| | | | | | | Period 03/06 Total | | .00 | 390.82 | |
| 04/06 | MAT | AP | PJ-151-041006 | 739 | AMERICAN EXPRESS | 03/30/06 | 3782630799 | .00 | 322.84 | MAS |
| 04/06 | MAT | AP | PJ-151-041006 | 6195 | FASTENAL COMPANY | 03/24/06 | 96955 | .00 | 61.77 | |
| 04/06 | MAT | AP | PJ-152-041306 | 3968 | CARVER'S WESTSIDE PWR.E | 03/17/06 | 144223 | .00 | 898.86 | |
| 04/06 | MAT | AP | PJ-152-041306 | 3968 | CARVER'S WESTSIDE PWR.E | 03/25/06 | 144599 | .00 | 35.03 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/27/06 | 97029 | .00 | 115.95 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/29/06 | 97155 | .00 | 113.77 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/30/06 | 97258 | .00 | 65.75 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/31/06 | 97293 | .00 | 3.47 | |
| 04/06 | MAT | AP | PJ-154-042106 | 8576 | ILL-MO WELDING PRODUCTS | 03/31/06 | MR20061667 | .00 | 11.32 | |
| 04/06 | MAT | AP | VC-068-042406 | 6195 | FASTENAL COMPANY | 03/29/06 | 97155 | .00 | 113.77- | |
| 04/06 | MAT | AP | PJ-149-040606 | L340 | CHAS BLYTHE | 04/03/06 | 4/3 BIG R | .00 | 25.85 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 04/03/06 | 97356 | .00 | 140.00 | |
| 04/06 | MAT | AP | PJ-154-042106 | 6195 | FASTENAL COMPANY | 04/03/06 | 97408 | .00 | 7.21 | |
| 04/06 | MAT | AP | CR-410-051506 | L1065 | HARVEY HAMILTON | 04/28/06 | 51094 ICE | .00 | 3.83 | |
| 04/06 | MAT | AP | CR-410-051506 | L5776 | MARTY SMITH | 04/28/06 | 51094 ICE | .00 | 10.86 | |
| | | | | | | | Material | | 1702.74 | |
| | | | | | | Period 04/06 Total | | .00 | 1702.74 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 03/27/06 | 122767 | .00 | 75.54 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 04/05/06 | 123171 | .00 | 31.98 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 04/11/06 | 123443 | .00 | 6.43 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 04/26/06 | 124228 | .00 | 4.30 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 04/28/06 | 124367 | .00 | 20.42 | |
| 05/06 | MAT | AP | PJ-164-051106 | 320 | ACE HARDWARE | 04/28/06 | 412335 | .00 | 44.76 | |
| 05/06 | MAT | AP | PJ-165-051106 | 10090 | MATHIS-KELLEY CONSTRUCT | 04/03/06 | 393428 | .00 | 114.62 | |
| 05/06 | MAT | AP | PJ-165-051106 | 10090 | MATHIS-KELLEY CONSTRUCT | 04/12/06 | 394944 | .00 | 14.04 | |
| 05/06 | MAT | AP | PJ-165-051106 | 10090 | MATHIS-KELLEY CONSTRUCT | 04/25/06 | 397448 | .00 | 347.41 | |
| 05/06 | MAT | AP | PJ-161-051006 | 8702 | JAMES MACHINERY, INC. | 05/02/06 | 267631 | .00 | 214.42 | |
| 05/06 | MAT | AP | PJ-179-052206 | 2560 | R.W. BRADLEY SUPPLY CO. | 05/02/06 | 21436 | .00 | 118.53 | |
| 05/06 | MAT | AP | PJ-179-052206 | 6195 | FASTENAL COMPANY | 05/02/06 | 98765 | .00 | 123.78 | |
| 05/06 | MAT | AP | PJ-179-052206 | 6195 | FASTENAL COMPANY | 05/03/06 | 98818 | .00 | 6.40 | |
| 05/06 | MAT | AP | PJ-179-052206 | 6195 | FASTENAL COMPANY | 05/03/06 | 98862 | .00 | 13.16 | |
| 05/06 | MAT | AP | PJ-165-051106 | L2200 | HAROLD CANTRALL | 05/04/06 | SHELL T RD | .00 | 3.21 | |
| 05/06 | MAT | AP | PJ-165-051106 | L2200 | HAROLD CANTRALL | 05/06/06 | MOTOMART | .00 | 3.91 | |
| 05/06 | MAT | AP | PJ-165-051106 | L2200 | HAROLD CANTRALL | 05/08/06 | MENARDS | .00 | 12.91 | |
| 05/06 | MAT | AP | PJ-165-051106 | L2200 | HAROLD CANTRALL | 05/08/06 | SHELL HBRO | .00 | 4.43 | |
| 05/06 | MAT | AP | PJ-179-052206 | 8702 | JAMES MACHINERY, INC. | 05/17/06 | 272507 | .00 | 699.30 | |

Jones & Otis Construction Co.

** Cost Detail Report **

Job Number: 51094 GOODMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| Customer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| Contr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Prj Mgr : MR MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/15 SHELL | .00 | 4.43 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/22 MENAR | .00 | 16.77 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/22 SHELL | .00 | 4.43 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/24 SHELL | .00 | 2.95 | |
| | | | | | | | Material | | 1888.13 | |
| | | | | | | | Period 05/06 Total | .00 | 1888.13 | |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 142.21 | MAS |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 64.39 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 137.83 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 64.39 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 6195 | FASTENAL COMPANY | 05/30/06 | 99943 | .00 | 51.44 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16249 | UNITED RENTALS-HIGHWAY | 05/25/06 | 56502190-1 | .00 | 532.18 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16392 | VERIZON WIRELESS | 05/28/06 | 3682041466 | .00 | 46.17 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/16/06 | 124139 | .00 | 9.24 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/01/06 | 124439 | .00 | 16.22 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/19/06 | 125313 | .00 | 6.47 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/25/06 | 125538 | .00 | 45.57 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/26/06 | 125592 | .00 | 16.08 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/05/06 | 412507 | .00 | 26.82 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/09/06 | 412602 | .00 | 23.68 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/17/06 | 412852 | .00 | 21.75 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/30/06 | 413204 | .00 | 29.19 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/31/06 | 413256 | .00 | 11.96 | |
| | 06/06 | MAT | AP PJ-205-062106 | 6195 | FASTENAL COMPANY | 05/30/06 | 100120 | .00 | 8.75 | |
| | 06/06 | MAT | AP PJ-199-060806 | L2200 | HAROLD CANTRALL | 06/05/06 | 6/5 SHELL | .00 | 2.95 | |
| | 06/06 | MAT | AP PJ-199-060806 | L2200 | HAROLD CANTRALL | 06/07/06 | 6/7 SHELL | .00 | 2.95 | |
| | 06/06 | MAT | GL JE-023-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | MOVE G/L |
| | 06/06 | MAT | GL JE-024-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2702.00- | JER |
| | 06/06 | EQP | GL JE-022-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | WAREHOUSE MATL |
| | 06/06 | EQP | GL JE-023-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50- | MOVE G/L |
| | | | | | | | Material | | 1279.16- | |
| | | | | | | | Period 06/06 Total | .00 | 1279.16- | |
| | | | | | | | Task Code 1- 1190 Total | .00 | 2702.53 | |

Johns Pyths Construction Co.
** Cost Detail Report **
Job Number: 51094 GOHRMANN REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| ustomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- | 1195 | CARRY DECK CRANE | | | | | | | | |
| | 04/06 | MAT | AP DJ-154-042106 | 12233 | ONE SOURCE | 04/11/06 | R101960 | .00 | 2223.75 | |
| | | | | | | | Material | | 2223.75 | |
| | | | | | | Period 04/06 Total | | .00 | 2223.75 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1112.00- | JEA |
| | | | | | | | Material | | 1112.00- | |
| | | | | | | Period 06/06 Total | | .00 | 1112.00- | |
| | | | | | | Task Code 1- 1195 Total | | .00 | 1111.75 | |
| 1- | 1300 | MISC HAULING | | | | | | | | |
| | 04/06 | L/F | FR DJ-768-040606 | 340 | CHARLES N BLYTHE | 04/06/06 | PAYROLL | 5.00 | 173.29 | |
| | 04/06 | L/F | FR DJ-768-040606 | 340 | CHARLES N BLYTHE | 04/06/06 | PAYROLL | 6.00 | 207.94 | |
| | 04/06 | L/F | FR DJ-768-040606 | 340 | CHARLES N BLYTHE | 04/06/06 | PAYROLL | 5.00 | 173.29 | |
| | 04/06 | L/F | FR DJ-769-041306 | 340 | CHARLES N BLYTHE | 04/13/06 | PAYROLL | 2.00 | 69.31 | |
| | 04/06 | L/F | FR DJ-770-042006 | 2200 | HAROLD CANTRALL JR. | 04/20/06 | PAYROLL | 1.50 | 66.15 | |
| | 04/06 | L/F | FR DJ-771-042706 | 340 | CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.97 | |
| | 04/06 | L/F | FR DJ-771-042706 | 340 | CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.97 | |
| | 04/06 | L/F | FR DJ-771-042706 | 340 | CHARLES N BLYTHE | 04/27/06 | PAYROLL | 6.00 | 207.94 | |
| | 04/06 | L/F | FR DJ-771-042706 | 340 | CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.98 | |
| | 04/06 | L/F | FR DJ-772-042806 | 340 | CHARLES N BLYTHE | 04/28/06 | PAYROLL | 2.00 | 69.31 | |
| | 04/06 | L/F | FR DJ-772-042806 | 340 | CHARLES N BLYTHE | 04/28/06 | PAYROLL | 2.00 | 69.31 | |
| | | | | | | | Labor | 38.50 | 1045.43 | |
| | | | | | | | Fringe | | 303.03 | |
| | | | | | | Period 04/06 Total | | 38.50 | 1348.46 | |
| | 05/06 | L/F | FR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | FR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | FR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | FR DJ-773-050406 | 340 | CHARLES N BLYTHE | 05/04/06 | PAYROLL | 3.00 | 109.52 | |
| | 05/06 | L/F | FR DJ-773-050406 | 340 | CHARLES N BLYTHE | 05/04/06 | PAYROLL | 6.00 | 219.04 | |
| | 05/06 | L/F | FR DJ-773-050406 | 340 | CHARLES N BLYTHE | 05/04/06 | PAYROLL | 8.00 | 292.03 | |
| | 05/06 | L/F | FR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | FR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | FR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | FR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | FR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 5.00 | 182.53 | |
| | 05/06 | L/F | FR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 6.00 | 219.04 | |
| | 05/06 | L/F | FR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 2.00 | 73.02 | |

Joe Baldt Construction Co.
** Cost Detail Report **
Job Number: 51094 GOODMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|---|---|---|

Customer:  
Contr No:  
Prj Mgr : MS MARK SORENSEN  
Job Type: TM T/M FOR SMALL JOBS  

| Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|
| Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 05/06 L/F | PR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 4.00 | 146.01 | |
| | 05/06 L/F | PR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 1.00 | 36.49 | |
| | 05/06 L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 | |
| | 05/06 L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 2.00 | 73.02 | |
| | 05/06 L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 1.00 | 36.50 | |
| | 05/06 L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 5.00 | 182.53 | |
| | 05/06 L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 4.00 | 145.99 | |
| | 05/06 L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 3.00 | 137.06 | |
| | 05/06 L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 L/F | PR DJ-777-053106 | 3105 | GREGORY J GIDDINGS | 05/31/06 | PAYROLL | 4.00 | 188.59 | |
| | 05/06 L/F | PR DJ-777-053106 | 3105 | GREGORY J GIDDINGS | 05/31/06 | PAYROLL | 3.00 | 141.45 | |
| | 05/06 L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 5.00 | 182.53 | |
| | 05/06 L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 2.00 | 73.02 | |
| | 05/06 L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 1.00 | 36.50 | |
| | 05/06 L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 3.00 | 109.52 | |
| | | | | | | Labor | 97.00 | 2709.10 | |
| | | | | | | Fringe | | 1204.28 | |
| | | | | | Period 05/06 Total | | 97.00 | 3913.38 | |
| | 06/06 L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 2.00 | 91.37 | |
| | 06/06 L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 2.00 | 91.37 | |
| | 06/06 L/F | PR DJ-779-060806 | 340 | CHARLES N BLYTHE | 06/08/06 | PAYROLL | 3.00 | 109.52 | |
| | 06/06 L/F | PR DJ-781-062106 | 1903 | VERN G VLACH | 06/21/06 | PAYROLL | 1.50 | 73.36 | |
| | 06/06 L/F | PR DJ-781-062206 | 1065 | HARVEY A HAMILTON | 06/22/06 | PAYROLL | 1.50 | 74.77 | |
| | 06/06 L/F | PR DJ-781-062206 | 340 | CHARLES N BLYTHE | 06/22/06 | PAYROLL | 1.00 | 36.50 | |
| | 06/06 L/F | PR DJ-781-062206 | 340 | CHARLES N BLYTHE | 06/22/06 | PAYROLL | 5.00 | 182.53 | |
| | 06/06 LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00- | |
| | 06/06 FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1214.00- | |
| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00-JEA | |
| | 06/06 MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | |
| | | | | | | Labor | 16.00 | 2514.71- | |
| | | | | | | Fringe | | 1000.87- | |
| | | | | | Period 06/06 Total | | 16.00 | 3515.58- | |
| | | | | | Task Code 1- 1300 Total | | 151.50 | 1746.26 | |

** Cost Detail Report **
Job Number: 51094 GORDHOUSE REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | | |
|---|---|---|---|---|
| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ontr No: | Est. Compl.: | Change Orders: | .00 | T & M Billings: .00 |
| o Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | J.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| 1- 1400 DUMPSTER | | | | | | | | | |
| | 04/06 MAT | AP PJ-151-041006 | 16708 | WASTE MANAGEMENT OF IL | 04/01/06 | 2271752477 | .00 | 767.19 | |
| | 04/06 MAT | AP PJ-154-042106 | 16708 | WASTE MANAGEMENT OF IL | 04/16/06 | 2274382477 | .00 | 3857.44 | |
| | | | | | | Material | | 4624.63 | |
| | | | | | | Period 04/06 Total | .00 | 4624.63 | |
| | 05/06 MAT | AP PJ-163-051006 | 16708 | WASTE MANAGEMENT OF IL | 05/01/06 | 2276862477 | .00 | 971.24 | |
| | 05/06 MAT | AP PJ-179-052206 | 16708 | WASTE MANAGEMENT OF IL | 05/16/06 | 2280632477 | .00 | 804.57 | |
| | | | | | | Material | | 1775.81 | |
| | | | | | | Period 05/06 Total | .00 | 1775.81 | |
| | 06/06 MAT | AP PJ-200-061206 | 16708 | WASTE MANAGEMENT OF IL | 06/01/06 | 2284132477 | .00 | 815.61 | |
| | 06/06 MAT | AP PJ-205-062106 | 16708 | WASTE MANAGEMENT OF IL | 06/16/06 | 2287612477 | .00 | 196.80 | |
| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 5616.00-JER | |
| | | | | | | Material | | 4603.59- | |
| | | | | | | Period 06/06 Total | .00 | 4603.59- | |
| | | | | | | Task Code 1- 1400 Total | .00 | 1796.85 | |
| 1- 1710 TEMP WALL | | | | | | | | | |
| | 03/06 MAT | AP PJ-147-033106 | 11547 | NEUWER MATERIALS, INC. | 03/20/06 | 2093353-00 | .00 | 3264.73 | |
| | 03/06 L/F | PR DJ-764-032306 | 1008 | DAN E BECKER | 03/23/06 | PAYROLL | 10.00 | 580.06 | |
| | 03/06 L/F | PR DJ-764-032306 | 1027 | CURTIS A BAUMAN | 03/23/06 | PAYROLL | 5.00 | 301.19 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 12.00 | 720.40 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 8.00 | 382.33 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 1.00 | 68.78 | |
| | 03/06 L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 2.00 | 93.14 | |
| | 03/06 L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 5.00 | 335.16 | |
| | 03/06 L/F | PR DJ-764-032306 | 1799 | MIKE T RYAN | 03/23/06 | PAYROLL | 5.00 | 344.22 | |
| | 03/06 L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 13.00 | 752.23 | |
| | 03/06 L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 8.00 | 373.71 | |
| | 03/06 L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 12.00 | 603.18 | |
| | 03/06 L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 13.00 | 609.21 | |
| | 03/06 L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 1.00 | 52.53 | |
| | 03/06 L/F | PR DJ-764-032306 | 2348 | ROBERT W KEHAL | 03/23/06 | PAYROLL | 7.00 | 390.85 | |
| | 03/06 L/F | PR DJ-764-032306 | 2401 | DENNIS E FARLEY JR. | 03/23/06 | PAYROLL | 5.00 | 277.62 | |
| | 03/06 L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 13.00 | 609.22 | |
| | 03/06 L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 1.00 | 52.52 | |
| | 03/06 L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 1.00 | 62.76 | |
| | 03/06 L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 1.50 | 94.15 | |
| | 03/06 L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 7.00 | 439.31 | |

a Of:06/27/06  On:06/27/06  (JC.8)                                      Time: 13:27  Page:  10

Jennifer Construction Co.

** Cost Detail Report **

Job Number: 51094 SORIMANE REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/23/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Trans. Date | Reference | Hours/Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | .50 | 31.40 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.50 | 99.02 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.50 | 99.02 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 7.00 | 462.11 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.00 | 66.03 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 13.00- | 609.21- | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 13.00 | 670.18 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 1.00- | 52.52- | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 1.00 | 57.94 | |
| | | | | | | | Labor | 142.00 | 4677.53 | |
| | | | | | | | Fringe | | 3289.01 | |
| | | | | | | | Material | | 3264.73 | |
| | | | | | | Period 03/06 Total | | 142.00 | 11231.27 | |
| | | | | | | | | | | |
| | 04/06 | MAT | AP PJ-151-041006 | 4475 | CONTRACTOR'S LUMBER CIT | 03/31/06 | 3/06 2810 | .00 | 288.77 | 181067 |
| | 04/06 | MAT | AP PJ-151-041006 | 4475 | CONTRACTOR'S LUMBER CIT | 03/31/06 | 3/06 2810 | .00 | 79.74 | 181018 |
| | 04/06 | MAT | AP PJ-151-041006 | 6195 | FASTENAL COMPANY | 03/20/06 | 96726 | .00 | 27.50 | |
| | 04/06 | MAT | AP PJ-151-041006 | 8126 | HUNDMAN LUMBER | 03/28/06 | 2014849 | .00 | 87.44 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KEMAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.10 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 5.50 | 262.86 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 5.50 | 221.47 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 63.00 | 1549.46 | |
| | | | | | | | Fringe | | 1197.21 | |
| | | | | | | | Material | | 483.45 | |
| | | | | | | Period 04/06 Total | | 63.00 | 3230.12 | |
| | | | | | | | | | | |
| | 06/06 | L/F | PR DJ-782-062606 | 4095 | JOHN E WEISS | 06/26/06 | PAYROLL | 8.00 | 351.40 | |
| | | | | | | | Labor | 8.00 | 190.40 | |
| | | | | | | | Fringe | | 161.00 | |
| | | | | | | Period 06/06 Total | | 8.00 | 351.40 | |
| | | | | | | Task Code 1- 1710 Total | | 213.00 | 14812.79 | |

**Jones-Blythe Construction Co.**

** Cost Detail Report **
Job Number: 5109A GORDMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| Customer: | | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 398274.00 |
|---|---|---|---|---|---|---|---|---|
| Contr No: | | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Prj Mgr: | MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 398274.00 |
| Job Type: | TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- | 1800 | MOVE FIXTURES | | | | | | | | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | | | | | | | Labor | 2.00 | 53.74 | |
| | | | | | | | Fringe | | 37.63 | |
| | | | | | | Period 05/06 Total | | 2.00 | 91.37 | |
| | | | | | | Task Code 1- 1800 Total | | 2.00 | 91.37 | |
| 1- | 1900 | FUEL & FILTERS | | | | | | | | |
| | 04/06 | MAT | AP PJ-158-042806 | 11179 | MDI | 03/17/06 | 275978 | .00 | 281.86 | |
| | | | | | | | Material | | 281.86 | |
| | | | | | | Period 04/06 Total | | .00 | 281.86 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11651 | NELSON OIL CO. INC. | 04/11/06 | 67715 | .00 | 194.47 | |
| | | | | | | | Material | | 194.47 | |
| | | | | | | Period 05/06 Total | | .00 | 194.47 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 238.00- | JEA |
| | | | | | | | Material | | 238.00- | |
| | | | | | | Period 06/06 Total | | .00 | 238.00- | |
| | | | | | | Task Code 1- 1900 Total | | .00 | 238.33 | |
| 1- | 1951 | LIFT RENT | | | | | | | | |
| | 04/06 | MAT | AP PJ-154-042106 | 13610 | RSC-SPRINGFIELD | 04/05/06 | 27807507 | .00 | 1374.00 | |
| | | | | | | | Material | | 1374.00 | |
| | | | | | | Period 04/06 Total | | .00 | 1374.00 | |
| | 05/06 | MAT | AP PJ-163-051006 | 13610 | RSC-SPRINGFIELD | 04/19/06 | 27895477-2 | .00 | 30.00 | |
| | 05/06 | MAT | AP PJ-165-051106 | 13610 | RSC-SPRINGFIELD | 05/03/06 | 27807507-3 | .00 | 1344.00 | |
| | | | | | | | Material | | 1374.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1374.00 | |
| | 06/06 | MAT | AP PJ-200-061206 | 13610 | RSC-SPRINGFIELD | 05/31/06 | 27807507-4 | .00 | 1344.00 | |
| | 06/06 | MAT | AP PJ-200-061206 | 13610 | RSC-SPRINGFIELD | 05/18/06 | 28319492-1 | .00 | 521.00 | |
| | 06/06 | MAT | AP PJ-205-062106 | 13610 | RSC-SPRINGFIELD | 06/15/06 | 28319492 | .00 | 491.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/15/06 | 28319492-2 | .00 | 491.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/22/06 | 27807507-5 | .00 | 1364.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/22/06 | 28319492-3 | .00 | 30.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3495.00- | JEA |

Run On:06/27/06  On:06/27/06 (JC.8)                                          Time: 13:27  Page: 12

Binggleyton Construction Co.
** Cost Detail Report **
Job Number: E1094 GORDMANS REPAIR
From: 01/01/2002  Thru: 05/30/2006
Open Jobs Only

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

Customer:                         Contr. Date:        Contr Amount:      .00    Contr Billings: 388274.00
Cntr No:                          Est. Compl.:        Changeorders:      .00    T & M Billings:      .00
Prj Mgr : MS MARK SORENSEN        Last Actvty: 06/27/06  Total Contr :    .00    Total Billed  : 388274.00
Job Type: TM T/M FOR SMALL JOBS   Last Billed: 05/25/06  Pending CO'S:    .00    Retainage Amt.:      .00

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Material | | 746.00 | |
| | | | | | Period 05/06 Total | | .00 | 746.00 | |
| | | | | | Task Code 1- | 1951 Total | .00 | 3494.00 | |

1-  1999 EQUIPMENT

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 2995.50 | RT 735 3/14--4/14 |
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 1374.50 | CAT BACKHOE ---4/14 |
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 93.00 | TAKEUCHI 3/28-4/1 |
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 373.50 | MLR WLDR 3/16-4/14 |
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 196.00 | RIGGING 3/16-4/14 |
| | 03/06 | EQP | GL JE-011-032906 | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 90.00 | SKIP BOX 3/20-4/14 |
| | | | | | | Equipment | | 5122.50 | |
| | | | | | Period 03/06 Total | | | 5122.50 | |
| | 05/06 | EQP | GL JE-017-052606 | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 2995.50 | PICKER 4/15-5/15 |
| | 05/06 | EQP | GL JE-017-052606 | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 1374.50 | CAT BKHOE 4/15-5/15 |
| | 05/06 | EQP | GL JE-017-052606 | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 1368.75 | TRUCK TIME |
| | 05/06 | EQP | GL JE-017-052606 | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 373.50 | WELDER 4/15/5/15 |
| | | | | | | Equipment | | 6112.25 | |
| | | | | | Period 05/06 Total | | .00 | 6112.25 | |
| | 06/06 | EQP | GL JE-022-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 600.00 | PICKUP-HAROLD |
| | 06/06 | EQP | GL JE-022-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 600.00 | PICKUP-HARVEY |
| | 06/06 | EQP | GL JE-022-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 50.00 | 2 MO PHONE EXP |
| | 06/06 | EQP | GL JE-022-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 262.50 | TRUCK TIME |
| | | | | | | Equipment | | 1512.50 | |
| | | | | | Period 06/06 Total | | .00 | 1512.50 | |
| | | | | | Task Code 1- | 1999 Total | .00 | 12747.25 | |

2-  2110 REMOVE RTU

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | FR DJ-764-032306 | 3105 GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 2.00 | 95.40 | |
| | 03/06 | L/F | FR DJ-764-032306 | 5776 MARTIN B SMITH | 03/23/06 | PAYROLL | 2.00 | 100.76 | |
| | | | | | | Labor | 4.00 | 105.00 | |
| | | | | | | Fringe | | 91.16 | |
| | | | | | Period 03/06 Total | | 4.00 | 196.16 | |
| | | | | | Task Code 2- | 2110 Total | 4.00 | 196.16 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 SORENSEN REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Data: | Contr Amount: .00 | Contr Billings: 388274.00 |
| ontr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code Prd. Type | Source-Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|
| 2-  2120 ROOF DEMO | | | | | | | | |
| 03/06 MAT  AP | PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96571 | .00 | 179.86 | |
| 03/06 MAT  AP | PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96636 | .00 | 105.61 | |
| 03/06 MAT  AP | PJ-147-033106 | 8576 | ILL-MO WELDING PRODUCTS | 03/16/06 | S1250454 | .00 | 86.20 | |
| 03/06 MAT  AP | PJ-147-033106 | 9229 | W.A. LASCODY TRUCKING,I | 03/16/06 | 41544 | .00 | 344.76 | |
| 03/06 MAT  AP | PJ-147-033106 | 226 | LINDE GAS LLC | 03/21/06 | 9305615465 | .00 | 45.82 | |
| 03/06 L/F  PR | DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 6.00 | 286.17 | |
| 03/06 L/F  PR | DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| 03/06 L/F  PR | DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| 03/06 L/F  PR | DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 6.00 | 302.28 | |
| 03/06 L/F  PR | DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06. | PAYROLL | 2.00 | 100.77 | |
| 03/06 L/F  PR | DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 8.00 | 403.03 | |
| 03/06 L/F  PR | DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 8.00 | 403.03 | |
| 03/06 L/F  PR | DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 95.59 | |
| 03/06 L/F  PR | DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| 03/06 L/F  PR | DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| 03/06 L/F  PR | DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 2.00 | 121.39 | |
| 03/06 L/F  PR | DJ-766-033006 | 5776 | MARTIN B SMITH | 03/30/06 | PAYROLL | 10.00 | 526.06 | |
| 03/06 L/F  PR | DJ-766-033006 | 5776 | MARTIN B SMITH | 03/30/06 | PAYROLL | 10.00 | 526.06 | |
| 03/06 L/F  PR | DJ-767-033106 | 5720 | GERALD A ROUSE JR | 03/31/06 | PAYROLL | 8.00 | 377.81 | |
| | | | | | Labor | 83.00 | 2258.16 | |
| | | | | | Fringe | | 1902.20 | |
| | | | | | Material | | 761.95 | |
| | | | | Period 03/06 Total | | 83.00 | 4922.31 | |
| 04/06 MAT  AP | PJ-151-041006 | 226 | LINDE GAS LLC | 03/23/06 | 9305629961 | .00 | 70.02 | |
| 04/06 MAT  AP | PJ-151-041006 | 8576 | ILL-MO WELDING PRODUCTS | 03/28/06 | S 1627930 | .00 | 235.98 | |
| 04/06 L/F  PR | DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 5.00 | 238.95 | |
| 04/06 L/F  PR | DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 5.00 | 212.36 | |
| 04/06 L/F  PR | DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| 04/06 L/F  PR | DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| 04/06 L/F  PR | DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 2.00 | 83.07 | |
| 04/06 L/F  PR | DJ-768-040606 | 2800 | LEON TARR SR. | 04/06/06 | PAYROLL | 5.00 | 201.31 | |
| 04/06 L/F  PR | DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| 04/06 L/F  PR | DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| 04/06 L/F  PR | DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| 04/06 L/F  PR | DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 4.00 | 181.58 | |
| 04/06 L/F  PR | DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 4.00 | 191.61 | |
| 04/06 L/F  PR | DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 6.00 | 296.49 | |
| 04/06 L/F  PR | DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 1.00 | 49.42 | |

Benson-Lynch Construction Co
\*\* Cost Detail Report \*\*
Job Number: 51094 CONDEMNS REPAIR
From: 01/01/2003  Thru: 06/30/2005
Open Jobs Only

| | | |
|---|---|---|
| istomer: | Contr. Date: | Contr Amount:     .00 | Contr Billings:  388274.00 |
| ntr No: | Est. Compl.: | Changeorders:    .00 | T & M Billings:       .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr :     .00 | Total Billed :  388274.00 |
| :b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's:     .00 | Retainage Amt.:      .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | FR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 2.00 | 98.83 | |
| | | | | | | | Labor | 49.00 | 1199.65 | |
| | | | | | | | Fringe | | 996.88 | |
| | | | | | | | Material | | 306.00 | |
| | | | | | | Period 04/06 Total | | 49.00 | 2502.53 | |
| | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3546.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2973.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3546.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3546.00- | |
| | | | | | | | Labor | .00 | 3546.00 | |
| | | | | | | | Fringe | | 2973.00 | |
| | | | | | | Period 06/06 Total | | .00 | 6519.00 | |
| | | | | | | Task Code 2- 2120 Total | | 132.00 | 13943.84 | |

2-  2130 DEMO BEARING WALL

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | FR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 5.00 | 238.94 | |
| | 03/06 | L/F | FR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 137.56 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 1.00 | 42.46 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.68 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 1.00 | 42.46 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2401 | DENNIS E FARLEY JR. | 03/30/06 | PAYROLL | 10.00 | 440.94 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2401 | DENNIS E FARLEY JR. | 03/30/06 | PAYROLL | 2.00 | 108.66 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 1.00 | 40.26 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 104.99 | |
| | 03/06 | L/F | FR DJ-766-033006 | 2805 | BILL TAYLOR | 03/30/06 | PAYROLL | 10.00 | 451.42 | |
| | 03/06 | L/F | FR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 8.00 | 370.54 | |
| | 03/06 | L/F | FR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 2.00 | 121.39 | |
| | 03/06 | L/F | FR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 2.00 | 121.43 | |

3:06-cv-03177-JES-CHE  # 13-10  Daniels Construction Co.

** Cost Detail Report **
Job Number: 81094 GOODMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| ustomer: | Contr. Data: | Contr. Amount: .00 | Contr Billings: 388274.00 |
| ontr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Labor | | | 80.00 | 2185.80 | |
| | | | | Fringe | | | | 1588.60 | |
| | | | | Period 03/06 Total | | | 80.00 | 3774.40 | |
| 04/06 MAT | AP PJ-151-041006 | 6195 FASTENAL COMPANY | 03/21/06 | 96805 | .00 | 29.52 | |
| 04/06 L/F | PR DJ-768-040606 | 2065 ABE M AYOUB | 04/06/06 | PAYROLL | 3.00 | 127.42 | |
| 04/06 L/F | PR DJ-768-040606 | 2065 ABE M AYOUB | 04/06/06 | PAYROLL | 1.00 | 42.48 | |
| 04/06 L/F | PR DJ-768-040606 | 2348 ROBERT W KENAL | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| 04/06 L/F | PR DJ-768-040606 | 2348 ROBERT W KENAL | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| 04/06 L/F | PR DJ-768-040606 | 2800 LEON TABER SR. | 04/06/06 | PAYROLL | 3.00 | 120.79 | |
| 04/06 L/F | PR DJ-768-040606 | 2800 LEON TABER SR. | 04/06/06 | PAYROLL | 1.00 | 40.26 | |
| 04/06 L/F | PR DJ-768-040606 | 2805 BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| 04/06 L/F | PR DJ-769-040706 | 2065 ABE M AYOUB | 04/07/06 | PAYROLL | 1.50 | 63.74 | |
| 04/06 L/F | PR DJ-769-041306 | 1065 HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 137.56 | |
| 04/06 L/F | PR DJ-769-041306 | 2348 ROBERT W KENAL | 04/13/06 | PAYROLL | 2.00 | 111.61 | |
| 04/06 L/F | PR DJ-769-041306 | 2401 DENNIS E FARLEY JR. | 04/13/06 | PAYROLL | 2.00 | 108.66 | |
| 04/06 L/F | PR DJ-769-041306 | 2800 LEON TABER SR. | 04/13/06 | PAYROLL | 3.00 | 120.79 | |
| 04/06 L/F | PR DJ-769-041306 | 2800 LEON TABER SR. | 04/13/06 | PAYROLL | 2.00 | 105.02 | |
| 04/06 L/F | PR DJ-769-041306 | 2805 BILL TAYLOR | 04/13/06 | PAYROLL | 2.00 | 111.65 | |
| 04/06 L/F | PR DJ-769-041306 | 3105 GREGORY J GIDDINGS | 04/13/06 | PAYROLL | 2.00 | 118.62 | |
| | | | | Labor | | | 32.50 | 901.58 | |
| | | | | Fringe | | | | 646.78 | |
| | | | | Material | | | | 29.52 | |
| | | | | Period 04/06 Total | | | 32.50 | 1577.88 | |
| 06/06 LAB | GL JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00- | |
| 06/06 FRG | GL JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1286.00- | |
| 06/06 MAT | GL JE-024-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00-JEA | |
| 06/06 MAT | GL JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 | |
| | | | | Labor | | | .00 | 1776.00- | |
| | | | | Fringe | | | | 1286.00- | |
| | | | | Period 06/06 Total | | | .00 | 3062.00- | |
| | | | | Task Code 2- 2130 Total | | | 112.50 | 2290.28 | |

Pr: 06/27/06  On: 06/27/06  (JC.8)  # 13-10    Page 16 of 37    Time: 13:27  Page: 16

Jones-Blythe Construction Co.

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| istomer: | Contr. Date: | Contr Amount: |
| mtr No: | Est. Compl.: | Changeorders: |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: |

Contr Billings: 388274.00
T & M Billings: .00
Total Billed : 388274.00
Retainage Amt.: .00

---

| Task Code | Prd. Type | Source Code | I.D.# Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|
| 2- 2140 DEMO STUDS & DRYWALL | | | | | | | | |
| | 03/06 L/F | PR DJ-766-033006 | 2065 ABE M AYOUB | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 L/F | PR DJ-766-033006 | 2065 ABE M AYOUB | 03/30/06 | PAYROLL | 4.00 | 169.87 | |
| | 03/06 L/F | PR DJ-766-033006 | 2348 ROBERT W KENAL | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| | 03/06 L/F | PR DJ-766-033006 | 2348 ROBERT W KENAL | 03/30/06 | PAYROLL | 4.00 | 169.87 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 LEON TABER SR. | 03/30/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 LEON TABER SR. | 03/30/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | Labor | 34.00 | 774.18 | |
| | | | | | Fringe | | 643.31 | |
| | | | | Period 03/06 Total | | 34.00 | 1417.49 | |
| | 05/06 MAT | AP PJ-161-051006 | 6195 FASTENAL COMPANY | 04/25/06 | 98392 | .00 | 85.99 | |
| | 05/06 L/F | PR DJ-773-050406 | 1065 HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 L/F | PR DJ-773-050406 | 2800 LEON TABER SR. | 05/04/06 | PAYROLL | 5.00 | 209.31 | |
| | | | | | Labor | 6.00 | 147.35 | |
| | | | | | Fringe | | 111.80 | |
| | | | | | Material | | 85.99 | |
| | | | | Period 05/06 Total | | 6.00 | 345.14 | |
| | | | | Task Code 2- 2140 Total | | 40.00 | 1762.63 | |
| 2- 2200 GENERAL DEMO | | | | | | | | |
| | 03/06 MAT | AP PJ-147-033106 | 6195 FASTENAL COMPANY | 03/16/06 | 96613 | .00 | 288.08 | |
| | 03/06 MAT | AP PJ-140-032306 | L2200 HAROLD CANTRALL | 03/20/06 | RURAL KING | .00 | 80.03 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 HARVEY A HAMILTON | 03/23/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 HARVEY A HAMILTON | 03/23/06 | PAYROLL | 2.00 | 95.59 | |
| | 03/06 L/F | PR DJ-764-032306 | 1065 HARVEY A HAMILTON | 03/23/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 L/F | PR DJ-764-032306 | 2065 ABE M AYOUB | 03/23/06 | PAYROLL | 8.00 | 339.78 | |
| | 03/06 L/F | PR DJ-764-032306 | 2065 ABE M AYOUB | 03/23/06 | PAYROLL | 8.00 | 339.76 | |
| | 03/06 L/F | PR DJ-764-032306 | 2200 HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 322.10 | |
| | 03/06 L/F | PR DJ-764-032306 | 2200 HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 322.10 | |
| | 03/06 L/F | PR DJ-764-032306 | 2348 ROBERT W KENAL | 03/23/06 | PAYROLL | 5.00 | 212.35 | |
| | 03/06 L/F | PR DJ-764-032306 | 2348 ROBERT W KENAL | 03/23/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 L/F | PR DJ-764-032306 | 2348 ROBERT W KENAL | 03/23/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 L/F | PR DJ-764-032306 | 2800 LEON TABER SR. | 03/23/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 L/F | PR DJ-764-032306 | 2800 LEON TABER SR. | 03/23/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 L/F | PR DJ-764-032306 | 3105 GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| | 03/06 L/F | PR DJ-764-032306 | 3105 GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| | 03/06 L/F | PR DJ-764-032306 | 340 CHARLES N BLYTHE | 03/23/06 | PAYROLL | 8.00 | 277.25 | |
| | 03/06 L/F | PR DJ-764-032306 | 340 CHARLES N BLYTHE | 03/23/06 | PAYROLL | 1.00 | 34.66 | |
| | 03/06 L/F | PR DJ-764-032306 | 5776 MARTIN B SMITH | 03/23/06 | PAYROLL | 4.00 | 201.52 | |

** Cost Detail Report **
Job Number: 51094 GOREMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| | | | | |
|---|---|---|---|---|
| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ontr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| rj Mgr : MR MARK SORENSEN | Last Actvty: 05/27/06 | Total Contr : | .00 | Total Billed : 398274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 16.00- | 644.20- | |
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 16.00 | 705.34 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 340 CHARLES N BLYTHE | 03/30/06 | PAYROLL | 3.00 | 103.97 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 340 CHARLES N BLYTHE | 03/30/06 | PAYROLL | 3.00 | 103.97 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 340 CHARLES N BLYTHE | 03/30/06 | PAYROLL | 2.00 | 69.31 | |
| | | | | | | | Labor | 116.00 | 2871.90 | |
| | | | | | | | Fringe | | 2080.82 | |
| | | | | | | | Material | | 368.11 | |
| | | | | | | | Period 03/06 Total | 116.00 | 5320.83 | |
| | 04/06 | L/F | PR | DJ-769-040706 | 2065 ABE M AYOUB | 04/07/06 | PAYROLL | 6.50 | 276.07 | |
| | | | | | | | Labor | 6.50 | 148.01 | |
| | | | | | | | Fringe | | 128.06 | |
| | | | | | | | Period 04/06 Total | 6.50 | 276.07 | |
| | | | | | | | Task Code 2- 2200 Total | 122.50 | 5596.90 | |

2- 2230 BRACE FRONT WALL

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR | DJ-766-033006 | 1008 DAN E BECKER | 03/30/06 | PAYROLL | 4.00 | 177.37 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 1065 HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 1950 STEVEN W WELLS | 03/30/06 | PAYROLL | 4.00 | 186.86 | |
| | | | | | | | Labor | 11.00 | 276.68 | |
| | | | | | | | Fringe | | 230.92 | |
| | | | | | | | Period 03/06 Total | 11.00 | 507.60 | |
| | 04/06 | MAT | AP | DJ-154-042106 | 6195 FASTENAL COMPANY | 03/28/06 | 97073 | .00 | 7.80 | |
| | | | | | | | Material | | 7.80 | |
| | | | | | | | Period 04/06 Total | .00 | 7.80 | |
| | | | | | | | Task Code 2- 2230 Total | 11.00 | 515.40 | |

2- 2240 SHORE JOISTS BBB

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR | DJ-766-033006 | 1008 DAN E BECKER | 03/30/06 | PAYROLL | 8.00 | 354.75 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 1065 HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| | 03/06 | L/F | PR | DJ-766-033006 | 1950 STEVEN W WELLS | 03/30/06 | PAYROLL | 8.00 | 373.73 | |
| | | | | | | | Labor | 19.00 | 472.36 | |
| | | | | | | | Fringe | | 399.49 | |
| | | | | | | | Period 03/06 Total | 19.00 | 871.85 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 6888 GOEDECKE COMPANY | 03/31/06 | Z29369 | .00 | 1105.00 | |
| | 04/06 | L/F | PR | DJ-768-040606 | 1008 DAN E BECKER | 04/06/06 | PAYROLL | 8.00 | 354.75 | |
| | 04/06 | L/F | PR | DJ-768-040606 | 1008 DAN E BECKER | 04/06/06 | PAYROLL | 8.00 | 354.75 | |

** Cost Detail Report **
Job Number: 51094 SORENSON REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|
| antr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| rj Mgr : MR MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : | 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 3.00 | 133.03 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 5.00 | 221.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 3.00 | 140.15 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 5.00 | 233.59 | |
| | 04/06 | L/F | PR DJ-769-041106 | 1008 | DAN E BECKER | 04/11/06 | PAYROLL | 5.50 | 243.90 | |
| | 04/06 | L/F | PR DJ-769-041106 | 1950 | STEVEN W WELLS | 04/11/06 | PAYROLL | 5.50 | 256.95 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 98.00 | 2435.54 | |
| | | | | | | | Fringe | | 1994.60 | |
| | | | | | | | Material | | 1105.00 | |
| | | | | | | Period 04/06 Total | | 98.00 | 5535.14 | |
| | | | | | | | | | | |
| | 05/06 | MAT | AP PJ-179-052206 | 6888 | GOEDECKE COMPANY | 04/27/06 | E31089 | .00 | 227.57 | |
| | | | | | | | Material | | | 227.57 | |
| | | | | | | Period 05/06 Total | | .00 | 227.57 | |
| | | | | | | Task Code 2- 2240 Total | | 117.00 | 6634.56 | |

2-  2242 DEMO BRG WALL TOP

| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2200 | HAROLD CANTRALL JR. | 04/13/06 | PAYROLL | 4.00 | 176.33 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 1.50 | 63.74 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 5.00 | 212.35 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2404 | JAMES H FARLEY | 04/13/06 | PAYROLL | 4.00 | 161.04 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 5.00 | 201.31 | |

## Cost Detail Report
Job Number: 51094 BOORDWARE REPAIR
From 01/01/2002 Thru 06/30/2006
Open Jobs Only

Customer:
Contr No:
Pj Mgr : MS MARK SCHENSEN
Job Type: TM T/M FOR SMALL JOBS

| | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|
| | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| | Last Actvty: 06/27/06 | | Total Contr: | .00 | Total Billed : | 388274.00 |
| | Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-770-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.77 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 6.00 | 241.57 | |
| | | | | | | | Labor | 76.50 | 1800.44 | |
| | | | | | | | Fringe | | 1445.14 | |
| | | | | | | Period 04/06 Total | | 76.50 | 3245.58 | |
| | | | | | | Task Code 2- 2242 Total | | 76.50 | 3245.58 | |

2- 2243 EXP JNT

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 7.00 | 172.08 | |
| | | | | | | | Fringe | | 132.33 | |
| | | | | | | Period 04/06 Total | | 7.00 | 304.41 | |
| | | | | | | Task Code 2- 2243 Total | | 7.00 | 304.41 | |

2- 2244 DEMO STUDS & DW @ BBB

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 6.50 | 276.08 | |
| | | | | | | | Labor | 6.50 | 148.01 | |
| | | | | | | | Fringe | | 128.07 | |
| | | | | | | Period 04/06 Total | | 6.50 | 276.08 | |
| | | | | | | Task Code 2- 2244 Total | | 6.50 | 276.08 | |

3- 3100 PATCH FLOOR

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | MAT | AP PJ-151-041006 | 11648 | NELCH CONCRETE | 03/31/06 | 50810 | .00 | 170.25 | |
| | | | | | | | Material | | 170.25 | |
| | | | | | | Period 04/06 Total | | .00 | 170.25 | |
| | 06/06 | L/F | PR DJ-781-062206 | 4095 | JOHN E WEISS | 06/22/06 | PAYROLL | 1.50 | 64.66 | |
| | 06/06 | L/F | PR DJ-781-062206 | 4095 | JOHN E WEISS | 06/22/06 | PAYROLL | 8.00 | 344.75 | |
| | 06/06 | L/F | PR DJ-782-052606 | 4095 | JOHN E WEISS | 06/26/06 | PAYROLL | 4.00 | 172.37 | |
| | 06/06 | LAB | GL JE-026-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 466.00- | |
| | 06/06 | FRG | GL JE-026-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 377.00- | |
| | 06/06 | MAT | GL JE-024-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 466.00-JEA | |
| | 06/06 | MAT | GL JE-026-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 466.00 | |
| | | | | | | | Labor | 13.50 | 144.70- | |
| | | | | | | | Fringe | | 116.52- | |
| | | | | | | Period 05/06 Total | | 13.50 | 261.22- | |
| | | | | | | Task Code 3- 3100 Total | | 13.50 | 90.97- | |

** Cost Detail Report **
Job Number: 51054 GOODMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| | | | | |
|---|---|---|---|---|
| stomer: | Contr. Data: | Contr Amount: | .00 | Contr Billings:  388274.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings:  .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed :  388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.:  .00 |

| Task-Code | Prd. | Type | Source-Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 3- 3500 DOWELS | | | | | | | | | | |
| | 04/06 | MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/31/06 | 97272 | .00 | 186.16 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 1.00 | 47.79 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 2.00 | 83.07 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| | 04/06 | L/F | PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 5.00 | 247.09 | |
| | | | | | | | Labor | 11.00 | 273.35 | |
| | | | | | | | Fringe | | 232.01 | |
| | | | | | | | Material | | 186.16 | |
| | | | | | | Period 04/06 Total | | 11.00 | 691.52 | |
| | 05/06 | MAT | AP PJ-165-051106 | 10090 | MATHIS-KELLEY CONSTRUCT | 04/03/06 | 393360 | .00 | 70.72 | |
| | | | | | | | Material | | 70.72 | |
| | | | | | | Period 05/06 Total | | .00 | 70.72 | |
| | | | | | | Task Code 3- 3500 Total | | 11.00 | 762.24 | |
| 4- 4100 GROUT WALL TOP | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 1.00 | 68.74 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 4.00 | 161.04 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 1.00 | 52.48 | |
| | 04/06 | L/F | PR DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 1.00 | 47.87 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 1.00 | 47.22 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 1.00 | 47.22 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 2.00 | 114.03 | |
| | | | | | | | Labor | 13.00 | 359.54 | |
| | | | | | | | Fringe | | 274.64 | |
| | | | | | | Period 04/06 Total | | 13.00 | 634.18 | |
| | | | | | | Task Code 4- 4100 Total | | 13.00 | 634.18 | |
| 4- 4200 PATCH WALL TOP | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 2.00 | 88.16 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2348 | ROBERT W KENAL | 04/28/06 | PAYROLL | 8.00 | 339.77 | |
| | | | | | | | Labor | 10.00 | 233.70 | |
| | | | | | | | Fringe | | 194.23 | |
| | | | | | | Period 04/06 Total | | 10.00 | 427.93 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11648 | NELCS CONCRETE | 04/30/06 | 51599 | .00 | 181.84 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 2.00 | 88.35 | |

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2008  Thru: 06/30/2006
Open Jobs Only

| | | | | |
|---|---|---|---|---|
| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: .00 |

| | | | | | --Transaction-- | Hours/ | Transaction | |
|---|---|---|---|---|---|---|---|---|
| ask Code | Prd | Type | Source Code | I.D.# | Name/Description | Date | Reference | Quantity | Amount | Description |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | 3.00 | 75.74 | |
| | | | | | | Fringe | | 62.45 | |
| | | | | | | Material | | 181.84 | |
| | | | | | Period 05/06 Total | | 3.00 | 320.03 | |
| | | | | Task Code 4- 4200 Total | | | 13.00 | 747.96 | |

5- 5100 BAR JOISTS

| Task | Prd | Type | Source Code | I.D.# | Name/Description | Date | Reference | Qty | Amount |
|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 3.00 | 133.03 |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 1.00 | 47.79 |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.36 |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 3.00 | 140.16 |
| | 04/06 | L/F | PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 2.00 | 98.83 |
| | 04/06 | MAT | AP BJ-154-042106 | 226 | LINDE GAS LLC | 04/10/06 | 9305783967 | .00 | 81.73 |
| | 04/06 | MAT | AP BJ-156-042206 | 6195 | FASTENAL COMPANY | 04/12/06 | 97762 | .00 | 643.16 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 3.00 | 143.37 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 |
| | 04/06 | L/F | PR DJ-769-041306 | 5176 | EARNEST D CUMMINGS | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5176 | EARNEST D CUMMINGS | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5489 | ERICK B PAYNE | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5489 | ERICK B PAYNE | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.80 |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.80 |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.82 |
| | 04/06 | L/F | PR DJ-769-041306 | 5644 | MARK A PICKFORD, SR | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5644 | MARK A PICKFORD, SR | 04/13/06 | PAYROLL | 8.00 | 377.81 |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 1.00 | 49.43 |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 8.00 | 395.34 |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 7.00 | 345.92 |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 8.00 | 395.31 |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 6.00 | 286.75 |

**Cost Detail Report**
Job Number: 51094 GOODMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| Customer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| Contr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| PJ Mgr : MS MARK SORENSEN | | Last Activy: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR | DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 6.00 | 286.75 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 8.00 | 382.33 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 8.00 | 383.23 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 8.00 | 383.23 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 7.00 | 335.32 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 7.00 | 330.58 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 7.00 | 330.58 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 7.00 | 345.92 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR | DJ-771-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-771-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-771-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-771-042106 | 5176 | EARNEST D CUMMINGS | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR | DJ-771-042106 | 5489 | ERICK B PAYNE | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR | DJ-771-042106 | 5630 | WILLIAM G MCKEE | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.00 | 236.13 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 377.81 | |

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| uxtomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| ontr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| oj Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO:s: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | .50 | 30.77 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 5.00 | 245.59 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 392.94 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 392.94 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | .50 | 32.11 | |
| | 04/06 | L/F | PR | DJ-772-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.50 | 259.76 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 5776 MARTIN B SMITH | 04/28/06 | PAYROLL | 5.50 | 259.03 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 5776 MARTIN B SMITH | 04/28/06 | PAYROLL | 6.00 | 282.56 | |
| | | | | | | | Labor | 491.50 | 12385.42 | |
| | | | | | | | Fringe | | 11068.67 | |
| | | | | | | | Material | | 724.89 | |
| | | | | | | Period 04/06 Total | | 491.50 | 24178.98 | |
| | | | | | | | | | | |
| | 05/06 | MAT | AP | PJ-161-051006 | 6195 FASTENAL COMPANY | 04/17/06 | 98030 | .00 | 22.31 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 6195 FASTENAL COMPANY | 04/19/06 | 98174 | .00 | 227.88 | |
| | | | | | | | Material | | 250.19 | |
| | | | | | | Period 05/06 Total | | .00 | 250.19 | |
| | | | | | | | | | | |
| | 06/06 | LAB | GL | JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00- | |
| | 06/06 | FRG | GL | JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 10917.00- | |
| | 06/06 | MAT | GL | JE-024-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00-JEA | |
| | 06/06 | MAT | GL | JE-026-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | |
| | | | | | | | Labor | .00 | 12215.00- | |
| | | | | | | | Fringe | | 10917.00- | |
| | | | | | | Period 06/06 Total | | .00 | 23132.00- | |
| | | | | | | Task Code 5- 5100 Total | | 491.50 | 1297.17 | |
| 5- 5100 WOOD BLOCKING | | | | | | | | | | |
| | 04/06 | L/F | PR | DJ-771-042706 | 1065 HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 2200 HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.68 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 5.00 | 245.59 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1065 HARVEY A HAMILTON | 04/28/06 | PAYROLL | 5.00 | 238.95 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2200 HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 5.00 | 220.42 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2800 LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | | | Labor | 33.00 | 862.05 | |
| | | | | | | | Fringe | | 658.43 | |
| | | | | | | Period 04/06 Total | | 33.00 | 1520.48 | |
| | | | | | | | | | | |
| | 06/06 | MAT | AP | PJ-204-061506 | 4475 CONTRACTOR'S LUMBER CIT | 05/25/06 | 182806 | .00 | 27.58 | |

** Cost Detail Report **
Job Number: 51094 CORDEANS REPAIR
From : 01/01/2003 Thru: 06/30/2006
** Open Jobs Only

| | | |
|---|---|---|
| ustomer: | | |
| ontr No: | | |

Contr. Date:        Contr Amount:        .00        Contr Billings: 388274.00
Est. Compl.:        Chargeorders:        .00        T & M Billings:        .00
TJ Mgr : MR MARK SORENSEN        Last Actvty: 06/27/06        Total Contr :        .00        Total Billed : 388274.00
ob Type: TM T/M FOR SMALL JOBS        Last Billed: 05/25/06        Pending CO'S:        .00        Retainage Amt.:        .00

| Task-Code | Prd. | Type | Source-Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Material | | 27.58 | |
| | | | | | | Period 06/06 Total | | .00 | 27.58 | |
| | | | | | | Task Code 6- | 6100 Total | 33.00 | 1548.06 | |

6-  6200 SHELVES & SIDE

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 1.00 | 44.08 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 3.00 | 132.25 | |
| | | | | | | | Labor | 4.00 | 103.08 | |
| | | | | | | | Fringe | | 73.25 | |
| | | | | | | Period 04/06 Total | | 4.00 | 176.33 | |
| | 05/06 | L/F | PR DJ-776-052506 | 1908 | DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-776-052506 | 1908 | DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1065 | HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 98.70 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1065 | HARVEY A HAMILTON | 05/31/06 | PAYROLL | 1.50 | 74.77 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1903 | VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1903 | VERN G VLACH | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1903 | VERN G VLACH | 05/31/06 | PAYROLL | 5.00 | 245.18 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2880 | LEON TABER SR. | 05/31/06 | PAYROLL | 1.00 | 41.86 | |
| | | | | | | | Labor | 65.50 | 1703.34 | |
| | | | | | | | Fringe | | 1500.72 | |
| | | | | | | Period 05/06 Total | | 65.50 | 3204.06 | |
| | 06/06 | MAT | AP PJ-204-061506 | 4475 | CONTRACTOR'S LUMBER CIT | 05/09/06 | 182334 | .00 | 20.36 | |
| | 06/06 | MAT | AP PJ-198-060806 | L340 | CHAS BLYTHE | 06/07/06 | 6/7 BIG R | .00 | 92.63 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 3.00 | 149.54 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 8.00 | 392.27 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 5.00 | 245.18 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 5.00 | 245.18 | |

** Cost Detail Report **
Job Number: 51094 BORDMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| Customer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| Contr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| PM Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 8.00 | 392.26 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 1.00 | 45.68 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 1.00 | 45.68 | |
| | 06/06 | L/F | PR DJ-780-060906 | 1903 | VERN G VLACH | 06/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 06/06 | L/F | PR DJ-780-060906 | 1903 | VERN G VLACH | 06/09/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1045 | JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 4.00 | 200.09 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1800 | PATRICK A RYAN | 06/15/06 | PAYROLL | 4.00 | 196.27 | |
| | 06/06 | L/F | PR DJ-782-062606 | 1065 | HARVEY A HAMILTON | 06/26/06 | PAYROLL | 7.00 | 348.91 | |
| | 06/06 | L/F | PR DJ-782-062606 | 1065 | HARVEY A HAMILTON | 06/26/06 | PAYROLL | 5.50 | 274.15 | |
| | | | | | | | Labor | 74.50 | 1996.15 | |
| | | | | | | | Fringe | | 1671.72 | |
| | | | | | | | Material | | 112.99 | |
| | | | | | | Period 06/06 Total | | 74.50 | 3780.86 | |
| | | | | | | Task Code 6- 6200 Total | | 144.00 | 7161.25 | |

6-  6300 ROOF BLOCKING

| | 05/06 | MAT | AP PJ-154-051106 | 4475 | CONTRACTOR'S LUMBER CIT | 04/30/06 | 4/06 2810 | .00 | 383.37 181945 |
|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | MAT | AP PJ-164-051106 | 4475 | CONTRACTOR'S LUMBER CIT | 04/30/06 | 4/06 2810 | .00 | 116.37 181407 |
| | | | | | | | Material | | 499.74 |
| | | | | | | Period 05/06 Total | | .00 | 499.74 |
| | | | | | | Task Code 6- 6300 Total | | .00 | 499.74 |

6-  6400 VALANCE

| | 05/06 | MAT | AP PJ-179-052206 | 8702 | JAMES MACHINERY, INC. | 05/17/06 | 272512 | .00 | 66.73 |
|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 3.00 | 149.54 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.84 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 3.00 | 147.11 |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 8.00 | 392.27 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.35 |
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 |
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 |

Date: 06/27/06  06/27/06  (JC.8)  Johnson Construction Co.

** Cost Detail Report **
Job Number: 51094 GOODMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| Customer: | | Contr. Date: | | Contr. Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| Contr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code Prd. Type Source Code I.D.# Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|
| 05/06 L/F PR DJ-776-052506 1903 VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 L/F PR DJ-776-052506 1903 VERN G VLACH | 05/25/06 | PAYROLL | 6.00 | 294.21 | |
| 05/06 L/F PR DJ-777-053106 1903 VERN G VLACH | 05/31/06 | PAYROLL | 2.00 | 98.07 | |
| 05/06 L/F PR DJ-777-053106 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | | Labor | 92.00 | 2480.48 | |
| | | Fringe | | 2049.52 | |
| | | Material | | 66.73 | |
| | Period 05/06 Total | | 92.00 | 4596.73 | |
| | | | | | |
| 06/06 MAT AP PJ-200-061206 6195 FASTENAL COMPANY | 05/19/06 | 99674 | .00 | 27.86 | |
| 06/06 MAT AP PJ-200-061206 8702 JAMES MACHINERY, INC. | 05/25/06 | 272745 | .00 | 10.88 | |
| 06/06 MAT AP PJ-200-061206 12540 PAWNEE LUMBER & HARDWAR | 05/12/06 | 214638 | .00 | 595.64 | |
| 06/06 MAT AP PJ-200-061206 12540 PAWNEE LUMBER & HARDWAR | 05/18/06 | 216331 | .00 | 300.48 | |
| 06/06 MAT AP PJ-204-061506 4475 CONTRACTOR'S LUMBER CIT | 05/23/06 | 182708 | .00 | 156.88 | |
| | | Material | | 1091.74 | |
| | Period 06/06 Total | | .00 | 1091.74 | |
| | Task Code 6- 6400 Total | | 92.00 | 5688.47 | |

5-  6500 LAMLINE

| | Date | Reference | Hours/Quantity | Amount | |
|---|---|---|---|---|---|
| 05/06 L/F PR DJ-776-052506 1903 VERN G VLACH | 05/25/06 | PAYROLL | 2.00 | 98.09 | |
| 05/06 L/F PR DJ-777-053106 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 3.00 | 149.54 | |
| 05/06 L/F PR DJ-777-053106 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 99.70 | |
| 05/06 L/F PR DJ-777-053106 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 99.70 | |
| 05/06 L/F PR DJ-777-053106 1903 VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| 05/06 L/F PR DJ-777-053106 1903 VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| 05/06 L/F PR DJ-777-053106 1903 VERN G VLACH | 05/31/06 | PAYROLL | 5.00 | 245.18 | |
| 05/06 L/F PR DJ-777-053106 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| 05/06 L/F PR DJ-777-053106 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| 05/06 L/F PR DJ-777-053106 2800 LEON TABER SR. | 05/31/06 | PAYROLL | 2.00 | 83.72 | |
| | | Labor | 24.00 | 634.31 | |
| | | Fringe | | 527.20 | |
| | Period 05/06 Total | | 24.00 | 1161.51 | |
| | | | | | |
| 06/06 MAT AP PJ-200-061206 6022 EPS SPECIALTIES LTD INC | 05/31/06 | 5877 | .00 | 2034.40 | |
| 06/06 MAT AP PJ-209-062206 6022 EPS SPECIALTIES LTD INC | 05/15/06 | 5856 | .00 | 85.00 | |
| 06/06 L/F PR DJ-779-060806 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| 06/06 L/F PR DJ-779-060806 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| 06/06 L/F PR DJ-779-060806 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| 06/06 L/F PR DJ-779-060806 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |

Jones-Blythe Construction Co.

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002  Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Date: | Contr. Amount: .00 | Contr. Billings: 388274.00 |
| ontr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | V.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | 9.00 | 239.46 | |
| | | | | | | Fringe | | 204.29 | |
| | | | | | | Material | | 2119.40 | |
| | | | | | Period 06/06 Total | | 9.00 | 2563.15 | |
| | | | | | Task Code 6- 6500 Total | | 33.00 | 3724.66 | |
| 6- 6600 DOOR TRIM | | | | | | | | | |
| | 05/06 L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 | |
| | 05/06 L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-777-053106 | 1065 | HARVEY A HAMILTON | 05/31/06 | PAYROLL | 5.00 | 249.22 | |
| | 05/06 L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | | | | | | Labor | 22.00 | 614.87 | |
| | | | | | | Fringe | | 477.53 | |
| | | | | | Period 05/06 Total | | 22.00 | 1092.40 | |
| | 06/06 L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 2.00 | 98.07 | |
| | | | | | | Labor | 2.00 | 51.82 | |
| | | | | | | Fringe | | 46.25 | |
| | | | | | Period 06/06 Total | | 2.00 | 98.07 | |
| | | | | | Task Code 6- 6600 Total | | 24.00 | 1190.47 | |
| 6- 6700 CORNER GUARDS | | | | | | | | | |
| | 06/06 L/F | PR DJ-782-062606 | 1065 | HARVEY A HAMILTON | 06/26/06 | PAYROLL | 8.00 | 398.75 | |
| | | | | | | Labor | 8.00 | 224.00 | |
| | | | | | | Fringe | | 174.75 | |
| | | | | | Period 06/06 Total | | 8.00 | 398.75 | |
| | | | | | Task Code 6- 6700 Total | | 8.00 | 398.75 | |
| 9- 5100 MTL STUDS | | | | | | | | | |
| | 04/06 L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.34 | |
| | 04/06 L/F | PR DJ-771-042706 | 1894 | MIKE G SPRINKEL | 04/27/06 | PAYROLL | 8.00 | 233.59 | |
| | 04/06 L/F | PR DJ-771-042706 | 1894 | MIKE G SPRINKEL | 04/27/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 L/F | PR DJ-771-042706 | 1903 | VERN G VLACH | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 L/F | PR DJ-772-042806 | 1065 | HARVEY A HAMILTON | 04/28/06 | PAYROLL | 1.00 | 47.79 | |
| | 04/06 L/F | PR DJ-772-042806 | 1894 | MIKE G SPRINKEL | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 L/F | PR DJ-772-042806 | 1894 | MIKE G SPRINKEL | 04/28/06 | PAYROLL | 8.00 | 373.72 | |
| | 04/06 L/F | PR DJ-772-042806 | 1903 | VERN G VLACH | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 L/F | PR DJ-772-042806 | 1903 | VERN G VLACH | 04/28/06 | PAYROLL | 8.00 | 373.72 | |

Jones-Blythe Construction Co.

** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| Customer : | Contr. Date: | Contr. Amount : .00 | Contr. Billings: 388274.00 |
| Contr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Date | --Transaction-- Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | | | Labor | 74.00 | 1812.62 | |
| | | | | | | | Fringe | | 1576.62 | |
| | | | | | | | Period 04/06 Total | 74.00 | 3389.24 | |
| | | | | | | | | | | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/28/06 | 98595 | .00 | 19.14 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/25/06 | 2094741-00 | .00 | 948.16 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/27/06 | 2094842-00 | .00 | 1216.35 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/03/06 | 2095079-00 | .00 | 30.76 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACH | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/08/06 | 2095226-00 | .00 | 40.59 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | | | | | | | Labor | 40.00 | 1036.40 | |
| | | | | | | | Fringe | | 924.98 | |
| | | | | | | | Material | | 2255.00 | |
| | | | | | | | Period 05/06 Total | 40.00 | 4216.38 | |
| | | | | | | | | | | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 6.50 | 323.99 | |
| | 06/06 | L/F | PR DJ-781-061606 | 1903 | VERN G VLACH | 06/16/06 | PAYROLL | 8.00 | 392.28 | |
| | 06/06 | MAT | GL JE-025-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 3880.19 | JEA |
| | | | | | | | Labor | 14.50 | 389.28 | |
| | | | | | | | Fringe | | 326.99 | |
| | | | | | | | Material | | 3880.19 | |
| | | | | | | | Period 06/06 Total | 14.50 | 4596.46 | |
| | | | | | | | Task Code 9- 9100 Total | 128.50 | 12202.08 | |

9- 9200 DRYWALL

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Date | --Transaction-- Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-771-042706 | 1181 | MARK W LAKE | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1194 | JAMIAN L MCCARTY | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.09 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1065 | HARVEY A HAMILTON | 04/28/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1181 | MARK W LAKE | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1181 | MARK W LAKE | 04/28/06 | PAYROLL | 8.00 | 373.72 | |

Jones-Blythe Construction Co.

\*\* Cost Detail Report \*\*
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| stomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| j Mgr: MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR | DJ-772-042806 | 1194 JAMIAN L MCCARTY | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1194 JAMIAN L MCCARTY | 04/28/06 | PAYROLL | 8.00 | 373.72 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2800 LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2800 LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | | | Labor | 62.00 | 1501.32 | |
| | | | | | | | Fringe | | 1319.77 | |
| | | | | | | Period 04/06 Total | | 62.00 | 2821.09 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 04/24/06 | 2094698-00 | .00 | 1775.57 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 04/25/06 | 2094700-00 | .00 | 5208.80 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 04/27/06 | 2094812-00 | .00 | 426.36 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 04/28/06 | 2094860-00 | .00 | 536.00 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 04/28/06 | 2094885-00 | .00 | 430.31 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 11547 NEGWER MATERIALS, INC. | 05/01/06 | 2094958-00 | .00 | 92.97 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1065 HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1065 HARVEY A HAMILTON | 05/04/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1065 HARVEY A HAMILTON | 05/04/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1115 DAVID L NESBITT | 05/04/06 | PAYROLL | 1.00 | 49.04 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1115 DAVID L NESBITT | 05/04/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1115 DAVID L NESBITT | 05/04/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1181 MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1181 MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1181 MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1194 JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1194 JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1194 JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1866 BRUCE E SMITH | 05/04/06 | PAYROLL | 1.00 | 49.04 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 1866 BRUCE E SMITH | 05/04/06 | PAYROLL | 7.00 | 343.24 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2200 HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2200 HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | MAT | AP | PJ-165-051106 | 11547 NEGWER MATERIALS, INC. | 05/04/06 | 2095143-00 | .00 | 114.33 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1115 DAVID L NESBITT | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1181 MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1181 MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1194 JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1194 JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1866 BRUCE E SMITH | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR | DJ-774-050906 | 1894 MIKE G SPRINKEL | 05/09/06 | PAYROLL | 2.00 | 98.08 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1065 HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.71 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1903 VERN G VLACH | 05/11/06 | PAYROLL | 2.00 | 98.07 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 SORENSEN REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| ustomer: | | Contr. Date: | | Contr. Amount: | .00 | Contr Billings: | 388274.00 |
| mtr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| 5 Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed  : | 388274.00 |
| b Type: TM E/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | --Transaction-- Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | 123.00 | 2210.71 | |
| | | | | | | Fringe | | 2818.59 | |
| | | | | | | Material | | 8584.34 | |
| | | | | | Period 05/06 Total | | 123.00 | 14613.64 | |
| | 06/06 MAT | AP EJ-200-061206 | 11547 | NEGWER MATERIALS, INC. | 05/25/06 | 2095795-00 | .00 | 93.66 | |
| | 06/06 MAT | GL JE-025-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2600.00-JEA | |
| | | | | | | Material | | 2506.34- | |
| | | | | | Period 06/06 Total | | .00 | 2506.34- | |
| | | | | | Task Code 9- | 9200 Total | 185.00 | 14928.39 | |
| 9- 9300 INSULATION | | | | | | | | | |
| | 05/06 MAT | AP EJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/24/06 | 2094698-00 | .00 | 522.50 | |
| | 05/06 MAT | AP EJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/28/06 | 2094860-00 | .00 | 270.31 | |
| | 05/06 L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 5.00 | 245.17 | |
| | 05/06 L/F | PR DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 1.00 | 49.03 | |
| | | | | | | Labor | 8.00 | 207.28 | |
| | | | | | | Fringe | | 184.99 | |
| | | | | | | Material | | 792.81 | |
| | | | | | Period 05/06 Total | | 8.00 | 1185.08 | |
| | | | | | Task Code 9- | 9300 Total | 8.00 | 1185.08 | |
| 9- 9400 CEILING | | | | | | | | | |
| | 05/06 L/F | PR DJ-774-051106 | 1903 | VERN G VLACK | 05/11/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 MAT | AP EJ-179-052206 | 11547 | NEGWER MATERIALS, INC. | 05/11/06 | 2095323-00 | .00 | 227.21 | |
| | 05/06 L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 L/F | PR DJ-775-051806 | 1903 | VERN G VLACK | 05/18/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-775-051806 | 1903 | VERN G VLACK | 05/18/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 | |
| | | | | | | Labor | 15.00 | 404.24 | |
| | | | | | | Fringe | | 333.59 | |
| | | | | | | Material | | 227.21 | |
| | | | | | Period 05/06 Total | | 15.00 | 965.04 | |
| | | | | | Task Code 9- | 9400 Total | 15.00 | 965.04 | |

Jones Blythe Construction Co.
** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | | |
|---|---|---|---|---|
| stomer: | Contr Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MR MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 9- | 1 | SPRINGFIELD OVERHEAD DOOR | | | | | | | | |
| | 06/06 | SUB | AP PJ-209-062206 | 15299 | SPRINGFIELD OVERHEAD DO | 06/02/06 | 92568 | .08 | 957.00 | |
| | | | | | Subcontr | | | | 957.00 | |
| | | | | | Period 06/06 Total | | | .00 | 957.00 | |
| | | | | | Task Code 709- | | 1 Total | .00 | 957.00 | |

| | | | |
|---|---|---|---|
| | Job Total | 2562.50 | 440653.98 |
| | Labor | 2562.50 | 50553.71 |
| | Fringe | | 40026.29 |
| | Material | | 36592.13 |
| | Subcontr | | 300734.46 |
| | Equipmnt | | 12747.25 |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51096 BED BATH & BEYOND
From: 01/05/2002 Thru: 06/30/2006
Open Jobs Only

| Customer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 20155.00 |
|---|---|---|---|---|---|
| Contr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : | .00 | Total Billed : | 20155.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date- | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|

1-  1000 TIME & MATERIAL

| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96576 | .00 | 256.59 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96597 | .00 | 395.14 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96638 | .00 | 178.30 | |
| | 03/06 | MAT | AP PJ-147-033106 | 14848 | SELVAGGIO STEEL, INC. | 03/16/06 | W35859 | .00 | 1475.81 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5100 | PAUL A BOOTH | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5376 | DONNIE L LUCAS | 03/17/06 | PAYROLL | 8.00 | 321.03 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5410 | CARL E FICKAS | 03/17/06 | PAYROLL | 8.00 | 294.75 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5489 | ERICK B PAYNE | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5644 | MARK A PICKFORD, SR | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5722 | ANTHONY E SCHNEIDERER J | 03/17/06 | PAYROLL | 8.00 | 268.47 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5765 | STEFFEN R SMITH | 03/17/06 | PAYROLL | 8.00 | 321.03 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5781 | ROBIN D SMITH | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5866 | BRIAN K TOMLIN | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5923 | TROY A WINBOLTZ | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5996 | TERRIE A VAN HUSS | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | MAT | AP PJ-140-032306 | 12200 | HAROLD CANTRALL | 03/17/06 | HARPER | .00 | 3.00 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96641 | .00 | 501.02 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96644 | .00 | 11.92 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96691 | .00 | 36.35 | |
| | 03/06 | MAT | AP CR-399-041406 | 4208 | CITY OF SPRINGFIELD | 03/17/06 | BBB | .00 | 25.50 | |
| | 03/06 | L/F | PR DJ-764-032006 | 5630 | WILLIAM G MCKEE | 03/20/06 | PAYROLL | 9.00 | 456.85 | |
| | 03/06 | L/F | PR DJ-765-032106 | 1894 | MIKE G SPRINKEL | 03/21/06 | PAYROLL | 17.50 | 818.54 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1027 | CURTIS A BAUMAN | 03/23/06 | PAYROLL | 4.00 | 202.04 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 6.00 | 325.20 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 8.00 | 419.62 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 3.00 | 141.62 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 2.00 | 132.93 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 10.00 | 503.28 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 8.00 | 369.50 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 2.00 | 92.38 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 3.00 | 125.94 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 342.66 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 10.00 | 422.21 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 2.00 | 79.55 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 9.00 | 391.16 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 3.00 | 125.94 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 2.00 | 79.55 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 6.00 | 298.81 | |
| | 03/06 | MAT | AP PJ-146-032906 | 4208 | CITY OF SPRINGFIELD | 03/29/06 | BB & BEYND | .00 | 84.60 | PERMIT |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51096 BED BATH & BEYOND
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| ustomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 20155.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK BOXENSEN | | Last Actvty: 06/26/06 | | Total Contr : | .00 | Total Billed : | 20155.00 |
| b Type: TM F/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt. : | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 20.00- | 844.39- | |
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 20.00 | 925.97 | |
| | | | | | | | Labor | 200.50 | 4945.20 | |
| | | | | | | | Fringe | | 4284.67 | |
| | | | | | | | Material | | 3068.23 | |
| | | | | | | Period 03/06 Total | | 200.50 | 12298.10 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 739 AMERICAN EXPRESS | 03/30/06 | 3782630799 | .00 | 484.81 MAS | |
| | 04/06 | MAT | AP | PJ-151-041006 | 8126 KUNDMAN LUMBER | 03/22/06 | 2014761 | .00 | 183.18 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 8126 KUNDMAN LUMBER | 03/22/06 | 2014763 | .00 | 604.63 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 10090 MATHIS-KELLEY CONSTRUCT | 03/16/06 | 391512 | .00 | 163.63 | |
| | 04/06 | MAT | AP | PJ-154-041006 | 6195 FASTENAL COMPANY | 04/06/06 | 97605 | .00 | 44.53 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 2800 LEON TABER SR. | 04/20/06 | PAYROLL | 8.00 | 318.15 | |
| | 04/06 | EQP | GL | JE-014-042106 | J/C JOB COBY | 04/21/06 | JRNL ENTRY | .00 | 172.00 | 2 WELDERS-1 DAY |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 373.59 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.00 | 233.49 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 388.42 | |
| | | | | | | | Labor | 29.00 | 707.51 | |
| | | | | | | | Fringe | | 606.14 | |
| | | | | | | | Material | | 1480.78 | |
| | | | | | | | Equipment | | 172.00 | |
| | | | | | | Period 04/06 Total | | 29.00 | 2966.43 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1903 VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 193.90 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 8.00 | 360.80 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.24 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.24 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 2.00 | 98.46 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1903 VERN G VLACH | 05/18/06 | PAYROLL | 6.00 | 290.83 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2200 HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 5.00 | 225.51 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2800 LEON TABER SR. | 05/18/06 | PAYROLL | 4.00 | 165.37 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2800 LEON TABER SR. | 05/18/06 | PAYROLL | 4.00 | 165.37 | |
| | | | | | | | Labor | 35.00 | 911.37 | |
| | | | | | | | Fringe | | 687.35 | |
| | | | | | | Period 05/06 Total | | 35.00 | 1598.72 | |
| | 06/06 | L/F | PR | DJ-780-060806 | 5776 MARTIN B SMITH | 06/08/06 | PAYROLL | 8.00 | 386.42 | |
| | 06/06 | L/F | PR | DJ-780-060906 | 1903 VERN G VLACH | 06/09/06 | PAYROLL | 3.00 | 145.43 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 1045 JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 2.00 | 98.82 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 1065 HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.24 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51096 BED, BATH & BEYOND
From 01/01/2002 Thru 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 20155.00 |
| ontr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MR MARK SORENSEN | Last Activy: 06/26/06 | Total Contr : .00 | Total Billed : 20155.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | L/F | PR | DJ-780-061506 | 1800 PATRICK A RYAN | 06/15/06 | PAYROLL | 2.00 | 96.92 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 2200 HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 3.00 | 135.23 | |
| | 06/06 | MAT | AP | PJ-205-062106 | 2375 PAUL BOLL PAINTING | 06/16/06 | 0004856-IN | .00 | 2897.34 | |
| | 06/06 | MAT | GL | JE-028-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2897.34- | |
| | | | | | | | Labor | 19.00 | 516.68 | |
| | | | | | | | Fringe | | 395.38 | |
| | | | | | | Period 06/06 Total | | 19.00 | 912.06 | |
| | | | | | | Task Code 1- | 1000 Total | 283.50 | 17775.31 | |

**01-    1 RM WILLEY INC**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | SUB | AP | PJ-201-061306 | 17103 RM WILLEY INC, MASONRY | 05/18/06 | 06-154-3 | .00 | 9380.00 | |
| | | | | | | | Subcontr | | 9380.00 | |
| | | | | | | Period 05/06 Total | | .00 | 9380.00 | |
| | | | | | | Task Code 701- | 1 Total | .00 | 9380.00 | |

**02-    1 FRITSCH PLASTER & DRYWALL**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | SUB | AP | PJ-201-061306 | 6545 FRITSCH PLASTER & DRYWA | 05/10/06 | 319-06 | .00 | 1388.00 | |
| | | | | | | | Subcontr | | 1388.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1388.00 | |
| | | | | | | Task Code 702- | 1 Total | .00 | 1388.00 | |

**03-    1 PATTERSON COMMERCIAL FL**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | SUB | AP | PJ-201-061306 | 12500 PATTERSON COMMERCIAL | 05/31/06 | 13689 | .00 | 1105.00 | |
| | | | | | | | Subcontr | | 1105.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1105.00 | |
| | 06/06 | SUB | GL | JE-024-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1105.00- | |
| | | | | | | | Subcontr | | 1105.00- | |
| | | | | | | Period 06/06 Total | | .00 | 1105.00- | |
| | | | | | | Task Code 703- | 1 Total | .00 | .00 | |

**04-    1 PAUL BOLL PAINT**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | SUB | GL | JE-028-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2897.34 | |
| | | | | | | | Subcontr | | 2897.34 | |
| | | | | | | Period 06/06 Total | | .00 | 2897.34 | |
| | | | | | | Task Code 704- | 1 Total | .00 | 2897.34 | |

Jones Blythe Construction Co.
** Cost Detail Report **
Job Number: 51096 RED BATH & BEYOND
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| Customer: | Contr. Date: | Contr. Amount: .00 | Contr Billings: 20155.00 |
| Cntr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| Pj Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : .00 | Total Billed : 20155.00 |
| Jb Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task-Code | Prd | Type | Source-Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Job Total | | | 283.50 | 31440.65 | |
| | | | | | Labor | | | 283.50 | 7080.76 | |
| | | | | | Fringe | | | | 5973.54 | |
| | | | | | Material | | | | 4549.01 | |
| | | | | | Subcontr | | | | 13665.34 | |
| | | | | | Equipment | | | | 172.00 | |

Jones-Blythe Construction Co.
Job Cost Detail Report
With Subtotals
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2005 Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| Cstjmer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 109158.00 |
| Cntr No: | Est. Compl: | Changeorders: .00 | T & M Billings: .00 |
| PS Mgr : MR MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| Jb Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1000 TIME & MATERIAL | | | | | | | | | | |
| | 03/06 | MAT | AP CR-393-033106 | 4208 | CITY OF SPRINGFIELD | 03/15/06 | SPORTS ATH | .00 | 188.90 | PERMIT |
| | | | | | | | Material | | 188.90 | |
| | | | | | | Period 03/06 Total | | .00 | 188.90 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2171.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | |
| | | | | | | | Labor | .00 | 2389.00 | |
| | | | | | | | Fringe | | 2171.00 | |
| | | | | | | Period 06/06 Total | | .00 | 4560.00 | |
| | | | | | | Task Code 1- 1000 Total | | .00 | 4748.90 | |
| 1- 1151 CLEANUP | | | | | | | | | | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.36 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2348 | ROBERT W KEHAL | 05/04/06 | PAYROLL | 3.00 | 132.54 | |
| | 05/06 | L/F | PR DJ-774-050406 | 2348 | ROBERT W KEHAL | 05/04/06 | PAYROLL | 2.00 | 88.35 | |
| | 05/06 | L/F | PR DJ-774-050406 | 2348 | ROBERT W KEHAL | 05/04/06 | PAYROLL | 4.00 | 176.72 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 3.00 | 125.58 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 6.00 | 251.18 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.90 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.34 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2800 | LEON TABER SR. | 05/31/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2800 | LEON TABER SR. | 05/31/06 | PAYROLL | 5.00 | 209.30 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From 01/01/2006 Thru 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| stomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 109158.00 |
| ntr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | 94.00 | 2292.91 | |
| | | | | | | Fringe | | 1728.30 | |
| | | | | | | Period 05/06 Total | 94.00 | 4021.21 | |
| | 06/06 L/F | PR DJ-780-060906 | 1903 | VERN G VLACH | 06/09/06 | PAYROLL | 2.00 | 98.06 | |
| | 06/06 L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 3.00 | 149.54 | |
| | 06/06 L/F | PR DJ-780-061506 | 2200 | HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 8.00 | 365.47 | |
| | | | | | | Labor | 13.00 | 350.78 | |
| | | | | | | Fringe | | 262.29 | |
| | | | | | | Period 06/06 Total | 13.00 | 613.07 | |
| | | | | | | Task Code 1- 1151 Total | 107.00 | 4634.28 | |
| 1- 1190 SM TOOLS | | | | | | | | | |
| | 04/06 MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/28/06 | 97118 | .00 | 49.46 | |
| | 04/06 MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/29/06 | 97136 | .00 | 113.77 | |
| | 04/06 MAT | AP VC-068-042406 | 6195 | FASTENAL COMPANY | 03/29/06 | 97136 | .00 | 113.77- | |
| | | | | | | Material | | 49.46 | |
| | | | | | | Period 04/06 Total | .00 | 49.46 | |
| | 05/06 MAT | AP PJ-161-051006 | 3560 | CAPITOL BLUEPRINT CO. | 04/25/06 | 07656 | .00 | 32.63 | |
| | | | | | | Material | | 32.63 | |
| | | | | | | Period 05/06 Total | .00 | 32.63 | |
| | 06/06 MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 57.20 | CNB |
| | 06/06 MAT | AP PJ-204-061506 | 10090 | MATHIS-KELLEY CONSTRUCT | 05/05/06 | 395148 | .00 | 81.81 | |
| | 06/06 MAT | AP PJ-205-062106 | 6195 | FASTENAL COMPANY | 06/12/06 | 101268 | .00 | 22.33 | |
| | 06/06 MAT | GL JE-023-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | MOVE G/L |
| | 06/06 MAT | GL JE-024-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2702.00 | JEA |
| | 06/06 EQP | GL JE-022-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | WAREHOUSE MATL |
| | 06/06 EQP | GL JE-023-062606 | J/C | JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50- | MOVE G/L |
| | | | | | | Material | | 3025.84 | |
| | | | | | | Period 06/06 Total | .00 | 3025.84 | |
| | | | | | | Task Code 1- 1190 Total | .00 | 3107.93 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| stomer: | | |
| ntr No: | Contr. Date: | Contr. Amount: .00 | Contr Billings: 109158.00 |
| j Mgr : MS MARK SORENSEN | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| b Type: TM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|

**1- 1195 CARRY DECK CRANE**

| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1112.00 | JEA |
| | | | | | | Material | | 1112.00 | |
| | | | | | Period 06/06 Total | | .00 | 1112.00 | |
| | | | | | Task Code 1- 1195 Total | | .00 | 1112.00 | |

**1- 1300 MISC HAULING**

| | 06/06 LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | |
| | 06/06 FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1214.00 | |
| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | JEA |
| | 06/06 MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00- | |
| | | | | | | Labor | .00 | 2961.00 | |
| | | | | | | Fringe | | 1214.00 | |
| | | | | | Period 06/06 Total | | .00 | 4175.00 | |
| | | | | | Task Code 1- 1300 Total | | .00 | 4175.00 | |

**1- 1400 DUMPSTERS**

| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 5616.00 | JEA |
| | | | | | | Material | | 5616.00 | |
| | | | | | Period 06/06 Total | | .00 | 5616.00 | |
| | | | | | Task Code 1- 1400 Total | | .00 | 5616.00 | |

**1- 1710 TEMP WALL**

| | 03/06 MAT | AP PJ-147-033106 | 11547 | NEGWER MATERIALS, INC. | 03/23/06 | 2053446-00 | .00 | 3102.08 | |
| | 03/06 L/F | PR DJ-766-032406 | 1030 | DAVID J DUERR | 03/24/06 | PAYROLL | 10.00 | 508.58 | |
| | 03/06 L/F | PR DJ-766-032406 | 1031 | WALTER W BABIAK | 03/24/06 | PAYROLL | 8.00 | 415.13 | |
| | 03/06 L/F | PR DJ-766-032406 | 1894 | MIKE G SPRINKEL | 03/24/06 | PAYROLL | 10.00 | 508.58 | |
| | 03/06 L/F | PR DJ-766-032406 | 1897 | DANIEL X STARK | 03/24/06 | PAYROLL | 10.00 | 453.99 | |
| | 03/06 L/F | PR DJ-766-032406 | 2802 | CLYDE D VEDDER | 03/24/06 | PAYROLL | 10.00 | 451.42 | |
| | 03/06 L/F | PR DJ-766-032706 | 1894 | MIKE G SPRINKEL | 03/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 03/06 MAT | AP PJ-147-033106 | 1028 | ARMBRUSTER MANUFACTURIN | 03/28/06 | Z3106 | .00 | 1012.00 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 5.00 | 221.72 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 8.00 | 354.75 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 5.00 | 221.72 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 2.00 | 127.73 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 2.00 | 127.73 | |
| | 03/06 L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 1.50 | 95.79 | |
| | 03/06 L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 8.00 | 382.32 | |
| | 03/06 L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 5.00 | 238.94 | |

Jones-Blythe Construction Co
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| Customer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|
| Contr No: | Est. Compl.: | Changeorders : | .00 | T & M Billings: | .00 |
| Prj Mgr : MS MARK BORENGEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : | 109158.00 |
| Job Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code Prd. Type Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|
| | | | Labor | | .00 | 3546.00- | |
| | | | Fringe | | | 2973.00- | |
| | | | Period 06/06 Total | | .00 | 6519.00- | |
| | | | Task Code 2- 2120 Total | | 284.00 | 7998.20 | |

2- 2130 DEMO COMMON WALL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/06 LAB GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 | |
| 06/06 FRG GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1286.00 | |
| 06/06 MAT GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 JEA | |
| 06/06 MAT GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00- | |
| | | | Labor | | .00 | 1776.00 | |
| | | | Fringe | | | 1286.00 | |
| | | | Period 06/06 Total | | .00 | 3062.00 | |
| | | | Task Code 2- 2130 Total | | .00 | 3062.00 | |

2- 2140 DEMO STUDS & DRYWALL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/06 L/F PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 137.56 | |
| 03/06 L/F PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| 03/06 L/F PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 7.00 | 297.30 | |
| 03/06 L/F PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| 03/06 L/F PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| 03/06 L/F PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 7.00 | 297.30 | |
| 03/06 L/F PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| 03/06 L/F PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 6.00 | 241.58 | |
| 03/06 L/F PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 7.00 | 281.85 | |
| 03/06 L/F PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| 03/06 L/F PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| 03/06 L/F PR DJ-766-033006 | 3105 | GREGORY J GEDDINGS | 03/30/06 | PAYROLL | 2.00 | 92.63 | |
| 03/06 L/F PR DJ-766-033006 | 3105 | GREGORY J GEDDINGS | 03/30/06 | PAYROLL | 1.00 | 60.69 | |
| | | | Labor | | 52.00 | 1332.75 | |
| | | | Fringe | | | 1019.22 | |
| | | | Period 03/06 Total | | 52.00 | 2351.97 | |
| | | | Task Code 2- 2140 Total | | 52.00 | 2351.97 | |

Jones-Blythe Construction Co.
Cost Detail Report
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| ustomer: | | |
| ontr No: | Contr. Date: | Contr Amount: .00 | Contr Billings: 109158.00 |
| rj Mgr : MS MARK SORENSEN | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| 2- 2200 GENERAL DEMO | | | | | | | | | |
| 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.40 | |
| 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 2.00 | 83.72 | |
| 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 8.00 | 334.91 | |
| 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 8.00 | 334.91 | |
| | | | | | | Labor | 22.00 | 537.14 | |
| | | | | | | Fringe | | 399.17 | |
| | | | | | Period 05/06 Total | | 22.00 | 936.31 | |
| | | | | | Task Code 2- 2200 Total | | 22.00 | 936.31 | |
| 2- 2230 DEMO FRONT WALL | | | | | | | | | |
| 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 4.00 | 191.16 | |
| 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 4.00 | 191.16 | |
| 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.37 | |
| 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 7.00 | 297.31 | |
| 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 8.00 | 339.75 | |
| 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 6.00 | 254.82 | |
| 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/08/06 | PAYROLL | 6.00 | 249.21 | |
| 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 6.00 | 249.21 | |
| 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 7.00 | 281.84 | |
| 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.11 | |
| 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.11 | |
| 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 1.50 | 63.74 | |
| 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 7.00 | 317.76 | |
| 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 6.00 | 272.38 | |
| 04/06 | L/F | PR DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 4.00 | 191.61 | |
| 04/06 | L/F | PR DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 8.00 | 383.22 | |
| 04/06 | MAT | AP PJ-154-042106 | 5568 | DONLEY INC. | 04/06/06 | 101620 | .00 | 680.40 | |
| 04/06 | L/F | PR DJ-769-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 8.00 | 339.77 | |
| 04/06 | L/F | PR DJ-769-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 2.00 | 111.62 | |
| 04/06 | MAT | AP PJ-154-042106 | 5568 | DONLEY INC. | 04/11/06 | 101667 | .00 | 529.20 | |
| 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 6.00 | 286.74 | |
| 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 7.00 | 297.31 | |
| 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |

Jones Blythe Construction Co.
Job Cost Detail Report
Job Number: 51097 HYPER AUTOPARTS
From: 01/01/2006 Thru: 06/30/2006
Open Jobs Only

| Customer: | | | | |
|---|---|---|---|---|
| Cntr No: | Contr Date: | Contr Amount: | .00 | Contr Billings: 109158.00 |
| Prj Mgr : MR MARK SORENSEN | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| Job Type: TM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 | Total Contr: | .00 | Total Billed : 109158.00 |
| | Last Billed: 05/25/06 | Pending CO's: | | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D. # | Name/Description | Date | Reference | Hours/Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-769-041306 | 3105 | GREGORY J GIDDINGS | 04/13/06 | PAYROLL | 4.50 | 204.29 | |
| | | | | | | | Labor | 151.00 | 3638.90 | |
| | | | | | | | Fringe | | 2931.00 | |
| | | | | | | | Material | | 1209.60 | |
| | | | | | | Period 04/06 Total | | 151.00 | 7779.50 | |
| | | | | | | Task Code 2- 2230 Total | | 151.00 | 7779.50 | |
| 3- 3100 PATCH FLOOR AT COMMON WAL | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 377.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00- | |
| | | | | | | | Labor | .00 | 466.00 | |
| | | | | | | | Fringe | | 377.00 | |
| | | | | | | Period 06/06 Total | | .00 | 843.00 | |
| | | | | | | Task Code 3- 3100 Total | | .00 | 843.00 | |
| 4- 4200 PATCH WALL TOP | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 2.00 | 88.17 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2348 | ROBERT W KEMAL | 04/28/06 | PAYROLL | 8.00 | 339.77 | |
| | | | | | | | Labor | 10.00 | 233.70 | |
| | | | | | | | Fringe | | 194.24 | |
| | | | | | | Period 04/06 Total | | 10.00 | 427.94 | |
| | | | | | | Task Code 4- 4200 Total | | 10.00 | 427.94 | |
| 5- 5100 JOIST & DECK INSTALLATION | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 10917.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00- | |
| | | | | | | | Labor | .00 | 12215.00 | |
| | | | | | | | Fringe | | 10917.00 | |
| | | | | | | Period 06/06 Total | | .00 | 23132.00 | |
| | | | | | | Task Code 5- 5100 Total | | .00 | 23132.00 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51097 HYDRAS AUTHORITY
From: 02/01/2002 Thru: 06/30/2006
Open Jobs Only

| Customer: | | | | | |
|---|---|---|---|---|---|
| Cntr No: | Contr. Data: | Contr Amount: | .00 | Contr Billings: | 109158.00 |
| Mgr : MS MARK SORENSEN | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| Type: EM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : | 109158.00 |
| | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 6- | 6200 | SHELVES & BINS | | | | | | | | |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACE | 05/18/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACE | 05/18/06 | PAYROLL | 8.00 | 392.28 | |
| | | | | | | | Labor | 20.00 | 526.56 | |
| | | | | | | | Fringe | | 457.36 | |
| | | | | | | Period 05/06 Total | | 20.00 | 983.92 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1045 | JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 8.00 | 400.19 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1800 | PATRICK A RYAN | 06/15/06 | PAYROLL | 8.00 | 392.54 | |
| | | | | | | | Labor | 16.00 | 452.56 | |
| | | | | | | | Fringe | | 340.17 | |
| | | | | | | Period 06/06 Total | | 16.00 | 792.73 | |
| | | | | | | Task Code 6- 6200 Total | | 36.00 | 1776.65 | |
| 9- | 9100 | MTL STUDS | | | | | | | | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/27/06 | 2094812-00 | .00 | 3880.19 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/02/06 | 2084999-00 | .00 | 1216.35 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACE | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACE | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | | | | | | | Labor | 63.00 | 1663.68 | |
| | | | | | | | Fringe | | 1437.62 | |
| | | | | | | | Material | | 5096.54 | |
| | | | | | | Period 05/06 Total | | 63.00 | 8197.84 | |
| | 06/06 | MAT | GL JE-025-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3880.19-JEA | |

Jones-Blythe Construction Co.
Cost Detail Report (***)
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Date: | .00 | Contr Billings: 109158.00 |
| ontr No: | Est. Comp.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARX SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| Task Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | ─Transaction─ Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Material | | | | 3880.19- | |
| | | | | Period 06/06 Total | | | .00 | 3880.19- | |
| | | | | Task Code 9- 9100 Total | | | 63.00 | 4317.65 | |
| | | | | | | | | | |
| 9- 9200 DRYWALL | | | | | | | | | |
| | 04/06 L/F | PR DJ-772-042806 | 1115 | DAVID L NESBITT | 04/28/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 L/F | PR DJ-772-042806 | 1866 | BRUCE E SMITH | 04/28/06 | PAYROLL | 8.00 | 373.74 | |
| | | | | Labor | | | 16.00 | 391.36 | |
| | | | | Fringe | | | | 356.12 | |
| | | | | Period 04/06 Total | | | 16.00 | 747.48 | |
| | | | | | | | | | |
| | 05/06 MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/02/06 | 2084999-00 | .00 | 61.60 | |
| | 05/06 L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 5.00 | 245.17 | |
| | 05/06 L/F | PR DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 5.00 | 245.18 | |
| | 05/06 MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/04/06 | 2095141-00 | .00 | 1718.90 | |
| | 05/06 L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 L/F | PR DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 05/06 L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 5.00 | 249.22 | |
| | 05/06 L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 L/F | PR DJ-774-051106 | 3160 | JOE W KAUFFMAN | 05/11/06 | PAYROLL | 3.00 | 149.53 | |
| | | | | Labor | | | 111.00 | 2914.42 | |
| | | | | Fringe | | | | 2540.22 | |
| | | | | Material | | | | 1780.50 | |
| | | | | Period 05/06 Total | | | 111.00 | 7235.14 | |

Jones Blythe Construction Co.
** Cost Detail Report **
Job Number: 21097 SPORTS AUTHORITY
From 05/09/2006 Thru 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| ustomer: | | |
| ontr No: | Contr. Date: | Contr Amount: .00 | Contr Billings: 109158.00 |
| rj Mgr : MS MARK SORENSEN | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Antvty: 06/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task-Code Prd. Type Source-Code I.D.# Name/Description | --Transaction-- Date Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|
| 06/06 MAT AP PJ-200-061206 11547 NEGWER MATERIALS, INC. | 05/26/06 2095854-00 | .00 | 20.49 | |
| 06/06 MAT GL JE-025-062606 J/C JOB COST | 06/26/06 JRNL ENTRY | .00 | 2600.00 JEA | |
| | Material | | 2620.49 | |
| | Period 06/06 Total | .00 | 2620.49 | |
| | Task Code 9- 9200 Total | 127.00 | 10603.11 | |

**9- 9300 INSULATION**

| | | | | |
|---|---|---|---|---|
| 05/06 MAT AP PJ-165-051106 11547 NEGWER MATERIALS, INC. | 05/02/06 2084999-00 | .00 | 622.33 | |
| 05/06 L/F PR DJ-773-050406 1115 DAVID L NESBITT | 05/04/06 PAYROLL | 2.00 | 98.07 | |
| 05/06 L/F PR DJ-773-050406 1866 BRUCE E SMITH | 05/04/06 PAYROLL | 2.00 | 98.07 | |
| 05/06 MAT AP PJ-165-051106 11547 NEGWER MATERIALS, INC. | 05/05/06 2095169-00 | .00 | 98.73 | |
| 05/06 L/F PR DJ-774-050906 1115 DAVID L NESBITT | 05/09/06 PAYROLL | 6.00 | 294.21 | |
| 05/06 L/F PR DJ-774-050906 1115 DAVID L NESBITT | 05/09/06 PAYROLL | 2.00 | 98.07 | |
| 05/06 L/F PR DJ-774-050906 1115 DAVID L NESBITT | 05/09/06 PAYROLL | 2.00 | 98.08 | |
| | Labor | 14.00 | 362.74 | |
| | Fringe | | 323.76 | |
| | Material | | 721.06 | |
| | Period 05/06 Total | 14.00 | 1407.56 | |
| | Task Code 9- 9300 Total | 14.00 | 1407.56 | |

**9- 9400 CEILING**

| | | | | |
|---|---|---|---|---|
| 05/06 MAT AP PJ-165-051106 11547 NEGWER MATERIALS, INC. | 05/02/06 2084999-00 | .00 | 211.97 | |
| 05/06 L/F PR DJ-774-050906 1894 MIKE G SPRINKEL | 05/09/06 PAYROLL | 4.00 | 196.14 | |
| 05/06 L/F PR DJ-774-050906 1894 MIKE G SPRINKEL | 05/09/06 PAYROLL | 6.00 | 294.21 | |
| 05/06 L/F PR DJ-774-051106 1903 VERN G VLACH | 05/11/06 PAYROLL | 4.00 | 196.14 | |
| 05/06 L/F PR DJ-774-051106 1903 VERN G VLACH | 05/11/06 PAYROLL | 6.00 | 294.21 | |
| 05/06 L/F PR DJ-777-053106 1065 HARVEY A HAMILTON | 05/31/06 PAYROLL | 8.00 | 398.76 | |
| 05/06 L/F PR DJ-777-053106 1065 HARVEY A HAMILTON | 05/31/06 PAYROLL | 4.00 | 199.37 | |
| | Labor | 32.00 | 854.20 | |
| | Fringe | | 724.63 | |
| | Material | | 211.97 | |
| | Period 05/06 Total | 32.00 | 1790.80 | |

| | | | | |
|---|---|---|---|---|
| 06/06 MAT AP PJ-200-061206 8126 NORDMAN LUMBER | 05/05/06 2015467 | .00 | 8.17 | |
| 06/06 MAT AP PJ-200-061206 11547 NEGWER MATERIALS, INC. | 05/25/06 2095019-00 | .00 | 147.70 | |
| 06/06 MAT AP PJ-200-061206 11547 NEGWER MATERIALS, INC. | 05/09/06 2095247-00 | .00 | 122.72 | |
| 06/06 MAT AP PJ-200-061206 11547 NEGWER MATERIALS, INC. | 06/02/06 2096016-00 | .00 | 201.96 | |
| 06/06 L/F PR DJ-780-061506 1065 HARVEY A HAMILTON | 06/15/06 PAYROLL | 3.00 | 149.54 | |
| 06/06 L/F PR DJ-780-061506 1065 HARVEY A HAMILTON | 06/15/06 PAYROLL | 3.00 | 149.54 | |

Jones-Blythe Construction Co
Job Cost Detail Report
Job Number: 51027 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| | | | |
|---|---|---|---|
| ustomer: | Contr. Date: | Contr. Amount: .00 | Contr Billings: 109158.00 |
| entr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Activty: 05/27/06 | Total Contr : .00 | Total Billed : 109158.00 |
| ab Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor | 6.00 | 168.00 | |
| | | | | | | | Fringe | | 131.08 | |
| | | | | | | | Material | | 480.55 | |
| | | | | | | Period 06/06 Total | | 6.00 | 779.63 | |
| | | | | | | Task Code 9- | 9400 Total | 38.00 | 2570.43 | |
| 9- | 9500 | NUDO BOARD | | | | | | | | |
| | 05/06 | MAT | AP PJ-180-052406 | 11950 | NUDO PRODUCTS, INC. | 05/05/06 | 174745A | .00 | 756.83 | |
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-776-052506 | 1908 | DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1065 | HARVEY A HAMILTON | 05/31/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1903 | VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.09 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 4.00 | 196.15 | |
| | | | | | | | Labor | 24.00 | 623.93 | |
| | | | | | | | Fringe | | 553.69 | |
| | | | | | | | Material | | 756.83 | |
| | | | | | | Period 05/06 Total | | 24.00 | 1934.45 | |
| | 06/06 | MAT | AP PJ-200-061206 | 11950 | NUDO PRODUCTS, INC. | 05/15/06 | 175590 | .00 | 10.45 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 757.00 | JEA |
| | | | | | | | Material | | 767.45 | |
| | | | | | | Period 06/06 Total | | .00 | 767.45 | |
| | | | | | | Task Code 9- | 9500 Total | 24.00 | 2701.90 | |
| 1- | 1 | SELVAGGIO STEEL | | | | | | | | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 21328.00 | HALF METALS |
| | | | | | | | Subcontr | | 21328.00 | |
| | | | | | | Period 06/06 Total | | .00 | 21328.00 | |
| | | | | | | Task Code 601- | 1 Total | .00 | 21328.00 | |
| - | 1 | RM WILLEY MASONRY | | | | | | | | |
| | 05/06 | SUB | AP PJ-163-051006 | 17103 | RM WILLEY INC. MASONRY | 04/21/06 | 06-154-2 | .00 | 12490.00 | |
| | | | | | | | Subcontr | | 12490.00 | |
| | | | | | | Period 05/06 Total | | .00 | 12490.00 | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 15457.00 | 1/2 BEARING WALL |

3:06-cv-03172-RSC-CHE    7/5/15    Page 1 of 2

Date: 06/27/06  On: 06/27/06  (GC:8)
Jones City & Co Construction Co
Project Detail Report
Job Number: 31007 SPORTS AUTHORITY
From: 01/01/200 through 06/30/2006
Open Jobs Only
Time: 15:27   Page: 55

| | |
|---|---|
| Customer: | |
| anct No: | Contr. Date: |
| j Mgr: MR MARK SORENSEN | Est. Compl.: |
| ob Type: TM T/M FOR SMALL JOBS | Last Actvty: 06/27/06 |
| | Last Billed: 05/25/06 |

| | |
|---|---|
| Contr Amount: .00 | Contr Billings: 109158.00 |
| Changeorders: .00 | T & M Billings: .00 |
| Total Contr: .00 | Total Billed: 109158.00 |
| Pending CO's: .00 | Retainage Amt.: .00 |

| Task Code | Prd | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Subcontr | | 15457.00 | |
| | | | | | | Period 06/06 Total | | .00 | 15457.00 | |
| | | | | | | Task Code 701- | 1 Total | .00 | 27947.00 | |
| 2- | 1 | RJ POWER | | | | | | | | |
| | 05/06 | SUB | AP PJ-165-051106 | 12990 | R.J. POWER PLUMBING & | 05/01/06 | 17296 | .00 | 393.30 | |
| | | | | | | | Subcontr | | 393.30 | |
| | | | | | | Period 05/06 Total | | .00 | 393.30 | |
| | 06/06 | SUB | AP PJ-205-062106 | 12990 | R.J. POWER PLUMBING & | 05/31/06 | 17385 | .00 | 900.53 | |
| | 06/06 | SUB | AP PJ-217-062706 | 12990 | R.J. POWER PLUMBING & | 05/22/06 | SA EST | .00 | 16426.00 | |
| | 06/06 | SUB | AP PJ-216-062706 | 12990 | R.J. POWER PLUMBING & | 06/27/06 | 5494 | .00 | 2802.00 | |
| | | | | | | | Subcontr | | 20128.53 | |
| | | | | | | Period 06/06 Total | | .00 | 20128.53 | |
| | | | | | | Task Code 702- | 1 Total | .00 | 20521.83 | |
| 5- | 1 | PAUL BOLL PAINTING | | | | | | | | |
| | 05/06 | SUB | AP PJ-201-061306 | 2375 | PAUL BOLL PAINTING | 05/24/06 | 0004835-IN | .00 | 27812.00 | |
| | | | | | | | Subcontr | | 27812.00 | |
| | | | | | | Period 05/06 Total | | .00 | 27812.00 | |
| | | | | | | Task Code 705- | 1 Total | .00 | 27812.00 | |
| 6- | 1 | FJ MURPHY | | | | | | | | |
| | 06/06 | SUB | AP PJ-214-062606 | 11200 | F. J. MURPHY & SON INC | 06/22/06 | 15775 | .00 | 9246.76 | |
| | | | | | | | Subcontr | | 9246.76 | |
| | | | | | | Period 06/06 Total | | .00 | 9246.76 | |
| | | | | | | Task Code 706- | 1 Total | .00 | 9246.76 | |
| | 1 | PATTERSON FLOORING | | | | | | | | |
| | 06/06 | SUB | GL JE-D24-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1105.00 | |
| | | | | | | | Subcontr | | 1105.00 | |
| | | | | | | Period 06/06 Total | | .00 | 1105.00 | |
| | | | | | | Task Code 707- | 1 Total | .00 | 1105.00 | |

Jones-Blythe Construction Co
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From 01/01/2002 Thru 06/30/2006
Open Jobs Only

| | | |
|---|---|---|
| ustomer: | Contr. Date: | Contr Amount:      .00   Contr Billings: 109158.00 |
| ontr No: | Est. Compl.: | Changeorders:      .00   T & M Billings:      .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 05/27/06 | Total Contr :      .00   Total Billed : 109158.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's:      .00   Retainage Amt.:      .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| JOB- | 1 | B&B ELECTRIC | | | | | | | | |
| | 06/06 | SUB | GL | JE-027-062606 | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 36000.00 | |
| | | | | | | | Subcontr | | 36000.00 | |
| | | | | | | Period 06/06 Total | | .00 | 36000.00 | |
| | | | | | Task Code 708- | 1 Total | | .00 | 36000.00 | |

| | | |
|---|---|---|
| Job Total | 1150.00 | 267819.07 |
| Labor | 1150.00 | 46227.26 |
| Fringe | | 37500.09 |
| Material | | 28752.63 |
| Subcontr | | 143960.59 |
| Equipment | | 11378.50 |

Johny Blythe Construction Co.

** Cost Detail Report **

From: 01/01/2002 Thru: 06/30/2004
Open Jobs Only

| | Hours | Cost |
|---|---|---|
| Report Totals | 3,996.00 | 739,913.60 |
| | | |
| Labor | 3,996.00 | 103861.73 |
| Fringe | | 83499.92 |
| Material | | 69893.79 |
| Subcontr | | 458360.41 |
| Equipment | | 24297.75 |

Reorder from: Forms & Supplies Direct for SKYLINE   800-992-1970  Form #7035  ©Copyright 1994

| Invoice No. | (943) Inv. Date | Amount | Discount | Description | Voucher No. | Net Amount |
|---|---|---|---|---|---|---|
| | | | CHECK DATE: 08/22/06 | | CHECK NO.  006563 | |
| Progress#3 | 06/27/06 | 370,309.00 | 0.00 | Final Bill tornado damage | 04670 | 370,309.00 |
| TOTAL | | 370,309.00 | 0.00 | | | 370,309.00 |

THIS CHECK IS VOID IF MICRO PRINT SIGNATURE LINE IS UNREADABLE UNDER MAGNIFICATION

**SWPLAZA III, LLC**
2144 S. MACARTHUR
SPRINGFIELD, IL 62704

(943)

*Illinois National Bank (943)*
*322 E. Capitol Avenue*
*Springfield, IL  62701*

**006563**

| DATE | CHECK NO. | AMOUNT |
|---|---|---|
| 08/22/06 | 006563 | $***370,309.00* |

THREE HUNDRED SEVENTY  THOUSAND  THREE HUNDRED NINE AND NO/100 DOLLARS  ****

PAY
TO THE
ORDER OF

JONES-BLYTHE CONSTRUCTION
1030 W. REYNOLDS STREET
P.O. BOX 5113
SPRINGFIELD, IL 62705

⑈006563⑈ ⑊071109338⑊ 021⑈113⑈

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 31094 SORENSEN REPAIR
From: 01/01/2002 Thru: 06/30/2006
* Open Jobs Only *

| | | | | |
|---|---|---|---|
| Customer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| Cntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| Pj Mgr : MR MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| Job Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO's: | .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 9- | 9500 NUDO BOARD | | | | | | | | | |
| | 05/06 | MAT | AP PJ-165-051106 | 11950 | NUDO PRODUCTS, INC. | 05/05/06 | 174745 | .00 | 756.83 | |
| | 05/06 | MAT | AP PJ-180-052406 | 11950 | NUDO PRODUCTS, INC. | 05/05/06 CM | 174745 | .00 | 756.83- | |
| | | | | | | Period 05/06 Total | | .00 | .00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 JRNL ENTRY | | .00 | 757.00- | JEA |
| | | | | | | Material | | | 757.00- | |
| | | | | | | Period 06/06 Total | | .00 | 757.00- | |
| | | | | | | Task Code 9- 9500 Total | | .00 | 757.00- | |
| 11- | 1 SELVAGGIO STEEL | | | | | | | | | |
| | 04/06 | SUB | AP PJ-151-041106 | 14848 | SELVAGGIO STEEL, INC. | 04/04/06 | 13874 | .00 | 42655.00 | |
| | | | | | | Subcontr | | | 42655.00 | |
| | | | | | | Period 04/06 Total | | .00 | 42655.00 | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 JRNL ENTRY | | .00 | 21328.00- | HALF METALS |
| | | | | | | Subcontr | | | 21328.00- | |
| | | | | | | Period 06/06 Total | | .00 | 21328.00- | |
| | | | | | | Task Code 601- 1 Total | | .00 | 21327.00 | |
| 12- | 1 SAVAGE DOORWAYS | | | | | | | | | |
| | 06/06 | SUB | AP PJ-207-062206 | 14261 | SAVAGE DOORWAYS INC. | 06/07/06 | 8855 | .00 | 14.22 | |
| | 06/06 | SUB | AP PJ-208-062206 | 14261 | SAVAGE DOORWAYS INC. | 06/07/06 | 8854 | .00 | 385.96 | |
| | 06/06 | SUB | AP PJ-209-062206 | 14261 | SAVAGE DOORWAYS INC. | 06/07/06 | 8856 | .00 | 137.70 | |
| | 06/06 | SUB | AP PJ-205-062206 | 14261 | SAVAGE DOORWAYS INC. | 06/14/06 | 6568 | .00 | 385.96 | |
| | | | | | | Subcontr | | | 923.84 | |
| | | | | | | Period 06/06 Total | | .00 | 923.84 | |
| | | | | | | Task Code 602- 1 Total | | .00 | 923.84 | |
| 13- | 1 RM WILLEY MASONRY | | | | | | | | | |
| | 04/06 | SUB | AP PJ-154-042106 | 17103 | RM WILLEY INC. MASONRY | 04/17/06 | 06-154 | .00 | 30654.00 | |
| | | | | | | Subcontr | | | 30654.00 | |
| | | | | | | Period 04/06 Total | | .00 | 30654.00 | |
| | 05/06 | SUB | AP PJ-163-051006 | 17103 | RM WILLEY INC. MASONRY | 04/21/06 | 06-154-1 | .00 | 259.65 | |
| | | | | | | Subcontr | | | 259.65 | |
| | | | | | | Period 05/06 Total | | .00 | 259.65 | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 JRNL ENTRY | | .00 | 15457.00- | 1/2 BEARING WALL |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 31094 GORDMANS REPAIR
From: 01/01/2002 Thru 06/30/2006
Open Jobs Only

| ustomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | Y.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Subcontr | | 15457.00- | |
| | | | | | | Period 06/06 | Total | .00 | 15457.00- | |
| | | | | | | Task Code 701- | 1 Total | .00 | 15456.65 | |
| 2- | 1 FJ MURPHY | | | | | | | | | |
| | 05/06 | SUB | AP PJ-161-051006 | 11200 | F. J. MURPHY & SON INC | 04/22/06 | 15423 | .00 | 92.00 | |
| | 05/06 | SUB | AP PJ-201-061306 | 11200 | F. J. MURPHY & SON INC | 05/26/06 | 15543 | .00 | 12312.70 | |
| | | | | | | | Subcontr | | 12404.70 | |
| | | | | | | Period 05/06 | Total | .00 | 12404.70 | |
| | 06/06 | SUB | AP PJ-205-062106 | 11200 | F. J. MURPHY & SON INC | 06/13/06 | 15776 | .00 | 112.50 | |
| | 06/06 | SUB | AP PJ-214-062606 | 11200 | F. J. MURPHY & SON INC | 06/22/06 | 15973 | .00 | 138.00 | |
| | | | | | | | Subcontr | | 250.50 | |
| | | | | | | Period 06/06 | Total | .00 | 250.50 | |
| | | | | | | Task Code 702- | 1 Total | .00 | 12655.20 | |
| 3- | 1 B&B ELECTRIC | | | | | | | | | |
| | 05/06 | SUB | AP PJ-161-051006 | 1408 | B & B ELECTRIC | 04/25/06 | 11113 | .00 | 28416.00 | |
| | 05/06 | SUB | AP PJ-201-061306 | 1408 | B & B ELECTRIC | 05/30/06 | 11244 | .00 | 53192.00 | |
| | | | | | | | Subcontr | | 81608.00 | |
| | | | | | | Period 05/06 | Total | .00 | 81608.00 | |
| | 06/06 | SUB | AP PJ-214-062606 | 1408 | B & B ELECTRIC | 06/22/06 | 11334 | .00 | 24789.00 | |
| | 06/06 | SUB | GL JE-027-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 36000.00- | |
| | 06/06 | SUB | AP PJ-216-062706 | 1408 | B & B ELECTRIC | 06/26/06 | PENDANT L | .00 | 800.00 | |
| | | | | | | | Subcontr | | 10411.00- | |
| | | | | | | Period 06/06 | Total | .00 | 10411.00- | |
| | | | | | | Task Code 703- | 1 Total | .00 | 71197.00 | |
| 4- | 1 RJ POWER | | | | | | | | | |
| | 05/06 | SUB | AP PJ-165-051106 | 12990 | R.J. POWER PLUMBING & | 04/28/06 | 17297 | .00 | 437.03 | |
| | | | | | | | Subcontr | | 437.03 | |
| | | | | | | Period 05/06 | Total | .00 | 437.03 | |
| | 06/06 | SUB | AP PJ-205-062106 | 12990 | R.J. POWER PLUMBING & | 05/18/06 | 17386 | .00 | 1988.68 | |
| | 06/06 | SUB | AP PJ-217-062706 | 12990 | R.J. POWER PLUMBING & | 04/11/06 | G EST | .00 | 23570.00 | |
| | 06/06 | SUB | AP PJ-216-062706 | 12990 | R.J. POWER PLUMBING & | 06/27/06 | 5474 | .00 | 24007.00 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51094 GOODMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| atr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Subcontr | | 49565.68 | |
| | | | | | Period 06/06 Total | | .00 | 49565.68 | |
| | | | | | Task Code 704- | 1 Total | .00 | 50002.71 | |
| | 1 PAUL BOLL PAINTING | | | | | | | | |
| | 05/06 SUB | AP PJ-181-052506 | 2375 | PAUL BOLL PAINTING | 05/12/06 | 0004826-IN | .00 | 69000.00 | |
| | | | | | | Subcontr | | 69000.00 | |
| | | | | | Period 05/06 Total | | .00 | 69000.00 | |
| | | | | | Task Code 705- | 1 Total | .00 | 69000.00 | |
| | 1 BACON & VAN BUSKIRK | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 1472 | BACON & VAN BUSKIRK GLA | 05/30/06 | I109548 | .00 | 213.08 | |
| | | | | | | Subcontr | | 213.08 | |
| | | | | | Period 05/06 Total | | .00 | 213.08 | |
| | 06/06 SUB | AP PJ-209-062206 | 1472 | BACON & VAN BUSKIRK GLA | 06/02/06 | 0602068-2 | .00 | 5700.00 | |
| | 06/06 SUB | AP PJ-216-062706 | 1472 | BACON & VAN BUSKIRK GLA | 06/26/06 | I109704 | .00 | 5300.00 | |
| | | | | | | Subcontr | | 11000.00 | |
| | | | | | Period 06/06 Total | | .00 | 11000.00 | |
| | | | | | Task Code 706- | 1 Total | .00 | 11213.08 | |
| | 1 PATTERSON COMMERCIAL FL | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 12500 | PATTERSON COMMERCIAL | 05/31/06 | 13712 | .00 | 41200.00 | |
| | | | | | | Subcontr | | 41200.00 | |
| | | | | | Period 05/06 Total | | .00 | 41200.00 | |
| | 06/06 SUB | AP PJ-206-062106 | 12500 | PATTERSON COMMERCIAL | 06/21/06 | VCT REMOVE | .00 | 590.00 | |
| | | | | | | Subcontr | | 590.00 | |
| | | | | | Period 06/06 Total | | .00 | 590.00 | |
| | | | | | Task Code 707- | 1 Total | .00 | 41790.00 | |
| | 1 FRITSCH PLASTER & DRYWALL | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 6545 | FRITSCH PLASTER & DRYWA | 05/10/06 | 309-06 | .00 | 6212.00 | |
| | | | | | | Subcontr | | 6212.00 | |
| | | | | | Period 05/06 Total | | .00 | 6212.00 | |
| | | | | | Task Code 708- | 1 Total | .00 | 6212.00 | |

**MARK A. SORENSEN**      PROJECT MANAGER/ESTIMATOR

RECEIVED
APR 0 2 2007
Hinshaw & Culbertson
SPRINGFIELD

46 years old
23 Years experience working for a General Contractor
1984 Graduate of Iowa State University
B.S. Construction Engineering

Following is a listing of major projects that I have been involved with during my career at Jones-Blythe Construction Co. Our office is structured such that the engineer assigned to a project typically carries that project from cradle to grave. For the majority of the projects listed below, I was responsible for the estimating, scheduling, cost control, subcontracting and overall management of the project.

### Major Projects Completed

| | |
|---|---|
| 2006 | Gordman's<br>Sports Authority<br>Tornado Damage Repair<br>Springfield, Illinois<br>$888,00 |
| 2006 | City Water Light & Power<br>Power Block Caissons, General Work<br>Springfield, Illinois<br>$1,500,000 |
| 2006 | City Water Light & Power<br>HV Caissons, General Work<br>Springfield, Illinois<br>$272,000 |
| 2005/2006 | Chatham Presbyterian Church<br>Sanctuary Addition<br>Chatham, Illinois<br>$1,701,000 |
| 2004/2005 | Menard Electric Cooperative<br>New Office Facility<br>Petersburg, Illinois<br>$2,843,000 |
| 2003/2004 | Our Saviors Lutheran Church<br>Parish Center and Gymnasium Addition<br>Springfield, Illinois<br>$3,500,000 |

March 28, 2007
Page 2

| | |
|---|---|
| **2002** | City Water Light & Power<br>SCR Project, General Work<br>Springfield, Illinois<br>$3,097,000 |
| **2001** | City Water Light & Power<br>Clarifier #2 Upgrade<br>Springfield, Illinois<br>$1,855,000 |
| **1999/2000** | Alliance Pipeline Company<br>Compressor Station 27A<br>Grassroots Compressor Station<br>Manchester, Iowa<br>$8,150,000 |
| **1999/2000** | Alliance Pipeline Company<br>Compressor Station 29A<br>Grassroots Compressor Station<br>Tampico, Illinois<br>$9,500,000 |
| **1998** | Northern Border Pipeline Company<br>Compressor Station #6 Retrofit<br>Glen Ullin, North Dakota<br>$2,305,000 |
| **1998** | Northern Border Pipeline Company<br>Compressor Station #8 Retrofit<br>Zeeland, North Dakota<br>$3,156,000 |
| **1997** | Central Illinois Public Service<br>Newton Generating Station FGD Restoration<br>Newton, Illinois<br>$2,200,000 |
| **1997** | First Presbyterian Church<br>Sanctuary Reordering<br>Springfield, Illinois |
| **1996** | Graham Correctional Center<br>X-Cellhouse<br>Hillsboro, Illinois<br>$8,000,000 |
| **1996** | Logan Correctional Center<br>X-Cellhouse<br>Lincoln, Illinois<br>$8,000,000 |

3:06-cv-03177-JES-CHE    #23-17    Page 12 of 48

| 1994 | Algonquin Gas Transmission Co.<br>Grassroots Compressor Station<br>13,000 Hp Solar Taurus Turbine (2 ea)<br>Chaplin, Connecticut<br>$5,250,000 |
|---|---|
| 1993 | Commonwealth Edison Power Plant<br>Miscellaneous Boiler Repairs/Fan Motor Removal & Realignment<br>Kincaid, Illinois<br>$83,000 |
| 1992 | Northern Border Pipeline Co.<br>Grassroots Compressor Station<br>20,000 Horsepower Gas Turbine<br>Trimont, Minnesota<br>$3,000,000 |
| 1991 | Taylorville Correctional Center<br>New Minimum Security Prison<br>Taylorville, IL<br>$5,997,000 |
| 1986 | St. John's Hospital<br>New Pavilion Office Building<br>Springfield, IL<br>$6,000,000 |



**National Disaster Recovery Services**

<Attachment A>

DATE: 3-14-06

TO:     MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
        DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
        TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM: JEFF KRONE

RE: TORNADO DAMAGE TO STORE # 618

Cotton viewed the CATASTROPHIC loss located at 3211 VETERANS PARKWAY in SPRINGFIELD, IL. Mike
Mavelle of THE SPORTS AUTHORITY requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the
structure and contenting to their pre-loss or better condition. The following material is presented in an order that
insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of
events, in which these procedures will be performed, is discussed later in this proposal under Critical Path
Management Program (CPM). The Scope of Service is broken into the following general areas of concern.

- *BRIEF SCENARIO OF THE LOSS: ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF
  THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED
  EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE
  ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30'X'50 FT SECTION WAS DESTROYED.
  EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A
  RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES
  ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-
  COTTON USA, TOM TIERNAN-LIBERTY MUTUAL-& MIKE MAVELLE- THE SPORTS AUTHORITY.
  THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

- *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA
  COMPLIANCE.*
- *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A
  CONSTRUCTION SITE.*
- *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- *WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE
  GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-
  DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE
  BUILDING AND COTTONS PROGRESS.*
- *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE
  TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST
  OF THE SPORTS AUTHORITY*
- *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM
  POINT A TO POINT B IF NEEDED.*
- *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-
  DAMAGED RACKS*
- *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN
  THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

EXHIBIT
6
SH 10-22-07

TSA 00301



☐ DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON
AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY
THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-
DAMAGED PRODUCT REMAINING IN THE STORE.

## INSTALL THE FOLLOWING: (FRONT OF THE STORE)

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE
SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE
OF THE STORE.
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE
STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE
DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

## INSTALL THE FOLLOWING: (BACK OF THE STORE)

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE
SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE
OF THE STORE.
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE
NORTH DOORWAY TO THE WAREHOUSE AREA.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE
STORE TO RUN PORTABLE DRYING EQUIPMENT.
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

➤ CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
➤ SWEEP UP ALL THE GLASS FROM FRONT OF STORE
➤ ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO
A MINIMUM

➤ COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-
GLOBAL) ON INSPECTION.
➤ COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
➤ COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION
PURPOSES
➤ COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

➤ SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
➤ ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
   ☐ HARD HATS
   ☐ EYE GLASSES
   ☐ DUST MASKS

TSA 00302

- ☐ STEEL TOED SHOES
- ☐ EAR PROTECTION
- ➤ CUT DOWN ALL HANGING DEBRIS
  - ☐ FLORESCENT LIGHTS
  - ☐ CONDUIT LINES
  - ☐ MONITORS
  - ☐ CAP SPRINKLER LINES
  - ☐ ELECTRICAL LINES
  - ☐ SPORT AUTHORITY SIGNAGE
  - ☐ PARTS OF THE ROOF DECKING
- ➤ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- ➤ WET VAC ALL STANDING WATER
- ➤ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- ➤ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*



- ➤ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

TSA 00303

- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00305

- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

███████████

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

███████████

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00306

- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ❖ *NOTE: SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ◆ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED, FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ◆ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

- ◆ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

---

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - C. TAGGED AND SALVAGE COMPANY WILL TAKE
  - D. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ◆ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

- ◆ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by Mike Mavelle, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

IMPORTANT POINTS

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of *COTTON* management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that *COTTON* will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the *COTTON'S* on-site Project Manager (Bruce Gear) and a designated representative from The Sports Authority meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, *COTTON* will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

*COTTON* proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

*COTTON* will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been *COTTON* pleasure to submit this proposal to Mike Mavelle and Tom Tiernan. Thank you for your consideration and cooperation.

Respectfully Submitted,

*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2962 (24hr CALL CENTER)*

76

| | | |
|---|---|---|
| 1 | SWPLAZA III, LLC, an Illinois | ) |
| | limited liability company, as | ) |
| 2 | successor to Illinois National | ) |
| | Bank, as Trustee under Trust | ) |
| 3 | Agreement dated November 6, 2000 | ) |
| | and known as Trust No. 00-0020, | ) |
| 4 | an Illinois banking institution, | ) |
| |               Plaintiff | ) |
| 5 |   -vs- | )NO.06-CV-3177 |
| | TSA STORES, INC., as successor | ) |
| 6 | to Gart Brothers Sporting Goods | ) |
| | Company, a Delaware corporation, | ) |
| 7 |              Defendant | ) |

8

9       I, MARK A. SORENSEN, do hereby certify

10  that I have read the foregoing transcript of
my testimony given in the above entitled

11  matter on the 22nd day of October, 2007, and
that the same fully and accurately sets forth

12  my testimony as given on said date, except as
I have indicated to the contrary on this page

13  below my signature.

14  DATE 11/26/07  SIGNATURE _Mark C. Sorensen_

| Page No. | Line No. | Change | Reason For change |
|---|---|---|---|
| 4 | 23 | Alen to Allen | |

15

16

17

18

19

20

21

22

23

24

E-FILED
Monday, 31 December, 2007 02:01:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

COPY

SWPLAZA III, LLC, an Illinois Limited )

Liability Company, as successor to )

Illinois National Bank, as Trustee )

under Trust Agreement dated )

November 6, 2000 and known as Trust )

No. 00-0020, an Illinois banking )

institution, )

   Plaintiff, )

 vs. ) No. 06-3177

TSA STORES, INC., as successor to Gart)

Brothers Sporting Goods Company, )

a Delaware Corporation, )

   Defendant. )

  The discovery deposition of JEFFREY WOLFORD,

taken in the above-entitled cause, before Christine

M. Jachimiak, a notary public of Cook County,

Illinois, on the 30th day of October, 2007 at

222 North LaSalle Street, Suite 300, Chicago,

Illinois, pursuant to Notice, at the hour of 1:30.

Reported by:  Christine M. Jachimiak, CSR

License No.:  084-004064

                1

**EXHIBIT D**

```
 1        APPEARANCES:

 2              SORLING, NORTHRUP, HANNA, CULLEN

 3              & COCHRAN, LTD., by

 4              MR. DAVID A. ROLF

 5              Suite 800 Illinois Building

 6              607 East Adams Street

 7              P.O. Box 5131

 8              Springfield, Illinois, 62705

 9              (217) 544-1144

10                  Representing the Plaintiff,

11

12              HINSHAW & CULBERTSON, LLP, by

13              MR. CHARLES R. SCHMADEKE

14              400 South Ninth Street, Suite 200

15              Springfield, Illinois, 62701-1908

16              (217) 528-7375

17                  Representing the Defendant.

18

19     ALSO PRESENT: Douglas Garrett

20

21

22

23

24
```

2

```
 1                    I N D E X
 2   WITNESS                          EXAMINATION
 3   JEFFREY WOLFORD
 4       By Mr. Rolf                       4
 5       By Mr. Schmadeke                 82
 6       By Mr. Rolf (Further)            84
 7
 8
 9
10
11
12                  E X H I B I T S
13   NUMBER                         MARKED FOR ID
14   Deposition Exhibit
15       No. 7                            8
16       No. 8                           22
17       No. 8                           78
18       No. 9                           80
19       No. 10                          89
20
21
22
23
24
                                              3
```

1                        (Witness sworn.)

2        MR. ROLF:  Could you please state your name and

3    your business address for us.

4        THE WITNESS:  Jeffrey B. Wolford.  I reside at

5    102 South Wheeling Road, Prospect Heights,

6    Illinois.

7                        JEFFREY WOLFORD,

8    called as a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10                        EXAMINATION

11   BY MR. ROLF:

12       Q.    How long have you been at that address?

13       A.    Approximately six years.

14       Q.    I sent a notice of deposition and asked

15   you to bring some things today which your counsel

16   has given me so why don't I let me Schmadeke go on

17   the record and make a record of what he's

18   delivering.

19       MR. SCHMADEKE:  I just wanted to state that we

20   have provided some Emails to and from TSA to

21   Mr. Wolford, some of which may have been previously

22   produced and some of which may not have been

23   produced.  We also have provided some preliminary

24   budget calculations for this and I think they have

                                                    4

1    been previously produced.

2        MR. ROLF:  Is that all the material you had in

3    your file for this particular project?

4        MR. WOLFORD:  That's correct, yes.

5        MR. SCHMADEKE:  I should say he has other

6    material, but I think you have everything else.

7    BY MR. ROLF:

8        Q.   So as of today you've produced your entire

9    file either before or after?

10       A.   Yes.

11       Q.   When were you first contacted about this,

12   Mr. Wolford?

13       A.   I believe the date was March 27th, 2006.

14       Q.   Who contacted you?

15       A.   David Freider.

16       Q.   What did he explain to you that they were

17   in need of?

18       A.   They were looking for a preliminary budget

19   for a replacement cost, construction cost for the

20   Sports Authority Store number 618 in Springfield,

21   Mass because of an unnatural disaster of the

22   tornado.

23       Q.   I think you just said Springfield, Mass.

24   Is it Illinois?

5

1        A.    I'm sorry, I'm bidding a job there, too.

2    Springfield, Illinois, store number 618.

3        Q.    Can you be more specific about what he

4    asked you to do?

5        A.    Because of the March 12th tornado

6    implosion of that space and the site he asked me to

7    put together a replacement cost of selective damage

8    that he described verbally either per an Email with

9    some very basic construction replacement scopes and

10    that means subcontractor scopes of the damages.

11        Q.    And he provided you with that information

12    then on March 27th?

13        A.    At that point a very basic budget or work

14    scope to put numbers on as he knew it in that time

15    frame.

16        Q.    Do you recall what the scope was that you

17    described?

18        A.    Not offhand without reading the Email.

19        Q.    Would there be an Email that that was in?

20        A.    Yes, there should be an Email.

21        Q.    Do you have that with you today?

22        A.    It should be.  That's actually the first

23    one they sent to me on March 27th it looks like.

24    It's specific to this Email to the 27th that I

6

1    provided.

2         Q.    Are we looking at the same Email?

3         A.    Yes, ~~we are.~~

4         Q.    So it's dated Monday, March 27th at

5    1:04 p.m. From David Freider to yourself?

6         A.    That's correct.

7         Q.    You had done work previously for TSA?

8         A.    That is correct.

9         Q.    What type of work had you done for TSA?

10        A.    The big box build-out primarily.  I've

11   done some out of the ground work and facade work,

12   but primarily it is 40,000 square foot tenant

13   build-out, tenant improvement work.

14        Q.    Did you talk on the 27th about what you

15   would be compensated for this particular project?

16        A.    No.

17        Q.    How are you being compensated?

18        A.    I have been compensated for the original

19   report dated June 1st for 2500 and I'm being

20   compensated today.

21        Q.    What's your compensation today?

22        A.    2500.

23        Q.    Do you anticipate having additional

24   compensation if you were to testify at trial?

                                                    7

1    A.    Yes.

2    Q.    Have you talked about those arrangements?

3    A.    Those arrangements have not been talked

4    about.

5    Q.    So you're into them for $5,000 so far

6    based on your initial report and your deposition

7    today?

8    A.    That is correct.

9    Q.    What did you do in response to this March

10    27th, 2006 Email?

11    A.    I provided a preliminary budget based on

12    this basic outline of the 27th.

13    Q.    Let me just mark this as Exhibit 7 if we

14    could so that we can refer to the same thing.  And

15    your basic budget are you looking at a particular

16    document for that?

17    A.    No, no because the original budget it was

18    always upgraded.  Once the scope was redefined over

19    the course of say a month and a site visit I put

20    together the final budget number for replacement

21    cost.

22                    (Whereupon, WOLFORD Deposition

23                     Exhibit No. 7 was marked for

24                     identification.)

8

1    BY MR. ROLF:

2        Q.    So you produced a report like this that

3    has the various items listed?

4        A.    That would be the final.  That would be

5    the final budget after the scopes were more

6    defined.

7        Q.    What was contained within your original

8    scope particularly in terms of the items listed?

9    Is there any way to tell that?

10       A.    Not at this point because it was overlaid

11   and more details as it went on after the site visit

12   and those types of things.

13       Q.    What kind of number did you come up with

14   based on this March 27th, 2006 Email?

15       A.    I could not tell you.  It wasn't that far

16   off.  Some of the numbers went up or down depending

17   on what I field determined and further information,

18   site photos, damage photos that were sent to me

19   after this Email.

20       Q.    How soon was it after the March 27th Email

21   that you got back to Mr. Freider?

22       A.    May I go through these Emails?

23       Q.    Sure.

24       A.    For this original budget?

9

1     Q.   Yes.

2     A.   Looking at the Email it looks like I did

3  an attachment April 19th. I believe there would not

4  be a copy of that because of that original budget

5  that I would have because I overlaid and it was a

6  work in progress over say plus or minus a month.

7     Q.   Is this the Email you're looking at?

8     A.   Yes, it is.

9     Q.   And you think that's the first time you

10  had an actual --

11    A.   That I actually Emailed a budget over, a

12  hard copy, yes.

13    Q.   We wouldn't be able to have a copy of

14  that?

15    A.   No.

16    Q.   Was all your correspondence on this

17  project with Mr. Freider?  Is that a yes?

18    A.   Yes.

19    MR. SCHMADEKE:  At that time?

20    THE WITNESS:  At that time.

21  BY MR. ROLF:

22    Q.   Who else from TSA have you had

23  correspondence with?

24    A.   Douglas Garrett, David Freider and

10

1    Charles.

2        Q.    What was your contact with Doug Garrett?

3        A.    My contact with Mr. Garrett was later on

4    but not during this original budgetary spreadsheet

5    and defining the scope process for replacement

6    costs.  It was solely to my best recollection with

7    David Freider.

8        Q.    And the Emails you've produced today --

9        A.    It's every Email correspondence I had with

10   David.

11       Q.    Is that the method in which you

12   corresponded with Mr. Freider?

13       A.    Primarily.

14       Q.    Would that give us a fairly accurate time

15   line as to when you got information and when you

16   sent information back?

17       A.    Yes.

18       Q.    Would there be anything missing if we

19   looked at those Emails?

20       A.    It was every chronological starting oldest

21   to the top to the newest that I had with David,

22   every one.

23       Q.    Would there be phone calls that would

24   supplement that or you pretty much did it by Email?

11

1          A.    90 percent of it was by Email.

2          Q.    Did you talk with anyone other than

3    Mr. Freider about the damage that was out at the

4    location in Springfield?

5          A.    Jeff Crohn with Cotton defining his

6    scopes. I spoke to several of the subcontractors

7    when I was there on May 4th, 2006 per the site

8    visit defining the scopes and damage.

9          Q.    But leading up to what you were asked to

10   do in defining this original scope was it just with

11   Mr. Freider?

12         A.    That's correct, sir.

13         Q.    Did Crohn -- did you talk to him to get a

14   description of any of the damage to the facility

15   when you were preparing your table?

16         A.    That is correct.

17         Q.    When were those conversations?

18         A.    Those were during the month of April at

19   some point.  I never document.  There was no phone

20   log.

21         Q.    Was that all by phone?

22         A.    It was all by phone.

23         Q.    This has been marked as Exhibit 1 which is

24   your report in this matter.  I want to run through

                                                    12

1    some of it. You list several projects there in the

2    introduction that you've done for Sports Authority?

3        A.    Yes.

4        Q.    We touched on this already.  Most of those

5    I take it are the tenant build-out where you have

6    the interior.  Is that what you mean?

7        A.    That is correct.

8        Q.    Are there any on there where you were from

9    the ground out?

10        A.    From the ground up and the shell itself?

11        Q.    Yeah.

12        A.    No.  None of those are straight ground up

13    projects.

14        Q.    Why don't you describe for me the business

15    of Wolford Retail Builders?

16        A.    I'm primarily a big box contractor, retail

17    contractor.  I do no residential work whatsoever.

18    It's strictly retail work.

19        Q.    Who besides Sports Authority do you do

20    work for?

21        A.    Since I have been in business for myself

22    in two and a half years I've done a couple of other

23    clients, but primarily Sports Authority is my

24    biggest client by far.

                                                    13

1       Q.   You've been in business for yourself for

2   two and a half years?

3       A.   Yes.

4       Q.   What were you doing prior to that?

5       A.   I was building Sports Authority work for

6   another contractor as a direct employee, that would

7   be the third employee that I had worked for doing

8   Sports Authority work.  They followed me over the

9   years.

10       Q.   You say Sports Authority followed you?

11       A.   Well, I've been able and lucky enough to

12   do their work over the last eight years with three

13   different other employers.

14       Q.   What's your educational background?

15       A.   Higher education?

16       Q.   Yes.

17       A.   I have four years from Pratt Institute in

18   Brooklyn, New York.

19       Q.   What does that get you?

20       A.   Nothing.

21       Q.   What is it designed to get you?

22       A.   That was an architectural school.

23       Q.   Does it take five and you only did four?

24       A.   That's exactly right.

                                                        14

1    Q.    After you completed those four years you

2    went into the job market?

3    A.    I went into the job market and got the

4    same exact position I had beforehand.

5    Q.    Who was that with?

6    A.    Fisher Development.

7    Q.    Is this resume that's in this packet

8    fairly up to date?

9    A.    May I see that one?

10    Q.    I guess it's not because it says Crown

11    Construction '96 to present.

12    A.    Yeah, that's an older one.  That's the

13    last one I had to produce that anybody asked me to

14    produce.

15    Q.    Can you just fill in from the Crown

16    Construction just for the record?

17    A.    Through the present?

18    Q.    Yes.

19    A.    Crown Construction I went on to Capital

20    Construction and I was with them for basically

21    three and a half years, three out of four.  I was

22    with Novak for one year, and I was with HCI for

23    about two years, and then I went into business for

24    myself.

15

1        Q.    With respect to the projects you were

2    doing on this Springfield store and the storm

3    damage that didn't relate to the same type of work

4    that you normally do for Sports Authority.  Is that

5    a fair statement?

6        A.    Would you repeat that?

7        Q.    Sure.  You've described the work you

8    normally do for Sports Authority as basically the

9    tenant improvement side of the building and not

10   from the ground out?

11       A.    That's correct.

12       Q.    This particular project didn't involve

13   tenant's improvements, is that a fair statement?

14       A.    As far as the damage work and the

15   replacement work?

16       Q.    Yes.

17       A.    The replacement work is very atypical to

18   some of the major build-out work and replacement

19   work or new construction that I do as build-out

20   work.  It would be a quasi version of remodel and

21   new construction.  I've done both for Sports

22   Authority.

23       Q.    Why don't you tell me what you do then

24   when these projects say interior?

16

1          A.    Absolutely.  The shelf space is secured.

2    The permit is procured and posted on site the first

3    day and basically the construction critical path is

4    started, and the standard work is rough and finish

5    carpentry, concrete pour back for the plumbing and

6    underground, the drywall partitioning, metal studs,

7    wall legends, the drywall installation, level four

8    taping, painting and concrete sealer, acoustical

9    ceilings, HVAC distribution and owner supplied

10   equipment package installation, the lighting and

11   switch gear package, the fire alarm stand alone and

12   sprinkler relocates, the final cleaning, full

13   inspections to procure a C of O, which is a

14   certificate of occupancy, and all costs included

15   that would insure the general conditions and all

16   costs related to that to procure that certificate

17   of occupancy for the store turnover on a Thursday

18   night.  It's always on a Thursday night.

19        Q.    How much of that was involved?

20        A.    There was specific scopes that I felt that

21   I broke out.  Some were selective demolition

22   because it entailed that which would be in a

23   remodel as well so I had to extrapolate that per

24   the site visit, per site photos and the information

                                                    17

1    I gathered say over the course of a month.

2        Q.   Paragraph four in your report says that

3    the terms used are defined as set forth in the

4    lease which is the subject of the above referenced

5    action.  Have you reviewed the lease in this case?

6        A.   Yes.

7        Q.   When did you review it?

8        A.   I reviewed the lease -- the lease was

9    after I put together the budget, but I don't

10   remember the time line on that.  That was a more

11   recent I would say six or eight months ago.

12       Q.   Who asked you to review the lease?

13       A.   I believe Douglas Garrett.  It could have

14   been Douglas Garrett or David Freider.  It was a

15   phone call.

16       Q.   Was it before or after you did your report

17   to him?

18       A.   It was after.

19       Q.   What were you asked to do when you were

20   asked to review the lease?

21       A.   Just to review the lease in general.

22       Q.   What were you looking for?

23       A.   Can you be more specific?

24       Q.   Well, I guess I would imagine that they

                                                    18

1     wouldn't just hand you the lease and say here's the

2     lease and say please review it.  Maybe they did.

3     Were you asked to look at this article, that

4     article, look at any definitions of terms.  Your

5     report here says the terms that are used are

6     defined in the lease?

7         A.    I read the whole lease.

8         Q.    What was your understanding of why you

9     were doing that?

10        A.    Just to see basically if there was a

11    60-day construction or replacement. There was just

12    certain time lines they wanted me to look at.  How

13    long did I think the reconstruction should take and

14    those type of things.  For the construction purpose

15    only is the reason why I reviewed the lease and I

16    believe it was provided to me.

17        Q.    How long did you think the reconstruction

18    would take?

19        A.    I believe the reconstruction would take

20    between 10 and 12 weeks.

21        Q.    That's not anywhere in this report, is it?

22        A.    I don't believe so.

23        Q.    What's the basis of that estimate?

24        A.    Due to they're usually like a nine-week

19

1    project but because of the cleanup working

2    concurrently with the recovery, emergency teams

3    that were out there just trying to start up and

4    immobilize construction I felt it would take a

5    longer duration.

6        Q.   You said they are usually a nine-week

7    project and what is they?

8        A.   They is a typical tenant build-out and

9    these were more selective scopes which makes -- and

10   some of them were reduced scopes but there were

11   some additional scopes.

12       Q.   Have you ever been involved in rebuilding

13   after storm damage for Sports Authority?

14       A.   Not for the Sports Authority, no.

15       Q.   Have you for someone else?

16       A.   For Fisher Development we would have

17   emergency basis type of jobs.

18       Q.   How long ago was that?

19       A.   That would be closer to 14, 15 years ago

20   was the last time I was involved with a project

21   like that that was an emergency situation.

22       Q.   Have you ever been asked other than in

23   this project to come up with an estimate of a

24   repair or replacement cost for TSA?

                                                    20

1      A.    No.

2      Q.    This is the only time?

3      A.    This is the only time.

4      Q.    In paragraph five of your report you say

5    that based on the reasonable certainty that the

6    estimated repair and reconstruction cost of the

7    premises as a result of the damages caused by the

8    tornado on March 12th exceeded 35 percent of the

9    then total reconstruction cost of the premises.

10   Does the term estimated repair and construction

11   cost appear anywhere in the lease documents you

12   reviewed?

13     A.    I would have to review those documents

14   again.

15     Q.    Do you know if you're using that as a term

16   defined within the lease, estimated repair and

17   reconstruction cost?

18     MR. SCHMADEKE:  If you know.

19     THE WITNESS:  I don't know to tell you the

20   truth.  Can I have a couple of minutes here?

21     MR. ROLF:  Sure.  Can you mark that as Exhibit

22   No. 8.

23

24

                                                21

1　　　　　　　　　　　　(Whereupon, WOLFORD Deposition

2　　　　　　　　　　　　Exhibit No. 8 was marked for

3　　　　　　　　　　　　identification.)

4　　　THE WITNESS:　Repeat your question again if you

5　　don't mind.

6　　　　　　　　　　　　(Whereupon, the record was read.)

7　　　THE WITNESS:　I don't believe so.

8　　BY MR. ROLF:

9　　　Q.　To your knowledge that term nowhere

10　　appears in the lease?

11　　　A.　Not to my knowledge.

12　　　Q.　In paragraph six you said on behalf of

13　　Capital Construction Group I guess you bid this

14　　store back in 2001?

15　　　A.　July of '01.

16　　　Q.　What type of company was Capital?

17　　　A.　They were a national retail contractor as

18　　well.

19　　　Q.　Did you bid this job from the ground out

20　　or you were bidding it --

21　　　A.　This is a straight tenant improvement

22　　build-out project.

23　　　Q.　Typical of what you were doing with Sports

24　　Authority before and even since?

　　　　　　　　　　　　　　　　　　　　　　　22

1        A.    Yes.

2        Q.    And Exhibit B to this report is that a

3    copy?

4        A.    That's a copy of my owner bid form.

5        Q.    Is that what would have been submitted to

6    the owner?

7        A.    Yes.

8        Q.    Would they then accept that bid, is that

9    the process?

10       A.    That bid was submitted to the architects.

11       Q.    This was being done at the owner's

12    request?

13       A.    That's correct.  It was build to suit.

14       Q.    This would have been submitted to the

15    owners?

16       A.    It was a closed, sealed bid process on

17    that particular project.

18       Q.    Is this the document Exhibit B there that

19    was submitted?

20       A.    That's it.

21       Q.    Would some of this other stuff have gone

22    with it?

23       A.    Yes, actually the clarifications as well,

24    title page, listing and drawings, the original bid

23

1    documentation, yes.

2        Q.   You didn't get the job in that instance,

3    right?

4        A.   That's correct.

5        Q.   Paragraph seven states that on May 2nd,

6    2006 you were asked to go to the premises?

7        A.   That is correct.

8        Q.   Actually to review the premises and also

9    review certain other matters identified herein to

10   provide an opinion.  What were the certain other

11   matters identified herein that you're referring to?

12       A.   How secure the space was, how the space

13   was secure with temporary barricades because of the

14   implosion of the space the storefront had blown

15   out, where they were as far as cleanup, water

16   control, some of the Cotton recovery team where

17   they were and to redefine the other trade work

18   scope such as how much that would supercede this

19   March 27th general outline from David Freider, what

20   the truer work scopes truly were.

21       Q.   And that was done after May 2nd then?

22       A.   I was there on Thursday, May 4th, '06.

23       Q.   Who did you talk to from Cotton when you

24   were there?

                                              24

1    A.   Nobody from Cotton.  This was all site

2    walk-through, three or four hours walking around

3    the building, walking through the building, walking

4    every room.

5    Q.   Why don't you tell me the condition of the

6    premises when you were there March 4th?

7    MR. SCHMADEKE:  May 4th.

8    THE WITNESS:  May 4th, yes.  Basically there

9    was selective demolition that still had to take

10   place for the new finished -- new floor finishes,

11   sealer. There was a select amount of safe off that

12   still had to be completed and reinstallation of

13   select light fixtures on the peropad and the entry

14   there were some selective lesser scope than I had

15   originally thought demolition and redistribution

16   that had to be replaced. There were quite a bit of

17   the millwork that had to be reinstalled. The

18   majority of the flooring the finishes needed to be

19   reinstalled and basically the reinstallation of all

20   the sales fixtures as well. Those were the

21   primary.  It was more specific in my report.

22   Q.   Did you observe anything with regard to

23   the bearing wall?

24   A.   Yes, they had replaced it.  There was a

25

1    specific scope of bar joist and beam pockets they

2    were working on as well as some masonry that had

3    been completed.  There was a roofer as well.  I

4    wasn't able to get on to the roof to see what kind

5    of damage there was.  That's why I didn't put in a

6    specific amount per unit cost in my budget.  This

7    is what I understood what was replaced, but I never

8    walked the actual roof.  That's why I was a little

9    more specific on what I thought the roof was by

10   talking to the other gentleman on the site.

11        Q.   Who did you talk to about the roof?

12        A.   There was a roofer there that I asked him

13   about how much actually of the roofing that needed

14   to be replaced.

15        Q.   What did he tell you?

16        A.   There was some notes that I had taken,

17   field notes and it spelled it out.

18        Q.   Do you still have your field notes today?

19        A.   No, I don't have those.  They were very

20   general but more specific to what I had originally

21   had had.

22        Q.   What happened to them?

23        A.   The original notes from that?

24        Q.   Yeah.

                                                    26

1        A.    After I had formalized this budget I

2    didn't keep them because that was a year and a half

3    ago.

4        Q.    When you're talking about that just

5    looking at this as line item five, is that it?

6        A.    Yes, that would be it.

7        Q.    So you approximated 1500 square feet

8    needed to be replaced?

9        A.    15,000 actually and/or its insulation

10    board.

11        Q.    Do you know what percentage of the entire

12    roof that was?

13        A.    It was approximately 38 percent

14    thereabouts.

15        Q.    With regard to the floor, the floor that

16    was in the building at the time of the storm had

17    been removed, is that true?

18        A.    I'm sorry, repeat the question.

19        Q.    The rubber flooring that was in the floor

20    at the time of the storm had all been removed?

21        A.    A significant amount of it was, yes.

22        Q.    You don't know what condition it was in?

23        A.    Prior to that time, no.  If it does get

24    wet it's a waterborne adhesive that's the product,

27

1    and it's a national account and so it would have to

2    be removed.  It would be my assumption it all had

3    to be removed.

4        Q.    Is that because of the adhesive?

5        A.    It can't be salvaged, that's correct.

6        Q.    Tell me a little more about what you

7    observed about the entry.  Are you talking the

8    doors or the storefront?

9        A.    There's three components to a Sports

10   Authority standard entry.  You've got the Stanley

11   Automatic doors that is part of the vestibule.  You

12   have the transoms above and there's always two

13   storefront sidelights or storefront openings and

14   they're usually 20 by 16 on either side.  Sometimes

15   they're a curtain wall.  In this case it's a

16   standard storefront with a five inch and standard

17   insulated glass.  That had been -- that had been

18   secured on both sides and secured temporary

19   barricading.  Site protection had been provided

20   there.

21       Q.    What needed to be done, if anything, to

22   repair those?

23       A.    It had to be replaced with clear anodized

24   and insulated glass. There might have been one

                                                    28

1    quadrisection that was still there. I can't

2    remember.  I do not recall but at some point it was

3    all going to be replaced.

4        Q.   How is it that you're familiar with the

5    construction costs in the Springfield area?

6        A.   Besides originally bidding the project and

7    having substantial bid coverage and that means

8    subcontractor coverage for each trade originally

9    and my past history working in multiple markets

10   throughout the country, union and nonunion and a

11   very parallel market in Delafield, Wisconsin which

12   is a union market and the labor rates are very

13   consistent with that I was able to formalize and

14   that assisted me in this budget, this replacement

15   budget.

16       Q.   When you were talking about familiarity

17   with it originally you're talking back in 2001?

18       A.   That is correct.

19       Q.   So those numbers wouldn't be good anymore?

20       A.   With pricing the Sports Authority work all

21   over the country doing them in 12 or 14 different

22   states, knowing the Springfield, Illinois market

23   with comparable markets I felt that the budget that

24   I produced was a very comprehensive budget and the

                                                    29

1    past history.

2        Q.   Did you know any of the subcontractors who

3    were performing work on this job?

4        A.   No, I did not.

5        Q.   Did you ever work with any of them before?

6        A.   Didn't have the opportunity.

7        Q.   You have never worked in Springfield?

8        A.   I have not worked in Springfield.

9        Q.   Springfield, Illinois?

10       A.   That's what I meant, I'm sorry.

11       Q.   In paragraph 12 of your report you say

12   it's your opinion based on a reasonable certainty

13   that the total building replacement cost on or

14   about March 12th, 2006 were $1,841,856?

15       A.   12 right?

16       Q.   Yeah, paragraph 12.

17       A.   And repeat your question.

18       Q.   That's your opinion?

19       A.   That is my opinion, yes.

20       Q.   How did you arrive at that?

21       A.   That was all replacement cost and all the

22   national accounts and my past history and knowing

23   some of these hard numbers in replacement.  That's

24   the number I formalized as a total replacement

30

1    cost.

2         Q.    Does that appear anywhere in any report

3    you made or anything?

4         A.    That was in -- I'd have to look at my

5    report again.

6         Q.    That's it.

7         A.    Can I?  I just want to make sure.  I don't

8    believe that specific number is in my report.

9         Q.    Where did that number come from?

10        A.    That was a number that I compiled three

11   other numbers the Cotton, the replacement, other

12   replacement costs that I got from the Sports

13   Authority and compiled my final number to review it

14   or to submit.

15        Q.    This is the total for the total building,

16   right, not just the cost of the repair of the

17   damage?

18        A.    That's correct.

19        Q.    So tell me again exactly how you came up

20   with that number?

21        A.    I'd have to review all my documentation

22   again.

23        Q.    I need to know how you came up with it

24   because if you look at Exhibit F which is also your

31

1    report in this back on May 1st you have a number of

2    $1,960,067?

3        A.    Can I see that please?

4        Q.    You've got it all right in front of you.

5        A.    Is this in the right order though?

6        Q.    Yeah, Exhibit F.

7        A.    Can you find that for me?

8        Q.    Yeah.

9        A.    Thank you.  This is in response to the

10   Email that I concurred with this Email that these

11   would be the total replacement costs and I plugged

12   in my number, and I felt that per this Email that

13   it absolutely was correct.

14       Q.    Did you generate Exhibit F?

15       A.    No.

16       Q.    Who did?

17       A.    Sports Authority I believe, yes.

18       Q.    Did they get those numbers on the shell

19   cost and the tenant improvement costs from you?

20       A.    Just the tenant improvement costs.

21       Q.    Do you know where they got the shell costs

22   from?

23       A.    I'm not recalling.

24       Q.    The three percent estimate for original

                                                          32

1    project changes did that number come from you?

2        A.    I don't recall.

3        Q.    As I read this it says, below is the

4    summary comment on the cost as related, etc., etc.,

5    and it says since I didn't know the change orders

6    from this project I assumed.  Do you know who the I

7    is?

8        A.    No.

9        Q.    So this isn't something you drafted?

10       A.    I did not draft this.

11       Q.    You didn't do anything with the Associated

12   General Contractors of America and the construction

13   costs and make adjustments to the bid to come up

14   with that number?

15       A.    I concur with this, but I didn't produce

16   this.

17       Q.    What do you mean by you concur with it?

18       A.    I agree with those totals.

19       Q.    So the building replacement cost you agree

20   would be $1,960,067?

21       A.    Yes.

22       Q.    And that's instead of $1,841,856 which is

23   in paragraph 12 of your Exhibit 1 report?

24       A.    Yes.

33

1      Q.    Looking at paragraph 13 of your report

2    which is on page four?

3      A.    Yeah.

4      Q.    You said you issued a report dated May 1,

5    2006 indicating that the premises sustained direct

6    cost damages.  Do you see that?

7      A.    Yes.

8      Q.    Is the term direct cost damages in the

9    lease?

10     A.    I don't recall.

11     Q.    And your number for that is 743,944?

12     A.    That is correct.

13     Q.    That's based on a May 1 report?

14     A.    The May 1 was a typo.  I started the

15   spreadsheet and then I went and talked to David and

16   I needed to go down there on May 2nd or I had to go

17   down there on May 4th and actually produce the

18   final spreadsheet on the 5th or 6th and worked on

19   it over the course of a couple of days.  It was

20   just the date that I actually started formalizing

21   it.

22     Q.    If we look at Exhibit F it does have a

23   May 1 date and its got an estimated cost of repairs

24   on it which is followed by a budget estimate which

34

1  was prepared by Jeff Wolford that has that same

2  number on it.  So May 1st you did have some number,

3  right?

4      A.   Yeah, I had started the spreadsheet and

5  that's the date that I started working on this.

6  That's a typo that I really finished -- I really

7  finished formalizing it on the 5th, 6th or 7th.

8      Q.   Well, I'd like to know your report says

9  that there is an issue to report May 1 that showed

10  direct cost damages of $743,944 as indicated in my

11  budget estimate which is attached as Exhibit F.

12  What are you referring to here?  I mean, it's your

13  report, you give me the date and you give me the

14  amount and you say it's attached as Exhibit F.

15  Those are Exhibit F.  Can you show me where the

16  743,944 is?

17      A.   No, I can't on Exhibit F.

18      Q.   Is there a budget estimate that has that

19  number on it somewhere to your knowledge?

20      A.   That number would have probably been on

21  the May 1st or May 2 or the May 1st spreadsheet or

22  the owner bid sheet.  That's been rolled over.  So

23  the original budget that I had before the site

24  visit is that number to my best recollection.

35

1    Q.    This says on it estimated repair cost

2    detail attached and what's attached to it is this

3    page right here and I don't know.

4    A.    These were what I brought in.  These were

5    working sheets.  This one says April 3rd and once I

6    redefine the work scope these numbers would change

7    the replacement costs and that's how it probably

8    happened.  That would be my strong assumption.

9    Q.    So then is the estimated repair cost in

10   your opinion $743,944?

11   A.    That's correct.

12   Q.    Not a million forty-six?

13   A.    That is for the specific scope of the

14   tenant build-out or replacement for the tenant

15   improvements only.

16   Q.    So I wouldn't find any document dated May

17   1 that has a $743,944 number on it?

18   A.    I don't believe so.

19   Q.    Were you aware what Sports Authority was

20   using these numbers or you were providing them for?

21   A.    Yes.

22   Q.    What did they tell you they needed them

23   for?

24   A.    If the replacement cost, the true

36

1    replacement cost exceeded 35 percent there was a

2    lease -- there was a possible lease that could be

3    broken.

4        Q.    Did they express to you that it was their

5    desire to get out of this lease?

6        A.    Yes, they did.

7        Q.    Who told you that?

8        A.    David Freider.

9        Q.    When did he tell you that?

10       A.    This was probably a couple of months after

11    the fact.

12       Q.    What's the fact?

13       A.    Well, March, March 27 -- my understanding

14    originally because I didn't have the lease in the

15    beginning was that where they were going back in,

16    back into the store but I thought it was more of an

17    insurance thing at that time.

18       Q.    When did you become aware that that

19    changed?

20       A.    I don't recall the dates on that.

21       Q.    Prior to your final estimate?

22       A.    I knew about that prior to the final

23    estimate I believe.

24       Q.    Based on Exhibit 7 you knew about that

                                                              37

1    March 27th, didn't you, that that was the threshold

2    of the lease?

3        A.    That was the threshold of the lease.

4        Q.    You didn't know they were trying to get

5    out of it at that time?

6        A.    Or what their intentions were.

7        Q.    Fair enough.  This Exhibit F which is

8    attached to your report the second page of which is

9    called a budget estimate you prepared that

10   document, correct?

11       A.    This looks like one of mine, yes.

12       Q.    That would have been completed if it was

13   done prior to May 1 before you ever saw or visited

14   the site, is that correct?

15       A.    That would have been done after.  That May

16   1 just didn't get changed.  I was on site May 4th.

17       Q.    See this budget estimate contains the same

18   number that's in the May 1 report, the million

19   forty-six so that number coming from the budget

20   estimate would have been done by May 1, would it

21   not have?

22       A.    I don't recall.

23       Q.    This is a Sports Authority Rule 26

24   disclosure pages 112 through 115 which is a letter

                                                    38

1    from Mr. Freider to my clients as well as our

2    office whereby he sent to the landlord those very

3    documents which are marked as Exhibit F in your

4    report together with the budget estimate, okay?

5         A.    Yes.

6         Q.    That letter is dated May 3rd so clearly

7    what we see as Exhibit F was done by you sometime

8    before your site visit?

9         A.    And I don't recall the exact date.

10        Q.    Would you agree it was done before your

11   site visit?

12        A.    Yes, because that date is May 4th.

13        Q.    In paragraph 14 of your report you talk

14   about the Cotton USA task that you performed?

15        A.    Yes.

16        Q.    Have you ever worked with Cotton before?

17        A.    No, I have not.

18        Q.    You've indicated that some of their work

19   that their certain tasks were directly preserving

20   or removing TSA's inventory and fixtures.  How did

21   you come about what task Cotton performed for

22   salvage and which you would attribute to

23   reconstruction costs?

24        A.    The breakdowns that Cotton USA submitted

                                                    39

1    by invoicing.

2        Q.    Can you show me what you're referring to?

3        A.    It's the Cotton invoicing dated 3-31 from

4    Mike Mabell or to Mike Mabell from Jeff Crohn.

5        Q.    How did you go about reviewing those

6    documents to determine that?

7        A.    I called Jeff Crohn directly with Cotton.

8        Q.    What did Mr. Crohn tell you?

9        A.    We went through exactly some of the

10   terminology of these work scopes in each department

11   that they did.

12       Q.    When you're talking about work scopes

13   you're talking about their contract and what they

14   were to do?

15       A.    Exactly.

16       Q.    How did you assign any -- the labor is

17   just shown with a name and the hours and rates?

18       A.    I had to define some of his terminology as

19   far as disaster or recovery or emergency, what was

20   emergency what was for example, glass extraction,

21   shard extraction from the finishes.

22       Q.    How do you do that with this document?

23       A.    What I did was I just went by line item

24   and I made sure it wouldn't be part of my number of

                                                    40

1    the 743 number and some change number.  Temporary

2    protection, shoring, anything he did.

3        Q.   That's by going through this contract?

4        A.   Yes.

5        Q.   How did you assign a cost to that from

6    Cotton's $319,000?

7        A.   I didn't include it into my replacement

8    cost.  Mine was for new construction, some

9    selective demolition and the immediate damages that

10   would be a subcontractor cost, not an emergency or

11   hazard removal type company or scope.

12       Q.   Why don't you go to this page which is the

13   last page of Exhibit C.

14       A.   What does that look like?  I'm not finding

15   it.  Thank you.

16       Q.   Is that your work product?

17       A.   Actually, it is.

18       Q.   Can you explain that to me as to what you

19   were doing or how you went about it?

20       A.   Oh, let's see.  This is actually -- I'll

21   put that here. This is how it would look on my

22   computer side bar like that so I pulled it out per

23   the line item.  If you go across the scopes I had

24   pulled it out 80 percent performed by Cotton for

                                                    41

1    demolition site, for example.  It was selective,

2    small portions of demolition in the say drywall

3    finish that they performed according to Jeff Crohn.

4        Q.   So we're looking at this spreadsheet and

5    that says dated 4-3-06, revised 5-7, correct?

6        A.   Yes.

7        Q.   And you're looking at line item number two

8    selective demolition, balance of damage?

9        A.   Yes.

10       Q.   It says budget estimation $28,600 on the

11   table?

12       A.   Yes.

13       Q.   And then you're saying that if you were to

14   continue to the right on that spreadsheet and it

15   would say 80 percent Cotton?

16       A.   Yes.

17       Q.   And then $22,880?

18       A.   Yes, as a proration.

19       Q.   What does that mean to me?

20       A.   Wherever there was overlap in what I would

21   consider more of a straight construction cost that

22   was in my number I took that out and prorated it as

23   a percentage.

24       Q.   So you're saying your estimate of 28,600,

42

1    80 percent of that was done by Cotton?

2        A.    Yes.

3        Q.    And Cotton charged 22,884 or that's just

4    80 percent of that number?

5        A.    That's just my math out of that number.

6        Q.    So you did not in looking at the documents

7    that Cotton sent with their billing which includes

8    a spreadsheet of all the materials, a spreadsheet

9    on all the labor, a spreadsheet on all the

10   equipment rental, you didn't go to those costs and

11   say these costs are attributable to repair and

12   replacement?

13       A.    What I did when I talked to Mr. Crohn with

14   Cotton is out of my budget, out of my budget and

15   what I thought the work was worth take out those

16   percentages.

17       Q.    So if we do that -- again, I don't know if

18   these line up but when you get down to line item 30

19   on your spreadsheet, and I guess it wouldn't be 30

20   and it would be the line below that total.  Do you

21   see where I'm at?

22       A.    Yes.

23       Q.    That's the $743,00?

24       A.    Yeah.

43

1      Q.    Would across from it be Cotton total

2  against WRB budget?

3      A.    That's what it means, yes, whether it

4  lines up with that number or not.

5      Q.    So based on your assigning these

6  percentages off of your budget to the work Cotton

7  did you concluded that $118,211.01 of your total

8  budget estimate was performed by Cotton?

9      A.    At that time, yes.

10      Q.    And at what time was that?

11      A.    I want to make sure you're looking at the

12  same spreadsheet I am.

13      Q.    This is 5-7.

14      A.    I have 4-3 here.

15      Q.    If you look that's the original date but

16  it's revised.

17      A.    Oh, I'm sorry, yes.

18      Q.    Would 4-3 be an indication that's the

19  first time you put together the spreadsheet?

20      A.    Yeah.

21      Q.    That date stayed the same on whatever

22  draft you had?

23      A.    Yeah, at times.  I never thought it would

24  be a legal matter so I wasn't real -- every time I

                                              44

1    entered it I might change the date when I had new

2    information or more finite or more detailed

3    information.

4        Q.   I'm trying to get an understanding of what

5    you did with the Cotton work because originally in

6    your original estimate of the cost of repairs you

7    had $319,000 for Cotton in that total, correct?

8        A.   That's correct.

9        Q.   And are you saying that you don't include

10   any of that now or did you subtract some of it or

11   how did you account for what you attribute that to

12   be?

13       A.   I left it because it was true replacement

14   cost that would be new or remodel construction.

15       Q.   So that's an actual cost.  You got an

16   actual cost, you ought to use an actual cost?

17       A.   That's correct.

18       Q.   To the extent you had actual costs you

19   would use them in your budget estimate?

20       A.   Yes, to the best of my knowledge knowing

21   the product as I do.

22       Q.   Would it be a fair characterization that

23   the $743,944 includes $118,211 of actual cost by

24   Cotton in it, is that fair?

45

E-FILED
Monday, 31 December, 2007 02:02:03 PM
Clerk, U.S. District Court, ILCD

```
1        A.    At the time I had the conversation with

2    Jeff Crohn that was what I thought at that time.

3    I'd have to re-look at my numbers and take a look

4    at it.

5        Q.    To be sure you don't take the $743,944 and

6    then add to it the 118,211?

7        A.    That was kind of a working spreadsheet

8    here so that cost I'd have to revisit that, but I

9    believe I left it in there because it was a true

10   cost and/or those were specific.  And this could be

11   it, too when I talked to Jeff I had questions for

12   him because I saw what work in place had been done,

13   did he do that work because that side bar list is a

14   working sheet and those are things I do and keep on

15   rolling over changing those dates.  And that is --

16   my true assessment is the 743 after talking to

17   Cotton, but these were questions.  It's more

18   questions, was this work completed by Cotton. How

19   much was, you know, if so I would have probably

20   changed it and in fact I know I would have.

21       Q.    What I'm trying to get an understanding of

22   is these working numbers as you described them what

23   would be on the far right are numbers that are

24   actually within this 743,000?  For instance, the
```

46

1    28,600 Cotton did 80 percent of that?

2        A.    That was a question to Jeff because 80

3    percent of it was completed per the site visit. It

4    was a question for him and he answered my

5    questions.

6        Q.    There's no doubt your opinion is that all

7    of the $319,000 bill from Cotton is not

8    attributable to the replacement cost at the

9    facility?

10        A.    Yes.

11        Q.    This sheet that shows the 118,211 would be

12    a fair estimate you've arrived at as to how much of

13    their work would have been considered in the scope

14    of the estimate you prepared for the replacement

15    and repair costs?

16        A.    Those were questions to identify with Jeff

17    and I had already put together those numbers before

18    I talked to him just in case.  That's a working

19    sheet that you see. It's kind of a work in

20    progress.

21        Q.    I take it then it's still a work in

22    progress for you. You haven't finalized these

23    numbers?

24        A.    No.  I have finalized the numbers.

47

1        Q.   Where do I see those finalized numbers?

2        A.   That was 743.

3        Q.   Paragraph 16 of your report and it's on

4   page five, you say you've concluded that

5   Mr. Sorenson's report cannot be considered as a

6   reliable budgeting evaluation.  Do you see that

7   statement?

8        A.   Yes.

9        Q.   You would agree that his report is the

10  actual costs incurred to make the repairs that were

11  made?

12       A.   No.  I didn't believe that to be the case.

13       Q.   Why didn't you believe that to be the

14  case?

15       A.   Because the closeout documentation for

16  final payment or paying finals to all the

17  subcontractors I felt was incomplete as I've put

18  together a couple hundred of these sworn statements

19  and the paperwork was incomplete or it was based on

20  final lien waivers.  If there was a final lien

21  produced it was final lien waivers against invoices

22  only, not a paid in full type of scenario.

23       Q.   Let me say this, in paragraph 17 you say

24  his report appears to outline actual repair and

                                                      48

1    construction costs.  You'd agree with that?

2        A.    Yes, that's what it does.

3        Q.    So in paragraph 16 when you say reliable

4    budgeting evaluation Mr. Sorenson never purported

5    to present his report as a budget.  It was

6    presented as actual costs?

7        A.    That's true.  Those were to be final

8    costs.

9        Q.    In paragraph 18 you state that you have an

10    understanding of the lease that the tenant has the

11    option to terminate the lease by reason of casualty

12    to be exercised within 60 days of the casualty.

13    How did you get that understanding of the lease?

14        A.    That was explained to me.

15        Q.    You're not offering any interpretations of

16    the lease document, are you?

17        A.    No.

18        Q.    Now, flipping to paragraph 19 on the next

19    page.  This is what I think you just elaborated on,

20    that the error in Mr. Sorenson's report is that

21    there was no backup information provided to his

22    cost reports?

23        A.    Final closeout documentation that would be

24    final lien waivers for all costs, material waivers,

49

1     final material waivers and sworn statements.

2         Q.   Have you seen these now?  They were

3     produced by Mr. Sorenson Monday at his deposition.

4         A.   No, I have not seen those.

5         Q.   Has it been indicated to you that you'll

6     be asked to review those to see if they match up?

7         A.   Not at this time.

8         Q.   If they do match up then you would not

9     have any criticism of his report as being in error

10    based on the lack of that documentation?

11        A.   I would have to see the reports.

12        Q.   I'm asking you to assume that the lien

13    waivers and the reports that are provided do and

14    are consistent with his cost report he gave.

15    That's your only error or criticism of it at this

16    time?

17        A.   That's correct.

18        Q.   If those match up that criticism goes

19    away, fair statement?

20        A.   It's a fair statement.

21        Q.   As you say here you're not suggesting that

22    he failed to include things or included incorrect

23    values.  You just said I don't have the information

24    to know?



                                                    50

1      A.   I didn't have a complete closeout package.

2      Q.   Flipping back to this kind of goes after

3   your resume.  You've got a list there of your

4   Sports Authority store locations?

5      A.   Yes.

6      Q.   Is that just all of them you've done since

7   it looks like the list goes back to '99?

8      A.   Yes, that's the list I produced.

9      Q.   It says at the top it says, retail project

10  manager and estimator.  There's a difference

11  between an estimator and project manager, right?

12     A.   There can be.

13     Q.   You were doing both jobs?

14     A.   I was always doing both projects, yes,

15  both sides.

16     Q.   When you say estimator that's exactly what

17  it says you try to estimate what it will cost?

18     A.   That is correct.

19     Q.   That is different in fact than a bid,

20  would it not be?

21     A.   No, it's the same thing.

22     Q.   When you use the term an estimate it's the

23  same as a bid?

24     A.   An estimate is the same as a bid, yes.

51

1      Q.    Are you familiar that some contractors

2    would have an estimator and they would do an

3    estimation of the job and then the owner gets to

4    look at that and say here's what our estimator says

5    but depending on whether work is slow or not slow

6    we may raise it or we may even lower it?

7      A.    We're still talking about the general

8    contractor, the owner of the general contracting

9    firm would review the estimator?

10      Q.    Yeah, the principal in the contracting

11    firm.  I guess my understanding is you have an

12    estimator who gives an estimate to the guy whose

13    going to decide what the bid is going to be.  The

14    bid may be the estimate and it may not be?

15      A.    In retail construction the estimator and

16    the project manager because of tenant build-outs is

17    90 percent the same person.  They wear both hats.

18      Q.    That's the hats you were wearing on these

19    jobs?

20      A.    Yes.

21      Q.    Now, can you tell me what Exhibit B is to

22    your report?

23      A.    It was a spreadsheet, wasn't it?

24      Q.    It's the 2001.

52

1          A.    Okay, I'm sorry.  Yeah, 7-26-01.

2          Q.    As I understand this is when Capital

3    Construction Group bid on the job these are the

4    documents?

5          A.    That's what I produced.

6          Q.    That's all of Exhibit B?

7          A.    Yes.

8          Q.    If we go through it looks like maybe to

9    the fifth page of that exhibit which is your July

10   26th?

11         A.    The clarifications?

12         Q.    Yes.

13         A.    Yeah.

14         Q.    You indicated in item number 10 your

15   basing this as an eight week schedule to complete

16   that project?

17         A.    That's correct.

18         Q.    That's based on items three and four just

19   a regular workday, 40-hour work week?

20         A.    That's correct.

21         Q.    So no expedited, no overtime type work?

22         A.    That would be all bought from the subs.

23   Those are always Exhibit B's within a

24   subcontractor's contract.  That was an expedited

                                                          53

1   schedule there as well.  They're typically nine

2   week schedules.

3        Q.   This Exhibit B the spreadsheet that was

4   your actual bid?

5        A.   This is the actual bid.

6        Q.   So that's the firm cost?

7        A.   That was the firm lump sum number.

8        Q.   If that's accepted by the owner they could

9   sign a contract for that number and then they would

10  have the cost they're going to have on the job?

11       A.   Unless there was any unforeseen

12  conditions.

13       Q.   Subject to change orders?

14       A.   Change orders, revisions.

15       Q.   But it would be possible for the owner to

16  have the pretty firm cost absent a change within a

17  scope of the project?

18       A.   Within 95 percent, yeah.

19       Q.   And he wouldn't necessarily have to wait

20  the eight weeks that you're predicting to complete

21  the work to have 95 percent sure what his costs on

22  the job are going to be?

23       A.   Those costs usually come out because they

24  need to be finalized.  Sometimes they're a time and

54

1    material basis and they might not be addressed for

2    a couple of weeks after the turn, maybe longer.

3        Q.    As you said 95 percent they're going to be

4    firm with the bid?

5        A.    With 95 percent on a typical Sports

6    Authority.

7        Q.    I also notice on that page paragraph or

8    item 14 you when you were with Capital Construction

9    required all the subs to have done a site visit

10   prior to them bidding to you?

11       A.    That's correct.

12       Q.    That's important I take it then to you as

13   a project manager that you know the subs have been

14   out there to see what needs to be done?

15       A.    Yes, confirm deck lengths or stud heights,

16   those type of things for example.

17       Q.    If they didn't do that then their estimate

18   is going to be --

19       A.    They would not receive a contract.  They

20   might not have to do a pre-bid but before they

21   receive a contract that's an unwritten rule for the

22   most part.  They have to do it.  That's my rule.

23   That's kind of my terminology.

24       Q.    That's because you don't want them coming

55

1  back and saying my estimate is off because I didn't

2  go out and look and now I found something

3  different?

4      A.   And it's requested prior to them bidding,

5  too but I would have confirmed that if I would have

6  awarded a successful general contractor.  They

7  would have had to have done it at that point.

8      Q.   The reason for that?

9      A.   Is to make sure that his price is as solid

10  as possible and that he understands the scope, and

11  that he can order his materials usually for the

12  most part.

13      Q.   If you're just doing an estimate there's a

14  lot of variables that could play into that,

15  correct?

16      A.   Yes.

17      Q.   Not the least of which is actually being

18  on site to see what condition its in, what's going

19  on there, what's going to be required?

20      A.   You want to perform a site visit and you

21  want to have as much documentation as possible to

22  nail down a hard, lump sum number.

23      Q.   Have you ever seen the letter from Mark

24  Sorenson that was giving an estimate of percentage

56

1    damage to the facility?

2        A.    There is a letter that I believe is in the

3    package that resembles this format anyway.

4        Q.    You don't know whether you've actually

5    seen that?

6        A.    It's not specifically that letter but,

7    yes, Jones Blythe a letter format like that.  I

8    don't know if it's the same letter.

9        Q.    Were you asked to review that letter to

10   see what you thought of it or offer any opinions

11   about it?

12       A.    Yes. .

13       Q.    What were you asked to do?

14       A.    To review it.  If it's the same letter.

15       Q.    Do you have any opinions because I did not

16   see any opinions disclosed with respect to that

17   particular letter?

18       A.    I might not have made an opinion whether

19   this was in the package that was provided to me or

20   not.  The format looks the same.  I don't know if

21   it's the same exact numbers and percentages.  Until

22   I had the closeout documents and substantiation

23   that those were the final costs I wouldn't have

24   made a comment on that probably anyway, this

57

1    letter.

2        Q.   You don't have any opinion as to whether

3    his -- I guess you would agree the foundation

4    system sustained no damage?

5        A.   That's correct.

6        Q.   The floor slab sustained no damage?

7        A.   Besides water, no.

8        Q.   Nothing that needed to be repaired as to

9    the floor slab, correct?

10       A.   No, there wasn't structural damage to the

11   substrate.

12       Q.   With regard to the bearing walls he says

13   about seven percent damage.  Do you agree or

14   disagree or don't have an opinion on that?

15       A.   I don't have an opinion about the seven

16   percent.  The seven percent I wouldn't agree to the

17   seven percent on that masonry wall.

18       Q.   Why not?

19       A.   There was more that was replaced.  The

20   seven percent would have been the beam pockets

21   alone on that as to what my understanding of the

22   reconstruction was by the time I hit the site.

23       Q.   So you didn't see it in its damaged state?

24       A.   It was more the repaired state.  What I

                                              58

1    could see that the work was performed.

2        Q.    Roof structure 13 percent?

3        A.    I believe that number is light.

4        Q.    You think it was more than that?

5        A.    I believe it's more.

6        Q.    That's based on what?

7        A.    A site visit, knowing what they had to

8    replace such as structural bar joists and such and

9    to substantiate that as the final closeout package,

10   the hard numbers for this job.

11       Q.    The actual costs?

12       A.    The true costs with sworn statements,

13   yeah, that would absolutely do it. That would tell

14   a great deal.

15       MR. ROLF:  Why don't we mark that as Exhibit

16   8.

17   BY MR. ROLF:

18       Q.    The letter we've just been talking about

19   we've now marked as Exhibit 8?

20       A.    Okay.

21       Q.    Let me withdraw Exhibit 8.  The letter we

22   were just talking about is Exhibit 5.  I'm going to

23   show you what's Exhibit 6 and ask if you've seen

24   that before?

                                              59

1      A.    This spreadsheet I'm not familiar with. I

2    don't remember seeing this.

3      Q.    You've not been asked to review that and

4    comment?

5      A.    To the best of my knowledge, no.

6      Q.    Do you have any opinions today as to

7    whether or not the actual cost as reported by Jones

8    Blythe are accurate or fair and reasonable?

9      MR. SCHMADEKE:   The actual cost is the middle

10    column labeled as such.

11      MR. ROLF:   Correct.

12      THE WITNESS:   Actually, this does look

13    familiar.  Can I retract that?

14    BY MR. ROLF:

15      Q.    Sure.  Do you recall when you first saw it

16    and the circumstances under which you saw it?

17      A.    I saw this yesterday.  This is one of the

18    articles I did see yesterday.  I thought there was

19    a header up here.  I was looking for a title block.

20      Q.    Who were you meeting with yesterday when

21    you reviewed this?

22      A.    I met with Mr. Schmadeke and Douglas

23    yesterday.

24      Q.    Is that the first time you saw this?

60

1    A.    That is the first time I saw this.

2    Q.    What did they ask you to do?

3    A.    Just review the cost.

4    Q.    Did you arrive at any opinions or what

5    were your comments after reviewing that?

6    A.    It was brief that I looked it over.

7    Q.    What were your comments with respect to

8    those costs?

9    A.    My first initial -- the big comment I did

10   have, the most important comment that I needed to

11   know is when it is addressed below or not included

12   where were those costs being picked up again.  For

13   example, in the fire alarm minor device replacement

14   in electric, minor ACT's which that's correct there

15   were minor ACT -- I'm sorry, electric safe off,

16   that would be an electrical.  Protection of the

17   finished materials below.  My other comment was the

18   general conditions which is paid for directly by

19   their direct cost for the general contractor.  The

20   supervision cost that's called out supervisory or

21   supervision 4814 and I had a full eight weeks in my

22   number, full eight or ten weeks.  Why was it only

23   4841 for full-time supervision.

24   Q.    But if the actual cost was 48 -- when you

                                              61

1    say 4841 and I know it's hard for the court

2    reporter and we're talking $4,841.  You don't have

3    any argument if that's the actual cost?

4        A.    That would not be supervision cost.  That

5    would be approximately two weeks of supervision of

6    real cost, maybe two and a half weeks.  If it was a

7    union superintendent it could be a week and a half

8    depending on the burden.  I believe Jones Blythe is

9    a union general contractor.

10        Q.    Any other comments about it?

11        A.    I feel the general conditions is way too

12    low and that's called out specifically list items

13    below and it's line item 25 and it's broken out.

14        Q.    Correct, but you don't know if that was

15    his actual cost of those items for general

16    condition?

17        A.    The general conditions depending on what

18    the true duration of construction is to obtain the

19    certificate of occupancy, all costs to obtain that

20    if that's let's say it's a ten-week project you

21    can't be out there for $900 a week.

22        Q.    Where are you looking at there?

23        A.    The general conditions of $7,742. If it

24    was an 8 or 10 week duration what the true duration

62

1   of construction was to get the C of O, the

2   certificate of occupancy.  You can't be on site for

3   9 or $800 a week. If you add the superintendent

4   that's 12 or 1300.

5        Q.   Are you adding general conditions and

6   general supervision?

7        A.   Yeah, because that is a general

8   contracting cost.

9        Q.   There's two separate line items.  One for

10  general conditions and one for supervision?

11       A.   The owner -- this is an owner bid sheet.

12  The owner always likes supervision broken out

13  because they want to know what they're paying for

14  that personnel because he's the go-to guy.

15       Q.   Exhibit 6 is your spreadsheet, correct?

16       A.   This type of spreadsheet -- this type of

17  spreadsheet, yes, it's formatted like a Gart's

18  spreadsheet and that's what they like to see as

19  well. It's been changed from the boiler plated

20  Gart's or Sports Authority spreadsheets because

21  it's more of a specific scope or different scopes

22  that were specific to this project.

23       Q.   All these numbers in the first column are

24  numbers that came from a document you prepared

                                                    63

1    originally?

2        A.    Yes.  You're talking about the left

3    column, yes, sir.

4        Q.    You came up with those individual items

5    listed?

6        A.    Yes, I did.

7        Q.    And you came up with the estimates?

8        A.    The middle column I didn't come up with

9    and/or the owner side column.  Those numbers I

10   didn't come up with.

11       Q.    Your numbers are just that they're your

12   estimates?

13       A.    Those are my estimates per documentation

14   and site visit.

15       Q.    This is marked as Exhibit 2 which we

16   talked a little bit about before.  This is

17   evidently Capital Construction Group's July 26,

18   2001 bid?

19       A.    That's correct.

20       Q.    As I understand this you have material,

21   labor and then the price per square foot and then

22   the total, correct?

23       A.    That's correct.

24       Q.    To get the total you would add the

                                                      64

1    material column to the labor column?

2        A.    That's correct.

3        Q.    That would give you your total?

4        A.    That's correct.

5        Q.    Is this a document you prepared when you

6    were working for Capital Construction Group?

7        A.    Yes, it is.

8        Q.    That's the bid you submitted?

9        A.    That is the bid I submitted.

10       Q.    If we go down to where it says item number

11   eight interior mirrors?

12       A.    Yes.

13       Q.    If you add the labor and materials that

14   number is $1,500, not the total reflected of $1400,

15   is that correct?

16       A.    That looks like a typo.

17       Q.    If you go down to number 12 carpet

18   installation?

19       A.    Yes.

20       Q.    If you add the labor and materials there

21   you'd come up with $45,970 rather than the $45,400?

22       A.    If at that time with this spreadsheet we

23   could discount the numbers on the right-hand side

24   it wasn't an automatic, and if I wanted to knock

65

```
 1    off a hundred for mirrors or if I wanted to just
 2    tweak a number that was a round number as opposed
 3    to going to -- we were prebuying our numbers always
 4    on these jobs because we knew we could get the
 5    subcontractor to do it for $1400 if he was going to
 6    do it for 15 to make our bottom line and the fee on
 7    top of that a better number so we would discount
 8    our trade numbers.  That's probably where it is.
 9    Those were the quotes per square foot price and we
10    would discount the low bidder, the low qualified
11    bidder.
12        Q.   So if we look at line item 14 plumbing.
13    Do you see those two totals and you decided to
14    discount the plumbing bid by more than $30,000?
15        A.   That is a typo.
16        Q.   That's just wrong?
17        A.   It's just wrong.
18        Q.   And then if you go to 15 the sprinklers
19    and add those numbers together they actually come
20    up to $122,500?
21        A.   And I remember -- let's see, the
22    sprinkler.  Actually, the sprinkler is right.
23        Q.   30,000 plus 34,000 right there is 64,000?
24        A.   Oh.
```

<div align="right">66</div>

1         Q.    It's going to be over 65?

2         A.    We discounted the numbers and these were

3    square foot numbers is the big number that the

4    owner would look at anyway or unit pricing.  It's

5    the far right-hand corner that would be what the

6    contracts would be written against and/or what

7    they're looking at anyway.  Some of those numbers

8    would be changed later and we were collecting bids

9    at the time and that would be the first low bidder

10   and we're always working the sheet.

11        Q.    So estimates can change as the things go

12   on?  Your original estimate here is a work in

13   progress?

14        A.    Well, this 7-26 date my final numbers are

15   on the right-hand side on the vertical column. We

16   take bids for two days, 48 hours we'll take bids or

17   prior to that.  And what I do is I keep on working

18   these numbers always and sometimes they might not

19   be reflected for material and labor because I

20   couldn't get that late number I just qualified a

21   number but maybe not got their breakdowns for labor

22   and materials or we're discounting them as well.

23        Q.    It's fair to say these estimates may

24   change what the actual cost to you would be?  The

                                                    67

1    actual cost may in fact be lower than your

2    estimates because you have to come in with a bid at

3    a certain point in time and when you get the actual

4    bid from the sub it may be less than you estimated?

5    A.   Well, there's an estimate and there's a

6    hard bid.  This was a hard bid.  As we have three

7    weeks to put a number on these projects.  For any

8    client it's usually a three-week duration so

9    there's a budget, you put together a project

10   management budget and that's how I've always worked

11   and that's how I was taught.  That would be one

12   thing and then when you start getting your hard

13   numbers from your subcontractors you'll take those

14   project manager estimates out and enter a real

15   number.  And sometimes you might not have an actual

16   number but you'll have a PMS that you would still

17   submit and find somebody to do it for it.

18   Q.   I'm showing you what's been marked as

19   Exhibit 3.  I think this is the spreadsheet and

20   that came with that May 1st report we were looking

21   at earlier.  Do you recall that which I think was

22   Exhibit B?

23   A.   Yeah.

24   MR. SCHMADEKE:  I think it's Exhibit C.

                                                    68

1    BY MR. ROLF:

2        Q.    Exhibit C to your disclosure.  You're

3    right Exhibit B was the 2001.  Actually, it's not

4    Exhibit C either because Exhibit C was Cotton.  It

5    might be F.  It accompanied Exhibit F and then you

6    said you revised that later, is that correct?

7        A.    This is the spreadsheet in Exhibit F.

8        Q.    And then Exhibit 4 is a spreadsheet that's

9    revised 5-7.  Do you see that?

10       A.    Yes.

11       Q.    Do you know what the revisions were

12   between those two?

13       A.    I don't recall specifically.

14       Q.    If you compare Exhibit 3 with Exhibit

15   No. 4 your first item on Exhibit 4 is shoring and

16   stabilization, correct?

17       A.    Yes.

18       Q.    So Cotton comes out but it comes back down

19   later but you don't have any architectural

20   engineering in Exhibit 4, correct?

21       A.    That's correct.

22       Q.    Then you're shoring and stabilization went

23   in Exhibit 3 up into Exhibit 4 to 28,000, correct?

24   It was 18,500 in your original or your May 1

69

1    estimate?

2        A.    That's correct.

3        Q.    And your May 7th is now up to 28,000,

4    correct?

5        A.    That's correct.

6        Q.    Do you know why that is specifically?

7        A.    That was due to the fact that it was a

8    site visit.

9        Q.    So your original estimate then from

10   Exhibit 3 to Exhibit 4 the changes are based on the

11   site visit?

12       A.    Yes.

13       Q.    In Exhibit 3 you've taken out to replace

14   124 foot structural masonry wall, correct?

15       A.    That's correct.

16       Q.    You've taken out duct work, remove and

17   replace -- no, that's not right.  Take out HVAC and

18   repair existing units which would have been between

19   9 and 10 on Exhibit No. 3?

20       A.    That's correct.

21       Q.    If you go down falling down light fixture

22   only.  Then you have light fixtures and you've

23   deleted that from Exhibit No. 4?

24       A.    Number 4 I have electrical safe off.

                                                    70

1    Light fixture installation only.  There's two

2    electrical scopes here.

3        Q.   If you look at Exhibit 3 you have

4    electrical safe off, circuit verification.  Then

5    you have light fixture installation only which

6    would be items 12 and 13 in Exhibit 4.  Then in

7    Exhibit 3 you have light fixtures and materials and

8    you don't include that on Exhibit 4, correct?

9        A.   No, actually I have 12 and 13.

10        Q.   But you don't have anything in Exhibit 4

11    that says light fixtures?

12        A.   What I had done there that included 50

13    fixtures. I have 50 fixtures material.  It was

14    based on 50 fixtures I could see.

15        Q.   But you've taken it out of Exhibit No. 4?

16        A.   Yes.  As a specific line item, yes.

17        Q.   Is it in there anywhere in the costs?

18        A.   In Exhibit 4?

19        Q.   Yeah.

20        A.   That would be line item 13.

21        Q.   Where it says light fixture installation

22    only?

23        A.   50 fixtures.

24        Q.   Yeah, you're installing 50 fixtures the

71

1    same as you had on Exhibit No. 3 light fixture

2    installation only, 50 fixtures?

3        A.    I was assuming -- at that time my

4    assumption maybe was the owner always supplies the

5    lights.  TSA purchases lighting and maybe that was

6    my assumption or they would reuse all existing.

7        Q.    Do you know?

8        A.    I don't know what happened with that

9    specifically.

10       Q.    In item 14 is paint and then item 15

11   dismantling sales floor fixtures.  Let me go down

12   to flooring materials does not appear in Exhibit

13   No. 4 but it is in Exhibit No. 3.  Do you know why

14   that is?

15       A.    That would be more of a lump sum number

16   because it was labor and materials.

17       Q.    But you've got entire flooring

18   installation in both of them but yet in Exhibit

19   No. 3 you have another line item for flooring

20   materials which you've decided to delete.  You

21   don't know why you deleted it?

22       A.    I'm not recalling offhand.

23       Q.    If you go down a few more lines where it

24   says millwork and that's deleted as well materials?

72

1          A.    That's the premier euro case package as

2    supplied by the owner, materials only.  That's

3    always supplied by the Sports Authority.

4          Q.    So that came out because it was -- when

5    you say owner you don't mean the landlord, you mean

6    the Sports Authority?

7          A.    The Sports Authority, yes.

8          Q.    You deleted protection of finish

9    materials, you deleted miscellaneous rental

10   equipment and you deleted the contingency from

11   Exhibit No. 4 because those items weren't

12   necessary?

13         A.    After the site visit, no.

14         Q.    Permit, the $4,000 permit was deleted as

15   well?

16         A.    That's correct.

17         Q.    Do you know why that was deleted?

18         A.    There was no re-permitting that I could

19   see or fees for that or that I could substantiate

20   as a number.

21         Q.    Do you know if there was any permit

22   required by the city?

23         A.    I know that a certificate of occupancy was

24   going to have to be reissued for that project to

                                                       73

1    have another tenant inside the space.

2        Q.   But in terms of -- is that the permit

3    you're talking about or you're talking about a

4    construction permit to do the work?

5        A.   To do the work I never substantiated if

6    there was a permit pulled.  I know there was an

7    inspection process that had to be done.

8        Q.   How did you arrive at the original $4,000

9    estimate?

10       A.   $4,000 covers 90 percent of the Sports

11   Authority permit.

12       Q.   Then you have in Exhibit No. 3 premium

13   from expedited work which is a number you left out

14   of Exhibit No. 4?

15       A.   Where are you seeing that?

16       Q.   Just above the total line in Exhibit No. 3

17   and I don't think it appears in Exhibit 4.

18       A.   That would be a -- that number was for a

19   surcharge if any night work or any fast track work

20   had to transpire.  And when I hit the site and

21   looked at the scope it doesn't look like they

22   needed any of that at that point.  It was just a

23   number to cover any fast track costs for labor.

24       Q.   As I review Exhibit 3 which was the first

74

1    budget estimate you prepared and this is a budget

2    estimate that TSA sent to the landlord as the basis

3    for their termination of the lease saying it was

4    over the 35 percent threshold?

5        A.    Yes.

6        Q.    There are 12 items which no longer appear

7    in your May 7th of '06 revision.  You don't have

8    any -- you don't disagree with that, do you?

9        A.    I would have to go line item to line item.

10       Q.    But you acknowledge?

11       A.    There were reduced scopes and/or changed

12   scopes.

13       Q.    The other thing I did, Mr. Wolford, was

14   compare your estimate in Exhibit No. 3 which went

15   out under a May 1 report with the revised estimate

16   of May 7th which is Exhibit 4, and as I look at

17   apart from the nine items which are deleted there

18   are 18 of the remaining items that are different

19   and the numbers have changed from Exhibit 3 to

20   Exhibit 4.  Does that sound to be about right to

21   you?

22       A.    I'd have to review it.

23       Q.    Do you know why the numbers would have

24   changed?

                                                    75

1      A.   We addressed the scopes, re-qualified the

2      numbers, put another budget number on those scopes

3      or deleted in whole or picked them up in another

4      number.  That's the only reason that would be.

5      Q.   It's fair to say that Exhibit 3 which is a

6      budget estimate is just that, it's an estimate of

7      what you thought might be the scope of the project

8      and what might be the cost to complete that scope

9      of project?

10     A.   To the best of my knowledge per the site

11     visit, per comparable markets, putting numbers and

12     estimates.

13     Q.   Let me correct you because it had nothing

14     to do with the site visit because I'm talking about

15     Exhibit 3 and you had not been there yet, right?

16     A.   Well, I had been to that site prior to

17     that when I bid it the first time.

18     Q.   That was a piece of bare ground, wasn't

19     it?

20     A.   Well, at that point, yeah.

21     Q.   Is that forming any basis of your opinion

22     today?

23     A.   No, not the site visit but in past

24     knowledge.

76

1          Q.    Exhibit No. 3 those numbers it's a budget

2     estimate.  It's an estimate of what you thought the

3     scope of the repairs might be and you've assigned

4     an estimate of the cost of those scope of repairs,

5     correct?

6          A.    That's correct.

7          Q.    We know for a fact if my representation is

8     correct, that at least nine of the scopes changed

9     and were deleted from a later estimate you did,

10    correct?

11         A.    I would have to review it but, yes.  There

12    was some pluses and adds, yes.

13         Q.    As I counted and you can check it later if

14    you want, but as many as 18 of these specific

15    numbers differed from your Exhibit 3 to the

16    estimate in Exhibit No. 4?

17         A.    Yes.  I redefined the scopes many times.

18         Q.    I added up the nine things that were

19    deducted and those deductions alone total $245,487

20    out of the $1,046,000 that shows up in Exhibit

21    No. 3.  That's about a little over 23 percent,

22    correct?

23         A.    I don't have a calculator, but is that

24    what it comes up to?

                                                        77

1      Q.    Yeah, 245,000 out of 1,046,000 is just

2    under 25 percent?

3      A.    Right.

4      MR. ROLF:  Do you know if this is in the report

5    somewhere?

6      MR. SCHMADEKE:  I believe it's in his report

7    here and I believe it's part of it, yes.  It's the

8    second to last page of Exhibit C.

9      MR. ROLF:  So that's accompanying with the

10   Cotton material.  Let me just mark this as Exhibit

11   8.

12                         (Whereupon, Deposition

13                         Exhibit No. 8 was marked for

14                         identification.)

15   BY MR. ROLF:

16     Q.    Let me show you what we've marked as

17   Exhibit No. 8.  This shows a date of 4-3-2006 and

18   revised 5-7.  Do you see that?

19     A.    Yes.

20     Q.    I take it all of the numbers in this

21   Exhibit 8 are the same as in Exhibit No. 4 other

22   than it looks like you've taken out the Cotton

23   number.  Is that a fair description of the change

24   between the two?

                                                    78

1      A.    Yes.

2      Q.    And is this Exhibit 8 then that you're

3    referring to when you say that it is direct cost

4    damages in paragraph 13 of your written disclosure?

5      A.    Yes.

6      Q.    So it's not $1,046,000, it's the 743,944?

7      A.    Those would include the Cotton costs on

8    top of this number in Exhibit 8.

9      Q.    I guess you lost me when you through in

10    that last part.

11      A.    This is your Exhibit 8.

12      Q.    Right.

13      A.    This is my base construction

14    reconstruction cost and had nothing to do with

15    Cotton's cost.

16      Q.    So some of Cotton's costs are in these

17    numbers the percentages you talked about earlier?

18      A.    Those percentages that was a working

19    side.  I wanted to make sure those numbers weren't

20    in my number because it wouldn't be true to the

21    budget or true to those hard costs.

22      Q.    So you're -- I guess to get an opinion

23    that you're going to give at trial in this matter

24    of a reasonable estimate of the cost of repair to

79

1    the premises that number is $743,944?

2        A.    That is correct.

3        Q.    That is an opinion you arrived at May 7th

4    or was it after May 7th because we have two of

5    these Exhibit 4 and Exhibit 8 that both show May

6    7th.  When did you decide to take Cotton out of

7    Exhibit No. 4?

8        A.    I don't recall.

9        Q.    And would it be fair to say that Exhibit

10   No. 8 as it describes it as a budget estimation and

11   does not represent any actual costs?

12       A.    That would be fair.

13   MR. ROLF:  Let's mark this as Exhibit No. 9.

14                        (Whereupon, Deposition

15                        Exhibit No. 9 was marked for

16                        identification.)

17   BY MR. ROLF:

18       Q.    Let's take a look at Exhibit No. 9.  Have

19   you ever seen that before?

20       A.    Yes.

21       Q.    When did you see it?

22       A.    I would assume that I read it a couple of

23   days after it was sent or prior.  I don't always

24   read my Emails.

                                                    80

1      Q.   I don't want to play tricks on you or

2    anything but it doesn't show you on the service

3    list so I don't want you to assume just because I

4    slowed you an Email that you got it.

5      A.   That's why I didn't -- okay.  Are you

6    asking me to read this?

7      Q.   Yeah, and then I'll give you another

8    chance to correct your answer.  Not that it was

9    incorrect before, you tell me, but have you seen

10    that before?

11      A.   It doesn't look familiar to me.

12      Q.   You had a discussion however with David

13    Freider after your visit to Springfield?

14      A.   Yes.

15      Q.   Did he go with you to Springfield?

16      A.   No.

17      Q.   Did anybody from Sports Authority

18    accompany you there?

19      A.   No.

20      Q.   I saw a lot of Emails about that visit

21    that were disclosed and I never gleaned from the

22    end result whether you had somebody with you or

23    not?

24      A.   It was just me.

81

1       Q.   You said that you reported to him an

2   estimate which is attached which is about 17,000

3   more than the original.  Do you know what estimate

4   that is and if we've seen it today?

5       A.   I probably had 15 different spreadsheets

6   on this project and I never changed the date

7   specifically when I changed them.

8       Q.   That's in part because you're working with

9   estimates, the estimate of the scope of the

10  project?

11      A.   Exactly, new information, bits and pieces

12  to finite the number the best I could.

13      MR. ROLF:  I don't think I have anything else.

14      MR. SCHMADEKE:  Can I have just 60 seconds?

15      MR. ROLF:  Sure.

16                  (A short break was taken.)

17                      EXAMINATION

18  BY MR. SCHMADEKE:

19      Q.   I have just a couple of questions.

20  Mr. Wolford, the number we're talking about on the

21  spreadsheet which is the second to last page of

22  Exhibit C and let me find it here quickly if I

23  may.  I had it marked and I lost my space.  If I

24  can use your Exhibit 8 that would be appreciative.

                                                82

1    You testified I believe that the $743,944 was your

2    estimate of the direct reconstruction costs?

3        A.   That is correct.

4        Q.   That doesn't include any costs from

5    Cotton, does it?

6        A.   No.  I pulled those numbers out.  That's

7    correct.

8        Q.   So any part of Cotton costs that would be

9    deemed to be reconstruction would have to be added

10   to that number?

11       A.   That's correct.

12       MR. SCHMADEKE:  I'm going to show him that if I

13   may, David.

14   BY MR. SCHMADEKE:

15       Q.   I'm going to show you a document and take

16   a look at that for me please.  I showed this

17   document to you yesterday, is that correct?

18       A.   That's correct.

19       Q.   Is that the first time you saw it?

20       A.   That's correct.

21       Q.   Could you tell me what this purports to

22   be?

23       A.   Well, it's a second notice to obtain a

24   certificate of occupancy.  It's a status report by

83

1    UCI and division, electrical, plumbing, mechanical

2    and life safety.

3        Q.    Essentially it says that certain items

4    haven't been completed, is that correct?  I don't

5    mean to put words in your mouth.

6        A.    That's correct.

7        Q.    And until those items are completed is the

8    reconstruction completed?

9        A.    If they can't occupy and they're in

10    violation here, status of certification, no.  They

11    can't occupy.

12        MR. SCHMADEKE:  Nothing further.

13                FURTHER EXAMINATION

14    BY MR. ROLF:

15        Q.    Let me just follow up on that.  You don't

16    have any idea why what remains to be done or why it

17    wasn't done at that particular point in time, do

18    you?

19        A.    I don't know.

20        Q.    It could be because the tenant said we're

21    not coming back in so rather than go forward the

22    landlord said let's wait and see.  We don't want to

23    do this electrical and do this because we don't

24    know what tenant fixtures are coming in?

84

1      A.    If the construction is not complete --

2    that wouldn't be how I would handle this.  I would

3    want to have all the construction.  It could be

4    occupied immediately because then you can truly --

5    you can truly close the space and close your job.

6    You don't want second notices out.

7      Q.    But you don't know why that second notice

8    came out?

9      A.    Only by the 13 line items called out by

10    three or four divisions here.

11      Q.    Going back to Exhibit No. 8 you say none

12    of Cotton's costs are in this number.  Is that what

13    you testified to?

14      A.    Yes.

15      Q.    As I understood it when we were looking at

16    part of Exhibit C to your report that had this

17    spreadsheet and there was certain work that Cotton

18    performed that was within your scope of work,

19    correct?

20      A.    These notes were completed or I had typed

21    these in because I saw that this work was

22    completed. I substantiated with Jeff Crohn they

23    were to be in the number.  My understanding is this

24    was just questions for me to ask Jeff.  I still

85

1    left them because it either couldn't be

2    substantiated and/or I still left it because the

3    work -- this was true construction cost.  There was

4    no overlap.  I still felt that way.  These are work

5    in progresses.

6         Q.   So what I'm getting at is your line item

7    number two selective demolition, balance of

8    damage.  Do you see that?

9         A.   Yes.

10        Q.   That's a scope you've chosen to use?

11        A.   That's my terminology, yes.

12        Q.   You estimate that as being $28,600 on this

13   particular job is your estimate.  Fair statement?

14        A.   That's correct.

15        Q.   Is it not true that what you found out is

16   that some of what Cotton was doing was within what

17   you called selective demolition balance of damage?

18   Some of what they were doing was within that scope

19   as you defined it, fair statement?

20        A.   These are working comments.  That's on

21   every one of these spreadsheets.  This happened to

22   be copied.

23        Q.   I need you to answer my question.

24        A.   Would you please repeat it?

86

1       Q.    Sure.  Scope of work item two, selective

2    demolition, balance of damage and your estimate of

3    28,600.  The question you had and what you found

4    out is some of the work Cotton was performing fell

5    within what you considered selective demolition,

6    balance of damage, fair statement, within that

7    scope of work?

8       A.    Within that scope of work these are the

9    numbers that they did not perform after further

10    clarification with Cotton.

11       Q.    Did Cotton perform anything that was

12    within selective demolition, balance of damage

13    scope of work?

14       A.    That was substantial enough to change my

15    number, no, or I would have changed it.

16       Q.    I can't line these up.  Can you tell me

17    what other number they might have gone to or I

18    can't do it upside at least.

19       A.    Number 15, dismantling sales floor

20    fixturing only because I see dismantling only.

21    That number I might have revised, but these are

22    what I personally believe absolutely felt was the

23    true budget numbers after talking to -- the true

24    construction, direct construction costs.

                                                    87

1    Q.    Which one did you just refer to?

2    A.    15.

3    Q.    I don't even see it on your earlier one.

4    Is it on Exhibit No. 3 anywhere?

5    A.    Not specifically, no.

6    Q.    Do we have a prior spreadsheet like this

7    before you took out Cotton's numbers?

8    A.    When this was actually produced and

9    against which spreadsheet because I left this on

10   the right side many times was printed, these

11   numbers would not reflect -- these are my final

12   numbers and what I felt the reconstruction cost

13   was. This could have been done well prior to this

14   final number.  I don't remember the exact date I

15   talked to Mr. Crohn.  There's other columns here

16   with other notes that gets erased. I update the

17   spreadsheet, but these were my final numbers for

18   this project.  I felt it was true construction

19   related costs, nutshell, but the direct damages.

20   Q.    So that's your estimate?

21   A.    This was my estimate.

22   MR. ROLF:  I don't have anything else.

23   MR. SCHMADEKE:  I would like that document to

24   be an exhibit of the deposition whatever number we

88

1    are on and I think it's 9 or 10.

2                              (Whereupon, Deposition

3                              Exhibit No. 10 was marked for

4                              identification.)

5        MR. SCHMADEKE:  Mr. Wolford, you have the right

6    to review your deposition and make sure the court

7    reporter transcribed everything you said properly

8    or you can waive that.  If you review it, you

9    review it and sign it or make changes if you think

10   there is an error.  Which do you prefer to do?

11       THE WITNESS:  Does it have to be done today?

12       MR. SCHMADEKE:  It would not be done today.

13   It's after she prepares the transcript and then you

14   have a chance to read it over.

15       THE WITNESS:  I would like a chance to read it

16   over.

17                      FURTHER DEPONENT SAITH NOT.

18

19

20

21

22

23

24

                                                       89

E-FILED
Monday, 31 December, 2007 02:02:22 PM
Clerk, U.S. District Court, ILCD

1    STATE OF ILLINOIS   )

2                        )   SS:

3    COUNTY OF C O O K   )

4        I, Christine M. Jachimiak, a notary public

5    within and for the County of Cook County and State

6    of Illinois, do hereby certify that heretofore,

7    to-wit, on the 30th day of October, 2007,

8    personally appeared before me, at 222 North

9    LaSalle, Chicago, Illinois, JEFFREY WOLFORD, in a

10   cause now pending and undetermined in the Circuit

11   Court of Cook County, Illinois, wherein SWPLAZA III

12   is the Plaintiff, and TSA STORES, INC. is the

13   Defendant.

14       I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in the

19   presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to the

91

1    foregoing deposition was not waived by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice, and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel for nor

8    in any way related to the parties to this suit, nor

9    am I in any way interested in the outcome thereof.

10        IN TESTIMONY WHEREOF:  I have hereunto set my

11    hand and affixed my notarial seal this _20_ day

12    of _November_ , 2007.

13

14

15

16    _____

17        NOTARY PUBLIC, COOK COUNTY, ILLINOIS

18

19

20

21

22

23

24

                                                    92

**A**

able
10:13 14:11
26:4 29:13
above-ent...
1:18 90:11
93:12
absent
54:16
absolutely
17:1 32:13
59:13 87:22
accept
23:8
accepted
54:8
accompanied
69:5
accompany
81:18
accompanying
78:9
account
28:1 45:11
accounts
30:22
accurate
11:14 60:8
accurately
90:13
acknowledge
75:10
acoustical
17:8
ACT
61:15
action
18:5
actual
10:10 26:8
45:15,16,16
45:18,23
48:10,24
49:6 54:4,5
59:11 60:7
60:9 61:24
62:3,15
67:24 68:1
68:3,15
80:11
ACT's
61:14

Adams
2:6
add
46:6 63:3
64:24 65:13
65:20 66:19
added
77:18 83:9
adding
63:5
additional
7:23 20:11
93:12
address
4:3,12 93:18
addressed
55:1 61:11
76:1
adds
77:12
adhesive
27:24 28:4
adjustments
33:13
affixed
92:11
aforement...
93:12
aforesaid
91:17,23
ago
18:11 20:18
20:19 27:3
agree
33:18,19
39:10 48:9
49:1 58:3
58:13,16
agreement
1:7 93:14
alarm
17:11 61:13
America
33:12
amount
25:11 26:6
27:21 35:14
and/or
27:9 46:10
64:9 67:6
75:11 86:2
anodized

28:23
answer
81:8 86:23
answered
47:4
answers
90:14
anticipate
7:23
anybody
15:13 81:17
anymore
29:19
anyway
57:3,24 67:4
67:7
apart
75:17
appear
21:11 31:2
72:12 75:6
90:15
APPEARANCES
2:1
appeared
91:8
appears
22:10 48:24
74:17
applicable
93:13
appreciative
82:24
approximated
27:7
approxima...
4:13 27:13
62:5
April
10:3 12:18
36:5
architects
23:10
architect...
14:22 69:19
area
29:5
argument
62:3
arrangements
8:2,3
arrive

30:20 61:4
74:8
arrived
47:12 80:3
article
19:3,4
articles
60:18
asked
4:14 6:4,6
12:9 15:13
18:12,19,20
19:3 20:22
24:6 26:12
50:6 57:9
57:13 60:3
90:14
asking
50:12 81:6
assessment
46:16
assign
40:16 41:5
assigned
77:3
assigning
44:5
assisted
29:14
Associated
33:11
assume
50:12 80:22
81:3
assumed
33:6
assuming
72:3
assumption
28:2 36:8
72:4,6
attached
35:11,14
36:2,2 38:8
82:2
attachment
10:3
Attn
93:7
attorneys
92:5
attributable

43:11 47:8
attribute
39:22 45:11
atypical
16:17
Authority
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,22
20:13,14
22:24 28:10
29:20 31:13
32:17 36:19
38:23 51:4
55:6 63:20
73:3,6,7
74:11 81:17
automatic
28:11 65:24
awarded
56:6
aware
36:19 37:18

**B**

B
3:12 4:4
23:2,18
52:21 53:6
54:3 68:22
69:3
back
9:21 11:16
17:5 22:14
29:17 32:1
37:15,16
51:2,7 56:1
69:18 84:21
85:11
background
14:14
backup
49:21
balance
42:8 86:7,17
87:2,6,12
Bank
1:6
banking
1:9
bar

26:1 41:22
46:13 59:8
bare
76:18
barricades
24:13
barricading
28:19
base
79:13
based
8:6,11 9:14
21:5 30:12
34:13 37:24
44:5 48:19
50:10 53:18
59:6 70:10
71:14
basic
6:9,13 8:12
8:15
basically
15:20 16:8
17:3 19:10
25:8,19
basing
53:15
basis
19:23 20:17
55:1 75:2
76:21
beam
26:1 58:20
bearing
25:23 58:12
beginning
37:15
behalf
22:12
believe
5:13 10:3
18:13 19:16
19:19,22
22:7 31:8
32:17 36:18
37:23 46:9
48:12,13
57:2 59:3,5
62:8 78:6,7
83:1 87:22
best
11:6 35:24

45:20 60:5
76:10 82:12
better
66:7
bid
22:13,19
23:4,8,10
23:16,24
29:7 33:13
35:22 51:19
51:23,24
52:13,14
53:3 54:4,5
55:4 63:11
64:18 65:8
65:9 66:14
68:2,4,6,6
76:17
bidder
66:10,11
67:9
bidding
6:1 22:20
29:6 55:10
56:4
bids
67:8,16,16
big
7:10 13:16
61:9 67:3
biggest
13:24
bill
47:7
billing
43:7
bit
25:16 64:16
bits
82:11
block
60:19
blown
24:14
Blythe
57:7 60:8
62:8
board
27:10
boiler
63:19
bottom

66:6
bought
53:22
box
2:7 7:10
13:16
break
82:16
breakdowns
39:24 67:21
brief
61:6
bring
4:15
broke
17:21
broken
37:3 62:13
63:12
Brooklyn
14:18
Brothers
1:14
brought
36:4
budget
4:24 5:18
6:13 8:11
8:15,17,20
9:5,24 10:4
10:11 18:9
26:6 27:1
29:14,15,23
29:24 34:24
35:11,18,23
38:9,17,19
39:4 42:10
43:14,14
44:2,6,8
45:19 49:5
68:9,10
75:1,1 76:2
76:6 77:1
79:21 80:10
87:23
budgetary
11:4
budgeting
48:6 49:4
build
23:13
Builders

13:15
building
2:5 14:5
16:9 25:3,3
27:16 30:13
31:15 33:19
build-out
7:10,13 13:5
16:18,19
20:8 22:22
36:14
build-outs
52:16
burden
62:8
business
4:3 13:14,21
14:1 15:23
B's
53:23

C

C
17:13 41:13
63:1 68:24
69:2,4,4
78:8 82:22
85:16 91:3
calculations
4:24
calculator
77:23
call
18:15 93:20
called
4:8 38:9
40:7 61:20
62:12 85:9
86:17
calls
11:23
can't
28:5 29:1
35:17 62:21
63:2 84:9
84:11 87:16
87:18
Capital
15:19 22:13
22:16 53:2
55:8 64:17
65:6

carpentry
17:5
carpet
65:17
case
18:5 28:15
47:18 48:12
48:14 73:1
casualty
49:11,12
cause
1:18 90:11
91:10,16
93:12
caused
21:7
ceilings
17:9
CENTRAL
1:2 90:2
certain
19:12 24:9
24:10 39:19
68:3 84:3
85:17
certainty
21:5 30:12
certificate
17:14,16
62:19 63:2
73:23 83:24
certifica...
84:10
Certified
90:12
certify
90:9 91:6,14
91:24 92:3
92:7
chance
81:8 89:14
89:15
change
33:5 36:6
41:1 45:1
54:13,14,16
67:11,24
78:23 87:14
changed
37:19 38:16
46:20 63:19
67:8 75:11

75:19,24
77:8 82:6,7
87:15
changes
33:1 70:10
89:9 93:15
changing
46:15
character...
45:22
charged
43:3
Charles
2:13 11:1
93:7
check
77:13
Chicago
1:21 91:9
93:3
chosen
86:10
Christine
1:18,23
90:11 91:4
93:23
chronolog...
11:20
circuit
71:4 91:10
circumsta...
60:16
city
73:22
clarifica...
87:10
clarifica...
23:23 53:11
cleaning
17:12
cleanup
20:1 24:15
clear
28:23
clearly
39:6
client
13:24 68:8
clients
13:23 39:1
close
85:5,5

closed
23:16
closeout
48:15 49:23
51:1 57:22
59:9
closer
20:19
COCHRAN
2:3
collecting
67:8
column
60:10 63:23
64:3,8,9
65:1,1
67:15
columns
88:15
come
9:13 20:23
31:9 33:1
33:13 39:21
54:23 64:8
64:10 65:21
66:19 68:2
comes
69:18,18
77:24
coming
38:19 55:24
84:21,24
comment
33:4 57:24
60:4 61:9
61:10,17
comments
61:5,7 62:10
86:20
company
1:5,14 22:16
41:11
comparable
29:23 76:11
compare
69:14 75:14
compensated
7:15,17,18
7:20
compensation
7:21,24
compiled

31:10,13
complete
51:1 53:15
54:20 76:8
85:1
completed
15:1 25:12
26:3 38:12
46:18 47:3
84:4,7,8
85:20,22
93:17
components
28:9
comprehen...
29:24
computer
41:22
Computer-...
91:20
concluded
44:7 48:4
concrete
17:5,8
concur
33:15,17
concurred
32:10
concurrently
20:2
condition
25:5 27:22
56:18 62:16
conditions
17:15 54:12
61:18 62:11
62:17,23
63:5,10
confirm
55:15
confirmed
56:5
consider
42:21
considered
47:13 48:5
87:5
consistent
29:13 50:14
construction
5:19 6:9
15:11,16,19

15:20 16:19
16:21 17:3
19:11,14
20:4 21:10
22:13 29:5
33:12 41:8
42:21 45:14
49:1 52:15
53:3 55:8
62:18 63:1
64:17 65:6
74:4 79:13
85:1,3 86:3
87:24,24
88:18
contact
11:2,3
contacted
5:11,14
contained
9:7
contains
38:17
contingency
73:10
continue
42:14
contract
40:13 41:3
53:24 54:9
55:19,21
contracting
52:8,10 63:8
contractor
13:16,17
14:6 22:17
52:8 56:6
61:19 62:9
contractors
33:12 52:1
contracts
67:6
control
24:16
conversation
46:1
conversat...
12:17
Cook
1:19 91:5,11
92:17
copied

86:22
copy
10:4,12,13
23:3,4
corner
67:5
Corporation
1:15
correct
5:4 7:6,8
8:8 12:12
12:16 13:7
16:11 23:13
24:4,7 28:5
29:18 31:18
32:13 34:12
36:11 38:10
38:14 42:5
45:7,8,17
50:17 51:18
53:17,20
55:11 56:15
58:5,9
60:11 61:14
62:14 63:15
64:19,22,23
65:2,4,15
69:6,16,20
69:21,23
70:2,4,5,14
70:15,20
71:8 73:16
76:13 77:5
77:6,8,10
77:22 80:2
81:8 83:3,7
83:11,17,18
83:20 84:4
84:6 85:19
86:14 91:22
corrections
93:15
corresponded
11:12
correspon...
10:16,23
11:9
cost
5:19,19 6:7
8:21 20:24
21:6,9,11
21:17 26:6

30:13,21
31:1,16
32:19 33:4
33:19 34:6
34:8,23
35:10 36:1
36:9,24
37:1 41:5,8
41:10 42:21
45:6,14,15
45:16,16,23
46:8,10
47:8 49:22
50:14 51:17
54:6,10,16
60:7,9 61:3
61:19,20,24
62:3,4,6,15
63:8 67:24
68:1 76:8
77:4 79:3
79:14,15,24
86:3 88:12
costs
11:6 17:14
17:16 29:5
31:12 32:19
32:19,20,21
33:13 36:7
39:23 43:10
43:11 45:18
47:15 48:10
49:1,6,8,24
54:21,23
57:23 59:11
59:12 61:8
61:12 62:19
71:17 74:23
79:7,16,21
80:11 83:2
83:4,8
85:12 87:24
88:19
Cotton
12:5 24:16
24:23 25:1
31:11 39:14
39:16,21,24
40:3,7
41:24 42:15
43:1,3,7,14
44:1,6,8

45:5,7,24
46:17,18
47:1,7 69:4
69:18 78:10
78:22 79:7
80:6 83:5,8
85:17 86:16
87:4,10,11
Cotton's
41:6 79:15
79:16 85:12
88:7
couldn't
67:20 86:1
counsel
4:15 92:1,7
counted
77:13
country
29:10,21
County
1:19 91:3,5
91:5,11
92:17
couple
13:22 21:20
34:19 37:10
48:18 55:2
80:22 82:19
course
8:19 18:1
34:19
court
1:1 62:1
89:6 90:1
91:11 93:2
93:8,23
cover
74:23
coverage
29:7,8
covers
74:10
critical
17:3
criticism
50:9,15,18
Crohn
12:5,13 40:4
40:7,8 42:3
43:13 46:2
85:22 88:15

Crown
15:10,15,19
CSR
1:23
CULBERTSON
2:12 93:5
CULLEN
2:2
curtain
28:15

────── D ──────

D
3:1
damage
6:7 9:18
12:3,8,14
16:3,14
20:13 26:5
31:17 42:8
57:1 58:4,6
58:10,13
86:8,17
87:2,6,12
damaged
58:23
damages
6:10 21:7
34:6,8
35:10 41:9
79:4 88:19
date
5:13 15:8
34:20,23
35:5,13
39:9,12
44:15,21
45:1 67:14
78:17 82:6
88:14 93:5
93:9
dated
1:7 7:4,19
34:4 36:16
39:6 40:3
42:5
dates
37:20 46:15
David
2:4 5:15 7:5
10:24 11:7
11:10,21

18:14 24:19
34:15 37:8
81:12 83:13
day
1:20 17:3
90:19 91:7
92:11
days
34:19 49:12
67:16 80:23
deal
59:14
Dear
93:10
decide
52:13 80:6
decided
66:13 72:20
deck
55:15
deducted
77:19
deductions
77:19
deemed
83:9
Defendant
1:16 2:17
91:13
Defendants
90:8
define
40:18
defined
9:6 18:3
19:6 21:16
86:19
defining
11:5 12:5,8
12:10
definitions
19:4
Delafield
29:11
Delaware
1:15
delete
72:20
deleted
70:23 72:21
72:24 73:8
73:9,10,14

73:17 75:17
76:3 77:9
delivering
4:18
demolition
17:21 25:9
25:15 41:9
42:1,2,8
86:7,17
87:2,5,12
department
40:10 93:23
depending
9:16 52:5
62:8,17
deponent
89:17 93:9
93:12,14,17
deposition
1:17 3:14
4:14 8:6,22
22:1 50:3
78:12 80:14
88:24 89:2
89:6 90:10
92:1,4,5
93:11
describe
13:14
described
6:8,17 16:7
46:22
describes
80:10
description
12:14 78:23
designed
14:21
desire
37:5
detail
36:2
detailed
45:2
details
9:11
determine
40:6
determined
9:17
Development
15:6 20:16

device
61:13
didn't
16:3,12 24:2
  26:5 27:2
  30:6 33:5
  33:11,15
  37:14 38:1
  38:4,16
  41:7 43:10
  48:12,13
  51:1 55:17
  56:1 58:23
  64:8,10
  81:5
differed
77:15
difference
51:10
different
14:13 29:21
  51:19 56:3
  63:21 75:18
  82:5
direct
14:6 34:5,8
  35:10 61:19
  79:3 83:2
  87:24 88:19
directly
39:19 40:7
  61:18
disagree
58:14 75:8
disaster
5:21 40:19
disclosed
57:16 81:21
disclosure
38:24 69:2
  79:4
discount
65:23 66:7
  66:10,14
discounted
67:2
discounting
67:22
discovery
1:17
discussion
81:12

dismantling
72:11 87:19
  87:20
distribution
17:9 93:19
DISTRICT
1:1,2 90:1,2
division
1:3 84:1
  90:3
divisions
85:10
document
8:16 12:19
  23:18 36:16
  38:10 40:22
  49:16 63:24
  65:5 83:15
  83:17 88:23
documenta...
24:1 31:21
  48:15 49:23
  50:10 56:21
  64:13
documents
21:11,13
  39:3 40:6
  43:6 53:4
  57:22
doesn't
74:21 81:2
  81:11 83:4
doing
14:4,7 16:2
  19:9 22:23
  29:21 41:19
  51:13,14
  56:13 86:16
  86:18
don't
4:16 13:14
  16:23 18:9
  19:22 21:19
  22:5,7 25:5
  26:19 27:22
  31:7 33:2
  34:10 36:3
  36:18 37:20
  38:22 39:9
  41:12 43:17
  45:9 46:5
  50:23 55:24

57:4,8,20
58:2,14,15
59:15 60:2
62:5,14
69:13,19
71:8,10
72:8,21
73:5 74:17
75:7,8
77:23 80:8
80:23 81:1
81:3 82:13
84:4,15,19
84:22,23
85:6,7 88:3
88:14,22
doors
28:8,11
doubt
47:6
Doug
11:2
Douglas
2:19 10:24
  18:13,14
  60:22
draft
33:10 44:22
drafted
33:9
drawings
23:24
drywall
17:6,7 42:2
duct
70:16
due
19:24 70:7
duly
4:8 91:15
duration
20:5 62:18
  62:24,24
  68:8

_____ E _____

E
3:1,12
earlier
68:21 79:17
  88:3
East

2:6
education
14:15
educational
14:14
eight
14:12 18:11
  53:15 54:20
  61:21,22
  65:11
either
5:9 6:8
  28:14 69:4
  86:1
elaborated
49:19
electric
61:14,15
electrical
61:16 70:24
  71:2,4 84:1
  84:23
Email
6:8,18,19,20
  6:24 7:2
  8:10 9:14
  9:19,20
  10:2,7 11:9
  11:24 12:1
  32:10,10,12
  81:4
Emailed
10:11
Emails
4:20 9:22
  11:8,19
  80:24 81:20
emergency
20:2,17,21
  40:19,20
  41:10
employee
14:6,7
employers
14:13
enclosed
93:11,12
engineering
69:20
entailed
17:22
enter

68:14
entered
45:1
entire
5:8 27:11
  72:17
entry
25:13 28:7
  28:10
equipment
17:10 43:10
  73:10
erased
88:16
errata
93:13,15,16
  93:18
error
49:20 50:9
  50:15 89:10
Essentially
84:3
estimate
19:23 20:23
  32:24 34:24
  35:11,18
  37:21,23
  38:9,17,20
  39:4 42:24
  44:8 45:6
  45:19 47:12
  47:14 51:17
  51:22,24
  52:12,14
  55:17 56:1
  56:13,24
  67:12 68:5
  70:1,9 74:9
  75:1,2,14
  75:15 76:6
  76:6 77:2,2
  77:4,9,16
  79:24 82:2
  82:3,9 83:2
  86:12,13
  87:2 88:20
  88:21
estimated
21:6,10,16
  34:23 36:1
  36:9 68:4
estimates

64:7,12,13
67:11,23
68:2,14
76:12 82:9
estimation
42:10 52:3
80:10
estimator
51:10,11,16
52:2,4,9,12
52:15
euro
73:1
evaluation
48:6 49:4
evidently
64:17
exact
15:4 39:9
57:21 88:14
exactly
14:24 31:19
40:9,15
51:16 82:11
EXAMINATION
3:2 4:10
82:17 84:13
examined
4:9
example
40:20 42:1
55:16 61:13
exceeded
21:8 37:1
exercised
49:12
exhibit
3:14 8:13,23
12:23 21:21
22:2 23:2
23:18 31:24
32:6,14
33:23 34:22
35:11,14,15
35:17 37:24
38:7 39:3,7
41:13 52:21
53:6,9,23
54:3 59:15
59:19,21,22
59:23 63:15
64:15 68:19

68:22,24
69:2,3,4,4
69:5,7,8,14
69:14,15,20
69:23,23
70:10,10,13
70:19,23
71:3,6,7,8
71:10,15,18
72:1,12,13
72:18 73:11
74:12,14,16
74:17,24
75:14,16,19
75:20 76:5
76:15 77:1
77:15,16,20
78:8,10,13
78:17,21,21
79:2,8,11
80:5,5,7,9
80:13,15,18
82:22,24
85:11,16
88:4,24
89:3
existing
70:18 72:6
expedited
53:21,24
74:13
explain
5:16 41:18
explained
49:14
express
37:4
extent
45:18
extraction
40:20,21
extrapolate
17:23

_____
F
_____

facade
7:11
facility
12:14 47:9
57:1
fact
37:11,12
46:20 51:19
68:1 70:7
77:7
failed
50:22
fair
16:5,13 38:7
45:22,24
47:12 50:19
50:20 60:8
67:23 76:5
78:23 80:9
80:12 86:13
86:19 87:6
fairly
11:14 15:8
falling
70:21
familiar
29:4 52:1
60:1,13
81:11
familiarity
29:16
far
8:5 9:15
13:24 16:14
24:15 40:19
46:23 67:5
fast
74:19,23
fee
66:6
feel
62:11
fees
73:19
feet
27:7
fell
87:4
felt
17:20 20:4
29:23 32:12
48:17 86:4

87:22 88:12
88:18
field
9:17 26:17
26:18
fifth
53:9
file
5:3,9
fill
15:15
final
8:20 9:4,5
17:12 31:13
34:18 37:21
37:22 48:16
48:20,20,21
49:7,23,24
50:1 57:23
59:9 67:14
88:11,14,17
finalized
47:22,24
48:1 54:24
finals
48:16
find
32:7 36:16
68:17 82:22
finding
41:14
finish
17:4 42:3
73:8
finished
25:10 35:6,7
61:17
finishes
25:10,18
40:21
finite
45:2 82:12
fire
17:11 61:13
firm
52:9,11 54:6
54:7,16
55:4
first
4:8 5:11
6:22 10:9
17:2 44:19

60:15,24
61:1,9
63:23 67:9
69:15 74:24
76:17 83:19
91:15
Fisher
15:6 20:16
five
14:23 21:4
27:5 28:16
48:4
fixture
70:21 71:1,5
71:21 72:1
fixtures
25:13,20
39:20 70:22
71:7,11,13
71:13,14,23
71:24 72:2
72:11 84:24
fixturing
87:20
flipping
49:18 51:2
floor
25:10 27:15
27:15,19
58:6,9
72:11 87:19
flooring
25:18 27:19
72:12,17,19
follow
84:15
followed
14:8,10
34:24
follows
4:9
foot
7:12 64:21
66:9 67:3
70:14
foregoing
90:13 91:21
92:1
form
23:4
formalize
29:13

formalized
27:1 30:24
formalizing
34:20 35:7
format
57:3,7,20
formatted
63:17
forming
76:21
forth
18:3
forty-six
36:12 38:19
forward
84:21
found
56:2 86:15
87:3
foundation
58:3
four
14:17,23
15:1,21
17:7 18:2
25:2 34:2
53:18 85:10
frame
6:15
Freider
5:15 7:5
9:21 10:17
10:24 11:7
11:12 12:3
12:11 18:14
24:19 37:8
39:1 81:13
front
32:4
full
17:12 48:22
61:21,22
full-time
61:23
further
3:6 9:17
84:12,13
87:9 89:17
91:14,24
92:3,7

───── G ─────

Garrett
2:19 10:24
11:2,3
18:13,14
Gart
1:13
Gart's
63:17,20
gathered
18:1
gear
17:11
general
17:15 18:21
24:19 26:20
33:12 52:7
52:8 56:6
61:18,19
62:9,11,15
62:17,23
63:5,6,7,10
generate
32:14
gentleman
26:10
getting
68:12 86:6
give
11:14 35:13
35:13 65:3
79:23 81:7
given
4:16 90:14
91:17,22
gives
52:12
giving
56:24
glass
28:17,24
40:20
gleaned
81:21
go
4:16 9:22
24:6 34:16
34:16 40:5
41:12,23
43:10 53:8
56:2 65:10
65:17 66:18
67:11 70:21

72:11,23
75:9 81:15
84:21
goes
50:18 51:2,7
going
29:3 37:15
41:3 52:13
52:13 54:10
54:22 55:3
55:18 56:18
56:19 59:22
66:3,5 67:1
73:24 79:23
83:12,15
85:11
good
29:19
Goods
1:14
go-to
63:14
great
59:14
ground
7:11 13:9,10
13:12 16:10
22:19 76:18
Group
22:13 53:3
65:6
Group's
64:17
guess
15:10 18:24
22:13 43:19
52:11 58:3
79:9,22
guy
52:12 63:14

───── H ─────

H
3:12
half
13:22 14:2
15:21 27:2
62:6,7
hand
19:1 92:11
handle
85:2 93:18

HANNA
2:2
happened
26:22 36:8
72:8 86:21
hard
10:12 30:23
56:22 59:10
62:1 68:6,6
68:12 79:21
hats
52:17,18
haven't
47:22 84:4
hazard
41:11
HCI
15:22
header
60:19
heights
4:5 55:15
hereinbefore
92:6
heretofore
91:6
hereunto
92:10
here's
19:1 52:4
he's
4:17 63:14
Higher
14:15
HINSHAW
2:12 93:5
history
29:9 30:1,22
hit
58:22 74:20
hour
1:22
hours
25:2 40:17
67:16
hundred
48:18 66:1
HVAC
17:9 70:17

───── I ─────

idea

84:16
identific...
8:24 22:3
78:14 80:16
89:4
identified
24:9,11
identify
47:16
III
1:4 90:4
91:11
Illinois
1:2,4,6,9,20
1:22 2:5,8
2:15 4:6
5:24 6:2
29:22 30:9
90:2 91:1,6
91:9,11
92:17 93:3
93:6
imagine
18:24
immediate
41:9
immediately
85:4
immobilize
20:4
implosion
6:6 24:14
important
55:12 61:10
improvement
7:13 16:9
22:21 32:19
32:20
improvements
16:13 36:15
inch
28:16
include
41:7 45:9
50:22 71:8
79:7 83:4
included
17:14 50:22
61:11 71:12
includes
43:7 45:23
incomplete

48:17,19
incorrect
50:22 81:9
incurred
48:10
indicated
35:10 39:18
50:5 53:14
indicating
34:5
indication
44:18
individual
64:4
information
6:11 9:17
11:15,16
17:24 45:2
45:3 49:21
50:23 82:11
initial
8:6 61:9
inside
74:1
inspection
74:7
inspections
17:13
installation
17:7,10
65:18 71:1
71:5,21
72:2,18
installing
71:24
instance
24:2 46:24
Institute
14:17
institution
1:10
insulated
28:17,24
insulation
27:9
insurance
37:17
insure
17:15
intentions
38:6
interested

92:9
interior
13:6 16:24
65:11
interpret...
49:15
introduction
13:2
inventory
39:20
invoices
48:21
invoicing
40:1,3
involve
16:12
involved
17:19 20:12
20:20
isn't
33:9
issue
35:9
issued
34:4
item
27:5 40:23
41:23 42:7
43:18 53:14
55:8 62:13
65:10 66:12
69:15 71:16
71:20 72:10
72:10,19
75:9,9 86:6
87:1
items
9:3,8 53:18
62:12,15
63:9 64:4
71:6 73:11
75:6,17,18
84:3,7 85:9
it's
6:24 7:4
11:9 13:18
15:10 17:18
27:24 28:1
28:15 30:12
35:12,14
40:3 44:16
46:17 47:19

47:21 48:3
50:20 51:21
51:22 52:24
56:4 57:6,8
57:14,21
59:5 62:1
62:13,13,20
63:17,19,21
66:17 67:1
67:4,23
68:8,24
69:3 76:5,6
77:1,2 78:6
78:7,7 79:6
79:6 83:23
83:24 89:1
89:13
I'd
31:4,21 35:8
46:3,8
75:22
I'll
41:20 81:7
I'm
6:1,1 7:19
13:16 27:18
30:10 32:23
41:14 43:21
44:17 45:4
46:21 50:12
53:1 59:22
60:1 61:15
68:18 72:22
76:14 83:12
83:15 86:6
I've
7:10 13:22
14:11 16:21
48:17 68:10

J
Jachimiak
1:19,23
90:11 91:4
93:23
Jeff
12:5 35:1
40:4,7 42:3
46:2,11
47:2,16
85:22,24
Jeffrey

1:17 3:3 4:4
4:7 90:17
91:9 93:9
job
6:1 15:2,3
22:19 24:2
30:3 52:3
53:3 54:10
54:22 59:10
85:5 86:13
jobs
20:17 51:13
52:19 66:4
joist
26:1
joists
59:8
Jones
57:7 60:7
62:8
July
22:15 53:9
64:17
June
7:19

K
K
91:3
keep
27:2 46:14
67:17
kind
9:13 26:4
46:7 47:19
51:2 55:23
knew
6:14 37:22
37:24 66:4
knock
65:24
know
21:15,18,19
27:11,22
30:2 31:23
32:21 33:5
33:6 35:8
36:3 38:4
43:17 46:19
46:20 50:24
55:13 57:4
57:8,20

61:11 62:1
62:14 63:13
69:11 70:6
72:7,8,13
72:21 73:17
73:21,23
74:6 75:23
77:7 78:4
82:3 84:19
84:24 85:7
knowing
29:22 30:22
45:20 59:7
knowledge
22:9,11
35:19 45:20
60:5 76:10
76:24
known
1:8

L
labeled
60:10
labor
29:12 40:16
43:9 64:21
65:1,13,20
67:19,21
72:16 74:23
lack
50:10
landlord
39:2 73:5
75:2 84:22
LaSalle
1:21 91:9
93:2
late
67:20
leading
12:9
lease
18:4,5,8,8
18:12,20,21
19:1,2,6,7
19:15 21:11
21:16 22:10
34:9 37:2,2
37:5,14
38:2,3
49:10,11,13

49:16 75:3
left
45:13 46:9
64:2 74:13
86:1,2 88:9
legal
44:24
legends
17:7
lengths
55:15
lesser
25:14
letter
38:24 39:6
56:23 57:2
57:6,7,8,9
57:14,17
58:1 59:18
59:21
let's
41:20 62:20
66:21 80:13
80:18 84:22
level
17:7
Liability
1:5
License
1:24
lien
48:20,20,21
49:24 50:12
life
84:2
light
25:13 59:3
70:21,22
71:1,5,7,11
71:21 72:1
lighting
17:10 72:5
lights
72:5
likes
63:12
Limited
1:4
line
11:15 18:10
27:5 40:23
41:23 42:7

43:18,18,20
62:13 63:9
66:6,12
71:16,20
72:19 74:16
75:9,9 85:9
86:6 87:16
lines
19:12 44:4
72:23
list
13:1 46:13
51:3,7,8
62:12 81:3
listed
9:3,8 64:5
listing
23:24
little
26:8 28:6
64:16 77:21
LLC
1:4
LLP
2:12
location
12:4
locations
51:4
log
12:20
long
4:12 19:13
19:17 20:18
longer
20:5 55:2
75:6
look
19:3,4,12
31:4,24
34:22 41:14
41:21 44:15
46:3 52:4
56:2 60:12
66:12 67:4
71:3 74:21
75:16 80:18
81:11 83:16
looked
11:19 61:6
74:21
looking

5:18 7:2
8:15 10:2,7
18:22 27:5
34:1 42:4,7
43:6 44:11
60:19 62:22
67:7 68:20
85:15
looks
6:23 10:2
38:11 51:7
53:8 57:20
65:16 78:22
lost
79:9 82:23
lot
56:14 81:20
low
62:12 66:10
66:10 67:9
lower
52:6 68:1
lucky
14:11
lump
54:7 56:22
72:15

——————————
          M
——————————
M
1:19,23
90:11 91:4
Mabell
40:4,4
major
16:18
majority
25:18
management
68:10
manager
51:10,11
52:16 55:13
68:14
March
5:13 6:5,12
6:23 7:4
8:9 9:14,20
21:8 24:19
25:6 30:14
37:13,13
38:1

Margaret
93:23
mark
8:13 21:21
56:23 59:15
78:10 80:13
marked
3:13 8:23
12:23 22:2
39:3 59:19
64:15 68:18
78:13,16
80:15 82:23
89:3
market
15:2,3 29:11
29:12,22
markets
29:9,23
76:11
masonry
26:2 58:17
70:14
Mass
5:21,23
match
50:6,8,18
material
5:2,6 49:24
50:1 55:1
64:20 65:1
67:19 71:13
78:10
materials
43:8 56:11
61:17 65:13
65:20 67:22
71:7 72:12
72:16,20,24
73:2,9
math
43:5
matter
12:24 44:24
79:23
matters
24:9,11
McCorkle
93:2
mean
13:6 33:17
35:12 42:19

73:5,5 84:5
means
6:10 29:7
44:3
meant
30:10
mechanical
84:1
meeting
60:20
mentioned
92:6
met
60:22
metal
17:6
method
11:11
middle
60:9 64:8
Mike
40:4,4
million
36:12 38:18
millwork
25:17 72:24
mind
22:5
mine
38:11 41:8
minor
61:13,14,15
minus
10:6
minutes
21:20
mirrors
65:11 66:1
miscellan...
73:9
missing
11:18
Monday
7:4 50:3
month
8:19 10:6
12:18 18:1
months
18:11 37:10
mouth
84:5
multiple

29:9

**N**

N
3:1 93:2
nail
56:22
name
4:2 40:17
national
1:6 22:17
28:1 30:22
necessarily
54:19
necessary
73:12
need
5:17 31:23
54:24 86:23
93:16
needed
25:18 26:13
27:8 28:21
34:16 36:22
58:8 61:10
74:22
needs
55:14
never
12:19 26:7
30:7 44:23
49:4 74:5
81:21 82:6
new
14:18 16:19
16:21 25:10
25:10 41:8
45:1,14
82:11
newest
11:21
night
17:18,18
74:19
nine
54:1 75:17
77:8,18
nine-week
19:24 20:6
Ninth
2:14 93:6
nonunion

29:10
normally
16:4,8
North
1:21 91:8
NORTHRUP
2:2
notarial
92:11
notarized
93:16
notary
1:19 90:22
91:4 92:17
notes
26:16,17,18
26:23 85:20
88:16
notice
1:22 4:14
55:7 83:23
85:7 92:4
notices
85:6
Novak
15:22
November
1:8 93:5
number
3:13 5:20
6:2 8:20
9:13 30:24
31:8,9,10
31:13,20
32:1,12
33:1,14
34:11 35:2
35:2,19,20
35:24 36:17
38:18,19
40:24 41:1
41:1 42:7
42:22 43:4
43:5 44:4
53:14 54:7
54:9 56:22
59:3 61:22
65:10,14,17
66:2,2,7
67:3,20,21
68:7,15,16
70:24 72:15

73:20 74:13
74:18,23
76:2,4
78:23 79:8
79:20 80:1
82:12,20
83:10 85:12
85:23 86:7
87:15,17,19
87:21 88:14
88:24 93:8
93:20
numbers
6:14 9:16
29:19 30:23
31:11 32:18
36:6,20
46:3,22,23
47:17,23,24
48:1 57:21
59:10 63:23
63:24 64:9
64:11 65:23
66:3,8,19
67:2,3,7,14
67:18 68:13
75:19,23
76:2,11
77:1,15
78:20 79:17
79:19 83:6
87:9,23
88:7,11,12
88:17
nutshell
88:19

**O**

O
17:13 63:1
91:3,3
observe
25:22
observed
28:7
obtain
62:18,19
83:23
occupancy
17:14,21
62:19 63:2
73:23 83:24

occupied
85:4
occupy
84:9,11
October
1:20 90:12
91:7 93:9
offer
57:10
offering
49:15
offhand
6:18 72:22
office
39:2
Oh
41:20 44:17
66:24
okay
39:4 53:1
59:20 81:5
older
15:12
oldest
11:20
once
8:18 36:5
openings
28:13
opinion
24:10 30:12
30:18,19
36:10 47:6
57:18 58:2
58:14,15
76:21 79:22
80:3
opinions
57:10,15,16
60:6 61:4
opportunity
30:6
opposed
66:2
option
49:11
order
32:5 56:11
orders
33:5 54:13
54:14
original

7:18 8:17
9:7,24 10:4
11:4 12:10
23:24 26:23
32:24 35:23
44:15 45:6
67:12 69:24
70:9 74:8
82:3
originally
25:15 26:20
29:6,8,17
37:14 45:5
64:1
ought
45:16
outcome
92:9
outline
8:12 24:19
48:24
overlaid
9:10 10:5
overlap
42:20 86:4
overtime
53:21
owner
17:9 23:4,6
35:22 52:3
52:8 54:8
54:15 63:11
63:11,12
64:9 67:4
72:4 73:2,5
owners
23:15
owner's
23:11

**P**

package
17:10,11
51:1 57:3
57:19 59:9
73:1
packet
15:7
page
23:24 34:2
36:3 38:8
41:12,13

48:4 49:19
53:9 55:7
78:8 82:21
pages
38:24 93:13
93:16,18
paid
48:22 61:18
paint
72:10
painting
17:8
paperwork
48:19
paragraph
18:2 21:4
22:12 24:5
30:11,16
33:23 34:1
39:13 48:3
48:23 49:3
49:9,18
55:7 79:4
parallel
29:11
part
28:11 40:24
55:22 56:12
78:7 79:10
82:8 83:8
85:16
particular
5:3 7:15
8:15 16:12
23:17 57:17
84:17 86:13
particularly
9:8
parties
92:2,8 93:19
partitioning
17:6
path
17:3
paying
48:16 63:13
payment
48:16
pending
91:10
percent
12:1 21:8

27:13 32:24
37:1 41:24
42:15 43:1
43:4 47:1,3
52:17 54:18
54:21 55:3
55:5 58:13
58:16,16,17
58:20 59:2
74:10 75:4
77:21 78:2
percentage
27:11 42:23
56:24
percentages
43:16 44:6
57:21 79:17
79:18
perform
56:20 87:9
87:11
performed
39:14,21
41:24 42:3
44:8 59:1
85:18
performing
30:3 87:4
permit
17:2 73:14
73:14,21
74:2,4,6,11
peropad
25:13
person
52:17
personally
87:22 91:8
personnel
63:14
phone
11:23 12:19
12:21,22
18:15 93:20
photos
9:18,18
17:24
picked
61:12 76:3
piece
76:18
pieces

82:11
place
25:10 46:12
Plaintiff
1:11 2:10
90:5 91:12
plated
63:19
play
56:14 81:1
please
4:2 19:2
32:3 83:16
86:24 93:14
93:17,20
plugged
32:11
plumbing
17:5 66:12
66:14 84:1
plus
10:6 66:23
pluses
77:12
PMS
68:16
pockets
26:1 58:20
point
6:13 9:10
12:19 29:2
56:7 68:3
74:22 76:20
84:17
portions
42:2
position
15:4
possible
37:2 54:15
56:10,21
posted
17:2
pour
17:5
Pratt
14:17
prebuying
66:3
predicting
54:20
prefer

89:10
preliminary
4:23 5:18
8:11
premier
73:1
premises
21:7,9 24:6
24:8 25:6
34:5 80:1
premium
74:12
prepared
35:1 38:9
47:14 63:24
65:5 75:1
prepares
89:13
preparing
12:15
presence
91:19
present
2:19 15:11
15:17 49:5
92:5
presented
49:6
preserving
39:19
pretty
11:24 54:16
previously
4:21 5:1 7:7
pre-bid
55:20
price
56:9 64:21
66:9
pricing
29:20 67:4
primarily
7:10,12
11:13 13:16
13:23
primary
25:21
principal
52:10
printed
88:10
prior

14:4 27:23
37:21,22
38:13 55:10
56:4 67:17
76:16 80:23
88:6,13
probably
35:20 36:7
37:10 46:19
57:24 66:8
82:5
process
11:5 23:9,16
74:7
procure
17:13,16
procured
17:2
produce
15:13,14
33:15 34:17
produced
4:22,23 5:1
5:8 9:2
11:8 29:24
48:21 50:3
51:8 53:5
88:8
product
27:24 41:16
45:21
progress
10:6 47:20
47:22 67:13
progresses
86:5
project
5:3 7:15
10:17 16:12
20:1,7,20
20:23 22:22
23:17 29:6
33:1,6 51:9
51:11 52:16
53:16 54:17
55:13 62:20
63:22 68:9
68:14 73:24
67:9 82:6
82:10 88:18
projects
13:1,13 16:1

16:24 51:14
68:7
properly
89:7
prorated
42:22
proration
42:18
Prospect
4:5
protection
28:19 41:2
61:16 73:8
provide
24:10
provided
4:20,23 6:11
7:1 8:11
19:16 28:19
49:21 50:13
57:19
providing
36:20
public
1:19 90:22
91:4 92:17
pulled
41:22,24
74:6 83:6
purchases
72:5
purported
49:4
purports
83:21
purpose
19:14
pursuant
1:22 92:4
put
6:7,14 8:19
18:9 26:5
41:21 44:19
47:17 48:17
68:7,9 76:2
84:5
putting
76:11
p.m
7:5
P.O
2:7

**Q**

quadrisec...
29:1
qualified
66:10 67:20
quasi
16:20
question
22:4 27:18
30:17 47:2
47:4 86:23
87:3
questions
46:11,17,18
47:5,16
82:19 85:24
90:14 93:20
quickly
82:22
quite
25:16
quotes
66:9

**R**

R
2:13
raise
52:6
rates
29:12 40:17
read
19:7 22:6
33:3 80:22
80:24 81:6
89:14,15
90:9
reading
6:18
real
44:24 62:6
68:14
really
35:6,6
reason
19:15 49:11
56:8 76:4
reasonable
21:5 30:12
60:8 79:24
rebuilding
20:12

recall
6:16 29:2
33:2 34:10
37:20 38:22
39:9 60:15
68:21 69:13
80:8
recalling
32:23 72:22
receive
55:19,21
recollection
11:6 35:24
reconstru...
19:13,17,19
21:6,9,17
39:23 58:22
79:14 83:2
83:9 84:8
88:12
record
4:17,17
15:16 22:6
recovery
20:2 24:16
40:19
redefine
24:17 36:6
redefined
8:18 77:17
redistrib...
25:15
reduced
20:10 75:11
91:20
refer
8:14 88:1
referenced
18:4
referring
24:11 35:12
40:2 79:3
reflect
88:11
reflected
65:14 67:19
regard
25:22 27:15
58:12
regular
53:19
reinstall...

25:12,19
reinstalled
25:17,19
reissued
73:24
relate
16:3
related
17:16 33:4
88:19 92:8
reliable
48:6 49:3
relocates
17:12
remaining
75:18
remains
84:16
remember
18:10 29:2
60:2 66:21
88:14
remodel
16:20 17:23
45:14
removal
41:11
remove
70:16
removed
27:17,20
28:2,3
removing
39:20
rental
43:10 73:9
repair
20:24 21:6
21:10,16
28:22 31:16
36:1,9
43:11 47:15
48:24 70:18
79:24
repaired
58:8,24
repairs
34:23 45:6
48:10 77:3
77:4
repeat
16:6 22:4

27:18 30:17
86:24
replace
59:8 70:13
70:17
replaced
25:16,24
26:7,14
27:8 28:23
29:3 58:19
replacement
5:19 6:7,9
8:20 11:5
16:15,17,18
19:11 20:24
29:14 30:13
30:21,23,24
31:11,12
32:11 33:19
36:7,14,24
37:1 41:7
43:12 45:13
47:8,14
61:13
report
7:19 8:6 9:2
12:24 18:2
18:16 19:5
19:21 21:4
23:2 25:21
30:11 31:2
31:5,8 32:1
33:23 34:1
34:4,13
35:8,9,13
38:8,18
39:4,13
48:3,5,9,24
49:5,20
50:9,14
52:22 68:20
75:15 78:4
78:6 83:24
85:16
reported
1:23 60:7
82:1 91:18
reporter
62:2 89:7
90:12 93:23
Reporters
93:2

13

reports
49:22 50:11
  50:13
represent
80:11
represent...
77:7
**Representing**
2:10,17
request
23:12
requested
56:4
required
55:9 56:19
  73:22
resembles
57:3
reside
4:4
residential
13:17
respect
16:1 57:16
  61:7
respective
92:2 93:19
response
8:9 32:9
result
21:7 81:22
resume
15:7 51:3
retail
13:15,16,18
  22:17 51:9
  52:15
retract
60:13
return
93:18
reuse
72:6
review
18:7,12,20
  18:21 19:2
  21:13 24:8
  24:9 31:13
  31:21 50:6
  52:9 57:9
  57:14 60:3
  61:3 74:24

75:22 77:11
89:6,8,9
  93:14
reviewed
18:5,8 19:15
  21:12 60:21
reviewing
40:5 61:5
revised
42:5 44:16
  69:6,9
  75:15 78:18
  87:21
revision
75:7
revisions
54:14 69:11
revisit
46:8
re-look
46:3
re-permit...
73:18
re-qualified
76:1
right
14:24 24:3
  30:15 31:16
  32:4,5 35:3
  36:3 42:14
  46:23 51:11
  66:22,23
  69:3 70:17
  75:20 76:15
  78:3 79:12
  88:10 89:5
right-hand
65:23 67:5
  67:15
**Road**
4:5
**Rolf**
2:4 3:4,6
  4:2,11 5:2
  5:7 9:1
  10:21 21:21
  22:8 59:15
  59:17 60:11
  60:14 69:1
  78:4,9,15
  80:13,17
  82:13,15

84:14 88:22
rolled
35:22
rolling
46:15
roof
26:4,8,9,11
  27:12 59:2
roofer
26:3,12
roofing
26:13
room
25:4
rough
17:4
round
66:2
rubber
27:19
rule
38:23 55:21
  55:22
run
12:24

----

**S**

S
3:12
safe
25:11 61:15
  70:24 71:4
safety
84:2
**SAITH**
89:17
sales
25:20 72:11
  87:19
salvage
39:22
salvaged
28:5
saw
38:13 46:12
  60:15,16,17
  60:24 61:1
  81:20 83:19
  85:21
saying
42:13,24
  45:9 56:1

75:3
says
15:10 18:2
  19:5 33:3,5
  35:8 36:1,5
  42:5,10
  51:9,9,17
  52:4 58:12
  65:10 71:11
  71:21 72:24
  84:3
scenario
48:22
schedule
53:15 54:1
schedules
54:2
**Schmadeke**
2:13 3:5
  4:16,19 5:5
  10:19 21:18
  25:7 60:9
  60:22 68:24
  78:6 82:14
  82:18 83:12
  83:14 84:12
  88:23 89:5
  89:12 93:7
  93:10
school
14:22
scope
6:14,16 8:18
  9:8 11:5
  12:10 24:18
  25:14 26:1
  36:6,13
  41:11 47:13
  54:17 56:10
  63:21 74:21
  76:7,8 77:3
  77:4 82:9
  85:18 86:10
  86:18 87:1
  87:7,8,13
scopes
6:9,10 9:5
  12:6,8
  17:20 20:9
  20:10,11
  24:20 40:10
  40:12 41:23

63:21 71:2
  75:11,12
  76:1,2 77:8
  77:17
seal
92:11
sealed
23:16
sealer
17:8 25:11
second
38:8 78:8
  82:21 83:23
  85:6,7
seconds
82:14
secure
24:12,13
  93:14
secured
17:1 28:18
  28:18
see
15:9 19:10
  26:4 32:3
  34:6 38:17
  39:7 41:20
  43:21 47:19
  48:1,6 50:6
  50:11 55:14
  56:18 57:10
  57:16 58:23
  59:1 60:18
  63:18 66:13
  66:21 69:9
  71:14 73:19
  78:18 80:21
  84:22 86:8
  87:20 88:3
seeing
60:2 74:15
seen
50:2,4 56:23
  57:5 59:23
  80:19 81:9
  82:4
select
25:11,13
selective
6:7 17:21
  20:9 25:9
  25:14 41:9

42:1,8 86:7
86:17 87:1
87:5,12
sent
4:14 6:23
9:18 11:16
39:2 43:7
75:2 80:23
separate
63:9
service
81:2
set
18:3 92:10
Setina
93:23
seven
24:5 58:13
58:15,16,17
58:20
shard
40:21
sheet
35:22 46:14
47:11,19
63:11 67:10
sheets
36:5 93:13
93:15,16,18
shelf
17:1
shell
13:10 32:18
32:21
shoring
41:2 69:15
69:22
short
82:16
Shorthand
90:12
show
35:15 40:2
59:23 78:16
80:5 81:2
83:12,15
showed
35:9 83:16
showing
68:18
shown
40:17

shows
47:11 77:20
78:17
side
16:9 28:14
41:22 46:13
64:9 65:23
67:15 79:19
88:10
sidelights
28:13
sides
28:18 51:15
sign
54:9 89:9
signature
91:24 93:12
93:14,15,16
93:18,23
signed
93:16,16
significant
27:21
Sincerely
93:22
sir
12:12 64:3
site
6:6 8:19
9:11,18
12:7 17:2
17:24,24
25:1 26:10
28:19 35:23
38:14,16
39:8,11
42:1 47:3
55:9 56:18
56:20 58:22
59:7 63:2
64:14 70:8
70:11 73:13
74:20 76:10
76:14,16,23
situation
20:21
six
4:13 18:11
22:12
slab
58:6,9
slow

52:5,5
slowed
81:4
small
42:2
solely
11:6
solid
56:9
somebody
68:17 81:22
soon
9:20
Sorenson
49:4 50:3
56:24
Sorenson's
48:5 49:20
SORLING
2:2
sorry
6:1 27:18
30:10 44:17
53:1 61:15
sound
75:20
South
2:14 4:5
93:6
space
6:6 17:1
24:12,12,14
74:1 82:23
85:5
specific
6:3,24 17:20
18:23 25:21
26:1,6,9,20
31:8 36:13
46:10 63:21
63:22 71:16
77:14
specifically
57:6 62:12
69:13 70:6
72:9 82:7
88:5
spelled
26:17
spoke
12:6
Sporting

1:14
Sports
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,21
20:13,14
22:23 28:9
29:20 31:12
32:17 36:19
38:23 51:4
55:5 63:20
73:3,6,7
74:10 81:17
spreadsheet
11:4 34:15
34:18 35:4
35:21 42:4
42:14 43:8
43:8,9,19
44:12,19
46:7 52:23
54:3 60:1
63:15,16,17
63:18 65:22
68:19 69:7
69:8 82:21
85:17 88:6
88:9,17
spreadsheets
63:20 82:5
86:21
Springfield
1:3 2:8,15
5:20,23 6:2
12:4 16:2
29:5,22
30:7,8,9
81:13,15
90:3 93:6
sprinkler
17:12 66:22
66:22
sprinklers
66:18
square
7:12 27:7
64:21 66:9
67:3
SS
91:2
stabiliza...

69:16,22
stand
17:11
standard
17:4 28:10
28:16,16
Stanley
28:10
start
20:3 68:12
started
17:4 34:14
34:20 35:4
35:5
starting
11:20
state
4:2,19 49:9
58:23,24
91:1,5
statement
16:5,13 48:7
50:19,20
86:13,19
87:6
statements
48:18 50:1
59:12
states
1:1 24:5
29:22 90:1
90:13
status
83:24 84:10
stayed
44:21
stenograp...
91:18
store
5:20 6:2
16:2 17:17
22:14 37:16
51:4
storefront
24:14 28:8
28:13,13,16
STORES
1:13 90:7
91:12 93:8
storm
16:2 20:13
27:16,20

straight
13:12 22:21
  42:21
Street
1:21 2:6,14
  93:2,6
strictly
13:18
strong
36:8
structural
58:10 59:8
  70:14
structure
59:2
stud
55:15
studs
17:6
stuff
23:21
sub
68:4
subcontra...
6:10 29:8
  41:10 66:5
subcontra...
12:6 30:2
  48:17 68:13
subcontra...
53:24
subject
18:4 54:13
submit
31:14 68:17
  93:14
submitted
23:5,10,14
  23:19 39:24
  65:8,9
subs
53:22 55:9
  55:13
SUBSCRIBED
90:18
substantial
29:7 87:14
substantiate
59:9 73:19
substanti...
74:5 85:22
  86:2

substanti...
57:22
substrate
58:11
subtract
45:10
successful
56:6
successor
1:5,13
suggesting
50:21
suit
23:13 92:8
Suite
1:21 2:5,14
  93:2,6
sum
54:7 56:22
  72:15
summary
33:4
supercede
24:18
superinte...
62:7 63:3
supervision
61:20,21,23
  62:4,5 63:6
  63:10,12
supervisory
61:20
supplement
11:24
supplied
17:9 73:2,3
supplies
72:4
surcharge
74:19
sure
9:23 16:7
  21:21 31:7
  40:24 44:11
  46:5 54:21
  56:9 60:15
  79:19 82:15
  87:1 89:6
sustained
34:5 58:4,6
switch
17:11

sworn
4:1,9 48:18
  50:1 59:12
  90:18 91:15
SWPLAZA
1:4 90:4
  91:11 93:8
system
58:4

_____ T _____
T
3:12
table
12:15 42:11
take
13:5 14:23
  19:13,18,19
  20:4 25:9
  43:15 46:3
  46:5 47:21
  55:12 67:16
  67:16 68:13
  70:17 78:20
  80:6,18
  83:15
taken
1:18 26:16
  70:13,16
  71:15 78:22
  82:16 90:10
  93:9
talk
7:14 12:2,13
  24:23 26:11
  39:13
talked
8:2,3 34:15
  43:13 46:11
  47:18 64:16
  79:17 88:15
talking
26:10 27:4
  28:7 29:16
  29:17 40:12
  40:13 46:16
  52:7 59:18
  59:22 62:2
  64:2 74:3,3
  76:14 82:20
  87:23
taping

17:8
task
39:14,21
tasks
39:19
taught
68:11
team
24:16
teams
20:2
tell
9:9,15 16:23
  21:19 25:5
  26:15 28:6
  31:19 36:22
  37:9 40:8
  52:21 59:13
  81:9 83:21
  87:16
temporary
24:13 28:18
  41:1
ten
61:22
tenant
7:12,13 13:5
  16:9 20:8
  22:21 32:19
  32:20 36:14
  36:14 49:10
  52:16 74:1
  84:20,24
tenant's
16:13
ten-week
62:20
term
21:10,15
  22:9 34:8
  51:22
terminate
49:11
termination
75:3
terminology
40:10,18
  55:23 86:11
terms
9:8 18:3
  19:4,5 74:2
testified

4:9 83:1
  85:13
testify
7:24 91:15
testimony
91:17,22
  92:10
Thank
32:9 41:15
that's
5:4 6:22 7:6
  10:9 12:12
  14:24 15:7
  15:12,12
  16:11 19:21
  23:4,13,20
  24:4 26:5,8
  27:24 28:5
  30:10,18,23
  31:6,18
  33:22 34:13
  35:5,6,22
  36:7,11
  38:18 41:3
  43:3,5,23
  44:3,15,18
  45:8,15,17
  47:18 49:2
  49:7 50:15
  50:17 51:8
  51:16 52:18
  53:5,6,17
  53:18,20
  54:6,8
  55:11,12,21
  55:22,23,24
  58:5 59:6
  61:14,20
  62:3,12,20
  63:4,18
  64:19,23
  65:2,4,8
  66:8,16
  68:10,11
  69:8,21
  70:2,5,15
  70:17,20
  72:24 73:1
  73:2,16
  76:4 77:6
  77:21 78:9
  81:5 82:8

83:6,11,18
83:20 84:6
86:10,11,14
86:20 88:20
**thereabouts**
27:14
**thereof**
92:9
**there's**
28:9,12 47:6
51:10 56:13
63:9 68:5,5
68:9 71:1
88:15
**they're**
19:24 28:14
28:15 54:1
54:10,24
55:3 63:13
64:11 67:7
84:9
**thing**
8:14 37:17
51:21 68:12
75:13
**things**
4:15 9:12
19:14 46:14
50:22 55:16
67:11 77:18
**think**
4:24 5:6,23
10:9 19:13
19:17 49:19
59:4 68:19
68:21,24
74:17 82:13
89:1,9
**third**
14:7
**thought**
25:15 26:9
37:16 43:15
44:23 46:2
57:10 60:18
76:7 77:2
**three**
14:12 15:21
15:21 25:2
28:9 31:10
32:24 53:18
68:6 85:10

**three-week**
68:8
**threshold**
38:1,3 75:4
**Thursday**
17:17,18
24:22
**time**
6:14 10:9,19
10:20 11:14
18:10 19:12
20:20 21:2
21:3 27:16
27:20,23
37:17 38:5
44:9,10,19
44:24 46:1
46:2 50:7
50:16 54:24
58:22 60:24
61:1 65:22
67:9 68:3
72:3 76:17
83:19 84:17
**times**
44:23 77:17
88:10
**title**
23:24 60:19
**today**
4:15 5:8
6:21 7:20
7:21 8:7
11:8 26:18
60:6 76:22
82:4 89:11
89:12
**told**
37:7
**top**
11:21 51:9
66:7 79:8
**tornado**
5:22 6:5
21:8
**total**
21:9 30:13
30:24 31:15
31:15 32:11
43:20 44:1
44:7 45:7
64:22,24

65:3,14
74:16 77:19
**totals**
33:18 66:13
**touched**
13:4
**to-wit**
91:7
**track**
74:19,23
**trade**
24:17 29:8
66:8
**transcribed**
89:7
**transcript**
89:13 90:10
90:13 91:22
93:11,14,15
**Transcrip...**
91:21
**transoms**
28:12
**transpire**
74:20
**trial**
7:24 79:23
**tricks**
81:1
**true**
27:17 36:24
45:13 46:9
46:16 49:7
59:12 62:18
62:24 79:20
79:21 86:3
86:15 87:23
87:23 88:18
91:21
**truer**
24:20
**truly**
24:20 85:4,5
**Trust**
1:7,8
**Trustee**
1:6
**truth**
21:20 91:15
91:16,16
**try**
51:17

**trying**
20:3 38:4
45:4 46:21
**TSA**
1:13 4:20
7:7,9 10:22
20:24 72:5
75:2 90:7
91:12 93:8
**TSA's**
39:20
**turn**
55:2
**turnover**
17:17
**tweak**
66:2
**two**
13:22 14:2
15:23 28:12
42:7 62:5,6
63:9 66:13
67:16 69:12
71:1 78:24
80:4 86:7
87:1
**type**
7:9 16:3
19:14 20:17
22:16 41:11
48:22 53:21
55:16 63:16
63:16
**typed**
85:20
**types**
9:12
**typewriting**
91:20
**typical**
20:8 22:23
55:5
**typically**
54:1
**typo**
34:14 35:6
65:16 66:15

___
**U**

**UCI**
84:1
**underground**

17:6
**understand**
53:2 64:20
**understan...**
19:8 37:13
45:4 46:21
49:10,13
52:11 58:21
85:23
**understands**
56:10
**understood**
26:7 85:15
**undetermined**
91:10
**unforeseen**
54:11
**union**
29:10,12
62:7,9
**unit**
26:6 67:4
**UNITED**
1:1 90:1
**units**
70:18
**unnatural**
5:21
**unwritten**
55:21
**update**
88:16
**upgraded**
8:18
**upside**
87:18
**USA**
39:14,24
**use**
45:16,19
51:22 82:24
86:10
**usually**
19:24 20:6
28:14 54:23
56:11 68:8

___
**V**

**values**
50:23
**variables**
56:14

various
9:3
verbally
6:8
verification
71:4
version
16:20
vertical
67:15
vestibule
28:11
violation
84:10
visit
8:19 9:11
  12:8 17:24
  35:24 39:8
  39:11 47:3
  55:9 56:20
  59:7 64:14
  70:8,11
  73:13 76:11
  76:14,23
  81:13,20
visited
38:13
vs
1:12 90:6
93:8

_____
        W
wait
54:19 84:22
waive
89:8
waived
92:1
waivers
48:20,21
  49:24,24
  50:1,13
walked
26:8
walking
25:2,3,3
walk-through
25:2
wall
17:7 25:23
  28:15 58:17
  70:14

walls
58:12
want
12:24 31:7
  44:11 55:24
  56:20,21
  63:13 77:14
  81:1,3
  84:22 85:3
  85:6
wanted
4:19 19:12
  65:24 66:1
  79:19
wasn't
9:15 26:4
  44:24 52:23
  58:10 65:24
  76:18 84:17
water
24:15 58:7
waterborne
27:24
way
9:9 62:11
  86:4 92:8,9
wear
52:17
wearing
52:18
week
53:15,19
  54:2 62:7
  62:21,24
  63:3
weeks
19:20 54:20
  55:2 61:21
  61:22 62:5
  62:6 68:7
went
9:11,16 15:2
  15:3,19,23
  34:15 40:9
  40:23 41:19
  69:22 75:14
weren't
73:11 79:19
wet
27:24
we'll
67:16

we're
42:4 52:7
  62:2 67:10
  67:22 82:20
  84:20
we've
59:18,19
  78:16 82:4
whatsoever
13:17
what's
7:21 14:14
  19:23 36:2
  37:12 56:18
  56:19 59:23
  68:18
Wheeling
4:5
WHEREOF
92:10
Wisconsin
29:11
withdraw
59:21
witness
3:2 4:1,4,8
  10:20 21:19
  22:4,7 25:8
  60:12 89:11
  89:15 91:14
  91:18,19,23
Wolford
1:17 3:3 4:4
  4:7,21 5:4
  5:12 8:22
  13:15 22:1
  35:1 75:13
  82:20 89:5
  90:17 91:9
  93:9
words
84:5
work
6:13 7:7,9
  7:11,11,13
  10:6 13:17
  13:18,20
  14:5,8,12
  16:3,7,14
  16:15,17,18
  16:19,20
  17:4 24:17

24:20 29:20
  30:3,5 36:6
  39:18 40:10
  40:12 41:16
  43:15 44:6
  45:5 46:12
  46:13,18
  47:13,19,21
  52:5 53:19
  53:21 54:21
  59:1 67:12
  70:16 74:4
  74:5,13,19
  74:19 85:17
  85:18,21
  86:3,4 87:1
  87:4,7,8,13
workday
53:19
worked
14:7 30:7,8
  34:18 39:16
  68:10
working
20:1 26:2
  29:9 35:5
  36:5 46:7
  46:14,22
  47:18 65:6
  67:10,17
  79:18 82:8
  86:20
worth
43:15
wouldn't
10:13 19:1
  29:19 36:16
  40:24 43:19
  54:19 57:23
  58:16 79:20
  85:2
WRB
44:2
written
67:6 79:4
wrong
66:16,17

_____
        X
X
3:1,12

_____
        Y
yeah
13:11 15:12
  26:24 30:16
  32:6,8 34:3
  35:4 43:24
  44:20,23
  52:10 53:1
  53:13 54:18
  59:13 63:7
  68:23 71:16
  71:24 76:20
  78:1 81:7
year
15:22 27:2
years
4:13 13:22
  14:2,9,12
  14:17 15:1
  15:21,23
  20:19
yesterday
60:17,18,20
  60:23 83:17
York
14:18
you'd
49:1 65:21
you'll
50:5 68:13
  68:16
you're
8:5 10:7
  21:15 24:11
  27:4 29:4
  29:17 40:2
  40:12,13
  42:7,13,24
  44:11 49:15
  50:21 54:20
  56:13 64:2
  69:2,22
  71:24 74:3
  74:3 79:2
  79:22,23
  82:8
you've
5:8 11:8
  13:2 14:1
  16:7 28:10
  32:4 39:18
  47:12 48:4

**$**

**$1,046,000**
77:20 79:6
**$1,500**
65:14
**$1,841,856**
30:14 33:22
**$1,960,067**
32:2 33:20
**$118,211**
45:23
**$118,211.01**
44:7
**$122,500**
66:20
**$1400**
65:14 66:5
**$22,880**
42:17
**$245,487**
77:19
**$28,600**
42:10 86:12
**$30,000**
66:14
**$319,000**
41:6 45:7
47:7
**$4,000**
73:14 74:8
74:10
**$4,841**
62:2
**$45,400**
65:21
**$45,970**
65:21
**$5,000**
8:5
**$7,742**
62:23
**$743,00**
43:23
**$743,944**
35:10 36:10

51:3,6 57:4
59:23 60:3
70:13,16,22
71:15 72:17
72:20 77:3
78:22 86:10

36:17 45:23
46:5 80:1
83:1
**$800**
63:3
**$900**
62:21

---

**0**

**00-0020**
1:9
**01**
22:15
**06**
24:22 75:7
**06-3177**
1:12 90:6
93:8
**084-004064**
1:24

---

**1**

**1**
12:23 33:23
34:4,13,14
34:23 35:9
36:17 38:13
38:16,18,20
69:24 75:15
**1st**
7:19 32:1
35:2,21,21
68:20
**1,046,000**
78:1
**1:04**
7:5
**1:30**
1:22
**10**
3:19 19:20
53:14 62:24
70:19 89:1
89:3
**102**
4:5
**112**
38:24
**115**
38:24
**118,211**
46:6 47:11

**12**
19:20 29:21
30:11,15,16
33:23 63:4
65:17 71:6
71:9 75:6
**12th**
6:5 21:8
30:14
**124**
70:14
**13**
34:1 59:2
71:6,9,20
79:4 85:9
**1300**
63:4
**14**
20:19 29:21
39:13 55:8
66:12 72:10
**15**
20:19 66:6
66:18 72:10
82:5 87:19
88:2
**15,000**
27:9
**1500**
27:7
**16**
28:14 48:3
49:3
**17**
48:23
**17,000**
82:2
**18**
49:9 75:18
77:14
**18,500**
69:24
**19**
49:18 93:5
**19th**
10:3

---

**2**

**2**
35:21 64:15
**2nd**
24:5,21

34:16
**20**
28:14
**200**
2:14 93:2,6
**2000**
1:8
**2001**
22:14 29:17
52:24 64:18
69:3
**2006**
5:13 8:10
9:14 12:7
24:6 30:14
34:5
**2007**
1:20 90:12
90:20 91:7
92:12 93:5
93:9
**217**
2:9,16
**22**
3:16
**22,884**
43:3
**222**
1:21 91:8
**23**
77:21
**245,000**
78:1
**25**
62:13 78:2
**2500**
7:19,22
**26**
38:23 64:17
**26th**
53:10
**27**
37:13
**27th**
5:13 6:12,23
6:24 7:4,14
8:10,12
9:14,20
24:19 38:1
**28,000**
69:23 70:3
**28,600**

42:24 47:1
87:3

---

**3**

**3**
68:19 69:14
69:23 70:10
70:13,19
71:3,7 72:1
72:13,19
74:12,16,24
75:14,19
76:5,15
77:1,15,21
88:4
**3rd**
36:5 39:6
**3-31**
40:3
**30**
43:18,19
90:12 93:9
**30th**
1:20 91:7
**30,000**
66:23
**300**
1:21 93:2
**34,000**
66:23
**35**
21:8 37:1
75:4
**38**
27:13

---

**4**

**4**
3:4 69:8,15
69:15,20,23
70:10,23,24
71:6,8,10
71:15,18
72:13 73:11
74:14,17
75:16,20
77:16 78:21
80:5,7
**4th**
12:7 24:22
25:6,7,8
34:17 38:16

39:12
**4-3**
44:14,18
**4-3-06**
42:5
**4-3-2006**
78:17
**40,000**
7:12
**40-hour**
53:19
**400**
2:14 93:6
**48**
61:24 67:16
**4814**
61:21
**4841**
61:23 62:1

**5**

**5**
59:22
**5th**
34:18 35:7
**5-7**
42:5 44:13
69:9 78:18
**50**
71:12,13,14
71:23,24
72:2
**5131**
2:7
**528-7375**
2:16
**544-1144**
2:9

**6**

**6**
1:8 59:23
63:15
**6th**
34:18 35:7
**60**
49:12 82:14
**60-day**
19:11
**60601-1014**
93:3
**607**

2:6
**618**
5:20 6:2
**62701-1908**
2:15 93:6
**62705**
2:8
**64,000**
66:23
**65**
67:1

**7**

**7**
3:15 8:13,23
37:24
**7th**
35:7 70:3
75:7,16
80:3,4,6
**7-26**
67:14
**7-26-01**
53:1
**743**
41:1 46:16
48:2
**743,000**
46:24
**743,944**
34:11 35:16
79:6
**78**
3:17

**8**

**8**
3:15,16,17
21:22 22:2
59:16,19,21
62:24 78:11
78:13,17,21
79:2,8,11
80:5,10
82:24 85:11
**80**
3:18 41:24
42:15 43:1
43:4 47:1,2
**800**
2:5
**82**

3:5
**84**
3:6
**89**
3:19

**9**

**9**
3:18 63:3
70:19 80:13
80:15,18
89:1
**90**
12:1 52:17
74:10
**95**
54:18,21
55:3,5
**96**
15:11
**99**
51:7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited )
liability company, as successor to Illinois )
National Bank, as Trustee under Trust )
Agreement dated November 6, 2000 and )
known as Trust No. 00-0020, an Illinois )
banking institution, )
)
       Plaintiff/Counter-Defendant, )    Case No. 06-CV-3177
)
vs. )
)
TSA STORES, INC., as successor to Gart )
Brothers Sporting Goods Company, a )
Delaware corporation, )
)
       Defendant/Counter-Plaintiff. )

## DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE

Pursuant to Rules 26(a)(2) of the Federal Rules of Civil Procedure and the Scheduling Order entered October 10, 2006, Defendant/Counter-Plaintiff, TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA"), by its attorneys, Hinshaw & Culbertson LLP, submit the following at its expert disclosure:

      Jeffrey Wolford
      Wolford Retail Builders, Inc.
      102 South Wheeling Road
      Prospect Heights, IL 60070
      (847)394-4509

Mr. Wolford's report is produced herewith, which includes a description of all information considered and his qualifications.



For his services in reviewing this matter and preparing the report, the witness will be compensated in the amount of $2,500.00.

Respectfully submitted,

TSA STORES, INC., as successor to Gart Bros. Sporting Goods Company, a Delaware corporation, Defendant,

By _____
One of Its Attorneys

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

2

## CERTIFICATE OF SERVICE

The foregoing DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE was made by hand-delivering a true and correct copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

_Barbara L Rozerly_

Subscribed and sworn to before me
this 1st day of June, 2007.

_Virginia M Heyen_
Notary Public



NOTARY PUBLIC
OFFICIAL
SEAL
STATE OF ILLINOIS
VIRGINIA M. HEYEN
MY COMMISSION EXPIRES
SEPTEMBER 18, 2009

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, ) ) ) ) ) ) ) | |
| Plaintiff/Counter-Defendant, ) ) | Case No.  06-CV-3177 |
| vs. ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, ) ) ) ) | |
| Defendant/Counter-Plaintiff. ) | |

## EXPERT WITNESS REPORT OF JEFFREY WOLFORD

I, Jeffrey Wolford, hereby submit the following report regarding the valuation of the repair and reconstruction costs to the Premises as defined herein, as a result of the tornadoes that damaged the SWPlaza and the TSA Store located therein on or about March 12, 2006.

## INTRODUCTION

1.     My name is Jeffrey Wolford.  I am the president of Wolford Retail Builders, Inc., located in Prospect Heights, Illinois., and has been incorporated in the state of Illinois and Florida since 2005.  I have more than twenty-nine years experience in the construction industry of retail/ commercial projects throughout the United States, including Illinois. In addition,  the following are recent Sports Authority projects that have been completed or are under contract to be completed by Wolford Retail Builders, Inc. Those projects include:

- Sports Authority #478 – Riverhead, NY (interior) 45,049 s.f. – date: 9/27/06
- Sports Authority #457 – Riverdale, NJ (interior) 40,627 s.f. – date: 9/27/06
- Sports Authority #477 – Paramus, NJ (interior) 51,106 s.f. – date: 8/4/05
- Sports Authority #174 – Somerville, MA (interior) 45,669 s.f. – date: 3/9/06

- SportMart #629 – Delafield, WI (interior) 40,934 s.f. – date: 3/2/06
- Sports Authority #176 – Milford, MA (interior) 46,266 s.f. – date: 9/25/05
- Sports Authority #511–Baltimore, MD (exterior,site,interior) 50,122 s.f.– date:7/13/06
- Sports Authority #178–Holyoke, MA (interior) 46,322 s.f. – date: 2/22/07
- Sports Authority #583- Lombard, IL (interior 2 levels) 47,013 s.f.- date: 7/27/07
- Sports Authority #376- Port St. Lucie, FL (interior) 39,334 s.f. - date: 9/13/07
- Sports Authority #604- Oak Lawn, IL (exterior facade only) date: 4/24/06
- Sports Authority #394 – Cape Coral, FL (interior) 29,359 s.f. – date: 08/23/07

2.    My educational and work experience is set forth in my biographical sketch, attached hereto as Exhibit A and by reference made a part hereof, and includes other projects. My experience began in 1977 as a union carpenter. Since 1989 I have had extensive experience working for other general contractor's as a project/ construction manager and have successfully completed many other retail stores throughout the United States, including Illinois.

3.    In addition, I am a member of the following professional organizations: Vested member of Carpenters union local #839 and a member #1329502 of the ICSC- The International Council of Shopping Centers

4.    Unless otherwise specified, the terms used herein are defined as set forth in the Lease which is the subject of the above-referenced action.

5.    Based upon my review of the Premises after the March 12, 2006 tornadoes, the material described herein, my knowledge of the costs of construction, including the costs of construction of the Premises originally in 2001, and the increased costs of labor and materials, and the information and data set forth herein, it is my opinion, based upon a reasonable certainty, that the estimated repair and reconstruction costs of the Premises as a result of the damage caused by the tornadoes of March 12, 2006, exceeded 35% of the then-total reconstruction costs of the Premises.

6.    In 2001, on behalf of Capitol Construction Group, Inc., of which I was then affiliated as project manager, I examined specifications dated June 27, 2001, and drawings

2

pertaining thereto, for the construction of The Sports Authority Store at the South West Plaza Shopping Center in Springfield, Illinois. Based upon that review, I submitted a proposal for the construction dated July 26, 2001, and a revised proposal dated July 30, 2001. The proposals submitted by me on behalf of Capitol Construction Group are attached hereto as Exhibit B and by reference made a part hereof.

## ANALYSIS

7.    On Tuesday, May 2, 2006, I was asked by TSA Stores, Inc., to review the Premises and certain other matters identified herein to provide an opinion as to the extent of the damage caused by the tornadoes of March 12, 2006, the total reconstruction costs of the Premises, and the proportion of the total reconstruction costs that the damage represented.

8.    I visited the premises on Thursday, May 4, 2006.

9.    During my visit to the Premises, I observed the contractor engaged in the reconstruction of miscellaneous work-scopes. Although TSA had demobilized and/or relocated all merchandise from its store, all sales floor fixturing and shelving from the TSA Store had not been fully dismantled and removed from the site. The emergency disaster recovery services contractor retained by TSA had provided all water and debris clean/haul off, moisture tests, disinfecting/ glass shard extraction, dismantling/ staging of OSF store metal fixtures, selective demolition, floor finish adhesive removal, required temporary emergency protection, and barricading/re-securing of space. The contractor retained by the landlord was performing but, not limited to the following work during my site visit: roofing, repair of structural steel and bar joists, miscellaneous electrical rework and reconstruction of effected drywall common to perimeter walls. The project and/or reconstruction was well underway from the total original damage caused by the tornadoes of March 12, 2006.

10.    I also reviewed the following:

3

a)    the disaster recovery services rendered by Cotton USA at the Premises as a result of the tornadoes of March 12, 2006, and the costs associated therewith;

b)    the original construction costs of the Premises and the Shopping Center from 2001 as defined by the general contractor of record, Vancil Contracting; and

c)    the Associated General Contractor's Construction Inflation Index prepared by economist Ken Simonson, which established an inflation factor for that period of 32% for the period from 2001 to 2006.

Copies of those documents are attached hereto as Exhibits C, D, and E respectively, and included herewith.

11.    Based upon my review set forth above, I am familiar with the damages to the Premises, the costs of construction (labor and materials) in the area, and the items needed to be repaired or reconstructed at the Premises as a result of the tornadoes of March 12, 2006.

12.    Based upon my review and my experience with and knowledge of construction costs for retail stores such as this, and my prior knowledge of the original 32,308 square feet project of July 2001, it is my opinion, based upon a reasonable certainty, that the total building replacement costs on or about March 12, 2006 were $1,841,856.00.

13.    Based upon my review of the Premises and the aforementioned items, I formed an opinion, based upon a reasonable degree of certainty, and issued a report dated May 1, 2006, indicating that the premises sustained 'direct costs damage' with the values as a result of the tornadoes of March 12, 2006, $743,944.00, as indicated in my Budget Estimate which is attached hereto as Exhibit F and made a part hereof.

14.    It is my opinion based upon my experience in the construction industry of retail stores, that certain services, projects, and tasks performed by Cotton USA must be considered as part of the legitimate costs of reconstruction and repair of the premises. Those services, projects, and tasks were a necessary component to restore the premises to their condition before the tornadoes of March 12, 2006, or were a necessary prerequisite to construction. Services,

4

projects, or tasks performed by Cotton USA solely directed at preserving or removing TSA's inventory or fixtures should not be included as reconstruction or repair costs. In addition, after reviewing Cotton USA's final costs I have made an adjustment due to overlap workscope/ costs included in my May 7, 2006 budget proposal and Cotton USA's actual work performed. Using pro-ration and percentages these deduct costs totaled $118,201.00 and is reflected in line 12.

15.     Even if all costs attributed to Cotton USA *i.e.,* $319,428, were excluded from the costs of repairs and reconstruction, which in my opinion would not be proper, the remaining reasonable reconstruction costs exceeds 35% of the total replacement cost.

### ANALYSIS OF PLAINTIFF'S EXPERT REPORT

16.     At the request of TSA, I have also conducted a review of the "Rule 26(a)(2) Expert Witness Report of Mark Sorensen," submitted by SWPlaza III, LLC. To that end, I analyzed the report as well as the documents submitted as part of the report. Because of the errors listed below, I have concluded that Mr. Sorensen's report cannot be considered as a reliable budgeting evaluation of the actual damages to the Premises for the purposes of this lawsuit as a result of the March 12, 2006 tornadoes.

17.     The report appears to outline the actual repair and construction costs to the Premises or common areas from the March 12, 2006 tornadoes.

18.     The information provided by Mr. Sorensen indicates that the actual repair and reconstruction work continued for a period greater than sixty (60) days from the occurrence of the tornadoes. My understanding of the Lease is that the Tenant's option to terminate the Lease by reason of casualty had to be exercised within sixty (60) days of the casualty. Since repair and reconstruction was not completed within that sixty (60) day period, the actual repair and reconstruction costs were not and would not have been available for either Landlord or Tenant to consider with respect to the Lease.

5

19.    In my opinion, the most important error in Mr. Sorensen's report, even with respect to actual reconstruction and repair costs, is that it is not supported with appropriate sworn statements by subcontractors and material suppliers, and the certified payroll. Rather the report is based upon running "in-house" activity and entry reports from the general contractor. The reports submitted are not consistent with the American Institute of Architects (AIA) format or title company for lien waivers for payment to contractors and materials suppliers. Although I am not suggesting that either Mr. Sorensen or Jones-Blyth failed to include items that should have been included or failed to specify the correct value for each item, the in-house activity and entry reports may reflect whatever a general contractor wants it to, including costs from other same site/ center projects. Such reports are used for the internal purposes of the general contractor only and are not relied upon for the purposes of making payments to contractors, laborers, and material providers. Also, they do not necessarily reflect the quality and quantity of materials actually used in the construction process.

## CONCLUSION

20.    For services in reviewing this matter and preparing this report, I am being compensated by TSA in the amount of $2500. No compensation has been determined for any testimony I may give in this matter.

21.    I have authored no publications in the preceding ten years.

22.    I have not testified as an expert at trial or by deposition within the preceding four years.

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: May 31, 2007

6

Jeffrey Wolford

7

## CERTIFICATE OF SERVICE

The foregoing Expert Witness Report of Jeffrey Wolford was served upon Plaintiff/Counter-Defendant by hand-delivering a copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

*Barbara L. Rogersby*

Subscribed and sworn to before me
this 1st day of June, 2007.

*Virginia M Heyen*
Notary Public

VIRGINIA M. HEYEN
OFFICIAL
SEAL
NOTARY PUBLIC
STATE OF ILLINOIS
MY COMMISSION EXPIRES
SEPTEMBER 18, 2009

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

# JEFFREY B. WOLFORD

1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-253-8133

Dear Sirs:

Enclosed is my resume; I am looking for a position in the field of Construction Management. Below is a short list of the most important points regarding my experience and goals. I would appreciate hearing from you concerning positions in my field of interest.

Position Pursued: Superintendent/Project Manager

Attributes Highlighted: I am highly aware of quality issues involving construction and construction management, and have had a great deal of experience with the clerical and record-keeping aspects of the field. In addition, I have knowledge of computer programs, such as WordPerfect/DOS, and Windows software.

Circumstances: I have been in New York City for the past 6 years working as a superintendent and project manager. While employed, I attended classes in night school at Pratt Institute School of Architecture, to increase my knowledge and understanding of construction and construction management.

Comments: I have been in the construction industry for the past 18 years. My resume indicates more recent employment information. I am seeking a position with an employer who will offer long-term employment opportunities; I am interested in the "long-haul". I am fully capable of taking any interior project, from permits to punchlist, as either a field superintendent or as a project manager.

Please contact me at the above number regarding opportunities for employment.

Yours sincerely.

Jeffrey B. Wolford

## EXHIBIT A

# JEFFREY B. WOLFORD

1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-253-8133

## OBJECTIVE

To secure a position that will utilize and challenge past experience and acquired expertise in the field of PROJECT MANAGEMENT positively effecting company growth and proficability.

## PROFILE

- Multi-dimensional Project Manager with strong Managerial and Administrative skills
- Background in General Contracting and Field Supervision, with training in Architecture
- Proven ability to communicate clearly and effectively with clients, sub-contractors, and vendors
- Strong organizational and planning skills
- Ability to prioritize work schedules and accomplish tasks simultaneously
- Highly knowledgeable of construction, contractor pricing & bills, building regulations and permits
- Able to remain calm under pressure, troubleshoot and resolve problems
- Consistent achievement record in timely project completion within established budgetary objectives
- Background in industry since 1977

## RELEVANT EXPERIENCE

**CROWN CONSTRUCTION, INC.**, Chicago, IL                                    1996-Present
*Construction Superintendent*
- Projects with budgets $500,000 and higher
- Involved in buying out projects as required
- Projects included: *The Glens, Zarosta (restaurant)*.

**FISHER DEVELOPMENT CORPORATION**, New York, NY                    1992 - 1995
(construction management company with offices in New York, Chicago, Washington DC, and San Francisco)
*Project Manager/Estimator*
- Write contracts, award bids and negotiate best prices based upon budgeting factors.
- Manage the renovation and construction for *388 GAP, GAP Kids* and *Banana republic* stores in the Tri-state area with projects ranging from $50,000 to $2,000,000; also manage projects for *Williams Sonoma, Pottery Barn,* and *Hold Everything* stores.
- Communicate with stores regarding initial project specifications and budget.
- Develop list of available and appropriate subcontractors through established list or referrals.
- Communicate regularly with stores regarding schedules, complaints, damage, instructions, etc.
- Perform site and Building Department visits to ensure that schedules and specifications are maintained
- Selected by company to administer high profile jobs.

**JOHNSEN CARPENTRY, INC.**, Dyer, IN                                           1987 - 1990
*Construction Superintendent*
- Managed concurrent projects throughout the Chicago area.
- Projects included: *The Polo Shop, The Coach Store, Chicago Health Clubs, Rosenthal Furs, Circle Gallery,    Spiaggia Cafe,* and *One Magnificent Mile Building.*
- Assisted in pre-construction planning, budget evaluation, and monitoring of field activities.
- Held project responsibilities ranging from carpentry superintendent through field superintendent, fully accountable  for all trades.

**PEPPER CONSTRUCTION**, Chicago, IL                                            1986 - 1987
*Field Superintendent*
- Supervised all trades, coordinating crews of 10-30 as well as participating in project planning and reporting activities.
- Projects included: *John Marshall Law School,* Chicago, IL and *Hampton Inns* (two locations).

## EDUCATION

Pratt Institute - School of Architecture, New York, 1990 - 1994
Carpenters Local 839, Member in good standing, 18 years
Home Inspectors Certification, 1988
OSHA, Construction Safety & Health Certification, 1983

Project Manager, Gilda's Club, New York

_References will be furnished upon request._

**JEFF WOLFORD**
**Sr. Project Manager/Business Development**

## GENERAL BACKGROUND

Mr. Wolford has over twenty-eight years of experience within the construction industry in multi-family residential, national and regional retail tenant improvement projects.

## RECENT EXPERIENCE

TSA Corporation- multiple Sportmart- Sports Authority new tenant improvement projects- 35,000 – 42,000 square foot retail spaces in Fresno, CA, Folsom, CA, Matteson, IL, Frankfort, IL, Bolingbrook, IL, Crystal Lake, IL, Woburn, MA, Plymouth, MA, N. Haven, CT, Kirkwood, MO, Farmers Branch, TX, McKinney, TX, Mays Landing, NJ, etc.  The store specializes in supplying a large selection of name brand sporting goods equipment for its customers.  Both projects consisted of new MEP's, Partitions, ACT ceilings, lighting, multiple floor finishes, millwork, fixturing, decorating, roofing and all related owner supplied materials and equipment. All projects were completed between a 5 week through (11) week `fast track` construction.

Chico's, Multiple Locations – Five New Locations in Atlanta GA, Lincoln NE, Philadelphia PA, Grand Rapids MI and Detroit MI.  The store specializes in women's dress and formal wear.  The projects consisted of new MEP's, stainless steal storefront, ceilings, lighting, millwork, fixturing, paint finishes, wood flooring, signage and adjacent mall finishes.  All projects were completed in six (6) weeks.

Holiday Inn Plaza, Rosemont, IL- New Plaza, and Site Construction Project.  This project consisted of the following: new light well corridor tying into to new existing atrium, new 5,000 square foot two level free standing storage facility, new plaza and gazebo. Other components of this two acre project includes, excavation of existing site, concrete planters, all landscaping, ground lighting, curtain wall system, roofing, custom pavers, awnings, decorating, MEP's, waterproofing and all adjacent finishes to existing building hotel.  The project duration was 6 months.

TSA Corporation- Gart Sports, Orem, UT – New 42,000 square foot retail space.  The store specializes in sporting goods equipment including Skiing, hunting, fishing and firearms. The project consisted of new MEP's, roofing, partitioning, floor finishes, `Compasso` ceilings, owner millwork installation, lighting, decorating and glazing.
This project was completed in nine (9) weeks.

Krueger International, Merchandise, Chicago, IL- Tenant improvements for 5,500 square foot sales showroom office space.  This client specializes in high-end office movable partitioning, furniture and fixtures.  The `design build` project consisted of demolition, carpentry, drywall partitioning, floor coverings, ceilings, decorating and modifications to existing MEP's.  For the last two (2) years the project/space was complete prior to and before the NEOCON show and was a commercial success.

Victoria's Secret, Brookdale Center, MN – New 5,200 square foot retail space.  The store specializes in women's lingerie, cosmetics and accessories.  The project consisted of demolition of the old space, new MEP'S, fire alarm system, millwork installation, partitioning, tile, wood flooring system, painting and wall covering, fixturing, lighting, complete storefront assembly, glazing/mirrors and adjacent mall finishes.  The project duration was fourteen weeks.

The Children's Place, Two New Locations in Terra Haute, IN and Evergreen Park, IL.  The store specializes in infant and children's apparel. The projects consisted of demolition of the existing tenant space, new MEP's, fire alarm system, storefront glazing, partitioning, carpentry, owner millwork installation, decorating, floor coverings, ACT ceilings, owner signage and adjacent mall finishes. Both projects were approx. 5,000 square feet and had six (6) week duration.

Cont.

TSA Corporation- Oshman's SS's, Houston and Austin, TX – New 33,000 square feet retail space. Both stores specializes in sporting goods including camping, fishing, hunting and including a large selection of fire arms. The project consisted of and also included the complete exterior `tear off` of the front and back facades, concrete, steel, masonry, carpentry, dryvit/stucco, light gg framing, storefront glazing, roofing, dock equipment, partitioning, ACT ceilings, floor finishes, mirrors, plumbing, fire protection, HVAC, fire alarm system, electrical and installation of owner supplied store fixturing. The project was completed in thirteen (13) weeks.

Lerner's New York, Lincolnwood, IL – New 4,300 square foot retail space. The store specializes in women's casual and dress apparel, footwear and accessories. The project consisted of demolition of existing space, new MEP's, carpentry, storefront assembly, glazing/mirrors, floor coverings, wall coverings, painting, owner millwork installation, drywall partitioning and adjacent mall finishes. The project was completed in eleven (11) weeks.


EDUCATION

Pratt Institute – Brooklyn, NY
School of Architecture- 1989 through 1993

Revised 01/04/99

| Store Location | Date Completed | Square Footage | Type |
|---|---|---|---|
| Jeff Wolford- Retail Project Manager- Estimator for other General Contractors | | | |
| Sportmart #608- Orland Park, IL | 6/30/1999 | 39,895. | New Store - Tenant Improvement |
| Gart Sports #321- Orem, UT | 6/4/2001 | 38,202 | New Store - Tenant Improvement |
| Sportmart #607- Crystal Lake, IL | 11/10/2001 | 35,533 | New Store - Tenant Improvement |
| Sportmart #673 - Folsom, CA | 6/11/2002 | 28,598 | New Store - Tenant Improvement |
| Sportmart #605- Schaumburg, IL | 6/22/2002 | 28,927 | Remodel - Tenant Improvement |
| Oshman's #240 - Houston, X | 10/30/2002 | 33,567 | New Store - Exterior Façade - Tenant Improvement |
| Sportmart #674 - Fresno, CA | 10/4/2002 | 35,894 | New Store - Tenant Improvement |
| Sportmart #612 - North Riverside | 1/27/2003 | 39,909 | Remodel - Tenant Improvement |
| Sportmart #600 - Bolingbrook, IL | 3/23/2003 | 42,201 | New Store - Tenant Improvement |
| Sportmart #625- Matteson, IL | 5/2/2003 | 38,651 | New Store - Tenant Improvement |
| Sportmart #604 - Oak Lawn, IL | 4/13/2003 | 39,102 | Remodel - Tenant Improvement |
| Sportmart #692 - Phoenix, AZ | 5/2/2003 | 44,837 | Remodel - Tenant Improvement |
| Sportmart #242 - Austin, TX | 8/5/2003 | 41,175 | New Store - Tenant Improvement |
| Oshman's #242 - Austin, TX | 5/2/2003 | 38,404 | New Store - Tenant Improvement |
| Sportmart #601 - Niles, IL | 4/11/2003 | 37,748 | Remodel - Tenant Improvement |
| Sportmart #617 - N. LaSalle St Chicago, IL | 8/2/2003 | 18,445 | Remodel - Tenant Improvement |
| Sportmart #614 - Vernon Hills, IL | 6/18/2003 | 34,998 | Remodel - Tenant Improvement |
| Sports Authority #753 - Kirkwood, MO | 8/8/2003 | 35,684 | New Store - Tenant Improvement |
| Sportmart #627 - Frankfort, IL | 10/24/2003 | 35,198 | New Store - Tenant Improvement |
| Sportmart #815 - Glendale Hts, IL | 10/3/2003 | 38,218 | Remodel - Tenant Improvement |
| Oshman's #207 - Farmers Branch, TX | 2/19/2004 | 46,249 | New Store - Exterior Façade - Tenant Improvement |
| Sports Authority #484 - W Long Branch, NJ | 3/14/2004 | 43,469 | Remodel - Tenant Improvement |
| Sports Authority #471 - Brick | 4/7/2004 | 40,097 | Remodel - Tenant Improvement |
| Sports Authority #470 - Ledgewood, NJ | 3/31/2004 | 43,136 | Remodel - Tenant Improvement |
| Sports Authority #153 - N Haven, CT | 12/7/2004 | 52,760 | New Store - Tenant Improvement |
| Sports Authority #166 - Maye Landing, NJ | 10/1/2004 | 43,975 | New Store - Tenant Improvement |
| Sportmart #702 - Minnetonka, MN | 8/4/2004 | 41,915 | Remodel - Tenant Improvement |
| Sportmart #704 - Richfield, MN | 6/16/2004 | 44,173 | Remodel - Tenant Improvement |
| Sportmart #701 - Roseville, MN | 6/23/2004 | 42,801 | Remodel - Tenant Improvement |
| Sportmart #165 - Woburn, MA | 9/17/2004 | 49,713 | New Store - Tenant Improvement |
| Sports Authority #166 - Plymouth, MA | 10/12/2004 | 38,407 | New Store - Tenant Improvement |
| Sports Authority #205 - McKinney, TX | 3/10/2005 | 38,106 | New Store - Tenant Improvement |
| Oshman's #205 - McKinney, TX | 4/3/2005 | 40,130 | New Store - Tenant Improvement |
| Sports Authority #474 - Clifton, NJ | 3/6/2005 | 44,520 | Remodel - Tenant Improvement |
| | | | |
| Wolford Retail Builders, Inc completed TSA/Gart work | | | |
| Sports Authority #478 - Riverhead, NY | 9/27/2005 | 45,049 | New Store - Tenant Improvement |
| Sports Authority #457 - Riverdale, NY | 9/27/2005 | 40,627 | New Store - Tenant Improvement |
| Sports Authority #457 - Riverdale, NJ | 8/4/2005 | 51,106 | New Store - Tenant Improvement |
| Sports Authority #477 - Paramus, NJ | 3/9/2006 | 45,669 | New Store - Tenant Improvement |
| Sports Authority #174 - Somerville, MA | 3/2/2006 | 40,934 | New Store - Tenant Improvement |
| Sportmart #629 - Delafield, WI | 9/25/2005 | 46,266 | New Store - Tenant Improvement |
| Sports Authority #176 - Milford, MA | 7/13/2006 | 50,122 | New Store - Exterior Façade - Tenant Improvement |
| Sports Authority #511 - Baltimore, MD | 2/21/2007 | 46,322 | New Store - Tenant Improvement |
| Sports Authority #178 - Holyoke, MA | 4/24/2008 | 47,013 | New Store - Tenant Improvement |
| Sports Authority #583 - Lombard, IL | new store under construction | | Exterior Façade |
| Sports Authority #604 - Oak Lawn, IL | new store under contract | 39,334 | New Store - Tenant Improvement |
| Sports Authority #376 - Port St Lucie, FL | currently competitively bidding | 40,122 | New Store competively bids 5/24/07 |
| Sports Authority #628 - Willowbrook, IL | currently competitively bidding | 39,359 | New Store competively bid on 5/15/07 |
| Sports Authority #394 - Cape Corei, FL | | | |

E-FILED
Monday, 31 December, 2007  02:02:38 PM
Clerk, U.S. District Court, ILCD

# GART SPORTS COMPANY

STORE #618                                    Date: 7/26/01

CENTER 3211 SOUTH VETERANS PARKWAY,  SPRINGFIELD, ILLINOIS Contractor: Capitol Const. Group

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT | TOTAL |
|---|---|---|---|---|
| | | BID BREAKDOWN | | |
| 1. Barricade | NIC | | | N/A |
| 2. Demolition | N/A | | | N/A |
| 3. Bond | N/A | | | N/A |
| 4. Concrete | 738.00 | 695.00 | 2.09 | 1,433.00 |
| 5. Carpentry/Rough Carpentry | 16,140.00 | 4,570.00 | 1.55 | 20,714.00 |
| 6. Studs and Drywall | 38,505.00 | 66,972.00 | 2.46 | 105,477.00 |
| 7. Storefront Glass | By Shell Contr. | | | NIC |
| 8. Interior Mirrors | 701.00 | 799.00 | 15.00 | 1,400.00 |
| 9. Acoustical Ceiling | 10,564.00 | 4,401.00 | 1.68 | 14,965.00 |
| 10. Store Fixtures/Finish Carpet | 31,233.00 | 11,300.00 | 0.76 | 42,533.00 |
| 11. Painting/Concrete Sealer | 13,310.00 | 4,162.00 | 0.55 | 17,472.00 |
| 12. Carpet Installation | 39,429.57 | 6,540.45 | 2.46 | 45,400.00 |
| 13. Vinyl Tile and Base | 7,293.00 | 3,162.00 | 6.59 | 11,200.00 |
| 14. Plumbing | 60,199.00 | 2,135.00 | 1.16 | 32,390.00 |
| 15. Sprinklers | 30,652.00 | 34,638.00 | 2.02 | 55,990.00 |
| 16. Electrical | 63,748.00 | 58,800.00 | 3.80 | 116,338.00 |
| 17. Fire Alarm System | 7,302.00 | 5,720.00 | 0.40 | 12,225.00 |
| 18. HVAC/Ventiliation | 82,409.00 | 32,194.00 | 3.55 | 114,603.00 |
| 19. Rubber Flooring /Sealer | 39,855.00 | 9,671.48 | 4.90 | 51,000.00 |
| 20. Insurance | | | | 6,899.00 |
| 21. Supervision/Travel/Per Diem | | | | 18,400.00 |
| 22. General Conditions (Itemize) | | | | 14,253.00 |
| 23. Other (Itemize below) | | | | 14,080.00 |
| SUBTOTAL | 441,978.57 | 246,759.93 | 48.97 | 696,772.00 |
| 24. Profit & Overhead (5.25%) | | | | 36,581.00 |
| 25. Taxes (Sales/State/Local) | | | | INCLUDED |
| TOTAL | $0 | $0 | $0 | 733,353.00 |
| List itemizing below: (#22 - Gen Cond.) | | | | ▓▓▓▓▓ |
| 1. Final Cleaning | | | | 2,400.00 |
| 2. Temporary Phones | | | | 1,000.00 |
| 3. Tool Rental | | | | 1,000.00 |
| List Itemizations below: (#23 - Other) | | | | ▓▓▓▓▓ |
| 1. Toilet Partitions/Accessories | | | | 1,900.00 |
| 2. Total Materials | | | | 10,265.00 |
| 3. Misc. Const. Materials & Equipment | | | | 3,815.00 |
| 4 | | | | |
| Site Verification (please circle): | | We have / have not verified site | | |
| UNION   100%   /   NON-UNION | | Amount of time to procure permit: | | NIC wks. |
| % of Union Increase:          % | | Amount of time for construction : | | 8 wks. |
| | | | | |
| Qualifications to be listed on separate sheet | | | | |

EXHIBIT  B

# BID SPREADSHEET

PROJECT: Sportmart #616
LOCATION: 3211 South Veterans PW
CITY, STATE: Springfield, IL

FAX: Jeff Wolford
AM:
PC: Mark Erickson

Yes — Union

Estimate/Job # 23158     BID DUE: 07/26/01

Sq. Ft.: 32,308
Start:
Complete:
Project Duration:

* COMPETITORS:

| Item | | | | | SUBTOTAL | |
|---|---|---|---|---|---|---|
| Concrete Infill | | | Wood River | $1,438 | $1,438 |
| Grading / Mischo | | | Mahan | $1,400 | $1,400 |
| Carpentry | | | | $20,714 | $20,714 |
| Millwork | | | | $44,683 | $44,683 |
| Drywall / Metal Studs | | | | $105,477 | $105,477 |
| Acoustical | | | | $14,965 | $14,965 |
| Rubber Bisting | | | Van Vinh | $52,100 | $52,100 |
| V.C.T. / Vinyl Base | | | Metro | $11,200 | $11,200 |
| Carpet | | | Metro | $45,400 | $45,400 |
| Painting / Concrete Sealer | | | | $17,472 | $17,472 |
| Tile, Furniture / Accessories | | | | $1,900 | $1,900 |
| Plumbing / Gas Piping | | | | $32,390 | $32,390 |
| Sprinkler | | | | $83,180 | $85,980 |
| HVAC | | | | $114,603 | $114,603 |
| Electrical | | | | $116,338 | $116,338 |
| Fire Alarm / Life Safety | | | | $12,225 | $12,225 |

SUBTOTAL     $865,942     $865,942
Change Billings     ($13,380.00)     ($13,380.00)
% of charge     -2.5%

BUDGET TOTAL

GRAND TOTAL     $943,142.00

approval _____     date _____



# FAX COVER SHEET

| | |
|---|---|
| Fax Number:303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9. 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.

July 26, 2001


Mr. Ken Parker
Steckel – Parker Architects, Inc.
2451 West Monroe
Springfield, IL 62704

Re:    Gart Sportmart #618
       Springfield, IL
       Capitol Project #23158

Dear Mr. Parker:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED
SEVENTY-ONE THOUSAND SEVEN HUNDRED FORTY-FIVE and No/100 Dollars
($771,745.00) for the new construction of the above referenced project based in accordance
with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1,
A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1,
E0.0, E0.1, E0.3, E2.0, E2.1, all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you
towards a timely and successful completion. If you have any questions please feel free to
contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.



Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:    Mark Ericksen, W/Encl.
       Capitol Construction Group, Inc.

       File, W/Enc.

Mr. Ken Parker                                      July 26, 2001
Page 2

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

A.    The following Clarifications shall supercede all other contract documents where conflicts may exist:

1.    Our proposal is based upon reaching equitable contract and payment terms with the Owner/Developer.

2.    Any and all work not reflected on the drawings that might be required due to field conditions.

3.    All work to be during normal working hours (7:00 am – 3:30pm).

4.    Work to be done during normal 40-hour workweek.

5.    This proposal is based upon and we will comply with the information provided on the bid documents only and SEM clarifications and specification book.

6.    Taxes are included.

7.    Telephone service primary conduit only is included.

8.    Owner supplied items are to be on site in a timely manner.

9.    Priced per union shop.

10.   Our proposal is based on an 8-week work schedule.

11.   Capitol Construction will provide and install the national vendor packages as follows:

| | |
|---|---|
| Electrical Gear | Loeb Electric |
| Lighting | Loeb Electric |
| Flooring | Shaw Contract Flooring |
| Roof Top Mechanical Unit | Trane Company |
| Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
| Millwork | Premier Eurocase, Inc. |

12.   Ontario Store Fixture package and Pallet Rack System will be purchased and installed by Gart Sports, Capitol Construction will receive and stage.

13.   The following items as noted on sheet A0.2 shall be provided and installed by the Landlord:
              Metal Bike Rack
              Metal Bench
              Metal Trash Receptacle

14.   All low bid subcontractors by request of Capitol Construction has performed a site visit prior to pricing.

Mr.Ken Parker                                    July 26, 2001
Page 3

## GART SPORTMART#618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

B.    The following exclusions are included in this proposal:

    1.    Temporary heating as none will be required.
    2.    Permit fees are not included.
    3.    Abatement work of any kind is not included.
    4.    No overtime is included.
    5.    No storefront glass or any automatic entry doors.
    6.    Fireproofing (spray on).
    7.    No demolition as none will be required.
    8.    Site Protection.

C.    May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW          -   ($ 2,800.00)

July 30, 2001

Mr. Michael Quaintance
Gart Sports
1000 Broadway
Denver, CO 80203

Re:     **REVISED BID**
        Gart Sportmart #618
        Springfield, IL
        Capitol Project #23158

Dear Mike:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED
THIRTY-THREE THOUSAND THREE HUNDRED FIFTY THREE and No/100 Dollars
($733,353.00) for the new construction of the above referenced project based in accordance
with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1,
A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1,
E0.0, E0.1, E0.3, E2.0, E2.1,  all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you
towards a timely and successful completion.  If you have any questions please feel free to
contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.



Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:     Mark Ericksen, W/Encl.
        Capitol Construction Group, Inc.

        File, W/Enc.

July 30, 2001

<div align="center">

GART SPORTMART #618
SPRINGFIELD, ILLINOIS
CAPTIOL PROJECT #23158

CLARIFICATIONS AND EXCLUSIONS

</div>

A.   The following Clarifications shall supercede all other contract documents where conflicts may exist:

1.   Our proposal is based upon reaching equitable contract and payment terms with the Owner/Developer.

2.   Any and all work not reflected on the drawings that might be required due to field conditions.

3.   All work to be during normal working hours (7:00 am – 3:30pm).

4.   Work to be done during normal 40-hour workweek.

5.   This proposal is based upon and we will comply with the information provided on the bid documents only and SEM clarifications and specification book.

6.   Taxes are included.

7.   Telephone service primary conduit only is included.

8.   Owner supplied items are to be on site in a timely manner.

9.   Priced per union shop.

10.  Our proposal is based on an 8-week work schedule.

11.  Capitol Construction will provide and install the national vendor packages as follows:

| | |
|---|---|
| Electrical Gear | Loeb Electric |
| Lighting | Loeb Electric |
| Flooring | Shaw Contract Flooring |
| Roof Top Mechanical Unit | Trane Company |
| Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
| Millwork | Premier Eurocase, Inc. |

12.  Ontario Store Fixture package and Pallet Rack System will be purchased and installed by Gart Sports, Capitol Construction will receive and stage.

13.  The following items as noted on sheet A0.2 shall be provided and installed by the Landlord:

    Metal Bike Rack
    Metal Bench
    Metal Trash Receptacle

14.  All low bid subcontractors by request of Capitol Construction has performed a site visit prior to pricing.

15.  The electric price includes 30 feet of feeder cable and pipe to transformer pad only.

Mr. Michael Quaintance                                July 30, 2001
Page 3

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

16. Fire protection number includes back flow preventor and 20 foot water storage capacity as per drawings.

17. The plumbing price is all inclusive of gas piping but excludes gas meter and meter bar.

18. Electric price does not include any underground/in slab piping as this has, or is to be done by shell contractor.

B. The following exclusions are included in this proposal:

1. Temporary heating as none will be required.
2. Permit fees are not included.
3. Abatement work of any kind is not included.
4. No overtime is included.
5. No storefront glass or any automatic entry doors.
6. Fireproofing (spray on).
7. No demolition as none will be required.
8. Site Protection/Barricade work.
9. No floor prep as this will be a new slab and none shall be required.

C. May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW                -    ($ 2,800.00)

Mr. Michael Quaintance                          July 30, 2001
Page 4

# GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158
## REVISED
## TRADE BREAKDOWN

| | |
|---|---|
| BARRICADE | N/A |
| DEMOLITION | N/A |
| BOND | N/A |
| CONCRETE | 1,433.00 |
| CARPENTRY/ROUGH CARPENTRY | 20,714.00 |
| STUDS & DRYWALL | 105,477.00 |
| STOREFRONT GLASS | NIC |
| INTERIOR MIRRORS | 1,400.00 |
| ACOUSTICAL CEILING | 14,965.00 |
| STORE FIXTURES/FINISH CARPENTRY | 42,533.00 |
| PAINTING/CONCRETE SEALER | 17,472.00 |
| CARPET INSTALLATION | 45,400.00 |
| VINYL TILE & BASE | 11,200.00 |
| PLUMBING | 32,390.00 |
| SPRINKLERS | 55,990.00 |
| ELECTRICAL | 116,338.00 |
| FIRE ALARM SYSTEM | 12,225.00 |
| HVAC/VENTILATION | 114,603.00 |
| RUBBER FLOORING/SEALER | 51,000.00 |
| INSURANCE | 6,899.00 |
| SUPERVISION/TRAVEL /PER DIEM | 18,400.00 |
| GENERAL CONDITIONS | 14,253.00 |
| TOTAL MATERIALS | 14,080.00 |
| SUBTOTAL | 696,772.00 |
| PROFIT & OVERHEAD (5.25%) | 36,581.00 |
| TAXES | INCLUDED |
| TOTAL | 733,353.00 |



# FAX COVER SHEET

Fax Number:303-832-4738     No. of Pages (including cover sheet): 1

To: Mike Quaintance     Company Name: Gart Sports

From: Jeff Wolford

Date: July 9, 2001

Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.



# FAX COVER SHEET

| | |
|---|---|
| Fax Number: 303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9, 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.

05/10/2006 14:02 FAX 3038642102                    GART SPORTS                    @001

#618
Store files



### COTTON

*National Disaster Recovery Services*

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | Insurance Co: | Liberty Mutual Property |
| City, State, Zip | Springfield, IL 62704 | Insurance Adj: | Tom Tiernan |
| Tel: | (217) 546-0132 | Claim #: | X69A-003155-00 |
| Fax: | (217) 546-1073 | | |
| Re: | Tornado Damages in Springfield, IL    #618 | | |
| Re: | Final Bill With Not To Exceed Amount: | | |

Not To Exceed Amount of $250,000.00 Set-Forth and agreed upon by the following parties:
Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)                    $   219,428.67

EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:                    $   (100,000.00)

COTTON HAS RECEIVED A INITIAL DRAW OF:

| | | |
|---|---|---|
| | *REMAINING BALANCE* | $ 219,428.67 |
| SUBTOTAL | | $ 219,428.67 |
| TOTAL DUE AND PAYABLE | | |

THE ABOVE CHARGES ARE CONSISTENT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT.

*Any queries regarding this invoice should be sent to us within ten days of receipt of this*

*invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.*

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77040

**Please include the invoice number on check**

03/31/06

## EXHIBIT C

TSA RULE 26 DISCLOSURES
0032

05/10/2006 14:02 FAX 3038842102                GART SPORTS                                    ☒002

## Bonnie Cochran

From:        Bonnie Cochran
Sent:        Wednesday, April 05, 2006 4:13 PM
To:          David Frieder
Subject:     RE: Sports Authority invoice 1-A(STIPULATED).xls


week ending 3/19/06:

Labor Totals: 54,453.38
Total for reimbursables:   3,410.23
Total for equipment: 43,248.75
Total for consumables: 9,494.62
Subtotal for Vendors (subcontractors)  51,545.21
Cotton USA mark up:  10,824.49
Total for Vendors (subcontractors)  62,369.70


week ending 3/26/06:

Labor Total: 20,955.38
Total for reimbursables:   2,181.19
Total for equipment:  41,336.50
Total for consumables: 3,039.62
Subtotal for Vendors (subcontractors):     103.96
Cotton USA markup:  21.83
Total for Vendors (subcontractors)  125.79


week ending 4/2/06:

Labor Totals:  1,807.50
Total for reimbursables:  99.00
Total for equipment:  -0-
Total for consumables: -0-
Subtotal for Vendors (subcontractors)  235.27
Cotton USA mark up:  49.41
Total for Vendors (subcontractors)    284.68


Invoice from Cotton:

Emergency services final stipulated invoice sum amount:  319,428.67
Cotton has received an initial draw of:                        (100,000.00)
Remaining Balance:                                             219,428.67

1

TSA RULE 26 DISCLOSURES
0033

**Daino USA**
**Contract # 4007171, Sports Authority**
**Labor Summary**
**Period Ended 03/19/06**

| Name | Classification | | Sub Rate O/T Prem | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Hours | Total Charge |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kraus, Jeff | Project Coordinator | Travel $ | 93.00 | 8 | | | | | | | 8.0 | 760.00 |
| | | Regular $ | 93.00 | | 10.5 | | 11 | 2 | | | 23.5 | 2,232.50 |
| | | Overtime $ | 142.50 | | | | | | | | 0.0 | - |
| Giaz, Bruce | Project Manager | Travel $ | 80.00 | 8 | | | | | | | 8.0 | 640.00 |
| | | Regular $ | 80.00 | | | | | | | | 40.0 | 3,200.00 |
| | | Overtime $ | 120.00 | | | | | | | | 30.5 | 3,660.00 |
| Castlio, Phillip | Asst. Project Manager | Travel $ | 75.00 | 19 | | | | | | | 19.0 | 1,421.00 |
| | | Regular $ | 75.00 | | | 12 | 13 | 10 | 11 | 11 | 32.0 | 3,000.00 |
| | | Overtime $ | 112.50 | | | | | | | | 0.0 | 3,600.00 |
| Persons, Shannon | Restoration Supervisor | Travel $ | 45.00 | 19 | | | | | | | 19.0 | 855.00 |
| | | Regular $ | 45.00 | | 12 | 10 | 13 | 9 | | 11 | 25.0 | 1,125.00 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | - |
| Smith, Paul | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 5.0 | 225.00 |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | - |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | - |
| Lindstrom, Bud | Restoration Supervisor | Travel $ | 45.00 | 8 | | 12 | 12 | 12 | 4 | 11 | 40.0 | 1,800.00 |
| | | Regular $ | 45.44 | | | | | | | | 11.0 | 1,215.50 |
| | | Overtime $ | 67.50 | | | | | | | | 11.0 | 1,315.50 |
| Baublit, Minor | Restoration Supervisor | Travel $ | 45.00 | | | 10.5 | 12 | 12 | 11 | 8 | 0.0 | - |
| | | Regular $ | 45.00 | | | | | | | | 40.0 | 1,800.00 |
| | | Overtime $ | 67.50 | | | | | | | | 6.0 | 405.00 |
| Basim, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | 8.5 | | 10 | 5 | 9.5 | 0.0 | - |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | - |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | - |
| Dlanglou, Jeffrey | Skilled Labor | Travel $ | 28.50 | | 9.5 | 8.5 | 8.5 | 9.5 | | 9.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | | | 14.5 | 619.88 |
| Kling, Daniel | Skilled Labor | Regular $ | 28.50 | | 8.5 | 8.5 | 9.5 | 10 | 3.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | | 4.5 | 192.38 |
| Selena, John | Skilled Labor | Regular $ | 28.50 | | 9 | 11.5 | | | 3.5 | 34.0 | 969.00 |
| | | Overtime $ | 42.75 | | | | | | 4.5 | 0.0 | - |
| Brown, Timmia | Skilled Labor | Regular $ | 28.56 | 9 | 9.5 | 8.5 | 9.5 | 3.5 | | 40.0 | 1,140.00 |
| | | Overtime $ | 42.71 | | | | | 6.5 | | 17.0 | 726.73 |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | 9 | 9.5 | 8.5 | 9.5 | 3.5 | 10.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | 6.5 | | 17.0 | 726.73 |
| Broomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | 10.5 | 8.5 | 11 | 10.5 | 97.5 | 2,778.75 |
| | | Overtime $ | 42.75 | | | | | | 0.0 | - |
| Stojkovocity, Gary | Skilled Labor | Regular $ | 28.50 | | | | | | 9.0 | 256.50 |
| | | Overtime $ | 42.75 | | | | | | 0.0 | - |

TSA RULE 26 DISCLOSURES
0035

05/10/2006 14:03 FAX 3038642102                GART SPORTS

| Name | Skilled Labor | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Edward, Marva | Regular $ 28.50 | | | | | | | $ 9.0 | $ 256.50 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Dawson, Robert | Regular $ 28.50 | | | | | | | $ 9.0 | $ 256.50 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Wigglns, Travis | Regular $ 28.50 | 9 | | | | | | $ 9.0 | $ 255.50 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Hawkins, Akhil | Regular $ 28.50 | 4.3 | | | | | | $ 3.0 | $ 124.75 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Oudley, Shania | Regular $ 28.50 | | | | | | | $ 5.5 | $ 156.75 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Edwards, Tracey | Regular $ 28.50 | 5.5 | | | | | | $ 5.5 | $ 156.75 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Glaser, Ray | Regular $ 28.50 | 5 | | | | | | $ 5.0 | $ 142.50 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Antoyning, Vivian | Regular $ 28.50 | 5 | | | | | | $ 5.0 | $ 147.50 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Johnson, Pesca | Regular $ 28.50 | 6 | | | | | | $ 6.0 | $ 171.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Bruker, Samridth | Regular $ 28.50 | 6 | | | | | | $ 6.0 | $ 171.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Jackson, Guy | Regular $ 28.50 | 0.5 | | | | | | $ 0.5 | $ 14.25 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Weatherspoong, Jason | Regular $ 28.50 | 4.5 | | | | | | $ 4.5 | $ 131.25 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Eudoras, Bruca | Regular $ 28.50 | | | 8 | | | | $ 8.0 | $ 228.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Mazerw, James | Regular $ 28.50 | | 8.5 | | | | | $ 8.5 | $ 242.25 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Williams, Charles | Regular $ 28.50 | | 8 | 8 | | | | $ 16.0 | $ 456.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Walton, Macey | Regular $ 28.50 | | 4.5 | | | | | $ 8.0 | $ 212.25 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Kohlrabeak, Benack | Regular $ 28.50 | | 8 | | | | | $ 8.0 | $ 228.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Hammers, Ralph | Regular $ 28.50 | | 9.5 | | 9.5 | 10 | 2.5 | $ 40.0 | $ 1140.00 |
| | Overtime $ 42.75 | | | | | | 8 | $ 0.0 | |
| Richmond, Alfred | Regular $ 28.50 | | 6 | | | | | $ 6.0 | $ 171.00 |
| | Overtime $ 42.75 | | | | | | | $ 0.0 | |
| Brown, John | Skilled Labor | | | | | | | | |

TSA RULE 26 DISCLOSURES
0036

| Name | Type | Rate | | | | | | | | | Total |
|------|------|------|---|---|---|---|---|---|---|---|---|
| Seaton, Al | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 8 | 8.5 | 9.5 | | | 36.0 $ / 0.0 $ | 741.00 |
| Hale, Jerry | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 8.5 | | 9.5 | | 3.5 / 3.5 | 21.5 $ / 3.5 $ | 1,140.00 / 245.13 |
| Stevenson, Henry | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 10.5 | 11 | | | | 21.5 $ / 0.0 $ | 612.75 |
| Winn, Ava | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 8.5 | 8.5 | | 10 | | 27.0 $ / 0.0 $ | 769.50 |
| Wahn, Richard | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 9.5 | 10 | 9.5 | | | 29.0 $ / 0.0 $ | 826.50 |
| Correll, German | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 6 | 5.5 | | | | 11.5 $ / 0.0 $ | 327.75 |
| Shryer, Jeremiah | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 6 | 5.5 | | | | 11.5 $ / 0.0 $ | 327.75 |
| Hamilton, Robert | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | 10.5 | 8.5 | 9.5 | | | 28.5 $ / 0.0 $ | 812.25 |
| Coury, Xavier | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | 5.5 | | | | 5.5 $ / 0.0 $ | 156.75 |
| Dalba, David | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | 5.5 | | 9 | | 14.5 $ / 0.0 $ | 413.25 |
| McDonald, Chris | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | 6.5 | | 10.5 | | 6.5 $ / 0.0 $ | 185.25 |
| Walters, Jim | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | 9.5 | | | 9.5 $ / 0.0 $ | 270.75 |
| Ward, George | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | 9.5 | | | 9.5 $ / 0.0 $ | 270.75 |
| Questin, Curtis | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | 9.5 | | | 9.5 $ / 0.0 $ | 270.75 |
| Reed, Curtis | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | 9.5 | | | 9.5 $ / 0.0 $ | 270.75 |
| White, Leon | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | 9.5 | | | 9.5 $ / 0.0 $ | 270.75 |
| Williams, Van | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | | | 10 | 10.0 $ / 0.0 $ | 285.00 |
| Pappas, Nick | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | | | 10 | 10.0 $ / 0.0 $ | 285.00 |
| Tisher, Terrence | Skilled Labor | Regular $ 28.50 / Overtime $ 42.75 | | | | | | | | 8.0 $ / 0.0 $ | 228.00 |

TSA RULE 26 DISCLOSURES
0037

05/10/2006 14:03 FAX 8038642102    007

| Name | | Rate | | | Total |
|------|---|------|---|---|-------|
| Sisson, Vinton | Skilled Labor | Overtime $ | 42.75 | | |
| | | Regular $ | 28.50 | 10 | $ 285.00 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| KirkGinary, Eric | Skilled Labor | Regular $ | 28.50 | 10 | $ 285.00 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Chilby, Christopher | Skilled Labor | Regular $ | 28.50 | 9 | $ 216.50 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Tonez, Dwight | Skilled Labor | Regular $ | 28.50 | 10 | $ 281.82 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Crafton, James | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.25 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Lethbridge, Andre | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.25 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Anderson, Morris | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.25 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Alexander, Dan | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.25 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Blaylock, Tiffany | Skilled Labor | Regular $ | 28.50 | 7 | $ 199.50 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Leachman, Chad | Skilled Labor | Regular $ | 28.50 | 9 | $ 256.50 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Johnston, Thomas | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.25 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Norris, Kevin | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.31 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Jick, Lorenzo | Skilled Labor | Regular $ | 28.50 | 10.5 | $ 299.31 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Longordor, Robert | Skilled Labor | Regular $ | 28.50 | 9 | $ 256.50 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Lagonlay, Tanos | Skilled Labor | Regular $ | 28.50 | 9 | $ 256.50 |
| | | Overtime $ | 42.75 | 0.0 | $ 0.0 |
| Good, Larry | Skilled Labor | Regular $ | 28.50 | | $ 216.50 |
| | | Overtime $ | 42.75 | 9.0 | $ 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | 0.6 | $ 0.0 |
| | | Overtime $ | 42.75 | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | 0.0 | $ 0.0 |
| | | Overtime $ | 42.75 | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | 0.0 | $ 0.0 |
| | | Overtime $ | 42.75 | 0.0 | |

05/10/2006 14:04 FAX 3038642102          GART SPORTS          Ø008

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | $ | 0.0 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 18.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 41.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 18.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 41.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Name | Skilled Labor | Regular $ | 24.50 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | | | | | | $ | 0.0 | |
| Labor Ready | Temporary Labor | Regular $ | 17.58 | | | | | | | | | | | | | $ | 0.0 | |
| | | Overtime $ | 26.37 | | | | | | | | | | | | | $ | 0.0 | |
| Management Fee | | | | | | | | | | | | | | | | | | |
| Total Personnel | Client Name | | | | | | | | | | | | | | | | | |
| Labor Totals | | | | | | | | | | | | | | | | $ | | 24,453.18 |

TSA RULE 26 DISCLOSURES
0039

05/10/2008 14:04 FAX 3038542102          GART SPORTS                                    ☒ 009

**Corsa USA**
**Contract #1400721; Sports Authority**
**Reimbursable Summary**
**Period Ended 03/19/06**

| | | Mon 03/13 | Tue 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Garg, Rinca | per diem | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 210.00 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 546.70 |
| | airfare | | | | | | | $ 218.00 | $ 218.00 |
| Castillo, Phillip | per diem | $ 95.05 | $ 95.05 | $ 95.05 | $ 95.05 | | | | $ 341.45 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | |
| | airfare | | | | | | | | |
| Parsons, Shawna | per diem | | | | $ 30.00 | $ 30.00 | $ 30.00 | | $ 98.00 |
| | hotel | | | | $ 39.05 | $ 39.05 | $ 39.05 | | $ 156.30 |
| | airfare | | | | | | | | $ 90.00 |
| Bandik & Milner | per diem | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | | | | $ 120.00 |
| | hotel | $ 39.05 | $ 39.05 | $ 39.05 | $ 39.05 | | | | $ 199.13 |
| | airfare | | | | | | | | |
| Bulido, Luke | per diem | | | | | | | $ 50.00 | $ 50.00 |
| | hotel | | | | | | | $ 78.10 | $ 78.10 |
| | airfare | | | | | | | | |
| Darisman, Bud | per diem | | | $ 30.00 | $ 39.65 | $ 39.65 | $ 39.65 | | $ 180.00 |
| | hotel | | | $ 78.10 | $ 39.65 | $ 39.65 | $ 39.65 | | $ 267.26 |
| | airfare | | | | | | | | |
| Hertz Rental Car | 3XNX161071441 | | | | $ 47.29 | $ 47.29 | $ 47.29 | $ 655.25 | $ 655.25 |
| **Subtotal for Reimbursables Corsa USA (Markup)** | | | | | | | | | $ 3,100.21 |
| | | | | | | | | | $ 310.02 |
| **Total for Reimbursables** | | | | | | | | | $ 3,410.23 |

TSA RULE 26 DISCLOSURES
0040

05/10/2006 14:04 FAX 3038642102     GART SPORTS     @010

Caesars USA
Contract # 14997141 Sports Authority
Equipment Summary
Period Ended 03/19/06

| Equipment Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $ 30.00 | | | | | | | | 0 | $ - |
| Air Mover | Ea | $ 22.50 | | | | 16 | 30 | | 53 | 109 | $ 2,472.50 |
| Bobcat | Ea | $ 175.00 | | | | | | | | 0 | $ - |
| Buffer, Floor | Ea | $ 30.00 | | | | | | | | 0 | $ - |
| Cart, Trip Disposition | Ea | $ 20.00 | 5 | | 3 | | 3 | 3 | | 18 | $ 350.00 |
| Dolly, 2 Way 4 Whl/Drml Trolley | Ea | $ 6.00 | | | | | | | | 0 | $ 18.00 |
| Dry Cleaning Unit (portable) | Ea | $ 85.00 | | | | | | | | 0 | $ 3,240.00 |
| Electrical Disk Test (Spider Box) | Ea | $ 47.00 | 12 | | 12 | 18 | 28 | | | 72 | $ 912.00 |
| Extension Cord (100') | Ea | $ 4.00 | 18 | | 18 | 18 | 28 | 28 | | 198 | $ 3,117.00 |
| Fibrillation Pack (Portable) | Ea | $ 95.00 | | | 4 | | 5 | 5 | 4 | 24 | $ - |
| Generator Dust Trailer | Ea | $ 185.00 | | | | | | | | 0 | $ - |
| Generator (less than 100kw) | Ea | $ 185.00 | | | | | | | | 0 | $ - |
| Generator (U/V/Thermal (Electric) | Ea | $ 45.00 | | | | | | | | 0 | $ - |
| Fogger, U/V/Thermal (Electric) | Ea | $ 25.00 | 1 | | 1 | 4 | 5 | 4 | | 13 | $ 1,260.00 |
| Fogger, Thermal (Gas Powered) | Ea | $ 103.00 | | | | | | | | 0 | $ - |
| Floor Cleaning System (Walk Behind) | Ea | $ 103.13 | 1 | | 1 | 1 | 1 | | | 21 | $ 173.13 |
| Bacteria Drift Trailer | Ea | $ 185.00 | | | | | | | | 0 | $ - |
| Bacteria HEPA Filtration Unit (Portable) | Ea | $ 35.00 | 1 | 3 | 3 | 4 | 4 | | 4 | 22 | $ 150.00 |
| HEPA Vibrating Unit Air Scrubbing | Ea | $ 15.00 | | | | | | | | 0 | $ - |
| Ozone Generator | Ea | $ 20.00 | | | | | | | | 0 | $ - |
| On-Site Accounting Package | Ea | $ 45.00 | | | | | | | | 0 | $ - |
| Moisture Meter | Ea | $ 20.00 | | | | | | | | 0 | $ - |
| Light Tower (Portable) | Ea | $ 205.00 | | | | | | | | 0 | $ 364.00 |
| Light, Power Extension | Ea | $ 13.00 | | | | | | | | 18 | $ 608.00 |
| Ladder, Step/Extension | Ea | $ 16.00 | | 2 | 8 | 8 | 8 | 5 | 5 | 38 | $ 24.00 |
| HVAC Vacuum System | Ea | $ 2.00 | | | | | | | | 6 | $ 330.00 |
| Pump, Trash 1" - 6" | Ea | $ 55.00 | | | | | | | | 0 | $ - |
| Pump, Submersible | Ea | $ 125.00 | | | | | | | | 0 | $ - |
| Pump, Trash 1" - 4" | Ea | $ 65.00 | | | | | | | | 0 | $ - |
| Radio, 2 way - 5ch sin cans. | Ea | $ 20.00 | | | | | | | | 0 | $ - |
| Safety Package | Ea | $ 30.00 | | | | | | | | 10 | $ 180.00 |
| Safety Cones/Barricades | Ea | $ 1.00 | 19 | | 25 | 22 | 20 | 11 | 31 | 128 | $ 1,970.00 |
| Personal Protection Equipment (PPE) | Ea | $ 10.00 | | | | | | | | 118 | $ 1,180.00 |
| Personal Fall Protection (PFP) | Ea | $ 30.00 | | | | | | | | 0 | $ - |
| Personal Respiratory Protection (PFP) | Ea | $ 90.00 | | | | | | | | 0 | $ - |
| Skid Steer/Loader | Ea | $ 125.00 | 2 | | 3 | 4 | 4 | | 4 | 19 | $ 1,255.00 |
| Scooter, Asphalt | Ea | $ 65.00 | | | | | | | | 0 | $ - |
| Glass Box Tool | Ea | $ 125.00 | | | | | | | | 0 | $ - |
| Trailer (Freezer) | Ea | $ 65.00 | | | | | | | | 0 | $ - |
| Trailer (NE-58) | Ea | $ 30.00 | | | | | | | | 0 | $ - |
| Trailer MP | Ea | $ 55.00 | | | | | | | | 0 | $ - |
| Trailer 14'/22' | Ea | $ 105.00 | | | | | | | | 0 | $ - |
| Trailer (Office Trailer) | Ea | $ 125.00 | | | | | | | | 0 | $ 580.00 |
| Trailer - Pallms | Ea | $ 95.00 | | | | | | | | 0 | $ - |
| Truck 24 ft. | Ea | $ 245.00 | 1 | | 1 | 2 | 2 | 1 | | 8 | $ - |
| Truck (box) | Ea | $ 125.00 | | | | | | | | 0 | $ 1,195.00 |
| Ultrasonic Bath, Large | Ea | $ 65.00 | | | | | | | | 0 | $ - |
| Ultrasonic Bath, Small | Ea | $ 25.00 | | | 1 | 4 | 3 | 5 | | 13 | $ - |
| Vacuum (with Squee) | Ea | $ 85.00 | | | | | | | | 0 | $ - |
| Vacuum, HEPA | Ea | $ 25.00 | | | | | | | | 0 | $ - |
| Vacuum, PP10/PP15 | Ea | $ 25.00 | | | | | | | | 0 | $ 125.00 |
| Van, Cargo / Company Owned | Ea | $ 125.00 | 1 | | 1 | 1 | 1 | | | 4 | $ 220.00 |
| Copilair Digital Vehicle | Ea | $ 55.00 | | | | | | | | 0 | $ 175.00 |
| Wysec TLC, Large | Ea | $ 70.00 | | | | | | | | 0 | $ - |
| Wysec TLC, Small | Ea | $ 35.00 | | | | | | | | 0 | $ - |
| Washer, High Pressure (Cold) | Ea | $ 31.00 | | | | | | | | 0 | $ - |

05/10/2006 14:05 FAX 3038642102     GART SPORTS     @011

| Dryer Equipment Description | Unit | Daily | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Washer, High Pressure (PSI) | Ea | $ 195.00 | | | | | | | | | 0 | $ - |
| Thermal Reactor | Ea | $ 225.00 | | | | | | | | | 0 | $ - |
| Dehumidification Unit - 200 cfm | Ea | $ 185.00 | | | | | | | | 3 | 3 | $ 315.00 |
| Dehumidification Unit - 300 cfm | Ea | $ 185.00 | | | | | | | | | 0 | $ - |
| Dehumidification Unit - 1125 cfm | Ea | $ 420.00 | | | | | | | | | 0 | $ - |
| Dehumidification Unit - 2000/2150 cfm | Ea | $ 875.00 | | | | | | | | | 0 | $ - |
| Dehumidification Unit - 2000/2150 cfm | Ea | $ 1,195.00 | | | | | | | | 20 | 20 | $23,900.00 |
| Dehumidification Unit - 2500 cfm | Ea | $ 1,795.00 | | | | | | | | | 0 | $ - |
| Dehumidification Unit - 4000 cfm | Ea | $ 875.00 | | | | | | | | | 0 | $ - |
| DX Unit - 3000w /floor cfm | Ea | $ 155.00 | | | | | | | | | 0 | $ - |
| DX Unit - 20/25 Ton | Ea | | | | | | | | | | | |
| Capacity Unit | | | | | | | | | | | | |
| Total for Equipment | | | | | | | | | | | $ | 43,148.73 |

TSA RULE 26 DISCLOSURES
0042

05/10/2008 14:05 FAX 3058842102    GART SPORTS    ☒ 012

Chase USA
Contract 160/TSA Sports Authority
Commercial Job Summary
Period Ending 03/19/05

| Chemical Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charge |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alkaline Remover | Gal | $ 77.00 | | | | | | | | 0.0 | $ |
| Alkaline Degreaser | Gal | $ 14.84 | | | | | | | | 0.0 | $ |
| Cleaner Stainless Steel | Gal | $ 32.00 | | | | | | | | 0.0 | $ |
| Cleaner Stainless Steel | Gal | $ 17.95 | | | | | | | | 0.0 | $ |
| Cleaner Carpet (Liquid) | Gal | $ 2.50 | | | | | | | | 0.0 | $ |
| Cleaner Carpet (Powder) | Lb | $ 12.80 | | | | | | | | 0.0 | $ |
| Cleaner Glass | Gal | | | | | | | | | 0.0 | $ |
| Cleaner Hard Surface | | | | | | | | | | | |
| Cleaner HVAC Coil | Gal | $ 35.00 | | | | | | | | 0.0 | $ |
| Deodorizer | | | | | | | | | | | |
| Deodorizing Gel | Lb | $ 13.00 | | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Gal | $ 37.50 | | | | | | | | 0.0 | $ |
| Deodorizing Brick | Ea | $ 11.25 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 19.75 | | | | | | | | 0.0 | $ |
| Disinfectant Brick | Ea | | | | | | | | | 0.0 | $ |
| Disinfectant/Biocide | Gal | $ 34.73 | | | | | 11.0 | | | 11.0 | $ 1,086.94 |
| Epoxy | Gal | $ 3.51 | | | | | | | | 0.0 | $ |
| Thermo Fog | Gal | $ 52.00 | | | | | | | | 0.0 | $ |
| Foaming Polish | Gal | $ 4.25 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 4.21 | | | | | | | | 0.0 | $ |
| Gun/Oil | | | | | | | | | | | |
| Lubricant Emulsion (Bluorized) | Gal | $ 23.75 | | | | | | | | 0.0 | $ |
| Lubricant (Graphite) | | | | | | | | | | | |
| Lubricant Machinery | | | | | | | | | | | |
| Transverse, light | Gal | $ 31.10 | | | 15.0 | 5.0 | | | 6.0 | 0.0 | $ |
| Long Term Preserver, heavy | Gal | $ 19.50 | | | | | | | | 0.0 | $ |
| Metal Polish Paste | Lb | $ 9.61 | | | | | | | | 0.0 | $ |
| Stainless Steel Polish | Gal | $ 2.51 | | | | | | | | 0.0 | $ |
| Roof Dust/Wood Preserver | Gal | | | | | | | | | 0.0 | $ |
| Carpet Cleaner | Gal | $ 59.00 | | | | | | | | 0.0 | $ |
| Degreaser | | | | | | | | | | 0.0 | $ |
| Sealants | | | | | | | | | | | |
| Duct Sealant Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ |
| Duct Sealant, Antibacterial | Gal | $ 67.00 | | | | | | | | 0.0 | $ |
| Seal Sealant, Pigmented | Gal | $ 35.00 | | | | | | | | 0.0 | $ |
| Seal Sealant, Clear | Gal | $ 22.00 | | | | | | | | 0.0 | $ |
| Steel Compound/Tile Cleaner | Ea | $ 12.00 | | | | | | | | 0.0 | $ |
| Spray Adhesive | Can | $ 7.25 | | 15.0 | 5.0 | 3.0 | 3.0 | 12.0 | 8.0 | 33.0 | $ 164.32 |
| Solvent Penetrating | Fluid | $ 5.00 | | | | | | | | 0.0 | $ |
| Basic Acid Stain | Ea | $ 29.00 | | 11.0 | 15.0 | 8.0 | 12.0 | 12.0 | 10.0 | 73.0 | $ 2,044.00 |
| Black Trash | Bl | $ 1.91 | | | | | | | | 0.0 | $ |
| Black Trash Environmental 4mil | Ea | $ 2.61 | | | | | | | | 0.0 | $ |
| Raw, Roofing Freeze Dry | Ea | $ 5.53 | | | | | | | | 0.0 | $ |
| Paint, Corrugated | Ea | $ 17.20 | | | | | | | | 0.0 | $ |
| Brush, Dispersion Bags | Bl | $ 19.00 | | | | | | | | 0.0 | $ |
| Brush, Dispersion 1-small | Ea | $ 4.00 | | | | | | | | 0.0 | $ |
| Brush, Double Sided Sponge | Bl | $ 4.80 | | | | | | | | 0.0 | $ |
| Brush, Dry Contact | Bl | $ 9.00 | | | | | | | | 0.0 | $ |
| Dust, Lay Flat (200) | Bl | $ 375.88 | | | | | | | | 0.0 | $ 2,250.00 |

TSA RULE 26 DISCLOSURES
0043

05/10/2005 14:05 FAX 3038642102          GART SPORTS                    ☑013

| Item | Unit | Price | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Dust Mask HEPA (N95/P100) | Ea | $ 8.00 | | | | 3.0 | | 16.0 | $ 392.00 |
| Dust Mask | Ea | $ 24.50 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 0.0 | $ — |
| Filter Material | Ea | $ 65.00 | | | | | | 0.0 | $ — |
| Filter Secondary | Ea | $ 9.80 | | | | | | 0.0 | $ — |
| Pre Filter | Ea | $ 3.75 | | | | | | 0.0 | $ — |
| Furniture Blocks | Ea | $ 77.00 | | | | | | 0.0 | $ — |
| Plumbers Putty | Ea | $ 84.00 | | | | | | 0.0 | $ — |
| Gloves, Cotton | Pr | $ 1.35 | | | | | | 0.0 | $ — |
| Gloves, Surgical Latex | Pr | $ 18.00 | | 12.0 | 20.0 | 11.0 | 31.0 | 120.0 | $ 872.00 |
| Gloves, Work/Rubber Chemical | Pr | $ 5.25 | 19.0 | | 2.0 | | | 2.0 | $ 14.00 |
| Rag Black | Bx | $ 15.00 | | | | | | 0.0 | $ — |
| Inventory Tags | Bx | $ 95.00 | | | | | | 13.0 | $ — |
| Non Sparking goose (P90) | Bx | $ 7.21 | | 2.0 | 1.0 | 2.0 | 6.0 | 13.0 | $ 63.00 |
| Non Gloves | Bx | $ 28.00 | 1.0 | | 6.0 | 2.0 | 4.0 | 8.0 | $ 8.00 |
| Plastic Sheeting (POLY TRP) | Rl | $ 72.00 | | | | 10.0 | 5.0 | 24.0 | $ 1,728.00 |
| Radiant Plastic (Ttem) | Rl | $ 18.25 | | | | | | 0.0 | $ — |
| Outlet Test Strips (set 10) | Rl | $ 24.00 | | | | | | 0.0 | $ — |
| Sponges, Rust Removal | Pkg | $ 1.80 | | | | | | 0.0 | $ — |
| Spray Bottle w/Trigger | Ea | $ 3.95 | | | | | | 0.0 | $ — |
| Tyvex, Duct | Rl | $ 7.00 | | | | | | — | $ 359.00 |

05/10/2006 14:06 FAX 3038642102          GART SPORTS                    ☒014

## Table for Consumables

Costum USA
Contracted # 1468714, Sports Authority
Ventura (Sub-contractor) Summary
Period Ended 03/19/04

| | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Disinfectant Materials (Petty Cash & Credit Card Control) | $ 149.09 | | | | | | | $ 149.09 |
| Vira-Tech Disinfectant | | $ 46.28 | | | | | | 46.28 |
| JRS Mop - Pad | | $ 41.99 | | | | | | 41.99 |
| Lowes - Supplies | | | $ 16.14 | | | | | 16.14 |
| Lowes - Supplies | | | | $ 49.22 | | | | 49.22 |
| Office Depot-Supplies | | | | | $ 97.31 | | | 97.31 |
| Lowes - Supplies | | | | | | $ 13.75 | | 13.75 |
| Thompson - Fuel | | | | | | | | 65.50 |
| Morgan Distributing Inc - Fuel for Cleaners | | | | | | | | 7,437.42 |
| Waste Management - Dumpster(14) | | | | | | | | 3,164.00 |
| Sanbelt - Lift | | | | | | | | 5,466.00 |
| Sanbelt - Gas Floor Stripper | | | | | | | | 1,063.92 |
| Sanbelt - 30 Ft. Articulate Narrows Jib Boom Lift | | | | | | | | 1,060.78 |
| Sanbelt - 11 Light Tower | | | | | | | | 4,786.64 |
| Sanbelt - (2) Slow Generator | | | | | | | | 2,311.59 |
| Sanbelt - Distribution Cable | | | | | | | | 1,639.00 |
| Sanbelt - 520kw Generator | | | | | | | | 270.18 |
| Sanbelt - 310kw Generator | | | | | | | | 3,564.00 |
| Sanbelt - 2 Eccentric Walk Behind Floor Strippers | | | | | | | | 3,591.00 |
| Jones Plumbing | | | | | | | | 6,000.00 |
| EER - Structural Inspection | | | | | | | | 6,000.00 |
| | | | | | | | | 383.66 |
| | | | | | | | | 1,830.00 |
| | | | | | | | | 1,010.00 |
| | | | | | | | | 7,500.00 |

| | | Mon | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | Rl | | $ 8.72 | | | | | | 0.0 | |
| Tape, HVAC (aluminum) | Rl | | $ 21.60 | | | | | | 0.0 | |
| Tape, Duct | Rl | | $ 2.68 | | | | | | 0.0 | |
| Tape, Poly Pan | sn | | $ 0.24 | | | | | | 0.0 | |
| Towels Roll | Ea | | $ 7.25 | | 310 | | | | 130.0 | 657.50 |
| Wipes Cotton Cloth | Lb | | $ 4.51 | | | | | | 0.0 | |
| Wipes, Lint Free | Bx | | $ 25.00 | | | | | | 0.0 | |
| Wiped, Shop | Rl | | $ 72.00 | | | | | | 0.0 | |
| Wipes, Wipe All | Pkg | | $ 9.80 | | | | | | 0.0 | |
| Wrap, Bubble/ And Shrink | Rl | | $ 64.75 | | | | | | 0.0 | |
| Wrap, Shrink | Rl | | $ 48.00 | | | | | | 0.0 | |

$ 9,891.88

TSA RULE 26 DISCLOSURES
0045

05/10/2006 14:06 FAX 3038642102    GART SPORTS    ☑015

Subtotal for Vendor (Subcontractors)

Dollar USA Markup

Total for Vendors (Subcontractors)

$    91,561.31
$    18,824.49

$    63,369.70

TSA RULE 26 DISCLOSURES
0046

05/10/2006 14:06 FAX 3038642102    GART SPORTS    016

**Casino USA**
**Consort # 6167721 Sports Authority**
**Labor Summary**
**Period Ending 03/26/06**

| Classification | | Std Rate OT/Prem | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/24 | Sun 03/26 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kraus, Jeff | Project Coordinator Travel $ | | | | | | | | | 0.0 | |
| | Regular $ | 95.00 | | | | 4 | | | | 4.0 | 380.00 |
| | Overtime $ | 142.50 | | | | | | | | 0.0 | |
| Genz, Bruce | Project Manager Travel $ | 80.00 | | | | | | | | 0.0 | |
| | Regular $ | 80.00 | | | | | | | | 36.0 | 2,880.00 |
| | Overtime $ | 120.00 | | | | | | | | 0.0 | |
| Cecilio, Phillip | Asst. Project Manager Travel $ | 75.00 | | | | | | | | 0.0 | |
| | Regular $ | 75.00 | 13 | 10 | 7 | 6 | | | | 40.0 | 3,060.00 |
| | Overtime $ | 112.50 | | | | 5 | | | | 5.0 | 562.50 |
| Parma, Shannon | Executive Supervisor Travel $ | 45.00 | | | | | | | | 0.0 | |
| | Regular $ | 45.00 | | | | | | | | 0.0 | |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| Pansza, Shannon | Restoration Supervisor Travel $ | 45.00 | | | | | | | | 0.0 | |
| | Regular $ | 45.00 | | | | | | | | 0.0 | |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| Haalman, Bud | Restoration Supervisor Travel $ | 44.00 | | | | | | | | 0.0 | |
| | Regular $ | 44.00 | | | | | | | | 0.0 | |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| Rozek, Victor | Restoration Supervisor Travel $ | 45.00 | | | | | | | | 0.0 | |
| | Regular $ | 45.00 | 11 | 10 | 11 | 8 | | | | 40.0 | 1,800.00 |
| | Overtime $ | 67.50 | | | | | | | | 3.0 | 202.10 |
| Balite, Luke | Restoration Supervisor Travel $ | 45.66 | | | | | | | | 11.0 | 49.50 |
| | Regular $ | 45.00 | | | | | | | | 11.0 | 49.50 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| DiAngelo, Jeffrey | Skilled Labor Travel $ | 28.50 | | | | | | | | 19.0 | 541.50 |
| | Regular $ | 43.75 | 10 | 9 | 9 | | | | | 19.0 | 541.50 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| King, Rachel | Skilled Labor Travel $ | 28.50 | | | | | | | | 37.0 | 1,041.50 |
| | Regular $ | 43.75 | 9 | 9 | 9 | 10 | | | | 37.0 | 1,041.50 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| McDougal, Jason | Skilled Labor Travel $ | 28.50 | | | | | | | | 39.5 | 1,115.75 |
| | Regular $ | 42.75 | 10 | 9 | 10.5 | 10 | | | | 39.5 | 1,115.75 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Sakata, John | Skilled Labor Regular $ | 28.50 | 10 | 9 | 10.5 | | | | | 29.5 | 840.75 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Brown, Timothy | Skilled Labor Regular $ | 28.50 | | | | | | | | 0.0 | |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Brummelord, Arthur | Skilled Labor Regular $ | 28.50 | | | | | | | | 0.0 | |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Hollenbeck, Russell | Skilled Labor Regular $ | 28.50 | 10 | | | | | | | 10.0 | 285.00 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |

TSA RULE 26 DISCLOSURES
0047

05/10/2006 14:06 FAX 3038642102                GART SPORTS                                @017

| Name | Classification | | Regular $ | Overtime $ | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hanemann, Ralph | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | 0.0 $ | |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Eaton, Al | Skilled Labor | Regular $ | 28.50 | 9 | 8.25 | | | | | | | | | | | 17.3 $ | 491.63 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Dahlin, David | Skilled Labor | Regular $ | 28.50 | 9 | | | | | | | | | | | | 9.0 $ | 256.50 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Williams, Wes | Skilled Labor | Regular $ | 28.50 | 9 | | | | | | | | | | | | 9.0 $ | 256.50 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Sykes, Andre | Skilled Labor | Regular $ | 28.50 | 10 | | | | | | | | | | | | 10.0 $ | 285.00 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Cayhne, Jason | Skilled Labor | Regular $ | 28.50 | 10 | | | | | | | | | | | | 10.0 $ | 285.00 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Cole, Milton | Skilled Labor | Regular $ | 28.50 | 9.5 | 9 | 10.5 | 10 | | | | | | | | | 39.0 $ | 1,111.50 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Bounxley, David | Skilled Labor | Regular $ | 28.50 | 10 | | 10.5 | | | | | | | | | | 10.5 $ | 256.50 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Witten, Phillip | Skilled Labor | Regular $ | 28.50 | 9 | 9 | | 10 | | | | | | | | | 9.0 $ | 256.50 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Pappas, Nick | Skilled Labor | Regular $ | 28.50 | 10 | 9 | 10.5 | | | | | | | | | | 29.5 $ | 770.75 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 9.5 $ | |
| Ochita, Terrance | Skilled Labor | Regular $ | 28.50 | 9.5 | | | | | | | | | | | | 9.5 $ | 270.75 |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Yard, Curtis | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | 9.0 $ | |
| | | Overtime $ | 43.71 | | | | | | | | | | | | | 0.0 $ | |
| Diaz, Steven | Skilled Labor | Regular $ | 28.50 | 9 | | | | | | | | | | | | 9.0 $ | 256.50 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| McKinney, Eric | Skilled Labor | Regular $ | 28.50 | 8.5 | 9 | 10.5 | 5.5 | | | | | | | | | 33.5 $ | 954.75 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Benz, Victor | Skilled Labor | Regular $ | 28.50 | 8.5 | | | | | | | | | | | | 8.5 $ | 242.25 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Lethridge, Aurita | Skilled Labor | Regular $ | 28.50 | 10 | | | | | | | | | | | | 10.0 $ | 285.00 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| King, Roy | Skilled Labor | Regular $ | 28.50 | | 9 | | | | | | | | | | | 19.5 $ | 555.75 |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Nenis | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | 0.0 $ | |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Niten | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | 0.0 $ | |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |
| Niena | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | | | 0.0 $ | |
| | | Overtime $ | 42.71 | | | | | | | | | | | | | 0.0 $ | |

TBA RULE 26 DISCLOSURES
0048

05/10/2006 14:07 FAX 3038642102    GART SPORTS    ☑ 018

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
|------|---------------|-----------|-------|---|---|---|---|---|---|---|---|---|---|-----|-----|
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | 0.0 |

05/10/2006 14:07 FAX 3038642102

GART SPORTS

| Name | Skilled Labor | Regular $ | Overtime $ | | | | |
|------|---------------|-----------|------------|---|---|---|---|
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |
| Name | Skilled Labor | 28.50 | 42.75 | | | | $ 0.0 | $ 0.0 |

TSA RULE 26 DISCLOSURES
9050

05/10/2006 14:08 FAX 3038642102          GART SPORTS                    @020

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | $ | 0.0 |
| | | Overtime $ | 42.71 | | | | | | | | | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | $ | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | $ | 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 |
| Labor Totals | Temporary Labor | Regular $ | 17.16 | | | | | | | | $ | 0.0 |
| | | Overtime $ | 26.57 | | | | | | | | | 0.0 |
| Management Fee Total Personal | Client Name | Regular $ | | | | | | | | | $ | 0.0 |
| | | Overtime $ | | | | | | | | | | 0.0 |
| Labor Totals | | | | | | | | | | | $ | 20,855.38 |

TSA RULE 26 DISCLOSURES
0051

GART SPORTS

05/10/2006 14:08 FAX 3038842102                                    021

Canon USA
Contract # 14(96772) Sports Authority
Reimbursable Summary
Period Ended 03/26/04

| | | Mon 03/20 | Tues 03/21 | Wed 03/21 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gant, Bruce | perdiem | $ 30.00 | $ 30.00 | | $ 30.00 | | | | $ 90.00 |
| | hotel | $ 78.10 | $ 78.10 | | $ 78.10 | $ 78.10 | | | $ 312.40 |
| | airfare | | | | | $ 253.50 | | | 253.50 |
| Castillo, Phillip | perdiem | $ 30.00 | $ 30.00 | $ 30 | $ 30.00 | $ 30.00 | $ 30.00 | | 180.00 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | 468.60 |
| | airfare | | | | | | | | |
| Pearson, Shannon | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Raadt, Nathan | perdiem | $ 50.00 | $ 50.00 | $ 30.00 | $ 50.00 | $ 20.00 | | | 150.00 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | | 390.50 |
| | airfare | | | | | | | | |
| Raadt, Luke | perdiem | $ 30.00 | | | | | | | 30.00 |
| | hotel | $ 78.10 | | | | | | | 78.10 |
| | airfare | | | | | | | | |
| Dieckman, Earl | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Maria Round | | | | | | | | | $ 1,982.99 |
| | | | | | | | | | 199.29 |
| Subtotal for Reimbursables | | | | | | | | | |
| Canon USA Markup | | | | | | | | | |
| Total for Reimbursables | | | | | | | | | 2,181.19 |

05/10/2006 14:08 FAX 3038642102                    GART SPORTS                                                    Ø022

Custom USA
Centura # 1400724 Sports Authority
Equipment Summary
Period Ended (excluded)

| Equipment Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea. | $ 50.00 | | | | | | | | 0 | $ |
| Air Mover | Ea. | $ 22.50 | 55 | 55 | 53 | 55 | 55 | | | 273 | $ 6,142.50 |
| Blower | Ea. | $ 175.00 | | | | | | | | 0 | $ |
| Buffer, Floor | Ea. | $ 30.00 | 1 | 1 | 2 | 2 | | | | 10 | $ 200.00 |
| Cart, City Demolition | Ea. | $ 6.00 | 1 | 1 | 1 | | | | | 4 | $ 24.00 |
| Dolly, 4 Whl/EPS 2 Door Walker | Ea. | $ 25.00 | | | | | | | | 0 | $ |
| Dry Thermal A.H. (Fixed) | Ea. | $ 15.00 | 12 | 13 | 12 | 12 | | | | 48 | $ 720.00 |
| Electric Panel (Gutter Box) | Ea. | $ 4.00 | 16 | 24 | 28 | 31 | | | | 119 | $ 476.00 |
| Extension Cords (25'-100') | Ea. | $ 15.00 | | | | 4 | | | | 4 | $ 150.00 |
| Extraction Unit (Portable) | Ea. | $ 18.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Wet Rinsed) | Ea. | $ 48.00 | | | | | | | | 0 | $ |
| Fogger, Thermal (Tow Towed) | Ea. | $ 24.00 | | | | | | | | 0 | $ |
| Fogger, ULV Thermal (Electric) | Ea. | $ 16.00 | | | | | | | | 0 | $ |
| Generator (less fuel 100w) | Ea. | $ 104.00 | | | | | | | | 0 | $ |
| HEPA Filtration Unit/Air Scrubber | Ea. | $ 8.21 | 4 | 5 | 5 | 5 | | | | 19 | $ 155.99 |
| Hudson Pump Sprayer | Ea. | $ 295.00 | | | | | | | | 0 | $ |
| HVAC Vacuum System | Ea. | $ 12.00 | 2 | 2 | 1 | 2 | | | | 7 | $ 84.00 |
| Ladder, Step (Various) | Ea. | $ 16.00 | 2 | 4 | 2 | | | | | 14 | $ 224.00 |
| Light, Drop Down Stand | Ea. | $ 2.60 | 1 | 1 | 1 | | | | | 4 | $ 14.00 |
| Light, Quartz Drop Stand Strip | Ea. | $ 15.00 | | | | | | | | 0 | $ |
| Moisture Meter | Ea. | $ 25.00 | | | | | | | | 0 | $ |
| On Site Assembly Fixtures | Ea. | $ 125.00 | | | | | | | | 0 | $ |
| Ozone Generator | Ea. | $ 150.00 | 3 | 3 | 3 | 2 | 2 | | | 13 | $ 915.00 |
| Project Trailer (Office/Job) | Ea. | $ 175.00 | | | | | | | | 0 | $ |
| Pump Sump | Ea. | $ 65.00 | | | | | | | | 0 | $ |
| Pump, Trash 2" - 4" | Ea. | $ 20.00 | 1 | 4 | 1 | | | | 6 | $ 180.00 |
| Radio, 2 way - Job site comm. | Ea. | $ 50.00 | 4 | | | | | | 6 | $ 815.00 |
| Safety Products | | | | | | | | | | 0 | $ |
| Personal Fall Protection (PFP) | Ea. | $ 13.00 | | | | 7 | | | | 9 | $ 220.00 |
| Personal Protection Equipment (PPE) | Ea. | $ 10.00 | 21 | 21 | 10 | 7 | | | | 59 | $ 915.00 |
| Personal Respiratory Protection (PRP) | Ea. | $ 10.00 | | | | | | | | 0 | $ |
| Small Tool Charge | Ea. | $ 90.00 | | | | | | | | 10 | $ 630.00 |
| Spray Painter | Ea. | $ 125.00 | | | | | | | | 0 | $ |
| Squeegee | Ea. | $ 25.00 | 4 | | 2 | | | | | 10 | $ 250.00 |
| Trailer (Boxed) | Ea. | $ 125.00 | | | | | | | | 0 | $ |
| Trailer (18' - 31') | Ea. | $ 80.00 | | | | | | | | 0 | $ |
| Trailer 50' | Ea. | $ 53.00 | | | | | | | | 0 | $ |
| Trailer 24' | Ea. | $ 165.00 | 3 | | | | | | | 3 | $ 475.00 |
| Trailer (Office Trailer) | Ea. | $ 125.00 | | | | | | | | 0 | $ |
| Truck 24 ft. | Ea. | $ 85.00 | | | | | | | | 0 | $ |
| Truck, Pooling | Ea. | $ 245.00 | 9 | 8 | 9 | | | | | 26 | $ 2,210.00 |
| Unreadable (Job) Large | Ea. | $ 135.00 | | | | | | | | 0 | $ |
| Unreadable High, Small | Ea. | $ 65.00 | | | | | | | | 0 | $ |
| Vacuum (Wet/Dry) | Ea. | $ 44.00 | | | | | | | | 0 | $ |
| Vacuum, HEPA | Ea. | $ 39.00 | | | | | | | | 0 | $ |
| Vacuum, PP29/PP22 | Ea. | $ 125.00 | | | | | | | | 0 | $ |
| Company Owned Vehicle | Ea. | $ 70.00 | | | | | | | | 0 | $ |
| Wiper Tank, Large | Ea. | $ 20.00 | | | | | | | | 0 | $ |
| Wipes, Wet, Small | Ea. | $ 55.00 | | | | | | | | 0 | $ 275.00 |
| Water, High Pressure (Daily) | Ea. | $ 75.00 | | | | | | | | | $ |

TSA RULE 26 DISCLOSURES
0053

GART SPORTS

| Drying Equipment Description | Unit | Qty | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Tie-up Crease | Ea | 195.00 | | | | | | 0 | |
| Dehumidification Unit-200 cfm | Ea | 233.00 | | | | | | 19 | 1,893.00 |
| Dehumidification Unit-300 cfm | Ea | 160.00 | 5 | | | | | 0 | 1,893.00 |
| Dehumidification Unit-1113 cfm | Ea | 188.00 | | | | | | 0 | |
| Dehumidification Unit-2000/7200 cfm | Ea | 620.00 | | | | | | 0 | |
| Dehumidification Unit-4500 cfm | Ea | 872.00 | | | | | | 24 | 20,900.00 |
| Dehumidification Unit-9000/10000 cfm | Ea | 1,195.00 | | | | | | 0 | |
| DX Unit-20/25 Ton | Ea | 1,195.00 | | | | | | 0 | |
| Refrigeration Unit | Ea | 973.00 | | | | | | 0 | |
| | Ea | 125.00 | | | | | | 0 | |

Total for Equipment: $ 41,336.58

TSA RULE 26 DISCLOSURES
0054

05/10/2008 14:09 FAX 3038642102          GART SPORTS          ☒ 024

**Gexpo USA**
**Contract # 168717/4 Sports Authority**
**Consumables Summary**
**Period Ended 03/26/06**

| Chemical Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Absorbent Granules | Gal | $ 77.00 | | | | | | | | 0.0 | $ |
| Alcohol Isopropyl | Gal | $ 14.85 | | | | | | | | 0.0 | $ |
| Cleaner, Stainless Steel | Gal | $ 32.00 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Liquid) | Gal | $ 19.95 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Powder) | Gal | $ 2.50 | | | | | | | | 0.0 | $ |
| Cleaner, Glass | Lb | $ 11.00 | | | | | 1.0 | | | 1.0 | $ 22.10 |
| Cleaner, Hard Surface | Gal | $ 22.10 | | | | | | | | 0.0 | $ |
| 815 LIV (HD) | Gal | $ 17.25 | | | | | | | | 0.0 | $ |
| General Purpose Degreaser | Gal | $ 11.25 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 39.71 | | | | | | | | 0.0 | $ |
| Nature Boy | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Cleaner, HVAC Coil | Gal | $ | | | | | | | | 0.0 | $ |
| Deodorizer | Gal | $ 15.00 | | | | | | | | 0.0 | $ |
| Deodorizer (Gel) | 15 | $ 27.50 | | | 4.0 | 15.0 | | | | 28.0 | $ 959.00 |
| Deodorizing Liquid | Gal | $ 18.00 | 4.0 | | | 1.0 | | | | 1.0 | $ 2.75 |
| Deodorizing Block | Ea | $ 2.75 | | | | | | | | 0.0 | $ 2.75 |
| Disinfectant Bleache | Ea | $ 2.51 | | | | | | | | 0.0 | $ |
| Bleach | Gal | $ 57.04 | | | | | | | | 0.0 | $ |
| Thomas Reg | Ea | $ 2.33 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 6.13 | | | | | | | | 0.0 | $ |
| Goof Off | Ea | $ | | | | | | | | 0.0 | $ |
| Toilet bowl/Urinal | Gal | $ 27.13 | | | | | | | | 0.0 | $ |
| Hairspray/Lacquer | Gal | $ 18.10 | | | | | | | | 0.0 | $ |
| Large Trash Removers, Heavy | Gal | $ 27.50 | | | | | | | | 0.0 | $ |
| Metal Polishing Paste | Gal | $ 19.50 | | | | | | | | 0.0 | $ |
| Bigfoot Slush Polish | Pt | $ 8.75 | | | | | | | | 0.0 | $ |
| Bon Ami/Wood Renewers | Ea | $ | | | | | | | | 0.0 | $ |
| Complete Cleaner | Pt | $ | | | | | | | | 0.0 | $ |
| | Gal | $ 34.00 | | | | | | | | 0.0 | $ |
| Descaler | Gal | $ 39.00 | | | | | | | | 0.0 | $ |
| Stodenty | | $ | | | | | | | | 0.0 | $ |
| Dust Repell Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ |
| Dust Sealant, Antibacterial | Gal | $ 65.00 | | | | | | | | 0.0 | $ |
| Rock Sealant, Impregnated | Gal | $ 22.00 | | | | | | | | 0.0 | $ |
| Rock Sealant | Pt | $ 12.00 | | | | | 2.0 | | | 2.0 | $ 10.52 |
| Silvex Cleaner/Total Cleaner | Can | $ 5.26 | | | | | | | | 0.0 | $ |
| Spray Adhesive | | | | | | | | | | | |

| Brush Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Broom, Angled | Ea | $ 3.00 | | | | | | | | 0.0 | $ |
| Broom, Push | Ea | $ 28.00 | | | | | 1.0 | | | 16.0 | $ 448.00 |
| Broom, Straw | Ea | $ 8.31 | | | | | | | | 0.0 | $ |
| Brush, Toilet | Ea | $ 2.69 | | | | | | | | 0.0 | $ |
| Box, Bowl/Freeze Dry | Ea | $ 5.44 | | | | | | | | 0.0 | $ |
| Bag, Vacuum | Ea | $ 11.50 | | | | | | | | 0.0 | $ |
| Bristle, Corrugated | Ea | $ 10.00 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - large | Ea | $ 4.00 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - small | Ea | $ 7.60 | | | | | | | | 0.0 | $ |
| Brush, Long Handled Scrub | Ea | $ | | | | | | | | 0.0 | $ |
| Brush, New Combed | Ea | $ 375.00 | | | | | | | | 0.0 | $ |
| Dust Pan Pail (500) | Ea | $ 8.00 | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0055

| | Unit | | $ | | | | | | | | $ | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (N95/P100) | Ea | $ | 9.50 | | | 2.0 | | | | | 0.0 | $ | 190.00 |
| Dust Mask | Bx | $ | 24.50 | | | | | | | | 0.0 | $ | |
| Filter Material | Rl | $ | 65.00 | | | | | 1.0 | | 3.0 | 0.0 | $ | |
| Filter Secondary | Rl | $ | 3.80 | | | | | | | | 0.0 | $ | |
| Pre Filter | Ea | $ | 3.75 | | | | | | | | 0.0 | $ | |
| Hardware Blocks | Bx | $ | 27.00 | | | | | | | | 0.0 | $ | |
| Furniture Pads | Yr | $ | 84.00 | | | | | | | 1.0 | 0.0 | $ | 16.00 |
| Gloves, Cotton | Yr | $ | 1.75 | | | | | | | | 64.0 | $ | 116.00 |
| Gloves, Surgical Latex | Pr | $ | 18.00 | | | | | | 1.0 | | 1.0 | $ | 16.00 |
| Gloves, Wrist Rubber Chemical | Pr | $ | 3.25 | | | 23.0 | 12.0 | 10.0 | 2.0 | | 6.0 | $ | |
| Hog Rings | Bx | $ | 15.00 | | | | | | | | 0.0 | $ | |
| Inventory Tags | Bx | $ | 97.00 | | 3.0 | | | | | | 0.0 | $ | |
| Mop Heads | Ea | $ | 5.25 | | | 4.0 | 3.0 | 5.0 | | | 0.0 | $ | 18.75 |
| Neat Constant Remediums Areas (690) | Bx | $ | 20.00 | 3.0 | | | | | | | 5.0 | $ | 360.00 |
| Plastic Sheeting (20'x100') | Rl | $ | 72.00 | | | | | | 2.0 | | 0.0 | $ | |
| Rubbish Plastic (Trash) | Rl | $ | 18.75 | | | | | | | | 0.0 | $ | |
| Quick Ted Shirts (pcs 10) | Pl | $ | 24.00 | | | | | | | | 0.0 | $ | |
| Spudger, Stick Removal | Pkg | $ | 1.80 | | | | | | | | 0.0 | $ | |
| Spray Bottle w/ Trigger | Ea | $ | 5.95 | | | | | | | | 0.0 | $ | |
| Tyve Duct | Rl | $ | 7.00 | 5.0 | | | | | 1.0 | | 8.0 | $ | 56.00 |

05/10/2006 14:09 FAX 3038542102          GART SPORTS                    ☑026

Cartou USA
Contract # 1488779, Sports Authority
Vendors (Subcontracted) Summary
Period Ended 03/26/06

| | | | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | EA | $ 8.75 | | | | | | | | $ 8.75 |
| Tape, HVAC (Aluminum) | EA | $ 23.00 | | | | | | 0.0 | | |
| Tape, Poly Box | EA | $ 2.60 | | | | | | 0.0 | | |
| Bags | EA | $ 0.26 | | | | | | 0.0 | | |
| Trash Bags | EA | $ 7.25 | 25.0 | | | | | 150.0 | | $ 43.25 |
| Wipes, Costco Cloth | EA | $ 4.55 | | 25.0 | | | | 0.0 | | |
| Wheat Lint Free | EA | $ 25.00 | | | 25.0 | | | 0.0 | | |
| Wipes, Shop | EA | $ 72.00 | | | | | | 0.0 | | |
| Wipes, Wipe-All | Pkg | $ 9.00 | | | | 50.0 | | 0.0 | | |
| Wrap, Bubble/Anti Static | EA | $ 65.25 | | | | | | 0.0 | | |
| Wrap, Shrink | EA | $ 48.10 | | | | | | 0.0 | | |
| **Total for Consumables** | | | | | | | | | | $ 3,035.61 |

Unscheduled Materials (Petty Cash & Credit Card Control)

| | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Thorntons - Fuel | $ 13.01 | | | | | | | $ 13.01 |
| Lowes - Supplies | | $ 7.31 | | | | | | $ 7.31 |
| Lowes - Supplies | | | $ 7.39 | | | | | $ 7.39 |
| Thorntons - Fuel | | | | $ 73.59 | | | | $ 73.59 |
| FedEx - Shipping | | | | $ 1.86 | | | | $ 1.86 |

05/10/2006 14:10 FAX 3038642102    GART SPORTS    ☑ 027

| Subtotal for Vendors (Subcontractors) | | |
|---|---|---|
| Carton (TSA Markup) | $ | 106.96 |
| | $ | 21.82 |
| Total for Vendors (Subcontractors) | $ | 115.79 |

TSA RULE 26 DISCLOSURES
0058

GART SPORTS

Ø028

E-FILED
Monday, 31 December, 2007  02:02:59 PM
Clerk, U.S. District Court, ILCD

05/10/2005 14:10 FAX 3038542102

Caissa USA
Cananea & 140(173) Sports Authority
Labor Summary
Period Ended 04/03/06

| Name | Classification | | BBA Rate O/T Prem | Mon 03/27 | Tue 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Hours | Total Charge |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kirton, Jeff | Project Coordinator | | | | 6 | | | | | | | |
| | Travel $ | 35.00 | | | | | | | | | | |
| | Regular $ | 55.00 | | | | | | | | 6.0 | | 400.00 |
| | Overtime $ | 142.50 | | | | | | | | 0.0 | | 0.0 |
| Gray, Matt | Project Manager | | | | | | | | | | | |
| | Travel $ | 80.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 80.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 120.00 | | | | | | | | 0.0 | | 0.0 |
| Castillo, Phillip | Asst. Project Manager | | | | | | | | | | | |
| | Travel $ | 75.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 75.00 | | 16.5 | 3 | 3 | 3 | | | 29.5 | | 1,372.50 |
| | Overtime $ | 112.50 | | | | | | | | 0.0 | | 0.0 |
| Farmers, Sharron | Restoration Supervisor | | | | | | | | | | | |
| | Travel $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | | 0.0 |
| Farmers, Shemual | Restoration Supervisor | | | | | | | | | | | |
| | Travel $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | | 0.0 |
| Hutchins, Bud | Restoration Supervisor | | | | | | | | | | | |
| | Travel $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | | 0.0 |
| Renick, Minor | Restoration Supervisor | | | | | | | | | | | |
| | Travel $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | | 0.0 |
| Easton, John | Skilled Labor | | | | | | | | | | | |
| | Travel $ | 48.00 | | | | | | | | 0.0 | | 0.0 |
| | Regular $ | 45.00 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 67.50 | | | | | | | | 0.0 | | 0.0 |
| Dibagalo, Jeffrey | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| King, Rachel | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| Schatz, John | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| Brown, Timmie | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| McDougal, James | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| Broomfield, Arthur | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |
| Heffenbrick, Russell | Skilled Labor | | | | | | | | | | | |
| | Regular $ | 28.50 | | | | | | | | 0.0 | | 0.0 |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | | 0.0 |

GART SPORTS

| Name | | | | |
|---|---|---|---|---|
| Eisenstern, Ralph | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Keslan, Al | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Dultz, David | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Williams, Vlae | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Sykes, Andre | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Crafton, Jason | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Cole, Milton | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Gonzalez, David | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Wilkins, Phillip | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Fergus, Nick | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Elsing, Terrance | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Reed, Curtis | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Elliz, Shervo | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| McKinney, Eric | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Simco, Victor | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Lockridge, Amlo | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| King, Roy | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |
| Name | Skilled Labor | Regular $ | 28.50 | |
| | | Overtime $ | 42.75 | |

05/10/2006 14:10 FAX 3038842104    GART SPORTS    ☑ 030

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |

05/10/2006 14:11 FAX 3038842102

GART SPORTS

| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 43.75 |

TSA RULE 26 DISCLOSURES
0062

05/10/2006 14:11 FAX 3038642102

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | $ 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | $ 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | $ 0.0 |
| | | Overtime $ | 42.75 | | | | | | | | | $ 0.0 |
| Labor Ready | Temporary Labor | Regular $ | 17.58 | | | | | | | | | $ 0.0 |
| | | Overtime $ | 26.37 | | | | | | | | | $ 0.0 |
| Management Fee | | Client Name | | | | | | | | | | 0 |
| Total Personal | | | | | | | | | | | | $ 1,107.50 |
| Labor Trade | | | | | | | | | | | | |

TSA RULE 26 DISCLOSURES
0063

05/10/2008 14:11 FAX 3038642102    GART SPORTS

**Costco USA**
**Company # 1408721 Sports Authority**
**Reimbursable Summary**
**Period Ended 04/2/06**

| | | Mon 03/27 | Tue 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Heard, Bruce | perdiem | $ 30.00 | | | | | | | $ 30.00 |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Castillo, Philip | perdiem | | $ 30.00 | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Pierson, Shannon | perdiem | | $ 30.00 | $ 30.00 | | | | | 60.00 |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Rostick, Labor | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Baldrig, Luke | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Stockham, Paul | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Hours Rental | | | | | | | | | |
| Subtotal for Reimbursables | | | | | | | | | $ 90.00 |
| Costco USA Mileage | | | | | | | | | 9.00 |
| Total for Reimbursables | | | | | | | | | $ 99.00 |

TSA RULE 26 DISCLOSURES
0964

05/10/2008 14:11 FAX 3038842102          GART SPORTS                    ☑ 034

**Catena USA**
**Chapter 11 FORTH1H Sports Authority**
**Equipment Summary**
**Period Ended 04/2006**

| Equipment Description | Unit | Rate | Mon 03/17 | Tues 03/18 | Wed 03/19 | Thurs 03/20 | Fri 03/21 | Sat 04/01 | Sun 04/02 | Total Units | Total Charge |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $50.00 | | | | | | | | 0 | $ - |
| Air Mover | Ea | 27.50 | | | | | | | | 0 | $ - |
| Bobcat | Ea | 179.00 | | | | | | | | 0 | $ - |
| Buffer, Floor | Ea | 30.00 | | | | | | | | 0 | $ - |
| Cart, Two Handled box | Ea | 20.00 | | | | | | | | 0 | $ - |
| Chair, 2-3 Poly (Wht/Charcoal) | Ea | 6.00 | | | | | | | | 0 | $ - |
| Dry Cleaning Head (Spin-Pin) | Ea | 85.00 | | | | | | | | 0 | $ - |
| Ergonomics Cart (Bit-1000) | Ea | 45.00 | | | | | | | | 0 | $ - |
| Extraction Unit (Portable) | Ea | 6.00 | | | | | | | | 0 | $ - |
| Extraction Unit (Trailer) | Ea | 55.00 | | | | | | | | 0 | $ - |
| Floor Cleaning System (Walk Behind) | Ea | 18.00 | | | | | | | | 0 | $ - |
| Fogger (Thermal / Gas Powered) | Ea | 18.00 | | | | | | | | 0 | $ - |
| Fogger, ULV (Electric) (Portable) | Ea | 43.00 | | | | | | | | 0 | $ - |
| Generator (less than 10kw) | Ea | 113.00 | | | | | | | | 0 | $ - |
| Generator (more than 10kw) | Ea | 197.00 | | | | | | | | 0 | $ - |
| Hepa Filter, Trailer Air Scrubber | Ea | 8.25 | | | | | | | | 0 | $ - |
| Hudson Pump Sprayer | Ea | | | | | | | | | 0 | $ - |
| HVAC / Vacuum System | Ea | 245.00 | | | | | | | | 0 | $ - |
| Ladder | Ea | 12.00 | | | | | | | | 0 | $ - |
| Mold Remediation | Ea | 2.00 | | | | | | | | 0 | $ - |
| Mini Bobcat | Ea | 55.00 | | | | | | | | 0 | $ - |
| On Site Aromatic Package | Ea | 125.00 | | | | | | | | 0 | $ - |
| Ozone Generator | Ea | 21.00 | | | | | | | | 0 | $ - |
| Project Phone (Cellular) | Ea | 20.00 | | | | | | | | 0 | $ - |
| Pump, Sump | Ea | 20.00 | | | | | | | | 0 | $ - |
| Pump, Trash 2" - 4" | Ea | 65.00 | | | | | | | | 0 | $ - |
| Radio, 2 way / full site comm | Ea | 20.00 | | | | | | | | 0 | $ - |
| Safety Package | Ea | | | | | | | | | 0 | $ - |
| Personal Fall Protection (PFP) | Ea | 90.00 | | | | | | | | 0 | $ - |
| Personal Protection Equipment (PPE) | Ea | 15.00 | | | | | | | | 0 | $ - |
| Personal Respiratory Protection (PRP) | Ea | 30.00 | | | | | | | | 0 | $ - |
| Small Tools Charge | Ea | 10.00 | | | | | | | | 0 | $ - |
| Service, Advisor | Ea | 90.00 | | | | | | | | 0 | $ - |
| Gang Box Tool | Ea | 65.00 | | | | | | | | 0 | $ - |
| Trailer (Freezer) | Ea | 123.00 | | | | | | | | 0 | $ - |
| Trailer 8' | Ea | 45.00 | | | | | | | | 0 | $ - |
| Trailer (18' - 19') | Ea | 50.00 | | | | | | | | 0 | $ - |
| Trailer 28' | Ea | 55.00 | | | | | | | | 0 | $ - |
| Trailer (45') | Ea | 123.00 | | | | | | | | 0 | $ - |
| Trailer (Office Trailer) | Ea | 123.00 | | | | | | | | 0 | $ - |
| Truck, 24 ft | Ea | 99.00 | | | | | | | | 0 | $ - |
| Truck, 2+ ft | Ea | 245.00 | | | | | | | | 0 | $ - |
| Ultrasonic Tank / Large | Ea | 125.00 | | | | | | | | 0 | $ - |
| Vacuum (Anti-Static) | Ea | 68.00 | | | | | | | | 0 | $ - |
| Vacuum | Ea | 18.00 | | | | | | | | 0 | $ - |
| Vacuum, HEPA | Ea | 15.00 | | | | | | | | 0 | $ - |
| Walting, TESD FFPS | Ea | 123.00 | | | | | | | | 0 | $ - |
| Vibra, Charge / Company Owned | Ea | 45.00 | | | | | | | | 0 | $ - |
| Company Owned Vehicle | Ea | 55.00 | | | | | | | | 0 | $ - |
| Vapor Tek, Large | Ea | 70.00 | | | | | | | | 0 | $ - |
| Water Heat Stream (Cold) | Ea | 75.00 | | | | | | | | 0 | $ - |

GART SPORTS
05/10/2006 14:12 FAX 3038642184

| Water High Pressure (Hot) | | Daily | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Unit | 192.00 | | | | | | | | | | |
| Dryer/Exhaust Hardening | Ea | 225.00 | | | | | | | | | 0 | $ |
| Rotary Oven | Ea | 105.00 | | | | | | | | | 0 | $ |
| Design Charge | Ea | 185.00 | | | | | | | | | 0 | $ |
| Deformation Unit | Ea | 420.00 | | | | | | | | | 0 | $ |
| Dehumidification Unit | Ea | 675.00 | | | | | | | | | 0 | $ |
| Dehumidification Unit | Ea | 1,195.00 | | | | | | | | | 0 | $ |
| Dehumidification Unit | Ea | 1,795.00 | | | | | | | | | 0 | $ |
| Dehumidification Unit | Ea | 875.00 | | | | | | | | | 0 | $ |
| IX Unit | Ea | 175.00 | | | | | | | | | 0 | $ |
| **Total for Equipment** | | | | | | | | | | | | $ |

05/10/2005 14:12 FAI 3038842102          GART SPORTS

☑038

**Berlen USA**
**Chemical #1407121 Sports Authority**
**Chesapeake Summary**
**Period Ended 04/2/06**

| Material Description | Unit | Rate | Mon 03/27 | Tue 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Chemical Distributing** | | | | | | | | | | | |
| Abrasive Remover | Gal | $ | 77.66 | | | | | | | 0.0 | $ |
| Alcohol Beverage | Gal | $ | 14.85 | | | | | | | 0.0 | $ |
| Cleaner Stainless Steel | Gal | $ | 32.80 | | | | | | | 0.0 | $ |
| Cleaner Chemical (Liquid) | Gal | $ | 17.91 | | | | | | | 0.0 | $ |
| Cleaner Chemical (Powder) | Lb | $ | 2.59 | | | | | | | 0.0 | $ |
| Cleaner Glass | Gal | $ | 12.00 | | | | | | | 0.0 | $ |
| Cleaner Hand Surface | | | | | | | | | | | |
| H.M.I.S (GHS) | Gal | $ | 92.10 | | | | | | | 0.0 | $ |
| General Purpose Degreaser | Gal | $ | 17.25 | | | | | | | 0.0 | $ |
| Field Soap | Gal | $ | 11.25 | | | | | | | 0.0 | $ |
| Febreze 8ci | Gal | $ | 19.75 | | | | | | | 0.0 | $ |
| Cleaner HVAC Coil | Gal | $ | 13.00 | | | | | | | 0.0 | $ |
| **Deodorizer** | | | | | | | | | | | |
| Deodorizing Gel | Lb | $ | 18.60 | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Gal | $ | 17.50 | | | | | | | 0.0 | $ |
| Deodorizing Block | Ea | $ | 14.50 | | | | | | | 0.0 | $ |
| Disinfectant Buckle | Gal | $ | 14.15 | | | | | | | 0.0 | $ |
| Bleach | Gal | $ | 2.75 | | | | | | | 0.0 | $ |
| Furnace Tag | Gal | $ | 52.00 | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ | 5.51 | | | | | | | 0.0 | $ |
| Glass OR | Ea | $ | 6.51 | | | | | | | 0.0 | $ |
| Lubricant (Electrical) | Gal | $ | 13.75 | | | | | | | 0.0 | $ |
| Lubricant, Machinery | Gal | $ | 31.10 | | | | | | | 0.0 | $ |
| Treatment, Light | Gal | $ | 19.50 | | | | | | | 0.0 | $ |
| Long Term Preserver, Heavy | Yr | $ | 9.65 | | | | | | | 0.0 | $ |
| Metal Polishing Paste | Ea | $ | 8.25 | | | | | | | 0.0 | $ |
| Stainless Steel Polish | | | | | | | | | | | |
| Rust Inhibitor/Reducers | Gal | $ | 94.00 | | | | | | | 0.0 | $ |
| Complete Cleaner | Gal | $ | 90.00 | | | | | | | 0.0 | $ |
| Descaler | Gal | $ | | | | | | | | 0.0 | $ |
| Sealant | Gal | $ | 41.00 | | | | | | | 0.0 | $ |
| Dust Sealant Spray | Gal | $ | 65.00 | | | | | | | 0.0 | $ |
| Dust Sealant / Antibacterial | Gal | $ | 55.00 | | | | | | | 0.0 | $ |
| Rust Sealant (Remover) | Gal | $ | 21.00 | | | | | | | 0.0 | $ |
| Rust Sealant, Clear | Pt | $ | 11.00 | | | | | | | 0.0 | $ |
| Silicone Complex/Dry Cleaner | Can | $ | 2.38 | | | | | | | 0.0 | $ |
| **Spray Adhesive** | | | | | | | | | | | |
| | Unit | Rate | | | | | | | | | |
| Paper, Anti Stain | Ea | $ | 9.00 | | | | | | | 0.0 | $ |
| Scrub Pad | Rl | $ | 28.00 | | | | | | | 0.0 | $ |
| Roll, Trash | Ea | $ | 1.95 | | | | | | | 0.0 | $ |
| Roll, Trash Environmental - 4ci | Ea | $ | 2.65 | | | | | | | 0.0 | $ |
| Roll, Towel Preran Dry | Ea | $ | 3.45 | | | | | | | 0.0 | $ |
| Box, Flat Pack | Ea | $ | 97.50 | | | | | | | 0.0 | $ |
| Paper, Crumpled | Ea | $ | 10.00 | | | | | | | 0.0 | $ |
| Brush Dispenser Large | El | $ | 4.00 | | | | | | | 0.0 | $ |
| Brush Dispenser Small | El | $ | 9.00 | | | | | | | 0.0 | $ |
| Brush, Long Handle Brush | El | $ | 6.00 | | | | | | | 0.0 | $ |
| Brush, Tube Product | El | $ | | | | | | | | 0.0 | $ |
| Duct Lay Flat (500) | Rl | $ | 275.00 | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0067

GART SPORTS

☒ 037

| Item | Unit | | Price | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask, PRE.I (ID:SP100) | Ea | $ | 8.00 | | | | | | | 0.0 | $ |
| Dust Mask | Box | $ | 24.00 | | | | | | | 0.0 | $ |
| Elbow Radial | Box | $ | 65.00 | | | | | | | 0.0 | $ |
| Elbow Secondary | Box | $ | 5.10 | | | | | | | 0.0 | $ |
| Pin Filler | Ea | $ | 3.25 | | | | | | | 0.0 | $ |
| Furniture Blocks | Box | $ | 77.00 | | | | | | | 0.0 | $ |
| Furniture Pads | Box | $ | 84.00 | | | | | | | 0.0 | $ |
| Gloves, Cotton | Pr | $ | 1.75 | | | | | | | 0.0 | $ |
| Gloves, Cotton | Box | $ | 18.00 | | | | | | | 0.0 | $ |
| Gloves, Surgical Latex | Pr | $ | 3.25 | | | | | | | 0.0 | $ |
| Gloves, Work/ Rubber/ Chemical | Pr | $ | 13.00 | | | | | | | 0.0 | $ |
| Flag Tape | Ea | $ | 59.00 | | | | | | | 0.0 | $ |
| Sweatney Tape | Ea | $ | 3.15 | | | | | | | 0.0 | $ |
| Mop Heads | Ea | $ | 20.00 | | | | | | | 0.0 | $ |
| Non Dissolving Scrubbers, green (#90) | Box | $ | 72.00 | | | | | | | 0.0 | $ |
| Plastic Sheeting (10FX100') | Rl | $ | 13.25 | | | | | | | 0.0 | $ |
| Rubber Plastic (1mil) | Pkg | $ | 24.00 | | | | | | | 0.0 | $ |
| Quick Trak Skins (per 36) | Ea | $ | 1.80 | | | | | | | 0.0 | $ |
| Squeegee/ Cord Removed | Ea | $ | 8.05 | | | | | | | 0.0 | $ |
| Spray Bottle w/ Trigger | Ea | $ | 7.00 | | | | | | | 0.0 | $ |
| Tie, Dust | | | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0068

05/10/2006 14:13 FAX 3038542102          GART SPORTS          ☒038

Colsen USA
Contract #110(723), Sports Authority
Vendors (Subcontractors) Summary
Period Ended 04/26/06

Unaudited Materials (Petty Cash & Credit Card Center)

Lower - Final
Choose - Final

Total for Commanities

| | | | Mon 03/27 | Tue 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | RI | $ | 3.75 | | | | | | | |
| Tape, HVAC (Aluminum) | RI | $ | 12.00 | | | | | | | |
| Tape, Poly Box | RI | $ | 2.60 | | | | | | 0.0 | |
| Tape | RI | $ | 6.74 | | | | | | 0.0 | |
| Tape | RI | $ | 7.15 | | | | | | 0.0 | |
| Tyvek Suite | RI | $ | 4.35 | | | | | | 0.0 | |
| Wipes, Cotton Cloth | RI | $ | 25.00 | | | | | | 0.0 | |
| Wipes, Lint Free | RI | $ | 10.00 | | | | | | 0.0 | |
| Wipes, Shop | RI | $ | 9.00 | | | | | | 0.0 | |
| Wipes, Wipe All | RI | $ | 64.75 | | | | | | 0.0 | |
| Wrap, Bubble And Static | RI | $ | 48.00 | | | | | | 0.0 | |
| Wrap, Shrink | RI | $ | | | | | | | 0.0 | |

$ 136.30
$ 98.97

136.30
98.97

TSA RULE 26 DISCLOSURES
0069



**COTTON USA**
*National Disaster Recovery Services*
RESTORATION SERVICE AGREEMENT

STORE #
618

EFFECTIVE DATE OF AGREEMENT: MARCH 14TH, 2006

CUSTOMER: THE SPORTS AUTHORITY
BILLING ADDRESS: 1050 W. HAMPDEN AVE
INSURANCE COMPANY: Liberty MUTUAL     CLAIM NO. X169A - 003155
PROPERTY ADDRESS ("Property"): 3311 VEGANS PARKWAY  (SPRINGFIELD, IL)
TYPE OF LOSS (Fire/Water/Other): TORNADO DAMAGE

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer agree as follows:

### ARTICLE I.
### CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1**    *Nature of Agreement.* This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

### ARTICLE II.
### DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1**    *Services and Materials Provided.* Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2**    *Cooperation By Customer / Term of Agreement.* The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3**    *Removal of Contents.* The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4**    *Subcontractors Allowed.* As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5**    *Insurance.* Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6**    *Permits.* Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7**    *Hazardous Materials.* Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8**    *Authority of Customer.* The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Cotton's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

ARTICLE III.
TIME FOR PERFORMANCE OF WORK

Section 3.1    Work Performed. The Work shall be commenced within forty-eight (48) hours or as reasonably practical given the specifications of the Work following execution of this Agreement and Cotton shall use reasonable efforts to diligently and fully complete the Work within a reasonable amount of time after beginning the Work. Should Cotton be delayed, hindered, interfered with or impeded in any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

ARTICLE IV.
CUSTOMER'S PAYMENT OF FEES AND COSTS

Section 4.1    Pricing and Invoicing.  All work performed hereunder shall be priced at:

_____    Lump-Sum Amount (See Estimate)

OR

__✓__    Time and Materials (See Rate Schedule)

PHASE 1
EMERGENCY SERVICES

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement. After the Work is begun, the Customer will receive progressive billings (Invoices) for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion. All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice. There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e., thirty (30) days) the payment is delinquent. Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice; provided, however, that delivery of such property and contents shall not be made until Cotton has received payment on such final Invoice and Customer has paid in full all previous Invoices (and any service charge accrued thereon) and there remains no Delinquency.  The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party. The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

Section 4.2    Change Orders.  Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

Section 4.3    Direct Pay Authorization.  This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

ARTICLE V.
MOLD REMEDIATION WORK; INDEMNIFICATION

Section 5.1    Mold Remediation Work.  With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold ("Mold Remediation Work"), Customer agrees as follows:

(a) Testing.  Customer shall engage the services of a person or firm ("Mold Expert") specializing in the investigation, testing and analysis of mold spores and microbial contamination ("Mold") occurring within buildings and other structures of a like-kind and nature as the project site  and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work. The scope of the Mold Remediation Work will be specified in a mold analysis report ("Report") that the Customer receives from the Mold Expert. The Customer shall be solely responsible for having the Mold Expert test ("Pretest") the Property for Mold prior to commencement of the Work and preparing the Report.  In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site.  Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test ("Post-test") the site (or portion/phase thereof).

(b) Work Completion.  Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements. Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with a statement that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested).  In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

Section 5.2    Release.  CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

2

TSA 00298

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS DAMAGES), IN RESPECT OF PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH, OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER SERVED OWNER, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING FROM OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THIS FOREGOING INDEMNITY PROVISION WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3**    No Consequential Damages. Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

## ARTICLE VI.
## TERMINATION

**Section 6.1**    Termination By Cotton. Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2**    Termination By Customer. In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton the for all Charges up to and including the date of such termination, regardless of whether Customer has received a Invoice for such Charges prior to such termination.

## ARTICLE VII
## DISPUTE RESOLUTION

**Section 7.1**    Non-binding Mediation. Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2**    Attorneys' Fees and Costs. If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

## ARTICLE VIII.
## GOVERNING LAW; VENUE

**Section 8.1**    Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2**    Venue. In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                          CUSTOMER:

By: JEFF KRONE                                   By: _____
Name: Jeff Krone                                 Name: _____
Title: Regional Director                         Title: _____
Date Signed: 3-14-06                             Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

3

TSA 00299

**Mike Mavelle**

From: Jeff Krone [jeffk@cottonteam.com]
Sent: Monday, March 20, 2006 8:39 AM
To:    Thomas.Tieman@LibertyMutual.com
Cc:    Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com

**TOM & MIKE-**

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF $100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS-PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

*Sent To D. Frich 3-20-06*

*National Disaster Recovery Services*

<Attachment A>

DATE: 3-14-06

TO:    MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM: JEFF KRONE

RE: TORNADO DAMAGE TO STORE # 618

Cotton viewed the CATASTROPHIC loss located at 3211 VETERANS PARKWAY in SPRINGFIELD, IL. Mike Mavelle of THE SPORTS AUTHORITY requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition. The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM). The Scope of Service is broken into the following general areas of concern.

**SCOPE OF WORK:**

- *BRIEF SCENARIO OF THE LOSS: ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-COTTON USA, TOM TIERNAN-LIBERTY MUTUAL & MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

**GENERAL ITEMS:**

- ❑ *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.*
- ❑ *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.*
- ❑ *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- ❑ *WEARING A COTTON LOGGED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- ❑ *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.*
- ❑ *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE*
- ❑ *TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- ❑ *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY*
- ❑ *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.*
- ❑ *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS*
- ❑ *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

**DEHUMIDIFICATION**



*DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-DAMAGED PRODUCT REMAINING IN THE STORE.*

**INSTALL THE FOLLOWING: (FRONT OF THE STORE)**

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE OF THE STORE.
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

**INSTALL THE FOLLOWING: (BACK OF THE STORE)**

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE OF THE STORE
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE NORTH DOORWAY TO THE WAREHOUSE AREA.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT.
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

**EXTERIOR OF BUILDING**

➤ CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
➤ SWEEP UP ALL THE GLASS FROM FRONT OF STORE
➤ ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO A MINIMUM

**ROOF**

➤ COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-GLOBAL) ON INSPECTION.
➤ COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
➤ COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION PURPOSES.
➤ COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

**FITNESS AREA EXERCISE**

➤ SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
➤ ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
    ▫ HARD HATS
    ▫ EYE GLASSES
    ▫ DUST MASKS

TSA 00302

- □ STEEL TOED SHOES
- □ EAR PROTECTION
- ➤ CUT DOWN ALL HANGING DEBRIS
  - □ FLORESCENT LIGHTS
  - □ CONDUIT LINES
  - □ MONITORS
  - □ WATER SPRINKLER LINES
  - □ ELECTRICAL LINES
  - □ SPORT AUTHORITY SIGNAGE
  - □ PARTS OF THE ROOF DECKING
- ➤ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- ➤ WET VAC ALL STANDING WATER
- ➤ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- ➤ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### LADIES

- ➤ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### OUTDOOR

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

➢ REMOVE AND DISCARD THE RUBBER MATTING
➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION
➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
➢ HEPA VAC ALL DUST DEBRIS PARTICLES
➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
➢ WORK WITH REGIS ON THE INVENTORY COUNTING
➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➢ UTILIZE THE ABOVE DRYING SCOPE
➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

**SNOW SPORTS**

➢ MANIPULATE ALL THE CONTENTS
➢ WET VAC ALL STANDING WATER
➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE AND DISCARD THE RUBBER MATTING
➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
➢ REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
➢ HEPA VAC ALL DUST DEBRIS PARTICLES
➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
➢ WORK WITH REGIS ON THE INVENTORY COUNTING
➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➢ UTILIZE THE ABOVE DRYING SCOPE
➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

**TRAVEL/LUGGAGE**

➢ MANIPULATE ALL THE CONTENTS
➢ WET VAC ALL STANDING WATER
➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE AND DISCARD THE RUBBER MATTING
➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
➢ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    A.  TAGGED AND SALVAGE COMPANY WILL TAKE
    B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA
➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
➢ HEPA VAC ALL DUST DEBRIS PARTICLES
➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
➢ WORK WITH REGIS ON THE INVENTORY COUNTING
➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00305

> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00306

> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGH OUT THE STORE

**BIKES**

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A.   TAGGED AND SALVAGE COMPANY WILL TAKE
>> B.   TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED, FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.

❖ NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.

**FOOTWEAR**

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A.   TAGGED AND SALVAGE COMPANY WILL TAKE
>> B.   TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ ~~THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.~~

- ❖ ~~THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN~~

- ❖ ~~NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.~~

~~SHOE DEPARTMENT~~

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - c. TAGGED AND SALVAGE COMPANY WILL TAKE
    - d. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

## CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by Mike Mavelle, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

## IMPORTANT POINTS

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of COTTON management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that COTTON will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the COTTON'S on-site Project Manager (Bruce Gear) and a designated representative from The Sports Authority meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, COTTON will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of Insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

COTTON proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

COTTON will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been COTTON pleasure to submit this proposal to Mike Mavelle and Tom Tieman. Thank you for your consideration and cooperation.

Respectfully Submitted,

JEFF KRONE
COTTON USA
REGIONAL RESTORATION DIRECTOR
SOUTHEAST REGION

813-887-3942 OFFICE
813-887-3943 FAX

813-299-7489 CELL
877-511-2962 (24hr CALL CENTER)

TSA 00309

| EXPENSE ITEM PURCHASE ORDER | | RFC# | | | PURCHASE ORDER NUMBER 125RM891 |
|---|---|---|---|---|---|
| The Sports Authority Inc. 1050 W. Hampden Ave. - Englewood, CO 80110 Phone (303) 200-5050 | | REQUESTING DEPT/STORE# Risk Management 9963 | | | ACCOUNT TO BE CHARGED TO 018530-120 |
| | | DATE OF ORDER 3/31/2006 | | | DELIVERY REQUIRED BY |

Address To: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 140B722 | emergency clean up and repair (insurance deductible) | | 100,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | Total | $ 100,000.00 |

3-31-06



| Name | Mike Mavelle | Date: | 3/20/2006 |
|---|---|---|---|
| Corp. Company | The Sports Authority | Invoice #: | 1408722 |
| Corp. Address | 1050 W. Hampden Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, Colorado 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-2285 | | |
| Fax: | (720) 475-2118 | | |

| Loss Address: | 3211 Veterans Parkway | Store Number: | # 618 |
|---|---|---|---|
| City, State, Zip | Springfield, IL 62704 | | |
| Tel: | (217) 546-0132 | Insurance Company: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | Insurance Adjuster: | Tom Tiernan - EGA |

**RE:**          DRAW REQUEST # 1

*EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE*          $          100,000.00
*MENTIONED LOSS ADDRESS:*

| | | |
|---|---|---|
| **SUBTOTAL** | $ | 100,000.00 |
| **TAX** | $ | - |
| **TOTAL DUE AND PAYABLE** | $ | 100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton Catastrophe
4345 Northwest Freeway
Huston, Texas 77040

**Please include the invoice number on check**

TSA 00311

**EXPENSE ITEM PURCHASE ORDER**

| | | |
|---|---|---|
| REC. | PURCHASE ORDER NUMBER | 125RM911 |

The Sports Authority Inc.
1050 W. Hampden Ave., Englewood, CO 80110
Phone (303) 200-5050

| | |
|---|---|
| REQUESTING DEPT./STORE | Risk Management 963 |
| DATE OF ORDER | 4/19/2006 |

| | |
|---|---|
| ACCOUNT TO BE CHARGED TO | 618-530-720 |
| DELIVERY REQUIRED BY | |

Cotton Catastrophe

Address to:

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1108722 | remainder of emergency Services for Roof damage | | $ 219,428.67 |

A Esend to Jeff 4-26-06

| | | | $ | 219,428.67 |
|---|---|---|---|---|

Please Press
ASAP

Nul Ubull    4-26-06

x Nm Am    4-26-06

TSA 00312

Star Fax #618



**COTTON**

*National Disaster Recovery Services*

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | Insurance Co: | Liberty Mutual Property |
| City, State, Zip | Springfield, IL 62704 | Insurance Adj: | Tom Tiernan |
| Tel: | (217) 546-0132 | Claim #: | X69A-003155-00 |
| Fax: | (217) 546-1073 | | |

Re:         Tornado Damages in Springfield, IL

Re:         **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |
| SUBTOTAL                    *REMAINING BALANCE* | $ | 219,428.67 |
| TOTAL DUE AND PAYABLE | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**Please include the invoice number on check**

03/31/06

TSA 00313



## COTTON USA
*National Disaster Recovery Services*

RESTORATION SERVICE AGREEMENT

STORE # 618

EFFECTIVE DATE OF AGREEMENT: MARCH 14TH, 2006

CUSTOMER: THE SPORTS Authority

BILLING ADDRESS: 1050 W. Hampden Ave

INSURANCE COMPANY: Liberty Mutual    CLAIM NO. XL69A - 003155

PROPERTY ADDRESS ("Property"): 3211 Veterans Parkway (Springfield, IL)

TYPE OF LOSS (Fire/Water/Other): Tornado Damage

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer agree as follows:

### ARTICLE I.
### CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1** _Nature of Agreement._ This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

### ARTICLE II.
### DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1** _Services and Materials Provided._ Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2** _Cooperation By Customer / Term of Agreement._ The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3** _Removal of Contents._ The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4** _Subcontractors Allowed._ As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5** _Insurance._ Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6** _Permits._ Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7** _Hazardous Materials._ Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8** _Authority of Customer._ The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Cotton's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

ARTICLE III.
TIME FOR PERFORMANCE OF WORK

**Section 3.3** Work Performed. The Work shall be commenced within forty-eight (48) hours (or as reasonably practical given the specifications of the Work) following execution of this Agreement, and Cotton shall use reasonable efforts to substantially or fully complete the Work within a reasonable amount of time after beginning the Work. Should Cotton be delayed, hindered, interfered with or impeded by any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment is not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

ARTICLE IV.
CUSTOMER'S PAYMENT OF FEES AND COSTS

**Section 4.1** Pricing and Invoicing. All work performed hereunder shall be priced at:

_____ Lump Sum Amount (See Estimate)                        PHASE 1

OR                                                            EMERGENCY SERVICES

__✓__ Time and Materials (See Rate Schedule)

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement. After the Work is begun, the Customer will receive progressive billings ("Invoice") for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion. All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice. There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e. thirty days) the payment is delinquent. Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice, provided, however, that delivery of such property and contents shall not be made until Cotton has received payment on such final Invoice and Customer has paid in full all previous Invoices (and any services charge accrued thereon) and there remains no Delinquency. The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party. The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

**Section 4.2** Change Orders. Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

**Section 4.3** Direct Pay Authorization. This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

ARTICLE V.
MOLD REMEDIATION WORK; INDEMNIFICATION

**Section 5.1** Mold Remediation Work. With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold ("Mold Remediation Work"), Customer agrees as follows:

(a) Testing. Customer shall engage the services of a person or firm ("Mold Expert") specializing in the investigation, testing and analysis of mold spores and microbial contamination ("Mold") occurring within buildings and other structures of a like-kind and nature as the project site and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work. The scope of the Mold Remediation Work will be specified in a mold analysis report ("Report") that the Customer receives from the Mold Expert. The Customer shall be solely responsible for having the Mold Expert test ("Pretest") the Property for Mold prior to commencement of the Work and preparing the Report. In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site. Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test ("Post-test") the site (or portion/phase thereof).

(b) Work Completion. Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements. Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with assurance that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested). In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

**Section 5.2** Release. CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

2

TSA 00298

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS "DAMAGES"), IN RESPECT TO PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER'S EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON, UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THE FOREGOING INDEMNITY PROVISIONS WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT, INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3     No Consequential Damages.** Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

### ARTICLE VI.
### TERMINATION

**Section 6.1     Termination By Cotton.** Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2     Termination By Customer.** In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton for all Charges up to and including the date of such termination, regardless of whether Customer has received a Invoice for such Charges prior to such termination.

### ARTICLE VII
### DISPUTE RESOLUTION

**Section 7.1     Non-binding Mediation.** Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2     Attorneys' Fees and Costs.** If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

### ARTICLE VIII.
### GOVERNING LAW; VENUE

**Section 8.1     Jurisdiction.** This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2     Venue.** In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                      CUSTOMER:

By: JEFF KRONE                               By: _____
Name: CXEFF Kron                             Name: _____
Title: Regional Dweller                      Title: _____
Date Signed: 3-14-06                         Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

3

TSA 00299

## Mike Mavelle

**From:** Jeff Krone [jeffk@cottonteam.com]
**Sent:** Monday, March 20, 2006 8:39 AM
**To:** Thomas.Tieman@LibertyMutual.com
**Cc:** Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com



**TOM & MIKE-**

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF $100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS- PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

Sent To D. Fraser 3-20-06

TSA 00300

**E-FILED**
Monday, 31 December, 2007  02:03:15 PM
Clerk, U.S. District Court, ILCD



### National Disaster Recovery Services

<Attachment A>

DATE: 3-14-06

TO:    MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
       DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
       TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM:  JEFF KRONE

RE:  TORNADO DAMAGE TO STORE # 518

Cotton viewed the CATASTROPHIC loss located at 3211 VETERANS PARKWAY In SPRINGFIELD, IL. Mike Mavelle of THE SPORTS AUTHORITY requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition. The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM). The Scope of Service Is broken into the following general areas of concern.

- *BRIEF SCENARIO OF THE LOSS:  ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-COTTON USA, TOM TIERNAN-LIBERTY MUTUAL-& MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

- ❑ *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.*
- ❑ *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.*
- ❑ *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- ❑ *WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- ❑ *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.*
- ❑ *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE*
- ❑ *TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- ❑ *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY*
- ❑ *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.*
- ❑ *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS*
- ❑ *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

████████████

□ *DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-DAMAGED PRODUCT REMAINING IN THE STORE.*

## INSTALL THE FOLLOWING: (FRONT OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

## INSTALL THE FOLLOWING: (BACK OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE NORTH DOORWAY TO THE WAREHOUSE AREA.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT.
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

████████████

- CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
- SWEEP UP ALL THE GLASS FROM FRONT OF STORE
- ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO A MINIMUM

████

- COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-GLOBAL) ON INSPECTION.
- COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
- COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION PURPOSES
- COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

████████████

- SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
- ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
  □ HARD HATS
  □ EYE GLASSES
  □ DUST MASKS

- □ STEEL TOED SHOES
- □ EAR PROTECTION
➤ CUT DOWN ALL HANGING DEBRIS
- □ FLORESCENT LIGHTS
- □ CONDUIT LINES
- □ MONITORS
- □ CAP SPRINKLER LINES
- □ ELECTRICAL LINES
- □ SPORT AUTHORITY SIGNAGE
- □ PARTS OF THE ROOF DECKING
➤ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
➤ WET VAC ALL STANDING WATER
➤ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➤ REMOVE AND DISCARD THE RUBBER MATTING
➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➤ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
➤ HEPA VAC ALL DUST DEBRIS PARTICLES
➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
➤ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
➤ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
➤ WORK WITH REGIS ON THE INVENTORY COUNTING
➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➤ UTILIZE THE ABOVE DRYING SCOPE
➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

██████████

➤ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
➤ WET VAC ALL STANDING WATER
➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➤ REMOVE AND DISCARD THE RUBBER MATTING
➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
➤ HEPA VAC ALL DUST DEBRIS PARTICLES
➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
➤ WORK WITH REGIS ON THE INVENTORY COUNTING
➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➤ UTILIZE THE ABOVE DRYING SCOPE
➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

❖ *THESE CONTENTS ARE TO BE SALVAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

██████████

➤ MANIPULATE ALL THE CONTENTS
➤ WET VAC ALL STANDING WATER
➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

TSA 00303

> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION.
> REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
> REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- ➤ REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- ➤ REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00305

> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR
>    OPTIONS A OR B.
>    A.  TAGGED AND SALVAGE COMPANY WILL TAKE
>    B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD
>        STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS
>    FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD*
   *THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR
>    OPTIONS A OR B.
>    A.  TAGGED AND SALVAGE COMPANY WILL TAKE
>    B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD
>        STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS
>    FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD*
   *THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR
>    OPTIONS A OR B.
>    A.  TAGGED AND SALVAGE COMPANY WILL TAKE
>    B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD
>        STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS
>    FOR TRANSPORTATION.

> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> ➤ MANIPULATE ALL THE CONTENTS
> ➤ WET VAC ALL STANDING WATER
> ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> ➤ REMOVE AND DISCARD THE RUBBER MATTING
> ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
> ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
> ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
> ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
> ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

> ➤ MANIPULATE ALL THE CONTENTS
> ➤ WET VAC ALL STANDING WATER
> ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> ➤ REMOVE AND DISCARD THE RUBBER MATTING
> ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
> ➤ DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
> ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
> ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
> ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
> ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
> ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

❖ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

▰▰▰▰▰▰▰▰▰▰

➢ MANIPULATE ALL THE CONTENTS
➢ WET VAC ALL STANDING WATER
➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE AND DISCARD THE RUBBER MATTING
➢ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➢ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
➢ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    C. TAGGED AND SALVAGE COMPANY WILL TAKE
    D. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
➢ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
➢ HEPA VAC ALL DUST DEBRIS PARTICLES
➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
➢ WORK WITH REGIS ON THE INVENTORY COUNTING
➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➢ UTILIZE THE ABOVE DRYING SCOPE
➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES, LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

❖ *NOTE- SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

<u>CRITICAL PATH MANAGEMENT</u>

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by Mike Mavelle, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

<u>IMPORTANT POINTS</u>

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of COTTON management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that COTTON will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the COTTON'S on-site Project Manager (Bruce Gear) and a designated representative from The Sports Authority meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, COTTON will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

COTTON proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

COTTON will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been COTTON pleasure to submit this proposal to Mike Mavelle and Tom Tiernan. Thank you for your consideration and cooperation.

Respectfully Submitted,


*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2952 (24hr CALL CENTER)*

TSA 00309

# EXPENSE ITEM PURCHASE ORDER

| RFC# | PURCHASE ORDER NUMBER |
| --- | --- |
| | 125RM891 |

| The Sports Authority Inc.<br>1050 W. Hampden Ave. - Englewood, CO 80110<br>Phone (303) 200-5050 | REQUESTING DEPT/STORE #<br>Risk Management - 963 | ACCOUNT TO BE CHARGED TO<br>618-630-1204 |
| --- | --- | --- |
| | DATE OF ORDER<br>3/21/2006 | DELIVERY REQUIRED BY |

**Cotton Catastrophe**

| | | DESCRIPTION | | | AMOUNT |
| --- | --- | --- | --- | --- | --- |
| | 1408722 | emergency clean up and repair (insurance deductible) | | | $ 100,000.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Total | $ 100,000.00 |

_[signature]_ 3-21-06



| Name | Mike Mavelle | | Date: | 3/20/2006 |
| Corp. Company | The Sports Authority | | Invoice #: | 1408722 |
| Corp. Address | 1050 W. Hampden Ave. | | Terms: | Net 10 |
| City, State, Zip | Englewood, Colorado 80110 | | Fed Id: | 76-D62E204 |
| Tel: | (720) 475-2285 | | | |
| Fax: | (720) 475-2118 | | | |

| Loss Address: | 3211 Veterans Parkway | | Store Number: | # 618 |
| City, State, Zip | Springfield, IL 62704 | | | |
| Tel: | (217) 546-0132 | | Insurance Company: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | | Insurance Adjuster: | Tom Tiernan - EGA |

---

RE:          DRAW REQUEST # 1

*EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE*          $    100,000.00
*MENTIONED LOSS ADDRESS:*

| SUBTOTAL | $ | 100,000.00 |
| TAX | $ | - |
| TOTAL DUE AND PAYABLE | $ | 100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton Catastrophe

14345 Northwest Freeway

Houston, Texas 77040

**Please include the invoice number on check**

TSA 00311

| EXPENSE ITEM PURCHASE ORDER | RFC# | | PURCHASE ORDER NUMBER 125RM911 | |
|---|---|---|---|---|
| The Sports Authority Inc. 1050 W. Hampden Ave. - Englewood, CO 80110 Phone (303) 200-5050 | REQUESTING DEPT/STORE # Risk Management- 963 | | ACCOUNT TO BE CHARGED TO 818-530-120 | |
| | DATE OF ORDER 4/19/2006 | | DELIVERY REQUIRED BY | |
| Cotton Catastrophe | | | | |

| QUANTITY | ITEM NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | remainder of emergency Services for Roof damage | | $  219,428.67 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | forward to Jacks 4-26-06 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | $  219,428.67 |

Please Process ASAP

Neil Udell   4-26-06

X _____   4.26.06

TSA 00312

Store Fit #618



*National Disaster Recovery Services*

| Name | Mike Mavelle | | Date: | 03/31/06 |
|---|---|---|---|---|
| Company | Sports Authority | | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | | |
| Fax: | (720) 475-3285 | | | |

| Loss Address: | 3211 South Veterans Parkway | | | |
|---|---|---|---|---|
| City, State, Zip | Springfield, IL 62704 | Insurance Co: | Liberty Mutual Property |
| Tel: | (217) 546-0132 | Insurance Adj: | Tom Tiernan |
| Fax: | (217) 546-1073 | Claim #: | X69A-003155-00 |
| | | | |
| Re: | Tornado Damages in Springfield, IL | | |
| | | | |
| Re: | **Final Bill With Not To Exceed Amount:** | | |

Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:

Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |
| **SUBTOTAL**          *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**\*\*Please include the Invoice number on check\*\***

03/31/06

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date: 4/3/2006
Contractor: Wolford Retail Builders, Inc.
Union    Revised 5/7    J. Wolford

| ITEM | MATERIAL | LABOR-Unit | PRICE/SQ.FT. | TOTAL |
|------|----------|-----------|--------------|-------|
| Budgetary- Insurance- 32,513 sf | | **BID BREAKDOWN** | | |
| 1. Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2. Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3. Structural- 110 sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4. Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5. Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6. Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7. Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8. Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9. Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalcement | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl's Re-insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remain | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring Installation | | | Budget- Estimation | $37,990 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | wks. | |
| UNION   /   NON-UNION | | Amount of time for construction: | Weeks | |

| | | |
|---|---|---|
| 80% Cotton | | $22,880.00 |
| | | |
| Demo only 10% by Cotton | | $2,650.00 |
| Demo only 15% by Cotton | | $6,765.00 |
| | | |
| 30% Cotton- dismantling only | | $32,700 |
| 40% Cotton | | $6,160.00 |
| 40% adhesive removal | | $4,016.80 |
| | | |
| 100% deordorizing only | | $11,000.00 |
| 50% Cotton | | $3,075.00 |
| 40% Cotton | | $10,100.00 |
| 33% Cotton | | $7,053.75 |
| **Cotton Sub-Total** | | **$106,400.55** |
| | | |
| Prorate % | 1% Percent | $1,064.00 |
| Prorate % | 10% Percent | $10,746.46 |
| **Cotton Total- Against WRB Budget** | | **$118,211.01** |

'05/09/2008 15:26 FAX 3038642102        GART SPORTS        ☒010

2001   T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL

Date: 7-26-01
Contractor: VAUCH CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|------|----------|-------|--------------|-------|---|
| BID BREAKDOWN | | | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | 10,500 | X |
| 3. Bond | | | | 1,450 | |
| 4. Concrete | | | | 17,127 | X |
| 5. Carpentry | | | | 109,440 | X |
| 6. Studs and Drywall | | | | ◯ | ✓ |
| 7. Storefront Glass | | | | 1,800 | |
| 8. Interior Mirrors | | | | 1,850 | |
| 9. Acoustical Ceiling | | | | 36,836 | X |
| 10. Store Fixtures | | | | 12,640 | |
| 11. Painting | | | | 105,880 | X |
| 12. Carpet Installation | | | | ABOVE | |
| 13. Vinyl Tile and Base | | | | 37,534 | |
| 14. Plumbing | | | | 39,825 | X |
| 15. Sprinklers | | | | 134,000 | X |
| 16. Electrical | | | | 9,850 | X |
| 17. Fire Alarm System | | | | 11,500 | X |
| 18. HVAC/Ventilation | | | | | |
| 19. Dumpster | | | | 895 | |
| 20. Insurance  BUILDERS RSK | | | | | |
| 21. Supervision | | | | 14,402 | SUPERVISION |
| 22. General Conditions (Itemize) | | | | 20,255 | |
| 23. Other (Itemize below) | | | | | |
| SUBTOTAL | | | | 33,000 | X |
| 24. Profit & Overhead (10% Max.) | | | | 3,950 | |
| 25. Taxes (Sales/State/Local) | | | | | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 |
| List Itemizations below: (#22 - Gen Cond.) | | | | | $22.18 □ |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List Itemizations below: (#23 - Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,635 | |
| 2. TOILET PARTITIONS | | | | 2,230 | 736,848 |
| 3. CONCRETE SEALING | | | | 2,390 | $22.80 □ |
| 4. | | | | | |

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: ◯ wks. |
| UNION  /  NON-UNION | Amount of time for construction: ◯ wks. |
| % of Union Increase:    % | |

Qualifications to be listed on separate sheet

7-26-01

**EXHIBIT D**

06/09/2005 15:25 FAX 3038642102    GART SPORTS    Ⓩ011
JUL-23-01 MON 04:01 PM  VANC  CONTRACTING    FAX NO. 217  10443    P. 02/02

Sheet3

*Springfield*

*#618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | | | Sportmart No. 618 | |
|---|---|---|---|---|---|
| | | | | | Cost |
| 1000 | General Requirements | | | | $28,529 |
| 2000 | Excavate and Grade | | | | $80,732 |
| 3000 | Concrete Foundations and slabs | | | | $174,422 |
| 4000 | Masonry and Foam Insulation | | | | $166,251 |
| 5000 | Structural, Joists, and Deck | | | | $177,927 |
| 6000 | Rough Carpentry | | | | $45,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | | $95,893 |
| 8100 | Doors, Frames | | | | $2,949 |
| 8300 | Overhead Doors | | | | $1,640 |
| 8400 | Storefronts | | | | $21,453 |
| 8460 | Auto Doors | | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | | $24,840 |
| 9900 | Exterior Painting | | | | $13,255 |
| 11100 | Dock Equipment | | | | $5,804 |
| 15400 | Plumbing Rough In | | | | $5,992 |
| 15700 | HVAC Curbs | | | | $3,122 |
| 18100 | Electrical Rough In | | | | $22,495 |
| | | | | | |
| | | | | | $831,117 |
| | Overhead and Profit | | | | $58,178 |
| | | | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

~~$27.53~~

LEASE AGREEMENT = $55.00 /SQ FT
          27.53

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

$1,777 total



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

EXHIBIT E

GART STORES

# AGC's Construction Inflation Alert

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 8.4 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fall.

### Chart 1



Cost of Construction Materials Costs vs. CPI-U and PPI

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

05/09/2008 15:29 FAX ...

# AGC's Construction Inflation Alert

[Illegible degraded paragraph of text]
...nonresidential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

### Chart 2



Changes in costs Among Construction Types

Legend: Nonresidential Buildings — Highway & Street Construction — Other Heavy Construction — Multi-Unit Residential — Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 56 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.



AGC's Construction Inflation Alert

Steel worldwide is damped, producers can still sell more, and the producer price index for steel mill products and bars rose by roughly 30 percent over the past three years. As a result, the PPI for copper and brass mills have also rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



Chart 3

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 9.2 percent in the last three months (annual rate of 37.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2005 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

Chart 4



03/2006 15:52 FAX 8053642102     GART STUDIES     ☒017



## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

### Oil & Natural Gas

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.



05/05/2008 15:33 FAX 2028543102    GART SPRINGS

### AGC's Construction Inflation Alert

The increased use of concrete in lumber and wood products plus use by cement plants will soften concrete demand as inflation slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



...son(k@agc.org) became Chief Economist of ...General Contractors of America (AGC), the leading national ...for the construction industry, on September 10th,

...of experience analyzing, advocating and communicat-... and tax issues. Before joining AGC, he spent three ...economic adviser in the Office of Advocacy of the U.S. ...istration and 13 years as vice president and chief ...American Trucking Associations. He also worked with ...mission on Industrial Competitiveness, the U.S. ...ce, the Federal Home Loan Bank Board, and an ...ing firm.

...page email newsletter that summarizes the latest eco-...author of AGC's monthly Construction Tax News, a ...tax developments affecting the industry.

...University of Chicago and an MA in economics from ...member of the National Association for Business...

E-FILED
Monday, 31 December, 2007  02:03:40 PM
Clerk, U.S. District Court, ILCD



## ASC's Construction Inflation Alerts

Appendix

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.5 | 3.4 | -0.6 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.5 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 8.1 | 2.6 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 6.0 | 5.0 | 1.5 |
| | 4.0 | 3.3 | 3.4 | 2.4 | 3.7 | 0.3 (Sept.–Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| | -0.1 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| | -0.6 | 1.0 | 2.6 | 10.6 | 14.1 | -2.2 |
| Highway and street construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.8 | -0.8 |
| Other heavy construction | -0.1 | 0.4 | 2.7 | 5.9 | 7.6 | 1.0 |
| Multi-unit residential | | | | | | |
| Single-unit residential | -0.4 | -0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.6 | 9.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.8 | 27.8 | 64.9 | 50.8 | -10.9 | 2.9 |
| Steel mill products | -2.1 | 11.1 | 1.7 | 46.8 | -3.5 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| | -17.5 | -5.8 | -37.4 | 65.1 | 34.1 | N/A |
| | -17.4 | 11.2 | 30.7 | 34.6 | 52.0 | 9.6 |
| Copper base scrap | -5.5 | -1.5 | -11.8 | 29.6 | 31.0 | 11.2 |
| Copper and brass mill shapes | -5.5 | -0.3 | -0.5 | 9.8 | 6.6 | 4.6 |
| Aluminum mill shapes | -2.0 | | | | | |
| Structural architectural, pre-engineered metal products | -1.5 | -0.4 | 1.0 | 26.1 | 2.1 | 1.2 |
| Fabricated structural metal | -1.3 | -2.4 | -0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -4.5 | -3.3 | -0.1 | 20.0 | 3.3 | 0.2 |
| Architectural-ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.5 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | 0.1 | 7.2 | 32.6 | 5.5 | 3.0 |
| Nonferrous pipe, tube, and fittings | 0.3 | 0.6 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.6 | 7.8 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.6 | 7.6 | 9.8 | 3.5 |
| Concrete block and brick | 2.8 | 1.6 | 3.2 | 4.7 | 6.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.5 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 5.7 | 11.8 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.8 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 8.5 | 6.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -38.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.8 | 9.2 | 6.4 | 23.8 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.6 |
| Asphalt | N/A | N/A | 10.0 | 16.5 | 17.8 | 8.1 |
| Paving mixtures and blocks | 0.8 | 2.0 | 3.7 | 4.3 | 14.2 | -4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 3.6 | 4.1 | 17.1 | 5.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 16.6 | 5.5 |
| Plastic construction products | -2.7 | 2.1 | 5.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -5.0 | 6.7 | 5.6 | 17.6 | 38.0 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.5 | 3.9 | 5.3 | 9.2 | 2.6 |
| Gypsum products | 0.4 | 3.4 | 2.6 | 20.0 | 16.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | -1.7 |



GART SPRING

**Appendix: Producer Price Indexes Relevant to Construction**

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction—the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components—items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods—the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special_requests/ppi/soprei06.txt.*

| BDP Code | Commodity Code | Index | Relative Importance |
|---|---|---|---|

05/05/2006 ... FAX ...    GANT SPORTS    ... ...

AGC's Construction Inflation Alert

| Code | Description | | |
|------|-------------|---|---|
| | Adhesives and sealants | .099 | .099 |
| 078902 | Other miscellaneous chemical products | .072 | .048 |
| 071200 | Tires | .000 | .000 |
| 071201 | Inner tubes | .003 | .003 |
| 071202 | Tread rubber, tire sundries, & repair | .001 | .001 |
| 071503 | Rubber and plastic belts and belting | .001 | .001 |
| 071504 | Rubber hose | .011 | .011 |
| 071506 | Miscellaneous rubber products, n.e.c | .955 | .955 |
| 072100 | Plastic construction products | .180 | .180 |
| 072105 | Unsupported plastic film/sheet/other s | .016 | .016 |
| 072304 | Laminated plastic sheets, rods, and tu | .091 | .081 |
| 072901 | Other plastic products | .043 | .043 |
| 081100 | Plywood, including pl, softwood s | .289 | .289 |
| 081106 | Softwood lumber, rough, worked, not | .035 | .035 |
| 081107 | Softwood lumber, MPM | .019 | .019 |
| 081203 | Hardwood dimension | .058 | .058 |
| 081204 | Hardwood flooring | .078 | .075 |
| 081205 | Hardwood lumber, not edge worked, not | .015 | .015 |
| 081206 | Hardwood lumber, MPM | .780 | .780 |
| 082101 | General millwork | .254 | .258 |
| 082201 | Prefabricated wooden members | .005 | .005 |
| 082301 | Miscellaneous millwork products | .192 | .094 |
| 083103 | Softwood veneer and plywood | — | .045 |
| 083201 | Hardwood plywood and related products | — | .017 |
| 083501 | Softwood veneer, not veneer backed | — | .018 |
| 083401 | Hardwood plywood veneer | .071 | — |
| 083504 | Hardwood veneer and plywood | .021 | .021 |
| 084905 | Wood flue, siding, shingles, & shakes | .003 | .003 |
| 084904 | Sawn wood fence stock, wood lot, and c | .142 | .142 |
| 086101 | Prefabricated wood buildings & compone | .146 | .153 |
| 087101 | Treated wood | .005 | .006 |
| 087102 | Contract wood preserving | .007 | .007 |
| 091303 | Packaging and industrial converting pa | .003 | .003 |
| 091305 | Coated and laminated paper, n.e.c | .006 | .006 |
| 091505 | Office and related paper supplies | .005 | .005 |
| 091508 | Pressed and molded pulp goods | .032 | .031 |
| 091599 | Misc. paperboard products and board product | .074 | .074 |
| 092201 | Particleboard/fiberboard | .016 | .015 |
| 092302 | Hardboard and insulated hardboard pro | .011 | .011 |
| 092301 | Paper, asphalt, hardpressed, insul ro | .006 | .006 |
| 093201 | Circulation | — | .001 |
| 093203 | Other periodicals, circulation/adverti | .003 | .003 |
| 093501 | Manifold business forms | .103 | .103 |
| 101502 | Pressure & centrifuge & fittings, cast | .092 | .092 |
| 101504 | Gray & ductile iron castings, other | .004 | .004 |
| 101505 | Malleable iron castings | | |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stel | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .148 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

## AGC's Construction Inflation Alert

| Code | Description | | |
|---|---|---|---|
| | | .019 | .018 |
| | Other sanitary ware | .018 | .018 |
| 105210 | Plumbing fixture fittings and trim | .136 | .138 |
| 105302 | Enameled iron & metal sanitary ware | .061 | .061 |
| 105501 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnace heaters/parts | .082 | .088 |
| 106291 | Other heating, non-elec., parts | .011 | .011 |
| 106301 | Domestic heating stoves | .030 | .031 |
| 106501 | Water heaters, domestic | .169 | .170 |
| 107102 | Metal doors and frames, exc. storm | .205 | .205 |
| 107103 | Metal window sash and frames, exc. sto | .021 | .022 |
| 107104 | Metal molding and trim and storefronts | .019 | .015 |
| 107105 | Storm sash and doors | | |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107401 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & fit | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab metal bldg systems, ex. farm's | .131 | .132 |
| 107902 | Other prefab. & portable metal building | .047 | .048 |
| 107903 | Panels, parts & sections, fabricated | .016 | .016 |
| 108102 | Externally thread. fasteners, ex. aircra | .005 | .005 |
| 108105 | Internally thread. fasteners, ex. aircra | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .004 | .001 |
| 108302 | Residential | .027 | .026 |
| 108303 | Commercial/institutional & industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .058 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .185 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114808 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general-purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

05/04/2001 FRIDAY FAX "BULLETIN"    GART SHORES

# AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| | Components with electrical elements | .160 | .160 |
| | Radio, television, communication equip | .149 | .159 |
| | Electron tubes, receiving | .000 | .000 |
| 117605 | Electric lamp bulbs | .009 | .005 |
| 117601 | Electric lamps and tubes | | |
| 117804 | Storage batteries | .002 | .002 |
| 117905 | Environmental controls | .181 | .180 |
| 118405 | Process control instruments | .000 | .000 |
| 118201 | Fluid meters and counting devices | .002 | .002 |
| 118301 | Aircraft engine instruments | .000 | .000 |
| 118401 | Nuclear radiation detect. & monitoring | .000 | .000 |
| 118906 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Medical, psychophysical & general instrumen | .000 | .000 |
| 124601 | Metal household furniture | .003 | .003 |
| 121901 | Household lawn furniture | .002 | .002 |
| 122204 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122304 | Public building furniture | .009 | .009 |
| 124101 | Carpets & rugs | .093 | .092 |
| 125201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .096 | .096 |
| | Vacuum cleaners | .002 | .002 |
| | Small household appliances | .007 | .007 |
| | Sheet, plate, and float glass | .009 | .009 |
| 131105 | Cement | .078 | .078 |
| 132201 | Structural block | .095 | .094 |
| 133111 | Decorative block | .013 | .011 |
| 139121 | Concrete brick | .007 | .007 |
| 133191 | Paving blocks | .012 | .012 |
| 133121 | Concrete pipe | .691 | .691 |
| 132301 | Ready mixed concrete | .065 | .065 |
| 132101 | Precast concrete products | .225 | .225 |
| 132101 | Prestressed concrete products | .077 | .077 |
| 138601 | Brick except ceramic, glazed & refrac | .089 | .089 |
| 138301 | Glazed brick struct, hollow & facing | .004 | .004 |
| 134202 | Ceramic floor and wall tile | .027 | .027 |
| 134401 | Structural clay products, n.e.c. | .006 | .006 |
| 134501 | Clay refractories | .025 | .024 |
| 135201 | Refractories, non clay | .032 | .032 |
| 135201 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136101 | Other asphalt roofing | .038 | .038 |
| 136201 | Gypsum products | .172 | .172 |
| 137101 | Mineral wool for structural insulation | .129 | .129 |
| 139201 | Paving mixtures and blocks | .312 | .312 |
| 139401 | Cut stone and stone products | .029 | .029 |
| 139501 | Gaskets and gasketing material | .002 | .002 |
| 139801 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139902 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 139906 | Signs and advertising displays | .009 | .009 |
| 159A04 | | | |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category: Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

05/09/2006 15:24 FAX 3038642102                GART SPORTS                                      ☑ 008

## SUMMARY OF REPLACEMENT AND REPAIR COSTS

5/1/2006

**Sports Authority**
**#618 Springfield**

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancll Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancli Contracting

|  |  |  |
|---|---|---|
|  | $889,295 | Includes all grading, foundation and slab |
| Shell Costs | $716,593 |  |
| TI Costs | $1,605,888 |  |
| Sub-Total |  |  |
|  |  |  |
| *3% estimate for original project changes | $48,177 |  |
| Sub-Total | $1,654,065 |  |
|  |  |  |
| **18.5% estimated 5 year cost increase | $306,002 |  |
|  |  |  |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 |  |
|  |  |  |
| 35% threshold as defined by the lease | $686,023 |  |
| Estimated Repair costs (detail attached) | $1,046,701 |  |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
** Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis   of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

## EXHIBIT F

05/09/2008 15:25 FAX 3038842102    GART SPORTS    ☒009

## BUDGET ESTIMATE

**Sports Authority**
#049
3235 South Veterans Parkway
Springfield, IL 62704
Budget: ~32,000 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $392,335 |
| Architectural & Engineering | | | $21,000 |
| Shoring & Stabilization | | | $30,500 |
| Selective Demolition / Balance of Damage | | 4000 sq ft | $67,890 |
| Structural Steel Repair / Welding / Deck | | 1 elevation | $40,500 |
| Masonry Brick Repair/Replacement | Colm Line E | | $32,500 |
| Replace Damaged Interior masonry wall | | 15k sq. ft. $82,000 for entire roof | $17,500 |
| Roof Reconstruction | | | $82,000 |
| Replace Revolving Entrance & Glass | | | $21,290 |
| Service Glasswork & Existing Damaged | | | $52,950 |
| Fire Alarm Wiring Device Replacement | | | $17,000 |
| Ductwork Remove and replace | | | $59,900 |
| HVAC Replace Distribution | | | $21,400 |
| Drywall / Ceiling Perimeter 4' U/S of Deck | | 4' up at Perim | $65,000 |
| Minor Work & Bar Replacement | | 4,000 sf | $36,200 |
| Electrical Re-Verify Circuits/Verification | | Sales Floor | $68,500 |
| Light Fixture Installation Only | 50 Fixtures | Materials | $9,850 |
| Light Fixtures | 50 Fixtures | | $9,950 |
| Emissions at Lower levels | | .40 per ft | $10,042 |
| Floor Repair / Adhesive Removal | | | $49,500 |
| Entire Flooring Installation | | Materials | $58,500 |
| Flooring Materials | | Install Only | $62,200 |
| RR Plumbing Re-Installation | | Install Only | $5,260 |
| Entire New Cramier Millwork Installation | | Materials | $25,890 |
| Millwork | | | $55,500 |
| Install Toilet Partitions/Accessories | | Union | $11,000 |
| Final Cleaning & Deodorizing | | 10 X $410.00 | $4,100 |
| Dumpsters | | | $22,500 |
| Barricades / Dismantling of Existing | | | $12,500 |
| Protection of Finish Materials | | | $58,290 |
| Misc Rental Equipment | | | $25,900 |
| Contingency | | 4% | $92,550 |
| General Conditions (itemize) | 9 Weeks | $2,375 Per Wk | $22,975 |
| Supervision | | | $2,200 |
| City Required Fire Watch | | | $4,000 |
| Permits | | | $988,746 |
| SUBTOTAL | | N/A | |
| Allowances | | | |
| SUBTOTAL | | 1.50% | $14,081 |
| Insurance | | 10% | $93,875 |
| Profit & Overhead | | 5% | $46,987 |
| Premium for expedited work | | | $1,040,701 |
| TOTAL | | | |
| List itemizations below: (#26 – Gen Cond.) | | | |
| Misc Construction Materials | | | $22,100 |
| PM Travel/ Misc Office & Field Costs | | | $22,200 |
| Temp Phone / Cell Phone | | | $2,500 |
| Construction Dumpsters & Clean-up | | | $1,800 |
| Superintendent Travel | | | $1,550 |
| Administration Time | | | |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 5 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

| UNION    /    NON-UNION | Amount of time for construction: | wks | Weeks |
|---|---|---|---|
| % of Union Increase:              % | | | |

# Sports Authority

Sportmart #615
3211 South Veterans Parkway
Springfield, IL 62704

Date:                  4/3/2006
Contractor:    Wolford Retail Builders, Inc.
Union            Revised 57        J. Wolford

Property Insurance  82,513 sf

| LINE ITEM | MATERIAL | LABOR- Union | PRICE SQ FT | TOTAL |
|---|---|---|---|---|
| | | | Budget- Estimation | $26,090 |
| 1. Shoring- Stabilizing | | Added Scope | Budget- Estimation | $26,500 |
| 2. Selective Demolition- Balance of Damage | | 42,000 sf | Budget- Estimation | $47,500 |
| 3. Structural- 10' Steel Joist & Deck | | Elevation | Budget- Estimation | $71,500 |
| 4. Masonry- Beam Pockets etc. | Calm Lintels | | Budget- Estimation | $69,500 |
| 5. Roofing- Installation | Verify Scope | 18,000 sf | Budget- Estimation | $29,900 |
| 6. Remove Exiting Storefront & Glass | | Deduct Scope | Budget- Estimation | $3,500 |
| 7. Sprinkler- Rework Existing Open | | Deduct Scope | Budget- Estimation | $2,950 |
| 8. Fire and Minor Device Replacement | | | Budget- Estimation | $26,500 |
| 9. Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $45,100 |
| 10. Drywall- Finish Repair Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $11,500 |
| 11. Mud Set & T-Bar- Replacement | Added Scope | 4,000 sf | Budget- Estimation | $8,200 |
| 12. Electrical- Saw cut Cut out Verification | | | Budget- Estimation | $46,500 |
| 13. Light Fixture- Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $22,300 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $109,000 |
| 15. Dismantling- Sales Floor Fixtur | Installation | Incl's Re-Insta | Budget- Estimation | $15,400 |
| 16. Existing Flooring- Removal | Added Scope | Mtcs. Remaining | Budget- Estimation | $10,042 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $37,900 |
| 18. Entire Flooring- Installation | | | Budget- Estimation | $58,800 |
| 19. RR- Plumbing RE- Installation | Added Scope | Install Only | Budget- Estimation | $45,500 |
| 20. Entire New Premier Millwork | | Install Only | Budget- Estimation | $1,850 |
| 21. New Toilet Partitions/ Acessorie | Salvage Parti | Deduct Scope | Budget- Estimation | $11,000 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $6,150 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $2,100 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | 25,250 |
| 25. General Conditions (itemize) | | | Incd's Per Diem | $21,375 |
| 26. Supervision | 9 Weeks | $2,375 Per Wk | Budget- Estimation | $2,200 |
| 27. City Required Fire Watch | | Verify | Revised | $682,017.00 |
| SUBTOTAL | | | N/A | |
| 28. Allowances | | | | |
| SUBTOTAL | | | 1. Percent | $6,820.00 |
| 29. Insurance | | | 8. Percent | $55,107.00 |
| 30. Profit & Overhead (10% Max.) | | | Actual | $319,428 |
| Emergency Response | | | Revised | $1,063,372.00 |
| TOTAL | | | | |
| List Itemizations below: (#25 - Gen Cond.) | | | Budget- Estimation | $2,400 |
| Mics. Construction Materials | | | Budget- Estimation | $6,100 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $2,200 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $7,500 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $3,700 |
| Equipment Rental- Polk Lift | | | Budget- Estimation | $1,800 |
| Superintendent- Travel | | | Budget- Estimation | $1,550 |
| Administration Time | | | | |

Site Verification (please circle):     We have / have not verified site

Amount of time to procure permit:    wks.

# GART SPORTS COMPANY

STORE #618    Date: 7/26/01

CENTER 3211 SOUTH VETERANS PARKWAY,  SPRINGFIELD, ILLINOIS  Contractor: Capitol Const. Group

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT | TOTAL |
|---|---|---|---|---|
| | | BID BREAKDOWN | | |
| 1. Barricade | NIC | | | N/A |
| 2. Demolition | N/A | | | N/A |
| 3. Bond | N/A | | | N/A |
| 4. Concrete | 738.00 | 695.00 | 2.09 | 1,433.00 |
| 5. Carpentry/Rough Carpentry | 16,140.00 | 4,570.00 | 1.55 | 20,714.00 |
| 6. Studs and Drywall | 38,505.00 | 66,972.00 | 2.46 | 105,477.00 |
| 7. Storefront Glass | By Shell Contr. | | | NIC |
| 8. Interior Mirrors | 701.00 | 799.00 | 15.00 | 1,400.00 |
| 9. Acoustical Ceiling | 10,564.00 | -4,401.00 | 1.68 | 14,965.00 |
| 10. Store Fixtures/Finish Carpet | 31,233.00 | 11,300.00 | 0.76 | 42,533.00 |
| 11. Painting/Concrete Sealer | 13,310.00 | 4,162.00 | 0.55 | 17,472.00 |
| 12. Carpet Installation | 39,429.57 | 6,540.45 | 2.46 | 45,400.00 |
| 13. Vinyl Tile and Base | 7,293.00 | 3,162.00 | 6.59 | 11,200.00 |
| 14. Plumbing | 60,199.00 | 2,135.00 | 1.16 | 32,390.00 |
| 15. Sprinklers | 30,552.00 | 34,638.00 | 2.02 | 55,990.00 |
| 16. Electrical | 63,748.00 | 58,800.00 | 3.80 | 116,338.00 |
| 17. Fire Alarm System | 7,302.00 | 5,720.00 | 0.40 | 12,225.00 |
| 18. HVAC/Ventilation | 82,409.00 | 32,194.00 | 3.55 | 114,603.00 |
| 19. Rubber Flooring /Sealer | 39,855.00 | 9,671.48 | 4.90 | 51,000.00 |
| 20. Insurance | | | | 6,899.00 |
| 21. Supervision/Travel/Per Diem | | | | 18,400.00 |
| 22. General Conditions (Itemize) | | | | 14,253.00 |
| 23. Other (Itemize below) | | | | 14,080.00 |
| SUBTOTAL | 441,978.57 | 245,759.93 | 48.97 | 696,772.00 |
| 24. Profit & Overhead (5.25%) | | | | 36,581.00 |
| 25. Taxes (Sales/State/Local) | | | | INCLUDED |
| TOTAL | $0 | $0 | $0 | 733,353.00 |
| List Itemizing below: (#22 - Gen Cond.) | | | | ░░░░░░░░░ |
| 1. Final Cleaning | | | | 2,400.00 |
| 2. Temporary Phones | | | | 1,000.00 |
| 3. Tool Rental | | | | 1,000.00 |
| List Itemizations below: (#23 - Other) | | | | ░░░░░░░░░ |
| 1. Toilet Partitions/Accessories | | | | 1,900.00 |
| 2. Total Materials | | | | 10,265.00 |
| 3. Misc. Const. Materials & Equipment | | | | 3,815.00 |
| 4 | | | | |
| Site Verification (please circle): | | We have / have not verified site | | |
| UNION   100%   /   NON-UNION | | Amount of time to procure permit: | | NIC wks. |
| % of Union Increase:      % | | Amount of time for construction : | | 8 wks. |
| | | | | |
| Qualifications to be listed on separate sheet | | | | |

EXHIBIT
2

EXHIBIT B

05/09/2006 15:25 FAX 3038542102    GART SPORTS    @009

## BUDGET ESTIMATE

Sports Authority
#615
5241 South Veterans Parkway
Springfield, IL 62704
Budget sq.: 82,949.sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $849,428 |
| Architectural and Engineering | | | $98,000 |
| Shoring Stabilizing | | | $12,500 |
| Selective Demolition-Balance of Damage | | | $92,198 |
| Structural-24' H Bar Joist & Deck | | 4950 sq ft | $57,506 |
| Masonry Beam Pockets etc. | Colm Line E | 1 elevation | $40,609 |
| Replace 24' Structural masonry wall | | | $24,600 |
| Roofing and Insulation | | 15K sq. ft., $82,000 for entire roof | $35,600 |
| Replace Existing Storefront & Glass | | | $24,900 |
| Sprinkler-Rework Existing-Damaged | | | $528,200 |
| Fire Alarm-Minor Device Replacement | | | $52,950 |
| Ductwork-Remove and replace | | | $87,000 |
| HVAC repair existing units | | | $59,000 |
| Drywall-Finish-Taping Perimeter 4' U/S of Deck | | 4' up at Perim | $86,500 |
| Minor ACGrid-& Bar Replacement | | 4,000 sf | $55,900 |
| Electrical-Set off & Circuit Verification | | | $56,200 |
| Light Fixture Installation Only | 160 Fixtures | Sales Floor | $13,500 |
| Light fixtures only | 160 Fixtures | Materials | $41,860 |
| Paint to match Lower Levels | | | $69,600 |
| Floor Prep & Adhesive Removal | | .40 per ft | $109,042 |
| Entire Flooring Installation | | | $49,500 |
| Flooring materials only | | Materials | $88,500 |
| RR Plumbing Re-Installation | | Install Only | $54,200 |
| Entire New Premier Millwork installation | | Install Only | $55,200 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions / Accessories | | | $3,550 |
| Final Cleaning - Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantling of Existing | | | $2,000 |
| Protection of Finish materials | | | $12,500 |
| Misc Rental Equipment | | | $55,000 |
| Contingency | | 4% | $26,000 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 19 Weeks | $2,375 Per Wk | $24,375 |
| City Required Fire Watch | | | $82,200 |
| Permit | | | $64,000 |
| SUBTOTAL | | | $985,746 |
| Allowance | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $98,876 |
| Premium for expedited work | | 5% | $45,987 |
| TOTAL | | | $1,045,701 |
| | | | |
| List itemizations below: #26 - Gen Cond.) | | | |
| Misc Construction Materials | | | $2,400 |
| PM Travel-Misc Office & Field Costs | | | $8,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Labor site & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

EXHIBIT
3

Via Fax 525-0545

March 29, 2006

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

**JONES-
BLYTHE**
CONSTRUCTION CO.
1000 WEST REYNOLDS STREET
POST OFFICE BOX 5118
SPRINGFIELD, ILLINOIS 62704
TELEPHONE   217.787.9140
FAX NUMBER   217.757.1895

Attn:   Art Seppi

Re:   Sports Authority
        Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased
to Sports Authority.

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patches and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the
overall damage to the structure will not exceed 30% of the total replacement cost of the
premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO

Mark A. Sorensen

EXHIBIT
5

EXHIBIT
A

| | | | Actual Cost | Owner | |
|---|---|---|---|---|---|
| Emergency Response from Cotton USA | | $319,428 | Owner | | (entire Plaza) |
| Architectural and Engineering | | $8,000 | Owner | 9,510 | |
| Shoring-Stabilizing | | $18,500 | 14,439 | | |
| Selective Demolition-Balance of Damage | | $37,400 | 32,128 | | |
| Structural-124'lf Bar Joist & Deck | | $57,600 | 46,951 | | |
| Masonry-Beam Pockets etc | | $10,500 | below | | |
| Replace 124' Structural masonry wall | | $21,500 | 29,218 | | |
| Roofing and insulation | | $39,500 | Owner | 86,038 | |
| Replace Existing Storefront & Glass | | $24,000 | Owner | 18,506 | |
| Sprinkler-Rework Existing-Damaged | | $28,200 | 9,247 | | |
| Fire Alarm - Minor Device Replacement | | $2,950 | in electrical | | |
| Ductwork- Remove and Replace | | $7,600 | In HVAC | | |
| HVAC repair existing units | | $9,600 | 16,426 | | |
| Drywall/Finish Taping Perimeter 4'/ U/S of Deck | | $31,600 | 18,205 | | |
| Minor ACT's - T-Bar Replacement | | $5,900 | 2,570 | | |
| Electrical-Safe off-Circuit Verification | | $6,200 | in Electrical | | |
| Light Fixture installation Only | | $18,500 | 25,322 | | |
| Light Fixtures | | $4,850 | 10,678 | | |
| Paint to match at lower levels | | $9,800 | 27,812 | | |
| Floor Prep & Adhesive Removal | | $10,042 | NIC | below | |
| Entire Flooring installation | | $49,500 | 1,105 | | |
| Flooring Materials | | $68,500 | NIC | 114,800 | |
| RR-Plumbing Re-installation | | $1,200 | 4,096 | | |
| Entire New Premier Millwork Installation | | $5,700 | NIC | | |
| Millwork | | $26,000 | 1,777 | | |
| Install Toilet Partitions/Accessories | | $3,550 | 545 | | |
| Final Cleaning-Deodorizing | | $11,000 | below | | |
| Dumpsters | | $4,100 | 5,616 | | |
| Barricades-Dismanteling of Existing | | $2,100 | 1,005 | | |
| Protection of finish materials | | $12,500 | below | | |
| Misc. Rental Equipment | | $8,200 | 7,908 | | |
| Contingency | | $25,600 | N/A | | |
| General Conditions (Itemize) | | $21,550 | 7,742 | | |
| Supervision | | $21,375 | 4,841 | | |
| City Required Fire Watch | | $2,200 | N/A | | |
| Permit | | $4,000 | 189 | | |
| SUBTOTAL | | $938,745 | 267,820 | 228,854 | |
| Allowances | in/a | | N/A | | |
| SUBTOTAL | | | | | |
| Insurance | 1.50% | $14,081 | in OH&P | | |
| Profit & Overhead | 10% | $93,875 | 26,782 | | |
| Premium for expedited work | 5% | $46,937 | 26,782 | | |
| TOTAL | | $1,093,638 | 321,384 | 228,854 | |
| | | | | | |
| List Itemizations below:( #25 Gen Cond) | | | | | |
| Misc. Construction Materials | | $2,400 | 3,108 | | |
| PM Travel-Misc Office & Field Costs | | $5,100 | 3,108 | | |
| Temp Phone-Cell Ph.. etc. | | $2,200 | | | |
| Construction Laborers & Clean-Up | | $7,500 | 4,634 | | |
| Superintendent ravel | | $1,800 | | | |

EXHIBIT 6

EXHIBIT C

## Jeff Wolford

**From:**     David Frieder [dfrieder@thesportsauthority.com]
**Sent:**     Monday, March 27, 2006 1:04 PM
**To:**        jwolford@wolfordretailbuilders.com
**Subject:** Springfield Sports authority

Jeff,
We have a severly damaged building in Springfield, I'll from a tornado. Our lease allows us to get out of the lease if the damages to the building exceed 35% of the cost to build the building at today's costs. So I could use some help with two different questions.
1. What is the approximate cost to build a new 33k sq ft block shell and our typical TI buildout in Springfield? It's a union area (I'm sure you know) and needs to be estimated that way. A range of 10-15% is ok.
2. The estimate on the repairs is more difficult. The emergency response contractor has already racked up about $325k. I'll have to send you a set of the original drawings noted up with areas of work. Basically, it includes 24 bar joist removal and replacment, repairs or replacement of structural was for about 110' and associated decking, insulation and roofing, lighting, spriklers and ductwork, all new flooring, replacement of glass storefront, replacement of al millwork, replacement of first 4' of drywall throughout entire store, replace about 50 light fixtures and 4k ft of ceiling grid. And on the list goes. Give me a call when you get a minute to discuss. 3039091739. Thanks. David


No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM



# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Contractor:    Date:      4/3/2006
Union      Wolford Retail Builders, Inc.
     Revised 5/7      J. Wolford

Budgetary- Insurance- 32,513 sf

| ITEM | MATERIAL | LABOR- Unit | PRICE/SQ.FT. | TOTAL |
|---|---|---|---|---|
| **BID BREAKDOWN** | | | | |
| 1.  Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.  Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.  Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.  Masonry- Beam Pockets etc. · · | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.  Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.  Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $28,900 |
| 7.  Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.  Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.  Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Replacement | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remain | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | | wks. |
| UNION / NON-UNION | | Amount of time for construction: | | Weeks |



EXHIBIT
9
10-30-0?

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date: 4/3/2006
Contractor: Wolford Retail Builders, Inc.
Union    Revised 5/7    J. Wolford

| Budgetary- Insurance- 32,513 sf | | | BID BREAKDOWN | |
|---|---|---|---|---|
| ITEM | MATERIAL | LABOR- Unit | PRICE/SQ.FT. | TOTAL |
| 1.  Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.  Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.  Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $67,600 |
| 4.  Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.  Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.  Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.  Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.  Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.  Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $46,100 |
| 11. Minor ACT's- T-Bar Repalcement | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- | Sales | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturing | Installation | incl's Re-Inst | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remain | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring Installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per Wl | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | | wks. |
| UNION    /    NON-UNION | | Amount of time for construction: | | Weeks |

| % of Union Increase: | % | | | |

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date: 4/3/2006
Contractor: Wolford Retail Builders, Inc.
Union Revised 5/7 J. Wolford

| ITEM | MATERIAL | LABOR- Unit | PRICE/SQ.FT. | TOTAL |
|------|----------|-------------|--------------|-------|
| Budgetary- Insurance- 32,513 sf | | | BID BREAKDOWN | |
| 1.  Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.  Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.  Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.  Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.  Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.  Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.  Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.  Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.  Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalcement | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Circuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remain | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork ins | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List Itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | | wks. |
| UNION    /    NON-UNION | | Amount of time for construction: | | Weeks |

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date:         4/3/2006
Contractor:   Wolford Retail Builders, Inc.
Union         Revised 5/7      J. Wolford

| ITEM | MATERIAL | LABOR- Unid | PRICE/SQ.FT. | TOTAL |
|---|---|---|---|---|
| Budgetary- Insurance- 32,513 sf | | BID BREAKDOWN | | |
| 1.   Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.   Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.   Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.   Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.   Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.   Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.   Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.   Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.   Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimete | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalcemer | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturir | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remain | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessorie | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | | wks. |
| UNION    /    NON-UNION | | Amount of time for construction: | | Weeks |

| % of Union Increase: | % | | | |

**Vicky Pierce**

| | |
|---|---|
| From: | David Frieder |
| Sent: | Monday, May 08, 2006 7:46 AM |
| To: | Missy Mayne; Lucy Kelton; Nesa Hassanein |
| Subject: | Springfield |
| Attachments: | #618 repair costs v3.xls |

Jeff Wolford went to Springfield last Thursday to verify his original estimate. I just received his revised estimate (attached) which is about $17k more then his original estimate—not including a full roof replacement. We still don't know if the entire roof was replaced although it would make sense in order to have a warranty. That would add about $55k to this estimate. Since we're so far into a safety margin with these numbers, I don't think we should resubmit to the LL but I wanted everyone to know the status. David



EXHIBIT

9

10-30-07

TSA RULE 26 DISCLOSURES
0099

7/24/2006





RECEIVED
OCT 09 2006
REAL ESTATE



BUILDING AND ZONING DEPARTMENT
CITY OF SPRINGFIELD, ILLINOIS
STATUS OF CERTIFICATE OF OCCUPANCY

**ADDRESS:** **3211 Veterans**
**USE:** Repair Storm Damage-Sports Authority
**OWNER:** **Sports Authority**
**PERMIT**
**NUMBER:** BP-2006-0613

**DATE:** September 22, 2006

$\boxed{2^{nd} \text{ Notice}}$

**STATUS:**
**BUILDING:** Certificate of Occupancy

**ELECTRICAL: Dustin Roberts, Inspector-Temporary Certificate of Occupancy**
1. Blank or trim out power at cash counters, 110.27
2. Install J-box cover in storage area ceiling southwest corner, 314.41
3. Blank or trim out floor boxes, 110.27

**PLUMBING: Russ Anders, Inspector-Failed**
1. No hot water, IPC 890.630 e
2. Urinal not installed, IPC 890.150

**MECHANICAL: Certificate of Occupancy**

**FIRE SAFETY: Failed** 1. Building work incomplete
2. Ceiling panels missing/holes in walls, 703.1
3. Extinguishers missing, 906.1
4. Extinguishers out of date, 906.2
5. Open wiring, 605.6
6. Fire alarm testing, 907.20.1
7. Maintain F/A records on site, 901.6.2
8. ID doors to sprinkler, fire alarm, and electrical rooms, 94.31K

**Please note that occupancy of the building is not authorized per section 110.1 Int. Bldg Code, 2003 edition until a temporary or final certificate of occupancy is issued.**

TO ARRANGE INSPECTIONS, CONTACT
SANDY
217-789-2171.

CC: Jones Blythe Construction Company, B & B Electric Inc.



EXHIBIT
10
10-30-07

```
1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF ILLINOIS

3                  SPRINGFIELD DIVISION

4    SWPLAZA III,                    )

5          Plaintiff,               )

6          vs.                      ) No. 06-3177

7    TSA STORES, INC.,              )

8          Defendants.             )

9              This is to certify that I have read the

10   transcript of my deposition taken in the

11   above-entitled cause by Christine M. Jachimiak,

12   Certified Shorthand Reporter, on October 30, 2007,

13   and that the foregoing transcript accurately states

14   the questions asked and the answers given by me as

15   they now appear.

16                          _____

17                              JEFFREY WOLFORD

18   SUBSCRIBED AND SWORN TO

19   before me this 13th day

20   of December, 2007.

21   _____

22      Notary Public

23
24
```

90

**E-FILED**
Monday, 31 December, 2007 02:03:51 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 06-CV-3177 |
| vs. | ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

**DEFENDANT'S ANSWERS AND OBJECTIONS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Fed.R.Civ.P. 26 and 33, Defendant/Counter-Plaintiff TSA Stores, Inc., a Delaware Corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company")(hereafter "TSA" or "Defendant"), by its attorneys Hinshaw & Culbertson LLP, hereby answers or objects as follows to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES**

1.      Defendant objects to all of Plaintiff's Interrogatories to the extent they purport to impose burdens on Defendant that exceed its obligations under the Federal Rules of Civil Procedure on the ground that they are burdensome and oppressive and exceed the scope of permissible discovery in this action.

**EXHIBIT E**

60155755v1 868372

7.  In responding to these Interrogatories, Defendant does not waive, and intends to preserve, and is preserving:

a.  all objections to competency, relevancy, materiality, and admissibility as evidence for any other purpose and in any proceeding, including the trial of this action or any other action.

b.  all rights to object on any grounds to the use of the responses herein in any subsequent proceeding, including the trial of this or any other action;

c.  all objections as to vagueness and ambiguity; and

d.  all rights to object on any grounds as to further discovery requests.

8.  Defendant objects to the Interrogatories to the extent that the Interrogatories are overbroad on their face, the Interrogatories are unduly burdensome and oppressive, and the information sought is not relevant and not reasonably calculated to lead to the discovery of admissible evidence in this litigation.

9.  Defendant objects to the Interrogatories to the extent that the Interrogatories seek information in the possession or control of individuals or entities other than Defendant.

10.  Defendant objects to the Interrogatories to the extent that the Interrogatories seek information already within Plaintiff's possession.

Defendant incorporates the foregoing general objections into each and every objection and any responses to the specific Interrogatory propounded by Plaintiff. Defendant does not intend to waive, and is not waiving, any general objections in response to any specific Interrogatory.

INTERROGATORY NO. 1:    Identify the person answering these Interrogatories:

**ANSWER:    Cynthia Cashman, Director of Real Estate, TSA**

3

INTERROGATORY NO. 2: Identify any person assisting in answering these interrogatories and the interrogatory for which they provided assistance.

**ANSWER:    The following assisted in preparing responses to these interrogatories:**

a)    **Charles R. Schmadeke**
      **Attorney for Defendant**

b)    **Medora Mayne**
      **Associate General Counsel / Real Estate**
      **TSA**

c)    **Paul Gaudet**
      **Senior Vice President, Construction – Visual**
      **TSA**

d)    **David Frieder**
      **Vice President, Construction**
      **TSA**

e)    **Mike Mavelle**
      **Vice President, Risk Management**
      **TSA**

INTERROGATORY NO. 3: Set for the calculation in support of the claim for damages under Count II of the Counterclaim.

**ANSWER:  As provided by Fed.R.Civ.P. 33(d), Defendant responds to Interrogatory No. 3 by stating that it has produced documents responsive to the Interrogatory. See TSA's Rule 26(a)(1) Initial Disclosures and documents produced therewith (including TSA Rule 26 Disclosures 0283-0294).**

INTERROGATORY NO. 4. Identify by every employee of TSA's Springfield store located at the Premises during 2005 and 2006.

**ANSWER:   Defendant objects to this Interrogatory in that the information sought is neither relevant to this litigation nor reasonably calculated to lead to the discovery of any admissible evidence regarding the subject matter of this litigation.**

INTERROGATORY NO. 5. Identify every individual at TSA involved in the decision to terminate the Lease.

4

ANSWER:    Liberty Mutual Fire Insurance Company
           Tom Tiernam
           200 Galleria Parkway, NE, Suite 1100
           Atlanta, GA

DATED:    January 19, 2007.

Legal Objections By: _____
                     Charles R. Schmadeke,
                     One of Defendant's Attorneys


Answers By: _____
            Cynthia J. Cashman


J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

9

60155755v1 868372

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 06-CV-3177 |
| vs. | ) ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

## TSA'S RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and CDIL-LR 26.2, Defendant, TSA STORES, INC., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA"), by its attorneys, Hinshaw & Culbertson LLP, hereby provides the following disclosures. These disclosures are based upon information presently available to TSA, and TSA reserves the right to supplement as provided in Fed.R.Civ.P. 26(e) based upon further investigation and discovery to the extent further disclosures are warranted and not mooted by future discovery responses.

The individuals identified above as being affiliated with TSA may be contacted through counsel for TSA, Hinshaw & Culbertson LLP, 400 South Ninth Street, Suite 200, Springfield, Illinois 62701 (217)528-7375.

It is anticipated that during the course of discovery, the identities of additional individuals with knowledge or discoverable information that TSA may use to support its claims and defenses in this case may become known. TSA reserves the right to supplement and/or amend these disclosures in accordance with the Federal Rules of Civil Procedure as additional information becomes available.

### Rule 26(a)(1)(B)

TSA is producing documents that are in its possession, custody, or control that it may use to support its claims or defenses as required by Fed.R.Civ.P. 26(a)(1)(B). Those documents are included herewith, BATES labeled "TSA Rule 26 Disclosures 0001 through 0294."

It is anticipated that during the course of discovery, additional documents that TSA may use to support its claims and defense in this case may become known. TSA reserves the right to supplement and/or amend these disclosures in accordance with the Federal Rules of Civil Procedure as additional information becomes available.

### Rule 26(a)(1)(C)

As required by Fed.R.Civ.P. 26(a)(1)(C), TSA computes its damages as follows:

a)   Overpaid rent for the period March 12, 2006,
      through May 31, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . $95,662.05

b)   Payments for utility services provided to the
      premises for time periods after March 12, 2006. . . . . . . $ 9,684.31

5

Non-privileged documents or other evidentiary material on which the above computations are based are being or will be provided.

In addition, TSA claims attorneys' fees and litigation costs, the computation of which cannot be calculated at this time.

**Rule 26(a)(1)(D)**

TSA has no insurance agreements, as identified in Fed.R.Civ.P. 26(a)(1)(D), to disclose at this time.

DATE: November 10, 2006

Respectfully submitted,

TSA STORES, INC., as successor to Gart Bros. Sporting Goods Company, a Delaware corporation, Defendant,

By _Charles T Schmadeke_

One of Its Attorneys

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60153654v1 868372

# Store 618 Utility Billings March 2006 - July 2006

| Vendor | Act. Number | Bill Date | Bill ID | Paid | Amount | Usage Dates | # of Days | Average per Day | TSA's Responsibility | LL's Responsibility | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AmerenCICLO | 91574-57454 | 7/26/2006 | 24385614 | 9/8/2006 | 192.11 | 7/8-7/24/06 | 17 | 11.30 | | $192.11 | |
| AmerenCICLO | 91574-57454 | 7/11/2006 | 24385614 | 8/8/2006 | 122.62 | 6/7-7/7/06 | 31 | 3.96 | | $122.62 | |
| AmerenCICLO | 91574-57454 | 6/8/2006 | 23518658 | 6/16/2006 | 127.74 | 5/5-6/6/06 | 33 | 3.87 | | $127.74 | |
| AmerenCICLO | 91574-57454 | 5/8/2006 | 23016583 | 5/18/2006 | 836.46 | 4/6-5/4/06 | 29 | 28.84 | | $836.46 | |
| AmerenCICLO | 91574-57454 | 4/7/2006 | 22542347 | 4/18/2006 | 1030.93 | 3/8-4/5/06 | 29 | 35.55 | $177.75 | $853.18 | TSA is responsible for 5 days |
| City Water, Light & Power | 085518416-00051344 | 7/17/2006 | | Final bill not receieved yet | | 7/12-7/25/06 | 14 | 32.07 | | $448.98 | This is an estimate calculated by # of Days x Average per Day from the previous bill. |
| City Water, Light & Power | 085518416-00051344 | 7/17/2006 | 24384137 | 8/8/2006 | 1058.32 | 6/9-7/11/06 | 33 | 32.07 | | $1,058.32 | |
| City Water, Light & Power | 085518416-00051344 | 6/14/2006 | 23859602 | 6/27/2006 | 2179.54 | 5/9-6/8/06 | 31 | 70.31 | | $2,179.54 | |
| City Water, Light & Power | 085518416-00051344 | 5/12/2006 | 23110597 | 5/23/2006 | 2308.46 | 4/9-5/8/06 | 30 | 76.95 | | $2,308.46 | |
| City Water, Light & Power | 085518416-00051344 | 4/13/2006 | 22831956 | 4/21/2006 | 2072.89 | 3/8-4/8/06 | 32 | 64.78 | $323.89 | $1,749.00 | TSA is responsible for 5 days |
| | | | | | | | | | $501.64 | $9,684.31 | |

TSA RULE 26 DISCLOSURES
0283

Nov. 9. 2006 12:15PM    AVISTA ADVANTAGE                    No. 6078   P. 10
JUL/25/2006/TUE 12:05 PM   TSA FACILITIES       FAX No. 7204732300      P. 001/001

Billing Date

July 17, 2006

Account Number
085518416-00051344

AMOUNT DUE
$1,058.32

AMOUNT ENCLOSED

DUE DATE
Aug. 07, 2006

☐ Check here and make
corrections on the
reverse side.

SPORTSMART #S0618
ATTN CYNTHIA CASHMAN
1050 W HAMDEN AVE
ENGLEWOOD CO 80110

3211 VETERANS PKWY

0005134408551841600010583220060807 8
PLEASE RETURN TOP PORTION WITH YOUR PAYMENT

| Account Number | Service Address | | | | | | |
|---|---|---|---|---|---|---|---|
| 085518416-00051344 | 3211 VETERANS PKWY | | | $2,179.54CR | 6/30/2006 | | |

Regular Bill

| | | Amount |
|---|---|---|
| Transaction | | $2,179.54CR |
| Payment - Thank You | | ($2,179.54) |
| Billing | | $1.00 |
| Warning Siren Surcharge | | |
| | Net Balance Forward | $1.00 |
| Electric Monthly Customer Charge | | $7.05 |
| Summer KWh Energy | 6048 x $0.0649 /KWh | $392.52 |
| Summer Kw Demand | 94.30000 x $7.99 /Kw | $517.75 |
| Fuel Adjustment | 6048 x $0.01034/KWh | $62.50 |
| State Utility Tax | | $19.35 |
| | Electric Charges | $999.17 |
| Water Monthly Customer Charge 1/2 inch meter | | $24.41 |
| | Water Charges | $24.41 |
| Sewer Fixed Monthly Customer Charge 1/2 inch meter | | $15.50 |
| | Sewer Charges | $15.50 |
| Sanitary District Monthly Customer Charge | | $1.20 |
| | Sanitary Charges | $1.20 |
| | Current Bill | $1,040.28 |
| Fire Protection | | |
| Line Size 5 inch | | $17.04 |
| | Fire Protection Charges | $17.04 |
| | Balance | $1,058.32 |

Warning Siren Surcharge applies per Ordinance 285-05-06
Applies June 1, 2006 - May 31, 2007

Customer Name   SPORTSMART #S0618

See Reverse Side For Billing Explanation

| CUSTOMER COPY | 7/17/2005 | $ 30.28 | 183.27 | 08/13/2005 | 8/1/2006 | $1,058.32 |
|---|---|---|---|---|---|---|
| | | | | | | PLEASE PAY THIS |

TSA RULE 26 DISCLOSURES
0284

Nov. 9, 2006 12:15PM    AVISTA ADVANTAGE                          No. 6078   P. 8

**Billing Date**

June 14, 2006

**Account Number**

085518416-00051344

AMOUNT DUE

**$2,179.54**

AMOUNT ENCLOSED

DUE DATE

**Jul. 05, 2006**

☐ Check here and make corrections on the reverse side.

SPORTSMART #S0618
FACILITY IQ-MS658
PO BOX 36280
LOUISVILLE KY 40233

3211 VETERANS PKWY

00051844085518416000217954200L0705   6

## PLEASE RETURN TOP PORTION WITH YOUR PAYMENT

| Account Number | Service Address | | Last Payment Amount | Last Payment Received On |
|---|---|---|---|---|
| 085518416-00051344 | 3211 VETERANS PKWY | | $2,308.46CR | 5/30/2006 |

| Type of Service | Meter Number | Mult | Read Date | Days | Bill Code | Meter Read Previous | Meter Read Current | Meter Multiplier | Usage | Current Billing |
|---|---|---|---|---|---|---|---|---|---|---|
| Electric | 00115463 | 40 | 06/08 | 31 | A | 4210.00 | 4309.00 | 144.00 | 14296.00 KWh | |
| Elec.KWD | 00115463 | 40 | 06/08 | 31 | A | | 0.95 | 144.00 | 136.80 Kw | |
| Water 1 1/2" | 16321006 | 10 | 06/08 | 31 | A | 43.00 | 45.00 | 1.00 | 2.00 Units | |
| Fire Protection | | | 06/13 | 33 | | | | | | |

**Regular Bill**

| Transaction | | Amount |
|---|---|---|
| Payment - Thank You | | $2,308.46CR |
| Billing | | $2,308.46 |
| Warning Siren Surcharge | | $1.00 |
| | Net Balance Forward | $1.00 |
| Electric Monthly Customer Charge | | $7.05 |
| Winter KWh Energy | 3219 x $0.0579 /KWh | $186.38 |
| Summer KWh Energy | 11077 x $0.0649 /KWh | $716.90 |
| Winter Kw Demand | 30.29000 x $6.61 /Kw | $200.18 |
| Summer Kw Demand | 105.91000 x $7.99 /Kw | $846.22 |
| Fuel Adjustment | 14296 x $0.00772 /KWh | $110.00 |
| State Utility Tax | | $45.02 |
| | Electric Charges | $2,115.75 |
| Water Monthly Customer Charge 1 1/2 Inch meter | | $24.41 |
| First 5 Units | 2 x $1.47 /Unit | $2.94 |
| | Water Charges | $27.35 |
| Sewer Fund Monthly Customer Charge 1 1/2 Inch meter | | $15.50 |
| First 5 Units | 2 x $0.35 /Unit | $0.70 |
| | Sewer Charges | $16.20 |
| Sanitary District Monthly Customer Charge | | $1.20 |
| All Units | 2 x $0.50 /Unit | $1.00 |
| | Sanitary Charges | $2.20 |
| | Current Bill | $2,161.50 |
| Fire Protection | | |
| Line Size 6 Inch | | $17.04 |
| | Fire Protection Charges | $17.04 |
| | Balance | $2,179.54 |

Warning Siren Surcharge applies per Ordinance 285-05-06
Applies June 1, 2006 – May 31, 2007

Customer Name   SPORTSMART #S0618

See Reverse Side For Billing Explanation

| **CUSTOMER COPY** | Billing Date | Average Daily Electric Cost | Average Daily Usage (KWh) | Next Scheduled Read Date | DUE DATE | PLEASE PAY THIS AMOUNT |
|---|---|---|---|---|---|---|

TSA RULE 26 DISCLOSURES
0285

Billing Date

June 14, 2006

Account Number

085518416-00051344

AMOUNT DUE

$2,179.54

AMOUNT ENCLOSED

DUE DATE

Jul. 05, 2006

Check here and make corrections on the reverse side.

SPORTSMART #30613
FACILITY ID-MS656
PO BOX 36230
LOUISVILLE KY 40233

3211 VETERANS PKWY

000518416551841600021795420060705  L

## PLEASE RETURN TOP PORTION WITH YOUR PAYMENT

| Account Number | Service Address | | | | | | | Last Payment Amount | Last Payment Received On |
|---|---|---|---|---|---|---|---|---|---|
| Type of Service | Meter Number | Rate | Read Date | Days | Bill Code | Meter Read Previous | Current | Meter Multiplier | Usage | Current Billing |

See Reverse Side For Billing Explanation

| CUSTOMER COPY | 6/14/2006 Billing Date | $ 68.25 Average Daily Electric Cost | 459.87 Average Daily Usage (KWH) | 07/13/2006 Next Scheduled Read Date | 7/5/2006 DUE DATE | $2,179.54 PLEASE PAY THIS AMOUNT |
|---|---|---|---|---|---|---|

TSA RULE 26 DISCLOSURES
0286

Nov. 9. 2006·12:15PM - AVISTA ADVANTAGE                No. 6078    P. 7

Billing Date

**May 12, 2006**

Account Number

085518416-00051344

AMOUNT DUE
**$2,308.46**

AMOUNT ENCLOSED ☐

DUE DATE
**Jun. 02, 2006**

☐ Check here and make corrections on the reverse side.

SPORTSMART #S0618
FACILITY IQ-MS658
PO BOX 36230
LOUISVILLE KY 40223

3211 VETERANS PKWY

00051344DA551841LD00E3DA4E00L0L02  5

## PLEASE RETURN TOP PORTION WITH YOUR PAYMENT

| Account Number | Service Address | Last Payment Amount | Last Payment Received On |
|---|---|---|---|
| 085518416-00051344 | 3211 VETERANS PKWY | $2,072.89CR | 4/24/2006 |

| Type of Service | Meter Number | Auth | Read Date | Days | Bill Code | Meter Read Previous | Meter Read Current | Meter Multiplier | Usage | Current Billing |
|---|---|---|---|---|---|---|---|---|---|---|
| Electric | 00115463 | 40 | 05/08 | 30 | A | 4023.00 | 4210.00 | 144.00 | 26928.00 KWh | |
| Elec.KWD | 00115463 | 40 | 05/08 | 30 | A | | 0.42 | 144.00 | 60.48 Kw | |
| Water 1 1/2" | 16321806 | 10 | 05/08 | 30 | A | 42.00 | 43.00 | 1.00 | 1.00 Units | |
| Fire Protection | | | 05/11 | 31 | | | | | | |

**Regular Bill**

| Transaction | Amount |
|---|---|
| Payment - Thank You | $2,072.89CR |
| Billing | $2,072.89 |
| Net Balance Forward | $0.00 |
| Electric Monthly Customer Charge | $7.05 |
| Winter KWh Energy  26928 x $0.0579 /KWh | $1,559.13 |
| Winter Kw Demand  60.48000 x $6.61 /Kw | $399.77 |
| Fuel Adjustment  26928 x $0.007274 /KWh | $195.87 |
| State Utility Tax | $86.17 |
| **Electric Charges** | **$2,247.99** |
| Water Monthly Customer Charge 1 1/2 Inch meter | $24.41 |
| First 5 Units  1 x $1.47 /Unit | $1.47 |
| **Water Charges** | **$25.88** |
| Sewer Fund Monthly Customer Charge 1 1/2 inch meter | $15.50 |
| First 5 Units  1 x $0.35 /Unit | $0.35 |
| **Sewer Charges** | **$15.85** |
| Sanitary District Monthly Customer Charge | $1.20 |
| All Units  1 x $0.50 /Unit | $0.50 |
| **Sanitary Charges** | **$1.70** |
| **Current Bill** | **$2,291.42** |
| Fire Protection  Line Size 6 Inch | $17.04 |
| **Fire Protection Charges** | **$17.04** |
| **Balance** | **$2,308.46** |

Customer Name SPORTSMART #90618

* See Reverse Side For Billing Explanation

| CUSTOMER COPY | 5/12/2006 | $ 74.93 | 897.60 | 06/10/2006 | 6/2/2006 | $2,308.46 |
|---|---|---|---|---|---|---|
| | Billing Period | Average Daily | Average Daily | Next Scheduled | | PLEASE PAY THIS |

TSA RULE 26 DISCLOSURES
0287

Nov. 9. 2006 12:14PM    AVISTA ADVANTAGE                No. 6078    P. 5

Billing Date

April 13, 2006

Account Number

085518416-00051344

**AMOUNT DUE**

$2,072.89
AMOUNT ENCLOSED

**DUE DATE**

May. 04, 2006

☐ Check here and make corrections on the reverse side.

SPORTSMART #S0618
FACILITY IQ-MS658
PO BOX 36230
LOUISVILLE KY 40233

3211 VETERANS PKWY

0005134408551841L00020728920060504  b

**PLEASE RETURN TOP PORTION WITH YOUR PAYMENT**

| Account Number | Service Address | | | | | Last Payment Amount | Last Payment Received On | |
|---|---|---|---|---|---|---|---|---|
| 085518416-00051344 | 3211 VETERANS PKWY | | | | | $2,276.53CR | 3/27/2006 | |

| Type of Service | Meter Number | Rate | Read Date | Days | Bill Code | Meter Read Previous | Meter Read Current | Meter Multiplier | Usage | Current Billing |
|---|---|---|---|---|---|---|---|---|---|---|
| Electric | 00115463 | 40 | 04/08 | 32 | A | 3857.00 | 4023.00 | 144.00 | 23904.00 KWh | |
| Elec.KWD | 00115463 | 40 | 04/08 | 32 | A | 0.37 | 0.57 | 144.00 | $2.08 Kw | |
| Water 1 1/2" | 16321006 | 10 | 04/08 | 32 | A | 40.00 | 42.00 | 1.00 | 2.00 Units | |
| Fire Protection | | | 04/10 | 24 | | | | | | |

| | Transaction | | Amount |
|---|---|---|---|
| **Regular Bill** | Payment – Thank You | | $2,276.53CR |
| | Billing | | $2,276.53 |
| | | Net Balance Forward | $0.00 |
| | Electric Monthly Customer Charge | | $7.05 |
| | Winter KWh Energy | 18675 x $0.0544 /KWh | $1,015.92 |
| | Winter KWh Energy | 5229 x $0.0579 /KWh | $302.76 |
| | Winter Kw Demand | 64.12500 x $6.21 /Kw | $398.22 |
| | Winter Kw Demand | 17.95500 x $6.61 /Kw | $118.68 |
| | Fuel Adjustment | 23904 x $0.003806 /KWh | $90.98 |
| | State Utility Tax | | $76.49 |
| | | **Electric Charges** | $2,010.19 |
| | Water Monthly Customer Charge 1 1/2 inch meter | | $24.41 |
| | First 5 Units | 2 x $1.47 /Unit | $2.94 |
| | | **Water Charges** | $27.35 |
| | Sewer Fund Monthly Customer Charge 1 1/2 inch meter | | $15.50 |
| | First 3 Units | 2 x $0.35 /Unit | $0.70 |
| | | **Sewer Charges** | $16.20 |
| | Sanitary District Monthly Customer Charge | | $1.20 |
| Customer Name  SPORTSMART #S0618 | All Units | 2 x $0.50 /Unit | $1.00 |
| | | **Sanitary Charges** | $2.20 |
| | | **Current Bill** | $2,055.85 |
| | Fire Protection | | $17.04 |
| * See Reverse Side For Billing Explanation | Line Size 6 Inch | | $17.04 |
| | | **Fire Protection Charges** | $17.04 |
| | | **Balance** | $2,072.89 |

| CUSTOMER COPY | Meter Parts | Average Daily Electric Plant | Average Daily Usage AVG12 | Read Schedule Read Parts | DUE DATE | PLEASE PAY THIS AMOUNT |
|---|---|---|---|---|---|---|

TSA RULE 26 DISCLOSURES
0288

Nov. 9, 2006 12:15PM   AVISTA ADVANTAGE                    No. 6078   P. 6

Billing Date

April 13, 2006

Account Number

085518416-00051344

AMOUNT DUE

$2,072.89

AMOUNT ENCLOSED

DUE DATE

May. 04, 2006

Check here and make corrections on the reverse side.

SPORTSMART #S0518
FACILITY ID-MS658
PO BOX 36230
LOUISVILLE KY 40233

3211 VETERANS PKWY

0005134406551541600020735520060504   6

## PLEASE RETURN TOP PORTION WITH YOUR PAYMENT

| Account Number | Service Address | | | | | | Last Payment Amount | Last Payment Received On | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Type of Service | Meter Number | Rate | Read Date | Days | Bill Code | Meter Read Previous | Current | Meter Multiplier | Usage | Current Chrg |
|---|---|---|---|---|---|---|---|---|---|---|

\* See Reverse Side For Billing Explanation

| CUSTOMER COPY | 4/13/2006 | $ 62.82 | 747.00 | 05/10/2006 | 5/4/2006 | $2,072.89 |
|---|---|---|---|---|---|---|
| | Billing Date | Average Daily Electric Cost | Average Daily Hours of kWh | Next Scheduled Read Date | DUE DATE | PLEASE PAY THIS AMOUNT |

TSA RULE DISCLOSURES

Nov. 9. 2006 12:18PM   AVISTA ADVANTAGE                    No. 6078   P. 18

AUG-29-2006  13:02           AMEREN UE               3142060440    P.03

 **Ameren CILCO**

Please Return This Portion With Your Payment

| AMOUNT DUE | DUE DATE |
|---|---|
| $192.11 | Aug 9, 2006 |
| AMOUNT PAYABLE AFTER DUE DATE | ACCOUNT NUMBER |
| $194.99 | 91574-57454 |

Amount
Enclosed $

GART BROS SPORTING GOODS CO
SPORTMART
CYNTHIA KASSMAN
1000 W HAMPDEN AVE.
ENGLEWOOD, CO 80110

AMERENCILCO
P.O. Box 66826
St. Louis, MO 63166-6826

6040000 0091574574504 00000000 00192110 00192110

Keep This Portion For Your Records

| ACCOUNT NUMBER | 91574-57454 | BILL DATE | Jul 25, 2006 |
|---|---|---|---|
| GART BROS SPORTING GOODS CO | | AMOUNT DUE BY    Aug 9, 2006 | $192.11 |
| 2211 S VENEKAR PKWY | | AMOUNT PAYABLE AFTER DUE DATE | $194.99 |
| SPRINGFIELD, IL 62704 | | | |

**SUMMARY**

Service To        07/24/2006

Sales Taxes

**NATURAL GAS SERVICE BILLING**

Rate 343 General Gas Service - Syc Ht        Service From 07/07/2006    To 07/24/2006

Customer Charge                                     $66.42
Total Service Amount                                            $67.42
Illinois State Commerce Commission Tax              $0.07
Total Tax Related Charges                                      $0.07

**MISCELLANEOUS CHARGES**

Prior Gas Service Amount                            $122.62

Current Amount Due                                             $192.11
Prior Amount Due                                               $0.00
Total Amount Due                                               $192.11

**\* \* \* FINAL BILL \* \* \***

DIRECT PAY MAKES PAYING BILLS EASIER - For an easy way to pay your bill, consider Direct Pay. The payment comes directly from your designated bank account on the due date of your bill. To enroll, go to UseDirectPayment.com, or call 1-877-877-5740 to request an enrollment form.

IMPORTANT MESSAGE FOR GAS CUSTOMERS - BE SAFE!
If you smell gas, call AmerenCILCO to investigate the problem. Before you dig, call JULIE at 1-800-892-0123 to locate underground gas pipelines for you.

**Ameren CILCO**
P.O. Box 66826
St. Louis, MO 63166
1-877-877-5740
www.ameren.com

| BILL FOR DAY | DAYS USED | kWh | AVG THERMS | TEMP |
|---|---|---|---|---|
| THIS PERIOD | 5.0 | 5.0 | 78 |
| SAME PERIOD LAST YEAR | 5.0 | 5.0 | 76 |

Page 1 of 1

TOTAL P.03

TSA RULE 26 DISCLOSURES
0290

**Ameren CILCO**

Please Return This Portion With Your Payment.   22785

| AMOUNT DUE | DUE DATE |
|---|---|
| $122.62 | Jul 25, 2006 |

| AMOUNT ENCLOSED | ACCOUNT NUMBER |
|---|---|
| $124.48 | 91574-57454 |

Amount
Enclosed $ _____

```
**********AUTO** MIXED AADC 620
00014699 01 MB  0.326 51
GART BROS SPORTING GOODS CO
SPORTMART
C/O FACILITY ID - MS #56
PO BOX 2440
SPOKANE, WA 99210-2440
```

AMERENCILCO
P.O. Box 66826
St. Louis, MO 63166-6826

8040000 0091574574504 00122620 00322620 00122620

*Keep This Portion For Your Records*

| 91574-57454 | | Jul 11, 2006 |
|---|---|---|
| GART BROS SPORTING GOODS CO | | |
| 3211 S VETERANS PKWY | Jul 25, 2006 | $122.62 |
| SPRINGFIELD, IL 62704 | | $124.48 |

Payment Received on Jun 21, 2006          -$127.74

| | | | SUMMARY | | | |
|---|---|---|---|---|---|---|
| Total Therm | 00317773  06/06-07/07  31 | 27741.0000 | 27741.0000 | 0.0000 | 1.1130 1.0000 | 0.0000A |
| | Service To | 07/07/2006 | | | Service To | |
| Sales Therm | | 0.0000 | | | | |

**NATURAL GAS SERVICE BILLING**
Service From  06/06/2006   To  07/07/2006

Rate 100 General Gas Service - Gas Mr
Customer Charge                            $122.50
Total Service Amount                                      $122.50
Illinois State Commerce Commission Tax    $0.12
Total Tax Related Charges                                 $0.12

Current Amount Due                $122.62
Prior Amount Due                    $0.00
Total Amount Due                  $122.62

**DIRECT PAY MAKES PAYING BILLS EASIER** - For an easy way to pay your bill, consider Direct Pay. The payment comes directly from your designated bank account on the due date of your bill. To enroll, go to ManDirectPayment.com, or call 1-877-677-5749 to request an enrollment form.

**IMPORTANT MESSAGE FOR OUR CUSTOMERS - BE SAFE**
If you smell gas, call AmerenCILCO to investigate the problem. Before you dig, call JULIE at 1-800-892-0123 to locate underground gas pipelines for you.

**Ameren CILCO**
P.O. Box 66826
St. Louis, MO 63166
1-877-677-5749
www.ameren.com

| METER READINGS | HEATING DAYS | GAS THERMS | TEMP |
|---|---|---|---|
| THIS PERIOD | 0.0 | 0.0 | 73 |
| SAME PERIOD LAST YEAR | 0.0 | 0.0 | 78 |

Page 1 Of 1

TSA RULE 26 DISCLOSURES
0301

Nov. 9. 2006—12:17PM—AVISTA ADVANTAGE                    No. 6078   P. 16

**Ameren CILCO**

Please Return This Portion With Your Payment.    24642

| CURRENT AMOUNT DUE | DUE DATE |
|---|---|
| $127.74 | Jun 22, 2006 |
| AMOUNT PAYABLE AFTER DUE DATE | ACCOUNT NUMBER |
| $129.66 | 91574-57454 |

Amount
Enclosed $

```
*****P**AUTO** MIXED AADC $30
0001575201 MB  0.335 01
GART BROS SPORTING GOODS CO
SPORTMART
C/O FACILITY ID - MS 658
PO BOX 2440
SPOKANE, WA 99210-2440
```

AMERENCILCO
P.O. Box 66826
St. Louis, MO 63166-6826

0040000 0091574574504 00127740 00127740 00127740

Keep This Portion For Your Records

| ACCOUNT NUMBER | 91574-57454 | BILL DATE | Jun 8, 2006 |
|---|---|---|---|
| NAME | GART BROS SPORTING GOODS CO | | |
| SERVICE ADDRESS | 3211 S VETERANS PKWY SPRINGFIELD, IL 62704 | DUE DATE / AMOUNT NOW DUE | Jun 22, 2006 / $127.74 |
| | | AMOUNT DUE AFTER DUE DATE | $129.66 |

Payment Received on May 18, 2006.          $836.46

| METER READING DATE | METER NUMBER | METER READING PREVIOUS | METER READING PRESENT | DIFFERENCE | THERM MULTIPLIER | THERM FACTOR | THERM USAGE |
|---|---|---|---|---|---|---|---|
| Total Therm | 00117772 05/04/06/05 33 | 27735.0000 | 27741.0000 | 5.0000 | 1.1130 | 1.00000 | 5.5560 A |

**SUMMARY**
Service To
Sales Therm          05/05/2006          5.0000          Service To

**NATURAL GAS SERVICE BILLING**

Rate 800 General Gas Service - See Yr

Service From 05/04/2006   To 05/05/2006

| | | | |
|---|---|---|---|
| Delivery Chg-Company Supplied Gas | 5.60 | @ $.11690000 | $0.65 |
| Total PGA Charge | 5.60 | @ $.77014466 | $4.31 |
| Con Gas Env Factor TAR | 5.60 | @ $.00433390 | $0.02 |
| Customer Charge | | | $122.50 |
| Total Service Amount | | | $127.48 |
| Illinois State Gas Revenue Tax | | | $0.13 |
| Illinois State Commerce Commission Tax | | | $0.13 |
| Total Tax Related Charges | | | $0.25 |

Current Amount Due          $127.74
Prior Amount Due          $0.00
Total Amount Due          $127.74

**DIRECT PAY MAKES PAYING BILLS EASIER** - For an easy way to pay your bill, consider Direct Pay. The payment comes directly from your designated bank account on the due date of your bill. To enroll, go to UseDirectPayment.com, or call 1-877-677-5740 to request an enrollment form.

**IMPORTANT MESSAGE FOR GAS CUSTOMERS - BE SAFE**
If you ever smell gas, call AmerenCILCO to investigate the problem. Before you dig, call JULIE at 1-800-892-0123 to locate underground gas pipelines for you.

**Ameren CILCO**
P.O. Box 66826
St. Louis, MO 63166
1-877-677-5740
www.ameren.com

| USE PER DAY | ELECTRIC KWH | GAS THERM | TEMP |
|---|---|---|---|
| THIS PERIOD | 0.0 | 0.1 | 65 |
| SAME PERIOD LAST YEAR | 0.0 | 0.0 | 67 |

Page 1 Of 1

TSA RULE 26 DISCLOSURES
0292

Nov. 9. 2006 12:17PM   AVISTA ADVANTAGE                    No.6078   P. 15

**Ameren CILCO**

Please Return This Portion With Your Payment.   20452

| AMOUNT DUE | DUE DATE |
|---|---|
| $836.46 | May 22, 2006 |

| AMOUNT PAYABLE AFTER DUE DATE | ACCOUNT NUMBER |
|---|---|
| $849.02 | 91574-57454 |

Amount Enclosed $ _____

**************AUTO** MIXED AADC 690
G0013020 01 MB  0.328 01
GART BROS SPORTING GOODS CO
SPORTMART
C/O FACILITY ID - MS 658
PO BOX 2440
SPOKANE, WA 99210-2440

AMERENCILCO
P.O. Box 66826
St. Louis, MO 63166-6826

llılılılılılılılılılılllllllllllllllllllllllllllllllllllllllllllllll    llılllllllllllllllllllllllllllllllllllllllllllllllll

20400000 0091574574504 00836460 00836460 00836460

*Keep This Portion For Your Records*

| ACCOUNT NUMBER | 91574-57454 | BILL DATE | May 8, 2006 |
|---|---|---|---|
| NAME | GART BROS SPORTING GOODS CO | | |
| SERVICE AT | 3211 S VETERANS PKWY | TOTAL AMOUNT DUE BY | May 22, 2006 | $836.46 |
| | SPRINGFIELD, IL 62704 | AMOUNT PAYABLE AFTER DUE DATE | | $849.02 |

Payment Received on Apr 24, 2006    $1,030.93

| TYPE OF READING | METER NUMBER | SERVICE FROM / TO | NO. OF DAYS | METER READING PREVIOUS | METER READING PRESENT | READING DIFFERENCE | METER MULTIPLIER | THERM FACTOR | USAGE | R D |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Therm | 00117773 | 04/05-05/04 | 29 | 27047.0000 | 27736.0000 | 689.0000 | 1.1130 | 1.00000 | 766.8570 A |

| | Service To | SUMMARY | | Service To |
|---|---|---|---|---|
| Sales Therm | 05/04/2006 | 766.9000 | | |

**NATURAL GAS SERVICE BILLING**

| Rate 600 General Gas Service - Spe Ht | Service From 04/05/2006 | | To 05/04/2006 |
|---|---|---|---|
| Delivery Chg-Company Supplied Gas | 766.90 | @ $.11690000 | $89.65 |
| Total PGA Charge | 766.90 | @ $.78881644 | $605.41 |
| Com Gas Env Factor TAR | 766.90 | @ $.00217930 | $1.67 |
| Customer Charge | | | $122.50 |
| Total Service Amount | | | $817.22 |
| Illinois State Gas Revenue Tax | | | $18.41 |
| Illinois State Commerce Commission Tax | | | $0.82 |
| Total Tax Related Charges | | | $19.23 |

| | |
|---|---|
| Current Amount Due | $836.45 |
| Prior Amount Due | $0.00 |
| Total Amount Due | $836.45 |

**DIRECT PAY MAKES PAYING BILLS EASIER** - For an easy way to pay your bill, consider Direct Pay. The payment comes directly from your designated bank account on the due date of your bill. To enroll, go to UseDirectPayment.com, or call 1-877-677-5740 to request an enrollment form.

**IMPORTANT MESSAGE FOR GAS CUSTOMERS - BE SAFE**
If you ever smell gas, call AmerenCILCO to investigate the problem. Before you dig, call JULIE at 1-800-892-0123 to locate underground gas pipelines for you.

**Ameren CILCO**
P.O. Box 66826
St. Louis, MO 63166
1-877-677-5740
www.ameren.com

| USE PER DAY | ELECTRIC KWH | GAS THERMS | TEMP |
|---|---|---|---|
| THIS PERIOD | 0.0 | 26.4 | 60 |
| SAME PERIOD LAST YEAR | 0.0 | 0.3 | 56 |

Page 1 Of 1

TSA RULE 26 DISCLOSURES
0293