**E-FILED**
Monday, 31 December, 2007  02:07:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, | ) ) ) ) ) ) |
| Plaintiff/Cross-Complainant, | ) ) ) |
| v. | ) Case No.: 06-CV-3177 ) |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation,, | ) ) ) ) ) |
| Defendant/Counter-Plaintiff. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF
TSA'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

After sustaining substantial damage to its leased premises in Springfield, Illinois, as a result of a tornado, TSA Stores, Inc., ("TSA," "Tenant," or "Defendant") properly and validly exercised its contractual option to terminate the lease. Consequently, the claim of SWPlaza III, LLC, ("SWPlaza," "Landlord," or "Plaintiff") for breach of that Lease is wholly without merit, and TSA is entitled to judgment as a matter of law on all claims.

The lease governing the relationship between TSA and the Landlord contained a conditional limitation; if the leased premises sustained damage as a result of a casualty, the repair cost of which would equal or exceed 35% of the then-total reconstruction cost, TSA had the right to terminate the lease within 60 days of the casualty. On March 12, 2006, TSA's leased premises in Springfield were struck by a tornado which caused substantial damage to TSA's leasehold. After retaining a disaster recovery specialist and a contractor concentrating in retail construction, who prepared a budget estimate of the costs of reconstruction, TSA reasonably concluded that

1

the cost of the damage exceeded the contractual threshold and terminated the lease on May 3, 2006, in strict compliance with its terms.

The Landlord contends, however, that the damage did not meet the threshold. It reaches this conclusion on the basis of erroneous analyses. First, during the 60-day window, it tendered an "estimate" based on the percent of damage to physical components of the structure rather than cost of repair as a percent of the aggregate reconstruction cost. At the time that "estimate" was completed, its preparer formed no opinion or estimate of the then-total cost of reconstruction and no estimate of the costs for repairing the premises. Second, the Landlord's reliance upon the purported "actual" costs is misplaced. The construction was not completed until well after the expiration of the 60-day window in which TSA had to exercise its option, and, hence, those numbers were unavailable to TSA. If TSA were restrained to use the "actual" costs, under the circumstances of this case, its option would be rendered meaningless and inoperative. Furthermore, Landlord's contractor admits that those costs do not reflect the total costs in that significant items of construction have not been included. Consequently, the Landlord had and still has no competent and relevant evidence to indicate that the damage threshold was not met.

These reasons compel the entry of summary judgment in favor of TSA.

**STATEMENT OF UNDISPUTED FACTS**

A.    **The Parties**

1.    TSA is a Delaware corporation, headquartered in Englewood, Colorado. (Mavelle Declaration, par. 6.)

2.    One of the largest full line sporting goods retailers in the United States, TSA had 398 stores in 45 states, with 32 of those located in Illinois in its 2005 fiscal year. (Mavelle Declaration, par. 7.)

2

3.      TSA is a wholly owned subsidiary of the Sports Authority, Inc., formerly known as Gart Sports Company.  (Mavelle Declaration, par. 8.)

4.      SWPlaza is an Illinois Limited Liability Company, the manager of which is SWPlaza III Management, Ltd.  (*See* Exhibit B to Response to Order on Notice of Removal (Doc. #6).)

5.      The organizers of both SWPlaza III, LLC, and SWPlaza III Management, Ltd., are Charles E. Robbins and Arthur F. Seppi    (*See* Exhibits B and C to Response to Order on Notice of Removal (Doc. #6).)

**B.      The Lease**

6.      The parties' predecessors[1] entered into a lease on April 2, 2001, (referred to herein as the "Lease").  (A true and correct copy of the Lease is appended to both the Complaint and Answer; Mavelle Declaration, par. 10; Exhibit A to Mavelle Declaration; Cushman Declaration, par. 6; Exhibit A to Cashman Declaration.)

7.      Prior to the execution of the Lease, the parties' predecessors negotiated its terms. Although the Tenant tendered a draft lease, that draft was rejected by the Landlord, which submitted its own proposal.  The Lease, including Section 15b thereof, is derived principally from the Landlord's proposal. (Mavelle Declaration, par. 11; Cashman Declaration, par. 7.)

8.      Under the terms of the Lease, the Landlord agreed to construct by October 1, 2001, a retail shopping center of approximately 120,000 leasable square feet, known as Southwest Plaza III Shopping Center (the "Shopping Center") in Springfield, Illinois.  (Lease, Sections IE, 1 and 2.)

---

[1]    The Tenant under the Lease was identified as Gart Bros. Sporting Goods Company, a Colorado Corporation.  Through a merger with TSA in 2005, the Tenant became TSA.  The Landlord under the Lease was identified as Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020.  SWPlaza III, LLC, succeeded the Illinois National Bank as the Landlord.  (*See* Plaintiff's Complaint).  For convenience, the parties will be referred to herein by their current designations even though it may have been their predecessors who undertook certain of the actions described herein.

9.    Of the total leasable square feet, TSA agreed to rent 32,630 square feet, measuring approximately 165 feet wide and 194 feet deep.  (Lease, Sections IB and 1.)

10.    In addition to constructing the shell of the Shopping Center, the Landlord agreed to construct the Tenant's leasehold improvements in accordance with certain Tenant specifications and requirements, including interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, interior wall and floor finishes, and décor.  (Lease Section 2; Exhibit C to the Lease, entitled "Construction Provisions," Sections 5 and 6.)

11.    The stated term of the Lease was fifteen years, commencing sixty days after TSA took possession of the constructed premises.  In addition, TSA had the option to extend the Lease for four consecutive five year periods by providing written notice of the exercise of the option at least 180 days before the exportation of the then current term.  (Lease, Sections IC, 3 and 4.)

12.    TSA took possession of the leased premises on December 18, 2001, and used the premises to operate a retail sporting goods store under the name "Sports Authority."  (Cashman Declaration, par. 8; Mavelle Declaration, par. 12.)

13.    The Lease provides that TSA, as the Tenant shall pay base rent for the term of the Lease divided into five-year increments, with the rent increasing as follows:

| LEASE YEAR | MONTHLY RENT | ANNUAL RENT | RENT PER SQUARE FOOT |
|---|---|---|---|
| 1-5 | $33,989.58 | $407,875.00 | $12.50 |
| 6-10 | $37,388.54 | $448,662.50 | $13.75 |
| 11-15 | $41,140.99 | $493,691.90 | $15.13 |

(Lease, Sections ID and 4(a).)

