## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  06-3177 |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

### SWPLAZA III, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO BAR OPINION WITNESS

NOW COMES Plaintiff, SWPLAZA III, LLC (hereinafter "Landlord"), an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution (hereinafter "Landlord"), by and through its attorneys, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., David A. Rolf, of Counsel, and pursuant to Federal Rule of Evidence 702 and Local Rule 7.1, and for its Memorandum in Support of Its Motion to Bar Opinion Witness disclosure and testimony of Defendant, TSA STORES, INC.'s (hereinafter "Tenant") expert witness, Jeffrey Wolford, states as follows:

### Introduction

Under Federal Rule of Evidence 702, a witness qualified as an expert may testify if "(1) the testimony is based upon sufficient facts or data, … (3) the witness has applied the principles

and methods reliably to the facts of the case." Federal Rule of Evidence 702. The Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. The court further clarified in <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), that the gatekeeper function applied to all expert testimony and not just testimony based in science. Following these decisions, Federal Rule of Evidence 702 was amended to define the court's role as gatekeeper and provide some general standards that the trial court must use to assess the reliability and helpfulness of the proposed expert testimony.

At issue is whether the cost of repairs to the Premises exceeds 35% of the total then reconstruction cost of the Premises, pursuant to Paragraph 15(b) of the Lease, a copy of which paragraph is attached as **Exhibit 1**. Tenant has disclosed Mr. Wolford as offering an opinion on those costs. His Rule 26(a)(2) disclosure is attached as **Exhibit 2**. The transcript of Wolford's October 30, 2007 deposition is attached as **Exhibit 3**.

**I.     Mr. Wolford's opinion is not based on the facts necessary.**

Federal Rule of Evidence 702(1) requires the expert testimony be based upon facts or data. In determining whether the testimony is based upon fact, the court should consider the sufficiency of the data that the expert relies upon in reaching his opinion. Federal Rule of Evidence 702 (2007). Therefore, one question is whether the expert considered enough information to make the proffered opinion reliable. <u>See</u> <u>Zenith Elecs. Corp. v. WH-T Broad. Corp.</u>, 395 F.3d 416 (7th Cir. 2005). Included in the analysis under Federal Rule of Evidence 702(1) is whether the expert considered the pertinent, physical, eyewitness evidence. <u>Id.</u> (holding that existing data should be considered and opinions using that data should be based upon more that just the *ipse dixit* of the expert).

In <u>Ancho v. Pentek Corp.</u> expert testimony was excluded where the expert did not view the piece of equipment he was opining on, nor the site at which the injury causing the damage occurred. 157 F.3d 512, 516 (7th Cir. 1998). The expert was not qualified as any opinions he proffered were not based upon sufficient facts that may have been obtained by visiting the site. <u>Id.</u> Additionally where the court did allow testimony, the court noted that the testimony passed the Daubert Test in that the opinions were based upon facts observed when the expert visited the property he was evaluating prior to proffering an opinion as to the value of the property. <u>In re Salem</u>, 465 F.3d 767, 777 (7th Cir. 2006).

Tenant's expert, Mr. Wolford, offered opinions in his report and deposition as to an estimate for repair of the damage to the Premises without considering all of the pertinent facts, or even bothering to view the damage to the Premises before offering an opinion concerning the extent of damage and cost of repair. Because Mr. Wolford's opinions are not based upon sufficient facts, Mr. Wolford's report should be stricken and he should be excluded from testifying.

A timeline of the events involving Mr. Wolford and the Tenant's decision to termination the Lease in this case proves telling.

| | | |
|---|---|---|
| 03/12/06 | Tornado | |
| 03/23/06 | Tenant "considering" termination – **Exhibit 4** | |
| 03/29/06 | Landlord response – less than 35% damaged – **Exhibit 5** | |
| 04/22/06 | Tenant terminates employees – told not reopening – **Exhibit 6** – Interrogatory Answer No. 10 | |
| 04/26/06 | Tenant responds to Landlord contractor's carpet inquiry – available on one weeks notice – **Exhibit 7** | |
| 04/26/06 | Tenant (not Wolford) makes up budget estimate "on the high side" to "start of the negotiations" – **Exhibit 8** | |
| 04/26/06 | Wolford admits site visit needed for "comprehensive scope" Tenant replies a lot of work already done – admits questions by Wolford – **Exhibit 9** | |
| 04/28/06 | Landlord update to Tenant of repair completion dates – **Exhibit 10** | |

| | |
|---|---|
| 05/01/06 | Tenant adds three items to 4/26/06 Budget Estimate and labels as prepared by Wolford – **Exhibit 11** |
| 05/02/06 | Tenant asks Wolford to view Premises – **Exhibit 2, p. 3** |
| 05/03/06 | Tenant notice of termination, with 5/1/06 Budget Estimate of Repair – **Exhibit 12** |
| 05/04/06 | Wolford visits site |
| | Told he may need to misrepresent who he is – **Exhibit 13** |
| 05/05/06 | Landlord rejects notice of termination |
| 05/07/06 | Wolford revised estimate – **Exhibit 14** |

What we learn from this timeline is that the Tenant's decision to terminate the Lease was made for certain by April 22, 2006 when, by its own admission in answers to interrogatories, it terminated employees and told them it would not be re-opening. (Exhibit 6). It terminated the employees, despite not having given notice to the Landlord, and in fact without any report from Mr. Wolford. Despite this notice to employees, on April 26th, the Tenant was representing to the Landlord's contractor who was undertaking the repairs, that the floor covering could be ready on a week's notice, rather than informing the contractor that it was terminating the Lease. (Exhibit 7). In addition, Tenant began its efforts to concoct a "budget estimate" to exceed the 35% threshold. It was the Tenant, not Mr. Wolford-the expert, who came up with the budget estimate. The Tenant purposefully did so to be on the "high side" to allow for "negotiation". (Exhibit 8).

Very telling is Wolford's reply e-mail. He inquires if Tenant needs him to go to Springfield "if you need a more comprehensive scope". (Exhibit 9). Wolford, the expert knows that a site visit is essential to lend any reliability to the budget estimate. Even Tenant, in its reply, acknowledges:

1.    It might be helpful.
2.    Although a lot of work is already done (by April 26).
3.    Needs to get the costs as close as possible.
4.    A visit would "crystallize" the questions that the expert-Wolford had.
(Exhibit 9).

Despite that, on May 1, 2006 the Tenant actually put together a report purportedly from Mr. Wolford. It is that report then the Tenant attached to its May 3, 2006 notice to the Landlord that it was terminating the Lease. (Exhibit 12). This notice was sent on May 3rd with the May 1st report despite the fact, and with knowledge by the Tenant that Mr. Wolford had never in fact visited the site, and Wolford had questions that could only be answered by a site visit.

Mr. Wolford's first visit and only visit to the site did not come until May 4, 2006, after Tenant had already terminated the Lease. At that point in time, the repairs had been substantially completed. Thus, it was impossible for Mr. Wolford to arrive at an accurate understanding of the amount of damage to the building, or as to the scope of repairs that were necessary, or even the amount of repairs that had been done given their state of completion by May 4, 2006. Interestingly enough, however, upon completing such visit, Mr. Wolford was able to determine that the May 1st estimate as originated by the Tenant, and on which the Tenant based its' decision to terminate the Lease, was substantially wrong in a great number of areas. To begin with, nine of the categories of repairs identified in various line items of Tenant's May 1st budget estimate were deleted from Wolford's May 7th report. Likewise, eighteen other items changed in value apparently based on the site visit. Wolford's testimony concerning the changes lends nothing— he could provide no further explanation other than he redefined the scope many times. (Exhibit 3; Wolford's deposition at p. 77).

As stated in commentary to the Federal Rules of Evidence, "assume that an auto accident case plaintiff calls an accident reconstruction expert who testifies defendant must have been traveling over the speed limit. The expert bases her opinion entirely upon the extent of damage to the vehicle and admits that she did not measure the skid marks, consider the extent of the personal injuries, or examine any other physical evidence pertinent to estimating speed. This

opinion may be challenged under Rule 702(1) on the ground it was not based on sufficient facts or data." Clearly, Wolford's disclosure and opinions are not based on sufficient facts to be admissible under Federal Rule of Evidence 702.

## II.     Mr. Wolford's opinion is inconsistent with the methodology he espouses.

Rule 702(3) provides additional grounds to strike the testimony of Mr. Wolford, as he did not reliably apply the principles and methods to the facts in the case. In order to testify as an expert, the testimony must be based upon a reliable method. See Ervin v. Johnson & Johnson Inc., 492 F.3d 901 (7th Cir. 2007) (holding that while a witness may be qualified based upon knowledge, education and experience, where the methods used to arrive at the experts opinions are unreliable, the opinions should be excluded). Experts must adhere to the same standards of intellectual rigor that are demanded in their professional work. Kumho, 526 U.S. at 152.

According to Mr. Wolford's own admission, in his business as an estimator, he thinks it is important that there be a visit to the site to see what work needs to be done. Exhibit B contained in Tenant's Federal Rule of Civil Procedure 26(a)(2) report (attached as Exhibit 2) are actual documents submitted by its expert Wolford, then with Capitol Construction, in 2001 when bidding on the original construction of the Premises. The fifth page of Exhibit B contains Clarifications and Exclusions to Wolford's bid. In item 14 therein, Wolford states:

> 14.     All low bid subcontractors by request of Capitol Construction has performed a site visit prior to pricing.

Mr. Wolford explained why a site visit is required as part of his methodology in arriving at an estimate:

> Question:    I also notice on that page paragraph or item 14 you when you were with Capital Construction required all the subs to have done a site visit prior to them bidding to you?
> Answer:      That's correct.

| | |
|---|---|
| Question: | That's important I take it then to you as a project manager that you know the subs have been out there to see what needs to be done? |
| Answer: | Yes, confirm deck lengths or stud heights, those type of things for example. |
| Question: | If they didn't do that then their estimate is going to be – |
| Answer: | They would not receive a contract. They might not have to do a pre-bid but before they receive a contract that's an unwritten rule for the most part. They have to do it. That's my rule. That's kind of my terminology. |
| Question: | That's because you don't want them coming back and saying my estimate is off because I didn't go out and look and now I found something different? |
| Answer: | And it's requested prior to them bidding, too but I would have confirmed that if I would have awarded a successful general contractor. They would have had to have done it at that point. |
| Question: | The reason for that? |
| Answer: | Is to make sure that his price is as solid as possible and that he understands the scope, and that he can order his materials usually for the most part. |
| Question: | If you're just doing an estimate there's a lot of variables that could play into that, correct? |
| Answer: | Yes. |
| Question: | Not the least of which is actually being on site to see what condition its in, what's going on there, what's going to be required? |
| Answer: | You want to perform a site visit and you want to have as much documentation as possible to nail down a hard, lump sum number. |

(Exhibit 3; Wolford's deposition at pp. 55-56).

Therefore, a site visit is part of the method Mr. Wolford uses to estimate the cost of repairs – the rigor he demands in his professional work. Despite this requirement, however, the Tenant provided an estimate on which it based its decision to terminate the Lease without ever having a contractor visit the site. Wolford's revised estimate was done so far after the tornado that the repairs were already substantially underway, and some even completed. Thus, Mr. Wolford's visit could not possibly provide an accurate view on which to arrive at the estimate he did. By his own standard, when he failed to visit the site, Wolford did not follow the appropriate method for evaluating the scope of repairs needed at the property, nor was he able to apply the

appropriate facts to his method.  Because the appropriate method, indeed the method Wolford insists on in his professional work, was not followed by Wolford himself in forming his opinions, those opinions are inadmissible.

**III.    Mr. Wolford's opinion is speculative.**

Generally speaking, opinion witness testimony is inadmissible if it is based on speculation. Cummins v. Lyle Industries, 93 F.3d 362, 367 (7th Cir. 1996). Opinions formed that are based solely upon conclusions are speculative and inadmissible. Where an expert starts with a conclusion and then forms opinions to support the conclusion, the opinions are speculative and inadmissible. See Korte v. Exxonmobile Coal USA, Inc., 164 Fed. Appx. 553 (7th Cir. 2006).

Mr. Wolford's own testimony proves that his opinions are pure speculation.  To start with, he was given the conclusion at the outset.  The Tenant provided Wolford with the initial "high side" budget estimate (Exhibit 8) to which apparently Wolford added Permit fee and Architectural and Engineering.  (Exhibit 12).  Wolford's task was clearly to form an opinion to support the conclusion.  In fact, the opinion he presumably intends to offer, a May 7, 2006 estimate, was not concocted until after the Tenant terminated the Lease, and therefore, formed no basis for the termination.  Clearly, it was concocted to support the conclusion the Tenant wanted supported.  The opinion he intends to offer based upon those spreadsheet revisions came so long after the decision to terminate the Lease, that it cannot possibly be the basis on which the Tenant relied to terminate the Lease.

Additionally, the fact that Wolford made no timely site visit in order to make actual observation of the damage to the Premises necessary to properly quantify the amount of damage and scope of repairs further supports the claim that Mr. Wolford's testimony is speculative. Mr. Wolford is being called upon to opine as to the scope and cost of repairs of damage caused by a

tornado in March, yet he did not view the Premises until the damages had been substantially repaired in May.  The May 1, 2006 Budget Estimate of Tenant is nothing more than an estimate of what the scope of repairs might be and an estimate of the cost of those scope of repairs.  That those are nothing more than speculation is evidenced by the fact that as many as nine items were deleted and eighteen others changed.  Indeed, $245,487 was deleted from the $1,046,000 the Tenant relied on to terminate the Lease, over 23%.

Wolford's explanation at his deposition (Exhibit 3):

| Answer | … Those were some pluses and adds, yes.  Page 77, Lines 11-12. |
| Answer: | Yes, I redefined the scope many times.  Page 77, Line 17. |
| Answer: | I probably had 15 different spreadsheets on this project and I never changed the date when I specifically changed them. |
| Question: | That's in part because you're working with estimates, the estimate of the scope of the project? |
| Answer: | Exactly, new information, bits and pieces to finite the number the best I could.  Page 82. |

So not only is Wolford estimating the cost of repairs, he is estimating the scope of repairs.   That can only be described as speculation.   Based upon the timeline of events, it appears Wolford was given a conclusion, that being the damage needed to be extensive enough to support Tenant's termination of the Lease.   He then formed opinions supporting the conclusion. Opinions formed in this manner fail to consider relevant facts, and are therefore speculative and inadmissible.

## <u>Conclusion</u>

Pursuant to <u>Daubert</u> and consistent with Federal Rule of Evidence 702, this Court must exercise its role as a gatekeeper with regard to allowing expert testimony.  Tenant's expert failed to base his opinion on sufficient facts.  Tenant's expert failed to apply his method reliably to the facts.  Tenant's expert is speculating to support a conclusion the Tenant reached well before the

expert arrived at his opinion.  Mr. Wolford's report should be stricken and he be barred from testifying in this matter.

Respectfully submitted,

SWPLAZA III, L.L.C., an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, Plaintiff,


By: _____/s/ David A. Rolf_____
      David A. Rolf, Bar # 6196030
      Attorney for Plaintiff
      Sorling, Northrup, Hanna,
      Cullen & Cochran, Ltd.
      Suite 800, Illinois Building
      Post Office Box 5131
      Springfield, IL 62705
      Telephone:  (217)544-1144
      Facsimile:  (217)522-3173

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was served by electronic service through the Court's ECF System to the following:

Mr. J. William Roberts
Mr. Charles R. Schmadeke
Hinshaw & Culbertson LLP
400 South 9th Street, Suite 200
Springfield, IL 62701

on the 31st day of December, 2007.

    /s/ David A. Rolf
    David A. Rolf, Bar # 6196030
    Attorney for Plaintiff
    Sorling, Northrup, Hanna,
    Cullen & Cochran, Ltd.
    Suite 800. Illinois Building
    Post Office Box 5131
    Springfield, IL 62705
    Telephone: (217)544-1144
    Facsimile: (217)522-3173
    E-Mail: darolf@sorlinglaw.com

**E-FILED**
Monday, 31 December, 2007  02:33:16 PM
Clerk, U.S. District Court, ILCD

## SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

# LEASE
between

## GART BROS. SPORTING GOODS COMPANY,

A Colorado Corporation

**as Tenant**

**and**

## ILLINOIS NATIONAL BANK, TRUSTEE,

under Trust Agreement dated November 6, 2000

and known as Trust No. 00-0020

**as Landlord**

**dated April 2, 2001**

SOUTHWEST PLAZA III SHOPPING CENTER

EXHIBIT
1
Bonberg No. 3308

494160-4  JDSTER  03/29/1 8:44 AM

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## W I T N E S S E T H:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## I.    FUNDAMENTAL LEASE TERMS

### A.    Parties.

| | |
|---|---|
| Landlord: | Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 |
| Tenant: | Gart Bros. Sporting Goods Company, a Colorado Corporation |

### B.    Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

### C.    Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.

### D.    Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

| | | | |
|---|---|---|---|
| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.15 |

**E.     Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

**F.     Addresses (paragraph 34)**

If to Tenant:
> GART BROS. SPORTING GOODS COMPANY
> 1000 Broadway
> Denver, Colorado 80203
> Attention: President
> Facsimile: (303) 863-2243

With a copy to:
> GART BROS. SPORTING GOODS COMPANY
> 1000 Broadway
> Denver, Colorado 80203
> Attention: Legal Department
> Facsimile: (303) 864-2188

If to Landlord:
> Charles E. Robbins, Realtor
> 2144 South MacArthur Boulevard
> Springfield, Illinois 62704
> Attention: Property Management
> Facsimile: (217) 525-0545

With a copy to:
> R. Lee Allen, Attorney
> Sorling, Northrup, Hanna, Cullen & Cochran
> 620 East Adams, Suite 800
> Springfield, Illinois 62701
> Facsimile: (217) 522-3173

1.     **The Premises.**  Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

> The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between **Exhibit "A"** and **Exhibit "B"**, **Exhibit "A"** shall control. The "Shopping Center" includes the land described on **Exhibit "A"**, all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as **Exhibit "B"**. The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with **Exhibit "B"**.

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.    Completion and Delivery of the Premises and Shopping Center. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as **Exhibit "C"** (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as **Exhibit "B"** including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred:  (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period.  If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed.  Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects.  In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached **Exhibit "C"**, made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3.    **Lease Term.** Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4.    **Rent.**

(a)    **Base Rent.** During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

    **(i)**    **First Five Years.** During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

    **(ii)**    **Reduction in Base Rent.** Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

    **(iii)**    **Increases in Base Rent.** Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

    **(b)**    **Co-Tenancy Requirement; Alternate Rent.** Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

     **5.**    **Development of Shopping Center by Landlord.** Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises. In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities. Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference). Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

     **6.**    **Easements.** In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    **Utility Easements.** During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)    **Common Area Easement.** During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations. Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)    **Non-Dedication.** None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    **Common Areas and Common Area Maintenance.**

(a)    **Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

    **(b)**   **CAM Charges.** For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

    (1)   real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

    (2)   any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

    (3)   maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

    (4)   repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

    (5)   amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)    repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)    management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    **Tenant Payments.**    Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

     **(d)**    <u>Examination of Landlord's Records.</u> Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

**8.**    <u>Signs and Communications Equipment.</u>

     **(a)**    <u>Signs.</u> Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of **Exhibit "D"** are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b) **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9. **Taxes.**

(a) **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b) **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c) **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)     **Payment Following Appeal**. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)     **Multiple Building Tax Parcel**. In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

10.     **Maintenance, Repairs and Replacements**.

(a)     Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)    Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

**11.    Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

**12.    Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    **Insurance**.

(a)    **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)    **Liability Insurance**. During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    **Workers' Compensation Insurance**. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    **Self-Insurance**. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)    **Rental Loss Insurance**. Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease. Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period. All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable. The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)    **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction**. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation – statutory limits;

2) Employers Liability - $500,000; and

3) Comprehensive General and Comprehensive Auto Liability as follows:

   a) Bodily Injury - $1,000,000 per occurrence;

   b) Property Damage - $1,000,000 per occurrence;

   c) Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;

   d) Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;

   e) "XCU" Hazard Endorsement, if applicable;

   f) "Broad Form" Property Damage Endorsement;

   g) "Personal Injury" Endorsement; and

   h) "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)    **Policy Provisions**.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)    **Waiver of Right of Recovery and Subrogation**.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises of the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)    **Evidence of Insurance**.  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)    **Indemnities**.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.    **Damages by Fire or Other Casualty**.

(a)    **Less Than Thirty Five Percent (35%)**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Thirty Five Percent (35%) or More**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    **Landlord's Termination Rights**. If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above). Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation**. If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17.    **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18.    **Use.**

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.   **Warranties and Representations**.

(a)     Landlord represents, warrants and covenants to Tenant that:

(i)     **Quiet and Peaceful Enjoyment**.   Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)     **Title**.   Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.   Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.   Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage.   This representation and warranty is a material inducement to the Tenant's execution of this Lease.   Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA").   Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)     **Certificate of Authority**.   Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust.   Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)   No Litigation.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   Hazardous or Toxic Materials.  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)   Tenant's Exclusive Use.  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    **Zoning and Subdivision.** The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    **Prohibited Activities.** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

    (A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

    (B)    a bowling alley;

    (C)    a billiard or bingo parlor;

    (D)    a flea market;

    (E)    a massage parlor;

    (F)    a funeral home;

    (G)    a facility for the sale of paraphernalia for use with illicit drugs;

    (H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (I)    an off-track betting parlor;

    (J)    a carnival, amusement park or circus;

    (K)    a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

    (L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

    (M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

    (N)    a skating rink;

    (O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

    (P)    a banquet hall, auditorium or other place of public assembly;

    (Q)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R)    a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

**(ix)    Site Covenants**. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

**(A)    Prohibited Uses in Common Areas**. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

**(B)    Interference with Tenant's Reception/Transmission.** Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

**(C)    Notices Affecting the Premises.** Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

**(D)    Constructive Trust.** Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)    **Restaurant Use.**  Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    **Tenant's Authority.**  Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials.**  As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    **Estoppel Certificates.**  Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21. **Subordination of Lease**. At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22. **Change of Landlord.** Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23. **Tenant's Financing.** Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    **Tenant's Property and Waiver of Landlord's Lien.**  All of the Personalty shall be and remain the personal property of Tenant.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises.  Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    **Memorandum of Lease: Commencement Date Agreement.**  Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    **Expiration of Term and Holding Over.**  All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease.  In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate.  Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    **"For Rent" Signs.**  Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center.  Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    **Force Majeure.**  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.    **Events of Tenant's Default.**  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

   (a)    **Failure to Pay Rent; Breach.**  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

   (b)    **Bankruptcy.**  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.    **Landlord's Remedies.**  After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant.  Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

   (a)    **Reimbursement of Landlord's Costs in Exercising Remedies.**  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

    **(b)**    **Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

    **31.**    **Events of Landlord's Default: Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

    Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

    **32.**    **Waiver.** If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    **Compliance with Applicable Laws**. During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    **Notices.**  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:    Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Attention:  Property Management
Facsimile: (217) 525-0545

With a copy to:       R. Lee Allen, Attorney
                      Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
                      607 East Adams Street, #800
                      P. O. Box 5131
                      Springfield, IL 62705-5131
                      Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party
in accordance with this paragraph.

    **35.**     **Brokers.** Landlord and Tenant each covenant that they have not dealt with any real
estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark
Commercial Real Estate Services LLC, which shall be paid a commission by Landlord pursuant to
their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial
Real Estate Services, LLC shall be solely responsible for any commissions due and payable to
Leonard W. Sapp or any related person or entity.  Except for the amounts due Edgemark
Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all
damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all
levels of proceedings), resulting from any claims that may be asserted against the other party by any
real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom
the indemnifying party either has or is purported to have dealt.

    **36.**     **Miscellaneous.**

       **(a)**     **Headings and Gender.** All paragraph headings, titles or captions contained
in this Lease are for convenience only and shall not be deemed a part of this Lease and shall
not in any way limit or amplify the terms and provisions of this Lease.  The masculine,
feminine or neuter gender and the singular or plural number shall be deemed to include the
others whenever the context so requires or indicates.

       **(b)**     **Construction.** The parties hereto agree that all the provisions hereof are to
be construed as covenants and agreements as though the words importing such covenants and
agreements were used in each separate paragraph hereof.

       **(c)**     **Relationship of Landlord-Tenant.** Nothing contained in this Lease shall
be deemed or construed by the parties hereto or by any third person to create the relationship
of principal and agent, partnership, joint venture, or any other association between Landlord
and Tenant other than the landlord-tenant relationship described herein.

       **(d)**     **Entire Agreement: Merger.** This Lease, including all exhibits hereto
(which are hereby incorporated herein by reference for all purposes), contains the full and
final agreement of every kind and nature whatsoever between the parties hereto concerning
the subject matter of this Lease, and all preliminary negotiations and agreements of
whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    **Attorneys' Fees.**  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)    **Partial Invalidity.**  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    **Consents.**  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)    **Holidays.**  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)    **Applicable Law.**  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)    **Successors and Assigns.**  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)    **Counterparts.**  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)    **Trademarks and Trade Names.**  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    **Effectiveness of Lease: Tenant's Right to Terminate.**  Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)    Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)    Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)    Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.    **Confidentiality.**    The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.    The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.    Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.    It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.    **Liability of the Trustee and the Beneficiary.**    This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank. It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof. It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises. This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof. Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.    **Liability of Directors and Shareholders.** Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    EXHIBITS

Attached hereto and made a part of this Lease are Exhibits A through G.


WITNESS the following signatures and seals:

LANDLORD

ILLINOIS NATIONAL BANK, TRUSTEE, under
Trust Agreement dated November 6, 2000, known as
Trust Number 00-0020

By: _____

Its _SUP & TD_____

ATTEST:

By: _____

Its _VPI & Controller_____


TENANT

GART BROS. SPORTING GOODS COMPANY, a
Colorado Corporation


By: _____

Its _____

ATTEST:

By:_____

Its _____

**Nesa** E. Hassanein
**Senior** Vice President
**and** General Counsel

0294793.005     3/29/01RLA

# MEE - BLOXDORF, P.C.

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. O1012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



Exhibit "C"

CONSTRUCTION PROVISIONS

1.    Definitions:  For purposes of this Lease:

(i)    "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(ii)    "Site Work Start Date" means April 15, 2001;

(iii)    "Building Shell Start Date" means May 15, 2001;

(iv)    "Scheduled Possession Date" means October 1, 2001;

(v)    "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

(vi)    "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings:  None.

2.    General Requirements.

2.1    Code Compliance.  Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

2.2    General Conditions.  Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

(i)    Liability and builder's risk insurance;

(ii)    Costs for permits, sewer and water connection fees, etc.;

(iii)     Sales and use taxes;

(iv)     Temporary field offices, toilet facilities, supplies and equipment;

(v)      Miscellaneous equipment rentals;

(vi)     Trash removal and clean-up;

(vii)    Survey, staking and layout;

(viii)   Job site field supervision;

(ix)     Mobilization;

(x)      Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)     Quality assurance, including materials testing, inspections and special inspections; and

(xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3     Warranties.  Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date.  At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain.  Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4     Engineering.  All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5     Permits.  Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.      Construction of Site Work.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage.    Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete.    Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping.    Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving.    Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities.    Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone.    Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting.    Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage.    Per paragraph 8(a) of the Lease and the Final Plans.

3.9    Cost Responsibility. All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4.    Construction of Building Shell. Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this Exhibit C.

4.1    Utilities. Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2    Cost Responsibility. All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3    Bids. On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5.    Construction of Leasehold Improvements. Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this Exhibit C.

5.1    Scope of Work.  The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property.  Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor.  The Leasehold Improvements will also include:  all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring.  All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.  The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.    Landlord  will  submit  the  Final  Plans  for  the  Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord.  Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant.  Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid. Acceptance and awarding of the contract will be the decision of both Landlord and Tenant. Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant.  No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld. Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.  Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    Leasehold Improvements Plans. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

6.3    Deviation from Final Plans. Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4    Change-Orders.  Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.    Construction Costs.

7.1    Included Costs.  As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this Exhibit C, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2   Excluded Costs.  In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3   Payment of Construction Costs.  The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease).  Landlord will pay for all Construction Costs up to the Construction Cap.  In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.   Construction Timing and Completion.

8.1   Outside Dates.  If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date.  Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date.  Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work.  Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2   Tenant's Option to Terminate.  If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder.  Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3   Inspection and Access.  During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on <u>Exhibit B</u> of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

       8.4.2  <u>Notice of the Possession Date</u>.  Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date").  If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

       8.5  <u>Condition of Premises at Delivery</u>.  Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

       8.6  <u>Indemnity by Landlord</u>.  Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

## EXHIBIT E
### Permitted Encumbrances

1.    Real Estate Taxes for years 2000 and 2001.

2.    Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3.    Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4.    Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

      NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5.    Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6.    Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7.    Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8.    Utility and drainage easements as shown by plat of subdivision.

9.    20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10.   Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11. Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12. Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13. Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14. Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

## RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.    In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.    If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.    This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.    This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.    The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.    IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____

Name: _____

Title: _____

ATTEST

By: _____

Name: _____

Title: _____

[SEAL]

**LENDER**

_____
_____

By:     _____
Name:   _____
Title:  _____

ATTEST

By:     _____
Name:   _____
Title:  _____

         [SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By:     _____
Name:   _____
Title:  _____

ATTEST

By:     _____
Name:   _____
Title:  _____

         [SEAL]

## ACKNOWLEDGMENTS

<u>LANDLORD</u>

STATE OF _____ )
                                                    ) SS.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:        _____


<u>LENDER</u>

STATE OF _____ )
                                                    ) SS.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:        _____

<u>TENANT</u>

STATE OF _____ )
                                                        ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

    WITNESS my hand and official seal.

_____
Notary Public

My commission expires:    _____

F-6

Exhibit G

MEMORANDUM OF LEASE

Demise. Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease. April 2, 2001.

Name and Address of Landlord. ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois 62704, Attention: Property Management.

Name and Address of Tenant. GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado 80203, Attention: President.

Description of Premises. Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

Term of Lease. Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

Options to Extend. The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

Restrictions on Construction. The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B," and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive. So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this ____ day of _____, 2001.

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By:     _____
Name:   _____
Title:  _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

# ACKNOWLEDGMENTS

<u>TENANT</u>

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

        WITNESS my hand and official seal.

                                        _____
                                        Notary Public

      My commission expires:        _____

<u>LANDLORD</u>

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

        WITNESS my hand and official seal.

                                         _____
                                        Notary Public

      My commission expires:        _____

Exhibit A

LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

E-FILED
Monday, 31 December, 2007  02:34:34 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 06-CV-3177 |
| vs. | ) ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

## DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE

Pursuant to Rules 26(a)(2) of the Federal Rules of Civil Procedure and the Scheduling Order entered October 10, 2006, Defendant/Counter-Plaintiff, TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA"), by its attorneys, Hinshaw & Culbertson LLP, submit the following at its expert disclosure:

Jeffrey Wolford
Wolford Retail Builders, Inc.
102 South Wheeling Road
Prospect Heights, IL 60070
(847)394-4509

Mr. Wolford's report is produced herewith, which includes a description of all information considered and his qualifications.



EXHIBIT
2

60159969v1 868372

For his services in reviewing this matter and preparing the report, the witness will be compensated in the amount of $2,500.00.

Respectfully submitted,

TSA STORES, INC., as successor to Gart Bros. Sporting Goods Company, a Delaware corporation, Defendant,

By *Charles R. Schmadeke*

One of Its Attorneys

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60159969v1 868372

## <u>CERTIFICATE OF SERVICE</u>

The foregoing DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE was made by hand-delivering a true and correct copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

*Barbara L Rozerz*

Subscribed and sworn to before me
this 1st day of June, 2007.

*Virginia M Heyen*
Notary Public

VIRGINIA M. HEYEN
MY COMMISSION EXPIRES
SEPTEMBER 18, 2009
NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited          )
liability company, as successor to Illinois    )
National Bank, as Trustee under Trust          )
Agreement dated November 6, 2000 and           )
known as Trust No. 00-0020, an Illinois        )
banking institution,                           )
                                               )
                Plaintiff/Counter-Defendant,   )          Case No.  06-CV-3177
                                               )
        vs.                                    )
                                               )
TSA STORES, INC., as successor to Gart         )
Brothers Sporting Goods Company, a             )
Delaware corporation,                          )
                                               )
                Defendant/Counter-Plaintiff.   )

## EXPERT WITNESS REPORT OF JEFFREY WOLFORD

I, Jeffrey Wolford, hereby submit the following report regarding the valuation of the repair and reconstruction costs to the Premises as defined herein, as a result of the tornadoes that damaged the SWPlaza and the TSA Store located therein on or about March 12, 2006.

## INTRODUCTION

1.      My name is Jeffrey Wolford.  I am the president of Wolford Retail Builders, Inc., located in Prospect Heights, Illinois., and has been incorporated in the state of Illinois and Florida since 2005.  I have more than twenty-nine years experience in the construction industry of retail/ commercial projects throughout the United States, including Illinois. In addition,  the following are recent Sports Authority projects that have been completed or are under contract to be completed by Wolford Retail Builders, Inc. Those projects include:

- Sports Authority #478 – Riverhead, NY (interior) 45,049 s.f. – date: 9/27/06
- Sports Authority #457 – Riverdale, NJ (interior) 40,627 s.f. – date: 9/27/06
- Sports Authority #477 – Paramus, NJ (interior) 51,106 s.f. – date: 8/4/05
- Sports Authority #174 – Somerville, MA (interior) 45,669 s.f. – date: 3/9/06

- SportMart #629 – Delafield, WI (interior) 40,934 s.f. – date: 3/2/06
- Sports Authority #176 – Milford, MA (interior) 46,266 s.f. – date: 9/25/05
- Sports Authority #511–Baltimore, MD (exterior,site,interior) 50,122 s.f.– date:7/13/06
- Sports Authority #178–Holyoke, MA (interior) 46,322 s.f. – date: 2/22/07
- Sports Authority #583- Lombard, IL (interior 2 levels) 47,013 s.f - date: 7/27/07
- Sports Authority #376- Port St. Lucie, FL (interior) 39,334 s.f. - date: 9/13/O7
- Sports Authority #604- Oak Lawn, IL (exterior facade only) date: 4/24/06
- Sports Authority #394 – Cape Coral, FL (interior) 29,359 s.f. – date: 08/23/07

2.     My educational and work experience is set forth in my biographical sketch, attached hereto as Exhibit A and by reference made a part hereof, and includes other projects. My experience began in 1977 as a union carpenter. Since 1989 I have had extensive experience working for other general contractor's as a project/ construction manager and have successfully completed many other retail stores throughout the United States, including Illinois.

3.     In addition, I am a member of the following professional organizations: Vested member of Carpenters union local #839 and a member #1329502 of the ICSC- The International Council of Shopping Centers

4.     Unless otherwise specified, the terms used herein are defined as set forth in the Lease which is the subject of the above-referenced action.

5.     Based upon my review of the Premises after the March 12, 2006 tornadoes, the material described herein, my knowledge of the costs of construction, including the costs of construction of the Premises originally in 2001, and the increased costs of labor and materials, and the information and data set forth herein, it is my opinion, based upon a reasonable certainty, that the estimated repair and reconstruction costs of the Premises as a result of the damage caused by the tornadoes of March 12, 2006, exceeded 35% of the then-total reconstruction costs of the Premises.

6.     In 2001, on behalf of Capitol Construction Group, Inc., of which I was then affiliated as project manager, I examined specifications dated June 27, 2001, and drawings

2

pertaining thereto, for the construction of The Sports Authority Store at the South West Plaza Shopping Center in Springfield, Illinois. Based upon that review, I submitted a proposal for the construction dated July 26, 2001, and a revised proposal dated July 30, 2001. The proposals submitted by me on behalf of Capitol Construction Group are attached hereto as Exhibit B and by reference made a part hereof.

## ANALYSIS

7.      On Tuesday, May 2, 2006, I was asked by TSA Stores, Inc., to review the Premises and certain other matters identified herein to provide an opinion as to the extent of the damage caused by the tornadoes of March 12, 2006, the total reconstruction costs of the Premises, and the proportion of the total reconstruction costs that the damage represented.

8.      I visited the premises on Thursday, May 4, 2006.

9.      During my visit to the Premises, I observed the contractor engaged in the reconstruction of miscellaneous work-scopes. Although TSA had demobilized and/or relocated all merchandise from its store, all sales floor fixturing and shelving from the TSA Store had not been fully dismantled and removed from the site. The emergency disaster recovery services contractor retained by TSA had provided all water and debris clean/haul off, moisture tests, disinfecting/ glass shard extraction, dismantling/ staging of OSF store metal fixtures, selective demolition, floor finish adhesive removal, required temporary emergency protection, and barricading/re-securing of space. The contractor retained by the landlord was performing but, not limited to the following work during my site visit: roofing, repair of structural steel and bar joists, miscellaneous electrical rework and reconstruction of effected drywall common to perimeter walls. The project and/or reconstruction was well underway from the total original damage caused by the tornadoes of March 12, 2006.

10.     I also reviewed the following:

3

60159970v1 868372

a)    the disaster recovery services rendered by Cotton USA at the Premises as a result of the tornadoes of March 12, 2006, and the costs associated therewith;

b)    the original construction costs of the Premises and the Shopping Center from 2001 as defined by the general contractor of record, Vancil Contracting; and

c)    the Associated General Contractor's Construction Inflation Index prepared by economist Ken Simonson, which established an inflation factor for that period of 32% for the period from 2001 to 2006.

Copies of those documents are attached hereto as Exhibits C, D, and E respectively, and included herewith.

11.    Based upon my review set forth above, I am familiar with the damages to the Premises, the costs of construction (labor and materials) in the area, and the items needed to be repaired or reconstructed at the Premises as a result of the tornadoes of March 12, 2006.

12.    Based upon my review and my experience with and knowledge of construction costs for retail stores such as this, and my prior knowledge of the original 32,308 square feet project of July 2001, it is my opinion, based upon a reasonable certainty, that the total building replacement costs on or about March 12, 2006 were $1,841,856.00.

13.    Based upon my review of the Premises and the aforementioned items, I formed an opinion, based upon a reasonable degree of certainty, and issued a report dated May 1, 2006, indicating that the premises sustained 'direct costs damage' with the values as a result of the tornadoes of March 12, 2006, $743,944.00, as indicated in my Budget Estimate which is attached hereto as Exhibit F and made a part hereof.

14.    It is my opinion based upon my experience in the construction industry of retail stores, that certain services, projects, and tasks performed by Cotton USA must be considered as part of the legitimate costs of reconstruction and repair of the premises.  Those services, projects, and tasks were a necessary component to restore the premises to their condition before the tornadoes of March 12, 2006, or were a necessary prerequisite to construction.  Services,

4

projects, or tasks performed by Cotton USA solely directed at preserving or removing TSA's inventory or fixtures should not be included as reconstruction or repair costs. In addition, after reviewing Cotton USA's final costs I have made an adjustment due to overlap workscope/ costs included in my May 7, 2006 budget proposal and Cotton USA's actual work performed. Using pro-ration and percentages these deduct costs totaled $118,201.00 and is reflected in line 12.

15.     Even if all costs attributed to Cotton USA *i.e.,* $319,428, were excluded from the costs of repairs and reconstruction, which in my opinion would not be proper, the remaining reasonable reconstruction costs exceeds 35% of the total replacement cost.

## ANALYSIS OF PLAINTIFF'S EXPERT REPORT

16.     At the request of TSA, I have also conducted a review of the "Rule 26(a)(2) Expert Witness Report of Mark Sorensen," submitted by SWPlaza III, LLC. To that end, I analyzed the report as well as the documents submitted as part of the report. Because of the errors listed below, I have concluded that Mr. Sorensen's report cannot be considered as a reliable budgeting evaluation of the actual damages to the Premises for the purposes of this lawsuit as a result of the March 12, 2006 tornadoes.

17.     The report appears to outline the actual repair and construction costs to the Premises or common areas from the March 12, 2006 tornadoes.

18.     The information provided by Mr. Sorensen indicates that the actual repair and reconstruction work continued for a period greater than sixty (60) days from the occurrence of the tornadoes. My understanding of the Lease is that the Tenant's option to terminate the Lease by reason of casualty had to be exercised within sixty (60) days of the casualty. Since repair and reconstruction was not completed within that sixty (60) day period, the actual repair and reconstruction costs were not and would not have been available for either Landlord or Tenant to consider with respect to the Lease.

5

19.     In my opinion, the most important error in Mr. Sorensen's report, even with respect to actual reconstruction and repair costs, is that it is not supported with appropriate sworn statements by subcontractors and material suppliers; and the certified payroll. Rather the report is based upon running "in-house" activity and entry reports from the general contractor. The reports submitted are not consistent with the American Institute of Architects (AIA) format or title company for lien waivers for payment to contractors and materials suppliers. Although I am not suggesting that either Mr. Sorensen or Jones-Blyth failed to include items that should have been included or failed to specify the correct value for each item, the in-house activity and entry reports may reflect whatever a general contractor wants it to, including costs from other same site/ center projects. Such reports are used for the internal purposes of the general contractor only and are not relied upon for the purposes of making payments to contractors, laborers, and material providers. Also, they do not necessarily reflect the quality and quantity of materials actually used in the construction process.

## CONCLUSION

20.     For services in reviewing this matter and preparing this report, I am being compensated by TSA in the amount of $2500. No compensation has been determined for any testimony I may give in this matter.

21.     I have authored no publications in the preceding ten years.

22.     I have not testified as an expert at trial or by deposition within the preceding four years.

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: May 31, 2007

6

Jeffrey Wolford

7

## CERTIFICATE OF SERVICE

The foregoing Expert Witness Report of Jeffrey Wolford was served upon Plaintiff/Counter-Defendant by hand-delivering a copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

*Barbara L. Rozinski*

Subscribed and sworn to before me
this 1st day of June, 2007.

*Virginia M Heyen*
Notary Public

VIRGINIA M. HEYEN
MY COMMISSION EXPIRES
SEPTEMBER 18, 2009
NOTARY PUBLIC · OFFICIAL SEAL · STATE OF ILLINOIS

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60159970v1 868372

# JEFFREY B. WOLFORD
1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-255-8133

Dear Sirs:

Enclosed is my resume; I am looking for a position in the field of Construction Management. Below is a short list of the most important points regarding my experience and goals. I would appreciate hearing from you concerning positions in my field of interest.

**Position Pursued:** Superintendent/Project Manager

**Attributes Highlighted:** I am highly aware of quality issues involving construction and construction management, and have had a great deal of experience with the clerical and record-keeping aspects of the field. In addition, I have knowledge of computer programs, such as WordPerfect/DOS, and Windows software.

**Circumstances:** I have been in New York City for the past 6 years working as a superintendent and project manager. While employed, I attended classes in night school at Pratt Institute School of Architecture, to increase my knowledge and understanding of construction and construction management.

**Comments:** I have been in the construction industry for the past 18 years. My resume indicates more recent employment information. I am seeking a position with an employer who will offer long-term employment opportunities; I am interested in the "long-haul". I am fully capable of taking any interior project, from permits to punchlist, as either a field superintendent or as a project manager.

Please contact me at the above number regarding opportunities for employment.

Yours sincerely,

Jeffrey B. Wolford

# EXHIBIT A

# JEFFREY B. WOLFORD

1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-253-8133

## OBJECTIVE

To secure a position that will utilize and challenge past experience and acquired expertise in the field of PROJECT MANAGEMENT positively effecting company growth and profitability.

## PROFILE

- Multi-dimensional Project Manager with strong Managerial and Administrative skills
- Background in General Contracting and Field Supervision, with training in Architecture
- Proven ability to communicate clearly and effectively with clients, sub-contractors, and vendors
- Strong organizational and planning skills
- Ability to prioritize work schedules and accomplish tasks simultaneously
- Highly knowledgeable of construction, contractor pricing & bills, building regulations and permits
- Able to remain calm under pressure, troubleshoot and resolve problems
- Consistent achievement record in timely project completion within established budgetary objectives
- Background in industry since 1977

## RELEVANT EXPERIENCE

**CROWN CONSTRUCTION, INC.**, Chicago, IL                     1996-Present
*Construction Superintendent*
- Projects with budgets $500,000 and higher
- Involved in buying out projects as required
- Projects included: *The Glens, Zarosta (restaurant).*

**FISHER DEVELOPMENT CORPORATION**, New York, NY              1992 - 1995
(construction management company with offices in New York, Chicago, Washington DC, and San Francisco)
*Project Manager/Estimator*
- Write contracts, award bids and negotiate best prices based upon budgeting factors.
- Manage the renovation and construction for *388 GAP, GAP Kids* and *Banana republic* stores in the Tri-state area with projects ranging from $50,000 to $2,000,000; also manage projects for *Williams Sonoma, Pottery Barn*, and *Hold Everything* stores.
- Communicate with stores regarding initial project specifications and budget.
- Develop list of available and appropriate subcontractors through established list or referrals.
- Communicate regularly with stores regarding schedules, complaints, damage, instructions, etc.
- Perform site and Building Department visits to ensure that schedules and specifications are maintained
- Selected by company to administer high profile jobs.

**JOHNSEN CARPENTRY, INC.**, Dyer, IN                         1987 - 1990
*Construction Superintendent*
- Managed concurrent projects throughout the Chicago area.
- Projects included: *The Polo Shop, The Coach Store, Chicago Health Clubs, Rosenthal Furs, Circle Gallery, Spiaggia Cafe*, and *One Magnificent Mile Building.*
- Assisted in pre-construction planning, budget evaluation, and monitoring of field activities.
- Held project responsibilities ranging from carpentry superintendent through field superintendent, fully accountable for all trades.

**PEPPER CONSTRUCTION**, Chicago, IL                          1986 - 1987
*Field Superintendent*
- Supervised all trades, coordinating crews of 10-30 as well as participating in project planning and reporting activities.
- Projects included: *John Marshall Law School*, Chicago, IL and *Hampton Inns* (two locations).

## EDUCATION

Pratt Institute - School of Architecture, New York, 1990 - 1994
Carpenters Local 839, Member in good standing, 18 years
Home Inspectors Certification, 1988
OSHA, Construction Safety & Health Certification, 1988

COMMUNITY SERVICE
Project Manager, Gilda's Club, New York

*References will be furnished upon request.*

**JEFF WOLFORD**
**Sr. Project Manager / Business Development**

## GENERAL BACKGROUND

Mr. Wolford has over twenty-eight years of experience within the construction industry in multi-family residential, national and regional retail tenant improvement projects.

## RECENT EXPERIENCE

TSA Corporation- multiple Sportmart- Sports Authority new tenant improvement projects- 35,000 – 42,000 square foot retail spaces in Fresno, CA, Folsom, CA, Matteson, IL, Frankfort, IL, Bolingbrook, IL, Crystal Lake, IL, Woburn, MA, Plymouth, MA, N. Haven, CT, Kirkwood, MO, Farmers Branch, TX, McKinney, TX, Mays Landing, NJ, etc. The store specializes in supplying a large selection of name brand sporting goods equipment for its customers. Both projects consisted of new MEP's, Partitions, ACT ceilings, lighting, multiple floor finishes, millwork, fixturing, decorating, roofing and all related owner supplied materials and equipment. All projects were completed between a 5 week through (11) week `fast track` construction.

Chico's, Multiple Locations – Five New Locations in Atlanta GA, Lincoln NE, Philadelphia PA, Grand Rapids MI and Detroit MI. The store specializes in women's dress and formal wear. The projects consisted of new MEP's, stainless steal storefront, partitions, ceilings, lighting, millwork, fixturing, paint finishes, wood flooring, signage and adjacent mall finishes. All projects were completed in six (6) weeks.

Holiday Inn Plaza, Rosemont, IL- New Plaza, and Site Construction Project. This project consisted of the following: new light well corridor tying into to new existing atrium, new 5,000 square foot two level free standing storage facility, new plaza and gazebo. Other components of this two acre project includes, excavation of existing site, concrete planters, all landscaping, ground lighting, curtain wall system, roofing, custom pavers, awnings, decorating, MEP's, waterproofing and all adjacent finishes to existing building hotel. The project duration was 6 months.

TSA Corporation- Gart Sports, Orem, UT – New 42,000 square foot retail space. The store specializes in sporting goods equipment including Skiing, hunting, fishing and firearms. The project consisted of new MEP's, roofing, partitioning, floor finishes, `Compasso` ceilings, owner millwork installation, lighting, decorating and glazing.
This project was completed in nine (9) weeks.

Krueger International, Merchandise, Chicago, IL- Tenant improvements for 5,500 square foot sales showroom office space. This client specializes in high-end office movable partitioning, furniture and fixtures. The `design build` project consisted of demolition, carpentry, drywall partitioning, floor coverings, ceilings, decorating and modifications to existing MEP's. For the last two (2) years the project/space was complete prior to and before the NEOCON show and was a commercial success.

Victoria's Secret, Brookdale Center, MN – New 5,200 square foot retail space. The store specializes in women's lingerie, cosmetics and accessories. The project consisted of demolition of the old space, new MEP'S, fire alarm system, millwork installation, partitioning, tile, wood flooring system, painting and wall covering, fixturing, lighting, complete storefront assembly, glazing/mirrors and adjacent mall finishes. The project duration was fourteen weeks.

The Children's Place, Two New Locations in Terra Haute, IN and Evergreen Park, IL. The store specializes in infant and children's apparel. The projects consisted of demolition of the existing tenant space, new MEP's, fire alarm system, storefront glazing, partitioning, carpentry, owner millwork installation, decorating, floor coverings, ACT ceilings, owner signage and adjacent mall finishes. Both projects were approx. 5,000 square feet and had six (6) week duration.

Cont.

TSA Corporation- Oshman`s SS`s, Houston and Austin, TX – New 33,000 square feet retail space. Both stores specializes in sporting
goods including camping, fishing, hunting and including a large selection of fire arms. The project consisted of and also included the complete exterior `tear off` of the front and back facades, concrete, steel, masonry, carpentry, dryvit/stucco, light gg framing, storefront glazing, roofing, dock equipment, partitioning, ACT ceilings, floor finishes, mirrors, plumbing, fire protection, HVAC, fire alarm system, electrical and installation of owner supplied store fixturing. The project was completed in thirteen (13) weeks.

Lerner's New York, Lincolnwood, IL – New 4,300 square foot retail space. The store specializes in women's casual and dress apparel, footwear and accessories. The project consisted of demolition of existing space, new MEP`s, carpentry, storefront assembly, glazing/mirrors, floor coverings, wall coverings, painting, owner millwork installation, drywall partitioning and adjacent mall finishes. The project was completed in eleven (11) weeks.


## EDUCATION

Pratt Institute – Brooklyn, NY
School of Architecture- 1989 through 1993

| Store Location | Date Completed | Square Footage | Type |
|---|---|---|---|
| **Jeff Wolford - Retail Project Manager - Estimator for other General Contractors** | | | |
| Sportmart #608- Orland Park, IL | 6/30/1999 | 39,885 | New Store - Tenant Improvement |
| Gart Sports #321 - Orem, UT | 6/4/2001 | 38,202 | New Store - Tenant Improvement |
| Sportmart #521 - Crystal Lake, IL | 11/10/2001 | 35,533 | New Store - Tenant Improvement |
| Sportmart #607 - Crystal Lake, IL | 6/11/2002 | 28,598 | New Store - Tenant Improvement |
| Sportmart #673 - Folsom, CA | 6/22/2002 | 28,927 | Remodel - Tenant Improvement |
| Sportmart #605 - Schaumburg, IL | 10/30/2002 | 33,567 | New Store - Exterior Façade - Tenant Improvement |
| Oshman's #240 - Houston, X | 10/4/2002 | 35,894 | New Store - Tenant Improvement |
| Sportmart #674 - Fresno, CA | 1/27/2003 | 39,909 | Remodel - Tenant Improvement |
| Sportmart #512 - North Riverside | 3/23/2003 | 42,201 | New Store - Tenant Improvement |
| Sportmart #600 - Bolingbrook, IL | 5/2/2003 | 38,851 | New Store - Tenant Improvement |
| Sportmart #626 - Matteson, IL | 4/13/2003 | 39,102 | Remodel - Tenant Improvement |
| Sportmart #604 - Oak Lawn, IL | 4/4/2003 | 44,837 | Remodel - Tenant Improvement |
| Sportmart #609 - Orland Park, IL | 5/2/2003 | 41,175 | New Store - Tenant Improvement |
| Sportmart #692 - Phoenix, AZ | 8/5/2003 | 38,404 | New Store - Tenant Improvement |
| Oshman's #242 - Austin, TX | 4/11/2003 | 37,748 | Remodel - Tenant Improvement |
| Sportmart #601 - Niles, IL | 8/2/2003 | 18,445 | Remodel - Tenant Improvement |
| Sportmart #617 - N. LaSalle St Chicago, IL | 6/6/2003 | 34,898 | Remodel - Tenant Improvement |
| Sportmart #614 - Vernon Hills, IL | 8/8/2003 | 35,684 | Remodel - Tenant Improvement |
| Sports Authority #753 - Kirkwood, MO | 10/24/2003 | 35,196 | New Store - Tenant Improvement |
| Sportmart #627 - Frankfort, IL | 10/3/2003 | 38,218 | Remodel - Tenant Improvement |
| Sportmart #615 - Glendale Hts, IL | 2/19/2004 | 46,249 | New Store - Exterior Façade - Tenant Improvement |
| Oshman's #207 - Farmers Branch, TX | 3/14/2004 | 43,459 | Remodel - Tenant Improvement |
| Sports Authority #464 - W Long Branch, NJ | 4/7/2004 | 40,097 | Remodel - Tenant Improvement |
| Sports Authority #471 - Brick | 3/31/2004 | 43,136 | Remodel - Tenant Improvement |
| Sports Authority $470 - Ledgewood, NJ | 12/7/2004 | 52,760 | New Store - Tenant Improvement |
| Sports Authority #153 - N Haven, CT | 10/1/2004 | 43,975 | New Store - Tenant Improvement |
| Sports Authority #459 - Mays Landing, NJ | 6/4/2004 | 41,815 | Remodel - Tenant Improvement |
| Sportmart #702 - Minnetonka, MN | 6/16/2004 | 44,173 | Remodel - Tenant Improvement |
| Sportmart #704 - Richfield, MN | 6/23/2004 | 42,801 | Remodel - Tenant Improvement |
| Sportmart #701 - Roseville, MN | 9/17/2004 | 49,713 | New Store - Tenant Improvement |
| Sports Authority #165 - Woburn, MA | 10/12/2004 | 38,407 | New Store - Tenant Improvement |
| Sports Authority #166 - Plymouth, MA | 6/4/2004 | 38,106 | New Store - Tenant Improvement |
| Oshman's #205 - McKinney, TX | 4/3/2005 | 40,130 | New Store - Tenant Improvement |
| Sports Authority #474 - Clifton, NJ | 3/6/2005 | 44,520 | New Store - Tenant Improvement |
| | | | |
| **Wolford Retail Builders, Inc completed TSA/Gart work** | | | |
| Sports Authority #478 - Riverhead, NY | 9/27/2006 | 45,049 | New Store - Tenant Improvement |
| Sports Authority #457 - Riverdale, NJ | 9/27/2006 | 40,627 | New Store - Tenant Improvement |
| Sports Authority #477 - Paramus, NJ | 8/4/2005 | 51,106 | New Store - Tenant Improvement |
| Sports Authority #174 - Somerville, MA | 3/9/2006 | 45,669 | New Store - Tenant Improvement |
| Sportmart #629 - Delafield, WI | 3/2/2006 | 40,934 | New Store - Tenant Improvement |
| Sports Authority #176 - Milford, MA | 9/25/2005 | 46,266 | New Store - Tenant Improvement |
| Sports Authority #511 - Baltimore, MD | 7/13/2006 | 50,122 | New Store - Exterior Façade - Tenant Improvement |
| Sports Authority #178 - Holyoke, MA | 2/22/2007 | 46,322 | New Store - Tenant Improvement |
| Sports Authority #583 - Lombard, IL | new store under construction | 47,013 | New Store - Tenant Improvement |
| Sports Authority #604 - Oak Lawn, IL | 4/24/2006 | | Exterior Façade |
| Sports Authority #376 - Port St Lucie, FL | new store under contract | 39,334 | New Store - Tenant Improvement |
| Sports Authority #628 - Willowbrook, IL | currently competitively bidding | 40,122 | New Store competively bids 5/24/07 |
| Sports Authority #394 - Cape Coral, FL | currently competitively bidding | 39,359 | New Store competively bid on 5/15/07 |

# GART SPORTS COMPANY

STORE #618                                     Date: 7/26/01

CENTER 3211 SOUTH VETERANS PARKWAY,  SPRINGFIELD, ILLINOIS Contractor: Capitol Const. Group

| ITEM | BID BREAKDOWN | | | |
|------|----------|-------|--------------|-------|
| | MATERIAL | LABOR | PRICE/SQ.FT | TOTAL |
| 1. Barricade | NIC | | | N/A |
| 2. Demolition | N/A | | | N/A |
| 3. Bond | N/A | | | N/A |
| 4. Concrete | 738.00 | 695.00 | 2.09 | 1,433.00 |
| 5. Carpentry/Rough Carpentry | 16,140.00 | 4,570.00 | 1.55 | 20,714.00 |
| 6. Studs and Drywall | 38,505.00 | 66,972.00 | 2.46 | 105,477.00 |
| 7. Storefront Glass | By Shell Contr. | | | NIC |
| 8. Interior Mirrors | 701.00 | 799.00 | 15.00 | 1,400.00 |
| 9. Acoustical Ceiling | 10,564.00 | 4,401.00 | 1.68 | 14,965.00 |
| 10. Store Fixtures/Finish Carpe | 31,233.00 | 11,300.00 | 0.76 | 42,533.00 |
| 11. Painting/Concrete Sealer | 13,310.00 | 4,162.00 | 0.55 | 17,472.00 |
| 12. Carpet Installation | 39,429.57 | 6,540.45 | 2.46 | 45,400.00 |
| 13. Vinyl Tile and Base | 7,293.00 | 3,162.00 | 6.59 | 11,200.00 |
| 14. Plumbing | 60,199.00 | 2,135.00 | 1.16 | 32,390.00 |
| 15. Sprinklers | 30,552.00 | 34,638.00 | 2.02 | 55,990.00 |
| 16. Electrical | 63,748.00 | 58,800.00 | 3.80 | 116,338.00 |
| 17. Fire Alarm System | 7,302.00 | 5,720.00 | 0.40 | 12,225.00 |
| 18. HVAC/Ventiliation | 82,409.00 | 32,194.00 | 3.55 | 114,603.00 |
| 19. Rubber Flooring /Sealer | 39,855.00 | 9,671.48 | 4.90 | 51,000.00 |
| 20. Insurance | | | | 6,899.00 |
| 21. Supervision/Travel/Per Diem | | | | 18,400.00 |
| 22. General Conditions (Itemize) | | | | 14,253.00 |
| 23. Other (Itemize below) | | | | 14,080.00 |
| SUBTOTAL | 441,978.57 | 245,759.93 | 48.97 | 696,772.00 |
| 24. Profit & Overhead (5.25%) | | | | 36,581.00 |
| 25. Taxes (Sales/State/Local) | | | | INCLUDED |
| TOTAL | $0 | $0 | $0 | 733,353.00 |
| List itemizing below: (#22 - Gen Cond.) | | | | 14,253.00 |
| 1.  Final Cleaning | | | | 2,400.00 |
| 2.  Temporary Phones | | | | 1,000.00 |
| 3.  Tool Rental | | | | 1,000.00 |
| List Itemizations below: (#23 - Other) | | | | 14,080.00 |
| 1. Toilet Partitions/Accessories | | | | 1,900.00 |
| 2. Total Materials | | | | 10,265.00 |
| 3. Misc. Const. Materials & Equipment | | | | 3,815.00 |
| 4 | | | | |
| Site Verification (please circle): | | We have / have not verified site | | |
| UNION    100%    /    NON-UNION | | Amount of time to procure permit: | NIC wks. | |
| % of Union Increase:             % | | Amount of time for construction : | 8 wks. | |
| Qualifications to be listed on separate sheet | | | | |

EXHIBIT  B

# BID SPREADSHEET

PROJECT: Scottrast #818
LOCATION: 3211 Smith Veterans PW
CITY, STATE: Springfield, IL

PM: Jeff Wolford
AM:
PC: Mark Erickson

Yes
Union

Estimate/Job # 23158
BID DUE: 07/26/01

Sq. Ft 32,308
Start:
Complete:
Project Duration: 8

\* COMPETITORS:

| CODE | TRADE/TASK | FIRM ESTIMATE | BIDDER | BIDDER | BIDDER | BIDDER | BIDDER | BIDDER | BEST BID | BID/PROPOSALS |
|------|-----------|---------------|--------|--------|--------|--------|--------|--------|----------|---------------|
| | Concrete Infill | $1,433 | By Others | Blanket | Blanket | | | | $1,433 | $1,433 |
| | Glazing / Mirrors | $1,500 | Brannac | Judge | Vision | Wood River | | | $1,400 | $1,400 |
| | Carpentry | $20,714 | BRH | Hat Constr. | | | | | $20,714 | $20,714 |
| | Millwork | $44,533 | BRH | Hat Constr. | Landgrebe | | | | $44,533 | $42,533 |
| | Drywall / Metal Studs | $105,477 | BRH | Hat Constr. | Landgrebe | Kirk Lebby | | | $105,477 | $105,477 |
| | Acoustical | $14,965 | BRH | Hat Constr. | Landgrebe | Kirk Lebby | | | $14,965 | $14,965 |
| | Rubber flooring | $52,100 | Patterson | Just Floors | Marquez | Metro | L&B Non Union | | $52,100 | $49,100 |
| | V.C.Ts / Vinyl Base | $11,200 | Patterson | Just Floors | Marquez | Metro | L&B Non Union | | $11,200 | $11,200 |
| | Carpet | $46,400 | Patterson | Just Floors | Marquez | Metro | L&B Non Union | | $46,400 | $45,400 |
| | Coating / Concrete Sealer | $18,327 | Bane Nelson | BRH | Division II | | | | $17,472 | $17,472 |
| | Toilet Partitions / Accessories | $1,900 | US Structurals | Petersburg | $2,225 | | | | $1,900 | $1,900 |
| | Plumbing / Gas Piping | $32,390 | E.L. Pruitt | E.L. Pruitt | R.J. Power | J.F. Murphy | | | $32,390 | $32,390 |
| | Sprinkler | $63,190 | F.J. Murphy | Grinnell | Davis Mech. | | | | $63,190 | $55,990 |
| | HVAC | $114,603 | Henson Robinson | Purzak | R.J. Power | Davis Mech. | E.L. Pruitt | | $114,603 | $114,603 |
| | Electrical | $116,338 | Egizii | Anderson | J.B & R.J. | Carmean | Mansfield | | $116,338 | $116,338 |
| | Fire Alarm / Life Saftey | $11,850 | Egizii | Anderson | J.B & R.J. | Carmean | Mansfield | | $12,225 | $12,225 |

SUBTOTAL $558,340 / $543,140

BUDGET TOTAL

change Bid/prop ($13,200.00)
% of change -2.01%

## GENERAL CONDITIONS

Supervision $1,800.00 Wks. 8
Start:
Per Diem
Per Diem $450
Total Supervision

AWARD

| GENERAL CONDITIONS | | |
|---|---|---|
| Telephone / Field Fax | | |
| Blueprints | | |
| Distribution | | |
| Dumpsters @ (8) 30 yards x $250.00 | | |
| Cond. Clean-Up 50/hrs @ $42.00/hr | | |
| Final Clean-Up | | |
| Permit | | |
| Temp. Utilities | | |
| PM Travel | | |
| All Weather Storage Container / Stobel | | |
| PM Labor | | |
| Porch 1st week | | |
| Equipment Rental / Fork Lift 7 wks @ $260.00 per wk | | |
| Total General Conditions | | |

## MATERIALS

| MATERIALS | | |
|---|---|---|
| Fire extinguishers (8) x $45.00 per | | |
| Misc. Construction materials | | |
| Herco Laminates / CIT x and Managers desk | | |
| US Structurals / RESOX Toilet Room accessories | | |
| Bane Nelson Doors Frames and HW | | |
| Golf Cage Cage Chain Link fencing | | |
| Totals Materials | | |

## SUMMARY

| SUMMARY | | |
|---|---|---|
| Trades | | |
| Material | | |
| Supervision, Travel & Per Diem | | |
| General Conditions (Itemized) | | |
| SUBTOTAL | | |
| General Conditions | | |
| SUBTOTAL | | |
| Insurance | 4.00% | |
| SUBTOTAL | | |
| Fee | 5.25% | |
| TOTAL | | |
| Gross Receipt Taxes | | |
| Cost / Sq.Ft | | |
| GRAND TOTAL | $22.70 | |

approval _____ date _____



# FAX COVER SHEET

| | |
|---|---|
| Fax Number: 303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9, 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1.  In the specifications, there is no Table of Contents. Is this done for a specific reason?

2.  Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.

July 26, 2001


Mr. Ken Parker
Steckel – Parker Architects, Inc.
2451 West Monroe
Springfield, IL  62704

Re:     Gart Sportmart #618
        Springfield, IL
        Capitol Project #23158

Dear Mr. Parker:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED
SEVENTY-ONE THOUSAND SEVEN HUNDRED FORTY-FIVE and No/100 Dollars
($771,745.00) for the new construction of the above referenced project based in accordance
with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1,
A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1,
E0.0, E0.1, E0.3, E2.0, E2.1,  all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you
towards a timely and successful completion.  If you have any questions please feel free to
contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.



Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:     Mark Ericksen, W/Encl.
        Capitol Construction Group, Inc.


        File, W/Enc.

GART SPORTMART #618
SPRINGFIELD, ILLINOIS
CAPTIOL PROJECT #23158

CLARIFICATIONS AND EXCLUSIONS

A.    The following Clarifications shall supercede all other contract documents where conflicts may exist:

1.    Our proposal is based upon reaching equitable contract and payment terms with the Owner/Developer.
2.    Any and all work not reflected on the drawings that might be required due to field conditions.
3.    All work to be during normal working hours (7:00 am – 3:30pm).
4.    Work to be done during normal 40-hour workweek.
5.    This proposal is based upon and we will comply with the information provided on the bid documents only and SEM clarifications and specification book.
6.    Taxes are included.
7.    Telephone service primary conduit only is included.
8.    Owner supplied items are to be on site in a timely manner.
9.    Priced per union shop.
10.   Our proposal is based on an 8-week work schedule.
11.   Capitol Construction will provide and install the national vendor packages as follows:

| | |
|---|---|
| Electrical Gear | Loeb Electric |
| Lighting | Loeb Electric |
| Flooring | Shaw Contract Flooring |
| Roof Top Mechanical Unit | Trane Company |
| Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
| Millwork | Premier Eurocase, Inc. |

12.   Ontario Store Fixture package and Pallet Rack System will be purchased and installed by Gart Sports, Capitol Construction will receive and stage.
13.   The following items as noted on sheet A0.2 shall be provided and installed by the Landlord:

      Metal Bike Rack
      Metal Bench
      Metal Trash Receptacle

14.   All low bid subcontractors by request of Capitol Construction has performed a site visit prior to pricing.

Mr. Ken Parker                                                    July 26, 2001
Page 3

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

B.    The following exclusions are included in this proposal:

1.    Temporary heating as none will be required.
2.    Permit fees are not included.
3.    Abatement work of any kind is not included.
4.    No overtime is included.
5.    No storefront glass or any automatic entry doors.
6.    Fireproofing (spray on).
7.    No demolition as none will be required.
8.    Site Protection.

C.    May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW                 -    ($ 2,800.00)

July 30, 2001


Mr. Michael Quaintance
Gart Sports
1000 Broadway
Denver, CO  80203

Re:     **REVISED BID**
        Gart Sportmart #618
        Springfield, IL
        Capitol Project #23158

Dear Mike:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED
THIRTY-THREE THOUSAND THREE HUNDRED FIFTY THREE  and No/100 Dollars
($733,353.00) for the new construction of the above referenced project based in accordance
with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1,
A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1,
E0.0, E0.1, E0.3, E2.0, E2.1,  all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you
towards a timely and successful completion.  If you have any questions please feel free to
contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.



Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:     Mark Ericksen, W/Encl.
        Capitol Construction Group, Inc.

        File, W/Enc.

Mr. Michael Quaintance                                          July 30, 2001
Page 2

# GART SPORTMART #618
# SPRINGFIELD, ILLINOIS
# CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

A.    The following Clarifications shall supercede all other contract documents where conflicts may exist:

1. Our proposal is based upon reaching equitable contract and payment terms with the Owner/Developer.
2. Any and all work not reflected on the drawings that might be required due to field conditions.
3. All work to be during normal working hours (7:00 am – 3:30pm).
4. Work to be done during normal 40-hour workweek.
5. This proposal is based upon and we will comply with the information provided on the bid documents only and SEM clarifications and specification book.
6. Taxes are included.
7. Telephone service primary conduit only is included.
8. Owner supplied items are to be on site in a timely manner.
9. Priced per union shop.
10. Our proposal is based on an 8-week work schedule.
11. Capitol Construction will provide and install the national vendor packages as follows:

    | | |
    |---|---|
    | Electrical Gear | Loeb Electric |
    | Lighting | Loeb Electric |
    | Flooring | Shaw Contract Flooring |
    | Roof Top Mechanical Unit | Trane Company |
    | Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
    | Millwork | Premier Eurocase, Inc. |

12. Ontario Store Fixture package and Pallet Rack System will be purchased and installed by Gart Sports, Capitol Construction will receive and stage.
13. The following items as noted on sheet A0.2 shall be provided and installed by the Landlord:

    Metal Bike Rack
    Metal Bench
    Metal Trash Receptacle

14. All low bid subcontractors by request of Capitol Construction has performed a site visit prior to pricing.
15. The electric price includes 30 feet of feeder cable and pipe to transformer pad only.

Mr.Michael Quaintance                                    July 30, 2001
Page 3

## GART SPORTMART#618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

16.  Fire protection number includes back flow preventor and 20 foot water storage capacity as per drawings.

17.  The plumbing price is all inclusive of gas piping but excludes gas meter and meter bar.

18.  Electric price does not include any underground/in slab piping as this has, or is to be done by shell contractor.

B.  The following exclusions are included in this proposal:

1.  Temporary heating as none will be required.
2.  Permit fees are not included.
3.  Abatement work of any kind is not included.
4.  No overtime is included.
5.  No storefront glass or any automatic entry doors.
6.  Fireproofing (spray on).
7.  No demolition as none will be required.
8.  Site Protection/Barricade work.
9.  No floor prep as this will be a new slab and none shall be required.

C.  May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW            -    ($ 2,800.00)

Mr. Michael Quaintance                                          July 30, 2001
Page 4

## GART SPORTMART#618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158
## REVISED
## TRADE BREAKDOWN

| | |
|---|---|
| BARRICADE | N/A |
| DEMOLITION | N/A |
| BOND | N/A |
| CONCRETE | 1,433.00 |
| CARPENTRY/ROUGH CARPENTRY | 20,714.00 |
| STUDS & DRYWALL | 105,477.00 |
| STOREFRONT GLASS | NIC |
| INTERIOR MIRRORS | 1,400.00 |
| ACOUSTICAL CEILING | 14,965.00 |
| STORE FIXTURES/FINISH CARPENTRY | 42,533.00 |
| PAINTING/CONCRETE SEALER | 17,472.00 |
| CARPET INSTALLATION | 45,400.00 |
| VINYL TILE & BASE | 11,200.00 |
| PLUMBING | 32,390.00 |
| SPRINKLERS | 55,990.00 |
| ELECTRICAL | 116,338.00 |
| FIRE ALARM SYSTEM | 12,225.00 |
| HVAC/VENTILATION | 114,603.00 |
| RUBBER FLOORING/SEALER | 51,000.00 |
| INSURANCE | 6,899.00 |
| SUPERVISION/TRAVEL /PER DIEM | 18,400.00 |
| GENERAL CONDITIONS | 14,253.00 |
| TOTAL MATERIALS | 14,080.00 |
| SUBTOTAL | 696,772.00 |
| PROFIT & OVERHEAD (5.25%) | 36,581.00 |
| TAXES | INCLUDED |
| **TOTAL** | **733,353.00** |



# FAX COVER SHEET

| | |
|---|---|
| Fax Number:303-832-4738 | No. of Pages (including cover sheet): 1 |
| To:  Mike Quaintance | Company Name:  Gart Sports |
| From:  Jeff Wolford | |
| Date:  July 9, 2001 | |
| Subject:  Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message:  Mike clarifications are needed on this project:

1.  In the specifications, there is no Table of Contents.  Is this done for a specific reason?

2.  Also in the specifications, there is no Division 4 and Division 5.  Should I proceed?

Please call me at 847-215-5345.



# FAX COVER SHEET

Fax Number: 303-832-4738          No. of Pages (including cover sheet): 1

To:  Mike Quaintance                Company Name:  Gart Sports

From:  Jeff Wolford

Date:  July 9, 2001

Subject:  Sportmart #618, Springfield, Illinois; Capitol Project #23158

Message:  Mike clarifications are needed on this project:

1.  In the specifications, there is no Table of Contents.  Is this done for a specific reason?

2.  Also in the specifications, there is no Division 4 and Division 5.  Should I proceed?

Please call me at 847-215-5345.

05/10/2006 14:02 FAX 3038642102    GART SPORTS    ☒001

*#618*
*Storefiles*



### National Disaster Recovery Services

| | | |
|---|---|---|
| **Name** | Mike Mavelle | **Date:** 03/31/06 |
| **Company** | Sports Authority | **Invoice #:** 1408722 |
| **Address** | 1050 W. Hampton Ave. | **Terms:** Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | **Fed Id:** 76-0628204 |
| **Tel:** | (720) 475-3285 | |
| **Fax:** | (720) 475-3285 | |

| | | |
|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | **Insurance Co:** Liberty Mutual Property |
| **City, State, Zip** | Springfield, Il. 62704 | **Insurance Adj:** Ton Tiernan |
| **Tel:** | (217) 546-0132 | **Claim #:** X69A-003155-00 |
| **Fax:** | (217) 546-1073 | |
| **Re:** | Tornado Damages in Springfield,IL | *#618* |
| **Re:** | Final Bill With Not To Exceed Amount: | |

*Not To Exceed Amount of $350,000.00 Set Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| | | $ 219,428.67 |
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | | $ (100,000.00) |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | | |
| | *REMAINING BALANCE* | $ 219,428.67 |
| **SUBTOTAL** | | $ 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | |

THE ABOVE CHARGES ARE CONSISTENT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

*Any queries regarding this invoice should be sent to us within ten days of receipt of this*

*invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.*

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact*

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77048

**\*\*Please include the invoice number on check\*\***

03/31/06

## EXHIBIT C

TSA RULE 26 DISCLOSURES
0032

05/10/2006 14:02 FAX 3038842102                GART SPORTS                                      ☒002

---

Bonnie Cochran

From:           Bonnie Cochran
Sent:           Wednesday, April 05, 2006 4:13 PM
To:             David Frieder
Subject:        RE: Sports Authority invoice 1-A(STIPULATED).xls


week ending 3/19/06:

Labor Totals: 54,453.38
Total for reimbursables:   3,410.23
Total for equipment:  43,248.75
Total for consumables: 9,494.82
Subtotal for Vendors (subcontractors)  51,545.21
Cotton USA mark up:  10,824.49
Total for Vendors (subcontractors)  62,369.70


week ending 3/26/06:

Labor Total:  20,855.38
Total for reimbursables:   2,181.19
Total for equipment:  41,336.50
Total for consumables:  3,039.82
Subtotal for Vendors (subcontractors):     103.96
Cotton USA markup:  21.83
Total for Vendors (subcontractors)  125.79


week ending 4/2/06:

Labor Totals:  1,807.50
Total for reimbursables:  99.00
Total for equipment:  -0-
Total for consumables:  -0-
Subtotal for Vendors (subcontractors)  235.27
Cotton USA mark up:  49.41
Total for Vendors (subcontractors)  284.68



Invoice from Cotton:

Emergency services final stipulated invoice sum amount:  319,428.57
Cotton has received an initial draw of:                       (100,000.00)
Remaining Balance:                                              219,428.57

1

TSA RULE 26 DISCLOSURES
0033

**Corium USA**
**Contract #1683724 Sports Authority**
**Labor Summary**
**Period Ended 03/19/06**

| Name | Classification | | Std Rate O/T Prem | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Knox, Jeff | Project Coordinator | Travel $ | 95.00 | | | | | | | | | |
| | | Regular $ | 95.00 | 8 | | | | | | | 8.0 | 760.00 |
| | | Overtime $ | 142.50 | | 10.5 | 11 | | 2 | | | 23.5 | 2,231.50 |
| Chau, Bruce | Project Manager | Travel $ | 80.00 | | | | | | | | | |
| | | Regular $ | 80.00 | 8 | 12 | 12 | 12 | | 11 | 11 | 40.0 | 3,200.00 |
| | | Overtime $ | 120.00 | | | | | | | | 19.0 | 3,650.00 |
| Castle, Phillip | Asst. Project Manager | Travel $ | 75.00 | 19 | | | | | | | 15.0 | 1,425.00 |
| | | Regular $ | 75.00 | | | | | | | | 40.0 | 3,000.00 |
| | | Overtime $ | 112.50 | | | | | | | | 32.0 | 3,600.00 |
| Parsons, Shannon | Restoration Supervisor | Travel $ | 45.00 | 19 | 13 | 10 | 13 | 10 | 11 | 11 | 19.0 | 855.00 |
| | | Regular $ | 45.00 | | | | | | | | 25.0 | 1,125.00 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | 0.00 |
| Smith, Brad | Restoration Supervisor | Travel $ | 45.00 | 5 | | | | | | | 5.0 | 225.00 |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | 0.00 |
| | | Overtime $ | 67.50 | | | | | | | | | |
| Lindeman, Bud | Restoration Supervisor | Travel $ | 45.00 | 8 | 8 | 12 | 12 | 12 | 7 | 6 | 8.0 | 360.00 |
| | | Regular $ | 45.00 | | | | | | | | 18.0 | 1,800.00 |
| | | Overtime $ | 67.50 | | 8.5 | | | | 4 | 11 | 13.0 | 1,315.00 |
| Banicki, Miroy | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | 0.00 |
| | | Regular $ | 45.00 | | | 10.5 | 12 | 13 | | | 40.0 | 1,800.00 |
| | | Overtime $ | 67.50 | | | | | 3 | | | 6.0 | 405.00 |
| Banish, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | | |
| | | Regular $ | 45.00 | | | | | | | | | |
| | | Overtime $ | 67.50 | | | | | | | | | |
| Dhangelo, Jeffrey | Skilled Labor | Regular $ | 28.50 | 5.5 | | 10.5 | 8.5 | 11.5 | | 9.5 | 14.5 | 619.88 |
| | | Overtime $ | 42.75 | | | | | | | | | |
| King, Rachel | Skilled Labor | Regular $ | 28.50 | | | 8.5 | 9.5 | 9.5 | 10 | | 40.0 | 1,140.00 |
| | | Overtime $ | 42.73 | | | | | | | | 4.5 | 192.38 |
| Sateta, John | Skilled Labor | Regular $ | 28.50 | | 9 | 8 | 5.5 | | | | 34.0 | 969.00 |
| | | Overtime $ | 42.73 | | | | | | | | | |
| Brown, Tommie | Skilled Labor | Regular $ | 28.50 | | 9 | 9.5 | 8.5 | 9.5 | 6.5 | 10.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.71 | | | | | | 3.5 | | 17.0 | 726.73 |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | | 9 | 9.5 | 8.5 | 9.5 | 3.5 6.5 | 10.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | 3.5 6.5 | | 17.0 | 726.75 |
| Broomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | | | | | | | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | | | 17.0 | 726.75 |
| Sujklovicki, Gary | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 1,068.75 |
| | | Overtime $ | 42.75 | | | | | | | | 9.0 | 168.50 |
| | | | | | | | | | | | 0.0 | 0.00 |

TSA RULE 26 DISCLOSURES
0035

05/10/2008 14:03 FAX 3038642102   GART SPORTS   ☑005

| Name | Skilled Labor | Rate $ | Hours | Total $ |
|---|---|---|---|---|
| Edward, Marvin | Regular $ | 28.50 | 9 | $ 256.50 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Dawson, Robert | Regular $ | 28.50 | 9 | $ 256.50 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Wiggins, Travis | Skilled Labor Regular $ | 28.50 | 9 | $ 256.50 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Hawkins, Abdul | Regular $ | 28.50 | 4.5 | $ 128.25 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Oatley, Shasta | Regular $ | 28.50 | 5.5 | $ 156.75 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Edwards, Tracey | Regular $ | 28.50 | 5.5 | $ 156.75 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Glisser, Ray | Regular $ | 28.50 | 5 | $ 142.50 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Anisowica, Vivian | Regular $ | 28.50 | 5 | $ 142.50 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Johnson, Ponce | Regular $ | 28.50 | 6 | $ 171.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Bireley, Samantha | Regular $ | 28.50 | 6 | $ 171.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Jackson, Gary | Regular $ | 28.50 | 0.5 | $ 14.25 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Washerspoon, Jason | Regular $ | 28.50 | 4.5 | $ 128.25 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Jackson, Bruce | Regular $ | 28.50 | 8 | $ 228.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Morrow, James | Regular $ | 28.50 | 8.5 | $ 242.25 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Williams, Charles | Regular $ | 28.50 | 16 | $ 456.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Walton, Nancy | Regular $ | 28.50 | 8.5 | $ 242.25 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Hollenback, Russell | Regular $ | 28.50 | 8 | $ 228.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Hammer, Ralph | Regular $ | 28.50 | 40 | $ 1,140.00 |
| | Overtime $ | 42.75 | 8 | $ 342.00 |
| Richmond, Alfred | Regular $ | 28.50 | 6 | $ 171.00 |
| | Overtime $ | 42.75 | | $ 0.00 |
| Brown, Ida | Skilled Labor | | | |

TSA RULE 26 DISCLOSURES
0036

05/10/2006 14:03 FAX 3038642102                    GART SPORTS                    ☒006

| Name | Type | Rate $ | | | | | | | Total $ |
|---|---|---|---|---|---|---|---|---|---|
| Seaton, Al | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 8 | 8.5 | | 9.5 | | 26.0 / 0.0 | 741.00 |
| Holm, Jerry | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 8.5 | 8.5 | | | 3.5 / 5.5 | 40.0 / 5.5 | 1,140.00 / 235.13 |
| Stevenson, Barry | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 10.5 | 11 | | | | 21.5 / 0.0 | 769.50 |
| Wilmz, Alva | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 8.5 | 8.5 | | | | 27.0 / 0.0 | 270.75 |
| Wake, Richard | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 10.5 | 10 | 9.5 | | | 30.0 / 0.0 | 855.00 |
| Garrel, Graeme | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 6 | 5.5 | | | | 11.5 / 0.0 | 327.75 |
| Shayer, Jeremiah | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 6 | 5.5 | | | | 11.5 / 0.0 | 327.75 |
| Hamilton, Robert | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 10.5 | 8.5 | 9.5 | | | 28.5 / 0.0 | 812.25 |
| Curry, Xavier | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 5.5 | 9.5 | | | 15.0 / 0.0 | 1,155.75 |
| Dahba, David | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | 6.5 | 5.5 | 9.5 | 10.5 | | 34.5 / 0.0 | 983.25 |
| McDonald, Chris | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | | | | | 6.5 / 0.0 | 185.25 |
| Walten, Jim | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 9.5 | | | | 9.5 / 0.0 | 270.75 |
| Ward, George | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 9.5 | | | | 9.5 / 0.0 | 270.75 |
| Quenlin, Curtis | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 9.5 | | | | 9.5 / 0.0 | 270.75 |
| Reed, Chania | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 9.5 | | | | 9.5 / 0.0 | 270.75 |
| White, Lena | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | 9.5 | | | | 9.5 / 0.0 | 270.75 |
| Williams, Van | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | | | 10 | 10 | 10.0 / 0.0 | 285.00 |
| Pappas, Nick | Skilled Labor Regular $ / Overtime $ | 28.50 / 42.75 | | | | 10 | 10 | 10.0 / 0.0 | 285.00 |
| Guitz, Terrance | Skilled Labor Regular $ | 28.50 | | | | | 8 | 8.0 / 0.0 | 228.00 |

TSA RULE 26 DISCLOSURES
0037

05/10/2006 14:03 FAX 3038642102  GART SPORTS  ☑007

| Name | | Regular $ | Overtime $ | | | Hours | | |
|---|---|---|---|---|---|---|---|---|
| Stone, Victor | Skilled Labor | 28.50 | 42.75 | | | 10 | 10.0 $ | 0.0 $ | 285.00 |
| McKinney, Eric | Skilled Labor | 28.50 | 42.75 | | | 10 | 10.0 $ | 0.0 $ | 285.00 |
| Colby, Christopher | Skilled Labor | 28.50 | 42.75 | | | 10 | 10.0 $ | 0.0 $ | 285.00 |
| Jones, Dwight | Skilled Labor | 28.50 | 42.75 | | | 10 | 10.0 $ | 0.0 $ | 285.00 |
| Crafton, James | Skilled Labor | 28.50 | 42.75 | | | 9 | 9.0 $ | 0.0 $ | 256.50 |
| Ludlridge, Andy | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Audazzar, Macni | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Alexander, Dan | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Blaylock, Tiffany | Skilled Labor | 28.50 | 42.75 | | | 7 | 7.0 $ | 0.0 $ | 199.50 |
| Leachman, Chad | Skilled Labor | 28.50 | 42.75 | | | 9 | 9.0 $ | 0.0 $ | 256.50 |
| Johnson, Thomas | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Nunis, Kevin | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Eck, Jerome | Skilled Labor | 28.50 | 42.75 | | | 10.5 | 10.5 $ | 0.0 $ | 299.25 |
| Longanbecker, Robert | Skilled Labor | 28.50 | 42.75 | | | 9 | 9.0 $ | 0.0 $ | 256.50 |
| Lagasse, Jason | Skilled Labor | 28.50 | 42.75 | | | 9 | 9.0 $ | 0.0 $ | 256.50 |
| Gund, Tory | Skilled Labor | 28.50 | 42.75 | | | | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | |

05/10/2006 14:04 FAX 3038642102

GART SPORTS

@008

| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Labor Ready | Temporary Labor | Regular $ | 17.58 |
| | | Overtime $ | 26.37 |
| | Client Name | | |
| Total Forward | | | |
| Management Fee | | | |
| Labor Totals | | | $ 14,833.81 |

05/10/2006 14:04 FAX 3038642102  GART SPORTS  ☑ 008

**Costco USA**
**Contract # J4083721; Sports Authority**
**Reimbursable Summary**
**Period Ended 03/19/06**

| | | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gray, Bruce | per diem | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | 210.00 |
| | hotel | 78.10 | 78.10 | 78.10 | 78.10 | 78.10 | 78.10 | 78.10 | 546.70 |
| | airfare | | | | | | | | 219.00 |
| Castillo, Phillip | per diem | 39.05 | 39.05 | 39.05 | 39.05 | 39.05 | | | 351.45 |
| | hotel | | | | | | | 78.10 | |
| | airfare | | | | | | | | |
| Parsons, Shannon | per diem | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 | | | 90.00 |
| | hotel | | | | | | | 78.10 | 155.20 |
| | airfare | | | | | | | | |
| Busch, Kilior | per diem | | 39.05 | 39.05 | 39.05 | 39.05 | 39.65 | | 120.00 |
| | hotel | | | | | | | | 195.25 |
| | airfare | | | | | | | | |
| Bultis, Luke | per diem | | | | 30.00 | 30.00 | 30.00 | 30.00 | 30.00 |
| | hotel | | | | | | | 78.10 | 78.10 |
| | airfare | | | | | | | | |
| Linehom, Rod | per diem | 99.05 | 39.05 | 39.05 | 47.29 | 47.29 | 47.29 | 47.29 | 180.00 |
| | hotel | | | | | | | | 267.26 |
| | airfare | | | | | | | | |
| Hertz Rental Car | | | | | | | | 655.25 | 655.25 |
| Subtotal for Reimbursables | | | | | | | | | 3,100.21 |
| Costco USA Markup | | | | | | | | | 310.02 |
| Total for Reimbursables | RRJ16107843) | | | | | | | | 3,410.23 |

TSA RULE 26 DISCLOSURES
0040

Costco USA
Costco # 1087121 Sports Authority
Equipment Summary
Period Ended 03/19/06

| Equipment Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Air Mover | Ea | $ 22.50 | | | | | | | 109 | 109 | $ 2,452.50 |
| Bobcat | Ea | $ 175.00 | | | | | | | | 0 | $ |
| Buffer, Floor | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Cart, Tilt/Demolition | Ea | $ 20.00 | | | | | 18 | | | 18 | $ 360.00 |
| Dolly 2 Whl/4 Whl/Dual Walkway | Ea | $ 6.00 | | | | | 1 | | | 3 | $ 18.00 |
| Dry Cleaning Unit (Portable) | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Electrical Disk Panel (Spider Box) | Ea | $ 45.00 | 12 | 12 | 12 | 12 | 28 | 28 | | 72 | $ 3,160.00 |
| Extension Cords (25' - 100') | Ea | $ 4.00 | | 18 | 18 | 18 | 28 | 28 | | 138 | $ 512.00 |
| Extraction Unit (Portable) | Ea | $ 95.00 | | 4 | 4 | 4 | 5 | 4 | 4 | 25 | $ 2,375.00 |
| Extraction Unit (Trailer) | Ea | $ 185.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Walk Behind) | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Fogger, Thermal (Gas Powered) | Ea | $ 45.00 | | | | | | | | 0 | $ |
| Fogger, ULV Thermal (Electric) | Ea | $ 235.00 | | | | | | | | 0 | $ |
| Generator (less than 3 kw) | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Generator (3kw - 6kw) | Ea | $ 165.00 | | | | | | | | 0 | $ |
| HEPA Filtration Unit/Air Scrubber | Ea | $ 105.00 | | 3 | 3 | 3 | 4 | | | 12 | $ 1,260.00 |
| Hudson Pump Sprayer | Ea | $ 8.25 | | 3 | 3 | 3 | | | | 21 | $ 173.25 |
| HVAC Vacuum System | Ea | $ 295.00 | | | | | | | | 0 | $ |
| Ladder, Step/Extension | Ea | $ 12.00 | | 1 | 8 | | 8 | | | 38 | $ 456.00 |
| Light, Dousy/Drop Stand String | Ea | $ 16.00 | | | | | 1 | 1 | | 6 | $ 310.00 |
| Mop Bucket | Ea | $ 2.00 | | | | | | | | 12 | $ |
| On Site Accounting Package | Ea | $ 125.00 | | 1 | 1 | | 1 | 1 | | 6 | $ 330.00 |
| Ozone Generator | Ea | $ 55.00 | | 1 | 1 | | 1 | 1 | | 22 | $ 550.00 |
| Personal (less than 3 hp) | Ea | $ 25.00 | | | | | | | | 0 | $ |
| Project Floors (Cellular) | Ea | $ 25.00 | | | | | | | | 0 | $ |
| Pump, Sump | Ea | $ 20.00 | | | | | | | | 0 | $ |
| Pump, Trash 1" - 4" | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Radio, 2 way/job site comm. | Ea | $ 20.00 | | | | | | | | 10 | $ 160.00 |
| Safety Package | Ea | $ 30.00 | | | | | 2 | 2 | 2 | 128 | $ 1,920.00 |
| Personal Fall Protection (PFP) | Ea | $ 30.00 | | 19 | 25 | 22 | 20 | 11 | 31 | 128 | $ 1,180.00 |
| Personal Protection Equipment (PPE) | Ea | $ 15.00 | | | | | | | | 0 | $ |
| Personal Respiratory Protection (PRP) | Ea | $ 30.00 | | | 25 | 21 | 20 | 11 | 31 | 0 | $ |
| Small Tools Charge | Ea | $ 10.00 | | | | | | | | 0 | $ |
| Sprayer, Airless | Ea | $ 90.00 | | | | | | | | 19 | $ 1,255.00 |
| Gang Box Tool | Ea | $ 65.00 | | 2 | 2 | | 4 | 4 | 4 | 0 | $ |
| Trailer (Freezer) | Ea | $ 123.00 | | | | | | | | 0 | $ |
| Trailer (18' - 28') | Ea | $ 90.00 | | | | | | | | 0 | $ |
| Trailer 36' | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Trailer 14'-22' | Ea | $ 33.00 | | | | | | | | 0 | $ |
| Trailer 18' | Ea | $ 105.00 | | | | | | | | 0 | $ |
| Trailer (Office Trailer) | Ea | $ 123.00 | | 1 | 1 | 1 | | | 1 | 6 | $ 570.00 |
| Truck - Parking | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Truck 24 ft. | Ea | $ 245.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Large | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Small | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Vacuum (Anti-Static) | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Vacuum, HEPA | Ea | $ 35.00 | | 2 | 2 | 2 | 3 | 3 | | 13 | $ 1,165.00 |
| Vacuum, PP30/PP75 | Ea | $ 125.00 | | | | | | | | 1 | $ 125.00 |
| Van, Cargo / Company Owned | Ea | $ 121.00 | | | | | | | | 1 | $ 220.00 |
| Company Owned Vehicle | Ea | $ 55.00 | | 1 | 1 | 1 | | 1 | 1 | 6 | $ |
| Vapor Tek, Large | Ea | $ 70.00 | | | | | 3 | 3 | | 0 | $ |
| Vapor Tek, Small | Ea | $ 35.00 | | | | | | | | 0 | $ |
| Washer, High Pressure (Cold) | Ea | $ 75.00 | | | | | | | | 0 | $ |

| Water, High Pressure (Hot) | Ea | $ | Daily | | | | | | 195.00 | | 0 | $ | 315.00 | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drying Equipment Description | | | | | | | | | | | | | | |
| Thermo Camera | Ea | $ | 225.00 | | | | | | | | 3 | $ | 315.00 | - |
| Dehumidification Unit - 200 cfm | Ea | $ | 105.00 | | | | | | | | 3 | $ | | - |
| Dehumidification Unit - 300 cfm | Ea | $ | 185.00 | | | | | | | | 0 | $ | | - |
| Dehumidification Unit - 300 dm | Ea | $ | 420.00 | | | | | | | | 0 | $ | | - |
| Dehumidification Unit - 1125 cfm | Ea | $ | 875.00 | | | | | | | | 0 | $ | | - |
| Dehumidification Unit - 2000/2150 cfm | Ea | $ | 1,195.00 | | | | | 4 | | | 20 | $ | 23,900.00 | - |
| Dehumidification Unit - 4900 cfm | Ea | $ | 1,795.00 | | | | | | | | 0 | $ | | - |
| Dehumidification Unit - 9000/10000 cfm | Ea | $ | 875.00 | | | | | | | | 0 | $ | | - |
| DX Unit - 20/25 Ton | Ea | $ | 125.00 | | | | | | | | 0 | $ | | - |
| InjectiDry Unit | Ea | $ | | | | | | | | | | $ | | - |

Total for Equipment $ 43,148.75

TSA RULE 26 DISCLOSURES
0042

05/10/2008 14:05 FAX 3038842102          GART SPORTS          ☒012

Corisus USA
Contract # 1039721, Sports Authority
Chemaraising Summary
Period Ended 03/19/2006

| Chemical Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ 77.00 | | | | | | | | 0.0 | $ |
| Alcohol, Isopropyl | Gal | $ 51.83 | | | | | | | | 0.0 | $ |
| Cleaner, Stainless Steel | Gal | $ 37.95 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Liquid) | Gal | $ 14.85 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Powder) | Lb | $ 2.50 | | | | | | | | 0.0 | $ |
| Cleaner, Glass | Gal | $ 13.00 | | | | | | | | 0.0 | $ |
| Cleaner, Hard Surface | Gal | $ 21.10 | | | | | | | | 0.0 | $ |
| 815 MX (GPD) | Gal | $ 17.25 | | | | | | | | 0.0 | $ |
| General Purpose Degreaser | Gal | $ 11.25 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 39.75 | | | | | | | | 0.0 | $ |
| Natura Sub | Gal | $ 33.00 | | | 5.0 | 5.0 | 6.0 | | | 33.0 | $ 1,096.00 |
| Cleaner, HVAC Coil | Gal | $ | | | | | | | | 0.0 | $ |
| Deodorizer | | | | | | | | | | | |
| Deodorizing Gel | Lb | $ 13.00 | | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Gal | $ 37.50 | | | | | | | | 0.0 | $ |
| Deodorizing Block | Ea | $ 45.00 | | | | | | | | 0.0 | $ |
| Disinfectant/Biocide | Gal | $ 34.25 | | | | | | | | 0.0 | $ |
| Bleach | Gal | $ 9.25 | | | | | | | | 0.0 | $ |
| Thermo Fog | Gal | $ 34.00 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 4.25 | | | | | | | | 0.0 | $ |
| Goof Off | Ea | $ 6.25 | | | | | | | | 0.0 | $ |
| Lubricant (Electrical) | | | | | | | | | | | |
| Lubricant (Electrical) | Gal | $ 23.75 | | 4.0 | 5.0 | 5.0 | 6.0 | | | | $ |
| Lubrication Machinery | | | | | | | | | | | |
| Penetrant, light | Gal | $ 31.10 | | | | | | | | | $ |
| Long Term Preserver, heavy | Gal | $ 19.50 | | | | | | | | | $ |
| Metal Polishing Paste | Ea | $ 9.65 | | | | | | | | | $ |
| Stainless Steel Polish | Ea | $ 8.25 | | | | | | | | | $ |
| Rust Inhibitor/Remover | | | | | | | | | | | $ |
| Complete Cleaner | | | | | | | | | | | $ |
| Descaler | Gal | $ 54.00 | | | | | | | | | $ |
| Sealtone | Gal | $ 59.00 | | | | | | | | | $ |
| Duct Sealant Spray | Gal | $ 41.00 | | | | | | | | | $ |
| Duct Sealant, Antifungicidal | Gal | $ 63.00 | | | | | | | | | $ |
| Duct Sealant, Pigmented | Gal | $ 35.00 | | | | | | | | | $ |
| Sand Sealant, Clear | Gal | $ 22.00 | | | | | | | | | $ |
| Silver/Copper/Flux Cleaner | Ea | $ 12.00 | | 1.0 | 5.0 | 9.0 | 3.0 | 12.0 | 8.0 | | $ |
| Spray Adhesive | Can | $ 5.26 | | | | | | | | | $ 168.32 |
| **Material Description** | **Unit** | **Rate** | | | | | | | | | |
| Bags, Acid Static | Ea | $ 14.00 | | | | | | | | 0.0 | $ |
| Bags, Trash | Ea | $ 28.00 | | 1.50 | 15.0 | 8.0 | 13.0 | 12.0 | 10.0 | 73.0 | $ 2,044.00 |
| Bags, Trash Environmental -Sml | Ea | $ 3.95 | | | | | | | | 0.0 | $ |
| Box, Body Freeze Dry | Ea | $ 2.65 | | | | | | | | 0.0 | $ |
| Box, Body Freeze Dry | Ea | $ 5.45 | | | | | | | | 0.0 | $ |
| Paper, Corrugated | Ea | $ 87.50 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - large | Ea | $ 10.00 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - small | Ea | $ 4.00 | | | | | | | | 0.0 | $ |
| Brush, Long Handled Scrub | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Brush, New Conduct | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Desi, Lay Flat (250') | Rl | $ 375.00 | | | | | 6.0 | | | 6.0 | $ 2,250.00 |

TSA RULE 26 DISCLOSURES
0043

05/10/2006 14:08 FAX 3038642102     GART SPORTS

☑013
E-FILED
Monday, 31 December, 2007 02:35:15 PM
Clerk, U.S. District Court, ILCD

| Item | Unit | $ | | | | | | | $ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask (HEPA (N95/P100)) | Ea | $ 8.00 | | 3.0 | 3.0 | 3.0 | 1.0 | 0.0 | $ | 392.00 |
| Dust Mask | Bx | $ 14.50 | | | | | | 16.0 | $ | |
| Filter Material | Bu | $ 65.00 | | | | | | 0.0 | $ | |
| Filter Secondary | Ea | $ 5.80 | | | | | | 0.0 | $ | |
| Pre Filter | Ea | $ 3.75 | | | | | | 0.0 | $ | |
| Furniture Blocks | Bx | $ 77.00 | | | | | | 0.0 | $ | |
| Furniture Pads | Bx | $ 84.00 | | | | | | 0.0 | $ | |
| Gloves, Cotton | Pr | $ 1.75 | | | | | | 0.0 | $ | |
| Gloves, Cotton | Pr | $ 18.00 | | | | | | 0.0 | $ | |
| Gloves, Surgical Latex | Pr | $ 5.25 | 19.0 | 25.0 | 22.0 | 20.0 | 11.0 | 31.0 | 128.0 | $ | 672.00 |
| Gloves, W.o./Rubber/Chemical | Bx | $ 15.00 | | | 2.0 | | | 2.0 | 2.0 | $ | 30.00 |
| Hog Rings | Bx | $ 95.00 | | | | 6.0 | 2.0 | 4.0 | 0.0 | $ | |
| Inventory Tags | Bx | $ 5.5 | | | 1.0 | | | 13.0 | $ | 63.00 |
| Mop Heads | Ea | $ 20.00 | | 2.0 | | 2.0 | 2.0 | | 24.0 | $ | |
| Non Contact Scrubbers, green (#96) | Bx | $ 72.00 | 1.0 | | 1.0 | | 10.0 | 8.0 | 24.0 | $ | 1,728.00 |
| Plastic Sheeting (20'X100') | Rl | $ 18.25 | | | | | | | 0.0 | $ | |
| Pulmari Plastic (Roll) | Rl | $ 24.00 | | | | | | | 0.0 | $ | |
| Quick Teat Strips (per 30) | Pkg | $ 4.90 | | | | | | | 0.0 | $ | |
| Sponges, Sout Removal | Ea | $ 3.95 | | | | | | | 0.0 | $ | |
| Spray Buds w/ Trigger | Ea | $ 7.00 | 5.0 | | | | | | 0.0 | $ | 359.00 |
| Tags, Dust | Rl | | | | | | | | | $ | |

05/10/2006 14:08 FAX 3038642102   GART SPORTS   ☑014

| Item | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | RI | $ 8.75 | | | | | | | 0.0 | $ — |
| Tape, HVAC (Aluminum) | RI | $ 21.00 | | | | | | | 0.0 | $ — |
| Tape, Poly Box | RI | $ 0.50 | | | | | | | 0.0 | $ — |
| Tarps | RI | $ 2.50 | | | | | | | 0.0 | $ — |
| Tyvek Suits | Ea | $ 7.25 | | | | | | | 0.0 | $ — |
| Wipes Cotton Cloth | LS | $ 4.35 | | | | | | | 0.0 | $ — |
| Wipes Lint Free | Bx | $ 25.00 | | | | | | | 0.0 | $ — |
| Wipes Shop | RI | $ 72.00 | | | | | | | 0.0 | $ — |
| Wipes Wipe All | Pkg | $ 9.00 | | | | | | | 0.0 | $ — |
| Wrap, Bubble/Anti Static | RI | $ 64.75 | | | | | | | 130.0 | $ 651.50 |
| Wrap Shrink | RI | $ 48.00 | | | | | | | 0.0 | $ — |
| | | | | 150.0 | 250.0 | 250.0 | 250.0 | 250.0 | 250.0 | |
| **Total for Consumables** | | | | | | | | | | **$ 9,494.82** |

Cintas USA
Contract # 140/8712; Sports Authority
Vendors (Subcontractors) Summary
Period Ended 03/19/06

| Item | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Unscheduled Materials (Petty Cash & Credit Card Control) | $ 149.09 | | | | | | | $ 149.09 |
| Vasa Truck Post - Fuel | | $ 46.28 | | | | | | $ 46.28 |
| IHI Shop - Fuel | | $ 41.99 | | | | | | $ 41.99 |
| Lowes - Supplies | | | $ 16.14 | | | | | $ 16.14 |
| Lowes - Supplies | | | | $ 49.22 | | | | $ 49.22 |
| Lowes - Supplies | | | | | $ 37.31 | | | $ 37.31 |
| Office Depot-Supplies | | | | | | $ 13.75 | | $ 13.75 |
| Lowes - Supplies | | | | | | | $ 63.50 | $ 63.50 |
| Thauton - Fuel | | | | | | | | $ 7,437.42 |
| Morgan Distributing Inc - Fuel for Generators | | | | | | | | $ -3,186.00 |
| Waste Management - Dumpsters(14) | | | | | | | | $ 5,486.00 |
| Sunbelt - Lull | | | | | | | | $ 1,063.92 |
| Mobile Mini Inc - 3 Storage Containers for 6 Months | | | | | | | | $ 4,786.50 |
| Sunbelt - Gas Floor Stripper | | | | | | | | $ 2,335.59 |
| Sunbelt - 20 Ft. Articulate Narrow 3lb Boom Lift | | | | | | | | $ 1,659.00 |
| Sunbelt - 1 Light Tower | | | | | | | | $ 1,359.50 |
| Sunbelt - (2) 56kW Generators | | | | | | | | $ 210.30 |
| Sunbelt - Distribution Cable | | | | | | | | $ 3,564.00 |
| Sunbelt - 320kW Generator | | | | | | | | $ 3,591.00 |
| Sunbelt - 320kW Generator | | | | | | | | $ 3,591.00 |
| Sunbelt - 2 Electric Walk Behind Floor Strippers | | | | | | | | $ 6,000.00 |
| Isuza Hoarding | | | | | | | | $ 6,000.00 |
| Sunbelt - 2 Electric Walk Behind Floor Strippers | | | | | | | | $ 382.00 |
| EFI - Structural Inspection | | | | | | | | $ 1,059.00 |
| | | | | | | | | $ 7,500.00 |

| | |
|---|---|
| Subtotal for Vendors (Subcontractor) | $ 51,545.21 |
| Cotton USA Markup | $ 10,824.49 |
| Total for Vendors (Subcontractor) | $ 62,369.70 |

TSA RULE 26 DISCLOSURES
0046

05/10/2006 14:06 FAX 3038642102

GART SPORTS

図016

Costco USA
Contractor # 1045721, Sports Authority
Labor Summary
Period Ended 3/26/06

| Name | Classification | | Std. Rate O/T Prem | Mon 03/20 | Tue 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kitoe, Jeff | Project Coordinate | Travel $ | | | | | | | | | 0.0 | $ 0.0 |
| | | Regular $ | 95.00 | | | | 4 | | | | 4.0 | $ 380.00 |
| | | Overtime $ | 142.50 | | | | | | | | 0.0 | $ 0.0 |
| Genz, Bruce | Project Manager | Travel $ | 80.00 | | | | | | | | 36.0 | $ 2,880.00 |
| | | Regular $ | 80.00 | 13 | | 7 | 6 | | | | 5.0 | $ 3,000.00 |
| | | Overtime $ | 120.00 | | | | | | | | 0.0 | $ |
| Castillo, Phillip | Asst. Project Manager | Travel $ | 75.00 | | | | | | | | 40.0 | $ |
| | | Regular $ | 75.00 | 13 | 10 | 11 | 6 | | | | 5.0 | $ 562.50 |
| | | Overtime $ | 112.50 | | | | | | | | 0.0 | $ |
| Pasneri, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 40.0 | $ 1,800.00 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 3.0 | $ 202.50 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Hutchings, Bud | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | 5 | | | | 40.0 | $ 1,800.00 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Bugsby, Mitote | Restoration Supervisor | Travel $ | 44.00 | | | | | | | | 11.0 | $ 495.00 |
| | | Regular $ | 45.00 | 11 | 10 | | 8 | | | | 3.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Babine, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 19.0 | $ 541.50 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Dinagelo, Jeffrey | Skilled Labor | Travel $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 28.50 | 18 | 9 | 9 | 10 | | | | 37.0 | $ 1,051.50 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| King, Rachel | Skilled Labor | Travel $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 28.50 | 10 | 9 | 10.5 | 10 | | | | 39.5 | $ 1,125.75 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Sakata, John | Skilled Labor | Regular $ | 28.50 | | | | | | | | 29.5 | $ 840.75 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Brown, Tomasie | Skilled Labor | Regular $ | 28.50 | 10 | 9 | 10.5 | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | 18 | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Bloomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Holtenback, Russell | Skilled Labor | Regular $ | 28.50 | 10 | | | | | | | 10.0 | $ 285.00 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0047

05/10/2006 14:06 FAX 3038842102          GART SPORTS          ☑ 017

| Name | | Regular $ | Overtime $ | | | | | | | | $ | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hammers, Ralph | Skilled Labor | 28.50 | 42.75 | 8.25 | | | | | | | 17.0 | 0.0 | 491.63 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Seaton, Al | Skilled Labor | 28.50 | 42.75 | 9 | | | | | | | 9.0 | 0.0 | 256.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Dabbs, David | Skilled Labor | 28.50 | 42.75 | 9 | | | | | | | 9.0 | 0.0 | 256.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Williams, Van | Skilled Labor | 28.50 | 42.75 | 9 | | | | | | | 9.0 | 0.0 | 256.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Sykes, Andre | Skilled Labor | 28.50 | 42.75 | 10 | | | | | | | 10.0 | 0.0 | 285.00 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Coulton, Jason | Skilled Labor | 28.50 | 42.75 | 10 | | | | | | | 10.0 | 0.0 | 285.00 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Cole, Milton | Skilled Labor | 28.50 | 42.75 | 9.5 | 9 | 10.5 | 10 | | | | 39.0 | 0.0 | 1,111.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Gonzalez, David | Skilled Labor | 28.50 | 42.75 | 10 | | | | | | | 10.0 | 0.0 | 285.00 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Wilkins, Phillip | Skilled Labor | 28.50 | 42.75 | 9 | 9 | 10.5 | 5.5 | | | | 29.5 | 0.0 | 840.75 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Poppas, Nick | Skilled Labor | 28.50 | 42.75 | 10 | 9 | | | | | | 9.5 | 0.0 | 270.75 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Gales, Terrance | Skilled Labor | 28.50 | 42.75 | 9.5 | 9 | 10.5 | 10 | | | | 37.0 | 0.0 | 1,054.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Reed, Corrie | Skilled Labor | 28.50 | 42.75 | 9 | 9 | 9 | | | | | 9.0 | 0.0 | 256.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Oller, Steven | Skilled Labor | 28.50 | 42.74 | 9 | | | | | | | 9.0 | 0.0 | 256.50 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| McKinney, Eric | Skilled Labor | 28.50 | 42.75 | 8.5 | 9 | 10.5 | | | | | 33.5 | 0.0 | 954.75 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Sims, Victor | Skilled Labor | 28.50 | 42.75 | 8.5 | | | | | | | 8.5 | 0.0 | 242.25 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Lambridge, Annie | Skilled Labor | 28.50 | 42.75 | 10 | 9 | | | | | | 10.0 | 0.0 | 285.00 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| King, Roy | Skilled Labor | 28.50 | 42.71 | 10 | 9 | 10.5 | | | | | 19.5 | 0.0 | 555.75 |
| | | | | | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | 0.0 | 0.0 | |

TSA RULE 26 DISCLOSURES
0048

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | 0.0 |
|------|---------------|-----------|-------|--|--|--|--|--|-----|
| | | Overtime $ | 42.75 | | | | | | 0.0 |

_(The page is a rotated labor-rate form consisting of repeated rows, each reading:)_

- Name — Skilled Labor — Regular $ 28.50 — Overtime $ 42.75

_(This block of Name / Skilled Labor / Regular $ 28.50 / Overtime $ 42.75 repeats approximately 22 times down the page, each row followed by a grid of blank cells ending in 0.0 values.)_

TSA RULE 26 DISCLOSURES
0049

05/10/2006 14:07 FAX 3038642102

GART SPORTS

| Name | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Skilled Labor | | | | | | | | | | | |
| Regular $ | 28.50 | | | | | | | | | | 0.0 $ |
| Overtime $ | 42.75 | | | | | | | | | | 0.0 $ |

TSA RULE 26 DISCLOSURES
0050

05/10/2006 14:08 FAX 3038642102          GART SPORTS                                    ☑020

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.73 | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ | |
| Labor Ready | Temporary Labor | Regular $ | 17.58 | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 26.37 | | | | | | | | | 0.0 | $ | |
| Management Fee | | Client Name | | | | | | | | | | | | |
| Total Personal | | | | | | | | | | | | | | |
| Labor Totals | | | | | | | | | | | | | $ | 10,655.58 |

05/10/2006 14:08 FAX 3038842102    GART SPORTS    ☑ 021

**Cotton USA**
**Contract # 140871J Sports Authority**
**Reimbursable Summary**
**Period Ended 03/26/06**

| | | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gant, Bruce | perdiem | $ 30.00 | | | | | | | $ 100.00 |
| | hotel | $ 312.40 | | | | | | | $ 312.40 |
| | airfare | | | | | | | | $ 253.30 |
| Casillo, Phillip | perdiem | | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | | | $ 180.00 |
| | hotel | | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | | $ 468.60 |
| | airfare | | | | | 253.30 | | | |
| Parson, Shannon | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Buslick, Minor | perdiem | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | | | $ 150.00 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | | $ 590.50 |
| | airfare | | | | | | | | |
| Butler, Luke | perdiem | | | | | | $ 30.00 | | $ 30.00 |
| | hotel | | | | | | $ 78.10 | | $ 78.10 |
| | airfare | | | | | | | | |
| Hutchman, Rod | perdiem | $ 30.00 | $ 30.00 | | | | | | |
| | hotel | $ 78.10 | $ 78.10 | | | | | | |
| | airfare | | | | | | | | |
| Hertz Rental | | | | | | | | | |
| Subtotal for Reimbursables | | | | | | | | | $ 1,982.90 |
| Cotton USA Markup | | | | | | | | | $ 198.39 |
| **Total for Reimbursables** | | | | | | | | | **$ 2,181.19** |

TSA RULE 26 DISCLOSURES
0052

GART SPORTS

Cabin USA
Contract # 1408772/ Sports Authority
Equipment Summary
Period Ended 03/26/06

| Equipment Description | Unit | Rate | Min 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | 91.00 | | | | | | | | 0 | |
| Air Mover | Ea | 22.50 | 53 | 55 | 55 | 55 | 55 | | | 273 | 6,142.50 |
| Bobcat | Ea | 111.00 | | | | | | | | 0 | |
| Buffer, Floor | Ea | 30.00 | 3 | 1 | 1 | 2 | | | | 10 | 200.00 |
| Cart, 3W Diamond | Ea | 20.00 | 3 | 1 | | | | | | 4 | 24.60 |
| Daily, 3 WM/4 WM/Enz/WMow | Ea | 6.00 | | | | | | | | | |
| Dry Cleaning Unit (Portable) | Ea | 45.00 | 12 | 12 | 12 | 12 | | | | 48 | 2,160.00 |
| Electrical Disk Panel (Gider Box) | Ea | 4.00 | 28 | 28 | 32 | 31 | | | | 119 | 476.00 |
| Extension Cords (25'-100') | Ea | 95.00 | | | | | | | | 2 | 190.00 |
| Extraction Unit (Portable) | Ea | 185.00 | | | | | | | | 0 | |
| Extraction Unit (Trailer) | Ea | 185.00 | | | | | | | | 0 | |
| Floor Cleaning System (Walk Behind) | Ea | 45.00 | | | | | | | | 0 | |
| Fogger, Thermal (Gas Powered) | Ea | 35.00 | | | | | | | | 0 | |
| Fogger, ULV/Thermal (Electric) | Ea | 105.00 | | | | | | | | 0 | |
| Generator (less than 10kw) | Ea | 103.00 | | | | | | | | 0 | |
| HEPA Rinsing Unit/ Air Scrubber | Ea | 8.25 | 4 | | | | | | | 8 | 66.00 |
| Hudson Pump Sprayer | Ea | 293.00 | | | | | | | | 0 | |
| HVAC Vacuum System | Ea | 16.00 | 4 | 4 | 4 | 5 | 2 | | | 19 | 228.00 |
| Ladder, Step/ Extension | Ea | 2.00 | 4 | 4 | 4 | 5 | | | | 16 | 96.00 |
| Light, Drand/ Drop/ Stand/ String | Ea | 8.00 | 1 | | | | | | | 5 | 34.00 |
| Mop Bucket | Ea | 123.00 | | 1 | 1 | 5 | 1 | | | 17 | 275.00 |
| On Site Accounting Package | Ea | 25.00 | | | | | | | | 13 | 325.00 |
| Ozone Generator | Ea | 25.00 | | | | | | | | 0 | |
| Project Phone (Cellular) | Ea | 20.00 | | | | | | | | 0 | |
| Pump, Sump | Ea | 65.00 | | | | | | | | 0 | |
| Pump, Trash 2"-4" | Ea | 20.00 | | | | | | | | 0 | |
| Radio, 2 way + job site comm. | Ea | | | | | | | | | 0 | |
| Safety Float Protection (PFP) | Ea | | | | | | | | | 6 | 180.00 |
| Personal Fall Protection (PFP) | Ea | 30.00 | 23 | 12 | 12 | 2 | 9 | | | 61 | 915.00 |
| Personal Respiratory Equipment (PRE) | Ea | 30.00 | | | | | | | | 0 | |
| Personal Respiratory Protection (PRP) | Ea | 10.00 | 23 | 12 | 10 | 2 | | | | 52 | 520.00 |
| Small Tools Charge | Ea | 90.00 | | | | | | | | 10 | 650.00 |
| Sprayer, Airless | Ea | 65.00 | | | | | | | | 0 | |
| Gang Box Tool | Ea | 125.00 | | | | | | | | 0 | |
| Trailer (Office Trailer) | Ea | 125.00 | | | | | | | | 0 | |
| Truck, Pulling | Ea | 65.00 | | | | | | | | 0 | |
| Truck, 24 ft | Ea | 93.00 | | | | | | | | 0 | |
| Trailer (28'-53') | Ea | 55.00 | | | | | | | | 0 | |
| Trailer 48' | Ea | 55.00 | | | | | | | | 0 | |
| Trailer 16'-27' | Ea | 105.00 | | | | | | | | 0 | |
| Ultrasonic Bath, Large | Ea | 285.00 | | | | | | | | 0 | |
| Ultrasonic Bath, Small | Ea | 125.00 | | | | | | | | 0 | |
| Vacuum (Anti-Static) | Ea | 65.00 | 8 | 6 | 6 | | | | | 26 | 2,110.00 |
| Vacuum, HEPA | Ea | 85.00 | | | | | | | | 0 | |
| Vacuum, HEPA | Ea | 25.00 | | | | | | | | 5 | |
| Vacuum, W350/ PPS | Ea | 125.00 | | | | | | | | 5 | 475.00 |
| Van, Cargo / Company Owned | Ea | 83.00 | | | | | | | | 0 | |
| Company Owned Vehicle | Ea | 55.00 | | | | | | | | 5 | |
| Vapor Tek, Large | Ea | 55.00 | | | | | | | | 5 | 275.00 |
| Vapor Tek, Small | Ea | 70.00 | | | | | | | | 0 | |
| Washer, High Pressure (Cold) | Ea | 73.00 | | | | | | | | 0 | |

TSA RULE 26 DISCLOSURES
0053

05/10/2006 14:08 FAX 3038642102 GART SPORTS @023

| Dry Ice Equipment Description | Unit | Daily | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Washer, High Pressure (Hot) | Ea | $ 195.00 | | | | | | | | 0 | $ | |
| Thermo Camera | Ea | $ 225.00 | 3 | | | | | | | 139 | $ 1,995.00 | |
| Dehumidification Unit - 200 cfm | Ea | $ 105.00 | | | | | | | | 0 | $ | |
| Dehumidification Unit - 300 cfm | Ea | $ 185.00 | 1 | | | | | | | 0 | $ | |
| Dehumidification Unit - 1125 cfm | Ea | $ 420.00 | | | | | | | | 0 | $ | |
| Dehumidification Unit - 2000/2250 cfm | Ea | $ 877.00 | 1 | 1 | 1 | 1 | 1 | | | 20 | $ 23,900.00 | |
| Dehumidification Unit - 4500 cfm | Ea | $ 1,195.00 | | | | | | | | 0 | $ | |
| Dehumidification Unit - 9000/10000 cfm | Ea | $ 1,795.00 | | | | | | | | 0 | $ | |
| DX Unit - 20/25 Ton | Ea | $ 875.00 | | | | | | | | 0 | $ | |
| Injectidry Unit | Ea | $ 125.00 | | | | | | | | 0 | $ | |
| Total for Equipment | | | | | | | | | | | $ 41,336.59 | |

TSA RULE 26 DISCLOSURES
0054

05/10/2006 14:08 FAX 3038642102

Cintas USA
Contract #168/214 Sports Authority
Consumables Summary
Period Ended 03/26/06

| Chemical Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ 77.00 | | | | | | | | 0.0 | $ |
| Alcohol, Isopropyl | Gal | $ 14.85 | | | | | | | | 0.0 | $ |
| Cleaner, Stainless Steel | Gal | $ 32.00 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Liquid) | Lb | $ 17.95 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Powder) | Lb | $ 2.50 | | | | | | | | 0.0 | $ |
| Cleaner, Glass | Gal | $ 11.00 | | | | | | | | 0.0 | $ |
| Cleaner, Hard Surface | Gal | $ | | | | 1.0 | | | | 1.0 | $ 22.10 |
| General Purpose Degreaser | Gal | $ 11.25 | | | | | | | | 0.0 | $ |
| FLEX (GID) | Gal | $ 11.50 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 59.73 | | | | | | | | 0.0 | $ |
| Nature Sol | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Cleaner, HVAC Coil | Gal | $ | | | | | | | | 0.0 | $ |
| Deodorizer | Lb | $ 13.00 | | | | | | | | 0.0 | $ |
| Deodorizing Gel | Ea | $ 37.50 | | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Gal | $ 43.00 | 4.0 | | 4.0 | 15.0 | | | | 18.0 | $ 950.00 |
| Deodorizing Block | Ea | $ 34.25 | | | | | | | | 0.0 | $ |
| Disinfectant Biocide | Gal | $ 2.75 | | | | 1.0 | | | | 1.0 | $ 2.75 |
| Bleach | Gal | $ 51.00 | | | | | | | | 0.0 | $ |
| Thermo Fog | Ea | $ 5.25 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 6.25 | | | | | | | | 0.0 | $ |
| Goof Off | Gal | $ | | | | | | | | 0.0 | $ |
| Lubricant, Electrical | Ea | $ 23.75 | | | | | | | | 0.0 | $ |
| Lubricant (silicone) | Ea | $ | | | | | | | | 0.0 | $ |
| Lubricant, Machinery | Gal | $ 91.10 | | | | | | | | 0.0 | $ |
| Preserver, light | Gal | $ 19.50 | | | | | | | | 0.0 | $ |
| Long Term Preserve, heavy | Ft | $ 9.65 | | | | | | | | 0.0 | $ |
| Metal Polishing Paste | Ea | $ 8.55 | | | | | | | | 0.0 | $ |
| Stainless Steel Polish | Gal | $ | | | | | | | | 0.0 | $ |
| Rust Inhibitor/Removers | Gal | $ | | | | | | | | 0.0 | $ |
| Complete Cleaner | Gal | $ 34.00 | | | | | | | | 0.0 | $ |
| Degreaser | Gal | $ 39.00 | | | | | | | | 0.0 | $ |
| Sealuster | | $ | | | | | | | | 0.0 | $ |
| Dust Sealant Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ |
| Dust Sealant, Antifungicidal | Gal | $ 65.00 | | | | | | | | 0.0 | $ |
| Soot Sealant, Pigmented | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Soot Sealant, Clear | Ft | $ 22.00 | | | | | | | | 0.0 | $ |
| Silver Copper/Tar Cleaner | Cga | $ 12.00 | | | | | | | | 0.0 | $ |
| Spray Adhesive | | $ 5.26 | | | | | | | | 2.0 | $ 10.52 |

| Metal Description | Unit | Rate | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bags, Anti Static | Ea | $ 3.00 | | | | | | | | 0.0 | $ |
| Bags, Trash | Ea | $ 28.00 | | 2.0 | | 8.0 | 1.0 | | | 16.0 | $ 418.00 |
| Back, Trash Reinforced - Sml | Ea | $ 1.95 | | | | | | | | 0.0 | $ |
| Box, Body/ Breeze Dry | Ea | $ 5.41 | | | | | | | | 0.0 | $ |
| Box, Dish Pack | Ea | $ 2.65 | | | | | | | | 0.0 | $ |
| Paper, Corrugated | Ea | $ 87.50 | | | | | | | | 0.0 | $ |
| Brush Dispenser - large | Ea | $ 10.00 | | | | | | | | 0.0 | $ |
| Brush Dispenser - small | Ea | $ 4.00 | | | | | | | | 0.0 | $ |
| Brush, Long Handled Scrub | Ea | $ 9.00 | | | | | | | | 0.0 | $ |
| Brush, Resin Combed | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Dust Lay Pad (5ft) | Rl | $ 575.00 | | | | | | | | 0.0 | $ |

05/10/2006 14:09 FAX 3038842102     GART SPORTS                     ☑025

| Item | Unit | | $ | | | | | | | $ | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (N95/P100) | Ea | $ | 8.00 | 2.0 | | 1.0 | 3.0 | 1.0 | | 0.0 | $ | 196.00 |
| Dust Mask | Bx | $ | 24.50 | | | | | | | 8.0 | $ | |
| Filter Material | Bl | $ | 56.00 | | | | | | | 0.0 | $ | |
| Filter Secondary | Bl | $ | 4.80 | | | | | | | 0.0 | $ | |
| Pre Filter | Ea | $ | 3.75 | | | | | | | 0.0 | $ | |
| Furniture Blocks | Bx | $ | 77.00 | | | | | | | 0.0 | $ | |
| Furniture Pads | Bx | $ | 84.00 | | | | | | | 0.0 | $ | |
| Gloves, Cotton | Bx | $ | 11.25 | | | 1.0 | | | | 0.0 | $ | 18.00 |
| Gloves, Surgical Latex | Bx | $ | 18.00 | | | | | | | 1.0 | $ | 18.00 |
| Gloves, Work/ Rubber/ Chemical | Pr | $ | 14.13 | 210.0 | 12.0 | 100.0 | 10.0 | 9.0 | | 64.0 | $ | 336.00 |
| Hog Rings | Bx | $ | 15.00 | | | | | | | 0.0 | $ | |
| Inventory Tags | Bx | $ | 94.00 | | | | | | | 0.0 | $ | |
| Mop Heads | Bx | $ | 5.25 | | 3.0 | | 5.0 | | | 15.0 | $ | 18.75 |
| Neat Combed Screwdrivers (6PS) | Bx | $ | 20.00 | | | | | | | 0.0 | $ | |
| Plastic Sheeting (20'X100') | Bx | $ | 18.75 | 3.0 | | | 2.0 | | | 5.0 | $ | 360.00 |
| Painters Plastic (9mil) | Rl | $ | 72.00 | | | | | | | 0.0 | $ | |
| Reinforce Plastic Strips (box 50) | Pkg | $ | 24.00 | | | | | | | 0.0 | $ | |
| Quick Test Strips (box 50) | Ea | $ | 1.80 | | | | | | | 0.0 | $ | |
| Spontex Sock Removal | Ea | $ | 3.95 | | | | | | | 0.0 | $ | |
| Spray Bottle w/ Trigger | Ea | $ | 7.00 | 5.0 | | | 2.0 | 1.0 | | 8.0 | $ | 56.00 |
| Tape, Duct | Rl | $ | | | | | | | | | $ | |

05/10/2006 14:08 FAX 3038642102                                    @028

| | | | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | Rl | $ | | | | | | | | 1.0 | $ | 8.75 |
| Tape, HVAC (Aluminum) | Rl | $ 21.00 | | | 1.0 | | | 0.0 | $ | 0.0 | | |
| Tape, Poly Bag | Rl | $ 2.60 | | | | | | 0.0 | $ | 0.0 | | |
| Tapes | Ea | $ 0.26 | | | | | | 0.0 | $ | 0.0 | | |
| Tyvek Suits | Lb | $ 7.35 | 25.0 | 25.0 | 25.0 | 50.0 | | 125.0 | $ | 545.13 | | |
| Wipes, Cotton Cloth | Lb | $ 4.53 | | | | | | 0.0 | $ | 0.0 | | |
| Wipes, Lint Free | Bx | $ 23.00 | | | | | | 0.0 | $ | 0.0 | | |
| Wipes, Shop | Rl | $ 72.60 | | | | | | 0.0 | $ | 0.0 | | |
| Wipes, Wipe All | Pkg | $ 9.00 | | | | | | 0.0 | $ | 0.0 | | |
| Wraps, Bubble/And Static | Rl | $ 64.73 | | | | | | 0.0 | $ | 0.0 | | |
| Wrap, Shrink | Rl | $ 48.00 | | | | | | 0.0 | $ | 0.0 | | |

**Total for Consumables** $

| | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Colton USA | | | | | | | | |
| Contract # 1408(TI) Sports Authority | | | | | | | | |
| Vendors (Subcontractor) Summary | | | | | | | | |
| Period Ended 03/26/06 | | | | | | | | |
| | | | | | | | | |
| Unscheduled Materials (Petty Cash & Credit Card Control) | | | | | | | | |
| Thackston - Fuel | $ 13.01 | | | | | | | $ 13.01 |
| Thackston - Fuel | | $ 7.31 | | | | | | $ 7.31 |
| Lopez - Supplies | | | $ 7.79 | | | | | $ 7.79 |
| Lowes - Supplies | | | | $ 73.99 | | | | $ 73.99 |
| Thornton - Fuel | | | | $ 1.86 | | | | $ 1.86 |
| FedEx - Shipping | | | | | | | | |

$ 3,039.61

05/10/2008 14:10 FAX 3038642102                GART SPORTS

| | | |
|---|---|---|
| Cotton USA Markup | $ | 108.96 |
| Subtotal for Vendors (Subcontractors) | $ | 21.83 |
| Total for Yankuz (Subcontractors) | $ | 145.79 |

TSA RULE 26 DISCLOSURES
0058

05/10/2005 14:10 FAX 3038642102                                                ☑028

Carlson USA
Contract # 160872) Sports Authority
Labor Summary
Period Ended 04/02/06

| Name | Classification | | Std Rate O/T Prem | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kmoc, Jeff | Project Coordinator | Travel $ | 95.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 95.00 | | | | | | | | 6.0 | 480.00 |
| | | Overtime $ | 142.50 | | | | | | | | 0.0 | $ |
| Gear, Bruce | Project Manager | Travel $ | 80.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 80.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 120.00 | | | | | | | | 0.0 | $ |
| Castillo, Philip | Asst Project Manager | Travel $ | 75.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 75.00 | | 16.5 | | 8 | 5 | | | 29.5 | 1,317.50 |
| | | Overtime $ | 112.50 | | | | | | | | 0.0 | $ |
| Pearson, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Pearson, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Hutchens, Bud | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Bostick, Minor | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Batista, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Brown, Tuanite | Skilled Labor | Travel $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Schein, John | Skilled Labor | Overtime $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 42.73 | | | | | | | | 0.0 | $ |
| King, Rachel | Skilled Labor | Overtime $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 42.75 | | | | | | | | 0.0 | $ |
| Dilongelo, Jeffrey | Skilled Labor | Overtime $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 42.75 | | | | | | | | 0.0 | $ |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Bloomfield, Arthur | Skilled Labor | Overtime $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Regular $ | 42.75 | | | | | | | | 0.0 | $ |
| Shifielhack, Russell | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0059

05/10/2006 14:10 FAX 3038642102          START SPORTS          ☑ 029

| Name | | Regular $ | Overtime $ | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hammocx, Ralph | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Seaton, Al | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Dubba, David | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Williams, Van | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Sykes, Andre | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Graham, Jason | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Cole, Milton | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Gonzalez, David | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Williams, Phillip | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Fuqua, Nick | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Gaiss, Terrance | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Reed, Cherie | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Oltre, Steven | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| McKinney, Eric | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Shore, Victor | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Lathridge, Annie | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| King, Roy | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | | | | | 0.0 / 0.0 / $ |
| Name | Skilled Labor | | | | | | | | | | | | | | | | |

| Name | Skilled Labor | Regular $ | Overtime $ | | | | | | | | | $ 0.0 |
|------|---------------|-----------|-----------|--|--|--|--|--|--|--|--|-------|
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | | | | $ 0.0 |

TSA RULE 26 DISCLOSURES
0061

🗐031

| Name | | | |
|------|------|------|------|
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |

| Name | | | | | | | | | | | | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | Overtime $ | 41.75 | | | | | | | | | 0.0 | $ |
| Name | | | | | | | | | | | | |
| Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | Overtime $ | 41.75 | | | | | | | | | 0.0 | $ |
| Name | | | | | | | | | | | | |
| Skilled Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Temporary Labor | Regular $ | 28.50 | | | | | | | | | 0.0 | $ |
| | Overtime $ | 42.75 | | | | | | | | | 0.0 | $ |
| Labor Ready | Regular $ | 17.58 | | | | | | | | | 0.0 | $ |
| | Overtime $ | 26.37 | | | | | | | | | 0 | |
| Client Name | | | | | | | | | | | | |
| Management Fee | | | | | | | | | | | | |
| Total Personnel | | | | | | | | | | | | |
| Labor Totals | | | | | | | | | | | | $ 1,397.50 |

TSA RULE 26 DISCLOSURES
0063

05/10/2006 14:11 FAX 3038642102                    GART SPORTS                                           Ø 023

Cutter USA
Contract # 14087121 Speech Authority
Reimbursable Summary
Period Ended 04/2006

| | | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/01 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gray, Bruce | per diem | $ 30.00 | $ 30.00 | | | | | | $ 30.00 |
| | hotel | | | $ 30.00 | | | | | |
| | airfare | | | | | | | | |
| Castillo, Phillip | per diem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Parsons, Shannon | per diem | | | | | | | | 60.00 |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Brodsick, Editor | per diem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Rubins, Luke | per diem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Littleton, Bud | per diem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Hertz Rental | | | | | | | | | 90.00 |
| Subtotal for Reimbursables | | | | | | | | | 9.00 |
| Cutter USA Markup | | | | | | | | | |
| Total for Reimbursables | | | | | | | | | 99.00 |

TSA RULE 26 DISCLOSURES
0064

05/10/2006 14:11 FAX 3038642102    GART SPORTS    ☑ 034

Cintas USA
Contract #1407171/Sports Authority
Equipment Summary
Period Ended 04/02/06

| Equipment Description | Unit | Rate | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $30.00 | | | | | | | | 0 | $ |
| Air Mover | Ea | $22.50 | | | | | | | | 0 | $ |
| Bobcat | Ea | $175.00 | | | | | | | | 0 | $ |
| Buffer, Floor | Ea | $30.00 | | | | | | | | 0 | $ |
| Chat, HEV Demolition | Ea | $20.00 | | | | | | | | 0 | $ |
| Dolly, 2 Whl/4 Whl Furni Dollys | Ea | $6.00 | | | | | | | | 0 | $ |
| Dry Cleaning Unit (Portable) | Ea | $85.00 | | | | | | | | 0 | $ |
| Electrical Dist Panel (Spider Box) | Ea | $45.00 | | | | | | | | 0 | $ |
| Extension Cords (25'-100') | Ea | $4.00 | | | | | | | | 0 | $ |
| Extraction Unit (Portable) | Ea | $95.00 | | | | | | | | 0 | $ |
| Extraction Unit (Trailer) | Ea | $185.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Walk Behind) | Ea | $185.00 | | | | | | | | 0 | $ |
| Fogger, Thermal (Gas Powered) | Ea | $45.00 | | | | | | | | 0 | $ |
| Fogger, ULV/ Thermal (Electric) | Ea | $23.00 | | | | | | | | 0 | $ |
| Generator (less than 10kw) | Ea | $103.00 | | | | | | | | 0 | $ |
| HEPA Filtration Unit/ Air Scrubber | Ea | $89.25 | | | | | | | | 0 | $ |
| Hudson Pump Sprayer | Ea | $255.00 | | | | | | | | 0 | $ |
| HVAC Vacuum System | Ea | $12.00 | | | | | | | | 0 | $ |
| Ladder, Step Extension | Ea | $16.00 | | | | | | | | 0 | $ |
| Light, Demol Droof Stand/ SHM | Ea | $2.00 | | | | | | | | 0 | $ |
| Mop Bucket | Ea | $55.00 | | | | | | | | 0 | $ |
| On Site Accounting Package | Ea | $155.00 | | | | | | | | 0 | $ |
| Ozone Generator | Ea | $25.00 | | | | | | | | 0 | $ |
| Project Manager (Cleanup) | Ea | $65.00 | | | | | | | | 0 | $ |
| Pump, Submg 2" - 4" | Ea | $10.00 | | | | | | | | 0 | $ |
| Pump, Trash 1 1/2" - 4" | Ea | $30.00 | | | | | | | | 0 | $ |
| Refuse, 3 way / Job Site comm | Ea | $90.00 | | | | | | | | 0 | $ |
| Safety Package | Ea | $15.00 | | | | | | | | 0 | $ |
| Personal Fall Protection (PFP) | Ea | $30.00 | | | | | | | | 0 | $ |
| Personal Protection Equipment (PPE) | Ea | $50.00 | | | | | | | | 0 | $ |
| Personal Respiratory Protection (PRP) | Ea | $65.00 | | | | | | | | 0 | $ |
| Small Tools Charge | Ea | $55.00 | | | | | | | | 0 | $ |
| Squeegee, Airless | Ea | $65.00 | | | | | | | | 0 | $ |
| Trailer (Office Trailer) | Ea | $123.00 | | | | | | | | 0 | $ |
| Trailer 14'-22' | Ea | $245.00 | | | | | | | | 0 | $ |
| Trailer 18'-22' | Ea | $95.00 | | | | | | | | 0 | $ |
| Trailer 36' | Ea | $125.00 | | | | | | | | 0 | $ |
| Trailer (18' - 53') | Ea | $105.00 | | | | | | | | 0 | $ |
| Trailer (Freezer) | Ea | $125.00 | | | | | | | | 0 | $ |
| Truck- Pulling | Ea | $95.00 | | | | | | | | 0 | $ |
| Truck, 24 ft | Ea | $85.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Large | Ea | $125.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Small | Ea | $55.00 | | | | | | | | 0 | $ |
| Vacuum (Anti-Static) | Ea | $70.00 | | | | | | | | 0 | $ |
| Vacuum, HEPA | Ea | $55.00 | | | | | | | | 0 | $ |
| Vacuum, Cargo / Company Owned | Ea | $33.00 | | | | | | | | 0 | $ |
| Company Owned Valdes | Ea | | | | | | | | | 0 | $ |
| Vapor Tek, Large | Ea | | | | | | | | | 0 | $ |
| Vapor Tek, Small | Ea | | | | | | | | | 0 | $ |
| Washer, High Pressure (Cold) | Ea | $75.00 | | | | | | | | 0 | $ |

05/10/2006 14:12 FAX 303384 2105 GART SPORTS

| Rental Equipment Description | Unit | Daily | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Washer, High Pressure (Hot) | Ea | $ 195.00 | | | | | | | | 0 | $ |
| Thermo Camera | Each | $ 225.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 200 cfm | Ea | $ 105.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 300 cfm | Ea | $ 183.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 1125 cfm | Ea | $ 420.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 2000/ 2350 cfm | Ea | $ 873.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 4500 cfm | Ea | $ 1,195.00 | | | | | | | | 0 | $ |
| Dehumidification Unit - 9000/ 10800 cfm | Ea | $ 1,795.00 | | | | | | | | 0 | $ |
| DX Unit - 20/ 25 Ton | Ea | $ 873.00 | | | | | | | | 0 | $ |
| Directley Unit | Ea | $ 723.00 | | | | | | | | 0 | $ |
| Total for Equipment | | | | | | | | | | | $ |

TSA RULE 26 DISCLOSURES
0066

05/10/2006 14:12 FAX 3038642102

Carlson USA
Contract # 4463721 Sports Authority
Consumables Inventory
Period Ended 04/2/06

| Chemical Description | Unit | Rate | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ 77.00 | | | | | | | | 0.0 | $ - |
| Alcohol Isopropyl | Gal | $ 14.85 | | | | | | | | 0.0 | $ - |
| Cleaner, Stainless Steel | Gal | $ 32.60 | | | | | | | | 0.0 | $ - |
| Cleaner, Carpet (Liquid) | Gal | $ 11.99 | | | | | | | | 0.0 | $ - |
| Cleaner, Carpet (Powder) | Lb | $ 2.50 | | | | | | | | 0.0 | $ - |
| Cleaner, Glass | Gal | $ 12.00 | | | | | | | | 0.0 | $ - |
| Cleaner, Hand Surface | Gal | $ 22.10 | | | | | | | | 0.0 | $ - |
| 815 MX (EPD) | Gal | $ 17.25 | | | | | | | | 0.0 | $ - |
| General Purpose Degreaser | Gal | $ 11.25 | | | | | | | | 0.0 | $ - |
| Dish Soap | Gal | $ 39.25 | | | | | | | | 0.0 | $ - |
| Nitnue Sol | Gal | $ 33.00 | | | | | | | | 0.0 | $ - |
| Cleaner, HVAC Coil | Gal | | | | | | | | | 0.0 | $ - |
| Descaler/liner | Lb | $ 13.00 | | | | | | | | 0.0 | $ - |
| Deodorizing Gel | Gal | $ 37.50 | | | | | | | | 0.0 | $ - |
| Deodorizing Liquid | Ea | $ 45.00 | | | | | | | | 0.0 | $ - |
| Deodorizing Block | Ea | $ 3.25 | | | | | | | | 0.0 | $ - |
| Disinfectant Biocide | Gal | $ 32.03 | | | | | | | | 0.0 | $ - |
| Bleach | Gal | $ 3.03 | | | | | | | | 0.0 | $ - |
| Disinfectant Fog | Ea | $ 9.24 | | | | | | | | 0.0 | $ - |
| Furniture Polish | Ea | $ 6.23 | | | | | | | | 0.0 | $ - |
| Goof Off | Ea | | | | | | | | | 0.0 | $ - |
| Lubricant, Electrical | Gal | $ 13.75 | | | | | | | | 0.0 | $ - |
| Lubricant Antichmoly | Gal | | | | | | | | | 0.0 | $ - |
| Preserver, Wax | Gal | $ 31.10 | | | | | | | | 0.0 | $ - |
| Long Term Preserver, heavy | Pr | $ 19.90 | | | | | | | | 0.0 | $ - |
| Metal Polishing Paste | Ea | $ 9.63 | | | | | | | | 0.0 | $ - |
| Stainless Steel Polish | Ea | $ 8.25 | | | | | | | | 0.0 | $ - |
| Buff&Adhesive/ Remover | Gal | | | | | | | | | 0.0 | $ - |
| Complex Cleaner | Gal | $ 34.00 | | | | | | | | 0.0 | $ - |
| Descaler | Gal | $ 90.00 | | | | | | | | 0.0 | $ - |
| Sealants | Gal | | | | | | | | | 0.0 | $ - |
| Dust Sealant Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ - |
| Dust Sealant, Antifogfishied | Gal | $ 65.00 | | | | | | | | 0.0 | $ - |
| Soot Sealant, Pigmented | Gal | $ 35.00 | | | | | | | | 0.0 | $ - |
| Soot Sealant, Clear | Gal | $ 22.00 | | | | | | | | 0.0 | $ - |
| Silver/ Copper/ Tin/ Cleaner | Pt | $ 12.00 | | | | | | | | 0.0 | $ - |
| Spray Adhesive | Can | $ 5.26 | | | | | | | | 0.0 | $ - |

| Material Description | Unit | Rate | | | | | | | | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bags, Trash | El | $ 28.00 | | | | | | | | 0.0 | $ - |
| Bags, Trash Environmental -6ml | El | $ 1.95 | | | | | | | | 0.0 | $ - |
| Bags, Trash Environmental -6ml | El | $ 2.65 | | | | | | | | 0.0 | $ - |
| Box, Bowl/ Freeze Dry | Ea | $ 3.45 | | | | | | | | 0.0 | $ - |
| Box, Dish Pack | Ea | $ 87.50 | | | | | | | | 0.0 | $ - |
| Paper, Corrugated | Ea | $ 10.00 | | | | | | | | 0.0 | $ - |
| Brush, Dispersion - large | Ea | $ 4.00 | | | | | | | | 0.0 | $ - |
| Brush, Dispersion - small | Ea | $ 9.00 | | | | | | | | 0.0 | $ - |
| Brush, Block Handle/ Scrub | Ea | $ 8.00 | | | | | | | | 0.0 | $ - |
| Brush, Deck Lay Flat (500') | El | $ 315.00 | | | | | | | | 0.0 | $ - |

TSA RULE 26 DISCLOSURES
0067

05/10/2006 14:13 FAX 303864210     GART SPORTS     ☒ 037

| Item | Unit | Price | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (RPSP100) | Ea | $ 8.00 | | | | | | 0.0 | $ |
| Dust Mask | Bx | $ 24.50 | | | | | | 0.0 | $ |
| Filter Material | Rl | $ 63.00 | | | | | | 0.0 | $ |
| Filter Secondary | Ea | $ 5.80 | | | | | | 0.0 | $ |
| Pre Filter | Ea | $ 3.15 | | | | | | 0.0 | $ |
| Furniture Pads | Ea | $ 3.15 | | | | | | 0.0 | $ |
| Furniture Pads | Bx | $ 77.00 | | | | | | 0.0 | $ |
| Gloves, Cotton | Bx | $ 84.00 | | | | | | 0.0 | $ |
| Gloves, Surgical Latex | Pr | $ 1.75 | | | | | | 0.0 | $ |
| Gloves, Work/ Rubber / Chemical | Bx | $ 18.00 | | | | | | 0.0 | $ |
| Rag Rings | Pr | $ 2.25 | | | | | | 0.0 | $ |
| Inventory Tags | Bx | $ 15.00 | | | | | | 0.0 | $ |
| Mop Heads | Ea | $ 15.00 | | | | | | 0.0 | $ |
| Non Gusseted Scrubbers, green (#96) | Bx | $ 99.10 | | | | | | 0.0 | $ |
| Plastic Sheeting (10'X100') | Rl | $ 3.15 | | | | | | 0.0 | $ |
| Politers Plastic (1mil) | Rl | $ 20.00 | | | | | | 0.0 | $ |
| Quick Test Strips (per 30) | Pkg | $ 72.00 | | | | | | 0.0 | $ |
| Spacers, Soul Removal | Ea | $ 18.25 | | | | | | 0.0 | $ |
| Spray Boats w/ Trigger | Ea | $ 24.00 | | | | | | 0.0 | $ |
| | Ea | $ 18.25 | | | | | | 0.0 | $ |
| | Ea | $ 1.80 | | | | | | 0.0 | $ |
| Tape, Duct | Ea | $ 3.95 | | | | | | 0.0 | $ |
| | Rl | $ 7.00 | | | | | | 0.0 | $ |

05/10/2006 14:13 FAX 3038642102

Ɩ038

Cotton USA
Contract # 1097321; Sports Authority
Vendors (Subcontractors) Summary
Period Ended 04/2/06

| | | | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Total for Consumables | | $ | | | | | | | $ | $ |
| Tape, Blue | R1 | $ 8.75 | | | | | | | 0.0 | $ |
| Tape, HVAC (Aluminum) | R1 | $ 21.00 | | | | | | | 0.0 | $ |
| Tape, Poly Box | R1 | $ 2.50 | | | | | | | 0.0 | $ |
| Tarps | SH | $ 0.54 | | | | | | | 0.0 | $ |
| Tarps | Ea | $ 7.95 | | | | | | | 0.0 | $ |
| Dyes Safe | Ea | $ 4.35 | | | | | | | 0.0 | $ |
| Wipes, Cotton Cloth | Lb | $ | | | | | | | 0.0 | $ |
| Wipes, Lint Free | Bx | $ 25.00 | | | | | | | 0.0 | $ |
| Wipes, Shop | R1 | $ 72.00 | | | | | | | 0.0 | $ |
| Wipes, Wipe-All | R1 | $ 9.90 | | | | | | | 0.0 | $ |
| Wrap, Bubble And Static | Pkg | $ 64.73 | | | | | | | 0.0 | $ |
| Wrap, Shrink | R1 | $ 48.00 | | | | | | | 0.0 | $ |

Unscheduled Materials (Petty Cash & Credit Card Control)

| | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Lows - Fuel | | $ 136.30 | | | | | | $ 136.30 |
| Conoco - Fuel | | $ 98.97 | | | | | | $ 98.97 |

TSA RULE 26 DISCLOSURES
0069

**COTTON**

**COTTON USA**
*National Disaster Recovery Services*

RESTORATION SERVICE AGREEMENT

STORE #
618

EFFECTIVE DATE OF AGREEMENT: MARCH 14th 2006

CUSTOMER: THE SPORTS Authority

BILLING ADDRESS: 1050 W. Hampden Ave

INSURANCE COMPANY: Liberty Mutual          CLAIM NO. X169A-003155

PROPERTY ADDRESS ("Property"): 3211 Veterns Parkway    (Springfield, IL)

TYPE OF LOSS (Fire/Water/Other): Tornado Damage

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer agree as follows:

## ARTICLE I.
## CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1** Nature of Agreement. This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

## ARTICLE II.
## DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1** Services and Materials Provided. Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2** Cooperation By Customer / Term of Agreement. The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3** Removal of Contents. The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4** Subcontractors Allowed. As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5** Insurance: Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6** Permits. Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7** Hazardous Materials. Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8** Authority of Customer. The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Customer's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

TSA 00297

ARTICLE III.
TIME FOR PERFORMANCE OF WORK

**Section 3.1**     Work Performed.  The Work shall be commenced within forty-eight (48) hours (or as reasonably practical given the specifications of the Work) following execution of this Agreement, and Cotton shall use reasonable efforts to substantially or fully complete the Work within a reasonable amount of time after beginning the Work.  Should Cotton be delayed, hindered, interfered with or impeded by any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment is not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

ARTICLE IV.
CUSTOMER'S PAYMENT OF FEES AND COSTS

**Section 4.1**     Pricing and Invoicing.  All work performed hereunder shall be priced at:

_____ Lump Sum Amount (See Estimate)

OR

__✓__ Time and Materials (See Rate Schedule)

*PHASE 1*
*EMERGENCY SERVICES*

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement.  After the Work is begun, the Customer will receive progressive billings ("Invoice") for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion.  All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice.  There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e. thirty days) the payment is delinquent.  Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice; provided, however, that delivery of such property and contents shall not be made until Cotton has received payment on such final Invoice and Customer has paid in full all previous Invoices (and any services charge accrued thereon) and there remains no Delinquency.  The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party.  The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

**Section 4.2**     Change Orders.  Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

**Section 4.3**     Direct Pay Authorization.  This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

ARTICLE V.
MOLD REMEDIATION WORK; INDEMNIFICATION

**Section 5.1**     Mold Remediation Work.  With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold ("**Mold Remediation Work**"), Customer agrees as follows:

(a) Testing.  Customer shall engage the services of a person or firm ("**Mold Expert**") specializing in the investigation, testing and analysis of mold spores and microbial contamination ("**Mold**") occurring within buildings and other structures of a like-kind and nature as the project site and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work.  The scope of the Mold Remediation Work will be specified in a mold analysis report ("**Report**") that the Customer receives from the Mold Expert.  The Customer shall be solely responsible for having the Mold Expert test ("**Pretest**") the Property for Mold prior to commencement of the Work and preparing the Report.  In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site.  Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test ("**Post-test**") the site (or portion/phase thereof).

(b) Work Completion.  Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements.  Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with a statement that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested).  In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

**Section 5.2**     Release.  CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

2

TSA 00298

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS "DAMAGES"), IN RESPECT TO PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER'S EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON, UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THE FOREGOING INDEMNITY PROVISIONS WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT, INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3**     No Consequential Damages. Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

### ARTICLE VI.
### TERMINATION

**Section 6.1**     Termination By Cotton. Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2**     Termination By Customer. In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton the for all Charges up to and including the date of such termination, regardless of whether Customer has received an Invoice for such Charges prior to such termination.

### ARTICLE VII
### DISPUTE RESOLUTION

**Section 7.1**     Non-binding Mediation. Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2**     Attorneys' Fees and Costs. If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

### ARTICLE VIII.
### GOVERNING LAW; VENUE

**Section 8.1**     Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2**     Venue. In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                      CUSTOMER:

By: _JEFF KRONE_____                        By: _____
Name: _Jeff Krone_____                      Name: _____
Title: _Regional Director___                 Title: _____
Date Signed: _3-14-06____                    Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

3

TSA 00299

Mike Mavelle

From: Jeff Krone [jeffk@cottonteam.com]
Sent: Monday, March 20, 2006 8:39 AM
To:   Thomas.Tiernan@LibertyMutual.com
Cc:   Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com

TOM & MIKE-

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I
AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF
$100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO
REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR
IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS-
PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON
SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

*Sent To D. Frick 3-20-06*



*National Disaster Recovery Services*

*<Attachment A>*

DATE: 3-14-06

TO:   MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
      DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
      TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM: JEFF KRONE

RE: TORNADO DAMAGE TO STORE # 618

Cotton viewed the **CATASTROPHIC** loss located at <u>3211 VETERANS PARKWAY in SPRINGFIELD, IL</u>. Mike Mavelle of **THE SPORTS AUTHORITY** requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition. The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM). The Scope of Service is broken into the following general areas of concern.

**SCOPE OF WORK:**

- *BRIEF SCENARIO OF THE LOSS:  ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-COTTON USA, TOM TIERNAN-LIBERTY MUTUAL & MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

**GENERAL ITEMS:**

- *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.*
- *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.*
- *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- *WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.*
- *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE*
- *TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY*
- *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.*
- *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS*
- *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

TSA 00301

**DEHUMIFICATION**

☐  DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-DAMAGED PRODUCT REMAINING IN THE STORE.

INSTALL THE FOLLOWING: (FRONT OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

INSTALL THE FOLLOWING: (BACK OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE NORTH DOORWAY TO THE WAREHOUSE AREA.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT.
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

**EXTERIOR PREMISES**

- CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
- SWEEP UP ALL THE GLASS FROM FRONT OF STORE
- ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO A MINIMUM

**ROOF**

- COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-GLOBAL) ON INSPECTION.
- COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
- COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION PURPOSES
- COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

**FITNESS AREA (EXERCISE)**

- SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
- ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
  - ☐  HARD HATS
  - ☐  EYE GLASSES
  - ☐  DUST MASKS

TSA 00302

E-FILED
Monday, 31 December, 2007 02:38:15 PM
Clerk, U.S. District Court, ILCD

☐ STEEL TOED SHOES
☐ EAR PROTECTION
- CUT DOWN ALL HANGING DEBRIS
  ☐ FLORESCENT LIGHTS
  ☐ CONDUIT LINES
  ☐ MONITORS
  ☐ CAP SPRINKLER LINES
  ☐ ELECTRICAL LINES
  ☐ SPORT AUTHORITY SIGNAGE
  ☐ PARTS OF THE ROOF DECKING
- UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- WET VAC ALL STANDING WATER
- TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ _THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE._

## TEAMSPORTS

- MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ NOTE- _SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED._

❖ _THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE._

## OUTDOOR

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

**SNOW SPORTS**

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

**MENS ATHLETICS**

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A.  TAGGED AND SALVAGE COMPANY WILL TAKE
    - B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### GIFT CENTER

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### CUSTOMER SERVICE

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### YOUTH SOFT GOODS

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00305

- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### MENS OUTDOORS:

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

### LICENSED APPAREL

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

**BIKES**

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

**FOOTWEAR**

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED, MOVED, AND THE RACKS DISASSEMBLED.*

**GOLF DEPARTMENT**

➢ MANIPULATE ALL THE CONTENTS
➢ WET VAC ALL STANDING WATER
➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE AND DISCARD THE RUBBER MATTING
➢ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
➢ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
➢ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
➢ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    C. TAGGED AND SALVAGE COMPANY WILL TAKE
    D. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
➢ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
➢ HEPA VAC ALL DUST DEBRIS PARTICLES
➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
➢ WORK WITH REGIS ON THE INVENTORY COUNTING
➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
➢ UTILIZE THE ABOVE DRYING SCOPE
➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

## CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by Mike Mavelie, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

## IMPORTANT POINTS

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of *COTTON* management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that *COTTON* will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the *COTTON'S* on-site Project Manager (**Bruce Gear**) and a designated representative from **The Sports Authority** meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, *COTTON* will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of Insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

*COTTON* proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

*COTTON* will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been *COTTON* pleasure to submit this proposal to Mike Mavelle and Tom Tiernan. Thank you for your consideration and cooperation.

Respectfully Submitted,

*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2962 (24hr CALL CENTER)*

TSA  00309



| EXPENSE ITEM PURCHASE ORDER | RFC# | | PURCHASE ORDER NUMBER |
|---|---|---|---|
| | | | **125RM891** |

**The Sports Authority Inc.**
1050 W. Hampden Ave. - Englewood, CO  80110
Phone (303) 200-5050

| REQUESTING DEPT/STORE # | ACCOUNT TO BE CHARGED TO |
|---|---|
| Risk Management- 963 | 618-630-120-1 |
| DATE OF ORDER | DELIVERY REQUIRED BY |
| 3/21/2006 | |

Address to: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | emergency clean up and repair (insurance deductible) | | $   100,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | Total | $    100,000.00 |

_[signature]_  3-21-06



| | | | | |
|---|---|---|---|---|
| Name | Mike Mavelle | | Date: | 3/20/2006 |
| Corp, Company | The Sports Authority | | Invoice #: | 1408722 |
| Corp. Address | 1050 W. Hampden Ave. | | Terms: | Net 10 |
| City, State, Zip | Englewood, Colorado 80110 | | Fed Id: | 76-0628204 |
| Tel: | (720) 475-2285 | | | |
| Fax: | (720) 475-2118 | | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 Veterans Parkway | Store Number: | # 618 |
| City, State, Zip | Springfield, IL 62704 | | |
| Tel: | (217) 546-0132 | Insurance Company: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | Insurance Adjuster: | Tom Tiernan - EGA |

RE:    DRAW REQUEST # 1

| | |
|---|---|
| *EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE MENTIONED LOSS ADDRESS:* | $    100,000.00 |
| | |

| | |
|---|---|
| SUBTOTAL | $    100,000.00 |
| TAX | $    - |
| TOTAL DUE AND PAYABLE | $    100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton Catastrophe
14345 Northwest Freeway
Houston, Texas 77040

**Please include the invoice number on check**

TSA 00311

| | | | | | |
|---|---|---|---|---|---|
| EXPENSE ITEM PURCHASE ORDER | | | RFC# | | PURCHASE ORDER NUMBER **125RM911** |
| The Sports Authority Inc. 1050 W. Hampden Ave. - Englewood, CO 80110 Phone (303) 200-5050 | | | REQUESTING DEPT/STORE # Risk Management- 963 | | ACCOUNT TO BE CHARGED TO 618-630-120 |
| | | | DATE OF ORDER 4/19/2006 | | DELIVERY REQUIRED BY |

Address to: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | remainder of emergency Services for Roof damage | | $  219,428.67 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | *signed to Jack 4-26-06* | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | $  219,428.67 |

Please Pracs
ASAP

*Neil Uhull*    4-26-06

x *[signature]*    4.26.06

TSA 00312

Store File #618



### National Disaster Recovery Services

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | Insurance Co: | Liberty Mutual Property |
| City, State, Zip | Springfield, Il. 62704 | Insurance Adj: | Ton Tiernan |
| Tel: | (217) 546-0132 | Claim #: | X69A-O03155-00 |
| Fax: | (217) 546-1073 | | |

Re:           Tornado Damages in Springfield, IL

Re:           **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |
| SUBTOTAL                                *REMAINING BALANCE* | $ | 219,428.67 |
| TOTAL DUE AND PAYABLE | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

*Any queries regarding this invoice should be sent to us within ten days of receipt of this*

*invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.*

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**Please include the invoice number on check**

03/31/06

TSA 00313



## COTTON USA
### *National Disaster Recovery Services*

RESTORATION SERVICE AGREEMENT

STORE #
618

EFFECTIVE DATE OF AGREEMENT: MARCH 14th 2006

CUSTOMER: THE SPORTS Authority

BILLING ADDRESS: 1050 W. HAMPDEN AVE

INSURANCE COMPANY: Liberty Mutual    CLAIM NO. XL69A - 003155

PROPERTY ADDRESS ("Property"): 3211 Veterns Parkway (Springfield, IL)

TYPE OF LOSS (Fire/Water/Other): Tornado Damage

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer agree as follows:

ARTICLE I.
CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1** Nature of Agreement. This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

ARTICLE II.
DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1** Services and Materials Provided. Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2** Cooperation By Customer / Term of Agreement. The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3** Removal of Contents. The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4** Subcontractors Allowed. As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5** Insurance. Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6** Permits. Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7** Hazardous Materials. Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8** Authority of Customer. The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Cotton's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

TSA 00297

ARTICLE III.
TIME FOR PERFORMANCE OF WORK

**Section 3.1** <u>Work Performed.</u> The Work shall be commenced within forty-eight (48) hours (or as reasonably practical given the specifications of the Work) following execution of this Agreement, and Cotton shall use reasonable efforts to substantially or fully complete the Work within a reasonable amount of time after beginning the Work. Should Cotton be delayed, hindered, interfered with or impeded by any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment is not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

ARTICLE IV.
CUSTOMER'S PAYMENT OF FEES AND COSTS

**Section 4.1** <u>Pricing and Invoicing.</u> All work performed hereunder shall be priced at:

_____ <u>Lump Sum Amount</u> (See Estimate)                                    PHASE 1

OR                                                                                EMERGENCY SERVICES

✓ <u>Time and Materials</u> (See Rate Schedule)

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement. After the Work is begun, the Customer will receive progressive billings ("Invoice") for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion. All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice. There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e. thirty days) the payment is delinquent. Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice; provided, however, that delivery of such property and contents shall not be made until Cotton has received payment on such final Invoice and Customer has paid in full all previous Invoices (and any services charge accrued thereon) and there remains no Delinquency. The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party. The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

**Section 4.2** <u>Change Orders.</u> Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

**Section 4.3** <u>Direct Pay Authorization.</u> This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

ARTICLE V.
MOLD REMEDIATION WORK; INDEMNIFICATION

**Section 5.1** <u>Mold Remediation Work.</u> With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold (**"Mold Remediation Work"**), Customer agrees as follows:

(a) <u>Testing.</u> Customer shall engage the services of a person or firm (**"Mold Expert"**) specializing in the investigation, testing and analysis of mold spores and microbial contamination (**"Mold"**) occurring within buildings and other structures of a like-kind and nature as the project site and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work. The scope of the Mold Remediation Work will be specified in a mold analysis report (**"Report"**) that the Customer receives from the Mold Expert. The Customer shall be solely responsible for having the Mold Expert test (**"Pretest"**) the Property for Mold prior to commencement of the Work and preparing the Report. In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site. Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test (**"Post-test"**) the site (or portion/phase thereof).

(b) <u>Work Completion.</u> Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements. Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with a statement that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested). In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

**Section 5.2** <u>Release.</u> CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

2

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS "DAMAGES"), IN RESPECT TO PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER'S EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON, UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THE FOREGOING INDEMNITY PROVISIONS WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT, INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3** No Consequential Damages. Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

## ARTICLE VI.
## TERMINATION

**Section 6.1** Termination By Cotton. Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2** Termination By Customer. In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton the for all Charges up to and including the date of such termination, regardless of whether Customer has received a Invoice for such Charges prior to such termination.

## ARTICLE VII
## DISPUTE RESOLUTION

**Section 7.1** Non-binding Mediation. Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2** Attorneys' Fees and Costs. If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

## ARTICLE VIII.
## GOVERNING LAW; VENUE

**Section 8.1** Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2** Venue. In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                      CUSTOMER:

By: _JEFF KRONE_____                         By: _____
Name: _Jeff Krone_____                      Name: _____
Title: _Regional Director__                  Title: _____
Date Signed: _3-14-06___                      Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

3

TSA 00299

Jeff Krone

## Mike Mavelle

**From:** Jeff Krone [jeffk@cottonteam.com]
**Sent:** Monday, March 20, 2006 8:39 AM
**To:** Thomas.Tieman@LibertyMutual.com
**Cc:** Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com

**TOM & MIKE-**

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I
AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF
$100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO
REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR
IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS-
PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON
SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

Sent To D. Frith 3-20-06

TSA 00300

3/20/2006

**E-FILED**
Monday, 31 December, 2007  02:39:52 PM
Clerk, U.S. District Court, ILCD



National Disaster Recovery Services

&lt;Attachment A&gt;

DATE: 3-14-06

TO:    MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
       DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
       TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM:  JEFF KRONE

RE:  TORNADO DAMAGE TO STORE # 618

Cotton viewed the CATASTROPHIC loss located at <u>3211 VETERANS PARKWAY</u> in <u>SPRINGFIELD, IL</u>. Mike Mavelle of THE SPORTS AUTHORITY requested the site inspection.


The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition. The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM). The Scope of Service is broken into the following general areas of concern.

- BRIEF SCENARIO OF THE LOSS:  ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.

- BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE- COTTON USA, TOM TIERNAN-LIBERTY MUTUAL & MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.

   ❑ COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.
   ❑ LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.
   ❑ COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.
   ❑ WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.
   ❑ DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.
   ❑ PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE
   ❑ TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.
   ❑ COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY
   ❑ COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.
   ❑ COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS
   ❑ COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY

TSA 00301

> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

████████████████

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

████████████████

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
> FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
>> A. TAGGED AND SALVAGE COMPANY WILL TAKE
>> B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
> REMOVE ALL THE SATURATED SHEETROCK
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

TSA 00307

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ❖ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

████████████████

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - C. TAGGED AND SALVAGE COMPANY WILL TAKE
  - D. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

## CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by **Mike Mavelle**, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

IMPORTANT POINTS

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of *COTTON* management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that *COTTON* will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the *COTTON'S* on-site Project Manager (**Bruce Gear**) and a designated representative from **The Sports Authority** meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, *COTTON* will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of Insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

*COTTON* proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

*COTTON* will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been *COTTON* pleasure to submit this proposal to Mike Mavelle and Tom Tieman. Thank you for your consideration and cooperation.

Respectfully Submitted,

*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2952 (24hr CALL CENTER)*

| EXPENSE ITEM PURCHASE ORDER | RFC# | | PURCHASE ORDER NUMBER |
| --- | --- | --- | --- |
| The Sports Authority Inc.<br>1050 W. Hampden Ave. - Englewood, CO 80110<br>Phone (303) 200-5050 | | | **125RM891** |
| | REQUESTING DEPT/STORE #<br>Risk Management- 963 | | ACCOUNT TO BE CHARGED TO<br>618-630-120-1 |
| | DATE OF ORDER<br>3/21/2006 | | DELIVERY REQUIRED BY |

Cotton Catastrophe

| | ITEM NUMBER | DESCRIPTION | | UNIT PRICE | AMOUNT |
| --- | --- | --- | --- | --- | --- |
| | 1408722 | emergency clean up and repair (insurance deductible) | | | $ 100,000.00 |
| | | | | Total | $ 100,000.00 |

*[signature]* 3-21-06

TSA 00310



| | | | |
|---|---|---|---|
| **Name** | Mike Mavelie | **Date:** | 3/20/2006 |
| **Corp. Company** | The Sports Authority | **Invoice #:** | 1408722 |
| **Corp. Address** | 1050 W. Hampden Ave. | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, Colorado 80110 | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-2285 | | |
| **Fax:** | (720) 475-2118 | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 Veterans Parkway | **Store Number:** | # 618 |
| **City, State, Zip** | Springfield, IL 62704 | | |
| **Tel:** | (217) 546-0132 | **Insurance Company:** | Liberty Mutual Property |
| **Fax:** | (217) 546-1073 | **Insurance Adjuster:** | Tom Tiernan - EGA |

**RE:** DRAW REQUEST # 1

*EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE MENTIONED LOSS ADDRESS:*   $  100,000.00

| | | |
|---|---|---|
| **SUBTOTAL** | $ | 100,000.00 |
| **TAX** | $ | - |
| **TOTAL DUE AND PAYABLE** | $ | 100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton Catastrophe
14345 Northwest Freeway
Houston, Texas 77040

**\*\*Please include the invoice number on check\*\***

TSA 00311

| EXPENSE ITEM PURCHASE ORDER | RFC# | PURCHASE ORDER NUMBER |
|---|---|---|
| The Sports Authority Inc.<br>1050 W. Hampden Ave. - Englewood, CO 80110<br>Phone (303) 200-5050 | REQUESTING DEPT/STORE #<br>Risk Management- 963 | 125RM911 |
| | | ACCOUNT TO BE CHARGED TO<br>618-630-120 |
| | DATE OF ORDER<br>4/19/2006 | DELIVERY REQUIRED BY |

ACCT: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | remainder of emergency Services for Roof damage | | $ 219,428.67 |
| | | | | |
| | | _faxed to Jack 4-26-06_ | | |
| | | | | |
| | | | | $ 219,428.67 |

_Please Press_
_ASAP_

Nul Klull  4-26-06

X Na Jin  4.26.06

TSA 00312

*Sports File #618*



**National Disaster Recovery Services**

| | | | |
|---|---|---|---|
| **Name** | Mike Mavelle | **Date:** | 03/31/06 |
| **Company** | Sports Authority | **Invoice #:** | 1408722 |
| **Address** | 1050 W. Hampton Ave. | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-3285 | | |
| **Fax:** | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | **Insurance Co:** | Liberty Mutual Property |
| **City, State, Zip** | Springfield, IL 62704 | **Insurance Adj:** | Ton Tiernan |
| **Tel:** | (217) 546-0132 | **Claim #:** | X69A-003155-00 |
| **Fax:** | (217) 546-1073 | | |

**Re:**     Tornado Damages in Springfield, IL

**Re:**     **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*
*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

03/31/06

**\*\*Please include the invoice number on check\*\***

TSA 00313

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date: 4/3/2006
Contractor: Wolford Retail Builders, Inc.
Union    Revised 5/7    J. Wolford

| Budgetary- Insurance- 32,513 sf | | | BID BREAKDOWN | |
|---|---|---|---|---|
| ITEM | MATERIAL | LABOR- Unid | PRICE/SQ.FT. | TOTAL |
| 1.  Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.  Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.  Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.  Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.  Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.  Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.  Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.  Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.  Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalcemen | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- | Sales | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl`s Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaini | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incid`s Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | ░░░░░░░░░ |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer`s & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | wks. | |
| UNION    /    NON-UNION | | Amount of time for construction: | Weeks | |

| | | |
|---|---|---|
| 80% Cotton | | $22,880.00 |
| | | |
| Demo only 10% by Cotton | | $2,650.00 |
| Demo only 15% by Cotton | | $6,765.00 |
| | | |
| 30% Cotton- dismantling only | | $32,700 |
| 40% Cotton | | $6,160.00 |
| 40% adhesive removal | | $4,016.80 |
| | | |
| 100% deordorizing only | | $11,000.00 |
| 50% Cotton | | $3,075.00 |
| | | |
| 40% Cotton | | $10,100.00 |
| 33% Cotton | | $7,053.75 |
| | | |
| **Cotton Sub-Total** | | **$106,400.55** |
| | | |
| Prorate % | 1% Percent | $1,064.00 |
| Prorate % | 10% Percent | $10,746.46 |
| | | |
| **Cotton Total- Against WRB Budget** | | **$118,211.01** |

▢   DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON
AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY
THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-
DAMAGED PRODUCT REMAINING IN THE STORE.

INSTALL THE FOLLOWING: (FRONT OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE
  SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE
  OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE
  STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE
  DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

INSTALL THE FOLLOWING: (BACK OF THE STORE)

- (2) 5000 CFM DESICCANTS
- (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE
  SUSPENDED FROM THE CEILING.
- INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE
  OF THE STORE.
- FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE
  NORTH DOORWAY TO THE WAREHOUSE AREA.
- INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE
  STORE TO RUN PORTABLE DRYING EQUIPMENT.
- EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
- COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

- CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
- SWEEP UP ALL THE GLASS FROM FRONT OF STORE
- ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO
  A MINIMUM

- COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-
  GLOBAL) ON INSPECTION.
- COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
- COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION
  PURPOSES
- COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

- SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
- ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
  - ▢ HARD HATS
  - ▢ EYE GLASSES
  - ▢ DUST MASKS

TSA 00302

- □ STEEL TOED SHOES
- □ EAR PROTECTION
- ➤ CUT DOWN ALL HANGING DEBRIS
  - □ FLORESCENT LIGHTS
  - □ CONDUIT LINES
  - □ MONITORS
  - □ CAP SPRINKLER LINES
  - □ ELECTRICAL LINES
  - □ SPORT AUTHORITY SIGNAGE
  - □ PARTS OF THE ROOF DECKING
- ➤ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- ➤ WET VAC ALL STANDING WATER
- ➤ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- ➤ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

███████████

- ➤ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED, MOVED, AND THE RACKS DISASSEMBLED.*

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

███████████

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORIZATION.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

> - UTILIZE THE ABOVE DRYING SCOPE
> - TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> - DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> - MANIPULATE ALL THE CONTENTS
> - WET VAC ALL STANDING WATER
> - REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> - REMOVE AND DISCARD THE RUBBER MATTING
> - REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> - SCRAPE ALL REMAINING GLUE FROM THE SLAB
> - DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> - REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
> - HEPA VAC ALL DUST DEBRIS PARTICLES
> - REMOVE AND DISCARD ALL AFFECTED INSULATION
> - WORK WITH REGIS ON THE INVENTORY COUNTING
> - WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> - UTILIZE THE ABOVE DRYING SCOPE
> - TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> - DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> - MANIPULATE ALL THE CONTENTS
> - WET VAC ALL STANDING WATER
> - REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> - REMOVE AND DISCARD THE RUBBER MATTING
> - REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> - SCRAPE ALL REMAINING GLUE FROM THE SLAB
> - DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> - REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
> - HEPA VAC ALL DUST DEBRIS PARTICLES
> - REMOVE AND DISCARD ALL AFFECTED INSULATION
> - WORK WITH REGIS ON THE INVENTORY COUNTING
> - WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> - UTILIZE THE ABOVE DRYING SCOPE
> - TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> - DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> - MANIPULATE ALL THE CONTENTS
> - WET VAC ALL STANDING WATER
> - REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> - REMOVE AND DISCARD THE RUBBER MATTING
> - REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> - SCRAPE ALL REMAINING GLUE FROM THE SLAB
> - COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
> - DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

E-FILED
Monday, 31 December, 2007  02:41:13 PM
Clerk, U.S. District Court, ILCD

'05/09/2006 15:25 FAX 3038642102          GART SPORTS

~2001  T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618                     Date: 7-26-01
Center: Southwest Plaza                    Contractor: VADON CONTRACTING
Springfield, IL

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|---|---|---|---|---|---|
| | | BID BREAKDOWN | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | 10,500 | X |
| 3. Bond | | | | 7,450 | X |
| 4. Concrete | | | | 17,427 | X |
| 5. Carpentry | | | | 109,440 | X |
| 6. Studs and Drywall | | | | O | X |
| 7. Storefront Glass | | | | 1,500 | |
| 8. Interior Mirrors | | | | 11,850 | |
| 9. Acoustical Ceiling | | | | 36,038 | |
| 10. Store Fixtures | | | | 18,640 | |
| 11. Painting | | | | 105,888 | |
| 12. Carpet Installation | | | | above | |
| 13. Vinyl Tile and Base | | | | 37,534 | |
| 14. Plumbing | | | | 30,025 | |
| 15. Sprinklers | | | | 34,000 | |
| 16. Electrical | | | | 9,800 | |
| 17. Fire Alarm System | | | | 11,500 | C |
| 18. HVAC/Ventilation | | | | | |
| 19. Dumpster | | | | 895 | |
| 20. Insurance  BUILDERS RISK | | | | | |
| 21. Supervision | | | | 14,402 | SUPERVISION |
| 22. General Conditions (itemize) | | | | 20,255 | |
| 23. Other (itemize below) | | | | | |
| SUBTOTAL | | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 35,000 | |
| 25. Taxes (Sales/State/Local) | | | | 39.50 | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 $22.78 A |
| List itemizations below: (#22 - Gen Cond.) | | | | | |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List itemizations below: (#23 - Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 | |
| 2. TOILET PARTITIONS | | | | 2,230 | |
| 3. CONCRETE SEALING | | | | 2,340 | 736,848 $22.80 A |
| 4. | | | | | |

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: O wks. |
| UNION  /  NON-UNION | Amount of time for construction: O wks. |
| % of Union Increase:       % | |

Qualifications to be listed on separate sheet

7-26-01

**EXHIBIT D**

05/09/2006 15:25 FAX 3038642102     GART SPORTS     ☑011
JUL-23-01 MON 04:01 PM  VANC  CONTRACTING     FAX NO. 217  10443     P. 02/02

Sheet3

*Springfield*

*#618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | Sportmart No. 618 | |
|---|---|---|---|
| | | | Cost |
| 1000 | General Requirements | | $28,829 |
| 2000 | Excavate and Grade | | $80,642 |
| 3000 | Concrete Foundations and slabs | | $174,482 |
| 4000 | Masonry and Foam Insulation | | $168,251 |
| 5000 | Structural, Joists, and Deck | | $477,827 |
| 6000 | Rough Carpentry | | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | $95,893 |
| 8100 | Doors, Frames | | $2,949 |
| 8300 | Overhead Doors | | $1,540 |
| 8400 | Storefronts | | $21,450 |
| 8460 | Auto Doors | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | $24,640 |
| 9900 | Exterior Painting | | $13,255 |
| 11100 | Dock Equipment | | $5,804 |
| 15400 | Plumbing Rough in | | $5,992 |
| 15700 | HVAC Curbs | | $3,122 |
| 16100 | Electrical Rough in | | $22,495 |
| | | | $831,117 |
| | Overhead and Profit | | $58,178 |
| | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

LEASE AGREEMENT = $55.00 / SQFT
27.53

AMOUNT REMAINING FOR T.I = $27.47 SQFT.

$1,777 total

Page 1



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months–through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced
## Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

## EXHIBIT E

05/08/2006 15:27 FAX 3038642702    GART SPORTS    ☒ 014



# AGC's Construction Inflation Alert

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.



Chart 1

Construction Materials Costs vs. CPI-U and PPI

— ◆ — CPI-U    — ○ — PPI for Finished Goods    — ▲ — Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction
## Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

05/08/2006 15:29 FAX 3038642102    GART SPORTS    ☑ 015

# AGC's Construction Inflation Alert

In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.8 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

Chart 2



### Changes in Costs Among Construction Types

Nonresidential Buildings — Highway & Street Construction — Other Heavy Construction — Multi-Unit Residential — Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 86 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.

05/09/2006 15:30 FAX 303664 2102    GART SPORTS    ☐ 016

# AGC's Construction Inflation Alert

Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



Chart 3
Change in Costs for Specific Construction Inputs

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

Chart 4



Change in Costs for Basic Inputs Important to Construction

05/08/2006 15:32 FAX 3038642102          GART SPORTS                                    @017



### Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.

The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.

05/08/2006 15:33 FAX 3038642102    GART SPORTS    Ø018



## AGC's Construction Inflation Alert

The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



(simonsonk@agc.org) became Chief Economist of Associated General Contractors of America (AGC), the leading national trade association for the construction industry, on September 10th, 2001.

He has 30 years of experience analyzing, advocating and communicating about economic and tax issues. Before joining AGC, he spent three years as senior economic advisor in the Office of Advocacy of the U.S. Small Business Administration and 13 years as vice president and chief economist for the American Trucking Associations. He also worked with the President's Commission on Industrial Competitiveness, the U.S. Chamber of Commerce, the Federal Home Loan Bank Board, and an economic consulting firm.

He writes a weekly e-mail newsletter that summarizes the latest economic news affecting construction. He is co-author of AGC's monthly Construction Tax News, a newsletter covering federal and state tax developments affecting the industry.

Mr. Simonson holds a BA in economics from the University of Chicago and an MA in economics from Northwestern University. He is a board member of the National Association for Business

05/09/2006 15:34 FAX 3038642102    GART SPORTS    ☒019



# AGC's Construction Inflation Alert

## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.9 | 3.4 | -0.6 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | N/A | 5.4 | -0.5 |
| New warehouse construction (finished cost) | N/A | 0.6 | 3.0 | 10.1 | 8.1 | 2.5 |
| Materials and components for construction | -0.1 | 1.8 | 1.3 | 6.0 | 6.0 | 1.6 |
| Construction machinery and equipment | 4.60 | 2.2 | 3.5 | 2.4 | 3.7 | 0.3 (Sept.-Dec./05) |
| Ed. for construction | 1.0 | | | | | |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Nonresidential buildings | -0.05 | 0.7 | 2.4 | 6.4 | 7.4 | 0.1 |
| Nonres. buildings | -3.6 | 1.0 | 2.6 | 10.6 | 14.1 | -2.2 |
| Highway and street construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.6 | -0.6 |
| Other heavy construction | -0.1 | 0.4 | 2.7 | 6.9 | 7.6 | 1.0 |
| Multi-unit residential | | | | | | |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.6 | 6.7 | 15.5 | 3.7 |
| Iron and steel scrap | -8.6 | 27.8 | 84.9 | 50.6 | -10.9 | 2.9 |
| Steel mill products | -5.1 | 11.1 | 1.7 | 46.6 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Steel pipe and tube | -19.5 | -9.6 | 37.4 | 65.1 | 34.1 | N/A |
| Copper ores | -17.4 | 11.2 | 30.7 | 34.6 | 52.0 | 9.6 |
| Copper base scrap | -9.5 | -1.6 | 11.6 | 29.6 | 31.0 | 11.2 |
| Copper and brass mill shapes | -2.9 | -0.9 | 5.5 | 9.9 | 6.6 | 4.6 |
| Aluminum mill shapes | | | | | | |
| Structural, architectural, pre-engineered metal prods | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | 0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.6 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | -0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.6 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.5 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.6 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.6 | 9.8 | 3.5 |
| Concrete block and brick | 2.8 | 1.5 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.6 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 6.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.6 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.6 | -0.2 | 6.2 | 3.6 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 6.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.9 | 9.2 | 6.4 | 26.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.6 |
| Asphalt | N/A | N/A | 10.0 | 16.3 | 17.6 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.8 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 18.5 | 9.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -5.0 | 8.7 | 5.6 | 17.6 | 36.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 6.6 | 2.6 | 4.0 |
| Architectural coatings | 2.6 | 0.6 | 3.9 | 5.3 | 9.2 | 2.6 |
| Gypsum products | 0.4 | 3.4 | 2.6 | 20.0 | 16.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | 1.7 |

05/08/2006 15:35 FAX 3038842102        GART SPORTS                              Ø 020

# AGC's Construction Inflation Alert

## Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI home-page, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/sopre106.txt.*

| SOP Code | Commodity Code | Index | Relative importance |
|---|---|---|---|
| | | | |
| | | Materials and components for construct | |
| | | Nonwovens and felts | |
| | | Industrial and other concrete product | |
| | | Industrial and other textiles | |
| | | Other metallic mineral | |
| | | Miscellaneous chemicals | |
| | | Natural rubber | |
| | | Special purpose coatings and paints | |
| | | Millwork and miscellaneous products | |

# AGC's Construction Inflation Alert

| Code | Description | | |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .000 | .000 |
| 071202 | Inner tubes | .003 | .003 |
| 071203 | Tread rubber, tire sundries, & repair | .001 | .001 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .011 | .011 |
| 071906 | Miscellaneous rubber products, n.e.c | .956 | .955 |
| 072106 | Plastic construction products | .130 | .130 |
| 072205 | Unsupported plastic film/sheet/other s | .018 | .018 |
| 072504 | Laminated plastic sheets, rods, and tu | .081 | .081 |
| 072901 | Other plastic products | .043 | .043 |
| 081105 | Flooring, siding, and cut stock | .289 | .289 |
| 081106 | Softwood lumber, not edge worked, not | .035 | .035 |
| 081107 | Softwood lumber MFPM | .019 | .019 |
| 081203 | Hardwood dimension | .058 | .058 |
| 081204 | Hardwood flooring | .075 | .075 |
| 081205 | Hardwood lumber, not edge worked, not | .015 | .015 |
| 081206 | Hardwood lumber MFPM | .780 | .780 |
| 082101 | General millwork | .254 | .238 |
| 082201 | Prefabricated structural members | .005 | .005 |
| 082301 | Miscellaneous millwork products | .102 | .094 |
| 083103 | Softwood veneer and plywood | — | .045 |
| 083201 | Hardwood plywood and related products | — | .017 |
| 083501 | Softwood veneer, incl veneer backed | — | .018 |
| 083401 | Hardwood plywood veneer | .071 | — |
| 083501 | Hardwood veneer and plywood | .021 | .021 |
| 084903 | Wood lies, siding, shingles, & shakes | .003 | .003 |
| 084904 | Sawn wood fence stock, wood lat, and c | .142 | .142 |
| 086101 | Prefabricated wood buildings & compone | .148 | .153 |
| 087101 | Treated wood | .005 | .006 |
| 087102 | Contract wood preserving | .007 | .007 |
| 091303 | Packaging and industrial converting pa | .003 | .003 |
| 094305 | Coated and laminated paper, n.e.c. | .006 | .006 |
| 091506 | Office supplies and accessories | .005 | .005 |
| 091508 | Pressed and molded pulp goods | .032 | .031 |
| 091509 | Misc. converted paper and board produc | .074 | .074 |
| 092201 | Particleboard and fiberboard | .015 | .015 |
| 092202 | Hardboard and fabricated hardboard 'pro | .011 | .011 |
| 092301 | Board: asphalt, hardpressed, insul, o | .006 | .006 |
| 093201 | Circulation | — | .001 |
| 093203 | Other periodicals, circulation/adverti | .008 | .008 |
| 093501 | Manifold business forms | .103 | .103 |
| 101502 | Pressure & soil pipe & fittings, cast | .092 | .092 |
| 101504 | Gray & ductile iron castings; other | .004 | .004 |
| 101505 | Malleable iron castings | — | — |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stal | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

05/09/2006 15:36 FAX 3038641102      GART SPORTS      ☒022

# AGC's Construction Inflation Alert

| | | |
|---|---|---|
| 104101 | Builders' hardware | .049 .049 |
| 104105 | Other hardware, n.e.c. | .074 .074 |
| 104201 | Hand and edge tools | .016 .016 |
| 105201 | Vitreous china fixtures | .039 .040 |
| 105402 | Plumbing fixture fittings and trim | .135 .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 .061 |
| 106101 | Steam and hot water equipment | .001 .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 .083 |
| 106301 | Other heating, non-elec., parts | .074 .074 |
| 106401 | Domestic heating stoves | .011 .011 |
| 106601 | Water heaters, domestic | .030 .031 |
| 107102 | Metal doors and frames, exc. storm | .169 .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 .205 |
| 107104 | Metal molding and trim and storefronts | .021 .022 |
| 107105 | Storm sash and doors | .019 .019 |
| 107106 | Screens and weatherstrip | .061 .062 |
| 107201 | Metal tanks | .106 .107 |
| 107301 | Sheet metal products | .542 .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 .022 |
| 107405 | Fabricated structural metal | .392 .395 |
| 107407 | Miscellaneous metal work | .118 .119 |
| 107405 | Architectural and ornamental metalwork | .191 .192 |
| 107409 | Fabricated iron & steel pipe, tube & fit | .099 .100 |
| 107501 | Heat exchangers and condensers | .046 .046 |
| 107601 | Fabricated steel plate | .058 .059 |
| 107701 | Steel power boilers | .009 .009 |
| 107801 | Nuclear steam supply systems | .008 .008 |
| 107901 | Prefab. metal bldg. systems, ex. farm's | .131 .132 |
| 107902 | Other prefab. & portable metal building | .047 .046 |
| 107903 | Panels, parts, & sections for prefab. | .016 .016 |
| 108102 | Externally thread. fasteners, exc. aircr | .005 .005 |
| 108103 | Internally thread. fasteners, ex. aircr | .001 .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 .002 |
| 108106 | Other formed fasteners | .004 .001 |
| 108302 | Residential | .027 .028 |
| 108303 | Commercial/institutional or industrial | .099 .099 |
| 108305 | Lighting equipment, n.e.c. | .059 .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 .057 |
| 108802 | Steel nails and spikes | .027 .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 .007 |
| 108809 | Other fabricated ferrous wire products | .088 .088 |
| 108905 | Other metal products | .036 .037 |
| 108907 | Metal stampings n.e.c. | .005 .005 |
| 114102 | Industrial pumps | .012 .012 |
| 114107 | Parts & attach for air & gas compresso | .004 .004 |
| 114108 | Industrial spraying equipment | .004 .004 |
| 114112 | Other pumps, including parts | .011 .011 |
| 114113 | Domestic water systems | .002 .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 .001 |
| 114201 | Elevators & escalators | .044 .044 |
| 114402 | Conveying equipment | .002 .002 |
| 114701 | Fans and blowers, except portable | .047 .047 |
| 114801 | Heat transfer equipment | .187 .186 |
| 114802 | Unitary air conditioners | .236 .235 |
| 114806 | Other a/c and refrigeration equipment | .017 .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 .007 |
| 114902 | Metal valves, except fluid power | .144 .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 .043 |
| 114908 | Filters and strainers | .006 .006 |
| 114911 | Other miscellaneous general purpose eq | .011 .011 |
| 117101 | Current carrying | .162 .161 |

05/05/2008  05:57 FAX 3086841108          CARP SPORTS          ☐ 028

# AGC's Construction Inflation Alert

| Code | Description | Former | Revised |
|---|---|---|---|
| | Lighting fixtures | .262 | .209 |
| 117X02 | Switchgear & switchgear apparatus | .262 | .461 |
| 11752 | Radio & television communication equip | .149 | .199 |
| 11760 | Electric lamps/lamps/bulbs | .000 | .000 |
| 117703 | Electric lamps, bulbs and tubes | .003 | .003 |
| 117704 | Storage batteries | .002 | .092 |
| 117A01 | Environmental controls | .151 | .156 |
| 118A05 | Process control instruments | .000 | .000 |
| 118201 | Fluid meters and counting devices | .002 | .002 |
| 118301 | Aircraft engine instruments | .000 | .000 |
| 118901 | Nuclear radiation detect & monitoring | .000 | .000 |
| 118904 | Physical properties and kinematic test | .001 | .001 |
| 118905 | Comm. geophysical & general instrumen | .000 | .000 |
| 118906 | Metal household furniture | .003 | .003 |
| 121101 | Porch and lawn furniture | .002 | .002 |
| 121501 | Wood office furniture and store fixtur | .047 | .047 |
| 122101 | Partitions and fixtures | .032 | .032 |
| 122304 | Public building furniture | .009 | .009 |
| 122301 | Carpets & rugs | .093 | .092 |
| 123101 | Hard surface floor coverings | .031 | .031 |
| 123201 | Other major appliances | .036 | .036 |
| 124104 | Vacuum cleaners | .002 | .002 |
| 124201 | Small household appliances | .007 | .007 |
| 124301 | Sheet, plate, and float glass | .003 | .003 |
| 131105 | Cement | .079 | .079 |
| 132201 | Structural block | .094 | .094 |
| 133111 | Decorative block | .011 | .011 |
| 133121 | Concrete brick | .007 | .007 |
| 133131 | Paving blocks | .012 | .012 |
| 133141 | Concrete pipe | .094 | .094 |
| 133201 | Ready-mixed concrete | .865 | .865 |
| 133301 | Precast concrete products | .225 | .225 |
| 133401 | Prestressed concrete products | .077 | .077 |
| 133501 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134201 | Glazed brick struct, hollow & facing | .004 | .004 |
| 134202 | Ceramic floor and wall tile | .027 | .027 |
| 134401 | Structural clay products, n.e.c. | .006 | .006 |
| 134501 | Clay refractories | .025 | .024 |
| 135201 | Refractories, non-clay | .032 | .032 |
| 135301 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136101 | Other asphalt roofing | .038 | .038 |
| 136201 | Gypsum products | .172 | .172 |
| 137101 | Mineral wool for structural insulation | .129 | .129 |
| 138201 | Paving mixtures and blocks | .312 | .312 |
| 139401 | Cut stone and stone products | .029 | .029 |
| 139501 | Gaskets and gasketing material | .002 | .002 |
| 139801 | Packing and sealing | .002 | .002 |
| 139802 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139902 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 139903 | Signs and advertising displays | .009 | .009 |
| 159A04 | | | |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category—Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 ship-ment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

05/05/2006 15:21 FAX 3038642102          GART SPORTS                                    ☑008

## SUMMARY OF REPLACEMENT AND REPAIR COSTS

5/1/2006

**Sports Authority**
#618  Springfield

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | |
|---|---|
| Shell Costs | $889,295 Includes all grading, foundation and slab |
| TI Costs | $716,593 |
| Sub-Total | $1,605,888 |
| *3% estimate for original project changes | $48,177 |
| Sub-Total | $1,654,065 |
| **18.5% estimated 5 year cost increase | $306,002 |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 |
| 35% threshold as defined by the lease | $686,023 |
| Estimated Repair costs (detail attached) | $1,046,701 |

\* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
\*\*Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis  of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

## EXHIBIT F

05/09/2008 15:25 FAX 3038642102          GART SPORTS

☒009

## BUDGET ESTIMATE

Sports Authority

#818
8277 South Veterans Parkway
Springfield, IL 82704
Budget sq. 32,515.sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| | | Invoice attached | $349,328 |
| Emergency Response from Cotton USA | | | $62,000 |
| Architectural and Engineering | | | $26,600 |
| Shoring/Stabilizing | | | $69,400 |
| Selective Demolition - Balance of Damage | | 4960 sq ft | $57,600 |
| Structural #2x Wall Bar, Joist & Deck | | 1 elevation | $40,800 |
| Masonry #2 Bar Backet etc. | Colm Line E | | $23,680 |
| Replace #2x Structural masonry wall | | | $33,580 |
| Roof Repair and Insulation | | 15k sq ft.  $62,000 for entire roof | $29,600 |
| Replace Existing Storefront & Glass | | | $23,280 |
| Sprinkler Rework Existing Damaged | | | $32,950 |
| Fire Alarm Minor Device Replacement | | | $67,600 |
| Ductwork Remove and replace | | | $59,680 |
| HVAC Repair existing units | | 4' up at Perim | $38,600 |
| Drywall Finish Tading Perimeter 4' U/S of Deck | | 4,000 sf | $59,980 |
| Minor ACT 2x4 Bar Replacement | | | $6,290 |
| Electrical Safe off & Circuit Verification | 60 Fixtures | Sales Floor | $46,890 |
| Light Fixture Installation Only | 60 Fixtures | Materials | $4,650 |
| Light fixtures | | | $9,650 |
| Paint to match at lower levels | | .40 per ft | $10,842 |
| Floor Prep & Adhesive Removal | | | $42,660 |
| Entire Flooring Installation | | Materials | $66,580 |
| Flooring materials | | Install Only | $4,200 |
| RR Plumbing Re-Installation | | Install Only | $6,720 |
| Entire New Premise Millwork Installation | | Materials | $26,000 |
| Millwork | | | $3,550 |
| Install Toilet Partitions/Acessories | | Union | $11,000 |
| Final Cleaning - Deodorizing | | 10 X $410.00 | $4,100 |
| Dempsters | | | $24,000 |
| Barricades - Dismantaling of Existing | | | $12,500 |
| Protection of finish materials | | | $6,290 |
| Misc Rental Equipment | | 4% | $29,600 |
| Contingency | | | $27,560 |
| General Conditions (Itemize) | 9 Weeks | $2,375 Per Wk | $21,375 |
| Supervision | | | $2,200 |
| City Required Fire Watch | | | $4,000 |
| Permits | | | $986,745 |
| SUBTOTAL | | N/A | |
| Allowances | | | |
| SUBTOTAL | | 1.50% | $14,081 |
| Insurance | | 10% | $96,875 |
| Profit & Overhead | | 5% | $46,987 |
| Premium for expedited work | | | $1,046,701 |
| TOTAL | | | |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | $2,400 |
| Misc Construction Materials | | | $6,100 |
| PM Travel Misc Office & Field Costs | | | $2,200 |
| Temp Phone, Cell Ph etc. | | | $7,500 |
| Construction Laborers & Clean-up | | | $4,800 |
| Superintendent Travel | | | $1,550 |
| Administration Time | | | |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

| UNION    /    NON-UNION | Amount of time for construction: | wks | Weeks | |
|---|---|---|---|---|
| % of Union Increase:    % | | | | |

# Sports Authority

Sportmart #618
3211 South Veterans Parkway
Springfield, IL 62704

Date: 4/3/2006

Contractor: Wolford Retail Builders, Inc.
Union  J. Wolford

Building- Insurance- 92,513 sf

| ITEM | BID BREAKDOWN | | | | |
|------|---------------|--------|-----------|-----------|--------|
| | | MATERIAL | LABOR- Union | PRICE/SQFT | TOTAL |
| 1. | Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2. | Selective Demolition- Balance of Damage | Added Scope | | Budget- Estimation | $28,500 |
| 3. | Structural- 110' st. Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4. | Masonry- Beam Pockets etc. | Coim Line E... | Reelevation | Budget- Estimation | $41,500 |
| 5. | Roofing & Roof Insulation | Verify- Scope | 15,000 sf | Budget- Estimation | $99,500 |
| 6. | Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7. | Sprinkler- Rework Existing- Dan | | Deduct Scope | Budget- Estimation | $8,500 |
| 8. | Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9. | Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. | Drywall- Finish Taping Perimete | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. | Minor ACT's- T-Bar Repalceme | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. | Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. | Light Fixture Installation Only | 60 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. | Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. | Dismantling- Sales Floor Fixtur | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. | Existing Flooring Removal | Added Scope | Mics. Remaining | Budget- Estimation | $15,400 |
| 17. | Floor Prep & Adhesive Remova | | .40 per ft | Budget- Estimation | $10,042 |
| 18. | Entire Flooring Installation | | | Budget- Estimation | $37,900 |
| 19. | RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,500 |
| 20. | Entire New Premier Millwork Ins | | Install Only | Budget- Estimation | $47,500 |
| 21. | New Toilet Partitions/ Acessorie | Salvage Parti | Deduct Scope | Budget- Estimation | $1,850 |
| 22. | Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. | Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. | Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. | General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. | Supetvision | 9 Weeks | $2,375 Per Wk | Incld's Per- Diem | $21,375 |
| 27. | City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| | SUBTOTAL | | | Revised | $682,017.00 |
| 28. | Allowances | | | N/A | |
| | SUBTOTAL | | | | |
| 29. | Insurance | | | 1 Percent | $6,820.00 |
| 30. | Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| | Emergency Response | | | Actual | $319,428 |
| | TOTAL | | | Revised | $1,063,972.00 |
| | List Itemizations below: (#25 - Gen Cond.) | | | | |
| | Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| | PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| | Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| | Construction- Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| | Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| | Superintendent- Travel | | | Budget- Estimation | $1,800 |
| | Administration Time | | | Budget- Estimation | $1,550 |
| | Site Verification (please circle): | We have / have not verified site | | | |
| | | Amount of time to procure permit | wks. | | |

E-FILED
Monday, 31 December, 2007  02:42:26 PM
Clerk, U.S. District Court, ILCD

**Page 1**

```
          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF ILLINOIS
              SPRINGFIELD DIVISION
SWPLAZA III, LLC, an Illinois Limited )
Liability Company, as successor to    )
Illinois National Bank, as Trustee    )
under Trust Agreement dated           )
November 6, 2000 and known as Trust   )
No. 00-0020, an Illinois banking      )
institution,                          )
               Plaintiff,             )
      vs.                             ) No. 06-3177
TSA STORES, INC., as successor to Gart)
Brothers Sporting Goods Company,      )
a Delaware Corporation,               )
               Defendant.             )
      The discovery deposition of JEFFREY WOLFORD,
taken in the above-entitled cause, before Christine
M. Jachimiak, a notary public of Cook County,
Illinois, on the 30th day of October, 2007 at
222 North LaSalle Street, Suite 300, Chicago,
Illinois, pursuant to Notice, at the hour of 1:30.
Reported by: Christine M. Jachimiak, CSR
License No.: 084-004064
```

**Page 2**

APPEARANCES:

SORLING, NORTHRUP, HANNA, CULLEN
& COCHRAN, LTD., by
MR. DAVID A. ROLF
Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, Illinois, 62705
(217) 544-1144
       Representing the Plaintiff,

HINSHAW & CULBERTSON, LLP, by
MR. CHARLES R. SCHMADEKE
400 South Ninth Street, Suite 200
Springfield, Illinois, 62701-1908
(217) 528-7375
       Representing the Defendant.

ALSO PRESENT: Douglas Garrett

**Page 3**

INDEX

WITNESS                    EXAMINATION
JEFFREY WOLFORD
   By Mr. Rolf               4
   By Mr. Schmadeke         82
   By Mr. Rolf (Further)    84


              E X H I B I T S
NUMBER                   MARKED FOR ID
Deposition Exhibit
   No. 7                     8
   No. 8                    22
   No. 8                    78
   No. 9                    80
   No. 10                   89

**Page 4**

1   (Witness sworn.)
2   MR. ROLF: Could you please state your name and
3   your business address for us.
4   THE WITNESS: Jeffrey B. Wolford. I reside at
5   102 South Wheeling Road, Prospect Heights,
6   Illinois.
7        JEFFREY WOLFORD,
8   called as a witness herein, having been first duly
9   sworn, was examined and testified as follows:
10        EXAMINATION
11   BY MR. ROLF:
12   Q.  How long have you been at that address?
13   A.  Approximately six years.
14   Q.  I sent a notice of deposition and asked
15   you to bring some things today which your counsel
16   has given me so why don't I let me Schmadeke go on
17   the record and make a record of what he's
18   delivering.
19   MR. SCHMADEKE: I just wanted to state that we
20   have provided some Emails to and from TSA to
21   Mr. Wolford, some of which may have been previously
22   produced and some of which may not have been
23   produced. We also have provided some preliminary
24   budget calculations for this and I think they have

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

EXHIBIT
3

1 been previously produced.
2    MR. ROLF: Is that all the material you had in
3 your file for this particular project?
4    MR. WOLFORD: That's correct, yes.
5    MR. SCHMADEKE: I should say he has other
6 material, but I think you have everything else.
7 BY MR. ROLF:
8    Q. So as of today you've produced your entire
9 file either before or after?
10    A. Yes.
11    Q. When were you first contacted about this,
12 Mr. Wolford?
13    A. I believe the date was March 27th, 2006.
14    Q. Who contacted you?
15    A. David Freider.
16    Q. What did he explain to you that they were
17 in need of?
18    A. They were looking for a preliminary budget
19 for a replacement cost, construction cost for the
20 Sports Authority Store 618 in Springfield,
21 Mass because of an unnatural disaster of the
22 tornado.
23    Q. I think you just said Springfield, Mass.
24 Is it Illinois?

5

1 provided.
2    Q. Are we looking at the same Email?
3    A. Yes, we are.
4    Q. So it's dated Monday, March 27th at
5 1:04 p.m. From David Freider to yourself?
6    A. That's correct.
7    Q. You had done work previously for TSA?
8    A. That is correct.
9    Q. What type of work had you done for TSA?
10    A. The big box build-out primarily. I've
11 done some out of the ground work and facade work,
12 but primarily it is 40,000 square foot tenant
13 build-out. tenant improvement work.
14    Q. Did you talk on the 27th about what you
15 would be compensated for this particular project?
16    A. No.
17    Q. How are you being compensated?
18    A. I have been compensated for the original
19 report dated June 1st for 2500 and I'm being
20 compensated today.
21    Q. What's your compensation today?
22    A. 2500.
23    Q. Do you anticipate having additional
24 compensation if you were to testify at trial?

7

1    A. I'm sorry, I'm bidding a job there, too.
2 Springfield, Illinois, store number 618.
3    Q. Can you be more specific about what he
4 asked you to do?
5    A. Because of the March 12th tornado
6 implosion of that space and the site he asked me to
7 put together a replacement cost of selective damage
8 that he described verbally either per an Email with
9 some very basic construction replacement scopes and
10 that means subcontractor scopes of the damages.
11    Q. And he provided you with that information
12 then on March 27th?
13    A. At that point a very basic budget or work
14 scope to put numbers on as he knew it in that time
15 frame.
16    Q. Do you recall what the scope was that you
17 described?
18    A. Not offhand without reading the Email.
19    Q. Would there be an Email that that was in?
20    A. Yes. there should be an Email.
21    Q. Do you have that with you today?
22    A. It should be. That's actually the first
23 one they sent to me on March 27th it looks like.
24 It's specific to this Email to the 27th that I

6

1    A. Yes.
2    Q. Have you talked about those arrangements?
3    A. Those arrangements have not been talked
4 about.
5    Q. So you're into them for $5,000 so far
6 based on your initial report and your deposition
7 today?
8    A. That is correct.
9    Q. What did you do in response to this March
10 27th, 2006 Email?
11    A. I provided a preliminary budget based on
12 this basic outline of the 27th.
13    Q. Let me just mark this as Exhibit 7 if we
14 could so that we can refer to the same thing. And
15 your basic budget are you looking at a particular
16 document for that?
17    A. No, no because the original budget it was
18 always upgraded. Once the scope was redefined over
19 the course of say a month and a site visit I put
20 together the final budget number for replacement
21 cost.
22         (Whereupon, WOLFORD Deposition
23         Exhibit No. 7 was marked for
24         identification.)

8

2 (Pages 5 to 8)

BY MR. ROLF:
1
2    Q.  So you produced a report like this that
3 has the various items listed?
4    A.  That would be the final.  That would be
5 the final budget after the scopes were more
6 defined.
7    Q.  What was contained within your original
8 scope particularly in terms of the items listed?
9 Is there any way to tell that?
10    A.  Not at this point because it was overlaid
11 and more details as it went on after the site visit
12 and those types of things.
13    Q.  What kind of number did you come up with
14 based on this March 27th, 2006 Email?
15    A.  I could not tell you.  It wasn't that far
16 off.  Some of the numbers went up or down depending
17 on what I field determined and further information,
18 site photos, damage photos that were sent to me
19 after this Email.
20    Q.  How soon was it after the March 27th Email
21 that you got back to Mr. Freider?
22    A.  May I go through these Emails?
23    Q.  Sure.
24    A.  For this original budget?

9

1 Charles.
2    Q.  What was your contact with Doug Garrett?
3    A.  My contact with Mr. Garrett was later on
4 but not during this original budgetary spreadsheet
5 and defining the scope process for replacement
6 costs.  It was solely to my best recollection with
7 David Freider.
8    Q.  And the Emails you've produced today --
9    A.  It's every Email correspondence I had with
10 David.
11    Q.  Is that the method in which you
12 corresponded with Mr. Freider?
13    A.  Primarily.
14    Q.  Would that give us a fairly accurate time
15 line as to when you got information and when you
16 sent information back?
17    A.  Yes.
18    Q.  Would there be anything missing if we
19 looked at those Emails?
20    A.  It was every chronological starting oldest
21 to the top to the newest that I had with David,
22 every one.
23    Q.  Would there be phone calls that would
24 supplement that or you pretty much did it by Email?

11

1    Q.  Yes.
2    A.  Looking at the Email it looks like I did
3 an attachment April 19th.  I believe there would not
4 be a copy of that because of that original budget
5 that I would have because I overlaid and it was a
6 work in progress over say plus or minus a month.
7    Q.  Is this the Email you're looking at?
8    A.  Yes, it is.
9    Q.  And you think that's the first time you
10 had an actual --
11    A.  That I actually Emailed a budget over, a
12 hard copy, yes.
13    Q.  We wouldn't be able to have a copy of
14 that?
15    A.  No.
16    Q.  Was all your correspondence on this
17 project with Mr. Freider?  Is that a yes?
18    A.  Yes.
19    MR. SCHMADEKE:  At that time?
20    THE WITNESS:  At that time.
21 BY MR. ROLF:
22    Q.  Who else from TSA have you had
23 correspondence with?
24    A.  Douglas Garrett, David Freider and

10

1    A.  90 percent of it was by Email.
2    Q.  Did you talk with anyone other than
3 Mr. Freider about the damage that was out at the
4 location in Springfield?
5    A.  Jeff Crohn with Cotton defining his
6 scopes.  I spoke to several of the subcontractors
7 when I was there on May 4th, 2006 per the site
8 visit defining the scopes and damage.
9    Q.  But leading up to what you were asked to
10 do in defining this original scope was it just with
11 Mr. Freider?
12    A.  That's correct, sir.
13    Q.  Did Crohn -- did you talk to him to get a
14 description of any of the damage to the facility
15 when you were preparing your table?
16    A.  That is correct.
17    Q.  When were those conversations?
18    A.  Those were during the month of April at
19 some point.  I never document.  There was no phone
20 log.
21    Q.  Was that all by phone?
22    A.  It was all by phone.
23    Q.  This has been marked as Exhibit 1 which is
24 your report in this matter.  I want to run through

12

1    some of it. You list several projects there in the
2    introduction that you've done for Sports Authority?
3        A.  Yes.
4        Q.  We touched on this already.  Most of those
5    I take it are the tenant build-out where you have
6    the interior.  Is that what you mean?
7        A.  That is correct.
8        Q.  Are there any on there where you were from
9    the ground out?
10       A.  From the ground up and the shell itself?
11       Q.  Yeah.
12       A.  No.  None of those are straight ground up
13   projects.
14       Q.  Why don't you describe for me the business
15   of Wolford Retail Builders?
16       A.  I'm primarily a big box contractor, retail
17   contractor.  I do no residential work whatsoever.
18   It's strictly retail work.
19       Q.  Who besides Sports Authority do you do
20   work for?
21       A.  Since I have been in business for myself
22   in two and a half years I've done a couple of other
23   clients, but primarily Sports Authority is my
24   biggest client by far.
                                                    13

1        Q.  After you completed those four years you
2    went into the job market?
3        A.  I went into the job market and got the
4    same exact position I had beforehand.
5        Q.  Who was that with?
6        A.  Fisher Development.
7        Q.  Is this resume that's in this packet
8    fairly up to date?
9        A.  May I see that one?
10       Q.  I guess it's not because it says Crown
11   Construction '96 to present.
12       A.  Yeah, that's an older one.  That's the
13   last one I had to produce that anybody asked me to
14   produce.
15       Q.  Can you just fill in from the Crown
16   Construction just for the record?
17       A.  Through the present?
18       Q.  Yes.
19       A.  Crown Construction I went on to Capital
20   Construction and I was with them for basically
21   three and a half years, three out of four.  I was
22   with Novak for one year, and I was with HCI for
23   about two years, and then I went into business for
24   myself.
                                                    15

1        Q.  You've been in business for yourself for
2    two and a half years?
3        A.  Yes.
4        Q.  What were you doing prior to that?
5        A.  I was building Sports Authority work for
6    another contractor as a direct employee, that would
7    be the third employee that I had worked for doing
8    Sports Authority work.  They followed me over the
9    years.
10       Q.  You say Sports Authority followed you?
11       A.  Well, I've been able and lucky enough to
12   do their work over the last eight years with three
13   different other employers.
14       Q.  What's your educational background?
15       A.  Higher education?
16       Q.  Yes.
17       A.  I have four years from Pratt Institute in
18   Brooklyn, New York.
19       Q.  What does that get you?
20       A.  Nothing.
21       Q.  What is it designed to get you?
22       A.  That was an architectural school.
23       Q.  Does it take five and you only did four?
24       A.  That's exactly right.
                                                    14

1        Q.  With respect to the projects you were
2    doing on this Springfield store and the storm
3    damage that didn't relate to the same type of work
4    that you normally do for Sports Authority.  Is that
5    a fair statement?
6        A.  Would you repeat that?
7        Q.  Sure.  You've described the work you
8    normally do for Sports Authority as basically the
9    tenant improvement side of the building and not
10   from the ground out?
11       A.  That's correct.
12       Q.  This particular project didn't involve
13   tenant's improvements, is that a fair statement?
14       A.  As far as the damage work and the
15   replacement work?
16       Q.  Yes.
17       A.  The replacement work is very atypical to
18   some of the major build-out work and replacement
19   work or new construction that I do as build-out
20   work.  It would be a quasi version of remodel and
21   new construction.  I've done both for Sports
22   Authority.
23       Q.  Why don't you tell me what you do then
24   when these projects say interior?
                                                    16

4 (Pages 13 to 16)

1    A. Absolutely. The shelf space is secured.
2 The permit is procured and posted on site the first
3 day and basically the construction critical path is
4 started, and the standard work is rough and finish
5 carpentry, concrete pour back for the plumbing and
6 underground, the drywall partitioning, metal studs,
7 wall legends, the drywall installation, level four
8 taping, painting and concrete sealer, acoustical
9 ceilings, HVAC distribution and owner supplied
10 equipment package installation, the lighting and
11 switch gear package, the fire alarm stand alone and
12 sprinkler relocates, the final cleaning, full
13 inspections to procure a C of O, which is a
14 certificate of occupancy, and all costs included
15 that would insure the general conditions and all
16 costs related to that to procure that certificate
17 of occupancy for the store turnover on a Thursday
18 night. It's always on a Thursday night.
19    Q. How much of that was involved?
20    A. There was specific scopes that I felt that
21 I broke out. Some were selective demolition
22 because it entailed that which would be in a
23 remodel as well so I had to extrapolate that per
24 the site visit, per site photos and the information
                                                    17

1 I gathered say over the course of a month.
2    Q. Paragraph four in your report says that
3 the terms used are defined as set forth in the
4 lease which is the subject of the above referenced
5 action. Have you reviewed the lease in this case?
6    A. Yes.
7    Q. When did you review it?
8    A. I reviewed the lease -- the lease was
9 after I put together the budget, but I don't
10 remember the time line on that. That was a more
11 recent I would say six or eight months ago.
12    Q. Who asked you to review the lease?
13    A. I believe Douglas Garrett. It could have
14 been Douglas Garrett or David Freider. It was a
15 phone call.
16    Q. Was it before or after you did your report
17 to him?
18    A. It was after.
19    Q. What were you asked to do when you were
20 asked to review the lease?
21    A. Just to review the lease in general.
22    Q. What were you looking for?
23    A. Can you be more specific?
24    Q. Well, I guess I would imagine that they
                                                    18

1 wouldn't just hand you the lease and say here's the
2 lease and say please review it. Maybe they did.
3 Were you asked to look at this article, that
4 article, look at any definitions of terms. Your
5 report here says the terms that are used are
6 defined in the lease?
7    A. I read the whole lease.
8    Q. What was your understanding of why you
9 were doing that?
10    A. Just to see basically if there was a
11 60-day construction or replacement. There was just
12 certain time lines they wanted me to look at. How
13 long did I think the reconstruction should take and
14 those type of things. For the construction purpose
15 only is the reason why I reviewed the lease and I
16 believe it was provided to me.
17    Q. How long did you think the reconstruction
18 would take?
19    A. I believe the reconstruction would take
20 between 10 and 12 weeks.
21    Q. That's not anywhere in this report, is it?
22    A. I don't believe so.
23    Q. What's the basis of that estimate?
24    A. Due to they're usually like a nine-week
                                                    19

1 project but because of the cleanup working
2 concurrently with the recovery, emergency teams
3 that were out there just trying to start up and
4 immobilize construction I felt it would take a
5 longer duration.
6    Q. You said they are usually a nine-week
7 project and what is they?
8    A. They is a typical tenant build-out and
9 these were more selective scopes which makes -- and
10 some of them were reduced scopes but there were
11 some additional scopes.
12    Q. Have you ever been involved in rebuilding
13 after storm damage for Sports Authority?
14    A. Not for the Sports Authority, no.
15    Q. Have you for someone else?
16    A. For Fisher Development we would have
17 emergency basis type of jobs.
18    Q. How long ago was that?
19    A. That would be closer to 14, 15 years ago
20 was the last time I was involved with a project
21 like that that was an emergency situation.
22    Q. Have you ever been asked other than in
23 this project to come up with an estimate of a
24 repair or replacement cost for TSA?
                                                    20

5 (Pages 17 to 20)

1    A. No.
2    Q. This is the only time?
3    A. This is the only time.
4    Q. In paragraph five of your report you say
5 that based on the reasonable certainty that the
6 estimated repair and reconstruction cost of the
7 premises as a result of the damages caused by the
8 tornado on March 12th exceeded 35 percent of the
9 then total reconstruction cost of the premises.
10 Does the term estimated repair and construction
11 cost appear anywhere in the lease documents you
12 reviewed?
13    A. I would have to review those documents
14 again.
15    Q. Do you know if you're using that as a term
16 defined within the lease, estimated repair and
17 reconstruction cost?
18    MR. SCHMADEKE: If you know.
19    THE WITNESS: I don't know to tell you the
20 truth. Can I have a couple of minutes here?
21    MR. ROLF: Sure. Can you mark that as Exhibit
22 No. 8.
23
24

21

1    A. Yes.
2    Q. And Exhibit B to this report is that a
3 copy?
4    A. That's a copy of my owner bid form.
5    Q. Is that what would have been submitted to
6 the owner?
7    A. Yes.
8    Q. Would they then accept that bid, is that
9 the process?
10    A. That bid was submitted to the architects.
11    Q. This was being done at the owner's
12 request?
13    A. That's correct. It was build to suit.
14    Q. This would have been submitted to the
15 owners?
16    A. It was a closed, sealed bid process on
17 that particular project.
18    Q. Is this the document Exhibit B there that
19 was submitted?
20    A. That's it.
21    Q. Would some of this other stuff have gone
22 with it?
23    A. Yes, actually the clarifications as well,
24 title page, listing and drawings, the original bid

23

1        (Whereupon, WOLFORD Deposition
2        Exhibit No. 8 was marked for
3        identification.)
4    THE WITNESS: Repeat your question again if you
5 don't mind.
6        (Whereupon, the record was read.)
7    THE WITNESS: I don't believe so.
8 BY MR. ROLF:
9    Q. To your knowledge that term nowhere
10 appears in the lease?
11    A. Not to my knowledge.
12    Q. In paragraph six you said on behalf of
13 Capital Construction Group I guess you bid this
14 store back in 2001?
15    A. July of '01.
16    Q. What type of company was Capital?
17    A. They were a national retail contractor as
18 well.
19    Q. Did you bid this job from the ground out
20 or you were bidding it --
21    A. This is a straight tenant improvement
22 build-out project.
23    Q. Typical of what you were doing with Sports
24 Authority before and even since?

22

1 documentation, yes.
2    Q. You didn't get the job in that instance,
3 right?
4    A. That's correct.
5    Q. Paragraph seven states that on May 2nd,
6 2006 you were asked to go to the premises?
7    A. That is correct.
8    Q. Actually to review the premises and also
9 review certain other matters identified herein to
10 provide an opinion. What were the certain other
11 matters identified herein that you're referring to?
12    A. How secure the space was, how the space
13 was secure with temporary barricades because of the
14 implosion of the space the storefront had blown
15 out, where they were as far as cleanup, water
16 control, some of the Cotton recovery team where
17 they were and to redefine the other trade work
18 scope such as how much that would supercede this
19 March 27th general outline from David Freider, what
20 the truer work scopes truly were.
21    Q. And that was done after May 2nd then?
22    A. I was there on Thursday, May 4th, '06.
23    Q. Who did you talk to from Cotton when you
24 were there?

24

1    A.  Nobody from Cotton.  This was all site
2  walk-through, three or four hours walking around
3  the building, walking through the building, walking
4  every room.
5    Q.  Why don't you tell me the condition of the
6  premises when you were there March 4th?
7    MR. SCHMADEKE:  May 4th.
8    THE WITNESS:  May 4th, yes.  Basically there
9  was selective demolition that still had to take
10  place for the new finished -- new floor finishes,
11  sealer.  There was a select amount of safe off that
12  still had to be completed and reinstallation of
13  select light fixtures on the peropad and the entry
14  there were some selective lesser scope than I had
15  originally thought demolition and redistribution
16  that had to be replaced.  There were quite a bit of
17  the millwork that had to be reinstalled.  The
18  majority of the flooring the finishes needed to be
19  reinstalled and basically the reinstallation of all
20  the sales fixtures as well.  Those were the
21  primary.  It was more specific in my report.
22    Q.  Did you observe anything with regard to
23  the bearing wall?
24    A.  Yes, they had replaced it.  There was a
                                          25

1  specific scope of bar joist and beam pockets they
2  were working on as well as some masonry that had
3  been completed.  There was a roofer as well.  I
4  wasn't able to get on to the roof to see what kind
5  of damage there was.  That's why I didn't put in a
6  specific amount per unit cost in my budget.  This
7  is what I understood what was replaced, but I never
8  walked the actual roof.  That's why I was a little
9  more specific on what I thought the roof was by
10  talking to the other gentleman on the site.
11    Q.  Who did you talk to about the roof?
12    A.  There was a roofer there that I asked him
13  about how much actually of the roofing that needed
14  to be replaced.
15    Q.  What did he tell you?
16    A.  There was some notes that I had taken,
17  field notes and it spelled it out.
18    Q.  Do you still have your field notes today?
19    A.  No, I don't have those.  They were very
20  general but more specific to what I had originally
21  had had.
22    Q.  What happened to them?
23    A.  The original notes from that?
24    Q.  Yeah.
                                          26

1    A.  After I had formalized this budget I
2  didn't keep them because that was a year and a half
3  ago.
4    Q.  When you're talking about that just
5  looking at this as line item five, is that it?
6    A.  Yes, that would be it.
7    Q.  So you approximated 1500 square feet
8  needed to be replaced?
9    A.  15,000 actually and/or its insulation
10  board.
11    Q.  Do you know what percentage of the entire
12  roof that was?
13    A.  It was approximately 38 percent
14  thereabouts.
15    Q.  With regard to the floor, the floor that
16  was in the building at the time of the storm had
17  been removed, is that true?
18    A.  I'm sorry, repeat the question.
19    Q.  The rubber flooring that was in the floor
20  at the time of the storm had all been removed?
21    A.  A significant amount of it was, yes.
22    Q.  You don't know what condition it was in?
23    A.  Prior to that time, no.  If it does get
24  wet it's a waterborne adhesive that's the product,
                                          27

1  and it's a national account and so it would have to
2  be removed.  It would be my assumption it all had
3  to be removed.
4    Q.  Is that because of the adhesive?
5    A.  It can't be salvaged, that's correct.
6    Q.  Tell me a little more about what you
7  observed about the entry.  Are you talking the
8  doors or the storefront?
9    A.  There's three components to a Sports
10  Authority standard entry.  You've got the Stanley
11  Automatic doors that is part of the vestibule.  You
12  have the transoms above and there's always two
13  storefront sidelights or storefront openings and
14  they're usually 20 by 16 on either side.  Sometimes
15  they're a curtain wall.  In this case it's a
16  standard storefront with a five inch and standard
17  insulated glass.  That had been -- that had been
18  secured on both sides and secured temporary
19  barricading.  Site protection had been provided
20  there.
21    Q.  What needed to be done, if anything, to
22  repair those?
23    A.  It had to be replaced with clear anodized
24  and insulated glass.  There might have been one
                                          28

(Pages 25 to 28)

1 quadrisection that was still there. I can't
2 remember. I do not recall but at some point it was
3 all going to be replaced.
4    Q. How is it that you're familiar with the
5 construction costs in the Springfield area?
6    A. Besides originally bidding the project and
7 having substantial bid coverage and that means
8 subcontractor coverage for each trade originally
9 and my past history working in multiple markets
10 throughout the country, union and nonunion and a
11 very parallel market in Delafield, Wisconsin which
12 is a union market and the labor rates are very
13 consistent with that I was able to formalize and
14 that assisted me in this budget, this replacement
15 budget.
16    Q. When you were talking about familiarity
17 with it originally you're talking back in 2001?
18    A. That is correct.
19    Q. So those numbers wouldn't be good anymore?
20    A. With pricing the Sports Authority work all
21 over the country doing them in 12 or 14 different
22 states, knowing the Springfield, Illinois market
23 with comparable markets I felt that the budget that
24 I produced was a very comprehensive budget and the
29

1 past history.
2    Q. Did you know any of the subcontractors who
3 were performing work on this job?
4    A. No, I did not.
5    Q. Did you ever work with any of them before?
6    A. Didn't have the opportunity.
7    Q. You have never worked in Springfield?
8    A. I have not worked in Springfield.
9    Q. Springfield, Illinois?
10    A. That's what I meant. I'm sorry.
11    Q. In paragraph 12 of your report you say
12 it's your opinion based on a reasonable certainty
13 that the total building replacement cost on or
14 about March 12th, 2006 were $1,841,856?
15    A. 12 right?
16    Q. Yeah, paragraph 12.
17    A. And repeat your question.
18    Q. That's your opinion?
19    A. That is my opinion, yes.
20    Q. How did you arrive at that?
21    A. That was all replacement cost and all the
22 national accounts and my past history and knowing
23 some of these hard numbers in replacement. That's
24 the number I formalized as a total replacement
30

1 cost.
2    Q. Does that appear anywhere in any report
3 you made or anything?
4    A. That was in -- I'd have to look at my
5 report again.
6    Q. That's it.
7    A. Can I? I just want to make sure. I don't
8 believe that specific number is in my report.
9    Q. Where did that number come from?
10    A. That was a number that I compiled three
11 other numbers the Cotton, the replacement, other
12 replacement costs that I got from the Sports
13 Authority and compiled my final number to review it
14 or to submit.
15    Q. This is the total for the total building,
16 right, not just the cost of the repair of the
17 damage?
18    A. That's correct.
19    Q. So tell me again exactly how you came up
20 with that number?
21    A. I'd have to review all my documentation
22 again.
23    Q. I need to know how you came up with it
24 because if you look at Exhibit F which is also your
31

1 report in this back on May 1st you have a number of
2 $1,960,067?
3    A. Can I see that please?
4    Q. You've got it all right in front of you.
5    A. Is this in the right order though?
6    Q. Yeah, Exhibit F.
7    A. Can you find that for me?
8    Q. Yeah.
9    A. Thank you. This is in response to the
10 Email that I concurred with this Email that these
11 would be the total replacement costs and I plugged
12 in my number, and I felt that per this Email that
13 it absolutely was correct.
14    Q. Did you generate Exhibit F?
15    A. No.
16    Q. Who did?
17    A. Sports Authority I believe, yes.
18    Q. Did they get those numbers on the shell
19 cost and the tenant improvement costs from you?
20    A. Just the tenant improvement costs.
21    Q. Do you know where they got the shell costs
22 from?
23    A. I'm not recalling.
24    Q. The three percent estimate for original
32

8 (Pages 29 to 32)

1    project changes did that number come from you?
2       A.  I don't recall.
3       Q.  As I read this it says, below is the
4    summary comment on the cost as related, etc., etc.,
5    and it says since I didn't know the change orders
6    from this project I assumed.  Do you know who the I
7    is?
8       A.  No.
9       Q.  So this isn't something you drafted?
10      A.  I did not draft this.
11      Q.  You didn't do anything with the Associated
12   General Contractors of America and the construction
13   costs and make adjustments to the bid to come up
14   with that number?
15      A.  I concur with this, but I didn't produce
16   this.
17      Q.  What do you mean by you concur with it?
18      A.  I agree with those totals.
19      Q.  So the building replacement cost you agree
20   would be $1,960,067?
21      A.  Yes.
22      Q.  And that's instead of $1,841,856 which is
23   in paragraph 12 of your Exhibit 1 report?
24      A.  Yes.
                                                    33

1    was prepared by Jeff Wolford that has that same
2    number on it.  So May 1st you did have some number,
3    right?
4       A.  Yeah, I had started the spreadsheet and
5    that's the date that I started working on this.
6    That's a typo that I really finished -- I really
7    finished formalizing it on the 5th, 6th or 7th.
8       Q.  Well, I'd like to know your report says
9    that there is an issue to report May 1 that showed
10   direct cost damages of $743.944 as indicated in my
11   budget estimate which is attached as Exhibit F.
12   What are you referring to here?  I mean, it's your
13   report, you give me the budget estimate, you give me
14   the amount and you say it's attached as Exhibit F.
15   Those are Exhibit F.  Can you show me where the
16   743,944 is?
17      A.  No, I can't on Exhibit F.
18      Q.  Is there a budget estimate that has that
19   number on it somewhere to your knowledge?
20      A.  That number would have probably been on
21   the May 1st or May 2 or the May 1st spreadsheet or
22   the owner bid sheet.  That's been rolled over.  So
23   the original budget that I had before the site
24   visit is that number to my best recollection.
                                                    35

1       Q.  Looking at paragraph 13 of your report
2    which is on page four?
3       A.  Yeah.
4       Q.  You said you issued a report dated May 1,
5    2006 indicating that the premises sustained direct
6    cost damages.  Do you see that?
7       A.  Yes.
8       Q.  Is the term direct cost damages in the
9    lease?
10      A.  I don't recall.
11      Q.  And your number for that is 743,944?
12      A.  That is correct.
13      Q.  That's based on a May 1 report?
14      A.  The May 1 was a typo.  I started the
15   spreadsheet and then I went and talked to David and
16   I needed to go down there on May 2nd or I had to go
17   down there on May 4th and actually produce the
18   final spreadsheet on the 5th or 6th and worked on
19   it over the course of a couple of days.  It was
20   just the date that I actually started formalizing
21   it.
22      Q.  If we look at Exhibit F it does have a
23   May 1 date and its got an estimated cost of repairs
24   on it which is followed by a budget estimate which
                                                    34

1       Q.  This says on it estimated repair cost
2    detail attached and what's attached to it is this
3    page right here and I don't know.
4       A.  These were what I brought in.  These were
5    working sheets.  This one says April 3rd and once I
6    redefine the work scope these numbers would change
7    the replacement costs and that's how it probably
8    happened.  That would be my strong assumption.
9       Q.  So then is the estimated repair cost in
10   your opinion $743,944?
11      A.  That's correct.
12      Q.  A million forty-six?
13      A.  That is for the specific scope of the
14   tenant build-out or replacement for the tenant
15   improvements only.
16      Q.  So I wouldn't find any document dated May
17   1 that has a $743,944 number on it?
18      A.  I don't believe so.
19      Q.  Were you aware what Sports Authority was
20   using these numbers or you were providing them for?
21      A.  Yes.
22      Q.  What did they tell you they needed them
23   for?
24      A.  If the replacement cost, the true
                                                    36

1  replacement cost exceeded 35 percent there was a
2  lease -- there was a possible lease that could be
3  broken.
4     Q.  Did they express to you that it was their
5  desire to get out of this lease?
6     A.  Yes, they did.
7     Q.  Who told you that?
8     A.  David Freider.
9     Q.  When did he tell you that?
10    A.  This was probably a couple of months after
11  the fact.
12    Q.  What's the fact?
13    A.  Well, March, March 27 -- my understanding
14  originally because I didn't have the lease in the
15  beginning was that where they were going back in,
16  back into the store but I thought it was more of an
17  insurance thing at that time.
18    Q.  When did you become aware that that
19  changed?
20    A.  I don't recall the dates on that.
21    Q.  Prior to your final estimate?
22    A.  I knew about that prior to the final
23  estimate I believe.
24    Q.  Based on Exhibit 7 you knew about that
                                                    37

1  March 27th, didn't you, that that was the threshold
2  of the lease?
3     A.  That was the threshold of the lease.
4     Q.  You didn't know they were trying to get
5  out of it at that time?
6     A.  Or what their intentions were.
7     Q.  Fair enough.  This Exhibit F which is
8  attached to your report the second page of which is
9  called a budget estimate you prepared that
10  document, correct?
11    A.  This looks like one of mine, yes.
12    Q.  That would have been completed if it was
13  done prior to May 1 before you ever saw or visited
14  the site, is that correct?
15    A.  That would have been done after.  That May
16  1 just didn't get changed.  I was on site May 4th.
17    Q.  See this budget estimate contains the same
18  number that's in the May 1 report, the million
19  forty-six so that number coming from the budget
20  estimate would have been done by May 1, would it
21  not have?
22    A.  I don't recall.
23    Q.  This is a Sports Authority Rule 26
24  disclosure pages 112 through 115 which is a letter
                                                    38

1  from Mr. Freider to my clients as well as our
2  office whereby he sent to the landlord those very
3  documents which are marked as Exhibit F in your
4  report together with the budget estimate, okay?
5     A.  Yes.
6     Q.  That letter is dated May 3rd so clearly
7  what we see as Exhibit F was done by you sometime
8  before your site visit?
9     A.  And I don't recall the exact date.
10    Q.  Would you agree it was done before your
11  site visit?
12    A.  Yes, because that date is May 4th.
13    Q.  In paragraph 14 of your report you talk
14  about the Cotton USA task that you performed?
15    A.  Yes.
16    Q.  Have you ever worked with Cotton before?
17    A.  No, I have not.
18    Q.  You've indicated that some of their work
19  that their certain tasks were directly preserving
20  or removing TSA's inventory and fixtures.  How did
21  you come about what task Cotton performed for
22  salvage and which you would attribute to
23  reconstruction costs?
24    A.  The breakdowns that Cotton USA submitted
                                                    39

1  by invoicing.
2     Q.  Can you show me what you're referring to?
3     A.  It's the Cotton invoicing dated 3-31 from
4  Mike Mabell or to Mike Mabell from Jeff Crohn.
5     Q.  How did you go about reviewing those
6  documents to determine that?
7     A.  I called Jeff Crohn directly with Cotton.
8     Q.  What did Mr. Crohn tell you?
9     A.  We went through exactly some of the
10  terminology of these work scopes in each department
11  that they did.
12    Q.  When you're talking about work scopes
13  you're talking about their contract and what they
14  were to do?
15    A.  Exactly.
16    Q.  How did you assign any -- the labor is
17  just shown with a name and the hours and rates?
18    A.  I had to define some of his terminology as
19  far as disaster or recovery or emergency, what was
20  emergency what was for example, glass extraction,
21  shard extraction from the finishes.
22    Q.  How do you do that with this document?
23    A.  What I did was I just went by line item
24  and I made sure it wouldn't be part of my number of
                                                    40

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1   the 743 number and some change number. Temporary
2   protection, shoring, anything he did.
3       Q.  That's by going through this contract?
4       A.  Yes.
5       Q.  How did you assign a cost to that from
6   Cotton's $319,000?
7       A.  I didn't include it into my replacement
8   cost. Mine was for new construction, some
9   selective demolition and the immediate damages that
10  would be a subcontractor cost, not an emergency or
11  hazard removal type company or scope.
12      Q.  Why don't you go to this page which is the
13  last page of Exhibit C.
14      A.  What does that look like? I'm not finding
15  it. Thank you.
16      Q.  Is that your work product?
17      A.  Actually, it is.
18      Q.  Can you explain that to me as to what you
19  were doing or how you went about it?
20      A.  Oh, let's see. This is actually -- I'll
21  put that here. This is how it would look on my
22  computer side bar like that so I pulled it out per
23  the line item. If you go across the scopes I had
24  pulled it out 80 percent performed by Cotton for

                                              41

1   80 percent of that was done by Cotton?
2       A.  Yes.
3       Q.  And Cotton charged 22,884 or that's just
4   80 percent of that number?
5       A.  That's just my math out of that number.
6       Q.  So you did not in looking at the documents
7   that Cotton sent with their billing which includes
8   a spreadsheet of all the materials, a spreadsheet
9   on all the labor, a spreadsheet on all the
10  equipment rental, you didn't go to those costs and
11  say these costs are attributable to repair and
12  replacement?
13      A.  What I did when I talked to Mr. Crohn with
14  Cotton is out of my budget, out of my budget and
15  what I thought the work was worth take out those
16  percentages.
17      Q.  So if we do that -- again, I don't know if
18  these line up but when you get down to line item 30
19  on your spreadsheet, and I guess it wouldn't be 30
20  and it would be the line below that total. Do you
21  see where I'm at?
22      A.  Yes.
23      Q.  That's the $743,00?
24      A.  Yeah.

                                              43

1   demolition site, for example. It was selective,
2   small portions of demolition in the say drywall
3   finish that they performed according to Jeff Crohn.
4       Q.  So we're looking at this spreadsheet and
5   that says dated 4-3-06, revised 5-7, correct?
6       A.  Yes.
7       Q.  And you're looking at line item number two
8   selective demolition, balance of damage?
9       A.  Yes.
10      Q.  It says budget estimation $28,600 on the
11  table?
12      A.  Yes.
13      Q.  And then you're saying that if you were to
14  continue to the right on that spreadsheet and it
15  would say 80 percent Cotton?
16      A.  Yes.
17      Q.  And then $22,880?
18      A.  Yes, as a proration.
19      Q.  What does that mean to me?
20      A.  Wherever there was overlap in what I would
21  consider more of a straight construction cost that
22  was in my number I took that out and prorated it as
23  a percentage.
24      Q.  So you're saving your estimate of 28,600,

                                              42

1       Q.  Would across from it be Cotton total
2   against WRB budget?
3       A.  That's what it means, yes, whether it
4   lines up with that number or not.
5       Q.  So based on your assigning these
6   percentages off of your budget to the work Cotton
7   did you concluded that $118,211.01 of your total
8   budget estimate was performed by Cotton?
9       A.  At that time, yes.
10      Q.  And at what time was that?
11      A.  I want to make sure you're looking at the
12  same spreadsheet I am.
13      Q.  This is 5-7.
14      A.  I have 4-3 here.
15      Q.  If you look that's the original date but
16  it's revised.
17      A.  Oh, I'm sorry, yes.
18      Q.  Would 4-3 be an indication that's the
19  first time you put together the spreadsheet?
20      A.  Yeah.
21      Q.  That date stayed the same on whatever
22  draft you had?
23      A.  Yeah, at times. I never thought it would
24  be a legal matter so I wasn't real -- every time I

                                              44

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1  entered it I might change the date when I had new
2  information or more finite or more detailed
3  information.,
4      Q.  I'm trying to get an understanding of what
5  you did with the Cotton work because originally in
6  your original estimate of the cost of repairs you
7  had $319,000 for Cotton in that total, correct?
8      A.  That's correct.
9      Q.  And are you saying that you don't include
10  any of that now or did you subtract some of it or
11  how did you account for what you attribute that to
12  be?
13      A.  I left it because it was true replacement
14  cost that would be new or remodel construction.
15      Q.  So that's an actual cost. You got an
16  actual cost, you ought to use an actual cost?
17      A.  That's correct.
18      Q.  To the extent you had actual costs you
19  would use them in your budget estimate?
20      A.  Yes, to the best of my knowledge knowing
21  the product as I do.
22      Q.  Would it be a fair characterization that
23  the $743,944 includes $118,211 of actual cost by
24  Cotton in it, is that fair?
                                                   45

1  28,600 Cotton did 80 percent of that?
2      A.  That was a question to Jeff because 80
3  percent of it was completed per the site visit. It
4  was a question for him and he answered my
5  questions.
6      Q.  There's no doubt your opinion is that all
7  of the $319,000 bill from Cotton is not
8  attributable to the replacement cost at the
9  facility?
10      A.  Yes.
11      Q.  This sheet that shows the 118,211 would be
12  a fair estimate you've arrived at as to how much of
13  their work would have been considered in the scope
14  of the estimate you prepared for the replacement
15  and repair costs?
16      A.  Those were questions to identify with Jeff
17  and I had already put together those numbers before
18  I talked to him just in case. That's a working
19  sheet that you see. It's kind of a work in
20  progress.
21      Q.  I take it then it's still a work in
22  progress for you. You haven't finalized these
23  numbers?
24      A.  No. I have finalized the numbers.
                                                   47

1      A.  At the time I had the conversation with
2  Jeff Crohn that was what I thought at that time.
3  I'd have to re-look at my numbers and take a look
4  at it.
5      Q.  To be sure you don't take the $743,944 and
6  then add to it the 118,211?
7      A.  That was kind of a working spreadsheet
8  here so that cost I'd have to revisit that, but I
9  believe I left it in there because it was a true
10  cost and/or those were specific. And this could be
11  it, too when I talked to Jeff I had questions for
12  him because I saw what work in place had been done,
13  did he do that work because that side bar list is a
14  working sheet and those are things I do and keep on
15  rolling over changing those dates. And that is --
16  my true assessment is the 743 after talking to
17  Cotton, but these were questions. It's more
18  questions, was this work completed by Cotton. How
19  much was, you know, if so I would have probably
20  changed it and in fact I know I would have.
21      Q.  What I'm trying to get an understanding of
22  is these working numbers as you described them what
23  would be on the far right are numbers that are
24  actually within this 743,000? For instance, the
                                                   46

1      Q.  Where do I see those finalized numbers?
2      A.  That was 743.
3      Q.  Paragraph 16 of your report and it's on
4  page five, you say you've concluded that
5  Mr. Sorenson's report cannot be considered as a
6  reliable budgeting evaluation. Do you see that
7  statement?
8      A.  Yes.
9      Q.  You would agree that his report is the
10  actual costs incurred to make the repairs that were
11  made?
12      A.  No. I didn't believe that to be the case.
13      Q.  Why didn't you believe that to be the
14  case?
15      A.  Because the closeout documentation for
16  final payment or paying finals to all the
17  subcontractors I felt was incomplete as I've put
18  together a couple hundred of these sworn statements
19  and the paperwork was incomplete or it was based on
20  final lien waivers. If there was a final lien
21  produced it was final lien waivers against invoices
22  only, not a paid in full type of scenario.
23      Q.  Let me say this, in paragraph 17 you say
24  his report appears to outline actual repair and
                                                   48

12 (Pages 45 to 48)

1  construction costs. You'd agree with that?
2      A. Yes, that's what it does.
3      Q. So in paragraph 16 when you say reliable
4  budgeting evaluation Mr. Sorenson never purported
5  to present his report as a budget. It was
6  presented as actual costs?
7      A. That's true. Those were to be final
8  costs.
9      Q. In paragraph 18 you state that you have an
10 understanding of the lease that the tenant have the
11 option to terminate the lease by reason of casualty
12 to be exercised within 60 days of the casualty.
13 How did you get that understanding of the lease?
14     A. That was explained to me.
15     Q. You're not offering any interpretations of
16 the lease document, are you?
17     A. No.
18     Q. Now, flipping to paragraph 19 on the next
19 page. This is what I think you just elaborated on,
20 that the error in Mr. Sorenson's report is that
21 there was no backup information provided to his
22 cost reports?
23     A. Final closeout documentation that would be
24 final lien waivers for all costs, material waivers,
                                                    49

1      A. I didn't have a complete closeout package.
2      Q. Flipping back to this kind of goes after
3  your resume. You've got a list there of your
4  Sports Authority store locations?
5      A. Yes.
6      Q. Is that just all of them you've done since
7  it looks like the list goes back to '99?
8      A. Yes, that's the list I produced.
9      Q. It says at the top it says, retail project
10 manager and estimator. There's a difference
11 between an estimator and project manager, right?
12     A. There can be.
13     Q. You were doing both jobs?
14     A. I was always doing both projects, yes,
15 both sides.
16     Q. When you say estimator that's exactly what
17 it says you try to estimate what it will cost?
18     A. That is correct.
19     Q. That is different in fact than a bid,
20 would it not be?
21     A. No, it's the same thing.
22     Q. When you use the term an estimate it's the
23 same as a bid?
24     A. An estimate is the same as a bid, yes.
                                                    51

1  final material waivers and sworn statements.
2      Q. Have you seen these now? They were
3  produced by Mr. Sorenson Monday at his deposition.
4      A. No, I have not seen those.
5      Q. Has it been indicated to you that you'll
6  be asked to review those to see if they match up?
7      A. Not at this time.
8      Q. If they do match up then you would not
9  have any criticism of his report as being in error
10 based on the lack of that documentation?
11     A. I would have to see the reports.
12     Q. I'm asking you to assume that the lien
13 waivers and the reports that are provided do and
14 are consistent with his cost report he gave.
15 That's your only error or criticism of it at this
16 time?
17     A. That's correct.
18     Q. If those match up that criticism goes
19 away, fair statement?
20     A. It's a fair statement.
21     Q. As you say here you're not suggesting that
22 he failed to include things or included incorrect
23 values. You just said I don't have the information
24 to know?
                                                    50

1      Q. Are you familiar that some contractors
2  would have an estimator and they would do an
3  estimation of the job and then the owner gets to
4  look at that and say here's what our estimator says
5  but depending on whether work is slow or not slow
6  we may raise it or we may even lower it?
7      A. We're still talking about the general
8  contractor, the owner of the general contracting
9  firm would review the estimator?
10     Q. Yeah, the principal in the contracting
11 firm. I guess my understanding is you have an
12 estimator who gives an estimate to the guy whose
13 going to decide what the bid is going to be. The
14 bid may be the estimate and it may not be?
15     A. In retail construction the estimator and
16 the project manager because of tenant build-outs is
17 90 percent the same person. They wear both hats.
18     Q. That's the hats you were wearing on these
19 jobs?
20     A. Yes.
21     Q. Now, can you tell me what Exhibit B is to
22 your report?
23     A. It was a spreadsheet, wasn't it?
24     Q. It's the 2001.
                                                    52

1    A.  Okay, I'm sorry.  Yeah, 7-26-01.
2    Q.  As I understand this is when Capital
3  Construction Group bid on the job these are the
4  documents?
5    A.  That's what I produced.
6    Q.  That's all of Exhibit B?
7    A.  Yes.
8    Q.  If we go through it looks like maybe to
9  the fifth page of that exhibit which is your July
10  26th?
11    A.  The clarifications?
12    Q.  Yes.
13    A.  Yeah.
14    Q.  You indicated in item number 10 your
15  basing this as an eight week schedule to complete
16  that project?
17    A.  That's correct.
18    Q.  That's based on items three and four just
19  a regular workday. 40-hour work week?
20    A.  That's correct.
21    Q.  So no expedited, no overtime type work?
22    A.  That would be all bought from the subs.
23  Those are always Exhibit B's within a
24  subcontractor's contract.  That was an expedited
                                                    53

1  material basis and they might not be addressed for
2  a couple of weeks after the turn, maybe longer.
3    Q.  As you said 95 percent they're going to be
4  firm with the bid?
5    A.  With 95 percent on a typical Sports
6  Authority.
7    Q.  I also notice on that page paragraph or
8  item 14 you when you were with Capital Construction
9  required all the subs to have done a site visit
10  prior to them bidding to you?
11    A.  That's correct.
12    Q.  That's important I take it then to you as
13  a project manager that you know the subs have been
14  out there to see what needs to be done?
15    A.  Yes, confirm deck lengths or stud heights,
16  those type of things for example.
17    Q.  If they didn't do that then their estimate
18  is going to be --
19    A.  They would not receive a contract.  They
20  might not have to do a pre-bid but before they
21  receive a contract that's an unwritten rule for the
22  most part.  They have to do it.  That's my rule.
23  That's kind of my terminology.
24    Q.  That's because you don't want them coming
                                                    55

1  schedule there as well.  They're typically nine
2  week schedules.
3    Q.  This Exhibit B the spreadsheet that was
4  your actual bid?
5    A.  This is the actual bid.
6    Q.  So that's the firm cost?
7    A.  That was the firm lump sum number.
8    Q.  If that's accepted by the owner they could
9  sign a contract for that number and then they would
10  have the cost they're going to have on the job?
11    A.  Unless there was any unforeseen
12  conditions.
13    Q.  Subject to change orders?
14    A.  Change orders, revisions.
15    Q.  But it would be possibie for the owner to
16  have the pretty firm cost absent a change within a
17  scope of the project?
18    A.  Within 95 percent, yeah.
19    Q.  And he wouldn't necessarily have to wait
20  the eight weeks that you're predicting to complete
21  the work to have 95 percent sure what his costs on
22  the job are going to be?
23    A.  Those costs usually come out because they
24  need to be finalized.  Sometimes they're a time and
                                                    54

1  back and saying my estimate is off because I didn't
2  go out and look and now I found something
3  different?
4    A.  And it's requested prior to them bidding,
5  too but I would have confirmed that if I would have
6  awarded a successful general contractor.  They
7  would have had to have done it at that point.
8    Q.  The reason for that?
9    A.  Is to make sure that his price is as solid
10  as possible and that he understands the scope, and
11  that he can order his materials usually for the
12  most part.
13    Q.  If you're just doing an estimate there's a
14  lot of variables that could play into that,
15  correct?
16    A.  Yes.
17    Q.  Not the least of which is actually being
18  on site to see what condition its in, what's going
19  on there, what's going to be required?
20    A.  You want to perform a site visit and you
21  want to have as much documentation as possible to
22  nail down a hard, lump sum number.
23    Q.  Have you ever seen the letter from Mark
24  Sorenson that was giving an estimate of percentage
                                                    56

1  damage to the facility?
2      A.  There is a letter that I believe is in the
3  package that resembles this format anyway.
4      Q.  You don't know whether you've actually
5  seen that?
6      A.  It's not specifically that letter but,
7  yes, Jones Blythe a letter format like that. I
8  don't know if it's the same letter.
9      Q.  Were you asked to review that letter to
10  see what you thought of it or offer any opinions
11  about it?
12      A.  Yes.
13      Q.  What were you asked to do?
14      A.  To review it.  If it's the same letter.
15      Q.  Do you have any opinions because I did not
16  see any opinions disclosed with respect to that
17  particular letter?
18      A.  I might not have made an opinion whether
19  this was in the package that was provided to me or
20  not.  The format looks the same.  I don't know if
21  it's the same exact numbers and percentages.  Until
22  I had the closeout documents and substantiation
23  that those were the final costs I wouldn't have
24  made a comment on that probably anyway, this
                                                    57

1  could see that the work was performed.
2      Q.  Roof structure 13 percent?
3      A.  I believe that number is light.
4      Q.  You think it was more than that?
5      A.  I believe it's more.
6      Q.  That's based on what?
7      A.  A site visit, knowing what they had to
8  replace such as structural bar joists and such and
9  to substantiate that as the final closeout package,
10  the hard numbers for this job.
11      Q.  The actual costs?
12      A.  The true costs with sworn statements,
13  yeah, that would absolutely do it. That would tell
14  a great deal.
15      MR. ROLF:  Why don't we mark that as Exhibit
16  8.
17  BY MR. ROLF:
18      Q.  The letter we've just been talking about
19  we've now marked as Exhibit 8?
20      A.  Okay.
21      Q.  Let me withdraw Exhibit 8.  The letter we
22  were just talking about is Exhibit 5.  I'm going to
23  show you what's Exhibit 6 and ask if you've seen
24  that before?
                                                    59

1  letter.
2      Q.  You don't have any opinion as to whether
3  his -- I guess you would agree the foundation
4  system sustained no damage?
5      A.  That's correct.
6      Q.  The floor slab sustained no damage?
7      A.  Besides water, no.
8      Q.  Nothing that needed to be repaired as to
9  the floor slab, correct?
10      A.  No, there wasn't structural damage to the
11  substrate.
12      Q.  With regard to the bearing walls he says
13  about seven percent damage.  Do you agree or
14  disagree or don't have an opinion on that?
15      A.  I don't have an opinion about the seven
16  percent.  The seven percent I wouldn't agree to the
17  seven percent on that masonry wall.
18      Q.  Why not?
19      A.  There was more that was replaced.  The
20  seven percent would have been the beam pockets
21  alone on that as to what my understanding of the
22  reconstruction was by the time I hit the site.
23      Q.  So you didn't see it in its damaged state?
24      A.  It was more the repaired state.  What I
                                                    58

1      A.  This spreadsheet I'm not familiar with. I
2  don't remember seeing this.
3      Q.  You've not been asked to review that and
4  comment?
5      A.  To the best of my knowledge, no.
6      Q.  Do you have any opinions today as to
7  whether or not the actual cost as reported by Jones
8  Blythe are accurate or fair and reasonable?
9      MR. SCHMADEKE:  The actual cost is the middle
10  column labeled as such.
11      MR. ROLF:  Correct.
12      THE WITNESS:  Actually, this does look
13  familiar.  Can I retract that?
14  BY MR. ROLF:
15      Q.  Sure.  Do you recall when you first saw it
16  and the circumstances under which you saw it?
17      A.  I saw this yesterday.  This is one of the
18  articles I did see yesterday.  I thought there was
19  a header up here.  I was looking for a title block.
20      Q.  Who were you meeting with yesterday when
21  you reviewed this?
22      A.  I met with Mr. Schmadeke and Douglas
23  yesterday.
24      Q.  Is that the first time you saw this?
                                                    60

15 (Pages 57 to 60)

1    A.    That is the first time I saw this.
2    Q.    What did they ask you to do?
3    A.    Just review the cost.
4    Q.    Did you arrive at any opinions or what
5  were your comments after reviewing that?
6    A.    It was brief that I looked it over.
7    Q.    What were your comments with respect to
8  those costs?
9    A.    My first initial -- the big comment I did
10  have, the most important comment that I needed to
11  know is when it is addressed below or not included
12  where were those costs being picked up again.  For
13  example, in the fire alarm minor device replacement
14  in electric, minor ACT which that's correct there
15  were minor ACT -- I'm sorry, electric safe off,
16  that would be an electrical.  Protection of the
17  finished materials below.  My other comment was the
18  general conditions which is paid for directly by
19  their direct cost for the general contractor.  The
20  supervision cost that's called out supervisory or
21  supervision 4814 and I had a full eight weeks in my
22  number, full eight or ten weeks.  Why was it only
23  4841 for full-time supervision.
24    Q.    But if the actual cost was 48 -- when you
61

1  of construction was to get the C of O, the
2  certificate of occupancy.  You can't be on site for
3  9 or $800 a week. If you add the superintendent
4  that's 12 or 1300.
5    Q.    Are you adding general conditions and
6  general supervision?
7    A.    Yeah, because that is a general
8  contracting cost.
9    Q.    There's two separate line items.  One for
10  general conditions and one for supervision?
11    A.    The owner -- this is an owner bid sheet.
12  The owner always likes supervision broken out
13  because they want to know what they're paying for
14  that personnel because he's the go-to guy.
15    Q.    Exhibit 6 is your spreadsheet, correct?
16    A.    This type of spreadsheet -- this type of
17  spreadsheet, yes, it's formatted like a Gart's
18  spreadsheet and that's what they like to see as
19  well. It's been changed from the boiler plated
20  Gart's or Sports Authority spreadsheets because
21  it's more of a specific scope or different scopes
22  that were specific to this project.
23    Q.    All these numbers in the first column are
24  numbers that came from a document you prepared
63

1  say 4841 and I know it's hard for the court
2  reporter and we're talking $4,841.  You don't have
3  any argument if that's the actual cost?
4    A.    That would not be supervision cost.  That
5  would be approximately two weeks of supervision of
6  real cost, maybe two and a half weeks.  If it was
7  a union superintendent it could be a week and a half
8  depending on the burden.  I believe Jones Blythe is
9  a union general contractor.
10    Q.    Any other comments about it?
11    A.    I feel the general conditions is way too
12  low and that's called out specifically list items
13  below and it's line item 25 and it's broken out.
14    Q.    Correct, but you don't know if that was
15  his actual cost of those items for general
16  condition?
17    A.    The general conditions depending on what
18  the true duration of construction is to obtain the
19  certificate of occupancy, all costs to obtain that
20  if that's let's say it's a ten-week project you
21  can't be out there for $900 a week.
22    Q.    Where are you looking at there?
23    A.    The general conditions of $7,742. If it
24  was an 8 or 10 week duration what the true duration
62

1  originally?
2    A.    Yes.  You're talking about the left
3  column, yes. sir.
4    Q.    You came up with those individual items
5  listed?
6    A.    Yes, I did.
7    Q.    And you came up with the estimates?
8    A.    The middle column I didn't come up with
9  and/or the owner side column.  Those numbers I
10  didn't come up with.
11    Q.    Your numbers are just that they're your
12  estimates?
13    A.    Those are my estimates per documentation
14  and site visit.
15    Q.    This is marked as Exhibit 2 which we
16  talked a little bit about before.  This is
17  evidently Capital Construction Group's July 26,
18  2001 bid?
19    A.    That's correct.
20    Q.    As I understand this you have material,
21  labor and then the price per square foot and then
22  the total, correct?
23    A.    That's correct.
24    Q.    To get the total you would add the
64

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1    material column to the labor column?
2        A.   That's correct.
3        Q.   That would give you your total?
4        A.   That's correct.
5        Q.   Is this a document you prepared when you
6    were working for Capital Construction Group?
7        A.   Yes, it is.
8        Q.   That's the bid you submitted?
9        A.   That is the bid I submitted.
10       Q.   If we go down to where it says item number
11   eight interior mirrors?
12       A.   Yes.
13       Q.   If you add the labor and materials that
14   number is $1,500, not the total reflected of $1400,
15   is that correct?
16       A.   That looks like a typo.
17       Q.   If you go down to number 12 carpet
18   installation?
19       A.   Yes.
20       Q.   If you add the labor and materials there
21   you'd come up with $45,970 rather than the $45,400?
22       A.   If at that time with this spreadsheet we
23   could discount the numbers on the right-hand side
24   it wasn't an automatic, and if I wanted to knock

                                                    65

1    off a hundred for mirrors or if I wanted to just
2    tweak a number that was a round number as opposed
3    to going to -- we were prebuying our numbers always
4    on these jobs because we knew we could get the
5    subcontractor to do it for $1400 if he was going to
6    do it for 15 to make our bottom line and the fee on
7    top of that a better number so we would discount
8    our trade numbers.  That's probably where it is.
9    Those were the quotes per square foot price and we
10   would discount the low bidder, the low qualified
11   bidder.
12       Q.   So if we look at line item 14 plumbing.
13   Do you see those two totals and you decided to
14   discount the plumbing bid by more than $30,000?
15       A.   That is a typo.
16       Q.   That's just wrong?
17       A.   It's just wrong.
18       Q.   And then if you go to 15 the sprinklers
19   and add those numbers together they actually come
20   up to $122,500?
21       A.   And I remember -- let's see, the
22   sprinkler.  Actually, the sprinkler is right.
23       Q.   30,000 plus 34,000 right there is 64,000?
24       A.   Oh.

                                                    66

1        Q.   It's going to be over 65?
2        A.   We discounted the numbers and these were
3    square foot numbers is the big number that the
4    owner would look at anyway or unit pricing.  It's
5    the far right-hand corner that would be what the
6    contracts would be written against and/or what
7    they're looking at anyway.  Some of those numbers
8    would be changed later and we were collecting bids
9    at the time and that would be the first low bidder
10   and we're always working the sheet.
11       Q.   So estimates can change as the things go
12   on?  Your original estimate here is a work in
13   progress?
14       A.   Well, this 7-26 date my final numbers are
15   on the right-hand side on the vertical column.  We
16   take bids for two days, 48 hours we'll take bids or
17   prior to that.  And what I do is I keep on working
18   these numbers always and sometimes they might not
19   be reflected for material and labor because I
20   couldn't get that late number I just qualified a
21   number but maybe not got their breakdowns for labor
22   and materials or we're discounting them as well.
23       Q.   It's fair to say these estimates may
24   change what the actual cost to you would be?  The

                                                    67

1    actual cost may in fact be lower than your
2    estimates because you have to come in with a bid at
3    a certain point in time and when you get the actual
4    bid from the sub it may be less than you estimated?
5        A.   Well, there's an estimate and there's a
6    hard bid.  This was a hard bid.  As we have three
7    weeks to put a number on these projects.  For any
8    client it's usually a three-week duration so
9    there's a budget, you put together a project
10   management budget and that's how I've always worked
11   and that's how I was taught.  That would be one
12   thing and then when you start getting your hard
13   numbers from your subcontractors you'll take those
14   project manager estimates out and enter a real
15   number.  And sometimes you might not have an actual
16   number but you'll have a PMS that you would still
17   submit and find somebody to do it for it.
18       Q.   I'm showing you what's been marked as
19   Exhibit 3.  I think this is the spreadsheet and
20   that came with that May 1st report we were looking
21   at earlier.  Do you recall that which I think was
22   Exhibit B?
23       A.   Yeah.
24       MR. SCHMADEKE:  I think it's Exhibit C.

                                                    68

BY MR. ROLF:

Q. Exhibit C to your disclosure. You're right Exhibit B was the 2001. Actually, it's not Exhibit C either because Exhibit C was Cotton. It might be F. It accompanied Exhibit F and then you said you revised that later, is that correct?

A. This is the spreadsheet in Exhibit F.

Q. And then Exhibit 4 is a spreadsheet that's revised 5-7. Do you see that?

A. Yes.

Q. Do you know what the revisions were between those two?

A. I don't recall specifically.

Q. If you compare Exhibit 3 with Exhibit No. 4 your first item on Exhibit 4 is shoring and stabilization, correct?

A. Yes.

Q. So Cotton comes out but it comes back down later but you don't have any architectural engineering in Exhibit 4, correct?

A. That's correct.

Q. Then you're shoring and stabilization went in Exhibit 3 up into Exhibit 4 to 28,000, correct? It was 18,500 in your original or your May 1

69

estimate?

A. That's correct.

Q. And your May 7th is now up to 28,000, correct?

A. That's correct.

Q. Do you know why that is specifically?

A. That was due to the fact that it was a site visit.

Q. So your original estimate then from Exhibit 3 to Exhibit 4 the changes are based on the site visit?

A. Yes.

Q. In Exhibit 3 you've taken out to replace 124 foot structural masonry wall, correct?

A. That's correct.

Q. You've taken out duct work, remove and replace -- no, that's not right. Take out HVAC and repair existing units which would have been between 9 and 10 on Exhibit No. 3?

A. That's correct.

Q. If you go down falling down light fixture only. Then you have light fixtures and you've deleted that from Exhibit No. 4?

A. Number 4 I have electrical safe off.

70

Light fixture installation only. There's two electrical scopes here.

Q. If you look at Exhibit 3 you have electrical safe off, circuit verification. Then you have light fixture installation only which would be items 12 and 13 in Exhibit 4. Then in Exhibit 3 you have light fixtures and materials and you don't include that on Exhibit 4, correct?

A. No, actually I have 12 and 13.

Q. But you don't have anything in Exhibit 4 that says light fixtures?

A. What I had done there that included 50 fixtures. I have 50 fixtures material. It was based on 50 fixtures I could see.

Q. But you've taken it out of Exhibit No. 4?

A. Yes. As a specific line item, yes.

Q. Is it in there anywhere in the costs?

A. In Exhibit 4?

Q. Yeah.

A. That would be line item 13.

Q. Where it says light fixture installation only?

A. 50 fixtures.

Q. Yeah, you're installing 50 fixtures the

71

same as you had on Exhibit No. 3 light fixture installation only, 50 fixtures?

A. I was assuming -- at that time my assumption maybe was the owner always supplies the lights. TSA purchases lighting and maybe that was my assumption or they would reuse all existing.

Q. Do you know?

A. I don't know what happened with that specifically.

Q. In item 14 is paint and then item 15 dismantling sales floor fixtures. Let me go down to flooring materials does not appear in Exhibit No. 4 but it is in Exhibit No. 3. Do you know why that is?

A. That would be more of a lump sum number because it was labor and materials.

Q. But you've got entire flooring installation in both of them but yet in Exhibit No. 3 you have another line item for flooring materials which you've decided to delete. You don't know why you deleted it?

A. I'm not recalling offhand.

Q. If you go down a few more lines where it says millwork and that's deleted as well materials?

72

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1    A.  That's the premier euro case package as
2  supplied by the owner, materials only.  That's
3  always supplied by the Sports Authority.
4    Q.  So that came out because it was -- when
5  you say owner you don't mean the landlord, you mean
6  the Sports Authority.
7    A.  The Sports Authority, yes.
8    Q.  You deleted protection of finish
9  materials, you deleted miscellaneous rental
10  equipment and you deleted the contingency from
11  Exhibit No. 4 because those items weren't
12  necessary?
13    A.  After the site visit, no.
14    Q.  Permit, the $4,000 permit was deleted as
15  well?
16    A.  That's correct.
17    Q.  Do you know why that was deleted?
18    A.  There was no re-permitting that I could
19  see or fees for that or that I could substantiate
20  as a number.
21    Q.  Do you know if there was any permit
22  required by the city?
23    A.  I know that a certificate of occupancy was
24  going to have to be reissued for that project to

73

1  budget estimate you prepared and this is a budget
2  estimate that TSA sent to the landlord as the basis
3  for their termination of the lease saying it was
4  over the 35 percent threshold?
5    A.  Yes.
6    Q.  There are 12 items which no longer appear
7  in your May 7th of '06 revision.  You don't have
8  any -- you don't disagree with that, do you?
9    A.  I would have to go line item to line item.
10    Q.  But you acknowledge?
11    A.  There were reduced scopes and/or changed
12  scopes.
13    Q.  The other thing I did, Mr. Wolford, was
14  compare your estimate in Exhibit No. 3 which went
15  out under a May 1 report with the revised estimate
16  of May 7th which is Exhibit 4, and as I look at
17  apart from the nine items which are deleted there
18  are 18 of the remaining items that are different
19  and the numbers have changed from Exhibit 3 to
20  Exhibit 4.  Does that sound to be about right to
21  you?
22    A.  I'd have to review it.
23    Q.  Do you know why the numbers would have
24  changed?

75

1  have another tenant inside the space.
2    Q.  But in terms of -- is that the permit
3  you're talking about or you're talking about a
4  construction permit to do the work?
5    A.  To do the work I never substantiated if
6  there was a permit pulled.  I know there was an
7  inspection process that had to be done.
8    Q.  How did you arrive at the original $4,000
9  estimate?
10    A.  $4,000 covers 90 percent of the Sports
11  Authority permit.
12    Q.  Then you have in Exhibit No. 3 premium
13  from expedited work which is a number you left out
14  of Exhibit No. 4?
15    A.  Where are you seeing that?
16    Q.  Just above the total line in Exhibit No. 3
17  and I don't think it appears in Exhibit 4.
18    A.  That would be a -- that number was for a
19  surcharge if any night work or any fast track work
20  had to transpire.  And when I hit the site and
21  looked at the scope it doesn't look like they
22  needed any of that at that point.  It was just a
23  number to cover any fast track costs for labor.
24    Q.  As I review Exhibit 3 which was the first

74

1    A.  We addressed the scopes, re-qualified the
2  numbers, put another budget number on those scopes
3  or deleted in whole or picked them up in another
4  number.  That's the only reason that would be.
5    Q.  It's fair to say that Exhibit 3 which is a
6  budget estimate is just that, it's an estimate of
7  what you thought might be the scope of the project
8  and what might be the cost to complete that scope
9  of project?
10    A.  To the best of my knowledge per the site
11  visit, per comparable markets, putting numbers and
12  estimates.
13    Q.  Let me correct you because it had nothing
14  to do with the site visit because I'm talking about
15  Exhibit 3 and you had not been there yet, right?
16    A.  Well, I had been to that site prior to
17  that when I bid it the first time.
18    Q.  That was a piece of bare ground, wasn't
19  it?
20    A.  Well, at that point, yeah.
21    Q.  Is that forming any basis of your opinion
22  today?
23    A.  No, not the site visit but in past
24  knowledge.

76

19 (Pages 73 to 76)

1    Q. Exhibit No. 3 those numbers it's a budget
2  estimate. It's an estimate of what you thought the
3  scope of the repairs might be and you've assigned
4  an estimate of the cost of those scope of repairs,
5  correct?
6    A. That's correct.
7    Q. We know for a fact if my representation is
8  correct, that at least nine of the scopes changed
9  and were deleted from a later estimate you did,
10  correct?
11    A. I would have to review it but, yes. There
12  was some pluses and adds, yes.
13    Q. As I counted and you can check it later if
14  you want, but as many as 18 of these specific
15  numbers differed from your Exhibit 3 to the
16  estimate in Exhibit No. 4?
17    A. Yes. I redefined the scopes many times.
18    Q. I added up the nine things that were
19  deducted and those deductions alone total $245,487
20  out of the $1,046,000 that shows up in Exhibit
21  No. 3. That's about a little over 23 percent,
22  correct?
23    A. I don't have a calculator, but is that
24  what it comes up to?
                                        77

1    Q. Yeah, 245,000 out of 1,046,000 is just
2  under 25 percent?
3    A. Right.
4    MR. ROLF: Do you know if this is in the report
5  somewhere?
6    MR. SCHMADEKE: I believe it's in his report
7  here and I believe it's part of it, yes. It's the
8  second to last page of Exhibit C.
9    MR. ROLF: So that's accompanying with the
10  Cotton material. Let me just mark this as Exhibit
11  8.
12          (Whereupon, Deposition
13          Exhibit No. 8 was marked for
14          identification.)
15  BY MR. ROLF:
16    Q. Let me show you what we've marked as
17  Exhibit No. 8. This shows a date of 4-3-2006 and
18  revised 5-7. Do you see that?
19    A. Yes.
20    C. I take it all of the numbers in this
21  Exhibit 8 are the same as in Exhibit No. 4 other
22  than it looks like you've taken out the Cotton
23  number. Is that a fair description of the change
24  between the two?
                                        78

1    A. Yes.
2    Q. And is this Exhibit 8 then that you're
3  referring to when you say that it is direct cost
4  damages in paragraph 13 of your written disclosure?
5    A. Yes.
6    Q. So it's not $1,046,000, it's the 743,944?
7    A. Those would include the Cotton costs on
8  top of this number in Exhibit 8.
9    Q. I guess you lost me when you through in
10  that last part.
11    A. This is your Exhibit 8.
12    Q. Right.
13    A. This is my base construction
14  reconstruction cost and had nothing to do with
15  Cotton's cost.
16    Q. So some of Cotton's costs are in these
17  numbers the percentages you talked about earlier?
18    A. Those percentages that was a working
19  side. I wanted to make sure those numbers weren't
20  in my number because it wouldn't be true to the
21  budget or true to those hard costs.
22    Q. So you're -- I guess to get an opinion
23  that you're going to give at trial in this matter
24  of a reasonable estimate of the cost of repair to
                                        79

1  the premises that number is $743,944?
2    A. That is correct.
3    Q. That is an opinion you arrived at May 7th
4  or was it after May 7th because we have two of
5  these Exhibit 4 and Exhibit 8 that both show May
6  7th. When did you decide to take Cotton out of
7  Exhibit No. 4?
8    A. I don't recall.
9    Q. And would it be fair to say that Exhibit
10  No. 8 as it describes it as a budget estimation and
11  does not represent any actual costs?
12    A. That would be fair.
13    MR. ROLF: Let's mark this as Exhibit No. 9.
14          (Whereupon, Deposition
15          Exhibit No. 9 was marked for
16          identification.)
17  BY MR. ROLF:
18    Q. Let's take a look at Exhibit No. 9. Have
19  you ever seen that before?
20    A. Yes.
21    Q. When did you see it?
22    A. I would assume that I read it a couple of
23  days after it was sent or prior. I don't always
24  read my Emails.
                                        80

20 (Pages 77 to 80)

1    Q.  I don't want to play tricks on you or
2  anything but it doesn't show you on the service
3  list so I don't want you to assume just because I
4  slowed you an Email that you got it.
5    A.  That's why I didn't -- okay.  Are you
6  asking me to read this?
7    Q.  Yeah, and then I'll give you another
8  chance to correct your answer.  Not that it was
9  incorrect before, you tell me, but have you seen
10  that before?
11    A.  It doesn't look familiar to me.
12    Q.  You had a discussion however with David
13  Freider after your visit to Springfield?
14    A.  Yes.
15    Q.  Did he go with you to Springfield?
16    A.  No.
17    Q.  Did anybody from Sports Authority
18  accompany you there?
19    A.  No.
20    Q.  I saw a lot of Emails about that visit
21  that were disclosed and I never gleaned from the
22  end result whether you had somebody with you or
23  not?
24    A.  It was just me.
                                              81

1  You testified I believe that the $743.944 was your
2  estimate of the direct reconstruction costs?
3    A.  That is correct.
4    Q.  That doesn't include any costs from
5  Cotton, does it?
6    A.  No.  I pulled those numbers out.  That's
7  correct.
8    Q.  So any part of Cotton costs that would be
9  deemed to be reconstruction would have to be added
10  to that number?
11    A.  That's correct.
12    MR. SCHMADEKE:  I'm going to show him that if I
13  may, David.
14  BY MR. SCHMADEKE:
15    Q.  I'm going to show you a document and take
16  a look at that for me please.  I showed this
17  document to you yesterday, is that correct?
18    A.  That's correct.
19    Q.  Is that the first time you saw it?
20    A.  That's correct.
21    Q.  Could you tell me what this purports to
22  be?
23    A.  Well, it's a second notice to obtain a
24  certificate of occupancy.  It's a status report by
                                              83

1    Q.  You said that you reported to him an
2  estimate which is attached which is about 17,000
3  more than the original.  Do you know what estimate
4  that is and if we've seen it today?
5    A.  I probably had 15 different spreadsheets
6  on this project and I never changed the date
7  specifically when I changed them.
8    Q.  That's in part because you're working with
9  estimates, the estimate of the scope of the
10  project?
11    A.  Exactly, new information, bits and pieces
12  to finite the number the best I could.
13    MR. ROLF:  I don't think I have anything else.
14    MR. SCHMADEKE:  Can I have just 60 seconds?
15    MR. ROLF:  Sure.
16      (A short break was taken.)
17        EXAMINATION
18  BY MR. SCHMADEKE:
19    Q.  I have just a couple of questions.
20  Mr. Wolford, the number we're talking about on the
21  spreadsheet which is the second to last page of
22  Exhibit C and let me find it here quickly if I
23  may.  I had it marked and I lost my space.  If I
24  can use your Exhibit 8 that would be appreciative.
                                              82

1  UCI and division, electrical, plumbing, mechanical
2  and life safety.
3    Q.  Essentially it says that certain items
4  haven't been completed, is that correct?  I don't
5  mean to put words in your mouth.
6    A.  That's correct.
7    Q.  And until those items are completed is the
8  reconstruction completed?
9    A.  If they can't occupy and they're in
10  violation here, status of certification, no.  They
11  can't occupy.
12    MR. SCHMADEKE:  Nothing further.
13        FURTHER EXAMINATION
14  BY MR. ROLF:
15    Q.  Let me just follow up on that.  You don't
16  have any idea why what remains to be done or why it
17  wasn't done at that particular point in time, do
18  you?
19    A.  I don't know.
20    Q.  It could be because the tenant said we're
21  not coming back in so rather than go forward the
22  landlord said let's wait and see.  We don't want to
23  do this electrical and do this because we don't
24  know what tenant fixtures are coming in?
                                              84

21 (Pages 81 to 84)

1    A. If the construction is not complete --
2  that wouldn't be how I would handle this. I would
3  want to have all the construction. It could be
4  occupied immediately because then you can truly --
5  you can truly close the space and close your job.
6  You don't want second notices out.
7    Q. But you don't know why that second notice
8  came out?
9    A. Only by the 13 line items called out by
10  three or four divisions here.
11    Q. Going back to Exhibit No. 8 you say none
12  of Cotton's costs are in this number. Is that what
13  you testified to?
14    A. Yes.
15    Q. As I understood it when we were looking at
16  part of Exhibit C to your report that had this
17  spreadsheet and there was certain work that Cotton
18  performed that was within your scope of work,
19  correct?
20    A. These notes were completed or I had typed
21  these in because I saw that this work was
22  completed. I substantiated with Jeff Crohn they
23  were to be in the number. My understanding is this
24  was just questions for me to ask Jeff. I still

85

1  left them because it either couldn't be
2  substantiated and/or I still left it because the
3  work -- this was true construction cost. There was
4  no overlap. I still felt that way. These are work
5  in progresses.
6    Q. So what I'm getting at is your line item
7  number two selective demolition, balance of
8  damage. Do you see that?
9    A. Yes.
10    Q. That's a scope you've chosen to use?
11    A. That's my terminology, yes.
12    Q. You estimate that as being $28,600 on this
13  particular job is your estimate. Fair statement?
14    A. That's correct.
15    Q. Is it not true that what you found out is
16  that some of what Cotton was doing was within what
17  you called selective demolition balance of damage?
18  Some of what they were doing was within that scope
19  as you defined it, fair statement?
20    A. These are working comments. That's on
21  every one of these spreadsheets. This happened to
22  be copied.
23    Q. I need you to answer my question.
24    A. Would you please repeat it?

86

1    Q. Sure. Scope of work item two, selective
2  demolition, balance of damage and your estimate of
3  28,600. The question you had and what you found
4  out is some of the work Cotton was performing fell
5  within what you considered selective demolition,
6  balance of damage, fair statement, within that
7  scope of work?
8    A. Within that scope of work these are the
9  numbers that they did not perform after further
10  clarification with Cotton.
11    Q. Did Cotton perform anything that was
12  within selective demolition, balance of damage
13  scope of work?
14    A. That was substantial enough to change my
15  number, no. or I would have changed it.
16    Q. I can't line these up. Can you tell me
17  what other number they might have gone to or I
18  can't do it upside at least.
19    A. Number 15, dismantling sales floor
20  fixturing only because I see dismantling only.
21  That number I might have revised. but these are
22  what I personally believe absolutely felt was the
23  true budget numbers after talking to -- the true
24  construction, direct construction costs.

87

1    Q. Which one did you just refer to?
2    A. 15.
3    Q. I don't even see it on your earlier one.
4  Is it on Exhibit No. 3 anywhere?
5    A. Not specifically, no.
6    Q. Do we have a prior spreadsheet like this
7  before you took out Cotton's numbers?
8    A. When this was actually produced and
9  against which spreadsheet because I left this on
10  the right side many times was printed, these
11  numbers would not reflect -- these are my final
12  numbers and what I felt the reconstruction cost
13  was. This could have been done well prior to this
14  final number. I don't remember the exact date I
15  talked to Mr. Crohn. There's other columns here
16  with other notes that gets erased. I update the
17  spreadsheet. but these were my final numbers for
18  this project. I felt it was true construction
19  related costs, nutshell, but the direct damages.
20    Q. So that's your estimate?
21    A. This was my estimate.
22    MR. ROLF: I don't have anything else.
23    MR. SCHMADEKE: I would like that document to
24  be an exhibit of the deposition whatever number we

88

22 (Pages 85 to 88)

1  are on and I think it's 9 or 10.
2              (Whereupon, Deposition
3              Exhibit No. 10 was marked for
4              identification.)
5      MR. SCHMADEKE: Mr. Wolford, you have the right
6  to review your deposition and make sure the court
7  reporter transcribed everything you said properly
8  or you can waive that. If you review it, you
9  review it and sign it or make changes if you think
10 there is an error. Which do you prefer to do?
11     THE WITNESS: Does it have to be done today?
12     MR. SCHMADEKE: It would not be done today.
13 It's after she prepares the transcript and then you
14 have a chance to read it over.
15     THE WITNESS: I would like a chance to read it
16 over.
17         FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24
                                                   89

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF C O O K )
4      I, Christine M. Jachimiak, a notary public
5  within and for the County of Cook County and State
6  of Illinois, do hereby certify that heretofore,
7  to-wit, on the 30th day of October, 2007,
8  personally appeared before me, at 222 North
9  LaSalle, Chicago, Illinois, JEFFREY WOLFORD, in a
10 cause now pending and undetermined in the Circuit
11 Court of Cook County, Illinois, wherein SWPLAZA III
12 is the Plaintiff, and TSA STORES, INC. is the
13 Defendant.
14     I further certify that the said witness was
15 first duly sworn to testify the truth, the whole
16 truth and nothing but the truth in the cause
17 aforesaid; that the testimony then given by said
18 witness was reported stenographically by me in the
19 presence of the said witness, and afterwards
20 reduced to typewriting by Computer-Aided
21 Transcription, and the foregoing is a true and
22 correct transcript of the testimony so given by
23 said witness as aforesaid.
24     I further certify that the signature to the
                                                   91

1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF ILLINOIS
3             SPRINGFIELD DIVISION
4  SWPLAZA III,              )
5       Plaintiff,           )
6       vs.                  ) No. 06-3177
7  TSA STORES, INC.,         )
8       Defendants.          )
9      This is to certify that I have read the
10 transcript of my deposition taken in the
11 above-entitled cause by Christine M. Jachimiak,
12 Certified Shorthand Reporter, on October 30, 2007,
13 and that the foregoing transcript accurately states
14 the questions asked and the answers given by me as
15 they now appear.
16 _____
17         JEFFREY WOLFORD
18 SUBSCRIBED AND SWORN TO
19 before me this _____ day
20 of _ _____, 2007.
21 _____
22   Notary Public
23
24
                                                   90

1  foregoing deposition was not waived by counsel for
2  the respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice, and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7      I further certify that I am not counsel for nor
8  in any way related to the parties to this suit, nor
9  am I in any way interested in the outcome thereof.
10     IN TESTIMONY WHEREOF: I have hereunto set my
11 hand and affixed my notarial seal this _____ day
12 of _____, 2007.
13
14
15
16 _____
17     NOTARY PUBLIC, COOK COUNTY, ILLINOIS
18
19
20
21
22
23
24
                                                   92

23 (Pages 89 to 92)



1
2          McCorkle Court Reporters, inc.
            200 N. LaSalle Street Suite 300
3           Chicago, Illinois 60601-1014
4
5   DATE:  November 19, 2007
    HINSHAW & CULBERTSON
6   400 South Ninth Street, Suite 200
    Springfield, Illinois, 62701-1908
7   Attn: Mr. Charles Schmadeke
8   IN RE: SWPLAZA vs. TSA STORES. INC.
    COURT NUMBER: 06-3177
9   DATE TAKEN: October 30, 2007
    DEPONENT: Jeffrey Wolford
10
    Dear Mr. Schmadeke:
11
    Enclosed is the deposition transcript for the
12  aforementioned deponent in the above-entitled
    cause. Also enclosed are additional signature
13  pages, if applicable, and errata sheets.
14  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
15  and signature.  All changes or corrections must be
    made on the errata sheets. not on the transcript
16  itself.  All errata sheets should be signed and all
    signature pages need to be signed and notarized.
17
    After the deponent has completed the above, please
18  return all signature pages and errata sheets to me
    at the above address, and I will handle
19  distribution to the respective parties.
20  If you have any questions, please call me at the
    phone number below.
21
22  Sincerely,
23  Margaret Setina        Christine Jachimiak
    Signature Department      Court Reporter
24
                                              93

**A**

able
10:13 14:11
26:4 29:13
above-ent...
1:18 90:11
93:12
absent
54:16
absolutely
17:1 32:13
59:13 87:22
accept
23:8
accepted
54:8
accompanied
69:5
accompany
81:18
accompanying
78:9
account
28:1 45:11
accounts
30:22
accurate
11:14 60:8
accurately
90:13
acknowledge
75:10
acoustical
17:8
ACT
61:15
action
18:5
actual
10:10 26:8
45:15,16,16
45:18,23
48:10,24
49:6 54:4,5
59:11 60:7
60:9 61:24
62:3,15
67:24 68:1
68:3,15
80:11
ACT's
61:14

Adams
2:6
add
46:6 63:3
64:24 65:13
65:20 66:19
added
77:18 83:9
adding
63:5
additional
7:23 20:11
93:12
address
4:3,12 93:18
addressed
55:1 61:11
76:1
adds
77:12
adhesive
27:24 28:4
adjustments
33:13
affixed
92:11
aforement...
93:12
aforesaid
91:17,23
ago
18:11 20:18
20:19 27:3
agree
33:18,19
39:10 48:9
49:1 58:3
58:13,16
agreement
1:7 93:14
alarm
17:11 61:13
America
33:12
amount
25:11 26:6
27:21 35:14
and/or
27:9 46:10
64:9 67:6
75:11 86:2
anodized

28:23
answer
81:8 86:23
answered
47:4
answers
90:14
anticipate
7:23
anybody
15:13 81:17
anymore
29:19
anyway
57:3,24 67:4
67:7
apart
75:17
appear
21:11 31:2
72:12 75:6
90:15
APPEARANCES
2:1
appeared
91:8
appears
22:10 48:24
74:17
applicable
93:13
appreciative
82:24
approximated
27:7
approxima...
4:13 27:13
62:5
April
10:3 12:18
36:5
architects
23:10
architect...
14:22 69:19
area
29:5
argument
62:3
arrangements
8:2,3
arrive

30:20 61:4
74:8
arrived
47:12 80:3
article
19:3,4
articles
60:18
asked
4:14 6:4,6
12:9 15:13
18:12,19,20
19:3 20:22
24:6 26:12
50:6 57:9
57:13 60:3
90:14
asking
50:12 81:6
assessment
46:16
assign
40:16 41:5
assigned
77:3
assigning
44:5
assisted
29:14
Associated
33:11
assume
50:12 80:22
81:3
assumed
33:6
assuming
72:3
assumption
28:2 36:8
72:4,6
attached
35:11,14
36:2,2 38:8
82:2
attachment
10:3
Attn
93:7
attorneys
92:5
attributable

43:11 47:8
attribute
39:22 45:11
atypical
16:17
Authority
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,22
20:13,14
22:24 28:10
29:20 31:13
32:17 36:19
38:23 51:4
55:6 63:20
73:3,6,7
74:11 81:17
automatic
28:11 65:24
awarded
56:6
aware
36:19 37:18

**B**

B
3:12 4:4
23:2,18
52:21 53:6
54:3 68:22
69:3
back
9:21 11:16
17:5 22:14
29:17 32:1
37:15,16
51:2,7 56:1
69:18 84:21
85:11
background
14:14
backup
49:21
balance
42:8 86:7,17
87:2,6,12
Bank
1:6
banking
1:9
bar

26:1 41:22
46:13 59:8
bare
76:18
barricades
24:13
barricading
28:19
base
79:13
based
8:6,11 9:14
21:5 30:12
34:13 37:24
44:5 48:19
50:10 53:18
59:6 70:10
71:14
basic
6:9,13 8:12
8:15
basically
15:20 16:8
17:3 19:10
25:8,19
basing
53:15
basis
19:23 20:17
55:1 75:2
76:21
beam
26:1 58:20
bearing
25:23 58:12
beginning
37:15
behalf
22:12
believe
5:13 10:3
18:13 19:16
19:19,22
22:7 31:8
32:17 36:18
37:23 46:9
48:12,13
57:2 59:3,5
62:8 78:6,7
83:1 87:22
best
11:6 35:24

45:20 60:5
76:10 82:12
better
66:7
bid
22:13,19
23:4,8,10
23:16,24
29:7 33:13
35:22 51:19
51:23,24
52:13,14
53:3 54:4,5
55:4 63:11
64:18 65:8
65:9 66:14
68:2,4,6,6
76:17
bidder
66:10,11
67:9
bidding
6:1 22:20
29:6 55:10
56:4
bids
67:8,16,16
big
7:10 13:16
61:9 67:3
biggest
13:24
bill
47:7
billing
43:7
bit
25:16 64:16
bits
82:11
block
60:19
blown
24:14
Blythe
57:7 60:8
62:8
board
27:10
boiler
63:19
bottom

66:6
bought
53:22
box
2:7 7:10
13:16
break
82:16
breakdowns
39:24 67:21
brief
61:6
bring
4:15
broke
17:21
broken
37:3 62:13
63:12
Brooklyn
14:18
Brothers
1:14
brought
36:4
budget
4:24 5:18
6:13 8:11
8:15,17,20
9:5,24 10:4
10:11 18:9
26:6 27:1
29:14,15,23
29:24 34:24
35:11,18,23
38:9,17,19
39:4 42:10
43:14,14
44:2,6,8
45:19 49:5
68:9,10
75:1,1 76:2
76:6 77:1
79:21 80:10
87:23
budgetary
11:4
budgeting
48:6 49:4
build
23:13
Builders

13:15
building
2:5 14:5
16:9 25:3,3
27:16 30:13
31:15 33:19
build-out
7:10,13 13:5
16:18,19
20:8 22:22
36:14
build-outs
52:16
burden
62:8
business
4:3 13:14,21
14:1 15:23
B's
53:23

C

C
17:13 41:13
63:1 68:24
69:2,4,4
78:8 82:22
85:16 91:3
calculations
4:24
calculator
77:23
call
18:15 93:20
called
4:8 38:9
40:7 61:20
62:12 85:9
86:17
calls
11:23
can't
28:5 29:1
35:17 62:21
63:2 84:9
84:11 87:16
87:18
Capital
15:19 22:13
22:16 53:2
55:8 64:17
65:6

carpentry
17:5
carpet
65:17
case
18:5 28:15
47:18 48:12
48:14 73:1
casualty
49:11,12
cause
1:18 90:11
91:10,16
93:12
caused
21:7
ceilings
17:9
CENTRAL
1:2 90:2
certain
19:12 24:9
24:10 39:19
68:3 84:3
85:17
certainty
21:5 30:12
certificate
17:14,16
62:19 63:2
73:23 83:24
certifica...
84:10
Certified
90:12
certify
90:9 91:6,14
91:24 92:3
92:7
chance
81:8 89:14
89:15
change
33:5 36:6
41:1 45:1
54:13,14,16
67:11,24
78:23 87:14
changed
37:19 38:16
46:20 63:19
67:8 75:11

75:19,24
77:8 82:6,7
  87:15
changes
33:1 70:10
  89:9 93:15
changing
46:15
character...
45:22
charged
43:3
Charles
2:13 11:1
  93:7
check
77:13
Chicago
1:21 91:9
  93:3
chosen
86:10
Christine
1:18,23
  90:11 91:4
  93:23
chronolog...
11:20
circuit
71:4 91:10
circumsta...
60:16
city
73:22
clarifica...
87:10
clarifica...
23:23 53:11
cleaning
17:12
cleanup
20:1 24:15
clear
28:23
clearly
39:6
client
13:24 68:8
clients
13:23 39:1
close
85:5,5

closed
23:16
closeout
48:15 49:23
  51:1 57:22
  59:9
closer
20:19
COCHRAN
2:3
collecting
67:8
column
60:10 63:23
  64:3,8,9
  65:1,1
  67:15
columns
88:15
come
9:13 20:23
  31:9 33:1
  33:13 39:21
  54:23 64:8
  64:10 65:21
  66:19 68:2
comes
69:18,18
  77:24
coming
38:19 55:24
  84:21,24
comment
33:4 57:24
  60:4 61:9
  61:10,17
comments
61:5,7 62:10
  86:20
company
1:5,14 22:16
  41:11
comparable
29:23 76:11
compare
69:14 75:14
compensated
7:15,17,18
  7:20
compensation
7:21,24
compiled

31:10,13
complete
51:1 53:15
  54:20 76:8
  85:1
completed
15:1 25:12
  26:3 38:12
  46:18 47:3
  84:4,7,8
  85:20,22
  93:17
components
28:9
comprehen...
29:24
computer
41:22
Computer-...
91:20
concluded
44:7 48:4
concrete
17:5,8
concur
33:15,17
concurred
32:10
concurrently
20:2
condition
25:5 27:22
  56:18 62:16
conditions
17:15 54:12
  61:18 62:11
  62:17,23
  63:5,10
confirm
55:15
confirmed
56:5
consider
42:21
considered
47:13 48:5
  87:5
consistent
29:13 50:14
construction
5:19 6:1
  15:11,16,19

15:20 16:19
16:21 17:3
19:11,14
20:4 21:10
22:13 29:5
33:12 41:8
42:21 45:14
49:1 52:15
53:3 55:8
62:18 63:1
64:17 65:6
74:4 79:13
85:1,3 86:3
87:24,24
88:18
contact
11:2,3
contacted
5:11,14
contained
9:7
contains
38:17
contingency
73:10
continue
42:14
contract
40:13 41:3
  53:24 54:9
  55:19,21
contracting
52:8,10 63:8
contractor
13:16,17
  14:6 22:17
  52:8 56:6
  61:19 62:9
contractors
33:12 52:1
contracts
67:6
control
24:16
conversation
46:1
conversat...
12:17
Cook
1:19 91:5,11
  92:17
copied

86:22
copy
10:4,12,13
  23:3,4
corner
67:5
Corporation
1:15
correct
5:4 7:6,8
  8:8 12:12
  12:16 13:7
  16:11 23:13
  24:4,7 28:5
  29:18 31:18
  32:13 34:12
  36:11 38:10
  38:14 42:5
  45:7,8,17
  50:17 51:18
  53:17,20
  55:11 56:15
  58:5,9
  60:11 61:14
  62:14 63:15
  64:19,22,23
  65:2,4,15
  69:6,16,20
  69:21,23
  70:2,4,5,14
  70:15,20
  71:8 73:16
  76:13 77:5
  77:6,8,10
  77:22 80:2
  81:8 83:3,7
  83:11,17,18
  83:20 84:4
  84:6 85:19
  86:14 91:22
corrections
93:15
corresponded
11:12
correspon...
10:16,23
  11:9
cost
5:19,19 6:7
  8:21 20:24
  21:6,9,11
  21:17 26:6

30:13,21
31:1,16
32:19 33:4
33:19 34:6
34:8,23
35:10 36:1
36:9,24
37:1 41:5,8
41:10 42:21
45:6,14,15
45:16,16,23
46:8,10
47:8 49:22
50:14 51:17
54:6,10,16
60:7,9 61:3
61:19,20,24
62:3,4,6,15
63:8 67:24
68:1 76:8
77:4 79:3
79:14,15,24
86:3 88:12
**costs**
11:6 17:14
17:16 29:5
31:12 32:11
32:19,20,21
33:13 36:7
39:23 43:10
43:11 45:18
47:15 48:10
49:1,6,8,24
54:21,23
57:23 59:11
59:12 61:8
61:12 62:19
71:17 74:23
79:7,16,21
80:11 83:2
83:4,8
85:12 87:24
88:19
**Cotton**
12:5 24:16
24:23 25:1
31:11 39:14
39:16,21,24
40:3,7
41:24 42:15
43:1,3,7,14
44:1,6,8

45:5,7,24
46:17,18
47:1,7 69:4
69:18 78:10
78:22 79:7
80:6 83:5,8
85:17 86:16
87:4,10,11
**Cotton's**
41:6 79:15
79:16 85:12
88:7
**couldn't**
67:20 86:1
**counsel**
4:15 92:1,7
**counted**
77:13
**country**
29:10,21
**County**
1:19 91:3,5
91:5,11
92:17
**couple**
13:22 21:20
34:19 37:10
48:18 55:2
80:22 82:19
**course**
8:19 18:1
34:19
**court**
1:1 62:1
89:6 90:1
91:11 93:2
93:8,23
**cover**
74:23
**coverage**
29:7,8
**covers**
74:10
**critical**
17:3
**criticism**
50:9,15,18
**Crohn**
12:5,13 40:4
40:7,8 42:3
43:13 46:2
85:22 88:15

**Crown**
15:10,15,19
**CSR**
1:23
**CULBERTSON**
2:12 93:5
**CULLEN**
2:2
**curtain**
28:15

——————— D ———————

**D**
3:1
**damage**
6:7 9:18
12:3,8,14
16:3,14
20:13 26:5
31:17 42:8
57:1 58:4,6
58:10,13
86:8,17
87:2,6,12
**damaged**
58:23
**damages**
6:10 21:7
34:6,8
35:10 41:9
79:4 88:19
**date**
5:13 15:8
34:20,23
35:5,13
39:9,12
44:15,21
45:1 67:14
78:17 82:6
88:14 93:5
93:9
**dated**
1:7 7:4,19
34:4 36:16
39:6 40:3
42:5
**dates**
37:20 46:15
**David**
2:4 5:15 7:5
10:24 11:7
1'':10,21

18:14 24:19
34:15 37:8
81:12 83:13
**day**
1:20 17:3
90:19 91:7
92:11
**days**
34:19 49:12
67:16 80:23
**deal**
59:14
**Dear**
93:10
**decide**
52:13 80:6
**decided**
66:13 72:20
**deck**
55:15
**deducted**
77:19
**deductions**
77:19
**deemed**
83:9
**Defendant**
1:16 2:17
91:13
**Defendants**
90:8
**define**
40:18
**defined**
9:6 18:3
19:6 21:16
86:19
**defining**
11:5 12:5,8
12:10
**definitions**
19:4
**Delafield**
29:11
**Delaware**
1:15
**delete**
72:20
**deleted**
70:23 72:21
72:24 73:8
73:9,10,14

73:17 75:17
76:3 77:9
**delivering**
4:18
**demolition**
17:21 25:9
25:15 41:9
42:1,2,8
86:7,17
87:2,5,12
**department**
40:10 93:23
**depending**
9:16 52:5
62:8,17
**deponent**
89:17 93:9
93:12,14,17
**deposition**
1:17 3:14
4:14 8:6,22
22:1 50:3
78:12 80:14
88:24 89:2
89:6 90:10
92:1,4,5
93:11
**describe**
13:14
**described**
6:8,17 16:7
46:22
**describes**
80:10
**description**
12:14 78:18
**designed**
14:21
**desire**
37:5
**detail**
36:2
**detailed**
45:2
**details**
9:11
**determine**
40:6
**determined**
9:17
**Development**
15:6 20:16

device
61:13
didn't
16:3,12 24:2
26:5 27:2
30:6 33:5
33:11,15
37:14 38:1
38:4,16
41:7 43:10
48:12,13
51:1 55:17
56:1 58:23
64:8,10
81:5
differed
77:15
difference
51:10
different
14:13 29:21
51:19 56:3
63:21 75:18
82:5
direct
14:6 34:5,8
35:10 61:19
79:3 83:2
87:24 88:19
directly
39:19 40:7
61:18
disagree
58:14 75:8
disaster
5:21 40:19
disclosed
57:16 81:21
disclosure
38:24 69:2
79:4
discount
65:23 66:7
66:10,14
discounted
67:2
discounting
67:22
discovery
1:17
discussion
81:12

dismantling
72:11 87:19
87:20
distribution
17:9 93:19
DISTRICT
1:1,2 90:1,2
division
1:3 84:1
90:3
divisions
85:10
document
8:16 12:19
23:18 36:16
38:10 40:22
49:16 63:24
65:5 83:15
83:17 88:23
documenta...
24:1 31:21
48:15 49:23
50:10 56:21
64:13
documents
21:11,13
39:3 40:6
43:6 53:4
57:22
doesn't
74:21 81:2
81:11 83:4
doing
14:4,7 16:2
19:9 22:23
29:21 41:19
51:13,14
56:13 86:16
86:18
don't
4:16 13:14
16:23 18:9
19:22 21:19
22:5,7 25:5
26:19 27:22
31:7 33:2
34:10 36:3
36:18 37:20
38:22 39:9
41:12 43:17
45:9 46:5
50:23 55:24

57:4,8,20
58:2,14,15
59:15 60:2
62:2,14
69:13,19
71:8,10
72:8,21
73:5 74:17
75:7,8
77:23 80:8
80:23 81:1
81:3 82:13
84:4,15,19
84:22,23
85:6,7 88:3
88:14,22
doors
28:8,11
doubt
47:6
Doug
11:2
Douglas
2:19 10:24
18:13,14
60:22
draft
33:10 44:22
drafted
33:9
drawings
23:24
drywall
17:6,7 42:2
duct
70:16
due
19:24 70:7
duly
4:8 91:15
duration
20:5 62:18
62:24,24
68:8

_____ E _____

E
3:1,12
earlier
68:21 79:17
88:3
East

2:6
education
14:15
educational
14:14
eight
14:12 18:11
53:15 54:20
61:21,22
65:11
either
5:9 6:8
28:14 69:4
86:1
elaborated
49:19
electric
61:14,15
electrical
61:16 70:24
71:2,4 84:1
84:23
Email
6:8,18,19,20
6:24 7:2
8:10 9:14
9:19,20
10:2,7 11:9
11:24 12:1
32:10,10,12
81:4
Emailed
10:11
Emails
4:20 9:22
11:8,19
80:24 81:20
emergency
20:2,17,21
40:19,20
41:10
employee
14:6,7
employers
14:13
enclosed
93:11,12
engineering
69:20
entailed
17:22
enter

68:14
entered
45:1
entire
5:8 27:11
72:17
entry
25:13 28:7
28:10
equipment
17:10 43:10
73:10
erased
88:16
errata
93:13,15,16
93:18
error
49:20 50:9
50:15 89:10
Essentially
84:3
estimate
19:23 20:23
32:24 34:24
35:11,18
37:21,23
38:9,17,20
39:4 42:24
44:8 45:6
45:19 47:12
47:14 51:17
51:22,24
52:12,14
55:17 56:1
56:13,24
67:12 68:5
70:1,9 74:9
75:1,2,14
75:15 76:6
76:6 77:2,2
77:4,9,16
79:24 82:2
82:3,9 83:2
86:12,13
87:2 88:20
88:21
estimated
21:6,10,16
34:23 36:1
36:9 68:4
estimates

64:7,12,13
67:11,23
68:2,14
76:12 82:9
estimation
42:10 52:3
80:10
estimator
51:10,11,16
52:2,4,9,12
52:15
euro
73:1
evaluation
48:6 49:4
evidently
64:17
exact
15:4 39:9
57:21 88:14
exactly
14:24 31:19
40:9,15
51:16 82:11
EXAMINATION
3:2 4:10
82:17 84:13
examined
4:9
example
40:20 42:1
55:16 61:13
exceeded
21:8 37:1
exercised
49:12
exhibit
3:14 8:13,23
12:23 21:21
22:2 23:2
23:18 31:24
32:6,14
33:23 34:22
35:11,14,15
35:17 37:24
38:7 39:3,7
41:13 52:21
53:6,9,23
54:3 59:15
59:19,21,22
59:23 63:15
64:15 68:19

68:22,24
69:2,3,4,4
69:5,7,8,14
69:14,15,20
69:23,23
70:10,10,13
70:19,23
71:3,6,7,8
71:10,15,18
72:1,12,13
72:18 73:11
74:12,14,16
74:17,24
75:14,16,19
75:20 76:5
76:15 77:1
77:15,16,20
78:8,10,13
78:17,21,21
79:2,8,11
80:5,5,7,9
80:13,15,18
82:22,24
85:11,16
88:4,24
89:3
existing
70:18 72:6
expedited
53:21,24
74:13
explain
5:16 41:18
explained
49:14
express
37:4
extent
45:18
extraction
40:20,21
extrapolate
17:23

_____
        F
_____
F
31:24 32:6
32:14 34:22
35:11,14,15
35:17 38:7
39:3,7 69:5
69:5,7

facade
7:11
facility
12:14 47:9
57:1
fact
37:11,12
46:20 51:19
68:1 70:7
77:7
failed
50:22
fair
16:5,13 38:7
45:22,24
47:12 50:19
50:20 60:8
67:23 76:5
78:23 80:9
80:12 86:13
86:19 87:6
fairly
11:14 15:8
falling
70:21
familiar
29:4 52:1
60:1,13
81:11
familiarity
29:16
far
8:5 9:15
13:24 16:14.
24:15 40:19
46:23 67:5
fast
74:19,23
fee
66:6
feel
62:11
fees
73:19
feet
27:7
fell
87:4
felt
17:20 20:4
29:23 32:12
48:17 86:4

facade
87:22 88:12
88:18
field
9:17 26:17
26:18
fifth
53:9
file
5:3,9
fill
15:15
final
8:20 9:4,5
17:12 31:13
34:18 37:21
37:22 48:16
48:20,20,21
49:7,23,24
50:1 57:23
59:9 67:14
88:11,14,17
finalized
47:22,24
48:1 54:24
finals
48:16
find
32:7 36:16
68:17 82:22
finding
41:14
finish
17:4 42:3
73:8
finished
25:10 35:6,7
61:17
finishes
25:10,18
40:21
finite
45:2 82:12
fire
17:11 61:13
firm
52:9,11 54:6
54:7,16
55:4
first
4:8 5:11
6:22 10:9
17:2 44:19

60:15,24
61:1,9
63:23 67:9
69:15 74:24
76:17 83:19
91:15
Fisher
15:6 20:16
five
14:23 21:4
27:5 28:16
48:4
fixture
70:21 71:1,5
71:21 72:1
fixtures
25:13,20
39:20 70:22
71:7,11,13
71:13,14,23
71:24 72:2
72:11 84:24
fixturing
87:20
flipping
49:18 51:2
floor
25:10 27:15
27:15,19
58:6,9
72:11 87:19
flooring
25:18 27:19
72:12,17,19
follow
84:15
followed
14:8,10
34:24
follows
4:9
foot
7:12 64:21
66:9 67:3
70:14
foregoing
90:13 91:21
92:1
form
23:4
formalize
29:13

formalized
27:1 30:24
formalizing
34:20 35:7
format
57:3,7,20
formatted
63:17
forming
76:21
forth
18:3
forty-six
36:12 38:19
forward
84:21
found
56:2 86:15
87:3
foundation
58:3
four
14:17,23
15:1,21
17:7 18:2
25:2 34:2
53:18 85:10
frame
6:15
Freider
5:15 7:5
9:21 10:17
10:24 11:7
11:12 12:3
12:11 18:14
24:19 37:8
39:1 81:13
front
32:4
full
17:12 48:22
61:21,22
full-time
61:23
further
3:6 9:17
84:12,13
87:9 89:17
91:14,24
92:3,7

G

Garrett
2:19 10:24
11:2,3
18:13,14
Gart
1:13
Gart's
63:17,20
gathered
18:1
gear
17:11
general
17:15 18:21
24:19 26:20
33:12 52:7
52:8 56:6
61:18,19
62:9,11,15
62:17,23
63:5,6,7,10
generate
32:14
gentleman
26:10
getting
68:12 86:6
give
11:14 35:13
35:13 65:3
79:23 81:7
given
4:16 90:14
91:17,22
gives
52:12
giving
56:24
glass
28:17,24
40:20
gleaned
81:21
go
4:16 9:22
24:6 34:16
34:16 40:5
41:12,23
43:10 53:8
56:2 65:10
65:17 66:18
67:11 70:21

72:11,23
75:9 81:15
84:21
goes
50:18 51:2,7
going
29:3 37:15
41:3 52:13
52:13 54:10
54:22 55:3
55:18 56:18
56:19 59:22
66:3,5 67:1
73:24 79:23
83:12,15
85:11
good
29:19
Goods
1:14
go-to
63:14
great
59:14
ground
7:11 13:9,10
13:12 16:10
22:19 76:18
Group
22:13 53:3
65:6
Group's
64:17
guess
15:10 18:24
22:13 43:19
52:11 58:3
79:9,22
guy
52:12 63:14

H

H
3:12
half
13:22 14:2
15:21 27:2
62:6,7
hand
19:1 92:11
handle
85:2 93:18

HANNA
2:2
happened
26:22 36:8
72:8 86:21
hard
10:12 30:23
56:22 59:10
62:1 68:6,6
68:12 79:21
hats
52:17,18
haven't
47:22 84:4
hazard
41:11
HCI
15:22
header
60:19
heights
4:5 55:15
hereinbefore
92:6
heretofore
91:6
hereunto
92:10
here's
19:1 52:4
he's
4:17 63:14
Higher
14:15
HINSHAW
2:12 93:5
history
29:9 30:1,22
hit
58:22 74:20
hour
1:22
hours
25:2 40:17
67:16
hundred
48:18 66:1
HVAC
17:9 70:17

I

idea

84:16
identific...
8:24 22:3
78:14 80:16
89:4
identified
24:9,11
identify
47:16
III
1:4 90:4
91:11
Illinois
1:2,4,6,9,20
1:22 2:5,8
2:15 4:6
5:24 6:2
29:22 30:9
90:2 91:1,6
91:9,11
92:17 93:3
93:6
imagine
18:24
immediate
41:9
immediately
85:4
immobilize
20:4
implosion
6:6 24:14
important
55:12 61:10
improvement
7:13 16:9
22:21 32:19
32:20
improvements
16:13 36:15
inch
28:16
include
41:7 45:9
50:22 71:8
79:7 83:4
included
17:14 50:22
61:11 71:12
includes
43:7 45:23
incomplete

48:17,19
incorrect
50:22 81:9
incurred
48:10
indicated
35:10 39:18
  50:5 53:14
indicating
34:5
indication
44:18
individual
64:4
information
6:11 9:17
  11:15,16
  17:24 45:2
  45:3 49:21
  50:23 82:11
initial
8:6 61:9
inside
74:1
inspection
74:7
inspections
17:13
installation
17:7,10
  65:18 71:1
  71:5,21
  72:2,18
installing
71:24
instance
24:2 46:24
Institute
14:17
institution
1:10
insulated
28:17,24
insulation
27:9
insurance
37:17
insure
17:15
intentions
38:6
interested

92:9
interior
13:6 16:24
  65:11
interpret...
49:15
introduction
13:2
inventory
39:20
invoices
48:21
invoicing
40:1,3
involve
16:12
involved
17:19 20:12
  20:20
isn't
33:9
issue
35:9
issued
34:4
item
27:5 40:23
  41:23 42:7
  43:18 53:14
  55:8 62:13
  65:10 66:12
  69:15 71:16
  71:20 72:10
  72:10,19
  75:9,9 86:6
  87:1
items
9:3,8 53:18
  62:12,15
  63:9 64:4
  71:6 73:11
  75:6,17,18
  84:3,7 85:9
it's
6:24 7:4
  11:9 13:18
  15:10 17:18
  27:24 28:1
  28:15 30:12
  35:12,14
  40:3 44:16
  46:17 47:19

47:21 48:3
50:20 51:21
51:22 52:24
56:4 57:6,8
57:14,21
59:5 62:1
62:13,13,20
63:17,19,21
66:17 67:1
67:4,23
68:8,24
69:3 76:5,6
77:1,2 78:6
78:7,7 79:6
79:6 83:23
83:24 89:1
89:13
I'd
31:4,21 35:8
46:3,8
75:22
I'll
41:20 81:7
I'm
6:1,1 7:19
  13:16 27:18
  30:10 32:23
  41:14 43:21
  44:17 45:4
  46:21 50:12
  53:1 59:22
  60:1 61:15
  68:18 72:22
  76:14 83:12
  83:15 86:6
I've
7:10 13:22
  14:11 16:21
  48:17 68:10

_____ J _____
Jachimiak
1:19,23
  90:11 91:4
  93:23
Jeff
12:5 35:1
  40:4,7 42:3
  46:2,11
  47:2,16
  85:22,24
Jeffrey

1:17 3:3 4:4
  4:7 90:17
  91:9 93:9
job
6:1 15:2,3
  22:19 24:2
  30:3 52:3
  53:3 54:10
  54:22 59:10
  85:5 86:13
jobs
20:17 51:13
  52:19 66:4
joist
26:1
joists
59:8
Jones
57:7 60:7
  62:8
July
22:15 53:9
  64:17
June
7:19

_____ K _____
K
91:3
keep
27:2 46:14
  67:17
kind
9:13 26:4
  46:7 47:19
  51:2 55:23
knew
6:14 37:22
  37:24 66:4
knock
65:24
know
21:15,18,19
  27:11,22
  30:2 31:23
  32:21 33:5
  33:6 35:8
  36:3 38:4
  43:17 46:19
  46:20 50:24
  55:13 57:4
  57:8,20

61:11 62:1
62:14 63:13
69:11 70:6
72:7,8,13
72:21 73:17
73:21,23
74:6 75:23
77:7 78:4
82:3 84:19
84:24 85:7
knowing
29:22 30:22
  45:20 59:7
knowledge
22:9,11
  35:19 45:20
  60:5 76:10
  76:24
known
1:8

_____ L _____
labeled
60:10
labor
29:12 40:16
  43:9 64:21
  65:1,13,20
  67:19,21
  72:16 74:23
lack
50:10
landlord
39:2 73:5
  75:2 84:22
LaSalle
1:21 91:9
  93:2
late
67:20
leading
12:9
lease
18:4,5,8,8
  18:12,20,21
  19:1,2,6.7
  19:15 21:11
  21:16 22:10
  34:9 37.2,2
  37:5,14
  38:2,3
  49:10,11,13

49:16 75:3
left
45:13 46:9
64:2 74:13
86:1,2 88:9
legal
44:24
legends
17:7
lengths
55:15
lesser
25:14
letter
38:24 39:6
56:23 57:2
57:6,7,8,9
57:14,17
58:1 59:18
59:21
let's
41:20 62:20
66:21 80:13
80:18 84:22
level
17:7
Liability
1:5
License
1:24
lien
48:20,20,21
49:24 50:12
life
84:2
light
25:13 59:3
70:21,22
71:1,5,7,11
71:21 72:1
lighting
17:10 72:5
lights
72:5
likes
63:12
Limited
1:4
line
11:15 18:10
27:5 40:23
41:23 42:7

43:18,18,20
62:13 63:9
66:6,12
71:16,20
72:19 74:16
75:9,9 85:9
86:6 87:16
lines
19:12 44:4
72:23
list
13:1 46:13
51:3,7,8
62:12 81:3
listed
9:3,8 64:5
listing
23:24
little
26:8 28:6
64:16 77:21
LLC
1:4
LLP
2:12
location
12:4
locations
51:4
log
12:20
long
4:12 19:13
19:17 20:18
longer
20:5 55:2
75:6
look
19:3,4,12
31:4,24
34:22 41:14
41:21 44:15
46:3 52:4
56:2 60:12
66:12 67:4
71:3 74:21
75:16 80:18
81:11 83:16
looked
11:19 61:6
74:21
looking

5:18 7:2
8:15 10:2,7
18:22 27:5
34:1 42:4,7
43:6 44:11
60:19 62:22
67:7 68:20
85:15
looks
6:23 10:2
38:11 51:7
53:8 57:20
65:16 78:22
lost
79:9 82:23
lot
56:14 81:20
low
62:12 66:10
66:10 67:9
lower
52:6 68:1
lucky
14:11
lump
54:7 56:22
72:15

_____
          M
_____
M
1:19,23
90:11 91:4
Mabell
40:4,4
major
16:18
majority
25:18
management
68:10
manager
51:10,11
52:16 55:13
68:14
March
5:13 6:5,12
6:23 7:4
8:9 9:14,20
21:8 24:19
25:6 30:14
37:13,13
38:1

Margaret
93:23
mark
8:13 21:21
56:23 59:15
78:10 80:13
marked
3:13 8:23
12:23 22:2
39:3 59:19
64:15 68:18
78:13,16
80:15 82:23
89:3
market
15:2,3 29:11
29:12,22
markets
29:9,23
76:11
masonry
26:2 58:17
70:14
Mass
5:21,23
match
50:6,8,18
material
5:2,6 49:24
50:1 55:1
64:20 65:1
67:19 71:13
78:10
materials
43:8 56:11
61:17 65:13
65:20 67:22
71:7 72:12
72:16,20,24
73:2,9
math
43:5
matter
12:24 44:24
79:23
matters
24:9,11
McCorkle
93:2
mean
13:6 33:17
35:12 42:19

73:5,5 84:5
means
6:10 29:7
44:3
meant
30:10
mechanical
84:1
meeting
60:20
mentioned
92:6
met
60:22
metal
17:6
method
11:11
middle
60:9 64:8
Mike
40:4,4
million
36:12 38:18
millwork
25:17 72:24
mind
22:5
mine
38:11 41:8
minor
61:13,14,15
minus
10:6
minutes
21:20
mirrors
65:11 66:1
miscellan...
73:9
missing
11:18
Monday
7:4 50:3
month
8:19 10:6
12:18 18:1
months
18:11 37:10
mouth
84:5
multiple

29:9

**N**

N
3:1 93:2
nail
56:22
name
4:2 40:17
national
1:6 22:17
28:1 30:22
necessarily
54:19
necessary
73:12
need
5:17 31:23
54:24 86:23
93:16
needed
25:18 26:13
27:8 28:21
34:16 36:22
58:8 61:10
74:22
needs
55:14
never
12:19 26:7
30:7 44:23
49:4 74:5
81:21 82:6
new
14:18 16:19
16:21 25:10
25:10 41:8
45:1,14
82:11
newest
11:21
night
17:18,18
74:19
nine
54:1 75:17
77:8,18
nine-week
19:24 20:6
Ninth
2:14 93:6
nonunion

29:10
normally
16:4,8
North
1:21 91:8
NORTHRUP
2:2
notarial
92:11
notarized
93:16
notary
1:19 90:22
91:4 92:17
notes
26:16,17,18
26:23 85:20
88:16
notice
1:22 4:14
55:7 83:23
85:7 92:4
notices
85:6
Novak
15:22
November
1:8 93:5
number
3:13 5:20
6:2 8:20
9:13 30:24
31:8,9,10
31:13,20
32:1,12
33:1,14
34:11 35:2
35:2,19,20
35:24 36:17
38:18,19
40:24 41:1
41:1 42:7
42:22 43:4
43:5 44:4
53:14 54:7
54:9 56:22
59:3 61:22
65:10,14,17
66:2,2,7
67:3,20,21
68:7,15,16
70:24 72:15

73:20 74:13
74:18,23
76:2,4
78:23 79:8
79:20 80:1
82:12,20
83:10 85:12
85:23 86:7
87:15,17,19
87:21 88:14
88:24 93:8
93:20
numbers
6:14 9:16
29:19 30:23
31:11 32:18
36:6,20
46:3,22,23
47:17,23,24
48:1 57:21
59:10 63:23
63:24 64:9
64:11 65:23
66:3,8,19
67:2,3,7,14
67:18 68:13
75:19,23
76:2,11
77:1,15
78:20 79:17
79:19 83:6
87:9,23
88:7,11,12
88:17
nutshell
88:19

**O**

O
17:13 63:1
91:3,3
observe
25:22
observed
28:7
obtain
62:18,19
83:23
occupancy
17:14,17
62:19 63:2
73:23 83:24

occupied
85:4
occupy
84:9,11
October
1:20 90:12
91:7 93:9
offer
57:10
offering
49:15
offhand
6:18 72:22
office
39:2
Oh
41:20 44:17
66:24
okay
39:4 53:1
59:20 81:5
older
15:12
oldest
11:20
once
8:18 36:5
openings
28:13
opinion
24:10 30:12
30:18,19
36:10 47:6
57:18 58:2
58:14,15
76:21 79:22
80:3
opinions
57:10,15,16
60:6 61:4
opportunity
30:6
opposed
66:2
option
49:11
order
32:5 56:11
orders
33:5 54:13
54:14
original

7:18 8:17
9:7,24 10:4
11:4 12:10
23:24 26:23
32:24 35:23
44:15 45:6
67:12 69:24
70:9 74:8
82:3
originally
25:15 26:20
29:6,8,17
37:14 45:5
64:1
ought
45:16
outcome
92:9
outline
8:12 24:19
48:24
overlaid
9:10 10:5
overlap
42:20 86:4
overtime
53:21
owner
17:9 23:4,6
35:22 52:3
52:8 54:8
54:15 63:11
63:11,12
64:9 67:4
72:4 73:2,5
owners
23:15
owner's
23:11

**P**

package
17:10,11
51:1 57:3
57:19 59:9
73:1
packet
15:7
page
23:24 34:2
36:3 38:8
41:12,13

48:4 49:19
53:9 55:7
78:8 82:21
pages
38:24 93:13
93:16,18
paid
48:22 61:18
paint
72:10
painting
17:8
paperwork
48:19
paragraph
18:2 21:4
22:12 24:5
30:11,16
33:23 34:1
39:13 48:3
48:23 49:3
49:9,18
55:7 79:4
parallel
29:11
part
28:11 40:24
55:22 56:12
78:7 79:10
82:8 83:8
85:16
particular
5:3 7:15
8:15 16:12
23:17 57:17
84:17 86:13
particularly
9:8
parties
92:2,8 93:19
partitioning
17:6
path
17:3
paying
48:16 63:13
payment
48:16
pending
91:10
percent
12:1 21:8

27:13 32:24
37:1 41:24
42:15 43:1
43:4 47:1,3
52:17 54:18
54:21 55:3
55:5 58:13
58:16,16,17
58:20 59:2
74:10 75:4
77:21 78:2
percentage
27:11 42:23
56:24
percentages
43:16 44:6
57:21 79:17
79:18
perform
56:20 87:9
87:11
performed
39:14,21
41:24 42:3
44:8 59:1
85:18
performing
30:3 87:4
permit
17:2 73:14
73:14,21
74:2,4,6,11
peropad
25:13
person
52:17
personally
87:22 91:8
personnel
63:14
phone
11:23 12:19
12:21,22
18:15 93:20
photos
9:18,18
17:24
picked
61:12 76:3
piece
76:18
pieces

82:11
place
25:10 46:12
Plaintiff
1:11 2:10
90:5 91:12
plated
63:19
play
56:14 81:1
please
4:2 19:2
32:3 83:16
86:24 93:14
93:17,20
plugged
32:11
plumbing
17:5 66:12
66:14 84:1
plus
10:6 66:23
pluses
77:12
PMS
68:16
pockets
26:1 58:20
point
6:13 9:10
12:19 29:2
56:7 68:3
74:22 76:20
84:17
portions
42:2
position
15:4
possible
37:2 54:15
56:10,21
posted
17:2
pour
17:5
Pratt
14:17
prebuying
66:3
predicting
54:20
prefer

89:10
preliminary
4:23 5:18
8:11
premier
73:1
premises
21:7,9 24:6
24:8 25:6
34:5 80:1
premium
74:12
prepared
35:1 38:9
47:14 63:24
65:5 75:1
prepares
89:13
preparing
12:15
presence
91:19
present
2:19 15:11
15:17 49:5
92:5
presented
49:6
preserving
39:19
pretty
11:24 54:16
previously
4:21 5:1 7:7
pre-bid
55:20
price
56:9 64:21
66:9
pricing
29:20 67:4
primarily
7:10,12
11:13 13:16
13:23
primary
25:21
principal
52:10
printed
88:10
prior

14:4 27:23
37:21,22
38:13 55:10
56:4 67:17
76:16 80:23
88:6,13
probably
35:20 36:7
37:10 46:19
57:24 66:8
82:5
process
11:5 23:9,16
74:7
procure
17:13,16
procured
17:2
produce
15:13,14
33:15 34:17
produced
4:22,23 5:1
5:8 9:2
11:8 29:24
48:21 50:3
51:8 53:5
88:8
product
27:24 41:16
45:21
progress
10:6 47:20
47:22 67:13
progresses
86:5
project
5:3 7:15
10:17 16:12
20:1,7,20
20:23 22:22
23:17 29:6
33:1,6 51:9
51:11 52:16
53:16 54:17
55:13 62:20
63:22 68:9
68:14 73:24
76:7,9 82:6
82:10 88:18
projects
13:1,13 16:1

16:24 51:14
68:7
properly
89:7
prorated
42:22
proration
42:18
Prospect
4:5
protection
28:19 41:2
61:16 73:8
provide
24:10
provided
4:20,23 6:11
7:1 8:11
19:16 28:19
49:21 50:13
57:19
providing
36:20
public
1:19 90:22
91:4 92:17
pulled
41:22,24
74:6 83:6
purchases
72:5
purported
49:4
purports
83:21
purpose
19:14
pursuant
1:22 92:4
put
6:7,14 8:19
18:9 26:5
41:21 44:19
47:17 48:17
68:7,9 76:2
84:5
putting
76:11
p.m
7:5
P.O
2:7

**Q**
quadrisec...
29:1
qualified
66:10 67:20
quasi
16:20
question
22:4 27:18
30:17 47:2
47:4 86:23
87:3
questions
46:11,17,18
47:5,16
82:19 85:24
90:14 93:20
quickly
82:22
quite
25:16
quotes
66:9

**R**
R
2:13
raise
52:6
rates
29:12 40:17
read
19:7 22:6
33:3 80:22
80:24 81:6
89:14,15
90:9
reading
6:18
real
44:24 62:6
68:14
really
35:6,6
reason
19:15 49:11
56:8 76:4
reasonable
21:5 30:12
60:8 79:24
rebuilding
20:12

recall
6:16 29:2
33:2 34:10
37:20 38:22
39:9 60:15
68:21 69:13
80:8
recalling
32:23 72:22
receive
55:19,21
recollection
11:6 35:24
reconstru...
19:13,17,19
21:6,9,17
39:23 58:22
79:14 83:2
83:9 84:8
88:12
record
4:17,17
15:16 22:6
recovery
20:2 24:16
40:19
redefine
24:17 36:6
redefined
8:18 77:17
redistrib...
25:15
reduced
20:10 75:11
91:20
refer
8:14 88:1
referenced
18:4
referring
24:11 35:12
40:2 79:3
reflect
88:11
reflected
65:14 67:19
regard
25:22 27:15
58:12
regular
53:19
reinstall...

25:12,19
reinstalled
25:17,19
reissued
73:24
relate
16:3
related
17:16 33:4
88:19 92:8
reliable
48:6 49:3
relocates
17:12
remaining
75:18
remains
84:16
remember
18:10 29:2
60:2 66:21
88:14
remodel
16:20 17:23
45:14
removal
41:11
remove
70:16
removed
27:17,20
28:2,3
removing
39:20
rental
43:10 73:9
repair
20:24 21:6
21:10,16
28:22 31:16
36:1,9
43:11 47:15
48:24 70:18
79:24
repaired
58:8,24
repairs
34:23 45:6
48:10 77:3
77:4
repeat
16:6 22:4

27:18 30:17
86:24
replace
59:8 70:13
70:17
replaced
25:16,24
26:7,14
27:8 28:23
29:3 58:19
replacement
5:19 6:7,9
8:20 11:5
16:15,17,18
19:11 20:24
29:14 30:13
30:21,23,24
31:11,12
32:11 33:19
36:7,14,24
37:1 41:7
43:12 45:13
47:8,14
61:13
report
7:19 8:6 9:2
12:24 18:2
18:16 19:5
19:21 21:4
23:2 25:21
30:11 31:2
31:5,8 32:1
33:23 34:1
34:4,13
35:8,9,13
38:8,18
39:4,13
48:3,5,9,24
49:5,20
50:9,14
52:22 68:20
75:15 78:4
78:6 83:24
85:16
reported
1:23 60:7
82:1 91:18
reporter
62:2 89:7
90:12 93:23
Reporters
93:2

reports
49:22 50:11
  50:13
represent
80:11
represent...
77:7
Representing
2:10,17
request
23:12
requested
56:4
required
55:9 56:19
  73:22
resembles
57:3
reside
4:4
residential
13:17
respect
16:1 57:16
  61:7
respective
92:2 93:19
response
8:9 32:9
result
21:7 81:22
resume
15:7 51:3
retail
13:15,16,18
  22:17 51:9
  52:15
retract
60:13
return
93:18
reuse
72:6
review
18:7,12,20
  18:21 19:2
  21:13 24:8
  24:9 31:13
  31:21 50:6
  52:9 57:9
  57:14 60:3
  61:3 74:24

75:22 77:11
89:6,8,9
93:14
reviewed
18:5,8 19:15
  21:12 60:21
reviewing
40:5 61:5
revised
42:5 44:16
  69:6,9
  75:15 78:18
  87:21
revision
75:7
revisions
54:14 69:11
revisit
46:8
re-look
46:3
re-permit...
73:18
re-qualified
76:1
right
14:24 24:3
  30:15 31:16
  32:4,5 35:3
  36:3 42:14
  46:23 51:11
  66:22,23
  69:3 70:17
  75:20 76:15
  78:3 79:12
  88:10 89:5
right-hand
65:23 67:5
  67:15
Road
4:5
Rolf
2:4 3:4,6
  4:2,11 5:2
  5:7 9:1
  10:21 21:21
  22:8 59:15
  59:17 60:11
  60:14 69:1
  78:4,9,15
  80:13,17
  82:13,15

84:14 88:22
rolled
35:22
rolling
46:15
roof
26:4,8,9,11
  27:12 59:2
roofer
26:3,12
roofing
26:13
room
25:4
rough
17:4
round
66:2
rubber
27:19
rule
38:23 55:21
  55:22
run
12:24

─────────
        S
─────────
S
3:12
safe
25:11 61:15
  70:24 71:4
safety
84:2
SAITH
89:17
sales
25:20 72:11
  87:19
salvage
39:22
salvaged
28:5
saw
38:13 46:12
  60:15,16,17
  60:24 61:1
  81:20 83:19
  85:21
saying
42:13,24
  45:9 56:1

75:3
says
15:10 18:2
  19:5 33:3,5
  35:8 36:1,5
  42:5,10
  51:9,9,17
  52:4 58:12
  65:10 71:11
  71:21 72:24
  84:3
scenario
48:22
schedule
53:15 54:1
schedules
54:2
Schmadeke
2:13 3:5
  4:16,19 5:5
  10:19 21:18
  25:7 60:9
  60:22 68:24
  78:6 82:14
  82:18 83:12
  83:14 84:12
  88:23 89:5
  89:12 93:7
  93:10
school
14:22
scope
6:14,16 8:18
  9:8 11:5
  12:10 24:18
  25:14 26:1
  36:6,13
  41:11 47:13
  54:17 56:10
  63:21 74:21
  76:7,8 77:3
  77:4 82:9
  85:18 86:10
  86:18 87:1
  87:7,8,13
scopes
6:9,10 9:5
  12:6,8
  17:20 20:9
  20:10,11
  24:20 40:10
  40:12 41:23

63:21 71:2
  75:11,12
  76:1,2 77:8
  77:17
seal
92:11
sealed
23:16
sealer
17:8 25:11
second
38:8 78:8
  82:21 83:23
  85:6,7
seconds
82:14
secure
24:12,13
  93:14
secured
17:1 28:18
  28:18
see
15:9 19:10
  26:4 32:3
  34:6 38:17
  39:7 41:20
  43:21 47:19
  48:1,6 50:6
  50:11 55:14
  56:18 57:10
  57:16 58:23
  59:1 60:18
  63:18 66:13
  66:21 69:9
  71:14 73:19
  78:18 80:21
  84:22 86:8
  87:20 88:3
seeing
60:2 74:15
seen
50:2,4 56:23
  57:5 59:23
  80:19 81:9
  82:4
select
25:11,13
selective
6:7 17:21
  20:9 25:9
  25:14 41:9

42:1,8 86:7
86:17 87:1
87:5,12
sent
4:14 6:23
9:18 11:16
39:2 43:7
75:2 80:23
separate
63:9
service
81:2
set
18:3 92:10
Setina
93:23
seven
24:5 58:13
58:15,16,17
58:20
shard
40:21
sheet
35:22 46:14
47:11,19
63:11 67:10
sheets
36:5 93:13
93:15,16,18
shelf
17:1
shell
13:10 32:18
32:21
shoring
41:2 69:15
69:22
short
82:16
Shorthand
90:12
show
35:15 40:2
59:23 78:16
80:5 81:2
83:12,15
showed
35:9 83:16
showing
68:18
snown
40:17

shows
47:11 77:20
78:17
side
16:9 28:14
41:22 46:13
64:9 65:23
67:15 79:19
88:10
sidelights
28:13
sides
28:18 51:15
sign
54:9 89:9
signature
91:24 93:12
93:14,15,16
93:18,23
signed
93:16,16
significant
27:21
Sincerely
93:22
sir
12:12 64:3
site
6:8 8:19
9:11,18
12:7 17:2
17:24,24
25:1 26:10
28:19 35:23
38:14,16
39:8,11
42:1 47:3
55:9 56:18
56:20 58:22
59:7 63:2
64:14 70:8
70:11 73:13
74:20 76:10
76:14,16,23
situation
20:21
six
4:13 18:11
22:12
slab
58:6,9
slow

shows
52:5,5
slowed
81:4
small
42:2
solely
11:6
solid
56:9
somebody
68:17 81:22
soon
9:20
Sorenson
49:4 50:3
56:24
Sorenson's
48:5 49:20
SORLING
2:2
sorry
6:1 27:18
30:10 44:17
53:1 61:15
sound
75:20
South
2:14 4:5
93:6
space
6:6 17:1
24:12,12,14
74:1 82:23
85:5
specific
6:3,24 17:20
18:23 25:21
26:1,6,9,20
31:8 36:13
46:10 63:21
63:22 71:16
77:14
specifically
57:6 62:12
69:13 70:6
72:9 82:7
88:5
spelled
26:17
spoke
12:6
Sporting

1:14
Sports
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,21
20:13,14
22:23 28:9
29:20 31:12
32:17 36:19
38:23 51:4
55:5 63:20
73:3,6,7
74:10 81:17
spreadsheet
11:4 34:15
34:18 35:4
35:21 42:4
42:14 43:8
43:8,9,19
44:12,19
46:7 52:23
54:3 60:1
63:15.16,17
63:18 65:22
68:19 69:7
69:8 82:21
85:17 88:6
88:9,17
spreadsheets
63:20 82:5
86:21
Springfield
1:3 2:8,15
5:20,23 6:2
12:4 16:2
29:5,22
30:7,8,9
81:13,15
90:3 93:6
sprinkler
17:12 66:22
66:22
sprinklers
66:18
square
7:12 27:7
64:21 66:9
67:3
SS
91:2
stabiliza...

69:16,22
stand
17:11
standard
17:4 28:10
28:16,16
Stanley
28:10
start
20:3 68:12
started
17:4 34:14
34:20 35:4
35:5
starting
11:20
state
4:2,19 49:9
58:23,24
91:1,5
statement
16:5,13 48:7
50:19,20
86:13,19
87:6
statements
48:18 50:1
59:12
states
1:1 24:5
29:22 90:1
90:13
status
83:24 84:10
stayed
44:21
stenograp...
91:18
store
5:20 6:2
16:2 17:17
22:14 37:16
51:4
storefront
24:14 28:8
28:13,13,16
STORES
1:13 90:7
91:12 93:8
storm
16:2 20:13
27:16,20

straight
13:12 22:21
    42:21
Street
1:21 2:6,14
    93:2,6
strictly
13:18
strong
36:8
structural
58:10 59:8
    70:14
structure
59:2
stud
55:15
studs
17:6
stuff
23:21
sub
68:4
subcontra...
6:10 29:8
    41:10 66:5
subcontra...
12:6 30:2
    48:17 68:13
subcontra...
53:24
subject
18:4 54:13
submit
31:14 68:17
    93:14
submitted
23:5,10,14
    23:19 39:24
    65:8,9
subs
53:22 55:9
    55:13
SUBSCRIBED
90:18
substantial
29:7 87:14
substantiate
59:9 73:19
substanti...
74:5 85:22
    86:2

substanti...
57:22
substrate
58:11
subtract
45:10
successful
56:6
successor
1:5,13
suggesting
50:21
suit
23:13 92:8
Suite
1:21 2:5,14
    93:2,6
sum
54:7 56:22
    72:15
summary
33:4
supercede
24:18
superinte...
62:7 63:3
supervision
61:20,21,23
    62:4,5 63:6
    63:10,12
supervisory
61:20
supplement
11:24
supplied
17:9 73:2,3
supplies
72:4
surcharge
74:19
sure
9:23 16:7
    21:21 31:7
    40:24 44:11
    46:5 54:21
    56:9 60:15
    79:19 82:15
    87:1 89:6
sustained
34:5 58:4,6
switch
17:11

sworn
4:1,9 48:18
    50:1 59:12
    90:18 91:15
SWPLAZA
1:4 90:4
    91:11 93:8
system
58:4

T

T
3:12
table
12:15 42:11
take
13:5 14:23
    19:13,18,19
    20:4 25:9
    43:15 46:3
    46:5 47:21
    55:12 67:16
    67:16 68:13
    70:17 78:20
    80:6,18
    83:15
taken
1:18 26:16
    70:13,16
    71:15 78:22
    82:16 90:10
    93:9
talk
7:14 12:2,13
    24:23 26:11
    39:13
talked
8:2,3 34:15
    43:13 46:11
    47:18 64:16
    79:17 88:15
talking
26:10 27:4
    28:7 29:16
    29:17 40:12
    40:13 46:16
    52:7 59:18
    59:22 62:2
    64:2 74:3,3
    76:14 82:20
    87:23
taping

17:8
task
39:14,21
tasks
39:19
taught
68:11
team
24:16
teams
20:2
tell
9:9,15 16:23
    21:19 25:5
    26:15 28:6
    31:19 36:22
    37:9 40:8
    52:21 59:13
    81:9 83:21
    87:16
temporary
24:13 28:18
    41:1
ten
61:22
tenant
7:12,13 13:5
    16:9 20:8
    22:21 32:19
    32:20 36:14
    36:14 49:10
    52:16 74:1
    84:20,24
tenant's
16:13
ten-week
62:20
term
21:10,15
    22:9 34:8
    51:22
terminate
49:11
termination
75:3
terminology
40:10,18
    55:23 86:11
terms
9:8 18:3
    19:4,5 74:2
testified

4:9 83:1
    85:13
testify
7:24 91:15
testimony
91:17,22
    92:10
Thank
32:9 41:15
that's
5:4 6:22 7:6
    10:9 12:12
    14:24 15:7
    15:12,12
    16:11 19:21
    24:4,13,20
    24:4 26:5,8
    27:24 28:5
    30:10,18,23
    31:6,18
    33:22 34:13
    35:5,6,22
    36:7,11
    38:18 41:3
    43:3,5,23
    44:3,15,18
    45:8,15,17
    47:18 49:2
    49:7 50:15
    50:17 51:8
    51:16 52:18
    53:5,6,17
    53:18,20
    54:6,8
    55:11,12,21
    55:22,23,24
    58:5 59:6
    61:14,20
    62:3,12,20
    63:4,18
    64:19,23
    65:2,4,8
    66:8,16
    68:10,11
    69:8,21
    70:2,5,15
    70:17,20
    72:24 73:1
    73:2,16
    76:4 77:6
    77:21 78:9
    81:5 82:8

83:6,11,18
83:20 84:6
86:10,11,14
86:20 88:20
thereabouts
27:14
thereof
92:9
there's
28:9,12 47:6
51:10 56:13
63:9 68:5,5
68:9 71:1
88:15
they're
19:24 28:14
28:15 54:1
54:10,24
55:3 63:13
64:11 67:7
84:9
thing
8:14 37:17
51:21 68:12
75:13
things
4:15 9:12
19:14 46:14
50:22 55:16
67:11 77:18
think
4:24 5:6,23
10:9 19:13
19:17 49:19
59:4 68:19
68:21,24
74:17 82:13
89:1,9
third
14:7
thought
25:15 26:9
37:16 43:15
44:23 46:2
57:10 60:18
76:7 77:2
three
14:12 15:21
15:21 25:2
28:9 31:10
32:24 53:18
68:6 85:10

three-week
68:8
threshold
38:1,3 75:4
Thursday
17:17,18
24:22
time
6:14 10:9,19
10:20 11:14
18:10 19:12
20:20 21:2
21:3 27:16
27:20,23
37:17 38:5
44:9,10,19
44:24 46:1
46:2 50:7
50:16 54:24
58:22 60:24
61:1 65:22
67:9 68:3
72:3 76:17
83:19 84:17
times
44:23 77:17
88:10
title
23:24 60:19
today
4:15 5:8
6:21 7:20
7:21 8:7
11:8 26:18
60:6 76:22
82:4 89:11
89:12
told
37:7
top
11:21 51:9
66:7 79:8
tornado
5:22 6:5
21:8
total
21:9 30:13
30:24 31:15
31:15 32:11
43:20 44:1
44:7 45:7
64:22,24

65:3,14
74:16 77:19
totals
33:18 66:13
touched
13:4
to-wit
91:7
track
74:19,23
trade
24:17 29:8
66:8
transcribed
89:7
transcript
89:13 90:10
90:13 91:22
93:11,14,15
Transcrip...
91:21
transoms
28:12
transpire
74:20
trial
7:24 79:23
tricks
81:1
true
27:17 36:24
45:13 46:9
46:16 49:7
59:12 62:18
62:24 79:20
79:21 86:3
86:15 87:23
87:23 88:18
91:21
truer
24:20
truly
24:20 85:4,5
Trust
1:7,8
Trustee
1:6
truth
21:20 91:15
91:16,16
try
51:17

trying
20:3 38:4
45:4 46:21
TSA
1:13 4:20
7:7,9 10:22
20:24 72:5
75:2 90:7
91:12 93:8
TSA's
39:20
turn
55:2
turnover
17:17
tweak
66:2
two
13:22 14:2
15:23 28:12
42:7 62:5,6
63:9 66:13
67:16 69:12
71:1 78:24
80:4 86:7
87:1
type
7:9 16:3
19:14 20:17
22:16 41:11
48:22 53:21
55:16 63:16
63:16
typed
85:20
types
9:12
typewriting
91:20
typical
20:8 22:23
55:5
typically
54:1
typo
34:14 35:6
65:16 66:15

U

UCI
84:1
underground

17:6
understand
53:2 64:20
understan...
19:8 37:13
45:4 46:21
49:10,13
52:11 58:21
85:23
understands
56:10
understood
26:7 85:15
undetermined
91:10
unforeseen
54:11
union
29:10,12
62:7,9
unit
26:6 67:4
UNITED
1:1 90:1
units
70:18
unnatural
5:21
unwritten
55:21
update
88:16
upgraded
8:18
upside
87:18
USA
39:14,24
use
45:16,19
51:22 82:24
86:10
usually
19:24 20:6
28:14 54:23
56:11 68:8

V

values
50:23
variables
56:14

various
9:3
verbally
6:8
verification
71:4
version
16:20
vertical
67:15
vestibule
28:11
violation
84:10
visit
8:19 9:11
  12:8 17:24
  35:24 39:8
  39:11 47:3
  55:9 56:20
  59:7 64:14
  70:8,11
  73:13 76:11
  76:14,23
  81:13,20
visited
38:13
vs
1:12 90:6
  93:8

**W**

wait
54:19 84:22
waive
89:8
waived
92:1
waivers
48:20,21
  49:24,24
  50:1,13
walked
26:8
walking
25:2,3,3
walk-through
25:2
wall
17:7 25:23
  28:15 58:17
  70:14

walls
58:12
want
  12:24 31:7
  44:11 55:24
  56:20,21
  63:13 77:14
  81:1,3
  84:22 85:3
  85:6
wanted
4:19 19:12
  65:24 66:1
  79:19
wasn't
9:15 26:4
  44:24 52:23
  58:10 65:24
  76:18 84:17
water
24:15 58:7
waterborne
27:24
way
9:9 62:11
  86:4 92:8,9
wear
52:17
wearing
52:18
week
53:15,19
  54:2 62:7
  62:21,24
  63:3
weeks
19:20 54:20
  55:2 61:21
  61:22 62:5
  62:6 68:7
went
9:11,16 15:2
  15:3,19,23
  34:15 40:9
  40:23 41:19
  69:22 75:14
weren't
73:11 79:19
wet
27:24
we'll
67:16

we're
42:4 52:7
  62:2 67:10
  67:22 82:20
  84:20
we've
59:18,19
  78:16 82:4
whatsoever
13:17
what's
7:21 14:14
  19:23 36:2
  37:12 56:18
  56:19 59:23
  68:18
Wheeling
4:5
WHEREOF
92:10
Wisconsin
29:11
withdraw
59:21
witness
3:2 4:1,4,8
  10:20 21:19
  22:4,7 25:8
  60:12 89:11
  89:15 91:14
  91:18,19,23
Wolford
1:17 3:3 4:4
  4:7,21 5:4
  5:12 8:22
  13:15 22:1
  35:1 75:13
  82:20 89:5
  90:17 91:9
  93:9
words
84:5
work
6:13 7:7,9
  7:11,11,13
  10:6 13:17
  13:18,20
  14:5,8,12
  16:3,7,14
  16:15,17,18
  16:19,20
  17:4 24:17

24:20 29:20
  30:3,5 36:6
  39:18 40:10
  40:12 41:16
  43:15 44:6
  45:5 46:12
  46:13,18
  47:13,19,21
  52:5 53:19
  53:21 54:21
  59:1 67:12
  70:16 74:4
  74:5,13,19
  74:19 85:17
  85:18,21
  86:3,4 87:1
  87:4,7,8,13
workday
53:19
worked
14:7 30:7,8
  34:18 39:16
  68:10
working
20:1 26:2
  29:9 35:5
  36:5 46:7
  46:14,22
  47:18 65:6
  67:10,17
  79:18 82:8
  86:20
worth
43:15
wouldn't
10:13 19:1
  29:19 36:16
  40:24 43:19
  54:19 57:23
  58:16 79:20
  85:2
WRB
44:2
written
67:6 79:4
wrong
66:16,17

**X**

X
3:1,12

**Y**

yeah
13:11 15:12
  26:24 30:16
  32:6,8 34:3
  35:4 43:24
  44:20,23
  52:10 53:1
  53:13 54:18
  59:13 63:7
  68:23 71:19
  71:24 76:20
  78:1 81:7
year
15:22 27:2
years
4:13 13:22
  14:2,9,12
  14:17 15:1
  15:21,23
  20:19
yesterday
60:17,18,20
  60:23 83:17
York
14:18
you'd
49:1 65:21
you'll
50:5 68:13
  68:16
you're
8:5 10:7
  21:15 24:11
  27:4 29:4
  29:17 40:2
  40:12,13
  42:7,13,24
  44:11 49:15
  50:21 54:20
  56:13 64:2
  69:2,22
  71:24 74:3
  74:3 79:2
  79:22,23
  82:8
you've
5:8 11:8
  13:2 14:1
  16:7 28:10
  32:4 39:18
  47:12 48:4

51:3,6 57:4
59:23 60:3
70:13,16,22
71:15 72:17
72:20 77:3
78:22 86:10

**$**

$1,046,000
77:20 79:6
$1,500
65:14
$1,841,856
30:14 33:22
$1,960,067
32:2 33:20
$118,211
45:23
$118,211.01
44:7
$122,500
66:20
$1400
65:14 66:5
$22,880
42:17
$245,487
77:19
$28,600
42:10 86:12
$30,000
66:14
$319,000
41:6 45:7
47:7
$4,000
73:14 74:8
74:10
$4,841
62:2
$45,400
65:21
$45,970
65:21
$5,000
8:5
$7,742
62:23
$743,00
43:23
$743,944
35:10 36:10

36:17 45:23
46:5 80:1
83:1
$800
63:3
$900
62:21

**0**

00-0020
1:9
01
22:15
06
24:22 75:7
06-3177
1:12 90:6
93:8
084-004064
1:24

**1**

1
12:23 33:23
34:4,13,14
34:23 35:9
36:17 38:13
38:16,18,20
69:24 75:15
1st
7:19 32:1
35:2,21,21
68:20
1,046,000
78:1
1:04
7:5
1:30
1:22
10
3:19 19:20
53:14 62:24
70:19 89:1
89:3
102
4:5
112
38:24
115
38:24
118,211
46:6 47:11

12
19:20 29:21
30:11,15,16
33:23 63:4
65:17 71:6
71:9 75:6
12th
6:5 21:18
30:14
124
70:14
13
34:1 59:2
71:6,9,20
79:4 85:9
1300
63:4
14
20:19 29:21
39:13 55:8
66:12 72:10
15
20:19 66:6
66:18 72:10
82:5 87:19
88:2
15,000
27:9
1500
27:7
16
28:14 48:3
49:3
17
48:23
17,000
82:2
18
49:9 75:18
77:14
18,500
69:24
19
49:18 93:5
19th
10:3

**2**

2
35:21 64:15
2nd
24:5,21

34:16
20
28:14
200
2:14 93:2,6
2000
1:8
2001
22:14 29:17
52:24 64:18
69:3
2006
5:13 8:10
9:14 12:7
24:6 30:14
34:5
2007
1:20 90:12
90:20 91:7
92:12 93:5
93:9
217
2:9,16
22
3:16
22,884
43:3
222
1:21 91:8
23
77:21
245,000
78:1
25
62:13 78:2
2500
7:19,22
26
38:23 64:17
26th
53:10
27
37:13
27th
5:13 6:12,23
6:24 7:4,14
8:10,12
9:14,20
24:19 38:1
28,000
69:23 70:3
28,600

42:24 47:1
87:3

**3**

3
68:19 69:14
69:23 70:10
70:13,19
71:3,7 72:1
72:13,19
74:12,16,24
75:14,19
76:5,15
77:1,15,21
88:4
3rd
36:5 39:6
3-31
40:3
30
43:18,19
90:12 93:9
30th
1:20 91:7
30,000
66:23
300
1:21 93:2
34,000
66:23
35
21:8 37:1
75:4
38
27:13

**4**

4
3:4 69:8,15
69:15,20,23
70:10,23,24
71:6,8,10
71:15,18
72:13 73:11
74:14,17
75:16,20
77:16 78:21
80:5,7
4th
12:7 24:22
25:6,7,8
34:17 38:16

39:12
4-3
44:14,18
4-3-06
42:5
4-3-2006
78:17
40,000
7:12
40-hour
53:19
400
2:14 93:6
48
61:24 67:16
4814
61:21
4841
61:23 62:1

_____ 5 _____

5
59:22
5th
34:18 35:7
5-7
42:5 44:13
69:9 78:18
50
71:12,13,14
71:23,24
72:2
5131
2:7
528-7375
2:16
544-1144
2:9

_____ 6 _____

6
1:8 59:23
63:15
6th
34:18 35:7
60
49:12 82:14
60-day
19:11
60601-1014
93:3
607

2:6
618
5:20 6:2
62701-1908
2:15 93:6
62705
2:8
64,000
66:23
65
67:1

_____ 7 _____

7
3:15 8:13,23
37:24
7th
35:7 70:3
75:7,16
80:3,4,6
7-26
67:14
7-26-01
53:1
743
41:1 46:16
48:2
743,000
46:24
743,944
34:11 35:16
79:6
78
3:17

_____ 8 _____

8
3:15,16,17
21:22 22:2
59:16,19,21
62:24 78:11
78:13,17,21
79:2,8,11
80:5,10
82:24 85:11
80
3:18 41:24
42:15 43:1
43:4 47:1,2
800
2:5
82

3:5
84
3:6
89
3:19

_____ 9 _____

9
3:18 63:3
70:19 80:13
80:15,18
89:1
90
12:1 52:17
74:10
95
54:18,21
55:3,5
96
15:11
99
51:7

**E-FILED**
Monday, 31 December, 2007  02:44:44 PM
Clerk, U.S. District Court, ILCD



**SPORTS**
**AUTHORITY.**

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

**SENT VIA FEDERAL EXPRESS**

March 23, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention:  Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701

Re:  Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods
     Company ("Tenant"), and Illinois National Bank, Trustee  ("Landlord")

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Thank you very much for meeting with me during my trip to Springfield this week.  As you know, the
Tenant has the option to terminate the Lease pursuant to Paragraph 15(b) of the Lease if the repair and
reconstruction cost resulting from the recent tornado is 35% or more of the then-total reconstruction cost of
the Premises and Common Areas.  Based on our initial review of the extensive damage to the Premises and
Common Areas, we believe that this threshold will be met, and as a result, Tenant has the right to elect to
terminate the lease within 60 days from the date of the casualty.   Although the Lease provides that the
Tenant has 60 days in which to notify the Landlord of its election to terminate the Lease, we want the
Landlord to be aware that we are considering terminating the Lease, and accordingly, any repairs or
reconstruction to our Premises are at the Landlord's risk.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc:  Nesa Hassanein
     Paul Gaudet
     Chris Day             SWPlaza III
     Cynthia J Cashman     Initial Rule 26 Production 586
     Missy Mayne                 11/28/06

EXHIBIT
4






**E-FILED**
Monday, 31 December, 2007 02:45:09 PM
Clerk, U.S. District Court, ILCD

# SORLING
## NORTHRUP, HANNA,
## CULLEN & COCHRAN, LTD.
### ATTORNEYS AT LAW

REPLY TO:

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

**David A. Rolf**
Attorney at Law

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Eniow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo
————————————
Elizabeth A. Urbance
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fathauer
Brian D. Jones
————————————
Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson
————————————
Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

March 29, 2006

**VIA FEDERAL EXPRESS & FACSIMILE (720-475-2967)**

Mr. David Frieder
Vice President – Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

**Re:   Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("Tenant"), and Illinois National Bank, Trustee ("Landlord")**

Dear Mr. Frieder:

I am writing in response to your March 23, 2006 letter to Arthur Seppi, Charles Robbins, and my partner, R. Lee Allen (in Mr. Allen's absence from the office this week). I appreciate your courtesy in advising the Landlord that you were considering terminating the Lease. We have now, however, received an estimate from our contractor, Jones-Blythe Construction Company, providing an opinion as to the extent of the damage to the Premises leased to Sports Authority. As you can see from this estimate, the damage does not exceed the 35% threshold referred to in Paragraph 15(b) of the Lease. Pursuant to Paragraph 15(a) of that Lease, the Landlord will be proceeding with repair and restoration of the Premises, and expects that Sports Authority will abide by its continuing obligations pursuant to that Lease.

Yours truly,

David A. Rolf

DAR/mah
Enclosure
cc:   Mr. William L. Hall, L.J. Shaw & Company
      Mr. Arthur Seppi
      Mr. Charles Robbins

{S0504337.2  3/29/2006 DAR MAH}

**EXHIBIT**
**5**

Via Fax 525-0545

March 29, 2006

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

**JONES-BLYTHE**
CONSTRUCTION CO.
1000 WEST PLYMOUTH STREET
POST OFFICE BOX 5113
SPRINGFIELD, ILLINOIS 62705
TELEPHONE   217-787-1140
FAX NUMBER  217-787-1888

Attn:   Art Seppi

Re:     Sports Authority
         Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen

**E-FILED**
Monday, 31 December, 2007  02:45:19 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited )
liability company, as successor to Illinois )
National Bank, as Trustee under Trust )
Agreement dated November 6, 2000 and )
known as Trust No. 06-0020, an Illinois )
banking institution, )
)
    Plaintiff/Counter-Defendant, )  Case No. 06-CV-3177
)
vs. )
)
TSA STORES, INC., as successor to Gart )
Brothers Sporting Goods Company, a )
Delaware corporation, )
)
    Defendant/Counter-Plaintiff. )

## DEFENDANT'S AMENDED ANSWERS AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES NO. 4 AND NO. 10

Pursuant to Rules 26(e) and 33 of the Federal Rules of Civil Procedure, Defendant / Counter-Plaintiff TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA" or "Defendant"), by its attorneys, Hinshaw & Culbertson LLP, hereby amends its answers or objections to Plaintiff's Interrogatories No. 4 and No. 10 as follows:

### INCORPORATION BY REFERENCE OF GENERAL OBJECTIONS

Defendant incorporates herein by reference as though expressly stated herein all General Objections Applicable to All Interrogatories set forth in Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories.



EXHIBIT
6

6015853v1 868372

## INTERROGATORIES

INTERROGATORY NO. 4. Identify by every employee of TSA's Springfield store located at the Premises during 2005 and 2006.

ANSWER:    Defendant objects to this Interrogatory in that the information sought is neither relevant to this litigation nor reasonably calculated to lead to the discovery of any admissible evidence regarding the subject matter of this litigation. Subject to and without waiving said objection, Defendant states that Plaintiff has agreed to limit Interrogatory No. 4 to those employees of Defendant at TSA's Springfield store as of March 12, 2006. The following persons were employed by Defendant at its store in Springfield, Illinois, as of March 12, 2006 (please note that the addresses and telephone numbers provided are the last ones known by Defendant):

1.    David K. Lee
69 Pheasant Run
Chatham, IL 62629
217-483-9459

2.    Betty J. Poe
108 Northwoods Court
Chatham, IL 62629
217-483-7824

3.    Shiloah S. Tubbs
26 Robinhood Court
Springfield, IL 62704
217-698-7245

4.    Jonathan Thielken
2410 Country Trails
Decatur, IL 62526
217-553-8818

5.    Eugene O. Tubbs
26 Robinhood Court
Springfield, IL 62704
217-698-7245

6.    Christopher D. Revelle
219 Collier Drive
Springfield, IL 62711
217-787-1959

7.    Jason I. Stogsdill

60:5853kv) 865372

14 Candlewood Drive, Apt. 7
Springfield, IL 62704
217-299-1460

8.    Ryne A. Pfeifer
3816 Greenfield Drive
Springfield, IL 62704
217-787-8888

9.    Mindy B. Zulauf
1141 Heritage rive
Jacksonville, IL 62650
217-473-9168

10.    Rebekah D. Coleman
1004 Durkin Drive, #3
Springfield, IL 62704
217-585-6715

11.    Phillip L. Pinkston
208 South Elm
Raymond, IL 62560
217-229-3546

12.    James C. Myers
689 Peach
Petersburg, IL 62675
217-632-7899

13.    Christopher E. Yancy
603 High School Street
Divernon, IL 62530
217-628-9803

14.    Charles M. Gallant
407 S. Fillmore
Edwardsville, IL 62025
618-210-7000

15.    Katie L. Pasley
259 Camp Sangamo Road
Springfield, IL 62707
217-523-0256

16.    Dawn C. Melcher
2741 South 4th Street, Apt. B
Springfield, IL 62703

3

6015853kv1 80837

217-523-4184

17.    Daniel J. Webb
       396 South McCullough Street
       Waggoner, IL 62572
       217-227-3335

18.    Michael J. Basarich
       2251 Boysenberry Lane
       Springfield, IL 62711
       618-616-6175

19.    Diedre D. Nicholson
       242 South Elm
       Winchester, IL 62694
       217-883-2162

20.    Brittany Scheer
       705 N. Allen Drive
       Athens, IL 62613
       217-899-0669

21.    Nicole L. Minor
       12710 Pine Ridge Lane
       Petersburg, IL 62675
       217-632-4376

22.    Jaclyn K. Damm
       219 N. Menard
       Mason City, IL 62664
       217-971-0661

23.    Adam J. Beyer
       9220 Old Indian Trial
       Chatham, IL 62629
       217-483-2125

INTERROGATORY NO. 10: State the date and manner in which employees of TSA at

the premises were notified of the closing of TSA facility at the Premises, and whether any such

notice was in writing.

ANSWER:    Defendant objects to this Interrogatory in that the information sought
is neither relevant to this litigation nor reasonably calculated to lead to the discovery of any
admissible evidence regarding the subject matter of this litigation. Subject to and without

4

60158538v1 868371

waiving said objection, Defendant states that, except for materials related to employee's severance, written notice of the closing of TSA's Springfield store was not provided to the employees of TSA's Springfield store. The employment of the employees at TSA's Springfield store was terminated by oral communication. The majority were terminated effective April 22, 2007; one was terminated effective April 27, 2007; one was terminated effective May 5, 2007; two were terminated effective May 7, 2007; and three were terminated effective May 8, 2007. In addition, the employment of one employee was terminated effective March 24, 2006, for reasons unrelated to the closing of TSA's Springfield store, and one employee was terminated effective August 2, 2006, for reasons unrelated to the closing of TSA's Springfield store.

DATED:      March 23, 2007.

TSA STORES, INC., as successor to Gart Bros. Sporting Goods Company, a Delaware corporation, Defendant/Counter-Plaintiff,

Legal Objections By: _____
                      Charles R. Schmadeke,
                      One of Defendant's Attorneys

Answers By: _____
              Cynthia J. Cashman

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

5

## CERTIFICATE OF SERVICE

The foregoing Defendant's Amended Answers and Objections to Plaintiff's Interrogatories No. 4 and No. 10 was served upon Plaintiff/Counter-Defendant by personal service upon:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701
darolf@sorlinglaw.com

on this 23rd day of March, 2007.

*Charles T Schmadeke*

J. William Roberts (#2251714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60158538v1 860572

E-FILED
Monday, 31 December, 2007  02:45:30 PM
Clerk, U.S. District Court, ILCD

**David Frieder**

| | |
|---|---|
| From: | David Frieder |
| Sent: | Wednesday, April 26, 2006 6:22 PM |
| To: | 'Mark Sorensen' |
| Subject: | RE: Springfield Store |

Mark,
We have availability of carpeting with a notice of less then a week to the manufacturer
for shipping. Let's talk tomorrow.  Thanks. David

-----Original Message-----
From: Mark Sorensen [mailto:MSorensen@jones-blythe.com]
Sent: Wednesday, April 26, 2006 10:31 AM
To: David Frieder
Subject: Springfield Store

David,

Art Sepi asked me to let you know that we will be ready for floor covering materials to be
delivered the week of May 15.

Installation needs to be coordinated since painting will be ongoing through the end of
May.

Please contact me to coordinate flooring and fixture installation.

Mark A. Sorensen
Jones-Blythe Construction Co.
1030 West Reynolds
P.O. Box 5113
Springfield, IL 62705
217-787-1640 office
217-787-1666 fax
217-725-2170 cell

1

EXHIBIT
7

TSA RULE 26 DISCLOSURES
0106

Page 1 of 1    **E-FILED**
Monday, 31 December, 2007  02:45:39 PM
Clerk, U.S. District Court, ILCD

## Jeff Wolford

| | |
|---|---|
| **From:** | David Frieder [dfrieder@thesportsauthority.com] |
| **Sent:** | Wednesday, April 26, 2006 11:22 AM |
| **To:** | jwolford@wolfordretailbuilders.com |
| **Subject:** | Springfield repair costs |
| **Attachments:** | Copy of #618- Springfield Owner Bid Rev (2).xls |

Jeff,  Please take a look at this and see what you think.  I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhere reasonable but on the high side since this is the start of the negotiations.  Let me know what adjustments you would make.  Thanks.  David

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

10/29/2007

EXHIBIT

8

# Sports Authority

#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs

## Budget Estimate

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft.  $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4'/ U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT`s- T-Bar Repaicement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| **SUBTOTAL** | | | $607,317 |
| Allowances | | N/A | |
| **SUBTOTAL** | | | |
| Insurance | | 1.50% | $9,110 |
| Profit & Overhead | | 10% | $60,732 |
| Premium for expedited work | | 5% | $30,366 |
| **TOTAL** | | | $677,158 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer`s & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

## Jeff Wolford

| | |
|---|---|
| **From:** | David Frieder [dfrieder@thesportsauthority.com] |
| **Sent:** | Wednesday, April 26, 2006 7:15 PM |
| **To:** | Jeff Wolford |
| **Subject:** | RE: Springfield repair costs |

It looks like it may be helpful afterall.  A lot of the work is already done but I do need to nail the costs as closely as possible and a visit might crystallize some of the questions that you currently have.  Thanks. David

**From:** Jeff Wolford [mailto:jwolford@wolfordretailbuilders.com]
**Sent:** Wednesday, April 26, 2006 3:48 PM
**To:** David Frieder
**Subject:** RE: Springfield repair costs

David, please let me know if you need me to go down to the Springfield location, if you need a more comprehensive scope..As I said before I would happy to do so, see you this coming Friday. Jeff

Jeff Wolford
Owner
**WOLFORD RETAIL BUILDERS, INC.**
jwolford@wolfordretailbuilders.com
847-394-4504 main
847-309-9675 mobile
847-394-4506 fax

-----Original Message-----
**From:** David Frieder [mailto:dfrieder@thesportsauthority.com]
**Sent:** Wednesday, April 26, 2006 11:22 AM
**To:** jwolford@wolfordretailbuilders.com
**Subject:** Springfield repair costs

Jeff,  Please take a look at this and see what you think.  I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhere reasonable but on the high side since this is the start of the negotiations.  Let me know what adjustments you would make.  Thanks. David

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

EXHIBIT
9

10/29/2007

E-FILED
Monday, 31 December, 2007  02:45:56 PM
Clerk, U.S. District Court, ILCD

# SORLING
### NORTHRUP. HANNA,
### CULLEN & COCHRAN, LTD.
ATTORNEYS AT LAW

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

April 28, 2006

Mr. David Frieder
Vice President-Construction
Sports Authority
1050 W. Hampden Avenue
Englewood, CO 80110

Re:     Lease, dated April 2, 2001, between TSA Stores, Inc., as
        successor to Gart Bros. Sporting Goods Company ("Tenant"),
        and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Frieder:

The Landlord asked me to update you with respect to the reconstruction of
the Sports Authority store in Springfield, Illinois. Below is information
relating to the status of that reconstruction, as received from Jones-Blythe
Construction Co.

1.  Roof structure replacement is complete.

2.  Punched hole in roof on North side of building repaired on April
    27, 2006.

3.  Roof insulation and membrane at new roof structure completed on
    April 27, 2006.

4.  Metal stud and drywall delivery due on April 27, 2006.

5.  Temporary walls removed.

6.  Metal stud work starts April 28, 2006.

7.  Drywall hanging will start on Monday, May 1, 2006.

8.  June 1 turnover to Tenant work includes all drywall taped and
    finished ready for Tenant finishes. Contractor is preparing pricing
    for painting and floor covering installation and will submit them as
    soon as possible.

If you have any further questions, please contact me or Arthur Seppi.

R. Lee Allen
Attorney at Law
rlallen@sorlinglaw.com

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo
---------------------
Elizabeth A. Urbance
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Perilli
Emily B. Fathauer
Brian D. Jones
---------------------
Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson
---------------------
Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

EXHIBIT
10

SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.
APRIL 28, 2006
PAGE 2

Sincerely,

R. Lee Allen

RLA/lp

cc:    Arthur F. Seppi
       Mark A. Sorenson

{S0507136.1  4/28/2006 RLA LMP}

E-FILED
Monday, 31 December, 2007  02:46:06 PM
Clerk, U.S. District Court, ILCD

BUDGET ESTIMATE

Sports Authority
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $6,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4' U/S of Deck | | 4' up at Perim. | $31,600 |
| Minor ACT s- T-Bar Replacement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc., Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $938,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

EXHIBIT
11

**E-FILED**
Monday, 31 December, 2007  02:46:45 PM
Clerk, U.S. District Court, ILCD



<div align="center">

**SPORTS AUTHORITY**®

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

</div>

**SENT VIA FEDERAL EXPRESS**

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention:  Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re:  Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee  ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornados. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation.  To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornados, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001.  As demonstrated by the attached materials, the cost to repair the damage caused by the tornados significantly exceeds the 35% threshold set forth in Paragraph

<div align="center">

SWPlaza III
Initial Rule 26 Production  87
11/28/06

</div>

  

**EXHIBIT
12**

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**                                                    5/1/2006
**#618  Springfield**

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority.  3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction.  Increase based on analysis   of Chief Economist Ken Simonson.  Associated General Contractors of America, March 2006.  See attached.

**BUDGET ESTIMATE**

## Sports Authority

#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|------|----------|-------|-------|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft  $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 47 U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT s- T-Bar Repalcement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | 40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| **SUBTOTAL** | | | $938,745 |
| Allowances | | N/A | |
| **SUBTOTAL** | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| **TOTAL** | | | $1,046,701 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | ▓▓▓▓▓▓▓ |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
        Springfield, IL.

Date: 7-26-01
Contractor: VAUCH CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|---|---|---|---|---|---|
| BID BREAKDOWN | | | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | | |
| 3. Bond | | | | 10,500 | X |
| 4. Concrete | | | | 1452 | |
| 5. Carpentry | | | | 17,427 | X |
| 6. Studs and Drywall | | | | 109,440 | X |
| 7. Storefront Glass | | | | 0 | X |
| 8. Interior Mirrors | | | | 1500 | |
| 9. Acoustical Ceiling | | | | 11,850 | |
| 10. Store Fixtures | | | | 36,038 | X |
| 11. Painting | | | | 18,640 | X |
| 12. Carpet Installation | | | | 105,880 | |
| 13. Vinyl Tile and Base | | | | above | |
| 14. Plumbing | | | | 37,534 | X |
| 15. Sprinklers | | | | 30,025 | |
| 16. Electrical | | | | 134,000 | X |
| 17. Fire Alarm System | | | | 9800 | X |
| 18. HVAC/Ventilation | | | | 115,000 | X |
| 19. Dumpster | | | | | |
| 20. Insurance   BUILDERS RISK | | | | 895 | X |
| 21. Supervision | | | | | |
| 22. General Conditions (Itemize) | | | | 14,402 | SUPERVISION |
| 23. Other (Itemize below) | | | | 20,255 | X |
| SUBTOTAL | | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 38,000 | |
| 25. Taxes (Sales/State/Local) | | | | 3950 | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 |
| List itemizations below: (#22 - Gen Cond.) | | | | | $22.18 |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List itemizations below: (#23 - Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 | |
| 2. TOILET PARTITIONS | | | | 2230 | |
| 3. CONCRETE SEALING | | | | 2340 | 736,848 |
| 4. | | | | | $22.80 |

Site Verification (please circle): We have / have not verified site
Amount of time to procure permit: 0 wks.

UNION / NON-UNION    Amount of time for construction: 6 wks.
% of Union Increase:    %

SWPlaza III
Initial Rule 26 Production 91
11/28/06

Qualifications to be listed on separate sheet

7-26-01

JUL-23-01 MON 04:01 PM   VANCIL CONTRACTING          FAX NO. 2177440443                    P. 02/02

Sheet3

*Springfield*

*#618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | | | | Sportmart No. 618 | |
|---|---|---|---|---|---|---|
| | | | | | | Cost |
| 1000 | General Requirements | | | | | $28,829 |
| 2000 | Excavate and Grade | | | | | $60,642 |
| 3000 | Concrete Foundations and slabs | | | | | $174,482 |
| 4000 | Masonry and Foam Insulation | | | | | $168,251 |
| 5000 | Structural, Joists, and Deck | | | | | $177,827 |
| 6000 | Rough Carpentry | | | | | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | | | $95,393 |
| 8100 | Doors, Frames | | | | | $2,949 |
| 8300 | Overhead Doors | | | | | $1,540 |
| 8400 | Storefronts | | | | | $21,450 |
| 8460 | Auto Doors | | | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | | | $24,640 |
| 9900 | Exterior Painting | | | | | $13,255 |
| 11100 | Dock Equipment | | | | | $5,804 |
| 15400 | Plumbing Rough In | | | | | $5,992 |
| 15700 | HVAC Curbs | | | | | $3,122 |
| 16100 | Electrical Rough In | | | | | $22,495 |
| | | | | | | $831,117 |
| | Overhead and Profit | | | | | $58,178 |
| | | | | | | $889,295 |

$889,295.00 ÷ 32,308 ft$^2$ = $27.53 SQ FT.

LEASE AGREEMENT = $ $\frac{55.00}{27.53}$ /SQ FT

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

SWPlaza III
Initial Rule 26 Production 92
11/28/06

$ 1,777 total

Page 1

*Store files*



*National Disaster Recovery Services*

| | | | | |
|---|---|---|---|---|
| **Name** | Mike Mavelle | | **Date:** | 03/31/06 |
| **Company** | Sports Authority | | **Invoice #:** | 1408722 |
| **Address** | 1050 W. Hampton Ave. | | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-3285 | | | |
| **Fax:** | (720) 475-3285 | | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | | |
| **City, State, Zip** | Springfield, Il. 62704 | **Insurance Co:** | Liberty Mutual Property |
| **Tel:** | (217) 546-0132 | **Insurance Adj:** | Ton Tiernan |
| **Fax:** | (217) 546-1073 | **Claim #:** | X69A-003155-00 |

**Re:**    Tornado Damages in Springfield,IL    *# 618*

**Re:**    **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |
| **SUBTOTAL** *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

SWPlaza III
Initial Rule 26 Production **93**
11/28/06

**\*\*Please include the invoice number on check\*\***

03/31/06



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced
## Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

SWPlaza III
Initial Rule 26 Production 94
11/28/06

# AGC's Construction Inflation Alert

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

Chart 1



**Construction Materials Costs vs. CPI-U and PPI**

Legend: CPI-U — PPI for Finished Goods — Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. *(See Chart 2 (Page 3) and Table 2 (Page 7).)*

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

> In 2005, the PPI for highway and street construction rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

SWPlaza III
Initial Rule 26 Production 95
11/28/06

*Reported by AGC Chief Economist Ken Simonson (March 2006)*

**AGC's Construction Inflation Alert**

In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

Chart 2



### Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. *(See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)*

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.

SWPlaza III
Initial Rule 26 Production 96
11/28/06

# AGC's Construction Inflation Alert

Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



**Chart 3**

Changes in Costs for Specific Construction Inputs

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full pro-

duction.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

**Chart 4**



Change in Costs for Basic Inputs Important to Construction

**AGC's Construction Inflation Alert**

## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.

**Metals**

The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

**Oil & Natural Gas**

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.

SWPlaza III
Initial Rule 26 Production 98
11/28/06

# AGC's Construction Inflation Alert

The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

## Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



Ken Simonson (simonsonk@agc.org) became Chief Economist of Associated General Contractors of America (AGC), the leading national trade association for the construction industry, on September 10th, 2001.

Ken has 30 years of experience analyzing, advocating and communicating about economic and tax issues. Before joining AGC, he spent three years as senior economic advisor in the Office of Advocacy of the U.S. Small Business Administration and 13 years as vice president and chief economist for the American Trucking Associations. He also worked with the President's Commission on Industrial Competitiveness, the U.S. Chamber of Commerce, the Federal Home Loan Bank Board, and an economic consulting firm.

Ken writes The Data DIGest, a weekly one-page email newsletter that summarizes the latest economic news relevant to construction. He is co-author of AGC's monthly Construction Tax News, a one-page email covering federal and state tax developments affecting the industry.

Ken has a BA in economics from the University of Chicago and an MA in economics from Northwestern University. He is a board member of the National Association for Business Economics.

SWPlaza III
Initial Rule 26 Production 99
11/28/06

**AGC's Construction Inflation Alert**

## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | 10.1 | 7.8 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 6.0 | 5.0 | 1.5 |
| ECI for construction | 4.3 | 3.2 | 3.4 | 2.4 | 3.7 | 0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Nonresidential buildings | -0.5 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.6 | 1.0 | 2.6 | 10.8 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.8 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 8.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.6 | 6.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.6 | 27.8 | 64.9 | 50.8 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Steel mill bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Hot-rolled bars, plates, and structural shapes | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Steel pipe and tube | -19.6 | 3.6 | 37.4 | 65.1 | 34.1 | N/A |
| Copper ores | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper base scrap | -9.5 | -1.6 | 11.6 | 29.6 | 31.0 | 11.2 |
| Copper and brass mill shapes | -2.9 | -0.9 | -0.5 | 9.9 | 6.6 | 4.6 |
| Aluminum mill shapes | | | | | | |
| Structural, architectural, pre-engineered metal prods | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.9 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | 0.1 | 1.2 | 32.8 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.8 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.6 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.6 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.5 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.6 | 9.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.6 | 3.2 | 4.7 | 6.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.8 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.8 | 9.2 | 6.4 | 28.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.8 |
| Asphalt | N/A | N/A | 10.0 | 16.3 | 17.8 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 16.5 | 6.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 8.7 | 5.8 | 17.6 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 6.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.8 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | -1.7 |

## AGC's Construction Inflation Alert

### Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components–items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprel06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance | |
|---|---|---|---|---|
| | | | (Revised) 1997 | (Former) 1997 |
| 2200 | | Materials and components for construct | 12.635 | 12.646 |
| | 034503 | Nonwovens and felt goods | .003 | .003 |
| | 038303 | Industrial and other fabricated produc | .008 | .008 |
| | 039101 | Textile fibers, yarns, and fabrics, n. | .001 | .001 |
| | 061302 | Other inorganic chemicals | .013 | .013 |
| | 062101 | Architectural coatings | .157 | .157 |
| | 062103 | Special purpose coatings, incl. marine | .084 | .084 |
| | 062301 | Allied and miscellaneous paint product | .044 | .044 |

SWPlaza III
Initial Rule 26 Production 101
11/28/06

AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c. | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding, and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | --- | .045 |
| 083301 | Softwood veneer, incl veneer backed | --- | .017 |
| 083401 | Hardwood plywood veneer | --- | .018 |
| 083501 | Hardwood veneer and plywood | .071 | --- |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .148 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul. ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | --- | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stai | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

SWPlaza III
Initial Rule 26 Production  102
11/28/06

AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elect., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farm s | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab b | .016 | .016 |
| 108102 | Externally thread. fasteners, ex. airc | .005 | .005 |
| 108103 | Internally thread. fasteners, ex. airc | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

SWPlaza III
Initial Rule 26 Production   103
11/28/06

# AGC's Construction Inflation Alert

| | | | |
|---|---|---:|---:|
| 117102 | Noncurrent carrying | .204 | .203 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect.& monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132201 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .091 | .091 |
| 133301 | Ready-mixed concrete | .866 | .865 |
| 133401 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134202 | Glazed brick struct., hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 135201 | Clay refractories | .025 | .024 |
| 135301 | Refractories, non clay | .032 | .032 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category--Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

Page 1 of 1
**E-FILED**
Monday, 31 December, 2007  02:46:55 PM
Clerk, U.S. District Court, ILCD

## Jeff Wolford

**From:**    David Frieder [dfrieder@thesportsauthority.com]
**Sent:**    Thursday, May 04, 2006 9:26 AM
**To:**       Jeff Wolford
**Subject:** RE: Springfield site visit

The contractor is Jones/Blythe however I don't know who the super is.  You may need to go in as the fixture installer, an insurance rep or someone  from TSA.  Please give me an idea of what it will take to pack up the fixtures and remove them for use somewhere else.   Looks like we will have to do that fairly quickly now that we have decided to move out.  We'll need to be broom clean and that will take some doing.

**From:** Jeff Wolford [mailto:jwolford@wolfordretailbuilders.com]
**Sent:** Thursday, May 04, 2006 5:55 AM
**To:** David Frieder
**Subject:** Springfield site visit

David, I will be on site late morning today…i will call you on your cel. also is there a field contact I should meet with first?

Jeff Wolford
Owner
**WOLFORD RETAIL BUILDERS, INC.**
jwolford@wolfordretailbuilders.com
847-394-4504 main
847-309-9675 mobile
847-394-4506 fax

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

EXHIBIT
13

E-FILED
Monday, 31 December, 2007  02:47:05 PM
Clerk, U.S. District Court, ILCD

# Sports Authority

Sportmart #618  
3211 South Verteranas Parkway  
Springfield, IL 62704

Date:    4/3/2006  
Contractor:  Wolford Retail Builders, Inc.  
Union    **Revised 5/7**    J. Wolford

| Budgetary- Insurance- 32,513 sf | | BID BREAKDOWN | | |
|---|---|---|---|---|
| ITEM | MATERIAL | LABOR- Unid | PRICE/SQ.FT. | TOTAL |
| 1.  Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.  Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.  Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.  Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.  Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.  Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.  Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.  Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.  Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT´s- T-Bar Repalcemer | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturir | Installation | Incl´s Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaini | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld´s Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30.  Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer´s & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | wks. | |
| UNION    /    NON-UNION | | Amount of time for construction: | Weeks | |

EXHIBIT
14