**E-FILED**
Monday, 31 December, 2007  03:36:42 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  06-3177 |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

### SWPLAZA III, LLC'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, by and through its attorneys, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., David A. Rolf, of Counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1, moves for Summary Judgment, and states as follows:

## I.    INTRODUCTION

On April 2, 2001, a Lease was entered into between Illinois National Bank, as Trustee under Trust No. 00-0020, the owner of real estate in Springfield, Illinois, and the Gart Brothers Sporting Goods Company, a Colorado corporation, in the business of operating a sports retail store.   SWPlaza III, LLC., (hereinafter "Landlord") the Plaintiff herein, is successor to the Trustee and the owner and landlord of the real estate.   TSA Stores, Inc., (hereinafter Tenant)

Defendant in this case, is successor to Gart Brothers. A copy of the Lease is attached to the Complaint, as well as to this Motion as **Exhibit 1**. The Lease called for the Landlord to construct a shopping center containing approximately 120,000 leasable square feet of which Tenant agreed to lease approximately 32,000 square feet (the "Premises"). Landlord was to complete construction on or before October 1, 2001. The initial term of the Lease began on the Commencement Date, the date 60 days after Landlord turned over possession to Tenant. Possession was given to the Tenant October 1, 2001. The Tenant opened for business November 13, 2001. The Rent Commencement Date was December 1, 2001. The initial term of the Lease was for 15 years, with Tenant having four (4) consecutive five (5) year option periods.

Financial obligations of the Tenant under the Lease include rent, utilities, pro-rated share of common area and maintenance (CAM) charges, pro-rated share of real estate taxes. Rent for the first 15 years, set at $12.50 per square foot for years 1 through 5, $13.75 for years 6 through 10, and $15.13 for years 11 through 15 (See page 2 of Lease). These financial obligations of Tenant appear in paragraphs 7, 9 and 11 of the Lease.

On March 12, 2006, a tornado occurred in Springfield, Illinois, damaging the leased premises. Paragraph 15 of the Lease, beginning on Page 21, sets forth provisions when the premise is damaged by fire or other casualty.

> (b) <u>Thirty-Five Percent (35%) or More</u>. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a **repair and reconstruction cost** of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty. In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject

to force majeure, within two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage.  In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property.  Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.  (emphasis added).

In essence, if the cost to repair the damage to the Premises is less than 35% of the then total reconstruction cost, there are certain options provided in Paragraph 15(c) whereby the Landlord may terminate the Lease if it is in the final 2 years of the term.  Otherwise the Landlord is obligated to rebuild.  If the cost to repair damage to the Premises exceeds 35% of the then total reconstruction costs of the Premises, then the Tenant has the option of terminating the Lease, providing notice is given to the Landlord within 60 days of the occurrence of the casualty.

Immediately following the tornado, Landlord began to restore the Premises.  Work was undertaken by Jones-Blythe Contractors of Springfield, Illinois.   On March 23, Landlord

received a letter from Tenant, while not providing notice, indicating that the Tenant was contemplating terminating the Lease pursuant to Paragraph 15(b).  (**Exhibit 2**).  Landlord responded March 29, 2006, indicating to Tenant that the Premises had not been damaged to the extent of 35% and provided an estimate of the percentage of the Premises that were damaged from Jones-Blythe in support of that contention.  (**Exhibit 3**).  Despite that response, on May 3, 2006, Tenant sent notice that it was terminating the Lease.  (**Exhibit 4**).  In support of its contention that the cost of repairs exceeded 35%, it provided information it represented was from a Chicago contractor who had originally bid on the construction of the project.  (**Exhibit 5**).  His purported estimate was attached to Tenant's letter, despite he had never visited the site prior to providing that estimate.  Thereafter, and very close to within 60 days, Landlord completed the restoration of the premises.  The actual cost of repair came in consistent with Jones-Blythe estimate of the amount of damage and; in fact, the actual costs of repair were less than 35% of the cost to reconstruct the Premises as a whole.

Landlord initiated its Complaint in state court on or about July 12, 2006, seeking declaratory relief that the Lease remain in effect and Tenant be ordered to pay its obligations according to the Lease.  Tenant removed the matter to federal court and answered the Complaint and filed a two count Counterclaim for declaratory relief, as well as for damages for alleged overpayment of rent.  Although the Lease is somewhat unclear in Paragraph 36(i) concerning applicable law, Illinois law is in any event applicable.  See Curran v. Kwon, 153 F.3d 481, 488 (7th Cir. 1998), cited in Lantz v. American Honda Motor Co., Inc., 2007 U.S. Dist. Lexis 34948 (N.D. IL. May 14, 2007) (where in contract cases, "Courts consider (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile and nationality of the parties").

## II.    <u>UNDISPUTED MATERIAL FACTS</u>

1.      On or about April 2, 2001, Illinois National Bank, as Trustee under Trust No. 00-0020, was the owner of real estate in Springfield, Sangamon County, Illinois.  SWPLAZA III, LLC ("Landlord") is successor to said Trustee.  (Landlord's Complaint; Tenant's Answer).

2.      At such time, Gart Brothers Sporting Goods Company was a corporation organized under the laws of Colorado, engaged in the business of operating a sport retail store commonly known as Sports Authority, at various locations throughout the country.  TSA Stores, Inc. ("Tenant") is successor to Gart Brothers.  (Landlord's Complaint; Tenant's Answer).

3.      On or about April 2, 2001, Landlord and Tenant entered into a written Lease, under which the Landlord was to construct a retail shopping center on the property described in Exhibit A thereto, and referred to as Southwest Plaza III Shopping Center, a portion of which shopping center would then be leased to the Tenant pursuant to the terms set forth in the Lease attached hereto as Exhibit 1.  (Landlord's Complaint; Tenant's Answer).

4.      Thereafter, Landlord completed construction of the shopping center and the Premises and Tenant occupied the Premises pursuant to the terms of the Lease attached as Exhibit 1.  (Landlord's Complaint; Tenant's Answer).

5.      On or about March 12, 2006, a tornado occurred in Springfield, Illinois and resulted in damage to the Premises subject to the Lease attached as Exhibit 1.  (Landlord's Complaint; Tenant's Answer).

6.      Thereafter, Landlord began the process of reconstruction and repair of the Premises to ready it for continued use by Tenant.  (Landlord's Complaint; Tenant's Answer).

7.      On or about March 23, 2006, Tenant sent to Landlord a letter notifying Landlord that Tenant may be exercising its right under Paragraph 15.B. of said Lease to terminate the

Lease as the cost of reconstruction and repair of the premises exceeded 35% of the then total replacement cost of the premises. A copy of said notice is attached as Exhibit 2. (Landlord's Complaint; Tenant's Answer).

8.      Thereafter, Landlord, through counsel, informed Tenant that the cost of the repair did not exceed the 35% threshold as set forth in Paragraph 15 of said Lease and that the Landlord intended to make the repairs and that tenant remained bound under the terms of the Lease. A copy of the letter is attached as Exhibit 3. (Landlord's Complaint; Tenant's Answer).

9.      On or about May 3, 2006, Tenant sent notice to Landlord that it was exercising its right pursuant to Paragraph 15.B. of the Lease to terminate the lease as the estimate it had secured reflected the cost of repair and replacement as exceeding the 35% threshold. Attached hereto as Exhibit 4 is a copy of said letter with Defendant's estimate as Exhibit 5. (Landlord's Complaint; Tenant's Answer).

10.     Thereafter, and prior to the expiration of sixty days from the March 12, 2006 tornadic event, Landlord provided to Tenant information from the contractor doing the repair work, which showed that the cost of repair and replacement would not reach the 35% threshold. A copy is attached as Exhibit 3. (Landlord's Complaint; Tenant's Answer).

11.     Despite this notice, Tenant maintained its position that it had properly terminated the Lease pursuant to Paragraph 15 and has refused and continues to fail and refuse to abide by its continued obligations pursuant to the Lease. Tenant has not reoccupied the Premises nor paid any rent or other financial obligations under the Lease since its notice of termination.

12.     Tenant terminated most of its employees April 22, 2006, prior to giving notice of termination of the lease to landlord. (**Exh. 6**, Answer to Interrogatory No. 10).

13.     Attached as **Exhibit 7** is Tenant's estimate of cost of repairs totaling $677, 158.00, prepared by David Frieder.  (April 26, 2006 e-mail of Frieder to Wolford).

14.     Wolford did not prepare the report attached to Tenant's notice of termination, specifically attached as Exhibits 4 and 5.  (Wolford deposition at p. 32, Attached as **Exh. 8**).

15.     Wolford, Tenant's disclosed expert's latest estimate is $743,944.  (Exh. 8, Wolford at pp. 79-80).

16.     Wolford revised his estimate by perhaps as many as fifteen times, while not retaining any of the drafts.  (Exh. 8, Wolford at p. 82).

17.     Nine individual line items identifying repairs purportedly needed to the Premises in Tenant's estimate which accompanied its notice of termination were removed from Wolford's last estimate disclosed as his Rule 26 expert report.  (Exh. 8, Wolford at p. 77).

18.     Eighteen individual line item estimates, other than those deleted in their entirety, changed from the Tenant's estimate which accompanied its notice of termination from Wolford's last estimate disclosed as his Rule 26 expert report.  (Exh. 8, Wolford at p. 77).

19.     The total of the nine individual line item estimates removed reduced the Tenant's estimate which accompanied its notice of termination is $245,487, or approximately 23%.  (Exh. 8, Wolford at pp. 77-78).

20.     Tenant created an estimate of repairs purposefully higher than what the repairs would be in order to have room to negotiate those estimates.  (Exh. 7, April 26, 2006 e-mail of Frieder).

21.     Jones-Blythe Contractors was hired by Landlord to complete repairs to the Premises.  (Art Seppi Affidavit, Attached as **Exh. 9**).

22.    Mark Sorensen was the project manager for Jones-Blythe and was first on the site March 14, 2006.  (Sorensen deposition at p. 12, Attached as **Exh. 10**).

23.    Mark Sorensen completed a table identifying the actual cost of repairs as $550,238.  (Exh. 10, Sorensen at p. 60).

24.    Mark Sorensen's report is based on actual costs of the repairs to the Premises. (Exh. 10, Sorensen at p. 60; Exh. 8, Wolford at pp. 48-49).

25.    The 2006 reconstruction cost of the Premises is $1,960,067.  (Exh. 10, Sorensen at p. 44; Exh. 8, Wolford at p. 33).

26.    Thirty-five percent of the then-total reconstruction cost of the Premises is $686,023.45.

## III.    <u>ARGUMENT</u>

### A.    **The cost of the repairs to the Premises did not exceed the 35% threshold necessary to allow Tenant to terminate the Lease.**

Under Illinois law, contract construction is a question of law for the court.  <u>Central Illinois Light Co.</u>, 213 Ill.2d 141, 154, 821 N.E.2d 206, 214 (2004), citing <u>Quake Construction, Inc. v. American Airlines, Inc.</u>, 141 Ill. 2d 281, 288, 565 N.E.2d 990 (1990).  If the language is unambiguous, the court must give the language its fair and common meaning.  <u>Id.</u> 213 Ill. 2d at 153, 821 N.E.2d at 213.  In this instance, Paragraph 15(b) of the Lease defines the threshold at which the Tenant has the option of terminating the Lease as when the repair and reconstruction <u>costs</u> are at 35% or more of the then total reconstruction cost.  There is no dispute between the parties that the "then total reconstruction costs" of the Premises is $1,960,067.  This figure is calculated based on the original construction cost of the Premises for work performed by Vancil Contracting.  (Exh. 8, Wolford at p. 33).  Those actual costs were then increased to state those costs in terms of 2006 dollars based on industry norms.  Thus, it is the costs, and not an estimate,

which forms the basis for the denominator in the calculation of determining whether the 35% threshold has been met.

The actual repair and reconstruction costs are provided by the Landlord's opinion witness, Mr. Sorensen. Mr. Sorensen was not retained for purposes of giving an opinion on these costs. Rather, Mr. Sorensen is the job superintendent of Jones-Blythe, the actual contractor who performed the actual repairs. His opinion, thus, is not so much opinion as it is the actual, factual costs of the reconstruction. Those costs are set forth in a table labeled Exhibit C in his Rule 26(a)(2) Report. **(Exhibit 11)**. The cost to repair the Premises as incurred by Jones-Blythe together with the actual costs which were incurred by the owner apart from payments to Jones-Blythe totaled $550,238. This is well under $686,023.45, representing the 35% threshold.

Mr. Wolford, Tenant's expert, agrees that the term "estimated" repair and reconstruction cost does not appear anywhere in the Lease document. (Exh. 8, Wolford at pp. 21-22). Mr. Wolford agrees that Mr. Sorensen's figures are the actual costs of the repairs. (Exh. 8, Wolford at pp. 48-49). Mr. Wolford's only criticism of Mr. Sorensen's numbers is that they were not supported by final close-out documents. (Exh. 8, Wolford at p. 50). Mr. Wolford also admits that with such documentation, he would have no argument with Mr. Sorensen's report (Exh. 8, Wolford at p. 50). Mr. Sorensen provided to Tenant all of the close-out documentation at his October 22, 2007 deposition. (Exh. 10, Sorensen at p. 10). Mr. Wolford, at his October 30, 2007 deposition, had not reviewed any of that material. (Exh. 8, Wolford at p. 50). However, up to and through the filing of this Motion, over sixty days after having the material available for Mr. Wolford, Tenant has made no supplemental disclosure by Mr. Wolford or anyone else expressing any criticism, raising any issue, fault, or error in the documents or Mr. Sorensen's calculation of the actual costs of repair. They stand, therefore, unrefuted.

Admittedly, when the Tenant first suggested it was considering terminating the Lease, the Landlord provided the Tenant with a damage estimate from Jones-Blythe.  (See Exh. 3; Exhibit A attached to Sorensen's Rule 26(a)(2) Report, Exhibit 11).  That estimate, however, was not a cost estimate.  Rather, it was an estimate of the percent of damage to the various components of the building.  The point of the estimate was to let the Tenant know that if the building, or any its component parts were not damaged more than 35% or 35% in the aggregate, it stood to reason that the actual reconstruction costs would not exceed that 35% threshold.  Indeed, Jones-Blythe proceeded with the repairs and those repairs did not exceed the 35% threshold.

Even if one were to attribute a portion of Cotton USA's bills to the reconstruction costs, the 35% threshold still would not be met.  Cotton USA was a salvage company, on site on behalf of Tenant to secure and salvage the Tenant fixtures and inventory.   Cotton's total bill is $319,428.  Despite the Tenant including that entire amount in its basis for sending its notice of terminating the Lease (see Exhibit 5), it admits that not all of that expense can be attributable to the reconstruction costs.  (Exh. 8, Wolford at p. 47).  Indeed, Tenant's expert, Mr. Wolford, reviewed those numbers with the Cotton USA representative, and testified in his deposition that based on those conversations $118,211.01 would be attributable to repair and reconstruction costs, rather than merely salvage of the Tenant's property.   (Exh. 8, Wolford at p. 47). Therefore, accepting that as true for purposes of this Motion only, and obviously the Tenant cannot refute that being the opinion of their expert, the total cost including Cotton comes to $668,449.01.  That amount still remains under the 35% threshold of $686,023.45.  Therefore, there remains no genuine issue of material fact that the cost of repairs did not exceed the 35% threshold.  Therefore, the Tenant is not entitled to exercise the option to terminate the Lease.

Further, the actual costs could very well have been less.  The Landlord spent more money repairing than necessary in an effort to do so quickly to allow the Tenant to reoccupy the Premises.  For example, the Landlord replaced the roof of the entire building, rather than just the portion that was damaged because the insurance company said it would cover the entire amount and the repair then went faster.  (Exhibit 11 at Paragraph 5).  The same is true with regard to the store front/glass wherein walls could have been shored up and repairs made.  However, since the insurance carrier agreed to pay for the total replacement, it could be done more quickly.  (Exhibit 11 at Paragraph 5).  This was done by the Landlord in order to get the Premises ready as soon as possible for reoccupancy by the Tenant, and further allowed for the actual costs of the repairs to be determined in such time.

The Lease is clear that the calculation is to be made based on the <u>costs</u> of repairs.  The undisputed costs of repair do not exceed the 35% threshold, and therefore, Landlord is entitled to summary judgment on its Complaint, and in its favor on the Counterclaim of Tenant.

**B.     To the extent the Lease is silent as to which party determines whether the 35% threshold has been exceeded, it is reasonable that the Landlord make that determination.**

The Tenant has heretofore taken the position that it is the Tenant that determines whether or not the 35% threshold has been exceeded.  In taking such position, it has argued that the Lease is silent on that determination.  It is anticipated that the Tenant will also attempt to say that this provision of the Lease was drafted by the Landlord, and thus should be construed against it.  From there, the Tenant claims that the Tenant gets to make that determination.  To the contrary, to the extent the Lease is silent, the court will make a reasonable determination as to how the threshold is determined.

In support of the Landlord making the decision, it is the Landlord whose obligation it was to build the original premises, as well as Landlord's obligation to insure and rebuild the Premises after a casualty. Accordingly, all of the costs are within the Landlord's knowledge. Indeed, the Landlord is the party dealing with the actual on the ground contractor and, therefore, is in the best position to determine the costs, and whether the 35% threshold has been met.

With respect to a reasonable method of doing the calculation, again the determination of reasonableness favors the Landlord. The original construction costs were utilized even by the Tenant in its estimate. The Tenant took the original accepted bid and increased it to 2006 dollars. That is the denominator in the calculation of the percentage. It is reasonable, therefore, to use the actual costs in reconstructing the Premises as the numerator, rather than merely a budget estimate as the Tenant has done.

Case law supports that the court may consider issues or factors such as those just described in arriving at what is reasonable to provide a missing term in the Lease. In Hansen v. Duffy, 106 Ill.App.3d 727, 435 N.E.2d 1373 (2nd Dist. 1982), the parties to the case were parties to a lease wherein the tenant exercised the option to purchase the real estate as provided in the lease. The real estate agreement attached to the lease failed to fix a date for closing or provide for payment of interest in the interval between termination of the lease and the closing of the real estate purchase. The trial court reasoned that where there is a failure to specify a time of performance, the law supplies a reasonable time under the circumstances. The court determined March 26, 1978 was a reasonable date from which performance could be considered due under the circumstances, which decision was upheld on appeal. In Kane v. McDermott, 191 Ill.App.3d 212, 547 N.E.2d 108 (4th Dist. 1989), the issue was again a tenant's option to purchase real estate pursuant to a lease. In that instance, the contract failed to specify the time of payment. The

court reasoned the law would imply performance within in a reasonable time. What time was reasonable depended on the circumstances surrounding the case. In that case, the trial court again set a time for closing based on the facts and circumstances including the type of sale and community custom.

Tenant may take the position that given the sixty day timeframe within which it was required to make the election, costs of repairs would not have been available. However, in this instance, they were completed and the Tenant was kept up to date with the estimate of the costs. Further, it is not an impossibility that the costs will be known within sixty days. Mr. Wolford admitted the project could have gone out for bid and a contract signed to make the repairs. In other words, it is not at all the case that either party would have to wait eight weeks to determine those costs. Mr. Wolford testified that a contract could have been entered based on a firm bid that would likely have been 95% correct. (Exh. 8, Wolford at p. 54-55).

What is the most clear is that to allow the Tenant to make up an estimate is totally unreasonable, as such a construction allows for manipulation in order to support a desired decision on termination. The e-mail correspondence between David Frieder, Vice President of Tenant, and the Tenant's expert, Jeffrey Wolford, tells the story. To begin with, David Frieder came up with the original "estimate", not Wolford. (Exhibit 7). Tenant has not disclosed any qualifications or basis on which Mr. Frieder came up with the "estimate". It is also obvious Frieder's "estimate" is not based on any degree of reasonable certainty. He states in his April 26, 2006 e-mail to Mr. Wolford, to which he attached the budget estimate:

> "I want to make sure that the numbers are somewhere reasonable, but on the high side since this is the start of the negotiations." (Exh. 7).

That same table which was attached to the e-mail accompanied the termination notice sent by Tenant to Landlord with the only additions being for architectural and engineering fees,

the cost of a permit, and the inclusion of the entire bill from Cotton USA, the salvage company. There has been no basis provided by Mr. Frieder, nor for that matter Mr. Wolford, where the architectural and engineering or permit amounts came from.  Cotton USA must have been added in total by David Frieder, because Mr. Wolford admitted at his deposition that it should not all be included in the "estimate".  (Exh. 8, Wolford at p. 47).

Tenant finally decides to ask Mr. Wolford to go visit the site.  According to Mr. Wolford's report, that request came on May 2, 2006.  (**Exh. 12**, Wolford Rule 26(a)(2) report, at p. 3, para. 7).  Despite that request, the Tenant went ahead and sent its termination notice on May 3rd with the accompany report prepared by David Frieder.  Mr. Wolford visited the site on May 4, 2006 and apparently revised some of the numbers.  As we see in his May 8, 2006 e-mail to David Frieder, he produced a "redline version" to the owner bid sheet.  **(Exhibit 13).**  That redline version has never been produced in this case and presumably is one of the many drafts which Mr. Wolford did not retain, but merely revised over.  As indicated in Mr. Frieder's May 8, 2006 responsive e-mail, he says the new information is "great", because now the figures he made up and gave to the Landlord to support the termination can be replaced by ones "with more authority".  (Exhibit 13).

It is blatantly evident is that the Tenant wanted out of non-performing location.  It fired its employees before it terminated the Lease.  (Exh. 11, Answer to Interrogatory No. 10).  It concocted a "budget estimate" and passed it off as that of a contractor Mr. Wolford.  The Tenant purposely estimated high to have room to negotiate, so admittedly the estimate is not reasonable or reliable.  (Exh. 7).

When the Landlord responded, contesting the estimate, the Tenant finally sent its contractor, Mr. Wolford, albeit seven weeks after repairs had begun, to view the Premises.

Tenant even went so far as to tell Wolford to lie about who he was in order to get on the Premises, if you read the May 4, 2006 e-mail of David Frieder to Jeffrey Wolford suggesting that he "go in as the fixture installer, insurance rep or someone from TSA". (See **Exhibit 14**). This display of gamesmanship is distasteful to say the least.

Case law supports that the court can make a determination whether it is reasonable for the Landlord to decide the issue and whether the 35% calculation of the Landlord is reasonable. In looking at the facts and circumstances, the Landlord believes that they support it is reasonable for the Landlord to make the decision, as well as support that the Landlord's use of the actual costs in this instance is reasonable. The facts and circumstances also support that it is patently unreasonable to allow the Tenant to manufacture an estimate, as that allows for the very type of bad faith and manipulation that Tenant has demonstrated herein, all in order to support a decision it made to get out of the Lease.

The Lease put the burden of construction of the original shopping center on the Landlord. Likewise, the obligation of repair and reconstruction following a casualty is on the Landlord. It is reasonable, therefore, to assume that the Landlord is the party responsible to determine if the costs to repair the damage exceeded 35% threshold. The Landlord having incurred the original costs, and having a contractor on the ground completing the repairs, is in the best position to make the determination. The Landlord has the actual true costs from the parties performing the work, which is certainly an objective, reasonable value to use under the terms of the Lease.

**C.      Tenant has failed to, and cannot sustain its burden of demonstrating that the costs of repairs to the Premises exceeded the 35% threshold necessary for it to terminate the Lease.**

In the alternative to the above arguments, in order for the Tenant to exercise the option, it has the burden of proving that the 35% threshold has been exceeded. A party seeking to enforce

a forfeiture provision bears the burden of proving that right, clearly and unequivocally.  Moss v. Elofsson, 194 Ill. App. 2d 256, 550 N.E.2d 1228 (1st Dist. 1990); Bauer v. Clark, 161 F2d 397 (7th Cir. 1947).  In the instant case, there are two things to note.  First, the Tenant made its decision to terminate at a time when it had no such evidence, but rather merely an estimate by David Frieder.  Secondly, Tenant's expert admitted that not only was his estimate a work in progress, it continued to be a moving target wherein various categories of repairs have been deleted in their entirety, as well as the estimates assigned continuing to change.  Given that at the time of the Tenant's decision, and indeed at all times up through the filing of this Motion, the Tenant had no reasonable admissible basis on which to sustain its burden of proving the 35% threshold has been exceeded, its election must be voided.[1]

The notice of termination went out by the Tenant on May 3, 2006.  (Exh. 4)  Tenant's expert, Mr. Wolford, however, did not visit the site until May 4, 2006.  Indeed, Mr. Wolford's testimony was that not until the scope was redefined over the course of a month and a site visit, did he ever put together final budget estimate for replacement costs (Exh. 8, Wolford at p. 8).  Thus, Tenant terminated the Lease before it even had a final budget estimate for the replacement costs.

Even Mr. Wolford himself admitted in his contract documents which were submitted on earlier projects, that he requires his subcontractors to have a site visit.  (Exh. 12, at p. 5 of Exhibit B).  As he stated, "you want to perform a site visit and you want to have as much documentation as possible to nail down a hard lump sum number."  (Exh. 8, Wolford at pp. 55-56).  It is the standard he requires in his professional work.  Without that, the estimate becomes a

---

[1]      Landlord has filed a Motion to Bar Mr. Wolford's opinions as being inadmissible pursuant to Federal Rule of Evidence 702.  Wolford's report and opinions are inadmissible under Daubert, and without it, Tenant has no evidence to support its burden to stave off summary judgment.  McMahon v. Bunn – O – Matic Corp., 150 F.3d 651, 658 (7th Cir. 1998)

guesstimate which is a moving target and subject to revisions. That is precisely the problem with the estimate on which the Tenant relied and based its decision to terminate. That is also precisely the reason why the Tenant cannot sustain its burden of proof in this case. The original "budget estimate" on which Tenant relied was not at all accurate. The latest revised budget estimate of Wolford deleted nine items which appeared in Tenant's original which accompanied the termination notice. His explanation was that there were reduced scopes and/or changed scopes. Unfortunately, in his deposition, Mr. Wolford could not explain those. For example, when talking about the lighting, he originally included fifty light fixtures he later deleted. He was asked why he deleted the light fixtures and left in the installation. His answer was "I was assuming at that time my assumption <u>maybe</u> was the owner always supplies the lights. TSA purchases lighting and <u>maybe</u> that was my assumption or they would reuse all existing. Question: Do you know? Answer: I don't know what happened with that specifically." (Exh. 8, Wolford at pp. 71-72, emphasis added). His explanation or lack thereof was similar with regard to leaving off the flooring materials and when asked "You don't know why you deleted it" his answer was "I am not recalling off-hand." (Exh. 8, Wolford at p. 72).

Further, his latest "estimate" deleted miscellaneous rental equipment and deleted contingency. When asked if those items weren't necessary, his answer was "after the site visit, no." He deleted a $4,000 permit item. When asked why, he acknowledged there was no re-permitting that he could see. (Exh. 8, Wolford at p. 73).

The court need only compare Exhibit No. 3 to his deposition, (Exhibit 5 to this Motion), which was the estimate that the Tenant sent with its notice of termination, arrived at before any site visit by Mr. Wolford, with the latest revised estimate of May 7th, Exhibit 4 to his deposition. (**Exhibit 15** to this Motion). As pointed out at the deposition, nine of the items in Exhibit 3 were

deleted from Exhibit 4 and eighteen of the remaining "estimates" are different from Exhibit 3.

(Exh. 8, Wolford at p. 77).  After describing those differences to Mr. Wolford, the following

testimony was given:

| | |
|---|---|
| Question: | Do you know why the numbers would have changed? |
| Answer: | We addressed the scopes, re-qualified the numbers, put another budget number on those scopes or deleted in whole or picked them up in another number, that's the only reason that would be. |
| Question: | It is fair to say that Exhibit 3 which is a budget estimate is just that, it's an estimate of what you thought <u>might be</u> the scope of the project and what <u>might be</u> the cost to complete that scope of the project. |
| Answer: | To the best of my knowledge per the site visit, per comparable markets, putting numbers in estimates. |
| Question: | Let me correct you because it had nothing to do with the site visit because I am talking about Exhibit 3 and you had not been there yet, right? |
| Answer: | Well I had been to the site prior to that when I bid it the first time. |
| Question: | That was a piece of bare ground, wasn't it? |
| Answer: | Well at that point, yeah. |
| Question: | Is that forming any basis of your opinion today? |
| Answer: | No, not the site visit, but in past knowledge. |
| Question: | Exhibit No. 3, those numbers it is a budget estimate.  It is an estimate of what you thought the scope of the repairs <u>might be</u> and you have assigned an estimate of the cost of those scope of repairs, correct? |
| Answer: | That is correct. |
| Question: | We know for a fact if my representation is correct that at least nine of the scopes changed and were deleted from a later estimate you did, correct? |
| Answer: | I would have to review it, but yes.  There was some pluses and adds yes. |
| Question: | As I counted and you can check it later if you want, but as many as eighteen of these specific numbers differed from your Exhibit 3 to the estimate in Exhibit 4? |
| Answer: | Yes, I redefined the scopes many times. |
| Question: | I added up the nine things that were deducted and those deductions alone totaled $245,487 out of the $1,046,000 that shows up in Exhibit 3, that's a little over 23%, correct? |
| Answer: | I don't have a calculator, but is that what it comes up to? |
| Question: | Yeah, $245,000 out of $1,046,000 is just under 25%? |
| Answer: | Right. |

(Exh. 8, Wolford at pp. 75-78 (emphasis added)).

Mr. Wolford provided yet another estimate, Exhibit 8 to his deposition (**Exhibit 16** to this Motion), representing the repair cost as $743,944, which takes out all of the Cotton expense. When asked to explain the difference between deposition Exhibit 4 and Exhibit 8, Mr. Wolford could not do so.

> Question: That is an opinion you arrived May 7th or was it after May 7th because we have two of these Exhibit 4 and Exhibit 8 that both show May 7th. When did you decide to take Cotton out of Exhibit No. 4?
>
> Answer: I don't recall.
>
> Question: And would it be fair to say that Exhibit 8 as it describes it as a budget estimation and does not represent any actual costs?
>
> Answer: That would be fair. (Exh. 8, Wolford at p. 80).

Even later, Mr. Wolford may have offered another opinion to Tenant, this time increasing the original estimate. When asked about it, referring to an e-mail, it leads to further ambiguity and uncertainty as to the "budget estimate" offered by Mr. Wolford.

> Question: You said that you reported to him an estimate which is attached which is about $17,000 more than the original. Do you know what estimate that is and if we seen it today?
>
> Answer: I probably have fifteen different spreadsheets on this project and I never changed the dates specifically when I changed them.
>
> Question: That is in part because you are working with estimates, the estimate of the scope of the project?
>
> Answer: Exactly. New information bits and pieces to finite the number the best I could. (Exh. 8, Wolford at p. 82).

What we have from Mr. Wolford, as he testified to repeatedly, is any number of estimates and revisions thereof. It essentially is a moving target which remains yet moving today. Most importantly, the budget estimate on which the Tenant based its decision to terminate the Lease is not the estimate which its expert is now going to offer at trial. Tenant is not itself even relying on the estimate it provided with the notice of termination. The estimate which Tenant's expert is now relying on made many changes from the original estimate, deleting as many as nine items and changing as many as eighteen others. However, Mr. Wolford is unable to explain the basis

for those deletions and changes.  The Tenant, in bearing the burden of proving the 35% threshold, has a burden of proving it with some degree of certainty and reasonableness.  Mr. Wolford's opinion wholly lacks any such certainty and given his lack of ability to explain it at his deposition, the Tenant is unable to sustain its burden to demonstrate that the cost of the repairs to the Premises exceeded the 35% threshold.

It needs no citation to authority to say that every contract carries with it an obligation on the parties thereof to deal with each other in good faith.  That obligation of good faith and fair dealing deserves consideration when this court decides whether the Tenant has met its burden in support of exercising the option to terminate the Lease.  The Tenant certainly did not meet its obligation in dealing with the Landlord in good faith and fair dealing as set forth earlier in this Motion, nor even in dealing with this court.  Indeed, to file the Counterclaim Tenant has filed knowing that it had misrepresented to the Landlord that it had a contractor's estimate which was in fact prepared by David Frieder, knowing that it had misrepresented to the contractor doing repairs that the flooring material was going to come when it knew it was going to terminate the Lease and not proceed with the flooring repairs, and concealing from the Landlord that it had terminated its employees well prior to terminating the Lease all evidence bad faith.  Further, the Tenant, in essence, withheld the real report of Wolford after the fact, and has neither retained, nor produced any of the numerous drafts or revisions that its expert apparently came up with throughout the process prior to even visiting the site.  In essence, if the Court looks at the time of termination of the Lease, the Tenant did not have a good faith reasonable estimate of a contractor on which to base its claim that it could exercise the option.  Rather, it had figures it had put together itself that were purposely high in an effort to allow room for negotiation to ensure that it

could get out of non-performing Lease.  Clearly, the Tenant cannot meet its burden of proof in this case and, therefore, summary judgment should be granted in favor of the Landlord.

IV.    **<u>CONCLUSION</u>**

There remains no genuine issue of material fact that the actual cost of repairs of the Premises did not exceed the 35% threshold established in the Lease allowing the Tenant to terminate the Lease.

Further, there remains no genuine issue of material fact that the Tenant cannot sustain its burden of proving that the 35% threshold was exceeded.

Accordingly, Landlord is entitled to summary judgment and asks this Court to declare that Tenant's termination notice is void, that the Lease remains in effect, that the Landlord be allowed to present evidence of damages to date based on Tenant's wrongful termination, together with its costs and attorney's fees pursuant to the Lease.  Further, Landlord is entitled to summary judgment in its favor on Tenant's Counterclaim in total.

SWPLAZA III, L.L.C., an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020,

Plaintiff,

By: _____/s/ David A. Rolf_____

David A. Rolf, Bar # 6196030
Attorney for Plaintiff
Sorling, Northrup, Hanna,
Cullen & Cochran, Ltd.
Suite 800, Illinois Building
Post Office Box 5131
Springfield, IL 62705
Telephone:  (217)544-1144
Facsimile:  (217)522-3173

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was served by electronic service through the Court's ECF System to the following:

Mr. J. William Roberts
Mr. Charles R. Schmadeke
Hinshaw & Culbertson LLP
400 South 9th Street, Suite 200
Springfield, IL 62701

on the 31st day of December, 2007.

/s/ David A. Rolf
David A. Rolf, Bar # 6196030
Attorney for Plaintiff
Sorling, Northrup, Hanna,
Cullen & Cochran, Ltd.
Suite 800. Illinois Building
Post Office Box 5131
Springfield, IL 62705
Telephone:  (217)544-1144
Facsimile:  (217)522-3173
E-Mail:  darolf@sorlinglaw.com

**E-FILED**
Monday, 31 December, 2007  03:37:48 PM
Clerk, U.S. District Court, ILCD

SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

# LEASE
### between

## GART BROS. SPORTING GOODS COMPANY,

### A Colorado Corporation

### as Tenant

### and

## ILLINOIS NATIONAL BANK, TRUSTEE,

### under Trust Agreement dated November 6, 2000

### and known as Trust No. 00-0020

### as Landlord

### dated April 2, 2001

SOUTHWEST PLAZA III SHOPPING CENTER

EXHIBIT
1

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## I.  FUNDAMENTAL LEASE TERMS

### A.  Parties.

Landlord:    Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

Tenant:    Gart Bros. Sporting Goods Company, a Colorado Corporation

### B.  Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

### C.  Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.

### D.  Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

| | | | |
|---|---|---|---|
| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.15 |

**E.    Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

**F.    Addresses (paragraph 34)**

If to Tenant:           GART BROS. SPORTING GOODS COMPANY
                        1000 Broadway
                        Denver, Colorado 80203
                        Attention:  President
                        Facsimile: (303) 863-2243

With a copy to:         GART BROS. SPORTING GOODS COMPANY
                        1000 Broadway
                        Denver, Colorado 80203
                        Attention: Legal Department
                        Facsimile: (303) 864-2188

If to Landlord:         Charles E. Robbins, Realtor
                        2144 South MacArthur Boulevard
                        Springfield, Illinois  62704
                        Attention:  Property Management
                        Facsimile: (217) 525-0545

With a copy to:         R. Lee Allen, Attorney
                        Sorling, Northrup, Hanna, Cullen & Cochran
                        620 East Adams, Suite 800
                        Springfield, Illinois 62701
                        Facsimile: (217) 522-3173

1.    **The Premises.**  Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between **Exhibit "A"** and **Exhibit "B"**, **Exhibit "A"**
shall control. The "Shopping Center" includes the land described on
**Exhibit "A"**, all buildings and other improvements constructed or to
be constructed thereon, together with all rights, privileges, easements
and appurtenances pertaining thereto. The Premises contain
approximately thirty two thousand six hundred thirty (32,630)
Leasable Square Feet (as defined below) of building area and are
cross-hatched on the site plan attached as **Exhibit "B"**. The
Shopping Center will contain approximately 120,000 Leasable
Square Feet when completely built out in accordance with
**Exhibit "B"**.

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than
98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size").
Further, if the actual measurement of the Leasable Square Feet of the Premises determines that there exists within
the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for
purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for
all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the
variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises
be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level
or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales
area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for
purposes of determining the number of Leasable Square Feet within the Premises, no wall will be
deemed to exceed 12" in width); provided, however, that the following areas will not be included
in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for
storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior
canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of
Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping
Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured
and have such measurement certified to by a licensed architect on or before the Possession Date (as
defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification,
if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of
(a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable
Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's
measurement of the Premises, together with its objection, Tenant will specify the number of
Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to
resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not
resolved their differences, each will name an architect within ten (10) days thereafter. Within ten
(10) days after being named, such architects will name a third architect, who will, within twenty (20)
days, measure the Premises. The measurement of the third architect will be averaged with either
Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount
will be deemed the correct number of Leasable Square Feet in the Premises. The party whose
measurement was not averaged with that of the third architect will pay the fees and expenses of the
third architect, and each party will pay the fees and expenses of its own architect.

2.    <u>Completion and Delivery of the Premises and Shopping Center</u>. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as **Exhibit "C"** (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as **Exhibit "B"** including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached **Exhibit "C"**, made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3.     **Lease Term.** Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4.     **Rent.**

**(a)**     **Base Rent.** During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i)    <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)    <u>Reduction in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)    <u>Co-Tenancy Requirement; Alternate Rent</u>. Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

5.      **Development of Shopping Center by Landlord.** Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises. In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities. Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference). Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.      **Easements.** In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    **Utility Easements.** During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)    **Common Area Easement.** During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations. Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)    **Non-Dedication.** None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    **Common Areas and Common Area Maintenance.**

(a)    **Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)    repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)    management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    **Tenant Payments**.    Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

**(d)    Examination of Landlord's Records.** Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

**8.    Signs and Communications Equipment.**

**(a)    Signs.** Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of **Exhibit "D"** are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    **Taxes.**

(a)    **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    **Payment Following Appeal.**  Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)    **Multiple Building Tax Parcel.**  In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

## 10.    Maintenance, Repairs and Replacements.

(a)    Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)     Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.     **Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.     **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    **Insurance**.

(a)    **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)    **Liability Insurance**. During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    **Workers' Compensation Insurance**. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    **Self-Insurance**. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)    **Rental Loss Insurance**. Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease. Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period. All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable. The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)    **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction**. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

  1)  Workers' Compensation – statutory limits;
  2)  Employers Liability - $500,000; and
  3)  Comprehensive General and Comprehensive Auto Liability as follows:
      a)  Bodily Injury - $1,000,000 per occurrence;
      b)  Property Damage - $1,000,000 per occurrence;
      c)  Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;
      d)  Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;
      e)  "XCU" Hazard Endorsement, if applicable;
      f)  "Broad Form" Property Damage Endorsement;
      g)  "Personal Injury" Endorsement; and
      h)  "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)    **Policy Provisions**.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)    **Waiver of Right of Recovery and Subrogation**.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises of the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)    **Evidence of Insurance**.  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)    **Indemnities**.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.    **Damages by Fire or Other Casualty**.

(a)    **Less Than Thirty Five Percent (35%)**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Thirty Five Percent (35%) or More**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    **Landlord's Termination Rights**. If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above). Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation**. If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17.    **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18.    Use.

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.  **Warranties and Representations.**

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    **Quiet and Peaceful Enjoyment.** Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    **Title.** Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease. Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA"). Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)    **Certificate of Authority.** Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)    <u>No Litigation</u>.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    <u>Hazardous or Toxic Materials</u>.  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority, or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    <u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    **Zoning and Subdivision.** The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    **Prohibited Activities.** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

    (A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

    (B)    a bowling alley;

    (C)    a billiard or bingo parlor;

    (D)    a flea market;

    (E)    a massage parlor;

    (F)    a funeral home;

    (G)    a facility for the sale of paraphernalia for use with illicit drugs;

    (H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (I)    an off-track betting parlor;

    (J)    a carnival, amusement park or circus;

    (K)    a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

    (L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

    (M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

    (N)    a skating rink;

    (O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

    (P)    a banquet hall, auditorium or other place of public assembly;

    (Q)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R)    a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

(ix)    **Site Covenants**. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    **Prohibited Uses in Common Areas**. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B)    **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C)    **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D)    **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)    **Restaurant Use.**  Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    **Tenant's Authority.**  Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials.** As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.  The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default.  In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

**20.**    **Estoppel Certificates.**  Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    **Subordination of Lease**.  At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22.    **Change of Landlord**.  Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.    **Tenant's Financing**.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    **Tenant's Property and Waiver of Landlord's Lien.** All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    **Memorandum of Lease: Commencement Date Agreement.** Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    **Expiration of Term and Holding Over.** All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    **"For Rent" Signs.** Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.   **Force Majeure.** Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.   **Events of Tenant's Default.** Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)   **Failure to Pay Rent; Breach.** (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)   **Bankruptcy.** Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.   **Landlord's Remedies.** After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant. Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

(a)   **Reimbursement of Landlord's Costs in Exercising Remedies.** Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

      **(b)**    **Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

      **31.**    **Events of Landlord's Default: Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

      Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

      **32.**    **Waiver.** If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws. During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:    Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Attention:  Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

**35.    Brokers**.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark Commercial Real Estate Services LLC, which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial Real Estate Services, LLC shall be solely responsible for any commissions due and payable to Leonard W. Sapp or any related person or entity.    Except for the amounts due Edgemark Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom the indemnifying party either has or is purported to have dealt.

**36.    Miscellaneous.**

(a)    **Headings and Gender.**  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.   The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    **Construction.**  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    **Relationship of Landlord-Tenant.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)    **Entire Agreement; Merger.**  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    **Attorneys' Fees.** In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)    **Partial Invalidity.** If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    **Consents.** Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)    **Holidays.** If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)    **Applicable Law.** This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)    **Successors and Assigns.** All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)    **Counterparts.** This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)    **Trademarks and Trade Names.** All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    **Effectiveness of Lease: Tenant's Right to Terminate.** Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)     Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)     Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)     Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)     Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.    **Confidentiality.**   The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.   The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction. Any publication or article run by lender for the Shopping Center will not be considered a breach hereof. It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.    **Liability of the Trustee and the Beneficiary.**  This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank. It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof. It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises. This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof. Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.    **Liability of Directors and Shareholders.**  Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    **EXHIBITS**

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

**LANDLORD**

ILLINOIS NATIONAL BANK, TRUSTEE, under Trust Agreement dated November 6, 2000, known as Trust Number 00-0020

By: _____

Its _SUP & TO_

**ATTEST:**

By: _____

Its _V P & Controller_

**TENANT**

GART BROS. SPORTING GOODS COMPANY, a Colorado Corporation

By: _____

Its _____

**ATTEST:**

By: _____

Its _____

**Nesa E. Hassanein**
**Senior** Vice President
**and General** Counsel

0294793.005     3/29/01RLA

Exhibit A

## COMBE BLOXDORF, P.C

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477  •  Fax (217) 544-8483

March 27, 2001
Job No. O1012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



Exhibit "C"

CONSTRUCTION PROVISIONS

1.  Definitions: For purposes of this Lease:

(i)  "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(ii)  "Site Work Start Date" means April 15, 2001;

(iii)  "Building Shell Start Date" means May 15, 2001;

(iv)  "Scheduled Possession Date" means October 1, 2001;

(v)  "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

(vi)  "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings: None.

2.  General Requirements.

2.1  Code Compliance.  Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

2.2  General Conditions.  Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

(i)  Liability and builder's risk insurance;

(ii)  Costs for permits, sewer and water connection fees, etc.;

(iii)    Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment;

(v)     Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)   Survey, staking and layout;

(viii)  Job site field supervision;

(ix)    Mobilization;

(x)     Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)   Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3    Warranties. Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date. At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain. Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4    Engineering. All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5    Permits. Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.    Construction of Site Work. Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage. Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete. Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping. Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving. Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities. Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone. Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting. Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage. Per paragraph 8(a) of the Lease and the Final Plans.

3.9    Cost Responsibility.  All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4.    Construction of Building Shell.  Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this Exhibit C.

4.1    Utilities.  Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2    Cost Responsibility.  All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3    Bids.  On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued: provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5.    Construction of Leasehold Improvements.  Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements.  All work will comply with the general requirements of Article 2 of this Exhibit C.

5.1    Scope of Work.    The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property.    Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor.    The Leasehold Improvements will also include:  all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring.  All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.    The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.    Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord.  Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant.  Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid.  Acceptance and awarding of the contract will be the decision of both Landlord and Tenant.  Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant.  No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld.  Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.  Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    <u>Leasehold Improvements Plans</u>. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leasable Square Foot of the Premises will be included in Construction Costs.

6.3    <u>Deviation from Final Plans</u>. Notwithstanding the terms of Article 8.5 of this <u>Exhibit C</u>, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this <u>Exhibit C</u>, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4    Change-Orders.  Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.    Construction Costs.

7.1    Included Costs.  As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this Exhibit C, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2    Excluded Costs. In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3    Payment of Construction Costs. The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease). Landlord will pay for all Construction Costs up to the Construction Cap. In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.    Construction Timing and Completion.

8.1    Outside Dates. If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date. Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date. Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work. Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2    Tenant's Option to Terminate. If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder. Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3    Inspection and Access. During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

8.4.2 Notice of the Possession Date. Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date"). If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

8.5 Condition of Premises at Delivery. Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

8.6 Indemnity by Landlord. Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

## EXHIBIT E
### Permitted Encumbrances

1.    Real Estate Taxes for years 2000 and 2001.

2.    Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3.    Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4.    Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

      NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5.    Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6.    Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7.    Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8.    Utility and drainage easements as shown by plat of subdivision.

9.    20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10.   Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11. Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12. Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13. Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14. Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001    3/29/01RLA

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

## RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.    In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.    If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.    This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.    This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.    The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.    IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____
_____

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

## ACKNOWLEDGMENTS

### LANDLORD

STATE OF _____ )
                                     ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:            _____

### LENDER

STATE OF _____ )
                                     ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:            _____

<u>TENANT</u>

STATE OF _____ )
                                                      ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.


_____
Notary Public

My commission expires:            _____

Exhibit G

MEMORANDUM OF LEASE

Demise. Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease. April 2, 2001.

Name and Address of Landlord. ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois 62704, Attention: Property Management.

Name and Address of Tenant. GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado 80203, Attention: President.

Description of Premises. Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

Term of Lease. Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

Options to Extend. The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

Restrictions on Construction. The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B." and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses.  There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking.  Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive.  So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this ____ day of _____, 2001.

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

## ACKNOWLEDGMENTS

<u>TENANT</u>

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of
_____, 2001 by _____ as
_____ and by _____
as _____ of Gart Bros. Sporting Goods Company, a
Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:      _____

<u>LANDLORD</u>

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of
_____, 20_____ by _____ as
_____ and by _____
as _____ of ILLINOIS NATIONAL BANK, Trustee
under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires:      _____

Exhibit A

LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

**E-FILED**
Monday, 31 December, 2007  03:38:01 PM
Clerk, U.S. District Court, ILCD



### SPORTS AUTHORITY®

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

**SENT VIA FEDERAL EXPRESS**

March 23, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention:  Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701

Re:  Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods
     Company ("Tenant"), and Illinois National Bank, Trustee  ("Landlord")

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Thank you very much for meeting with me during my trip to Springfield this week.  As you know, the
Tenant has the option to terminate the Lease pursuant to Paragraph 15(b) of the Lease if the repair and
reconstruction cost resulting from the recent tornado is 35% or more of the then-total reconstruction cost of
the Premises and Common Areas.  Based on our initial review of the extensive damage to the Premises and
Common Areas, we believe that this threshold will be met, and as a result, Tenant has the right to elect to
terminate the lease within 60 days from the date of the casualty.   Although the Lease provides that the
Tenant has 60 days in which to notify the Landlord of its election to terminate the Lease, we want the
Landlord to be aware that we are considering terminating the Lease, and accordingly, any repairs or
reconstruction to our Premises are at the Landlord's risk.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc:  Nesa Hassanein
     Paul Gaudet
     Chris Day
     Cynthia J Cashman
     Missy Mayne

SWPlaza III
Initial Rule 26 Production  586
11/28/06




EXHIBIT
2



E-FILED
Monday, 31 December, 2007 03:38:10 PM
Clerk, U.S. District Court, ILCD

# SORLING

### NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.
ATTORNEYS AT LAW

REPLY TO:

Springfield Office Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

March 29, 2006

**VIA FEDERAL EXPRESS & FACSIMILE (720-475-2967)**

Mr. David Frieder
Vice President – Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

**Re:　Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("Tenant"), and Illinois National Bank, Trustee ("Landlord")**

Dear Mr. Frieder:

I am writing in response to your March 23, 2006 letter to Arthur Seppi, Charles Robbins, and my partner, R. Lee Allen (in Mr. Allen's absence from the office this week). I appreciate your courtesy in advising the Landlord that you were considering terminating the Lease. We have now, however, received an estimate from our contractor, Jones-Blythe Construction Company, providing an opinion as to the extent of the damage to the Premises leased to Sports Authority. As you can see from this estimate, the damage does not exceed the 35% threshold referred to in Paragraph 15(b) of the Lease. Pursuant to Paragraph 15(a) of that Lease, the Landlord will be proceeding with repair and restoration of the Premises, and expects that Sports Authority will abide by its continuing obligations pursuant to that Lease.

Yours truly,

*David A. Rolf*

David A. Rolf

DAR/mah
Enclosure
cc:　Mr. William L. Hall, L.J. Shaw & Company
　　　Mr. Arthur Seppi
　　　Mr. Charles Robbins

David A. Rolf
Attorney at Law

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo
————————
Elizabeth A. Urbanc
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fathauer
Brian D. Jones
————————
Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson
————————
Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

SWPlaza III
Initial Rule 26 Production 590
11/28/06

{S0504337.2  3/29/2006 DAR MAH}

EXHIBIT
3

Via Fax  525-0545

March 29, 2006

**JONES-BLYTHE**
CONSTRUCTION CO.
1000 WEST PLYMOUTH INTERSTATE
POST OFFICE BOX 5113
SPRINGFIELD, ILLINOIS 62705
TELEPHONE  217.787.1140
FAX NUMBER  217.787.1666

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL  62704

Attn:  Art Seppi

Re:    Sports Authority
       Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen

E-FILED

Monday, 31 December, 2007  03:38:48 PM

Clerk, U.S. District Court, ILCD



**SPORTS AUTHORITY**

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

**SENT VIA FEDERAL EXPRESS**

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re: Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation. To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001. As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

SWPlaza III
Initial Rule 26 Production 87
11/28/06






EXHIBIT
4

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**                                                5/1/2006
**#618  Springfield**

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis  of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

BUDGET ESTIMATE

## Sports Authority

#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4'/ U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT s- T-Bar Repalcement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $938,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

2001    T. I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
 Springfield, IL.

Date: 7-26-01
Contractor: VAUGH CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL | |
|---|---|---|---|---|---|
| BID BREAKDOWN | | | | | |
| 1. Barricade | | | | | |
| 2. Demolition | | | | | |
| 3. Bond | | | | 10,500 | |
| 4. Concrete | | | | 1,452 | |
| 5. Carpentry | | | | 17,427 | |
| 6. Studs and Drywall | | | | 109,440 | |
| 7. Storefront Glass | | | | 0 | |
| 8. Interior Mirrors | | | | 1500 | |
| 9. Acoustical Ceiling | | | | 11,850 | |
| 10. Store Fixtures | | | | 36,038 | |
| 11. Painting | | | | 18,640 | |
| 12. Carpet Installation | | | | 105,888 | |
| 13. Vinyl Tile and Base | | | | above | |
| 14. Plumbing | | | | 37,534 | |
| 15. Sprinklers | | | | 30,025 | |
| 16. Electrical | | | | 134,000 | |
| 17. Fire Alarm System | | | | 9,800 | |
| 18. HVAC/Ventilation | | | | 115,000 | |
| 19. Dumpster | | | | | |
| 20. Insurance   BUILDERS RISK | | | | 895 | |
| 21. Supervision | | | | | |
| 22. General Conditions (Itemize) | | | | 14,402 | SUPERVISION |
| 23. Other (Itemize below) | | | | 20,255 | |
| SUBTOTAL | | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 38,000 | |
| 25. Taxes (Sales/State/Local) | | | | -3950 | |
| TOTAL | $0 | $0 | $0 | $0 | 716,593 |
| List itemizations below: (#22 - Gen Cond.) | | | | | $22.18 |
| 1. Final Cleaning | | | | | |
| 2. Temporary Phones | | | | | |
| 3. Tool Rental | | | | | |
| List itemizations below: (#23 - Other) | | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 | |
| 2. TOILET PARTITIONS | | | | 2230 | |
| 3. CONCRETE SEALING | | | | 2340 | 736,848 |
| 4. | | | | | $22.80 |

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: O wks. |
| UNION / NON-UNION | Amount of time for construction: 9 wks. |
| % of Union Increase: % | |

Qualifications to be listed on separate sheet

SWPlaza III
Initial Rule 26 Production 91
11/28/06

7-26-01

JUL-23-01 MON 04:01 PM  VANCIL CONTRACTING    FAX NO. 2177440443    P. 02/02

Sheet3

*Springfield*

*#618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | Sportmart No. 618 Cost |
|----------|-------|------------------------|
| 1000 | General Requirements | $28,829 |
| 2000 | Excavate and Grade | $60,642 |
| 3000 | Concrete Foundations and slabs | $174,482 |
| 4000 | Masonry and Foam Insulation | $168,251 |
| 5000 | Structural, Joists, and Deck | $177,827 |
| 6000 | Rough Carpentry | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | $95,393 |
| 8100 | Doors, Frames | $2,949 |
| 8300 | Overhead Doors | $1,540 |
| 8400 | Storefronts | $21,450 |
| 8460 | Auto Doors | $11,171 |
| 9230 | Cold Metal Framing, EIFS | $24,640 |
| 9900 | Exterior Painting | $13,255 |
| 11100 | Dock Equipment | $5,804 |
| 15400 | Plumbing Rough In | $5,992 |
| 15700 | HVAC Curbs | $3,122 |
| 16100 | Electrical Rough In | $22,495 |
|  |  | $831,117 |
|  | Overhead and Profit | $58,178 |
|  |  | $889,295 |

$$\$889,295.00 \div 32,308 \, ft^2 = \$27.53 \, SQ \, FT.$$

LEASE AGREEMENT =  $\dfrac{\$55.00 \; /SQFT}{27.53}$

AMOUNT REMAINING FOR T.I = $27.47 SQFT.

SWPlaza III
Initial Rule 26 Production  92
11/28/06

$ 1.777 total

*Storefiles*



**National Disaster Recovery Services**

| | | | | |
|---|---|---|---|---|
| **Name** | Mike Mavelle | | **Date:** | 03/31/06 |
| **Company** | Sports Authority | | **Invoice #:** | 1408722 |
| **Address** | 1050 W. Hampton Ave. | | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-3285 | | | |
| **Fax:** | (720) 475-3285 | | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | | |
| **City, State, Zip** | Springfield, Il. 62704 | **Insurance Co:** | Liberty Mutual Property |
| **Tel:** | (217) 546-0132 | **Insurance Adj:** | Ton Tiernan |
| **Fax:** | (217) 546-1073 | **Claim #:** | X69A-003155-00 |
| **Re:** | Tornado Damages in Springfield.IL   *# 618* | | |
| **Re:** | **Final Bill With Not To Exceed Amount:** | | |

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

SWPlaza III
Initial Rule 26 Production 93
11/28/06

**\*\*Please include the invoice number on check\*\***

03/31/06



## AGC's Construction Inflation Alert
### Reported by AGC Chief Economist Ken Simonson

## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced
## Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

SWPlaza III
Initial Rule 26 Production 94
11/28/06

# AGC's Construction Inflation Alert

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (*See Chart 2 (Page 3) and Table 2 (Page 7).)*

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up

> In 2005, the PPI for highway and street construction rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices.

about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

SWPlaza.III
Initial Rule 26 Production 95
11/28/06

## AGC's Construction Inflation Alert

In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

Chart 2



### Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. *(See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)*

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.

SWPlaza III
Initial Rule 26 Production  96
11/28/06

# AGC's Construction Inflation Alert

Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



Chart 3

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

Chart 4



**AGC's Construction Inflation Alert**

## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.

**Hurricanes**

Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.

**Metals**

The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

**Oil & Natural Gas**

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.

SWPlaza III
Initial Rule 26 Production 98
11/28/06



The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



*Ken Simonson (simonsonk@agc.org) became Chief Economist of Associated General Contractors of America (AGC), the leading national trade association for the construction industry, on September 10th, 2001.*

*Ken has 30 years of experience analyzing, advocating and communicating about economic and tax issues. Before joining AGC, he spent three years as senior economic advisor in the Office of Advocacy of the U.S. Small Business Administration and 13 years as vice president and chief economist for the American Trucking Associations. He also worked with the President's Commission on Industrial Competitiveness, the U.S. Chamber of Commerce, the Federal Home Loan Bank Board, and an economic consulting firm.*

*Ken writes The Data DIGest, a weekly one-page email newsletter that summarizes the latest economic news relevant to construction. He is co-author of AGC's monthly Construction Tax News, a one-page email covering federal and state tax developments affecting the industry.*

*Ken has a BA in economics from the University of Chicago and an MA in economics from Northwestern University. He is a board member of the National Association for Business Economics.*

SWPlaza III
Initial Rule 26 Production  99
11/28/06



## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 6.0 | 5.0 | 1.5 |
| ECI for construction | 4.3 | 3.2 | 3.4 | 2.4 | 3.7 | 0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Nonresidential buildings | -0.5 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.6 | 1.0 | 2.6 | 10.8 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.6 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 8.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.6 | 6.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.6 | 27.8 | 64.9 | 50.8 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.6 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Copper ores | -19.6 | 3.6 | 37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.6 | 11.6 | 29.6 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.9 | -0.5 | 9.9 | 6.6 | 4.6 |
| Structural, architectural, pre-engineered metal prods | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | 0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.8 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.6 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.6 | 9.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.6 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.8 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.8 | 9.2 | 6.4 | 28.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.6 |
| Asphalt | N/A | N/A | 10.0 | 18.3 | 17.8 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.6 | -1.7 | 5.3 | 4.6 | 18.5 | 6.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 8.7 | 5.8 | 17.8 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.8 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | 1.7 |

SWPlaza III
Initial Rule 26 Production  100
11/28/06



### Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprel06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance | |
|---|---|---|---|---|
| | | | (Revised) 1997 | (Former) 1997 |
| 2200 | | Materials and components for construct | 12.635 | 12.646 |
| | 034503 | Nonwovens and felt goods | .003 | .003 |
| | 038303 | Industrial and other fabricated produc | .008 | .008 |
| | 039101 | Textile fibers, yarns, and fabrics. n. | .001 | .001 |
| | 061302 | Other inorganic chemicals | .013 | .013 |
| | 062101 | Architectural coatings | .157 | .157 |
| | 062103 | Special purpose coatings, incl. marine | .084 | .084 |
| | 062301 | Allied and miscellaneous paint product | .044 | .044 |

SWPlaza III
Initial Rule 26 Production 101
11/28/06

AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c. | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding, and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | --- | .045 |
| 083301 | Softwood veneer, incl veneer backed | --- | .017 |
| 083401 | Hardwood plywood veneer | --- | .018 |
| 083501 | Hardwood veneer and plywood | .071 | --- |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .148 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul. ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | --- | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stai | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

SWPlaza III
Initial Rule 26 Production  102
11/28/06

**AGC's Construction Inflation Alert**

| | | | |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elect., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farm s | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab b | .016 | .016 |
| 108102 | Externally thread. fasteners, ex. airc | .005 | .005 |
| 108103 | Internally thread. fasteners, ex. airc | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

SWPlaza III
Initial Rule 26 Production   103
11/28/06

## AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| 117102 | Noncurrent carrying | .204 | .203 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect.& monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132201 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .091 | .091 |
| 133301 | Ready-mixed concrete | .866 | .865 |
| 133401 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134202 | Glazed brick struct., hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 135201 | Clay refractories | .025 | .024 |
| 135301 | Refractones, non clay | .032 | .032 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category--Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

BUDGET ESTIMATE

E-FILED
Monday, 31 December, 2007   03:38:57 PM
Clerk, U.S. District Court, ILCD

Sports Authority
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4'l U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT s- T-Bar Repalcement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Circuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | 40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $6,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| **SUBTOTAL** | | | $936,745 |
| Allowances | | N/A | |
| **SUBTOTAL** | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| **TOTAL** | | | $1,046,701 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer s & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

SWPlaza III
Initial Rule 26 Production   90
11/28/06

EXHIBIT
5

**E-FILED**
Monday, 31 December, 2007  03:39:08 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited )
liability company, as successor to Illinois )
National Bank, as Trustee under Trust )
Agreement dated November 6, 2000 and )
known as Trust No. 00-0020, an Illinois )
banking institution, )
 )
      Plaintiff/Counter-Defendant, )    Case No. 06-CV-3177
 )
  vs. )
 )
TSA STORES, INC., as successor to Gart )
Brothers Sporting Goods Company, a )
Delaware corporation, )
 )
      Defendant/Counter-Plaintiff. )

## DEFENDANT'S AMENDED ANSWERS AND OBJECTIONS TO PLAINTIFF'S INTERROGATORIES NO. 4 AND NO. 10

Pursuant to Rules 26(e) and 33 of the Federal Rules of Civil Procedure, Defendant / Counter-Plaintiff TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA" or "Defendant"), by its attorneys, Hinshaw & Culbertson LLP, hereby amends its answers or objections to Plaintiff's interrogatories No. 4 and No. 10 as follows:

### INCORPORATION BY REFERENCE OF GENERAL OBJECTIONS

Defendant incorporates herein by reference as though expressly stated herein all General Objections Applicable to All Interrogatories set forth in Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories.



EXHIBIT
6

6015953v1 860371

## INTERROGATORIES

INTERROGATORY NO. 4. Identify by every employee of TSA's Springfield store located at the Premises during 2005 and 2006.

ANSWER:   Defendant objects to this interrogatory in that the information sought is neither relevant to this litigation nor reasonably calculated to lead to the discovery of any admissible evidence regarding the subject matter of this litigation.  Subject to and without waiving said objection, Defendant states that Plaintiff has agreed to limit Interrogatory No. 4 to those employees of Defendant at TSA's Springfield store as of March 12, 2006.  The following persons were employed by Defendant at its store in Springfield, Illinois, as of March 12, 2006 (please note that the addresses and telephone numbers provided are the last ones known by Defendant):

1.    David K. Lee
      69 Pheasant Run
      Chatham, IL 62629
      217-483-9459

2.    Betty J. Poe
      108 Northwoods Court
      Chatham, IL 62629
      217-483-7824

3.    Shiloah S. Tubbs
      26 Robinhood Court
      Springfield, IL 62704
      217-698-7245

4.    Jonathan Thielken
      2410 Country Trails
      Decatur, IL 62526
      217-553-8818

5.    Eugene O. Tubbs
      26 Robinhood Court
      Springfield, IL 62704
      217-698-7245

6.    Christopher D. Revelis
      219 Collier Drive
      Springfield, IL 62711
      217-787-1959

7.    Jason I. Stogsdill

6015853891 868372

14 Candlewood Drive, Apt. 7
Springfield, IL 62704
217-299-1460

8.  Ryne A. Pfeifer
    3816 Greenfield Drive
    Springfield, IL 62704
    217-787-8888

9.  Mindy B. Zulauf
    1141 Heritage rive
    Jacksonville, IL 62650
    217-473-9168

10. Rebekah D. Coleman
    1004 Durkin Drive, #3
    Springfield, IL 62704
    217-585-6715

11. Phillip L. Pinkston
    208 South Elm
    Raymond, IL 62560
    217-229-3546

12. James C. Myers
    689 Peach
    Petersburg, IL 62675
    217-632-7899

13. Christopher E. Yancy
    603 High School Street
    Divernon, IL 62530
    217-628-9805

14. Charles M. Gallant
    407 S. Fillmore
    Edwardsville, IL 62025
    618-210-7000

15. Katie L. Pasley
    259 Camp Sangamo Road
    Springfield, IL 62707
    217-523-0256

16. Dawn C. Melcher
    2741 South 4th Street, Apt. B
    Springfield, IL 62703

6015853kv1 86807

217-523-4184

17.    Daniel J. Webb
       396 South McCullough Street
       Waggoner, IL 62572
       217-227-3335

18.    Michael J. Basarich
       2251 Boysenberry Lane
       Springfield, IL 62711
       618-616-6175

19.    Diedre D. Nicholson
       242 South Elm
       Winchester, IL 62694
       217-883-2162

20.    Brittany Scheer
       705 N. Allen Drive
       Athens, IL 62613
       217-899-0669

21.    Nicole L. Minor
       12710 Pine Ridge Lane
       Petersburg, IL 62675
       217-632-4376

22.    Jaclyn K. Damm
       219 N. Menard
       Mason City, IL 62664
       217-971-0661

23.    Adam J. Beyer
       9220 Old Indian Trial
       Chatham, IL 62629
       217-483-2125

INTERROGATORY NO. 10: State the date and manner in which employees of TSA at

the premises were notified of the closing of TSA facility at the Premises, and whether any such

notice was in writing.

ANSWER:    Defendant objects to this Interrogatory in that the information sought
is neither relevant to this litigation nor reasonably calculated to lead to the discovery of any
admissible evidence regarding the subject matter of this litigation. Subject to and without

4

waiving said objection. Defendant states that, except for materials related to employee's severance, written notice of the closing of TSA's Springfield store was not provided to the employees of TSA's Springfield store. The employment of the employees at TSA's Springfield store was terminated by oral communication. The majority were terminated effective April 22, 2007; one was terminated effective April 27, 2007; one was terminated effective May 5, 2007; two were terminated effective May 7, 2007; and three were terminated effective May 8, 2007. In addition, the employment of one employee was terminated effective March 24, 2006, for reasons unrelated to the closing of TSA's Springfield store, and one employee was terminated effective August 2, 2006, for reasons unrelated to the closing of TSA's Springfield store.

DATED:    March 23, 2007.


TSA STORES, INC., as successor to Gart Bros.
Sporting Goods Company, a Delaware corporation,
Defendant/Counter-Plaintiff,


Legal Objections By: _____
Charles R. Schmadeke,
One of Defendant's Attorneys


Answers By: _____
Cynthia J. Cashman


J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

5

## CERTIFICATE OF SERVICE

The foregoing Defendant's Amended Answers and Objections to Plaintiff's Interrogatories No. 4 and No. 10 was served upon Plaintiff/Counter-Defendant by personal service upon:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701
darolf@sorlinglaw.com

on this 23rd day of March, 2007.

*Charles T Schmadeke*

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

6

60158538v1 868572

Page 1 of 1

**E-FILED**
Monday, 31 December, 2007  03:39:18 PM
Clerk, U.S. District Court, ILCD

**Jeff Wolford**

| | |
|---|---|
| **From:** | David Frieder [dfrieder@thesportsauthority.com] |
| **Sent:** | Wednesday, April 26, 2006 11:22 AM |
| **To:** | jwolford@wolfordretailbuilders.com |
| **Subject:** | Springfield repair costs |
| **Attachments:** | Copy of #618- Springfield Owner Bid Rev (2).xls |

Jeff,  Please take a look at this and see what you think.  I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhere reasonable but on the high side since this is the start of the negotiations.  Let me know what adjustments you would make.  Thanks.  David

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

10/29/2007

EXHIBIT
7

# Sports Authority

#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs

## Budget Estimate

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft.  $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,600 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4'/ U/S of Deck | | 4' up at Perim | $31,600 |
| Minor ACT`s- T-Bar Repalcement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| **SUBTOTAL** | | | $607,317 |
| Allowances | | N/A | |
| **SUBTOTAL** | | | |
| Insurance | | 1.50% | $9,110 |
| Profit & Overhead | | 10% | $60,732 |
| Premium for expedited work | | 5% | $30,366 |
| **TOTAL** | | | $677,158 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer`s & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

E-FILED
Monday, 31 December, 2007  03:40:23 PM
Clerk, U.S. District Court, ILCD

**Page 1**

```
            UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
                 SPRINGFIELD DIVISION
SWPLAZA III, LLC, an Illinois Limited )
Liability Company, as successor to    )
Illinois National Bank, as Trustee    )
under Trust Agreement dated           )
November 6, 2000 and known as Trust   )
No. 00-0020, an Illinois banking      )
institution,                          )
               Plaintiff,             )
     vs.                              ) No. 06-3177
TSA STORES, INC., as successor to Gart)
Brothers Sporting Goods Company,      )
a Delaware Corporation,               )
               Defendant.             )
     The discovery deposition of JEFFREY WOLFORD,
taken in the above-entitled cause, before Christine
M. Jachimiak, a notary public of Cook County,
Illinois, on the 30th day of October, 2007 at
222 North LaSalle Street, Suite 300, Chicago,
Illinois, pursuant to Notice, at the hour of 1:30.
Reported by: Christine M. Jachimiak, CSR
License No.: 084-004064
```

**Page 2**

```
1   APPEARANCES:
2       SORLING, NORTHRUP, HANNA, CULLEN
3       & COCHRAN, LTD., by
4       MR. DAVID A. ROLF
5       Suite 800 Illinois Building
6       607 East Adams Street
7       P.O. Box 5131
8       Springfield, Illinois, 62705
9       (217) 544-1144
10          Representing the Plaintiff,
11
12      HINSHAW & CULBERTSON, LLP, by
13      MR. CHARLES R. SCHMADEKE
14      400 South Ninth Street, Suite 200
15      Springfield, Illinois, 62701-1908
16      (217) 528-7375
17          Representing the Defendant.
18
19  ALSO PRESENT: Douglas Garrett
```

**Page 3**

I N D E X

WITNESS                          EXAMINATION
JEFFREY WOLFORD
   By Mr. Rolf                        4
   By Mr. Schmadeke                   82
   By Mr. Rolf (Further)              84


          E X H I B I T S
NUMBER                        MARKED FOR ID
Deposition Exhibit
   No. 7                          8
   No. 8                          22
   No. 8                          78
   No. 9                          80
   No. 10                         89

**Page 4**

```
1            (Witness sworn.)
2       MR. ROLF:  Could you please state your name and
3   your business address for us.
4       THE WITNESS:  Jeffrey B. Wolford.  I reside at
5   102 South Wheeling Road, Prospect Heights,
6   Illinois.
7            JEFFREY WOLFORD,
8   called as a witness herein, having been first duly
9   sworn, was examined and testified as follows:
10           EXAMINATION
11  BY MR. ROLF:
12      Q.  How long have you been at that address?
13      A.  Approximately six years.
14      Q.  I sent a notice of deposition and asked
15  you to bring some things today which your counsel
16  has given me so why don't I let me Schmadeke go on
17  the record and make a record of what he's
18  delivering.
19      MR. SCHMADEKE:  I just wanted to state that we
20  have provided some Emails to and from TSA to
21  Mr. Wolford, some of which may have been previously
22  produced and some of which may not have been
23  produced.  We also have provided some preliminary
24  budget calculations for this and I think they have
```

1 (Pages 1 to 4)

EXHIBIT
8

1  been previously produced.
2     MR. ROLF:  Is that all the material you had in
3  your file for this particular project?
4     MR. WOLFORD:  That's correct, yes.
5     MR. SCHMADEKE:  I should say he has other
6  material, but I think you have everything else.
7  BY MR. ROLF:
8     Q.  So as of today you've produced your entire
9  file either before or after?
10    A.  Yes.
11    Q.  When were you first contacted about this,
12  Mr. Wolford?
13    A.  I believe the date was March 27th, 2006.
14    Q.  Who contacted you?
15    A.  David Freider.
16    Q.  What did he explain to you that they were
17  in need of?
18    A.  They were looking for a preliminary budget
19  for a replacement cost, construction cost for the
20  Sports Authority Store number 618 in Springfield,
21  Mass because of an unnatural disaster of a
22  tornado.
23    Q.  I think you just said Springfield, Mass.
24  Is it Illinois?

5

1  provided.
2     Q.  Are we looking at the same Email?
3     A.  Yes, we are.
4     Q.  So it's dated Monday, March 27th at
5  1:04 p.m. From David Freider to yourself?
6     A.  That's correct.
7     Q.  You had done work previously for TSA?
8     A.  That is correct.
9     Q.  What type of work had you done for TSA?
10    A.  The big box build-out primarily.  I've
11  done some out of the ground work and facade work,
12  but primarily it is 40,000 square foot tenant
13  build-out, tenant improvement work.
14    Q.  Did you talk on the 27th about what you
15  would be compensated for this particular project?
16    A.  No.
17    Q.  How are you being compensated?
18    A.  I have been compensated for the original
19  report dated June 1st for 2500 and I'm being
20  compensated today.
21    Q.  What's your compensation today?
22    A.  2500.
23    Q.  Do you anticipate having additional
24  compensation if you were to testify at trial?

7

1     A.  I'm sorry, I'm bidding a job there, too.
2  Springfield, Illinois, store number 618.
3     Q.  Can you be more specific about what he
4  asked you to do?
5     A.  Because of the March 12th tornado
6  implosion of that space and the site he asked me to
7  put together a replacement cost of selective damage
8  that he described verbally either per an Email with
9  some very basic construction replacement scopes and
10  that means subcontractor scopes of the damages.
11    Q.  And he provided you with that information
12  then on March 27th?
13    A.  At that point a very basic budget or work
14  scope to put numbers on as he knew it in that time
15  frame.
16    Q.  Do you recall what the scope was that you
17  described?
18    A.  Not offhand without reading the Email.
19    Q.  Would there be an Email that that was in?
20    A.  Yes, there should be an Email.
21    Q.  Do you have that with you today?
22    A.  It should be.  That's actually the first
23  one they sent to me on March 27th it looks like.
24  It's specific to this Email to the 27th that I

6

1     A.  Yes.
2     Q.  Have you talked about those arrangements?
3     A.  Those arrangements have not been talked
4  about.
5     Q.  So you're into them for $5,000 so far
6  based on your initial report and your deposition
7  today?
8     A.  That is correct.
9     Q.  What did you do in response to this March
10  27th, 2006 Email?
11    A.  I provided a preliminary budget based on
12  this basic outline of the 27th.
13    Q.  Let me just mark this as Exhibit 7 if we
14  could so that we can refer to the same thing.  And
15  your basic budget are you looking at a particular
16  document for that?
17    A.  No, no because the original budget it was
18  always upgraded.  Once the scope was redefined over
19  the course of say a month and a site visit I put
20  together the final budget number for replacement
21  cost.
22          (Whereupon, WOLFORD Deposition
23          Exhibit No. 7 was marked for
24          identification.)

8

BY MR. ROLF:

1  Q. So you produced a report like this that
2  has the various items listed?
3  A. That would be the final. That would be
4  the final budget after the scopes were more
5  defined.
6  Q. What was contained within your original
7  scope particularly in terms of the items listed?
8  Is there any way to tell that?
9  A. Not at this point because it was overlaid
10 and more details as it went on after the site visit
11 and those types of things.
12 Q. What kind of number did you come up with
13 based on this March 27th, 2006 Email?
14 A. I could not tell you. It wasn't that far
15 off. Some of the numbers went up or down depending
16 on what I field determined and further information,
17 site photos, damage photos that were sent to me
18 after this Email.
19 Q. How soon was it after the March 27th Email
20 that you got back to Mr. Freider?
21 A. May I go through these Emails?
22 Q. Sure.
23 A. For this original budget?

9

1  Q. Yes.
2  A. Looking at the Email it looks like I did
3  an attachment April 19th. I believe there would not
4  be a copy of that because of that original budget
5  that I would have because I overlaid and it was a
6  work in progress over say plus or minus a month.
7  Q. Is this the Email you're looking at?
8  A. Yes, it is.
9  Q. And you think that's the first time you
10 had an actual --
11 A. That I actually Emailed a budget over, a
12 hard copy, yes.
13 Q. We wouldn't be able to have a copy of
14 that?
15 A. No.
16 Q. Was all your correspondence on this
17 project with Mr. Freider? Is that a yes?
18 A. Yes.
19 MR. SCHMADEKE: At that time?
20 THE WITNESS: At that time.
21 BY MR. ROLF:
22 Q. Who else from TSA have you had
23 correspondence with?
24 A. Douglas Garrett, David Freider and

10

1  Charles.
2  Q. What was your contact with Doug Garrett?
3  A. My contact with Mr. Garrett was later on
4  but not during this original budgetary spreadsheet
5  and defining the scope process for replacement
6  costs. It was solely to my best recollection with
7  David Freider.
8  Q. And the Emails you've produced today --
9  A. It's every Email correspondence I had with
10 David.
11 Q. Is that the method in which you
12 corresponded with Mr. Freider?
13 A. Primarily.
14 Q. Would that give us a fairly accurate time
15 line as to when you got information and when you
16 sent information back?
17 A. Yes.
18 Q. Would there be anything missing if we
19 looked at those Emails?
20 A. It was every chronological starting oldest
21 to the top to the newest that I had with David,
22 every one.
23 Q. Would there be phone calls that would
24 supplement that or you pretty much did it by Email?

11

1  A. 90 percent of it was by Email.
2  Q. Did you talk with anyone other than
3  Mr. Freider about the damage that was out at the
4  location in Springfield?
5  A. Jeff Crohn with Cotton defining his
6  scopes. I spoke to several of the subcontractors
7  when I was there on May 4th, 2006 per the site
8  visit defining the scopes and damage.
9  Q. But leading up to what you were asked to
10 do in defining this original scope was it just with
11 Mr. Freider?
12 A. That's correct, sir.
13 Q. Did Crohn -- did you talk to him to get a
14 description of any of the damage to the facility
15 when you were preparing your table?
16 A. That is correct.
17 Q. When were those conversations?
18 A. Those were during the month of April at
19 some point. I never document. There was no phone
20 log.
21 Q. Was that all by phone?
22 A. It was all by phone.
23 Q. This has been marked as Exhibit 1 which is
24 your report in this matter. I want to run through

12

3 (Pages 9 to 12)

1  some of it. You list several projects there in the
2  introduction that you've done for Sports Authority?
3    A.  Yes.
4    Q.  We touched on this already.  Most of those
5  I take it are the tenant build-out where you have
6  the interior.  Is that what you mean?
7    A.  That is correct.
8    Q.  Are there any on there where you were from
9  the ground out?
10   A.  From the ground up and the shell itself?
11   Q.  Yeah.
12   A.  No.  None of those are straight ground up
13  projects.
14   Q.  Why don't you describe for me the business
15  of Wolford Retail Builders?
16   A.  I'm primarily a big box contractor, retail
17  contractor.  I do no residential work whatsoever.
18  It's strictly retail work.
19   Q.  Who besides Sports Authority do you do
20  work for?
21   A.  Since I have been in business for myself
22  in two and a half years I've done a couple of other
23  clients, but primarily Sports Authority is my
24  biggest client by far.

13

1    Q.  You've been in business for yourself for
2  two and a half years?
3    A.  Yes.
4    Q.  What were you doing prior to that?
5    A.  I was building Sports Authority work for
6  another contractor as a direct employee, that would
7  be the third employee that I had worked for doing
8  Sports Authority work.  They followed me over the
9  years.
10   Q.  You say Sports Authority followed you?
11   A.  Well, I've been able and lucky enough to
12  do their work over the last eight years with three
13  different other employers.
14   Q.  What's your educational background?
15   A.  Higher education?
16   Q.  Yes.
17   A.  I have four years from Pratt Institute in
18  Brooklyn, New York.
19   Q.  What does that get you?
20   A.  Nothing.
21   Q.  What is it designed to get you?
22   A.  That was an architectural school.
23   Q.  Does it take five and you only did four?
24   A.  That's exactly right.

14

1    Q.  After you completed those four years you
2  went into the job market?
3    A.  I went into the job market and got the
4  same exact position I had beforehand.
5    Q.  Who was that with?
6    A.  Fisher Development.
7    Q.  Is this resume that's in this packet
8  fairly up to date?
9    A.  May I see that one?
10   Q.  I guess it's not because it says Crown
11  Construction '96 to present.
12   A.  Yeah, that's an older one.  That's the
13  last one I had to produce that anybody asked me to
14  produce.
15   Q.  Can you just fill in from the Crown
16  Construction just for the record?
17   A.  Through the present?
18   Q.  Yes.
19   A.  Crown Construction I went on to Capital
20  Construction and I was with them for basically
21  three and a half years, three out of four.  I was
22  with Novak for one year, and I was with HCI for
23  about two years, and then I went into business for
24  myself.

15

1    Q.  With respect to the projects you were
2  doing on this Springfield store and the storm
3  damage that didn't relate to the same type of work
4  that you normally do for Sports Authority.  Is that
5  a fair statement?
6    A.  Would you repeat that?
7    Q.  Sure.  You've described the work you
8  normally do for Sports Authority as basically the
9  tenant improvement side of the building and not
10  from the ground out?
11   A.  That's correct.
12   Q.  This particular project didn't involve
13  tenant's improvements, is that a fair statement?
14   A.  As far as the damage work and the
15  replacement work?
16   Q.  Yes.
17   A.  The replacement work is very atypical to
18  some of the major build-out work and replacement
19  work or new construction that I do as build-out
20  work.  It would be a quasi version of remodel and
21  new construction.  I've done both for Sports
22  Authority.
23   Q.  Why don't you tell me what you do then
24  when these projects say interior?

16

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1    A.  Absolutely.  The shelf space is secured.
2  The permit is procured and posted on site that first
3  day and basically the construction critical path is
4  started. and the standard work is rough and finish
5  carpentry. concrete pour back for the plumbing and
6  underground. the drywall partitioning, metal studs,
7  wall legends. the drywall installation, level four
8  taping, painting and concrete sealer, acoustical
9  ceilings, HVAC distribution and owner supplied
10  equipment package installation, the lighting and
11  switch gear package, the fire alarm stand alone and
12  sprinkler relocates, the final cleaning, full
13  inspections to procure a C of O. which is a
14  certificate of occupancy, and all costs included
15  that would insure the general conditions and all
16  costs related to that to procure that certificate
17  of occupancy for the store turnover on a Thursday
18  night.  It's always on a Thursday night.
19    Q.  How much of that was involved?
20    A.  There was specific scopes that I felt that
21  I broke out.  Some were selective demolition
22  because it entailed that which would be in a
23  remodel as well so I had to extrapolate that per
24  the site visit, per site photos and the information

17

1  I gathered say over the course of a month.
2    Q.  Paragraph four in your report says that
3  the terms used are defined as set forth in the
4  lease which is the subject of the above referenced
5  action.  Have you reviewed the lease in this case?
6    A.  Yes.
7    Q.  When did you review it?
8    A.  I reviewed the lease -- the lease was
9  after I put together the budget, but I don't
10  remember the time line on that.  That was a more
11  recent I would say six or eight months ago.
12    Q.  Who asked you to review the lease?
13    A.  I believe Douglas Garrett.  It could have
14  been Douglas Garrett or David Freider.  It was a
15  phone call.
16    Q.  Was it before or after you did your report
17  to him?
18    A.  It was after.
19    Q.  What were you asked to do when you were
20  asked to review the lease?
21    A.  Just to review the lease in general.
22    Q.  What were you looking for?
23    A.  Can you be more specific?
24    Q.  Well, I guess I would imagine that they

18

1  wouldn't just hand you the lease and say here's the
2  lease and say please review it.  Maybe they did.
3  Were you asked to look at this article. that
4  article, look at any definitions of terms.  Your
5  report here says the terms that are used are
6  defined in the lease?
7    A.  I read the whole lease.
8    Q.  What was your understanding of why you
9  were doing that?
10    A.  Just to see basically if there was a
11  60-day construction or replacement.  There was just
12  certain time lines they wanted me to look at.  How
13  long did I think the reconstruction should take and
14  those type of things.  For the construction purpose
15  only is the reason why I reviewed the lease and I
16  believe it was provided to me.
17    Q.  How long did you think the reconstruction
18  would take?
19    A.  I believe the reconstruction would take
20  between 10 and 12 weeks.
21    Q.  That's not anywhere in this report, is it?
22    A.  I don't believe so.
23    Q.  What's the basis of that estimate?
24    A.  Due to they're usually like a nine-week

19

1  project but because of the cleanup working
2  concurrently with the recovery, emergency teams
3  that were out there just trying to start up and
4  immobilize construction I felt it would take a
5  longer duration.
6    Q.  You said they are usually a nine-week
7  project and what is they?
8    A.  They is a typical tenant build-out and
9  these were more selective scopes which makes -- and
10  some of them were reduced scopes but there were
11  some additional scopes.
12    Q.  Have you ever been involved in rebuilding
13  after storm damage for Sports Authority?
14    A.  Not for the Sports Authority, no.
15    Q.  Have you for someone else?
16    A.  For Fisher Development we would have
17  emergency basis type of jobs.
18    Q.  How long ago was that?
19    A.  That would be closer to 14, 15 years ago
20  was the last time I was involved with a project
21  like that that was an emergency situation.
22    Q.  Have you ever been asked other than in
23  this project to come up with an estimate of a
24  repair or replacement cost for TSA?

20

5 (Pages 17 to 20)

| | |
|---|---|
| 1  A. No. | 1  A. Yes. |
| 2  Q. This is the only time? | 2  Q. And Exhibit B to this report is that a |
| 3  A. This is the only time. | 3  copy? |
| 4  Q. In paragraph five of your report you say | 4  A. That's a copy of my owner bid form. |
| 5  that based on the reasonable certainty that the | 5  Q. Is that what would have been submitted to |
| 6  estimated repair and reconstruction cost of the | 6  the owner? |
| 7  premises as a result of the damages caused by the | 7  A. Yes. |
| 8  tornado on March 12th exceeded 35 percent of the | 8  Q. Would they then accept that bid, is that |
| 9  then total reconstruction cost of the premises. | 9  the process? |
| 10  Does the term estimated repair and construction | 10  A. That bid was submitted to the architects. |
| 11  cost appear anywhere in the lease documents you | 11  Q. This was being done at the owner's |
| 12  reviewed? | 12  request? |
| 13  A. I would have to review those documents | 13  A. That's correct. It was build to suit. |
| 14  again. | 14  Q. This would have been submitted to the |
| 15  Q. Do you know if you're using that as a term | 15  owners? |
| 16  defined within the lease, estimated repair and | 16  A. It was a closed, sealed bid process on |
| 17  reconstruction cost? | 17  that particular project. |
| 18  MR. SCHMADEKE: If you know. | 18  Q. Is this the document Exhibit B there that |
| 19  THE WITNESS: I don't know to tell you the | 19  was submitted? |
| 20  truth. Can I have a couple of minutes here? | 20  A. That's it. |
| 21  MR. ROLF: Sure. Can you mark that as Exhibit | 21  Q. Would some of this other stuff have gone |
| 22  No. 8. | 22  with it? |
| 23 | 23  A. Yes, actually the clarifications as well, |
| 24 | 24  title page, listing and drawings, the original bid |
| 21 | 23 |

| | |
|---|---|
| 1        (Whereupon, WOLFORD Deposition | 1  documentation, yes. |
| 2        Exhibit No. 8 was marked for | 2  Q. You didn't get the job in that instance, |
| 3        identification.) | 3  right? |
| 4  THE WITNESS: Repeat your question again if you | 4  A. That's correct. |
| 5  don't mind. | 5  Q. Paragraph seven states that on May 2nd, |
| 6        (Whereupon, the record was read.) | 6  2006 you were asked to go to the premises? |
| 7  THE WITNESS: I don't believe so. | 7  A. That is correct. |
| 8  BY MR. ROLF: | 8  Q. Actually to review the premises and also |
| 9  Q. To your knowledge that term nowhere | 9  review certain other matters identified herein to |
| 10  appears in the lease? | 10  provide an opinion. What were the certain other |
| 11  A. Not to my knowledge. | 11  matters identified herein that you're referring to? |
| 12  Q. In paragraph six you said on behalf of | 12  A. How secure the space was, how the space |
| 13  Capital Construction Group I guess you bid this | 13  was secure with temporary barricades because of the |
| 14  store back in 2001? | 14  implosion of the space the storefront had blown |
| 15  A. July of '01. | 15  out, where they were as far as cleanup, water |
| 16  Q. What type of company was Capital? | 16  control, some of the Cotton recovery team where |
| 17  A. They were a national retail contractor as | 17  they were and to redefine the other trade work |
| 18  well. | 18  scope such as how much that would supercede this |
| 19  Q. Did you bid this job from the ground out | 19  March 27th general outline from David Freider, what |
| 20  or you were bidding it -- | 20  the truer work scopes truly were. |
| 21  A. This is a straight tenant improvement | 21  Q. And that was done after May 2nd then? |
| 22  build-out project. | 22  A. I was there on Thursday, May 4th, '06. |
| 23  Q. Typical of what you were doing with Sports | 23  Q. Who did you talk to from Cotton when you |
| 24  Authority before and even since? | 24  were there? |
| 22 | 24 |

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1    A.   Nobody from Cotton.  This was all site
2   walk-through, three or four hours walking around
3   the building, walking through the building, walking
4   every room.
5    Q.   Why don't you tell me the condition of the
6   premises when you were there March 4th?
7    MR. SCHMADEKE:  May 4th.
8    THE WITNESS:  May 4th, yes.  Basically there
9   was selective demolition that still had to take
10  place for the new finished -- new floor finishes,
11  sealer.  There was a select amount of safe off that
12  still had to be completed and reinstallation of
13  select light fixtures on the peropad and the entry
14  there were some selective lesser scope than I had
15  originally thought demolition and redistribution
16  that had to be replaced.  There were quite a bit of
17  the millwork that had to be reinstalled.  The
18  majority of the flooring the finishes needed to be
19  reinstalled and basically the reinstallation of all
20  the sales fixtures as well.  Those were the
21  primary.  It was more specific in my report.
22   Q.   Did you observe anything with regard to
23  the bearing wall?
24   A.   Yes, they had replaced it.  There was a
                                                    25

1   specific scope of bar joist and beam pockets they
2   were working on as well as some masonry that had
3   been completed.  There was a roofer as well.  I
4   wasn't able to get on to the roof to see what kind
5   of damage there was.  That's why I didn't put in a
6   specific amount per unit cost in my budget.  This
7   is what I understood what was replaced, but I never
8   walked the actual roof.  That's why I was a little
9   more specific on what I thought the roof was by
10  talking to the other gentleman on the site.
11   Q.   Who did you talk to about the roof?
12   A.   There was a roofer there that I asked him
13  about how much actually of the roofing that needed
14  to be replaced.
15   Q.   What did he tell you?
16   A.   There was some notes that I had taken,
17  field notes and it spelled it out.
18   Q.   Do you still have your field notes today?
19   A.   No, I don't have those.  They were very
20  general but more specific to what I originally
21  had had.
22   Q.   What happened to them?
23   A.   The original notes from that?
24   Q.   Yeah.
                                                    26

1    A.   After I had formalized this budget I
2   didn't keep them because that was a year and a half
3   ago.
4    Q.   When you're talking about that just
5   looking at this as line item five, is that it?
6    A.   Yes, that would be it.
7    Q.   So you approximated 1500 square feet
8   needed to be replaced?
9    A.   15,000 actually and/or its insulation
10  board.
11   Q.   Do you know what percentage of the entire
12  roof that was?
13   A.   It was approximately 38 percent
14  thereabouts.
15   Q.   With regard to the floor, the floor that
16  was in the building at the time of the storm had
17  been removed, is that true?
18   A.   I'm sorry, repeat the question.
19   Q.   The rubber flooring that was in the floor
20  at the time of the storm had all been removed?
21   A.   A significant amount of it was, yes.
22   Q.   You don't know what condition it was in?
23   A.   Prior to that time, no.  If it does get
24  wet it's a waterborne adhesive that's the product,
                                                    27

1   and it's a national account and so it would have to
2   be removed.  It would be my assumption it all had
3   to be removed.
4    Q.   Is that because of the adhesive?
5    A.   It can't be salvaged, that's correct.
6    Q.   Tell me a little more about what you
7   observed about the entry.  Are you talking the
8   doors or the storefront?
9    A.   There's three components to a Sports
10  Authority standard entry.  You've got the Stanley
11  Automatic doors that is part of the vestibule.  You
12  have the transoms above and there's always two
13  storefront sidelights or storefront openings and
14  they're usually 20 by 16 on either side.  Sometimes
15  they're a curtain wall.  In this case it's a
16  standard storefront with a five inch and standard
17  insulated glass.  That had been -- that had been
18  secured on both sides and secured temporary
19  barricading.  Site protection had been provided
20  there.
21   Q.   What needed to be done, if anything, to
22  repair those?
23   A.   It had to be replaced with clear anodized
24  and insulated glass.  There might have been one
                                                    28

(Pages 25 to 28)

1    quadrisection that was still there. I can't
2    remember. I do not recall but at some point it was
3    all going to be replaced.
4        Q.   How is it that you're familiar with the
5    construction costs in the Springfield area?
6        A.   Besides originally bidding the project and
7    having substantial bid coverage and that means
8    subcontractor coverage for each trade originally
9    and my past history working in multiple markets
10   throughout the country, union and nonunion and a
11   very parallel market in Delafield, Wisconsin which
12   is a union market and the labor rates are very
13   consistent with that I was able to formalize and
14   that assisted me in this budget, this replacement
15   budget.
16       Q.   When you were talking about familiarity
17   with it originally you're talking back in 2001?
18       A.   That is correct.
19       Q.   So those numbers wouldn't be good anymore?
20       A.   With pricing the Sports Authority work all
21   over the country doing them in 12 or 14 different
22   states, knowing the Springfield, Illinois market
23   with comparable markets I felt that the budget that
24   I produced was a very comprehensive budget and the

29

1    past history.
2        Q.   Did you know any of the subcontractors who
3    were performing work on this job?
4        A.   No. I did not.
5        Q.   Did you ever work with any of them before?
6        A.   Didn't have the opportunity.
7        Q.   You have never worked in Springfield?
8        A.   I have not worked in Springfield.
9        Q.   Springfield, Illinois?
10       A.   That's what I meant, I'm sorry.
11       Q.   In paragraph 12 of your report you say
12   it's your opinion based on a reasonable certainty
13   that the total building replacement cost on or
14   about March 12th, 2006 were $1,841,856?
15       A.   12 right?
16       Q.   Yeah, paragraph 12.
17       A.   And repeat your question.
18       Q.   That's your opinion?
19       A.   That is my opinion, yes.
20       Q.   How did you arrive at that?
21       A.   That was all replacement cost and all the
22   national accounts and my past history and knowing
23   some of these hard numbers in replacement. That's
24   the number I formalized as a total replacement

30

1    cost.
2        Q.   Does that appear anywhere in any report
3    you made or anything?
4        A.   That was in -- I'd have to look at my
5    report again.
6        Q.   That's it.
7        A.   Can I? I just want to make sure. I don't
8    believe that specific number is in my report.
9        Q.   Where did that number come from?
10       A.   That was a number that I compiled three
11   other numbers the Cotton, the replacement, other
12   replacement costs that I got from the Sports
13   Authority and compiled my final number to review it
14   or to submit.
15       Q.   This is the total for the total building,
16   right, not just the cost of the repair of the
17   damage?
18       A.   That's correct.
19       Q.   So tell me again exactly how you came up
20   with that number?
21       A.   I'd have to review all my documentation
22   again.
23       Q.   I need to know how you came up with it
24   because if you look at Exhibit F which is also your

31

1    report in this back on May 1st you have a number of
2    $1,960,067?
3        A.   Can I see that please?
4        Q.   You've got it all right in front of you.
5        A.   Is this in the right order though?
6        Q.   Yeah, Exhibit F.
7        A.   Can you find that for me?
8        Q.   Yeah.
9        A.   Thank you. This is in response to the
10   Email that I concurred with this Email that these
11   would be the total replacement costs and I plugged
12   in my number, and I felt that per this Email that
13   it absolutely was correct.
14       Q.   Did you generate Exhibit F?
15       A.   No.
16       Q.   Who did?
17       A.   Sports Authority I believe, yes.
18       Q.   Did they get those numbers on the shell
19   cost and the tenant improvement costs from you?
20       A.   Just the tenant improvement costs.
21       Q.   Do you know where they got the shell costs
22   from?
23       A.   I'm not recalling.
24       Q.   The three percent estimate for original

32

8 (Pages 29 to 32)

1   project changes did that number come from you?
2     A. I don't recall.
3     Q. As I read this it says, below is the
4   summary comment on the cost as related, etc., etc.,
5   and it says since I didn't know the change orders
6   from this project I assumed. Do you know who the I
7   is?
8     A. No.
9     Q. So this isn't something you drafted?
10     A. I did not draft this.
11     Q. You didn't do anything with the Associated
12   General Contractors of America and the construction
13   costs and make adjustments to the bid to come up
14   with that number?
15     A. I concur with this, but I didn't produce
16   this.
17     Q. What do you mean by you concur with it?
18     A. I agree with those totals.
19     Q. So the building replacement cost you agree
20   would be $1,960,067?
21     A. Yes.
22     Q. And that's instead of $1,841,856 which is
23   in paragraph 12 of your Exhibit 1 report?
24     A. Yes.

33

1     Q. Looking at paragraph 13 of your report
2   which is on page four?
3     A. Yeah.
4     Q. You said you issued a report dated May 1,
5   2006 indicating that the premises sustained direct
6   cost damages. Do you see that?
7     A. Yes.
8     Q. Is the term direct cost damages in the
9   lease?
10     A. I don't recall.
11     Q. And your number for that is 743,944?
12     A. That is correct.
13     Q. That's based on a May 1 report?
14     A. The May 1 was a typo. I started the
15   spreadsheet and then I went and talked to David and
16   I needed to go down there on May 2nd or I had to go
17   down there on May 4th and actually produce the
18   final spreadsheet on the 5th or 6th and worked on
19   it over the course of a couple of days. It was
20   just the date that I actually started formalizing
21   it.
22     Q. If we look at Exhibit F it does have a
23   May 1 date and its got an estimated cost of repairs
24   on it which is followed by a budget estimate which

34

1   was prepared by Jeff Wolford that has that same
2   number on it. So May 1st you did have some number,
3   right?
4     A. Yeah, I had started the spreadsheet and
5   that's the date that I started working on this.
6   That's a typo that I really finished -- I really
7   finished formalizing it on the 5th, 6th or 7th.
8     Q. Well, I'd like to know your report says
9   that there is an issue to report May 1 that showed
10   direct cost damages of $743,944 as indicated in my
11   budget estimate which is attached as Exhibit F.
12   What are you referring to here? I mean, it's your
13   report, you give me the date and you give me the
14   amount and you say it's attached as Exhibit F.
15   Those are Exhibit F. Can you show me where the
16   743,944 is?
17     A. No, I can't on Exhibit F.
18     Q. Is there a budget estimate that has that
19   number on it somewhere to your knowledge?
20     A. That number would have probably been on
21   the May 1st or May 2 or the May 1st spreadsheet or
22   the owner bid sheet. That's been rolled over. So
23   the original budget that I had before the site
24   visit is that number to my best recollection.

35

1     Q. This says on it estimated repair cost
2   detail attached and what's attached to it is this
3   page right here and I don't know.
4     A. These were what I brought in. These were
5   working sheets. This one says April 3rd and once I
6   redefine the work scope these numbers would change
7   the replacement costs and that's how it probably
8   happened. That would be my strong assumption.
9     Q. So then is the estimated repair cost in
10   your opinion $743,944?
11     A. That's correct.
12     Q. Not a million forty-six?
13     A. That is for the specific scope of the
14   tenant build-out or replacement for the tenant
15   improvements only.
16     Q. So I wouldn't find any document dated May
17   1 that has a $743,944 number on it?
18     A. I don't believe so.
19     Q. Were you aware what Sports Authority was
20   using these numbers or you were providing them for?
21     A. Yes.
22     Q. What did they tell you they needed them
23   for?
24     A. If the replacement cost, the true

36

9 (Pages 33 to 36)

1  replacement cost exceeded 35 percent there was a
2  lease -- there was a possible lease that could be
3  broken.
4      Q.  Did they express to you that it was their
5  desire to get out of this lease?
6      A.  Yes, they did.
7      Q.  Who told you that?
8      A.  David Freider.
9      Q.  When did he tell you that?
10     A.  This was probably a couple of months after
11 the fact.
12     Q.  What's the fact?
13     A.  Well, March, March 27 -- my understanding
14 originally because I didn't have the lease in the
15 beginning was that where they were going back in,
16 back into the store but I thought it was more of an
17 insurance thing at that time.
18     Q.  When did you become aware that that
19 changed?
20     A.  I don't recall the dates on that.
21     Q.  Prior to your final estimate?
22     A.  I knew about that prior to the final
23 estimate I believe.
24     Q.  Based on Exhibit 7 you knew about that

37

1  March 27th, didn't you, that that was the threshold
2  of the lease?
3      A.  That was the threshold of the lease.
4      Q.  You didn't know they were trying to get
5  out of it at that time?
6      A.  Or what their intentions were.
7      Q.  Fair enough.  This Exhibit F which is
8  attached to your report the second page of which is
9  called a budget estimate you prepared that
10 document, correct?
11     A.  This looks like one of mine, yes.
12     Q.  That would have been completed if it was
13 done prior to May 1 before you ever saw or visited
14 the site, is that correct?
15     A.  That would have been done after.  That May
16 1 just didn't get changed.  I was on site May 4th.
17     Q.  See this budget estimate contains the same
18 number that's in the May 1 report, the million
19 forty-six so that number coming from the budget
20 estimate would have been done by May 1, would it
21 not have?
22     A.  I don't recall.
23     Q.  This is a Sports Authority Rule 26
24 disclosure pages 112 through 115 which is a letter

38

1  from Mr. Freider to my clients as well as our
2  office whereby he sent to the landlord those very
3  documents which are marked as Exhibit F in your
4  report together with the budget estimate, okay?
5      A.  Yes.
6      Q.  That letter is dated May 3rd so clearly
7  what we see as Exhibit F was done by you sometime
8  before your site visit?
9      A.  And I don't recall the exact date.
10     Q.  Would you agree it was done before your
11 site visit?
12     A.  Yes, because that date is May 4th.
13     Q.  In paragraph 14 of your report you talk
14 about the Cotton USA task that you performed?
15     A.  Yes.
16     Q.  Have you ever worked with Cotton before?
17     A.  No, I have not.
18     Q.  You've indicated that some of their work
19 that their certain tasks were directly preserving
20 or removing TSA's inventory and fixtures.  How did
21 you come about what task Cotton performed for
22 salvage and which you would attribute to
23 reconstruction costs?
24     A.  The breakdowns that Cotton USA submitted

39

1  by invoicing.
2      Q.  Can you show me what you're referring to?
3      A.  It's the Cotton invoicing dated 3-31 from
4  Mike Mabell or to Mike Mabell from Jeff Crohn.
5      Q.  How did you go about reviewing those
6  documents to determine that?
7      A.  I called Jeff Crohn directly with Cotton.
8      Q.  What did Mr. Crohn tell you?
9      A.  We went through exactly some of the
10 terminology of these work scopes in each department
11 that they did.
12     Q.  When you're talking about work scopes
13 you're talking about their contract and what they
14 were to do?
15     A.  Exactly.
16     Q.  How did you assign any -- the labor is
17 just shown with a name and the hours and rates?
18     A.  I had to define some of his terminology as
19 far as disaster or recovery or emergency, what was
20 emergency what was for example, glass extraction,
21 shard extraction from the finishes.
22     Q.  How do you do that with this document?
23     A.  What I did was I just went by line item
24 and I made sure it wouldn't be part of my number of

40

1  the 743 number and some change number. Temporary
2  protection, shoring, anything he did.
3    Q.  That's by going through this contract?
4    A.  Yes.
5    Q.  How did you assign a cost to that from
6  Cotton's $319,000?
7    A.  I didn't include it into my replacement
8  cost. Mine was for new construction, some
9  selective demolition and the immediate damages that
10  would be a subcontractor cost, not an emergency or
11  hazard removal type company or scope.
12    Q.  Why don't you go to this page which is the
13  last page of Exhibit C.
14    A.  What does that look like? I'm not finding
15  it. Thank you.
16    Q.  Is that your work product?
17    A.  Actually, it is.
18    Q.  Can you explain that to me as to what you
19  were doing or how you went about it?
20    A.  Oh, let's see. This is actually -- I'll
21  put that here. This is how it would look on my
22  computer side bar like that so I pulled it out per
23  the line item. If you go across the scopes I had
24  pulled it out 80 percent performed by Cotton for
                                              41

1    demolition site, for example. It was selective,
2  small portions of demolition in the say drywall
3  finish that they performed according to Jeff Crohn.
4    Q.  So we're looking at this spreadsheet and
5  that says dated 4-3-06, revised 5-7, correct?
6    A.  Yes.
7    Q.  And you're looking at line item number two
8  selective demolition, balance of damage?
9    A.  Yes.
10    Q.  It says budget estimation $28,600 on the
11  table?
12    A.  Yes.
13    Q.  And then you're saying that if you were to
14  continue to the right on that spreadsheet and it
15  would say 80 percent Cotton?
16    A.  Yes.
17    Q.  And then $22,880?
18    A.  Yes, as a proration.
19    Q.  What does that mean to me?
20    A.  Wherever there was overlap in what I would
21  consider more of a straight construction cost that
22  was in my number I took that out and prorated it as
23  a percentage.
24    Q.  So you're saving your estimate of 28,600,
                                              42

1    80 percent of that was done by Cotton?
2    A.  Yes.
3    Q.  And Cotton charged 22,884 or that's just
4  80 percent of that number?
5    A.  That's just my math out of that number.
6    Q.  So you did not in looking at the documents
7  that Cotton sent with their billing which includes
8  a spreadsheet of all the materials, a spreadsheet
9  on all the labor, a spreadsheet on all the
10  equipment rental, you didn't go to those costs and
11  say these costs are attributable to repair and
12  replacement?
13    A.  What I did when I talked to Mr. Crohn with
14  Cotton is out of my budget, out of my budget and
15  what I thought the work was worth take out those
16  percentages.
17    Q.  So if we do that -- again, I don't know if
18  these line up but when you get down to line item 30
19  on your spreadsheet, and I guess it wouldn't be 30
20  and it would be the line below that total. Do you
21  see where I'm at?
22    A.  Yes.
23    Q.  That's the 743,00?
24    A.  Yeah.
                                              43

1    Q.  Would across from it be Cotton total
2  against WRB budget?
3    A.  That's what it means, yes, whether it
4  lines up with that number or not.
5    Q.  So based on your assigning these
6  percentages off of your budget to the work Cotton
7  did you concluded that $118,211.01 of your total
8  budget estimate was performed by Cotton?
9    A.  At that time, yes.
10    Q.  And at what time was that?
11    A.  I want to make sure you're looking at the
12  same spreadsheet I am.
13    Q.  This is 5-7.
14    A.  I have 4-3 here.
15    Q.  If you look that's the original date but
16  it's revised.
17    A.  Oh, I'm sorry, yes.
18    Q.  Would 4-3 be an indication that's the
19  first time you put together the spreadsheet?
20    A.  Yeah.
21    Q.  That date stayed the same on whatever
22  draft you had?
23    A.  Yeah, at times. I never thought it would
24  be a legal matter so I wasn't real -- every time I
                                              44

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1  entered it I might change the date when I had new
2  information or more finite or more detailed
3  information.
4      Q.  I'm trying to get an understanding of what
5  you did with the Cotton work because originally in
6  your original estimate of the cost of repairs you
7  had $319,000 for Cotton in that total, correct?
8      A.  That's correct.
9      Q.  And are you saying that you don't include
10 any of that now or did you subtract some of it or
11 how did you account for what you attribute that to
12 be?
13     A.  I left it because it was true replacement
14 cost that would be new or remodel construction.
15     Q.  So that's an actual cost.  You got an
16 actual cost, you ought to use an actual cost?
17     A.  That's correct.
18     Q.  To the extent you had actual costs you
19 would use them in your budget estimate?
20     A.  Yes, to the best of my knowledge knowing
21 the product as I do.
22     Q.  Would it be a fair characterization that
23 the $743,944 includes $118,211 of actual cost by
24 Cotton in it, is that fair?
                                                45

1  28,600 Cotton did 80 percent of that?
2      A.  That was a question to Jeff because 80
3  percent of it was completed per the site visit. It
4  was a question for him and he answered my
5  questions.
6      Q.  There's no doubt your opinion is that all
7  of the $319,000 bill from Cotton is not
8  attributable to the replacement cost at the
9  facility?
10     A.  Yes.
11     Q.  This sheet that shows the 118,211 would be
12 a fair estimate you've arrived at as to how much of
13 their work would have been considered in the scope
14 of the estimate you prepared for the replacement
15 and repair costs?
16     A.  Those were questions to identify with Jeff
17 and I had already put together those numbers before
18 I talked to him just in case. That's a working
19 sheet that you see. It's kind of a work in
20 progress.
21     Q.  I take it then it's still a work in
22 progress for you. You haven't finalized these
23 numbers?
24     A.  No. I have finalized the numbers.
                                                47

1      A.  At the time I had the conversation with
2  Jeff Crohn that was what I thought at that time.
3  I'd have to re-look at my numbers and take a look
4  at it.
5      Q.  To be sure you don't take the $743,944 and
6  then add to it the 118,211?
7      A.  That was kind of a working spreadsheet
8  here so that cost I'd have to revisit that, but I
9  believe I left it in there because it was a true
10 cost and/or those were specific. And this could be
11 it, too when I talked to Jeff I had questions for
12 him because I saw what work in place had been done,
13 did he do that work because that side bar list is a
14 working sheet and those are things I do and keep on
15 rolling over changing those dates. And that is --
16 my true assessment is the 743 after talking to
17 Cotton, but these were questions. It's more
18 questions, was this work completed by Cotton. How
19 much was, you know, if so I would have probably
20 changed it and in fact I know I would have.
21     Q.  What I'm trying to get an understanding of
22 is these working numbers as you described them what
23 would be on the far right are numbers that are
24 actually within this 743,000? For instance, the
                                                46

1      Q.  Where do I see those finalized numbers?
2      A.  That was 743.
3      Q.  Paragraph 16 of your report and it's on
4  page five, you say you've concluded that
5  Mr. Sorenson's report cannot be considered as a
6  reliable budgeting evaluation. Do you see that
7  statement?
8      A.  Yes.
9      Q.  You would agree that his report is the
10 actual costs incurred to make the repairs that were
11 made?
12     A.  No. I didn't believe that to be the case.
13     Q.  Why didn't you believe that to be the
14 case?
15     A.  Because the closeout documentation for
16 final payment or paying finals to all the
17 subcontractors I felt was incomplete as I've put
18 together a couple hundred of these sworn statements
19 and the paperwork was incomplete or it was based on
20 final lien waivers. If there was a final lien
21 produced it was final lien waivers against invoices
22 only, not a paid in full type of scenario.
23     Q.  Let me say this, in paragraph 17 you say
24 his report appears to outline actual repair and
                                                48

12 (Pages 45 to 48)

1  construction costs. You'd agree with that?
2     A. Yes, that's what it does.
3     Q. So in paragraph 16 when you say reliable
4  budgeting evaluation Mr. Sorenson never purported
5  to present his report as a budget. It was
6  presented as actual costs?
7     A. That's true. Those were to be final
8  costs.
9     Q. In paragraph 18 you state that you have an
10  understanding of the lease that the tenant has the
11  option to terminate the lease by reason of casualty
12  to be exercised within 60 days of the casualty.
13  How did you get that understanding of the lease?
14     A. That was explained to me.
15     Q. You're not offering any interpretations of
16  the lease document, are you?
17     A. No.
18     Q. Now, flipping to paragraph 19 on the next
19  page. This is what I think you just elaborated on,
20  that the error in Mr. Sorenson's report is that
21  there was no backup information provided to his
22  cost reports?
23     A. Final closeout documentation that would be
24  final lien waivers for all costs, material waivers,
         49

1  final material waivers and sworn statements.
2     Q. Have you seen these now? They were
3  produced by Mr. Sorenson Monday at his deposition.
4     A. No, I have not seen those.
5     Q. Has it been indicated to you that you'll
6  be asked to review those to see if they match up?
7     A. Not at this time.
8     Q. If they do match up then you would not
9  have any criticism of his report as being in error
10  based on the lack of that documentation?
11     A. I would have to see the reports.
12     Q. I'm asking you to assume that the lien
13  waivers and the reports that are provided do and
14  are consistent with his cost report he gave.
15  That's your only error or criticism of it at this
16  time?
17     A. That's correct.
18     Q. If those match up that criticism goes
19  away, fair statement?
20     A. It's a fair statement.
21     Q. As you say here you're not suggesting that
22  he failed to include things or included incorrect
23  values. You just said I don't have the information
24  to know?
         50

1     A. I didn't have a complete closeout package.
2     Q. Flipping back to this kind of goes after
3  your resume. You've got a list there of your
4  Sports Authority store locations?
5     A. Yes.
6     Q. Is that just all of them you've done since
7  it looks like the list goes back to '99?
8     A. Yes, that's the list I produced.
9     Q. It says at the top it says, retail project
10  manager and estimator. There's a difference
11  between an estimator and project manager, right?
12     A. There can be.
13     Q. You were doing both jobs?
14     A. I was always doing both projects, yes,
15  both sides.
16     Q. When you say estimator that's exactly what
17  it says you try to estimate what it will cost?
18     A. That is correct.
19     Q. That is different in fact than a bid,
20  would it not be?
21     A. No, it's the same thing.
22     Q. When you use the term an estimate it's the
23  same as a bid?
24     A. An estimate is the same as a bid, yes.
         51

1     Q. Are you familiar that some contractors
2  would have an estimator and they would do an
3  estimation of the job and then the owner gets to
4  look at that and say here's what our estimator says
5  but depending on whether work is slow or not slow
6  we may raise it or we may even lower it?
7     A. We're still talking about the general
8  contractor, the owner of the general contracting
9  firm would review the estimator?
10     Q. Yeah, the principal in the contracting
11  firm. I guess my understanding is you have an
12  estimator who gives an estimate to the guy whose
13  going to decide what the bid is going to be. The
14  bid may be the estimate and it may not be?
15     A. In retail construction the estimator and
16  the project manager because of tenant build-outs is
17  90 percent the same person. They wear both hats.
18     Q. That's the hats you were wearing on these
19  jobs?
20     A. Yes.
21     Q. Now, can you tell me what Exhibit B is to
22  your report?
23     A. It was a spreadsheet, wasn't it?
24     Q. It's the 2001.
         52

13 (Pages 49 to 52)

1    A.  Okay, I'm sorry.  Yeah, 7-26-01.
2    Q.  As I understand this is when Capital
3  Construction Group bid on the job these are the
4  documents?
5    A.  That's what I produced.
6    Q.  That's all of Exhibit B?
7    A.  Yes.
8    Q.  If we go through it looks like maybe to
9  the fifth page of that exhibit which is your July
10  26th?
11    A.  The clarifications?
12    Q.  Yes.
13    A.  Yeah.
14    Q.  You indicated in item number 10 your
15  basing this as an eight week schedule to complete
16  that project?
17    A.  That's correct.
18    Q.  That's based on items three and four just
19  a regular workday, 40-hour work week?
20    A.  That's correct.
21    Q.  So no expedited, no overtime type work?
22    A.  That would be all bought from the subs.
23  Those are always Exhibit B's within a
24  subcontractor's contract.  That was an expedited
                                                    53

1  schedule there as well.  They're typically nine
2  week schedules.
3    Q.  This Exhibit B the spreadsheet that was
4  your actual bid?
5    A.  This is the actual bid.
6    Q.  So that's the firm cost?
7    A.  That was the firm lump sum number.
8    Q.  If that's accepted by the owner they could
9  sign a contract for that number and then they would
10  have the cost they're going to have on the job?
11    A.  Unless there was any unforeseen
12  conditions.
13    Q.  Subject to change orders?
14    A.  Change orders, revisions.
15    Q.  But it would be possible for the owner to
16  have the pretty firm cost absent a change within a
17  scope of the project?
18    A.  Within 95 percent, yeah.
19    Q.  And he wouldn't necessarily have to wait
20  the eight weeks that you're predicting to complete
21  the work to have 95 percent sure what his costs on
22  the job are going to be?
23    A.  Those costs usually come out because they
24  need to be finalized.  Sometimes they're a time and
                                                    54

1  material basis and they might not be addressed for
2  a couple of weeks after the turn, maybe longer.
3    Q.  As you said 95 percent they're going to be
4  firm with the bid?
5    A.  With 95 percent on a typical Sports
6  Authority.
7    Q.  I also notice on that page paragraph or
8  item 14 you when you were with Capital Construction
9  required all the subs to have done a site visit
10  prior to them bidding to you?
11    A.  That's correct.
12    Q.  That's important I take it then to you as
13  a project manager that you know the subs have been
14  out there to see what needs to be done?
15    A.  Yes, confirm deck lengths or stud heights,
16  those type of things for example.
17    Q.  If they didn't do that then their estimate
18  is going to be --
19    A.  They would not receive a contract.  They
20  might not have to do a pre-bid but before they
21  receive a contract that's an unwritten rule for the
22  most part.  They have to do it.  That's my rule.
23  That's kind of my terminology.
24    Q.  That's because you don't want them coming
                                                    55

1  back and saying my estimate is off because I didn't
2  go out and look and now I found something
3  different?
4    A.  And it's requested prior to them bidding,
5  too but I would have confirmed that if I would have
6  awarded a successful general contractor.  They
7  would have had to have done it at that point.
8    Q.  The reason for that?
9    A.  Is to make sure that his price is as solid
10  as possible and that he understands the scope, and
11  that he can order his materials usually for the
12  most part.
13    Q.  If you're just doing an estimate there's a
14  lot of variables that could play into that,
15  correct?
16    A.  Yes.
17    Q.  Not the least of which is actually being
18  on site to see what condition its in, what's going
19  on there, what's going to be required?
20    A.  You want to perform a site visit and you
21  want to have as much documentation as possible to
22  nail down a hard, lump sum number.
23    Q.  Have you ever seen the letter from Mark
24  Sorenson that was giving an estimate of percentage
                                                    56

                                    14 (Pages 53 to 56)

1 damage to the facility?
2    A.  There is a letter that I believe is in the
3 package that resembles this format anyway.
4    Q.  You don't know whether you've actually
5 seen that?
6    A.  It's not specifically that letter but,
7 yes, Jones Blythe a letter format like that. I
8 don't know if it's the same letter.
9    Q.  Were you asked to review that letter to
10 see what you thought of it or offer any opinions
11 about it?
12    A.  Yes.
13    Q.  What were you asked to do?
14    A.  To review it. If it's the same letter.
15    Q.  Do you have any opinions because I did not
16 see any opinions disclosed with respect to that
17 particular letter?
18    A.  I might not have made an opinion whether
19 this was in the package that was provided to me or
20 not. The format looks the same. I don't know if
21 it's the same exact numbers and percentages. Until
22 I had the closeout documents and substantiation
23 that those were the final costs I wouldn't have
24 made a comment on that probably anyway, this
                                                   57

1 could see that the work was performed.
2    Q.  Roof structure 13 percent?
3    A.  I believe that number is light.
4    Q.  You think it was more than that?
5    A.  I believe it's more.
6    Q.  That's based on what?
7    A.  A site visit, knowing what they had to
8 replace such as structural bar joists and such and
9 to substantiate that as the final closeout package,
10 the hard numbers for this job.
11    Q.  The actual costs?
12    A.  The true costs with sworn statements,
13 yeah, that would absolutely do it. That would tell
14 a great deal.
15    MR. ROLF: Why don't we mark that as Exhibit
16 8.
17 BY MR. ROLF:
18    Q.  The letter we've just been talking about
19 we've now marked as Exhibit 8?
20    A.  Okay.
21    Q.  Let me withdraw Exhibit 8. The letter we
22 were just talking about is Exhibit 5. I'm going to
23 show you what's Exhibit 6 and ask if you've seen
24 that before?
                                                   59

1 letter.
2    Q.  You don't have any opinion as to whether
3 his -- I guess you would agree the foundation
4 system sustained no damage?
5    A.  That's correct.
6    Q.  The floor slab sustained no damage?
7    A.  Besides water, no.
8    Q.  Nothing that needed to be repaired as to
9 the floor slab, correct?
10    A.  No, there wasn't structural damage to the
11 substrate.
12    Q.  With regard to the bearing walls he says
13 about seven percent damage. Do you agree or
14 disagree or don't have an opinion on that?
15    A.  I don't have an opinion about the seven
16 percent. The seven percent I wouldn't agree to the
17 seven percent on that masonry wall.
18    Q.  Why not?
19    A.  There was more that was replaced. The
20 seven percent would have been the beam pockets
21 alone on that as to what my understanding of the
22 reconstruction was by the time I hit the site.
23    Q.  So you didn't see it in its damaged state?
24    A.  It was more the repaired state. What I
                                                   58

1    A.  This spreadsheet I'm not familiar with. I
2 don't remember seeing this.
3    Q.  You've not been asked to review that and
4 comment?
5    A.  To the best of my knowledge, no.
6    Q.  Do you have any opinions today as to
7 whether or not the actual cost as reported by Jones
8 Blythe are accurate or fair and reasonable?
9    MR. SCHMADEKE: The actual cost is the middle
10 column labeled as such.
11    MR. ROLF: Correct.
12    THE WITNESS: Actually, this does look
13 familiar. Can I retract that?
14 BY MR. ROLF:
15    Q.  Sure. Do you recall when you first saw it
16 and the circumstances under which you saw it?
17    A.  I saw this yesterday. This is one of the
18 articles I did see yesterday. I thought there was
19 a header up here. I was looking for a title block.
20    Q.  Who were you meeting with yesterday when
21 you reviewed this?
22    A.  I met with Mr. Schmadeke and Douglas
23 yesterday.
24    Q.  Is that the first time you saw this?
                                                   60

15 (Pages 57 to 60)

1    A. That is the first time I saw this.
2    Q. What did they ask you to do?
3    A. Just review the cost.
4    Q. Did you arrive at any opinions or what
5 were your comments after reviewing that?
6    A. It was brief that I looked it over.
7    Q. What were your comments with respect to
8 those costs?
9    A. My first initial -- the big comment I did
10 have, the most important comment that I needed to
11 know is when it is addressed below or not included
12 where were those costs being picked up again. For
13 example, in the fire alarm minor device replacement
14 in electric, minor ACT's which that's correct there
15 were minor ACT -- I'm sorry, electric safe off,
16 that would be an electrical. Protection of the
17 finished materials below. My other comment was the
18 general conditions which is paid for directly by
19 their direct cost for the general contractor. The
20 supervision that's called out supervisory or
21 supervision 4814 and I had a full eight weeks in my
22 number, full eight or ten weeks. Why was it only
23 4841 for full-time supervision.
24    Q. But if the actual cost was 48 -- when you

61

1 say 4841 and I know it's hard for the court
2 reporter and we're talking $4,841. You don't have
3 any argument if that's the actual cost?
4    A. That would not be supervision cost. That
5 would be approximately two weeks of supervision of
6 real cost, maybe two and a half weeks. If it was a
7 union superintendent it could be a week and a half
8 depending on the burden. I believe Jones Blythe is
9 a union general contractor.
10    Q. Any other comments about it?
11    A. I feel the general conditions is way too
12 low and that's called out specifically list items
13 below and it's line item 25 and it's broken out.
14    Q. Correct, but you don't know if that was
15 his actual cost of those items for general
16 condition?
17    A. The general conditions depending on what
18 the true duration of construction is to obtain the
19 certificate of occupancy, all costs to obtain that
20 if that's let's say it's a ten-week project you
21 can't be out there for $900 a week.
22    Q. Where are you looking at there?
23    A. The general conditions of $7,742. If it
24 was an 8 or 10 week duration what the true duration

62

1 of construction was to get the C of O, the
2 certificate of occupancy. You can't be on site for
3 9 or $800 a week. If you add the superintendent
4 that's 12 or 1300.
5    Q. Are you adding general conditions and
6 general supervision?
7    A. Yeah, because that is a general
8 contracting cost.
9    Q. There's two separate line items. One for
10 general conditions and one for supervision?
11    A. The owner -- this is an owner bid sheet.
12 The owner always likes supervision broken out
13 because they want to know what they're paying for
14 that personnel because he's the go-to guy.
15    Q. Exhibit 6 is your spreadsheet, correct?
16    A. This type of spreadsheet -- this type of
17 spreadsheet, yes, it's formatted like a Gart's
18 spreadsheet and that's what they like to see as
19 well. It's been changed from the boiler plated
20 Gart's or Sports Authority spreadsheets because
21 it's more of a specific scope or different scopes
22 that were specific to this project.
23    Q. All these numbers in the first column are
24 numbers that came from a document you prepared

63

1 originally?
2    A. Yes. You're talking about the left
3 column, yes, sir.
4    Q. You came up with those individual items
5 listed?
6    A. Yes, I did.
7    Q. And you came up with the estimates?
8    A. The middle column I didn't come up with
9 and/or the owner side column. Those numbers I
10 didn't come up with.
11    Q. Your numbers are just that they're your
12 estimates?
13    A. Those are my estimates per documentation
14 and site visit.
15    Q. This is marked as Exhibit 2 which we
16 talked a little bit about before. This is
17 evidently Capital Construction Group's July 26,
18 2001 bid?
19    A. That's correct.
20    Q. As I understand this you have material,
21 labor and then the price per square foot and then
22 the total, correct?
23    A. That's correct.
24    Q. To get the total you would add the

64

16 (Pages 61 to 64)

1  material column to the labor column?
2      A.  That's correct.
3      Q.  That would give you your total?
4      A.  That's correct.
5      Q.  Is this a document you prepared when you
6  were working for Capital Construction Group?
7      A.  Yes, it is.
8      Q.  That's the bid you submitted?
9      A.  That is the bid I submitted.
10     Q.  If we go down to where it says item number
11  eight interior mirrors?
12     A.  Yes.
13     Q.  If you add the labor and materials that
14  number is $1,500, not the total reflected of $1400,
15  is that correct?
16     A.  That looks like a typo.
17     Q.  If you go down to number 12 carpet
18  installation?
19     A.  Yes.
20     Q.  If you add the labor and materials there
21  you'd come up with $45,970 rather than the $45,400?
22     A.  If at that time with this spreadsheet we
23  could discount the numbers on the right-hand side
24  it wasn't an automatic, and if I wanted to knock

65

1      Q.  It's going to be over 65?
2      A.  We discounted the numbers and these were
3  square foot numbers is the big number that the
4  owner would look at anyway or unit pricing.  It's
5  the far right-hand corner that would be what the
6  contracts would be written against and/or what
7  they're looking at anyway.  Some of those numbers
8  would be changed later and we were collecting bids
9  at the time and that would be the first low bidder
10  and we're always working the sheet.
11     Q.  So estimates can change as the things go
12  on?  Your original estimate here is a work in
13  progress?
14     A.  Well, this 7-26 date my final numbers are
15  on the right-hand side on the vertical column.  We
16  take bids for two days, 48 hours we'll take bids or
17  prior to that.  And what I do is I keep on working
18  these numbers always and sometimes they might not
19  be reflected for material and labor because I
20  couldn't get that late number I just qualified a
21  number but maybe not got their breakdowns for labor
22  and materials or we're discounting them as well.
23     Q.  It's fair to say these estimates may
24  change what the actual cost to you would be?  The

67

1  off a hundred for mirrors or if I wanted to just
2  tweak a number like was a round number as opposed
3  to going to -- we were prebuying our numbers always
4  on these jobs because we knew we could get the
5  subcontractor to do it for $1400 if he was going to
6  do it for 15 to make our bottom line and the fee on
7  top of that a better number so we would discount
8  our trade numbers.  That's probably where it is.
9  Those were the quotes per square foot price and we
10  would discount the low number, the low qualified
11  bidder.
12     Q.  So if we look at line item 14 plumbing.
13  Do you see those two totals and you decided to
14  discount the plumbing bid by more than $30,000?
15     A.  That is a typo.
16     Q.  That's just wrong?
17     A.  It's just wrong.
18     Q.  And then if you go to 15 the sprinklers
19  and add those numbers together they actually come
20  up to $122,500?
21     A.  And I remember -- let's see, the
22  sprinkler.  Actually, the sprinkler is right.
23     Q.  30,000 plus 34,000 right there is 64,000?
24     A.  Oh.

66

1  actual cost may in fact be lower than your
2  estimates because you have to come in with a bid at
3  a certain point in time and when you get the actual
4  bid from the sub it may be less than you estimated?
5      A.  Well, there's an estimate and there's a
6  hard bid.  This was a hard bid.  As we have three
7  weeks to put a number on these projects.  For any
8  client it's usually a three-week duration so
9  there's a budget, you put together a project
10  management budget and that's how I've always worked
11  and that's how I was taught.  That would be one
12  thing and then when you start getting your hard
13  numbers from your subcontractors you'll take those
14  project manager estimates out and enter a real
15  number.  And sometimes you might not have an actual
16  number but you'll have a PMS that you would still
17  submit and find somebody to do it for it.
18     Q.  I'm showing you what's been marked as
19  Exhibit 3.  I think this is the spreadsheet and
20  that came with that May 1st report we were looking
21  at earlier.  Do you recall that which I think was
22  Exhibit B?
23     A.  Yeah.
24     MR. SCHMADEKE:  I think it's Exhibit C.

68

17 (Pages 65 to 68)

BY MR. ROLF:

Q. Exhibit C to your disclosure. You're right Exhibit B was the 2001. Actually, it's not Exhibit C either because Exhibit C was Cotton. It might be F. It accompanied Exhibit F and then you said you revised that later, is that correct?

A. This is the spreadsheet in Exhibit F.

Q. And then Exhibit 4 is a spreadsheet that's revised 5-7. Do you see that?

A. Yes.

Q. Do you know what the revisions were between those two?

A. I don't recall specifically.

Q. If you compare Exhibit 3 with Exhibit No. 4 your first item on Exhibit 4 is shoring and stabilization, correct?

A. Yes.

Q. So Cotton comes out but it comes back down later but you don't have any architectural engineering in Exhibit 4, correct?

A. That's correct.

Q. Then you're shoring and stabilization went in Exhibit 3 up into Exhibit 4 to 28,000, correct? It was 18,500 in your original or your May 1

69

estimate?

A. That's correct.

Q. And your May 7th is now up to 28,000, correct?

A. That's correct.

Q. Do you know why that is specifically?

A. That was due to the fact that it was a site visit.

Q. So your original estimate then from Exhibit 3 to Exhibit 4 the changes are based on the site visit?

A. Yes.

Q. In Exhibit 3 you've taken out to replace 124 foot structural masonry wall, correct?

A. That's correct.

Q. You've taken out duct work, remove and replace -- no, that's not right. Take out HVAC and repair existing units which would have been between 9 and 10 on Exhibit No. 3?

A. That's correct.

Q. If you go down falling down light fixture only. Then you have light fixtures and you've deleted that from Exhibit No. 4?

A. Number 4 I have electrical safe off.

70

Light fixture installation only. There's two electrical scopes here.

Q. If you look at Exhibit 3 you have electrical safe off, circuit verification. Then you have light fixture installation only which would be items 12 and 13 in Exhibit 4. Then in Exhibit 3 you have light fixtures and materials and you don't include that on Exhibit 4, correct?

A. No, actually I have 12 and 13.

Q. But you don't have anything in Exhibit 4 that says light fixtures?

A. What I had done there that included 50 fixtures. I have 50 fixtures material. It was based on 50 fixtures I could see.

Q. But you've taken it out of Exhibit No. 4?

A. Yes. As a specific line item, yes.

Q. Is it in there anywhere in the costs?

A. In Exhibit 4?

Q. Yeah.

A. That would be line item 13.

Q. Where it says light fixture installation only?

A. 50 fixtures.

Q. Yeah, you're installing 50 fixtures the

71

same as you had on Exhibit No. 3 light fixture installation only, 50 fixtures?

A. I was assuming -- at that time my assumption maybe was the owner always supplies the lights. TSA purchases lighting and maybe that was my assumption or they would reuse all existing.

Q. Do you know?

A. I don't know what happened with that specifically.

Q. In item 14 is paint and then item 15 dismantling sales floor fixtures. Let me go down to flooring materials does not appear in Exhibit No. 4 but it is in Exhibit No. 3. Do you know why that is?

A. That would be more of a lump sum number because it was labor and materials.

Q. But you've got entire flooring installation in both of them but yet in Exhibit No. 3 you have another line item for flooring materials which you've decided to delete. You don't know why you deleted it?

A. I'm not recalling offhand.

Q. If you go down a few more lines where it says millwork and that's deleted as well materials?

72

1    A.   That's the premier euro case package as
2  supplied by the owner, materials only.  That's
3  always supplied by the Sports Authority.
4    Q.   So that came out because it was -- when
5  you say owner you don't mean the landlord, you mean
6  the Sports Authority?
7    A.   The Sports Authority, yes.
8    Q.   You deleted protection of finish
9  materials, you deleted miscellaneous rental
10  equipment and you deleted the contingency from
11  Exhibit No. 4 because those items weren't
12  necessary?
13    A.   After the site visit, no.
14    Q.   Permit, the $4,000 permit was deleted as
15  well?
16    A.   That's correct.
17    Q.   Do you know why that was deleted?
18    A.   There was no re-permitting that I could
19  see or fees for that or that I could substantiate
20  as a number.
21    Q.   Do you know if there was any permit
22  required by the city?
23    A.   I know that a certificate of occupancy was
24  going to have to be reissued for that project to

73

1  have another tenant inside the space.
2    Q.   But in terms of -- is that the permit
3  you're talking about or you're talking about a
4  construction permit to do the work?
5    A.   To do the work I never substantiated if
6  there was a permit pulled.  I know there was an
7  inspection process that had to be done.
8    Q.   How did you arrive at the original $4,000
9  estimate?
10    A.   $4,000 covers 90 percent of the Sports
11  Authority permit.
12    Q.   Then you have in Exhibit No. 3 premium
13  from expedited work which is a number you left out
14  of Exhibit No. 4?
15    A.   Where are you seeing that?
16    Q.   Just above the total line in Exhibit No. 3
17  and I don't think it appears in Exhibit 4.
18    A.   That would be a -- that number was for a
19  surcharge if any night work or any fast track work
20  had to transpire.  And when I hit the site and
21  looked at the scope it doesn't look like they
22  needed any of that at that point.  It was just a
23  number to cover any fast track costs for labor.
24    Q.   As I review Exhibit 3 which was the first

74

1  budget estimate you prepared and this is a budget
2  estimate that TSA sent to the landlord as the basis
3  for their termination of the lease saying it was
4  over the 35 percent threshold?
5    A.   Yes.
6    Q.   There are 12 items which no longer appear
7  in your May 7th of '06 revision.  You don't have
8  any -- you don't disagree with that, do you?
9    A.   I would have to go line item to line item.
10    Q.   But you acknowledge?
11    A.   There were reduced scopes and/or changed
12  scopes.
13    Q.   The other thing I did, Mr. Wolford, was
14  compare your estimate in Exhibit No. 3 which went
15  out under a May 1 report with the revised estimate
16  of May 7th which is Exhibit 4, and as I look at
17  apart from the nine items which are deleted there
18  are 18 of the remaining items that are different
19  and the numbers have changed from Exhibit 3 to
20  Exhibit 4.  Does that sound to be about right to
21  you?
22    A.   I'd have to review it.
23    Q.   Do you know why the numbers would have
24  changed?

75

1    A.   We addressed the scopes, re-qualified the
2  numbers, put another budget number on those scopes
3  or deleted in whole or picked them up in another
4  number.  That's the only reason that would be.
5    Q.   It's fair to say that Exhibit 3 which is a
6  budget estimate is just that, it's an estimate of
7  what you thought might be the scope of the project
8  and what might be the cost to complete that scope
9  of project?
10    A.   To the best of my knowledge per the site
11  visit, per comparable markets, putting numbers and
12  estimates.
13    Q.   Let me correct you because it had nothing
14  to do with the site visit because I'm talking about
15  Exhibit 3 and you had not been there yet, right?
16    A.   Well, I had been to that site prior to
17  that when I bid it the first time.
18    Q.   That was a piece of bare ground, wasn't
19  it?
20    A.   Well, at that point, yeah.
21    Q.   Is that forming any basis of your opinion
22  today?
23    A.   No, not the site visit but in past
24  knowledge.

76

19 (Pages 73 to 76)

1    Q.  Exhibit No. 3 those numbers it's a budget
2  estimate.  It's an estimate of what you thought the
3  scope of the repairs might be and you've assigned
4  an estimate of the cost of those scope of repairs,
5  correct?
6    A.  That's correct.
7    Q.  We know for a fact if my representation is
8  correct, that at least nine of the scopes changed
9  and were deleted from a later estimate you did,
10  correct?
11    A.  I would have to review it but, yes.  There
12  was some pluses and adds, yes.
13    Q.  As I counted and you can check it later if
14  you want, but as many as 18 of these specific
15  numbers differed from your Exhibit 3 to the
16  estimate in Exhibit No. 4?
17    A.  Yes.  I redefined the scopes many times.
18    Q.  I added up the nine things that were
19  deducted and those deductions alone total $245,487
20  out of the $1,046,000 that shows up in Exhibit
21  No. 3.  That's about a little over 23 percent,
22  correct?
23    A.  I don't have a calculator, but is that
24  what it comes up to?
                                                    77

1    Q.  Yeah, 245,000 out of 1,046,000 is just
2  under 25 percent?
3    A.  Right.
4    MR. ROLF:  Do you know if this is in the report
5  somewhere?
6    MR. SCHMADEKE:  I believe it's in his report
7  here and I believe it's part of it, yes.  It's the
8  second to last page of Exhibit C.
9    MR. ROLF:  So that's accompanying with the
10  Cotton material.  Let me just mark this as Exhibit
11  8.
12        (Whereupon, Deposition
13        Exhibit No. 8 was marked for
14        identification.)
15  BY MR. ROLF:
16    Q.  Let me show you what we've marked as
17  Exhibit No. 8.  This shows a date of 4-3-2006 and
18  revised 5-7.  Do you see that?
19    A.  Yes.
20    C.  I take it all of the numbers in this
21  Exhibit 8 are the same as in Exhibit No. 4 other
22  than it looks like you've taken out the Cotton
23  number.  Is that a fair description of the change
24  between the two?
                                                    78

1    A.  Yes.
2    Q.  And is this Exhibit 8 then that you're
3  referring to when you say that it is direct cost
4  damages in paragraph 13 of your written disclosure?
5    A.  Yes.
6    Q.  So it's not $1,046,000. it's the 743,944?
7    A.  Those would include the Cotton costs on
8  top of this number in Exhibit 8.
9    Q.  I guess you lost me when you through in
10  that last part.
11    A.  This is your Exhibit 8.
12    Q.  Right.
13    A.  This is my base construction
14  reconstruction cost and had nothing to do with
15  Cotton's cost.
16    Q.  So some of Cotton's costs are in these
17  numbers the percentages you talked about earlier?
18    A.  Those percentages that was a working
19  side.  I wanted to make sure those numbers weren't
20  in my number because it wouldn't be true to the
21  budget or true to those hard costs.
22    Q.  So you're -- I guess to get an opinion
23  that you're going to give at trial in this matter
24  of a reasonable estimate of the cost of repair to
                                                    79

1  the premises that number is $743,944?
2    A.  That is correct.
3    Q.  That is an opinion you arrived at May 7th
4  or was it after May 7th because we have two of
5  these Exhibit 4 and Exhibit 8 that both show May
6  7th.  When did you decide to take Cotton out of
7  Exhibit No. 4?
8    A.  I don't recall.
9    Q.  And would it be fair to say that Exhibit
10  No. 8 as it describes it as a budget estimation and
11  does not represent any actual costs?
12    A.  That would be fair.
13    MR. ROLF:  Let's mark this as Exhibit No. 9.
14        (Whereupon, Deposition
15        Exhibit No. 9 was marked for
16        identification.)
17  BY MR. ROLF:
18    Q.  Let's take a look at Exhibit No. 9.  Have
19  you ever seen that before?
20    A.  Yes.
21    Q.  When did you see it?
22    A.  I would assume that I read it a couple of
23  days after it was sent or prior.  I don't always
24  read my Emails.
                                                    80

20 (Pages 77 to 80)

1    Q.  I don't want to play tricks on you or
2  anything but it doesn't show you on the service
3  list so I don't want you to assume just because I
4  slowed you an Email that you got it.
5    A.  That's why I didn't -- okay.  Are you
6  asking me to read this?
7    Q.  Yeah, and then I'll give you another
8  chance to correct your answer.  Not that it was
9  incorrect before, you tell me, but have you seen
10  that before?
11    A.  It doesn't look familiar to me.
12    Q.  You had a discussion however with David
13  Freider after your visit to Springfield?
14    A.  Yes.
15    Q.  Did he go with you to Springfield?
16    A.  No.
17    Q.  Did anybody from Sports Authority
18  accompany you there?
19    A.  No.
20    Q.  I saw a lot of Emails about that visit
21  that were disclosed and I never gleaned from the
22  end result whether you had somebody with you or
23  not?
24    A.  It was just me.
                                                    81

1  You testified I believe that the $743,944 was your
2  estimate of the direct reconstruction costs?
3    A.  That is correct.
4    Q.  That doesn't include any costs from
5  Cotton, does it?
6    A.  No.  I pulled those numbers out.  That's
7  correct.
8    Q.  So any part of Cotton costs that would be
9  deemed to be reconstruction would have to be added
10  to that number?
11    A.  That's correct.
12    MR. SCHMADEKE:  I'm going to show him that if I
13  may, David.
14  BY MR. SCHMADEKE:
15    Q.  I'm going to show you a document and take
16  a look at that for me please.  I showed this
17  document to you yesterday, is that correct?
18    A.  That's correct.
19    Q.  Is that the first time you saw it?
20    A.  That's correct.
21    Q.  Could you tell me what this purports to
22  be?
23    A.  Well, it's a second notice to obtain a
24  certificate of occupancy.  It's a status report by
                                                    83

1    Q.  You said that you reported to him an
2  estimate which is attached which is about 17,000
3  more than the original.  Do you know what estimate
4  that is and if we've seen it today?
5    A.  I probably had 15 different spreadsheets
6  on this project and I never changed the date
7  specifically when I changed them.
8    Q.  That's in part because you're working with
9  estimates, the estimate of the scope of the
10  project?
11    A.  Exactly, new information, bits and pieces
12  to finite the number the best I could.
13    MR. ROLF:  I don't think I have anything else.
14    MR. SCHMADEKE:  Can I have just 60 seconds?
15    MR. ROLF:  Sure.
16        (A short break was taken.)
17        EXAMINATION
18  BY MR. SCHMADEKE:
19    Q.  I have just a couple of questions.
20  Mr. Wolford, the number we're talking about on the
21  spreadsheet which is the second to last page of
22  Exhibit C and let me find it here quickly if I
23  may.  I had it marked and I lost my space.  If I
24  can use your Exhibit 8 that would be appreciative.
                                                    82

1  UCI and division, electrical, plumbing, mechanical
2  and life safety.
3    Q.  Essentially it says that certain items
4  haven't been completed, is that correct?  I don't
5  mean to put words in your mouth.
6    A.  That's correct.
7    Q.  And until those items are completed is the
8  reconstruction completed?
9    A.  If they can't occupy and they're in
10  violation here, status of certification, no.  They
11  can't occupy.
12    MR. SCHMADEKE:  Nothing further.
13        FURTHER EXAMINATION
14  BY MR. ROLF:
15    Q.  Let me just follow up on that.  You don't
16  have any idea why what remains to be done or why it
17  wasn't done at that particular point in time, do
18  you?
19    A.  I don't know.
20    Q.  It could be because the tenant said we're
21  not coming back in so rather than go forward the
22  landlord said let's wait and see.  We don't want to
23  do this electrical and do this because we don't
24  know what tenant fixtures are coming in?
                                                    84

21 (Pages 81 to 84)

1    A.  If the construction is not complete --
2    that wouldn't be how I would handle this.  I would
3    want to have all the construction.  It could be
4    occupied immediately because then you can truly --
5    you can truly close the space and close your job.
6    You don't want second notices out.
7    Q.  But you don't know why that second notice
8    came out?
9    A.  Only by the 13 line items called out by
10   three or four divisions here.
11   Q.  Going back to Exhibit No. 8 you say none
12   of Cotton's costs are in this number.  Is that what
13   you testified to?
14   A.  Yes.
15   Q.  As I understood it when we were looking at
16   part of Exhibit C to your report that had this
17   spreadsheet and there was certain work that Cotton
18   performed that was within your scope of work,
19   correct?
20   A.  These notes were completed or I had typed
21   these in because I saw that this work was
22   completed.  I substantiated with Jeff Crohn they
23   were to be in the number.  My understanding is this
24   was just questions for me to ask Jeff.  I still

85

1    Q.  Sure.  Scope of work item two, selective
2    demolition, balance of damage and your estimate of
3    28,600.  The question you had and what you found
4    out is some of the work Cotton was performing fell
5    within what you considered selective demolition,
6    balance of damage, fair statement, within that
7    scope of work?
8    A.  Within that scope of work these are the
9    numbers that they did not perform after further
10   clarification with Cotton.
11   Q.  Did Cotton perform anything that was
12   within selective demolition, balance of damage
13   scope of work?
14   A.  That was substantial enough to change my
15   number, no, or I would have changed it.
16   Q.  I can't line these up.  Can you tell me
17   what other number they might have gone to or I
18   can't do it upside at least.
19   A.  Number 15, dismantling sales floor
20   fixturing only because I see dismantling only.
21   That number I might have revised, but these are
22   what I personally believe absolutely felt was the
23   true budget numbers after talking to -- the true
24   construction, direct construction costs.

87

1    left them because it either couldn't be
2    substantiated and/or I still left it because the
3    work -- this was true construction cost.  There was
4    no overlap.  I still felt that way.  These are work
5    in progresses.
6    Q.  So what I'm getting at is your line item
7    number two selective demolition, balance of
8    damage.  Do you see that?
9    A.  Yes.
10   Q.  That's a scope you've chosen to use?
11   A.  That's my terminology, yes.
12   Q.  You estimate that as being $28,600 on this
13   particular job is your estimate.  Fair statement?
14   A.  That's correct.
15   Q.  Is it not true that what you found out is
16   that some of what Cotton was doing was within what
17   you called selective demolition balance of damage?
18   Some of what they were doing was within that scope
19   as you defined it, fair statement?
20   A.  These are working comments.  That's on
21   every one of these spreadsheets.  This happened to
22   be copied.
23   Q.  I need you to answer my question.
24   A.  Would you please repeat it?

86

1    Q.  Which one did you just refer to?
2    A.  15.
3    Q.  I don't even see it on your earlier one.
4    Is it on Exhibit No. 3 anywhere?
5    A.  Not specifically, no.
6    Q.  Do we have a prior spreadsheet like this
7    before you took out Cotton's numbers?
8    A.  When this was actually produced and
9    against which spreadsheet because I left this on
10   the right side many times was printed, these
11   numbers would not reflect -- these are my final
12   numbers and what I felt the reconstruction cost
13   was.  This could have been done well prior to this
14   final number.  I don't remember the exact date I
15   talked to Mr. Crohn.  There's other columns here
16   with other notes that gets erased.  I update the
17   spreadsheet, but these were my final numbers for
18   this project.  I felt it was true construction
19   related costs, nutshell, but the direct damages.
20   Q.  So that's your estimate?
21   A.  This was my estimate.
22   MR. ROLF:  I don't have anything else.
23   MR. SCHMADEKE:  I would like that document to
24   be an exhibit of the deposition whatever number we

88

22  (Pages 85 to 88)

| | |
|---|---|
| 1  are on and I think it's 9 or 10. | 1  STATE OF ILLINOIS ) |
| 2           (Whereupon, Deposition | 2              ) SS: |
| 3           Exhibit No. 10 was marked for | 3  COUNTY OF C O O K ) |
| 4           identification.) | 4     I, Christine M. Jachimiak, a notary public |
| 5     MR. SCHMADEKE: Mr. Wolford, you have the right | 5  within and for the County of Cook County and State |
| 6  to review your deposition and make sure the court | 6  of Illinois, do hereby certify that heretofore, |
| 7  reporter transcribed everything you said properly | 7  to-wit, on the 30th day of October, 2007, |
| 8  or you can waive that. If you review it, you | 8  personally appeared before me, at 222 North |
| 9  review it and sign it or make changes if you think | 9  LaSalle, Chicago, Illinois, JEFFREY WOLFORD, in a |
| 10 there is an error. Which do you prefer to do? | 10 cause now pending and undetermined in the Circuit |
| 11    THE WITNESS: Does it have to be done today? | 11 Court of Cook County, Illinois, wherein SWPLAZA III |
| 12    MR. SCHMADEKE: It would not be done today. | 12 is the Plaintiff, and TSA STORES, INC. is the |
| 13 It's after she prepares the transcript and then you | 13 Defendant. |
| 14 have a chance to read it over. | 14    I further certify that the said witness was |
| 15    THE WITNESS: I would like a chance to read it | 15 first duly sworn to testify the truth, the whole |
| 16 over. | 16 truth and nothing but the truth in the cause |
| 17       FURTHER DEPONENT SAITH NOT. | 17 aforesaid; that the testimony then given by said |
| 18 | 18 witness was reported stenographically by me in the |
| 19 | 19 presence of the said witness, and afterwards |
| 20 | 20 reduced to typewriting by Computer-Aided |
| 21 | 21 Transcription, and the foregoing is a true and |
| 22 | 22 correct transcript of the testimony so given by |
| 23 | 23 said witness as aforesaid. |
| 24 | 24    I further certify that the signature to the |
| **89** | **91** |
| 1       UNITED STATES DISTRICT COURT | 1  foregoing deposition was not waived by counsel for |
| 2       CENTRAL DISTRICT OF ILLINOIS | 2  the respective parties. |
| 3         SPRINGFIELD DIVISION | 3     I further certify that the taking of this |
| 4  SWPLAZA III,            ) | 4  deposition was pursuant to Notice, and that there |
| 5     Plaintiff,           ) | 5  were present at the deposition the attorneys |
| 6     vs.                  ) No. 06-3177 | 6  hereinbefore mentioned. |
| 7  TSA STORES, INC..       ) | 7     I further certify that I am not counsel for nor |
| 8     Defendants.          ) | 8  in any way related to the parties to this suit, nor |
| 9       This is to certify that I have read the | 9  am I in any way interested in the outcome thereof. |
| 10 transcript of my deposition taken in the | 10    IN TESTIMONY WHEREOF: I have hereunto set my |
| 11 above-entitled cause by Christine M. Jachimiak, | 11 hand and affixed my notarial seal this _____ day |
| 12 Certified Shorthand Reporter, on October 30, 2007, | 12 of _____, 2007. |
| 13 and that the foregoing transcript accurately states | 13 |
| 14 the questions asked and the answers given by me as | 14 |
| 15 they now appear. | 15 |
| 16    _____ | 16    _____ |
| 17       JEFFREY WOLFORD | 17    NOTARY PUBLIC, COOK COUNTY, ILLINOIS |
| 18 SUBSCRIBED AND SWORN TO | 18 |
| 19 before me this _____ day | 19 |
| 20 of _ _____, 2007. | 20 |
| 21 _____ | 21 |
| 22    Notary Public | 22 |
| 23 | 23 |
| 24 | 24 |
| **90** | **92** |

23 (Pages 89 to 92)



1
2          McCorkle Court Reporters, Inc.
              200 N. LaSalle Street Suite 300
3                Chicago, Illinois 60601-1014
4
5     DATE:  November 19, 2007
       HINSHAW & CULBERTSON
6     400 South Ninth Street, Suite 200
       Springfield, Illinois, 62701-1908
7     Attn:  Mr. Charles Schmadeke
8     IN RE: SWPLAZA vs. TSA STORES, INC.
       COURT NUMBER: 06-3177
9     DATE TAKEN: October 30, 2007
       DEPONENT: Jeffrey Wolford
10
       Dear Mr. Schmadeke:
11
       Enclosed is the deposition transcript for the
12    aforementioned deponent in the above-entitled
       cause. Also enclosed are additional signature
13    pages, if applicable, and errata sheets.
14    Per your agreement to secure signature, please
       submit the transcript to the deponent for review
15    and signature.  All changes or corrections must be
       made on the errata sheets, not on the transcript
16    itself. All errata sheets should be signed and all
       signature pages need to be signed and notarized.
17
       After the deponent has completed the above, please
18    return all signature pages and errata sheets to me
       at the above address, and I will handle
19    distribution to the respective parties.
20    If you have any questions, please call me at the
       phone number below.
21
22    Sincerely,
23    Margaret Setina        Christine Jachimiak
       Signature Department        Court Reporter
24

                                                    93

**A**

able
10:13 14:11
26:4 29:13
above-ent...
1:18 90:11
93:12
absent
54:16
absolutely
17:1 32:13
59:13 87:22
accept
23:8
accepted
54:8
accompanied
69:5
accompany
81:18
accompanying
78:9
account
28:1 45:11
accounts
30:22
accurate
11:14 60:8
accurately
90:13
acknowledge
75:10
acoustical
17:8
ACT
61:15
action
18:5
actual
10:10 26:8
45:15,16,16
45:18,23
48:10,24
49:6 54:4,5
59:11 60:7
60:9 61:24
62:3,15
67:24 68:1
68:3,15
80:11
ACT's
61:14

Adams
2:6
add
46:6 63:3
64:24 65:13
65:20 66:19
added
77:18 83:9
adding
63:5
additional
7:23 20:11
93:12
address
4:3,12 93:18
addressed
55:1 61:11
76:1
adds
77:12
adhesive
27:24 28:4
adjustments
33:13
affixed
92:11
aforement...
93:12
aforesaid
91:17,23
ago
18:11 20:18
20:19 27:3
agree
33:18,19
39:10 48:9
49:1 58:3
58:13,16
agreement
1:7 93:14
alarm
17:11 61:13
America
33:12
amount
25:11 26:6
27:21 35:14
and/or
27:9 46:10
64:9 67:6
75:11 86:2
anodized

28:23
answer
81:8 86:23
answered
47:4
answers
90:14
anticipate
7:23
anybody
15:13 81:17
anymore
29:19
anyway
57:3,24 67:4
67:7
apart
75:17
appear
21:11 31:2
72:12 75:6
90:15
APPEARANCES
2:1
appeared
91:8
appears
22:10 48:24
74:17
applicable
93:13
appreciative
82:24
approximated
27:7
approxima...
4:13 27:13
62:5
April
10:3 12:18
36:5
architects
23:10
architect...
14:22 69:19
area
29:5
argument
62:3
arrangements
8:2,3
arrive

30:20 61:4
74:8
arrived
47:12 80:3
article
19:3,4
articles
60:18
asked
4:14 6:4,6
12:9 15:13
18:12,19,20
19:3 20:22
24:6 26:12
50:6 57:9
57:13 60:3
90:14
asking
50:12 81:6
assessment
46:16
assign
40:16 41:5
assigned
77:3
assigning
44:5
assisted
29:14
Associated
33:11
assume
50:12 80:22
81:3
assumed
33:6
assuming
72:3
assumption
28:2 36:8
72:4,6
attached
35:11,14
36:2,2 38:8
82:2
attachment
10:3
Attn
93:7
attorneys
92:5
attributable

43:11 47:8
attribute
39:22 45:11
atypical
16:17
Authority
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,22
20:13,14
22:24 28:10
29:20 31:13
32:17 36:19
38:23 51:4
55:6 63:20
73:3,6,7
74:11 81:17
automatic
28:11 65:24
awarded
56:6
aware
36:19 37:18

**B**

B
3:12 4:4
23:2,18
52:21 53:6
54:3 68:22
69:3
back
9:21 11:16
17:5 22:14
29:17 32:1
37:15,16
51:2,7 56:1
69:18 84:21
85:11
background
14:14
backup
49:21
balance
42:8 86:7,17
87:2,6,12
Bank
1:6
banking
1:9
bar

26:1 41:22
46:13 59:8
bare
76:18
barricades
24:13
barricading
28:19
base
79:13
based
8:6,11 9:14
21:5 30:12
34:13 37:24
44:5 48:19
50:10 53:18
59:6 70:10
71:14
basic
6:9,13 8:12
8:15
basically
15:20 16:8
17:3 19:10
25:8,19
basing
53:15
basis
19:23 20:17
55:1 75:2
76:21
beam
26:1 58:20
bearing
25:23 58:12
beginning
37:15
behalf
22:12
believe
5:13 10:3
18:13 19:16
19:19,22
22:7 31:8
32:17 36:18
37:23 46:9
48:12,13
57:2 59:3,5
62:8 78:6,7
83:1 87:22
best
11:6 35:24

45:20 60:5
76:10 82:12
better
66:7
bid
22:13,19
23:4,8,10
23:16,24
29:7 33:13
35:22 51:19
51:23,24
52:13,14
53:3 54:4,5
55:4 63:11
64:18 65:8
65:9 66:14
68:2,4,6,6
76:17
bidder
66:10,11
67:9
bidding
6:1 22:20
29:6 55:10
56:4
bids
67:8,16,16
big
7:10 13:16
61:9 67:3
biggest
13:24
bill
47:7
billing
43:7
bit
25:16 64:16
bits
82:11
block
60:19
blown
24:14
Blythe
57:7 60:8
62:8
board
27:10
boiler
63:19
bottom

66:6
bought
53:22
box
2:7 7:10
13:16
break
82:16
breakdowns
39:24 67:21
brief
61:6
bring
4:15
broke
17:21
broken
37:3 62:13
63:12
Brooklyn
14:18
Brothers
1:14
brought
36:4
budget
4:24 5:18
6:13 8:11
8:15,17,20
9:5,24 10:4
10:11 18:9
26:6 27:1
29:14,15,23
29:24 34:24
35:11,18,23
38:9,17,19
39:4 42:10
43:14,14
44:2,6,8
45:19 49:5
68:9,10
75:1,1 76:2
76:6 77:1
79:21 80:10
87:23
budgetary
11:4
budgeting
48:6 49:4
build
23:13
Builders

13:15
building
2:5 14:5
16:9 25:3,3
27:16 30:13
31:15 33:19
build-out
7:10,13 13:5
16:18,19
20:8 22:22
36:14
build-outs
52:16
burden
62:8
business
4:3 13:14,21
14:1 15:23
B's
53:23

C

C
17:13 41:13
63:1 68:24
69:2,4,4
78:8 82:22
85:16 91:3
calculations
4:24
calculator
77:23
call
18:15 93:20
called
4:8 38:9
40:7 61:20
62:12 85:9
86:17
calls
11:23
can't
28:5 29:1
35:17 62:21
63:2 84:9
84:11 87:16
87:18
Capital
15:19 22:13
22:16 53:2
55:8 64:17
65:6

carpentry
17:5
carpet
65:17
case
18:5 28:15
47:18 48:12
48:14 73:1
casualty
49:11,12
cause
1:18 90:11
91:10,16
93:12
caused
21:7
ceilings
17:9
CENTRAL
1:2 90:2
certain
19:12 24:9
24:10 39:19
68:3 84:3
85:17
certainty
21:5 30:12
certificate
17:14,16
62:19 63:2
73:23 83:24
certifica...
84:10
Certified
90:12
certify
90:9 91:6,14
91:24 92:3
92:7
chance
81:8 89:14
89:15
change
33:5 36:6
41:1 45:1
54:13,14,16
67:11,24
78:23 87:14
changed
37:19 38:16
46:20 63:19
67:8 75:11

75:19,24
77:8 82:6,7
87:15
changes
33:1 70:10
89:9 93:15
changing
46:15
character...
45:22
charged
43:3
Charles
2:13 11:1
93:7
check
77:13
Chicago
1:21 91:9
93:3
chosen
86:10
Christine
1:18,23
90:11 91:4
93:23
chronolog...
11:20
circuit
71:4 91:10
circumsta...
60:16
city
73:22
clarifica...
87:10
clarifica...
23:23 53:11
cleaning
17:12
cleanup
20:1 24:15
clear
28:23
clearly
39:6
client
13:24 68:8
clients
13:23 39:1
close
85:5,5

closed
23:16
closeout
48:15 49:23
51:1 57:22
59:9
closer
20:19
COCHRAN
2:3
collecting
67:8
column
60:10 63:23
64:3,8,9
65:1,1
67:15
columns
88:15
come
9:13 20:23
31:9 33:1
33:13 39:21
54:23 64:8
64:10 65:21
66:19 68:2
comes
69:18,18
77:24
coming
38:19 55:24
84:21,24
comment
33:4 57:24
60:4 61:9
61:10,17
comments
61:5,7 62:10
86:20
company
1:5,14 22:16
41:11
comparable
29:23 76:11
compare
69:14 75:14
compensated
7:15,17,18
7:20
compensation
7:21,24
compiled

31:10,13
complete
51:1 53:15
54:20 76:8
85:1
completed
15:1 25:12
26:3 38:12
46:18 47:3
84:4,7,8
85:20,22
93:17
components
28:9
comprehen...
29:24
computer
41:22
Computer-...
91:20
concluded
44:7 48:4
concrete
17:5,8
concur
33:15,17
concurred
32:10
concurrently
20:2
condition
25:5 27:22
56:18 62:16
conditions
17:15 54:12
61:18 62:11
62:17,23
63:5,10
confirm
55:15
confirmed
56:5
consider
42:21
considered
47:13 48:5
87:5
consistent
29:13 50:14
construction
5:19 6:9
15:11,16,19

15:20 16:19
16:21 17:3
19:11,14
20:4 21:10
22:13 29:5
33:12 41:8
42:21 45:14
49:1 52:15
53:3 55:8
62:18 63:1
64:17 65:6
74:4 79:13
85:1,3 86:3
87:24,24
88:18
contact
11:2,3
contacted
5:11,14
contained
9:7
contains
38:17
contingency
73:10
continue
42:14
contract
40:13 41:3
53:24 54:9
55:19,21
contracting
52:8,10 63:8
contractor
13:16,17
14:6 22:17
52:8 56:6
61:19 62:9
contractors
33:12 52:1
contracts
67:6
control
24:16
conversation
46:1
conversat...
12:17
Cook
1:19 91:5,11
92:17
copied

86:22
copy
10:4,12,13
23:3,4
corner
67:5
Corporation
1:15
correct
5:4 7:6,8
8:8 12:12
12:16 13:7
24:4,7 28:5
29:18 31:18
32:13 34:12
36:11 38:10
38:14 42:5
45:7,8,17
50:17 51:18
53:17,20
55:11 56:15
58:5,9
60:11 61:14
62:14 63:15
64:19,22,23
65:2,4,15
69:6,16,20
69:21,23
70:2,4,5,14
70:15,20
71:8 73:16
76:13 77:5
77:6,8,10
77:22 80:2
81:8 83:3,7
83:11,17,18
83:20 84:4
84:6 85:19
86:14 91:22
corrections
93:15
corresponded
11:12
correspon...
10:16,23
11:9
cost
5:19,19 6:7
8:21 20:24
21:6,9,11
21:17 26:6

30:13,21
31:1,16
32:19 33:4
33:19 34:6
34:8,23
35:10 36:1
36:9,24
37:1 41:5,8
41:10 42:21
45:6,14,15
45:16,16,23
46:8,10
47:8 49:22
50:14 51:17
54:6,10,16
60:7,9 61:3
61:19,20,24
62:3,4,6,15
63:8 67:24
68:1 76:8
77:4 79:3
79:14,15,24
86:3 88:12
costs
11:6 17:14
17:16 29:5
31:12 32:11
32:19,20,21
33:13 36:7
39:23 43:10
43:11 45:18
47:15 48:10
49:1,6,8,24
54;21,23
57:23 59:11
59:12 61:8
61:12 62:19
71:17 74:23
79:7,16,21
80:11 83:2
83:4,8
85:12 87:24
88:19
Cotton
12:5 24:16
24:23 25:1
31:11 39:14
39:16,21,24
40:3,7
41:24 42:15
43:1,3,7,14
44:1,6,8

45:5,7,24
46:17,18
47:1,7 69:4
69:18 78:10
78:22 79:7
80:6 83:5,8
85:17 86:16
87:4,10,11
Cotton's
41:6 79:15
79:16 85:12
88:7
couldn't
67:20 86:1
counsel
4:15 92:1,7
counted
77:13
country
29:10,21
County
1:19 91:3,5
91:5,11
92:17
couple
13:22 21:20
34:19 37:10
48:18 55:2
80:22 82:19
course
8:19 18:1
34:19
court
1:1 62:1
89:6 90:1
91:11 93:2
93:8,23
cover
74:23
coverage
29:7,8
covers
74:10
critical
17:3
criticism
50:9,15,18
Crohn
12:5,13 40:4
40:7,8 42:3
43:13 46:2
85:22 88:15

Crown
15:10,15,19
CSR
1:23
CULBERTSON
2:12 93:5
CULLEN
2:2
curtain
28:15

---

D

D
3:1
damage
6:7 9:18
12:3,8,14
16:3,14
20:13 26:5
31:17 42:8
57:1 58:4,6
58:10,13
86:8,17
87:2,6,12
damaged
58:23
damages
6:10 21:7
34:6,8
35:10 41:9
79:4 88:19
date
5:13 15:8
34:20,23
35:5,13
39:9,12
44:15,21
45:1 67:14
78:17 82:6
88:14 93:5
93:9
dated
1:7 7:4,19
34:4 36:16
39:6 40:3
42:5
dates
37:20 46:15
David
2:4 5:15 7:5
10:24 11:7
11:10,21

18:14 24:19
34:15 37:8
81:12 83:13
day
1:20 17:3
90:19 91:7
92:11
days
34:19 49:12
67:16 80:23
deal
59:14
Dear
93:10
decide
52:13 80:6
decided
66:13 72:20
deck
55:15
deducted
77:19
deductions
77:19
deemed
83:9
Defendant
1:16 2:17
91:13
Defendants
90:8
define
40:18
defined
9:6 18:3
19:6 21:16
86:19
defining
11:5 12:5,8
12:10
definitions
19:4
Delafield
29:11
Delaware
1:15
delete
72:20
deleted
70:23 72:21
72:24 73:8
73:9,10,14

73:17 75:17
76:3 77:9
delivering
4:18
demolition
17:21 25:9
25:15 41:9
42:1,2,8
86:7,17
87:2,5,12
department
40:10 93:23
depending
9:16 52:5
62:8,17
deponent
89:17 93:9
93:12,14,17
deposition
1:17 3:14
4:14 8:6,22
22:1 50:3
78:12 80:14
88:24 89:2
89:6 90:10
92:1,4,5
93:11
describe
13:14
described
6:8,17 16:7
46:22
describes
80:10
description
12:14 78:23
designed
14:21
desire
37:5
detail
36:2
detailed
45:2
details
9:11
determine
40:6
determined
9:17
Development
15:6 20:16

device
61:13
didn't
16:3,12 24:2
26:5 27:2
30:6 33:5
33:11,15
37:14 38:1
38:4,16
41:7 43:10
48:12,13
51:1 55:17
56:1 58:23
64:8,10
81:5
differed
77:15
difference
51:10
different
14:13 29:21
51:19 56:3
63:21 75:18
82:5
direct
14:6 34:5,8
35:10 61:19
79:3 83:2
87:24 88:19
directly
39:19 40:7
61:18
disagree
58:14 75:8
disaster
5:21 40:19
disclosed
57:16 81:21
disclosure
38:24 69:2
79:4
discount
65:23 66:7
66:10,14
discounted
67:2
discounting
67:22
discovery
1:17
discussion
81:12

dismantling
72:11 87:19
87:20
distribution
17:9 93:19
DISTRICT
1:1,2 90:1,2
division
1:3 84:1
90:3
divisions
85:10
document
8:16 12:19
23:18 36:16
38:10 40:22
49:16 63:24
65:5 83:15
83:17 88:23
documenta...
24:1 31:21
48:15 49:23
50:10 56:21
64:13
documents
21:11,13
39:3 40:6
43:6 53:4
57:22
doesn't
74:21 81:2
81:11 83:4
doing
14:4,7 16:2
19:9 22:23
29:21 41:19
51:13,14
56:13 86:16
86:18
don't
4:16 13:14
16:23 18:9
19:22 21:19
22:5,7 25:5
26:19 27:22
31:7 33:2
34:10 36:3
36:18 37:20
38:22 39:9
41:12 43:17
45:9 46:5
50:23 55:24

57:4,8,20
58:2,14,15
59:15 60:2
62:2,14
69:13,19
71:8,10
72:8,21
73:5 74:17
75:7,8
77:23 80:8
80:23 81:1
81:3 82:13
84:4,15,19
84:22,23
85:6,7 88:3
88:14,22
doors
28:8,11
doubt
47:6
Doug
11:2
Douglas
2:19 10:24
18:13,14
60:22
draft
33:10 44:22
drafted
33:9
drawings
23:24
drywall
17:6,7 42:2
duct
70:16
due
19:24 70:7
duly
4:8 91:15
duration
20:5 62:18
62:24,24
68:8

_____
E
_____
E
3:1,12
earlier
68:21 79:17
88:3
East

2:6
education
14:15
educational
14:14
eight
14:12 18:11
53:15 54:20
61:21,22
65:11
either
5:9 6:8
28:14 69:4
86:1
elaborated
49:19
electric
61:14,15
electrical
61:16 70:24
71:2,4 84:1
84:23
Email
6:8,18,19,20
6:24 7:2
8:10 9:14
9:19,20
10:2,7 11:9
11:24 12:1
32:10,10,12
81:4
Emailed
10:11
Emails
4:20 9:22
11:8,19
80:24 81:20
emergency
20:2,17.21
40:19,20
41:10
employee
14:6,7
employers
14:13
enclosed
93:11,12
engineering
69:20
entailed
17:22
enter

68:14
entered
45:1
entire
5:8 27:11
72:17
entry
25:13 28:7
28:10
equipment
17:10 43:10
73:10
erased
88:16
errata
93:13,15,16
93:18
error
49:20 50:9
50:15 89:10
Essentially
84:3
estimate
19:23 20:23
32:24 34:24
35:11,18
37:21,23
38:9,17,20
39:4 42:24
44:8 45:6
45:19 47:12
47:14 51:17
51:22,24
52:12,14
55:17 56:1
56:13,24
67:12 68:5
70:1,9 74:9
75:1,2,14
75:15 76:6
76:6 77:2,2
77:4,9,16
79:24 82:2
82:3,9 83:2
86:12,13
87:2 88:20
88:21
estimated
21:6,10,16
34:23 36:1
36:9 68:4
estimates

64:7,12,13
67:11,23
68:2,14
76:12 82:9
estimation
42:10 52:3
80:10
estimator
51:10,11,16
52:2,4,9,12
52:15
euro
73:1
evaluation
48:6 49:4
evidently
64:17
exact
15:4 39:9
57:21 88:14
exactly
14:24 31:19
40:9,15
51:16 82:11
EXAMINATION
3:2 4:10
82:17 84:13
examined
4:9
example
40:20 42:1
55:16 61:13
exceeded
21:8 37:1
exercised
49:12
exhibit
3:14 8:13,23
12:23 21:21
22:2 23:2
23:18 31:24
32:6,14
33:23 34:22
35:11,14,15
35:17 37:24
38:7 39:3,7
41:13 52:21
53:6,9,23
54:3 59:15
59:19,21,22
59:23 63:15
64:15 68:19

68:22,24
69:2,3,4,4
69:5,7,8,14
69:14,15,20
69:23,23
70:10,10,13
70:19,23
71:3,6,7,8
71:10,15,18
72:1,12,13
72:18 73:11
74:12,14,16
74:17,24
75:14,16,19
75:20 76:5
76:15 77:1
77:15,16,20
78:8,10,13
78:17,21,21
79:2,8,11
80:5,5,7,9
80:13,15,18
82:22,24
85:11,16
88:4,24
89:3
existing
70:18 72:6
expedited
53:21.24
74:13
explain
5:16 41:18
explained
49:14
express
37:4
extent
45:18
extraction
40:20,21
extrapolate
17:23

_____
         F
_____
F
31:24 32:6
32:14 34:22
35:11,14,15
35:17 38:7
39:3,7 69:5
69:5,7

facade
7:11
facility
12:14 47:9
57:1
fact
37:11,12
46:20 51:19
68:1 70:7
77:7
failed
50:22
fair
16:5,13 38:7
45:22,24
47:12 50:19
50:20 60:8
67:23 76:5
78:23 80:9
80:12 86:13
86:19 87:6
fairly
11:14 15:8
falling
70:21
familiar
29:4 52:1
familiarity
29:16
far
8:5 9:15
13:24 16:14.
24:15 40:19
46:23 67:5
fast
74:19,23
fee
66:6
feel
62:11
fees
73:19
feet
27:7
fell
87:4
felt
17:20 20:4
29:23 32:12
48:17 86:4

87:22 88:12
88:18
field
9:17 26:17
26:18
fifth
53:9
file
5:3,9
fill
15:15
final
8:20 9:4,5
17:12 31:13
34:18 37:21
37:22 48:16
48:20,20,21
49:7,23,24
50:1 57:23
59:9 67:14
88:11,14,17
finalized
47:22,24
48:1 54:24
finals
48:16
find
32:7 36:16
68:17 82:22
finding
41:14
finish
17:4 42:3
73:8
finished
25:10 35:6,7
61:17
finishes
25:10,18
40:21
finite
45:2 82:12
fire
17:11 61:13
firm
52:9,11 54:6
54:7,16
55:4
first
4:8 5:11
6:22 10:9
17:2 44:19

60:15,24
61:1,9
63:23 67:9
69:15 74:24
76:17 83:19
91:15
Fisher
15:6 20:16
five
14:23 21:4
27:5 28:16
48:4
fixture
70:21 71:1,5
71:21 72:1
fixtures
25:13,20
39:20 70:22
71:7,11,13
71:13,14,23
71:24 72:2
72:11 84:24
fixturing
87:20
flipping
49:18 51:2
floor
25:10 27:15
27:15,19
58:6,9
72:11 87:19
flooring
25:18 27:19
72:12,17,19
follow
84:15
followed
14:8,10
34:24
follows
4:9
foot
7:12 64:21
66:9 67:3
70:14
foregoing
90:13 91:21
92:1
form
23:4
formalize
29:13

formalized
27:1 30:24
formalizing
34:20 35:7
format
57:3,7,20
formatted
63:17
forming
76:21
forth
18:3
forty-six
36:12 38:19
forward
84:21
found
56:2 86:15
  87:3
foundation
58:3
four
14:17,23
  15:1,21
  17:7 18:2
  25:2 34:2
  53:18 85:10
frame
6:15
Freider
5:15 7:5
  9:21 10:17
  10:24 11:7
  11:12 12:3
  12:11 18:14
  24:19 37:8
  39:1 81:13
front
32:4
full
17:12 48:22
  61:21,22
full-time
61:23
further
3:6 9:17
  84:12,13
  87:9 89:17
  91:14,24
  92:3,7

_____ G _____

Garrett
2:19 10:24
  11:2,3
  18:13,14
Gart
1:13
Gart's
63:17,20
gathered
18:1
gear
17:11
general
17:15 18:21
  24:19 26:20
  33:12 52:7
  52:8 56:6
  61:18,19
  62:9,11,15
  62:17,23
  63:5,6,7,10
generate
32:14
gentleman
26:10
getting
68:12 86:6
give
11:14 35:13
  35:13 65:3
  79:23 81:7
given
4:16 90:14
  91:17,22
gives
52:12
giving
56:24
glass
28:17,24
  40:20
gleaned
81:21
go
4:16 9:22
  24:6 34:16
  34:16 40:5
  41:12,23
  43:10 53:8
  56:2 65:10
  65:17 66:18
  67:11 70:21

72:11,23
  75:9 81:15
  84:21
goes
50:18 51:2,7
going
29:3 37:15
  41:3 52:13
  52:13 54:10
  54:22 55:3
  55:18 56:18
  56:19 59:22
  66:3,5 67:1
  73:24 79:23
  83:12,15
  85:11
good
29:19
Goods
1:14
go-to
63:14
great
59:14
ground
7:11 13:9,10
  13:12 16:10
  22:19 76:18
Group
22:13 53:3
  65:6
Group's
64:17
guess
15:10 18:24
  22:13 43:19
  52:11 58:3
  79:9,22
guy
52:12 63:14

_____ H _____

H
3:12
half
13:22 14:2
  15:21 27:2
  62:6,7
hand
19:1 92:11
handle
85:2 93:18

HANNA
2:2
happened
26:22 36:8
  72:8 86:21
hard
10:12 30:23
  56:22 59:10
  62:1 68:6,6
  68:12 79:21
hats
52:17,18
haven't
47:22 84:4
hazard
41:11
HCI
15:22
header
60:19
heights
4:5 55:15
hereinbefore
92:6
heretofore
91:6
hereunto
92:10
here's
19:1 52:4
he's
4:17 63:14
Higher
14:15
HINSHAW
2:12 93:5
history
29:9 30:1,22
hit
58:22 74:20
hour
1:22
hours
25:2 40:17
  67:16
hundred
48:18 66:1
HVAC
17:9 70:17

_____ I _____

idea

84:16
identific...
8:24 22:3
  78:14 80:16
  89:4
identified
24:9,11
identify
47:16
III
1:4 90:4
  91:11
Illinois
1:2,4,6,9,20
  1:22 2:5,8
  2:15 4:6
  5:24 6:2
  29:22 30:9
  90:2 91:1,6
  91:9,11
  92:17 93:3
  93:6
imagine
18:24
immediate
41:9
immediately
85:4
immobilize
20:4
implosion
6:6 24:14
important
55:12 61:10
improvement
7:13 16:9
  22:21 32:19
  32:20
improvements
16:13 36:15
inch
28:16
include
41:7 45:9
  50:22 71:8
  79:7 83:4
included
17:14 50:22
  61:11 71:12
includes
43:7 45:23
incomplete

48:17,19
incorrect
50:22 81:9
incurred
48:10
indicated
35:10 39:18
  50:5 53:14
indicating
34:5
indication
44:18
individual
64:4
information
6:11 9:17
  11:15,16
  17:24 45:2
  45:3 49:21
  50:23 82:11
initial
8:6 61:9
inside
74:1
inspection
74:7
inspections
17:13
installation
17:7,10
  65:18 71:1
  71:5,21
  72:2,18
installing
71:24
instance
24:2 46:21
Institute
14:17
institution
1:10
insulated
28:17,24
insulation
27:9
insurance
37:17
insure
17:15
intentions
38:6
interested

92:9
interior
13:6 16:24
  65:11
interpret...
49:15
introduction
13:2
inventory
39:20
invoices
48:21
invoicing
40:1,3
involve
16:12
involved
17:19 20:12
  20:20
isn't
33:9
issue
35:9
issued
34:4
item
27:5 40:23
  41:23 42:7
  43:18 53:14
  55:8 62:13
  65:10 66:12
  69:15 71:16
  71:20 72:10
  72:10,19
  75:9,9 86:6
  87:1
items
9:3,8 53:18
  62:12,15
  63:9 64:4
  71:6 73:11
  75:6,17,18
  84:3,7 85:9
it's
6:24 7:4
  11:9 13:18
  15:10 17:18
  27:24 28:1
  28:15 30:12
  35:12,14
  40:3 44:16
  46:17 47:19

47:21 48:3
50:20 51:21
51:22 52:24
56:4 57:6,8
57:14,21
59:5 62:1
62:13,13,20
63:17,19,21
66:17 67:1
67:4,23
68:8,24
69:3 76:5,6
77:1,2 78:6
78:7,7 79:6
79:6 83:23
83:24 89:1
89:13
I'd
31:4,21 35:8
46:3,8
75:22
I'll
41:20 81:7
I'm
6:1,1 7:19
  13:16 27:18
  30:10 32:23
  41:14 43:21
  44:17 45:4
  46:21 50:12
  53:1 59:22
  60:1 61:15
  68:18 72:22
  76:14 83:12
  83:15 86:6
I've
7:10 13:22
  14:11 16:21
  48:17 68:10

                J
Jachimiak
1:19,23
  90:11 91:4
  93:23
Jeff
12:5 35:1
  40:4,7 42:3
  46:2,11
  47:2,16
  85:22,24
Jeffrey

1:17 3:3 4:4
  4:7 90:17
  91:9 93:9
job
6:1 15:2,3
  22:19 24:2
  30:3 52:3
  53:3 54:10
  54:22 59:10
  85:5 86:13
jobs
20:17 51:13
  52:19 66:4
joist
26:1
joists
59:8
Jones
57:7 60:7
  62:8
July
22:15 53:9
  64:17
June
7:19

                K
K
91:3
keep
27:2 46:14
  67:17
kind
9:13 26:4
  46:7 47:19
  51:2 55:23
knew
6:14 37:22
  37:24 66:4
knock
65:24
know
21:15,18,19
  27:11,22
  30:2 31:23
  32:21 33:5
  33:6 35:8
  36:3 38:4
  43:17 46:19
  46:20 50:24
  55:13 57:4
  57:8,20

61:11 62:1
62:14 63:13
69:11 70:6
72:7,8,13
72:21 73:17
73:21,23
74:6 75:23
77:7 78:4
82:3 84:19
84:24 85:7
knowing
29:22 30:22
  45:20 59:7
knowledge
22:9,11
  35:19 45:20
  60:5 76:10
  76:24
known
1:8

                L
labeled
60:10
labor
29:12 40:16
  43:9 64:21
  65:1,13,20
  67:19,21
  72:16 74:23
lack
50:10
landlord
39:2 73:5
  75:2 84:22
LaSalle
1:21 91:9
  93:2
late
67:20
leading
12:9
lease
18:4,5,8,8
  18:12,20,21
  19:1,2,6.7
  19:15 21:11
  21:16 22:10
  34:9 37.2,2
  37:5,14
  38:2,3
  49:10,11,13

left
45:13 46:9
64:2 74:13
86:1,2 88:9
legal
44:24
legends
17:7
lengths
55:15
lesser
25:14
letter
38:24 39:6
56:23 57:2
57:6,7,8,9
57:14,17
58:1 59:18
59:21
let's
41:20 62:20
66:21 80:13
80:18 84:22
level
17:7
Liability
1:5
License
1:24
lien
48:20,20,21
49:24 50:12
life
84:2
light
25:13 59:3
70:21,22
71:1,5,7,11
71:21 72:1
lighting
17:10 72:5
lights
72:5
likes
63:12
Limited
1:4
line
11:15 18:10
27:5 40:23
41:23 42:7

49:16 75:3
43:18,18,20
62:13 63:9
66:6,12
71:16,20
72:19 74:16
75:9,9 85:9
86:6 87:16
lines
19:12 44:4
72:23
list
13:1 46:13
51:3,7,8
62:12 81:3
listed
9:3,8 64:5
listing
23:24
little
26:8 28:6
64:16 77:21
LLC
1:4
LLP
2:12
location
12:4
locations
51:4
log
12:20
long
4:12 19:13
19:17 20:18
longer
20:5 55:2
75:6
look
19:3,4,12
31:4.24
34:22 41:14
41:21 44:15
46:3 52:4
56:2 60:12
66:12 67:4
71:3 74:21
75:16 80:18
81:11 83:16
looked
11:19 61:6
74:21
looking

5:18 7:2
8:15 10:2,7
18:22 27:5
34:1 42:4,7
43:6 44:11
60:19 62:22
67:7 68:20
85:15
looks
6:23 10:2
38:11 51:7
53:8 57:20
65:16 78:22
lost
79:9 82:23
lot
56:14 81:20
low
62:12 66:10
66:10 67:9
lower
52:6 68:1
lucky
14:11
lump
54:7 56:22
72:15

───── M ─────

M
1:19,23
90:11 91:4
Mabell
40:4,4
major
16:18
majority
25:18
management
68:10
manager
51:10,11
52:16 55:13
68:14
March
5:13 6:5,12
6:23 7:4
8:9 9:14,20
21:8 24:19
25:6 30:14
37:13,13
38:1

Margaret
93:23
mark
8:13 21:21
56:23 59:15
78:10 80:13
marked
3:13 8:23
12:23 22:2
39:3 59:19
64:15 68:18
78:13,16
80:15 82:23
89:3
market
15:2,3 29:11
29:12,22
markets
29:9,23
76:11
masonry
26:2 58:17
70:14
Mass
5:21,23
match
50:6,8,18
material
5:2,6 49:24
50:1 55:1
64:20 65:1
67:19 71:13
78:10
materials
43:8 56:11
61:17 65:13
65:20 67:22
71:7 72:12
72:16,20,24
73:2,9
math
43:5
matter
12:24 44:24
79:23
matters
24:9,11
McCorkle
93:2
mean
13:6 33:17
35:12 42:19

73:5,5 84:5
means
6:10 29:7
44:3
meant
30:10
mechanical
84:1
meeting
60:20
mentioned
92:6
met
60:22
metal
17:6
method
11:11
middle
60:9 64:8
Mike
40:4,4
million
36:12 38:18
millwork
25:17 72:24
mind
22:5
mine
38:11 41:8
minor
61:13,14,15
minus
10:6
minutes
21:20
mirrors
65:11 66:1
miscellan...
73:9
missing
11:18
Monday
7:4 50:3
month
8:19 10:6
12:18 18:1
months
18:11 37:10
mouth
84:5
multiple

29:9

**N**

N
3:1 93:2
nail
56:22
name
4:2 40:17
national
1:6 22:17
28:1 30:22
necessarily
54:19
necessary
73:12
need
5:17 31:23
54:24 86:23
93:16
needed
25:18 26:13
27:8 28:21
34:16 36:22
58:8 61:10
74:22
needs
55:14
never
12:19 26:7
30:7 44:23
49:4 74:5
81:21 82:6
new
14:18 16:19
16:21 25:10
25:10 41:8
45:1,14
82:11
newest
11:21
night
17:18,18
74:19
nine
54:1 75:17
77:8,18
nine-week
19:24 20:6
Ninth
2:14 93:6
nonunion

29:10
normally
16:4,8
North
1:21 91:8
NORTHRUP
2:2
notarial
92:11
notarized
93:16
notary
1:19 90:22
91:4 92:17
notes
26:16,17,18
26:23 85:20
88:16
notice
1:22 4:14
55:7 83:23
85:7 92:4
notices
85:6
Novak
15:22
November
1:8 93:5
number
3:13 5:20
6:2 8:20
9:13 30:24
31:8,9,10
31:13,20
32:1,12
33:1,14
34:11 35:2
35:2,19,20
35:24 36:17
38:18,19
40:24 41:1
41:1 42:7
42:22 43:4
43:5 44:4
53:14 54:7
54:9 56:22
59:3 61:22
65:10,14,17
66:2,2,7
67:3,20,21
68:7,15,16
70:24 72:15

73:20 74:13
74:18,23
76:2,4
78:23 79:8
79:20 80:1
82:12,20
83:10 85:12
85:23 86:7
87:15,17,19
87:21 88:14
88:24 93:8
93:20
numbers
6:14 9:16
29:19 30:23
31:11 32:18
36:6,20
46:3,22,23
47:17,23,24
48:1 57:21
59:10 63:23
63:24 64:9
64:11 65:23
66:3,8,19
67:2,3,7,14
67:18 68:13
75:19,23
76:2,11
77:1,15
78:20 79:17
79:19 83:6
87:9,23
88:7,11,12
88:17
nutshell
88:19

**O**

O
17:13 63:1
91:3,3
observe
25:22
observed
28:7
obtain
62:18,19
83:23
occupancy
17:14,17
62:19 63:2
73:23 83:24

occupied
85:4
occupy
84:9,11
October
1:20 90:12
91:7 93:9
offer
57:10
offering
49:15
offhand
6:18 72:22
office
39:2
Oh
41:20 44:17
66:24
okay
39:4 53:1
59:20 81:5
older
15:12
oldest
11:20
once
8:18 36:5
openings
28:13
opinion
24:10 30:12
30:18,19
36:10 47:6
57:18 58:2
58:14,15
76:21 79:22
80:3
opinions
57:10,15,16
60:6 61:4
opportunity
30:6
opposed
66:2
option
49:11
order
32:5 56:11
orders
33:5 54:13
54:14
original

7:18 8:17
9:7,24 10:4
11:4 12:10
23:24 26:23
32:24 35:23
44:15 45:6
67:12 69:24
70:9 74:8
82:3
originally
25:15 26:20
29:6,8,17
37:14 45:5
64:1
ought
45:16
outcome
92:9
outline
8:12 24:19
48:24
overlaid
9:10 10:5
overlap
42:20 86:4
overtime
53:21
owner
17:9 23:4,6
35:22 52:3
52:8 54:8
54:15 63:11
63:11,12
64:9 67:4
72:4 73:2,5
owners
23:15
owner's
23:11

**P**

package
17:10,11
51:1 57:3
57:19 59:9
73:1
packet
15:7
page
23:24 34:2
36:3 38:8
41:12,13

48:4 49:19
53:9 55:7
78:8 82:21
pages
38:24 93:13
93:16,18
paid
48:22 61:18
paint
72:10
painting
17:8
paperwork
48:19
paragraph
18:2 21:4
22:12 24:5
30:11,16
33:23 34:1
39:13 48:3
48:23 49:3
49:9,18
55:7 79:4
parallel
29:11
part
28:11 40:24
55:22 56:12
78:7 79:10
82:8 83:8
85:16
particular
5:3 7:15
8:15 16:12
23:17 57:17
84:17 86:13
particularly
9:8
parties
92:2,8 93:19
partitioning
17:6
path
17:3
paying
48:16 63:13
payment
48:16
pending
91:10
percent
12:1 21:8

27:13 32:24
37:1 41:24
42:15 43:1
43:4 47:1,3
52:17 54:18
54:21 55:3
55:5 58:13
58:16,16,17
58:20 59:2
74:10 75:4
77:21 78:2
percentage
27:11 42:23
56:24
percentages
43:16 44:6
57:21 79:17
79:18
perform
56:20 87:9
87:11
performed
39:14,21
41:24 42:3
44:8 59:1
85:18
performing
30:3 87:4
permit
17:2 73:14
73:14,21
74:2,4,6,11
peropad
25:13
person
52:17
personally
87:22 91:8
personnel
63:14
phone
11:23 12:19
12:21,22
18:15 93:20
photos
9:18,18
17:24
picked
61:12 76:3
piece
76:18
pieces

82:11
place
25:10 46:12
Plaintiff
1:11 2:10
90:5 91:12
plated
63:19
play
56:14 81:1
please
4:2 19:2
32:3 83:16
86:24 93:14
93:17,20
plugged
32:11
plumbing
17:5 66:12
66:14 84:1
plus
10:6 66:23
pluses
77:12
PMS
68:16
pockets
26:1 58:20
point
6:13 9:10
12:19 29:2
56:7 68:3
74:22 76:20
84:17
portions
42:2
position
15:4
possible
37:2 54:15
56:10,21
posted
17:2
pour
17:5
Pratt
14:17
prebuying
66:3
predicting
54:20
prefer

89:10
preliminary
4:23 5:18
8:11
premier
73:1
premises
21:7,9 24:6
24:8 25:6
34:5 80:1
premium
74:12
prepared
35:1 38:9
47:14 63:24
65:5 75:1
prepares
89:13
preparing
12:15
presence
91:19
present
2:19 15:11
15:17 49:5
92:5
presented
49:6
preserving
39:19
pretty
11:24 54:16
previously
4:21 5:1 7:7
pre-bid
55:20
price
56:9 64:21
66:9
pricing
29:20 67:4
primarily
7:10,12
11:13 13:16
13:23
primary
25:21
principal
52:10
printed
88:10
prior

14:4 27:23
37:21,22
38:13 55:10
56:4 67:17
76:16 80:23
88:6,13
probably
35:20 36:7
37:10 46:19
57:24 66:8
82:5
process
11:5 23:9,16
74:7
procure
17:13,16
procured
17:2
produce
15:13,14
33:15 34:17
produced
4:22,23 5:1
5:8 9:2
11:8 29:24
48:21 50:3
51:8 53:5
88:8
product
27:24 41:16
45:21
progress
10:6 47:20
47:22 67:13
progresses
86:5
project
5:3 7:15
10:17 16:12
20:1,7,20
20:23 22:22
23:17 29:6
33:1,6 51:9
51:11 52:16
53:16 54:17
55:13 62:20
63:22 68:9
68:14 73:24
76:7,9 82:6
82:10 88:18
projects
13:1,13 16:1

properly
89:7
prorated
42:22
proration
42:18
Prospect
4:5
protection
28:19 41:2
61:16 73:8
provide
24:10
provided
4:20,23 6:11
7:1 8:11
19:16 28:19
49:21 50:13
57:19
providing
36:20
public
1:19 90:22
91:4 92:17
pulled
41:22,24
74:6 83:6
purchases
72:5
purported
49:4
purports
83:21
purpose
19:14
pursuant
1:22 92:4
put
6:7,14 8:19
18:9 26:5
41:21 44:19
47:17 48:17
68:7,9 76:2
84:5
putting
76:11
p.m
7:5
P.O
2:7

**Q**

quadrisec...
29:1
qualified
66:10 67:20
quasi
16:20
question
22:4 27:18
30:17 47:2
47:4 86:23
87:3
questions
46:11,17,18
47:5,16
82:19 85:24
90:14 93:20
quickly
82:22
quite
25:16
quotes
66:9

**R**

R
2:13
raise
52:6
rates
29:12 40:17
read
19:7 22:6
33:3 80:22
80:24 81:6
89:14,15
90:9
reading
6:18
real
44:24 62:6
68:14
really
35:6,6
reason
19:15 49:11
56:8 76:4
reasonable
21:5 30:12
60:8 79:24
rebuilding
20:12

recall
6:16 29:2
33:2 34:10
37:20 38:22
39:9 60:15
68:21 69:13
80:8
recalling
32:23 72:22
receive
55:19,21
recollection
11:6 35:24
reconstru...
19:13,17,19
21:6,9,17
39:23 58:22
79:14 83:2
83:9 84:8
88:12
record
4:17,17
15:16 22:6
recovery
20:2 24:16
40:19
redefine
24:17 36:6
redefined
8:18 77:17
redistrib...
25:15
reduced
20:10 75:11
91:20
refer
8:14 88:1
referenced
18:4
referring
24:11 35:12
40:2 79:3
reflect
88:11
reflected
65:14 67:19
regard
25:22 27:15
58:12
regular
53:19
reinstall...

25:12,19
reinstalled
25:17,19
reissued
73:24
relate
16:3
related
17:16 33:4
88:19 92:8
reliable
48:6 49:3
relocates
17:12
remaining
75:18
remains
84:16
remember
18:10 29:2
60:2 66:21
88:14
remodel
16:20 17:23
45:14
removal
41:11
remove
70:16
removed
27:17,20
28:2,3
removing
39:20
rental
43:10 73:9
repair
20:24 21:6
21:10,16
28:22 31:16
36:1,9
43:11 47:15
48:24 70:18
79:24
repaired
58:8,24
repairs
34:23 45:6
48:10 77:3
77:4
repeat
16:6 22:4

27:18 30:17
86:24
replace
59:8 70:13
70:17
replaced
25:16,24
26:7,14
27:8 28:23
29:3 58:19
replacement
5:19 6:7,9
8:20 11:5
16:15,17,18
19:11 20:24
29:14 30:13
30:21,23,24
31:11,12
32:11 33:19
36:7,14,24
37:1 41:7
43:12 45:13
47:8,14
61:13
report
7:19 8:6 9:2
12:24 18:2
18:16 19:5
19:21 21:4
23:2 25:21
30:11 31:2
31:5,8 32:1
33:23 34:1
34:4,13
35:8,9,13
38:8,18
39:4,13
48:3,5,9,24
49:5,20
50:9,14
52:22 68:20
75:15 78:4
78:6 83:24
85:16
reported
1:23 60:7
82:1 91:18
reporter
62:2 89:7
90:12 93:23
Reporters
93:2

| | | | | |
|---|---|---|---|---|
| reports | 75:22 77:11 | 84:14 88:22 | 75:3 | 63:21 71:2 |
| 49:22 50:11 | 89:6,8,9 | rolled | says | 75:11,12 |
| 50:13 | 93:14 | 35:22 | 15:10 18:2 | 76:1,2 77:8 |
| represent | reviewed | rolling | 19:5 33:3,5 | 77:17 |
| 80:11 | 18:5,8 19:15 | 46:15 | 35:8 36:1,5 | seal |
| represent... | 21:12 60:21 | roof | 42:5,10 | 92:11 |
| 77:7 | reviewing | 26:4,8,9,11 | 51:9,9,17 | sealed |
| Representing | 40:5 61:5 | 27:12 59:2 | 52:4 58:12 | 23:16 |
| 2:10,17 | revised | roofer | 65:10 71:11 | sealer |
| request | 42:5 44:16 | 26:3,12 | 71:21 72:24 | 17:8 25:11 |
| 23:12 | 69:6,9 | roofing | 84:3 | second |
| requested | 75:15 78:18 | 26:13 | scenario | 38:8 78:8 |
| 56:4 | 87:21 | room | 48:22 | 82:21 83:23 |
| required | revision | 25:4 | schedule | 85:6,7 |
| 55:9 56:19 | 75:7 | rough | 53:15 54:1 | seconds |
| 73:22 | revisions | 17:4 | schedules | 82:14 |
| resembles | 54:14 69:11 | round | 54:2 | secure |
| 57:3 | revisit | 66:2 | Schmadeke | 24:12,13 |
| reside | 46:8 | rubber | 2:13 3:5 | 93:14 |
| 4:4 | re-look | 27:19 | 4:16,19 5:5 | secured |
| residential | 46:3 | rule | 10:19 21:18 | 17:1 28:18 |
| 13:17 | re-permit... | 38:23 55:21 | 25:7 60:9 | 28:18 |
| respect | 73:18 | 55:22 | 60:22 68:24 | see |
| 16:1 57:16 | re-qualified | run | 78:6 82:14 | 15:9 19:10 |
| 61:7 | 76:1 | 12:24 | 82:18 83:12 | 26:4 32:3 |
| respective | right | | 83:14 84:12 | 34:6 38:17 |
| 92:2 93:19 | 14:24 24:3 | ———— S ———— | 88:23 89:5 | 39:7 41:20 |
| response | 30:15 31:16 | S | 89:12 93:7 | 43:21 47:19 |
| 8:9 32:9 | 32:4,5 35:3 | 3:12 | 93:10 | 48:1,6 50:6 |
| result | 36:3 42:14 | safe | school | 50:11 55:14 |
| 21:7 81:22 | 46:23 51:11 | 25:11 61:15 | 14:22 | 56:18 57:10 |
| resume | 66:22,23 | 70:24 71:4 | scope | 57:16 58:23 |
| 15:7 51:3 | 69:3 70:17 | safety | 6:14,16 8:18 | 59:1 60:18 |
| retail | 75:20 76:15 | 84:2 | 9:8 11:5 | 63:18 66:13 |
| 13:15,16,18 | 78:3 79:12 | SAITH | 12:10 24:18 | 66:21 69:9 |
| 22:17 51:9 | 88:10 89:5 | 89:17 | 25:14 26:1 | 71:14 73:19 |
| 52:15 | right-hand | sales | 36:6,13 | 78:18 80:21 |
| retract | 65:23 67:5 | 25:20 72:11 | 41:11 47:13 | 84:22 86:8 |
| 60:13 | 67:15 | 87:19 | 54:17 56:10 | 87:20 88:3 |
| return | Road | salvage | 63:21 74:21 | seeing |
| 93:18 | 4:5 | 39:22 | 76:7,8 77:3 | 60:2 74:15 |
| reuse | Rolf | salvaged | 77:4 82:9 | seen |
| 72:6 | 2:4 3:4,6 | 28:5 | 85:18 86:10 | 50:2,4 56:23 |
| review | 4:2,11 5:2 | saw | 86:18 87:1 | 57:5 59:23 |
| 18:7,12,20 | 5:7 9:1 | 38:13 46:12 | 87:7,8,13 | 80:19 81:9 |
| 18:21 19:2 | 10:21 21:21 | 60:15,16,17 | scopes | 82:4 |
| 21:13 24:8 | 22:8 59:15 | 60:24 61:1 | 6:9,10 9:5 | select |
| 24:9 31:13 | 59:17 60:11 | 81:20 83:19 | 12:6,8 | 25:11,13 |
| 31:21 50:6 | 60:14 69:1 | 85:21 | 17:20 20:9 | selective |
| 52:9 57:9 | 78:4,9,15 | saying | 20:10,11 | 6:7 17:21 |
| 57:14 60:3 | 80:13,17 | 42:13,24 | 24:20 40:10 | 20:9 25:9 |
| 61:3 74:24 | 82:13,15 | 45:9 56:1 | 40:12 41:23 | 25:14 41:9 |

42:1,8 86:7
86:17 87:1
87:5,12
sent
4:14 6:23
9:18 11:16
39:2 43:7
75:2 80:23
separate
63:9
service
81:2
set
18:3 92:10
Setina
93:23
seven
24:5 58:13
58:15,16,17
58:20
shard
40:21
sheet
35:22 46:14
47:11,19
63:11 67:10
sheets
36:5 93:13
93:15,16,18
shelf
17:1
shell
13:10 32:18
32:21
shoring
41:2 69:15
69:22
short
82:16
Shorthand
90:12
show
35:15 40:2
59:23 78:16
80:5 81:2
83:12.15
showed
35:9 83:16
showing
68:18
shown
40:17

shows
47:11 77:20
78:17
side
16:9 28:14
41:22 46:13
64:9 65:23
67:15 79:19
88:10
sidelights
28:13
sides
28:18 51:15
sign
54:9 89:9
signature
91:24 93:12
93:14,15,16
93:18,23
signed
93:16,16
significant
27:21
Sincerely
93:22
sir
12:12 64:3
site
6:6 8:19
9:11,18
12:7 17:2
17:24,24
25:1 26:10
28:19 35:23
38:14,16
39:8,11
42:1 47:3
55:9 56:18
56:20 58:22
59:7 63:2
64:14 70:8
70:11 73:13
74:20 76:10
76:14,16,23
situation
20:21
six
4:13 18:11
22:12
slab
58:6,9
slow

52:5,5
slowed
81:4
small
42:2
solely
11:6
solid
56:9
somebody
68:17 81:22
soon
9:20
Sorenson
49:4 50:3
56:24
Sorenson's
48:5 49:20
SORLING
2:2
sorry
6:1 27:18
30:10 44:17
53:1 61:15
sound
75:20
South
2:14 4:5
93:6
space
6:6 17:1
24:12,12,14
74:1 82:23
85:5
specific
6:3,24 17:20
18:23 25:21
26:1,6,9,20
31:8 36:13
46:10 63:21
63:22 71:16
77:14
specifically
57:6 62:12
69:13 70:6
72:9 82:7
88:5
spelled
26:17
spoke
12:6
Sporting

1:14
Sports
5:20 13:2,19
13:23 14:5
14:8,10
16:4,8,21
20:13,14
22:23 28:9
29:20 31:12
32:17 36:19
38:23 51:4
55:5 63:20
73:3,6,7
74:10 81:17
spreadsheet
11:4 34:15
34:18 35:4
35:21 42:4
42:14 43:8
43:8,9,19
44:12,19
46:7 52:23
54:3 60:1
63:15,16,17
63:18 65:22
68:19 69:7
69:8 82:21
85:17 88:6
88:9,17
spreadsheets
63:20 82:5
86:21
Springfield
1:3 2:8,15
5:20,23 6:2
12:4 16:2
29:5,22
30:7,8,9
81:13,15
90:3 93:6
sprinkler
17:12 66:22
66:22
sprinklers
66:18
square
7:12 27:7
64:21 66:9
67:3
SS
91:2
stabiliza...

69:16,22
stand
17:11
standard
17:4 28:10
28:16,16
Stanley
28:10
start
20:3 68:12
started
17:4 34:14
34:20 35:4
35:5
starting
11:20
state
4:2,19 49:9
58:23,24
91:1,5
statement
16:5,13 48:7
50:19,20
86:13,19
87:6
statements
48:18 50:1
59:12
states
1:1 24:5
29:22 90:1
90:13
status
83:24 84:10
stayed
44:21
stenograp...
91:18
store
5:20 6:2
16:2 17:17
22:14 37:16
51:4
storefront
24:14 28:8
28:13.13,16
STORES
1:13 90:7
91:12 93:8
storm
16:2 20:13
27:16,20

straight
13:12 22:21
  42:21
Street
1:21 2:6,14
  93:2,6
strictly
13:18
strong
36:8
structural
58:10 59:8
  70:14
structure
59:2
stud
55:15
studs
17:6
stuff
23:21
sub
68:4
subcontra...
6:10 29:8
  41:10 66:5
subcontra...
12:6 30:2
  48:17 68:13
subcontra...
53:24
subject
18:4 54:13
submit
31:14 68:17
  93:14
submitted
23:5,10,14
  23:19 39:24
  65:8,9
subs
53:22 55:9
  55:13
SUBSCRIBED
90:18
substantial
29:7 87:14
substantiate
59:9 73:19
substanti...
74:5 85:22
  86:2

substanti...
57:22
substrate
58:11
subtract
45:10
successful
56:6
successor
1:5,13
suggesting
50:21
suit
23:13 92:8
Suite
1:21 2:5,14
  93:2,6
sum
54:7 56:22
  72:15
summary
33:4
supercede
24:18
superinte...
62:7 63:3
supervision
61:20,21,23
  62:4,5 63:6
  63:10,12
supervisory
61:20
supplement
11:24
supplied
17:9 73:2,3
supplies
72:4
surcharge
74:19
sure
9:23 16:7
  21:21 31:7
  40:24 44:11
  46:5 54:21
  56:9 60:15
  79:19 82:15
  87:1 89:6
sustained
34:5 58:4,6
switch
17:11

sworn
4:1,9 48:18
  50:1 59:12
  90:18 91:15
SWPLAZA
1:4 90:4
  91:11 93:8
system
58:4

_____ T _____

T
3:12
table
12:15 42:11
take
13:5 14:23
  19:13,18,19
  20:4 25:9
  43:15 46:3
  46:5 47:21
  55:12 67:16
  67:16 68:13
  70:17 78:20
  80:6,18
  83:15
taken
1:18 26:16
  70:13,16
  71:15 78:22
  82:16 90:10
  93:9
talk
7:14 12:2,13
  24:23 26:11
  39:13
talked
8.2.3 34:15
  43:13 46:11
  47:18 64:16
  79:17 88:15
talking
26:10 27:4
  28:7 29:16
  29:17 40:12
  40:13 46:16
  52:7 59:18
  59:22 62:2
  64:2 74:3,3
  76:14 82:20
  87:23
taping

17:8
task
39:14,21
tasks
39:19
taught
68:11
team
24:16
teams
20:2
tell
9:9,15 16:23
  21:19 25:5
  26:15 28:6
  31:19 36:22
  37:9 40:8
  52:21 59:13
  81:9 83:21
  87:16
temporary
24:13 28:18
  41:1
ten
61:22
tenant
7:12,13 13:5
  16:9 20:8
  22:21 32:19
  32:20 36:14
  36:14 49:10
  52:16 74:1
  84:20.24
tenant's
16:13
ten-week
62:20
term
21:10,15
  22:9 34:8
  51:22
terminate
49:11
termination
75:3
terminology
40:10,18
  55:23 86:11
terms
9:8 18:3
  19:4,5 74:2
testified

4:9 83:1
  85:13
testify
7:24 91:15
testimony
91:17,22
  92:10
Thank
32:9 41:15
that's
5:4 6:22 7:6
  10:9 12:12
  14:24 15:7
  15:12,12
  16:11 19:21
  23:4.13,20
  24:4 26:5,8
  27:24 28:5
  30:10,18,23
  31:6,18
  33:22 34:13
  35:5,6,22
  36:7,11
  38:18 41:3
  43:3,5,23
  44:3,15,18
  45:8,15,17
  47:18 49:2
  49:7 50:15
  50:17 51:8
  51:16 52:18
  53:5,6,17
  53:18,20
  54:6,8
  55:11,12,21
  55:22,23,24
  58:5 59:6
  61:14,20
  62:3,12.20
  63:4.18
  64:19.23
  65:2,4,8
  66:8,16
  68:10,11
  69:8,21
  70:2,5,15
  70:17,20
  72:24 73:1
  73:2,16
  76:4 77:6
  77:21 78:9
  81:5 82:8

83:6,11,18
83:20 84:6
86:10,11,14
86:20 88:20
**thereabouts**
27:14
**thereof**
92:9
**there's**
28:9,12 47:6
51:10 56:13
63:9 68:5,5
68:9 71:1
88:15
**they're**
19:24 28:14
28:15 54:1
54:10,24
55:3 63:13
64:11 67:7
84:9
**thing**
8:14 37:17
51:21 68:12
75:13
**things**
4:15 9:12
19:14 46:14
50:22 55:16
67:11 77:18
**think**
4:24 5:6,23
10:9 19:13
19:17 49:19
59:4 68:19
68:21,24
74:17 82:13
89:1,9
**third**
14:7
**thought**
25:15 26:9
37:16 43:15
44:23 46:2
57:10 60:18
76:7 77:2
**three**
14:12 15:21
15:21 25:2
28:9 31:10
32:24 53:18
68:6 85:10

**three-week**
68:8
**threshold**
38:1,3 75:4
**Thursday**
17:17,18
24:22
**time**
6:14 10:9,19
10:20 11:14
18:10 19:12
20:20 21:2
21:3 27:16
27:20,23
37:17 38:5
44:9,10,19
44:24 46:1
46:2 50:7
50:16 54:24
58:22 60:24
61:1 65:22
67:9 68:3
72:3 76:17
83:19 84:17
**times**
44:23 77:17
88:10
**title**
23:24 60:19
**today**
4:15 5:8
6:21 7:20
7:21 8:7
11:8 26:18
60:6 76:22
82:4 89:11
89:12
**told**
37:7
**top**
11:21 51:9
66:7 79:8
**tornado**
5:22 6:5
21:8
**total**
21:9 30:13
30:24 31:15
31:15 32:11
43:20 44:1
44:7 45:7
64:22,24

**three-week**
65:3,14
74:16 77:19
**totals**
33:18 66:13
**touched**
13:4
**to-wit**
91:7
**track**
74:19,23
**trade**
24:17 29:8
66:8
**transcribed**
89:7
**transcript**
89:13 90:10
90:13 91:22
93:11,14,15
Transcrip...
91:21
**transoms**
28:12
**transpire**
74:20
**trial**
7:24 79:23
**tricks**
81:1
**true**
27:17 36:24
45:13 46:9
46:16 49:7
59:12 62:18
62:24 79:20
79:21 86:3
86:15 87:23
87:23 88:18
91:20
**truer**
24:20
**truly**
24:20 85:4.5
**Trust**
1:7,8
**Trustee**
1:6
**truth**
21:20 91:15
91:16,16
**try**
51:17

**trying**
20:3 38:4
45:4 46:21
**TSA**
1:13 4:20
7:7,9 10:22
20:24 72:5
75:2 90:7
91:12 93:8
**TSA's**
39:20
**turn**
55:2
**turnover**
17:17
**tweak**
66:2
**two**
13:22 14:2
15:23 28:12
42:7 62:5,6
63:9 66:13
67:16 69:12
71:1 78:24
80:4 86:7
87:1
**type**
7:9 16:3
19:14 20:17
22:16 41:11
48:22 53:21
55:16 63:16
63:16
**typed**
85:20
**types**
9:12
**typewriting**
91:20
**typical**
20:8 22:23
55:5
**typically**
54:1
**typo**
34:14 35:6
65:16 66:15

U

**UCI**
84:1
**underground**

**17:6**
**understand**
53:2 64:20
understan...
19:8 37:13
45:4 46:21
49:10,13
52:11 58:21
85:23
**understands**
56:10
**understood**
26:7 85:15
**undetermined**
91:10
**unforeseen**
54:11
**union**
29:10,12
62:7,9
**unit**
26:6 67:4
**UNITED**
1:1 90:1
**units**
70:18
**unnatural**
5:21
**unwritten**
55:21
**update**
88:16
**upgraded**
8:18
**upside**
87:18
**USA**
39:14,24
**use**
45:16,19
51:22 82:24
86:10
**usually**
19:24 20:6
28:14 54:23
56:11 68:8

V

**values**
50:23
**variables**
56:14

various
9:3
verbally
6:8
verification
71:4
version
16:20
vertical
67:15
vestibule
28:11
violation
84:10
visit
8:19 9:11
  12:8 17:24
  35:24 39:8
  39:11 47:3
  55:9 56:20
  59:7 64:14
  70:8,11
  73:13 76:11
  76:14,23
  81:13,20
visited
38:13
vs
1:12 90:6
93:8

W

wait
54:19 84:22
waive
89:8
waived
92:1
waivers
48:20,21
  49:24,24
  50:1,13
walked
26:8
walking
25:2,3,3
walk-through
25:2
wall
17:7 25:23
  28:15 58:17
  70:14

walls
58:12
want
  12:24 31:7
  44:11 55:24
  56:20,21
  63:13 77:14
  81:1,3
  84:22 85:3
  85:6
wanted
  4:19 19:12
  65:24 66:1
  79:19
wasn't
  9:15 26:4
  44:24 52:23
  58:10 65:24
  76:18 84:17
water
  24:15 58:7
waterborne
  27:24
way
  9:9 62:11
  86:4 92:8,9
wear
  52:17
wearing
  52:18
week
  53:15,19
  54:2 62:7
  62:21,24
  63:3
weeks
  19:20 54:20
  55:2 61:21
  61:22 62:5
  62:6 68:7
went
  9:11,16 15:2
  15:3,19,23
  34:15 40:9
  40:23 41:19
  69:22 75:14
weren't
  73:11 79:19
wet
  27:24
we'll
  67:16

we're
  42:4 52:7
  62:2 67:10
  67:22 82:20
  84:20
we've
  59:18,19
  78:16 82:4
whatsoever
  13:17
wnat's
  7:21 14:14
  19:23 36:2
  37:12 56:18
  56:19 59:23
  68:18
Wheeling
  4:5
WHEREOF
  92:10
Wisconsin
  29:11
withdraw
  59:21
witness
  3:2 4:1,4,8
  10:20 21:19
  22:4,7 25:8
  60:12 89:11
  89:15 91:14
  91:18,19,23
Wolford
  1:17 3:3 4:4
  4:7,21 5:4
  5:12 8:22
  13:15 22:1
  35:1 75:13
  82:20 89:5
  90:17 91:9
  93:9
words
  84:5
work
  6:13 7:7,9
  7:11,11,13
  10:6 13:17
  13:18,20
  14:5,8,12
  16:3,7,14
  16:15,17,18
  16:19,20
  17:4 24:17

24:20 29:20
  30:3,5 36:6
  39:18 40:10
  40:12 41:16
  43:15 44:6
  45:5 46:12
  46:13,18
  47:13,19,21
  52:5 53:19
  53:21 54:21
  59:1 67:12
  70:16 74:4
  74:5,13,19
  74:19 85:17
  85:18,21
  86:3,4 87:1
  87:4,7,8,13
workday
  53:19
worked
  14:7 30:7,8
  34:18 39:16
  68:10
working
  20:1 26:2
  29:9 35:5
  36:5 46:7
  46:14,22
  47:18 65:6
  67:10,17
  79:18 82:8
  86:20
worth
  43:15
wouldn't
  10:13 19:1
  29:19 36:16
  40:24 43:19
  54:19 57:23
  58:16 79:20
  85:2
WRB
  44:2
written
  67:6 79:4
wrong
  66:16,17

X

X
  3:1,12

Y

yeah
  13:11 15:12
  26:24 30:16
  32:6,8 34:3
  35:4 43:24
  44:20,23
  52:10 53:1
  53:13 54:18
  59:13 63:7
  68:23 71:19
  71:24 76:20
  78:1 81:7
year
  15:22 27:2
years
  4:13 13:22
  14:2,9,12
  14:17 15:1
  15:21,23
  20:19
yesterday
  60:17,18,20
  60:23 83:17
York
  14:18
you'd
  49:1 65:21
you'll
  50:5 68:13
  68:16
you're
  8:5 10:7
  21:15 24:11
  27:4 29:4
  29:17 40:2
  40:12,13
  42:7,13,24
  44:11 49:15
  50:21 54:20
  56:13 64:2
  69:2,22
  71:24 74:3
  74:3 79:2
  79:22,23
  82:8
you've
  5:8 11:8
  13:2 14:1
  16:7 28:10
  32:4 39:18
  47:12 48:4

| | | | | |
|---|---|---|---|---|
| 51:3,6 57:4 | 36:17 45:23 | **12** | 34:16 | 42:24 47:1 |
| 59:23 60:3 | 46:5 80:1 | 19:20 29:21 | **20** | 87:3 |
| 70:13,16,22 | 83:1 | 30:11,15,16 | 28:14 | |
| 71:15 72:17 | **$800** | 33:23 63:4 | **200** | **3** |
| 72:20 77:3 | 63:3 | 65:17 71:6 | 2:14 93:2,6 | **3** |
| 78:22 86:10 | **$900** | 71:9 75:6 | **2000** | 68:19 69:14 |
| **$** | 62:21 | **12th** | 1:8 | 69:23 70:10 |
| **$1,046,000** | **0** | 6:5 21:18 | **2001** | 70:13,19 |
| 77:20 79:6 | **00-0020** | 30:14 | 22:14 29:17 | 71:3,7 72:1 |
| **$1,500** | 1:9 | **124** | 52:24 64:18 | 72:13,19 |
| 65:14 | **01** | 70:14 | 69:3 | 74:12,16,24 |
| **$1,841,856** | 22:15 | **13** | **2006** | 75:14,19 |
| 30:14 33:22 | **06** | 34:1 59:2 | 5:13 8:10 | 76:5,15 |
| **$1,960,067** | 24:22 75:7 | 71:6,9,20 | 9:14 12:7 | 77:1,15,21 |
| 32:2 33:20 | **06-3177** | 79:4 85:9 | 24:6 30:14 | 88:4 |
| **$118,211** | 1:12 90:6 | **1300** | 34:5 | **3rd** |
| 45:23 | 93:8 | 63:4 | **2007** | 36:5 39:6 |
| **$118,211.01** | **084-004064** | **14** | 1:20 90:12 | **3-31** |
| 44:7 | 1:24 | 20:19 29:21 | 90:20 91:7 | 40:3 |
| **$122,500** | **1** | 39:13 55:8 | 92:12 93:5 | **30** |
| 66:20 | **1** | 66:12 72:10 | 93:9 | 43:18,19 |
| **$1400** | 12:23 33:23 | **15** | **217** | 90:12 93:9 |
| 65:14 66:5 | 34:4,13,14 | 20:19 66:6 | 2:9,16 | **30th** |
| **$22,880** | 34:23 35:9 | 66:18 72:10 | **22** | 1:20 91:7 |
| 42:17 | 36:17 38:13 | 82:5 87:19 | 3:16 | **30,000** |
| **$245,487** | 38:16,18,20 | 88:2 | **22,884** | 66:23 |
| 77:19 | 69:24 75:15 | **15,000** | 43:3 | **300** |
| **$28,600** | **1st** | 27:9 | **222** | 1:21 93:2 |
| 42:10 86:12 | 7:19 32:1 | **1500** | 1:21 91:8 | **34,000** |
| **$30,000** | 35:2,21,21 | 27:7 | **23** | 66:23 |
| 66:14 | 68:20 | **16** | 77:21 | **35** |
| **$319,000** | **1,046,000** | 28:14 48:3 | **245,000** | 21:8 37:1 |
| 41:6 45:7 | 78:1 | 49:3 | 78:1 | 75:4 |
| 47:7 | **1:04** | **17** | **25** | **38** |
| **$4,000** | 7:5 | 48:23 | 62:13 78:2 | 27:13 |
| 73:14 74:8 | **1:30** | **17,000** | **2500** | |
| 74:10 | 1:22 | 82:2 | 7:19,22 | **4** |
| **$4,841** | **10** | **18** | **26** | **4** |
| 62:2 | 3:19 19:20 | 49:9 75:18 | 38:23 64:17 | 3:4 69:8,15 |
| **$45,400** | 53:14 62:24 | 77:14 | **26th** | 69:15,20,23 |
| 65:21 | 70:19 89:1 | **18,500** | 53:10 | 70:10,23,24 |
| **$45,970** | 89:3 | 69:24 | **27** | 71:6,8,10 |
| 65:21 | **102** | **19** | 37:13 | 71:15,18 |
| **$5,000** | 4:5 | 49:18 93:5 | **27th** | 72:13 73:11 |
| 8:5 | **112** | **19th** | 5:13 6:12,23 | 74:14,17 |
| **$7,742** | 38:24 | 10:3 | 6:24 7:4,14 | 75:16,20 |
| 62:23 | **115** | | 8:10,12 | 77:16 78:21 |
| **$743,00** | 38:24 | **2** | 9:14,20 | 80:5,7 |
| 43:23 | **118,211** | **2** | 24:19 38:1 | **4th** |
| **$743,944** | 46:6 47:11 | 35:21 64:15 | **28,000** | 12:7 24:22 |
| 35:10 36:10 | | **2nd** | 69:23 70:3 | 25:6,7,8 |
| | | 24:5,21 | **28,600** | 34:17 38:16 |

39:12
4-3
44:14,18
4-3-06
42:5
4-3-2006
78:17
40,000
7:12
40-hour
53:19
400
2:14 93:6
48
61:24 67:16
4814
61:21
4841
61:23 62:1

___5___
5
59:22
5th
34:18 35:7
5-7
42:5 44:13
69:9 78:18
50
71:12,13,14
71:23,24
72:2
5131
2:7
528-7375
2:16
544-1144
2:9

___6___
6
1:8 59:23
63:15
6th
34:18 35:7
60
49:12 82:14
60-day
19:11
60601-1014
93:3
607

2:6
618
5:20 6:2
62701-1908
2:15 93:6
62705
2:8
64,000
66:23
65
67:1

___7___
7
3:15 8:13,23
37:24
7th
35:7 70:3
75:7,16
80:3,4,6
7-26
67:14
7-26-01
53:1
743
41:1 46:16
48:2
743,000
46:24
743,944
34:11 35:16
79:6
78
3:17

___8___
8
3:15,16,17
21:22 22:2
59:16,19,21
62:24 78:11
78:13,17,21
79:2,8,11
80:5,10
82:24 85:11
80
3:18 41:24
42:15 43:1
43:4 47:1,2
800
2:5
82

3:5
84
3:6
89
3:19

___9___
9
3:18 63:3
70:19 80:13
80:15,18
89:1
90
12:1 52:17
74:10
95
54:18,21
55:3,5
96
15:11
99
51:7

**E-FILED**
Monday, 31 December, 2007  03:40:38 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited<br>liability company, as successor to<br>Illinois National Bank, as Trustee under<br>Trust Agreement dated November 6, 2000<br>and known as Trust No. 00-0020,<br>an Illinois banking institution,<br><br>     Plaintiff,<br><br>v.<br><br>TSA STORES, INC., as successor to Gart<br>Brothers Sporting Goods Company,<br>a Delaware corporation,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:  06-3177 |

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF SANGAMON | ) |

### <u>AFFIDAVIT OF ARTHUR F. SEPPI</u>

ARTHUR F. SEPPI, first being duly sworn, states that he can competently testify on his personal knowledge of the following facts:

1.    Affiant is Manager of Southwest Plaza III, Landlord in this action.

2.    Landlord hired Jones-Blythe to perform reconstruction of the Premises following the March 12, 2006 tornado in Springfield, Illinois.

3.    Landlord, or its insurance company, paid to Jones-Blythe the sum of $321,384.00 for its reconstruction work on the Premises.

4.    Landlord, or its insurance company, paid to the roofing contractor $86,038.00 for its replacement of the roof of the Premises.

{S0565741.1  12/31/2007 DAR MAH}

EXHIBIT
9

5.     Landlord, or its insurance company, paid $18,506.00 for glass and storefront repair.

6.     Landlord, or its insurance company, paid engineering fees of $9,510.00 for the entire plaza, only a portion of which is attributable to the Premises.

7.     Although Landlord was ready, willing and able to, and had a bid, it did not undertake the flooring repair because the floor covering was unique to Sports Authority and Sports Authority terminated the Lease.

FURTHER AFFIANT SAYETH NOT.


_____
ARTHUR F. SEPPI

Subscribed and sworn to before me this 31st day of December, 2007.


_____
Notary Public

```
"OFFICIAL SEAL"
Douglas J. Kent
Notary Public, State of Illinois
My Commission Expires Oct. 25, 2008
```

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois )
limited liability company, as )
successor to Illinois National )
Bank, as Trustee under Trust )
Agreement dated November 6, 2000) )
and known as Trust No. 00-0020, )
an Illinois banking institution,)
Plaintiff )
)
-vs- )NO.06-CV-3177
)
TSA STORES, INC., as successor )
to Gart Brothers Sporting Goods )
Company, a Delaware corporation,)
)
Defendant )

Deposition of MARK A. SORENSEN taken at the instance of the Defendant, on the 22nd day of October, 2007, at 607 East Adams Street, Suite 800, Springfield, Illinois, before Sandra K. Haines, CSR and Notary Public, pursuant to notice.

CSR NO. 084-002423

---

APPEARANCES

SORLING, NORTHRUP, HANNA, CULLEN
AND COCHRAN, LTD.
Attorneys at Law
Suite 800
Illinois Building
P.O. Box 5131
Springfield, Illinois 62705
(217)544-1144

BY:  MR. DAVID A. ROLF
     Appearing on behalf of the Plaintiff

HINSHAW & CULBERTSON
Attorneys at Law
400 South Ninth Street
Suite 200
Springfield, Illinois 62701

BY:  MR. CHARLES R. SCHMADEKE
     Appearing on behalf of the Defendant

POSEGATE & DENES, P.C.
Attorneys at Law
111 North Sixth Street
Suite 200
Springfield, Illinois 62701
(217)522-6152

BY:  MS. CAROL POSEGATE
     Appearing on behalf of Jones-Blythe

EXHIBIT
10

---

Direct Examination by Mr. Schmadeke    4 - 70
Cross Examination by Mr. Rolf ....... 70 - 74

EXHIBITS

Deposition Exhibit Number 1 ......... 14
Deposition Exhibit Number 2 ......... 26
Deposition Exhibit Number 3 ......... 32
Deposition Exhibit Number 4 ......... 38
Deposition Exhibit Number 5 ......... 42
Deposition Exhibit Number 6 ......... 60

---

MARK A. SORENSEN called as a witness herein, at the instance of the Defendant, having been first duly sworn on his oath, was examined and testified as follows, to-wit:

DIRECT EXAMINATION

BY MR. SCHMADEKE:

Q. Mr. Sorensen, my name is Charles Schmadeke, and I represent TSA or also called the Sports Authority in this litigation, and I am going to be asking you a series of questions about what you have done with respect to the premises out at the Southwest Plaza III. I want to forewarn you since I have been in grade school I have been told that I speak very fast. So, please if you don't understand what I am saying, don't hesitate to slow me down, or stop me, or whatever.

A. Okay.

Q. Fair enough. Would you tell me your full name, please.

A. Mark Alan Sorensen.

Q. What is your current business

5

1  address?
2  A. 1030 West Reynolds, Springfield,
3  Illinois.
4  Q. That's with Jones-Blythe?
5  A. Jones-Blythe.
6  Q. Can you please tell me your date of
7  birth?
8  A. 1-18-61.
9  Q. What's your present occupation?
10  A. I am a project manager estimator for
11  Jones-Blythe Construction Company.
12  Q. In a nutshell can you tell me what
13  the duties of that job or the different
14  functions of that are?
15  A. It is really two-fold. Jones-Blythe
16  kind of takes a cradle to grave approach for
17  their projects. So, the engineers estimate
18  the job, bid the job, and then when they are
19  successful in that job, then they manage that
20  through completion. So, you're basically
21  responsible for the entire project from start
22  to finish. I work as an estimator and
23  obviously manager.
24  Q. An estimator you mean specifically?

6

1  A. Quantity take off, detailed work
2  pricing, put the bids together on bid day,
3  submitting the proposal, preparing the
4  proposal.
5  Q. Could you give me a rundown of your
6  educational background?
7  A. I have a Bachelor's Degree from Iowa
8  State University in construction engineering
9  1984. That's essentially it.
10  Q. Any other specialized training in the
11  field that you're currently employed?
12  A. Other than routine updates on safety
13  qualifications, OSHA type training for field
14  work, no.
15  Q. Did you serve any apprenticeships
16  anyplace?
17  A. I worked as a, I was a co-op student
18  while attending college. I worked for Oak
19  View Construction Company out of Red Oak,
20  Iowa, worked there for three years on a
21  project, and only attended school one semester
22  out of the year. It was really a way for me
23  to pay for college.
24  Q. Does your profession require any

7

1  professional licenses?
2  A. No.
3  Q. Are you a member of any professional
4  organizations, associations, societies?
5  A. No. I do have, I mean when I
6  graduated from Iowa State I did take the
7  engineering training exam so I could get my
8  professional license if I ever desired, but I
9  have not taken the professional license exam.
10  Q. How long have you been employed by
11  Jones-Blythe?
12  A. Twenty-three years.
13  Q. Do you have any ownership interest in
14  the company?
15  A. No.
16  Q. How long have you been serving as a
17  project manager estimator?
18  A. That entire time. Obviously they
19  start you out on smaller projects, and you
20  progress to larger projects.
21  Q. Any prior employment experiences
22  before Jones-Blythe?
23  A. Just Oak View Construction where I
24  served my co-op, and then other non-related

8

1  construction project jobs.
2  Q. Have you ever done any work for Mr.
3  Robbins, Mr. Seppi, or any of their business
4  entities other than this particular project?
5  A. No. This is our first project with
6  them.
7  Q. Your first project for you or for
8  Jones-Blythe?
9  A. For Jones-Blythe and me.
10  Q. You rendered some opinions in this
11  matter, is that correct to say, fair to say?
12  A. Yes.
13  Q. Were you informed by anybody what
14  opinion would be most favorable?
15  MR. ROLF: I will object to -- I am
16  not sure I understand the question.
17  Q. If you understand, you can answer.
18  If you don't, I would be glad to explain it
19  further.
20  A. Explain further, please.
21  Q. Did anybody tell you what would be
22  the most favorable opinion as far as they were
23  concerned before you formed your opinion?
24  A. My initial opinion I was asked to

**9**

1    walk through the structure, and evaluate what
2    percentage I thought of damage was done.
3        Q. I am going to get back to that
4    particular thing. In the report that you
5    provided you stated that, and I believe that
6    you were not being paid any more than what you
7    did for the project?
8        A. That's correct.
9        Q. Is that still the case?
10       A. This is still the case.
11       Q. Did you do anything to prepare for
12   your testimony today?
13       A. Yes.
14       Q. What did you do?
15       A. I have reviewed the documents, went
16   back and kind of refreshed my memory as far as
17   what all had happened.
18       Q. What documents have you reviewed?
19       A. I reviewed, of course, the statements
20   that I made, went back and looked at our job
21   cost reports for the project, prepared some
22   back-up information that was requested in the
23   letter for the deposition, made sure that we
24   had all that covered. That's really I

**10**

1    guess -- I went back through e-mails and stuff
2    just refreshing myself. It has been awhile.
3        Q. Did you speak with anybody about your
4    preparation for the testimony?
5        A. Yes.
6        Q. Can you tell me who you spoke with?
7        A. Yes, Carol Posegate, and then also
8    David Rolf.
9        Q. What back-up information did you
10   prepare or bring with you that hasn't
11   previously been given, if you know?
12       A. That would be this packet of the,
13   basically defines the cost as far as certified
14   payroll, lien waivers, all of the things that
15   were noted there on the letterhead. I think
16   that also might even have copies, yes, it has
17   copies of all of our billings.
18       Q. Thank you.
19       A. That's actually your copy, if you
20   want it.
21       Q. Appreciate that. Now, you mentioned
22   earlier that you were asked to do a walk
23   through to give, review the structural damage
24   of the premises. Is that basically correct?

**11**

1        A. Yes.
2        Q. Who asked you to do that?
3        A. Art Seppi.
4        Q. And do you remember when he contacted
5    you?
6        A. No, I do not.
7        Q. Did he contact you, or did somebody
8    else from Jones-Blythe ask you to do it?
9        A. No, he contacted me. Actually I was
10   out at the site. Reconstruction had already
11   started, and he asked me to walk through and
12   look at it.
13       Q. Who was doing the reconstruction at
14   the site?
15       A. We had started preparations to do the
16   reconstruction, although Cotton was also
17   working on site at the same time doing
18   whatever they were doing for Sports Authority.
19       Q. Getting to the reconstruction, that
20   had already started before you went to view
21   the premises?
22       A. Well, sorry.
23       Q. Please.
24       A. I was on site from day one that we

**12**

1    started work. So, but we had already been
2    under way before I was asked to review the
3    structure for the overall project.
4        Q. Did you make any estimates before you
5    started reconstruction?
6        A. No, it was an emergency project, and
7    they just asked us to come out and get going,
8    because we didn't know at the time what the
9    extent of damage was. So, until we got in and
10   started sorting through things we really
11   couldn't put together an estimated bid.
12       Q. Were you serving as project manager
13   on that reconstruction?
14       A. I was serving as everything, yes,
15   project manager, estimator.
16       Q. Do you remember after the tornado of
17   March 12, 2006 when did you first visit the
18   Southwest Plaza?
19       A. I believe it was March 14th.
20       Q. Can you tell me what you observed?
21       A. Yes. Oh, boy, I actually have it in
22   a report, but if you want I could actually
23   give you a copy of this also, but you want me
24   to -- I documented daily when I was out there

13

1    what I was observing, and the process that was
2    under way.
3        **Q.** What I would like you to do is just
4    tell me what you remember, and then we can go
5    through your report.
6        **A.** What I remember was, and of course,
7    we were working both in Gordmans, Bed Bath And
8    Beyond, and Sports Authority.  At Sports
9    Authority there was a lot of activity when I
10   first arrived on site, which was with Cotton
11   dealing with whatever they were dealing with
12   inside, lot of merchandise.  They had some
13   trailers and stuff there.  I assume that they
14   were putting material in, wasn't really my
15   main concern.  In Sports Authority one small
16   section of the roof structure had collapsed.
17   There was some lights hanging from the
18   ceiling.  There was obviously water damage.
19   Some of the glass was missing out of the front
20   entry.  There was some ceiling structural
21   damage, some ceiling grid and tile that had
22   fallen kind of off over on the right-hand
23   side.  There was just a lot of activity by
24   Cotton.

14

1        **Q.** What kind of activity did you observe
2    that Cotton was engaged in at that time?
3        **A.** Looks like they were removing
4    merchandise for the most part.  They were also
5    cleaning up water, other debris.
6        **Q.** If I understand it correctly, Mr.
7    Seppi asked you to do a walk through for the
8    purpose of estimating the damage?
9        **A.** Not at that time.  It was at a later
10   date.
11       **Q.** Do you remember when that was?
12       **A.** Not exactly, it is on my report
13   though.
14           MR. SCHMADEKE:  Let's mark that as
15   One.
16       (Whereupon said document was duly marked,
17       for purposes of identification, as
18       Deposition Exhibit Number One, as of this
19       date.)
20       **Q.** I have given you a copy of what has
21   been marked as Exhibit One.  Do you recognize
22   this document?
23       **A.** Yes.
24       **Q.** Can you tell me what it purports to

15

1    be?
2        **A.** It is my summary of the extended
3    damage at the building, at Sports Authority
4    building.
5        **Q.** It is dated March 29, 2006, is that
6    correct?
7        **A.** Yes, that's correct.
8        **Q.** When you formed, when you prepared
9    this report, did you have an opinion as to the
10   total replacement cost of the premises on the
11   date of the report?
12       **A.** No.
13       **Q.** Now, go through this, and you do have
14   a copy?
15       **A.** Yes.
16       **Q.** I would like to -- it is two columns,
17   building component and then the percent of
18   damage, is that correct?
19       **A.** Correct.
20       **Q.** The foundation system, you observed
21   if I am reading this properly, there was no
22   damage to that, is that correct?
23       **A.** Correct.
24       **Q.** Same with the floor slab?

16

1        **A.** Correct.
2        **Q.** The bearing walls, could you explain
3    what that means, what's written next to the
4    bearing walls?
5        **A.** Yes, there were -- I was looking at
6    the overall.  There was a certain, 124 foot of
7    bearing wall was damaged, and it needed to be
8    repaired, replaced, whatever.  At that point
9    we weren't sure of, but there was a total of
10   97 lineal feet, I believe, in the whole
11   building.  So, I took -- that was just really
12   a percentage, and that bearing wall half of
13   that is Gordmans.
14       **Q.** So, the way you got the 7 percent is
15   970 divided by two?
16       **A.** 124.
17       **Q.** 50 percent for Gordmans, and 50
18   percent for Sports Authority?
19       **A.** Yes.  It is a common wall, and then
20   same for the roof structure was really just a
21   matter of square footage.
22       **Q.** And the roof membrane, explain to me
23   what you observed there.
24       **A.** The roof membrane at the time it

17

1  didn't appear -- it was still raining after
2  the storm there, and it didn't appear to be
3  leaking. But with roof damage it is sometimes
4  hard to tell where, if it is damaged initially
5  because the water gets down into the
6  insulation, runs down the metal deck, and
7  may all be dripping out at the end of the
8  building. At this time we didn't really
9  observe any major leaking except for the
10  obvious small hole in the front of the store.
11  So, we didn't know what the extent of the roof
12  patching was. The roofing contractor had not
13  been up and done an evaluation of it yet.
14  **Q.** Explain to me about the glass and
15  glazing, which you have estimated at this time
16  to be 83 percent, what did you observe about
17  that?
18  **A.** The majority of the store front glass
19  was broken, although the anodized aluminum
20  frames and operators and everything seemed to
21  be okay. It was a matter of the glass itself
22  that was broke.
23  **Q.** The notation you made next to the 83
24  percent says minimum glass cost overall?

18

1  **A.** Overall cost of the project, the cost
2  of the glass and glazing, the minimal for the
3  envelope that we are talking about. So, even
4  though it is a high percentage number, the
5  component is a very small cost in the overall
6  package.
7  **Q.** So, when you observed that 83 percent
8  was damaged of the glass and glazing, is it
9  fair to say then that 17 percent was not
10  damaged?
11  **A.** Yes.
12  **Q.** And can you tell me where that 17
13  percent would have been located?
14  **A.** I don't recall.
15  **Q.** The automatic doors you estimated at
16  10 percent damage, is that correct?
17  **A.** Yes.
18  **Q.** What did you observe about them that
19  made you come up with this estimate?
20  **A.** I observed that there was still a lot
21  of debris in the area in the process of being
22  cleaned up, and I thought that even though
23  they may not need to be replaced, there is
24  going to have to be some cost associated with

19

1  refurbishing them possibly, or having a
2  specialty company come in and rework them, and
3  make sure they work properly. They are
4  sliding glass doors.
5  **Q.** What did you observe about the studs
6  and dry wall to lead you to believe that 25
7  percent of them were damaged?
8  **A.** There is basically four walls in the
9  building. 124 foot of the one wall was
10  damaged structurally. I knew that from the
11  Gordmans side. So, basically 25 percent of
12  the dry wall is one whole wall of that
13  building.
14  **Q.** Tell me what you observed about the
15  painting, which made you estimate it less than
16  30 percent, please.
17  **A.** It was really just lot of the -- it
18  didn't appear that the upper portions of the
19  walls were damaged. The paint would be fine,
20  and it was just down wherever the dry wall
21  patching was going to need to be repaired.
22  So, I knew where you're going to replace 25
23  percent of the dry wall that entire wall would
24  get repainted, and then I threw another 5

20

1  percent in there to cover other miscellaneous
2  patching.
3  **Q.** And the HVAC, what did you observe
4  about that?
5  **A.** Well, the power was off in the
6  building. So, they really couldn't be tested,
7  but the units appeared to be all intact, but
8  until you could really get the gas back on and
9  the power back on, we really couldn't make an
10  evaluation of what the status of those units
11  are.
12  **Q.** RTU stands for what?
13  **A.** Roof top unit.
14  **Q.** So, the notation meaning RTU 20K each
15  if replaced, that's if they needed to be
16  replaced, that would be the replacement cost?
17  **A.** That's about what they cost, yes. I
18  was really just trying to give Art an idea of
19  what that component is.
20  **Q.** Did they look to be damaged to you at
21  all?
22  **A.** They did not appear to be damaged.
23  **Q.** And tell me what you observed about
24  the electrical to come up with your estimate.

21

1    A. At the very front of the store there
2  was a ceiling grid system that some of it had
3  tile in it, some of it didn't, and where this
4  one section of the roof had collapsed that
5  ceiling grid came down with the roof
6  structure, and those light fixtures were
7  damaged.
8    Q. Did you observe anything else about
9  the Sports Authority premises at that time
10  that's not listed on this particular letter?
11    A. As far as pertaining to the damage of
12  the envelope you mean?
13    Q. Yes, let's start with that.
14    A. I would say no. I mean there were
15  some light poles in the parking lot that had
16  gotten knocked over, but I wasn't sure. I was
17  only told to look at the Sports Authority
18  envelope. So, obviously there is related
19  parking and stuff, I guess. So, there could
20  be some light poles that were knocked down.
21    Q. Going back to your notation on the
22  bearing walls, if I am reading this properly
23  it says 7 percent. That's a physical
24  component that's damaged, is that correct?

22

1    A. That's correct.
2    Q. And do you have a cost estimate as to
3  what that would have been to repair on the
4  date of March 29th?
5    A. No.
6    Q. And the same for the roof structure
7  at 13 percent, that's physical damage of 13
8  percent, is that correct?
9    A. That's correct.
10    Q. Do you have a cost estimate on, dated
11  March 29, 2006, what that would have cost?
12    A. No.
13    Q. Going to the glass and glazing at 83
14  percent, that's a physical portion that you
15  have estimated to be damaged?
16    A. Yes.
17    Q. Did you make a cost estimate as to
18  what that would be at that time?
19    A. No, no.
20    Q. What about the automatic doors again,
21  that's 10 percent physical damage that you
22  observed?
23    A. Not so much physical damage there as
24  I am not, the automatic doors are kind of a

23

1  specialty item. I knew there was going to be
2  some repair required. So, to say that it was
3  10 percent damage, I do not know that. I did
4  not prepare an estimate at that time though.
5  I didn't have a specialty company come in and
6  look at them and ask what it is going to cost
7  to refurbish them.
8    Q. Is 10 percent then just you thought
9  there was some damage, so you ascribed 10
10  percent to it?
11    A. Yes. Knowing about what they cost,
12  and what it costs for a technician to come
13  down for a couple days and go through them,
14  that's what I based it on.
15    Q. Same with the studs and dry wall that
16  you estimated at 25 percent of the studs and
17  dry wall was damaged?
18    A. Yes.
19    Q. Did you have a cost estimate to
20  repair those at that particular time --
21    A. No.
22    Q. -- March 29? With regard to the
23  painting less than 30 percent, again that's
24  the physical portion of it that was damaged?

24

1    A. Yes.
2    Q. Did you prepare a cost estimate or
3  have one --
4    A. No.
5    Q. -- as to what it would cost to
6  repair? The sprinkler system you estimated
7  that's a 10 percent physical percentage?
8    A. Yes, physical percentage.
9    Q. Did you prepare cost estimate as to
10  what that would be?
11    A. No.
12    Q. And finally the electrical less than
13  10 percent, did you prepare a cost estimate
14  what it would cost?
15    A. No.
16    Q. I want to refer you then to your
17  second to last sentence, which begins with the
18  majority of the major building components
19  being undamaged. You rendered an opinion.
20  Would you mind reading that sentence, the
21  entire sentence?
22    A. With the majority of major building
23  components being undamaged, in my opinion, the
24  overall damage to the structure will not

25

1  exceed 30 percent of the total replacement
2  cost of the premises.
3      Q. On what basis did you form that
4  opinion?
5      A. It was really just a gut feel from
6  experience in doing this for 23 years, knowing
7  that certain components of a structure or of a
8  project usually costs a certain percentage of
9  the value of that structure, and just having a
10  feel for that in my opinion it was not going
11  to exceed that amount.
12      Q. Did you consult a structural engineer
13  about the damage to the facility at all?
14      A. At this time, no.
15      Q. Did you subsequently?
16      A. No, the owner, Art Seppi, had Hanson
17  Engineers, they hired them directly, and they
18  were doing all of the structural engineering
19  review for us or for the project. So, they
20  were the ones making the determinations as to
21  what needed to be replaced, and to what extent
22  it needed to be replaced.
23      MR. SCHMADEKE: Mark that as Two.
24

26

1      (Whereupon said document was duly marked,
2      for purposes of identification, as
3      Deposition Exhibit Number Two, as of this
4      date.)
5      Q. Mr. Sorensen, have you seen this
6  document previously?
7      A. I don't know. I haven't seen it.
8      Q. I am sorry, I apologize.
9      A. I haven't seen it yet. I really
10  don't recall. I don't know who these people
11  are.
12      Q. I would ask you then to read the
13  letter, if you would, please.
14      A. Okay.
15      Q. I want to direct your attention to
16  the second sentence, and if you don't mind, I
17  will just read it. During the inspection,
18  instability was observed in the load-bearing
19  masonry wall between the Sports Authority
20  and Gordmans tenants spaces and in the
21  load-bearing masonry wall between Gordmans and
22  Bath and Body Works tenant spaces.
23      A. Okay.
24      Q. Would you agree with that assessment?

27

1      A. Yes.
2      Q. Could you tell me what instability
3  there was that you observed?
4      A. At the Sports Authority and Gordmans
5  tenant space common wall the wall was knocked
6  out of plumb. It had actually been moved over
7  slightly. As a result it had been moved over
8  enough that the joists on the Gordmans side of
9  the facility had fallen off of their bearing,
10  and fell into the store. On the Bed Bath And
11  Beyond there was just damage to the masonry.
12  It had cracked, and we subsequently went in
13  and shored those joists up through the
14  masonry, and did the repairs at a later date
15  so it was safe for them to reopen.
16      Q. Referring to the same letter, the
17  last sentence in the second paragraph, and I
18  will read it, instability was also observed at
19  the ends of the bar joists supported by the
20  common walls. Would you agree with that
21  statement?
22      A. Yes, that's why they fell into the
23  Gordmans space.
24      Q. So, these two observations about

28

1  instability are related?
2      A. Yes. We actually did some temporary
3  shoring work to remove that instability so it
4  was safe to work in that space.
5      Q. Are these items of instability, are
6  they reflected in your March 29, 2006 letter?
7      A. Again I am not sure I understand the
8  question.
9      Q. You agreed --
10      A. Obviously I saw that that bearing
11  wall was damaged, and that the roof structure,
12  of course, bears on the bearing wall. So, I
13  guess in a sense, yes.
14      Q. Let me rephrase that. I want you to
15  correct me, or please feel free to make me
16  elaborate if you need to. You have agreed
17  that this letter is accurate in terms of
18  observed instability?
19      A. Yes.
20      Q. The cost of repairing or damage, the
21  damage caused by that instability is that
22  reflected in your letter of March 29th?
23      A. Yes.
24      Q. That would be where?

29

1   A. That would be in the bearing walls
2   and the roof structure items.
3   Q. You said Hanson Engineers was later
4   retained?
5   A. I am not sure. I later got involved
6   with Hanson Engineers because they were
7   retained by Southwest Plaza. So, I don't know
8   at what point they got involved. I assume
9   they were involved from day one, but I did not
10  initially -- they may have been involved
11  before I actually was in contact with them.
12  Q. Do you know if they issued any
13  opinions about the structural soundness of the
14  structure?
15  A. Yes.
16  Q. Did they do that in writing?
17  A. I don't know the answer to that.
18  Q. Do you know when those opinions were
19  issued?
20  A. Basically as we were going through
21  the repair process uncovering items that
22  needed possible repair, we would contact Dave
23  Goetz with Hanson Engineers. He would come
24  out. They would review it and render an

30

1   opinion on which way we go next. There was
2   not a lot of, due to the emergency nature of
3   it there was not a lot of effort put into
4   making documents, et cetera, et cetera, going
5   through the proper channels. It was here is
6   what we need to do, get it done, let's move
7   forward.
8   Q. So, they would come out on an ongoing
9   basis to review certain projects as you needed
10  them?
11  A. Certain tasks on the job, yes.
12  Pretty much any time we ran into something
13  that was of a structural nature, we contacted
14  Hanson Engineers.
15  Q. Do you know if they issued any
16  opinion as to the amount of damage to the
17  premises?
18  A. I don't know.
19  Q. Do you know if they issued any
20  opinion about the total cost of repair of the
21  premises?
22  A. I have no knowledge of that.
23  Q. And do you know if they issued any
24  opinion regarding the structural needs, cost

31

1   of the structural repairs of the premises?
2   A. Again as far as cost goes I have no
3   knowledge of that. They obviously rendered
4   opinions on the needs because they are the
5   ones that we looked to to give us direction as
6   to how to do the repairs.
7   Q. Now, going back to Exhibit One, which
8   is your letter of March 29th, you reference
9   that the structure will not exceed 30 percent
10  of the total replacement cost?
11  A. Right.
12  Q. Were you told before you rendered
13  this opinion as to what percentage was
14  critical in this?
15  A. Art had asked me, he says do you
16  think this structure has been damaged beyond
17  30 percent of the replacement cost. That's
18  where I got that. That's why this document
19  was prepared.
20  Q. Did you review the lease at all
21  before this?
22  A. No.
23  Q. Have you reviewed the lease since?
24  A. Only a very small portion of it, but

32

1   again not being a lease expert I just, it
2   didn't matter to me.
3   Q. I understand.
4       MR. SCHMADEKE: Mark that as Three.
5   (Whereupon said document was duly marked,
6   for purposes of identification, as
7   Deposition Exhibit Number Three, as of
8   this date.)
9   Q. I am going to hand you what has been
10  marked as Exhibit Number 3. Have you seen
11  this document before?
12  A. No.
13  Q. Well, this purports to be the lease
14  between the parties to this lawsuit, and ask
15  you tell me what portion you may have
16  reviewed?
17  A. Is it okay to look in my documents?
18  Q. By all means, by all means.
19  A. What I have, let's see here. Boy, I
20  am not sure I have that. Yes, it is right
21  here.
22  Q. Take your time.
23  A. No, that's not it. Somewhere -- I
24  actually did not see a portion of the lease.

33

1   I saw a document basically trying to define
2   what it was that they were after here late in
3   the project.
4       Q. When you say what they were after?
5       A. That's all I saw as far as the lease.
6   It was a paragraph out of it trying to explain
7   to me what was going on, because I really
8   didn't understand at that point what they were
9   after.
10      Q. Could the record show that this is a
11  letter dated May 10th, 2006 from R. Lee Allen
12  to the witness. Going back to Exhibit Three,
13  which you have in front of you, I am aware
14  that you haven't read this before, the first
15  part that has a yellow tab on there, which I
16  have taken the liberty of designating, that's
17  titled completion and delivery of the premises
18  and shopping center. Do you see that?
19      A. Uh-huh.
20      MR. ROLF: Is that a yes?
21      A. Yes, sorry.
22      Q. Could you read the first sentence of
23  this paragraph to me?
24      A. Landlord agrees to complete the

34

1   following work in accordance with the
2   construction provisions attached hereto as
3   Exhibit C on or before October 1st, 2001.
4       Q. That's good enough. Were you aware
5   of this before you undertook the work of
6   reconstructing the premises?
7       A. No.
8       Q. Were you, and I assume by that then
9   you weren't aware of the construction
10  provisions when you rendered your opinion on
11  March 29th, 2006, is that correct?
12      A. That's correct.
13      Q. If you go to the second tab, please,
14  take a minute to review it, please, as long as
15  you would like.
16      A. You want me to review the entire
17  Exhibit C?
18      Q. Well, what I am asking for is if you
19  were aware of these construction provisions?
20      A. No.
21      Q. Is this the first time that you have
22  seen this document labeled Exhibit C?
23      A. Yes.
24      Q. Had anybody told you about any tenant

35

1   specifications for reconstruction of the
2   premises?
3       A. No.
4       Q. So, any tenant specifications would
5   not have been taken into account in your March
6   29th, 2006 letter?
7       A. Correct.
8       Q. They weren't taken into account
9   during the reconstruction or refurbishing
10  process, is that correct?
11      A. That is correct. The only item that
12  I am still uncertain of is the flooring
13  materials. At one point I was told that
14  Sports Authority was going to provide the
15  flooring materials to us. They put me in
16  contact with David Freeters, who was their
17  employee in charge of construction. We had a
18  couple of e-mails back and forth. I was
19  trying to keep him up-to-date as to when we
20  were going to need the materials, and it came
21  down to mid May, and he advised me that they
22  would not be supplying the materials as their
23  lease was they weren't moving back in.
24      Q. Jones-Blythe did the actual

36

1   reconstruction work of the premises from the
2   March 12, 2006 tornado, is that correct?
3       A. Yes.
4       Q. You served as the general contractor?
5       A. Yes.
6       Q. You hired a series of subcontractors?
7       A. And self performed the majority of
8   the work.
9       Q. When did the reconstruction work
10  begin? Do you remember what date that was?
11      A. Would have been March 14th or March
12  15th. As soon as we reviewed it we were
13  immediately on site doing some work to try to
14  minimize the loss to the tenants' merchandise.
15  We put up a bunch of temporary walls with
16  tarps.
17      Q. Have you completed the reconstruction
18  of the premises?
19      A. Yes.
20      Q. What date were they completed?
21      A. We had originally scheduled -- well,
22  let me back up. We had originally scheduled
23  to complete it prior to June 1 for tenant move
24  in. However, once Art had learned that they

37

1    weren't going to move back in, we did not
2    proceed with putting the new flooring
3    materials in. Other than the flooring
4    materials and tenant improvements it was ready
5    for a tenant to move in. Gordmans next door
6    moved in as scheduled.
7        Q. When was the day of completion other
8    than the flooring materials and the tenant
9    improvements?
10       A. I don't know of that exact date.
11       Q. Can you give me a reasonable
12   estimate?
13       A. Would have been last week of May
14   probably, maybe the second to last week of
15   May. Sports Authority it kind of fell off the
16   map because everybody knew they weren't moving
17   back in, and there was no point in rushing to
18   get it done. So, at that point we were
19   essentially done anyway. So, we didn't worry
20   about it too much.
21       Q. So, the last week or the second to
22   last week of May of 2006?
23       A. Correct.
24       Q. Do you know if all certificates of

39

1    authorized by Art Seppi to continue with the
2    work. So, they couldn't finalize the
3    certificate of occupancy.
4        Q. This is -- could you tell me what
5    this document is?
6        A. This is a notice to us that we can't
7    issue your certificate of occupancy because
8    there are certain deficiencies.
9        Q. What's the date of this document?
10       A. September, September 22nd, 2006.
11       Q. And could you -- the problems that
12   they observed could you tell me what they are
13   referring to, please.
14       A. Electrical, blank or trim out power
15   at the cash counters, 110.27 is the section of
16   the code that they are referencing as to where
17   the problem is, but it obviously won't allow
18   you to have an open-ended wire without a
19   termination.
20       Install junction box cover in the storage
21   area ceiling southwest corner, blank or trim
22   out floor boxes.
23       Q. What are floor boxes?
24       A. Floor boxes are electrical items

38

1    occupancy have been issued?
2        A. I do not know that.
3        Q. Do you know if any have been?
4        A. For Sports Authority there was some
5    issue. Since we did not finish the project
6    there was an issue I know with the electrical
7    where it came out of the floor for the teller
8    counters, and that was causing a problem on
9    the final certificate of occupancy because
10   they were open-ended wires and stuff there
11   that weren't terminated.
12       MR. SCHMADEKE: Mark that as Four.
13       (Whereupon said document was duly marked,
14       for purposes of identification, as
15       Deposition Exhibit Number Four, as of this
16       date.)
17       Q. I hand you what has been marked as
18   Exhibit Number Four. Have you ever seen this
19   before?
20       A. Yes.
21       Q. When did you see it?
22       A. I don't know. I mean -- I don't
23   recall. They send these out. It was really
24   an issue with the fact that we weren't

40

1    turned up, and they are mounted on the floor
2    for them to plug displays in, or really tenant
3    type improvement items.
4        Q. Onto the plumbing.
5        A. On the plumbing there was no hot
6    water.
7        Q. Why was that?
8        A. I believe it was just never turned
9    on. I mean the hot water heater was there.
10   The system was intact. I am not sure why that
11   is there.
12       The urinal not installed at that point, we
13   had to salvage, we salvaged the toilets and
14   stuff to go back in the bathrooms that were
15   disposed of previously, and I believe the
16   urinal was damaged, and once Art had realized
17   that they weren't moving back in, he just
18   pretty much stopped all work, and never did
19   want to buy new fixtures and stuff to finish
20   it.
21       Mechanical they gave us a certificate of
22   occupancy.
23       Q. For the fire safety?
24       A. Fire safety, ceiling panels missing,

41

1    that's where there was a fairly large ceiling
2    grid. It was kind of a specialty thing. It
3    was store specific. They had an area up in
4    the front of the store that had lay in ceiling
5    in it, and they didn't replace the ceiling
6    panels because obviously if they weren't going
7    to move in, the next tenant was not going to
8    want that ceiling structure there.
9        Fire extinguishers were missing.
10    Extinguishers out of date.
11        Open wiring, again which I assume was
12    related to the cash counters.
13        Fire alarm testing was never completed.
14        Maintain fire alarm records on site is
15    usually a clerical type item.
16        Q. Go back to fire alarm testing, if you
17    will, why was that never completed?
18        A. I don't know the answer to that.
19    That was not something that was part of our
20    contract.
21        Q. Okay. Then number seven you were
22    talking about?
23        A. Maintain fire alarm records on site,
24    that's really like a clerical item. However,

42

1    nobody was in the building so, and the fire
2    alarm testing had never been done. So,
3    obviously there could be no records on site.
4        Then ID doors to the sprinkler, fire
5    alarm, and electrical rooms.
6        Q. Have any of these items been
7    completed, finished, altered since the date of
8    this notice?
9        A. I have no knowledge of that. We have
10    not been back to finish any work there.
11        Q. I believe you testified that you
12    don't know if the certificate of occupancy has
13    been issued at this point?
14        A. Correct.
15        MR. SCHMADEKE: Could you mark that,
16    please.
17        (Whereupon said document was duly marked,
18    for purposes of identification, as
19    Deposition Exhibit Number Five, as of this
20    date.)
21        Q. Mr. Sorensen, Exhibit Number Five,
22    have you seen that document before? I presume
23    you have.
24        A. Yes.

43

1        Q. What is that document?
2        A. This is my statement of, for this
3    case.
4        Q. It is your report of your opinions,
5    is that correct?
6        A. Right.
7        Q. Going to the third page in that
8    group, that's your signature on the bottom of
9    that?
10        A. Yes, it is.
11        Q. If you want to take a minute or two
12    to look at the whole thing, I want to make
13    sure you agree that this is a true and
14    complete copy of the report as far as you can
15    tell.
16        A. Yes.
17        Q. I want to refer you to Page 2,
18    paragraph three, the last sentence begins
19    accepting the total replacement costs of
20    $1,960,067.00, do you see that?
21        A. Yes.
22        Q. Did you form an opinion as to the
23    total replacement cost as that number?
24        A. Not as that number. That was

44

1    basically agreeing to Mr. Wolford's number, I
2    believe.
3        Q. Did you believe Mr. Wolford's
4    replacement cost estimate was reasonable?
5        A. It was reasonable, yes.
6        Q. You didn't prepare your own estimate
7    of the total repair costs?
8        A. We didn't need to because we had the
9    actual cost.
10        Q. Actual costs of what?
11        A. Actual cost of reconstruction, I am
12    sorry, of the replacement cost. No, we
13    actually took, Mr. Wolford used the AGC's
14    source, and the method he used we were fine
15    with. We use a similar method on this type of
16    an application. We used the ENR source using
17    their factors and basically came up with
18    approximately the same number. So, we just
19    decided that that number was acceptable.
20        Q. When you say we did that, who are you
21    referring to?
22        A. Jones-Blythe.
23        Q. Did you do it for Jones-Blythe, or
24    somebody else?

45

1    A. I did it with support by Steve Read.
2    Q. Can you spell his last name.
3    A. R-E-A-D.
4    Q. What's his position?
5    A. He is the vice president.
6    Q. Is he your superior?
7    A. My superior. I just basically
8    bounced it off him as a sounding board.
9    Q. Going to Page 3, paragraph six, do
10   you see that?
11   A. Yes.
12   Q. Take a second to review it, if you
13   would like, please.
14   A. Okay.
15   Q. So, you are saying that most of the
16   work performed by Cotton was to protect or
17   salvage TSA's personal property, is that
18   correct?
19   A. Yes, that was my observation.
20   Q. Was all of it all of the Cotton work?
21   A. Most of the work.
22   Q. But not all of it?
23   A. Correct, most of the work.
24   Q. Right. What percent of Cotton's

46

1    work that you observed was related to
2    reconstruction?
3    A. They removed a certain portion of dry
4    wall that would later have to be replaced.
5    Q. Anything else?
6    A. They also, let's see, they also
7    removed flooring materials, but at the time I
8    guess I wasn't sure exactly whose
9    responsibility that was.
10   Q. Did you observe anything else that
11   they did which would be considered part of the
12   reconstruction?
13   A. Obviously they did just general
14   cleanup, but for the most part the area where
15   the major structure damage was we partitioned
16   off to keep their employees out of just due to
17   its instability.
18   Q. In paragraph six you note that the
19   removal of the flooring was not necessary.
20   A. Yes.
21   Q. Why did you make that conclusion?
22   A. Well, it really is more of an overall
23   feeling on the way Cotton approached the whole
24   project. They were in there moving so fast

47

1    that nobody really had an opportunity to
2    review really whether the removal was
3    necessary, or if it was damaged to the extent
4    that it needed to be removed and be replaced.
5    The same happened on the dry wall.
6    Q. So, is it your view that it may have
7    been needed, but you didn't have a chance to
8    review it first?
9    A. Yes.
10   Q. What about the bathroom partitions
11   and fixtures, you say that was not necessary.
12   Is that the same situation where it happened
13   so quickly?
14   A. Yes.
15   Q. So, it may have been necessary, but
16   you just didn't have a chance to make a
17   conclusion?
18   A. I would say that is correct.
19   However, we ended up reusing the partitions
20   and fixtures after they were removed.
21   Q. Cotton is called the emergency
22   disaster recovery service. Have you ever
23   dealt with such a company before?
24   A. No.

48

1    Q. Have you ever had any experience with
2    Cotton before?
3    A. No.
4    Q. It was your first experience?
5    A. First experience.
6    Q. Do you know what the function of an
7    emergency disaster recovery service is?
8    A. Generally, yeah.
9    Q. What is your understanding of them?
10   A. They come in and basically clean up
11   the mess, vacuum up the water, try to salvage
12   whatever merchandise might be there, secure
13   the building possibly, try to limit the loss.
14   Q. I have taken the liberty of putting a
15   yellow tag on a page in your report near the
16   end. It is marked Exhibit C. Do you notice
17   that?
18   A. Yes.
19   Q. Have you reviewed this particular
20   document before?
21   A. Yes.
22   Q. I assume you have. What is this
23   particular page?
24   A. This is a page where I was asked to

1  compare our actual cost on an item by item
2  basis against the estimated cost of
3  replacement.
4     **Q.** Whose estimated cost?
5     **A.** Not of replacement, of repair.
6     **Q.** And whose estimate were you
7  comparing?
8     **A.** Would have been Jeff Wolford, I
9  believe is the name.
10     **Q.** Just to explain this, the first
11  column is the type of work we are talking
12  about?
13     **A.** Yes.
14     **Q.** And then the second column is what?
15     **A.** That is a breakdown that was prepared
16  by Jeff Wolford as to the reconstruction cost.
17     **Q.** And the third column is what?
18     **A.** Our actual incurred cost to do the
19  reconstruction.
20     **Q.** And the fourth column labeled owner,
21  what does that refer to?
22     **A.** Those were items that I wasn't really
23  involved in, but I know the owner was, the
24  owner had contracted directly like with the

50

1  engineer for items of work that we did not do,
2  but we knew there was a cost associated with
3  it that reflected the overall reconstruction
4  cost.
5     **Q.** So, I want to refer then to the first
6  item, which is emergency response from Cotton
7  USA.
8     **A.** Right.
9     **Q.** Mr. Wolford put in $319,428.00.
10     **A.** Uh-huh.
11     **Q.** And you put owner?
12     **A.** Right.
13     **Q.** Meaning what?
14     **A.** It was the owner's responsibility. I
15  didn't know what the owner was responsible
16  for, some or if -- I wasn't responsible for
17  that. The emergency response stuff was
18  essentially the owner's responsibility.
19     **Q.** So, that part of the work of Cotton
20  USA that you would consider to be part of
21  construction or reconstruction wasn't put in
22  here?
23     **A.** Could you rephrase that, please.
24     **Q.** The part of the work performed

51

1  by Cotton USA that you would consider
2  reconstruction was not put in this chart?
3     **A.** The part of the work -- yes.
4     **Q.** The architectural and engineering, so
5  if I am reading this properly, Mr. Wolford
6  estimated it to be $8,000.00, but you
7  determined that it was actually $9,510.00?
8     **A.** That's correct. That was the
9  engineering fees that the owner paid Hanson
10  Engineers.
11     **Q.** So, then shoring stabilizing Mr.
12  Wolford estimated at 18,500, and the actual
13  cost was $14,439.00?
14     **A.** Correct.
15     **Q.** I want to skip down to where it says
16  masonry beam pockets, et cetera.
17     **A.** Okay.
18     **Q.** Do you see that?
19     **A.** Yes.
20     **Q.** First of all, what does that mean?
21  What are masonry beam pockets, et cetera?
22     **A.** Beam pockets are typically a place
23  location where a bar joist or a beam is going
24  to come into a masonry wall, and it is a place

52

1  for it to pick up its bearing. The reason I
2  say below is those two items go together. You
3  don't do the beam pockets without redoing the
4  walls. So, they are related. So, you really
5  have to look at those two numbers to compare
6  to the 29,218 that it actually cost.
7     **Q.** So, if I read this properly, and I
8  don't mean to put words in your mouth, if
9  those two items are related, Mr. Wolford's
10  estimate would have been 32,000?
11     **A.** Correct.
12     **Q.** And yours was actual cost was
13  $29,218.00?
14     **A.** That's correct.
15     **Q.** Fairly close?
16     **A.** Fairly close.
17     **Q.** Roofing insulation Mr. Wolford
18  estimated at 39,500, but the actual cost as
19  far as you were told was 86,038?
20     **A.** Correct.
21     **Q.** Where did you learn that number?
22     **A.** I contacted the roofing contractor
23  that did the work, and he told me what the
24  amount was. The same with the store front and

1    glass.
2        Q. Going down to the item labeled duct
3    work, remove and replace, okay, do you see
4    that item? Mr. Wolford put $7,600.00. You
5    have put in HVAC. What do you mean by that?
6        A. That's in the heating, ventilation,
7    and air conditioning work, and it is HVAC
8    repair right below it, HVAC repair existing
9    units 16,426.
10        Q. And the item right above that which I
11    missed, fire alarm minor device replacement,
12    you put in electrical. Where were you
13    referring to?
14        A. That would be down below. There
15    should be an electrical item. I guess it
16    would be in these electrical costs. I
17    basically took our entire electrical contract
18    with B & B Electric. Am I just missing it
19    here? It has to be in the light fixtures
20    money, those two items, the 25,322 and the
21    10,678. Give me one moment, please.
22        Q. Take your time.
23        A. Yes, that's where it is at.
24    Basically in general contractor terms those

1    are all electrical items, and that was the
2    only real breakdown I had from the
3    electrician, and the other things were thrown
4    in as just ancillary items.
5        Q. Going down further to the item
6    labeled floor prep and adhesive removal --
7        A. Yes.
8        Q. -- you put NIC.
9        A. Not in contract, it was just a
10    general contractor term that I used, and we
11    did not have, we did not contract for the
12    flooring materials for this project. I had
13    secured bids on it, and then once TSA decided
14    not to move back into the space, we stopped
15    construction on all flooring materials.
16        Q. So, the word below means what there?
17        A. Below means right below here you go
18    to flooring materials, the 114,800, that was
19    the bid I got for flooring replacement, and
20    that included floor prep and adhesive removal.
21        Q. Was that a bid amount, or was the
22    114,800, was that actually paid, do you know?
23        A. No, it was not.
24        Q. That's an estimate?

1        A. The work was never done. I had
2    secured a bid in anticipation of the work
3    being done, and then it was canceled before
4    the materials were ordered.
5        Q. That was canceled because of what,
6    why?
7        A. Because of TSA, because of the
8    situation with TSA not moving back in. It was
9    a special -- their space utilizes several
10    special floorings, rubber and stuff that
11    normal tenants wouldn't use. So, Art didn't
12    want to spend the money on all the special
13    flooring materials if they weren't going to
14    move back in.
15        Q. But for the reconstruction purposes
16    that would have been something, if you were
17    going to complete the reconstruction that
18    would have been a figure that you would have
19    included?
20        A. Absolutely, that's why it is included
21    in that column.
22        Q. Going back to final cleaning,
23    deodorizing, Mr. Wolford estimated 11,000. Do
24    you see that?

1        A. I am not sure where you're at.
2        Q. It is about two thirds of the way
3    down.
4        A. Right here, final cleaning, okay.
5        Q. You put the word below.
6        A. Below, it would have been just down
7    here in our general cleanup, construction
8    laborers cleanup 4,634 down at the very
9    bottom, second number up, no, bottom number
10    actually, I guess.
11        Q. And then continuing going down
12    protection of finish materials Mr. Wolford had
13    put 12,500. You put below.
14        A. Protection of finish materials, yes,
15    again I guess it must just be some of these
16    items, this is Mr. Wolford's list of
17    activities that he thought may or may not be
18    done, or may need to be done, and some of
19    this, I mean there really was no protection of
20    things, but it was required. So, when I say
21    below, it is in our total cost below. If
22    there was any protection required, if we had
23    to hang Visqueen over some stuff to keep it
24    from getting further damaged, or some other

57

1    work going on in the area, that it is in
2    there.
3        Q. Going two lines lower contingency you
4    had 25,600, and you put N/A. Does that mean
5    not applicable?
6        A. Yes.
7        Q. Why is it not applicable?
8        A. We are working there on a time and
9    material basis. We have no contingencies
10   built in.
11       Q. Continuing lower, city required fire
12   watch, $2,200.00 estimated by Mr. Wolford, do
13   you see that?
14       A. Yes.
15       Q. Again you said not applicable, what
16   does that mean there?
17       A. Again fire watch was not required.
18   Our fire watch is in our crew when we are
19   doing the work.
20       Q. So, then if I am reading correctly
21   taking your actual costs column, which is the
22   middle column of the number, your total is
23   $321,384.00, correct?
24       A. Yes.

59

1    flooring materials would have been a proper
2    cost of reconstruction?
3        A. Yes.
4        Q. Would the architectural and
5    engineering costs of $9,510.00 be a proper
6    cost for reconstruction?
7        A. Yes.
8        Q. The $8,638.00 that you have there for
9    roofing insulation, is that an estimate or
10   actual cost?
11       A. $86,038.00.
12       Q. I am sorry, I apologize, again I am
13   talking too fast.
14       A. Yes, that was actual cost.
15       Q. And that would be considered a part
16   of a repair cost, reconstruction cost?
17       A. That was actual full replacement
18   cost. They chose to replace the roof instead
19   of repair the roof.
20       Q. The next item, replace existing store
21   front and glass, $18,506.00 --
22       A. Yes.
23       Q. -- is that an actual cost or an
24   estimate?

58

1        Q. That's where you come up with that
2    particular number for the basis of your
3    opinion in paragraph three on Page 2 of your
4    report, correct?
5        A. Yes.
6        Q. Which says the actual repair cost,
7    construction costs are 321 dollars and 384
8    cents?
9        MR. ROLF: Incorrect.
10       Q. I am sorry, 300 --
11       A. $321,384.00.
12       Q. Correct?
13       A. Yes.
14       Q. That doesn't include the items in the
15   owner column on Exhibit C, correct?
16       A. Wait a minute, let me back up here.
17   Yes, that $321,384.00 is our actual costs
18   only. I could not attest to what the other
19   actual costs may or other costs may be.
20       Q. I want to go back then to Exhibit C
21   and the column labeled owner.
22       A. Okay.
23       Q. If I remember properly, you already
24   testified that the $114,800.00 estimate for

60

1        A. That was actual cost.
2        Q. And should that properly be
3    considered a reconstruction cost?
4        A. Yes, however again that was
5    replacement of the entire store front instead
6    of just repairing what was there.
7        Q. So, when you add up the total owner's
8    column, that's 228 dollars, excuse me,
9    $228,854.00?
10       A. Yes.
11       Q. So, is it fair and reasonable to
12   say that from your opinion that the actual
13   reconstruction costs were, the actual cost to
14   you was $321,384.00 plus the $228,854.00?
15       A. Yes.
16       MR. SCHMADEKE: Mark that as Six.
17   (Whereupon said document was duly marked,
18   for purposes of identification, as
19   Deposition Exhibit Number Six, as of this
20   date.)
21       Q. Exhibit Six, have you seen this
22   before? Take a moment to look at it.
23       A. If it wasn't this exact document, it
24   was one similar to it.

1  Q. Can you tell me what this purports to
2  be?
3  A. It looks like Cotton's review of
4  services needed for the project.
5  Q. Review of services or scope of
6  services?
7  A. Scope of work.
8  Q. I would like to review some of
9  these things, and see what your opinion is,
10 whether they should be considered part of
11 reconstruction or not.
12 A. Okay.
13 Q. Do you understand what I am asking?
14 A. Yes. I guess the only question is
15 when you say part of reconstruction --
16 Q. Of the premises.
17 A. Just solely reconstruction of the
18 premises? Obviously Cotton was there doing
19 more than that.
20 Q. Well, let me put it this way. There
21 is no dispute from our perspective that some
22 Cotton costs should not be attributed to being
23 part of the reconstruction because it was
24 taking care of its own product, of the

1  tenant's product or equipment.
2  A. Okay.
3  Q. I am looking for not that, what you
4  consider to be part of reconstruction of the
5  premises. Does that make sense to you?
6  A. That makes sense.
7  MR. ROLF: I guess the objection I
8  would have is to the extent reconstruction of
9  the premises being used as a term within the
10 lease, he is not, as he has testified reviewed
11 that or making opinions on that.
12 MR. SCHMADEKE: I understand. I am
13 not asking for legal opinions. I am asking
14 for your opinion as the Plaintiff's expert in
15 this as to what reconstruction of the premises
16 entailed.
17 MR. ROLF: I would further object to
18 the extent that he may or may not know what
19 Cotton is referring to in their scope of work.
20 Q. And if you don't understand, it is
21 certainly acceptable to say you don't know.
22 A. Okay.
23 Q. So, I believe we should most properly
24 start at the first boxed item in the lower

1  third of the page where it says Cotton will
2  provide safety meeting daily, do you see that?
3  A. Yes.
4  Q. There is a lot of materials here, and
5  I really don't want to belabor this any more
6  than we have to, but if you would read through
7  those, and tell me which ones you would think
8  would be properly considered part of
9  reconstruction as we defined it.
10 A. Obviously the first few items are
11 really just internal to their company. I mean
12 whether they are working on reconstruction, or
13 working there to salvage tenant's material, I
14 mean they are responsible to provide that
15 stuff for their own employees. That's their
16 deal not really related to the reconstruction
17 cost. I think you get down to the bottom, I
18 guess I am not really sure that any of that
19 stuff is related to reconstruction.
20 Q. Very good. Feel free to go to the
21 next page. If you would do the same thing,
22 read and tell me what you believe would
23 properly be considered part of reconstruction.
24 A. Well, again I don't know that I can

1  make an opinion as far as what is, as far as
2  the relationship with the lease as far as what
3  constitutes reconstruction. Obviously at some
4  point before you can rebuild the thing, you
5  need to get it dried out. Whether that is the
6  contractor's responsibility, or that's the
7  emergency guy's responsibility, or he is
8  drying it out for the contents, I don't know
9  that I can make a judgment there.
10 Q. Let me put it this way.
11 Hypothetically if Cotton didn't do the dry
12 out, you or a subcontractor of yours would
13 have been required to do so?
14 A. Yes.
15 Q. Continue, please.
16 A. That takes care of that whole first
17 paragraph basically. More of the same, I mean
18 air movers. Up until such time as the
19 permanent power came back on, which was only a
20 matter of a few days, generators would be
21 required to run the equipment, and lights, et
22 cetera.
23 Q. Where do you see that?
24 A. Installing the following at the

65

1  back of the store, and install the following
2  at the front of the store, and they make a
3  mention of generators. Clean all of the
4  debris, obviously you have to clean it up
5  before you could put new flooring down, you
6  know. There is items here that we actually
7  did. Cotton will build a barrier in the
8  exercise area to help eliminate the moisture.
9  We actually built those temporary partitions.
10 Cotton didn't. Cotton to help seal off
11 the hole in the corner of the roof for
12 climitization purposes. We did all that work.
13 They did not perform that.
14    Q. Have you moved onto the next page?
15    A. Oh, yes, I am sorry, I am on the next
16 page. Cut down all hanging debris, actually
17 we removed all electrical items, lights that
18 were hanging with the electrical contractor.
19 They didn't have qualified people to do that.
20    Q. They didn't do any of it?
21    A. No. Well, not to my knowledge. My
22 observation was, and I was out there on a
23 daily basis, that our electricians from B & B,
24 we went over there with a lift, and we removed

66

1  the light fixtures so it was a safe situation.
2     Q. B & B?
3     A. B & B Electric, they were our
4  subcontractor, the same with the sprinkler
5  lines.
6     Q. Let me go back. If Cotton did do the
7  cut down of the hanging debris, fluorescent
8  lights, and so forth, would that properly be
9  considered part of the reconstruction?
10    A. I think it would have to be because
11 you have to take down the damaged stuff before
12 you can put the new stuff back up.
13    Q. Very good, please continue.
14    A. Wet vac all standing water, tarp
15 corner of department to help seal off the
16 outside elements, that's something we did.
17 Remove all saturated sheet rock and any
18 additional sheet rock that will allow
19 assessment of potentially damaged cinder block
20 wall that is common to the Gordmans Department
21 Store.
22    Q. What was your point about that item?
23    A. That you would have to take that
24 wall, you would have to remove that sheet rock

67

1  in order to see the extent of damage so you
2  would know what to reconstruct.
3     Q. That would have been considered part
4  of reconstruction?
5     A. Yes. You know, talking about
6  removing all rubberized aisles with scrapers
7  and flooring material, obviously again if you
8  are going to replace the flooring, you have to
9  take the old flooring up.
10    Q. If I may go back a couple, what about
11 the remove and discard all effected
12 insulation?
13    A. Yes, but if there is insulation
14 there, it would have to come out. I am just
15 trying to think. He is talking about the in
16 wall insulation, probably behind the dry wall,
17 I don't know.
18    Q. If you don't know, that's fine.
19    A. That's fairly vague.
20    Q. Now, the item there listed
21 disassemble all racks and relocate to other
22 areas, that would not be --
23    A. That would not be part of the
24 reconstruction. Obviously inventory counting

68

1  not part of reconstruction. Manipulating
2  exercise equipment away from the damaged area
3  not part of reconstruction. Remove and
4  discard all commercial glued down carpet would
5  definitely be part of reconstruction, and
6  scrape all remaining glue from the slab.
7     Q. I am sorry, where did you see that?
8     A. Sorry, right here, fourth line down.
9     Q. Thank you.
10    A. The second grouping, obviously
11 disassemble all of the racks and relocate to
12 other areas of the store is not part of
13 reconstruction. Those are all tenant
14 improvements. Remove all saturated sheet rock
15 to a height of four feet from the floor to
16 allow quicker replacement, that is part of
17 reconstruction.
18    Q. Where is that?
19    A. That's about the sixth item down.
20    Q. I am sorry.
21    A. Again remove and discard all
22 insulation, that's kind of an item that when
23 you take the dry wall off, the insulation is
24 going to come with it. So, when you do the

69

1 one, you're going to take the other with it.
2 Obviously none of the work with the salvage
3 company to manipulate the contents, that is
4 not part of reconstruction. It looks like
5 they keep going through the same items over
6 and over. I am not sure what the blocked out
7 sections are.
8    Q. I am sorry for the quality of the
9 print.
10    MR. ROLF: The blocked out sections,
11 I believe, are the different departments in
12 the store. One would be golf. One would be
13 outdoor.
14    A. It looks like they are just repeating
15 the same thing over and over again as to what
16 they are going to do. You want me to continue
17 each blocked out section as to what we have
18 just talked about?
19    Q. If you could look at them and see if
20 there is some item that we haven't talked
21 about.
22    A. Okay. I don't see, I don't really
23 see any other items. It looks like it just
24 repeats over and over again. So, I don't see

70

1 any other items that would be considered
2 reconstruction.
3    Q. Other than the items that you have
4 described?
5    A. Right. Basically removing the dry
6 wall and damaged insulation, possibly damaged
7 flooring, drying the place out.
8    MR. SCHMADEKE: I have no further
9 questions.
10    MR. ROLF: Okay, I have a few
11 follow-up remarks. I just want to make sure
12 we are clear.
13
14       CROSS EXAMINATION
15    BY MR. ROLF:
16    Q. You mentioned upon your arrival that
17 there was some work going on, or there were
18 people cleaning up. That didn't in any way
19 interfere or prevent you from assessing the
20 damage as you did in Exhibit Number One, did
21 it?
22    A. No.
23    Q. In fact, you had firsthand knowledge
24 from day one as to what the damage was even

71

1 though this Exhibit Number One is March 29 and
2 some repairs or things had already been done?
3    A. Yes.
4    Q. You saw it from day one?
5    A. Yes, it was probably day two.
6    Q. March 14th?
7    A. March 14th.
8    Q. With respect to the opinions from
9 Hanson on the structural you did what they
10 directed needed to be done in terms of shoring
11 up any walls or things like that?
12    A. Yes.
13    Q. So, the cost of anything they
14 directed is within your cost estimate you have
15 provided?
16    A. Yes, it is in our actual cost.
17    Q. Right?
18    A. Yes.
19    Q. With regard to the rubberized
20 flooring, water alone wouldn't damage
21 rubberized flooring, would it?
22    A. In theory, no, I mean it is a rubber
23 product.
24    Q. Okay.

72

1    A. Again not really. Nobody ever had
2 the opportunity to ever look at it because it
3 was all gone before anybody had a chance.
4    Q. When you said the partitions were
5 reused, these are the rest-room partitions?
6    A. Yes.
7    Q. Were they back in the same place they
8 were when they were removed?
9    A. We put them all back in the exact
10 same locations, yes.
11    Q. So, in terms, it wasn't that they
12 were replaced somewhere else, or the removal
13 of the partitions would have been necessary,
14 they ended up being right where they were?
15    A. Yes.
16    Q. On Exhibit Number Five, which is your
17 report, Exhibit C to it which was the three
18 column, four column table, with regard to the
19 A and E expenses up at the top there is a
20 parenthetical to the side of that. It says
21 entire plaza.
22    A. Yes.
23    Q. Could you explain that?
24    A. That was their fee actually for

73

1  structural review at both Sports Authority,
2  Gordmans, and Bed Bath And Beyond.
3      Q. So, you didn't make any effort to
4  break out, reduce that just as to Sports
5  Authority?
6      A. I did not. The problem with that was
7  we were working on a common wall. I mean the
8  majority of a common wall that both sides
9  beared on. So, whether they did the analysis
10  for one side or both sides, they still had to
11  go through the analysis. So, it would have
12  cost about the same.
13      Q. Fair enough, but the entire, all of
14  their work is in there?
15      A. All of their work is in there.
16      Q. With respect to the other cost in
17  that fourth column which were borne by the
18  owner directly, you did observe the damage
19  that was being repaired?
20      A. Yes.
21      Q. You did observe that the, as the
22  repairs were being done, that they did take
23  place other than the flooring?
24      A. Right. The flooring was an estimate

74

1  that they pulled the plug on it before it was
2  started.
3      Q. With regard to the companies that
4  performed that work, the roofing company, and
5  the glass company, as well as the person you
6  got the bid from, you're familiar with those
7  contractors or suppliers?
8      A. Yes.
9      Q. You made a direct inquiry as to the
10  actual costs on this job?
11      A. Yes.
12      Q. Those numbers, and is it your opinion
13  that those are customary and reasonable
14  numbers for that type of work?
15      A. Yes, and they are good contractors
16  that we deal with, and have dealt with for 20
17  plus years.
18      MR. ROLF: I don't think I have
19  anything else.
20      MR. SCHMADEKE: Signature?
21      MR. ROLF: We will go ahead and read
22  it.
23      (Witness Excused)
24

75

1  STATE OF ILLINOIS   )
                        ) SS
2  COUNTY OF CHRISTIAN)
3
4      I, Sandra K. Haines, a Notary Public and
5  Certified Shorthand Reporter, associated with
6  Haines Court Reporting, do hereby certify that
7  prior to the taking of the deposition herein,
8  and on the 22nd day of October, 2007, the
9  Deponent, MARK A. SORENSEN was, by me, duly
10  sworn to testify to the truth in relation to
11  the matter in controversy herein. That on
12  said date the foregoing deposition was taken
13  down stenographically by me and afterwards
14  reduced to typewritten form by me, and that
15  the foregoing transcript contains a true and
16  accurate translation of all such shorthand
17  notes.
18      Given under my hand and seal this 25th
19  day of October, 2007 at Taylorville, Illinois.
20
21            _Sandra K Haines_
22                    Notary Public and CSR
23        OFFICIAL SEAL
          SANDRA K HAINES
24  NOTARY PUBLIC - STATE OF ILLINOIS
    MY COMMISSION EXPIRES:02/07/09

76

1  SWPLAZA III, LLC, an Illinois    )
   limited liability company, as   )
2  successor to Illinois National  )
   Bank, as Trustee under Trust    )
3  Agreement dated November 6, 2000)
   and known as Trust No. 00-0020, )
4  an Illinois banking institution,)
               Plaintiff           )
5      -vs-                         ) NO.06-CV-3177
   TSA STORES, INC., as successor  )
6  to Gart Brothers Sporting Goods )
   Company, a Delaware corporation,)
7              Defendant            )
8
9      I, MARK A. SORENSEN, do hereby certify
10  that I have read the foregoing transcript of
    my testimony given in the above entitled
11  matter on the 22nd day of October, 2007, and
    that the same fully and accurately sets forth
12  my testimony as given on said date, except as
    I have indicated to the contrary on this page
13  below my signature.
14  DATE_____  SIGNATURE_____
15  Page   Line        Change              Reason
    No.    No.                            For change
16
17           _full size errata_
18
19         _sheet next page_
20
21
22
23
24

```
1    SWPLAZA III, LLC, an Illinois   )
     limited liability company, as   )
2    successor to Illinois National  )
     Bank, as Trustee under Trust    )
3    Agreement dated November 6, 2000)
     and known as Trust No. 00-0020, )
4    an Illinois banking institution,)
                       Plaintiff     )
5        -vs-                        )NO.06-CV-3177
     TSA STORES, INC., as successor  )
6    to Gart Brothers Sporting Goods )
     Company, a Delaware corporation,)
7                       Defendant    )

8


9         I, MARK A. SORENSEN, do hereby certify
     that I have read the foregoing transcript of
10   my testimony given in the above entitled
     matter on the 22nd day of October, 2007, and
11   that the same fully and accurately sets forth
     my testimony as given on said date, except as
12   I have indicated to the contrary on this page
     below my signature.
13
     DATE_____ SIGNATURE_____
14   _____
     Page   Line         Change          Reason
15   No.    No.                           For change
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
     _____
22   _____
     _____
23   _____
     _____
24   _____
     _____
```

**$1,960,067.00**
[1] 4:20
**$114,800.00**
[1] 58:24
**$14,439.00**
[1] 51:13
**$18,506.00**
[1] 59:21
**$2,200.00**
[1] 57:12
**$228,854.00**
[2] 60:9 60:14
**$29,218.00**
[1] 52:13
**$319,428.00**
[1] 50:9
**$321,384.00**
[4] 57:23 58:11 58:17 60:14
**$7,600.00**
[1] 53:4
**$8,000.00**
[1] 51:6
**$8,638.00**
[1] 59:8
**$86,038.00**
[1] 59:11
**$9,510.00**
[2] 51:7 59:5

### 0

**00-0020**
[2] 1:9 76:6
**084-002423**
[1] 1:24

### 1

**1**
[2] 3:8 36:23
**1-18-61**
[1] 5:8
**10**
[7] 18:16 22:21 23:3 23:8 23:9 24:7 24:13
**10,678**
[1] 53:21
**1030**
[1] 5:2
**10th**
[1] 33:11
**11,000**
[1] 55:23
**110.27**
[1] 39:15
**111**
[1] 2:16
**114,800**
[2] 54:18 54:22
**12**
[2] 12:17 36:2
**12,500**
[1] 56:13
**124**
[3] 16:6 16:16 19:9
**13**
[2] 22:7 22:7
**14**
[1] 3:8
**14th**
[4] 12:19 36:11 71:6 71:7
**15th**
[1] 36:12
**16,426**
[1] 53:9
**17**
[2] 18:9 18:12
**18,500**
[1] 51:12
**1984**
[1] 6:9
**1st**

---

[1] 34:3
**2**
[3] 3:9 43:17 58:3
**20**
[1] 74:16
**200**
[2] 2:11 2:17
**2000**
[2] 1:8 76:5
**2001**
[1] 34:3
**2006**
[10] 12:17 15:5 22:11 28:6 33:11 34:11 35:6 36:2 37:22 39:10
**2007**
[4] 1:19 75:9 75:20 76:18
**20K**
[1] 20:14
**217) 522-6152**
[1] 2:18
**217) 544-1144**
[1] 2:6
**228**
[1] 60:8
**22nd**
[4] 1:18 39:10 75:9 76:18
**23**
[1] 25:6
**25**
[4] 19:6 19:11 19:22 23:16
**25,322**
[1] 53:20
**25,600**
[1] 57:4
**25th**
[1] 75:19
**26**
[1] 3:9
**29**
[5] 15:5 22:11 23:22 28:6 71:1
**29,218**
[1] 52:6
**29th**
[5] 22:4 28:22 31:8 34:11 35:6

### 3

**3**
[3] 3:9 32:10 45:9
**30**
[5] 19:16 23:23 25:1 31:9 31:17
**300**
[1] 58:10
**32**
[1] 3:9
**32,000**
[1] 52:10
**321**
[1] 58:7
**38**
[1] 3:10
**384**
[1] 58:7
**39,500**
[1] 52:18

### 4

**4**
[2] 3:3 3:10
**4,634**
[1] 56:8
**400**
[1] 2:11
**42**
[1] 3:10

### 5

**5**

---

[2] 31:1 59:4
**50**
[2] 16:17 76:17
**5131**
[1] 25

### 6

**6**
[3] 18:11 74:5
**60**
[1] 3:11
**607**
[1] 119
**62701**
[2] 2:22 2:17
**62705**
[1] 2:6

### 7

**7**
[2] 16:14 21:3
**70**
[2] 33:3
**74**
[1] 3:3

### 8

**800**
[1] 21:204
**83**
[4] 17:16 17:20 18:2 22:13
**86,038**
[1] 52:19

### 9

**97**
[1] 16:10
**970**
[1] 16:15

[1] 7:22

### A

**Absolutely**
[1] 55:20
**Acceptable**
[2] 44:19 52:1
**Accepting**
[1] 43:19
**Accordance**
[1] 3:41
**Account**
[2] 35:3 5:8
**Accurate**
[2] 28:17 53:17
**Accurately**
[1] 76:9
**Activities**
[1] 56:17
**Activity**
[3] 13:9 13:22 13:41
**Actual**
[22] 35:24 44:9 44:10 44:11 49:14 49:18 51:2 52:2 52:5 14:7 2:18 68:7 68:17 58:19 59:10 59:14 59:17 59:24 60:1 60:12 60:17 61:7 67:10
**Adams**
[1] 119
**Add**
[1] 16:7
**Additional**
[1] 16:18
**Address**
[1] 2:51
**Adhesive**

---

[2] 54:6 54:20
**Advised**
[1] 35:21
**Afterwards**
[1] 75:14
**AGC's**
[1] 44:13
**Agree**
[3] 26:24 27:20 43:13
**Agreed**
[2] 28:9 28:16
**Agreeing**
[1] 44:1
**Agreement**
[2] 1:8 76:5
**Agrees**
[1] 33:24
**Ahead**
[1] 74:21
**Air**
[2] 53:7 64:18
**Aisles**
[1] 67:6
**Alan**
[1] 4:23
**Alarm**
[7] 41:13 41:14 41:16 41:23 42:2 42:5 53:11
**Allen**
[1] 33:11
**Allow**
[3] 39:17 66:18 68:16
**Alone**
[1] 71:20
**Altered**
[1] 42:7
**Aluminum**
[1] 17:19
**Amount**
[4] 25:11 30:16 52:24 54:21
**Analysis**
[2] 73:9 73:11
**Ancillary**
[1] 54:4
**Anodized**
[1] 17:19
**Answer**
[3] 8:17 29:17 41:18
**Anticipation**
[1] 55:2
**Anyplace**
[1] 6:16
**Anyway**
[1] 37:19
**Apologize**
[2] 26:8 59:12
**Appear**
[4] 17:1 17:2 19:18 20:22
**APPEARANCES**
[1] 2:1
**Appeared**
[1] 20:7
**Appearing**
[3] 2:8 2:13 2:19
**Applicable**
[3] 57:5 57:7 57:15
**Application**
[1] 44:16
**Appreciate**
[1] 10:21
**Apprenticeships**
[1] 6:15
**Approach**
[1] 5:16
**Approached**
[1] 46:23
**Architectural**
[2] 51:4 59:4
**Area**
[7] 18:21 39:21 41:3 46:14 57:1 65:8 68:2

## Areas
Arrival
[1] 70:16

Arrived
[1] 13:10

Art
[8] 11:3 20:18 25:16 31:15 36:24 39:1 40:16 55:11

Ascribed
[1] 23:9

Assessing
[1] 70:19

Assessment
[2] 26:24 66:19

Associated
[3] 18:24 50:2 75:6

Associations
[1] 7:4

Assume
[5] 13:13 29:8 34:8 41:11 48:22

Attached
[1] 34:2

Attended
[1] 6:21

Attending
[1] 6:18

Attention
[1] 26:15

Attest
[1] 58:18

Attorneys
[3] 2:4 2:10 2:16

Attributed
[1] 61:22

Authority
[16] 4:10 11:18 13:8 13:9 13:15 15:3 16:9 21:9 21:17 26:19 27:4 35:14 37:15 38:4 73:1 73:5

Authorized
[1] 39:1

Automatic
[3] 18:15 22:20 22:24

Aware
[4] 33:13 34:4 34:9 34:19

Awhile
[1] 10:2

## B
Bachelor's
[1] 6:7

Back-up
[2] 9:22 10:9

Background
[1] 6:6

Bank
[2] 1:8 76:4

Banking
[2] 1:9 76:7

Bar
[2] 27:19 51:23

Barrier
[1] 65:7

Based
[1] 23:14

Basis
[6] 25:3 30:9 49:2 57:9 58:2 65:23

Bath
[4] 13:7 26:22 27:10 73:2

Bathroom
[1] 47:10

Bathrooms
[1] 40:14

Beam
[5] 51:16 51:21 51:22 51:23 52:3

Beared
[1] 73:9

Bearing

[13] 16:2 16:4 16:7 16:12 26:18 26:21 29:10 29:13 10:28:12 29:1 9:22 76:5

Bears
[1] 28:12

Bed
[3] 13:7 27:10 73:2

Begin
[1] 36:10

Begins
[2] 24:17 43:18

Behalf
[3] 2:8 2:13 2:19

Behind
[1] 67:16

Belabor
[1] 63:5

Below
[12] 52:2 53:8 53:14 54:16 54:17 54:17 56:5 56:6 56:13 56:21 56:21 76:22

Between
[3] 26:19 26:21 32:14

Beyond
[4] 13:8 27:11 31:16 73:2

Bid
[7] 5:18 6:2 12:11 54:19 54:21 55:2 74:6

Bids
[2] 6:2 54:13

Billings
[1] 10:17

Birth
[1] 5:7

Blank
[2] 39:14 39:21

Block
[1] 66:19

Blocked
[3] 69:6 69:10 69:17

Blythe
[1] 44:23

Board
[1] 45:8

Body
[1] 26:22

Borne
[1] 73:17

Bottom
[4] 43:8 56:9 56:9 63:17

Bounced
[1] 45:8

Box
[2] 2:5 39:20

Boxed
[1] 62:24

Boxes
[3] 39:22 39:23 39:24

Boy
[2] 12:21 32:19

Break
[1] 73:4

Breakdown
[2] 49:15 54:2

Bring
[1] 10:10

Broke
[1] 17:22

Broken
[1] 17:19

Brothers
[2] 1:13 76:11

Build
[1] 65:7

Building
[13] 2:5 15:3 15:4 15:17 16:11 17:8 19:9 19:13 20:6 24:24:22 42:1 48:13

Built
[2] 57:10 65:9

Bunch
[1] 36:15

## Business
[4] 24:8 3

Buy
[1] 40:19

## C
Canceled
[2] 55:3 55:5

Care
[2] 61:24 64:16

Carol
[1] 10:7

Carpet
[1] 68:4

Case
[3] 9:9 9:10 43:3

Cash
[2] 39:15 41:12

Caused
[1] 28:21

Causing
[1] 38:8

Ceiling
[11] 13:20 13:21 21:2 21:5 39:21 40:24 41:1 41:4 41:5 41:8

Center
[1] 33:18

CENTRAL
[1] 1:4

Cents
[1] 58:8

Certain
[7] 16:6 25:7 25:8 30:9 30:11 39:8 46:3

Certainly
[1] 62:21

Certificate
[5] 38:9 39:3 39:7 40:21 42:12

Certificates
[1] 37:24

Certified
[2] 10:13 75:6

Certify
[2] 75:7 76:15

Cetera
[5] 30:4 30:4 51:16 51:21 64:22

Chance
[3] 47:7 47:16 72:3

Change
[2] 76:14 76:15

Channels
[1] 30:5

Charge
[1] 35:17

Charles
[2] 2:13 4:8

Chart
[1] 51:2

Chose
[1] 59:18

CHRISTIAN
[1] 75:3

Cinder
[1] 66:19

City
[1] 57:11

Clean
[3] 48:10 65:3 65:4

Cleaned
[1] 18:22

Cleaning
[4] 14:5 55:22 56:4 70:18

Cleanup
[3] 46:14 56:7 56:8

Clear
[1] 70:12

Clerical
[2] 41:15 41:24

Climitization

## Close
[2] 52:15 52:16

Co
[1] 7:24

Co-op
[2] 6:17 7:24

COCHRAN
[2] 2:3

Code
[1] 39:16

Collapsed
[2] 13:16 21:4

College
[2] 6:18 6:23

Column
[13] 49:11 49:14 49:17 49:20 55:21 57:21 57:22 58:15 58:21 60:8 72:18 72:18 73:17

Columns
[1] 15:16

Commercial
[1] 68:4

Common
[16] 16:19 27:5 27:20 66:20 73:7 73:8

Companies
[1] 74:3

Company
[14] 1:7 1:13 5:11 6:19 7:14 19:2 23:5 47:23 63:11 69:3 74:4 74:5 76:2 76:12

Compare
[2] 49:1 52:5

Comparing
[1] 49:7

Complete
[4] 33:24 36:23 43:14 55:17

Completed
[5] 36:17 36:20 41:13 41:17 42:7

Completion
[3] 5:20 33:17 37:7

Component
[4] 15:17 18:5 20:19 21:24

Components
[3] 24:18 24:23 25:7

Concern
[1] 13:15

Concerned
[1] 8:23

Conclusion
[2] 46:21 47:17

Conditioning
[1] 53:7

Consider
[3] 50:20 51:1 62:4

Considered
[9] 46:11 59:15 60:3 61:10 63:8 63:23 66:9 67:3 70:1

Constitutes
[1] 64:3

Construction
[13] 5:11 6:8 6:19 7:23 8:1 34:2 34:9 34:19 35:17 50:21 54:15 56:7 58:7

Consult
[1] 25:12

Contact
[4] 11:7 29:11 29:22 35:16

Contacted
[4] 11:1 11:9 30:13 52:22

Contains
[1] 75:16

Contents
[2] 64:8 69:3

Contingencies
[1] 57:9

Contingency
[1] 57:3

Continue

**[4]** 33:1 57:15 66:13 69:19
[2] 56:11 57:11

**Contract**
[4] 41:20 53:17 54:9 54:11

**Contracted**
[1] 49:24

**Contractor**
[6] 17:12 36:4 52:22 53:24
54:10 65:18

**Contractor's**
[1] 64:6

**Contractors**
[2] 74:7 74:15

**Contrary**
[1] 76:21

**Controversy**
[1] 75:12

**Copies**
[2] 10:16 10:17

**Copy**
[5] 10:19 12:23 14:20 15:14
43:14

**Corner**
[3] 39:21 65:11 66:15

**Corporation**
[2] 1:13 76:12

**Correct**
[37] 8:11 9:8 10:24 15:6 15:
7 15:18 15:19 15:22 15:23
16:1 18:16 21:24 22:12 22:8
22:9 28:15 34:11 34:12 35:
7 35:10 35:11 36:2 37:23
42:14 43:5 45:18 45:23 47:
18 51:8 51:11 52:11 52:14
52:20 57:23 58:4 58:12 58:
15

**Correctly**
[2] 14:6 57:20

**Cost**
[64] 9:21 10:13 15:10 17:24
18:1 18:1 18:5 18:24 20:16
20:17 22:2 22:10 22:11 22:
17 23:6 23:11 23:19 24:2
24:5 24:9 24:13 24:14 25:2
28:20 30:20 30:24 31:2 31:
10 31:17 43:23 44:4 44:9
44:11 44:12 49:1 49:2 49:4
49:16 49:18 50:2 50:4 51:
13 52:6 52:12 52:18 56:21
58:6 59:2 59:16 59:22 59:
59:16 59:16 59:18 59:23 60:
1 60:3 60:13 61:13 71:11
71:14 71:16 73:12 73:16

**Costs**
[15] 23:12 25:8 43:19 44:7
44:10 53:16 57:21 58:7 58:
17 58:19 58:19 59:5 60:13
61:22 74:10

**Cotton**
[21] 11:16 13:10 13:24 14:2
45:16 45:20 46:23 47:21 48:
2 50:6 50:19 51:1 61:18 61:
22 62:19 63:1 64:11 65:7
65:10 65:10 66:6

**Cotton's**
[2] 45:24 61:3

**Counters**
[3] 38:8 39:15 41:12

**Counting**
[1] 67:24

**COUNTY**
[1] 75:3

**Couple**
[3] 23:13 35:18 67:10

**Course**
[3] 9:19 13:6 28:12

**Court**
[2] 1:3 75:7

**Cover**
[20] 1 39:20

**Covered**
[1] 9:24

**Cracked**
[1] 27:12

**Cradle**
[1] 5:16

**Crew**
[1] 57:18

**Critical**
[1] 31:14

**Cross**
[2] 3:3 70:14

**CSR**
[3] 1:21 1:24 75:23

**CULBERTSON**
[1] 2:10

**CULLEN**
[2] 2:3

**Current**
[1] 4:24

**Customary**
[1] 74:13

**Cut**
[2] 65:16 66:7

**D**

**Daily**
[3] 12:24 63:2 65:23

**Damage**
[29] 9:10 10:23 12:9 13:18
13:21 14:8 15:3 15:18 15:
22 17:3 18:16 21:11 22:7
22:21 22:23 23:3 23:4 24:
24 25:13 27:11 28:20 28:21
30:16 46:15 67:1 70:20 70:
24 71:20 73:18

**Damaged**
[24] 16:7 17:4 18:8 18:10
19:7 19:10 19:19 20:20 20:
22 21:7 21:24 22:15 23:17
23:24 28:11 31:16 40:16 47:
3 56:24 66:11 66:19 68:2
70:6 70:6

**Date**
[19] 5:6 14:10 14:19 15:11
22:4 26:4 27:14 32:8 36:10
36:20 37:10 38:16 39:9 41:
10 42:7 42:20 60:20 75:13
76:20

**DATE_____**
[1] 76:24

**Dated**
[5] 1:8 15:5 22:10 33:11 76:
5

**Dave**
[1] 29:22

**David**
[3] 2:7 10:8 35:16

**Days**
[2] 23:13 64:20

**Deal**
[2] 63:16 74:16

**Dealing**
[2] 13:11 13:11

**Dealt**
[2] 47:23 74:16

**Debris**
[5] 14:5 18:21 65:4 65:16
66:7

**Decided**
[2] 44:19 54:13

**Deck**
[1] 17:6

**Defendant**
[5] 1:14 1:18 2:13 4:3 76:13

**Deficiencies**
[1] 39:8

**Define**
[1] 33:1

**Defined**
[1] 63:9

**Defines**
[1] 10:13

**Definitely**
[1] 68:5

**Degree**
[1] 6:7

**Delaware**
[1] 1:13 76:12

**Delivery**
[1] 33:17

**DENES**
[1] 2:15

**Deodorizing**
[1] 55:23

**Department**
[2] 66:15 66:20

**Departments**
[1] 69:11

**Deponent**
[1] 75:10

**Deposition**
[16] 1:17 3:3 3:9 3:9 3:10
3:10 3:11 9:23 14:18 26:3
32:7 38:15 42:19 60:17 75:
8 75:13

**Described**
[1] 70:4

**Designating**
[1] 33:13

**Desired**
[1] 7:8

**Detailed**
[1] 6:1

**Determinations**
[1] 25:20

**Determined**
[1] 51:7

**Device**
[1] 53:11

**Different**
[2] 5:13 69:11

**Direct**
[4] 3:3 4:6 26:15 74:9

**Directed**
[2] 71:10 71:14

**Direction**
[1] 31:5

**Directly**
[3] 25:17 49:24 73:18

**Disassemble**
[2] 67:21 68:11

**Disaster**
[2] 47:22 48:7

**Discard**
[3] 67:11 68:4 68:21

**Displays**
[1] 40:2

**Disposed**
[1] 40:15

**Dispute**
[1] 61:21

**DISTRICT**
[2] 1:3 1:4

**Divided**
[1] 16:15

**DIVISION**
[1] 1:4

**Document**
[18] 14:16 14:22 26:1 26:6
31:18 32:5 32:11 33:1 34:
22 38:13 39:5 39:9 42:17
42:22 43:1 48:20 60:17 60:
23

**Documented**
[1] 12:24

**Documents**
[4] 9:15 9:18 30:4 32:17

**Dollars**
[2] 58:7 60:8

**Done**
[15] 4:12 8:2 9:2 17:13 30:
6 37:18 37:19 42:2 55:1 55:
3 56:18 56:19 71:2 71:10
73:22

**Door**
[1] 35:7

**Doors**
[5] 18:15 19:4 22:20 22:24

**42:4**

**Down**
[25] 4:18 17:5 17:6 19:20
21:5 21:20 23:13 35:21 51:
15 53:2 53:14 54:5 56:3 56:
6 56:8 56:11 63:17 65:15 65:
16 66:7 66:11 68:4 68:8 68:
19 75:14

**Dried**
[1] 64:5

**Dripping**
[1] 7:7

**Dry**
[12] 19:6 19:12 19:20 19:23
23:15 23:17 46:3 47:5 64:
11 67:16 68:23 70:5

**Drying**
[2] 64:8 70:7

**Duct**
[1] 53:2

**Due**
[2] 30:2 46:16

**Duly**
[8] 4:3 14:16 26:1 32:5 38:
13 42:14 60:17 75:10

**During**
[2] 26:17 35:9

**Duties**
[1] 5:13

**E**

**E-mails**
[2] 10:1 35:18

**East**
[1] 1:19

**Educational**
[1] 6:6

**Effected**
[1] 67:11

**Effort**
[2] 30:3 73:3

**Elaborate**
[1] 28:16

**Electric**
[2] 53:18 66:3

**Electrical**
[13] 20:24 24:12 38:6 39:14
39:24 42:5 53:12 53:15 53:
16 53:17 54:1 65:17 65:18

**Electrician**
[1] 54:3

**Electricians**
[1] 65:23

**Elements**
[1] 66:16

**Eliminate**
[1] 65:8

**Emergency**
[7] 1:6 30:2 47:21 48:7 50:
6 50:17 64:7

**Employed**
[2] 6:11 7:10

**Employee**
[1] 35:17

**Employees**
[2] 46:16 63:15

**Employment**
[1] 7:21

**End**
[2] 17:7 48:16

**Ended**
[2] 47:19 72:14

**Ends**
[1] 27:19

**Engaged**
[2] 14:2

**Engineer**
[2] 25:12 50:1

**Engineering**
[6] 6:8 7:7 25:18 51:4 51:19
59:5

**Engineers**
[7] 5:17 25:17 29:3 29:6 29:

**Entailed**
[1] 44:16

**Entire**
[1] 62:16

**Entire**
[9] 5:21 7:18 19:23 24:21 34:16 53:17 60:5 72:21 73:13

**Entities**
[1] 8:4

**Entitled**
[1] 76:17

**Entry**
[1] 13:20

**Envelope**
[3] 18:3 21:12 21:18

**Equipment**
[3] 62:1 64:21 68:2

**Essentially**
[3] 6:9 37:19 50:18

**Estimate**
[23] 5:17 18:19 19:15 20:24 22:2 22:10 22:17 23:4 23:19 24:2 24:9 24:13 37:12 44:4 44:6 49:6 52:10 54:24 58:24 59:5 74:14 73:24

**Estimated**
[13] 12:11 17:15 18:15 22:15 23:16 24:6 49:2 49:4 51:6 51:12 52:18 55:23 57:12

**Estimates**
[1] 12:4

**Estimating**
[1] 14:8

**Estimator**
[5] 5:10 5:22 5:24 7:17 12:15

**Et**
[5] 30:4 30:4 51:16 51:21 64:21

**Evaluate**
[1] 9:1

**Evaluation**
[2] 17:13 20:10

**Exact**
[3] 37:10 60:23 72:9

**Exactly**
[2] 14:12 46:8

**Exam**
[2] 7:7 7:9

**Examination**
[4] 3:3 3:3 4:6 70:14

**Examined**
[1] 4:4

**Exceed**
[3] 25:1 25:11 31:9

**Except**
[2] 17:9 76:20

**Excuse**
[1] 60:1

**Excused**
[1] 74:23

**Exercise**
[2] 65:8 68:2

**Exhibit**
[29] 3:8 3:9 3:9 3:10 3:10 3:11 14:18 14:21 26:3 31:7 32:7 32:10 33:12 34:3 34:17 34:22 38:15 38:18 42:19 42:21 48:16 58:15 58:20 60:19 60:21 70:20 71:1 72:16 72:17

**EXHIBITS**
[1] 3:6

**Existing**
[2] 53:8 59:20

**Expenses**
[1] 72:19

**Experience**
[4] 25:6 48:1 48:4 48:5

**Experiences**

**Expert**
[1] 7:21

**Explain**
[8] 8:18 8:20 16:2 16:22 17:14 33:6 49:10 72:23

**Extended**
[1] 15:2

**Extent**
[7] 12:9 17:11 25:21 47:3 62:8 62:18 67:1

**Extinguishers**
[2] 41:9 41:10

## F

**Facility**
[2] 25:11 27:9

**Fact**
[2] 38:24 70:23

**Factors**
[1] 44:17

**Fair**
[5] 4:21 8:11 18:9 60:11 73:13

**Fairly**
[4] 41:1 52:15 52:16 67:19

**Fallen**
[2] 13:22 27:9

**Familiar**
[1] 74:6

**Far**
[11] 8:22 9:16 10:13 21:11 31:2 33:5 43:14 52:19 64:1 64:1 64:2

**Fast**
[3] 4:16 46:24 59:13

**Favorable**
[2] 8:14 8:21

**Fee**
[1] 72:24

**Fees**
[1] 51:9

**Feet**
[2] 16:10 68:15

**Fell**
[3] 27:10 27:22 37:15

**Few**
[3] 63:10 64:20 70:10

**Field**
[2] 6:11 6:13

**Figure**
[1] 55:18

**Final**
[3] 38:9 55:22 56:4

**Finalize**
[1] 39:2

**Finally**
[1] 24:12

**Fine**
[3] 19:19 44:14 67:18

**Finish**
[6] 5:22 38:5 40:19 42:10 56:12 56:14

**Finished**
[1] 42:7

**Fire**
[13] 40:23 40:24 41:9 41:13 41:14 41:16 41:22 42:4 53:11 57:11 57:17 57:18

**First**
[17] 4:3 8:5 8:7 12:17 13:10 33:14 33:22 34:21 47:8 48:4 48:5 49:10 50:5 51:20 62:24 63:10 64:16

**Firsthand**
[1] 70:23

**Five**
[3] 42:19 42:21 72:16

**Fixtures**
[6] 21:6 40:19 47:11 47:20 53:19 66:1

**Floor**
[9] 15:24 38:7 39:22 39:23

**Flooring**
[22] 35:12 35:15 37:2 37:3 37:8 46:7 54:12 54:12 54:14 54:18 54:19 55:13 59:1 65:5 67:7 73:6 67:9 70:7 71:20 71:21 73:23 73:24

**Floorings**
[1] 55:10

**Fluorescent**
[1] 66:7

**Fold**
[1] 5:15

**Follow-up**
[1] 70:11

**Following**
[3] 34:1 64:24 65:1

**Follows**
[1] 4:5

**Foot**
[2] 16:6 19:9

**Footage**
[1] 16:22

**Foregoing**
[2] 75:13 76:16

**Forewarn**
[1] 4:14

**Form**
[3] 25:3 43:22 75:15

**Formed**
[2] 8:23 15:8

**Forth**
[3] 35:18 66:8 70:9

**Forward**
[1] 30:7

**Foundation**
[1] 15:20

**Four**
[6] 19:8 38:12 38:15 38:18 68:15 72:18

**Fourth**
[1] 49:22 68:8 73:17

**Frames**
[1] 17:20

**Free**
[1] 28:15 63:20

**Freeters**
[1] 35:16

**Front**
[10] 13:19 17:10 17:18 21:1 33:13 41:4 52:24 59:21 60:5 65:2

**Full**
[1] 4:22 59:17

**Fully**
[1] 76:19

**Function**
[1] 48:6

**Functions**
[1] 5:14

## G

**Gart**
[1] 1:13 76:11

**Gas**
[1] 20:8

**General**
[2] 36:4 46:13 53:24 54:10 56:7

**Generally**
[1] 48:8

**Generators**
[1] 64:20 65:3

**Given**
[5] 10:11 14:20 75:19 76:17 76:20

**Glad**
[1] 8:18

**Glass**
[12] 13:19 17:14 17:18 17:21 17:24 18:2 18:8 19:4 22:13 53:1 59:21 74:5

**Glazing**

**Glue**
[1] 68:6

**Glued**
[1] 68:4

**Goetz**
[1] 29:23

**Golf**
[1] 69:12

**Goods**
[2] 1:13 76:11

**Gordmans**
[12] 13:7 16:13 16:17 19:11 26:20 26:21 27:4 27:8 27:23 37:5 66:20 73:2

**Grade**
[1] 4:15

**Graduated**
[1] 7:6

**Grave**
[1] 5:16

**Grid**
[4] 13:21 21:2 21:5 41:2

**Group**
[2] 43:8

**Grouping**
[1] 5:15

**Guess**
[10] 10:1 21:19 28:13 46:8 53:15 56:10 56:15 61:14 62:7 63:18

**Gut**
[2] 25:5

## H

**Haines**
[3] 1:21 75:5 75:7

**Half**
[1] 16:12

**Hand**
[4] 13:22 32:9 38:17 75:19

**Hang**
[1] 56:23

**Hanging**
[4] 13:17 65:16 65:18 66:7

**HANNA**
[1] 2:3

**Hanson**
[7] 25:16 29:3 29:6 29:23 30:14 51:9 71:9

**Hard**
[1] 17:4

**Heater**
[1] 40:9

**Heating**
[1] 53:6

**Height**
[1] 68:15

**Help**
[3] 65:8 65:10 66:15

**Hereby**
[2] 75:7 76:15

**Herein**
[3] 4:2 75:8 75:12

**Hereto**
[1] 34:2

**Hesitate**
[1] 4:18

**High**
[1] 18:4

**HINSHAW**
[2] 1:10

**Hired**
[2] 25:17 36:6

**Hole**
[2] 17:10 65:11

**Hot**
[2] 40:5 40:9

**HVAC**
[4] 20:3 53:5 53:7 53:8

**Hypothetically**
[1] 64:11

**ID**
[1] 42:4

**Idea**
[1] 20:18

**Identification**
[6] 14:17 26:2 32:6 38:14 42:18 60:18

**III**
[3] 1:6 4:14 76:1

**Illinois**
[15] 1:4 1:6 1:7 1:9 1:20 2: 5 2:6 2:12 2:17 5:3 75:1 75:20 76:1 76:3 76:7

**Immediately**
[1] 36:13

**Improvement**
[1] 40:3

**Improvements**
[3] 37:4 37:9 68:14

**INC**
[2] 1:12 76:10

**Include**
[1] 58:14

**Included**
[3] 54:20 55:19 55:20

**Incorrect**
[1] 58:9

**Incurred**
[1] 49:18

**INDEX**
[1] 3:1

**Indicated**
[1] 76:21

**Information**
[2] 9:22 10:9

**Informed**
[1] 8:13

**Initial**
[1] 8:24

**Inquiry**
[1] 74:9

**Inside**
[1] 13:12

**Inspection**
[1] 26:17

**Instability**
[9] 26:18 27:2 27:18 28:1 28:3 28:5 28:18 28:21 46:17

**Install**
[2] 39:20 65:1

**Installed**
[1] 40:12

**Installing**
[1] 64:24

**Instance**
[2] 1:18 4:2

**Instead**
[2] 59:18 60:5

**Institution**
[2] 1:9 76:7

**Insulation**
[9] 17:6 52:17 59:9 67:12 67:13 67:16 68:22 68:23 70: 6

**Intact**
[2] 20:7 40:10

**Interest**
[1] 7:13

**Interfere**
[1] 70:19

**Internal**
[1] 63:11

**Inventory**
[1] 67:24

**Involved**
[5] 29:5 29:8 29:9 29:10 49: 23

**Iowa**
[3] 6:7 6:20 7:6

**Issue**

**Issued**
[4] 38:5 38:6 38:24 39:7
[7] 29:12 29:19 30:15 30:19 30:23 38:1 42:13

**Item**
[19] 23:1 35:11 41:15 41:24 49:1 49:1 50:6 53:2 53:4 53:10 53:15 54:5 59:20 62: 24 66:22 67:20 68:19 68:22 69:20

**Items**
[22] 28:5 29:2 29:21 39:24 40:3 42:6 49:22 50:1 52:2 52:9 53:20 54:1 54:4 56:16 58:14 63:10 65:6 65:17 69: 5 69:23 70:1 70:3

**Itself**
[1] 17:21

## J

**Jeff**
[2] 49:8 49:16

**Job**
[7] 5:13 5:18 5:18 5:19 9: 20 30:11 74:10

**Jobs**
[1] 8:1

**Joist**
[1] 51:23

**Joists**
[3] 27:8 27:13 27:19

**Jones**
[1] 44:23

**Jones-Blythe**
[13] 2:19 5:4 5:5 5:11 5:15 7:11 7:22 8:8 8:9 11:8 35: 24 44:22 44:23

**Judgment**
[1] 64:9

**Junction**
[1] 39:20

**June**
[1] 36:23

## K

**Keep**
[4] 35:19 46:16 56:23 69:5

**Kind**
[8] 5:16 9:16 13:22 14:1 22: 24 37:15 41:12 68:22

**Knocked**
[2] 21:16 21:20 27:5

**Knowing**
[2] 23:11 25:6

**Knowledge**
[5] 30:22 31:3 42:9 65:21 70:23

**Known**
[2] 1:9 76:6

## L

**Labeled**
[5] 34:22 49:20 53:2 54:6 58:21

**Laborers**
[1] 56:8

**Landlord**
[1] 33:24

**Large**
[1] 41:1

**Larger**
[1] 7:20

**Last**
[8] 24:17 27:17 37:13 37:14 37:21 37:22 43:18 45:2

**Late**
[1] 33:2

**Law**
[3] 2:4 2:10 2:16

**Lawsuit**
[1] 32:14

**Lay**
[1] 41:4

**Lead**

**Leaking**
[1] 19:6

**Learn**
[2] 17:3 17:9

**Learned**
[1] 52:21

**Lease**
[1] 36:24

**Lee**
[9] 31:20 31:23 32:1 32:13 32:24 33:5 35:23 62:10 64:2

**Legal**
[1] 33:11

**Less**
[1] 62:13

**Letter**
[3] 19:15 23:23 24:12

**Letterhead**
[10] 9:23 21:10 26:13 27:16 28:6 28:17 28:22 31:8 33: 11 35:6

**Liability**
[1] 10:15

**Liberty**
[2] 1:7 76:2

**License**
[2] 33:16 48:14

**Licenses**
[1] 7:8 7:9

**Lien**
[1] 7:1

**Lift**
[1] 10:14

**Light**
[1] 65:24

**Lights**
[5] 21:6 21:15 21:20 53:19 66:1

**Limit**
[4] 13:17 64:21 65:17 66:8

**Limited**
[1] 48:13

**Line**
[2] 1:7 76:2

**Lineal**
[1] 68:8 76:14

**Lines**
[1] 16:10

**List**
[1] 57:3 66:5

**Listed**
[1] 56:16

**Litigation**
[1] 21:10 67:20

**LLC**
[1] 4:10

**Load**
[2] 1:6 76:1

**Load-bearing**
[2] 26:18 26:21

**Located**
[2] 26:18 26:21

**Location**
[1] 18:13

**Locations**
[1] 51:23

**Look**
[1] 72:10

**Looked**
[10] 11:12 20:20 21:17 23:6 32:17 43:12 52:5 60:22 69: 19 72:2

**Looking**
[1] 9:20 31:5

**Looks**
[1] 16:5 62:3

**Loss**
[5] 14:3 61:3 69:4 69:14 69: 23

**Lower**
[2] 36:14 48:13

**LTD**
[3] 57:3 57:11 62:24
[1] 2:3

## M

**Main**
[1] 13:15

**Maintain**
[2] 41:14 41:23

**Major**
[4] 17:9 24:18 24:22 46:15

**Majority**
[5] 17:18 24:18 24:22 36:7 73:8

**Manage**
[1] 5:19

**Manager**
[5] 5:10 5:23 7:17 12:12 12: 15

**Manipulate**
[1] 69:3

**Manipulating**
[1] 68:1

**Map**
[1] 37:16

**March**
[17] 12:17 12:19 15:5 22:4 22:11 23:22 28:6 28:22 31: 8 34:11 35:5 36:2 36:11 36: 11 71:1 71:6 71:7

**Mark**
[11] 1:17 4:1 4:23 14:14 25: 23 32:4 38:12 42:15 60:16 75:10 76:15

**Marked**
[10] 14:16 14:21 26:1 32:5 32:10 38:13 38:17 42:17 48: 16 60:17

**Masonry**
[5] 26:19 26:21 27:11 27:14 51:16 51:21 51:24

**Material**
[4] 13:14 57:9 63:13 67:7

**Materials**
[17] 35:13 35:15 35:20 35: 22 37:3 37:4 37:8 46:7 54: 12 54:15 54:18 55:4 55:13 56:12 56:14 59:1 63:4

**Matter**
[7] 8:11 16:21 17:21 32:2 64:20 75:12 76:18

**Mean**
[17] 5:24 7:5 21:12 21:14 38:22 40:9 51:20 52:8 53:5 56:19 57:4 57:16 63:11 63: 14 64:17 71:22 73:7

**Meaning**
[2] 20:14 50:13

**Means**
[5] 16:3 32:18 32:18 54:16 54:17

**Mechanical**
[1] 40:11

**Meeting**
[1] 63:2

**Member**
[1] 7:3

**Membrane**
[2] 16:22 16:24

**Memory**
[1] 9:16

**Mention**
[1] 65:3

**Mentioned**
[2] 10:21 70:16

**Merchandise**
[4] 13:12 14:4 36:14 48:12

**Mess**
[1] 48:11

**Metal**
[1] 17:6

**Method**
[2] 44:14 44:15

**Mid**

[1] 35:21
[1] 57:22
**Might**
[2] 10:16 48:12
**Mind**
[2] 24:20 26:16
**Minimal**
[1] 18:2
**Minimize**
[1] 36:14
**Minimum**
[1] 17:24
**Minor**
[1] 53:11
**Minute**
[3] 34:14 43:11 58:16
**Miscellaneous**
[1] 20:1
**Missed**
[1] 53:11
**Missing**
[4] 13:19 40:24 41:9 53:18
**Moisture**
[1] 65:8
**Moment**
[2] 53:21 60:22
**Money**
[2] 53:20 55:12
**Most**
[8] 8:14 8:22 14:4 45:15 45:
21 45:23 46:14 62:23
**Mounted**
[1] 40:1
**Mouth**
[1] 52:8
**Move**
[7] 30:6 36:23 37:1 37:5 41:
7 54:14 55:14
**Moved**
[4] 27:6 27:7 37:6 65:14
**Movers**
[1] 64:18
**Moving**
[5] 35:23 37:16 40:17 46:24
55:8
**Must**
[1] 56:15

## N

**N/A**
[1] 57:4
**Name**
[4] 4:8 4:22 45:2 49:9
**National**
[2] 1:7 76:3
**Nature**
[2] 30:2 30:13
**Near**
[1] 48:15
**Necessary**
[5] 46:19 47:3 47:11 47:15
72:13
**Need**
[8] 18:23 19:21 28:16 30:6
35:20 44:8 56:18 64:5
**Needed**
[10] 16:7 20:15 25:21 25:22
29:22 30:9 47:4 47:7 61:4
71:10
**Needs**
[2] 30:24 31:4
**Never**
[6] 40:8 40:18 41:13 41:17
42:2 55:1
**New**
[4] 37:2 40:19 65:5 66:12
**Next**
[9] 16:3 17:23 30:1 37:5 41:
9 59:20 63:21 65:14 65:15
**NIC**
[1] 54:8

**Ninth**
NO.06-CV-3177
[2] 1:11 76:9
**Nobody**
[3] 42:1 47:1 72:1
**Non**
[1] 7:24
**Non-related**
[1] 7:24
**None**
[1] 69:2
**Normal**
[1] 55:11
**North**
[1] 2:16
**NORTHRUP**
[1] 2:3
**Notary**
[3] 1:21 75:5 75:23
**Notation**
[3] 17:23 20:14 21:21
**Note**
[1] 46:18
**Noted**
[1] 10:15
**Notes**
[1] 75:18
**Notice**
[4] 1:22 39:6 42:8 48:16
**November**
[2] 1:8 76:5
**Number**
[30] 3:8 3:9 3:9 3:10 3:10
3:11 14:18 18:4 26:3 32:7
32:10 36:15 38:16 41:21 42:
19 42:21 43:23 43:24 44:1
44:18 44:19 52:21 56:9 56:
9 57:22 58:2 60:19 70:20
71:1 72:16
**Numbers**
[3] 52:5 74:12 74:14
**Nutshell**
[1] 5:12

## O

**Oak**
[3] 6:18 6:19 7:23
**Oath**
[1] 4:4
**Object**
[2] 8:15 62:17
**Objection**
[1] 62:7
**Observation**
[2] 45:19 65:22
**Observations**
[1] 27:24
**Observe**
[10] 14:1 17:9 17:16 18:18
19:5 20:3 21:8 46:10 73:18
73:21
**Observed**
[14] 12:20 15:20 16:23 18:7
18:20 19:14 20:23 22:22 26:
9 26:17 27:18 28:18 39:12
46:1
**Observing**
[1] 13:1
**Obvious**
[1] 17:10
**Obviously**
[18] 5:23 7:18 13:18 21:18
28:10 31:3 39:17 41:6 42:3
46:13 61:18 63:10 64:3 65:
4 67:7 67:24 68:10 69:2
**Occupancy**
[6] 38:1 38:9 39:3 39:7 40:
22 41:12
**Occupation**
[1] 5:9
**October**
[5] 1:19 34:3 75:9 75:20 76:

18
**Old**
[1] 67:9
**Once**
[3] 36:24 40:16 54:13
**One**
[23] 6:21 11:24 13:15 14:15
14:18 14:21 19:9 19:22 24:
4 24:3 29:9 31:7 35:13 53:
21 60:24 69:1 69:12 69:12
70:20 70:24 71:1 71:4 73:10
**Ones**
[2] 25:20 31:5 63:7
**Ongoing**
[1] 30:8
**Op**
[1] 7:24
**Open**
[1] 41:11
**Open-ended**
[2] 38:10 39:18
**Operators**
[1] 17:20
**Opinion**
[22] 8:14 8:22 8:23 8:24 15:
9 24:19 24:23 25:4 25:10
30:1 30:16 30:20 30:24 31:
34 34:10 43:22 58:3 60:12
61:9 62:14 64:1 74:12
**Opinions**
[8] 8:10 29:13 29:18 31:4
43:4 62:11 62:13 71:8
**Opportunity**
[2] 47:1 72:2
**Order**
[1] 67:1
**Ordered**
[1] 55:4
**Organizations**
[1] 7:4
**Originally**
[2] 36:21 36:22
**OSHA**
[1] 6:13
**Outdoor**
[1] 69:13
**Outside**
[1] 66:16
**Overall**
[8] 12:3 16:6 17:24 18:1 18:
5 24:24 46:22 50:3
**Own**
[3] 44:6 61:24 63:15
**Owner**
[10] 25:16 49:20 49:23 49:
24 50:11 50:15 51:9 58:15
58:21 73:18
**Owner's**
[3] 50:14 50:18 60:7
**Ownership**
[1] 7:13

## P

**P.C.**
[2] 2:15
**P.O.**
[2] 2:5
**Package**
[1] 18:6
**Packet**
[1] 10:12
**Page**
[13] 43:7 43:17 45:9 48:15
48:23 48:24 58:3 63:1 63:
21 65:14 65:16 76:21 76:14
**Paid**
[3] 9:6 51:9 54:22
**Paint**
[1] 19:19
**Painting**
[2] 19:15 23:23
**Panels**
[2] 40:24 41:6

**Paragraph**
[8] 27:17 33:6 33:23 43:18
45:9 46:18 58:3 64:17
**Parenthetical**
[1] 72:20
**Parking**
[2] 21:15 21:19
**Part**
[25] 14:4 33:15 41:19 46:11
46:14 50:19 50:20 50:24 51:
3 59:15 61:10 61:15 61:23
62:4 63:8 63:23 66:9 67:3
67:23 68:1 68:3 68:5 68:12
68:16 69:4
**Particular**
[7] 8:4 9:4 21:10 23:20 48:
19 48:23 58:2
**Parties**
[1] 32:14
**Partitioned**
[1] 46:15
**Partitions**
[6] 47:10 47:19 65:9 72:4
72:5 72:13
**Patching**
[3] 17:12 19:21 20:2
**Pay**
[1] 6:23
**Payroll**
[1] 10:14
**People**
[2] 26:10 65:19 70:18
**Percent**
[31] 15:17 16:14 16:17 16:
18 17:16 17:24 18:7 18:9
18:13 18:16 19:7 19:11 19:
16 19:23 20:1 21:23 22:7
22:8 22:14 22:21 23:3 23:8
23:10 23:16 23:23 24:7 24:
13 25:1 31:9 31:17 45:24
**Percentage**
[7] 9:2 16:12 18:4 24:7 24:
8 25:8 31:13
**Perform**
[1] 65:13
**Performed**
[4] 36:7 45:16 50:24 74:4
**Permanent**
[1] 64:19
**Person**
[1] 74:5
**Personal**
[1] 45:17
**Perspective**
[1] 61:21
**Pertaining**
[1] 21:11
**Physical**
[8] 21:23 22:7 22:14 22:21
22:23 23:24 24:7 24:8
**Pick**
[1] 52:1
**Place**
[4] 51:24 70:7 72:7 73:23
**Plaintiff**
[3] 1:10 2:8 76:8
**Plaintiff's**
[1] 62:14
**Plaza**
[4] 4:12 14:12 29:7 72:21
**Plug**
[2] 40:2 74:1
**Plumb**
[1] 27:6
**Plumbing**
[2] 40:4 40:5
**Plus**
[2] 60:14 74:17
**Pockets**
[4] 51:16 51:21 51:22 52:3
**Point**
[10] 16:8 29:8 33:8 35:13
33:17 37:18 40:12 42:13 64:

[4 66:23
[2] 21:15 21:20

**Portion**
[6] 22:14 23:24 31:24 32:15 32:24 46:3

**Portions**
[1] 19:18

**Posegate**
[3] 2:15 2:19 10:7

**Position**
[1] 45:4

**Possible**
[1] 29:22

**Possibly**
[3] 19:1 48:13 70:6

**Potentially**
[1] 66:19

**Power**
[4] 20:5 20:9 39:14 64:19

**Premises**
[19] 4:13 10:24 11:21 15:10 21:9 25:2 30:17 30:21 31:1 33:17 34:6 35:2 36:1 36:18 61:16 61:18 62:5 62:9 62:15

**Prep**
[2] 54:6 54:20

**Preparation**
[1] 10:4

**Preparations**
[1] 11:15

**Prepare**
[7] 9:11 10:10 23:4 24:2 24:9 24:13 44:6

**Prepared**
[4] 9:21 15:8 31:19 49:15

**Preparing**
[1] 6:3

**Present**
[1] 5:9

**President**
[1] 45:5

**Presume**
[1] 42:22

**Pretty**
[2] 30:12 40:18

**Prevent**
[1] 70:19

**Previously**
[3] 10:11 26:6 40:15

**Pricing**
[1] 6:2

**Print**
[1] 69:9

**Problem**
[3] 38:8 39:17 73:6

**Problems**
[1] 39:11

**Proceed**
[1] 37:2

**Process**
[4] 13:1 18:21 29:21 35:10

**Product**
[3] 61:24 62:1 71:23

**Profession**
[1] 6:24

**Professional**
[4] 7:1 7:3 7:8 7:9

**Progress**
[1] 7:20

**Project**
[22] 5:10 5:24 6:21 7:17 8:1 8:4 8:5 8:7 9:7 9:21 12:3 12:16 12:12 12:15 18:1 25:8 25:19 33:3 43:8 46:24 54:12 61:4

**Projects**
[4] 5:17 7:19 7:20 30:9

**Proper**
[3] 30:5 59:1 59:5

**Properly**
[11] 15:21 19:3 21:22 51:5

[52:7 58:23 60:2 62:23 63:8
[2] 11:11

**Property**
[1] 45:17

**Proposal**
[2] 6:3 6:4

**Protect**
[1] 45:16

**Protection**
[4] 56:12 56:14 56:19 56:22

**Provide**
[3] 35:14 63:2 63:14

**Provided**
[2] 9:5 71:15

**Provisions**
[3] 34:2 34:10 34:19

**Public**
[3] 1:21 75:5 75:23

**Pulled**
[1] 74:1

**Purports**
[3] 14:24 32:13 61:1

**Purpose**
[1] 14:8

**Purposes**
[8] 14:17 26:2 32:6 38:14 42:18 55:15 60:18 65:12

**Pursuant**
[1] 1:22

**Put**
[23] 6:12 12:11 30:3 35:15 36:15 50:9 50:11 50:21 51:2 52:8 53:4 53:15 53:12 54:1 56:5 56:13 56:13 57:4 61:20 64:10 65:5 66:12 72:9

**Putting**
[3] 13:14 37:2 48:14

## Q

**Qualifications**
[1] 6:13

**Qualified**
[1] 65:19

**Quality**
[1] 69:8

**Quantity**
[1] 6:1

**Questions**
[2] 4:12 70:9

**Quicker**
[1] 68:16

**Quickly**
[1] 47:13

## R

**Racks**
[2] 67:21 68:11

**Raining**
[1] 17:1

**Ran**
[1] 30:12

**Read**
[12] 26:12 26:17 27:18 33:14 33:22 45:1 45:3 52:7 63:6 63:22 74:21 76:16

**Reading**
[5] 15:21 21:22 24:20 51:5 57:20

**Ready**
[1] 37:4

**Real**
[1] 54:2

**Realized**
[1] 40:16

**Really**
[31] 5:15 6:22 9:24 12:10 13:14 16:11 16:20 17:8 19:17 20:6 20:8 20:9 20:18 25:5 26:9 33:7 38:23 40:2 41:24:22 45:4 47:2 49:22 52:4 56:19 63:5 63:11 63:16 63:18 69:22 72:1

**Reason**

[2] 52:1 76:14

**Reasonable**
[5] 37:11 44:4 44:5 60:11 74:13

**Rebuild**
[1] 64:4

**Recognize**
[1] 14:21

**Reconstruct**
[1] 67:2

**Reconstructing**
[1] 34:6

**Reconstruction**
[49] 11:10 11:13 11:16 11:21 11:24 11:17 19:12 12:13 35:1 35:9 36:1 36:9 36:17 44:11 46:2 46:2 12 49:16 49:19 50:3 50:21 52:5 55:15 55:17 59:2 59:6 59:16 60:3 60:13 61:11 61:15 61:17 61:23 62:4 62:8 62:15 63:9 63:12 63:16 63:19 63:23 64:3 66:9 67:4 67:24 68:1 68:3 68:5 68:13 68:17 69:4 70:2

**Record**
[1] 33:10

**Records**
[3] 41:14 41:23 42:3

**Recovery**
[2] 47:22 48:7

**Red**
[1] 6:19

**Redoing**
[1] 52:3

**Reduce**
[1] 73:4

**Reduced**
[1] 75:15

**Refer**
[4] 24:16 43:17 49:21 50:5

**Reference**
[1] 31:8

**Referencing**
[1] 39:16

**Referring**
[5] 27:16 39:13 44:21 53:13 62:19

**Reflected**
[3] 28:6 28:22 50:3

**Refreshed**
[1] 9:16

**Refreshing**
[1] 10:2

**Refurbish**
[1] 23:7

**Refurbishing**
[2] 19:1 35:9

**Regard**
[4] 23:22 71:19 72:18 74:3

**Regarding**
[1] 30:24

**Related**
[9] 7:24 21:18 28:1 41:12 46:1 52:4 52:9 63:16 63:19

**Relation**
[1] 75:11

**Relationship**
[1] 64:2

**Relocate**
[2] 67:21 68:11

**Remaining**
[1] 68:6

**Remarks**
[1] 70:11

**Remember**
[7] 11:4 12:16 13:4 13:6 14:6 34:10 58:23

**Removal**
[5] 46:19 47:2 54:6 54:20 72:12

**Remove**
[8] 28:3 53:3 66:17 66:24 67:11 68:3 68:14 68:21

**Removed**
[7] 46:3 46:7 47:4 47:20 65:17 65:24 72:6

**Removing**
[3] 14:3 67:6 70:5

**Render**
[1] 29:24

**Rendered**
[5] 8:10 24:19 31:3 31:12 34:10

**Reopen**
[1] 27:15

**Repainted**
[1] 19:24

**Repair**
[14] 22:3 23:2 23:20 24:6 29:21 29:22 30:20 44:7 49:5 5:3 53:8 58:6 59:16 59:19

**Repaired**
[3] 16:8 19:21 73:19

**Repairing**
[2] 28:20 60:6

**Repairs**
[5] 27:14 31:1 31:6 71:2 73:22

**Repeating**
[1] 69:14

**Repeats**
[1] 69:24

**Rephrase**
[2] 48:14 50:23

**Replace**
[6] 19:22 41:5 53:3 59:18 59:20 67:8

**Replaced**
[9] 16:8 18:23 20:15 20:16 25:21 25:22 46:4 47:4 72:12

**Replacement**
[16] 15:10 20:16 25:1 31:10 31:17 43:19 43:23 44:4 44:9 44:9:3 49:5 53:11 54:19 59:17 60:5 68:16

**Report**
[11] 9:4 12:22 13:5 14:12 15:9 15:11 43:4 43:14 48:15 58:4 72:17

**Reporter**
[1] 75:6

**Reporting**
[1] 75:7

**Reports**
[1] 9:21

**Represent**
[1] 4:9

**Requested**
[1] 9:22

**Require**
[1] 6:14

**Required**
[7] 23:2 56:20 56:22 57:11 57:17 64:13 64:21

**Respect**
[3] 4:1 71:8 73:16

**Response**
[2] 50:6 50:17

**Responsibility**
[5] 46:9 50:14 50:18 64:6 64:7

**Responsible**
[4] 5:21 50:15 50:16 63:14

**Rest-room**
[1] 72:5

**Result**
[1] 27:7

**Retained**
[1] 29:4 29:7

**Reused**
[1] 72:5

**Reusing**
[1] 47:19

**Review**
[15] 10:23 12:2 25:19 29:24

[30]:9 31:20 34:14 34:16 45:
51: 8 73:1

**Reviewed**
[8] 9:15 9:18 9:19 31:23 32:
16 36:12 48:19 62:10

**Rework**
[1] 19:2

**Reynolds**
[1] 5:2

**Right-hand**
[1] 13:22

**Robbins**
[1] 8:3

**Rock**
[4] 66:17 66:18 66:24 68:14

**Rolf**
[13] 2:7 3:3 8:15 10:8 33:
20 58:9 62:7 62:17 69:10
70:10 70:15 74:18 74:21

**Roof**
[15] 13:16 16:20 16:22 16:
24 17:3 17:11 20:13 21:4
21:5 22:6 28:11 29:2 59:18
59:19 65:11

**Roofing**
[5] 17:12 52:17 52:22 59:9
74:4

**Rooms**
[1] 42:5

**Routine**
[1] 6:12

**RTU**
[2] 20:12 20:14

**Rubber**
[2] 55:10 71:22

**Rubberized**
[3] 67:6 71:19 71:21

**Run**
[1] 64:21

**Rundown**
[1] 6:5

**Runs**
[1] 17:6

**Rushing**
[1] 37:17

**S**

**Safe**
[3] 27:15 28:4 66:1

**Safety**
[4] 6:12 40:23 40:24 63:2

**Salvage**
[5] 40:13 45:17 48:11 63:13
69:2

**Salvaged**
[1] 40:13

**Sandra**
[2] 1:21 75:5

**Saturated**
[2] 66:17 68:14

**Saw**
[4] 28:10 33:1 33:5 71:4

**Scheduled**
[3] 36:21 36:22 37:6

**Schmadeke**
[12] 2:13 3:3 4:7 4:9 14:14
15:23 32:4 38:12 42:15 60:
16 62:12 70:8 74:20

**School**
[2] 4:15 6:21

**Scope**
[3] 61:5 61:7 62:19

**Scrape**
[1] 68:6

**Scrapers**
[1] 67:6

**Seal**
[3] 65:10 66:15 75:19

**Second**
[10] 24:17 26:16 27:17 34:
13 37:14 37:21 45:12 49:14
56:9 68:10

**Section**
[4] 13:16 13:21 14:15 63:6

**Sections**
[2] 69:7 69:10

**Secure**
[1] 48:12

**Secured**
[2] 54:13 55:2

**See**
[32] 32:19 32:24 33:3 38:36:
21 45:20 45:10 46:6 51:18
53:3 55:24 57:13 61:9 63:2
64:23 67:1 68:7 69:19 69:
22 69:23 69:24

**Self**
[1] 16:7

**Semester**
[1] 6:21

**Send**
[1] 38:23

**Sense**
[2] 28:13 62:5 62:6

**Sentence**
[5] 24:17 24:20 24:21 26:16
27:17 33:22 43:18

**Seppi**
[5] 8:3 11:3 14:7 25:16 39:1

**September**
[2] 39:10 39:10

**Series**
[2] 4:11 16:6

**Serve**
[1] 6:15

**Served**
[2] 7:24 36:4

**Service**
[2] 47:22 48:7

**Services**
[5] 61:4 61:5 61:6

**Serving**
[2] 7:16 12:12 12:14

**Sets**
[1] 76:19

**Seven**
[1] 41:21

**Several**
[1] 55:9

**Sheet**
[4] 66:17 66:18 66:24 68:14

**Shopping**
[1] 33:18

**Shored**
[1] 27:13

**Shoring**
[2] 28:3 51:17 71:10

**Shorthand**
[2] 76:5 76:07

**Show**
[1] 33:10

**Side**
[3] 13:23 19:11 27:18 72:20
73:10

**Sides**
[2] 73:8 73:10

**Signature**
[1] 76:24

**SIGNATURE**
[1] 76:24

**Similar**
[2] 44:15 60:24

**Site**
[5] 11:10 11:14 11:17 11:24
13:10 36:13 41:14 41:23 42:
3

**Situation**
[2] 47:12 55:8 66:1

**Six**
[5] 45:9 46:18 60:16 60:19
60:21

**Sixth**
[2] 2:16 68:19

**Skip**

**Slab**
[2] 15:24 68:6

**Sliding**
[1] 19:4

**Slightly**
[1] 27:7

**Slow**
[4] 4:18

**Small**
[4] 13:15 17:10 18:5 31:24

**Smaller**
[1] 7:19

**Societies**
[1] 7:4

**Solely**
[1] 61:17

**Sometimes**
[1] 17:3

**Somewhere**
[2] 32:23 72:12

**Soon**
[1] 36:12

**Sorensen**
[8] 1:17 4:1 4:8 4:23 26:5
42:21 75:10 76:15

**SORLING**
[1] 2:3

**Sorry**
[11] 11:22 26:8 33:21 44:12
58:10 59:12 65:15 68:7 68:
8 68:20 69:8

**Sorting**
[1] 12:10

**Sounding**
[1] 45:8

**Soundness**
[1] 29:13

**Source**
[2] 44:14 44:16

**South**
[1] 2:11

**Southwest**
[4] 4:13 12:18 29:7 39:21

**Space**
[5] 27:5 27:23 28:4 54:14
55:9

**Spaces**
[2] 26:20 26:22

**Special**
[2] 55:9 55:10 55:12

**Specialized**
[1] 6:10

**Specialty**
[4] 19:2 23:1 23:5 41:2

**Specific**
[1] 41:3

**Specifically**
[1] 5:24

**Specifications**
[2] 35:1 35:4

**Spell**
[1] 45:2

**Spend**
[1] 55:12

**Sporting**
[2] 1:1 76:11

**Sports**
[16] 4:10 11:18 13:8 13:8
13:15 15:3 16:18 21:9 21:
17 26:19 27:4 35:14 37:15
38:4 73:1 73:4

**Springfield**
[6] 1:4 1:20 2:6 2:12 2:17
5:2

**Sprinkler**
[3] 24:6 42:4 66:4

**Square**
[1] 16:21

**SS**
[1] 75:2

**Stabilizing**

**Standing**
[1] 51:11

**Standing**
[1] 66:14

**Stands**
[1] 20:12

**Start**
[4] 5:21 7:19 21:13 62:24

**Started**
[7] 11:11 11:15 11:20 12:1
12:5 12:10 74:2

**State**
[3] 6:8 7:6 75:1

**Statement**
[2] 27:21 43:2

**Statements**
[1] 9:19

**STATES**
[1] 1:3

**Status**
[1] 20:10

**Stenographically**
[1] 75:14

**Steve**
[1] 45:1

**Still**
[6] 9:9 9:10 17:1 18:20 35:
12 73:10

**Stop**
[1] 4:18

**Stopped**
[2] 40:18 54:14

**Storage**
[1] 39:20

**Store**
[14] 17:10 17:18 21:1 27:10
41:3 41:4 52:24 59:20 60:5
65:1 65:2 66:21 68:12 69:12

**STORES**
[2] 1:2 76:10

**Storm**
[1] 17:2

**Street**
[3] 1:19 2:11 2:16

**Structural**
[10] 10:23 13:20 25:12 25:
18 29:13 30:13 30:24 31:1
71:9 73:1

**Structurally**
[1] 19:10

**Structure**
[16] 9:1 12:3 13:16 16:20
21:6 24:24 24:24 25:7 25:9
28:11 29:2 29:14 31:9 31:
16 41:8 46:15

**Student**
[1] 6:17

**Studs**
[3] 19:5 23:15 23:16

**Stuff**
[13] 10:1 13:13 21:19 38:10
40:14 40:19 50:17 55:10 56:
23 63:15 63:19 66:11 66:12

**Subcontractor**
[2] 64:12 66:4

**Subcontractors**
[1] 36:6

**Submitting**
[1] 6:3

**Subsequently**
[2] 25:15 27:12

**Successful**
[1] 5:19

**Successor**
[4] 1:7 1:12 76:3 76:10

**Suite**
[4] 1:20 2:4 2:11 2:17

**Summary**
[1] 15:2

**Superior**
[2] 45:6 45:7

**Suppliers**
[1] 74:7

Supplying
Support
[1] 45:1
Supported
[1] 27:19
Sworn
[2] 4:3 75:11
SWPLAZA
[2] 1:6 76:1
System
[4] 15:20 21:2 24:6 40:10

**T**

Tab
[2] 33:15 34:13
Table
[1] 72:18
Tag
[1] 48:15
Tarp
[1] 66:14
Tarps
[1] 36:16
Tasks
[1] 30:11
Taylorville
[1] 75:20
Technician
[1] 23:12
Teller
[1] 38:7
Temporary
[3] 28:2 36:15 65:9
Tenant
[11] 26:22 27:5 34:24 35:4
36:23 37:4 37:5 37:8 40:2
41:7 68:13
Tenant's
[2] 62:1 63:13
Tenants
[2] 26:20 55:11
Tenants'
[1] 36:14
Term
[2] 54:10 62:9
Terminated
[1] 38:11
Termination
[1] 39:19
Terms
[4] 28:17 53:24 71:10 72:11
Tested
[1] 20:6
Testified
[4] 4:4 42:11 58:24 62:10
Testify
[1] 75:11
Testimony
[4] 9:12 10:4 76:17 76:20
Testing
[3] 41:13 41:16 42:2
Theory
[1] 71:22
Third
[3] 43:7 49:17 63:1
Thirds
[1] 56:2
Three
[8] 6:20 7:12 32:4 32:7 33:
12 43:18 58:3 72:17
Threw
[1] 19:24
Thrown
[1] 54:3
Tile
[2] 13:21 21:3
Titled
[1] 33:17
To-wit
[1] 4:5

Today
Together
[3] 6:2 12:11 52:2
Toilets
[1] 40:13
Took
[3] 16:11 44:13 53:17
Top
[2] 20:13 72:19
Tornado
[2] 12:16 36:2
Total
[11] 15:10 16:9 25:1 30:20
31:10 43:19 43:23 44:7 56:
21 57:22 60:7
Trailers
[1] 13:13
Training
[3] 6:10 6:13 7:7
Transcript
[2] 75:16 76:16
Translation
[1] 75:17
Trim
[2] 39:14 39:21
True
[2] 43:13 75:16
Trust
[4] 1:8 1:9 76:4 76:6
Trustee
[2] 1:8 76:4
Truth
[1] 75:11
Try
[3] 36:13 48:11 48:13
Trying
[5] 20:18 33:1 33:6 35:19
67:15
TSA
[6] 1:12 4:9 54:13 55:7 55:
8 76:10
TSA's
[1] 45:17
Turned
[2] 40:1 40:8
Twenty
[1] 7:12
Twenty-three
[1] 7:12
Two
[14] 5:15 15:16 16:15 25:23
26:3 27:24 43:11 52:2 52:5
52:9 53:20 56:2 57:3 71:5
Two-fold
[1] 5:15
Type
[6] 6:13 40:3 41:15 44:15
49:11 74:14
Typewritten
[1] 75:15
Typically
[1] 51:22

**U**

Uncertain
[1] 35:12
Uncovering
[1] 29:21
Undamaged
[2] 24:19 24:23
Under
[5] 1:8 12:2 13:2 75:19 76:4
Undertook
[1] 34:5
Unit
[1] 20:13
UNITED
[1] 1:3
Units
[2] 20:7 20:10 53:9
University

[1] 6:8
Up
[27] 14:5 17:13 18:19 18:22
20:24 27:13 36:15 36:22 40:
1 41:3 44:17 47:19 48:10
50:21 52:1 56:9 58:1 58:16
60:7 64:18 65:4 66:12 67:9
70:18 71:11 72:14 72:19
Up-to-date
[1] 35:19
Updates
[1] 6:12
Upper
[1] 19:18
Urinal
[2] 40:12 40:16
USA
[3] 50:7 50:20 51:1
Utilizes
[1] 55:9

**V**

Vac
[1] 66:14
Vacuum
[1] 48:11
Vague
[1] 67:19
Value
[1] 25:9
Ventilation
[1] 53:6
Vice
[1] 45:5
View
[4] 6:19 7:23 11:20 47:6
Visit
[1] 12:17
Visqueen
[1] 56:23
Vs
[2] 1:11 76:9

**W**

Wait
[1] 58:16
Waivers
[1] 10:14
Walk
[4] 9:1 10:22 11:11 14:7
Wall
[29] 16:7 16:12 16:19 19:6
19:9 19:12 19:12 19:20 19:
23 19:23 23:15 23:17 26:19
26:21 27:5 27:5 28:11 28:
12 46:4 47:5 51:24 66:20
66:24 67:16 67:16 68:23 70:
6 73:7 73:8
Walls
[10] 16:2 16:4 19:8 19:19
21:22 27:20 29:1 36:15 52:
4 71:11
Watch
[3] 57:12 57:17 57:18
Water
[8] 13:18 14:5 17:5 40:6 40:
9 48:11 66:14 71:20
Week
[4] 37:13 37:14 37:21 37:22
West
[1] 5:2
Wet
[1] 66:14
Whole
[5] 16:10 19:12 43:12 46:23
64:16
Wire
[1] 39:18
Wires
[1] 38:10
Wiring
[1] 41:11
Wit

[2] 4:5
Witness
[3] 4:2 33:12 74:23
Wolford
[11] 44:13 49:8 49:16 50:9
51:5 51:12 52:17 53:4 55:
23 56:12 57:12
Wolford's
[4] 44:1 44:3 52:9 56:16
Word
[2] 54:16 56:5
Words
[1] 52:8
Works
[1] 26:22
Worry
[1] 37:19
Writing
[1] 29:16
Written
[1] 16:3

**Y**

Year
[1] 6:22
Years
[4] 6:20 7:12 25:6 74:17
Yellow
[2] 33:15 48:15

**E-FILED**
Monday, 31 December, 2007  03:42:24 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited    )<br>liability company, as successor to    )<br>Illinois National Bank, as Trustee under    )<br>Trust Agreement dated November 6, 2000    )<br>and known as Trust No. 00-0020,    )<br>an Illinois banking institution,    )<br>    )<br>       Plaintiff,    )<br>    )<br>v.    )    Case No.:  06-CV-3177<br>    )<br>TSA STORES, INC., as successor to Gart    )<br>Brothers Sporting Goods Company,    )<br>a Delaware corporation,    )<br>    )<br>       Defendant.    )| |

## RULE 26(a)(2) EXPERT WITNESS REPORT OF MARK SORENSEN

The Terms used herein are those as defined in the Lease which is the subject of this action.

1.    The repair and reconstruction costs to the Premises and/or Common Areas resulting from the March 12, 2006 tornadic event in Springfield, Illinois were less than 35% of the then total replacement costs of the Premises and/or Common Area.

2.    Upon initial inspection of the damages to the Premises and/or Common Areas, a fair and reasonable estimate of the percentage of damage to the Premises and/or Common Area based on the component parts is as set forth in **Exhibit A** hereto, a letter dated March 29, 2006 to Mr. Seppi.  Based on the percentage of damage to the components of the Premises, and the relation of the components to the total Premises, it was reasonable to estimate that the repair and reconstruction costs to the Premises and/or Common Areas were less than 35% of the then total replacement costs of the Premises and/or Common Area.

{S0540019.4  3/30/2007 DAR MAH}

**EXHIBIT**
11

3.    The actual repair and reconstruction costs, which includes contractors mark-up for overhead and profit of the Premises and/or Common Areas as a result of the damage from the March 12, 2006 tornadic event in Springfield, Illinois was as set forth in **Exhibit B** hereto, and supported by the attachments thereto, specifically $321,384. This figure includes $14,439 for studs and tarps installed solely to protect TSA's merchandise, and for TSA's insurer paid one-half. To that number should be added roofing and insulation ($86,038), storefront and glass ($18,506) and flooring materials ($114,800) as provided by Owner, and a portion of A&E ($9,510). Accepting the total replacement costs of $1,960,067, the actual repair and reconstruction costs of the Premises and/or Common Areas was less than 35% of the then total replacement costs of the Premises and/or Common Areas.

4.    Attached as **Exhibit C** is a spreadsheet comparing TSA's estimate of the repair and replacement costs with the actual costs for the items included within said estimate. The estimate for the repair and replacement costs provided by TSA is excessive in a number of regards, as reflected in the exhibit.

5.    The actual costs incurred in the repair and replacement of the Premises as shown in Exhibit B were actually higher than they would have been if the owner had proceeded on a non-expedited basis. Specifically, if the project proceeded on a customary schedule as for new construction, more competitive bids would have been sought and received. In addition, the roof membrane could have been repaired as only 7,000 square feet of it required repair. In order to expedite the repairs and replacements the entire roof membrane was replaced at a cost of $86,038. Further, the store front could have been repaired at a cost of less than the actual cost of $18,506. Further, the front wall of the premises could have been repaired at a cost less than the

total replacement of $17,518. In addition, the entire facility was repainted which would not have been required.

6.    Most of the work performed by Cotton U.S.A. was to protect and/or salvage TSA's personal property, and not a cost attributable to repair or replacement of the Premises. Some work by Cotton U.S.A. was not necessary and unnecessarily increased the cost of repair. For example, Cotton U.S.A. removed all of the flooring when that was not necessary for the rubber flooring. In addition, Cotton U.S.A. removed the bathroom partitions and fixtures which was not necessary. Jones-Blythe recovered the partitions and fixtures from the scrap and reused them. The cost Cotton U.S.A. charged for removal of drywall was excessive, based on the total cost incurred by Jones-Blythe to replace all the drywall that was necessary.

The basis for my opinions are my experience in the industry, actual physical inspection of the damage to the Premises and/or Common Area, the actual supervision of the repair and reconstruction to the Premises and/or Common Areas, Lease dated April 2, 2001, the ENR Cost Index, and review of the documents provided by TSA Bates stamped SWPLAZA III Initial Rule 26 Production, 11/26/06, Pages 89-104.

My qualifications are set forth in the attached Curriculum Vitae.

I have authored no publications in the last ten years.

I am not being compensated for my work on this project other than as an employee of Jones-Blythe, the contractor on the job.

I have not testified as an expert at trial or by deposition within the preceding four years.

_Mark A. Sorensen_
MARK SORENSEN

Subscribed and sworn to before me this _30th_ day of _____ _March_ _____, 2007.

OFFICIAL SEAL
**DAVID A. ROLF**
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES 3-28-2008

_____
Notary Public

Via Fax 525-0545

March 29, 2006

**JONES-BLYTHE**
CONSTRUCTION CO
1000 WEST PLYMOUTH STREET
POST OFFICE BOX 5113
SPRINGFIELD, ILLINOIS 62705
TELEPHONE  217-753-1040
FAX NUMBER  217-753-1888

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn:   Art Seppi

Re:     Sports Authority
        Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen

**EXHIBIT**

A

Date : June 26, 2006

Charles E. Robbins Realtor
2144 S. Macarthur Blvd
Springfield, IL 62704

JONES-BLYTHE CONSTRUCTION CO.
1030 WEST REYNOLDS STREET
P. O. BOX 5113
SPRINGFIELD, IL 62705

*Paid 8/22/06*
*370,309-*

Phone: 217-787-1640                    Fax: 217-787-1666

---

Re:   Southwest Plaza III Shopping Center
      Progress Billing #3, Final Bill
      Tornado Damage Repair

Gordmans
      Labor                          50,554
      Labor Burden                   40,026
      Material                       36,592
      Subcontractor                 300,734
      Equipment                      12,747
                  Cost subtotal            440,653


115,351
+30,859
146,210 ✓

Sports Authority
      Labor                          46,227
      Labor Burden                   37,500
      Material                       28,753
      Subcontractor                 143,961
      Equipment                      11,379
                  Cost subtotal            267,820


178,662
18,515.40
191,177.40 ✓

Bed Bath & Beyond
      Labor                           7,081
      Labor Burden                    5,974
      Material                        4,549
      Subcontractor                  13,665
      Equipment                         172
                  Cost subtotal             31,441


14,578
12,343.60
26,921.60 ✓

                                             739,914
      Overhead @ 10%                          73,991
      Profit  @ 10%                           73,991

Total Cost to Date...............................$ 887,896
Previous Payments................................ ($ 517,587)

Total Due........................................$ 370,309



**EXHIBIT**
B

```
                              Jones-Blythe Construction Co.                          Time: 13:27  Page:  1
                                  ** Cost Detail Report **
                              Job Number: 51094 GORDMANS REPAIR
                               From: 01/01/2002 Thru: 06/30/2006
                                      Open Jobs Only
```

```
stomer:                    Contr. Date:         Contr Amount:        .00    Contr Billings: 388274.00
ntr No:                    Est. Compl.:         Changeorders:        .00    T & M Billings:       .00
 Mgr : MS MARK SORENSEN    Last Actvty: 06/27/06 Total Contr :       .00    Total Billed  : 388274.00
 Type: TM T/M FOR SMALL JOBS Last Billed: 05/25/06 Pending CO'S:      .00    Retainage Amt.:       .00
```

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1000 TIME & MATERIAL | | | | | | | | | | |
| | 03/06 | MAT | AP PJ-143-032806 | 3968 | CARVER'S WESTSIDE PWR.E | 03/14/06 | 143939 | .00 | 3.19 | |
| | 03/06 | MAT | AP CR-393-033106 | 4208 | CITY OF SPRINGFIELD | 03/15/06 | GORDMANS | .00 | 306.40 | PERMIT |
| | 03/06 | L/F | PR DJ-763-031606 | 1065 | HARVEY A HAMILTON | 03/16/06 | PAYROLL | 1.50 | 103.18 | |
| | 03/06 | L/F | PR DJ-763-031606 | 3105 | GREGORY J GIDDINGS | 03/16/06 | PAYROLL | 7.00 | 333.87 | |
| | 03/06 | L/F | PR DJ-763-031606 | 4095 | JOHN E WEISS | 03/16/06 | PAYROLL | 5.00 | 222.06 | |
| | 03/06 | L/F | PR DJ-763-031606 | 5630 | WILLIAM G MCKEE | 03/16/06 | PAYROLL | 8.00 | 377.81 | |
| | 03/06 | L/F | PR DJ-763-031606 | 5776 | MARTIN B SMITH | 03/16/06 | PAYROLL | 9.50 | 502.07 | |
| | 03/06 | L/F | PR DJ-764-032006 | 5376 | DONNIE L LUCAS | 03/20/06 | PAYROLL | 18.00 | 752.79 | |
| | 03/06 | L/F | PR DJ-764-032006 | 5630 | WILLIAM G MCKEE | 03/20/06 | PAYROLL | 17.00 | 817.14 | |
| | 03/06 | MAT | AP PJ-140-032306 | L336 | MARK SORENSEN | 03/20/06 | ARMBRUSTER | .00 | 592.63 | |
| | 03/06 | L/F | PR DJ-765-032106 | 1894 | MIKE G SPRINKEL | 03/21/06 | PAYROLL | 12.00 | 581.32 | |
| | 03/06 | L/F | PR DJ-764-032206 | 5376 | DONNIE L LUCAS | 03/22/06 | PAYROLL | 1.00 | 51.97 | |
| | 03/06 | L/F | PR DJ-764-032206 | 5630 | WILLIAM G MCKEE | 03/22/06 | PAYROLL | 1.00 | 61.51 | |
| | | | | | | | Labor | 80.00 | 1992.66 | |
| | | | | | | | Fringe | | 1811.06 | |
| | | | | | | | Material | | 902.22 | |
| | | | | | | | Period 03/06 Total | 80.00 | 4705.94 | |
| | 04/06 | MAT | AP PJ-151-041006 | 3560 | CAPITOL BLUEPRINT CO. | 03/31/06 | 06109 | .00 | 15.56 | |
| | 04/06 | MAT | AP PJ-152-041306 | L1065 | HARVEY HAMILTON | 04/12/06 | ICE | .00 | 3.83 | |
| | | | | | | | Material | | 19.39 | |
| | | | | | | | Period 04/06 Total | .00 | 19.39 | |
| | 05/06 | MAT | AP PJ-163-051006 | 16392 | VERIZON WIRELESS | 04/28/06 | 3676754583 | .00 | 51.65 | |
| | | | | | | | Material | | 51.65 | |
| | | | | | | | Period 05/06 Total | .00 | 51.65 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2171.00- | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | |
| | | | | | | | Labor | .00 | 2389.00- | |
| | | | | | | | Fringe | | 2171.00- | |
| | | | | | | | Period 06/06 Total | .00 | 4560.00- | |
| | | | | | | | Task Code 1- 1000 Total | 80.00 | 216.98 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| sk Code  Prd. Type  Source Code   I.D.#  Name/Description | --Transaction-- Date   Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|

**-- 1102 SUPERVISION**

| 04/06 L/F  PR DJ-772-042806   1065 HARVEY A HAMILTON | 04/28/06   PAYROLL | 8.00 | 382.31 |
| | Labor | 8.00 | 216.00 |
| | Fringe | | 166.31 |
| | Period 04/06 Total | 8.00 | 382.31 |
| | Task Code 1-  1102 Total | 8.00 | 382.31 |

**-- 1104 SURVEY**

| 03/06 L/F  PR DJ-764-032306   1065 HARVEY A HAMILTON | 03/23/06   PAYROLL | 4.00 | 191.13 |
| 03/06 L/F  PR DJ-764-032306   5776 MARTIN B SMITH | 03/23/06   PAYROLL | 4.00 | 201.52 |
| 03/06 L/F  PR DJ-766-033006   1008 DAN E BECKER | 03/30/06   PAYROLL | 3.00 | 133.04 |
| 03/06 L/F  PR DJ-766-033006   1008 DAN E BECKER | 03/30/06   PAYROLL | 3.00 | 133.04 |
| 03/06 L/F  PR DJ-766-033006   1065 HARVEY A HAMILTON | 03/30/06   PAYROLL | 2.00 | 95.59 |
| 03/06 L/F  PR DJ-766-033006   1065 HARVEY A HAMILTON | 03/30/06   PAYROLL | 3.00 | 143.37 |
| 03/06 L/F  PR DJ-766-033006   1950 STEVEN W WELLS | 03/30/06   PAYROLL | 3.00 | 140.16 |
| 03/06 L/F  PR DJ-766-033006   1950 STEVEN W WELLS | 03/30/06   PAYROLL | 3.00 | 140.16 |
| | Labor | 25.00 | 643.12 |
| | Fringe | | 534.89 |
| | Period 03/06 Total | 25.00 | 1178.01 |
| | Task Code 1-  1104 Total | 25.00 | 1178.01 |

**-- 1150 HOISTING**

| 04/06 L/F  PR DJ-768-040606   3105 GREGORY J GIDDINGS | 04/06/06   PAYROLL | 4.00 | 181.58 |
| 04/06 L/F  PR DJ-771-042706   3105 GREGORY J GIDDINGS | 04/27/06   PAYROLL | 2.00 | 90.80 |
| 04/06 L/F  PR DJ-771-042706   3160 JOE W KAUFFMAN | 04/27/06   PAYROLL | 1.50 | 71.86 |
| 04/06 L/F  PR DJ-771-042706   3160 JOE W KAUFFMAN | 04/27/06   PAYROLL | 8.50 | 414.75 |
| 04/06 L/F  PR DJ-772-042806   3105 GREGORY J GIDDINGS | 04/28/06   PAYROLL | 2.00 | 90.79 |
| | Labor | 18.00 | 471.77 |
| | Fringe | | 378.01 |
| | Period 04/06 Total | 18.00 | 849.78 |
| 05/06 MAT  AP PJ-161-051006   6195 FASTENAL COMPANY | 04/24/06   98313 | .00 | 30.36 |
| 05/06 MAT  AP PJ-161-051006   6195 FASTENAL COMPANY | 04/26/06   98504 | .00 | 41.92 |
| 05/06 L/F  PR DJ-776-052506   3105 GREGORY J GIDDINGS | 05/25/06   PAYROLL | 4.00 | 188.58 |
| 05/06 L/F  PR DJ-776-052506   3105 GREGORY J GIDDINGS | 05/25/06   PAYROLL | 8.00 | 377.17 |
| | Labor | 12.00 | 318.60 |
| | Fringe | | 247.15 |
| | Material | | 72.28 |
| | Period 05/06 Total | 12.00 | 638.03 |

Of 06/27/06  06:06/27/06  (JS-8)

Time: 13:27  Page: 3

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | | | | | |
|---------|---|---|---|---|---|---|
| ntr No: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: 388274.00 |
| ; Mgr : MS MARK SORENSEN | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: .00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : 388274.00 |
| | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|----------|------|------|-------------|-------|------------------|------|-----------|-----------------|--------|-------------|
| | 06/06 | L/F | PR | DJ-779-060806 | 3105 | GREGORY J GIDDINGS | 06/08/06 | PAYROLL | 2.50 | 117.83 | |
| | 06/06 | MAT | AP | PJ-205-062106 | 9229 | W.A. LASCODY TRUCKING,I | 06/08/06 | 41773 | .00 | 199.50 | |
| | | | | | | | Labor | 2.50 | 66.38 | |
| | | | | | | | Fringe | | 51.45 | |
| | | | | | | | Material | | 199.50 | |
| | | | | | | Period 06/06 Total | | 2.50 | 317.33 | |
| | | | | | | Task Code 1- 1150 Total | | 32.50 | 1805.14 | |

.- 1151 CLEANUP

| | 04/06 | L/F | PR | DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 1.00 | 42.47 | |
| | 04/06 | L/F | PR | DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 5.00 | 201.31 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 2348 | ROBERT W KENAL | 04/27/06 | PAYROLL | 8.00 | 339.77 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 3.00 | 132.25 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 4.00 | 161.06 | |
| | | | | | | | Labor | 23.00 | 532.71 | |
| | | | | | | | Fringe | | 424.67 | |
| | | | | | | Period 04/06 Total | | 23.00 | 957.38 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR | DJ-773-050406 | 2800 | LEON TABER SR. | 05/04/06 | PAYROLL | 4.00 | 167.46 | |
| | 05/06 | L/F | PR | DJ-774-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 4.00 | 176.72 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 6.00 | 274.11 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 3.00 | 125.60 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 6.00 | 274.10 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 8.00 | 365.47 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| ) Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 4.00 | 182.75 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 8.00 | 365.47 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 8.00 | 365.47 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 6.00 | 274.10 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 5.00 | 228.42 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 5.00 | 228.42 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2800 | LEON TABER SR. | 05/31/06 | PAYROLL | 3.00 | 125.59 | |
| | | | | | | | Labor | 143.00 | 3723.58 | |
| | | | | | | | Fringe | | 2691.70 | |
| | | | | | | Period 05/06 Total | | 143.00 | 6415.28 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16239 | TRIAD INDUSTRIAL SUPPLY | 05/25/06 | 144138 | .00 | 1239.53 | |
| | 06/06 | MAT | AP PJ-204-061506 | 10090 | MATHIS-KELLEY CONSTRUCT | 05/04/06 | 398899 | .00 | 145.56 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR DJ-779-060806 | 1065 | HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 8.00 | 365.47 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 6.00 | 274.10 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 6.00 | 274.10 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 7.00 | 319.79 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 7.00 | 319.79 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-780-061506 | 2200 | HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 3.00 | 137.05 | |
| | 06/06 | L/F | PR DJ-780-061506 | 3105 | GREGORY J GIDDINGS | 06/15/06 | PAYROLL | 1.00 | 47.15 | |
| | | | | | | | Labor | 43.00 | 1160.74 | |
| | | | | | | | Fringe | | 825.93 | |
| | | | | | | | Material | | 1385.09 | |
| | | | | | | Period 06/06 Total | | 43.00 | 3371.76 | |
| | | | | | | Task Code 1- 1151 Total | | 209.00 | 10744.42 | |

- 1190 SMALL TOOLS

| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96516 | .00 | 27.70 | |
| | 03/06 | MAT | AP PJ-147-033106 | 8702 | JAMES MACHINERY, INC. | 03/23/06 | 266396 | .00 | 363.12 | |

Of: 06/27/06   On: 06/27/06  (JC 8)

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| :tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| ; Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| | | | | | --Transaction-- | | Hours/ | Transaction | |
| :sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Quantity | Amount | Description |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Material | | 390.82 | |
| | | | | | | Period 03/06 Total | | .00 | 390.82 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 739 AMERICAN EXPRESS | 03/30/06 | 3782630799 | .00 | 322.84 | MAS |
| | 04/06 | MAT | AP | PJ-151-041006 | 6195 FASTENAL COMPANY | 03/24/06 | 96955 | .00 | 61.77 | |
| | 04/06 | MAT | AP | PJ-152-041306 | 3968 CARVER'S WESTSIDE PWR.E | 03/17/06 | 144223 | .00 | 898.86 | |
| | 04/06 | MAT | AP | PJ-152-041306 | 3968 CARVER'S WESTSIDE PWR.E | 03/25/06 | 144599 | .00 | 35.03 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 03/27/06 | 97029 | .00 | 115.95 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 03/29/06 | 97155 | .00 | 113.77 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 03/30/06 | 97258 | .00 | 65.75 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 03/31/06 | 97293 | .00 | 3.47 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 8576 ILL-MO WELDING PRODUCTS | 03/31/06 | MR20061667 | .00 | 11.32 | |
| | 04/06 | MAT | AP | VC-068-042406 | 6195 FASTENAL COMPANY | 03/29/06 | 97155 | .00 | 113.77- | |
| | 04/06 | MAT | AP | PJ-148-040606 | L340 CHAS BLYTHE | 04/03/06 | 4/3 BIG R | .00 | 25.85 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 04/03/06 | 97356 | .00 | 140.00 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 04/03/06 | 97408 | .00 | 7.21 | |
| | 04/06 | MAT | AP | CR-410-051506 | L1065 HARVEY HAMILTON | 04/28/06 | 51094 ICE | .00 | 3.83 | |
| | 04/06 | MAT | AP | CR-410-051506 | L5776 MARTY SMITH | 04/28/06 | 51094 ICE | .00 | 10.86 | |
| | | | | | | | Material | | 1702.74 | |
| | | | | | | Period 04/06 Total | | .00 | 1702.74 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 03/27/06 | 122767 | .00 | 75.54 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 04/05/06 | 123171 | .00 | 31.98 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 04/11/06 | 123443 | .00 | 6.43 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 04/26/06 | 124228 | .00 | 4.30 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 04/28/06 | 124367 | .00 | 20.42 | |
| | 05/06 | MAT | AP | PJ-164-051106 | 320 ACE HARDWARE | 04/28/06 | 412335 | .00 | 44.76 | |
| | 05/06 | MAT | AP | PJ-165-051106 | 10090 MATHIS-KELLEY CONSTRUCT | 04/03/06 | 393428 | .00 | 114.62 | |
| | 05/06 | MAT | AP | PJ-165-051106 | 10090 MATHIS-KELLEY CONSTRUCT | 04/12/06 | 394944 | .00 | 14.04 | |
| | 05/06 | MAT | AP | PJ-165-051106 | 10090 MATHIS-KELLEY CONSTRUCT | 04/25/06 | 397448 | .00 | 347.41 | |
| | 05/06 | MAT | AP | PJ-161-051006 | 8702 JAMES MACHINERY, INC. | 05/02/06 | 267631 | .00 | 214.42 | |
| | 05/06 | MAT | AP | PJ-179-052206 | 2560 R.W. BRADLEY SUPPLY CO. | 05/02/06 | 21436 | .00 | 118.53 | |
| | 05/06 | MAT | AP | PJ-179-052206 | 6195 FASTENAL COMPANY | 05/02/06 | 98765 | .00 | 123.78 | |
| | 05/06 | MAT | AP | PJ-179-052206 | 6195 FASTENAL COMPANY | 05/03/06 | 98818 | .00 | 6.40 | |
| | 05/06 | MAT | AP | PJ-179-052206 | 6195 FASTENAL COMPANY | 05/03/06 | 98862 | .00 | 13.16 | |
| | 05/06 | MAT | AP | PJ-165-051106 | L2200 HAROLD CANTRALL | 05/04/06 | SHELL T RD | .00 | 3.21 | |
| | 05/06 | MAT | AP | PJ-165-051106 | L2200 HAROLD CANTRALL | 05/06/06 | MOTOMART | .00 | 3.91 | |
| | 05/06 | MAT | AP | PJ-165-051106 | L2200 HAROLD CANTRALL | 05/08/06 | MENARDS | .00 | 12.91 | |
| | 05/06 | MAT | AP | PJ-165-051106 | L2200 HAROLD CANTRALL | 05/08/06 | SHELL HBRO | .00 | 4.43 | |
| | 05/06 | MAT | AP | PJ-179-052206 | 8702 JAMES MACHINERY, INC. | 05/17/06 | 272507 | .00 | 699.30 | |

3:06-cv-03177-JES-CHE

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/15 SHELL | .00 | 4.43 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/22 MENAR | .00 | 16.77 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/22 SHELL | .00 | 4.43 | |
| | 05/06 | MAT | AP PJ-181-052506 | L2200 | HAROLD CANTRALL | 05/25/06 | 5/24 SHELL | .00 | 2.95 | |
| | | | | | | | Material | | 1888.13 | |
| | | | | | | Period 05/06 Total | | .00 | 1888.13 | |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 142.21 | MAS |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 64.39 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 137.83 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 64.39 | CNB |
| | 06/06 | MAT | AP PJ-200-061206 | 6195 | FASTENAL COMPANY | 05/30/06 | 99943 | .00 | 51.44 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16249 | UNITED RENTALS-HIGHWAY | 05/25/06 | 56502190-1 | .00 | 532.18 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16392 | VERIZON WIRELESS | 05/28/06 | 3682041466 | .00 | 46.17 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/16/06 | 124139 | .00 | 9.24 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/01/06 | 124439 | .00 | 16.22 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/19/06 | 125313 | .00 | 6.47 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/25/06 | 125538 | .00 | 45.57 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/26/06 | 125592 | .00 | 16.08 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/05/06 | 412507 | .00 | 26.92 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/09/06 | 412602 | .00 | 23.68 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/17/06 | 412852 | .00 | 21.75 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/30/06 | 413204 | .00 | 29.19 | |
| | 06/06 | MAT | AP PJ-204-061506 | 320 | ACE HARDWARE | 05/31/06 | 413256 | .00 | 11.96 | |
| | 06/06 | MAT | AP PJ-205-062106 | 6195 | FASTENAL COMPANY | 05/30/06 | 100120 | .00 | 8.75 | |
| | 06/06 | MAT | AP PJ-199-060806 | L2200 | HAROLD CANTRALL | 06/05/06 | 6/5 SHELL | .00 | 2.95 | |
| | 06/06 | MAT | AP PJ-199-060806 | L2200 | HAROLD CANTRALL | 06/07/06 | 6/7 SHELL | .00 | 2.95 | |
| | 06/06 | MAT | GL JE-023-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 162.50 | MOVE G/L |
| | 06/06 | MAT | GL JE-024-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 2702.00- | JEA |
| | 06/06 | EQP | GL JE-022-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 162.50 | WAREHOUSE MATL |
| | 06/06 | EQP | GL JE-023-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 162.50- | MOVE G/L |
| | | | | | | | Material | | 1279.16- | |
| | | | | | | Period 06/06 Total | | .00 | 1279.16- | |
| | | | | | | Task Code 1- 1190 Total | | .00 | 2702.53 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---------|--|--------------|--|---------------|-----|-----------------|-----------|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| ; Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| ; Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

---

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|----------|-----------|-------------|-------|-----------------|------|-----------|-----------------|--------|-------------|

--Transaction--     Hours/   Transaction

**1- 1195 CARRY DECK CRANE**

| | 04/06 MAT | AP PJ-154-042106 | 12233 ONE SOURCE | | 04/11/06 | R101960 | .00 | 2223.75 | |
| | | | | | | Material | | 2223.75 | |
| | | | | | | Period 04/06 Total | .00 | 2223.75 | |
| | 06/06 MAT | GL JE-024-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 1112.00-JEA | |
| | | | | | | Material | | 1112.00- | |
| | | | | | | Period 06/06 Total | .00 | 1112.00- | |
| | | | | | | Task Code 1- 1195 Total | .00 | 1111.75 | |

**1- 1300 MISC HAULING**

| | 04/06 L/F | PR DJ-768-040606 | 340 CHARLES N BLYTHE | 04/06/06 | PAYROLL | 5.00 | 173.29 |
| | 04/06 L/F | PR DJ-768-040606 | 340 CHARLES N BLYTHE | 04/06/06 | PAYROLL | 6.00 | 207.94 |
| | 04/06 L/F | PR DJ-768-040606 | 340 CHARLES N BLYTHE | 04/06/06 | PAYROLL | 5.00 | 173.29 |
| | 04/06 L/F | PR DJ-769-041306 | 340 CHARLES N BLYTHE | 04/13/06 | PAYROLL | 2.00 | 69.31 |
| | 04/06 L/F | PR DJ-770-042006 | 2200 HAROLD CANTRALL JR. | 04/20/06 | PAYROLL | 1.50 | 66.15 |
| | 04/06 L/F | PR DJ-771-042706 | 340 CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.97 |
| | 04/06 L/F | PR DJ-771-042706 | 340 CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.97 |
| | 04/06 L/F | PR DJ-771-042706 | 340 CHARLES N BLYTHE | 04/27/06 | PAYROLL | 6.00 | 207.94 |
| | 04/06 L/F | PR DJ-771-042706 | 340 CHARLES N BLYTHE | 04/27/06 | PAYROLL | 3.00 | 103.98 |
| | 04/06 L/F | PR DJ-772-042806 | 340 CHARLES N BLYTHE | 04/28/06 | PAYROLL | 2.00 | 69.31 |
| | 04/06 L/F | PR DJ-772-042806 | 340 CHARLES N BLYTHE | 04/28/06 | PAYROLL | 2.00 | 69.31 |
| | | | | | Labor | 38.50 | 1045.43 |
| | | | | | Fringe | | 303.03 |
| | | | | Period 04/06 Total | | 38.50 | 1348.46 |
| | 05/06 L/F | PR DJ-773-050406 | 2200 HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 3.00 | 137.05 |
| | 05/06 L/F | PR DJ-773-050406 | 2200 HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-773-050406 | 2200 HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-773-050406 | 340 CHARLES N BLYTHE | 05/04/06 | PAYROLL | 3.00 | 109.52 |
| | 05/06 L/F | PR DJ-773-050406 | 340 CHARLES N BLYTHE | 05/04/06 | PAYROLL | 6.00 | 219.04 |
| | 05/06 L/F | PR DJ-773-050406 | 340 CHARLES N BLYTHE | 05/04/06 | PAYROLL | 8.00 | 292.03 |
| | 05/06 L/F | PR DJ-774-051106 | 1065 HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 |
| | 05/06 L/F | PR DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 L/F | PR DJ-774-051106 | 340 CHARLES N BLYTHE | 05/11/06 | PAYROLL | 5.00 | 182.53 |
| | 05/06 L/F | PR DJ-774-051106 | 340 CHARLES N BLYTHE | 05/11/06 | PAYROLL | 6.00 | 219.04 |
| | 05/06 L/F | PR DJ-774-051106 | 340 CHARLES N BLYTHE | 05/11/06 | PAYROLL | 2.00 | 73.02 |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| :stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 4.00 | 146.01 | |
| | 05/06 | L/F | PR DJ-774-051106 | 340 | CHARLES N BLYTHE | 05/11/06 | PAYROLL | 1.00 | 36.49 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 | |
| | 05/06 | L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 2.00 | 73.02 | |
| | 05/06 | L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 1.00 | 36.50 | |
| | 05/06 | L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 5.00 | 182.53 | |
| | 05/06 | L/F | PR DJ-775-051806 | 340 | CHARLES N BLYTHE | 05/18/06 | PAYROLL | 4.00 | 145.99 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 3.00 | 137.06 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-777-053106 | 3105 | GREGORY J GIDDINGS | 05/31/06 | PAYROLL | 4.00 | 188.59 | |
| | 05/06 | L/F | PR DJ-777-053106 | 3105 | GREGORY J GIDDINGS | 05/31/06 | PAYROLL | 3.00 | 141.45 | |
| | 05/06 | L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 5.00 | 182.53 | |
| | 05/06 | L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 2.00 | 73.02 | |
| | 05/06 | L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 1.00 | 36.50 | |
| | 05/06 | L/F | PR DJ-777-053106 | 340 | CHARLES N BLYTHE | 05/31/06 | PAYROLL | 3.00 | 109.52 | |
| | | | | | | Labor | | 97.00 | 2709.10 | |
| | | | | | | Fringe | | | 1204.28 | |
| | | | | | | Period 05/06 Total | | 97.00 | 3913.38 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 2.00 | 91.37 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 2.00 | 91.37 | |
| | 06/06 | L/F | PR DJ-779-060806 | 340 | CHARLES N BLYTHE | 06/08/06 | PAYROLL | 3.00 | 109.52 | |
| | 06/06 | L/F | PR DJ-781-062106 | 1903 | VERN G VLACH | 06/21/06 | PAYROLL | 1.50 | 73.36 | |
| | 06/06 | L/F | PR DJ-781-062206 | 1065 | HARVEY A HAMILTON | 06/22/06 | PAYROLL | 1.50 | 74.77 | |
| | 06/06 | L/F | PR DJ-781-062206 | 340 | CHARLES N BLYTHE | 06/22/06 | PAYROLL | 1.00 | 36.50 | |
| | 06/06 | L/F | PR DJ-781-062206 | 340 | CHARLES N BLYTHE | 06/22/06 | PAYROLL | 5.00 | 182.53 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00- | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1214.00- | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00-JEA | |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | |
| | | | | | | Labor | | 16.00 | 2514.71- | |
| | | | | | | Fringe | | | 1000.87- | |
| | | | | | | Period 06/06 Total | | 16.00 | 3515.58- | |
| | | | | | | Task Code 1- 1300 Total | | 151.50 | 1746.26 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| ; Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : | 388274.00 |
| > Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|

**l— 1400 DUMPSTER**

| | 04/06 | MAT | AP PJ-151-041006 | 16708 | WASTE MANAGEMENT OF IL | 04/01/06 | 2271752477 | .00 | 767.19 | |
| | 04/06 | MAT | AP PJ-154-042106 | 16708 | WASTE MANAGEMENT OF IL | 04/16/06 | 2274382477 | .00 | 3857.44 | |
| | | | | | | | Material | | 4624.63 | |
| | | | | | | Period 04/06 Total | | .00 | 4624.63 | |
| | 05/06 | MAT | AP PJ-163-051006 | 16708 | WASTE MANAGEMENT OF IL | 05/01/06 | 2276862477 | .00 | 971.24 | |
| | 05/06 | MAT | AP PJ-179-052206 | 16708 | WASTE MANAGEMENT OF IL | 05/16/06 | 2280632477 | .00 | 804.57 | |
| | | | | | | | Material | | 1775.81 | |
| | | | | | | Period 05/06 Total | | .00 | 1775.81 | |
| | 06/06 | MAT | AP PJ-200-061206 | 16708 | WASTE MANAGEMENT OF IL | 06/01/06 | 2284132477 | .00 | 815.61 | |
| | 06/06 | MAT | AP PJ-205-062106 | 16708 | WASTE MANAGEMENT OF IL | 06/16/06 | 2287612477 | .00 | 196.80 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 5616.00-JEA | |
| | | | | | | | Material | | 4603.59- | |
| | | | | | | Period 06/06 Total | | .00 | 4603.59- | |
| | | | | | | Task Code 1- 1400 Total | | .00 | 1796.85 | |

**l— 1710 TEMP WALL**

| | 03/06 | MAT | AP PJ-147-033106 | 11547 | NEGWER MATERIALS, INC. | 03/20/06 | 2093353-00 | .00 | 3264.73 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1008 | DAN E BECKER | 03/23/06 | PAYROLL | 10.00 | 580.06 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1027 | CURTIS A BAUMAN | 03/23/06 | PAYROLL | 5.00 | 301.19 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 12.00 | 720.40 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 8.00 | 382.33 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 1.00 | 68.78 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 2.00 | 93.14 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 5.00 | 335.16 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1799 | MIKE T RYAN | 03/23/06 | PAYROLL | 5.00 | 344.22 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 13.00 | 752.23 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 8.00 | 373.71 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 12.00 | 603.18 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 13.00 | 609.21 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 1.00 | 52.53 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 7.00 | 390.85 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2401 | DENNIS E FARLEY JR. | 03/23/06 | PAYROLL | 5.00 | 277.62 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 13.00 | 609.22 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 1.00 | 52.52 | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 1.00 | 62.76 | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 1.50 | 94.15 | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 7.00 | 439.31 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| | | |
|---|---|---|
| stomer: | Contr. Date: | Contr Amount:     .00 | Contr Billings: 388274.00 |
| tr No: | Est. Compl.: | Changeorders:     .00 | T & M Billings:     .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr :     .00 | Total Billed  : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S:     .00 | Retainage Amt.:     .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | .50 | 31.40 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.50 | 99.02 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.50 | 99.02 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 7.00 | 462.11 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 1.00 | 66.03 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 13.00- | 609.21- | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 13.00 | 670.18 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 1.00- | 52.52- | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 1.00 | 57.94 | |
| | | | | | | | Labor | 142.00 | 4677.53 | |
| | | | | | | | Fringe | | 3289.01 | |
| | | | | | | | Material | | 3264.73 | |
| | | | | | | | Period 03/06 Total | 142.00 | 11231.27 | |
| | 04/06 | MAT | AP PJ-151-041006 | 4475 | CONTRACTOR'S LUMBER CIT | 03/31/06 | 3/06 2810 | .00 | 288.77 | 181067 |
| | 04/06 | MAT | AP PJ-151-041006 | 4475 | CONTRACTOR'S LUMBER CIT | 03/31/06 | 3/06 2810 | .00 | 79.74 | 181018 |
| | 04/06 | MAT | AP PJ-151-041006 | 6195 | FASTENAL COMPANY | 03/20/06 | 96726 | .00 | 27.50 | |
| | 04/06 | MAT | AP PJ-151-041006 | 8126 | HUNDMAN LUMBER | 03/28/06 | 2014849 | .00 | 87.44 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.10 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 5.50 | 262.86 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 5.50 | 221.47 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 63.00 | 1549.46 | |
| | | | | | | | Fringe | | 1197.21 | |
| | | | | | | | Material | | 483.45 | |
| | | | | | | | Period 04/06 Total | 63.00 | 3230.12 | |
| | 06/06 | L/F | PR DJ-782-062606 | 4095 | JOHN E WEISS | 06/26/06 | PAYROLL | 8.00 | 351.40 | |
| | | | | | | | Labor | 8.00 | 190.40 | |
| | | | | | | | Fringe | | 161.00 | |
| | | | | | | | Period 06/06 Total | 8.00 | 351.40 | |
| | | | | | | | Task Code 1- 1710 Total | 213.00 | 14812.79 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| ustomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
|---|---|---|---|---|
| ontr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| rj Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| ob Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1800 MOVE FIXTURES | | | | | | | | | | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | | | | | | | Labor | 2.00 | 53.74 | |
| | | | | | | | Fringe | | 37.63 | |
| | | | | | | Period 05/06 Total | | 2.00 | 91.37 | |
| | | | | | | Task Code 1- 1800 Total | | 2.00 | 91.37 | |
| 1- 1900 FUEL & FILTERS | | | | | | | | | | |
| | 04/06 | MAT | AP PJ-158-042806 | 11179 | MDI | 03/17/06 | 275978 | .00 | 281.86 | |
| | | | | | | | Material | | 281.86 | |
| | | | | | | Period 04/06 Total | | .00 | 281.86 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11651 | NELSON OIL CO. INC. | 04/11/06 | 67715 | .00 | 194.47 | |
| | | | | | | | Material | | 194.47 | |
| | | | | | | Period 05/06 Total | | .00 | 194.47 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 238.00- | JEA |
| | | | | | | | Material | | 238.00- | |
| | | | | | | Period 06/06 Total | | .00 | 238.00- | |
| | | | | | | Task Code 1- 1900 Total | | .00 | 238.33 | |
| 1- 1951 LIFT RENT | | | | | | | | | | |
| | 04/06 | MAT | AP PJ-154-042106 | 13610 | RSC-SPRINGFIELD | 04/05/06 | 27807507 | .00 | 1374.00 | |
| | | | | | | | Material | | 1374.00 | |
| | | | | | | Period 04/06 Total | | .00 | 1374.00 | |
| | 05/06 | MAT | AP PJ-163-051006 | 13610 | RSC-SPRINGFIELD | 04/19/06 | 27895477-2 | .00 | 30.00 | |
| | 05/06 | MAT | AP PJ-165-051106 | 13610 | RSC-SPRINGFIELD | 05/03/06 | 27807507-3 | .00 | 1344.00 | |
| | | | | | | | Material | | 1374.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1374.00 | |
| | 06/06 | MAT | AP PJ-200-061206 | 13610 | RSC-SPRINGFIELD | 05/31/06 | 27807507-4 | .00 | 1344.00 | |
| | 06/06 | MAT | AP PJ-200-061206 | 13610 | RSC-SPRINGFIELD | 05/18/06 | 28319492-1 | .00 | 521.00 | |
| | 06/06 | MAT | AP PJ-205-062106 | 13610 | RSC-SPRINGFIELD | 06/15/06 | 28319492 | .00 | 491.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/15/06 | 28319492-2 | .00 | 491.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/22/06 | 27807507-5 | .00 | 1364.00 | |
| | 06/06 | MAT | AP PJ-215-062606 | 13610 | RSC-SPRINGFIELD | 06/22/06 | 28319492-3 | .00 | 30.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3495.00- | JEA |

Of: 06/27/06  On: 06/27/06  (JC-B)

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Material | | | 746.00 | |
| | | | | | Period 06/06 Total | | | .00 | 746.00 | |
| | | | | | Task Code 1- 1951 Total | | | .00 | 3494.00 | |
| **l- 1999 EQUIPMENT** | | | | | | | | | | |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 2995.50 | RT 735 3/14--4/14 |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 1374.50 | CAT BACKHOE ---4/14 |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 93.00 | TAKEUCHI 3/28--4/1 |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 373.50 | MLR WLDR 3/16-4/14 |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 196.00 | RIGGING 3/16-4/14 |
| | 03/06 | EQP | GL JE-011-032906 | | J/C JOB COST | 03/29/06 | JRNL ENTRY | .00 | 90.00 | SKIP BOX 3/20-4/14 |
| | | | | | | Equipmnt | | | 5122.50 | |
| | | | | | Period 03/06 Total | | | .00 | 5122.50 | |
| | 05/06 | EQP | GL JE-017-052606 | | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 2995.50 | PICKER 4/15-5/15 |
| | 05/06 | EQP | GL JE-017-052606 | | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 1374.50 | CAT BKHOE 4/15-5/15 |
| | 05/06 | EQP | GL JE-017-052606 | | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 1368.75 | TRUCK TIME |
| | 05/06 | EQP | GL JE-017-052606 | | J/C JOB COST | 05/26/06 | JRNL ENTRY | .00 | 373.50 | WELDER 4/15/5/15 |
| | | | | | | Equipment | | | 6112.25 | |
| | | | | | Period 05/06 Total | | | .00 | 6112.25 | |
| | 06/06 | EQP | GL JE-022-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 600.00 | PICKUP-HAROLD |
| | 06/06 | EQP | GL JE-022-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 600.00 | PICKUP-HARVEY |
| | 06/06 | EQP | GL JE-022-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 50.00 | 2 MO PHONE EXP |
| | 06/06 | EQP | GL JE-022-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 262.50 | TRUCK TIME |
| | | | | | | Equipmnt | | | 1512.50 | |
| | | | | | Period 06/06 Total | | | .00 | 1512.50 | |
| | | | | | Task Code 1- 1999 Total | | | .00 | 12747.25 | |
| **- 2110 REMOVE RTU** | | | | | | | | | | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 2.00 | 95.40 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITE | 03/23/06 | PAYROLL | 2.00 | 100.76 | |
| | | | | | | Labor | | 4.00 | 105.00 | |
| | | | | | | Fringe | | | 91.16 | |
| | | | | | Period 03/06 Total | | | 4.00 | 196.16 | |
| | | | | | Task Code 2- 2110 Total | | | 4.00 | 196.16 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | | | | | | |
|---|---|---|---|---|---|---|---|
| ntr No: | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| j Mgr : MS MARK SORENSEN | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code  Prd. Type  Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|

2- 2120 ROOF DEMO

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/06 MAT  AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96571 | .00 | 179.56 | |
| 03/06 MAT  AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96636 | .00 | 105.61 | |
| 03/06 MAT  AP PJ-147-033106 | 8576 | ILL-MO WELDING PRODUCTS | 03/16/06 | S150454 | .00 | 86.20 | |
| 03/06 MAT  AP PJ-147-033106 | 9229 | W.A. LASCODY TRUCKING, I | 03/16/06 | 41544 | .00 | 344.76 | |
| 03/06 MAT  AP PJ-147-033106 | 226 | LINDE GAS LLC | 03/21/06 | 9305615465 | .00 | 45.82 | |
| 03/06 L/F  PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 6.00 | 286.17 | |
| 03/06 L/F  PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| 03/06 L/F  PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| 03/06 L/F  PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 6.00 | 302.28 | |
| 03/06 L/F  PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 2.00 | 100.77 | |
| 03/06 L/F  PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 8.00 | 403.03 | |
| 03/06 L/F  PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 8.00 | 403.03 | |
| 03/06 L/F  PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 95.59 | |
| 03/06 L/F  PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| 03/06 L/F  PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| 03/06 L/F  PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 2.00 | 121.39 | |
| 03/06 L/F  PR DJ-766-033006 | 5776 | MARTIN B SMITH | 03/30/06 | PAYROLL | 10.00 | 526.06 | |
| 03/06 L/F  PR DJ-766-033006 | 5776 | MARTIN B SMITH | 03/30/06 | PAYROLL | 10.00 | 526.06 | |
| 03/06 L/F  PR DJ-767-033106 | 5720 | GERALD A ROUSE JR | 03/31/06 | PAYROLL | 8.00 | 377.81 | |
| | | | | Labor | 83.00 | 2258.16 | |
| | | | | Fringe | | 1902.20 | |
| | | | | Material | | 761.95 | |
| | | | Period 03/06 Total | | 83.00 | 4922.31 | |
| 04/06 MAT  AP PJ-151-041006 | 226 | LINDE GAS LLC | 03/23/06 | 9305629961 | .00 | 70.02 | |
| 04/06 MAT  AP PJ-151-041006 | 8576 | ILL-MO WELDING PRODUCTS | 03/28/06 | S 1627930 | .00 | 235.98 | |
| 04/06 L/F  PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 5.00 | 238.95 | |
| 04/06 L/F  PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 5.00 | 212.36 | |
| 04/06 L/F  PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| 04/06 L/F  PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| 04/06 L/F  PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 2.00 | 83.07 | |
| 04/06 L/F  PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 5.00 | 201.31 | |
| 04/06 L/F  PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| 04/06 L/F  PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| 04/06 L/F  PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| 04/06 L/F  PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 4.00 | 181.58 | |
| 04/06 L/F  PR DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 4.00 | 191.61 | |
| 04/06 L/F  PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 6.00 | 296.49 | |
| 04/06 L/F  PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 1.00 | 49.42 | |

Jones-Blythe Construction Co.

\*\* Cost Detail Report \*\*

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| } Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| | | | | | | | --Transaction-- | | Hours/ | Transaction | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | | Date | Reference | Quantity | Amount | Description |
| | 04/06 | L/F | PR DJ-768-040606 | 5776 | MARTIN B SMITH | | 04/06/06 | PAYROLL | 2.00 | 98.83 | |
| | | | | | | | | Labor | 49.00 | 1199.65 | |
| | | | | | | | | Fringe | | 996.88 | |
| | | | | | | | | Material | | 306.00 | |
| | | | | | | | Period 04/06 Total | | 49.00 | 2502.53 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 3546.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 2973.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 3546.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 3546.00- | |
| | | | | | | | | Labor | .00 | 3546.00 | |
| | | | | | | | | Fringe | | 2973.00 | |
| | | | | | | | Period 06/06 Total | | .00 | 6519.00 | |
| | | | | | | | Task Code 2- 2120 Total | | 132.00 | 13943.84 | |
| - 2130 | DEMO BEARING WALL | | | | | | | | | | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | | 03/30/06 | PAYROLL | 5.00 | 238.94 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | | 03/30/06 | PAYROLL | 2.00 | 137.56 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | | 03/30/06 | PAYROLL | 1.00 | 42.46 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | | 03/30/06 | PAYROLL | 2.00 | 111.68 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | | 03/30/06 | PAYROLL | 1.00 | 42.46 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2401 | DENNIS E FARLEY JR. | | 03/30/06 | PAYROLL | 10.00 | 440.94 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2401 | DENNIS E FARLEY JR. | | 03/30/06 | PAYROLL | 2.00 | 108.66 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | | 03/30/06 | PAYROLL | 1.00 | 40.26 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | | 03/30/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | | 03/30/06 | PAYROLL | 2.00 | 104.99 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2805 | BILL TAYLOR | | 03/30/06 | PAYROLL | 10.00 | 451.42 | |
| | 03/06 | L/F | PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | | 03/30/06 | PAYROLL | 8.00 | 370.54 | |
| | 03/06 | L/F | PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | | 03/30/06 | PAYROLL | 2.00 | 121.39 | |
| | 03/06 | L/F | PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | | 03/30/06 | PAYROLL | 2.00 | 121.43 | |

Of 06/27/06 09:07:27 PDC CHE

```
                                      Jones-Blythe Construction Co.
                                         ** Cost Detail Report **                    Time: 13:27  Page:  15
                                   Job Number: 51094 GORDMANS REPAIR
                                   From: 01/01/2002  Thru: 06/30/2006
                                            Open Jobs Only
```

| | | |
|---|---|---|
| stomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| tr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

```
-----------------------------------------------------------------------------------------------------------
                                                         --Transaction--   Hours/    Transaction
 sk Code  Prd. Type   Source Code    I.D.#  Name/Description   Date   Reference  Quantity   Amount    Description
-----------------------------------------------------------------------------------------------------------
```

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor | 80.00 | 2185.80 | |
| | | | | | | | Fringe | | 1588.60 | |
| | | | | | | Period 03/06 Total | | 80.00 | 3774.40 | |
| | 04/06 | MAT | AP PJ-151-041006 | 6195 | FASTENAL COMPANY | 03/21/06 | 96805 | .00 | 29.52 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 3.00 | 127.42 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 1.00 | 42.48 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 3.00 | 120.79 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 1.00 | 40.26 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| | 04/06 | L/F | PR DJ-768-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 1.50 | 63.74 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 137.56 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 2.00 | 111.61 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2401 | DENNIS E FARLEY JR. | 04/13/06 | PAYROLL | 2.00 | 108.66 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 3.00 | 120.79 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 2.00 | 105.02 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2805 | BILL TAYLOR | 04/13/06 | PAYROLL | 2.00 | 111.65 | |
| | 04/06 | L/F | PR DJ-769-041306 | 3105 | GREGORY J GIDDINGS | 04/13/06 | PAYROLL | 2.00 | 118.62 | |
| | | | | | | | Labor | 32.50 | 901.58 | |
| | | | | | | | Fringe | | 646.78 | |
| | | | | | | | Material | | 29.52 | |
| | | | | | | Period 04/06 Total | | 32.50 | 1577.88 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00- | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1286.00- | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00- | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 | |
| | | | | | | | Labor | .00 | 1776.00- | |
| | | | | | | | Fringe | | 1286.00- | |
| | | | | | | Period 06/06 Total | | .00 | 3062.00- | |
| | | | | | | Task Code 2- 2130 Total | | 112.50 | 2290.28 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|----------|------|------|-------------|-------|------------------|------|-----------|-----------------|--------|-------------|

**- 2140 DEMO STUDS & DRYWALL**

| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 4.00 | 169.87 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 4.00 | 169.87 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 | L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 34.00 | 774.18 | |
| | | | | | | | Fringe | | 643.31 | |
| | | | | | | Period 03/06 Total | | 34.00 | 1417.49 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/25/06 | 98392 | .00 | 85.99 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2800 | LEON TABER SR. | 05/04/06 | PAYROLL | 5.00 | 209.31 | |
| | | | | | | | Labor | 6.00 | 147.35 | |
| | | | | | | | Fringe | | 111.80 | |
| | | | | | | | Material | | 85.99 | |
| | | | | | | Period 05/06 Total | | 6.00 | 345.14 | |
| | | | | | | Task Code 2- 2140 Total | | 40.00 | 1762.63 | |

**- 2200 GENERAL DEMO**

| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96613 | .00 | 288.08 | |
| | 03/06 | MAT | AP PJ-140-032306 | L2200 | HAROLD CANTRALL | 03/20/06 | RURAL KING | .00 | 80.03 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 2.00 | 95.59 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 8.00 | 339.78 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 8.00 | 339.76 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 322.10 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 322.10 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 5.00 | 212.35 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 8.00 | 339.77 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 8.00 | 322.11 | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| | 03/06 | L/F | PR DJ-764-032306 | 3105 | GREGORY J GIDDINGS | 03/23/06 | PAYROLL | 8.00 | 381.57 | |
| | 03/06 | L/F | PR DJ-764-032306 | 340 | CHARLES N BLYTHE | 03/23/06 | PAYROLL | 8.00 | 277.25 | |
| | 03/06 | L/F | PR DJ-764-032306 | 340 | CHARLES N BLYTHE | 03/23/06 | PAYROLL | 1.00 | 34.66 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITH | 03/23/06 | PAYROLL | 4.00 | 201.52 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 16.00- | 644.20- | |
| | 03/06 | L/F | PR DJ-766-033006 | 2200 | HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 16.00 | 705.34 | |
| | 03/06 | L/F | PR DJ-766-033006 | 340 | CHARLES N BLYTHE | 03/30/06 | PAYROLL | 3.00 | 103.97 | |
| | 03/06 | L/F | PR DJ-766-033006 | 340 | CHARLES N BLYTHE | 03/30/06 | PAYROLL | 3.00 | 103.97 | |
| | 03/06 | L/F | PR DJ-766-033006 | 340 | CHARLES N BLYTHE | 03/30/06 | PAYROLL | 2.00 | 69.31 | |
| | | | | | | | Labor | 116.00 | 2871.90 | |
| | | | | | | | Fringe | | 2080.82 | |
| | | | | | | | Material | | 368.11 | |
| | | | | | | Period 03/06 Total | | 116.00 | 5320.83 | |
| | 04/06 | L/F | PR DJ-769-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 6.50 | 276.07 | |
| | | | | | | | Labor | 6.50 | 148.01 | |
| | | | | | | | Fringe | | 128.06 | |
| | | | | | | Period 04/06 Total | | 6.50 | 276.07 | |
| | | | | | | Task Code 2- 2200 Total | | 122.50 | 5596.90 | |

2- 2230 BRACE FRONT WALL

| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 4.00 | 177.37 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1950 | STEVEN W WELLS | 03/30/06 | PAYROLL | 4.00 | 186.86 | |
| | | | | | | | Labor | 11.00 | 276.68 | |
| | | | | | | | Fringe | | 230.92 | |
| | | | | | | Period 03/06 Total | | 11.00 | 507.60 | |
| | 04/06 | MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/28/06 | 97073 | .00 | 7.80 | |
| | | | | | | | Material | | 7.80 | |
| | | | | | | Period 04/06 Total | | .00 | 7.80 | |
| | | | | | | Task Code 2- 2230 Total | | 11.00 | 515.40 | |

2- 2240 SHORE JOISTS BBB

| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 8.00 | 354.75 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 3.00 | 143.37 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1950 | STEVEN W WELLS | 03/30/06 | PAYROLL | 8.00 | 373.73 | |
| | | | | | | | Labor | 19.00 | 472.36 | |
| | | | | | | | Fringe | | 399.49 | |
| | | | | | | Period 03/06 Total | | 19.00 | 871.85 | |
| | 04/06 | MAT | AP PJ-151-041006 | 6888 | GOEDECKE COMPANY | 03/31/06 | E29369 | .00 | 1105.00 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 8.00 | 354.75 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 8.00 | 354.75 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: 388274.00 |
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 3.00 | 133.03 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 5.00 | 221.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 3.00 | 140.15 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 5.00 | 233.59 | |
| | 04/06 | L/F | PR DJ-769-041106 | 1008 | DAN E BECKER | 04/11/06 | PAYROLL | 5.50 | 243.90 | |
| | 04/06 | L/F | PR DJ-769-041106 | 1950 | STEVEN W WELLS | 04/11/06 | PAYROLL | 5.50 | 256.95 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 98.00 | 2435.54 | |
| | | | | | | | Fringe | | 1994.60 | |
| | | | | | | | Material | | 1105.00 | |
| | | | | | | Period 04/06 Total | | 98.00 | 5535.14 | |
| | 05/06 | MAT | AP PJ-179-052206 | 6888 | GOEDECKE COMPANY | 04/27/06 | E31089 | .00 | 227.57 | |
| | | | | | | | Material | | 227.57 | |
| | | | | | | Period 05/06 Total | | .00 | 227.57 | |
| | | | | | | Task Code 2- 2240 Total | | 117.00 | 6534.56 | |

- 2242 DEMO BRG WALL TOP

| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2200 | HAROLD CANTRALL JR. | 04/13/06 | PAYROLL | 4.00 | 176.33 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 1.50 | 63.74 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 5.00 | 212.35 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2404 | JAMES H FARLEY | 04/13/06 | PAYROLL | 4.00 | 161.04 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 5.00 | 201.31 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
|---|---|---|---|---|
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| ⊃ Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-770-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 8.00 | 339.77 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 6.00 | 241.57 | |
| | | | | | | | Labor | 76.50 | 1800.44 | |
| | | | | | | | Fringe | | 1445.14 | |
| | | | | | | Period 04/06 Total | | 76.50 | 3245.58 | |
| | | | | | | Task Code 2- 2242 Total | | 76.50 | 3245.58 | |

2- 2243 EXP JNT

| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 3.00 | 143.37 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 4.00 | 161.04 | |
| | | | | | | | Labor | 7.00 | 172.08 | |
| | | | | | | | Fringe | | 132.33 | |
| | | | | | | Period 04/06 Total | | 7.00 | 304.41 | |
| | | | | | | Task Code 2- 2243 Total | | 7.00 | 304.41 | |

!- 2244 DEMO STUDS & DW @ BBB

| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 6.50 | 276.08 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor | 6.50 | 148.01 | |
| | | | | | | | Fringe | | 128.07 | |
| | | | | | | Period 04/06 Total | | 6.50 | 276.08 | |
| | | | | | | Task Code 2- 2244 Total | | 6.50 | 276.08 | |

3- 3100 PATCH FLOOR

| | 04/06 | MAT | AP PJ-151-041006 | 11648 | NELCH CONCRETE | 03/31/06 | 50810 | .00 | 170.25 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Material | | 170.25 | |
| | | | | | | Period 04/06 Total | | .00 | 170.25 | |
| | 06/06 | L/F | PR DJ-781-062206 | 4095 | JOHN E WEISS | 06/22/06 | PAYROLL | 1.50 | 64.66 | |
| | 06/06 | L/F | PR DJ-781-062206 | 4095 | JOHN E WEISS | 06/22/06 | PAYROLL | 8.00 | 344.75 | |
| | 06/06 | L/F | PR DJ-782-062606 | 4095 | JOHN E WEISS | 06/26/06 | PAYROLL | 4.00 | 172.37 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00- | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 377.00- | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00-JEA | |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00 | |
| | | | | | | | Labor | 13.50 | 144.70- | |
| | | | | | | | Fringe | | 116.52- | |
| | | | | | | Period 06/06 Total | | 13.50 | 261.22- | |
| | | | | | | Task Code 3- 3100 Total | | 13.50 | 90.97- | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| | | | |
|---|---|---|---|
| tomer: | Contr. Date: | Contr Amount: .00 | Contr Billings: 388274.00 |
| tr No: | Est. Compl.: | Changeorders: .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: .00 | Retainage Amt.: .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| **- 3500 DOWELS** | | | | | | | | | | |
| | 04/06 | MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/31/06 | 97272 | .00 | 186.16 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 1.00 | 47.79 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 2.00 | 83.07 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| | 04/06 | L/F | PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 5.00 | 247.09 | |
| | | | | | | | Labor | 11.00 | 273.35 | |
| | | | | | | | Fringe | | 232.01 | |
| | | | | | | | Material | | 186.16 | |
| | | | | | | Period 04/06 Total | | 11.00 | 691.52 | |
| | 05/06 | MAT | AP PJ-165-051106 | 10090 | MATHIS-KELLEY CONSTRUCT | 04/03/06 | 393360 | .00 | 70.72 | |
| | | | | | | | Material | | 70.72 | |
| | | | | | | Period 05/06 Total | | .00 | 70.72 | |
| | | | | | | Task Code 3- 3500 Total | | 11.00 | 762.24 | |
| **- 4100 GROUT WALL TOP** | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 1.00 | 68.74 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 4.00 | 161.04 | |
| | 04/06 | L/F | PR DJ-770-042006 | 2800 | LEON TABER SR. | 04/20/06 | PAYROLL | 1.00 | 52.48 | |
| | 04/06 | L/F | PR DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 1.00 | 47.87 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 1.00 | 47.22 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 1.00 | 47.22 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 2.00 | 114.03 | |
| | | | | | | | Labor | 13.00 | 359.54 | |
| | | | | | | | Fringe | | 274.64 | |
| | | | | | | Period 04/06 Total | | 13.00 | 634.18 | |
| | | | | | | Task Code 4- 4100 Total | | 13.00 | 634.18 | |
| **- 4200 PATCH WALL TOP** | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 2.00 | 88.16 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2348 | ROBERT W KENAL | 04/28/06 | PAYROLL | 8.00 | 339.77 | |
| | | | | | | | Labor | 10.00 | 233.70 | |
| | | | | | | | Fringe | | 194.23 | |
| | | | | | | Period 04/06 Total | | 10.00 | 427.93 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11648 | NELCH CONCRETE | 04/30/06 | 51599 | .00 | 181.84 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 2.00 | 88.35 | |

Jones~Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
|---|---|---|---|---|
| tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | | 3.00 | 75.74 | |
| | | | | | | Fringe | | | 62.45 | |
| | | | | | | Material | | | 181.84 | |
| | | | | | | Period 05/06 Total | | 3.00 | 320.03 | |
| | | | | | | Task Code 4- 4200 Total | | 13.00 | 747.96 | |

~ 5100 BAR JOISTS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-768-040606 | 1008 | DAN E BECKER | 04/06/06 | PAYROLL | 3.00 | 133.03 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 1.00 | 47.79 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.36 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1950 | STEVEN W WELLS | 04/06/06 | PAYROLL | 3.00 | 140.16 | |
| | 04/06 | L/F | PR DJ-768-040606 | 5776 | MARTIN B SMITH | 04/06/06 | PAYROLL | 2.00 | 98.83 | |
| | 04/06 | MAT | AP PJ-154-042106 | 226 | LINDE GAS LLC | 04/10/06 | 9305783967 | .00 | 81.73 | |
| | 04/06 | MAT | AP PJ-156-042506 | 6195 | FASTENAL COMPANY | 04/12/06 | 97762 | .00 | 643.16 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 4.00 | 191.16 | |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 | |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 | |
| | 04/06 | L/F | PR DJ-769-041306 | 3160 | JOE W KAUFFMAN | 04/13/06 | PAYROLL | 8.00 | 383.22 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5176 | EARNEST D CUMMINGS | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5176 | EARNEST D CUMMINGS | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5489 | ERICK B PAYNE | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5489 | ERICK B PAYNE | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5630 | WILLIAM G MCKEE | 04/13/06 | PAYROLL | 8.00 | 377.82 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5644 | MARK A PICKFORD, SR | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5644 | MARK A PICKFORD, SR | 04/13/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 1.00 | 49.43 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 7.00 | 345.92 | |
| | 04/06 | L/F | PR DJ-769-041306 | 5776 | MARTIN B SMITH | 04/13/06 | PAYROLL | 8.00 | 395.31 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 6.00 | 286.75 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| Task Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 6.00 | 286.75 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-770-042006 | 1065 | HARVEY A HAMILTON | 04/20/06 | PAYROLL | 8.00 | 382.33 | |
| | 04/06 | L/F | PR DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 8.00 | 383.23 | |
| | 04/06 | L/F | PR DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 8.00 | 383.23 | |
| | 04/06 | L/F | PR DJ-770-042006 | 3160 | JOE W KAUFFMAN | 04/20/06 | PAYROLL | 7.00 | 335.32 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 7.00 | 330.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.80 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 7.00 | 330.58 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5644 | MARK A PICKFORD, SR | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 7.00 | 345.92 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR DJ-770-042006 | 5776 | MARTIN B SMITH | 04/20/06 | PAYROLL | 8.00 | 395.34 | |
| | 04/06 | L/F | PR DJ-771-042006 | 5176 | EARNEST D CUMMINGS | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-771-042006 | 5489 | ERICK B PAYNE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-771-042006 | 5630 | WILLIAM G MCKEE | 04/20/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-771-042106 | 5176 | EARNEST D CUMMINGS | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR DJ-771-042106 | 5489 | ERICK B PAYNE | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR DJ-771-042106 | 5630 | WILLIAM G MCKEE | 04/21/06 | PAYROLL | .50 | 30.76 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.67 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.00 | 236.13 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 377.81 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 377.81 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | .50 | 30.77 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5776 | MARTIN B SMITH | 04/27/06 | PAYROLL | 5.00 | 245.59 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5776 | MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 392.94 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5776 | MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 392.94 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5776 | MARTIN B SMITH | 04/27/06 | PAYROLL | .50 | 32.11 | |
| | 04/06 | L/F | PR DJ-772-042706 | 5644 | MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.50 | 259.76 | |
| | 04/06 | L/F | PR DJ-772-042806 | 5776 | MARTIN B SMITH | 04/28/06 | PAYROLL | 5.50 | 259.03 | |
| | 04/06 | L/F | PR DJ-772-042806 | 5776 | MARTIN B SMITE | 04/28/06 | PAYROLL | 6.00 | 282.56 | |
| | | | | | Labor | | | 491.50 | 12385.42 | |
| | | | | | Fringe | | | | 11068.67 | |
| | | | | | Material | | | | 724.89 | |
| | | | | | Period 04/06 Total | | | 491.50 | 24178.98 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/17/06 | 98030 | .00 | 22.31 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/19/06 | 98174 | .00 | 227.88 | |
| | | | | | Material | | | | 250.19 | |
| | | | | | Period 05/06 Total | | | .00 | 250.19 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00- | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 10917.00- | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00-JEA | |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | |
| | | | | | Labor | | | .00 | 12215.00- | |
| | | | | | Fringe | | | | 10917.00- | |
| | | | | | Period 06/06 Total | | | .00 | 23132.00- | |
| | | | | | Task Code 5- 5100 Total | | | 491.50 | 1297.17 | |

6-  6100 WOOD BLOCKING

| | 04/06 | L/F | PR DJ-771-042706 | 1065 | HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.32 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-771-042706 | 2200 | HAROLD CANTRALL JR. | 04/27/06 | PAYROLL | 8.00 | 352.68 | |
| | 04/06 | L/F | PR DJ-771-042706 | 5776 | MARTIN B SMITH | 04/27/06 | PAYROLL | 5.00 | 245.59 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1065 | HARVEY A HAMILTON | 04/28/06 | PAYROLL | 5.00 | 238.95 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 5.00 | 220.42 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | Labor | | | 33.00 | 862.05 | |
| | | | | | Fringe | | | | 658.43 | |
| | | | | | Period 04/06 Total | | | 33.00 | 1520.48 | |
| | 06/06 | MAT | AP PJ-204-061506 | 4475 | CONTRACTOR'S LUMBER CIT | 05/25/06 | 182806 | .00 | 27.58 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| | | | | | --Transaction-- | | Hours/ | Transaction | |
|---|---|---|---|---|---|---|---|---|---|
| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Quantity | Amount | Description |

|  |  |  |  |  | Material | | | | 27.58 | |
|  |  |  |  |  | Period 06/06 Total | | | .00 | 27.58 | |
|  |  |  |  |  | Task Code 6- 6100 Total | | | 33.00 | 1548.06 | |

**6-  6200 SHELVES & STDS**

| | 04/06 | L/F | PR | DJ-772-042806 | 2200 HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 1.00 | 44.08 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 2200 HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 3.00 | 132.25 | |
| | | | | | | | Labor | 4.00 | 103.08 | |
| | | | | | | | Fringe | | 73.25 | |
| | | | | | | | Period 04/06 Total | 4.00 | 176.33 | |

| | 05/06 | L/F | PR | DJ-776-052506 | 1908 DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 1908 DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 99.70 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 1.50 | 74.77 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 5.00 | 245.18 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1908 DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1908 DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1908 DONALD A WAKE | 05/31/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1908 DONALD A WAKE | 05/31/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2800 LEON TABER SR. | 05/31/06 | PAYROLL | 1.00 | 41.86 | |
| | | | | | | | Labor | 65.50 | 1703.34 | |
| | | | | | | | Fringe | | 1500.72 | |
| | | | | | | | Period 05/06 Total | 65.50 | 3204.06 | |

| | 06/06 | MAT | AP | PJ-204-061506 | 4475 CONTRACTOR'S LUMBER CIT | 05/09/06 | 182334 | .00 | 20.36 | |
| | 06/06 | MAT | AP | PJ-198-060806 | L340 CHAS BLYTHE | 06/07/06 | 6/7 BIG R | .00 | 92.63 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 3.00 | 149.54 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 8.00 | 392.27 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 5.00 | 245.18 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 5.00 | 245.18 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | | | |
|---|---|---|---|---|
| ntr No: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

--------------------------------------------------------------------------------

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | L/F | PR DJ-779-060806 | 1903 | VERN G VLACH | 06/08/06 | PAYROLL | 8.00 | 392.26 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 1.00 | 45.68 | |
| | 06/06 | L/F | PR DJ-779-060806 | 2200 | HAROLD CANTRALL JR. | 06/08/06 | PAYROLL | 1.00 | 45.68 | |
| | 06/06 | L/F | PR DJ-780-060906 | 1903 | VERN G VLACH | 06/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 06/06 | L/F | PR DJ-780-060906 | 1903 | VERN G VLACH | 06/09/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1045 | JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 4.00 | 200.09 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1800 | PATRICK A RYAN | 06/15/06 | PAYROLL | 4.00 | 196.27 | |
| | 06/06 | L/F | PR DJ-782-062606 | 1065 | HARVEY A HAMILTON | 06/26/06 | PAYROLL | 7.00 | 348.91 | |
| | 06/06 | L/F | PR DJ-782-062606 | 1065 | HARVEY A HAMILTON | 06/26/06 | PAYROLL | 5.50 | 274.15 | |
| | | | | | | | Labor | 74.50 | 1996.15 | |
| | | | | | | | Fringe | | 1671.72 | |
| | | | | | | | Material | | 112.99 | |
| | | | | | | Period 06/06 Total | | 74.50 | 3780.86 | |
| | | | | | | Task Code 6- 6200 Total | | 144.00 | 7161.25 | |

j- 6300 ROOF BLOCKING

| | 05/06 | MAT | AP PJ-164-051106 | 4475 | CONTRACTOR'S LUMBER CIT | 04/30/06 | 4/06 2810 | .00 | 383.37 181945 |
| | 05/06 | MAT | AP PJ-164-051106 | 4475 | CONTRACTOR'S LUMBER CIT | 04/30/06 | 4/06 2810 | .00 | 116.37 181407 |
| | | | | | | | Material | | 499.74 |
| | | | | | | Period 05/06 Total | | .00 | 499.74 |
| | | | | | | Task Code 6- 6300 Total | | .00 | 499.74 |

j- 6400 VALANCE

| | 05/06 | MAT | AP PJ-179-052206 | 8702 | JAMES MACHINERY, INC. | 05/17/06 | 272512 | .00 | 66.73 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 3.00 | 149.54 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.84 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 3.00 | 147.11 |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 8.00 | 392.27 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 |
| | 05/06 | L/F | PR DJ-776-052506 | 1065 | HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.35 |
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 |
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| b Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR | DJ-776-052506 | 1903 VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 1903 VERN G VLACH | 05/25/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | | | | | | | Labor | 92.00 | 2480.48 | |
| | | | | | | | Fringe | | 2049.52 | |
| | | | | | | | Material | | 66.73 | |
| | | | | | | Period 05/06 Total | | 92.00 | 4596.73 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 6195 FASTENAL COMPANY | 05/19/06 | 99674 | .00 | 27.86 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 8702 JAMES MACHINERY, INC. | 05/25/06 | 272745 | .00 | 10.88 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 12540 PAWNEE LUMBER & HARDWAR | 05/12/06 | 214638 | .00 | 595.64 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 12540 PAWNEE LUMBER & HARDWAR | 05/18/06 | 216331 | .00 | 300.48 | |
| | 06/06 | MAT | AP | PJ-204-061506 | 4475 CONTRACTOR'S LUMBER CIT | 05/23/06 | 182708 | .00 | 156.88 | |
| | | | | | | | Material | | 1091.74 | |
| | | | | | | Period 06/06 Total | | .00 | 1091.74 | |
| | | | | | | Task Code 6- 6400 Total | | 92.00 | 5688.47 | |

5- 6500 LAMLINE

| | 05/06 | L/F | PR | DJ-776-052506 | 1903 VERN G VLACH | 05/25/06 | PAYROLL | 2.00 | 98.09 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 99.70 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 2.00 | 99.70 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1903 VERN G VLACH | 05/31/06 | PAYROLL | 5.00 | 245.18 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2800 LEON TABER SR. | 05/31/06 | PAYROLL | 2.00 | 83.72 | |
| | | | | | | | Labor | 24.00 | 634.31 | |
| | | | | | | | Fringe | | 527.20 | |
| | | | | | | Period 05/06 Total | | 24.00 | 1161.51 | |
| | 06/06 | MAT | AP | PJ-200-061206 | 6022 EPS SPECIALTIES LTD INC | 05/31/06 | 5877 | .00 | 2034.40 | |
| | 06/06 | MAT | AP | PJ-209-062206 | 6022 EPS SPECIALTIES LTD INC | 05/15/06 | 5856 | .00 | 85.00 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 2.00 | 99.69 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1065 HARVEY A HAMILTON | 06/08/06 | PAYROLL | 1.00 | 49.84 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 3.00 | 147.11 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51094 GORDMANS REPAIR
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO's: | .00 | Retainage Amt.: | .00 |

-----------------------------------------------------------------------------------------------------------

| | | | | | --Transaction-- | | Hours/ | Transaction | |
|---|---|---|---|---|---|---|---|---|---|
| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Quantity | Amount | Description |

-----------------------------------------------------------------------------------------------------------

| | | | | | | | Labor | 9.00 | 239.46 | |
| | | | | | | | Fringe | | 204.29 | |
| | | | | | | | Material | | 2119.40 | |
| | | | | | | Period 06/06 Total | | 9.00 | 2563.15 | |
| | | | | | | Task Code 6- 6500 Total | | 33.00 | 3724.66 | |

**- 6600 DOOR TRIM**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR | DJ-776-052506 | 1065 HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 1065 HARVEY A HAMILTON | 05/25/06 | PAYROLL | 8.00 | 398.76 | |
| | 05/06 | L/F | PR | DJ-776-052506 | 1065 HARVEY A HAMILTON | 05/25/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 5.00 | 249.22 | |
| | 05/06 | L/F | PR | DJ-777-053106 | 2200 HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 1.00 | 45.68 | |
| | | | | | | | Labor | 22.00 | 614.87 | |
| | | | | | | | Fringe | | 477.53 | |
| | | | | | | Period 05/06 Total | | 22.00 | 1092.40 | |
| | 06/06 | L/F | PR | DJ-779-060806 | 1903 VERN G VLACH | 06/08/06 | PAYROLL | 2.00 | 98.07 | |
| | | | | | | | Labor | 2.00 | 51.82 | |
| | | | | | | | Fringe | | 46.25 | |
| | | | | | | Period 06/06 Total | | 2.00 | 98.07 | |
| | | | | | | Task Code 6- 6600 Total | | 24.00 | 1190.47 | |

**- 6700 CORNER GUARDS**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 06/06 | L/F | PR | DJ-782-062606 | 1065 HARVEY A HAMILTON | 06/26/06 | PAYROLL | 8.00 | 398.75 | |
| | | | | | | | Labor | 8.00 | 224.00 | |
| | | | | | | | Fringe | | 174.75 | |
| | | | | | | Period 06/06 Total | | 8.00 | 398.75 | |
| | | | | | | Task Code 6- 6700 Total | | 8.00 | 398.75 | |

**- 9100 MTL STUDS**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR | DJ-771-042706 | 1065 HARVEY A HAMILTON | 04/27/06 | PAYROLL | 8.00 | 382.34 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 1894 MIKE G SPRINKEL | 04/27/06 | PAYROLL | 5.00 | 233.59 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 1894 MIKE G SPRINKEL | 04/27/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 1903 VERN G VLACH | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 2800 LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1065 HARVEY A HAMILTON | 04/28/06 | PAYROLL | 1.00 | 47.79 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1894 MIKE G SPRINKEL | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1894 MIKE G SPRINKEL | 04/28/06 | PAYROLL | 8.00 | 373.72 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1903 VERN G VLACH | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR | DJ-772-042806 | 1903 VERN G VLACH | 04/28/06 | PAYROLL | 8.00 | 373.72 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| tr No: | | Est. Compl: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | | | Labor | 74.00 | 1812.62 | |
| | | | | | | | Fringe | | 1576.62 | |
| | | | | | | Period 04/06 Total | | 74.00 | 3389.24 | |
| | 05/06 | MAT | AP PJ-161-051006 | 6195 | FASTENAL COMPANY | 04/28/06 | 98595 | .00 | 19.14 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/25/06 | 2094741-00 | .00 | 948.16 | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/27/06 | 2094842-00 | .00 | 1216.35 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/03/06 | 2095079-00 | .00 | 30.76 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACH | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/08/06 | 2095226-00 | .00 | 40.59 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | | | | | | | Labor | 40.00 | 1036.40 | |
| | | | | | | | Fringe | | 924.98 | |
| | | | | | | | Material | | 2255.00 | |
| | | | | | | Period 05/06 Total | | 40.00 | 4216.38 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 6.50 | 323.99 | |
| | 06/06 | L/F | PR DJ-781-061606 | 1903 | VERN G VLACH | 06/16/06 | PAYROLL | 8.00 | 392.28 | |
| | 06/06 | MAT | GL JE-025-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3880.19 | JEA |
| | | | | | | | Labor | 14.50 | 389.28 | |
| | | | | | | | Fringe | | 326.99 | |
| | | | | | | | Material | | 3880.19 | |
| | | | | | | Period 06/06 Total | | 14.50 | 4596.46 | |
| | | | | | | Task Code 9- 9100 Total | | 128.50 | 12202.08 | |

9200 DRYWALL

| | 04/06 | L/F | PR DJ-771-042706 | 1181 | MARK W LAKE | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR DJ-771-042706 | 1194 | JAMIAN L MCCARTY | 04/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR DJ-771-042706 | 2800 | LEON TABER SR. | 04/27/06 | PAYROLL | 8.00 | 322.09 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1065 | HARVEY A HAMILTON | 04/28/06 | PAYROLL | 2.00 | 95.58 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1181 | MARK W LAKE | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1181 | MARK W LAKE | 04/28/06 | PAYROLL | 8.00 | 373.72 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

stomer:

ntr No:

j Mgr : MS MARK SORENSEN

b Type: TM T/M FOR SMALL JOBS

| | Contr. Date: | | Contr Amount: | .00 | Contr Billings: 388274.00 |
| | Est. Compl.: | | Changeorders: | .00 | T & M Billings: .00 |
| | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : 388274.00 |
| | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/06 | L/F | PR | DJ-772-042806 | 1194 | JAMIAN L MCCARTY | 04/28/06 | PAYROLL | 8.00 | 373.73 | |
| 04/06 | L/F | PR | DJ-772-042806 | 1194 | JAMIAN L MCCARTY | 04/28/06 | PAYROLL | 8.00 | 373.72 | |
| 04/06 | L/F | PR | DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| 04/06 | L/F | PR | DJ-772-042806 | 2800 | LEON TABER SR. | 04/28/06 | PAYROLL | 2.00 | 80.52 | |
| | | | | | | | Labor | 62.00 | 1501.32 | |
| | | | | | | | Fringe | | 1319.77 | |
| | | | | | | Period 04/06 Total | | 62.00 | 2821.09 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/24/06 | 2094698-00 | .00 | 1775.57 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/25/06 | 2094700-00 | .00 | 5208.80 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/27/06 | 2094812-00 | .00 | 426.36 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/28/06 | 2094860-00 | .00 | 536.00 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/28/06 | 2094885-00 | .00 | 430.31 | |
| 05/06 | MAT | AP | PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 05/01/06 | 2094958-00 | .00 | 92.97 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 1.00 | 49.84 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 3.00 | 149.54 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 4.00 | 199.37 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 1.00 | 49.04 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 6.00 | 294.21 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 3.00 | 147.11 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1181 | MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1181 | MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1181 | MARK W LAKE | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1194 | JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1194 | JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1194 | JAMIAN L MCCARTY | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 1.00 | 49.04 | |
| 05/06 | L/F | PR | DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 7.00 | 343.24 | |
| 05/06 | L/F | PR | DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| 05/06 | L/F | PR | DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 1.00 | 45.68 | |
| 05/06 | MAT | AP | PJ-165-051006 | 11547 | NEGWER MATERIALS, INC. | 05/04/06 | 2095143-00 | .00 | 114.33 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| 05/06 | L/F | PR | DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 2.00 | 98.08 | |
| 05/06 | L/F | PR | DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.71 | |
| 05/06 | L/F | PR | DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 2.00 | 98.07 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| } Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| ) Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Labor | | 123.00 | 3210.71 | |
| | | | | | Fringe | | | 2818.59 | |
| | | | | | Material | | | 8584.34 | |
| | | | | | Period 05/06 Total | | 123.00 | 14613.64 | |
| | 06/06 MAT | AP PJ-200-061206 | 11547 | NEGWER MATERIALS, INC. | 05/25/06 | 2095795-00 | .00 | 93.66 | |
| | 06/06 MAT | GL JE-025-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2600.00-JEA | |
| | | | | | Material | | | 2506.34- | |
| | | | | | Period 06/06 Total | | .00 | 2506.34- | |
| | | | | | Task Code 9- | 9200 Total | 185.00 | 14928.39 | |

**}- 9300 INSULATION**

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 05/06 MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/24/06 | 2094698-00 | .00 | 522.50 | |
| | 05/06 MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/28/06 | 2094860-00 | .00 | 270.31 | |
| | 05/06 L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 5.00 | 245.17 | |
| | 05/06 L/F | PR DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 1.00 | 49.03 | |
| | | | | | Labor | | 8.00 | 207.28 | |
| | | | | | Fringe | | | 184.99 | |
| | | | | | Material | | | 792.81 | |
| | | | | | Period 05/06 Total | | 8.00 | 1185.08 | |
| | | | | | Task Code 9- | 9300 Total | 8.00 | 1185.08 | |

**}- 9400 CEILING**

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 05/06 L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 MAT | AP PJ-179-052206 | 11547 | NEGWER MATERIALS, INC. | 05/11/06 | 2095323-00 | .00 | 227.21 | |
| | 05/06 L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 3.00 | 147.11 | |
| | 05/06 L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 1.00 | 45.67 | |
| | | | | | Labor | | 15.00 | 404.24 | |
| | | | | | Fringe | | | 333.59 | |
| | | | | | Material | | | 227.21 | |
| | | | | | Period 05/06 Total | | 15.00 | 965.04 | |
| | | | | | Task Code 9- | 9400 Total | 15.00 | 965.04 | |

Time: 13:27  Page:  31

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: 388274.00 |
|---|---|---|---|---|---|---|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code  Prd. Type   Source Code    I.D.#   Name/Description | --Transaction--<br>Date    Reference | Hours/<br>Quantity | Transaction<br>Amount    Description |
|---|---|---|---|
| 9-  9500 NUDO BOARD | | | |
| 05/06 MAT  AP PJ-165-051106  11950 NUDO PRODUCTS, INC. | 05/05/06    174745 | .00 | 756.83 |
| 05/06 MAT  AP PJ-180-052406  11950 NUDO PRODUCTS, INC. | 05/05/06 CM 174745 | .00 | 756.83- |
| | Period 05/06 Total | .00 | .00 |
| 06/06 MAT  GL JE-024-062606   J/C JOB COST | 06/26/06 JRNL ENTRY | .00 | 757.00-JEA |
| | Material | | 757.00- |
| | Period 06/06 Total | .00 | 757.00- |
| | Task Code 9-  9500 Total | .00 | 757.00- |
| 1 SELVAGGIO STEEL | | | |
| 04/06 SUB  AP PJ-151-041006  14848 SELVAGGIO STEEL, INC. | 04/04/06    13874 | .00 | 42655.00 |
| | Subcontr | | 42655.00 |
| | Period 04/06 Total | .00 | 42655.00 |
| 06/06 SUB  GL JE-024-062606   J/C JOB COST | 06/26/06 JRNL ENTRY | .00 | 21328.00-HALF METALS |
| | Subcontr | | 21328.00- |
| | Period 06/06 Total | .00 | 21328.00- |
| | Task Code 601-  1 Total | .00 | 21327.00 |
| 1 SAVAGE DOORWAYS | | | |
| 06/06 SUB  AP PJ-207-062206  14261 SAVAGE DOORWAYS INC. | 06/07/06    8855 | .00 | 14.22 |
| 06/06 SUB  AP PJ-208-062206  14261 SAVAGE DOORWAYS INC. | 06/07/06    8854 | .00 | 385.96 |
| 06/06 SUB  AP PJ-209-062206  14261 SAVAGE DOORWAYS INC. | 06/07/06    8856 | .00 | 137.70 |
| 06/06 SUB  AP PJ-205-062106  14261 SAVAGE DOORWAYS INC. | 06/14/06    6568 | .00 | 385.96 |
| | Subcontr | | 923.84 |
| | Period 06/06 Total | .00 | 923.84 |
| | Task Code 602-  1 Total | .00 | 923.84 |
| 1 RM WILLEY MASONRY | | | |
| 04/06 SUB  AP PJ-154-042106  17103 RM WILLEY INC. MASONRY | 04/17/06    06-154 | .00 | 30654.00 |
| | Subcontr | | 30654.00 |
| | Period 04/06 Total | .00 | 30654.00 |
| 05/06 SUB  AP PJ-163-051006  17103 RM WILLEY INC. MASONRY | 04/21/06    06-154-1 | .00 | 259.65 |
| | Subcontr | | 259.65 |
| | Period 05/06 Total | .00 | 259.65 |
| 06/06 SUB  GL JE-024-062606   J/C JOB COST | 06/26/06 JRNL ENTRY | .00 | 15457.00-1/2 BEARING WALL |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Transaction Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Subcontr | | 15457.00- | |
| | | | | | | Period 06/06 Total | | .00 | 15457.00- | |
| | | | | | | Task Code 701- | 1 Total | .00 | 15456.65 | |
| :- | 1 | FJ MURPHY | | | | | | | | |
| | 05/06 | SUB | AP PJ-161-051006 | 11200 | F. J. MURPHY & SON INC | 04/22/06 | 15423 | .00 | 92.00 | |
| | 05/06 | SUB | AP PJ-201-061306 | 11200 | F. J. MURPHY & SON INC | 05/26/06 | 15543 | .00 | 12312.70 | |
| | | | | | | | Subcontr | | 12404.70 | |
| | | | | | | Period 05/06 Total | | .00 | 12404.70 | |
| | 06/06 | SUB | AP PJ-205-062106 | 11200 | F. J. MURPHY & SON INC | 06/13/06 | 15776 | .00 | 112.50 | |
| | 06/06 | SUB | AP PJ-214-062606 | 11200 | F. J. MURPHY & SON INC | 06/22/06 | 15973 | .00 | 138.00 | |
| | | | | | | | Subcontr | | 250.50 | |
| | | | | | | Period 06/06 Total | | .00 | 250.50 | |
| | | | | | | Task Code 702- | 1 Total | .00 | 12655.20 | |
| :- | 1 | B&B ELECTRIC | | | | | | | | |
| | 05/06 | SUB | AP PJ-161-051006 | 1408 | B & B ELECTRIC | 04/25/06 | 11113 | .00 | 28416.00 | |
| | 05/06 | SUB | AP PJ-201-061306 | 1408 | B & B ELECTRIC | 05/30/06 | 11244 | .00 | 53192.00 | |
| | | | | | | | Subcontr | | 81608.00 | |
| | | | | | | Period 05/06 Total | | .00 | 81608.00 | |
| | 06/06 | SUB | AP PJ-214-062606 | 1408 | B & B ELECTRIC | 06/22/06 | 11334 | .00 | 24789.00 | |
| | 06/06 | GL | JE-027-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 36000.00- | |
| | 06/06 | SUB | AP PJ-216-062706 | 1408 | B & B ELECTRIC | 06/26/06 | PENDANT L | .00 | 800.00 | |
| | | | | | | | Subcontr | | 10411.00- | |
| | | | | | | Period 06/06 Total | | .00 | 10411.00- | |
| | | | | | | Task Code 703- | 1 Total | .00 | 71197.00 | |
| :- | 1 | RJ POWER | | | | | | | | |
| | 05/06 | SUB | AP PJ-165-051106 | 12990 | R.J. POWER PLUMBING & | 04/28/06 | 17297 | .00 | 437.03 | |
| | | | | | | | Subcontr | | 437.03 | |
| | | | | | | Period 05/06 Total | | .00 | 437.03 | |
| | 06/06 | SUB | AP PJ-205-062106 | 12990 | R.J. POWER PLUMBING & | 05/18/06 | 17386 | .00 | 1988.68 | |
| | 06/06 | SUB | AP PJ-217-062706 | 12990 | R.J. POWER PLUMBING & | 04/11/06 | G EST | .00 | 23570.00 | |
| | 06/06 | SUB | AP PJ-216-062706 | 12990 | R.J. POWER PLUMBING & | 06/27/06 | 5474 | .00 | 24007.00 | |

of :06/27/06  On 06/27/06  (3U.6)                                            Time: 13:27  Page:  33

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| tomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 388274.00 |
| r No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 388274.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

---

| sk Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---------|-----------|-------------|-------|-----------------|------|-----------|-----------------|--------|-------------|
| | | | | | Subcontr | | | 49565.68 | |
| | | | | | Period 06/06 Total | | .00 | 49565.68 | |
| | | | | | Task Code 704- | 1 Total | .00 | 50002.71 | |
| 1 PAUL BOLL PAINTING | | | | | | | | | |
| | 05/06 SUB | AP PJ-181-052506 | 2375 | PAUL BOLL PAINTING | 05/12/06 | 0004826-IN | .00 | 69000.00 | |
| | | | | | Subcontr | | | 69000.00 | |
| | | | | | Period 05/06 Total | | .00 | 69000.00 | |
| | | | | | Task Code 705- | 1 Total | .00 | 69000.00 | |
| 1 BACON & VAN BUSKIRK | | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 1472 | BACON & VAN BUSKIRK GLA | 05/30/06 | I109548 | .00 | 213.08 | |
| | | | | | Subcontr | | | 213.08 | |
| | | | | | Period 05/06 Total | | .00 | 213.08 | |
| | 06/06 SUB | AP PJ-209-062206 | 1472 | BACON & VAN BUSKIRK GLA | 06/02/06 | 060206S-2 | .00 | 5700.00 | |
| | 06/06 SUB | AP PJ-216-062706 | 1472 | BACON & VAN BUSKIRK GLA | 06/26/06 | I109704 | .00 | 5300.00 | |
| | | | | | Subcontr | | | 11000.00 | |
| | | | | | Period 06/06 Total | | .00 | 11000.00 | |
| | | | | | Task Code 706- | 1 Total | .00 | 11213.08 | |
| 1 PATTERSON COMMERCIAL FL | | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 12500 | PATTERSON COMMERCIAL | 05/31/06 | 13712 | .00 | 41200.00 | |
| | | | | | Subcontr | | | 41200.00 | |
| | | | | | Period 05/06 Total | | .00 | 41200.00 | |
| | 06/06 SUB | AP PJ-206-062106 | 12500 | PATTERSON COMMERCIAL | 06/21/06 | VCT REMOVE | .00 | 590.00 | |
| | | | | | Subcontr | | | 590.00 | |
| | | | | | Period 06/06 Total | | .00 | 590.00 | |
| | | | | | Task Code 707- | 1 Total | .00 | 41790.00 | |
| 1 FRITSCH PLASTER & DRYWALL | | | | | | | | | |
| | 05/06 SUB | AP PJ-201-061306 | 6545 | FRITSCH PLASTER & DRYWA | 05/10/06 | 309-06 | .00 | 6212.00 | |
| | | | | | Subcontr | | | 6212.00 | |
| | | | | | Period 05/06 Total | | .00 | 6212.00 | |
| | | | | | Task Code 708- | 1 Total | .00 | 6212.00 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51094 GORDMANS REPAIR

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 388274.00 |
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 388274.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| sk Code | Prd. Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| - | 1 SPRINGFIELD OVERHEAD DOOR | | | | | | | | |
| | 06/06 SUB AP | PJ-209-062206 | 15299 | SPRINGFIELD OVERHEAD DO | 06/02/06 | 92568 | .00 | 957.00 | |
| | | | | Subcontr | | | | 957.00 | |
| | | | | Period 06/06 Total | | | .00 | 957.00 | |
| | | | | Task Code 709- | 1 Total | | .00 | 957.00 | |
| | | | | Job Total | | | 2562.50 | 440653.88 | |
| | | | | Labor | | | 2562.50 | 50553.71 | |
| | | | | Fringe | | | | 40026.29 | |
| | | | | Material | | | | 36592.15 | |
| | | | | Subcontr | | | | 300734.48 | |
| | | | | Equipmnt | | | | 12747.25 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51096 BED BATH & BEYOND

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | | | |
|---|---|---|---|---|
| | Contr. Date: | Contr Amount: | .00 | Contr Billings: 20155.00 |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : | .00 | Total Billed : 20155.00 |
| o Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1000 TIME & MATERIAL | | | | | | | | | | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96576 | .00 | 356.59 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96597 | .00 | 395.14 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/16/06 | 96638 | .00 | 178.30 | |
| | 03/06 | MAT | AP PJ-147-033106 | 14848 | SELVAGGIO STEEL, INC. | 03/16/06 | W35859 | .00 | 1475.81 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5100 | PAUL A BOOTH | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5376 | DONNIE L LUCAS | 03/17/06 | PAYROLL | 8.00 | 321.03 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5410 | CARL E FICKAS | 03/17/06 | PAYROLL | 8.00 | 294.75 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5489 | ERICK B PAYNE | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5644 | MARK A PICKFORD, SR | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5722 | ANTHONY H SCHMEIDERER J | 03/17/06 | PAYROLL | 8.00 | 268.47 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5765 | STEFFEN R SMITH | 03/17/06 | PAYROLL | 8.00 | 321.03 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5781 | ROBIN D SMITH | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5866 | BRIAN K TOMLIN | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5923 | TROY A WINHOLTZ | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | L/F | PR DJ-764-031706 | 5996 | TERRIE A VAN HUSS | 03/17/06 | PAYROLL | 8.00 | 373.59 | |
| | 03/06 | MAT | AP PJ-140-032306 | L2200 | HAROLD CANTRALL | 03/17/06 | HARPER | .00 | 3.00 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96641 | .00 | 501.02 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96644 | .00 | 11.92 | |
| | 03/06 | MAT | AP PJ-147-033106 | 6195 | FASTENAL COMPANY | 03/17/06 | 96691 | .00 | 36.35 | |
| | 03/06 | MAT | AP CR-399-041406 | 4208 | CITY OF SPRINGFIELD | 03/17/06 | BBB | .00 | 25.50 | |
| | 03/06 | L/F | PR DJ-764-032006 | 5630 | WILLIAM G MCKEE | 03/20/06 | PAYROLL | 9.00 | 456.85 | |
| | 03/06 | L/F | PR DJ-765-032106 | 1894 | MIKE G SPRINKEL | 03/21/06 | PAYROLL | 17.50 | 818.64 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1027 | CURTIS A BAUMAN | 03/23/06 | PAYROLL | 4.00 | 202.04 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 6.00 | 325.20 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 8.00 | 419.62 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1065 | HARVEY A HAMILTON | 03/23/06 | PAYROLL | 3.00 | 141.62 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1145 | DAVE PFEIFFER | 03/23/06 | PAYROLL | 2.00 | 132.93 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 10.00 | 503.28 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 8.00 | 369.50 | |
| | 03/06 | L/F | PR DJ-764-032306 | 1950 | STEVEN W WELLS | 03/23/06 | PAYROLL | 2.00 | 92.38 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2065 | ABE M AYOUB | 03/23/06 | PAYROLL | 3.00 | 125.94 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 8.00 | 342.66 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 10.00 | 422.21 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2200 | HAROLD CANTRALL JR. | 03/23/06 | PAYROLL | 2.00 | 79.55 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 9.00 | 391.16 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2348 | ROBERT W KENAL | 03/23/06 | PAYROLL | 3.00 | 125.94 | |
| | 03/06 | L/F | PR DJ-764-032306 | 2800 | LEON TABER SR. | 03/23/06 | PAYROLL | 2.00 | 79.55 | |
| | 03/06 | L/F | PR DJ-764-032306 | 5776 | MARTIN B SMITE | 03/23/06 | PAYROLL | 6.00 | 298.81 | |
| | 03/06 | MAT | AP PJ-146-032906 | 4208 | CITY OF SPRINGFIELD | 03/29/06 | BB & BEYND | .00 | 84.60 | PERMIT |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51096 BED BATH & BEYOND

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 20155.00 |
|---|---|---|---|---|---|
| tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : | .00 | Total Billed : | 20155.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 20.00- | 844.39- | |
| | 03/06 | L/F | PR | DJ-766-033006 | 2200 HAROLD CANTRALL JR. | 03/30/06 | PAYROLL | 20.00 | 925.97 | |
| | | | | | | | Labor | 200.50 | 4945.20 | |
| | | | | | | | Fringe | | 4284.67 | |
| | | | | | | | Material | | 3068.23 | |
| | | | | | | Period 03/06 Total | | 200.50 | 12298.10 | |
| | | | | | | | | | | |
| | 04/06 | MAT | AP | PJ-151-041006 | 739 AMERICAN EXPRESS | 03/30/06 | 3782630799 | .00 | 484.81 | MAS |
| | 04/06 | MAT | AP | PJ-151-041006 | 8126 HUNDMAN LUMBER | 03/22/06 | 2014761 | .00 | 183.18 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 8126 HUNDMAN LUMBER | 03/22/06 | 2014763 | .00 | 604.63 | |
| | 04/06 | MAT | AP | PJ-151-041006 | 10090 MATHIS-KELLEY CONSTRUCT | 03/16/06 | 391512 | .00 | 163.63 | |
| | 04/06 | MAT | AP | PJ-154-042106 | 6195 FASTENAL COMPANY | 04/06/06 | 97605 | .00 | 44.53 | |
| | 04/06 | L/F | PR | DJ-770-042006 | 2800 LEON TABER SR. | 04/20/06 | PAYROLL | 8.00 | 318.15 | |
| | 04/06 | EQP | GL | JE-014-042106 | J/C JOB COST | 04/21/06 | JRNL ENTRY | .00 | 172.00 | 2 WELDERS-1 DAY |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 8.00 | 373.59 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5644 MARK A PICKFORD, SR | 04/27/06 | PAYROLL | 5.00 | 233.49 | |
| | 04/06 | L/F | PR | DJ-771-042706 | 5776 MARTIN B SMITH | 04/27/06 | PAYROLL | 8.00 | 388.42 | |
| | | | | | | | Labor | 29.00 | 707.51 | |
| | | | | | | | Fringe | | 606.14 | |
| | | | | | | | Material | | 1480.78 | |
| | | | | | | | Equipmnt | | 172.00 | |
| | | | | | | Period 04/06 Total | | 29.00 | 2966.43 | |
| | | | | | | | | | | |
| | 05/06 | L/F | PR | DJ-774-051106 | 1903 VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 193.90 | |
| | 05/06 | L/F | PR | DJ-774-051106 | 2200 HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 8.00 | 360.80 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.24 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 1.00 | 49.24 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1065 HARVEY A HAMILTON | 05/18/06 | PAYROLL | 2.00 | 98.46 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 1903 VERN G VLACH | 05/18/06 | PAYROLL | 6.00 | 290.83 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2200 HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 5.00 | 225.51 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2800 LEON TABER SR. | 05/18/06 | PAYROLL | 4.00 | 165.37 | |
| | 05/06 | L/F | PR | DJ-775-051806 | 2800 LEON TABER SR. | 05/18/06 | PAYROLL | 4.00 | 165.37 | |
| | | | | | | | Labor | 35.00 | 911.37 | |
| | | | | | | | Fringe | | 687.35 | |
| | | | | | | Period 05/06 Total | | 35.00 | 1598.72 | |
| | | | | | | | | | | |
| | 06/06 | L/F | PR | DJ-780-060806 | 5776 MARTIN B SMITH | 06/08/06 | PAYROLL | 8.00 | 386.42 | |
| | 06/06 | L/F | PR | DJ-780-060906 | 1903 VERN G VLACH | 06/09/06 | PAYROLL | 3.00 | 145.43 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 1045 JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 2.00 | 98.82 | |
| | 06/06 | L/F | PR | DJ-780-061506 | 1065 HARVEY A HAMILTON | 06/15/06 | PAYROLL | 1.00 | 49.24 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51096 BED BATH & BEYOND

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: | 20155.00 |
| --- | --- | --- | --- | --- | --- |
| ntr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : | .00 | Total Billed : | 20155.00 |
| b Type : TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 06/06 | L/F | PR DJ-780-061506 | 1800 | PATRICK A RYAN | 06/15/06 | PAYROLL | 2.00 | 96.92 | |
| | 06/06 | L/F | PR DJ-780-061506 | 2200 | HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 3.00 | 135.23 | |
| | 06/06 | MAT | AP PJ-205-062106 | 2375 | PAUL BOLL PAINTING | 06/16/06 | 0004856-IN | .00 | 2897.34 | |
| | 06/06 | MAT | GL JE-028-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2897.34- | |
| | | | | | | | Labor | 19.00 | 516.68 | |
| | | | | | | | Fringe | | 395.38 | |
| | | | | | | Period 06/06 Total | | 19.00 | 912.06 | |
| | | | | | | Task Code 1- 1000 Total | | 283.50 | 17775.31 | |

1- 1 RM WILLEY INC

| | 05/06 | SUB | AP PJ-201-061306 | 17103 | RM WILLEY INC. MASONRY | 05/18/06 | 06-154-3 | .00 | 9380.00 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Subcontr | | 9380.00 | |
| | | | | | | Period 05/06 Total | | .00 | 9380.00 | |
| | | | | | | Task Code 701- 1 Total | | .00 | 9380.00 | |

2- 1 FRITSCH PLASTER & DRYWALL

| | 05/06 | SUB | AP PJ-201-061306 | 6545 | FRITSCH PLASTER & DRYWA | 05/10/06 | 319-06 | .00 | 1388.00 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Subcontr | | 1388.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1388.00 | |
| | | | | | | Task Code 702- 1 Total | | .00 | 1388.00 | |

3- 1 PATTERSON COMMERCIAL FL

| | 05/06 | SUB | AP PJ-201-061306 | 12500 | PATTERSON COMMERCIAL | 05/31/06 | 13689 | .00 | 1105.00 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Subcontr | | 1105.00 | |
| | | | | | | Period 05/06 Total | | .00 | 1105.00 | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1105.00- | |
| | | | | | | | Subcontr | | 1105.00- | |
| | | | | | | Period 06/06 Total | | .00 | 1105.00- | |
| | | | | | | Task Code 703- 1 Total | | .00 | .00 | |

1- 1 PAUL BOLL PAINT

| | 06/06 | SUB | GL JE-028-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2897.34 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Subcontr | | 2897.34 | |
| | | | | | | Period 06/06 Total | | .00 | 2897.34 | |
| | | | | | | Task Code 704- 1 Total | | .00 | 2897.34 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51096 BED BATH & BEYOND
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| stomer: | Contr. Data: | Contr Amount: | .00 | Contr Billings: | 20155.00 |
|---|---|---|---|---|---|
| tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/26/06 | Total Contr : | .00 | Total Billed : | 20155.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Job Total | 283.50 | 31440.65 | |
| | | | | | | Labor | 283.50 | 7080.76 | |
| | | | | | | Fringe | | 5973.54 | |
| | | | | | | Material | | 4549.01 | |
| | | | | | | Subcontr | | 13665.34 | |
| | | | | | | Equipmnt | | 172.00 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|--------|--|--------------|--|---------------|-----|-----------------|-----------|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|----------|------|------|-------------|-------|------------------|------|-----------|-----------------|--------------------|-------------|
| - 1000 TIME & MATERIAL | | | | | | | | | | |
| | 03/06 | MAT | AP CR-393-033106 | 4208 | CITY OF SPRINGFIELD | 03/15/06 | SPORTS ATH | .00 | 188.90 | PERMIT |
| | | | | | | | Material | | 188.90 | |
| | | | | | | Period 03/06 Total | | .00 | 188.90 | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2171.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2389.00- | |
| | | | | | | | Labor | .00 | 2389.00 | |
| | | | | | | | Fringe | | 2171.00 | |
| | | | | | | Period 06/06 Total | | .00 | 4560.00 | |
| | | | | | | Task Code 1- 1000 Total | | .00 | 4748.90 | |
| - 1151 CLEANUP | | | | | | | | | | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2200 | HAROLD CANTRALL JR. | 05/04/06 | PAYROLL | 2.00 | 91.36 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 3.00 | 132.54 | |
| | 05/06 | L/F | PR DJ-773-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 2.00 | 88.35 | |
| | 05/06 | L/F | PR DJ-774-050406 | 2348 | ROBERT W KENAL | 05/04/06 | PAYROLL | 4.00 | 176.72 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 3.00 | 125.58 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2800 | LEON TABER SR. | 05/11/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 6.00 | 251.18 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2200 | HAROLD CANTRALL JR. | 05/25/06 | PAYROLL | 4.00 | 182.74 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-776-052506 | 2800 | LEON TABER SR. | 05/25/06 | PAYROLL | 8.00 | 334.90 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 3.00 | 137.05 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2200 | HAROLD CANTRALL JR. | 05/31/06 | PAYROLL | 2.00 | 91.34 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2800 | LEON TABER SR. | 05/31/06 | PAYROLL | 5.00 | 209.31 | |
| | 05/06 | L/F | PR DJ-777-053106 | 2800 | LEON TABER SR. | 05/31/06 | PAYROLL | 5.00 | 209.30 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor | 94.00 | 2292.91 | |
| | | | | | | | Fringe | | 1728.30 | |
| | | | | | | | Period 05/06 Total | 94.00 | 4021.21 | |
| | 06/06 | L/F | PR DJ-780-060906 | 1903 | VERN G VLACE | 06/09/06 | PAYROLL | 2.00 | 98.06 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1065 | HARVEY A HAMILTON | 06/15/06 | PAYROLL | 3.00 | 149.54 | |
| | 06/06 | L/F | PR DJ-780-061506 | 2200 | HAROLD CANTRALL JR. | 06/15/06 | PAYROLL | 8.00 | 365.47 | |
| | | | | | | | Labor | 13.00 | 350.78 | |
| | | | | | | | Fringe | | 262.29 | |
| | | | | | | | Period 06/06 Total | 13.00 | 613.07 | |
| | | | | | | | Task Code 1- 1151 Total | 107.00 | 4634.28 | |
| - 1190 | SM | TOOLS | | | | | | | | |
| | 04/06 | MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/28/06 | 97118 | .00 | 49.46 | |
| | 04/06 | MAT | AP PJ-154-042106 | 6195 | FASTENAL COMPANY | 03/29/06 | 97136 | .00 | 113.77 | |
| | 04/06 | MAT | AP VC-068-042406 | 6195 | FASTENAL COMPANY | 03/29/06 | 97136 | .00 | 113.77- | |
| | | | | | | | Material | | 49.46 | |
| | | | | | | | Period 04/06 Total | .00 | 49.46 | |
| | 05/06 | MAT | AP PJ-161-051006 | 3560 | CAPITOL BLUEPRINT CO. | 04/25/06 | 07666 | .00 | 32.63 | |
| | | | | | | | Material | | 32.63 | |
| | | | | | | | Period 05/06 Total | .00 | 32.63 | |
| | 06/06 | MAT | AP PJ-200-061206 | 739 | AMERICAN EXPRESS | 05/30/06 | 3782630799 | .00 | 57.20 | CNB |
| | 06/06 | MAT | AP PJ-204-061506 | 10090 | MATHIS-KELLEY CONSTRUCT | 05/05/06 | 399148 | .00 | 81.81 | |
| | 06/06 | MAT | AP PJ-205-062106 | 6195 | FASTENAL COMPANY | 06/08/06 | 101268 | .00 | 22.33 | |
| | 06/06 | MAT | GL JE-023-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | MOVE G/L |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2702.00 | JEA |
| | 06/06 | EQP | GL JE-022-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50 | WAREHOUSE MATL |
| | 06/06 | EQP | GL JE-023-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 162.50- | MOVE G/L |
| | | | | | | | Material | | 3025.84 | |
| | | | | | | | Period 06/06 Total | .00 | 3025.84 | |
| | | | | | | | Task Code 1- 1190 Total | .00 | 3107.93 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| o Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

---

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 1- 1195 CARRY DECK CRANE | | | | | | | | | | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1112.00 | JEA |
| | | | | | | | Material | | 1112.00 | |
| | | | | | | Period 06/06 Total | | .00 | 1112.00 | |
| | | | | | | Task Code 1- 1195 Total | | .00 | 1112.00 | |
| 1- 1300 MISC HAULING | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1214.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 2961.00- | |
| | | | | | | | Labor | .00 | 2961.00 | |
| | | | | | | | Fringe | | 1214.00 | |
| | | | | | | Period 06/06 Total | | .00 | 4175.00 | |
| | | | | | | Task Code 1- 1300 Total | | .00 | 4175.00 | |
| 1- 1400 DUMPSTERS | | | | | | | | | | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 5616.00 | JEA |
| | | | | | | | Material | | 5616.00 | |
| | | | | | | Period 06/06 Total | | .00 | 5616.00 | |
| | | | | | | Task Code 1- 1400 Total | | .00 | 5616.00 | |
| 1- 1710 TEMP WALL | | | | | | | | | | |
| | 03/06 | MAT | AP PJ-147-033106 | 11547 | NEGWER MATERIALS, INC. | 03/23/06 | 2093446-00 | .00 | 3102.08 | |
| | 03/06 | L/F | PR DJ-766-032406 | 1030 | DAVID J DUERR | 03/24/06 | PAYROLL | 10.00 | 508.58 | |
| | 03/06 | L/F | PR DJ-766-032406 | 1031 | WALTER W BABIAK | 03/24/06 | PAYROLL | 8.00 | 415.13 | |
| | 03/06 | L/F | PR DJ-766-032406 | 1894 | MIKE G SPRINKEL | 03/24/06 | PAYROLL | 10.00 | 508.58 | |
| | 03/06 | L/F | PR DJ-766-032406 | 1897 | DANIEL K STARK | 03/24/06 | PAYROLL | 10.00 | 453.99 | |
| | 03/06 | L/F | PR DJ-766-032406 | 2802 | CLYDE D VEDDER | 03/24/06 | PAYROLL | 10.00 | 451.42 | |
| | 03/06 | L/F | PR DJ-766-032706 | 1894 | MIKE G SPRINKEL | 03/27/06 | PAYROLL | 8.00 | 373.74 | |
| | 03/06 | MAT | AP PJ-147-033106 | 1028 | ARMBRUSTER MANUFACTURIN | 03/28/06 | 23106 | .00 | 1012.00 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 5.00 | 221.72 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 8.00 | 354.75 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 5.00 | 221.72 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 2.00 | 127.73 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 2.00 | 127.73 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1008 | DAN E BECKER | 03/30/06 | PAYROLL | 1.50 | 95.79 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 4.00 | 191.16 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 8.00 | 382.32 | |
| | 03/06 | L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 5.00 | 238.94 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Labor | .00 | 3546.00- | |
| | | | | | | Fringe | | 2973.00- | |
| | | | | | Period 06/06 Total | | .00 | 6519.00- | |
| | | | | | Task Code 2- 2120 Total | | 284.00 | 7998.20 | |

2- 2130 DEMO COMMON WALL

| | 06/06 LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 | |
|---|---|---|---|---|---|---|---|---|---|
| | 06/06 FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1286.00 | |
| | 06/06 MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00 | JEA |
| | 06/06 MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 1776.00- | |
| | | | | | | Labor | .00 | 1776.00 | |
| | | | | | | Fringe | | 1286.00 | |
| | | | | | Period 06/06 Total | | .00 | 3062.00 | |
| | | | | | Task Code 2- 2130 Total | | .00 | 3062.00 | |

2- 2140 DEMO STUDS & DRYWALL

| | 03/06 L/F | PR DJ-766-033006 | 1065 | HARVEY A HAMILTON | 03/30/06 | PAYROLL | 2.00 | 137.56 | |
|---|---|---|---|---|---|---|---|---|---|
| | 03/06 L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| | 03/06 L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 7.00 | 297.30 | |
| | 03/06 L/F | PR DJ-766-033006 | 2065 | ABE M AYOUB | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 6.00 | 254.83 | |
| | 03/06 L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 7.00 | 297.30 | |
| | 03/06 L/F | PR DJ-766-033006 | 2348 | ROBERT W KENAL | 03/30/06 | PAYROLL | 2.00 | 111.66 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 6.00 | 241.58 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 7.00 | 281.85 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| | 03/06 L/F | PR DJ-766-033006 | 2800 | LEON TABER SR. | 03/30/06 | PAYROLL | 2.00 | 105.04 | |
| | 03/06 L/F | PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 2.00 | 92.63 | |
| | 03/06 L/F | PR DJ-766-033006 | 3105 | GREGORY J GIDDINGS | 03/30/06 | PAYROLL | 1.00 | 60.69 | |
| | | | | | | Labor | 52.00 | 1332.75 | |
| | | | | | | Fringe | | 1019.22 | |
| | | | | | Period 03/06 Total | | 52.00 | 2351.97 | |
| | | | | | Task Code 2- 2140 Total | | 52.00 | 2351.97 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| g Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| o Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 2- 2200 GENERAL DEMO | | | | | | | | | | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2200 | HAROLD CANTRALL JR. | 05/18/06 | PAYROLL | 2.00 | 91.40 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 2.00 | 83.72 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 8.00 | 334.91 | |
| | 05/06 | L/F | PR DJ-775-051806 | 2800 | LEON TABER SR. | 05/18/06 | PAYROLL | 8.00 | 334.91 | |
| | | | | | | | Labor | 22.00 | 537.14 | |
| | | | | | | | Fringe | | 399.17 | |
| | | | | | | Period 05/06 Total | | 22.00 | 936.31 | |
| | | | | | | Task Code 2- 2200 Total | | 22.00 | 936.31 | |
| 2- 2230 DEMO FRONT WALL | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 4.00 | 191.16 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 4.00 | 191.16 | |
| | 04/06 | L/F | PR DJ-768-040606 | 1065 | HARVEY A HAMILTON | 04/06/06 | PAYROLL | 3.00 | 143.37 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 7.00 | 297.31 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2065 | ABE M AYOUB | 04/06/06 | PAYROLL | 8.00 | 339.75 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 2.00 | 84.94 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 6.00 | 254.82 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2348 | ROBERT W KENAL | 04/06/06 | PAYROLL | 8.00 | 339.78 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 6.00 | 249.21 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2401 | DENNIS E FARLEY JR. | 04/06/06 | PAYROLL | 6.00 | 249.21 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 7.00 | 281.84 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2800 | LEON TABER SR. | 04/06/06 | PAYROLL | 8.00 | 322.11 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 3.00 | 127.41 | |
| | 04/06 | L/F | PR DJ-768-040606 | 2805 | BILL TAYLOR | 04/06/06 | PAYROLL | 1.50 | 63.74 | |
| | 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 7.00 | 317.76 | |
| | 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 1.00 | 45.39 | |
| | 04/06 | L/F | PR DJ-768-040606 | 3105 | GREGORY J GIDDINGS | 04/06/06 | PAYROLL | 6.00 | 272.38 | |
| | 04/06 | L/F | PR DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 4.00 | 191.61 | |
| | 04/06 | L/F | PR DJ-768-040606 | 3160 | JOE W KAUFFMAN | 04/06/06 | PAYROLL | 8.00 | 383.22 | |
| | 04/06 | MAT | AP PJ-154-042106 | 5568 | DONLEY INC. | 04/06/06 | 101620 | .00 | 680.40 | |
| | 04/06 | L/F | PR DJ-769-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 8.00 | 339.77 | |
| | 04/06 | L/F | PR DJ-769-040706 | 2065 | ABE M AYOUB | 04/07/06 | PAYROLL | 2.00 | 111.62 | |
| | 04/06 | MAT | AP PJ-154-042106 | 5568 | DONLEY INC. | 04/11/06 | 101667 | .00 | 529.20 | |
| | 04/06 | L/F | PR DJ-769-041306 | 1065 | HARVEY A HAMILTON | 04/13/06 | PAYROLL | 6.00 | 286.74 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2348 | ROBERT W KENAL | 04/13/06 | PAYROLL | 7.00 | 297.31 | |
| | 04/06 | L/F | PR DJ-769-041306 | 2800 | LEON TABER SR. | 04/13/06 | PAYROLL | 8.00 | 322.11 | |

Jones-Blythe Construction Co.
** Cost Detail Report **
Job Number: 51097 SPORTS AUTHORITY
From: 01/01/2002 Thru: 06/30/2006
Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| ntr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| j Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| o Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

---

| ask Code | Prd. | Type | Source Code | I.D.# | Name/Description | --Transaction--<br>Date | Reference | Hours/<br>Quantity | Transaction<br>Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | 04/06 | L/F | PR DJ-769-041306 | 3105 | GREGORY J GIDDINGS | 04/13/06 | PAYROLL | 4.50 | 204.29 | |
| | | | | | | | Labor | 151.00 | 3638.90 | |
| | | | | | | | Fringe | | 2931.00 | |
| | | | | | | | Material | | 1209.60 | |
| | | | | | | Period 04/06 Total | | 151.00 | 7779.50 | |
| | | | | | | Task Code 2- 2230 Total | | 151.00 | 7779.50 | |
| 3- 3100 PATCH FLOOR AT COMMON WAL | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 377.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 466.00- | |
| | | | | | | | Labor | .00 | 466.00 | |
| | | | | | | | Fringe | | 377.00 | |
| | | | | | | Period 06/06 Total | | .00 | 843.00 | |
| | | | | | | Task Code 3- 3100 Total | | .00 | 843.00 | |
| 4- 4200 PATCH WALL TOP | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 2200 | HAROLD CANTRALL JR. | 04/28/06 | PAYROLL | 2.00 | 88.17 | |
| | 04/06 | L/F | PR DJ-772-042806 | 2348 | ROBERT W KENAL | 04/28/06 | PAYROLL | 8.00 | 339.77 | |
| | | | | | | | Labor | 10.00 | 233.70 | |
| | | | | | | | Fringe | | 194.24 | |
| | | | | | | Period 04/06 Total | | 10.00 | 427.94 | |
| | | | | | | Task Code 4- 4200 Total | | 10.00 | 427.94 | |
| 5- 5100 JOIST & DECK INSTALLATION | | | | | | | | | | |
| | 06/06 | LAB | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | |
| | 06/06 | FRG | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 10917.00 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00 | JEA |
| | 06/06 | MAT | GL JE-026-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 12215.00- | |
| | | | | | | | Labor | .00 | 12215.00 | |
| | | | | | | | Fringe | | 10917.00 | |
| | | | | | | Period 06/06 Total | | .00 | 23132.00 | |
| | | | | | | Task Code 5- 5100 Total | | .00 | 23132.00 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---|---|---|---|---|---|---|---|
| tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| - 6200 SHELVES & STDS | | | | | | | | | | |
| | 05/06 | L/F | PR DJ-775-051806 | 1065 | HARVEY A HAMILTON | 05/18/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACH | 05/18/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-775-051806 | 1903 | VERN G VLACE | 05/18/06 | PAYROLL | 8.00 | 392.28 | |
| | | | | | | | Labor | 20.00 | 526.56 | |
| | | | | | | | Fringe | | 457.36 | |
| | | | | | | Period 05/06 Total | | 20.00 | 983.92 | |
| | | | | | | | | | | |
| | 06/06 | L/F | PR DJ-780-061506 | 1045 | JAMES V CAMILLE JR. | 06/15/06 | PAYROLL | 8.00 | 400.19 | |
| | 06/06 | L/F | PR DJ-780-061506 | 1800 | PATRICK A RYAN | 06/15/06 | PAYROLL | 8.00 | 392.54 | |
| | | | | | | | Labor | 16.00 | 452.56 | |
| | | | | | | | Fringe | | 340.17 | |
| | | | | | | Period 06/06 Total | | 16.00 | 792.73 | |
| | | | | | | Task Code 6- 6200 Total | | 36.00 | 1776.65 | |
| | | | | | | | | | | |
| - 9100 MTL STUDS | | | | | | | | | | |
| | 05/06 | MAT | AP PJ-161-051006 | 11547 | NEGWER MATERIALS, INC. | 04/27/06 | 2094812-00 | .00 | 3880.19 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/02/06 | 2084999-00 | .00 | 1216.35 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 3.00 | 149.54 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1894 | MIKE G SPRINKEL | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACH | 05/04/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACH | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1903 | VERN G VLACH | 05/04/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1894 | MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 | |
| | | | | | | | Labor | 63.00 | 1663.68 | |
| | | | | | | | Fringe | | 1437.62 | |
| | | | | | | | Material | | 5096.54 | |
| | | | | | | Period 05/06 Total | | 63.00 | 8197.84 | |
| | | | | | | | | | | |
| | 06/06 | MAT | GL JE-025-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 3880.19-JEA | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| ..tomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 109158.00 |
| ..tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| .) Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 109158.00 |
| .> Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| ..sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Material | | | 3880.19- | |
| | | | | | | Period 06/06 Total | | .00 | 3880.19- | |
| | | | | | | Task Code 9- 9100 Total | | 63.00 | 4317.65 | |
| | | | | | | | | | | |
| .)- 9200 DRYWALL | | | | | | | | | | |
| | 04/06 | L/F | PR DJ-772-042806 | 1115 | DAVID L NESBITT | 04/28/06 | PAYROLL | 8.00 | 373.74 | |
| | 04/06 | L/F | PR DJ-772-042806 | 1866 | BRUCE E SMITH | 04/28/06 | PAYROLL | 8.00 | 373.74 | |
| | | | | | | | Labor | 16.00 | 391.36 | |
| | | | | | | | Fringe | | 356.12 | |
| | | | | | | Period 04/06 Total | | 16.00 | 747.48 | |
| | | | | | | | | | | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/02/06 | 2084999-00 | .00 | 61.60 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1065 | HARVEY A HAMILTON | 05/04/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1115 | DAVID L NESBITT | 05/04/06 | PAYROLL | 5.00 | 245.17 | |
| | 05/06 | L/F | PR DJ-773-050406 | 1866 | BRUCE E SMITH | 05/04/06 | PAYROLL | 5.00 | 245.18 | |
| | 05/06 | MAT | AP PJ-165-051106 | 11547 | NEGWER MATERIALS, INC. | 05/04/06 | 2095141-00 | .00 | 1718.90 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1115 | DAVID L NESBITT | 05/09/06 | PAYROLL | 6.00 | 294.21 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1181 | MARK W LAKE | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1194 | JAMIAN L MCCARTY | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 4.00 | 196.14 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-774-050906 | 1866 | BRUCE E SMITH | 05/09/06 | PAYROLL | 8.00 | 392.28 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 2.00 | 99.69 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 5.00 | 249.22 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1065 | HARVEY A HAMILTON | 05/11/06 | PAYROLL | 4.00 | 199.37 | |
| | 05/06 | L/F | PR DJ-774-051106 | 1903 | VERN G VLACH | 05/11/06 | PAYROLL | 2.00 | 98.07 | |
| | 05/06 | L/F | PR DJ-774-051106 | 2200 | HAROLD CANTRALL JR. | 05/11/06 | PAYROLL | 1.00 | 45.68 | |
| | 05/06 | L/F | PR DJ-774-051106 | 3160 | JOE W KAUFFMAN | 05/11/06 | PAYROLL | 3.00 | 148.53 | |
| | | | | | | | Labor | 111.00 | 2914.42 | |
| | | | | | | | Fringe | | 2540.22 | |
| | | | | | | | Material | | 1780.50 | |
| | | | | | | Period 05/06 Total | | 111.00 | 7235.14 | |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: 109158.00 |
|---|---|---|---|---|---|---|
| htr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: .00 |
| 5 Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : 109158.00 |
| > Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: .00 |

| | | | | | --Transaction-- | Hours/ | Transaction | |
|---|---|---|---|---|---|---|---|---|
| ask Code  Prd. Type  Source Code  I.D.#  Name/Description | | | | | Date  Reference | Quantity | Amount | Description |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 06/06 MAT | AP PJ-200-061206 | 11547 NEGWER MATERIALS, INC. | 05/26/06 2095854-00 | .00 | 20.49 | |
| | 06/06 MAT | GL JE-025-062606 | J/C JOB COST | 06/26/06 JRNL ENTRY | .00 | 2600.00 JEA | |
| | | | | Material | | 2620.49 | |
| | | | | Period 06/06 Total | .00 | 2620.49 | |
| | | | | Task Code 9- 9200 Total | 127.00 | 10603.11 | |

**9- 9300 INSULATION**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 05/06 MAT | AP PJ-165-051106 | 11547 NEGWER MATERIALS, INC. | 05/02/06 2084999-00 | .00 | 622.33 | |
| 05/06 L/F | PR DJ-773-050406 | 1115 DAVID L NESBITT | 05/04/06 | PAYROLL | 2.00 | 98.07 |
| 05/06 L/F | PR DJ-773-050406 | 1866 BRUCE E SMITH | 05/04/06 | PAYROLL | 2.00 | 98.07 |
| 05/06 MAT | AP PJ-165-051106 | 11547 NEGWER MATERIALS, INC. | 05/05/06 2095169-00 | .00 | 98.73 | |
| 05/06 L/F | PR DJ-774-050906 | 1115 DAVID L NESBITT | 05/09/06 | PAYROLL | 6.00 | 294.21 |
| 05/06 L/F | PR DJ-774-050906 | 1115 DAVID L NESBITT | 05/09/06 | PAYROLL | 2.00 | 98.07 |
| 05/06 L/F | PR DJ-774-050906 | 1115 DAVID L NESBITT | 05/09/06 | PAYROLL | 2.00 | 98.08 |
| | | | | Labor | 14.00 | 362.74 |
| | | | | Fringe | | 323.76 |
| | | | | Material | | 721.06 |
| | | | Period 05/06 Total | 14.00 | 1407.56 | |
| | | | Task Code 9- 9300 Total | 14.00 | 1407.56 | |

**9- 9400 CEILING**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 05/06 MAT | AP PJ-165-051106 | 11547 NEGWER MATERIALS, INC. | 05/02/06 2084999-00 | .00 | 211.97 | |
| 05/06 L/F | PR DJ-774-050906 | 1894 MIKE G SPRINKEL | 05/09/06 | PAYROLL | 4.00 | 196.14 |
| 05/06 L/F | PR DJ-774-050906 | 1894 MIKE G SPRINKEL | 05/09/06 | PAYROLL | 6.00 | 294.21 |
| 05/06 L/F | PR DJ-774-051106 | 1903 VERN G VLACH | 05/11/06 | PAYROLL | 4.00 | 196.14 |
| 05/06 L/F | PR DJ-774-051106 | 1903 VERN G VLACH | 05/11/06 | PAYROLL | 6.00 | 294.21 |
| 05/06 L/F | PR DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 8.00 | 398.76 |
| 05/06 L/F | PR DJ-777-053106 | 1065 HARVEY A HAMILTON | 05/31/06 | PAYROLL | 4.00 | 199.37 |
| | | | | Labor | 32.00 | 854.20 |
| | | | | Fringe | | 724.63 |
| | | | | Material | | 211.97 |
| | | | Period 05/06 Total | 32.00 | 1790.80 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 06/06 MAT | AP PJ-200-061206 | 8126 HUNDMAN LUMBER | 05/05/06 2015467 | .00 | 8.17 | |
| 06/06 MAT | AP PJ-200-061206 | 11547 NEGWER MATERIALS, INC. | 05/25/06 2095019-00 | .00 | 147.70 | |
| 06/06 MAT | AP PJ-200-061206 | 11547 NEGWER MATERIALS, INC. | 05/09/06 2095247-00 | .00 | 122.72 | |
| 06/06 MAT | AP PJ-200-061206 | 11547 NEGWER MATERIALS, INC. | 06/02/06 2096016-00 | .00 | 201.96 | |
| 06/06 L/F | PR DJ-780-061506 | 1065 HARVEY A HAMILTON | 06/15/06 | PAYROLL | 3.00 | 149.54 |
| 06/06 L/F | PR DJ-780-061506 | 1065 HARVEY A HAMILTON | 06/15/06 | PAYROLL | 3.00 | 149.54 |

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| stomer: | Contr. Date: | Contr Amount: | .00 | Contr Billings: 109158.00 |
|---|---|---|---|---|
| tr No: | Est. Compl.: | Changeorders: | .00 | T & M Billings: .00 |
| Mgr : MS MARK SORENSEN | Last Actvty: 06/27/06 | Total Contr : | .00 | Total Billed : 109158.00 |
| Type: TM T/M FOR SMALL JOBS | Last Billed: 05/25/06 | Pending CO'S: | .00 | Retainage Amt.: .00 |

| sk Code | Prd. | Type | Source Code | I.D.# | Name/Description | Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Labor | 6.00 | 168.00 | |
| | | | | | | | Fringe | | 131.08 | |
| | | | | | | | Material | | 480.55 | |
| | | | | | | Period 06/06 Total | | 6.00 | 779.63 | |
| | | | | | | Task Code 9- 9400 Total | | 38.00 | 2570.43 | |

9500 NUDO BOARD

| | 05/06 | MAT | AP PJ-180-052406 | 11950 | NUDO PRODUCTS, INC. | 05/05/06 | 174745A | .00 | 756.83 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 05/06 | L/F | PR DJ-776-052506 | 1903 | VERN G VLACH | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-776-052506 | 1908 | DONALD A WAKE | 05/25/06 | PAYROLL | 8.00 | 392.27 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1065 | HARVEY A HAMILTON | 05/31/06 | PAYROLL | 1.00 | 49.84 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1903 | VERN G VLACH | 05/31/06 | PAYROLL | 3.00 | 147.09 | |
| | 05/06 | L/F | PR DJ-777-053106 | 1908 | DONALD A WAKE | 05/31/06 | PAYROLL | 4.00 | 196.15 | |
| | | | | | | | Labor | 24.00 | 623.93 | |
| | | | | | | | Fringe | | 553.69 | |
| | | | | | | | Material | | 756.83 | |
| | | | | | | Period 05/06 Total | | 24.00 | 1934.45 | |
| | 06/06 | MAT | AP PJ-200-061206 | 11950 | NUDO PRODUCTS, INC. | 05/15/06 | 175590 | .00 | 10.45 | |
| | 06/06 | MAT | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 757.00 | JEA |
| | | | | | | | Material | | 767.45 | |
| | | | | | | Period 06/06 Total | | .00 | 767.45 | |
| | | | | | | Task Code 9- 9500 Total | | 24.00 | 2701.90 | |

1 SELVAGGIO STEEL

| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 21328.00 | HALF METALS |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Subcontr | | 21328.00 | |
| | | | | | | Period 06/06 Total | | .00 | 21328.00 | |
| | | | | | | Task Code 601- 1 Total | | .00 | 21328.00 | |

1 RM WILLEY MASONRY

| | 05/06 | SUB | AP PJ-163-051006 | 17103 | RM WILLEY INC. MASONRY | 04/21/06 | 06-154-2 | .00 | 12490.00 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Subcontr | | 12490.00 | |
| | | | | | | Period 05/06 Total | | .00 | 12490.00 | |
| | 06/06 | SUB | GL JE-024-062606 | | J/C JOB COST | 06/26/06 | JRNL ENTRY | .00 | 15457.00 | 1/2 BEARING WALL |

```
0:106/27/06  09:06/27/06  09:19:12
                                  Jones-Blythe Construction Co.                              Time: 13:27  Page: 53
                                     ** Cost Detail Report **
                                 Job Number: 51097 SPORTS AUTHORITY
                                 From: 01/01/2002  Thru: 06/30/2006
                                          Open Jobs Only

tomer:                        Contr. Date:          Contr Amount:       .00    Contr Billings: 109158.00
er No:                        Est. Compl.:          Changeorders:       .00    T & M Billings:      .00
Mgr : MS MARK SORENSEN        Last Actvty: 06/27/06 Total Contr :       .00    Total Billed  : 109158.00
Type: TM T/M FOR SMALL JOBS   Last Billed: 05/25/06 Pending CO'S:       .00    Retainage Amt.:      .00
----------------------------------------------------------------------------------------------------------
                                                    --Transaction--  Hours/    Transaction
sk Code  Prd. Type  Source Code  I.D.#  Name/Description   Date   Reference Quantity  Amount    Description
----------------------------------------------------------------------------------------------------------
                                                Subcontr                     15457.00
                                       Period 06/06 Total        .00         15457.00
                                  Task Code 701-    1 Total      .00         27947.00


    1 RJ POWER
       05/06 SUB  AP PJ-165-051106 12990 R.J. POWER PLUMBING &  05/01/06  17296   .00     393.30
                                                Subcontr                      393.30
                                       Period 05/06 Total        .00          393.30


       06/06 SUB  AP PJ-205-062106 12990 R.J. POWER PLUMBING &  05/31/06  17385   .00     900.53
       06/06 SUB  AP PJ-217-062706 12990 R.J. POWER PLUMBING &  05/22/06  SA EST  .00   16426.00
       06/06 SUB  AP PJ-216-062706 12990 R.J. POWER PLUMBING &  06/27/06  5494    .00    2802.00
                                                Subcontr                    20128.53
                                       Period 06/06 Total        .00        20128.53
                                  Task Code 702-    1 Total      .00        20521.83


    1 PAUL BOLL PAINTING
       05/06 SUB  AP PJ-201-061306  2375 PAUL BOLL PAINTING     05/24/06 0004835-IN .00  27812.00
                                                Subcontr                    27812.00
                                       Period 05/06 Total        .00        27812.00
                                  Task Code 705-    1 Total      .00        27812.00


    1 FJ MURPHY
       06/06 SUB  AP PJ-214-062606 11200 F. J. MURPHY & SON INC 06/22/06 15775    .00    9246.76
                                                Subcontr                     9246.76
                                       Period 06/06 Total        .00         9246.76
                                  Task Code 706-    1 Total      .00         9246.76


    1 PATTERSON FLOORING
       06/06 SUB  GL JE-024-062606       J/C JOB COST           06/26/06 JRNL ENTRY .00   1105.00
                                                Subcontr                     1105.00
                                       Period 06/06 Total        .00         1105.00
                                  Task Code 707-    1 Total      .00         1105.00
```

Jones-Blythe Construction Co.

** Cost Detail Report **

Job Number: 51097 SPORTS AUTHORITY

From: 01/01/2002 Thru: 06/30/2006

Open Jobs Only

| :tomer: | | Contr. Date: | | Contr Amount: | .00 | Contr Billings: | 109158.00 |
|---------|--|--------------|--|---------------|-----|-----------------|-----------|
| :tr No: | | Est. Compl.: | | Changeorders: | .00 | T & M Billings: | .00 |
| : Mgr : MS MARK SORENSEN | | Last Actvty: 06/27/06 | | Total Contr : | .00 | Total Billed : | 109158.00 |
| : Type: TM T/M FOR SMALL JOBS | | Last Billed: 05/25/06 | | Pending CO'S: | .00 | Retainage Amt.: | .00 |

----------------------------------------------------------------------------------------------------

| ask Code | Prd. Type | Source Code | I.D.# | Name/Description | --Transaction-- Date | Reference | Hours/ Quantity | Transaction Amount | Description |
|----------|-----------|-------------|-------|-----------------|---------|-----------|-----------------|--------|-------------|

----------------------------------------------------------------------------------------------------

| ~ | 1 B&B ELECTRIC | | | | | | | | |
| | 06/06 SUB | GL JE-027-062606 | J/C JOB COST | | 06/26/06 | JRNL ENTRY | .00 | 36000.00 | |
| | | | | | | Subcontr | | 36000.00 | |
| | | | | | Period 06/06 Total | | .00 | 36000.00 | |
| | | | | | Task Code 708- | 1 Total | .00 | 36000.00 | |

| | | | Job Total | 1150.00 | 267819.07 |
|--|--|--|-----------|---------|-----------|
| | | | ---------------------------------- | | |
| | | | Labor | 1150.00 | 46227.26 |
| | | | Fringe | | 37500.09 |
| | | | Material | | 28752.63 |
| | | | Subcontr | | 143960.59 |
| | | | Equipmnt | | 11378.50 |

Jones-Blythe Construction Co.

** Cost Detail Report **

From: 01/01/2002  Thru: 06/30/2006

Open Jobs Only

| | Hours | Cost |
|---|---|---|
| Report Totals | 3,996.00 | 739,913.60 |
| Labor | 3,996.00 | 103861.73 |
| Fringe | | 83499.92 |
| Material | | 69893.79 |
| Subcontr | | 458360.41 |
| Equipmnt | | 24297.75 |

Reorder from: **Forms & Supplies Direct** for **SKYLINE.** 800-992-1970 Form #703S ©Copyright 1994

| Invoice No. | (943) Inv. Date | Amount | Discount | CHECK DATE : 08/22/06 Description | CHECK NO. : 006563 Voucher No. | Net Amount |
|---|---|---|---|---|---|---|
| Progress#3 | 06/27/06 | 370,309.00 | 0.00 | Final Bill-tornado damage | 04670 | 370,309.00 |
| TOTAL | | 370,309.00 | 0.00 | | | 370,309.00 |

**THIS CHECK IS VOID IF MICRO PRINT SIGNATURE LINE IS UNREADABLE UNDER MAGNIFICATION**

**SWPLAZA III, LLC**
2144 S. MACARTHUR
SPRINGFIELD, IL 62704

(943)

*Illinois National Bank (943)*
*322 E. Capitol Avenue*
*Springfield, IL 62701*

006563

| DATE | CHECK NO. | AMOUNT |
|---|---|---|
| 08/22/06 | 006563 | $***370,309.00* |

THREE HUNDRED SEVENTY  THOUSAND THREE HUNDRED NINE AND NO/100 DOLLARS ****

PAY
TO THE
ORDER OF

JONES-BLYTHE CONSTRUCTION
1030 W. REYNOLDS STREET
P.O. BOX 5113
SPRINGFIELD, IL 62705

MP

⑈006563⑈ ⑆071109338⑆ 021⑈113⑈

| | | Actual Cost | Owner | | |
|---|---|---|---|---|---|
| Emergency Response from Cotton USA | | $319,428 | Owner | | |
| Architectural and Engineering | | $8,000 | Owner | 9,510 | (entire Plaza) |
| Shoring-Stabilizing | | $18,500 | 14,439 | | |
| Selective Demolition-Balance of Damage | | $37,400 | 32,128 | | |
| Structural-124'lf Bar Joist & Deck | | $57,600 | 46,951 | | |
| Masonry-Beam Pockets etc | | $10,500 | below | | |
| Replace 124' Structural masonry wall | | $21,500 | 29,218 | | |
| Roofing and insulation | | $39,500 | Owner | 86,038 | |
| Replace Existing Storefront & Glass | | $24,000 | Owner | 18,506 | |
| Sprinkler-Rework Existing-Damaged | | $28,200 | 9,247 | | |
| Fire Alarm - Minor Device Replacement | | $2,950 | in electrical | | |
| Ductwork- Remove and Replace | | $7,600 | in HVAC | | |
| HVAC repair existing units | | $9,600 | 16,426 | | |
| Drywall/Finish Taping Perimeter 4'/ U/S of Deck | | $31,600 | 18,205 | | |
| Minor ACT's - T-Bar Replacement | | $5,900 | 2,570 | | |
| Electrical-Safe off-Circuit Verification | | $6,200 | In Electrical | | |
| Light Fixture Installation Only | | $18,500 | 25,322 | | |
| Light Fixtures | | $4,850 | 10,678 | | |
| Paint to match at lower levels | | $9,800 | 27,812 | | |
| Floor Prep & Adhesive Removal | | $10,042 | NIC | below | |
| Entire Flooring Installation | | $49,500 | 1,105 | | |
| Flooring Materials | | $68,500 | NIC | 114,800 | |
| RR-Plumbing Re-installation | | $1,200 | 4,096 | | |
| Entire New Premier Millwork Installation | | $5,700 | NIC | | |
| Millwork | | $26,000 | 1,777 | | |
| Install Toilet Partitions/Accessories | | $3,550 | 545 | | |
| Final Cleaning-Deodorizing | | $11,000 | below | | |
| Dumpsters | | $4,100 | 5,616 | | |
| Barricades-Dismanteling of Existing | | $2,100 | 1,005 | | |
| Protection of finish materials | | $12,500 | below | | |
| Misc. Rental Equipment | | $8,200 | 7,908 | | |
| Contingency | | $25,600 | N/A | | |
| General Conditions (Itemize) | | $21,550 | 7,742 | | |
| Supervision | | $21,375 | 4,841 | | |
| City Required Fire Watch | | $2,200 | N/A | | |
| Permit | | $4,000 | 189 | | |
| SUBTOTAL | | $938,745 | 267,820 | 228,854 | |
| Allowances | n/a | | N/A | | |
| SUBTOTAL | | | | | |
| Insurance | 1.50% | $14,081 | in OH&P | | |
| Profit & Overhead | 10% | $93,875 | 26,782 | | |
| Premium for expedited work | 5% | $46,937 | 26,782 | | |
| TOTAL | | $1,093,638 | 321,384 | 228,854 | |
| | | | | | |
| List itemizations below:( #25 Gen Cond) | | | | | |
| Misc. Construction Materials | | $2,400 | 3,108 | | |
| PM Travel-Misc Office & Field Costs | | $6,100 | 3,108 | | |
| Temp Phone-Cell Ph... etc. | | $2,200 | | | |
| Construction Laborer's & Clean-Up | | $7,500 | 4,634 | | |
| Superintendent ravel | | $1,800 | | | |

EXHIBIT

C

Bramberg No. 5208

540175

| Administration Time | | $1.550 | |

(entire Plaza)

**MARK A. SORENSEN**     **PROJECT MANAGER/ESTIMATOR**

46 years old
23 Years experience working for a General Contractor
1984 Graduate of Iowa State University
B.S. Construction Engineering

Following is a listing of major projects that I have been involved with during my career at Jones-Blythe Construction Co. Our office is structured such that the engineer assigned to a project typically carries that project from cradle to grave. For the majority of the projects listed below, I was responsible for the estimating, scheduling, cost control, subcontracting and overall management of the project.

**Major Projects Completed**

| | |
|---|---|
| **2006** | Gordman's<br>Sports Authority<br>Tornado Damage Repair<br>Springfield, Illinois<br>$888,00 |
| **2006** | City Water Light & Power<br>Power Block Caissons, General Work<br>Springfield, Illinois<br>$1,500,000 |
| **2006** | City Water Light & Power<br>HV Caissons, General Work<br>Springfield, Illinois<br>$272,000 |
| **2005/2006** | Chatham Presbyterian Church<br>Sanctuary Addition<br>Chatham, Illinois<br>$1,701,000 |
| **2004/2005** | Menard Electric Cooperative<br>New Office Facility<br>Petersburg, Illinois<br>$2,843,000 |
| **2003/2004** | Our Saviors Lutheran Church<br>Parish Center and Gymnasium Addition<br>Springfield, Illinois<br>$3,500,000 |

March 28, 2007
Page 2

| | |
|---|---|
| **2002** | City Water Light & Power<br>SCR Project, General Work<br>Springfield, Illinois<br>$3,097,000 |
| **2001** | City Water Light & Power<br>Clarifier #2 Upgrade<br>Springfield, Illinois<br>$1,855,000 |
| **1999/2000** | Alliance Pipeline Company<br>Compressor Station 27A<br>Grassroots Compressor Station<br>Manchester, Iowa<br>$8,150,000 |
| **1999/2000** | Alliance Pipeline Company<br>Compressor Station 29A<br>Grassroots Compressor Station<br>Tampico, Illinois<br>$9,500,000 |
| **1998** | Northern Border Pipeline Company<br>Compressor Station #6 Retrofit<br>Glen Ullin, North Dakota<br>$2,305,000 |
| **1998** | Northern Border Pipeline Company<br>Compressor Station #8 Retrofit<br>Zeeland, North Dakota<br>$3,156,000 |
| **1997** | Central Illinois Public Service<br>Newton Generating Station FGD Restoration<br>Newton, Illinois<br>$2,200,000 |
| **1997** | First Presbyterian Church<br>Sanctuary Reordering<br>Springfield, Illinois |
| **1996** | Graham Correctional Center<br>X-Cellhouse<br>Hillsboro, Illinois<br>$8,000,000 |
| **1996** | Logan Correctional Center<br>X-Cellhouse<br>Lincoln, Illinois<br>$8,000,000 |

March 28, 2007
Page 3

| | |
|---|---|
| **1994** | Algonquin Gas Transmission Co.<br>Grassroots Compressor Station<br>13,000 Hp Solar Taurus Turbine (2 ea)<br>Chaplin, Connecticut<br>$5,250,000 |
| **1993** | Commonwealth Edison Power Plant<br>Miscellaneous Boiler Repairs/Fan Motor Removal & Realignment<br>Kincaid, Illinois<br>$83,000 |
| **1992** | Northern Border Pipeline Co.<br>Grassroots Compressor Station<br>20,000 Horsepower Gas Turbine<br>Trimont, Minnesota<br>$3,000,000 |
| **1991** | Taylorville Correctional Center<br>New Minimum Security Prison<br>Taylorville, IL<br>$5,997,000 |
| **1986** | St. John's Hospital<br>New Pavilion Office Building<br>Springfield, IL<br>$6,000,000 |

**E-FILED**
Monday, 31 December, 2007  03:43:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 06-CV-3177 |
| vs. | ) ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

## DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE

Pursuant to Rules 26(a)(2) of the Federal Rules of Civil Procedure and the Scheduling Order entered October 10, 2006, Defendant/Counter-Plaintiff, TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods Company (incorrectly identified in the Complaint as "Gart Brothers Sporting Goods Company") (hereinafter "TSA"), by its attorneys, Hinshaw & Culbertson LLP, submit the following at its expert disclosure:

Jeffrey Wolford
Wolford Retail Builders, Inc.
102 South Wheeling Road
Prospect Heights, IL 60070
(847)394-4509

Mr. Wolford's report is produced herewith, which includes a description of all information considered and his qualifications.



EXHIBIT
2

60159969v1 868372

For his services in reviewing this matter and preparing the report, the witness will be compensated in the amount of $2,500.00.

Respectfully submitted,

TSA STORES, INC., as successor to Gart Bros. Sporting Goods Company, a Delaware corporation, Defendant,

By _Charles R. Schmadeke_

One of Its Attorneys

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60159969v1 868372

## CERTIFICATE OF SERVICE

The foregoing DEFENDANT/COUNTER-PLAINTIFF'S RULE 26(a)(2) EXPERT DISCLOSURE was made by hand-delivering a true and correct copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

_Barbara L Rozerg_

Subscribed and sworn to before me
this 1st day of June, 2007.

_Virginia M Heyen_
Notary Public

```
        NOTARY PUBLIC
        OFFICIAL
          SEAL          VIRGINIA M. HEYEN
      STATE OF ILLINOIS  MY COMMISSION EXPIRES
                         SEPTEMBER 18, 2009
```

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

3

60159969v1 868372

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) | |
| Plaintiff/Counter-Defendant, | ) ) | Case No. 06-CV-3177 |
| vs. | ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

## EXPERT WITNESS REPORT OF JEFFREY WOLFORD

I, Jeffrey Wolford, hereby submit the following report regarding the valuation of the repair and reconstruction costs to the Premises as defined herein, as a result of the tornadoes that damaged the SWPlaza and the TSA Store located therein on or about March 12, 2006.

## INTRODUCTION

1.      My name is Jeffrey Wolford. I am the president of Wolford Retail Builders, Inc., located in Prospect Heights, Illinois., and has been incorporated in the state of Illinois and Florida since 2005. I have more than twenty-nine years experience in the construction industry of retail/ commercial projects throughout the United States, including Illinois. In addition, the following are recent Sports Authority projects that have been completed or are under contract to be completed by Wolford Retail Builders, Inc. Those projects include:

- Sports Authority #478 – Riverhead, NY (interior) 45,049 s.f. – date: 9/27/06
- Sports Authority #457 – Riverdale, NJ (interior) 40,627 s.f. – date: 9/27/06
- Sports Authority #477 – Paramus, NJ (interior) 51,106 s.f. – date: 8/4/05
- Sports Authority #174 – Somerville, MA (interior) 45,669 s.f. – date: 3/9/06

- SportMart #629 – Delafield, WI (interior) 40,934 s.f. – date:  3/2/06
- Sports Authority #176 – Milford, MA (interior) 46,266 s.f. – date: 9/25/05
- Sports Authority #511–Baltimore, MD (exterior,site,interior) 50,122 s.f.– date:7/13/06
- Sports Authority #178–Holyoke, MA (interior) 46,322 s.f. – date: 2/22/07
- Sports Authority #583- Lombard, IL (interior 2 levels) 47,013 s.f- date:  7/27/07
- Sports Authority #376- Port St. Lucie, FL  (interior) 39,334 s.f. - date:  9/13/O7
- Sports Authority #604- Oak Lawn, IL  (exterior facade only) date:  4/24/06
- Sports Authority #394 – Cape Coral, FL (interior) 29,359 s.f. – date:  08/23/07

2.      My educational and work experience is set forth in my biographical sketch, attached hereto as Exhibit A and by reference made a part hereof, and includes other projects. My experience began in 1977 as a union carpenter. Since 1989 I have had extensive experience working for other general contractor's as a project/ construction manager and have successfully completed many other retail stores throughout the United States, including Illinois.

3.      In addition, I am a member of the following professional organizations: Vested member of Carpenters union local #839 and a member #1329502 of the ICSC- The International Council of Shopping Centers

4.      Unless otherwise specified, the terms used herein are defined as set forth in the Lease which is the subject of the above-referenced action.

5.      Based upon my review of the Premises after the March 12, 2006 tornadoes, the material described herein, my knowledge of the costs of construction, including the costs of construction of the Premises originally in 2001, and the increased costs of labor and materials, and the information and data set forth herein, it is my opinion, based upon a reasonable certainty, that the estimated repair and reconstruction costs of the Premises as a result of the damage caused by the tornadoes of March 12, 2006, exceeded 35% of the then-total reconstruction costs of the Premises.

6.      In 2001, on behalf of Capitol Construction Group, Inc., of which I was then affiliated as project manager, I examined specifications dated June 27, 2001, and drawings

2

60159970v1 868372

pertaining thereto, for the construction of The Sports Authority Store at the South West Plaza Shopping Center in Springfield, Illinois. Based upon that review, I submitted a proposal for the construction dated July 26, 2001, and a revised proposal dated July 30, 2001. The proposals submitted by me on behalf of Capitol Construction Group are attached hereto as Exhibit B and by reference made a part hereof.

## ANALYSIS

7.     On Tuesday, May 2, 2006, I was asked by TSA Stores, Inc., to review the Premises and certain other matters identified herein to provide an opinion as to the extent of the damage caused by the tornadoes of March 12, 2006, the total reconstruction costs of the Premises, and the proportion of the total reconstruction costs that the damage represented.

8.     I visited the premises on Thursday, May 4, 2006.

9.     During my visit to the Premises, I observed the contractor engaged in the reconstruction of miscellaneous work-scopes. Although TSA had demobilized and/or relocated all merchandise from its store, all sales floor fixturing and shelving from the TSA Store had not been fully dismantled and removed from the site. The emergency disaster recovery services contractor retained by TSA had provided all water and debris clean/haul off, moisture tests, disinfecting/ glass shard extraction, dismantling/ staging of OSF store metal fixtures, selective demolition, floor finish adhesive removal, required temporary emergency protection, and barricading/re-securing of space. The contractor retained by the landlord was performing but, not limited to the following work during my site visit: roofing, repair of structural steel and bar joists, miscellaneous electrical rework and reconstruction of effected drywall common to perimeter walls. The project and/or reconstruction was well underway from the total original damage caused by the tornadoes of March 12, 2006.

10.     I also reviewed the following:

3

a)    the disaster recovery services rendered by Cotton USA at the Premises as a result of the tornadoes of March 12, 2006, and the costs associated therewith;

b)    the original construction costs of the Premises and the Shopping Center from 2001 as defined by the general contractor of record, Vancil Contracting; and

c)    the Associated General Contractor's Construction Inflation Index prepared by economist Ken Simonson, which established an inflation factor for that period of 32% for the period from 2001 to 2006.

Copies of those documents are attached hereto as Exhibits C, D, and E respectively, and included herewith.

11.    Based upon my review set forth above, I am familiar with the damages to the Premises, the costs of construction (labor and materials) in the area, and the items needed to be repaired or reconstructed at the Premises as a result of the tornadoes of March 12, 2006.

12.    Based upon my review and my experience with and knowledge of construction costs for retail stores such as this, and my prior knowledge of the original 32,308 square feet project of July 2001, it is my opinion, based upon a reasonable certainty, that the total building replacement costs on or about March 12, 2006 were $1,841,856.00.

13.    Based upon my review of the Premises and the aforementioned items, I formed an opinion, based upon a reasonable degree of certainty, and issued a report dated May 1, 2006, indicating that the premises sustained 'direct costs damage' with the values as a result of the tornadoes of March 12, 2006, $743,944.00, as indicated in my Budget Estimate which is attached hereto as Exhibit F and made a part hereof.

14.    It is my opinion based upon my experience in the construction industry of retail stores, that certain services, projects, and tasks performed by Cotton USA must be considered as part of the legitimate costs of reconstruction and repair of the premises. Those services, projects, and tasks were a necessary component to restore the premises to their condition before the tornadoes of March 12, 2006, or were a necessary prerequisite to construction. Services,

4

projects, or tasks performed by Cotton USA solely directed at preserving or removing TSA's inventory or fixtures should not be included as reconstruction or repair costs. In addition, after reviewing Cotton USA's final costs I have made an adjustment due to overlap workscope/ costs included in my May 7, 2006 budget proposal and Cotton USA's actual work performed. Using pro-ration and percentages these deduct costs totaled $118,201.00 and is reflected in line 12.

15.    Even if all costs attributed to Cotton USA *i.e.,* $319,428, were excluded from the costs of repairs and reconstruction, which in my opinion would not be proper, the remaining reasonable reconstruction costs exceeds 35% of the total replacement cost.

## ANALYSIS OF PLAINTIFF'S EXPERT REPORT

16.    At the request of TSA, I have also conducted a review of the "Rule 26(a)(2) Expert Witness Report of Mark Sorensen," submitted by SWPlaza III, LLC. To that end, I analyzed the report as well as the documents submitted as part of the report. Because of the errors listed below, I have concluded that Mr. Sorensen's report cannot be considered as a reliable budgeting evaluation of the actual damages to the Premises for the purposes of this lawsuit as a result of the March 12, 2006 tornadoes.

17.    The report appears to outline the actual repair and construction costs to the Premises or common areas from the March 12, 2006 tornadoes.

18.    The information provided by Mr. Sorensen indicates that the actual repair and reconstruction work continued for a period greater than sixty (60) days from the occurrence of the tornadoes. My understanding of the Lease is that the Tenant's option to terminate the Lease by reason of casualty had to be exercised within sixty (60) days of the casualty. Since repair and reconstruction was not completed within that sixty (60) day period, the actual repair and reconstruction costs were not and would not have been available for either Landlord or Tenant to consider with respect to the Lease.

5

19.    In my opinion, the most important error in Mr. Sorensen's report, even with respect to actual reconstruction and repair costs, is that it is not supported with appropriate sworn statements by subcontractors and material suppliers; and the certified payroll. Rather the report is based upon running "in-house" activity and entry reports from the general contractor. The reports submitted are not consistent with the American Institute of Architects (AIA) format or title company for lien waivers for payment to contractors and materials suppliers. Although I am not suggesting that either Mr. Sorensen or Jones-Blyth failed to include items that should have been included or failed to specify the correct value for each item, the in-house activity and entry reports may reflect whatever a general contractor wants it to, including costs from other same site/ center projects. Such reports are used for the internal purposes of the general contractor only and are not relied upon for the purposes of making payments to contractors, laborers, and material providers. Also, they do not necessarily reflect the quality and quantity of materials actually used in the construction process.

## CONCLUSION

20.    For services in reviewing this matter and preparing this report, I am being compensated by TSA in the amount of $2500. No compensation has been determined for any testimony I may give in this matter.

21.    I have authored no publications in the preceding ten years.

22.    I have not testified as an expert at trial or by deposition within the preceding four years.

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: May 31, 2007

60159970v1 868372

Jeffrey Wofford

7

## CERTIFICATE OF SERVICE

The foregoing Expert Witness Report of Jeffrey Wolford was served upon Plaintiff/Counter-Defendant by hand-delivering a copy thereof to:

David A. Rolf
R. Lee Allen
Sorling Northrup Hanna Cullen & Cochran LTD
Illinois Building
607 E. Adams Street, Suite 800
Springfield, IL 62701

on this 1st day of June, 2007.

*Barbara L. Rozich*

Subscribed and sworn to before me
this 1st day of June, 2007.

*Virginia M. Heyen*
Notary Public

VIRGINIA M. HEYEN
MY COMMISSION EXPIRES
SEPTEMBER 18, 2009
NOTARY PUBLIC OFFICIAL SEAL STATE OF ILLINOIS

J. William Roberts (#2351714)
Charles R. Schmadeke (#2489813)
HINSHAW & CULBERTSON LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375 (phone)
217/528-0075 (fax)

60159970v1 868372

# JEFFREY B. WOLFORD
1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-255-8133

Dear Sirs:

Enclosed is my resume; I am looking for a position in the field of Construction Management. Below is a short list of the most important points regarding my experience and goals. I would appreciate hearing from you concerning positions in my field of interest.

**Position Pursued:** Superintendent/Project Manager

**Attributes Highlighted:** I am highly aware of quality issues involving construction and construction management, and have had a great deal of experience with the clerical and record-keeping aspects of the field. In addition, I have knowledge of computer programs, such as WordPerfect/DOS, and Windows software.

**Circumstances:** I have been in New York City for the past 6 years working as a superintendent and project manager. While employed, I attended classes in night school at Pratt Institute School of Architecture, to increase my knowledge and understanding of construction and construction management.

**Comments:** I have been in the construction industry for the past 18 years. My resume indicates more recent employment information. I am seeking a position with an employer who will offer long-term employment opportunities; I am interested in the "long-haul". I am fully capable of taking any interior project, from permits to punchlist, as either a field superintendent or as a project manager.

Please contact me at the above number regarding opportunities for employment.

Yours sincerely.

Jeffrey B. Wolford

# EXHIBIT A

# JEFFREY R. WOLFORD

1105 N. Meadow Lane
Mt. Prospect, IL 60056
847-253-8133

## OBJECTIVE

To secure a position that will utilize and challenge past experience and acquired expertise in the field of PROJECT MANAGEMENT positively effecting company growth and profitability.

## PROFILE

- Multi-dimensional Project Manager with strong Managerial and Administrative skills
- Background in General Contracting and Field Supervision, with training in Architecture
- Proven ability to communicate clearly and effectively with clients, sub-contractors, and vendors
- Strong organizational and planning skills
- Ability to prioritize work schedules and accomplish tasks simultaneously
- Highly knowledgeable of construction, contractor pricing & bills, building regulations and permits
- Able to remain calm under pressure, troubleshoot and resolve problems
- Consistent achievement record in timely project completion within established budgetary objectives
- Background in industry since 1977

## RELEVANT EXPERIENCE

**CROWN CONSTRUCTION, INC.**, Chicago, IL                                    1996-Present
*Construction Superintendent*
- Projects with budgets $500,000 and higher
- Involved in buying out projects as required
- Projects included: *The Glens, Zarosta (restaurant).*

**FISHER DEVELOPMENT CORPORATION**, New York, NY                 1992 - 1995
(construction management company with offices in New York, Chicago, Washington DC, and San Francisco)
*Project Manager/Estimator*
- Write contracts, award bids and negotiate best prices based upon budgeting factors.
- Manage the renovation and construction for *388 GAP, GAP Kids* and *Banana republic* stores in the Tri-state area with projects ranging from $50,000 to $2,000,000; also manage projects for *Williams Sonoma, Pottery Barn*, and *Hold Everything* stores.
- Communicate with stores regarding initial project specifications and budget.
- Develop list of available and appropriate subcontractors through established list or referrals.
- Communicate regularly with stores regarding schedules, complaints, damage, instructions, etc.
- Perform site and Building Department visits to ensure that schedules and specifications are maintained
- Selected by company to administer high profile jobs.

**JOHNSEN CARPENTRY, INC.**, Dyer, IN                                      1987 - 1990
*Construction Superintendent*
- Managed concurrent projects throughout the Chicago area.
- Projects included: *The Polo Shop, The Coach Store, Chicago Health Clubs, Rosenthal Furs, Circle Gallery,     Spiaggia Cafe*, and *One Magnificent Mile Building.*
- Assisted in pre-construction planning, budget evaluation, and monitoring of field activities.
- Held project responsibilities ranging from carpentry superintendent through field superintendent, fully accountable   for all trades.

**PEPPER CONSTRUCTION**, Chicago, IL                                        1986 - 1987
*Field Superintendent*
- Supervised all trades, coordinating crews of 10-30 as well as participating in project planning and reporting activities.
- Projects included: *John Marshall Law School*, Chicago, IL and *Hampton Inns* (two locations).

## EDUCATION

Pratt Institute - School of Architecture, New York, 1990 - 1994
Carpenters Local 839, Member in good standing, 18 years
Home Inspectors Certification, 1988
OSHA Construction Safety & Health Certification, 1988

COMMUNITY SERVICE
Project Manager, Gilda's Club, New York

*References will be furnished upon request.*

**JEFF WOLFORD**
Sr. Project Manager / Business Development

## GENERAL BACKGROUND

Mr. Wolford has over twenty-eight years of experience within the construction industry in multi-family residential, national and regional retail tenant improvement projects.

## RECENT EXPERIENCE

TSA Corporation- multiple Sportmart- Sports Authority new tenant improvement projects- 35,000 – 42,000 square foot retail spaces in Fresno, CA, Folsom, CA, Matteson, IL, Frankfort, IL, Bolingbrook, IL, Crystal Lake, IL, Woburn, MA, Plymouth, MA, N. Haven, CT, Kirkwood, MO, Farmers Branch, TX, McKinney, TX, Mays Landing, NJ, etc.   The store specializes in supplying a large selection of name brand sporting goods equipment for its customers.  Both projects consisted of new MEP's, Partitions, ACT ceilings, lighting, multiple floor finishes, millwork, fixturing, decorating, roofing and all related owner supplied materials and equipment. All projects were completed between a 5 week through (11) week `fast track` construction.

Chico's, Multiple Locations – Five New Locations in Atlanta GA, Lincoln NE, Philadelphia PA, Grand Rapids MI and Detroit MI.  The store specializes in women's dress and formal wear.  The projects consisted of new MEP's, stainless steal storefront, partitions, ceilings, lighting, millwork, fixturing, paint finishes, wood flooring, signage and adjacent mall finishes.  All projects were completed in six (6) weeks.

Holiday Inn Plaza, Rosemont, IL- New Plaza, and Site Construction Project.  This project consisted of the following: new light well corridor tying into to new existing atrium, new 5,000 square foot two level free standing storage facility, new plaza and gazebo. Other components of this two acre project includes, excavation of existing site, concrete planters, all landscaping, ground lighting, curtain wall system, roofing, custom pavers, awnings, decorating, MEP's, waterproofing and all adjacent finishes to existing building hotel. The project duration was 6 months.

TSA Corporation- Gart Sports, Orem, UT – New 42,000 square foot retail space.  The store specializes in sporting goods equipment including Skiing, hunting, fishing and firearms. The project consisted of new MEP's, roofing, partitioning, floor finishes, `Compasso` ceilings, owner millwork installation, lighting, decorating and glazing.
This project was completed in nine (9) weeks.

Krueger International, Merchandise, Chicago, IL- Tenant improvements for 5,500 square foot sales showroom office space.  This client specializes in high-end office movable partitioning, furniture and fixtures. The `design build` project consisted of demolition, carpentry, drywall partitioning, floor coverings, ceilings, decorating and modifications to existing MEP's.  For the last two (2) years the project/space was complete prior to and before the NEOCON show and was a commercial success.

Victoria's Secret, Brookdale Center, MN – New 5,200 square foot retail space.  The store specializes in women's lingerie, cosmetics and accessories.  The project consisted of demolition of the old space, new MEP'S, fire alarm system, millwork installation, partitioning, tile, wood flooring system, painting and wall covering, fixturing, lighting, complete storefront assembly, glazing/mirrors and adjacent mall finishes. The project duration was fourteen weeks.

The Children's Place, Two New Locations in Terra Haute, IN and Evergreen Park, IL.  The store specializes in infant and children's apparel. The projects consisted of demolition of the existing tenant space, new MEP's, fire alarm system, storefront glazing, partitioning, carpentry, owner millwork installation, decorating, floor coverings, ACT ceilings, owner signage and adjacent mall finishes. Both projects were approx. 5,000 square feet and had six (6) week duration.

Cont.

TSA Corporation- Oshman's SS's, Houston and Austin, TX – New 33,000 square feet retail space. Both stores specializes in sporting
goods including camping, fishing, hunting and including a large selection of fire arms.  The project consisted of and also included the complete exterior `tear off` of the front and back facades, concrete, steel, masonry, carpentry, dryvit/stucco, light gg framing, storefront glazing, roofing, dock equipment, partitioning, ACT ceilings, floor finishes, mirrors, plumbing, fire protection, HVAC, fire alarm system, electrical and installation of owner supplied store fixturing.  The project was completed in thirteen (13) weeks.

Lerner's New York, Lincolnwood, IL – New 4,300 square foot retail space.  The store specializes in women's casual and dress apparel, footwear and accessories.  The project consisted of demolition of existing space, new MEP's, carpentry, storefront assembly, glazing/mirrors, floor coverings, wall coverings, painting, owner millwork installation, drywall partitioning and adjacent mall finishes.  The project was completed in eleven (11) weeks.


## EDUCATION

Pratt Institute – Brooklyn, NY
School of Architecture- 1989 through 1993

| Store Location | Date Completed | Square Footage | Type |
| --- | --- | --- | --- |
| **Jeff Wolford - Retail Project Manager - Estimator for other General Contractors** | | | |
| Sportmart #608- Orland Park, IL | 6/30/1999 | 39,885 | New Store - Tenant Improvement |
| Gart Sports #321- Orem, UT | 6/4/2001 | 38,202 | New Store - Tenant Improvement |
| Sportmart #321 - Crystal Lake, IL | 11/10/2001 | 35,533 | New Store - Tenant Improvement |
| Sportmart #607 - Folsom, CA | 6/11/2002 | 28,598 | New Store - Tenant Improvement |
| Sportmart #673 - Folsom, CA | 6/22/2002 | 28,927 | Remodel - Tenant Improvement |
| Sportmart #605 - Schaumburg, IL | 10/30/2002 | 33,567 | New Store - Exterior Façade - Tenant Improvement |
| Oshman's #240 - Houston, X | 10/4/2002 | 35,894 | New Store - Tenant Improvement |
| Sportmart #674 - Fresno, CA | | 39,909 | Remodel - Tenant Improvement |
| Sportmart #612 - North Riverside | 1/27/2003 | 42,201 | New Store - Tenant Improvement |
| Sportmart #600 - Bolingbrook, IL | 3/23/2003 | 38,851 | New Store - Tenant Improvement |
| Sportmart #626 - Matteson, IL | 5/2/2003 | 39,102 | Remodel - Tenant Improvement |
| Sportmart #604 - Oak Lawn, IL | 4/13/2003 | 44,837 | Remodel - Tenant Improvement |
| Sportmart #608 - Orland Park, IL | 4/4/2003 | 41,175 | New Store - Tenant Improvement |
| Sportmart #692 - Phoenix, AZ | 5/2/2003 | 38,404 | New Store - Tenant Improvement |
| Oshman's #242 - Austin, TX | 8/5/2003 | 37,748 | Remodel - Tenant Improvement |
| Sportmart #601 - Niles, IL | 4/11/2003 | 18,445 | Remodel - Tenant Improvement |
| Sportmart #617 - N. LaSalle St Chicago, IL | 8/2/2003 | 34,898 | Remodel - Tenant Improvement |
| Sportmart #614 - Vernon Hills, IL | 6/8/2003 | 35,684 | Remodel - Tenant Improvement |
| Sports Authority #753 - Kirkwood, MO | 8/8/2003 | 35,196 | New Store - Tenant Improvement |
| Sportmart #627 - Frankfort, IL | 10/24/2003 | 38,218 | New Store - Tenant Improvement |
| Sportmart #615 - Glendale Hts, IL | 10/3/2003 | 46,249 | Remodel - Tenant Improvement |
| Oshman's #207 - Farmers Branch, TX | 2/19/2004 | 43,459 | New Store - Exterior Façade - Tenant Improvement |
| Sports Authority #464 - W Long Branch, NJ | 3/14/2004 | 40,097 | Remodel - Tenant Improvement |
| Sports Authority #471 - Brick | 4/7/2004 | 43,136 | Remodel - Tenant Improvement |
| Sports Authority $470 - Ledgewood, NJ | 3/31/2004 | 40,097 | Remodel - Tenant Improvement |
| Sports Authority #153 - N Haven, CT | 12/7/2004 | 52,760 | Remodel - Tenant Improvement |
| Sports Authority #459 - Mays Landing, NJ | 10/1/2004 | 43,975 | New Store - Tenant Improvement |
| Sportmart #702 - Minnetonka, MN | 6/4/2004 | 41,815 | New Store - Tenant Improvement |
| Sportmart #704 - Richfield, MN | 6/16/2004 | 44,173 | Remodel - Tenant Improvement |
| Sportmart #701 - Roseville, MN | 6/23/2004 | 42,801 | Remodel - Tenant Improvement |
| Sports Authority #165 - Woburn, MA | 9/17/2004 | 49,713 | Remodel - Tenant Improvement |
| Sports Authority #166 - Plymouth, MA | 10/12/2004 | 38,407 | New Store - Tenant Improvement |
| Oshman's #205 - McKinney, TX | 3/10/2005 | 38,106 | New Store - Tenant Improvement |
| Sports Authority #205 - McKinney, TX | 4/3/2005 | 40,130 | New Store - Tenant Improvement |
| Sports Authority #474 - Clifton, NJ | 3/6/2005 | 44,520 | New Store - Tenant Improvement |
| **Wolford Retail Builders, Inc completed TSA/Gart work** | | | |
| Sports Authority #478 - Riverhead, NY | 9/27/2006 | 45,049 | New Store - Tenant Improvement |
| Sports Authority #457 - Riverdale, NJ | 9/27/2006 | 40,627 | New Store - Tenant Improvement |
| Sports Authority #477 - Paramus, NJ | 8/4/2005 | 51,106 | New Store - Tenant Improvement |
| Sports Authority #174 - Somerville, MA | 3/9/2006 | 45,669 | New Store - Tenant Improvement |
| Sportmart #629 - Delafield, WI | 3/2/2006 | 40,934 | New Store - Tenant Improvement |
| Sports Authority #176 - Milford, MA | 9/25/2005 | 46,266 | New Store - Tenant Improvement |
| Sports Authority #511 - Baltimore, MD | 7/13/2006 | 50,122 | New Store - Exterior Façade - Tenant Improvement |
| Sports Authority #178 - Holyoke, MA | 2/22/2007 | 46,322 | New Store - Tenant Improvement |
| Sports Authority #583 - Lombard, IL | new store under construction | 47,013 | New Store - Tenant Improvement |
| Sports Authority #604 - Oak Lawn, IL | 4/24/2006 | | Exterior Façade |
| Sports Authority #376 - Port St Lucie, FL | new store under contract | 39,334 | New Store - Tenant Improvement |
| Sports Authority #628 - Willowbrook, IL | currently competitively bidding | 40,122 | New Store competitively bids 5/24/07 |
| Sports Authority #394 - Cape Coral, FL | currently competitively bidding | 39,359 | New Store competitively bid on 5/15/07 |

# GART SPORTS COMPANY

STORE #618                                    Date: 7/26/01

CENTER 3211 SOUTH VETERANS PARKWAY,  SPRINGFIELD, ILLINOIS Contractor: Capitol Const. Group

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT | TOTAL |
|---|---|---|---|---|
| | BID BREAKDOWN | | | |
| 1. Barricade | NIC | | | N/A |
| 2. Demolition | N/A | | | N/A |
| 3. Bond | N/A | | | N/A |
| 4. Concrete | 738.00 | 695.00 | 2.09 | 1,433.00 |
| 5. Carpentry/Rough Carpentry | 16,140.00 | 4,570.00 | 1.55 | 20,714.00 |
| 6. Studs and Drywall | 38,505.00 | 66,972.00 | 2.46 | 105,477.00 |
| 7. Storefront Glass | By Shell Contr. | | | NIC |
| 8. Interior Mirrors | 701.00 | 799.00 | 15.00 | 1,400.00 |
| 9. Acoustical Ceiling | 10,564.00 | 4,401.00 | 1.68 | 14,965.00 |
| 10. Store Fixtures/Finish Carpe | 31,233.00 | 11,300.00 | 0.76 | 42,533.00 |
| 11. Painting/Concrete Sealer | 13,310.00 | 4,162.00 | 0.55 | 17,472.00 |
| 12. Carpet Installation | 39,429.57 | 6,540.45 | 2.46 | 45,400.00 |
| 13. Vinyl Tile and Base | 7,293.00 | 3,162.00 | 6.59 | 11,200.00 |
| 14. Plumbing | 60,199.00 | 2,135.00 | 1.16 | 32,390.00 |
| 15. Sprinklers | 30,552.00 | 34,638.00 | 2.02 | 55,990.00 |
| 16. Electrical | 63,748.00 | 58,800.00 | 3.80 | 116,338.00 |
| 17. Fire Alarm System | 7,302.00 | 5,720.00 | 0.40 | 12,225.00 |
| 18. HVAC/Ventiliation | 82,409.00 | 32,194.00 | 3.55 | 114,603.00 |
| 19. Rubber Flooring /Sealer | 39,855.00 | 9,671.48 | 4.90 | 51,000.00 |
| 20. Insurance | | | | 6,899.00 |
| 21. Supervision/Travel/Per Diem | | | | 18,400.00 |
| 22. General Conditions (Itemize) | | | | 14,253.00 |
| 23. Other (Itemize below) | | | | 14,080.00 |
| SUBTOTAL | 441,978.57 | 245,759.93 | 48.97 | 696,772.00 |
| 24. Profit & Overhead (5.25%) | | | | 36,581.00 |
| 25. Taxes (Sales/State/Local) | | | | INCLUDED |
| TOTAL | $0 | $0 | $0 | 733,353.00 |
| List itemizing below: (#22 - Gen Cond.) | | | | 14,253.00 |
| 1.  Final Cleaning | | | | 2,400.00 |
| 2.  Temporary Phones | | | | 1,000.00 |
| 3.  Tool Rental | | | | 1,000.00 |
| List Itemizations below: (#23 - Other) | | | | 14,080.00 |
| 1. Toilet Partitions/Accessories | | | | 1,900.00 |
| 2. Total Materials | | | | 10,265.00 |
| 3. Misc. Const. Materials & Equipment | | | | 3,815.00 |
| 4 | | | | |
| Site Verification (please circle): | | We have / have not verified site | | |
| UNION    100%    /    NON-UNION | | Amount of time to procure permit: | NIC wks. | |
| % of Union Increase:           % | | Amount of time for construction : | 8 wks. | |
| Qualifications to be listed on separate sheet | | | | |

EXHIBIT  B

# BID SPREADSHEET

PROJECT: Scotfrost #818
LOCATION: 3211 Smith Veterans PW
CITY, STATE: Springfield, IL

PM: Jeff Wolford
AM:
PC: Mark Erickson

Union / Yes

Estimate/Job # 23155  BID DUE: 07/26/01

Sq. Ft. 32,308
Start:
Complete:
Project Duration: 8

* COMPETITORS:

| DIVISION CODE / TRADE TASK | ESTIMATE | BIDDER #1 | BIDDER #2 | BIDDER #3 | BIDDER #4 | BIDDER #5 | BIDDER #6 | BEST BID | FINANCE PROPOSAL |
|---|---|---|---|---|---|---|---|---|---|
| Concrete Infill | | By Coderse | Brannier | Judge | Vision | Wood River | | $1,433 | $1,433 |
| Glazing / Mirrors | $1,950 | | | | | | | $1,400 | $1,400 |
| Carpentry | | $20,714 | $21,111 | Landgraba | | | | $20,714 | $20,714 |
| Millwork | $46,161 | Hal Constr. | Hal Constr. | Landgraba | | | | $44,533 | $42,533 |
| | $44,533 | $42,522 | | | | | | | |
| Drywall / Metal Studs | $105,477 | Langdraba | Landgraba | Kirk Lesley | North Union | | | $105,477 | $105,477 |
| Acoustical | $14,965 | Langdraba | Hal Constr. | Kirk Lesley | North Union | | | $14,965 | $14,965 |
| Rubber flooring | Patterson | Just Floors | Matjaes | Metro | L3B Non Union | | | $52,100 | $52,100 |
| V.C.Ts / Vinyl Base | $11,200 | Patterson | Just Floors | Matjaes | Metro | L3B Non Union | | $11,200 | $49,100 |
| Carpet | $46,000 | Patterson | Just Floors | Matjaes | Metro | L3B Non Union | | $46,400 | $45,400 |
| Painting / Concrete Sealer | $18,850 | LR Fritsch | BBH | Paul Gold | BBH | | | $17,472 | $17,472 |
| | $18,027 | $18,324 | $17,472 | Division 16 | | | | | |
| Toilet Partitions / Accessories | $1,950 | US Structural | Patterburg | $2,225 | J F Murphy | | | $1,900 | $1,900 |
| Plumbing / Gas Piping | $46,180 | $32,390 | E.L.Pruitt | BLJ Power? | | | | $32,390 | $32,390 |
| | | | $37,950 | $37,534 | | | | | |
| Sprinkler | $57,134 | F-J-Murphy | Girrrall | Davis Mech. | | | | $63,190 | $55,990 |
| | $35,990 | | | | | | | | |
| HVAC | $131,561 | Dauson | Punzak | RLJ Power | Davis Mech. | E.L.Pruitt | | $114,603 | $114,603 |
| | $152,000 | $114,601 | $114,603 | | $122,000 | | | | |
| Electrical | $118,000 | Eads | Anderson | J B & Ric. | | Carmean | Mansfield | $116,338 | $116,338 |
| | Eads | Haerig | Anderson | $16,600 | | | Mansfield | | |
| Fire Alarm / Life Saftey | $14,650 | $12,225 | $15,400 | $9,800 | | Carmean | Mansfield | $12,225 | $12,225 |
| BUDGET TOTAL | | | | | | | SUBTOTAL | $655,340 | $643,140 |

change Bid/prop. ($13,270.00)
% of change -2.01%

---

## GENERAL CONDITIONS

| | | |
|---|---|---|
| Supervision | $1,800.00 | Wks 8 |
| Per Diem | | |
| Total Supervision | $450 | |

Telephone / Field Fax
Blueprints
Distribution
Dumpsters @ (8) 30 yards x $250.00
Cond. Clean-Up 50hrs @ $42.00/hr
Final Clean-Up
Permit
Temp. Utilities
PM Travel
All Weather Storage Container / Global
PM Labor
Punch-List week
Equipment Rental / Fork Lift 7 wks @ $250.00 per wk

Total General Conditions

## MATERIALS

Fire extinguishers 8ft x $45.00 per
Misc. Construction materials
Reception / CIT and Managers desk
US Stationary / ReBYXX Toilet Room accessories
Bane Nelson Doors Frames and HW
Golf Cage Chain Link fencing

Totals Materials

## SUMMARY

| | |
|---|---|
| Trailer | |
| Material | |
| Supervision, Travel & Per Diem | |
| General Conditions (itemized) | |
| SUBTOTAL | |
| General Conditions | |
| Insurance | 4.00 |
| SUBTOTAL | |
| Fee | 5.25 |
| SUBTOTAL | |
| TOTAL | |
| Gross Receipt Taxes | |
| Cost / Sq.Ft. | |
| GRAND TOTAL | $22.70 |

approval _____ date _____



# FAX COVER SHEET

| | |
|---|---|
| Fax Number: 303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9, 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.

July 26, 2001


Mr. Ken Parker
Steckel – Parker Architects, Inc.
2451 West Monroe
Springfield, IL 62704

Re:     Gart Sportmart #618
        Springfield, IL
        Capitol Project #23158

Dear Mr. Parker:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED
SEVENTY-ONE THOUSAND SEVEN HUNDRED FORTY-FIVE and No/100 Dollars
($771,745.00) for the new construction of the above referenced project based in accordance
with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1,
A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1,
E0.0, E0.1, E0.3, E2.0, E2.1, all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you
towards a timely and successful completion. If you have any questions please feel free to
contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.



Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:     Mark Ericksen, W/Encl.
        Capitol Construction Group, Inc.

        File, W/Enc.

Mr. Ken Parker                                              July 26, 2001
Page 2

GART SPORTMART #618
SPRINGFIELD, ILLINOIS
CAPTIOL PROJECT #23158

CLARIFICATIONS AND EXCLUSIONS

A.   The following Clarifications shall supercede all other contract documents where
     conflicts may exist:

1.   Our proposal is based upon reaching equitable contract and payment terms
     with the Owner/Developer.
2.   Any and all work not reflected on the drawings that might be required due to
     field conditions.
3.   All work to be during normal working hours (7:00 am – 3:30pm).
4.   Work to be done during normal 40-hour workweek.
5.   This proposal is based upon and we will comply with the information
     provided on the bid documents only and SEM clarifications and
     specification book.
6.   Taxes are included.
7.   Telephone service primary conduit only is included.
8.   Owner supplied items are to be on site in a timely manner.
9.   Priced per union shop.
10.  Our proposal is based on an 8-week work schedule.
11.  Capitol Construction will provide and install the national vendor packages
     as follows:

     | | |
     |---|---|
     | Electrical Gear | Loeb Electric |
     | Lighting | Loeb Electric |
     | Flooring | Shaw Contract Flooring |
     | Roof Top Mechanical Unit | Trane Company |
     | Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
     | Millwork | Premier Eurocase, Inc. |

12.  Ontario Store Fixture package and Pallet Rack System will be purchased
     and installed by Gart Sports, Capitol Construction will receive and stage.
13.  The following items as noted on sheet A0.2 shall be provided and installed
     by the Landlord:

          Metal Bike Rack
          Metal Bench
          Metal Trash Receptacle

14.  All low bid subcontractors by request of Capitol Construction has performed
     a site visit prior to pricing.

Mr. Ken Parker                                              July 26, 2001
Page 3

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

B.    The following exclusions are included in this proposal:

1.    Temporary heating as none will be required.
2.    Permit fees are not included.
3.    Abatement work of any kind is not included.
4.    No overtime is included.
5.    No storefront glass or any automatic entry doors.
6.    Fireproofing (spray on).
7.    No demolition as none will be required.
8.    Site Protection.

C.    May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW            -    ($ 2,800.00)

July 30, 2001

Mr. Michael Quaintance
Gart Sports
1000 Broadway
Denver, CO  80203

Re:    **REVISED BID**
       Gart Sportmart #618
       Springfield, IL
       Capitol Project #23158

Dear Mike:

Capitol Construction Group, Inc. is pleased to propose the sum of SEVEN HUNDRED THIRTY-THREE THOUSAND THREE HUNDRED FIFTY THREE  and No/100 Dollars ($733,353.00) for the new construction of the above referenced project based in accordance with the Specifications dated June 27, 2001 and the following drawings; A0.1, A0.2, F.1, A2.1, A2.2, A2.3, A4.1, A5.0, A5.1, A5.2, A5.3, A5.5, A5.6, A5.7, M1, M2, P1.0, P2.1, E0.0, E0.1, E0.3, E2.0, E2.1,  all dated 6/27/01 and prepared by SEM Architects, Inc.

Our proposal is subject to the enclosed Clarifications and Inclusions.

We appreciate the opportunity to bid on this work and look forward to working with you towards a timely and successful completion.  If you have any questions please feel free to contact me.

Sincerely,

CAPITOL CONSTRUCTION GROUP, INC.

Jeffrey Wolford
Project Manager

JW/cm

Enc.

Cc:    Mark Ericksen, W/Encl.
       Capitol Construction Group, Inc.

       File, W/Enc.

Mr.Michael Quaintance                                          July 30, 2001
Page 2

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

A.   The following Clarifications shall supercede all other contract documents where
conflicts may exist:

1.   Our proposal is based upon reaching equitable contract and payment terms
with the Owner/Developer.
2.   Any and all work not reflected on the drawings that might be required due to
field conditions.
3.   All work to be during normal working hours (7:00 am – 3:30pm).
4.   Work to be done during normal 40-hour workweek.
5.   This proposal is based upon and we will comply with the information
provided on the bid documents only and SEM clarifications and
specification book.
6.   Taxes are included.
7.   Telephone service primary conduit only is included.
8.   Owner supplied items are to be on site in a timely manner.
9.   Priced per union shop.
10.  Our proposal is based on an 8-week work schedule.
11.  Capitol Construction will provide and install the national vendor packages
as follows:

| | |
|---|---|
| Electrical Gear | Loeb Electric |
| Lighting | Loeb Electric |
| Flooring | Shaw Contract Flooring |
| Roof Top Mechanical Unit | Trane Company |
| Interior Drs, Frms & HDW | Colorado Doorways, Inc. |
| Millwork | Premier Eurocase, Inc. |

12.  Ontario Store Fixture package and Pallet Rack System will be purchased
and installed by Gart Sports, Capitol Construction will receive and stage.
13.  The following items as noted on sheet A0.2 shall be provided and installed
by the Landlord:

Metal Bike Rack
Metal Bench
Metal Trash Receptacle

14.  All low bid subcontractors by request of Capitol Construction has performed
a site visit prior to pricing.
15.  The electric price includes 30 feet of feeder cable and pipe to transformer
pad only.

Mr.Michael Quaintance                                July 30, 2001
Page 3

## GART SPORTMART#618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158

## CLARIFICATIONS AND EXCLUSIONS

16. Fire protection number includes back flow preventor and 20 foot water storage capacity as per drawings.
17. The plumbing price is all inclusive of gas piping but excludes gas meter and meter bar.
18. Electric price does not include any underground/in slab piping as this has, or is to be done by shell contractor.

B. The following exclusions are included in this proposal:

1. Temporary heating as none will be required.
2. Permit fees are not included.
3. Abatement work of any kind is not included.
4. No overtime is included.
5. No storefront glass or any automatic entry doors.
6. Fireproofing (spray on).
7. No demolition as none will be required.
8. Site Protection/Barricade work.
9. No floor prep as this will be a new slab and none shall be required.

C. May we suggest the following add alternates/deducts:

Alternate supplier for Drs, Frms & HDW          -    ($ 2,800.00)

Mr. Michael Quaintance                                        July 30, 2001
Page 4

## GART SPORTMART #618
## SPRINGFIELD, ILLINOIS
## CAPTIOL PROJECT #23158
## REVISED
## TRADE BREAKDOWN

| | |
|---|---:|
| BARRICADE | N/A |
| DEMOLITION | N/A |
| BOND | N/A |
| CONCRETE | 1,433.00 |
| CARPENTRY/ROUGH CARPENTRY | 20,714.00 |
| STUDS & DRYWALL | 105,477.00 |
| STOREFRONT GLASS | NIC |
| INTERIOR MIRRORS | 1,400.00 |
| ACOUSTICAL CEILING | 14,965.00 |
| STORE FIXTURES/FINISH CARPENTRY | 42,533.00 |
| PAINTING/CONCRETE SEALER | 17,472.00 |
| CARPET INSTALLATION | 45,400.00 |
| VINYL TILE & BASE | 11,200.00 |
| PLUMBING | 32,390.00 |
| SPRINKLERS | 55,990.00 |
| ELECTRICAL | 116,338.00 |
| FIRE ALARM SYSTEM | 12,225.00 |
| HVAC/VENTILATION | 114,603.00 |
| RUBBER FLOORING/SEALER | 51,000.00 |
| INSURANCE | 6,899.00 |
| SUPERVISION/TRAVEL /PER DIEM | 18,400.00 |
| GENERAL CONDITIONS | 14,253.00 |
| TOTAL MATERIALS | 14,080.00 |
| SUBTOTAL | 696,772.00 |
| PROFIT & OVERHEAD (5.25%) | 36,581.00 |
| TAXES | INCLUDED |
| **TOTAL** | **733,353.00** |



# FAX COVER SHEET

| | |
|---|---|
| Fax Number: 303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9, 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.



## FAX COVER SHEET

| | |
|---|---|
| Fax Number: 303-832-4738 | No. of Pages (including cover sheet): 1 |
| To: Mike Quaintance | Company Name: Gart Sports |
| From: Jeff Wolford | |
| Date: July 9, 2001 | |
| Subject: Sportmart #618, Springfield, Illinois; Capitol Project #23158 | |

Message: Mike clarifications are needed on this project:

1. In the specifications, there is no Table of Contents. Is this done for a specific reason?

2. Also in the specifications, there is no Division 4 and Division 5. Should I proceed?

Please call me at 847-215-5345.

05/10/2006 14:02 FAX 3038642102    GART SPORTS    @001

*#618*
*Storefiles*



National Disaster Recovery Services

| | | | |
|---|---|---|---|
| | | Date: | 03/31/06 |
| Name | Mike Mavelle | Invoice #: | 1408722 |
| Company | Sports Authority | Terms: | Net 10 |
| Address | 1050 W. Hampton Ave. | Fed Id: | 76-0628204 |
| City, State, Zip | Englewood, CO 80110 | | |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | Insurance Co: | Liberty Mutual Property |
| City, State, Zip | Springfield, Il. 62704 | Insurance Adj: | Ton Tiernan |
| Tel: | (217) 546-0132 | Claim #: | X69A-003155-00 |
| Fax: | (217) 546-1073 | | |
| Re: | Tornado Damages in Springfield,IL    *#618* | | |
| Re: | Final Bill With Not To Exceed Amount: | | |

Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:
Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)

| | | |
|---|---|---|
| | $ | 219,428.67 |
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | (100,000.00) |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | | |
| *REMAINING BALANCE* | $ | 219,428.67 |
| SUBTOTAL | $ | 219,428.67 |
| TOTAL DUE AND PAYABLE | | |

THE ABOVE CHARGES ARE CONSISTENT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

All expenses received after final billing will be invoiced at a later date

For questions concerning your account, Please contact:

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77048

**Please include the invoice number on check**

03/31/06

EXHIBIT C

TSA RULE 26 DISCLOSURES
0032

05/10/2006 14:02 FAX 3038842102                GART SPORTS                                      ☒002

---

## Bonnie Cochran

From:          Bonnie Cochran
Sent:          Wednesday, April 05, 2006 4:13 PM
To:            David Frieder
Subject:       RE: Sports Authority invoice 1-A(STIPULATED).xls


week ending 3/19/06:

Labor Totals: 54,453.38
Total for reimbursables:   3,410.23
Total for equipment:  43,248.75
Total for consumables: 9,494.82
Subtotal for Vendors (subcontractors)  51,545.21
Cotton USA mark up:  10,824.49
Total for Vendors (subcontractors)  62,369.70


week ending 3/26/06:

Labor Total:  20,855.38
Total for reimbursables:   2,181.19
Total for equipment:  41,336.50
Total for consumables: 3,039.62
Subtotal for Vendors (subcontractors):     103.96
Cotton USA markup:  21.83
Total for Vendors (subcontractors)  125.79


week ending 4/2/06:

Labor Totals:  1,807.50
Total for reimbursables:  99.00
Total for equipment:  -0-
Total for consumables:  -0-
Subtotal for Vendors (subcontractors)  235.27
Cotton USA mark up:  49.41
Total for Vendors (subcontractors)  284.68



Invoice from Cotton:

Emergency services final stipulated invoice sum amount:  319,428.57
Cotton has received an initial draw of:                      (100,000.00)
Remaining Balance:                                            219,428.57

1

TSA RULE 26 DISCLOSURES
0033

**Custom USA**
Contract # 1083724 Sports Authority
Labor Summary
Period Ended 03/19/06

| Name | Classification | | Std Rate OT Prem | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kneas, Jeff | Project Coordinator | Travel $ | 95.00 | 8 | | | | | | | 8.0 | 760.00 |
| | | Regular $ | 95.00 | | | | | | | | 23.5 | 2,232.50 |
| | | Overtime $ | 142.50 | | | | | | | | | |
| Gnau, Bruce | Project Manager | Travel $ | 80.00 | 8 | | | | | | | 8.0 | 640.00 |
| | | Regular $ | 80.00 | | | | | | | | 40.0 | 3,200.00 |
| | | Overtime $ | 120.00 | | | 12 | 12 | 12 | | | 30.5 | 3,660.00 |
| Castillo, Phillip | Asst. Project Manger | Travel $ | 75.00 | 19 | | | | | | | 19.0 | 1,425.00 |
| | | Regular $ | 75.00 | | | | | | | | 40.0 | 3,000.00 |
| | | Overtime $ | 112.50 | | 12 | 12 | 12 | 12 | | | 32.0 | 3,600.00 |
| Parson, Shawn | Restoration Supervisor | Travel $ | 45.00 | 19 | | | | | | | 19.0 | 855.00 |
| | | Regular $ | 45.00 | | 13 | 10 | 4 | 10 | 11 | 11 | 25.0 | 1,125.00 |
| | | Overtime $ | 67.50 | | | | | 3 | | | 0.0 | |
| Smith, Brad | Restoration Supervisor | Travel $ | 45.00 | | | | | | 5 | | 5.0 | 225.00 |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | |
| | | Overtime $ | 67.50 | | | | | | | | | |
| Lindeman, Bud | Restoration Supervisor | Travel $ | 45.00 | 8 | | | | | | | 8.0 | 360.00 |
| | | Regular $ | 45.00 | | 10.5 | 12 | 10.5 | 12 | 11 | 11 | 40.0 | 1,800.00 |
| | | Overtime $ | 67.50 | | 8.5 | | | | 7 | | 18.0 | 1,315.00 |
| Banda, Mirce | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | |
| | | Regular $ | 45.00 | | 9 | 12 | 12 | 12 | 4 | 9 | 40.0 | 1,800.00 |
| | | Overtime $ | 67.50 | | | | | | | | 6.0 | 405.00 |
| Banda, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | |
| Disangalo, Jeffrey | Skilled Labor | Regular $ | 28.50 | | 5.5 | 10.5 | 8.5 | 11.5 | 4 | 9.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | 5 | | 14.5 | 619.88 |
| King, Rachel | Skilled Labor | Regular $ | 28.50 | | | 8.5 | 8.5 | 9.5 | | 9.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | | | 4.5 | 192.38 |
| Saleta, John | Skilled Labor | Regular $ | 28.50 | | | 8 | 5.5 | 11.5 | | | 34.0 | 969.00 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Brown, Tammie | Skilled Labor | Regular $ | 28.50 | | 9 | 9.5 | 8.5 | 9.5 | 6.5 | 10.5 | 40.5 | 1,140.00 |
| | | Overtime $ | 42.71 | | | | | | | | 17.0 | 726.13 |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | | 9 | 9.5 | 8.5 | 9.5 | 3.5 | 10.5 | 40.0 | 1,140.00 |
| | | Overtime $ | 42.75 | | | | | | 6.5 | | 17.0 | 726.75 |
| Broomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | | | | | | | 37.5 | 1,068.75 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Sujkiovich, Gary | Skilled Labor | Regular $ | 28.50 | | | | | | | | 9.0 | 256.50 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |

TSA RULE 26 DISCLOSURES
0035

05/10/2008 14:03 FAX 3038642102                                        ☑ 005

| Name | Classification | Regular $ | Overtime $ | Reg Hrs | OT Hrs | Total $ |
|---|---|---|---|---|---|---|
| Edward, Marvin | Skilled Labor | 28.50 | 42.75 | 9.0 | 0.0 | 256.50 |
| Dawson, Robert | Skilled Labor | 28.50 | 42.75 | 9.0 | 0.0 | 256.50 |
| Wiggins, Travis | Skilled Labor | 28.50 | 42.75 | 9.0 | 0.0 | 256.50 |
| Hawkins, Abdul | Skilled Labor | 28.50 | 42.75 | 4.5 | 0.0 | 128.25 |
| Ousley, Shatia | Skilled Labor | 28.50 | 42.75 | 5.5 | 0.0 | 156.75 |
| Edwards, Tracey | Skilled Labor | 28.50 | 42.75 | 5.5 | 0.0 | 156.75 |
| Glasser, Roy | Skilled Labor | 28.50 | 42.75 | 5.0 | 0.0 | 142.50 |
| Aniszewicz, Vivian | Skilled Labor | 28.50 | 42.75 | 6 | 0.0 | 131.00 |
| Johnson, Ponce | Skilled Labor | 28.50 | 42.75 | 5 | 0.0 | 131.00 |
| Blawkey, Samantha | Skilled Labor | 28.50 | 42.75 | 6 | 0.0 | 171.00 |
| Jackson, Gary | Skilled Labor | 28.50 | 42.75 | 0.5 | 0.0 | 14.25 |
| Washerspoon, Jason | Skilled Labor | 28.50 | 42.75 | 4.5 | 0.0 | 128.25 |
| Jackson, Bruce | Skilled Labor | 28.50 | 42.75 | 8 | 0.0 | 128.25 |
| Morrow, James | Skilled Labor | 28.50 | 42.75 | 8.5 | 0.0 | 242.25 |
| Williams, Charles | Skilled Labor | 28.50 | 42.75 | 16.0 | 0.0 | 456.00 |
| Walton, Nancy | Skilled Labor | 28.50 | 42.75 | 6 | 0.0 | 212.25 |
| Hollenbeck, Russell | Skilled Labor | 28.50 | 42.75 | 9.5 | 0.0 | 228.00 |
| Henriquez, Ralph | Skilled Labor | 28.50 | 42.75 | 10 | 8 | 1,140.00 |
| Hildenwood, Alfred | Skilled Labor | 28.50 | 42.75 | 2.5 | 8.0 | 142.00 |
| Brown, John | Skilled Labor | 28.50 | 42.75 | | | 111.00 |

TSA RULE 26 DISCLOSURES
0036

| Name | | Rate | | | | | | | | Total $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Seaton, Al | Skilled Labor | Regular $ 28.50 | | 8 | 11 | | | 26.0 | | 741.00 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Holm, Jerry | Skilled Labor | Regular $ 28.50 | | 8.5 | 8.5 | 9.5 | 3.5 | 40.0 | | 1,140.00 |
| | | Overtime $ 42.75 | | | | | 5.5 | 5.5 | | 235.13 |
| | | | | | | | | | | 2,311.13 |
| | | | | | | | | | | 612.13 |
| Stevenson, Barry | Skilled Labor | Regular $ 28.50 | | 10.5 | 8.5 | | | 21.5 | | 769.50 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Wines, Alva | Skilled Labor | Regular $ 28.50 | | 8.5 | | | | 27.0 | | 210.75 |
| | | Overtime $ 42.75 | | | | | | 9.5 | | |
| Waite, Richard | Skilled Labor | Regular $ 28.50 | | 10.5 | 10 | 9.5 | | 30.0 | | 855.00 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Garrad, Graman | Skilled Labor | Regular $ 28.50 | | 6 | 5.5 | | | 11.5 | | 337.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Sharpe, Jeremiah | Skilled Labor | Regular $ 28.50 | | 6 | 5.5 | | | 11.5 | | 337.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Hamilton, Robert | Skilled Labor | Regular $ 28.50 | | 10.5 | 8.5 | 9.5 | | 28.5 | | 812.25 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Curry, Xavier | Skilled Labor | Regular $ 28.50 | | 9.5 | 5.5 | 9.5 | | 5.5 | | 1,155.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Dabba, David | Skilled Labor | Regular $ 28.50 | | | 6.5 | | 10.5 | 34.5 | | 983.25 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| McDonald, Chris | Skilled Labor | Regular $ 28.50 | | | | | 9 | 6.5 | | 185.25 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Walters, Jim | Skilled Labor | Regular $ 28.50 | | | 9.5 | | | 9.5 | | 270.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Ward, George | Skilled Labor | Regular $ 28.50 | | | 9.5 | | | 9.5 | | 270.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Quenlin, Curtis | Skilled Labor | Regular $ 28.50 | | | 9.5 | | | 9.5 | | 270.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Reed, Charlie | Skilled Labor | Regular $ 28.50 | | | 9.5 | | | 9.5 | | 270.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| White, Leon | Skilled Labor | Regular $ 28.50 | | | 9.5 | | | 9.5 | | 270.75 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Williams, Van | Skilled Labor | Regular $ 28.50 | | | | | 10 | 10.0 | | 285.00 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Pappas, Nick | Skilled Labor | Regular $ 28.50 | | | | | 10 | 10.0 | | 285.00 |
| | | Overtime $ 42.75 | | | | | | 0.0 | | |
| Gaitz, Terrance | Skilled Labor | Regular $ 28.50 | | | | | 8 | 8.0 | | 228.00 |

| Name | | Regular $ | Overtime $ | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stone, Victor | Skilled Labor | 28.50 | 42.75 | | | | | | 10 | 10.0 | 0.0 | 285.00 |
| McKinney, Eric | Skilled Labor | 28.50 | 42.75 | | | | | | 10 | 10.0 | 0.0 | 285.00 |
| Colby, Christopher | Skilled Labor | 28.50 | 42.75 | | | | | | 9 | 9.0 | 0.0 | 256.50 |
| Jones, Dwight | Skilled Labor | 28.50 | 42.75 | | | | | | 10 | 10.0 | 0.0 | 285.00 |
| Cruthas, James | Skilled Labor | 28.50 | 42.75 | | | | | | | 10.5 | 0.0 | 299.25 |
| Luthiridge, Annie | Skilled Labor | 28.50 | 42.75 | | | | | | 10.5 | 10.5 | 0.0 | 299.25 |
| Andazona, Micah | Skilled Labor | 28.50 | 42.75 | | | | | | 10.5 | 10.5 | 0.0 | 299.25 |
| Alexander, Dan | Skilled Labor | 28.50 | 42.75 | | | | | | 10.5 | 10.5 | 0.0 | 299.25 |
| Bluytick, Tiffany | Skilled Labor | 28.50 | 42.75 | | | | | | 7 | 7.0 | 0.0 | 199.50 |
| Leachman, Chad | Skilled Labor | 28.50 | 42.75 | | | | | | 9 | 9.0 | 0.0 | 256.50 |
| Johnson, Thomas | Skilled Labor | 28.50 | 42.75 | | | | | | 10.5 | 10.5 | 0.0 | 299.25 |
| Nault, Kevin | Skilled Labor | 28.50 | 42.75 | | | | | | 10.5 | 10.5 | 0.0 | 299.25 |
| Eck, Jerome | Skilled Labor | 28.50 | 42.75 | | | | | | 9 | 9.0 | 0.0 | 256.50 |
| Longanecker, Robert | Skilled Labor | 28.50 | 42.75 | | | | | | 9 | 9.0 | 0.0 | 256.50 |
| Lagassie, Jason | Skilled Labor | 28.50 | 42.75 | | | | | | 9 | 9.0 | 0.0 | 256.50 |
| Gund, Larry | Skilled Labor | 28.50 | 42.75 | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | 0.0 | 0.0 | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | 0.0 | 0.0 | |

TSA RULE 26 DISCLOSURES
0038

05/10/2006 14:04 FAX 3038642102          GART SPORTS                    ☒ 008

| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Name | Skilled Labor | Regular $ | 28.50 |
| | | Overtime $ | 42.75 |
| Labor Ready | Temporary Labor | Regular $ | 17.58 |
| | | Overtime $ | 26.37 |

Client Name

Management Fee
Total Forward

Labor Totals                                      $14,533.81

05/10/2006 14:04 FAX 3038642102          GART SPORTS

**Costco USA**
**Contract # 14087211 Sports Authority**
**Reimbursable Summary**
**Period Ended 03/19/06**

| | | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gest, Bruce | perdiem | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 210.00 |
| | hotel | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 546.70 |
| | airfare | | | | | | | | $ 219.00 |
| Castillo, Phillip | perdiem | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 210.00 |
| | hotel | $ 39.05 | $ 39.05 | $ 39.05 | $ 39.05 | $ 39.05 | $ 39.65 | $ 78.10 | $ 351.45 |
| | airfare | | | | | | | | |
| Parsons, Shannon | perdiem | $ 30.00 | $ 30.00 | | | | | | $ 90.00 |
| | hotel | $ 99.05 | $ 39.05 | | | | | | $ 155.20 |
| | airfare | | | | | | | | |
| Bostick, Elinor | perdiem | | | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | | $ 120.00 |
| | hotel | | | $ 39.05 | $ 39.05 | $ 39.05 | $ 39.65 | $ 78.10 | $ 195.25 |
| | airfare | | | | | | | | |
| Bulfin, Luke | perdiem | | | | | | | $ 30.00 | $ 30.00 |
| | hotel | | | | | | | $ 78.10 | $ 78.10 |
| | airfare | | | | | | | | |
| Linscheae, Bud | perdiem | | | | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 180.00 |
| | hotel | | | | $ 47.29 | $ 47.29 | $ 47.29 | $ 47.29 | $ 267.26 |
| | airfare | | | | | | | | |
| Hertz Rental Car   RR816107843 | | | | | | | | $ 665.25 | $ 665.25 |
| Subtotal for Reimbursables | | | | | | | | | $ 3,100.21 |
| Costco USA Markup | | | | | | | | | $ 310.02 |
| **Total for Reimbursables** | | | | | | | | | **$ 3,410.23** |

TSA RULE 26 DISCLOSURES
0040

05/10/2006 14:04 FAX 3038642102          GART SPORTS                    ☑010

Costco USA
Costco # 1 0977121 Sports Authority
Equipment Summary
Period Ended 03/19/06

| Equipment Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Air Mover | Ea | $ 22.50 | | | | 16 | 20 | 20 | 53 | 109 | $ 2,452.50 |
| Bobcat | Ea | $ 175.00 | | | | | | | | 0 | $ |
| Buffer, Floor | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Cart, Tilt/ Demolition | Ea | $ 20.00 | | | | 18 | | | | 18 | $ 360.00 |
| Dolly 2 Whl/ 4 Whl/ Dual Whey | Ea | $ 6.00 | | | | | 3 | | | 3 | $ 18.00 |
| Dry Cleaning Unit (Portable) | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Electrical Disc Panel (Spider Box) | Ea | $ 45.00 | | 12 | 12 | 12 | 28 | 28 | | 72 | $ 3,240.00 |
| Extension Cords (25' - 100') | Ea | $ 4.00 | | 18 | 18 | 18 | 28 | 28 | | 138 | $ 552.00 |
| Extraction Unit (Trailer) | Ea | $ 95.00 | | 4 | | 4 | 5 | 4 | 4 | 25 | $ 2,375.00 |
| Extraction Unit (Portable) | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Walk Behind) | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Ride Behind) | Ea | $ 245.00 | | | | | | | | 0 | $ |
| Fogger, Thermal (Gas Powered) | Ea | $ 45.00 | | | | | | | | 0 | $ |
| Fogger, ULV Thermal (Electric) | Ea | $ 35.00 | | 3 | | 3 | 3 | | | 12 | $ 1,760.00 |
| Generator (less than 3 kw) | Ea | $ 105.00 | | 3 | | | | | | 0 | $ |
| Generator (more than 3 kw) | Ea | $ 105.00 | | | | | | | | 0 | $ |
| HEPA Filtration Unit/ Air Scrubber | Ea | $ 8.25 | | | | | 4 | | | 21 | $ 173.25 |
| Hudson Pump Sprayer | Ea | $ 295.00 | | | | | | | | 0 | $ |
| HVAC Vacuum System | Ea | $ 12.00 | | 3 | 8 | | 5 | 5 | 4 | 28 | $ 336.00 |
| Ladder, Step/ Extension | Ea | $ 16.00 | | | | | 8 | | | 38 | $ 608.00 |
| Light, Stand/ Drop/ Stand String | Ea | $ 2.00 | | | | | 1 | | | 12 | $ 24.00 |
| Mop Bucket | Ea | $ 55.00 | | | | | | | | 6 | $ 330.00 |
| On Site Accounting Package | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Ozone Generator | Ea | $ 25.00 | | | | | | | | 22 | $ 550.00 |
| Personal Protection Package | Ea | $ 45.00 | | | | | | | | 0 | $ |
| Project Phone (Cellular) | Ea | $ 20.00 | | | | | | | | 0 | $ |
| Pump, Trash 1 - 4" | Ea | $ 16.00 | | | | | | | | 0 | $ |
| Pump, Trash 1 - 4" | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Radio, 2 way/ Job site comm. | Ea | $ 20.00 | | | | | | | | 0 | $ |
| Safety Packages | Ea | | | | | | | | | | |
| Personal Fall Protection (PFP) | Ea | $ 30.00 | | | 2 | 2 | 2 | 2 | 2 | 10 | $ 300.00 |
| Personal Protection Equipment (PPE) | Ea | $ 15.00 | | 19 | 25 | 22 | 20 | 11 | 31 | 128 | $ 1,920.00 |
| Personal Respiratory Protection (PRP) | Ea | $ 30.00 | | | | | | | | 128 | $ 1,180.00 |
| Small Tools Charge | Ea | $ 10.00 | | | | | | | | 0 | $ |
| Sprayer, Airless | Ea | $ 99.00 | | | | | | | | 0 | $ |
| Gang Box Tool | Ea | $ 65.00 | | 2 | 2 | 2 | 4 | 4 | 4 | 19 | $ 1,235.00 |
| Trailer (Freezer) | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Trailer (18' - 28') | Ea | $ 90.00 | | | | | | | | 0 | $ |
| Trailer 36' | Ea | $ 35.00 | | | | | | | | 0 | $ |
| Trailer 14'-22' | Ea | $ 105.00 | | | | | | | | 0 | $ |
| Trailer (Office Trailer) | Ea | $ 125.00 | | | | | | | 1 | 6 | $ 570.00 |
| Truck, Parking | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Truck 24 ft. | Ea | $ 245.00 | | | | | | | | 0 | $ |
| Truck 26 ft. | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Large | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Small | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Vacuum, (Anti-Static) | Ea | $ | | | | | | | | 0 | $ |
| Vacuum, HEPA | Ea | $ | | | | | 3 | | | 13 | $ 1,165.00 |
| Vacuum, PP30/ PP75 | Ea | $ 125.00 | | | | | | | 1 | 1 | $ 125.00 |
| Van, Cargo / Company Owned | Ea | $ 55.00 | | | | | | | | 4 | $ 220.00 |
| Company Owned Vehicle | Ea | $ 55.00 | | | 1 | 1 | 3 | 3 | 1 | | $ |
| Vapor Tek, Large | Ea | $ 70.00 | | | | | | | | 0 | $ |
| Vapor Tek, Small | Ea | $ 35.00 | | | | | | | | 0 | $ |
| Washer, High Pressure (Cold) | Ea | $ 75.00 | | | | | | | | 0 | $ |

| Drying Equipment Description | Unit | Daily | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Washer, High Pressure (Hot) | Ea | $ 195.00 | | | | | 0 | $ 315.00 |
| Thermo Camera | Ea | $ 225.00 | | | | | 3 | $ — |
| Dehumidification Unit - 200 cfm | Ea | $ 105.00 | | | | | 0 | $ — |
| Dehumidification Unit - 300 cfm | Ea | $ 185.00 | | | | | 0 | $ — |
| Dehumidification Unit - 1125 cfm | Ea | $ 420.00 | | | | | 0 | $ — |
| Dehumidification Unit - 2000/2250 cfm | Ea | $ 875.00 | | | | | 20 | $ 23,900.00 |
| Dehumidification Unit - 4500 cfm | Ea | $ 1,195.00 | | | | | 0 | $ — |
| Dehumidification Unit - 9000/10000 cfm | Ea | $ 1,795.00 | | | | | 0 | $ — |
| DX Unit - 20/25 Ton | Ea | $ 875.00 | | | | | 0 | $ — |
| InjectiDry Unit | Ea | $ 125.00 | | | | | 0 | $ — |

Total for Equipment                                                    $ 43,148.75

TSA RULE 26 DISCLOSURES
0042

**Cintas USA**
Contract # 1039732; Sports Authority
Consumable Summary
Period Ended 03/19/2006

| Chemical Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ 22.00 | | | | | | | | 0.0 | $ |
| Alcohol Isopropyl | Gal | $ 34.85 | | | | | | | | 0.0 | $ |
| Cleaner, Stainless Steel | Gal | $ 31.95 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Liquid) | Gal | $ 14.85 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Powder) | Lb | $ 2.50 | | | | | | | | 0.0 | $ |
| Cleaner, Glass | Gal | $ 13.00 | | | | | | | | 0.0 | $ |
| Cleaner, Hard Surface | Gal | $ | | | | | | | | 0.0 | $ |
| 815 MX (GPD) | Gal | $ 21.10 | | | | | | | | 0.0 | $ |
| General Purpose Degreaser | Gal | $ 17.25 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 11.25 | | | | | | | | 0.0 | $ |
| Hand Soap | Gal | $ 39.75 | | | | | | | | 0.0 | $ |
| Nature Sol | Gal | $ 33.00 | | | 5.0 | 5.0 | 6.0 | 6.0 | | 33.0 | $ 1,096.00 |
| Cleaner, HVAC Coil | Gal | $ | | | | | | | | 0.0 | $ |
| Deodorizer | | | | | | | | | | 0.0 | $ |
| Deodorizing Gel | Lb | $ 13.00 | | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Gal | $ 37.50 | | | | | | | | 0.0 | $ |
| Deodorizing Block | Ea | $ 45.00 | | | | | | | | 0.0 | $ |
| Disinfectant/Biocide | Gal | $ 34.25 | | | | | | | | 0.0 | $ |
| Bleach | Gal | $ 9.25 | | | | | | | | 0.0 | $ |
| Thermo Fog | Gal | $ 52.00 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 4.25 | | | | | | | | 0.0 | $ |
| Goof Off | Ea | $ 6.25 | | | | | | | | 0.0 | $ |
| Lubricant, Electrical | | $ | | | | | | | | 0.0 | $ |
| Lubricant, Penetrating | Gal | $ 23.75 | | 4.0 | 5.0 | 5.0 | 6.0 | 6.0 | | 0.0 | $ |
| Lubricant, Machinery | | $ | | | | | | | | 0.0 | $ |
| Penetrant, Light | Gal | $ 31.10 | | | | | | | | 0.0 | $ |
| Long Term Preserver, Heavy | Gal | $ 19.50 | | | | | | | | 0.0 | $ |
| Metal Polishing Paste | Ft | $ 9.65 | | | | | | | | 0.0 | $ |
| Stainless Steel Polish | Ea | $ 8.25 | | | | | | | | 0.0 | $ |
| Rust Inhibitor/Remover | | $ | | | | | | | | 0.0 | $ |
| Rust Inhibitor/Rust Remover | | $ | | | | | | | | 0.0 | $ |
| Complete Cleaner | Gal | $ 54.00 | | | | | | | | 0.0 | $ |
| Descaler | Gal | $ 59.00 | | | | | | | | 0.0 | $ |
| Sealcoat | | $ | | | | | | | | 0.0 | $ |
| Duct Sealant Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ |
| Duct Sealant, Anti-Microbial | Gal | $ 63.00 | | | | | | | | 0.0 | $ |
| Duct Sealant, Pigmented | Gal | $ 35.00 | | | | | | | | 0.0 | $ |
| Sand Sealant, Clear | Gal | $ 22.00 | | | | | | | | 0.0 | $ |
| Silver/Copper/Tile Cleaner | Ea | $ 12.00 | | 1.0 | 5.0 | 5.0 | 3.0 | 12.0 | 8.0 | 31.0 | $ 168.12 |
| Spray Adhesive | Can | $ 5.26 | | | | | | | | 0.0 | $ |

| Material Description | Unit | Rate | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bags, Acid and Static | Ea | $ 18.00 | | | | | | | | 0.0 | $ |
| Bags, Trash | Ea | $ 28.00 | | 15.0 | 15.0 | 8.0 | 13.0 | 12.0 | 10.0 | 73.0 | $ 2,044.00 |
| Bags, Trash Environmental -5ml | Ea | $ 3.95 | | | | | | | | 0.0 | $ |
| Box Back/ Freezer Dry | Ea | $ 2.65 | | | | | | | | 0.0 | $ |
| | Ea | $ 5.45 | | | | | | | | 0.0 | $ |
| Paper, Corrugated | Rl | $ 87.50 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - large | Rl | $ 10.00 | | | | | | | | 0.0 | $ |
| Brush, Dispersion - small | Ea | $ 4.00 | | | | | | | | 0.0 | $ |
| Brush, Long Handled Scrub | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Brush, New Product | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Desk, Lay Flat (250') | Rl | $ 375.00 | | | | | 6.0 | | | 6.0 | $ 2,250.00 |

05/10/2006 14:06 FAX 3038642102          GART SPORTS

| Item | Unit | Price | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (N95/P100) | Ea | $ 8.00 | | | | | | 1.0 | 0.0 | $ 392.00 |
| Dust Mask | Bx | $ 14.50 | | | | 3.0 | | | 16.0 | $ |
| Filter Material | Bu | $ 63.00 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | | 0.0 | $ |
| Filter Secondary | Ea | $ 5.80 | | | | | | | 0.0 | $ |
| Pre Filter | Ea | $ 3.75 | | | | | | | 0.0 | $ |
| Furniture Blocks | Ea | $ 7.00 | | | | | | | 0.0 | $ |
| Furniture Pads | Bx | $ 84.00 | | | | | | | 0.0 | $ |
| Gloves, Cotton | Pr | $ 1.75 | | | | | | | 0.0 | $ |
| Gloves, Cotton | Pr | $ 18.00 | | | | | | | 0.0 | $ |
| Gloves, Surgical Latex | Bx | $ 5.25 | 19.0 | 25.0 | 22.0 | 20.0 | 11.0 | 31.0 | 128.0 | $ 672.00 |
| Gloves, Wtr/V Rubber/Chemical | Pr | $ 15.00 | | | 2.0 | | | | 2.0 | $ 340.00 |
| Hog Rings | Bx | $ 95.00 | | | | 6.0 | 2.0 | 4.0 | 0.0 | $ |
| Inventory Tags | Bx | $ 5.25 | | | | | | | 13.0 | $ 63.00 |
| Mop Heads | Ea | $ 20.00 | | 2.0 | 1.0 | 2.0 | 2.0 | | 24.0 | $ |
| Non Conduct Sprinklers, green (#90) | Bx | $ 72.00 | 1.0 | | | | 10.0 | 8.0 | 24.0 | $ 1,728.00 |
| Plastic Sheeting (20'X100') | Rl | $ 18.25 | | | | | | | 0.0 | $ |
| Quick Test Strips (per 30) | Pkg | $ 24.00 | | | | | | | 0.0 | $ |
| Sponges, Soot Removal | Ea | $ 9.00 | | | | | | | 0.0 | $ |
| Spray Bottle w/ Trigger | Ea | $ 3.95 | 5.0 | 10.0 | 6.0 | 5.0 | 15.0 | 13.0 | 54.0 | $ 359.00 |
| Tape, Duct | Rl | $ 7.00 | | | | | | | | $ |

| Item | Unit | Price | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | R1 | $ 8.75 | | | | | | | 0.0 | $ |
| Tape, HVAC (Aluminum) | R1 | $ 21.60 | | | | | | | 0.0 | $ |
| Tape, Poly Box | R1 | $ 0.60 | | | | | | | 0.0 | $ |
| Tarps | R1 | $ 7.25 | | | | | | | 0.0 | $ |
| Drysk Stils | B4 | $ 1.25 | | | | | | | 0.0 | $ |
| Wipes Cotton Cloth | L5 | $ 4.35 | | | | | | | 0.0 | $ |
| Wipes Lint Free | Bx | $ 25.00 | 150 | | 25.0 | 25.0 | 25.0 | 25.0 | 150.0 | $ 652.50 |
| Wipes Shop | R1 | $ 72.00 | | | | | | | 0.0 | $ |
| Wipes Wipe All | R1 | $ 9.00 | | | | | | | 0.0 | $ |
| Wrap, Bubble/Anti Static | R1 | $ 64.75 | | | | | | | 0.0 | $ |
| Wrap Shrink | R1 | $ 48.00 | | | | | | | 0.0 | $ |

**Total for Consumables**    $ 9,494.82

| Item | | Mon 03/13 | Tues 03/14 | Wed 03/15 | Thurs 03/16 | Fri 03/17 | Sat 03/18 | Sun 03/19 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Cintas USA | | $ 149.09 | | | | | | | $ 149.09 |
| Contract # 1403/7214 Sports Authority | | | | | | | | | |
| Vendors (Subcontractors) Summary | | | | | | | | | |
| Period Ended 03/19/06 | | | | | | | | | |
| Unscheduled Materials (Petty Cash & Credit Card Control) | | | $ 46.28 | | | | | | $ 46.28 |
| Vass Truck Pool - Fuel | | | $ 41.99 | | | | | | $ 41.99 |
| IHI Shop - Fuel | | | | $ 16.14 | | | | | $ 16.14 |
| Lowes - Supplies | | | | | $ 49.22 | | | | $ 49.22 |
| Lowes - Supplies | | | | | | $ 37.31 | | | $ 37.31 |
| Lowes - Supplies | | | | | | | $ 13.75 | | $ 13.75 |
| Office Depot-Supplies | | | | | | | 63.50 | | $ 63.50 |
| Lowes - Supplies | | | | | | | 7,437.42 | | $ 7,437.42 |
| Thantton - Fuel | | | | | | | | 5,486.00 | $ 5,486.00 |
| Morgan Distributing Inc - Fuel Bx Generation | | | | | | | | 1,063.92 | $ 1,063.92 |
| Waste Management - Dumpsters(14) | | | | | | | | 4,786.50 | $ 4,786.50 |
| Sunbelt - Lull | | | | | | | | 2,335.59 | $ 2,335.59 |
| Mobile Mini Inc - 3 Storage Containers for 6 Months | | | | | | | | 1,659.00 | $ 1,659.00 |
| Sunbelt - Gas Floor Stripper | | | | | | | | 1,659.00 | $ 1,659.00 |
| Sunbelt - 30' Articulate Narrows Jib Boom Lift | | | | | | | | 270.30 | $ 270.30 |
| Sunbelt - 1 Light Tower | | | | | | | | 3,564.00 | $ 3,564.00 |
| Sunbelt - (2) 96kW Generators | | | | | | | | 3,591.00 | $ 3,591.00 |
| Sunbelt - Distribution Cable | | | | | | | | 6,000.00 | $ 6,000.00 |
| Sunbelt - 320kW Generator | | | | | | | | 6,000.00 | $ 6,000.00 |
| Sunbelt - 320kW Generator | | | | | | | | 382.00 | $ 382.00 |
| Sunbelt - 320kW Generator | | | | | | | | 1,039.00 | $ 1,039.00 |
| Sunbelt - 2 Electric Walk Behind Floor Strippers | | | | | | | | 7,500.00 | $ 7,500.00 |
| Iowa Plumbing | | | | | | | | | |
| EFI - Structural Inspection | | | | | | | | | |

TSA RULE 26 DISCLOSURES
0045

| | |
|---|---|
| Subtotal for Vendors (Subcontractors) | $ 51,545.21 |
| Cotton USA Markup | $ 10,824.49 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| **Total for Vendors (Subcontractors)** | $ 62,369.70 |

TSA RULE 26 DISCLOSURES
0046

05/10/2006 14:06 FAX 3038642102    GART SPORTS    ☒016

**Costco USA**
**Contract # 1048721 Sports Authority**
**Labor Summary**
**Period Ended 03/26/06**

| Name | Classification | Rate type | Sub Rate / O/T Prem | Mon 03/20 | Tue 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kiser, Jeff | Project Coordinator | Travel $ | 95.00 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 95.00 | | | | 4 | | | | 4.0 | $ 380.00 |
| | | Overtime $ | 142.50 | | | | | | | | 0.0 | $ - |
| Genz, Bruce | Project Manager | Travel $ | 80.00 | | | | | | | | | |
| | | Regular $ | 80.00 | 13 | 10 | 7 | 6 | | | | 36.0 | $ 2,880.00 |
| | | Overtime $ | 120.00 | | | | | | | | | $ 3,000.00 |
| Carillo, Phillip | Asst. Project Manager | Travel $ | 75.00 | | | | | | | | | |
| | | Regular $ | 75.00 | 13 | | 11 | | | | | | |
| | | Overtime $ | 112.50 | | | | | | | | 5.0 | $ 562.50 |
| Parsons, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ - |
| Passey, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ - |
| Linehan, Bud | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 45.00 | | | 11 | | | | | 40.0 | $ 1,800.00 |
| | | Overtime $ | 67.50 | | | | | | | | 3.0 | $ 202.50 |
| Buskin, Mike | Restoration Supervisor | Travel $ | 45.00 | 11 | 10 | | 8 | | | | 0.0 | $ - |
| | | Regular $ | 45.00 | | | | 3 | | | | 11.0 | $ - |
| | | Overtime $ | 67.50 | | | | | | | | | |
| Babich, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 45.00 | | | | | | | | 11.0 | $ 495.00 |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ - |
| DiAngelo, Jeffrey | Skilled Labor | Travel $ | 28.50 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 28.50 | 10 | 9 | | | | | | 19.0 | $ 541.50 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| King, Rachel | Skilled Labor | Travel $ | 28.50 | | | | | | | | 0.0 | $ - |
| | | Regular $ | 28.50 | | 9 | 9 | 10 | | | | 37.0 | $ 1,051.50 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| Sakata, John | Skilled Labor | Regular $ | 28.50 | | | | | | | | 22.5 | $ 840.75 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| Brown, Tomie | Skilled Labor | Regular $ | 28.50 | 10 | 9 | 10.5 | | | | | 29.5 | |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | 10 | | 10.5 | 10 | | | | 39.5 | $ 1,125.75 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| Bloomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ - |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |
| Hollenback, Russell | Skilled Labor | Regular $ | 28.50 | 10 | | | | | | | 10.0 | $ 385.00 |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ - |

TSA RULE 26 DISCLOSURES
0047

05/10/2006 14:06 FAX 3038842102    GART SPORTS    ☑ 017

| Name | Skilled Labor | Regular $ | Overtime $ | | | | | | $ | $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Hammers, Ralph | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | 8.25 | | | | | 17.3 / 0.0 | 491.63 |
| Seaton, Al | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | | | | | | 0.0 | |
| Dabbs, David | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | 9 | | | | | 9.0 / 0.0 | 256.50 |
| Williams, David | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | 9 | | | | | 9.0 / 0.0 | 256.50 |
| Williams, Van | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | | | | 10 | | 10.0 / 0.0 | 285.00 |
| Sykes, Andre | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | 10 | | | | | 10.0 / 0.0 | 285.00 |
| Coulton, Isacca | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | | | 10.5 | | | 10.0 / 0.0 | 285.00 |
| Cole, Milton | Skilled Labor | Regular $ 28.50 | Overtime $ 42.73 | 9.5 | 9 | 10.5 | | | 39.0 / 0.0 | 1,111.50 |
| Gonzalez, David | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 10 | | | | | 10.0 / 0.0 | 285.00 |
| Wilkins, Phillip | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 9 | | | | | 9.0 / 0.0 | 256.50 |
| Poppas, Nick | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 10 | 9 | 10.5 | | | 29.5 / 0.0 | 840.75 |
| Gains, Terrance | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 9.5 | | | | | 9.5 / 0.0 | 270.75 |
| Reed, Corrie | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 9 | 9 | 9 | 10 | | 37.0 / 0.0 | 1,054.50 |
| Oller, Steven | Skilled Labor | Regular $ 28.50 | Overtime $ 42.74 | 9 | | | | | 9.0 / 0.0 | 256.50 |
| McEleney, Eric | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 8.5 | 9 | 10.5 | 5.5 | | 33.5 / 0.0 | 955.71 |
| Sions, Victor | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 8.5 | | | | | 8.5 / 0.0 | 242.25 |
| Lambridge, Annie | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | 10 | | | | | 10.0 / 0.0 | 285.00 |
| King, Roy | Skilled Labor | Regular $ 28.50 | Overtime $ 42.71 | | 9 | | | | 19.5 / 0.0 | 555.75 |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | 0.0 / 0.0 | |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | 0.0 / 0.0 | |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | | | | | 0.0 / 0.0 | |

GART SPORTS

05/10/2006 14:07 FAX 3038642102    ☑ 018

| Name | Skilled Labor | Regular $ | Overtime $ | | | | | | | | | | |
|------|---------------|-----------|------------|--|--|--|--|--|--|--|--|--|--|
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | 0.0 | $ | | | |
| Name | Skilled Labor | 28.50 | 42.75 | | | | | | | | | | |

| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | $ | |
|------|---------------|-----------|-------|---|---|---|---|---|---|---|---|---|---|-----|---|---|
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | $ | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | | | | 0.0 | $ | |
| | | Overtime $ | 42.75 | | | | | | | | | | | 0.0 | $ | |

05/10/2006 14:08 FAX 3038542102     GART SPORTS

| Name | | | | | | | | | | | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Skilled Labor Regular $ | 28.50 | | | | | | | | 0.0 | |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Name | | | | | | | | | | | |
| | Skilled Labor Regular $ | 28.50 | | | | | | | | 0.0 | |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Name | | | | | | | | | | | |
| | Skilled Labor Regular $ | 28.50 | | | | | | | | 0.0 | |
| | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Labor Ready | | | | | | | | | | | |
| | Temporary Labor Regular $ | 17.58 | | | | | | | | 0.0 | |
| | Overtime $ | 26.37 | | | | | | | | 0.0 | |
| Total Personnel | Client Name | | | | | | | | | | |
| Management Fee | | | | | | | | | | | |
| Labor Totals | | | | | | | | | | $ | 10,655.18 |

TSA RULE 26 DISCLOSURES
0051

**Cotton USA**
**Contract # 140837J; Sports Authority**
**Reimbursable Summary**
**Period Ended 03/24/06**

| | | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gast, Bruce | perdiem | | | | | | | | $ 110.00 |
| | hotel | $ 30.00 | $ 30.00 | $30 | $ 30.00 | $ 30.00 | $ 30.00 | | $ 312.40 |
| | airfare | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 253.30 | $ 78.10 | | $ 253.30 |
| Casillo, Phillip | perdiem | | | | | | | | $ 180.00 |
| | hotel | $ 30.00 | $ 30.00 | $30 | $ 30.00 | $ 30.00 | $ 30.00 | | $ 468.60 |
| | airfare | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | |
| Parsons, Shannon | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Buslik, Minor | perdiem | | | | | | | | $ 150.00 |
| | hotel | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | | | | $ 590.50 |
| | airfare | $ 78.10 | $ 78.10 | $ 78.10 | $ 78.10 | | | | |
| Butler, Luke | perdiem | | | | | | | | $ 30.00 |
| | hotel | $ 30.00 | $ 30.00 | | | | | | $ 78.10 |
| | airfare | $ 78.10 | $ 78.10 | | | | | | |
| Heichman, Bud | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Hertz Rental | | | | | | | | | |
| Subtotal for Reimbursables | | | | | | | | | $ 1,982.90 |
| Cotton USA Markup | | | | | | | | | $ 198.29 |
| Total for Reimbursables | | | | | | | | | $ 2,181.19 |

TSA RULE 26 DISCLOSURES
0052

GART SPORTS

05/10/2006 14:08 FAX 3038642102    ☒ 022

**Cabras USA**
**Contract # 140872/Sports Authority**
**Equipment Summary**
**Period Ended 03/26/06**

| Equipment Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $91.00 | | | | | | | | 0 | |
| Air Mover | Ea | $22.50 | 53 | 55 | 55 | 55 | 55 | | | 273 | 6,142.50 |
| Bobcat | Ea | $111.00 | | | | | | | | 0 | |
| Buffer, Floor | Ea | $30.00 | 3 | 1 | 1 | 2 | | | | 10 | 200.00 |
| Cart, 11W Demolition | Ea | $20.00 | | | | | | | | 4 | 24.00 |
| Daily, 3-WAY 4-WAY Drag/Wallsaw | Ea | $6.00 | | | | | | | | | |
| Dry Cleaning Unit (Portable) | Ea | $85.00 | | | | | | | | | |
| Electrical Disk Panel (Gisder Box) | Ea | $45.00 | 12 | 12 | 12 | 12 | | | | 48 | 2,160.00 |
| Extension Cords (25'-100') | Ea | $4.00 | 28 | 28 | 28 | 31 | | | | 119 | 476.00 |
| Extraction Disk (Portable) | Ea | $95.00 | | | | | | | | 2 | 190.00 |
| Extraction Unit (Trailer) | Ea | $185.00 | | | | | | | | 0 | |
| Floor Cleaning System (Walk Behind) | Ea | $185.00 | | | | | | | | 0 | |
| Fogger, Thermal (Gas Powered) | Ea | $45.00 | | | | | | | | 0 | |
| Fogger, ULV/Thermal (Electric) | Ea | $35.00 | | | | | | | | 0 | |
| Generator (less than 10kw) | Ea | $105.00 | | | | | | | | 0 | |
| HEPA Rinsing Unit/ Air Scrubber | Ea | $103.00 | | | | | | | | 0 | 66.00 |
| Hudson Power Sprayer | Ea | $8.25 | 4 | | | | | | | 8 | |
| HVAC Vacuum System | Ea | $295.00 | | | | 2 | | | | 19 | 228.00 |
| Ladder, Step/Extension | Ea | $12.00 | 4 | | | 4 | 2 | | | 8 | 96.00 |
| Light, Demo/ Dust Stand String | Ea | $16.00 | 4 | 4 | 5 | 4 | | | | 17 | 314.00 |
| Mop Bucket | Ea | $2.00 | 1 | 1 | 1 | 1 | 1 | | | 275.00 | |
| On Site Accounting Package | Ea | $55.00 | | | | | | | | | |
| Ozone Generator | Ea | $125.00 | | | | | | | | 13 | 335.00 |
| Project Phone (Cellular) | Ea | $25.00 | 3 | 3 | 2 | 5 | | | | | |
| Pump, Sump | Ea | $20.00 | | | | | | | | 0 | |
| Pump, Trash 2"-4" | Ea | $65.00 | | | | | | | | 0 | |
| Radio, 2-Way + 4 site comm. | Ea | $20.00 | | | | | | | | 0 | |
| Safety Package 1 (Required) | Ea | | | 2 | 2 | 2 | | | | 10 | 650.00 |
| Safety Roll Protection (PEP) | Ea | $30.00 | | | | | | | | 0 | |
| Personal Protection Equipment (PEP) | Ea | $30.00 | 23 | 12 | 10 | 7 | 9 | | | 52 | 520.00 |
| Personal Respiratory Protection (PRP) | Ea | $10.00 | | | | | | | | 0 | |
| Small Tools Charge | Ea | $90.00 | | | | | | | | 10 | 915.00 |
| Sprayer, Airless | Ea | $65.00 | 4 | | | | | | | 6 | 180.00 |
| Gang Box Tool | Ea | $125.00 | | | | | | | | 0 | |
| Truck (Pulling) | Ea | $65.00 | | | | | | | | 0 | |
| Truck, 24 ft | Ea | $95.00 | | | | | | | | 0 | |
| Trailer (Office Trailer) | Ea | $125.00 | | | | | | | | 0 | 475.00 |
| Trailer (28'-53') | Ea | $60.00 | | | | | | | | 0 | |
| Trailer 48' | Ea | $55.00 | | | | | | | | 0 | |
| Trailer 24'-42' | Ea | $105.00 | | | | | | | | 0 | |
| Ultrasonic Bath, Large | Ea | $125.00 | | 6 | 6 | 6 | | | | 26 | 2,110.00 |
| Ultrasonic Bath, Small | Ea | $85.00 | 8 | | | | | | | | |
| Vacuum (Anti-Static) | Ea | $25.00 | | | | | | | | 0 | |
| Vacuum, HEPA | Ea | $85.00 | | | | | | | | 5 | |
| Vacuum, WET/DRY | Ea | $25.00 | | | | | | | | 0 | |
| Van, Cargo / Company Owned | Ea | $125.00 | | | | | | | | 5 | 275.00 |
| Company Owned Vehicle | Ea | $55.00 | | | | | | | | 5 | |
| Vapor Tek, Small | Ea | $55.00 | | | | | | | | 0 | |
| Vapor Tek, Large | Ea | $70.00 | | | | | | | | 0 | |
| Washer, High Pressure (Cold) | Ea | $75.00 | | | | | | | | 0 | |

TSA RULE 26 DISCLOSURES
0053

| Dry-Ice Equipment Description | Unit | Daily | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Water, High Pressure (Hot) | Ea | $ 195.00 | 0 | | | | | | $ |
| Thermo Camera | Ea | $ 225.00 | 139 | | | | | | $ 1,995.00 |
| Dehumidification Unit - 200 cfm | Ea | $ 105.00 | 0 | | | | | | $ |
| Dehumidification Unit - 300 cfm | Ea | $ 185.00 | 0 | | | | | | $ |
| Dehumidification Unit - 1121 cfm | Ea | $ 420.00 | 0 | | | | | | $ |
| Dehumidification Unit - 1121 cfm | Ea | $ 877.00 | 20 | | | | | | $ 23,900.00 |
| Dehumidification Unit - 2000/2250 cfm | Ea | $ 1,195.00 | 0 | | | | | | $ |
| Dehumidification Unit - 4500 cfm | Ea | $ 1,795.00 | 0 | | | | | | $ |
| Dehumidification Unit - 9000/10000 cfm | Ea | $ 873.00 | 0 | | | | | | $ |
| DX Unit - 20/25 Ton | Ea | $ 125.00 | 0 | | | | | | $ |
| Injectidry Unit | | | | | | | | | |
| Total for Equipment | | | | | | | | | $ 41,356.59 |

TSA RULE 26 DISCLOSURES
0054

Corpus USA
Contract #168/3124 Sports Authority
Commodities Summary
Period Ended 03/26/06

| Chemical Description | Unit | Rate | Mon 03/20 | Tues 03/21 | Wed 03/22 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ 77.00 | | | | | | | | 0.0 | $ |
| Alcohol, Isopropyl | Gal | $ 14.85 | | | | | | | | 0.0 | $ |
| Cleaner, Stainless Steel | Gal | $ 32.00 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Liquid) | Gal | $ 17.95 | | | | | | | | 0.0 | $ |
| Cleaner, Carpet (Powder) | Lb | $ 2.30 | | | | | | | | 0.0 | $ |
| Cleaner, Glass | Gal | $ 11.00 | | | | | 1.0 | | | 1.0 | $ 22.10 |
| Cleaner, Hard Surface | | $ | | | | | | | | 0.0 | $ |
| General Purpose Degreaser | Gal | $ 17.21 | | | | | | | | 0.0 | $ |
| 13 LX (GED) | Gal | $ 11.21 | | | | | | | | 0.0 | $ |
| Dish Soap | Gal | $ 59.73 | | | | | | | | 0.0 | $ |
| Nature Sol | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Cleaner, HVAC Coil | | $ | | | | | | | | 0.0 | $ |
| Deodorizer | Lb | $ 13.00 | | | | | | | | 0.0 | $ |
| Deodorizing Gel | Gal | $ 37.50 | | | | | | | | 0.0 | $ |
| Deodorizing Liquid | Ea | $ 43.00 | 4.0 | | 4.0 | 15.0 | | | | 18.0 | $ 959.00 |
| Deodorizing Block | Ea | $ 3.425 | | | | | | | | 0.0 | $ |
| Disinfectant/Biocide | Gal | $ 2.75 | | 5.0 | | 1.0 | | | | 1.0 | $ 2.75 |
| Bleach | Gal | $ 51.00 | | | | | | | | 0.0 | $ |
| Thermo Fog | Gal | $ 5.53 | | | | | | | | 0.0 | $ |
| Furniture Polish | Ea | $ 6.25 | | | | | | | | 0.0 | $ |
| Goof Off | | $ | | | | | | | | 0.0 | $ |
| Lubricant, Electrical | | $ | | | | | | | | 0.0 | $ |
| Lubricant (chemical) | | $ | | | | | | | | 0.0 | $ |
| Lubricant, Machinery | Gal | $ 91.10 | | | | | | | | 0.0 | $ |
| Preserver, light | Gal | $ 19.50 | | | | | | | | 0.0 | $ |
| Preserver, Heavy | Pt | $ 9.65 | | | | | | | | 0.0 | $ |
| Long Term Preserve, Heavy | Ea | $ 8.55 | | | | | | | | 0.0 | $ |
| Metal Polishing Paste | | $ | | | | | | | | 0.0 | $ |
| Stainless Steel Polish | | $ | | | | | | | | 0.0 | $ |
| Rust Inhibitor/Remover | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Complete Cleaner | Gal | $ 39.00 | | | | | | | | 0.0 | $ |
| Degreaser | | $ | | | | | | | | 0.0 | $ |
| Sealgrey | | $ | | | | | | | | 0.0 | $ |
| Dust Sealant Spray | Gal | $ 41.00 | | | | | | | | 0.0 | $ |
| Dust Sealant, Antifungicial | Gal | $ 65.00 | | | | | | | | 0.0 | $ |
| Soot Sealant, Pigmented | Gal | $ 33.00 | | | | | | | | 0.0 | $ |
| Soot Sealant, Clear | Gal | $ 22.00 | | | | | | | | 0.0 | $ |
| Silver Copper/Tin/ Cleaner | Pt | $ 12.00 | | | | | | | | 0.0 | $ |
| Surgy Adhesive | Cup | $ 5.26 | | | | | 8.0 | | | 2.0 | $ 10.52 |

| Metal Description | Unit | Rate | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bag, Anti Static | Ea | $ 3.00 | | 2.0 | | | | | | 16.0 | $ 418.00 |
| Bag, Trash | Ea | $ 28.00 | | | | | | | | 0.0 | $ |
| Bag, Trash Reinforced - Sml | Ea | $ 1.95 | | | | | | | | 0.0 | $ |
| Box, Body/ Freeze Dry | Ea | $ 5.41 | | | | | | | | 0.0 | $ |
| Box, Dish Pack | Ea | $ 87.50 | | | | | | | | 0.0 | $ |
| Paper, Corrugated | Ea | $ 10.00 | | | | | | | | 0.0 | $ |
| Brush, Disposable - large | Ea | $ 4.90 | | | | | | | | 0.0 | $ |
| Brush, Disposable - small | Ea | $ 4.90 | | | | | | | | 0.0 | $ |
| Brush, Long Handle/ Scrub | Ea | $ 8.00 | | | | | | | | 0.0 | $ |
| Brush, Stiff Cleaning | Ea | $ | | | | | | | | 0.0 | $ |
| Duct Lay Flat (100') | Rl | $ 575.00 | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0055

05/10/2006 14:09 FAX 3038642102          GART SPORTS

☑ 025

E-FILED
Monday, 31 December, 2007  03:45:27 PM
Clerk, U.S. District Court, ILCD

| Item | Unit | $ | | | | | | | $ | |
|---|---|---|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (0895P100) | Ea | $ 8.00 | 2.0 | | 3.0 | | | 0.0 | $ | 196.00 |
| Dust Mask | Bx | $ 24.50 | | | | | | 8.0 | $ | . |
| Filter Material | Bl | $ 6.00 | | | | | | 0.0 | $ | . |
| Filter Secondary | Bl | $ 4.80 | | | | | | 0.0 | $ | . |
| Pre Filter | Bl | $ 3.75 | | | | | | 0.0 | $ | . |
| Furniture Blocks | Bx | $ 77.00 | | | | | | 0.0 | $ | . |
| Furniture Pads | Bx | $ 84.00 | | | | | | 0.0 | $ | . |
| Gloves, Cotton | Pc | $ 1.75 | | | 1.0 | | | 1.0 | $ | 18.00 |
| Gloves, Surgical Latex | Pr | $ 11.75 | | | 100.0 | | | 64.0 | $ | 335.00 |
| Gloves, Work/ Rubber/ Chemical | Bx | $ 118.00 | 12.0 | | | 10.0 | 9.0 | 64.0 | $ | . |
| Hog Rings | Ft | $ 4.13 | | | | | | 0.0 | $ | . |
| Inventory Tags | Bx | $ 15.00 | | | | | | 0.0 | $ | . |
| Mop Heads | Bx | $ 95.00 | 4.0 | 3.0 | 5.0 | | | 15.0 | $ | 18.75 |
| Neat Combust Scrubbers, Razor (6PK) | Bx | $ 5.25 | | | 2.0 | | | 5.0 | $ | 360.00 |
| Plastic Sheeting (20'X100') | Bl | $ 20.00 | 3.0 | | | | | 0.0 | $ | . |
| Rainbow Plastic (3mil) | Rl | $ 18.75 | | | | | | 0.0 | $ | . |
| Quick Test Strips (Box 50) | Pkg | $ 24.00 | | | | | | 0.0 | $ | . |
| Spopless Sock Removal | Ea | $ 1.80 | | | | | | 0.0 | $ | . |
| Spray Bottle w/ Trigger | Ea | $ 3.95 | | | 2.0 | 1.0 | | 8.0 | $ | 56.00 |
| Tape, Duct | Rl | $ 7.00 | 5.0 | | | | | | $ | . |

05/10/2006 14:08 FAX 3038642102

| Item | | | Mon 03/10 | Tues 03/21 | Wed 03/23 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| Tape, Blue | BI | $ 8.75 | 1.0 | | | 1.0 | | | | $ 8.75 |
| Tape, HVAC (Aluminum) | BI | $ 21.00 | 0.0 | | | | | | 0.0 | |
| Tape, Poly Box | BI | $ 2.60 | 0.0 | | | | | | 0.0 | |
| Paper | SH | $ 0.26 | 0.0 | | | | | | 0.0 | |
| Tyvek Suits | Ea | $ 7.35 | 25.0 | 25.0 | 25.0 | 50.0 | | | 125.0 | $ 545.15 |
| Wipes, Cotton Cloth | Lb | $ 4.55 | | | | | | | 0.0 | |
| Wipes, Lint Free | Bx | $ 23.00 | | | | | | | 0.0 | |
| Wipes, Stge | Ro | $ 72.60 | | | | | | | 0.0 | |
| Wipes, Wipe All | Pkg | $ 9.00 | | | | | | | 0.0 | |
| Wipes, Buffalo And Safic | Ro | $ 64.73 | | | | | | | 0.0 | |
| Wrap, Shrink | Ro | $ 48.00 | | | | | | | 0.0 | |
| Total for Consumables | | $ | | | | | | | | $ |

Carbon USA
Contract # 1408711; Sports Authority
Vendran (Subcontractor) Summary
Period Ended 03/26/06

| | Mon 03/10 | Tues 03/21 | Wed 03/23 | Thurs 03/23 | Fri 03/24 | Sat 03/25 | Sun 03/26 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Distributed Materials (Petty Cash & Credit Card Control) | $ 13.01 | $ 7.31 | $ 7.79 | $ 73.99 | $ 1.86 | | | $ 13.01 |
| Thurlotant - Red | | | | | | | | $ 7.31 |
| Lopez - Supplies | | | | | | | | $ 7.79 |
| Lowen - Supplies | | | | | | | | $ 73.99 |
| Thornton - Fuel | | | | | | | | $ 1.86 |
| FedEx - Shipping | | | | | | | | $ |

T&A RULE 26 DISCLOSURES
0057

05/10/2006 14:10 FAX 3038542102        BART SPORTS                    ☑ 027

| | | |
|---|---|---|
| Subtotal for Vendors (Subcontractors) | $ | 108.96 |
| Calico USA Markup | $ | 21.83 |
| Total for Vendors (Subcontractors) | $ | 145.79 |

TSA RULE 26 DISCLOSURES
0058

05/10/2005 14:10 FAX 3038642102    GART SPORTS    ☑028

Colisa USA
Contract # 160B721 Sports Authority
Labor Summary
Period Ended 04/02/06

| Name | Classification | | Sth. Rate O/T Prem | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Hours | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kinne, Jeff | Project Coordinator | Travel $ | 95.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 95.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 142.50 | | | | | | | | 0.0 | $ |
| Gear, Bruce | Project Manager | Travel $ | 80.00 | | 6 | | | | | | 6.0 | 480.00 |
| | | Regular $ | 80.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 120.00 | | | | | | | | 0.0 | $ |
| Casillo, Phillip | Asst. Project Manger | Travel $ | 75.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 75.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 112.50 | | | | | | | | 0.0 | $ |
| Pearson, Shannon | Restoration Supervisor | Travel $ | 45.00 | | 16.5 | 8 | 5 | | | | 29.5 | 1,327.50 |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Pearson, Shannon | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Hutchens, Bud | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Bostick, Minor | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Entsing, Luke | Restoration Supervisor | Travel $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Regular $ | 45.00 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 67.50 | | | | | | | | 0.0 | $ |
| Dillingsly, Jeffery | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| King, Rachel | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Scheile, John | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.73 | | | | | | | | 0.0 | $ |
| Brown, Tuamiie | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.73 | | | | | | | | 0.0 | $ |
| McDougal, James | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Bloomfield, Arthur | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |
| Shiltebaak, Russell | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | $ |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0059

05/10/2008 14:10 FAX 3038642102    WART SPORTS    ☒ 029

| Name | | Regular $ | Overtime $ |
|------|------|------|------|
| Hammers, Ralph | Skilled Labor | 28.50 | 42.75 |
| Seaton, Al | Skilled Labor | 28.50 | 42.75 |
| Dahlin, David | Skilled Labor | 28.50 | 42.75 |
| Williams, Van | Skilled Labor | 28.50 | 42.75 |
| Sykes, Andre | Skilled Labor | 28.50 | 42.75 |
| Graham, Jason | Skilled Labor | 28.50 | 42.75 |
| Cole, Milton | Skilled Labor | 28.50 | 42.75 |
| Gonzalez, David | Skilled Labor | 28.50 | 42.75 |
| Williams, Phillip | Skilled Labor | 28.50 | 42.75 |
| Fuqua, Nick | Skilled Labor | 28.50 | 42.75 |
| Gaite, Terrance | Skilled Labor | 28.50 | 42.75 |
| Reed, Chris | Skilled Labor | 28.50 | 42.75 |
| Oltz, Steven | Skilled Labor | 28.50 | 42.75 |
| McKinney, Eric | Skilled Labor | 28.50 | 42.75 |
| Shoot, Victor | Skilled Labor | 28.50 | 42.75 |
| Lethridge, Aaron | Skilled Labor | 28.50 | 42.75 |
| King, Roy | Skilled Labor | 28.50 | 42.75 |
| Name | Skilled Labor | 28.50 | 42.75 |
| Name | Skilled Labor | 28.50 | 42.75 |
| Name | Skilled Labor | 28.50 | 42.75 |

TSA RULE 26 DISCLOSURES
0060

| Name | | Skilled Labor | | |
|------|--|--------------|--|--|
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |
| Name | | Skilled Labor | Regular $ | 28.50 |
| | | | Overtime $ | 42.75 |

TSA. RULE 26 DISCLOSURES
0061

05/10/2006 14:11 FAX 3038642102
GART SPORTS
☐031

| Name | Skilled Labor | Regular $ | Overtime $ | | | |
|---|---|---|---|---|---|---|
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |
| Name | Skilled Labor | Regular $ 28.50 | Overtime $ 42.75 | | 0.0 | $ |

TSA RULE 26 DISCLOSURES
0062

| Name | Skilled Labor | Regular $ | | | | | | | | | $ | |
| | | Overtime $ | | | | | | | | | | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Name | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| | Skilled Labor | Regular $ | 28.50 | | | | | | | | 0.0 | |
| | | Overtime $ | 42.75 | | | | | | | | 0.0 | |
| Labor Ready | Temporary Labor | Regular $ | 17.58 | | | | | | | | 0.0 | |
| | | Overtime $ | 26.37 | | | | | | | | 0.0 | |
| | Official Name | | | | | | | | | | 0 | |
| Management Fee | | | | | | | | | | | | |
| Total Prorated | | | | | | | | | | | | |
| Labor Totals | | | | | | | | | | | $ | 1,397.50 |

TSA RULE 26 DISCLOSURES
0063

**Cutas USA**
**Contract # 14087721 Speech Authority**
**Reimbursable Summary**
**Period Ended 04/2006**

| | | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/01 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Gray, Bruce | perdiem | $ 30.00 | | | | | | | $ 30.00 |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Castillo, Phillip | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Parsons, Shannon | perdiem | | $ 30.00 | $ 30.00 | | | | | 60.00 |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Brodik, Edgar | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Rubin, Luke | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Lindstrom, Bud | perdiem | | | | | | | | |
| | hotel | | | | | | | | |
| | airfare | | | | | | | | |
| Hertz Rental | | | | | | | | | 90.00 |
| Subtotal for Reimbursables | | | | | | | | | 9.00 |
| Cutas USA Markup | | | | | | | | | |
| Total for Reimbursables | | | | | | | | | 99.00 |

TSA RULE 26 DISCLOSURES
0064

05/10/2006 14:11 FAX 3038642102          GART SPORTS          Ø034

Cartwa USA
Contract # 4087121 Sports Authority
Equipment Summary
Period Ended 04/02/06

| Equipment Description | Unit | Rate | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Compressor | Ea | $ 90.00 | | | | | | | | 0 | $ |
| Air Mover | Ea | $ 22.50 | | | | | | | | 0 | $ |
| Bobcat | Ea | $ 175.00 | | | | | | | | 0 | $ |
| Buffer, Floor | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Can, HEV Demolition | Ea | $ 20.00 | | | | | | | | 0 | $ |
| Dolly, 2 Whl/ 4 Whl Furn/ Wallsaw | Ea | $ 6.00 | | | | | | | | 0 | $ |
| Dry Cleaning Unit (Portable) | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Electrical Dist Panel (Spider Box) | Ea | $ 45.00 | | | | | | | | 0 | $ |
| Extension Cords (25' - 100') | Ea | $ 4.00 | | | | | | | | 0 | $ |
| Extraction Unit (Portable) | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Extraction Unit (Truck) | Ea | $ 185.00 | | | | | | | | 0 | $ |
| Floor Cleaning System (Walk Behind) | Ea | $ 185.00 | | | | | | | | 0 | $ |
| Fogger, Thermal (Gas Powered) | Ea | $ 45.00 | | | | | | | | 0 | $ |
| Fogger, ULV/ Thermal (Electric) | Ea | $ 25.00 | | | | | | | | 0 | $ |
| Generator (less than 10kw) | Ea | $ 100.00 | | | | | | | | 0 | $ |
| HEPA Filtration Unit / Air Scrubber | Ea | $ 109.00 | | | | | | | | 0 | $ |
| Hudson Pump Sprayer | Ea | $ 8.21 | | | | | | | | 0 | $ |
| HVAC Vacuum System | Ea | $ 295.00 | | | | | | | | 0 | $ |
| Ladder, Step Extension | Ea | $ 12.00 | | | | | | | | 0 | $ |
| Light, Deour Drop Stand/ SHM | Ea | $ 16.00 | | | | | | | | 0 | $ |
| Mop Bucket | Ea | $ 2.00 | | | | | | | | 0 | $ |
| On Site Accounting Package | Ea | $ 155.00 | | | | | | | | 0 | $ |
| Ozone Generator | Ea | $ 25.00 | | | | | | | | 0 | $ |
| Project Trailer (Climate) | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Pump Siphon | Ea | $ 10.00 | | | | | | | | 0 | $ |
| Ram Jet 2 way - Job site comm | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Safety Package? | Ea | | | | | | | | | 0 | $ |
| Personal Fall Protection (PFP) | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Personal Protection Equipment (PPE) | Ea | $ 15.00 | | | | | | | | 0 | $ |
| Personal Respiratory Protection (RLP) | Ea | $ 30.00 | | | | | | | | 0 | $ |
| Small Tools Charge | Ea | $ 90.00 | | | | | | | | 0 | $ |
| Sprayer, Airless | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Squeege | Ea | | | | | | | | | 0 | $ |
| Trailer (Office Trailer) | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Trailer 14'-22' | Ea | $ 105.00 | | | | | | | | 0 | $ |
| Trailer 36' | Ea | $ 50.00 | | | | | | | | 0 | $ |
| Trailer (18' - 19') | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Trailer (Freezer) | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Truck - Pulling | Ea | $ 95.00 | | | | | | | | 0 | $ |
| Truck, 24 ft | Ea | $ 245.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Large | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Ultrasonic Bath, Small | Ea | $ 65.00 | | | | | | | | 0 | $ |
| Vacuum (Anti-Static) | Ea | $ 85.00 | | | | | | | | 0 | $ |
| Vacuum, HEPA | Ea | $ 55.00 | | | | | | | | 0 | $ |
| Vacuum, Pygmy HEPA | Ea | $ 125.00 | | | | | | | | 0 | $ |
| Vacuum, Large / Company Owned | Ea | $ 11.00 | | | | | | | | 0 | $ |
| Company Owned Valdds | Ea | $ 55.00 | | | | | | | | 0 | $ |
| Vapor Tek, Large | Ea | $ 70.00 | | | | | | | | 0 | $ |
| Vapor Tek, Small | Ea | $ 33.00 | | | | | | | | 0 | $ |
| Washer, High Pressure (Cold) | Ea | $ 75.00 | | | | | | | | 0 | $ |

TSA RULE 26 DISCLOSURES
0065

05/10/2006 14:22 FAX 3038642776    BARTA SPORTS

| | Unit | Daily | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Washer, High Pressure (Hot) | Ea | $ 195.00 | | | | | | | 0 | $ - |
| **Drying Equipment Distribution** | | | | | | | | | | |
| Thermo Camera | Unit | $ Daily | | | | | | | | |
| Dehumidification Units - 200 cfm | Ea | $ 215.00 | | | | | | | 0 | $ - |
| Dehumidification Units - 300 cfm | Ea | $ 165.00 | | | | | | | 0 | $ - |
| Dehumidification Units - cfm | Ea | $ 183.00 | | | | | | | 0 | $ - |
| Dehumidification Unit - 1115 cfm | Ea | $ 420.00 | | | | | | | 0 | $ - |
| Dehumidification Unit - 2000/2350 cfm | Ea | $ 873.00 | | | | | | | 0 | $ - |
| Dehumidification Unit - 4500 cfm | Ea | $ 1,195.00 | | | | | | | 0 | $ - |
| Dehumidification Unit - 9000/10000 cfm | Ea | $ 1,795.00 | | | | | | | 0 | $ - |
| DX Unit- 20/25 Ton | Ea | $ 875.00 | | | | | | | 0 | $ - |
| Directfry Unit | Ea | $ 725.00 | | | | | | | 0 | $ - |
| **Total for Equipment** | | | | | | | | | | $ - |

TSA RULE 26 DISCLOSURES
0066

05/10/2006 14:12 FAX 3038642102

Carbon USA
Contract # 1405721 Sports Authority
Consumables Delivery
Period Ended 04/2/06

| Chemical Description | Unit | Rate | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Units | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Adhesive Remover | Gal | $ | 77.00 | | | | | | | 0.0 | $ - |
| Alcohol Isopropyl | Gal | $ | 18.95 | | | | | | | 0.0 | $ - |
| Cleaner, Stainless Steel | Gal | $ | 32.00 | | | | | | | 0.0 | $ - |
| Cleaner, Carpet (Liquid) | Gal | $ | 11.59 | | | | | | | 0.0 | $ - |
| Cleaner, Carpet (Powder) | Lb | $ | 2.50 | | | | | | | 0.0 | $ - |
| Cleaner, Glass | Gal | $ | 12.00 | | | | | | | 0.0 | $ - |
| Cleaner, Hand Surface | Gal | $ | 22.10 | | | | | | | 0.0 | $ - |
| 815 MX (EPD) | Gal | $ | 17.25 | | | | | | | 0.0 | $ - |
| General Purpose Degreaser | Gal | $ | 11.25 | | | | | | | 0.0 | $ - |
| Dish Soap | Gal | $ | 39.75 | | | | | | | 0.0 | $ - |
| Nature Sol | Gal | $ | 33.00 | | | | | | | 0.0 | $ - |
| Cleaner, HVAC Coil | Gal | $ | | | | | | | | 0.0 | $ - |
| Descaler/liner | Lb | $ | 13.00 | | | | | | | 0.0 | $ - |
| Deodorizing Gel | Gal | $ | 37.50 | | | | | | | 0.0 | $ - |
| Deodorizing Liquid | Gal | $ | 45.00 | | | | | | | 0.0 | $ - |
| Deodorizing Block | Ea | $ | 3.25 | | | | | | | 0.0 | $ - |
| Disinfectant/Biocide | Gal | $ | 3.05 | | | | | | | 0.0 | $ - |
| Bleach | Gal | $ | 3.50 | | | | | | | 0.0 | $ - |
| Thermal Fog | Gal | $ | 9.21 | | | | | | | 0.0 | $ - |
| Furniture Polish | Ea | $ | 6.23 | | | | | | | 0.0 | $ - |
| Gum Off | Ea | $ | | | | | | | | 0.0 | $ - |
| Lubricant, Electrical | Gal | $ | 13.75 | | | | | | | 0.0 | $ - |
| Lubricant (electrical) | Gal | $ | 31.10 | | | | | | | 0.0 | $ - |
| Lubricant Anti-chatter | Gal | $ | 37.50 | | | | | | | 0.0 | $ - |
| Preservit, light | Pr | $ | 9.65 | | | | | | | 0.0 | $ - |
| Long Term Preservit, heavy | Ea | $ | 8.25 | | | | | | | 0.0 | $ - |
| Metal Polishing Paste | | $ | | | | | | | | | $ - |
| Stainless Steel Polish | | $ | | | | | | | | | $ - |
| Rust Inhibitor/Remover | | $ | | | | | | | | | $ - |
| Degreaser | Gal | $ | 34.00 | | | | | | | 0.0 | $ - |
| Complex Cleaner | Gal | $ | 90.00 | | | | | | | 0.0 | $ - |
| Descaler | | $ | | | | | | | | | $ - |
| Sealant | Gal | $ | 41.00 | | | | | | | 0.0 | $ - |
| Dust Sealant Spray | Gal | $ | 65.00 | | | | | | | 0.0 | $ - |
| Dust Sealant, Antifogdental | Gal | $ | 33.00 | | | | | | | 0.0 | $ - |
| Soot Sealant, Pigmented | Gal | $ | 22.00 | | | | | | | 0.0 | $ - |
| Soot Sealant Clear | Pt | $ | 12.00 | | | | | | | 0.0 | $ - |
| Silver Copper/Tin Cleaner | Can | $ | 5.26 | | | | | | | 0.0 | $ - |
| Spray Adhesive | | | | | | | | | | | |

| Material Description | Unit | Rate | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bags and Shade | El | $ | 28.00 | | | | | | | 0.0 | $ - |
| Bags, Trash | El | $ | 1.95 | | | | | | | 0.0 | $ - |
| Bags, Trash Environmental -Gal | El | $ | 2.65 | | | | | | | 0.0 | $ - |
| Bags, Biohaz/Freeza Dry | El | $ | 5.45 | | | | | | | 0.0 | $ - |
| Box, Disk Pack | Ea | $ | 87.50 | | | | | | | 0.0 | $ - |
| Box, Roll/Freeze Dry | Ea | $ | 10.00 | | | | | | | 0.0 | $ - |
| Paper, Corrugated | Ea | $ | 4.00 | | | | | | | 0.0 | $ - |
| Brush, Dispersion - large | Ea | $ | 9.60 | | | | | | | 0.0 | $ - |
| Brush, Dispersion - small | Ea | $ | 8.00 | | | | | | | 0.0 | $ - |
| Brush, Steel Handle/Scrub | Ea | $ | 315.00 | | | | | | | 0.0 | $ - |
| Brush, Bassic/Hand Scrub | El | $ | | | | | | | | 0.0 | $ - |
| Buck Lay Flat (500) | El | $ | | | | | | | | 0.0 | $ - |

TSA RULE 26 DISCLOSURES
0067

05/10/2006 14:13 FAX 303864210٭   GART SPORTS   ☑ 037

| Item | Unit | Price | | | | | |
|---|---|---|---|---|---|---|---|
| Dust Mask, HEPA (#95P100) | Ea | $ 8.00 | | | | 0.0 | $ |
| Dust Mask | Bx | $ 24.00 | | | | 0.0 | $ |
| Filter Material | Rl | $ 65.00 | | | | 0.0 | $ |
| Filter Secondary | Ea | $ 5.80 | | | | 0.0 | $ |
| Pre Filter | Ea | $ 3.32 | | | | 0.0 | $ |
| Furniture Blocks | Ea | $ 77.00 | | | | 0.0 | $ |
| Furniture Pads | Bx | $ 84.00 | | | | 0.0 | $ |
| Gloves, Cotton | Bx | $ 1.75 | | | | 0.0 | $ |
| Gloves, Surgical Latex | Bx | $ 18.00 | | | | 0.0 | $ |
| Gloves, W/o/ Rubber/ Chemical | Pr | $ 2.23 | | | | 0.0 | $ |
| Hat BUgs | Fr | $ 1.23 | | | | 0.0 | $ |
| Inventory Tags | Bx | $ 15.00 | | | | 0.0 | $ |
| Inventory Tags | Ea | $ 99.00 | | | | 0.0 | $ |
| Mop Heads | Ea | $ 3.25 | | | | 0.0 | $ |
| Non finished Scrubbers, green (#96) | Bx | $ 20.00 | | | | 0.0 | $ |
| Plastic Sheeting (20'X100') | Rl | $ 72.00 | | | | 0.0 | $ |
| Painters Plastic (1mil) | Rl | $ 18.35 | | | | 0.0 | $ |
| Quick Test Strips (per 30) | Pkg | $ 24.00 | | | | 0.0 | $ |
| Sponges, Soot Removal | Ea | $ 1.80 | | | | 0.0 | $ |
| Spray Bottle w/ Trigger | Ea | $ 3.95 | | | | 0.0 | $ |
| Tape, Duct | Rl | $ 7.00 | | | | 0.0 | $ |

05/10/2006 14:18 FAX 3038642102  GART SPORTS  Ø038

| Item | | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| Tape, Elec | R1 | $ 8.75 | | | | | | 0.0 | $ |
| Tape, HVAC (Aluminum) | R1 | $ 21.00 | | | | | | 0.0 | $ |
| Tape, Poly Box | R1 | $ 2.60 | | | | | | 0.0 | $ |
| Tarps | SN | $ 0.54 | | | | | | 0.0 | $ |
| Dyzek Sale | Ea | $ 7.95 | | | | | | 0.0 | $ |
| Wipes, Cotton Cloth | lb | $ 4.35 | | | | | | 0.0 | $ |
| Wipes, Lint Free | Bx | $ 25.00 | | | | | | 0.0 | $ |
| Wipes, Shop | R1 | $ 72.00 | | | | | | 0.0 | $ |
| Wipes, Wipe-All | Pkg | $ 9.90 | | | | | | 0.0 | $ |
| Wrap, Bubble/ Anti Static | R1 | $ 64.13 | | | | | | 0.0 | $ |
| Wrap, Shrink | R1 | $ 48.00 | | | | | | 0.0 | $ |

Total for Consumables

Colton USA
Contract # 108721; Sports Authority
Vendors (Subcontractors) Summary
Period Ended 04/02/06

Unscheduled Materials (Petty Cash & Credit Card Control)

|  | Mon 03/27 | Tues 03/28 | Wed 03/29 | Thurs 03/30 | Fri 03/31 | Sat 04/01 | Sun 04/02 | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Lucas - Fuel | | $ 136.30 | | | | | | $ 136.30 |
| Conoco - Fuel | | $ 98.97 | | | | | | $ 98.97 |

TSA RULE 26 DISCLOSURES
0069



**COTTON USA**
*National Disaster Recovery Services*

RESTORATION SERVICE AGREEMENT

STORE #
618

EFFECTIVE DATE OF AGREEMENT: MARCH 14 ᵗʰ 2006

CUSTOMER: THE SPORTS Authority

BILLING ADDRESS: 1050 W. Hampden Ave

INSURANCE COMPANY: Liberty Mutual        CLAIM NO. X169A - 003155

PROPERTY ADDRESS ("Property"): 3211 Veterns Parkway    (Springfield, IL)

TYPE OF LOSS (Fire/Water/Other): Tornado Damage

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer agree as follows:

ARTICLE I.
CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1**    Nature of Agreement. This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

ARTICLE II.
DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1**    Services and Materials Provided. Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2**    Cooperation By Customer / Term of Agreement. The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3**    Removal of Contents. The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4**    Subcontractors Allowed. As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5**    Insurance: Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6**    Permits. Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7**    Hazardous Materials. Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8**    Authority of Customer. The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Customer's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

TSA 00297

## ARTICLE III.
## TIME FOR PERFORMANCE OF WORK

**Section 3.1**    Work Performed. The Work shall be commenced within forty-eight (48) hours (or as reasonably practical given the specifications of the Work) following execution of this Agreement, and Cotton shall use reasonable efforts to substantially or fully complete the Work within a reasonable amount of time after beginning the Work. Should Cotton be delayed, hindered, interfered with or impeded by any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment is not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

## ARTICLE IV.
## CUSTOMER'S PAYMENT OF FEES AND COSTS

**Section 4.1**    Pricing and Invoicing. All work performed hereunder shall be priced at:

_____ Lump Sum Amount (See Estimate)

OR

   ✓ _____ Time and Materials (See Rate Schedule)

*[handwritten: PHASE 1 EMERGENCY SERVICES]*

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement. After the Work is begun, the Customer will receive progressive billings ("Invoice") for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion. All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice. There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e. thirty days) the payment is delinquent. Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice; provided, however, that delivery of such property and contents shall not be made until Cotton has received such final Invoice and Customer has paid in full all previous Invoices (and any services charge accrued thereon) and there remains no Delinquency. The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party. The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

**Section 4.2**    Change Orders. Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

**Section 4.3**    Direct Pay Authorization. This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

## ARTICLE V.
## MOLD REMEDIATION WORK; INDEMNIFICATION

**Section 5.1**    Mold Remediation Work. With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold ("**Mold Remediation Work**"), Customer agrees as follows:

(a) Testing. Customer shall engage the services of a person or firm ("**Mold Expert**") specializing in the investigation, testing and analysis of mold spores and microbial contamination ("**Mold**") occurring within buildings and other structures of a like-kind and nature as the project site and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work. The scope of the Mold Remediation Work will be specified in a mold analysis report ("**Report**") that the Customer receives from the Mold Expert. The Customer shall be solely responsible for having the Mold Expert test ("**Pretest**") the Property for Mold prior to commencement of the Work and preparing the Report. In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site. Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test ("**Post-test**") the site (or portion/phase thereof).

(b) Work Completion. Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements. Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with a statement that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested). In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

**Section 5.2**    Release. CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

TSA 00298

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS "DAMAGES"), IN RESPECT TO PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER'S EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON, UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THE FOREGOING INDEMNITY PROVISIONS WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT, INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3**    No Consequential Damages. Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

### ARTICLE VI.
### TERMINATION

**Section 6.1**    Termination By Cotton. Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2**    Termination By Customer. In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton the for all Charges up to and including the date of such termination, regardless of whether Customer has received a invoice for such Charges prior to such termination.

### ARTICLE VII
### DISPUTE RESOLUTION

**Section 7.1**    Non-binding Mediation.  Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2**    Attorneys' Fees and Costs.  If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

### ARTICLE VIII.
### GOVERNING LAW; VENUE

**Section 8.1**    Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2**    Venue. In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                    CUSTOMER:

By: _JEFF KRONE_____                      By: _____
Name: _Jeff Krone_____                    Name: _____
Title: _Regional Director___               Title: _____
Date Signed: _3-14-06___                   Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

TSA 00299

Mike Mavelle
_____

From: Jeff Krone [jeffk@cottonteam.com]
Sent: Monday, March 20, 2006 8:39 AM
To:    Thomas.Tiernan@LibertyMutual.com
Cc:    Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com

**TOM & MIKE-**

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I
AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF
$100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO
REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR
IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS-
PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON
SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

Sent To D. Frick 3-20-06

**COTTON**

*National Disaster Recovery Services*

<Attachment A>

DATE: 3-14-06

TO:   MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
      DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
      TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM: JEFF KRONE

RE: TORNADO DAMAGE TO STORE # 618

Cotton viewed the **CATASTROPHIC** loss located at <u>3211 VETERANS PARKWAY in SPRINGFIELD, IL</u>. Mike Mavelle of **THE SPORTS AUTHORITY** requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition. The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view. The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM). The Scope of Service is broken into the following general areas of concern.

**SCOPE OF WORK:**

- *BRIEF SCENARIO OF THE LOSS:  ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-COTTON USA, TOM TIERNAN-LIBERTY MUTUAL & MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

**GENERAL ITEMS**

- ☐ *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.*
- ☐ *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.*
- ☐ *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- ☐ *WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- ☐ *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.*
- ☐ *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE*
- ☐ *TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- ☐ *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY*
- ☐ *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.*
- ☐ *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS*
- ☐ *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

## DEHUMIDIFICATION

☐ DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-DAMAGED PRODUCT REMAINING IN THE STORE.

INSTALL THE FOLLOWING: (FRONT OF THE STORE)

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE OF THE STORE.
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

INSTALL THE FOLLOWING: (BACK OF THE STORE)

➤ (2) 5000 CFM DESICCANTS
➤ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
➤ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
➤ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE OF THE STORE.
➤ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
➤ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE NORTH DOORWAY TO THE WAREHOUSE AREA.
➤ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
➤ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT.
➤ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
➤ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

## EXTERIOR PREMISES

➤ CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
➤ SWEEP UP ALL THE GLASS FROM FRONT OF STORE
➤ ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO A MINIMUM

## ROOF

➤ COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-GLOBAL) ON INSPECTION.
➤ COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
➤ COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION PURPOSES
➤ COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

## FITNESS AREA (EXERCISE)

➤ SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
➤ ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
  ☐ HARD HATS
  ☐ EYE GLASSES
  ☐ DUST MASKS

E-FILED
Monday, 31 December, 2007  03:47:00 PM
Clerk, U.S. District Court, ILCD

- □ STEEL TOED SHOES
- □ EAR PROTECTION
- CUT DOWN ALL HANGING DEBRIS
  - □ FLORESCENT LIGHTS
  - □ CONDUIT LINES
  - □ MONITORS
  - □ CAP SPRINKLER LINES
  - □ ELECTRICAL LINES
  - □ SPORT AUTHORITY SIGNAGE
  - □ PARTS OF THE ROOF DECKING
- ➢ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- ➢ WET VAC ALL STANDING WATER
- ➢ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- ➢ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- ➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ _THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE._

## TEAM SPORTS

- ➢ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ NOTE- _SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED._

- ❖ _THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE._

## OUTDOOR

- ➢ MANIPULATE ALL THE CONTENTS
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

### SNOW SPORTS

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

### MENS ATHLETICS

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A.  TAGGED AND SALVAGE COMPANY WILL TAKE
    - B.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED
>
> ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

**GIFT CENTER**

> ➤ MANIPULATE ALL THE CONTENTS
> ➤ WET VAC ALL STANDING WATER
> ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> ➤ REMOVE AND DISCARD THE RUBBER MATTING
> ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
> ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> ➤ REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
> ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
> ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
> ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
> ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED
>
> ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

**CUSTOMER SERVICE**

> ➤ MANIPULATE ALL THE CONTENTS
> ➤ WET VAC ALL STANDING WATER
> ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> ➤ REMOVE AND DISCARD THE RUBBER MATTING
> ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
> ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> ➤ REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
> ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
> ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
> ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
> ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> ➤ UTILIZE THE ABOVE DRYING SCOPE
> ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> ➤ DAILY MOISTURE LOGS WILL BE REQUIRED
>
> ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

**YOUTH SOFT GOODS**

> ➤ MANIPULATE ALL THE CONTENTS
> ➤ WET VAC ALL STANDING WATER
> ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> ➤ REMOVE AND DISCARD THE RUBBER MATTING
> ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
> ➤ COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
> ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00305

- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

## MENS OUTDOORS:

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

## LICENSED APPAREL:

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

**BIKES**

- ➢ MANIPULATE ALL THE CONTENTS
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

**FOOTWEAR**

- ➢ MANIPULATE ALL THE CONTENTS
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ❖ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED, MOVED, AND THE RACKS DISASSEMBLED.*

**GOLF DEPARTMENT**

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
     - C.  TAGGED AND SALVAGE COMPANY WILL TAKE
     - D.  TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

## CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by Mike Mavelle, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

## IMPORTANT POINTS

TSA  00308

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of *COTTON* management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that *COTTON* will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the *COTTON'S* on-site Project Manager (**Bruce Gear**) and a designated representative from **The Sports Authority** meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, *COTTON* will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of Insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

## PRICING

*COTTON* proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

## SCHEDULING

*COTTON* will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been *COTTON* pleasure to submit this proposal to Mike Mavelle and Tom Tieman. Thank you for your consideration and cooperation.

Respectfully Submitted,

*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2962 (24hr CALL CENTER)*



| EXPENSE ITEM PURCHASE ORDER | RFC# | | PURCHASE ORDER NUMBER |
|---|---|---|---|
| | | | **125RM891** |

| | REQUESTING DEPT/STORE # | ACCOUNT TO BE CHARGED TO |
|---|---|---|
| The Sports Authority Inc. | Risk Management - 963 | 618-630-120-1 |
| 1050 W. Hampden Ave. - Englewood, CO  80110 | DATE OF ORDER | DELIVERY REQUIRED BY |
| Phone (303) 200-5050 | 3/21/2006 | |

**Address to:** Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | emergency clean up and repair (insurance deductible) | | $    100,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | Total | $    100,000.00 |

_(signature)_ 3-21-06

TSA 00310



| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 3/20/2006 |
| Corp. Company | The Sports Authority | Invoice #: | 1408722 |
| Corp. Address | 1050 W. Hampden Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, Colorado 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-2285 | | |
| Fax: | (720) 475-2118 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 Veterans Parkway | Store Number: | # 618 |
| City, State, Zip | Springfield, IL 62704 | | |
| Tel: | (217) 546-0132 | Insurance Company: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | Insurance Adjuster: | Tom Tiernan - EGA |

RE:         DRAW REQUEST # 1

*EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE MENTIONED LOSS ADDRESS:*            $    100,000.00

| | |
|---|---|
| SUBTOTAL | $    100,000.00 |
| TAX | $    - |
| TOTAL DUE AND PAYABLE | $    100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton Catastrophe

14345 Northwest Freeway

Houston, Texas 77040

**Please include the invoice number on check**

TSA  00311

| EXPENSE ITEM PURCHASE ORDER | RFC# | | PURCHASE ORDER NUMBER **125RM911** |
|---|---|---|---|
| The Sports Authority Inc. | REQUESTING DEPT/STORE # | | ACCOUNT TO BE CHARGED TO |
| 1050 W. Hampden Ave. - Englewood, CO 80110 | Risk Management- 963 | | 618-630-120 |
| Phone (303) 200-5050 | DATE OF ORDER | | DELIVERY REQUIRED BY |
| | 4/19/2006 | | |

Address to: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | remainder of emergency Services for Roof damage | | $  219,428.67 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | ~~approved to Jack 4-26-06~~ | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | $  219,428.67 |

Please process
ASAP

Niel Uhrell   4-26-06

x Nor Hin   4.26.06

TSA 00312

*Store File #618*



**COTTON**

*National Disaster Recovery Services*

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | Insurance Co: | Liberty Mutual Property |
| City, State, Zip | Springfield, Il. 62704 | Insurance Adj: | Ton Tiernan |
| Tel: | (217) 546-0132 | Claim #: | X69A-O03155-00 |
| Fax: | (217) 546-1073 | | |

Re:      Tornado Damages in Springfield, IL

Re:      **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ | 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ | (100,000.00) |
| SUBTOTAL      *REMAINING BALANCE* | $ | 219,428.67 |
| TOTAL DUE AND PAYABLE | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

For questions concerning your account, Please contact:

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**\*\*Please include the invoice number on check\*\***

03/31/06

TSA 00313



## COTTON USA
### *National Disaster Recovery Services*

RESTORATION SERVICE AGREEMENT

STORE # 618

EFFECTIVE DATE OF AGREEMENT: MARCH 14th 2006

CUSTOMER: THE SPORTS Authority

BILLING ADDRESS: 1050 W. HAMPDEN AVE

INSURANCE COMPANY: Liberty Mutual     CLAIM NO. X69A - 003155

PROPERTY ADDRESS ("Property"): 3211 Veterans Parkway (Springfield, IL)

TYPE OF LOSS (Fire/Water/Other): Tornado Damage

Cotton Commercial USA, L.P. d/b/a Cotton USA ("Cotton"), a Texas limited partnership, and the Customer as follows:

### ARTICLE I.
### CONTENTS OF AGREEMENT AND ASSIGNABILITY

**Section 1.1**     Nature of Agreement. This Agreement is a contract for restoration services between Cotton and the Customer, with the scope of services ("Work") to be provided as described in the written estimate ("Estimate") that will be provided by Cotton to the Customer and Customer's Insurance Company. This Agreement, the Estimate and all addenda issued prior to and all modifications issued after execution of this Agreement, constitute the entire agreement between Cotton and the Customer. The Customer shall not assign this Agreement without the prior written consent of Cotton. Cotton shall provide to the Customer certificate(s) of insurance upon request.

### ARTICLE II.
### DUTIES, COOPERATION AND AUTHORIZATION

**Section 2.1**     Services and Materials Provided. Cotton agrees to furnish all labor, supervision, materials, equipment, tools, supplies, subcontract work and services, which in Cotton's sole discretion is reasonably necessary to timely and fully perform and complete the Work in a good and workmanlike manner.

**Section 2.2**     Cooperation By Customer / Term of Agreement. The Customer agrees to cooperate with Cotton in the performance of the Work, and such duty shall last until completion of the Work, and the Customer agrees to fully cooperate with Cotton as is reasonably required by Cotton for completion of the Work.

**Section 2.3**     Removal of Contents. The Customer authorizes Cotton to remove contents and non-fixture parts of the building as necessary in accordance with the scope of work for the purposes of safekeeping, inventory, testing and/or appraisal of damages, cleaning of contents offsite, and such other purposes reasonably related to completing the Work. However, Cotton requires Customer (or Customer's tenant) to remove and secure all valuables and fragile items.

**Section 2.4**     Subcontractors Allowed. As Cotton is an independent general contractor, Cotton has exclusive authority to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work. The Customer is hereby obligated to allow Cotton to sub-contract and to utilize other contractors, as it deems necessary for completion of the Work.

**Section 2.5**     Insurance. Cotton shall provide to the Customer certificate(s) of insurance upon request.

**Section 2.6**     Permits. Any federal, state or local permits or consents required for the performance of the Work are the responsibility of the Customer (notwithstanding Cotton assistance of Customer in obtaining same) and Customer shall bear all costs related to same.

**Section 2.7**     Hazardous Materials. Disposal of any Hazardous Materials (including specimens or samples) or any property that contains Hazardous Materials performed as a part of the Work will be made in the name of the Customer and under any applicable generator number or other identification assigned by the Customer or the applicable governmental authority.

**Section 2.8**     Authority of Customer. The Customer and the person signing below ("Signing Party") on behalf of Customer hereby represent and warrant that one of the following is true: (i) Customer is the absolute fee simple owner of the real property (the "Property") upon which the Work is to be performed and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's behalf and to bind Customer under the terms of this Agreement or (ii) Customer is the agent of the absolute fee simple owner of the Property, whose identity and contact information will be disclosed to Cotton upon Cotton's request for same, under a written property management agreement (or other written instrument) that will be provided to Cotton for inspection upon Cotton's request for same, and the Signing Party is an officer of Customer who is duly authorized to execute this Agreement on Customer's (and the absolute fee simple owner's) behalf and to bind Customer (and the absolute fee simple owner) under the terms of this Agreement.

1

TSA 00297

ARTICLE III.
TIME FOR PERFORMANCE OF WORK

**Section 3.1** Work Performed. The Work shall be commenced within forty-eight (48) hours (or as reasonably practical given the specifications of the Work) following execution of this Agreement, and Cotton shall use reasonable efforts to substantially or fully complete the Work within a reasonable amount of time after beginning the Work. Should Cotton be delayed, hindered, interfered with or impeded by any act or omission of the Customer, or by any cause beyond Cotton's control, and if a cause of the delay, hindrance, interference or impediment is not due to any act or omission of Cotton, then Cotton shall be entitled to a reasonable extension of time for completion of the Work.

ARTICLE IV.
CUSTOMER'S PAYMENT OF FEES AND COSTS

**Section 4.1** Pricing and Invoicing. All work performed hereunder shall be priced at:

_____ Lump Sum Amount (See Estimate)                 PHASE 1

OR      ✓ Time and Materials (See Rate Schedule)        EMERGENCY SERVICES

The Customer shall pay Cotton an initial deposit of $_____ as a condition to Cotton beginning performance of the Work contemplated by this Agreement. After the Work is begun, the Customer will receive progressive billings ("Invoice") for the Work performed for Customer lasting one month or more, unless more frequent billing is appropriate as determined in Cotton's sole discretion. All fees and costs ("Charges") as reflected on the Invoice shall be due fifteen (15) days after the date of the Invoice. There will be a service charge on all or any portion of the Charges reflected on the Invoice, which are not paid within thirty (30) days of the invoice date ("Delinquency"), which shall be the sum of 1.5% of the Delinquency for each month (i.e. thirty days) the payment is delinquent. Prior to the delivery of the Customer's property and contents (i.e., items removed from the dwelling/building), Cotton shall submit to the Customer the final Invoice; provided, however, that delivery of such property and contents shall not be made until Cotton has received payment on such final Invoice and Customer has paid in full all previous Invoices (and any services charge accrued thereon) and there remains no Delinquency. The Customer agrees to pay Cotton in full for all Charges upon the receipt of an Invoice and agrees to be legally responsible for such payment regardless of whether the Customer is entitled to coverage or reimbursement from its insurance carrier or any third party. The cumulative sum of all Charges incurred by the Customer hereunder shall be considered the "Contract Price".

**Section 4.2** Change Orders. Any modifications or change orders with respect to this Agreement shall be agreed to in writing by Cotton and the Customer and shall take effect upon execution of such modification or change order by Cotton and the Customer.

**Section 4.3** Direct Pay Authorization. This Agreement shall serve as Customer's consent to its property and casualty insurance carrier to pay Cotton directly with respect to any amounts claimed by the Customer under any insurance policy covering the property that is the subject of the Work.

ARTICLE V.
MOLD REMEDIATION WORK; INDEMNIFICATION

**Section 5.1** Mold Remediation Work. With respect to any portion of the Work to be performed by Cotton that involves the remediation of mold (**"Mold Remediation Work"**), Customer agrees as follows:

(a) Testing. Customer shall engage the services of a person or firm ("Mold Expert") specializing in the investigation, testing and analysis of mold spores and microbial contamination ("Mold") occurring within buildings and other structures of a like-kind and nature as the project site and shall have the Mold Expert test the Site for microbial contamination prior to commencement of the Mold Remediation Work. The scope of the Mold Remediation Work will be specified in a mold analysis report ("Report") that the Customer receives from the Mold Expert. The Customer shall be solely responsible for having the Mold Expert test ("Pretest") the Property for Mold prior to commencement of the Work and preparing the Report. In performance of the Mold Remediation Work, Cotton will not be required to perform any testing or analysis of the site. Cotton will perform the Mold Remediation Work to substantial completion in keeping with the specifications of the Report, and after notice by Cotton to Customer of substantial completion of the Mold Remediation Work (or portion/phase thereof), Customer shall cause the Mold Expert to again test ("Post-test") the site (or portion/phase thereof).

(b) Work Completion. Customer acknowledges that mold spores are naturally occurring substances and that after the Mold Remediation Work is substantially complete, the site may still contain traces of Mold or other microbial elements. Notwithstanding, once the Mold Expert completes the Post-test and provides Customer with a statement that the Mold at the site (or portion/phase of the site tested) has been remediated to within acceptable industry standards or limits, Cotton's Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase of the site tested), and going forward, Customer assumes all risks as to the site (or portion/phase of the site tested) with respect to the presence of Mold and other microbial elements, and Cotton will have no further obligation or liability to Customer with respect to the Mold Remediation Work at the site (or portion/phase of the site tested). In the event that a Post-test is not performed at the site (or any portion/phase thereof), the Mold Remediation Work shall be deemed fully complete as to the site (or portion/phase thereof) at such time that Cotton notifies Customer of substantial completion of the Mold Remediation Work.

**Section 5.2** Release. CUSTOMER HEREBY RELEASES AND AGREES TO HOLD HARMLESS COTTON, ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS,

2

TSA 00298

EMPLOYEES, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, AND AGENTS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, AWARDS, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) AND LIABILITIES OF EVERY KIND OR CHARACTER (COLLECTIVELY REFERRED TO AS "DAMAGES"), IN RESPECT TO PERSONAL OR BODILY INJURY TO, SICKNESS, DISEASE, DEATH OR OTHER DAMAGES SUFFERED OR INCURRED BY CUSTOMER AND/OR THE CUSTOMER'S EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS OR AGENTS OR THOSE OF ITS PARENT, AFFILIATE AND SUBSIDIARY COMPANIES RESULTING OR ARISING FROM OR ARISING OUT OF OR IN CONNECTION WITH THE WORK DONE BY COTTON, UNLESS THE DAMAGES RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COTTON. IT IS THE INTENT OF BOTH COTTON AND CUSTOMER THAT THE FOREGOING INDEMNITY PROVISIONS WILL OPERATE WITHOUT REGARD TO ANY LEGAL THEORY OF NEGLIGENCE OR FAULT, INCLUDING BUT NOT LIMITED TO JOINT AND/OR CONCURRENT NEGLIGENCE OF THE INDEMNITEE.

**Section 5.3** No Consequential Damages. Customer agrees that under no circumstance shall Cotton be liable to the Customer for incidental, consequential or special damages including but not limited to lost revenue, lost profits, lost business, business interruptions, lost business opportunities or any other special, punitive, exemplary or consequential damages.

## ARTICLE VI.
## TERMINATION

**Section 6.1** Termination By Cotton. Cotton has the right to terminate the Agreement at any time and to be paid the reasonable value of the Work thus far performed.

**Section 6.2** Termination By Customer. In the event the Customer terminates the Agreement, the Customer shall be legally responsible to pay Cotton the for all Charges up to and including the date of such termination, regardless of whether Customer has received a Invoice for such Charges prior to such termination.

## ARTICLE VII
## DISPUTE RESOLUTION

**Section 7.1** Non-binding Mediation. Any controversy, dispute or claim arising out of this Agreement or the Work done hereunder (which can not be amicably resolved by senior management representatives of Cotton and the Customer), shall first be submitted to non-binding mediation. Both parties shall share equally in the expense of such mediation in which a non-interested mediator shall serve to facilitate the resolution of the dispute. If such controversy, dispute or claim can not be settled or resolved by non-binding mediation, either party may then submit such dispute for resolution by binding arbitration in accordance with the terms of this Article VII, provided, however, that in circumstances where equitable (non-monetary) relief is sought, such dispute may be submitted to a court of competent jurisdiction sitting in equity who may issue injunctive relief or other equitable remedy.

**Section 7.2** Attorneys' Fees and Costs. If any legal action or other legal proceeding relating to the enforcement of any provision of this Agreement is brought against either party, including arbitration, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party may be entitled).

## ARTICLE VIII.
## GOVERNING LAW; VENUE

**Section 8.1** Jurisdiction. This Agreement shall be construed in accordance with the laws of the State of Texas, without giving effect to conflict of laws.

**Section 8.2** Venue. In any legal action relating to this Agreement, the Customer agrees (a) to the exercise of jurisdiction over it by a state or federal court in the County in which the work is performed; provided, however, that the requirement to arbitrate all controversies, disputes and claims arising under this Agreement shall supercede the provisions of this paragraph.

COTTON:                                           CUSTOMER:

By: _JEFF KRONE_____                             By: _____
Name: _Jeff Krone_____                            Name: _____
Title: _Regional Director_                         Title: _____
Date Signed: _3-14-06_                            Date Signed: _____

Commercial Restoration Services - USA (Rev. 6-2005)

3

TSA 00299

Jeff Krone

## Mike Mavelle

**From:** Jeff Krone [jeffk@cottonteam.com]
**Sent:** Monday, March 20, 2006 8:39 AM
**To:** Thomas.Tieman@LibertyMutual.com
**Cc:** Mike Mavelle

Jeff Krone
National Restoration Director
Cotton USA

5432-A Crenshaw St.
Tampa, FL. 33634

Bus: 813-887-3942
Cell: 813-299-7489
Fax: 813-887-3943

24hr call center: (877) 511-2962

jeffk@cottonteam.com

Please visit our website @
www.cottoncompanies.com

**TOM & MIKE-**

HER IS THE SCOPE OF WORK FOR THE STORE IN SPRINGFIELD,IL

PLEASE REVIEW AND LET ME KNOW IF YOU HAVE ANY QUESTIONS. MIKE I AM GOING TO SEND YOU A INITIAL DRAW REQUEST IN THE AMOUNT OF $100,00.00.I HAVE SPOKE TO TOM AND LET HIM KNOW I WAS GOING TO REQUEST THIS SO HE COULD TAKE IN ACCOUNT IS WOULD BE ASKING FOR IT.

THANKS GUYS PLEASE DON'T HESITATE TO CALL WITH ANY QUESTIONS-PROGRESS IS STILL MOVING FULL SPEED AHEAD AND PLAN TO BE BACK ON SITE THIS THURSDAY FOR A WALK THU.

THANKS AGAIN
JEFF KRONE

Sent To D. Frith 3-20-06

TSA 00300

3/20/2006

**E-FILED**
Monday, 31 December, 2007  03:47:49 PM
Clerk, U.S. District Court, ILCD



*National Disaster Recovery Services*

<Attachment A>

DATE: 3-14-06

TO:   MIKE MAVELLE – THE SPORTS AUTHORITY VP OF RISK MANAGEMENT
      DAVID FRIEDER – THE SPORTS AUTHORITY VP OF CONSTRUCTION
      TOM TIERNAN – LIBERTY MUTUAL EXECUTIVE GENERAL ADJUSTER

FROM:  JEFF KRONE

RE:  TORNADO DAMAGE TO STORE # 618

Cotton viewed the CATASTROPHIC loss located at <u>3211 VETERANS PARKWAY</u> in SPRINGFIELD, IL.  Mike Mavelle of THE SPORTS AUTHORITY requested the site inspection.

The following information is respectfully submitted as our view of the necessary services required restoring the structure and contenting to their pre-loss or better condition.  The following material is presented in an order that insures all affected areas are properly addressed from a procedural point of view.  The chronological sequence of events, in which these procedures will be performed, is discussed later in this proposal under Critical Path Management Program (CPM).  The Scope of Service is broken into the following general areas of concern.

- *BRIEF SCENARIO OF THE LOSS:  ON 3-12-06 A TORNADO TOUCHED DOWN IN THE VICINITY OF THE SPORTS AUTHORITY LOCATED IN SPRINGFIELD, ILLINOIS. THE TORNADO CAUSED EXTENSIVE DAMAGE TO SEVERAL AREAS OF THE STORE. THE SOUTHWEST CORNER OF THE ROOF HAS BEEN COMPROMISED TO THE EXTEND OF A 30 X 50 FT SECTION WAS DESTROYED. EXTENSIVE FLOODING WAS CAUSED DUE TO THE OUTSIDE ELEMENTS ALONG WITH A RUPTURED WATER LINE. COTTON USA WAS CALLED IN TO PERFORM EMERGENCY SERVICES ALONG WITH SECURING THE BUILDING FROM A SECURITY AND A LIFE HEALTH SAFETY ASPECT.*

- *BELOW IS A DETAILED SCOPE OF WORK THAT WAS WALKED AND APPROVED BY JEFF KRONE-COTTON USA, TOM TIERNAN-LIBERTY MUTUAL-& MIKE MAVELLE- THE SPORTS AUTHORITY. THIS SCOPE WILL BE BROKEN OUT INTO A PER AREA BASIS OF THE STORE.*

- ❑ *COTTON WILL PROVIDE SAFETY MEETING DAILY. ALL MEETING WILL BE LOGGED FOR ASHA COMPLIANCE.*
- ❑ *LIFE, HEATH, SAFETY ISSUES WILL BE ENFORCED. THE SITE HAS BEEN DEEMED A CONSTRUCTION SITE.*
- ❑ *COTTON WILL PROVIDE ALL LABOR TO PERFORM EMERGENCY SERVICES.*
- ❑ *WEARING A COTTON LOGOED SHIRT WILL IDENTIFY ALL COTTON EMPLOYEES.*
- ❑ *DAILY MEETINGS WILL BE PERFORMED BY COTTON'S ON SITE PROJECT MANGER (BRUCE GEAR) AND A REPRESENTATIVE OF JONES-BLYTHE CONSTRUCTION COMPANY TO HAVE UP-DATE MEETINGS SO COTTON CAN INFORM THE POWERS TO BE ON THE PROGRESS OF THE BUILDING AND COTTONS PROGRESS.*
- ❑ *PORTABLE GENERATORS WILL BE UTILIZED TO RUN TEMPORARY LIGHTING IN THE STORE*
- ❑ *TRACK LIGHTS WILL BE PLACED THROUGHOUT THE FACILITY.*
- ❑ *COTTON WILL WORK HAND IN HAND WITH THE BUILDING CONTRACTOR IN THE BEST INTEREST OF THE SPORTS AUTHORITY*
- ❑ *COTTON WILL ALSO WORK WITH THE SALVAGE COMPANY TO HELP GET ALL CONTENTS FROM POINT A TO POINT B IF NEEDED.*
- ❑ *COTTON WILL PROVIDE (3) PORTABLE STORAGE CONTAINERS FOR STORAGE OF THE UN-DAMAGED RACKS*
- ❑ *COTTON WILL COORDINATE A STRUCTURAL ENGINEER TO HELP EVALUATE THE STRUCTURE IN THE BEST INTEREST OF LIBERTY MUTUAL AND THE SPORTS AUTHORITY*

TSA 00301

- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A.    TAGGED AND SALVAGE COMPANY WILL TAKE
  - B.    TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

▮▮▮▮▮▮

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A.    TAGGED AND SALVAGE COMPANY WILL TAKE
  - B.    TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

▮▮▮▮▮▮

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A.    TAGGED AND SALVAGE COMPANY WILL TAKE
  - B.    TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ DISASSEMBLE ALL THE RACKS ON THE NORTH WALL AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
  - A. TAGGED AND SALVAGE COMPANY WILL TAKE
  - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- ❖ *THE DISPLAY SHOES WILL BE SALVAGED BUT ALL REMAINING BOXED SHOES WILL REMAIN*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*



- ➤ MANIPULATE ALL THE CONTENTS
- ➤ WET VAC ALL STANDING WATER
- ➤ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE AND DISCARD THE RUBBER MATTING
- ➤ REMOVE AND DISCARD ALL THE LAMINATE WOOD FLOORING
- ➤ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➤ REMOVE ALL AFFECTED CEILING TILES IN THIS AREA AND DISCARD INTO COTTON PROVIDED DUMPSTERS
- ➤ REMOVE ALL THE CEILING GRID AND DISCARD INTO COTTON PROVIDED DUMPSTERS.
- ➤ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➤ FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - C. TAGGED AND SALVAGE COMPANY WILL TAKE
    - D. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- ➤ REMOVE ALL THE SATURATED SHEETROCK TO THE HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW FOR A QUICKER REPLACEMENT TO INCLUDE THE WALLS OF THE PRACTICE DRIVING RANGE.
- ➤ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➤ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➤ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➤ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➤ UTILIZE THE ABOVE DRYING SCOPE
- ➤ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➤ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE QUESTIONABLE DUE TO THE SEVERITY OF THE DAMAGES. LIBERTY MUTUAL WILL HAVE TO MAKE THE CALL ON THESE CONTENTS.*

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

## CRITICAL PATH MANAGEMENT

Understanding the sense of urgency inherent in projects of this nature, a flexible approach to the restoration project is mandatory. Following acceptance of this scope of work, a Critical Path Management (CPM) Program will be established that will outline the definitive sequence of events and their corresponding time frames for completion of each event. This CPM Program will be formulated based solely on the sense of urgency as reflected by **Mike Mavelle**, considering each phase of this operation. Coordination of all phases of this restoration project is critical to the successful, timely and cost effective completion of the work. The sequence in which the work will be performed will be discussed following determination of the Critical Path.

## IMPORTANT POINTS

This scope is an overview of the total project. Some cleaning procedures outlined above may be changed at the discretion of *COTTON* management to maximize effectiveness and efficiency. This scope is not intended to be a sequential outline of work but rather an overview of the total project. Any changes or alterations to this scope at the request of building management may cause an adjustment to the total project cost. All changes must be submitted in writing and approved by all parties involved before they become binding.

It is assumed that *COTTON* will have necessary access to the facility. Common utilities such as water and electrical power must be readily available in suitable quantities. All work and services provided for in this scope are based on initial inspections of the damage. Due to the unknowns in dealing with losses of this nature, some methods of the cleaning effort may require adjustment as the job progresses. All work provided for in this scope is intended to be accomplished under "best effort" circumstances.

Daily communication is critical for the success of any project. In an effort to keep all interested parties apprised of the status of this project, we request that the *COTTON'S* on-site Project Manager (**Bruce Gear**) and a designated representative from **The Sports Authority** meet daily. It is preferable that this representative have decision-making authority regarding any changes, either additions or deletions, to this scope of work.

At the request of management, *COTTON* will provide Material Safety Data Sheets (MSDS) on all chemicals brought on-site and used in the restoration, cleaning/decontamination process. All chemicals used are biodegradable. Proof of Insurance will also be provided at the customer's request.

An outside contractor licensed and bonded in accordance with local and federal regulations will provide all asbestos work. Costs for abatement are not figured in this proposal.

### PRICING

*COTTON* proposes to perform the scope of services as outlined above on a time and materials contract based on the attached Schedule of Rates. Cotton and Liberty Mutual have set a not to exceed amount on this loss. **The Not to Exceed price is: $ 350,000.00** Cotton will require an up-front draw in the amount of **$100,000.00** after the sports Authority has received there initial advance.

### SCHEDULING

*COTTON* will approach this project on a best-effort basis. The estimated completion time is 11 working days based on a 12-hour workday.

It has been *COTTON* pleasure to submit this proposal to Mike Mavelle and Tom Tieman. Thank you for your consideration and cooperation.

Respectfully Submitted,

*JEFF KRONE*
*COTTON USA*
*REGIONAL RESTORATION DIRECTOR*
*SOUTHEAST REGION*

*813-887-3942 OFFICE*
*813-887-3943 FAX*

*813-299-7489 CELL*
*877-511-2962 (24hr CALL CENTER)*

TSA 00309



| EXPENSE ITEM PURCHASE ORDER | RFC# | PURCHASE ORDER NUMBER |
|---|---|---|
| | | **125RM891** |
| The Sports Authority Inc.<br>1050 W. Hampden Ave. - Englewood, CO  80110<br>Phone (303) 200-5050 | REQUESTING DEPT/STORE #<br>Risk Management- 963 | ACCOUNT TO BE CHARGED TO<br>618-630-120-1 |
| | DATE OF ORDER<br>3/21/2006 | DELIVERY REQUIRED BY |

Cotton Catastrophe

| | ITEM NUMBER | DESCRIPTION | | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | 1408722 | emergency clean up and repair (insurance deductible) | | | $ 100,000.00 |
| | | | | | |
| | | | | | |
| | | | | Total | $ 100,000.00 |

TSA 00310



| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 3/20/2006 |
| Corp. Company | The Sports Authority | Invoice #: | 1408722 |
| Corp. Address | 1050 W. Hampden Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, Colorado 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-2285 | | |
| Fax: | (720) 475-2118 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 Veterans Parkway | Store Number: | # 618 |
| City, State, Zip | Springfield, IL 62704 | | |
| Tel: | (217) 546-0132 | Insurance Company: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | Insurance Adjuster: | Tom Tiernan – EGA |

**RE:**        DRAW REQUEST # 1

*EMERGENCY SERVICES DRAW REQUEST AS A RESULT OF TORNADO DAMAGE TO THE ABOVE*
*MENTIONED LOSS ADDRESS:*                                                    $    100,000.00

| | | |
|---|---|---|
| SUBTOTAL | $ | 100,000.00 |
| TAX | $ | - |
| TOTAL DUE AND PAYABLE | $ | 100,000.00 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON CATASTROPHE
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton Catastrophe
14345 Northwest Freeway
Houston, Texas 77040

**\*\*Please include the invoice number on check\*\***

TSA 00311

| EXPENSE ITEM PURCHASE ORDER | RFC# | PURCHASE ORDER NUMBER |
|---|---|---|
| | | **125RM911** |

The Sports Authority Inc.
1050 W. Hampden Ave. - Englewood, CO 80110
Phone (303) 200-5050

| REQUESTING DEPT/STORE # | ACCOUNT TO BE CHARGED TO |
|---|---|
| Risk Management- 963 | 618-630-120 |
| DATE OF ORDER | DELIVERY REQUIRED BY |
| 4/19/2006 | |

ACCT#: Cotton Catastrophe

| QUANTITY | STOCK NUMBER | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| | 1408722 | remainder of emergency Services for Roof damage | | $  219,428.67 |
| | | | | |
| | | | | |
| | | | | |
| | | *faxed to Jack 4-26-06* | | |
| | | | | |
| | | | $ | 219,428.67 |

*Please prices*
*ASAP*

*Neil Klinell    4-26-06*

X *Nr. Stirn*    4.26.06

TSA 00312

Sports Fil #618



### National Disaster Recovery Services

| | | | |
|---|---|---|---|
| **Name** | Mike Mavelle | **Date:** | 03/31/06 |
| **Company** | Sports Authority | **Invoice #:** | 1408722 |
| **Address** | 1050 W. Hampton Ave. | **Terms:** | Net 10 |
| **City, State, Zip** | Englewood, CO 80110 | **Fed Id:** | 76-0628204 |
| **Tel:** | (720) 475-3285 | | |
| **Fax:** | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| **Loss Address:** | 3211 South Veterans Parkway | | |
| **City, State, Zip** | Springfield, Il. 62704 | **Insurance Co:** | Liberty Mutual Property |
| **Tel:** | (217) 546-0132 | **Insurance Adj:** | Ton Tiernan |
| **Fax:** | (217) 546-1073 | **Claim #:** | X69A-O03155-00 |

**Re:**     Tornado Damages in Springfield,IL

**Re:**     **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the follwoing parties:*
*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | |
|---|---|
| EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT: | $ 319,428.67 |
| COTTON HAS RECEIVED A INITIAL DRAW OF: | $ (100,000.00) |
| **SUBTOTAL**                 *REMAINING BALANCE* | $ 219,428.67 |
| **TOTAL DUE AND PAYABLE** | $ 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this

invoice otherwise we will expect prompt payment under our invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

\*\*Please include the invoice number on check\*\*

03/31/06

TSA 00313

# Sports Authority

Sportmart #618
3211 South Verterans Parkway
Springfield, IL 62704

Date:            4/3/2006
Contractor:  Wolford Retail Builders, Inc.
Union         Revised 5/7      J. Wolford

Budgetary- Insurance- 32,513 sf

| ITEM | MATERIAL | LABOR- Unit | PRICE/SQ.FT. | TOTAL |
|---|---|---|---|---|
| | | | BID BREAKDOWN | |
| 1. Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2. Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3. Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4. Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5. Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6. Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7. Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8. Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9. Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalcemer | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl`s Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaini | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld`s Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| TOTAL | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer`s & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | | wks. |
| UNION  /  NON-UNION | | Amount of time for construction: | | Weeks |

| | | |
|---|---|---|
| 80% Cotton | | $22,880.00 |
| | | |
| Demo only 10% by Cotton | | $2,650.00 |
| Demo only 15% by Cotton | | $6,765.00 |
| | | |
| 30% Cotton- dismantling only | | $32,700 |
| 40% Cotton | | $6,160.00 |
| 40% adhesive removal | | $4,016.80 |
| | | |
| 100% deordorizing only ( | | $11,000.00 |
| 50% Cotton | | $3,075.00 |
| | | |
| 40% Cotton | | $10,100.00 |
| 33% Cotton | | $7,053.75 |
| | | |
| **Cotton Sub-Total** | | **$106,400.55** |
| | | |
| Prorate % | 1% Percent | $1,064.00 |
| Prorate % | 10% Percent | $10,746.46 |
| | | |
| **Cotton Total- Against WRB Budget** | | **$118,211.01** |

▢   *DUE TO THE EXTENSIVE CONTENTS AND THE HIGH PROFILE NATURE OF THIS LOSS COTTON AND LIBERTY MUTUAL CAME TO THE AGREED UPON DEHUMIDIFICATION SCOPE TO HELP DRY THE STRUCTURE OF THE BUILDING AND TO HELP CLIMATIZE AND PROTECT ALL THE UN-DAMAGED PRODUCT REMAINING IN THE STORE.*

## INSTALL THE FOLLOWING: (FRONT OF THE STORE)

- ➢ (2) 5000 CFM DESICCANTS
- ➢ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- ➢ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- ➢ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER FRONT LEFT, FRONT RIGHT, AND MIDDLE OF THE STORE.
- ➢ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- ➢ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR.
- ➢ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- ➢ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT TO INCLUDE AIR MOVERS AND PORTABLE DEHUMIDIFIERS WHERE DESICCANTS CANNOT PROVIDE DRYING.
- ➢ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS
- ➢ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS AND DEHUMIDIFIERS.

## INSTALL THE FOLLOWING: (BACK OF THE STORE)

- ➢ (2) 5000 CFM DESICCANTS
- ➢ (35) PORTABLE AIR MOVERS TO HELP FACILITATE DRYING
- ➢ INSTALL LAY-FLAT DUCTING TO HELP DISTRIBUTE AIR FLOW. ALL LAY-FLAT WILL BE SUSPENDED FROM THE CEILING.
- ➢ INSTALL (Y) ADAPTORS TO SPLIT DUCTING TO COVER BACK LEFT, BACK RIGHT, AND MIDDLE OF THE STORE.
- ➢ FLEX DUCTING WILL BE INSTALLED FROM THE DESICCANT TO THE BUILDING
- ➢ HOLES WILL BE CUT OUT OF THE PLYWOOD TO TUNNEL IN THE DESICCANT DRY AIR FROM THE NORTH DOORWAY TO THE WAREHOUSE AREA.
- ➢ INSTALL (1) 320KW GENERATOR TO RUN BOTH DESICCANTS
- ➢ INSTALL JUNCTION BOXES WITH QUAD BOXES TO DISTRIBUTE POWER THROUGHOUT THE STORE TO RUN PORTABLE DRYING EQUIPMENT.
- ➢ EXTENSION CORDS WILL BE UTILIZED FOR PORTABLE AIR MOVERS
- ➢ COTTON WILL COORDINATE FUELING SCHEDULE FOR GENERATORS

- ➢ CLEAN ALL THE DEBRIS DISPOSE INTO COTTON PROVIDED DUMPSTERS
- ➢ SWEEP UP ALL THE GLASS FROM FRONT OF STORE
- ➢ ROPE OFF WITH CAUTION TAPE THE PERIMETER OF THE BUILDING TO KEEP TRAFFIC DOWN TO A MINIMUM

- ➢ COTTON WILL EVALUATE THE ROOFTOP FOR DAMAGE. COTTON TO COORDINATE WITH (EFI-GLOBAL) ON INSPECTION.
- ➢ COTTON WILL EVALUATE ALL THE ROOFTOP UNITS.
- ➢ COTTON TO HELP SEAL OFF THE HOLE IN THE CORNER OF THE ROOF FOR CLIMITIZATION PURPOSES
- ➢ COTTON WILL BUILD A BARRIER IN THE EXERCISE AREA TO HELP ELIMINATE AND MOISTURE.

- ➢ SEAL OFF THIS AREA WITH CAUTION TAPE FOR LIFE HEALTH SAFETY ISSUES.
- ➢ ALL PERSONNEL ENTERING THIS AREA IS REQUIRED TO WEAR ALL SAFETY EQUIPMENT:
  - ▢ HARD HATS
  - ▢ EYE GLASSES
  - ▢ DUST MASKS

TSA 00302

- ❑ STEEL TOED SHOES
- ❑ EAR PROTECTION
- ➢ CUT DOWN ALL HANGING DEBRIS
  - ❑ FLORESCENT LIGHTS
  - ❑ CONDUIT LINES
  - ❑ MONITORS
  - ❑ CAP SPRINKLER LINES
  - ❑ ELECTRICAL LINES
  - ❑ SPORT AUTHORITY SIGNAGE
  - ❑ PARTS OF THE ROOF DECKING
- ➢ UTILIZE KNUCKLE BOOM AND SCISSOR LIFTS TO CUT HANGING DEBRIS
- ➢ WET VAC ALL STANDING WATER
- ➢ TARP CORNER OF DEPARTMENT TO HELP SEAL OFF TO THE OUTSIDE ELEMENTS
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ REMOVE ALL THE SATURATED SHEETROCK AND ANY ADDITIONAL SHEETROCK THAT WILL ALLOW ASSESSMENT OF POTENTIALLY DAMAGED CINDER BLOCK WALL THAT IS COMMON TO GORDMANS DEPARTMENT STORE.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ MANIPULATE ALL THE EXERCISE EQUIPMENT AWAY FROM THE DAMAGED AREA
- ➢ REMOVE ALL THE RUBBERIZED ISLES WITH SCRAPPERS
- ➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

▮▮▮▮▮▮▮

- ➢ MANIPULATE ALL THE CONTENTS AWAY FROM THE DAMAGED AREA
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- ➢ REMOVE AND DISCARD THE RUBBER MATTING
- ➢ REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- ➢ SCRAPE ALL REMAINING GLUE FROM THE SLAB
- ➢ DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- ➢ REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- ➢ HEPA VAC ALL DUST DEBRIS PARTICLES
- ➢ REMOVE AND DISCARD ALL AFFECTED INSULATION
- ➢ WORK WITH REGIS ON THE INVENTORY COUNTING
- ➢ WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- ➢ UTILIZE THE ABOVE DRYING SCOPE
- ➢ TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- ➢ DAILY MOISTURE LOGS WILL BE REQUIRED

- ❖ NOTE- *SOME MATTING/CARPET WILL REMAIN UNDER THE RACKS UNTIL ALL CONTENTS HAVE BEEN INVENTORIED MOVED, AND THE RACKS DISASSEMBLED.*

- ❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

▮▮▮▮▮▮▮

- ➢ MANIPULATE ALL THE CONTENTS
- ➢ WET VAC ALL STANDING WATER
- ➢ REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS

TSA 00303

- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE AS WELL AS COUNTER DISPLAYS AND DISCARD DUE TO EXTENSIVE DAMAGE AND SPORTS AUTHORITY AUTHORIZATION.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE
- REMOVE AND DISPOSE OF COUNTER CHECK/OUT CASES THAT ARE SEVERELY WATER DAMAGED
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
- UTILIZE THE ABOVE DRYING SCOPE
- TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
- DAILY MOISTURE LOGS WILL BE REQUIRED

- *THESE CONTENTS ARE NOT DAMAGED AND WILL NOT BE SALVAGED. FOCUS ON THESE CONTENTS FROM A RESTORATION STAND POINT TO MANIPULATE AND RESTORE.*

- MANIPULATE ALL THE CONTENTS
- WET VAC ALL STANDING WATER
- REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
- REMOVE AND DISCARD THE RUBBER MATTING
- REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
- SCRAPE ALL REMAINING GLUE FROM THE SLAB
- DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
- FREE STANDING RACKS WILL BE TAGGED AND STORED INTO STORAGE CONTAINERS FOR OPTIONS A OR B.
    - A. TAGGED AND SALVAGE COMPANY WILL TAKE
    - B. TAGGED AND STORED FOR THE SPORTS AUTHORITY TO RE-USE IN THE SPRINGFIELD STORE OR SHIP TO OTHER STORES IN THE AREA.
- REMOVE ALL THE SATURATED SHEETROCK TO A HEIGHT OF 4' UP FROM THE FLOOR TO ALLOW QUICKER REPLACEMENT.
- HEPA VAC ALL DUST DEBRIS PARTICLES
- REMOVE AND DISCARD ALL AFFECTED INSULATION
- WORK WITH REGIS ON THE INVENTORY COUNTING
- WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.

TSA 00304

> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> REMOVE ALL THE SATURATED SHEETROCK ABOVE THE DOORWAY
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE. AT THE DIRECTION OF SPORTS AUTHORITY.
> REMOVE ALL THE SATURATED SHEETROCK AROUND DOORWAY DUE TO ROOF LEAKS
> HEPA VAC ALL DUST DEBRIS PARTICLES
> REMOVE AND DISCARD ALL AFFECTED INSULATION
> WORK WITH REGIS ON THE INVENTORY COUNTING
> WORK WITH SALVAGE COMPANY TO MANIPULATE CONTENTS AND HELP LOAD INTO TRUCKS FOR TRANSPORTATION.
> UTILIZE THE ABOVE DRYING SCOPE
> TREAT ALL AREAS WITH A ANTI-MICROBIAL AGENT
> DAILY MOISTURE LOGS WILL BE REQUIRED

❖ *THESE CONTENTS ARE TO BE SALVAGED DAMAGED DUE TO GLASS SHARDS SPREAD THROUGHOUT THE STORE.*

> MANIPULATE ALL THE CONTENTS
> WET VAC ALL STANDING WATER
> REMOVE AND DISPOSE ALL DEBRIS INTO COTTON PROVIDED DUMPSTERS
> REMOVE AND DISCARD THE RUBBER MATTING
> REMOVE AND DISCARD ALL COMMERCIAL GLUE DOWN CARPET
> SCRAPE ALL REMAINING GLUE FROM THE SLAB
> COVER RACKS WITH PLASTIC TO ALLOW FOR SHEETROCK REMOVAL WHILE PROTECTING RESALABLE MERCHANDISE.
> DISASSEMBLE ALL THE RACKS AND RE-LOCATE TO OTHER AREAS OF THE STORE

TSA 00365

E-FILED
Monday, 31 December, 2007  03:49:05 PM
Clerk, U.S. District Court, ILCD

'05/08/2006 15:25 FAX 3038642102          GART SPORTS

~2001   T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL

Date: 7-26-01
Contractor: VALOR CONTRACTING

| ITEM | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL |
|---|---|---|---|---|
| BID BREAKDOWN |||||
| 1. Barricade | | | | |
| 2. Demolition | | | | 10,500 |
| 3. Bond | | | | 7,452 |
| 4. Concrete | | | | 17,127 |
| 5. Carpentry | | | | 109,440 |
| 6. Studs and Drywall | | | | 0 |
| 7. Storefront Glass | | | | 1,500 |
| 8. Interior Mirrors | | | | 11,850 |
| 9. Acoustical Ceiling | | | | 36,038 |
| 10. Store Fixtures | | | | 18,640 |
| 11. Painting | | | | 105,888 |
| 12. Carpet Installation | | | | ABOVE |
| 13. Vinyl Tile and Base | | | | 37,534 |
| 14. Plumbing | | | | 30,025 |
| 15. Sprinklers | | | | 34,000 |
| 16. Electrical | | | | 9,800 |
| 17. Fire Alarm System | | | | 11,500C |
| 18. HVAC/Ventilation | | | | |
| 19. Dumpster | | | | 895 |
| 20. Insurance  BUILDERS RISK | | | | |
| 21. Supervision | | | | 14,402  ─ SUPERVISION |
| 22. General Conditions (Itemize) | | | | 20,255 |
| 23. Other (Itemize below) | | | | |
| SUBTOTAL | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 33,000 |
| 25. Taxes (Sales/State/Local) | | | | 3950 |
| TOTAL | $0 | $0 | $0 | $0 |

716,593
$22.78A

| List Itemizations below: (#22 - Gen Cond.) | | | | |
|---|---|---|---|---|
| 1. Final Cleaning | | | | |
| 2. Temporary Phones | | | | |
| 3. Tool Rental | | | | |
| List Itemizations below: (#23 - Other) | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 |
| 2. TOILET PARTITIONS | | | | 2,230 |
| 3. CONCRETE SEALING | | | | 2,340 |
| 4. | | | | |

736,848
$22.80A

Site Verification (please circle):     We have / have not verified site
                                        Amount of time to procure permit: O wks.
(UNION) / NON-UNION                     Amount of time for construction: O wks.
% of Union Increase:        %

Qualifications to be listed on separate sheet

7-26-01

**EXHIBIT D**

05/09/2006 15:25 FAX 3038642102    GART SPORTS                    ☑011
JUL-23-01 MON 04:01 PM  VANCL CONTRACTING    FAX NO. 217 10443    P.02/02

Sheet3

*Springfield*

*#618*

Vancil Contracting

Shell Bid

2001

| Division | Title | | Sportmart No. 618 |
|---|---|---|---|
| | | | Cost |
| 1000 | General Requirements | | $28,829 |
| 2000 | Excavate and Grade | | $80,642 |
| 3000 | Concrete Foundations and slabs | | $174,482 |
| 4000 | Masonry and Foam Insulation | | $168,251 |
| 5000 | Structural, Joists, and Deck | | $477,827 |
| 6000 | Rough Carpentry | | $12,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | $95,893 |
| 8100 | Doors, Frames | | $2,949 |
| 8300 | Overhead Doors | | $1,540 |
| 8400 | Storefronts | | $21,450 |
| 8460 | Auto Doors | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | $24,640 |
| 9900 | Exterior Painting | | $13,255 |
| 11100 | Dock Equipment | | $5,804 |
| 15400 | Plumbing Rough in | | $5,992 |
| 15700 | HVAC Curbs | | $3,122 |
| 16100 | Electrical Rough in | | $22,495 |
| | | | $831,117 |
| | Overhead and Profit | | $58,178 |
| | | | $889,295 |

$ 889,295.00 ÷ 32,308 ft² = $ 27.53 SQ FT.

LEASE AGREEMENT = $ 55.00 / SQ FT
                          27.53

AMOUNT REMAINING FOR T.I = $ 27.47 SQ FT.

$ 1,777 total

Page 1



05/09/2006 15:28 FAX 8086644002    GARN SPORTS    ⚁002

# AGC's Construction Inflation Alert
## Reported by AGC Chief Economist Ken Simonson

## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

## EXHIBIT E

05/08/2006 15:27 FAX 3038642702          GART SPORTS                          @004

# AGC's Construction Inflation Alert

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



Construction Materials Costs vs. CPI-U and PPI

Legend: CPI-U — PPI for Finished Goods — Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

05/09/2006 15:29 FAX 3038642102          GART SPORTS                                          ☐ 015

# AGC's Construction Inflation Alert

In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of 8.8 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

Chart 2



**Changes in Costs Among Construction Types**

Legend: Nonresidential Buildings — Highway & Street Construction — Other Heavy Construction — Multi-Unit Residential — Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 86 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.

05/09/2006 15:30 FAX 3038642702    GART SPORTS    ☒016

# AGC's Construction Inflation Alert

Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



**Chart 3**
*Change in Costs for Specific Construction Inputs*

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.



**Chart 4**
*Change in Costs for Basic Inputs Important to Construction*

05/09/2006 15:32 FAX 3038642102    GART SPORTS    ☒017



## AGC's Construction Inflation Alert

### Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.

### Metals

The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

### Oil & Natural Gas

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.

05/09/2006 16:33 FAX 3038642102          GART SPORTS                                    ☑018



# AGC's Construction Inflation Alert

The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

## Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



_____ simonsonk@agc.org) became Chief Economist of _____ General Contractors of America (AGC), the leading national _____ association for the construction industry, on September 10th, _____

_____ 30 years of experience analyzing, advocating and communicat-
____ economic and tax issues. Before joining AGC, he spent three _____ as senior economic advisor in the Office of Advocacy of the U.S. _____ Administration and 13 years as vice president and chief _____ for the American Trucking Associations. He also worked with _____ President's Commission on Industrial Competitiveness, the U.S. _____ of Commerce, the Federal Home Loan Bank Board, and an _____ consulting firm.

_____ e-bags email newsletter that summarizes the latest eco-
_____ is co-author of AGC's monthly Construction Tax News, a
_____ of construction in federal and state tax developments affecting the industry.

_____ from the University of Chicago and an MA in economics from
_____ is a board member of the National Association for Business

05/09/2006 15:34 FAX 3038642102    GART SPORTS    ☒019



# AGC's Construction Inflation Alert

## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

|  | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
|  | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.9 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | N/A | 5.4 | -0.5 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.6 | 3.0 | 10.1 | 8.1 | 2.6 |
| Construction machinery and equipment | -0.1 | 1.8 | 1.3 | 6.0 | 5.0 | 1.5 |
| Eq. for construction | 4.90 | 2.7 | 3.5 | 2.4 | 3.7 | 0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

|  | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
|  | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Nonresidential buildings | -0.05 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.6 | 1.0 | 2.6 | 10.8 | 14.1 | 2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 6.8 | 0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 9.0 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

|  | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
|  | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Iron ore | 1.5 | -1.3 | 1.8 | 6.7 | 15.5 | 3.7 |
| Iron and steel scrap | -8.6 | 27.8 | 84.9 | 50.6 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | N/A |
| Deformed bar | -19.5 | -8.6 | -37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.6 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.6 | 11.6 | 29.6 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.9 | 0.5 | 9.9 | 6.6 | 4.6 |
| Structural, architectural, pre-engineered metal prods | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | 0.2 |
| Architectural and ornamental metalwork | 0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.6 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | -0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | -0.8 | -0.4 | 3.6 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | 1.0 | 0.6 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.6 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.6 | 7.6 | 6.8 | 3.5 |
| Concrete block and brick | 2.8 | 1.8 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 6.7 | 11.8 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.6 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.8 | 9.2 | 6.4 | 26.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.8 |
| Asphalt | N/A | N/A | 10.0 | 19.5 | 17.6 | 8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.8 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.8 | 18.5 | 9.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.0 | 8.7 | 5.8 | 17.8 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.9 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | 1.7 |

05/08/2006 15:35 FAX 3038642102          GART SPORTS          ☒020

# AGC's Construction Inflation Alert

## Appendix 2: Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction—the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components—items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods—the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprel06.txt.*

| SOP Code | Commodity Code | Index | Relative importance |
| --- | --- | --- | --- |
| | | | |
| 22200 | | Materials and components for construct | 12.855  12.546 |
| | | Nonwovens and felt goods | .003  .003 |
| | | | .006  .006 |
| | | Industrial and other inorganic chemi... | .008  .008 |
| | | Industrial and other... and textiles | .009  .009 |
| | | other organic chemicals | .013 |
| | | | .006 |
| | | natural rubber | .006  .006 |
| | | Special purpose coatings and varnishes | .002  .002 |
| | | Miscellaneous mineral rubber | .044  .041 |

05/09/2006 15:38 FAX 3038642102    GART SPORTS    ☒ 021

# AGC's Construction Inflation Alert

| Code | Description | Val1 | Val2 |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .000 | .000 |
| 071202 | Inner tubes | .009 | .003 |
| 071203 | Tread rubber, tire sundries, & repair | .001 | .001 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .011 | .011 |
| 071996 | Miscellaneous rubber products, n.e.c | .956 | .955 |
| 072106 | Plastic construction products | .130 | .130 |
| 072205 | Unsupported plastic film/sheet/other s | .018 | .018 |
| 072904 | Laminated plastic sheets, rods, and tu | .081 | .081 |
| 072991 | Other plastic products | .043 | .043 |
| 081105 | Flooring, siding, and cut stock | .289 | .289 |
| 081106 | Softwood lumber, not edge worked, not | .035 | .035 |
| 081107 | Softwood lumber MFPM | .019 | .019 |
| 081203 | Hardwood dimension | .058 | .058 |
| 081204 | Hardwood flooring | .075 | .075 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083501 | Softwood veneer, inch veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | |
| 084903 | Wood lbs, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .146 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 094305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091505 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board, asphalt, hardpressed, insul, o | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals, circulation/adverti | — | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stal | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .148 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

05/09/2006 15:38 FAX 303864?02    GART SPORTS    ☒022

# AGC's Construction Inflation Alert

| Code | Description | | |
|------|-------------|------|------|
| 104101 | Builders' hardware | .049 | .049 |
| 104106 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elec., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107101 | Metal doors and frames, exc. storm | .169 | .170 |
| 107102 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107103 | Metal molding and trim and storefronts | .021 | .022 |
| 107104 | Storm sash and doors | .019 | .019 |
| 107105 | Screens and weatherstrip | .061 | .062 |
| 107106 | Metal tanks | .106 | .107 |
| 107201 | Sheet metal products | .542 | .547 |
| 107301 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107404 | Fabricated structural metal | .392 | .395 |
| 107405 | Miscellaneous metal work | .118 | .119 |
| 107407 | Architectural and ornamental metalwork | .191 | .192 |
| 107405 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107409 | Heat exchangers and condensers | .046 | .046 |
| 107501 | Fabricated steel plate | .058 | .059 |
| 107601 | Steel power boilers | .009 | .009 |
| 107701 | Nuclear steam supply systems | .008 | .008 |
| 107801 | Prefab. metal bldg. systems, ex. farm's | .131 | .132 |
| 107901 | Other prefab. & portable metal building | .047 | .048 |
| 107902 | Panels, parts, & sections for prefab | .016 | .016 |
| 107903 | Externally thread. fasteners, exc. airc | .005 | .005 |
| 108102 | Internally thread. fasteners, ex. airc. | .001 | .001 |
| 108103 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108104 | Other formed fasteners | .001 | .001 |
| 108106 | Residential | .027 | .028 |
| 108302 | Commercial, institutional or industrial | .099 | .099 |
| 108303 | lighting equipment, n.e.c. | .059 | .059 |
| 108305 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108801 | Steel nails and spikes | .027 | .028 |
| 108802 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108807 | Other fabricated ferrous wire products | .088 | .088 |
| 108809 | Other metal products | .036 | .037 |
| 108905 | Metal stampings n.e.c. | .005 | .005 |
| 108907 | Industrial pumps | .012 | .012 |
| 114102 | Parts & attach for air & gas compresso | .004 | .004 |
| 114107 | Industrial spraying equipment | .004 | .004 |
| 114108 | Other pumps, including parts | .011 | .011 |
| 114112 | Domestic water systems | .002 | .002 |
| 114113 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114115 | Elevators & escalators | .044 | .044 |
| 114201 | Conveying equipment | .002 | .002 |
| 114402 | Fans and blowers, except portable | .047 | .047 |
| 114701 | Heat transfer equipment | .187 | .186 |
| 114801 | Unitary air conditioners | .236 | .235 |
| 114802 | Other a/c and refrigeration equipment | .017 | .017 |
| 114806 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114809 | Metal valves, except fluid power | .144 | .143 |
| 114902 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114903 | Filters and strainers | .006 | .006 |
| 114908 | Other miscellaneous general purpose eq | .011 | .011 |
| 114911 | Current carrying | .162 | .161 |
| 117101 | | | |

05/09/2008 05:47 FAX 3086841018 CARP SPORTS 023

# ACC's Construction Inflation Alert

| Code | Description | Former | Revised |
|---|---|---|---|
| 11740 | | .262 | .206 |
| 117A02 | Switchgear & switchboard apparatus | .262 | .461 |
| 11752 | Radio & television communication equip | .149 | .199 |
| 11760 | Current-carrying lamps/bulbs | .000 | .000 |
| 117D03 | Electric lamps, bulbs and tubes | .006 | .003 |
| 117704 | Storage batteries | .002 | .092 |
| 117A01 | Environmental controls | .181 | .166 |
| 118A05 | Process control instruments | .000 | .000 |
| 118201 | Fluid meters and counting devices | .002 | .002 |
| 118301 | Aircraft engine instruments | .000 | .000 |
| 118901 | Nuclear radiation detect & monitoring | .000 | .000 |
| 118904 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Geoth. geophysical & general instrumen | .000 | .000 |
| 118905 | Metal household furniture | .003 | .003 |
| 121101 | Porch and lawn furniture | .002 | .002 |
| 121501 | Wood office furniture and store fixtur | .047 | .047 |
| 122101 | Partitions and fixtures | .032 | .032 |
| 122204 | Public building furniture | .009 | .009 |
| 122301 | Carpets & rugs | .093 | .092 |
| 123101 | Hard surface floor coverings | .031 | .031 |
| 123201 | Other major appliances | .036 | .036 |
| 124104 | Vacuum cleaners | .002 | .002 |
| 124301 | Small household appliances | .007 | .007 |
| 124107 | Sheet, plate, and float glass | .006 | .006 |
| 131105 | Cement | .079 | .079 |
| 132201 | Structural block | .094 | .094 |
| 133101 | Decorative block | .011 | .011 |
| 133121 | Concrete brick | .007 | .007 |
| 133101 | Paving blocks | .012 | .012 |
| 133141 | Concrete pipe | .094 | .094 |
| 133201 | Ready-mixed concrete | .665 | .665 |
| 133301 | Precast concrete products | .025 | .025 |
| 133401 | Prestressed concrete products | .077 | .077 |
| 133601 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134201 | Glazed brick struct, hollow & facing | .004 | .004 |
| 134202 | Ceramic floor and wall tile | .027 | .027 |
| 134401 | Structural clay products, n.e.c. | .006 | .006 |
| 134501 | Clay refractories | .025 | .024 |
| 135201 | Refractories, non-clay | .032 | .032 |
| 135301 | Prep. asphalt & tar roofing & siding p | .206 | .206 |
| 136101 | Other asphalt roofing | .038 | .038 |
| 136201 | Gypsum products | .172 | .172 |
| 137101 | Mineral wool for structural insulation | .129 | .129 |
| 138201 | Paving mixtures and blocks | .312 | .312 |
| 139401 | Cut stone and stone products | .029 | .029 |
| 139501 | Gaskets and gasketing material | .002 | .002 |
| 139801 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139902 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 139903 | Signs and advertising displays | .009 | .009 |
| 159A04 | | | |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category--Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 ship-ment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

05/05/2006 15:21 FAX 3038642102          GART SPORTS                                    ☑ 008

## SUMMARY OF REPLACEMENT AND REPAIR COSTS

5/1/2006

**Sports Authority**
#618  Springfield

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | |
|---|---|
| Shell Costs | $889,295 includes all grading, foundation and slab |
| TI Costs | $716,593 |
| Sub-Total | $1,605,888 |
| *3% estimate for original project changes | $48,177 |
| Sub-Total | $1,654,065 |
| **18.5% estimated 5 year cost increase | $306,002 |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 |
| 35% threshold as defined by the lease | $686,023 |
| Estimated Repair costs (detail attached) | $1,046,701 |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis   of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

## EXHIBIT F

05/09/2008 15:25 FAX 3038642102   GART SPORTS                     ☑009

## BUDGET ESTIMATE

**Sports Authority**
#849
5227 South Veterans Parkway
Springfield, IL 62704
Budget qty: 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| | | Invoice attached | $349,328 |
| Emergency Response from Cotton USA | | | $62,000 |
| Architectural and Engineering | | | $26,500 |
| Shoring/Stabilizing | | | $66,400 |
| Selective Demolition - Balance of Damage | | 4960 sq ft | $57,600 |
| Structural - 12x4 in Bar Joist & Deck | | 1 elevation | $40,500 |
| Masonry/Beam/Pockets etc. | Colm Line E | | $23,560 |
| Replace 12x5 Structural masonry wall | | | $55,500 |
| Roof Repair and Insulation | | 15k sq ft   $62,000 for entire roof | $29,600 |
| Replace Existing Storefront & Glass | | | $21,200 |
| Sprinkler Rework Existing - Damaged | | | $32,950 |
| Fire Alarm Minor Device Replacement | | | $57,500 |
| Ductwork Remove and replace | | | $59,650 |
| HVAC Repair existing units | | | $37,600 |
| Drywall Finishing Taping Perimeter 4' U/S of Deck | | 4' up at Perim | $56,980 |
| Minor ACT Drop T-Bar Replacement | | 4,000 sf | $6,290 |
| Electrical Safe off & Circuit Verification | | Sales Floor | $14,650 |
| Light Fixture Installation Only | 60 Fixtures | Materials | $4,650 |
| Light fixtures | 60 Fixtures | | $6,650 |
| Paint to match at lower levels | | .40 per ft | $10,042 |
| Floor Prep & Adhesive Removal | | | $43,500 |
| Entire Flooring Installation | | Materials | $86,560 |
| Flooring material misc. | | Install Only | $4,200 |
| RR Plumbing Re-installation | | Install Only | $6,720 |
| Entire New Premise Millwork Installation | | Materials | $26,000 |
| Millwork | | | $3,560 |
| Install Toilet Partitions/Accessories | | Union | $11,000 |
| Final Cleaning - Deodorizing | | 10 X $410.00 | $4,100 |
| Dumpsters | | | $11,000 |
| Barricades - Dismantling of Existing | | | $12,600 |
| Protection of finish materials | | | $6,290 |
| Misc Rental Equipment | | 4% | $29,600 |
| Contingency | | | $27,560 |
| General Conditions (itemize) | 9 Weeks | $2,375 Per Wk | $21,375 |
| Supervision | | | $2,200 |
| City Required Fire Watch | | | $4,000 |
| Permits | | | $986,745 |
| SUBTOTAL | | | |
| Allowances | | N/A | |
| SUBTOTAL | | | $14,081 |
| Insurance | | 1.50% | $98,675 |
| Profit & Overhead | | 10% | $46,987 |
| Premium for expedited work | | 5% | $1,046,701 |
| TOTAL | | | |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | $2,400 |
| Misc Construction Materials | | | $6,100 |
| PM Travel Misc Office & Field Costs | | | $2,200 |
| Temp Phone Cell Ph etc. | | | $7,500 |
| Construction Laborers & Clean-up | | | $1,800 |
| Superintendent Travel | | | $1,550 |
| Administration Time | | | |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

| UNION / NON-UNION | Amount of time for construction: | wks | Weeks | |
|---|---|---|---|---|
| % of Union Increase: % | | | | |

# Sports Authority

Date:            4/3/2006

Sportmart #818
3211 South Veterans Parkway
Springfield, IL 62704

Contractor:        Wolford Retail Builders, Inc.
Union              Revised 5/7        J. Wolford

Budgetary- Insurance- 82,513 sf

## BID BREAKDOWN

| ITEM | MATERIAL | LABOR- Union | PRICE/SQFT | TOTAL |
|---|---|---|---|---|
| 1. Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2. Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $29,600 |
| 3. Structural- 110' st Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4. Masonry Beam Pockets etc. | Conn Line E | relevation | Budget- Estimation | $41,500 |
| 5. Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $99,500 |
| 6. Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7. Sprinkler- Rework Existing- Dan | | Deduct Scope | Budget- Estimation | $8,500 |
| 8. Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9. Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall Finish Taping Perimete | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalceme | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- | Sales | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixtur | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaining | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Remova | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring Installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,500 |
| 20. Entire New Premier Millwork Ins | | Install Only | Budget- Estimation | $47,500 |
| 21. New Toilet Partitions/ Acessorie | Salvage Parti | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supetvision | 9 Weeks | $2,375 Per Wk | Incld's Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| SUBTOTAL | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| Emergency Response | | | Actual | $319,428 |
| TOTAL | | | Revised | $1,063,972.00 |
| List Itemizations below: (#25 - Gen Cond.) | | | Budget- Estimation | $2,400 |
| Mics. Construction Materials | | | Budget- Estimation | $6,100 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $2,200 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $7,500 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $3,700 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $1,800 |
| Superintendent- Travel | | | Budget- Estimation | $1,550 |
| Administration Time | | | | |

Site Verification (please circle):    We have / have not verified site

Amount of time to procure permit         wks.

## Jeff Wolford

| | |
|---|---|
| **From:** | David Frieder [dfrieder@thesportsauthority.com] |
| **Sent:** | Monday, May 08, 2006 8:50 AM |
| **To:** | Jeff Wolford |
| **Subject:** | RE: #618 Springfield- Revised owner spreadsheet |

Jeff,  This is great.  It's only about $17k different from the original but with more authority since you made the visit.  Thanks for going out there.  I passed this along to Legal.  Since it is such a small difference, I don't think that we'll send a revised letter to the LL.  The biggest difference is actually the roof which we don't know.  Thanks again.  David

**From:** Jeff Wolford [mailto:jwolford@wolfordretailbuilders.com]
**Sent:** Monday, May 08, 2006 7:02 AM
**To:** David Frieder
**Subject:** #618 Springfield- Revised owner spreadsheet

David, per our conversation when I was on site last Thursday the 4th, please see the redlines made in the attached revised owner bid sheet referencing deducts and added scope note: if the shell GC did replace the entire roof, did it require tear off also? If so you can add another $55,000 to this revised SS...Jeff

Jeff Wolford
Owner
***WOLFORD RETAIL BUILDERS, INC.***
jwolford@wolfordretailbuilders.com
847-394-4504 main
847-309-9675 mobile
847-394-4506 fax

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

10/29/2007

**EXHIBIT**
**13**

Page 1 of **E-FILED**
Monday, 31 December, 2007  03:49:26 PM
Clerk, U.S. District Court, ILCD

## Jeff Wolford

| | |
|---|---|
| **From:** | David Frieder [dfrieder@thesportsauthority.com] |
| **Sent:** | Thursday, May 04, 2006 9:26 AM |
| **To:** | Jeff Wolford |
| **Subject:** | RE: Springfield site visit |

The contractor is Jones/Blythe however I don't know who the super is.  You may need to go in as the fixture installer, an insurance rep or someone  from TSA.  Please give me an idea of what it will take to pack up the fixtures and remove them for use somewhere else.   Looks like we will have to do that fairly quickly now that we have decided to move out.  We'll need to be broom clean and that will take some doing.

---

**From:** Jeff Wolford [mailto:jwolford@wolfordretailbuilders.com]
**Sent:** Thursday, May 04, 2006 5:55 AM
**To:** David Frieder
**Subject:** Springfield site visit

David, I will be on site late morning today...I will call you on your cel. also is there a field contact I should meet with first?

Jeff Wolford
Owner
**WOLFORD RETAIL BUILDERS, INC.**
jwolford@wolfordretailbuilders.com
847-394-4504 main
847-309-9675 mobile
847-394-4506 fax


No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.467 / Virus Database: 269.7.3/809 - Release Date: 5/17/2007 5:18 PM

EXHIBIT
14

10/29/2007

E-FILED
Monday, 31 December, 2007  03:49:37 PM
Clerk, U.S. District Court, ILCD

EXHIBIT
15

# Sports Authority

Sportmart #818
3211 South Veterans Parkway
Springfield, IL 62704

Contractor:
Union

Date:          4/3/2006
Wolford Retail Builders, inc.
Revised 5/7      J. Wolford

Budgetary- Insurance- 82,513 sf

### BID BREAKDOWN

| ITEM | MATERIAL | LABOR- Union | PRICE/SQ.FT. | TOTAL |
|---|---|---|---|---|
| 1. Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2. Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3. Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4. Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5. Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6. Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7. Sprinkler- Rework Existing- Dan | | Deduct Scope | Budget- Estimation | $8,500 |
| 8. Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9. Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimete | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT's- T-Bar Repalceme | Added Scope | 4,000 sf | Budget- Estimation | $11,309 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixtur | Installation | Incl's Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaining | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Remova | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring Installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Ins | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessorie | Salvage Parti | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Incl's Per- Diem | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per Wk | Budget- Estimation | $21,375 |
| 27. City Required Fire Watch | | Verify | Revised | $2,200 |
| SUBTOTAL | | | | $682,017.00 |
| 28. Allowances | | | N/A | |
| SUBTOTAL | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| Emergency Response | | | Actual | $319,428 |
| TOTAL | | | Revised | $1,063,372.00 |
| List Itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer's & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| | Site Verification (please circle): | | We have / have not verified site | |
| | | | Amount of time to procure permit: | WKS. |

**E-FILED**
Monday, 31 December, 2007  03:49:46 PM
Clerk, U.S. District Court, ILCD

# Sports Authority

Sportmart #618                                    Date:              4/3/2006
3211 South Verterans Parkway        Contractor:  Wolford Retail Builders, Inc.
Springfield, IL 62704                      Union        **Revised 5/7**      J. Wolford

| ITEM | MATERIAL | LABOR- Unit | PRICE/SQ.FT. | TOTAL |
|------|----------|-------------|--------------|-------|
| Budgetary- Insurance- 32,513 sf | | **BID BREAKDOWN** | | |
| 1.   Shoring- Stabilizing | | | Budget- Estimation | $28,000 |
| 2.   Selective Demolition- Balance of Damage | | Added Scope | Budget- Estimation | $28,600 |
| 3.   Structural- 110' sf Bar Joist & Deck | | 12,100 sf | Budget- Estimation | $87,600 |
| 4.   Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | Budget- Estimation | $41,500 |
| 5.   Roofing & Roof Insulation | Verify Scope | 15,000 sf | Budget- Estimation | $39,500 |
| 6.   Replace Existing Storefront & Glass | | Deduct Scope | Budget- Estimation | $29,900 |
| 7.   Sprinkler- Rework Existing- Dam | | Deduct Scope | Budget- Estimation | $8,500 |
| 8.   Fire Alarm- Minor Device Replacement | | | Budget- Estimation | $2,950 |
| 9.   Ductwork- Replacement of Damaged Only | | | Budget- Estimation | $26,500 |
| 10. Drywall/ Finish Taping Perimeter | Added Scope | 4' up at Perim | Budget- Estimation | $45,100 |
| 11. Minor ACT`s- T-Bar Repalcemen | Added Scope | 4,000 sf | Budget- Estimation | $11,300 |
| 12. Electrical- Safe off- Curcuit Verification | | | Budget- Estimation | $6,200 |
| 13. Light Fixture Installation Only | 50 Fixtures | Added Scope | Budget- Estimation | $48,500 |
| 14. Repaint- Entire Sales and Non- Sales | | Added Scope | Budget- Estimation | $22,300 |
| 15. Dismantling- Sales Floor Fixturin | Installation | Incl`s Re-Insta | Budget- Estimation | $109,000 |
| 16. Existing Flooring Removal | Added Scope | Mics. Remaini | Budget- Estimation | $15,400 |
| 17. Floor Prep & Adhesive Removal | | .40 per ft | Budget- Estimation | $10,042 |
| 18. Entire Flooring installation | | | Budget- Estimation | $37,900 |
| 19. RR- Plumbing Re-Installation | Added Scope | Install Only | Budget- Estimation | $8,800 |
| 20. Entire New Premier Millwork Inst | | Install Only | Budget- Estimation | $4,500 |
| 21. New Toilet Partitions/ Acessories | Salvage Partit | Deduct Scope | Budget- Estimation | $1,850 |
| 22. Final Cleaning- Deodorizing | | Union | Budget- Estimation | $11,000 |
| 23. Dumpsters | Added Units | 15 X $410.00 | Budget- Estimation | $6,150 |
| 24. Barricades- Dismantaling of Existing | | | Budget- Estimation | $2,100 |
| 25. General Conditions (Itemize) | | | Budget- Estimation | 25,250 |
| 26. Supervision | 9 Weeks | $2,375 Per W | Incld`s Per- Diem | $21,375 |
| 27. City Required Fire Watch | | Verify | Budget- Estimation | $2,200 |
| **SUBTOTAL** | | | Revised | $682,017.00 |
| 28. Allowances | | | N/A | |
| **SUBTOTAL** | | | | |
| 29. Insurance | | | 1 Percent | $6,820.00 |
| 30. Profit & Overhead (10% Max.) | | | 8 Percent | $55,107.00 |
| **TOTAL** | | | Revised | $743,944.00 |
| List itemizations below: (#25 - Gen Cond.) | | | | |
| Mics. Construction Materials | | | Budget- Estimation | $2,400 |
| PM Travel- Misc Office & Field Costs | | | Budget- Estimation | $6,100 |
| Temp Phone- Cell Ph etc. | | | Budget- Estimation | $2,200 |
| Construction Laborer`s & Clean-up | | | Budget- Estimation | $7,500 |
| Equipment Rental- Folk Lift | | | Budget- Estimation | $3,700 |
| Superintendent Travel | | | Budget- Estimation | $1,800 |
| Administration Time | | | Budget- Estimation | $1,550 |
| Site Verification (please circle): | | We have / have not verified site | | |
| | | Amount of time to procure permit: | wks. | |
| UNION    /    NON-UNION | | Amount of time for construction: | Weeks | |

**EXHIBIT**

16

Bumberg No. 5308