14.    In addition to the base rent, TSA agreed to pay a portion of the annual charges for common area maintenance ("CAM"), initially in the amount of $0.80 per leasable square foot

4

($26,104.00), payable in equal monthly installments ($2,175.33). After the second year of the lease, CAM charges would be annually prorated up to a 5% increase. (Lease, Section 7.)

15.     TSA was also responsible to pay the real estate taxes applicable to its leased space, utility expenses, and a pro-rata share of the insurance covering the shopping center common areas. (Lease, Sections 9(b), 11, and 14(f).)

16.     Section 15 of the Lease, entitled "Damages by Fire or Other Casualty," is the key provision for purposes of this action. Part (a) thereof governed situations where the destruction by casualty had a repair or reconstruction "cost of less than 35%[2] of the then-total replacement cost" of the premises,[3] and part (b) applied where the cost of repair or reconstruction was 35% or greater of the then-total reconstruction costs. If the destruction was less than 35% of the pertinent base, the "Lease shall not terminate." Rather, the Landlord was required and restore the damage, during which time, plus sixty days after the completion of repairs, all payments by TSA would abate. (Lease, Section 15(a).)

17.     If the repair or reconstruction costs resulting from casualty was 35% or more of the then-total reconstruction costs, TSA could elect to cancel the Lease by providing written notice within 60 days following the casualty:

> (b)     Thirty Five Percent (35%) or More. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty. In the

---

[2]     It is important to emphasize that the lease formula concerns a percentage of aggregate reconstruction costs and not a percentage of the physical structure or its components.

[3]     The 35% figure applies to the premises leased to TSA, common areas, or "Additional Areas," which is defined as "all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right. . . to provide insurance coverage). . . ." *See* Section 14(f) of the Lease.

60169293v1 868372

event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease * * * Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, * * * event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

18.     A termination of the Lease under Section 15 was deemed effective as of the date of the casualty with rent being apportioned to that date. The Tenant was required to vacate the leased premises within ten days after delivery of the notice of termination. (Lease, Section 15(c).)

19.     The Lease provides that, in the event of litigation relating to the Lease between the parties, the prevailing party is entitled to recover from the other "reasonable and actual attorneys' fees and costs . . . ." (Lease, Section 36(e).)

C.     **The March 12, 2006 Tornado**

20.     On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the Lease. (Complaint, par. 5; Answer, par. 5; Mavelle Declaration, par. 13; Cashman Declaration, par. 9.)

21.     The tornado hit Springfield on Sunday evening, March 12, 2006, at approximately 8:20 p.m. The tornado "entered the City of Springfield near Cockrell Lane and Constitution

60169293v1 868372

Drive, tracking to the east-northeast around 50 mph.  The tornado was about 300 yards wide, and produced F2 damage to several businesses from Constitution Drive, through Parkway Pointe, to Veterans Parkway and Lindbergh Blvd."  It was on the ground in Springfield for 5.5 miles for a duration of approximately 6 minutes with an estimated wind speed of 120 miles per hour. (National Oceanic and Atmospheric Administration's National Weather Service Weather Forecast office, Central Illinois, at http:www.crh.noaa.gov/ilx/?n=spi-tornado (last visited on December 31, 2007), attached hereto as Exhibit A.)[4]

22.     As a result of the tornado, and as further elaborated upon herein, TSA's leasehold in Springfield sustained damage to its bearing wall, roof, doors and framing, glass and glazing, ceiling, walls, floors, and electrical system. (Sorensen Deposition, pages 12-13, 16-24.)

**D.     TSA's Response to the Tornado, Damage to Premises, and Termination of The Lease**

23.     During the days immediately following the tornado of March 12, 2006, TSA focused on safeguarding its property at the leased premises, protecting the health and safety of persons in and around the leased premises, and assessing the nature and extent of the damage to the leased premises.  (Cashman Declaration, par. 10; Mavelle Declaration, par. 14.)

24.     TSA representatives, including Mike Mavelle, Vice President-Risk Management, traveled to Springfield from Colorado on March 13, 2006, to visit the premises and view the damage.  (Mavelle Declaration, par. 16; Cashman Declaration, par. 11.)

---

[4]     Under Rule 201(f) of the Federal Rules of Evidence, the Court may take judicial notice of adjudicative facts at any stage of the proceedings, including the summary judgment stage.  *Ochana v. Flores*, 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002), *aff'd*, 347 F. 3d 266 (7th Cir. 2002). Facts relating to weather conditions taken from the records of a federal agency may be judicially noticed.  *Newman v. Village of Hinsdale*, 592 F. Supp. 1307, 1309, n. 8 (N.D. Ill. 1984), *aff'd*, 767 F. 2d 925 (7th Cir. 1985).  This information is presented to demonstrate the breadth of the tornado.  The records show that two tornadoes hit Springfield on March 12, 2006.  The course of the second tornado was not near the shopping center.

60169293v1 868372

25.     TSA retained Cotton USA ("Cotton"), a company specializing in disaster recovery services, to stabilize and safeguard the TSA premises, including the structure and its systems and the fixtures in the premises. (Mavelle Declaration, par. 15.)

26.     The Landlord retained Jones-Blythe Construction Co. ("Jones-Blythe") to perform restoration and repair of the premises. (Sorensen Deposition, p. 8.)

27.     Jones-Blythe began the reconstruction of the premises on March 14 or 15, 2006. (Sorensen Deposition, p. 36; Complaint, par. 6; Answer, par. 6.)

28.     On March 16, 2006, four days after the casualty, Cynthia Cashman, TSA's Director of Real Estate, corresponded with the Landlord and its attorney stating that TSA desired to coordinate an "action plan and timetable" and that damage assessments were being made. (Cashman Declaration, par. 12; Exhibit B to Cashman Declaration.)

29.     On Thursday, March 21, 2006, David Frieder, TSA's Vice President of Construction, visited the leased premises. (Cashman Declaration, par. 13; Mavelle Declaration, par. 17.)

30.     During his visit on or near March 16, 2006, Mr. Mavelle observed that TSA's leasehold in Springfield, Illinois, sustained various holes in its roof; a bowed wall, shared with its neighbor to the south; glass in front, including doors, blown out; water damage; and lost power. (Mavelle Declaration, par. 16.)

31.     On March 23, 2006, Mr. Frieder, on behalf of TSA, sent a letter to the landlord and its attorney advising that, "[b]ased upon our initial review of the extensive damage to the premises and common areas, we believe that [the threshold of 35% or more of the then – total reconstruction cost of the premises and common areas] will be met, and as a result, tenant has the right to elect to terminate the lease within 60 days from the date of the casualty." (Mavelle

8

Declaration, par. 18; Exhibit B to Mavelle Declaration; Complaint, par 7; Exhibit C to Complaint; Answer, par. 7.)

32.     By letter dated March 29, 2006, the landlord's attorney, David Rolf, advised TSA that Jones-Blythe had "provid(ed) an opinion as to the extent of the damage to the premises leased to Sports Authority.  As you can see from this estimate, the damage does not exceed the 35% threshold. . . ."  Mavelle Declaration, par. 19; Complaint, pars. 8-10;  Exhibit E to the Complaint; Answer, pars. 8-10.)

33.     A copy of the Jones-Blythe "estimate," also dated March 29, 2006, prepared by Mark A. Sorensen, was included with Mr. Rolf's letter.  (Mavelle Declaration, par. 19; Exhibit D to Mavelle Declaration; Exhibit E to the Complaint.)

34.     Rather than detailing reconstruction costs as a percentage of the then-total reconstruction cost, Mr. Sorensen analyzed the proportion of damage to various physical components of TSA's  leasehold.  (Sorensen Deposition, p. 12, 15-22.)

35.     On March 29, 2006, Mr. Sorensen had no opinion as to the then-total replacement costs of TSA's leasehold.  (Sorensen Deposition, p. 15.)

36.     On March 29, 2006, Mr. Sorensen had no cost estimates to repair the damage to or reconstruct TSA's leased premises as a result of the casualty. (Sorensen Deposition, p. 22-24.)

37.     On March 29, 2006, Mr. Sorensen was aware of neither the "Construction Provisions" of the lease nor TSA's specifications and requirements for the leased premises as incorporated in the "Construction Provisions" and did not take them into account at any time. (Sorensen Deposition, p. 34-35.)

38.     Not withstanding his lack of knowledge as to the then-total reconstruction costs of TSA's leasehold and as to the costs of reconstruction of the damaged components of the

9

leasehold, Mr. Sorensen issued an opinion, based upon his "gut feel[ing]," that the damage would "not exceed 30% of the total replacement cost of the premises." (Sorensen Deposition, p. 25.)

39.     As part of its damage assessment process, in late March, 2006, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs for TSA's leasehold as a result of the tornado.  (Wolford Deposition, p. 5-8; Mavelle Declaration, par. 20; Cashman Declaration, par. 14.)

40.     For more than 20 years, Mr. Wolford has worked on construction of TSA "big box" stores.  (Wolford Deposition, p.7-16.)  For the past 2½ years, he has owned and operated a business constructing retail big box stores, primarily TSA stores. (Wolford Deposition, p. 14.)

41.     On behalf of his then employer, Mr. Wolford provided a bid in 2001 in connection with the original construction of the TSA premises at the shopping center but was not selected for that project.  (Wolford Deposition, p. 22.)

42.     At TSA's request, Mr. Wolford prepared a budget estimate of the reconstruction of TSA's leased premises.  (Wolford Deposition, p.8-9; Mavelle Declaration, pars. 20, 21; Cashman Declaration, pars. 14, 15.)

43.     Based upon the original Wolford budget estimate,[5] on May 1, 2006, TSA, by Mr. Frieder, prepared an estimate of the total building replacement costs and the repair costs of its leased premises.  (Mavelle Declaration, par. 21; Exhibit E to Mavelle Declaration; Complaint, par. 9; Exhibit E to Complaint.)

---

[5]   Mr. Wolford revised his estimates several times based upon site review and acquisition of additional information.  (Wolford Deposition, p. 24-35.)  Those modifications affect neither the analysis nor the outcome.

60169293v1 868372

44.    TSA estimated that the then total building replacement costs equaled $1,960,067, thirty-five percent of which is $686,023.  (Mavelle Declaration, par. 22; Cashman Declaration, par. 16; Wolford Deposition, p. 33.)

45.    Although the landlord, possessed no actual or estimated cost of either the then-total replacement costs or the repair costs on March 29, 2006 (Sorensen Deposition, p. 15), the landlord's contractor, by Mr. Sorensen, now agrees that $1,960,067.00 was a reasonable estimate of the then-total replacement costs.  (Sorensen Deposition, p. 43-44.)

46.    TSA estimated that the estimated repair cost of the leased premises, including the Cotton fees of $319,428, was $1,046,701, or 53.4% of the then-total replacement costs. (Mavelle Declaration, pars. 23-25; Exhibit E to Mavelle Declaration; Cashman Declaration, par. 17.)

47.    Based upon its cost assessments and analysis, TSA determined that its termination right under the lease was triggered and elected to exercise that option.  (Mavelle Declaration, par. 26; Cashman Declaration, par. 18.)

48.    By letter dated May 3, 2006, less than 60 days after the casualty, TSA, by Mr. Frieder, served notice upon the landlord that TSA was terminating the lease in accordance with Section 15(h) thereof.  (Complaint, par. 9; Answer, par. 9; Exhibit D to Complaint, Mavelle Declaration, par. 27;  Exhibit F to Mavelle Declaration; Cashman Declaration, par. 19; Exhibit D to Cashman Declaration.)

**E.    Reconstruction Of The Premises And Estimated And Actual Costs Of Repair**

49.    As noted above, on May 1, 2006, the estimate of the then total replacement costs of TSA's premises was $1,960,067.00, and the amount to trigger TSA's option to terminate the lease was $686,034.00.

50.    Jones-Blythe began its reconstruction or repair activities on the premises on March 14 or March 15, 2006.  (Sorensen Deposition, p. 36.)

51.    Although Jones-Blythe anticipated completion of its reconstruction or repair of the premises by June 1, 2006, more than 60 days after the date of the casualty, all reconstruction and repair to the premises were not completed as of October 22, 2007.  (Sorensen Deposition, p. 37-42.)

52.    In the second to last or last week of May, 2006, more than 60 days after the date of the casualty, Arthur Seppi directed Jones-Blythe to discontinue its reconstruction and repair efforts of the TSA store in Springfield.  (Sorensen Deposition, p. 37, 42.)

53.    Flooring materials, tenant improvements, certain electrical issues with respect to the teller counters, junction boxes and blanking or trimming of floor electrical boxes, plumbing (no hot water and no installed urinals), fire safety ceiling panels, and the installation of fire extinguishers had not been supplied or completed at TSA's leased premises by June 1, 2006, more than 60 days after the date of the casualty.  (Sorensen Deposition, p. 37-42.)

54.    Jones-Blythe did not take any tenant specifications into account during its reconstruction activities.  (Sorensen Deposition, p. 35.)

55.    For its unfinished work of reconstruction and repair of the TSA premises in Springfield, Jones-Blythe's actual costs were $321,384.00.  (Sorensen Deposition, p. 57-58.)

56.    In addition, the Landlord paid, estimated, or possessed an estimate of the following costs, considered to be an appropriate cost of reconstruction or repair:

    (a)    flooring materials              $114,800

    (b)    architectural and engineering costs   $   9,410

    (c)    roofing insulation           $  86,038

60169293v1 868372

  (d)  store front and glass     $ 18,506

      TOTAL       $228,854

(Sorensen Deposition, p. 58-60.)

  57.  Jones-Blythe's bill for its unfinished work ($321,384 – see par. 55) plus the additional actual or estimated costs attributable to SWPlaza ($228,854) (see par. 56) total $550,238, or 28.1% of the estimated then-total replacement costs of TSA's leased premises in Springfield.  (Sorensen Deposition, p. 60.)

  58.  Although all work performed by Cotton USA at TSA's premises in Springfield, Illinois, would not properly be considered a repair or reconstruction activity, some of these efforts would be properly deemed repair or reconstruction.  (Sorensen Deposition, p. 45-46; Sorensen's Expert Witness Report attached as Exhibit 5 to the Sorensen Deposition; Wolford Deposition, p. 41-47.)

  59.  Among the services provided by Cotton at TSA's leased premises were the following:

  (a)  drying of premises;

  (b)  cleaning and removing debris;

  (c)  removing standing water;

  (d)  removing sheet rock;

  (e)  removing all rubberized aisles with scrapers and flooring material;

  (f)  removing and discarding effected insulation;

  (g)  removing and discarding all commercially glued down carpet; and

  (h)  scraping remaining glue from slab.

(Mavelle Declaration, par. 24.)

60169293v1 868372

60.     Cotton's bill to TSA included these services, and TSA has paid the Cotton bill. (Mavelle Declaration, pars. 23-24.)

61.     The activities listed in paragraph 59 hereof are appropriately deemed part of repair and reconstruction of TSA's premises in Springfield, Illinois, and costs associated with those activities should be included in the calculation of the repair and reconstruction costs of TSA's premises in Springfield, Illinois.  (Sorensen Deposition, p. 60-69.)

62.     Plaintiff and plaintiff's contractor have not included the following repair and reconstruction activities in calculating the estimated or actual costs of repair or reconstruction of TSA's leased premises in Springfield, Illinois:

     (a)     the unfinished items (par. 53 hereof);

     (b)     tenant specifications as required by the lease (par. 54 hereof); and

     (c)     the Cotton services it agrees should be considered part of repair or reconstruction (pars. 59-61 hereof).

63.     Mr. Wolford has estimated that the TSA premises in Springfield, Illinois has sustained direct costs damages of $743,944.  (Wolford Deposition, p. 44-46; Wolford Expert Witness Report, attached as Exhibit 1 to Wolford Deposition.)

64.     In addition, Mr. Wolford has estimated that $118,211 of the costs of Cotton USA should be considered as costs of repair or reconstruction.  (Wolford Deposition, p. 44-46, 83; Wolford Expert Witness Report, attached as Exhibit 1 to Wolford Deposition.)

**F.     TSA's Rental and Utility Payments for Dates Subsequent to the Termination of the Lease**

65.     TSA had paid rent to the Landlord for its leasehold in Springfield, Illinois, for the period March 12, 2006, through May 31, 2006, in the amount of $95,662.05.  (TSA's Answer to Interrogatory No. 3 propounded by Plaintiff and documents referenced therein.)

60169293v1 868372

66.    TSA had paid for utility services provided to its leasehold in Springfield, Illinois, for periods after March 12, 2006, in the amount of $9,608.60.  (TSA's Answer to Interrogatory No. 3 propounded by Plaintiff and documents referenced therein.)

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, and affidavits disclose that there is no dispute about material facts and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c);  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *King v. Preferred Technical Group,* 166 F.3d 887, 890 (7th Cir. 1999); *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Derrico v. Bungee International Manufacturing Co.,* 989 F.2d 247, 250 (7th Cir. 1993).  A genuine issue of material fact is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Johnson v. university of Wisconsin–Eau Claire,* 70 F.3d 469, 477 (7th Cir. 1995).  Rather, a genuine issue of material fact precluding summary judgment exists only if there is sufficient evidence favoring the nonmoving party enabling the fact-finder to return a verdict for that party. *Szymanski v. Rite-way Lawn Maintenance Co., Inc.,* 231 F.3d 360, 364 (7th Cir. 2000).

In order to defeat a motion for summary judgment, the non-movant must present some evidence which would arguably entitle it to judgment.  Conversely, the absence of evidence supporting any essential element of which a plaintiff carries the burden of proof will entitle defendant to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548,

60169293v1 868372

2554, 91 L.Ed.2d 265 (1986); *Hottenroth v. Village of Slinger,* 388 F.3d 1015, 1027 (7th Cir. 2004).   A non-movant cannot survive summary judgment "with merely a scintilla of evidence supporting its position.   (Citation omitted.)   '[A] party will be successful in opposing summary judgment only when they *present definite, competent evidence to rebut the motion.*'"  *Szymanski,* 231 F.3d at 364, quoting *Smith v. Severn,* 129 F.3d 419, 427 (7th Cir. 1997) (emphasis added).

A federal court sitting in diversity (28 U.S.C. §1332) must apply the substantive law of the forum state.   *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc.,* 313 F.3d 385, 390 (7th Cir. 2002), *cert. denied,* 540 U.S. 1068, 124 S.Ct. 803, 157 L.Ed.2d 732 (2003).   Consequently, Illinois contract law governs this matter,[6] and under Illinois law, contract interpretation is appropriate for disposition by summary judgment.   *ECHO, Inc. v. Whitson Co., Inc.,* 52 F.3d 702, 705 (7th Cir. 1995) (subsequent history omitted).

In this matter, Plaintiff has not and cannot present relevant, definite, and competent evidence to support its position.   The undisputed evidence, shows that TSA's option to terminate the Lease was triggered and that TSA strictly complied with the requirements of the option and the exercise thereof.   Accordingly, TSA is entitled to judgment as a matter of law.

---

[6]   In a diversity case, the federal court also applies the choice-of-law rules of the forum state.  *Hinc v. Lime-O-Sol Company,* 382 F.3d 716, 719 (7th Cir. 2004).   Although Illinois law provides that a court should give effect to the parties' choice of law (*Newell Co. v. Petersen,* 325 Ill.App.3d 661, 686, 758 N.E.2d 903, 922, 259 Ill.Dec. 495, 514 (2nd Dist. 2001), *appeal dismissed,* 199 Ill.2d 558, 775 N.E.2d 3, 266 Ill.Dec. 441 (2002)), Section 36(i) of the Lease states that the "Lease shall be construed in accordance with the Laws of the State . . . ," but fails to designate the name of the state.   In the absence of a valid choice of law provision, Illinois employs the "most significant contacts" test set forth in the Restatement (Second) of Conflicts §188 (1971).   *Costello v. Liberty Mutual Fire Insurance Co.,* 376 Ill.App.3d 235, 240-41, 876 N.E.2d 115, 121, 315 Ill.Dec. 115, 121 (1st Dist. 2007).   Under that test, the contacts relevant to the decision include the places of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties.   *Hinc,* 382 F.3d at 719.   On balance, the factors favor the law of Illinois, and TSA is applying Illinois law herein.

16

## ARGUMENT

## IN THAT TSA LAWFULLY TERMINATED
## THE LEASE, THERE CAN BE NO BREACH

**A.    Rules Governing the Construction of the Lease**

In order to recover under a claim for breach of a lease, Plaintiff must establish:  1) the existence of a valid and enforceable contract; 2) performance by Plaintiff of all required conditions; 3) breach of the contract by Defendant; and 4) damages.  *Burrell v. City of Mattoon,* 378 F.3d 642, 651 (7th Cir. 2004); *Zirp-Burnham, LLC v. E. Terrell Associates, Inc.,* 356 Ill.App.3d 590, 600, 826 N.E.2d 430, 439, 292 Ill.Dec. 289, 298 (1st Dist. 2005).  In the matter *sub judice,* Plaintiff possesses no competent evidence on all requisite elements.  Specifically, there is a complete void of evidence showing that TSA failed to perform under the Lease as it was obligated.  Rather, the relevant and competent evidence incontrovertibly establishes that TSA's option to terminate the Lease, as set forth in Section 15(b) thereof, had matured and that TSA strictly conformed with the contractual requirements to exercise its option.

The rules governing the construction and enforcement of leases are the same as those for other contracts.  *See Nutrasweet Company v. American National Bank and Trust Company of Chicago,* 262 Ill.App.3d 688, 694, 635 N.E.2d 440, 444, 200 Ill.Dec. 101, 105 (1st Dist. 1994, *appeal denied,* 157 Ill.2d 505, 642 N.E.2d 1285, 205 Ill.Dec. 168 (1994); *Walgreen Co. v. American National Bank & Trust Company of Chicago,* 4 Ill.App.3d 549, 554, 281 N.E.2d 462, 466 (1st Dist. 1972).  The construction and legal effect of a lease are questions of law for the court to determine.  *Home Ins. Co. v. Chicago Northwestern Transp. Co.,* 56 F.3d 763, 767 (7th Cir. 1995); *Fleet Business Credit, LLC v. Enterasys Networks, Inc.,* 352 Ill.App.3d 456, 469, 816 N.E.2d 619, 629, 287 Ill.Dec. 652, 662 (1st Dist. 2004); *Plambeck v. Greystone Management & Columbia National Trust Co.,* 281 Ill.App.3d 260, 266, 666 N.E.2d 670, 673, 217 Ill.Dec. 1, 4

17

(1st Dist. 1996).   In construing a lease, the primary objective is to ascertain the intent of the parties, which must be determined, if possible, from the language of the lease.  The words should be given their common and generally accepted meaning.  *Chicago Housing Authority v. Rose,* 203 Ill.App.3d 208, 216, 560 N.E.2d 1131, 1136, 148 Ill.Dec. 534, 539 (1st Dist. 1990); *Chicago Title and Trust Company v. Northwestern University,* 36 Ill.App.3d 165, 168, 344 N.E.2d 52, 55 (1st Dist. 1976).

Where the language of a lease is ambiguous, however, the court may consider the position of the parties, the surrounding circumstances which existed at the time of the execution of the lease and the facts in connection with it.  "Where there is any doubt or uncertainty as to the meaning of the language used in a lease it should be construed most strongly against the lessor and in favor for the lessee."  *Nutrasweet Company,* 262 Ill.App.3d at 695, 635 N.E.2d at 445, 200 Ill.Dec. at 106; *see also Chicago Housing Authority,* 203 Ill.App.3d at 216, 560 N.E.2d at 1136, 148 Ill.Dec. at 539.  Moreover, doubts and ambiguities should be construed against the party that drafted the lease.  *Scoville Court Condominium Association v. Orozon,* 171 Ill.App.3d 932, 935, 525 N.E.2d 1109, 1110, 121 Ill.Dec. 802, 803 (1st Dist. 1988); *First National Bank of Elgin v. G.M.P.,* 148 Ill.App.3d 826, 830, 499 N.E.2d 1039, 1042, 102 Ill.Dec. 259, 262 (2nd Dist. 1986).  No contract may be interpreted to product absurd results or to render a provision meaningless.  *U.S. v. Burnett,* 415 F.3d 690, 692 (7th Cir. 2005); *Rubin v. Laser,* 301 Ill.App.3d 60, 68, 703 N.E.2d 453, 459, 234 Ill.Dec. 592, 598 (1st Dist. 1998).

Leases often provide that one or both of the parties to the lease has a right to cancel or terminate the lease before the time fixed for its expiration.  Milton R. Friedman and Patrick A. Randolph, Jr., *Practicing Law Institute, Friedman on Leases,* §21:1 (1997).

> A lease may also by its terms be made terminable before the
> expiration of the term stated thereon at the option of one of the

parties, and the lease may provide that such option may be exercised on the happening of certain conditions or contingencies. (Citations omitted.)   Such provisions must be constructed in accordance with their import, and the option must be exercised in the manner provided in the lease.   On the happening of the conditions or contingencies so stipulated the right to terminate the leasehold becomes absolute.

*Associated Cotton Shops, Inc. v. Evergreen Park Shopping Plaza of Delaware, Inc.,* 27 Ill.App.2d 467, 473-74, 170 N.E.2d 35, 37 (1st Dist. 1960).  Leases with options to cancel are known as "terminable tenancies."  *Cox v. Grant,* 57 Ill.Dec. 474, 476 (5th Dist. 1978), citing Restatement (second) of Property, Landlord & Tenant §§1-7, 2-5 (1976).[7]

An option to terminate a lease for a term of years is subject to the rule of strict compliance, *i.e.,* it must be construed in accordance with the terms of the lease and exercised in the manner provided in the lease.  *Thomson Learning, Inc. v. Olympia Properties, LLC,* 365 Ill.App.3d 621, 627, 850 N.E.2d 314, 320, 302 Ill.Dec. 877, 883 (2nd Dist. 2006), *appeal denied,* 221 Ill.2d 675, 857 .E.2d 684, 306 Ill.Dec. 285 (2006); *MXL Industries, Inc. v. Mulder,* 252 Ill.App.3d 18, 27-28, 623 N.E.2d 369, 378, 191 Ill.Dec. 124, 131 (2nd Dist. 1993).  The doctrine of substantial performance has no application to options to cancel a lease, and if the exercise of an option varies in any way from the terms of the agreement, it is ineffective.

At the same time, where an option to terminate is ambiguous, it is to be construed in favor of the party possessing the option.   49 Am.Jur.2d, Landlord and Tenant, Section 222 (1995).  Moreover, the motive of tenant in exercising an option to terminate a lease is wholly irrelevant to whether the exercise was legally valid.  *Plambeck,* 281 Ill.App.3d at 267, 666

---

[7]   "A tenancy terminable at the option of one of the parties to the lease on the occurrence of an event traditionally has been referred to as a term of years subject to a condition subsequent, or a periodic tenancy subject to a condition subsequent."  Restatement (Second) of Property:  Landlord & Tenant §1.7, cmt. e(1977).  Presently, use of the terms "condition precedent" and "condition subsequent" are not favored and have been criticized as confusing.  Restatement (Second) of Contracts §224, Reporter's Note (1981).

19

N.E.2d at 674, 217 Ill.Dec. at 5 (a tenant's "impure motives" cannot figure into a court's analysis of the effectiveness of the exercise of a termination right).

The application of the above-cited rules to the undisputed facts yields one, inexorable conclusion: TSA is entitled to judgment as a matter of law.

**B.    TSA's Lawful Exercise of Its Option to Terminate**

The Lease at issue was for a specific time unless circumstances described in the Lease occurred which would allow a party to cancel it before the stated expiration. Ordinarily, the issue of  whether conditions existed allowing a party an early termination is a question of fact.[8] *Presbyterian Distribution Service v. Chicago National Bank,* 28 Ill.App.2d 147, 155, 171 N.E.2d 86, 90 (1st Dist. 1960). In this matter, however, all competent evidence manifests that a casualty[9] occurred on March 12, 2006; that the casualty caused damage to TSA's leasehold; that TSA in good faith reasonably calculated that the repair costs of the damage exceeded 35% of the then-total replacement cost triggering its termination right; that, prior to the expiration of TSA's option, the Landlord provided an opinion relating to a percent of damage to physical components rather than the lease formula of a percent of the aggregate reconstruction costs; and that TSA strictly complied with the stipulations set forth in the Lease for the exercise of its option to terminate.

Section 15(b) of the Lease does not specify the manner by which the 35% threshold has been met, nor does it specify which party shall make the determination. Since Section 15(b) clearly states that termination is at the Tenant's election, the only reasonable interpretation of the Lease is that TSA, as the tenant, as the non-drafting party, and as the party with the option, was

---

[8]    Since a jury has not been requested by either party, the court will serve as the fact finder.

[9]    The term "casualty" for purposes of a lease termination provision has been defined as an event that comes without design or without being foreseen or a contingency which may or may not occur. *Miland v. Meiswinkel,* 82 Ill.App.522, 1898 WL 3166 (1st Dist. 1898).

60169293v1 868372

empowered to determine whether its termination right had matured, a judgment which is subject to a good faith and reasonableness standard.[10]  In making its assessment, TSA was governed by the formula set forth in Section 15(b) of the Lease ("destruction or damage to the Premises. . . which has a repair or reconstruction cost of thirty-five percent (35%) or more of the then-total reconstruction cost"),[11] and the objective and relevant evidence available to it within the time allotted by the Lease for exercise of the option.  Under Section 15(b), TSA had to make its assessment and notify the Landlord of the exercise of its termination right within 60 days of March 12, 2006.

On May 1, 2006, TSA estimated that the total repair costs of its premises as a result of the casualty was $1,046,701, or 53.4% of the estimated then-total reconstruction costs of $1,960,067.  (SOF No. 46.)  That estimated repair cost includes $319,428, which TSA paid to Cotton for disaster relief services.  If the total of Cotton's fees are subtracted from $1,046,701 repair estimate, the remainder is $727,273 or 37.1% of the aggregate reconstruction cost, still over the 35% threshold.  It must be emphasized, however, that even the Landlord's contractor and expert agrees that certain work performed by Cotton would properly be considered repair or reconstruction activities, the cost of which should be included in the calculation of repair cost. (SOF No. 58.)  Mr. Wolford has estimated that $118,211 represents the proper portion of the total Cotton costs to be considered as costs of repair or reconstruction.  (SOF No. 64.)[12]

---

[10]  Under Illinois law, the covenant of good faith and fair dealing is applicable to all contracts, including leases, and requires a party to a contract to exercise discretion reasonably.  *See LaSalle Bank National Association v. Moran Foods, Inc.*, 477 F.Supp.2d 932, 937 (N.D. Ill. 2007); *See Northern Trust Co. v. VIII South Michigan Associates,* 276 Ill.App.3d 355, 367, 657 N.E.2d 1095, 1104, 212 Ill.Dec. 750, 759 (1st Dist. 1998).

[11]  Repair or reconstruction cost is the measure of reasonable cost allowed to restore a building to the same condition in which it existed before the destruction.  *See Peet v. Dolese & Shepard Co.,* 41 Ill.App.2d 358, 368, 190 N.E.2d 613, 618 (2nd Dist. 1963).

[12]  During the course of this litigation, TSA again retained Mr. Wolford to analyze the reconstruction costs from the perspective of a year after the casualty.  His expert report is included with his deposition.  In his post-suit analysis, Mr. Wolford concluded that the Premises sustained $743,944.00 in "direct reconstruction costs" (38% of $1,960,067.00), but also opined that "certain services, projects, and tasks performed by Cotton USA must be considered as part of the legitimate costs of reconstruction. . . [as a] necessary component to restore the premises to their condition before the tornadoes of March 12, 2006, or were a necessary prerequisite to construction."  If TSA had not acted to stabilize and secure the Premises with Cotton's services, the responsibility to procure those services and to undertake them would have fallen to the

60169293v1 868372

The TSA estimate of May 1, 2006, based upon Mr. Wolford's budget estimate (SOF Nos. 42-44), constituted the only reasonable and relevant information TSA had within its 60-day window to exercise the option regarding whether the 35% threshold had been met and its termination right matured. Based upon its objective analysis of the aggregate reconstruction costs and repair costs, TSA reasonably concluded that the 35% threshold was easily satisfied, and, accordingly, TSA legally and effectively terminated the Lease.

Although not controlling, this point can be illustrated by cases from Illinois' sister states. In *Al-Madinah Petroleum, Inc. v. Mahsa, Inc.,* 529 S.E.2d 662 (Ga.App.Ct. 2000) (subsequent history omitted), each party to a 20 year lease had the right to cancel it if the leased premises were damaged to the extent of 50% or more of the monetary value of the premises. After a tornado damaged the property, only one party presented evidence as to the extent of the damage. The court held that "[t]he evidence shows without dispute that damage to the building exceeded the specified threshold." *Id.* at 572.

Similarly, *Molofsky v. Sigal*, 54 S.E. 2d 865 (Va. 1949), the tenant held an option to terminate a lease if repairs from fire damage could not be completed within 90 days of the fire. The court held that a tenant could rely upon the undisputed testimony from a contractor it had retained who opined to the effect that more than 90 days would be required to complete the repairs.

As noted above, the Landlord did provide TSA with an "estimate" of damages before the 60-day window expired. Neither that estimate nor evidence of the costs compiled after the expiration of the 60-day window are competent and relevant for purposes of determining the validity of TSA's termination. The only evidence available to TSA within the 60-day window

Landlord in order to perform and complete the reconstruction. Cotton's costs attributable only to preserving or removing TSA's inventory or fixtures should not be included in calculating reconstruction costs.

60169293v1 868372

was the estimate prepared by it using Mr. Wolford's budget. Because TSA was justified in using that evidence, its termination rights matured, and it properly served notice of termination as required by the Lease, thereby concluding its duties to the Landlord.

**C.    The Landlord's Erroneous Estimate and Purported "Actual" Costs**

Under Rule 401 of the Federal Rules of Evidence, relevant evidence is that evidence which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant scientific, technical, or other expert testimony is admissible if it, *inter alia,* is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts. Fed.R.Evid. 702. In addition, an expert's opinion must be sufficiently tied to or "fit" the facts of the case, *i.e.,* there must be a valid connection to the pertinent inquiry. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591-92, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (expert opinions must be relevant and reliable). Although these rules govern the admissibility of evidence, they are useful in demonstrating that Mr. Sorensen's estimate of March 29, 2006, is wholly incompetent[13] and that the Landlord's use of the "actual" costs incurred in reconstruction is equally flawed.

As noted above, the only estimate of damage provided by the Landlord to TSA before TSA exercised its termination right was that of Mr. Sorensen. (SOF Nos. 32-33.) That "estimate" was not useful. Rather than analyzing the damage in terms of costs with reference to a percent of the aggregate reconstruction costs, as required by Section 15(b), it referred only to the percent of various physical components that were damaged, a clearly erroneous analysis. It

---

13    TSA is not impugning the credentials of either Mr. Sorensen or Jones-Blythe as contractors. Their statements in this litigation concerning the damage, however, are being challenged.

provided absolutely no information to support any calculation of the threshold as required by the Lease, and rather than employing an acceptable methodology in calculating the percent of the aggregate reconstruction costs, Mr. Sorensen merely went with his "gut feel[ing]." (SOF No. 38.) Clearly, nothing of value in terms of whether the threshold was met was provided to TSA by the Landlord within the 60-day window.

The Landlord is also relying upon Mr. Sorensen's testimony relating to Jones-Blythe "actual" costs for repair. That evidence, however, is defective in at lest two major ways. The actual construction was not completed within 60 days of the casualty. The Lease did not require TSA to wait until the Landlord completed reconstruction before making the election to terminate the Lease. Rather, it required TSA to exercise its option, if at all, within 60-days of the casualty. Since there was an express time period in which TSA could exercise its rights to terminate, the parties clearly contemplated that the determination as to whether the threshold was met would be based upon information developed before the expiration of the right. Otherwise, Section 15(b) would be rendered meaningless, a result the court must avoid.

Second, the purported "actual" costs of Jones-Blythe fail to take into account the unfinished items in the construction process, the tenant specifications as contractually required, and the Cotton repair or reconstruction services. (SOF No. 62.) Even without those items, the Landlord's incomplete analysis shows that the repair cost was 28.1% of the aggregate reconstruction cost, very close to the threshold.

Because Mr. Sorensen's pre-litigation "estimate" applied an erroneous analysis, TSA had no reason to consider it and certainly no obligation to rely upon it. Moreover, neither Mr. Sorensen's Rule 26 expert report nor his deposition testimony offer competent, relevant, and definite evidence to rebut this Motion. The absence of such evidence from Plaintiff, indicating

60169293v1 868372

that TSA inappropriately exercised its option to terminate, together with TSA's reasonable calculation of repairs, warrants summary judgment in favor of TSA.

**D.  TSA's Right to Recover Rent and Utilities Attributable to Periods after March 12, 2006**

A termination of the Lease due to casualty was effective as of the date of the casualty. (SOF No. 18.)  TSA's lawful termination of the Lease, therefore, became effective on March 12, 2006, the date of the casualty.  Since TSA paid $95,662.05 in rent for the period of March 12, 2006, through May 31, 2006, and $9,608.60 for utilities for a period of time after March 12, 2006, TSA is entitled to judgment from Plaintiff for those amounts, totaling $105,270.65.

**CONCLUSION**

A lease, like other contracts, regulates the conduct between the parties, in this case sophisticated business parties.  One of the terms of the Lease between the parties hereto was that the Tenant had the right to terminate the Lease upon the occurrence of certain events, *viz.,* damage from casualty of 35% or more of the aggregate reconstruction costs.  The only competent and definite evidence available in this case shows that TSA made a reasonable, good faith, and honest appraisal of the damage made a valid and legally effective decision to terminate the Lease, and strictly complied with all requirements to terminate the Lease.

60169293v1 868372

For the reasons and under the authorities presented herein, TSA prays that this Court enter summary judgment in its favor and against Plaintiff by declaring that TSA lawfully terminated the Lease and awarding TSA the sum of $105,270.65 plus its attorneys' fees and costs of suit.

Dated: December 31, 2007

Respectfully submitted,

TSA Stores, Inc, as successor to Gart Bros. Sporting Goods Company, A Delaware Corp.

BY: /s/Charles R. Schmadeke
        J. William Roberts, No. 2351714
        Charles R. Schmadeke, No. 2489813
        Hinshaw & Culbertson LLP
        400 S. 9th St., Suite 200
        Springfield, IL 62701
        Phone: 217-528-7375
        Fax: 217-528-0075
        E-mail: broberts@hinshawlaw.com
        E-mail: cschmadeke@hinshawlaw.com
        Attorneys for TSA Stores, Inc.

26

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION</u>

In accordance with CDIL-LR 7.1(B)(4), I hereby certify that the foregoing Memorandum of Law in Support of TSA's Motion for Summary Judgment complies with the type volume limitations set forth in said Rule.  The Memorandum contains 7214 words and 38086 characters.

/s/Charles R. Schmadeke

60169293v1 868372

CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2007, I electronically filed the Memorandum of Law in Support of TSA's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system that will send notification of such filing(s) to the following:

David A. Rolf         Email:  darolf@sorlinglaw.com
R. Lee Allen          Email:  rlallen@sorlinglaw.com

/s/Charles R. Schmadeke
J. William Roberts, No. 2351714
Charles R. Schmadeke, No. 2489813
Hinshaw & Culbertson LLP
400 S. 9th St., Suite 200
Springfield, IL 62701
Phone: 217-528-7375
Fax: 217-528-0075
E-mail: broberts@hinshawlaw.com
E-mail: cschmadeke@hinshawlaw.com
Attorneys for TSA Stores, Inc.

28

60169293v1 868372

3:06-cv-03177-JES-CHE    # 14-2    Page 1 of 3

E-FILED
Monday, 31 December, 2007  02:07:19 PM
Clerk, U.S. District Court, ILCD

### NOAA's National Weather Service Weather Forecast Office
# Central Illinois

## Springfield Tornadoes


*Tornadoes in Sangamon County, 1950 through 2005*

Between 8:20 and 8:30 PM on March 12, 2006, the city of Springfield, IL, was affected by a pair of F2-strength tornadoes. These tornadoes had a path nearly identical to the track of the 1957 F4 tornado (which killed 2 people, injured 50, and caused $2.5 million in damage).

Click below a radar animation of the storm in Sangamon County:

- Reflectivity image (887 KB)
- Storm Relative Motion image (1.2 MB)


Tornado #1 *(click image to enlarge)*

This tornado was on the ground for about 60 miles before it moved into Springfield.

The tornado crossed Interstate 72 near mile marker 92, around 8:20 PM. It entered the city of Springfield near Cockrell Lane and Constitution Drive, tracking to the east-northeast around 50 mph. The tornado was about 300 yards wide, and produced F2 damage to several businesses from Constitution Drive, through Parkway Pointe, to Veterans Parkway and Lindbergh Blvd.

The tornado widened to about 0.4 mile wide as it continued to track east-northeast south of Wabash Avenue, between Veterans Parkway and Chatham Road. The tornado widened further, to just over 1/2 mile wide from Westchester Blvd to the village of Jerome. The damage was rated as F2 along Wabash Avenue, between Chatham Road and MacArthur Blvd.

The tornado then weakened slightly, producing F1 damage, as it turned to the northeast, nearly parallel with the Norfolk & Southern Railroad tracks. The damage path remained nearly 1/2 mile wide. The width of the tornado decreased to about 1/4 mile wide as it strengthened again, and turned to the north-northeast near Iles Park and in the vicinity of Oak and Myrtle Streets, between 6th and 9th Streets. The damage was rated as F2 in these locations, with roofs blown off of homes and businesses, and garages severely damaged. This tornado dissipated just north of 9th Street and South Grand Avenue.

This first tornado was on the ground in the city of Springfield for nearly 5.5 miles, for approximately 6 minutes between 8:20 and 8:26 PM. The estimated wind speed with this F2 tornado in the city was around 120 mph.

---

## EXHIBIT A

3:06-cv-03177-JES-CHE    # 14-2    Page 2 of 3



**Tornado #2** *(click image to enlarge)*

A second tornado developed as the first tornado was dissipating, around 8:25 PM. This tornado touched down about 1/4 mile north of the Bunn Park golf course, and tracked to the northeast. The strongest damage was bounded by 15th Street, Cornell Avenue, South Grand Avenue, and Pope Avenue. Several homes had roofs torn off, with extensive damage to power poles and lines, along with numerous downed trees.

The tornado continued to track northeast across Old Rochester Road, Singer Avenue, and Cook Street from White City Blvd. to a block east of Dirksen Parkway. The torando crossed I-55 at the Clear Lake Avenue interchange, and overturned a semi truck. This tornado dissipated near Old Route 36, about 3/4 mile southwest of the Village of Clear Lake.

This second tornado was on the ground for nearly 4 miles, for approximately 5 minutes between 8:25 and 8:30 PM. The estimated wind speeds with this tornado were also around 120 mph.

---

**Pictures** *(click images to enlarge):*

| | | |
|---|---|---|
| Parkway Pointe | Parkway Pointe | Cockrell Lane |
| Lindbergh Blvd. | Wabash Ave. | Wabash Ave. |
| Wabash Ave. | Wabash Ave. | Wabash Ave. at Chatham Rd. |
| Near Iles Park | Wheeler Ave. | Cedar St. |
| South Grand Ave. | Jerome *(photo by John McIntyre)* | Chatham Rd *(photo by State Journal-Register)* |

3:06-cv-03177-JES-CHE    # 14-2    Page 3 of 3



East Side *(photo by State Journal-Register)*



Lowell Ave *(photo by State Journal-Register)*



Parkway Pointe

More photos are available at the State Journal-Register's website (www.sj-r.com).

**Event Links:** Overview | Long-Track Tornado | Springfield | Franklin/Loami | Eastern Sangamon Southern Logan | Greene/Scott #2 | Logan/Macon | Macon/De Witt | Radar&Satellite

NOAA's National Weather Service
Central Illinois Weather Forecast Office
1362 State Route 10
Lincoln, IL 62656
217-732-3089 (8:30 am to 4 pm weekdays)
Page Author: ILX Webmaster
Web Master's E-mail: w-ilx.webmaster@noaa.gov
Page last modified: June 1st 2006 2:03 AM