**E-FILED**
Thursday, 24 January, 2008  04:03:16 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

|  |  |  |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, | ) ) ) ) ) ) | |
| Plaintiff/Cross-Complainant, | ) ) ) | Case No.: 06-CV-3177 |
| v. | ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation,, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

## TSA'S RESPONSE TO SWPLAZA'S MOTION FOR SUMMARY JUDGMENT

Defendant TSA Stores, Inc., a Delaware corporation, as successor to Gart Bros. Sporting Goods ("TSA" or "Tenant") by its attorneys, Hinshaw & Culbertson LLP, responds to the motion for summary judgment of Plaintiff, SWPlaza III, LLC ("SWPlaza" or "Landlord"), prays that it be denied, and states as follows:

### I.  INTRODUCTION

Landlord's motion for summary judgment is without merit.  Rather than basing its motion on reasoning, Landlord offers nothing but rhetoric – a diatribe against Tenant and its expert rather than legal analysis.  Instead of arguing undisputed facts, Landlord asks this Court to consider its own speculation as to the actions of Tenant and its expert.  Moreover, Landlord requests judgment as a matter of law based upon a list of its contractor's "actual" costs of construction.  The purported actual costs do not matter in this case.  They were not and could not have been compiled until after the expiration of Tenant's right to terminate the Lease. Additionally, the contractor admits that the list does not include all construction costs.  In fact, at this point, Landlord and its contractor still have not determined all actual construction costs of

the premises. The issue in this case is not what the actual, incomplete costs of reconstruction are, but whether TSA acted reasonably in determining that the contractual threshold had been met.

Contrary to Landlord's bald and unsupported assertions, where an option to terminate a lease is ambiguous, the option is construed in favor of the party possessing the option. In the matter *sub judice,* Tenant objectively assessed the cost of repairs, and reasonably and in good faith determined that the 35% threshold had been met or exceeded. Conversely, during the sixty-day window in which Tenant could exercise its option to terminate, Landlord tendered nothing but an irrelevant analysis of damage to physical components, rather than an analysis of costs of reconstruction, and an opinion based entirely upon conjecture and speculation.

The evidence in this matter clearly reveals that Landlord has no entitlement to summary judgment, but, even more importantly, the undisputed evidence establishes Tenant's right to judgment as a matter of law, as demonstrated in Tenant's own motion for summary judgment. Accordingly, SWPlaza's motion for summary judgment must be denied.

In support hereof, TSA attaches the following exhibits:

Exhibit A –    Selected pages from the deposition of Mark Sorensen, taken in this cause on October 22, 2007 (referred to as "Sorensen Deposition");

Exhibit B -    Selected pages from the deposition of Jeffrey Wolford, taken in this cause on October 30, 2007 (referred to as "Wolford Deposition");

Exhibit C -    Declaration of Cynthia Cashman (referred to as "Cashman Declaration");

Exhibit D -    Declaration of Michael R. Mavelle (referred to as "Mavelle Declaration"); and

Exhibit E -    Correspondence dated May 3, 2006 from David Frieder to Landlord.

## II.  RESPONSE TO UNDISPUTED MATERIAL FACTS

**A.    Agreed Undisputed Materials Facts**

The following numbered items, taken from Section II of Landlord's motion for summary judgment, are undisputed and material:

1;

2;

3;

4;

5;

6;

7;

9;

11;

13.    Notwithstanding that Exhibit 7 to Landlord's motion for summary judgment has not been submitted in accordance with Fed.R.Civ.P. 56(e), Tenant agrees that Exhibit 7 is an estimate of cost prepared by David Frieder;

21;

22;

25; and

26.

**B.    Disputed Material Facts**

The following numbered items, taken from Section II of Landlord's motion for summary judgment, are disputed:

3

8.      Although Tenant agrees that Landlord, through its counsel, corresponded with Tenant stating its view that the cost of repair would not exceed the 35% threshold, as set forth in Paragraph 15 of the Lease, and that Landlord intended to make repairs, Tenant disputes the accuracy of that view in that it was derived from an opinion of its expert employing an erroneous analysis under the Lease and not on any acceptable methodology.   Rather than detailing reconstruction costs as a percentage of the then-total reconstruction cost, Landlord's expert reviewed the proportion of damage to various physical components.  (Sorensen Deposition, p. 12, 15-22.)  Rather than utilizing an appropriate methodology in concluding that the repair would not exceed 35% of the then-total reconstruction cost, Landlord's expert based his opinion on his "gut feel[ing]."  (Sorensen Deposition, p. 25.)

10.      Although Tenant agrees that, prior to the expiration of sixty days from the March 12, 2006, tornadic event, Landlord provided to Tenant information from Landlord's contractor, which included the contractor's opinion that the cost of repair or replacement would not reach the 35% threshold, Tenant disputes the accuracy, reliability, and relevance of that opinion. Rather than detailing reconstruction costs as a percentage of the then-total reconstruction cost, Landlord's contractors reviewed the proportion of damage to various physical components. (Sorensen Deposition, p. 12, 15-22.)   Rather than utilizing an appropriate methodology in concluding that the repairs would not exceed the 35% threshold, Landlord's contractor based his opinion on his "gut feel[ing]."  (Sorensen Deposition, p. 25.)

15.      Wolford's estimate of direct reconstruction costs is $743,944, but that figure does not include any costs attributed to Cotton USA, the disaster recovery company retained by Tenant, that are part of reconstruction or repair of the premises.  (Wolford Deposition, p. 83.) Wolford has estimated that $118,211 of the costs of Cotton USA should be considered as costs of repair or reconstruction.  (Wolford Expert Witness Report.)

4

20.     Notwithstanding that Exhibit 7 to Landlord's Motion for Summary Judgment has not been submitted in accordance with Fed.R.Civ.P. 56(e), Tenant disputes Landlord's characterization of Exhibit 7.  Exhibit 7 specifically states in part as follows:

> I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhat reasonable but on the high side since this is the start of negotiation.

(Exhibit 7 to Landlord's motion for summary judgment.)

23.     Although Mark Sorensen prepared a table identifying certain actual and estimated costs, that table is not complete.  Sorensen's table does not include any costs of reconstruction performed by Cotton USA (Sorensen Deposition, p. 60-69), unfinished items, including flooring materials, electrical items, including flooring materials, electrical matters, plumbing matters, and fire safety matters (Sorensen Deposition, p. 37-42), and any tenant specifications required by the Lease.  (Sorensen Deposition, p. 35.)

24.     Although Sorensen's report includes some items of actual costs, it is incomplete in the manner set forth in paragraph 23 above.

**C.      Immaterial Facts**

The following numbered items, taken from Section II of Landlord's motion for summary judgment, are immaterial to the issues of this cause:

12.     The date that Tenant terminated its employees is of no consequence.  The issue in this case is whether the right of Tenant to terminate the Lease had been triggered.

14.     The person who prepared the report is of no consequence.  The issue in this cause is whether Tenant's right to terminate the Lease had been triggered, and to that issue, the contents of the report and its reliability, relevance, and reasonableness are material.

16.     The number of times that Wolford revised his estimate and his not retaining any earlier versions are not material.  The issue in this cause is whether Tenant's right to terminate

5

the Lease had been triggered, and to that issue, the contents of Wolford's estimate, and the reasonableness, the reliability, and the relevance thereof, are material.

17.     The number of revisions in Wolford's estimate is of no consequence.  The issue in this cause is whether Tenant's right to terminate the Lease had been triggered, and to that issue, the contents of his estimate, and the reasonableness, reliability, and relevance thereof, are material.

18.     The number of line item estimates deleted or changed is of no consequence.  The issue in this cause is whether Tenant's right to terminate the Lease had been triggered, and to that issue, the contents of the estimate, and the reasonableness, reliability, and relevance thereof are material.

19.     The number of line item estimates deleted or changed is of no consequence.  The issue in this cause is whether Tenant's right to terminate the Lease had been triggered, and to that issue, the contents of the estimate, and the reasonableness, reliability, and relevance thereof are material.

### D.     Additional Facts

The following additional material facts are raised in opposition to Landlord's motion for summary judgment:

1.     During the days immediately following the tornado of March 12, 2006, TSA focused on safeguarding its property at the leased premises, protecting the health and safety of persons in and around the leased premises, and assessing the nature and extent of the damage to the leased premises.  (Cashman Declaration, par. 10; Mavelle Declaration, par. 14.)

2.     TSA representatives, including Mike Mavelle, Vice President-Risk Management, traveled to Springfield from Colorado on March 13, 2006, to visit the premises and view the damage.  (Mavelle Declaration, par. 16; Cashman Declaration, par. 11.)

6

3.      TSA retained Cotton USA ("Cotton"), a company specializing in disaster recovery services, to stabilize and safeguard the TSA premises, including the structure and its systems and the fixtures in the premises.  (Mavelle Declaration, par. 15.)

4.      On Thursday, March 21, 2006, David Frieder, TSA's Vice President of Construction, visited the leased premises.  (Cashman Declaration, par. 13; Mavelle Declaration, par. 17.)

5.      During his visit on or near March 16, 2006, Mr. Mavelle observed that TSA's leasehold in Springfield, Illinois, sustained various holes in its roof; a bowed wall, shared with its neighbor to the south; glass in front, including doors, blown out; water damage; and lost power. (Mavelle Declaration, par. 16.)

6.      By letter dated March 29, 2006, the landlord's attorney, David Rolf, advised TSA that Jones-Blythe had "provid(ed) an opinion as to the extent of the damage to the premises leased to Sports Authority.  As you can see from this estimate, the damage does not exceed the 35% threshold. . . ."  (Mavelle Declaration, par. 19; Complaint, pars. 8-10;  Exhibit E to the Complaint; Answer, pars. 8-10.)

7.      A copy of the Jones-Blythe "estimate," also dated March 29, 2006, prepared by Mark A. Sorensen, was included with Mr. Rolf's letter.  (Mavelle Declaration, par. 19; Exhibit D to Mavelle Declaration; Exhibit E to the Complaint.)

8.      Rather than detailing reconstruction costs as a percentage of the then-total reconstruction cost, Mr. Sorensen analyzed the proportion of damage to various physical components of TSA's  leasehold.  (Sorensen Deposition, p. 12, 15-22.)

9.      On March 29, 2006, Mr. Sorensen had no opinion as to the then-total replacement costs of TSA's leasehold.  (Sorensen Deposition, p. 15.)

60170219v1 868372

10.    On March 29, 2006, Mr. Sorensen had no cost estimates to repair the damage to or reconstruct TSA's leased premises as a result of the casualty. (Sorensen Deposition, p. 22-24.)

11.    On March 29, 2006, Mr. Sorensen was aware of neither the "Construction Provisions" of the lease nor TSA's specifications and requirements for the leased premises as incorporated in the "Construction Provisions" of the Lease and did not take them into account at any time.  (Sorensen Deposition, p. 34-35.)

12.    Not withstanding his lack of knowledge as to the then-total reconstruction costs of TSA's leasehold and as to the costs of reconstruction of the damaged components of the leasehold, Mr. Sorensen issued an opinion, based upon his "gut feel[ing]," that the damage would "not exceed 30% of the total replacement cost of the premises." (Sorensen Deposition, p. 25.)

13.    As part of its damage assessment process, in late March, 2006, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs for TSA's leasehold as a result of the tornado.  (Wolford Deposition, p. 5-8; Mavelle Declaration, par. 20; Cashman Declaration, par. 14.)

14.    For more than 20 years, Mr. Wolford has worked on construction of "big box" stores.  (Wolford Deposition, p.7-16.)  For the past 2½ years, he has owned and operated a business constructing retail big box stores, primarily TSA stores and has acquired knowledge of TSA specifications for its stores. (Wolford Deposition, p. 14.)

15.    On behalf of his then employer, Mr. Wolford provided a bid in 2001 in connection with the original construction of the TSA premises at the shopping center but was not selected for that project.  (Wolford Deposition, p. 22.)

8

16.    At TSA's request, Mr. Wolford prepared a budget estimate of the reconstruction of TSA's leased premises.  (Wolford Deposition, p.8-9; Mavelle Declaration, pars. 20, 21; Cashman Declaration, pars. 14, 15.)  Wolford provided his initial budget estimate on April 19, 2006.  (Wolford Deposition, p. 10.)

17.    Buttressed by the original Wolford budget estimate,  on May 1, 2006, TSA, by Mr. Frieder, prepared an estimate of the total building replacement costs and the repair costs of its leased premises.  (Mavelle Declaration, par. 21; Exhibit E to Mavelle Declaration; Complaint, par. 9; Exhibit E to Complaint.)

18.    TSA estimated that the estimated repair cost of the leased premises, including the Cotton fees of $319,428, was $1,046,701, or 53.4% of the then-total replacement costs. (Mavelle Declaration, pars. 23-25; Exhibit E to Mavelle Declaration; Cashman Declaration, par. 17.)

19.    Based upon its cost assessments and analysis, TSA determined that its termination right under the lease was triggered and elected to exercise that option.  (Mavelle Declaration, par. 26; Cashman Declaration, par. 18.)

20.    By letter dated May 3, 2006, less than 60 days after the casualty, TSA, by Mr. Frieder, served notice upon the landlord that TSA was terminating the lease in accordance with Section 15(b) thereof.  (Complaint, par. 9; Answer, par. 9; Exhibit D to Complaint, Mavelle Declaration, par. 27;  Exhibit F to Mavelle Declaration; Cashman Declaration, par. 19; Exhibit D to Cashman Declaration.)

21.    When Jones-Blythe began its reconstruction or repair activities on the premises on March 14 or March 15, 2006 (Sorensen Deposition, p. 36), it did not and could not prepare a bid or estimate for the repairs and reconstruction.  (Sorensen Deposition, p. 12.)

9

22.     Although Jones-Blythe anticipated completion of its reconstruction or repair of the premises by June 1, 2006, more than 60 days after the date of the casualty, all reconstruction and repair to the premises were not completed as of October 22, 2007.  (Sorensen Deposition, p. 37-42.)

23.     In the second to last or last week of May, 2006, more than 60 days after the date of the casualty, Arthur Seppi directed Jones-Blythe to discontinue its reconstruction and repair efforts of the TSA store in Springfield.  (Sorensen Deposition, p. 37, 42.)

24.     As of June 1, 2006, more than 60 days after the date of the casualty, flooring, tenant improvements, certain electrical issues with respect to the teller counters, junction boxes, and blanking or trimming of floor electrical boxes, plumbing (no hot water and no installed urinals), fire safety ceiling panels, and the installation of fire extinguishers had not been supplied or completed at the premises.  (Sorensen Deposition, p. 37-42.)

25.     Jones-Blythe did not take any tenant specifications into account during its reconstruction activities.  (Sorensen Deposition, p. 35.)

26.     Although all work performed by Cotton at TSA's premises in Springfield, Illinois, would not properly be considered a repair or reconstruction activity, some of these efforts would be properly deemed repair or reconstruction.  (Sorensen Deposition, p. 45-46; Sorensen's Expert Witness Report attached as Exhibit 5 to the Sorensen Deposition; Wolford Deposition, p. 41-47.)

27.     Among the services provided by Cotton at TSA's leased premises were the following:

    (a)     drying of premises;

    (b)     cleaning and removing debris;

    (c)     removing standing water;

    (d)     removing sheet rock;

10

    (e)      removing all rubberized aisles with scrapers and flooring material;

    (f)      removing and discarding effected insulation;

    (g)      removing and discarding all commercially glued down carpet; and

    (h)      scraping remaining glue from slab.

(Mavelle Declaration, par. 24.)

28.    Cotton's bill to TSA included these services, and TSA has paid the Cotton bill. (Mavelle Declaration, pars. 23-24.)

29.    The activities listed in paragraph 27 hereof are appropriately deemed part of repair and reconstruction of TSA's premises in Springfield, Illinois, and costs associated with those activities should be included in the calculation of the repair and reconstruction costs of TSA's premises in Springfield, Illinois. (Sorensen Deposition, p. 60-69.)

30.    Mr. Wolford has estimated that $118,211 of the costs of Cotton USA should be considered as costs of repair or reconstruction. (Wolford Deposition, p. 44-46, 83; Wolford Expert Witness Report, attached as Exhibit 1 to Wolford Deposition.)

## III. ARGUMENT

### A.    The Only Relevant Assessment of Damages Available to Tenant Showed that the Threshold was exceeded.

The parties agree that "the threshold at which the tenant has the option of terminating the Lease was when the repair and reconstruction costs are at 35% or more of the then total reconstruction costs." Landlord's Motion for Summary Judgment, p. 8. Landlord then argues

11

3:06-cv-03177-JES-CHE     # 20     Page 12 of 20

that this must mean "actual costs."[1]  There are two significant flaws with Landlord's position: 1) the actual costs of reconstruction were unknown during the time period in which Tenant could exercise its option to terminate and remain unknown as of this point in time; and 2) any requirement for Tenant to wait until a calculation of actual costs could be compiled would render Tenant's option meaningless, a situation the law abhors, in that Tenant's option would have been long expired under the terms of the Lease by the time those costs were known and compiled.

### i)      Total Actual Costs Remain Unknown.

As noted in Tenant's Motion for Summary Judgment, the only purported estimate provided by Landlord to Tenant before the termination of the Lease was that of Mr. Sorensen, a copy of which is attached to Landlord's Motion for Summary Judgment as Exhibit 3.  Rather than analyzing the damage in terms of costs with reference to a percent of the aggregate reconstruction costs, as required by Section 15(b) of the Lease, it referred only to a percent of various physical components, an erroneous analysis.  Although that purported estimate concludes with the opinion that the 35% threshold was not met, Landlord's contractor concedes that he reached that conclusion, not on any reliable methodology, but on his "gut feel[ing]."  (Additional Facts 8-12.)  The contractor's pre-termination "estimate" had no value either to Tenant or to Landlord in determining whether the threshold was met and has no value to the Court in adjudicating this matter.

The total actual costs, which Landlord now urges upon this Court (*See* Landlord's Statement of Undisputed Material Facts, Pars. ¶¶22-24), remain unknown.  The contractor was

---

[1] In arguing that only actual costs should be considered, Landlord notes that "[t]here is no dispute between the parties" of the then total reconstruction costs.  Landlord's Motion for Summary Judgment, p. 8.  The agreed figure was estimated by Tenant using the original costs of construction and multiplying them by a certain factor.  While the Tenant's estimate clearly was reasonable, it is an estimate and not an "actual" cost since the entire premises were not reconstructed and no actual costs pertaining thereto existed within the sixty-day window.  Tenant, of course, is glad that Landlord agrees with its calculations and finds it reasonable.  We can only speculate as to why Landlord finds Tenant's estimate of the denominator satisfactory and reasonable, but disagrees with the use of and reasonableness of the estimated costs of reconstruction for the numerator.

12

60170219v1 868372

unaware that Tenant's specifications and requirements for the premises were incorporated into the Lease, and, consequently, is unable to conclude that its costs reflect those specifications. (Additional Fact 11, 25.)

Moreover, in late May 2006, more than 60 days after the date of the casualty, the contractor discontinued its reconstruction efforts of the TSA store in Springfield. Flooring, electrical matters (teller counters, junction boxes, and trimming of electrical boxes), plumbing, and fire safety components had not been completed by June 1, 2006. (Additional fact 24.) In fact, as of October 22, 2007, all reconstruction and repair to the premises had not been completed. (Additional Fact 22.)

Finally, the parties agree that at least a portion of the worked performed by Cotton at the TSA store constituted repair or reconstruction work. (Additional Fact 26-28.) Costs associated with those activities should be included in the calculation, according to Landlords' contractor. (Additional Fact 29.) Yet, they have not been.[2]

In short, as of October 22, 2007, more than 18 months after the date of the casualty, the reconstruction was not complete. That, plus the failure to consider the Tenant specifications and the appropriate portion of the Cotton costs, evinces that neither the Landlord nor its contractor know the true actual costs[3] at the time of this submission.[4] The incomplete list of actual costs

---

[2] Tenant may have an additional claim against Landlord for recovery of the Cotton costs attributable to its activities deemed to be reconstruction. To date, Tenant has not asserted such a claim.

[3] What the parties do know from the incomplete list of actual costs is that they represent more than 28% of the agreed estimated total reconstruction costs. Landlord has presented no evidence indicating the estimated or actual costs of the items not included in its list. Therefore, even at this time, Landlord has no evidence that the 35% threshold has not been met.

[4] Landlord states that the contractor's calculation of actual repair is unrefuted. As usual with Landlord's claims, that is only partially correct. To the extent that they represent completed activities or projects, Tenant does not contest them although their relevance to this matter is doubtful. However, the contractor's calculation, according to his own testimony, is not comprehensive (Additional Facts 23-29), and, accordingly, Tenant does refute and has refuted them as conclusive and as to the appropriateness of their use in this matter.

13

offers no proof as to whether the 35% threshold was met or not.  Consequently, Landlord is not entitled to summary judgment.

> ### ii)     The Lease Did Not Require Tenant to Wait Until a List of Actual Costs Could be Compiled.

Under Section 15(b), if Tenant elected to exercise its option to terminate the Lease due to damage by casualty, it was required to "notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty."  Since the casualty occurred on March 12, 2006, however, the exercise of the option had to occur on or before May 12, 2006.  By the end of May, 2006, the contractor had not completed the reconstruction of the TSA store. (Additional Fact 23.)  In fact, as of October 22, 2007, the reconstruction remained uncompleted. (Additional Fact.)

The law is well-settled that a contract must not be construed in a manner that nullifies or renders meaningless any provision of the contract.  *Atwood v. St. Paul Fire and Marine Insurance Co.*, 363 Ill.App.3d 861, 846, 845 N.E.2d 68, 71, 300 Ill.Dec. 647, 650 (2nd Dist. 2006); *Smith v. Burkitt*, 342 Ill.App.3d 365, 370, 795 N.E.2d 385, 389, 277 Ill.Dec. 18, 22 (5th Dist. 2003); *Coles-Moultrie Electric Cooperative v. City of Sullivan*, 304 Ill.App.3d 153, 159, 709 N.E.2d 249, 253, 237 Ill.Dec. 263, 267 (4th Dist 1999).  Under the circumstances of this case, interpreting the Lease to the effect that the Tenant was required to wait until actual costs were compiled would effectively nullify, vitiate, and render meaningless Tenant's option under Section 15(b).  Even with the assumption that construction could have been completed by June 1, 2006, *i.e.*, more than sixty days after the casualty, under Landlord's suggested interpretation, Tenant could not have exercised its option to terminate, even if the actual costs of construction exceeded the 35% threshold, because the ability to exercise the option would have expired under the terms of the Lease.

60170219v1 868372

Landlord insists that "it was not an impossibility that the [actual] costs will be known within sixty days." (Landlord's Motion for Summary Judgment, p. 13.) Of course, that statement is nothing but speculation, and whether it is true or not is irrelevant; the actual costs were not, in fact, known within sixty days. Furthermore, Landlord's contractor testified that he expected the reconstruction to be completed by June 1, 2006, more than sixty days after the casualty. Finally, Landlord's contractor stated that he was unable to make an estimate of repairs (*see* Additional Fact 21):

> Q.    Did you make any estimates before you started reconstruction?
>
> A.    No, it was an emergency project, and they just asked us to come out and get going because we didn't know at the time what the extent of damage was. So, until we got in and started sorting through things we really couldn't put together an estimated bid.

(Sorensen Deposition, p. 12.)

Under the circumstances of this case, the only mechanism available to determine whether Tenant's option had been triggered, allowing it to exercise the option, was to reasonably and in good faith make an estimate of the repair costs. This is what Tenant did; this is why Landlord's motion must be denied; and this is why judgment should be entered on behalf of TSA.

### iii)    TSA Lawfully Exercise Its Option to Terminate the Lease.

Without the citation to any apposite authority, Landlord baldly contends that only it could determine whether Tenant's option had been triggered. Landlord's Motion for Summary Judgment, p. 12. This position does not reflect the law.

As TSA explained in its Motion for Summary Judgment, where an option to terminate is ambiguous, it is to be construed in favor of the party possessing the option. 49 Am.Jur.2d, Landlord and Tenant, §222 (1995). In deciding whether it could exercise an option to terminate,

15

a tenant may rely upon the opinions of contractors.  *See* authorities cited in TSA's Motion for Summary Judgment.

In this case, TSA reached the conclusion, based in part on the opinion of Mr. Wolford, a contractor with many years of experience in constructing retail stress.  The estimate generated by or on behalf of Tenant was the only information available to both parties during the sixty-day window for the exercise of the option that was consistent with the terms of the Lease.

For these reasons, as amplified in TSA's Motion for Summary Judgment, TSA reasonably and lawfully terminated the Lease compelling denial of Landlord's Motion for Summary Judgment.

### B. Tenant has produced Evidence Demonstrating that the 35% Threshold Was Met.

Landlord asserts that Tenant lacks any evidence in this matter because 1) Mr. Wolford's opinions testimony must be barred, and 2) his estimates were a "moving target."  On that basis, Landlord contends that Tenant could not rely on Mr. Wolford's opinions.  In its response to Landlord's Motion to Bar, Tenant has demonstrated that Mr. Wolford's opinion testimony is both reliable and relevant and meets the standards of Fed.R.Evid. 702 and *Daubert*. Furthermore, while Mr. Wolford revised his estimate  a number of times, his final budget estimate was not "far off" the original.  Wolford Deposition, p. 9.  Tenant will not repeat the reasons that Wolford's testimony is admissible and respectfully refers the Court to its opposition to the motion to bar.  Mr. Wolford was originally retained to assist Tenant in analyzing the reconstruction costs to determine whether its termination option had been triggered.  After the commencement of this litigation, Mr. Wolford was retained to review whether Tenant's initial assessment was reasonable.  Suffice it to say, any doubts or confusion about Mr. Wolford's testimony either in pre-litigation capacity or as a retained expert, go to weight and not admissibility.

16

Contrary to Landlord's contention, however, Tenant has other evidence demonstrating that the 35% threshold has been satisfied. The law is well settled that the owner or officer of a business may give lay opinion testimony under Fed.R.Evid. 701 as to the value of the business's property or damages the business sustained. The advisory committee notes to Rule 701 (2000) explain:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See*, *e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participating in day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Accord United States v. Fidelity and Deposit Company of Maryland*, 986 F.2d 1110, 1117-18 (7th Cir. 1993) (it is unnecessary for an officer to be denominated an expert witness in order to admit his opinion testimony regarding the value of construction work where that the opinion was based upon his personal knowledge of the construction); *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F.Supp. 404, 408 (N.D. Ill. 1976) (a laymen is entitled to express an opinion as to the value of his employer's property and the damage sustained on the property).

The Landlord has correctly observed that David Frieder, TSA vice-president of construction, prepared an estimate of cost of repairs. (*See* Landlord's Statement of Undisputed Fact 13.) Landlord has attached to both its Complaint as Exhibit D and to its Motion for Summary Judgment as Exhibit 4, correspondence dated May 3, 2005 from Mr. Fielder. That correspondence is also attached hereto as Exhibit E. The letter provides, in part:

17

Attached hereto is analysis *which I prepared*[5] and which shows the current estimated total replacement cost of the premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes.  .  .  .  (Emphasis added.)

Mr. Freider's analysis was prepared after, *inter alia*, he personally visited the Springfield site and observed the damage.  Mr. Frieder's opinions as to value, based upon his personal knowledge acquired through his contact with the site, are admissible under Fed.R.Evid. 701.[6]

Tenant has presented evidence that the 35% threshold was satisfied.  (That evidence remains unrefuted by any competent, relevant evidence.)   Mr. Wolford's expert opinions together with Mr. Frieder's observations and lay opinions evince that Landlord's Motion for Summary Judgment must be denied (and that Tenant is entitled to judgment as a matter of law).

## IV. CONCLUSION

Unfortunately, Landlord's Motion for Summary Judgment is nothing but a screed, devoid of argument based upon the application of controlling law to the undisputed facts.   Rather, Landlord has submitted nothing but conclusions, conjecture, speculation, supposition, and invective; its motion palpably is not within the contemplation of Fed.R.Civ.P. 56.

---

[5]Landlord audaciously asserts that Tenant "misrepresented to Landlord that it had a contractor's estimate which was in fact prepared by Mr. Frieder.  .  .  ."  Landlord's Motion for Summary Judgment, p. 20.  The May 3, 2006, letter from Mr. Frieder expressly states that he prepared the accompanying analysis.  Landlord's charges of misrepresentation are entirely unwarranted.

[6]No disclosure under Fed.R.Civ.P. 26(a)(2) is required for witnesses offering lay opinion testimony.   TSA, however, did disclose Mr. Frieder under Fed.R.Civ.P. 26(a)(1)(A) and advised that "Mr. Frieder had information generally concerning . . . the damage to the premises as a result of the tornadoes [and] the damage assessment to the premises (costs of repair and reconstruction). . . ."  The Landlord elected not to depose Mr. Frieder.

60170219v1 868372

For the reasons presented herein, TSA respectfully prays that this Court deny SWPlaza's Motion for Summary Judgment.

Dated:  January 24, 2008

Respectfully submitted,

TSA Stores, Inc, as successor to Gart Bros. Sporting Goods Company, A Delaware Corp.

BY:  /s/Charles R. Schmadeke
     J. William Roberts, No. 2351714
     Charles R. Schmadeke, No. 2489813
     Hinshaw & Culbertson LLP
     400 S. 9th St., Suite 200
     Springfield, IL 62701
     Phone: 217-528-7375
     Fax: 217-528-0075
     E-mail: broberts@hinshawlaw.com
     E-mail:cschmadeke@hinshawlaw.com
     Attorneys for TSA Stores, Inc.

60170219v1 868372

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2008, I electronically filed the TSA's Response to SWPlaza's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system that will send notification of such filing(s) to the following:

David A. Rolf          Email: darolf@sorlinglaw.com
R. Lee Allen           Email: rlallen@sorlinglaw.com


/s/Charles R. Schmadeke
J. William Roberts, No. 2351714
Charles R. Schmadeke, No. 2489813
Hinshaw & Culbertson LLP
400 S. 9th St., Suite 200
Springfield, IL 62701
Phone: 217-528-7375
Fax: 217-528-0075
E-mail: broberts@hinshawlaw.com
E-mail: cschmadeke@hinshawlaw.com
Attorneys for TSA Stores, Inc.

60170219v1 868372

E-FILED
Thursday, 24 January, 2008  04:03:46 PM
Clerk, U.S. District Court, ILCD

1

2

3

4          IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
5               SPRINGFIELD DIVISION

6

7   SWPLAZA III, LLC, an Illinois     )
    limited liability company, as     )
8   successor to Illinois National    )
    Bank, as Trustee under Trust      )
9   Agreement dated November 6, 2000) 
    and known as Trust No. 00-0020, ) 
10  an Illinois banking institution,) 
                                     )
11                  Plaintiff         )
                                     )
12      -vs-                    )NO.06-CV-3177
                                     )
13  TSA STORES, INC., as successor   )
    to Gart Brothers Sporting Goods ) 
14  Company, a Delaware corporation,) 
                                     )
15                  Defendant         )

16

17      Deposition of MARK A. SORENSEN taken at

18  the instance of the Defendant, on the 22nd day

19  of October, 2007, at 607 East Adams Street,

20  Suite 800, Springfield, Illinois, before

21  Sandra K. Haines, CSR and Notary Public,

22  pursuant to notice.

23

24                        CSR NO. 084-002423

**EXHIBIT A**

```
 1    started work.  So, but we had already been

 2    under way before I was asked to review the

 3    structure for the overall project.

 4         Q.    Did you make any estimates before you

 5    started reconstruction?

 6         A.    No, it was an emergency project, and

 7    they just asked us to come out and get going,

 8    because we didn't know at the time what the

 9    extent of damage was.  So, until we got in and

10    started sorting through things we really

11    couldn't put together an estimated bid.

12         Q.    Were you serving as project manager

13    on that reconstruction?

14         A.    I was serving as everything, yes,

15    project manager, estimator.

16         Q.    Do you remember after the tornado of

17    March 12, 2006 when did you first visit the

18    Southwest Plaza?

19         A.    I believe it was March 14th.

20         Q.    Can you tell me what you observed?

21         A.    Yes.  Oh, boy, I actually have it in

22    a report, but if you want I could actually

23    give you a copy of this also, but you want me

24    to -- I documented daily when I was out there
```

1    be?

2        A.    It is my summary of the extended

3    damage at the building, at Sports Authority

4    building.

5        Q.    It is dated March 29, 2006, is that

6    correct?

7        A.    Yes, that's correct.

8        Q.    When you formed, when you prepared

9    this report, did you have an opinion as to the

10   total replacement cost of the premises on the

11   date of the report?

12       A.    No.

13       Q.    Now, go through this, and you do have

14   a copy?

15       A.    Yes.

16       Q.    I would like to -- it is two columns,

17   building component and then the percent of

18   damage, is that correct?

19       A.    Correct.

20       Q.    The foundation system, you observed

21   if I am reading this properly, there was no

22   damage to that, is that correct?

23       A.    Correct.

24       Q.    Same with the floor slab?

1    exceed 30 percent of the total replacement

2    cost of the premises.

3       Q.   On what basis did you form that

4    opinion?

5       A.   It was really just a gut feel from

6    experience in doing this for 23 years, knowing

7    that certain components of a structure or of a

8    project usually costs a certain percentage of

9    the value of that structure, and just having a

10   feel for that in my opinion it was not going

11   to exceed that amount.

12      Q.   Did you consult a structural engineer

13   about the damage to the facility at all?

14      A.   At this time, no.

15      Q.   Did you subsequently?

16      A.   No, the owner, Art Seppi, had Hanson

17   Engineers, they hired them directly, and they

18   were doing all of the structural engineering

19   review for us or for the project.  So, they

20   were the ones making the determinations as to

21   what needed to be replaced, and to what extent

22   it needed to be replaced.

23         MR. SCHMADEKE:  Mark that as Two.

24

1    following work in accordance with the

2    construction provisions attached hereto as

3    Exhibit C on or before October 1st, 2001.

4         Q.    That's good enough.  Were you aware

5    of this before you undertook the work of

6    reconstructing the premises?

7         A.    No.

8         Q.    Were you, and I assume by that then

9    you weren't aware of the construction

10   provisions when you rendered your opinion on

11   March 29th, 2006, is that correct?

12        A.    That's correct.

13        Q.    If you go to the second tab, please,

14   take a minute to review it, please, as long as

15   you would like.

16        A.    You want me to review the entire

17   Exhibit C?

18        Q.    Well, what I am asking for is if you

19   were aware of these construction provisions?

20        A.    No.

21        Q.    Is this the first time that you have

22   seen this document labeled Exhibit C?

23        A.    Yes.

24        Q.    Had anybody told you about any tenant

1    specifications for reconstruction of the

2    premises?

3         A.    No.

4         Q.    So, any tenant specifications would

5    not have been taken into account in your March

6    29th, 2006 letter?

7         A.    Correct.

8         Q.    They weren't taken into account

9    during the reconstruction or refurbishing

10   process, is that correct?

11        A.    That is correct.  The only item that

12   I am still uncertain of is the flooring

13   materials.  At one point I was told that

14   Sports Authority was going to provide the

15   flooring materials to us.  They put me in

16   contact with David Freeters, who was their

17   employee in charge of construction.  We had a

18   couple of e-mails back and forth.  I was

19   trying to keep him up-to-date as to when we

20   were going to need the materials, and it came

21   down to mid May, and he advised me that they

22   would not be supplying the materials as their

23   lease was they weren't moving back in.

24        Q.    Jones-Blythe did the actual

1    reconstruction work of the premises from the

2    March 12, 2006 tornado, is that correct?

3        A.    Yes.

4        Q.    You served as the general contractor?

5        A.    Yes.

6        Q.    You hired a series of subcontractors?

7        A.    And self performed the majority of

8    the work.

9        Q.    When did the reconstruction work

10    begin?  Do you remember what date that was?

11        A.    Would have been March 14th or March

12    15th.  As soon as we reviewed it we were

13    immediately on site doing some work to try to

14    minimize the loss to the tenants' merchandise.

15    We put up a bunch of temporary walls with

16    tarps.

17        Q.    Have you completed the reconstruction

18    of the premises?

19        A.    Yes.

20        Q.    What date were they completed?

21        A.    We had originally scheduled -- well,

22    let me back up.  We had originally scheduled

23    to complete it prior to June 1 for tenant move

24    in.  However, once Art had learned that they

1    weren't going to move back in, we did not

2    proceed with putting the new flooring

3    materials in.  Other than the flooring

4    materials and tenant improvements it was ready

5    for a tenant to move in.  Gordmans next door

6    moved in as scheduled.

7         Q.   When was the day of completion other

8    than the flooring materials and the tenant

9    improvements?

10        A.   I don't know of that exact date.

11        Q.   Can you give me a reasonable

12   estimate?

13        A.   Would have been last week of May

14   probably, maybe the second to last week of

15   May.  Sports Authority it kind of fell off the

16   map because everybody knew they weren't moving

17   back in, and there was no point in rushing to

18   get it done.  So, at that point we were

19   essentially done anyway.  So, we didn't worry

20   about it too much.

21        Q.   So, the last week or the second to

22   last week of May of 2006?

23        A.   Correct.

24        Q.   Do you know if all certificates of

1    occupancy have been issued?

2        A.    I do not know that.

3        Q.    Do you know if any have been?

4        A.    For Sports Authority there was some

5    issue.  Since we did not finish the project

6    there was an issue I know with the electrical

7    where it came out of the floor for the teller

8    counters, and that was causing a problem on

9    the final certificate of occupancy because

10   they were open-ended wires and stuff there

11   that weren't terminated.

12            MR. SCHMADEKE:  Mark that as Four.

13        (Whereupon said document was duly marked,

14        for purposes of identification, as

15        Deposition Exhibit Number Four, as of this

16        date.)

17        Q.    I hand you what has been marked as

18   Exhibit Number Four.  Have you ever seen this

19   before?

20        A.    Yes.

21        Q.    When did you see it?

22        A.    I don't know.  I mean -- I don't

23   recall.  They send these out.  It was really

24   an issue with the fact that we weren't

1    authorized by Art Seppi to continue with the

2    work.  So, they couldn't finalize the

3    certificate of occupancy.

4        Q.    This is -- could you tell me what

5    this document is?

6        A.    This is a notice to us that we can't

7    issue your certificate of occupancy because

8    there are certain deficiencies.

9        Q.    What's the date of this document?

10       A.    September, September 22nd, 2006.

11       Q.    And could you -- the problems that

12   they observed could you tell me what they are

13   referring to, please.

14       A.    Electrical, blank or trim out power

15   at the cash counters, 110.27 is the section of

16   the code that they are referencing as to where

17   the problem is, but it obviously won't allow

18   you to have an open-ended wire without a

19   termination.

20       Install junction box cover in the storage

21   area ceiling southwest corner, blank or trim

22   out floor boxes.

23       Q.    What are floor boxes?

24       A.    Floor boxes are electrical items

1    turned up, and they are mounted on the floor

2    for them to plug displays in, or really tenant

3    type improvement items.

4        Q.    Onto the plumbing.

5        A.    On the plumbing there was no hot

6    water.

7        Q.    Why was that?

8        A.    I believe it was just never turned

9    on.  I mean the hot water heater was there.

10   The system was intact.  I am not sure why that

11   is there.

12       The urinal not installed at that point, we

13   had to salvage, we salvaged the toilets and

14   stuff to go back in the bathrooms that were

15   disposed of previously, and I believe the

16   urinal was damaged, and once Art had realized

17   that they weren't moving back in, he just

18   pretty much stopped all work, and never did

19   want to buy new fixtures and stuff to finish

20   it.

21       Mechanical they gave us a certificate of

22   occupancy.

23       Q.    For the fire safety?

24       A.    Fire safety, ceiling panels missing,

1    that's where there was a fairly large ceiling

2    grid.  It was kind of a specialty thing.  It

3    was store specific.  They had an area up in

4    the front of the store that had lay in ceiling

5    in it, and they didn't replace the ceiling

6    panels because obviously if they weren't going

7    to move in, the next tenant was not going to

8    want that ceiling structure there.

9        Fire extinguishers were missing.

10       Extinguishers out of date.

11       Open wiring, again which I assume was

12   related to the cash counters.

13       Fire alarm testing was never completed.

14       Maintain fire alarm records on site is

15   usually a clerical type item.

16       Q.   Go back to fire alarm testing, if you

17   will, why was that never completed?

18       A.   I don't know the answer to that.

19   That was not something that was part of our

20   contract.

21       Q.   Okay.  Then number seven you were

22   talking about?

23       A.   Maintain fire alarm records on site,

24   that's really like a clerical item.  However,

1    nobody was in the building so, and the fire

2    alarm testing had never been done.  So,

3    obviously there could be no records on site.

4        Then ID doors to the sprinkler, fire

5    alarm, and electrical rooms.

6        Q.    Have any of these items been

7    completed, finished, altered since the date of

8    this notice?

9        A.    I have no knowledge of that.  We have

10   not been back to finish any work there.

11       Q.    I believe you testified that you

12   don't know if the certificate of occupancy has

13   been issued at this point?

14       A.    Correct.

15           MR. SCHMADEKE:  Could you mark that,

16   please.

17       (Whereupon said document was duly marked,

18       for purposes of identification, as

19       Deposition Exhibit Number Five, as of this

20       date.)

21       Q.    Mr. Sorensen, Exhibit Number Five,

22   have you seen that document before?  I presume

23   you have.

24       A.    Yes.

1          A.    That was actual cost.

2          Q.    And should that properly be

3    considered a reconstruction cost?

4          A.    Yes, however again that was

5    replacement of the entire store front instead

6    of just repairing what was there.

7          Q.    So, when you add up the total owner's

8    column, that's 228 dollars, excuse me,

9    $228,854.00?

10         A.    Yes.

11         Q.    So, is it fair and reasonable to

12   say that from your opinion that the actual

13   reconstruction costs were, the actual cost to

14   you was $321,384.00 plus the $228,854.00?

15         A.    Yes.

16         MR. SCHMADEKE:  Mark that as Six.

17         (Whereupon said document was duly marked,

18         for purposes of identification, as

19         Deposition Exhibit Number Six, as of this

20         date.)

21         Q.    Exhibit Six, have you seen this

22   before?  Take a moment to look at it.

23         A.    If it wasn't this exact document, it

24   was one similar to it.

1           Q.    Can you tell me what this purports to
2    be?
3           A.    It looks like Cotton's review of
4    services needed for the project.
5           Q.    Review of services or scope of
6    services?
7           A.    Scope of work.
8           Q.    I would like to review some of
9    these things, and see what your opinion is,
10   whether they should be considered part of
11   reconstruction or not.
12          A.    Okay.
13          Q.    Do you understand what I am asking?
14          A.    Yes.  I guess the only question is
15   when you say part of reconstruction --
16          Q.    Of the premises.
17          A.    Just solely reconstruction of the
18   premises?  Obviously Cotton was there doing
19   more than that.
20          Q.    Well, let me put it this way.  There
21   is no dispute from our perspective that some
22   Cotton costs should not be attributed to being
23   part of the reconstruction because it was
24   taking care of its own product, of the

1      tenant's product or equipment.

2          A.    Okay.

3          Q.    I am looking for not that, what you

4      consider to be part of reconstruction of the

5      premises.  Does that make sense to you?

6          A.    That makes sense.

7              MR. ROLF:  I guess the objection I

8      would have is to the extent reconstruction of

9      the premises being used as a term within the

10     lease, he is not, as he has testified reviewed

11     that or making opinions on that.

12             MR. SCHMADEKE:  I understand.  I am

13     not asking for legal opinions.  I am asking

14     for your opinion as the Plaintiff's expert in

15     this as to what reconstruction of the premises

16     entailed.

17             MR. ROLF:  I would further object to

18     the extent that he may or may not know what

19     Cotton is referring to in their scope of work.

20         Q.    And if you don't understand, it is

21     certainly acceptable to say you don't know.

22         A.    Okay.

23         Q.    So, I believe we should most properly

24     start at the first boxed item in the lower

1   third of the page where it says Cotton will

2   provide safety meeting daily, do you see that?

3       A.   Yes.

4       Q.   There is a lot of materials here, and

5   I really don't want to belabor this any more

6   than we have to, but if you would read through

7   those, and tell me which ones you would think

8   would be properly considered part of

9   reconstruction as we defined it.

10      A.   Obviously the first few items are

11  really just internal to their company.  I mean

12  whether they are working on reconstruction, or

13  working there to salvage tenant's material, I

14  mean they are responsible to provide that

15  stuff for their own employees.  That's their

16  deal not really related to the reconstruction

17  cost.  I think you get down to the bottom, I

18  guess I am not really sure that any of that

19  stuff is related to reconstruction.

20      Q.   Very good.  Feel free to go to the

21  next page.  If you would do the same thing,

22  read and tell me what you believe would

23  properly be considered part of reconstruction.

24      A.   Well, again I don't know that I can

1    make an opinion as far as what is, as far as

2    the relationship with the lease as far as what

3    constitutes reconstruction.  Obviously at some

4    point before you can rebuild the thing, you

5    need to get it dried out.  Whether that is the

6    contractor's responsibility, or that's the

7    emergency guy's responsibility, or he is

8    drying it out for the contents, I don't know

9    that I can make a judgment there.

10        Q.   Let me put it this way.

11   Hypothetically if Cotton didn't do the dry

12   out, you or a subcontractor of yours would

13   have been required to do so?

14        A.   Yes.

15        Q.   Continue, please.

16        A.   That takes care of that whole first

17   paragraph basically.  More of the same, I mean

18   air movers.  Up until such time as the

19   permanent power came back on, which was only a

20   matter of a few days, generators would be

21   required to run the equipment, and lights, et

22   cetera.

23        Q.   Where do you see that?

24        A.   Installing the following at the

1    back of the store, and install the following

2    at the front of the store, and they make a

3    mention of generators. ·Clean all of the

4    debris, obviously you have to clean it up

5    before you could put new flooring down, you

6    know. There is items here that we actually

7    did. Cotton will build a barrier in the

8    exercise area to help eliminate the moisture.

9    We actually built those temporary partitions.

10   Cotton didn't. Cotton to help seal off

11   the hole in the corner of the roof for

12   climitization purposes. We did all that work.

13   They did not perform that.

14       Q.   Have you moved onto the next page?

15       A.   Oh, yes, I am sorry, I am on the next

16   page. Cut down all hanging debris, actually

17   we removed all electrical items, lights that

18   were hanging with the electrical contractor.

19   They didn't have qualified people to do that.

20       Q.   They didn't do any of it?

21       A.   No. Well, not to my knowledge. My

22   observation was, and I was out there on a

23   daily basis, that our electricians from B & B,

24   we went over there with a lift, and we removed

1    the light fixtures so it was a safe situation.

2        Q.    B & B?

3        A.    B & B Electric, they were our

4    subcontractor, the same with the sprinkler

5    lines.

6        Q.    Let me go back.  If Cotton did do the

7    cut down of the hanging debris, fluorescent

8    lights, and so forth, would that properly be

9    considered part of the reconstruction?

10       A.    I think it would have to be because

11   you have to take down the damaged stuff before

12   you can put the new stuff back up.

13       Q.    Very good, please continue.

14       A.    Wet vac all standing water, tarp

15   corner of department to help seal off the

16   outside elements, that's something we did.

17   Remove all saturated sheet rock and any

18   additional sheet rock that will allow

19   assessment of potentially damaged cinder block

20   wall that is common to the Gordmans Department

21   Store.

22       Q.    What was your point about that item?

23       A.    That you would have to take that

24   wall, you would have to remove that sheet rock

 1    in order to see the extent of damage so you

 2    would know what to reconstruct.

 3         Q.    That would have been considered part

 4    of reconstruction?

 5         A.    Yes.  You know, talking about

 6    removing all rubberized aisles with scrapers

 7    and flooring material, obviously again if you

 8    are going to replace the flooring, you have to

 9    take the old flooring up.

10         Q.    If I may go back a couple, what about

11    the remove and discard all effected

12    insulation?

13         A.    Yes, but if there is insulation

14    there, it would have to come out.  I am just

15    trying to think.  He is talking about the in

16    wall insulation, probably behind the dry wall,

17    I don't know.

18         Q.    If you don't know, that's fine.

19         A.    That's fairly vague.

20         Q.    Now, the item there listed

21    disassemble all racks and relocate to other

22    areas, that would not be --

23         A.    That would not be part of the

24    reconstruction.  Obviously inventory counting

1   not part of reconstruction.  Manipulating

2   exercise equipment away from the damaged area

3   not part of reconstruction.  Remove and

4   discard all commercial glued down carpet would

5   definitely be part of reconstruction, and

6   scrape all remaining glue from the slab.

7       Q.    I am sorry, where did you see that?

8       A.    Sorry, right here, fourth line down.

9       Q.    Thank you.

10      A.    The second grouping, obviously

11  disassemble all of the racks and relocate to

12  other areas of the store is not part of

13  reconstruction.  Those are all tenant

14  improvements.  Remove all saturated sheet rock

15  to a height of four feet from the floor to

16  allow quicker replacement, that is part of

17  reconstruction.

18      Q.    Where is that?

19      A.    That's about the sixth item down.

20      Q.    I am sorry.

21      A.    Again remove and discard all

22  insulation, that's kind of an item that when

23  you take the dry wall off, the insulation is

24  going to come with it.  So, when you do the

69

1    one, you're going to take the other with it.

2    Obviously none of the work with the salvage

3    company to manipulate the contents, that is

4    not part of reconstruction.  It looks like

5    they keep going through the same items over

6    and over.  I am not sure what the blocked out

7    sections are.

8        Q.    I am sorry for the quality of the

9    print.

10           MR. ROLF:  The blocked out sections,

11   I believe, are the different departments in

12   the store.  One would be golf.  One would be

13   outdoor.

14       A.    It looks like they are just repeating

15   the same thing over and over again as to what

16   they are going to do.  You want me to continue

17   each blocked out section as to what we have

18   just talked about?

19       Q.    If you could look at them and see if

20   there is some item that we haven't talked

21   about.

22       A.    Okay.  I don't see, I don't really

23   see any other items.  It looks like it just

24   repeats over and over again.  So, I don't see

E-FILED

Thursday, 24 January, 2008  04:04:01 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois Limited  )

Liability Company, as successor to     )

Illinois National Bank, as Trustee     )

under Trust Agreement dated            )

November 6, 2000 and known as Trust    )

No. 00-0020, an Illinois banking       )

institution,                           )

      Plaintiff,                      )

   vs.                                 ) No. 06-3177

TSA STORES, INC., as successor to Gart)

Brothers Sporting Goods Company,       )

a Delaware Corporation,                )

      Defendant.                      )

The discovery deposition of JEFFREY WOLFORD,

taken in the above-entitled cause, before Christine

M. Jachimiak, a notary public of Cook County,

Illinois, on the 30th day of October, 2007 at

222 North LaSalle Street, Suite 300, Chicago,

Illinois, pursuant to Notice, at the hour of 1:30.

Reported by:  Christine M. Jachimiak, CSR

License No.:  084-004064

1



**EXHIBIT B**

1    been previously produced.

2        MR. ROLF:  Is that all the material you had in

3    your file for this particular project?

4        MR. WOLFORD:  That's correct, yes.

5        MR. SCHMADEKE:  I should say he has other

6    material, but I think you have everything else.

7    BY MR. ROLF:

8        Q.  So as of today you've produced your entire

9    file either before or after?

10       A.  Yes.

11       Q.  When were you first contacted about this,

12   Mr. Wolford?

13       A.  I believe the date was March 27th, 2006.

14       Q.  Who contacted you?

15       A.  David Freider.

16       Q.  What did he explain to you that they were

17   in need of?

18       A.  They were looking for a preliminary budget

19   for a replacement cost, construction cost for the

20   Sports Authority Store number 618 in Springfield,

21   Mass because of an unnatural disaster of the

22   tornado.

23       Q.  I think you just said Springfield, Mass.

24   Is it Illinois?

5

1     A.    I'm sorry, I'm bidding a job there, too.

2    Springfield, Illinois, store number 618.

3     Q.    Can you be more specific about what he

4    asked you to do?

5     A.    Because of the March 12th tornado

6    implosion of that space and the site he asked me to

7    put together a replacement cost of selective damage

8    that he described verbally either per an Email with

9    some very basic construction replacement scopes and

10   that means subcontractor scopes of the damages.

11    Q.    And he provided you with that information

12   then on March 27th?

13    A.    At that point a very basic budget or work

14   scope to put numbers on as he knew it in that time

15   frame.

16    Q.    Do you recall what the scope was that you

17   described?

18    A.    Not offhand without reading the Email.

19    Q.    Would there be an Email that that was in?

20    A.    Yes, there should be an Email.

21    Q.    Do you have that with you today?

22    A.    It should be.  That's actually the first

23   one they sent to me on March 27th it looks like.

24   It's specific to this Email to the 27th that I

6

1    provided.

2        Q.    Are we looking at the same Email?

3        A.    Yes, we are.

4        Q.    So it's dated Monday, March 27th at

5    1:04 p.m. From David Freider to yourself?

6        A.    That's correct.

7        Q.    You had done work previously for TSA?

8        A.    That is correct.

9        Q.    What type of work had you done for TSA?

10       A.    The big box build-out primarily.  I've

11   done some out of the ground work and facade work,

12   but primarily it is 40,000 square foot tenant

13   build-out, tenant improvement work.

14       Q.    Did you talk on the 27th about what you

15   would be compensated for this particular project?

16       A.    No.

17       Q.    How are you being compensated?

18       A.    I have been compensated for the original

19   report dated June 1st for 2500 and I'm being

20   compensated today.

21       Q.    What's your compensation today?

22       A.    2500.

23       Q.    Do you anticipate having additional

24   compensation if you were to testify at trial?

7

1      A.    Yes.

2      Q.    Have you talked about those arrangements?

3      A.    Those arrangements have not been talked

4    about.

5      Q.    So you're into them for $5,000 so far

6    based on your initial report and your deposition

7    today?

8      A.    That is correct.

9      Q.    What did you do in response to this March

10   27th, 2006 Email?

11     A.    I provided a preliminary budget based on

12   this basic outline of the 27th.

13     Q.    Let me just mark this as Exhibit 7 if we

14   could so that we can refer to the same thing.  And

15   your basic budget are you looking at a particular

16   document for that?

17     A.    No, no because the original budget it was

18   always upgraded.  Once the scope was redefined over

19   the course of say a month and a site visit I put

20   together the final budget number for replacement

21   cost.

22                        (Whereupon, WOLFORD Deposition

23                        Exhibit No. 7 was marked for

24                        identification.)

                                                    8

BY MR. ROLF:

Q.    So you produced a report like this that has the various items listed?

A.    That would be the final.  That would be the final budget after the scopes were more defined.

Q.    What was contained within your original scope particularly in terms of the items listed?  Is there any way to tell that?

A.    Not at this point because it was overlaid and more details as it went on after the site visit and those types of things.

Q.    What kind of number did you come up with based on this March 27th, 2006 Email?

A.    I could not tell you.  It wasn't that far off.  Some of the numbers went up or down depending on what I field determined and further information, site photos, damage photos that were sent to me after this Email.

Q.    How soon was it after the March 27th Email that you got back to Mr. Freider?

A.    May I go through these Emails?

Q.    Sure.

A.    For this original budget?

9

1      Q.   Yes.

2      A.   Looking at the Email it looks like I did

3   an attachment April 19th. I believe there would not

4   be a copy of that because of that original budget

5   that I would have because I overlaid and it was a

6   work in progress over say plus or minus a month.

7      Q.   Is this the Email you're looking at?

8      A.   Yes, it is.

9      Q.   And you think that's the first time you

10  had an actual --

11     A.   That I actually Emailed a budget over, a

12  hard copy, yes.

13     Q.   We wouldn't be able to have a copy of

14  that?

15     A.   No.

16     Q.   Was all your correspondence on this

17  project with Mr. Freider?  Is that a yes?

18     A.   Yes.

19     MR. SCHMADEKE:  At that time?

20     THE WITNESS:  At that time.

21  BY MR. ROLF:

22     Q.   Who else from TSA have you had

23  correspondence with?

24     A.   Douglas Garrett, David Freider and

10

1    Charles.

2        Q.    What was your contact with Doug Garrett?

3        A.    My contact with Mr. Garrett was later on

4    but not during this original budgetary spreadsheet

5    and defining the scope process for replacement

6    costs.  It was solely to my best recollection with

7    David Freider.

8        Q.    And the Emails you've produced today --

9        A.    It's every Email correspondence I had with

10   David.

11       Q.    Is that the method in which you

12   corresponded with Mr. Freider?

13       A.    Primarily.

14       Q.    Would that give us a fairly accurate time

15   line as to when you got information and when you

16   sent information back?

17       A.    Yes.

18       Q.    Would there be anything missing if we

19   looked at those Emails?

20       A.    It was every chronological starting oldest

21   to the top to the newest that I had with David,

22   every one.

23       Q.    Would there be phone calls that would

24   supplement that or you pretty much did it by Email?

11

1    A.    90 percent of it was by Email.

2    Q.    Did you talk with anyone other than

3  Mr. Freider about the damage that was out at the

4  location in Springfield?

5    A.    Jeff Crohn with Cotton defining his

6  scopes. I spoke to several of the subcontractors

7  when I was there on May 4th, 2006 per the site

8  visit defining the scopes and damage.

9    Q.    But leading up to what you were asked to

10  do in defining this original scope was it just with

11  Mr. Freider?

12    A.    That's correct, sir.

13    Q.    Did Crohn -- did you talk to him to get a

14  description of any of the damage to the facility

15  when you were preparing your table?

16    A.    That is correct.

17    Q.    When were those conversations?

18    A.    Those were during the month of April at

19  some point. I never document. There was no phone

20  log.

21    Q.    Was that all by phone?

22    A.    It was all by phone.

23    Q.    This has been marked as Exhibit 1 which is

24  your report in this matter. I want to run through

12

1    some of it. You list several projects there in the

2    introduction that you've done for Sports Authority?

3        A.   Yes.

4        Q.   We touched on this already.  Most of those

5    I take it are the tenant build-out where you have

6    the interior.  Is that what you mean?

7        A.   That is correct.

8        Q.   Are there any on there where you were from

9    the ground out?

10        A.   From the ground up and the shell itself?

11        Q.   Yeah.

12        A.   No.  None of those are straight ground up

13    projects.

14        Q.   Why don't you describe for me the business

15    of Wolford Retail Builders?

16        A.   I'm primarily a big box contractor, retail

17    contractor.  I do no residential work whatsoever.

18    It's strictly retail work.

19        Q.   Who besides Sports Authority do you do

20    work for?

21        A.   Since I have been in business for myself

22    in two and a half years I've done a couple of other

23    clients, but primarily Sports Authority is my

24    biggest client by far.

                                                    13

1      Q.    You've been in business for yourself for

2    two and a half years?

3      A.    Yes.

4      Q.    What were you doing prior to that?

5      A.    I was building Sports Authority work for

6    another contractor as a direct employee, that would

7    be the third employee that I had worked for doing

8    Sports Authority work.  They followed me over the

9    years.

10      Q.    You say Sports Authority followed you?

11      A.    Well, I've been able and lucky enough to

12    do their work over the last eight years with three

13    different other employers.

14      Q.    What's your educational background?

15      A.    Higher education?

16      Q.    Yes.

17      A.    I have four years from Pratt Institute in

18    Brooklyn, New York.

19      Q.    What does that get you?

20      A.    Nothing.

21      Q.    What is it designed to get you?

22      A.    That was an architectural school.

23      Q.    Does it take five and you only did four?

24      A.    That's exactly right.

                                                    14

1    Q.    After you completed those four years you

2    went into the job market?

3    A.    I went into the job market and got the

4    same exact position I had beforehand.

5    Q.    Who was that with?

6    A.    Fisher Development.

7    Q.    Is this resume that's in this packet

8    fairly up to date?

9    A.    May I see that one?

10    Q.    I guess it's not because it says Crown

11    Construction '96 to present.

12    A.    Yeah, that's an older one.  That's the

13    last one I had to produce that anybody asked me to

14    produce.

15    Q.    Can you just fill in from the Crown

16    Construction just for the record?

17    A.    Through the present?

18    Q.    Yes.

19    A.    Crown Construction I went on to Capital

20    Construction and I was with them for basically

21    three and a half years, three out of four.  I was

22    with Novak for one year, and I was with HCI for

23    about two years, and then I went into business for

24    myself.

15

```
1         Q.    With respect to the projects you were

2    doing on this Springfield store and the storm

3    damage that didn't relate to the same type of work

4    that you normally do for Sports Authority.  Is that

5    a fair statement?

6         A.    Would you repeat that?

7         Q.    Sure.  You've described the work you

8    normally do for Sports Authority as basically the

9    tenant improvement side of the building and not

10   from the ground out?

11        A.    That's correct.

12        Q.    This particular project didn't involve

13   tenant's improvements, is that a fair statement?

14        A.    As far as the damage work and the

15   replacement work?

16        Q.    Yes.

17        A.    The replacement work is very atypical to

18   some of the major build-out work and replacement

19   work or new construction that I do as build-out

20   work.  It would be a quasi version of remodel and

21   new construction.  I've done both for Sports

22   Authority.

23        Q.    Why don't you tell me what you do then

24   when these projects say interior?
```

16

1                         (Whereupon, WOLFORD Deposition

2                         Exhibit No. 8 was marked for

3                         identification.)

4        THE WITNESS:   Repeat your question again if you

5    don't mind.

6                         (Whereupon, the record was read.)

7        THE WITNESS:   I don't believe so.

8    BY MR. ROLF:

9        Q.   To your knowledge that term nowhere

10   appears in the lease?

11       A.   Not to my knowledge.

12       Q.   In paragraph six you said on behalf of

13   Capital Construction Group I guess you bid this

14   store back in 2001?

15       A.   July of '01.

16       Q.   What type of company was Capital?

17       A.   They were a national retail contractor as

18   well.

19       Q.   Did you bid this job from the ground out

20   or you were bidding it --

21       A.   This is a straight tenant improvement

22   build-out project.

23       Q.   Typical of what you were doing with Sports

24   Authority before and even since?

                                                    22

1    the 743 number and some change number.  Temporary

2    protection, shoring, anything he did.

3        Q.   That's by going through this contract?

4        A.   Yes.

5        Q.   How did you assign a cost to that from

6    Cotton's $319,000?

7        A.   I didn't include it into my replacement

8    cost.  Mine was for new construction, some

9    selective demolition and the immediate damages that

10   would be a subcontractor cost, not an emergency or

11   hazard removal type company or scope.

12       Q.   Why don't you go to this page which is the

13   last page of Exhibit C.

14       A.   What does that look like?  I'm not finding

15   it.  Thank you.

16       Q.   Is that your work product?

17       A.   Actually, it is.

18       Q.   Can you explain that to me as to what you

19   were doing or how you went about it?

20       A.   Oh, let's see.  This is actually -- I'll

21   put that here. This is how it would look on my

22   computer side bar like that so I pulled it out per

23   the line item.  If you go across the scopes I had

24   pulled it out 80 percent performed by Cotton for

                                                       41

1    demolition site, for example.  It was selective,

2    small portions of demolition in the say drywall

3    finish that they performed according to Jeff Crohn.

4         Q.   So we're looking at this spreadsheet and

5    that says dated 4-3-06, revised 5-7, correct?

6         A.   Yes.

7         Q.   And you're looking at line item number two

8    selective demolition, balance of damage?

9         A.   Yes.

10        Q.   It says budget estimation $28,600 on the

11   table?

12        A.   Yes.

13        Q.   And then you're saying that if you were to

14   continue to the right on that spreadsheet and it

15   would say 80 percent Cotton?

16        A.   Yes.

17        Q.   And then $22,880?

18        A.   Yes, as a proration.

19        Q.   What does that mean to me?

20        A.   Wherever there was overlap in what I would

21   consider more of a straight construction cost that

22   was in my number I took that out and prorated it as

23   a percentage.

24        Q.   So you're saying your estimate of 28,600,

                                                    42

1     80 percent of that was done by Cotton?

2         A.    Yes.

3         Q.    And Cotton charged 22,884 or that's just

4     80 percent of that number?

5         A.    That's just my math out of that number.

6         Q.    So you did not in looking at the documents

7     that Cotton sent with their billing which includes

8     a spreadsheet of all the materials, a spreadsheet

9     on all the labor, a spreadsheet on all the

10    equipment rental, you didn't go to those costs and

11    say these costs are attributable to repair and

12    replacement?

13        A.    What I did when I talked to Mr. Crohn with

14    Cotton is out of my budget, out of my budget and

15    what I thought the work was worth take out those

16    percentages.

17        Q.    So if we do that -- again, I don't know if

18    these line up but when you get down to line item 30

19    on your spreadsheet, and I guess it wouldn't be 30

20    and it would be the line below that total.  Do you

21    see where I'm at?

22        A.    Yes.

23        Q.    That's the $743,00?

24        A.    Yeah.

43

1      Q.   Would across from it be Cotton total

2   against WRB budget?

3      A.   That's what it means, yes, whether it

4   lines up with that number or not.

5      Q.   So based on your assigning these

6   percentages off of your budget to the work Cotton

7   did you concluded that $118,211.01 of your total

8   budget estimate was performed by Cotton?

9      A.   At that time, yes.

10      Q.   And at what time was that?

11      A.   I want to make sure you're looking at the

12   same spreadsheet I am.

13      Q.   This is 5-7.

14      A.   I have 4-3 here.

15      Q.   If you look that's the original date but

16   it's revised.

17      A.   Oh, I'm sorry, yes.

18      Q.   Would 4-3 be an indication that's the

19   first time you put together the spreadsheet?

20      A.   Yeah.

21      Q.   That date stayed the same on whatever

22   draft you had?

23      A.   Yeah, at times.  I never thought it would

24   be a legal matter so I wasn't real -- every time I

44

1    entered it I might change the date when I had new

2    information or more finite or more detailed

3    information.

4        Q.    I'm trying to get an understanding of what

5    you did with the Cotton work because originally in

6    your original estimate of the cost of repairs you

7    had $319,000 for Cotton in that total, correct?

8        A.    That's correct.

9        Q.    And are you saying that you don't include

10   any of that now or did you subtract some of it or

11   how did you account for what you attribute that to

12   be?

13       A.    I left it because it was true replacement

14   cost that would be new or remodel construction.

15       Q.    So that's an actual cost.  You got an

16   actual cost, you ought to use an actual cost?

17       A.    That's correct.

18       Q.    To the extent you had actual costs you

19   would use them in your budget estimate?

20       A.    Yes, to the best of my knowledge knowing

21   the product as I do.

22       Q.    Would it be a fair characterization that

23   the $743,944 includes $118,211 of actual cost by

24   Cotton in it, is that fair?

                                                    45

1      A.    At the time I had the conversation with

2    Jeff Crohn that was what I thought at that time.

3    I'd have to re-look at my numbers and take a look

4    at it.

5      Q.    To be sure you don't take the $743,944 and

6    then add to it the 118,211?

7      A.    That was kind of a working spreadsheet

8    here so that cost I'd have to revisit that, but I

9    believe I left it in there because it was a true

10   cost and/or those were specific.  And this could be

11   it, too when I talked to Jeff I had questions for

12   him because I saw what work in place had been done,

13   did he do that work because that side bar list is a

14   working sheet and those are things I do and keep on

15   rolling over changing those dates.  And that is --

16   my true assessment is the 743 after talking to

17   Cotton, but these were questions.  It's more

18   questions, was this work completed by Cotton.  How

19   much was, you know, if so I would have probably

20   changed it and in fact I know I would have.

21     Q.    What I'm trying to get an understanding of

22   is these working numbers as you described them what

23   would be on the far right are numbers that are

24   actually within this 743,000?  For instance, the

                                                    46

1    28,600 Cotton did 80 percent of that?

2        A.   That was a question to Jeff because 80

3    percent of it was completed per the site visit. It

4    was a question for him and he answered my

5    questions.

6        Q.   There's no doubt your opinion is that all

7    of the $319,000 bill from Cotton is not

8    attributable to the replacement cost at the

9    facility?

10       A.   Yes.

11       Q.   This sheet that shows the 118,211 would be

12   a fair estimate you've arrived at as to how much of

13   their work would have been considered in the scope

14   of the estimate you prepared for the replacement

15   and repair costs?

16       A.   Those were questions to identify with Jeff

17   and I had already put together those numbers before

18   I talked to him just in case.  That's a working

19   sheet that you see. It's kind of a work in

20   progress.

21       Q.   I take it then it's still a work in

22   progress for you. You haven't finalized these

23   numbers?

24       A.   No.  I have finalized the numbers.

47

1    You testified I believe that the $743,944 was your

2    estimate of the direct reconstruction costs?

3        A.    That is correct.

4        Q.    That doesn't include any costs from

5    Cotton, does it?

6        A.    No.  I pulled those numbers out.  That's

7    correct.

8        Q.    So any part of Cotton costs that would be

9    deemed to be reconstruction would have to be added

10    to that number?

11        A.    That's correct.

12        MR. SCHMADEKE:  I'm going to show him that if I

13    may, David.

14    BY MR. SCHMADEKE:

15        Q.    I'm going to show you a document and take

16    a look at that for me please.  I showed this

17    document to you yesterday, is that correct?

18        A.    That's correct.

19        Q.    Is that the first time you saw it?

20        A.    That's correct.

21        Q.    Could you tell me what this purports to

22    be?

23        A.    Well, it's a second notice to obtain a

24    certificate of occupancy.  It's a status report by

83

**E-FILED**
Thursday, 24 January, 2008 ·04:04:23 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, | ) ) ) ) ) ) | |
| Plaintiff/Cross-Complainant, | ) ) | Case No.: 06-CV-3177 |
| v. | ) ) | |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant/Counter-Plaintiff. | ) ) | |

## DECLARATION OF CYNTHIA CASHMAN

I, CYNTHIA CASHMAN, declare, certify, verify, and state:

1.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could competently testify thereto.

2.      I am presently the Director of Real Estate for TSA Stores, Inc. ("TSA"), and have held such position since January 1998.  I am 44 years old, and presently reside in the State of Colorado.

3.      I have earned a baccalaureate degree in Finance from DePaul University in the year of 1989.

4.      Prior to my present position, I was employed as follows:

| **COMPANY** | **POSITION** | **TIME** |
|---|---|---|
| Sportmart, Inc. | Various positions | October 1993-January 1998 |

5.      As Director of Real Estate for TSA, my principal duties are:

a.      Property management;

60169278v1 868372

**EXHIBIT  C**

   b.  Lease administration/compliance; and

   c.  Excess property.

  6.  On April 2, 2001, TSA's predecessor, Gart Bros. Sporting Goods Company ("Gart") entered into a lease with the Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020 ("Trustee-Landlord"), for the rental of space in a shopping center in Springfield, Illinois, from which to operate a retail sporting goods store. A true and correct copy of such Lease is attached hereto as Exhibit A.

  7.  Gart had tendered a proposed lease agreement for the space to the prospective landlord, but that proposal was rejected. In turn, the Trustee-Landlord submitted its own proposal. The lease ultimately executed by the parties, including Section 15(b), was primarily drafted by the landlord.

  8.  Gart took possession of the leased premises on December 18, 2001.

  9.  On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the lease.

  10.  In response to the tornado, TSA took action to protect persons in and around the leased premised and its property.

  11.  Mike Mavelle, Vice President of Risk Management for TSA, visited TSA's leased premises in Springfield, Illinois from March 13, 2006 through March 15, 2006 to view the damage.

  12.  On March 16, 2006, I sent a letter to Charles E. Robbins and R. Lee Allen addressing an action plan and time table for reconstruction and TSA's assessment of the damage. A true and correct copy of that letter is attached hereto as Exhibit B.

  13.  On March 21, 2006, David Frieder, Vice President of Construction for TSA,

60169278v1 868372

visited TSA's leased premises and observed damage to these premises.

14.    Also as part of TSA's response, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs of TSA's leased premises in Springfield, Illinois.

15.    In April 2006, TSA received a budget estimate of the reconstruction costs of TSA's leased premises in Springfield, Illinois from Mr. Wolford (*see* page 2 of Exhibit C). Mr. Wolford's budget estimates was incorporated into a Summary of Replacement and Repair Costs prepared by TSA. A true and correct copy of that Summary of Replacement and Repair Costs is attached hereto as Exhibit C.

16.    TSA, by Mr. Frieder, estimated the then-total building replacement cost to be $1,960,067.00. This figure was calculated based upon the original cost of construction in 2001 and adjusted for inflation by using tables prepared by The Associated General Contractors of America. Thirty-five percent of the then-total replacement cost of TSA's leased premises in Springfield was calculated at $686,023.00.

17.    Including the Cotton USA fees, TSA estimated that the repair or reconstruction costs of the leased premises was $1,046,701.00 or 53.4% of the then-total replacement costs.

18.    On that basis, TSA determined that its termination rights under Section 15(b) of the Lease were triggered and elected to terminate the Lease.

19.    On behalf of TSA, by Mr. Frieder, sent a letter, dated May 3, 2006, to Arthur Seppi, Charles E. Robbins, and R. Lee Allen, providing notice of TSA's election to terminate the Lease. A true and correct copy of said letter is attached hereto as Exhibit D.

3

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 31, 2007.

CYNTHIA J. CASHMAN

4

# SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

## LEASE
between

## GART BROS. SPORTING GOODS COMPANY,

A Colorado Corporation

**as Tenant**

**and**

## ILLINOIS NATIONAL BANK, TRUSTEE,

under Trust Agreement dated November 6, 2000

and known as Trust No. 00-0020

**as Landlord**

dated April 2, 2001

SOUTHWEST PLAZA III SHOPPING CENTER

**EXHIBIT A**

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

### WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## I. FUNDAMENTAL LEASE TERMS

### A. Parties.

Landlord:    Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

Tenant:    Gart Bros. Sporting Goods Company, a Colorado Corporation

### B. Premises (paragraph 1)

Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

### C. Term (paragraph 3)

Fifteen (15) Lease Years, with four (4) five (5) year renewals.

### D. Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

|          |              |               |         |
|----------|--------------|---------------|---------|
| Option 1 | $45,246.93   | $542,963.20   | $16.64  |
| Option 2 | $49,760.75   | $597,129.00   | $18.30  |
| Option 3 | $54,736.83   | $656,841.90   | $20.13  |
| Option 4 | $60,229.54   | $722,754.50   | $22.13  |

**E.    Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

**F.    Addresses (paragraph 34)**

If to Tenant:

    GART BROS. SPORTING GOODS COMPANY
    1000 Broadway
    Denver, Colorado 80203
    Attention: President
    Facsimile: (303) 863-2243

With a copy to:

    GART BROS. SPORTING GOODS COMPANY
    1000 Broadway
    Denver, Colorado 80203
    Attention: Legal Department
    Facsimile: (303) 864-2188

If to Landlord:

    Charles E. Robbins, Realtor
    2144 South MacArthur Boulevard
    Springfield, Illinois 62704
    Attention: Property Management
    Facsimile: (217) 525-0545

With a copy to:

    R. Lee Allen, Attorney
    Sorling, Northrup, Hanna, Cullen & Cochran
    620 East Adams, Suite 800
    Springfield, Illinois 62701
    Facsimile: (217) 522-3173

1.    **The Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

    The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between Exhibit "A" and Exhibit "B", Exhibit "A" shall control. The "Shopping Center" includes the land described on Exhibit "A", all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as Exhibit "B". The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with Exhibit "B".

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of: (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.    Completion and Delivery of the Premises and Shopping Center. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as Exhibit "C" (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as Exhibit "B" including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached Exhibit "C", made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3. **Lease Term.** Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4. **Rent.**

(a) **Base Rent.** During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i).    <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)    <u>Reduction in Base Rent</u>. Notwithstanding the Base Rent provisions in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)    <u>Co-Tenancy Requirement; Alternate Rent</u>. Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

5.    **Development of Shopping Center by Landlord.**  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements.  All such parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises.  In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities.  Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference).  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    **Easements.**  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)  **Utility Easements.**  During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)  **Common Area Easement.**  During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.  Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)  **Non-Dedication.**  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.  **Common Areas and Common Area Maintenance.**

(a)  **Definition of Common Areas.**  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    **CAM Charges.** For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)   amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)   premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)   repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)   interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)   management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)   amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)   other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)   _Tenant Payments_.   Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    **Examination of Landlord's Records.** Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    **Signs and Communications Equipment.**

(a)    **Signs.** Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of Exhibit "D" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    **Communications Equipment.** Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    **Taxes.**

(a)    **Taxes Contemplated Hereunder.** The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes.** Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property.** Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    **Payment Following Appeal.** Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e)    **Multiple Building Tax Parcel.** In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

## 10.    Maintenance, Repairs and Replacements.

(a)    Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)     Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.     **Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.     **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    **Insurance**.

(a)    **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)    <u>Liability Insurance</u>. During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    <u>Workers' Compensation Insurance</u>.    To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)    <u>Rental Loss Insurance</u>. Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease. Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period. All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable. The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)     Workers' Compensation – statutory limits;

2)     Employers Liability - $500,000; and

3)     Comprehensive General and Comprehensive Auto Liability as follows:

      a)     Bodily Injury - $1,000,000 per occurrence;

      b)     Property Damage - $1,000,000 per occurrence;

      c)     Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;

      d)     Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;

      e)     "XCU" Hazard Endorsement, if applicable;

      f)     "Broad Form" Property Damage Endorsement;

      g)     "Personal Injury" Endorsement; and

      h)     "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)  **Policy Provisions.**  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)  **Waiver of Right of Recovery and Subrogation.**  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises of the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)  **Evidence of Insurance.**  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)  **Indemnities.**  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.   **Damages by Fire or Other Casualty.**

(a)   **Less Than Thirty Five Percent (35%).**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)   **Thirty Five Percent (35%) or More.**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    **Landlord's Termination Rights.**  If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above).  Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation.**  If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17.    **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18.    <u>Use</u>.

(a)    Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

(b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19. **Warranties and Representations.**

(a)    Landlord represents, warrants and covenants to Tenant that:

(I)    **Quiet and Peaceful Enjoyment.** Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    **Title.** Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease. Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA"). Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)    **Certificate of Authority.** Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)   **No Litigation.**   There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   **Hazardous or Toxic Materials.**   Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority; or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.   If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)   **Tenant's Exclusive Use.**   So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on **Exhibit "E"**, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    **Zoning and Subdivision.** The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    **Prohibited Activities.** Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop;

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    a banquet hall, auditorium or other place of public assembly;

(Q)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room,

school or other facility catering primarily to students or trainees rather than customers); or

(R) a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

(ix) **Site Covenants**. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A) **Prohibited Uses in Common Areas**. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B) **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C) **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D) **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)    **Restaurant Use**. Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on **Exhibit B**; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    **Tenant's Authority**. Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials**. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    **Estoppel Certificates**. Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    **Subordination of Lease.**  At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof. The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof. Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22.    **Change of Landlord.**  Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.    **Tenant's Financing.**  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personality, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    **Tenant's Property and Waiver of Landlord's Lien.** All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    **Memorandum of Lease: Commencement Date Agreement.** Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    **Expiration of Term and Holding Over.** All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    **"For Rent" Signs.** Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    **Force Majeure.**  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.    **Events of Tenant's Default.**  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    **Failure to Pay Rent: Breach.**  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Bankruptcy.**  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.    **Landlord's Remedies.**  After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant.  Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

(a)    **Reimbursement of Landlord's Costs in Exercising Remedies.**  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(b)　　**Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.　　**Events of Landlord's Default: Tenant's Remedies.** Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

32.　　**Waiver.** If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws. During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
                 1000 Broadway
                 Denver, Colorado 80203
                 Attention: President
                 Facsimile: (303) 863-2243

With a copy to:  GART BROS. SPORTING GOODS COMPANY
                 1000 Broadway
                 Denver, Colorado 80203
                 Attention: Legal Department
                 Facsimile: (303) 864-2188

If to Landlord:  Charles E. Robbins, Realtor
                 2144 South MacArthur Boulevard
                 Springfield, Illinois 62704

Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.    **Brokers**. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark Commercial Real Estate Services LLC, which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial Real Estate Services, LLC shall be solely responsible for any commissions due and payable to Leonard W. Sapp or any related person or entity. Except for the amounts due Edgemark Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom the indemnifying party either has or is purported to have dealt.

36.    **Miscellaneous**.

(a)    **Headings and Gender**. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    **Construction**. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)    **Entire Agreement: Merger**. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e) **Attorneys' Fees**. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f) **Partial Invalidity**. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g) **Consents**. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h) **Holidays**. If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i) **Applicable Law**. This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j) **Successors and Assigns**. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k) **Counterparts**. This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l) **Trademarks and Trade Names**. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.    **Effectiveness of Lease: Tenant's Right to Terminate**. Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)    Landlord's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)    Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)    Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

**E-FILED**
Thursday, 24 January, 2008  04:04:45 PM
Clerk, U.S. District Court, ILCD

38.    Confidentiality.    The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.    **Liability of the Trustee and the Beneficiary.**  This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank. It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof. It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises.  This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof.  Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.    **Liability of Directors and Shareholders.**  Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    **EXHIBITS**

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

LANDLORD

ILLINOIS NATIONAL BANK, TRUSTEE, under
Trust Agreement dated November 6, 2000, known as
Trust Number 00-0020

By: _____

Its _SVP & TO_

**ATTEST:**

By: _____

Its _VP & Controller_

TENANT

GART BROS. SPORTING GOODS COMPANY, a
Colorado Corporation

By: _____

Its _____

**ATTEST:**

By: _____

Its _____

**Nesa E. Hassanein**
**Senior** Vice President
**and General** Counsel

0294793.005    3/29/01 RLA

# COE IBE – BLOXDORF, P.C.
### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704                (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.

Post-it® Fax Note   7671   Date 3/23   # of pages ► 1
To Lee Alice          From C. Mourse
Co./Dept.             Co.
Phone #              Phone #
Fax #                Fax #



Exhibit "C"

CONSTRUCTION PROVISIONS

1.  Definitions: For purposes of this Lease:

(i)   "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(ii)  "Site Work Start Date" means April 15, 2001;

(iii) "Building Shell Start Date" means May 15, 2001;

(iv)  "Scheduled Possession Date" means October 1, 2001;

(v)   "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

(vi)  "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings: None.

2.  General Requirements.

2.1   Code Compliance. Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

2.2   General Conditions. Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

(i)   Liability and builder's risk insurance;

(ii)  Costs for permits, sewer and water connection fees, etc.;

(iii)    Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment;

(v)    Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)    Survey, staking and layout;

(viii)    Job site field supervision;

(ix)    Mobilization;

(x)    Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3   <u>Warranties</u>.  Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date. At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain. Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4   <u>Engineering</u>.  All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5   <u>Permits</u>.  Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.   <u>Construction of Site Work</u>.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1    Earthwork and Drainage.  Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2    Concrete.  Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3    Landscaping.  Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4    Parking Lot Paving.  Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5    Utilities.  Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6    Power and Telephone.  Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7    Exterior Lighting.  Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8    Exterior Signage.  Per paragraph 8(a) of the Lease and the Final Plans.

3.9    Cost Responsibility.    All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4.    Construction of Building Shell.    Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this Exhibit C.

4.1    Utilities.    Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2    Cost Responsibility.    All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3    Bids.    On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for the general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5.    Construction of Leasehold Improvements.    Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this Exhibit C.

**5.1    Scope of Work.** The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property. Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor. The Leasehold Improvements will also include: all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring. All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

**5.2    Not Included.** The Leasehold Improvements do not include tenant trade fixtures and equipment.

**5.3    Bids.** Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord. Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant. Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid. Acceptance and awarding of the contract will be the decision of both Landlord and Tenant. Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant. No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld. Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

**6.1    Building Shell Plans.** Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    Leasehold Improvements Plans. Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

6.3    Deviation from Final Plans. Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4    Change Orders. Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4. Landlord acknowledges that Tenant will not be required to pay for any revision or change order unless such revision or change order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.    Construction Costs.

7.1    Included Costs. As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this Exhibit C, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2    Excluded Costs. In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3    Payment of Construction Costs. The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease). Landlord will pay for all Construction Costs up to the Construction Cap. In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.    Construction Timing and Completion.

8.1    Outside Dates. If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date. Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date. Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work. Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2    Tenant's Option to Terminate. If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder. Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3    Inspection and Access. During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises, Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4     Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection.   Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

8.4.2   Notice of the Possession Date.   Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date").   If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

8.5   Condition of Premises at Delivery.   Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

8.6   Indemnity by Landlord.   Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

EXHIBIT E
Permitted Encumbrances

1.    Real Estate Taxes for years 2000 and 2001.

2.    Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no.
      2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee
      under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount
      of $6,458,027.23.  (Affects the land and other property)

3.    Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made
      by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an
      indebtedness in the amount of $1,750,000.00.  Modifications recorded March 6, 1997, as
      document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4.    Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book
      550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield
      Marine Bank, as Trustee, to City of Jacksonville.

      NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book
      671, page 628, as Document No. 361253.

5.    Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971,
      as Document Nos. 341363 and 341364, respectively, purporting to give notice by the
      Department of Transportation of the State of Illinois, Department of Public Works and
      Buildings, now known as the Department of Transportation, of their intent to establish a
      freeway on, over, across, or contiguous to the land in a manner which will permit access
      between said freeway and abutting lands only at entrances provided for said purpose.

6.    Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed
      Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as
      Trustee under Trust Agreement No.  53-0034-0, to the Springfield Sanitary District, an
      Illinois municipal corporation.

7.    Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20,
      1987, as Document No. 66473.

8.    Utility and drainage easements as shown by plat of subdivision.

9.    20-foot utility easement as shown by Plat of Subdivision.  (Affects the Westerly 20 feet and
      the Northerly 20 feet of Lot 7.)

10.   Utility and sanitary sewer easement as shown by Plat and Document No. 385237.  (Affects
      the East 20 feet of Lot 7.)

11. Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12. Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13. Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14. Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001        3/29/01RLA

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $ _____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.      In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.      If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.      This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.      This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.      The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.      IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST


By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____
_____

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

# ACKNOWLEDGMENTS

## LANDLORD

STATE OF _____ )
                         ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## LENDER

STATE OF _____ )
                         ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20_____ by _____ as _____ and by _____ as _____ of _____, a _____

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>TENANT</u>

STATE OF _____ )
                       ) ss.
COUNTY OF _____ )

     The foregoing instrument was acknowledged before me this _____ day of _____, 20\_\_\_\_ by _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

     WITNESS my hand and official seal.


                       _____
                       Notary Public

My commission expires:     _____

## Exhibit G

## MEMORANDUM OF LEASE

Demise.  Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease.  Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease.  April 2, 2001.

Name and Address of Landlord.  ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois  62704, Attention: Property Management.

Name and Address of Tenant.  GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado  80203, Attention: President.

Description of Premises.  Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in Exhibit A attached hereto.

Term of Lease.  Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

Options to Extend.  The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

Restrictions on Construction.  The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B," and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive. So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this_____ day of _____, 2001.

TENANT

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

## ACKNOWLEDGMENTS

### TENANT

STATE OF _____ )
                  ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

    WITNESS my hand and official seal:

_____
Notary Public

My commission expires: _____

### LANDLORD

STATE OF _____ )
                  ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

    WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## Exhibit A

## LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

# CO᷂MBE - BLOXDORF, P.C.

### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



#618
7s



**SPORTS AUTHORITY**

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303-200-5050 • FAX 720-475-2967

March 16, 2006

<u>VIA FEDERAL EXPRESS NEXT DAY DELIVERY</u>

Mr. Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, IL 62704
Attention: Property Manager

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P.O. Box 5131
Springfield, IL 62705-5131

Re:   Lease Agreement, dated as of April 2, 2001, by and between Illinois National Bank,
      Trustee under Trust Agreement dated November 6, 2000 known as Trust No. 00-0020
      ("Landlord") and TSA Stores, Inc. as successor to Gart Bros. Sporting Goods Company,
      a Delaware corporation ("Tenant"), regarding the "Premises" located in the Southwest
      Plaza III Shopping Center, located at 3211 S. Veterans Parkway, Springfield, Illinois.
      <u>TSA Store No. 618</u>

Dear Mr. Robbins:

Thank you for taking the time today to briefly talk about the damage to our Premises from the
recent tornado at the above-referenced location. I appreciate that you are taking all necessary
steps to ensure that we re-open our business as soon as possible. However, we would appreciate
a more detailed conversation with an agreed upon action plan and timetable. With that in mind,
we request that you do not enter or restore anything in the Premises until we can fully assess our
damage. As further discussed, we expect assessment reports from our insurance agent, structural
engineer, and others shortly. Additionally, our Vice President of Construction, David Frieder,
will be on-site Tuesday, March 21, 2006, to also make an evaluation of our damage. He would
like to meet with you there at 2:30 pm. David can be contacted at 303-909-1739.

We look forward to coordinating efforts between both parties.

  Springmaid    OSHMAN'S

**EXHIBIT B**

TSA RULE 26 DISCLOSURES
.0093

Mr. Charles E. Robbins, Realtor
R. Lee Allen, Attorney
March 16, 2005
Page 2

Sincerely,

Cynthia J. Cashman
Director of Real Estate

Cc:   Missy Mayne
      Michelle Riggins
      David Frieder
      Lease file

H:\STORES\Store 618 Springfield IL\Tornado\Ltr to LL.doc

TSA RULE 26 DISCLOSURES
0094

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**
**#618 Springfield**                                                                            5/1/2006

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

**EXHIBIT C**

# BUDGET ESTIMATE

**Sports Authority**
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wofford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $6,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' W Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,600 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and Insulation | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,500 |
| HVAC repair existing units | | | $6,600 |
| Drywall/ Finish Taping Perimeter 4' U/S of Deck | | 4' up at Perim | $31,500 |
| Minor ACT's- T-Bar Replacement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $6,600 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring Installation | | | $49,590 |
| Flooring materials | | Materials | $58,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acassories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,105 |
| Barricades- Dismantling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $938,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,676 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| | | | |
| List itemizations below: #25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

.001  T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL.

Date: 7-26-01
Contractor: VANDIL CONTRACTING

| ITEM | BID BREAKDOWN | | | |
|------|----------|-------|--------------|-------|
|  | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL |
| 1. Barricade |  |  |  |  |
| 2. Demolition |  |  |  |  |
| 3. Bond |  |  |  |  |
| 4. Concrete |  |  |  | 10,500 X |
| 5. Carpentry |  |  |  | 1452 |
| 6. Studs and Drywall |  |  |  | 17,427 X |
| 7. Storefront Glass |  |  |  | 109,440 X |
| 8. Interior Mirrors |  |  |  | 0 X |
| 9. Acoustical Ceiling |  |  |  | 1500 |
| 10. Store Fixtures |  |  |  | 11,850 X |
| 11. Painting |  |  |  | 36,038 X |
| 12. Carpet Installation |  |  |  | 18,640 X |
| 13. Vinyl Tile and Base |  |  |  | 105,888 X |
| 14. Plumbing |  |  |  | ABOVE |
| 15. Sprinklers |  |  |  | 37,534 X |
| 16. Electrical |  |  |  | 30,025 |
| 17. Fire Alarm System |  |  |  | 134,000 X |
| 18. HVAC/Ventilation |  |  |  | 9800 X |
| 19. Dumpster |  |  |  | 115,000 X |
| 20. Insurance BUILDERS RISK |  |  |  | 895 |
| 21. Supervision |  |  |  |  |
| 22. General Conditions (Itemize) |  |  |  |  |
| 23. Other (Itemize below) |  |  |  | 14,402 SUPERVISION |
| SUBTOTAL |  |  |  | 20,255 X |
| 24. Profit & Overhead (10% Max.) |  |  |  | 38,000 |
| 25. Taxes (Sales/State/Local) |  |  |  | 3950 |
| TOTAL | $0 | $0 | $0 | $0  716,593 |
| List itemizations below: (#22 - Gen Cond.) |  |  |  |  $22.18ᴬ |
| 1. Final Cleaning |  |  |  |  |
| 2. Temporary Phones |  |  |  |  |
| 3. Tool Rental |  |  |  |  |
| List itemizations below: (#23 - Other) |  |  |  |  |
| 1. DOORS & HARDWARE |  |  |  | 15,685 |
| 2. TOILET PARTITIONS |  |  |  | 2230 |
| 3. CONCRETE SEALING |  |  |  | 2340 |
| 4. |  |  |  |  |

736,848
$22.80ᴬ

Site Verification (please circle): We have / have not verified site

Amount of time to procure permit: O wks.
Amount of time for construction: O wks.

UNION / NON-UNION
% of Union increase: ____ %

Qualifications to be listed on separate sheet

7-26-01

JUL-23-01 MON 04:01 PM  VANCIL CONTRACTING          FAX NO. 21774D443          P. 02/02

Sheet3

*Springfield*

*#618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | | | Sportmart No. 618 | |
|---|---|---|---|---|---|
| | | | | | Cost |
| 1000 | General Requirements | | | | $28,829 |
| 2000 | Excavate and Grade | | | | $60,642 |
| 3000 | Concrete Foundations and slabs | | | | $174,482 |
| 4000 | Masonry and Foam Insulation | | | | $168,251 |
| 5000 | Structural, Joists, and Deck | | | | $177,827 |
| 6000 | Rough Carpentry | | | | $18,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | | $95,393 |
| 8100 | Doors, Frames | | | | $2,949 |
| 8300 | Overhead Doors | | | | $1,540 |
| 8400 | Storefronts | | | | $21,450 |
| 8460 | Auto Doors | | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | | $24,640 |
| 9900 | Exterior Painting | | | | $13,255 |
| 11100 | Dock Equipment | | | | $5,804 |
| 15400 | Plumbing Rough In | | | | $5,992 |
| 15700 | HVAC Curbs | | | | $3,122 |
| 16100 | Electrical Rough In | | | | $22,496 |
| | | | | | $831,117 |
| | Overhead and Profit | | | | $58,178 |
| | | | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

LEASE AGREEMENT = $ $\frac{55.00}{27.53}$ /SQ FT

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

$1.777 total

2.6

Page 1

*Storefiles*



**National Disaster Recovery Services**

| | |
|---|---|
| Name | Mike Mavelle |
| Company | Sports Authority |
| Address | 1050 W. Hampton Ave. |
| City, State, Zip | Englewood, CO 80110 |
| Tel: | (720) 475-3285 |
| Fax: | (720) 475-3285 |

| | |
|---|---|
| Date: | 03/31/06 |
| Invoice #: | 1408722 |
| Terms: | Net 10 |
| Fed Id: | 76-0628204 |

| | |
|---|---|
| Loss Address: | 3211 South Veterans Parkway |
| City, State, Zip | Springfield, IL 62704 |
| Tel: | (217) 546-0132 |
| Fax: | (217) 546-1073 |

| | |
|---|---|
| Insurance Co: | Liberty Mutual Property |
| Insurance Adj: | Ton Tiernan |
| Claim #: | X69A-003155-00 |

| | |
|---|---|
| Re: | Tornado Damages in Springfield, IL   #618 |
| Re: | Final Bill With Not To Exceed Amount: |

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |
| **SUBTOTAL** | REMAINING BALANCE | $  219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $  219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

*Any queries regarding this invoice should be sent to us within ten days of receipt of this*

*invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.*

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**Please include the invoice number on check**

03/31/06



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. (See Chart 1(Page 2) and Table 1 (Page 7).)

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.

The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.



In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

*Reported by AGC Chief Economist Ken Simonson (March 2006)*



In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

### Chart 2



Changes in Costs Among Construction Types

- - ◆ - - Nonresidential Buildings    —○— Highway & Street Construction    —▲— Other Heavy Construction
- ■ — Multi-Unit Residential    —+— Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.



Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).

**Chart 3**



Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

**Chart 4**





## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.



Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.



The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

### Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



...imonson@agc.org) became Chief Economist of ...eral Contractors of America (AGC), the leading national ...ation for the construction industry, on September 10th,

...th 30 years of experience analyzing, advocating and communicat-...economic and tax issues. Before joining AGC, he spent three ...senior economic advisor in the Office of Advocacy of the U.S. ...inistration and 13 years as vice president and chief ...merican Trucking Associations. He also worked with ...Commission on Industrial Competitiveness, the U.S. ...ommerce, the Federal Home Loan Bank Board, and an ...consulting firm.

...one-page email newsletter that summarizes the latest eco-...e is co-author of AGC's monthly Construction Tax News, a ...ederal and state tax developments affecting the industry.

...the University of Chicago and an MA in economics from ...e is a board member of the National Association for Business



## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 8.9 | 5.0 | 1.5 |
| BCI cost change index | 1.2 | -3.2 | 1.3 | 2.4 | 3.1 | -0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Nonresidential buildings | -0.9 | -0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.5 | 1.0 | 2.6 | 10.6 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.8 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 8.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 8.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
| Iron ore | 1.6 | -1.3 | 1.6 | 6.7 | 16.5 | 3.7 |
| Iron and steel scrap | -5.6 | 27.6 | 64.9 | 60.6 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.6 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.6 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Copper ores | -19.6 | 3.6 | -37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.5 | 11.6 | 29.9 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.9 | -0.5 | 9.9 | 6.9 | 4.6 |
| Structural, architectural, pre-engineered metal prods. | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | -8.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.6 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.0 | 0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.6 | -0.4 | 3.6 | 20.1 | 7.6 |
| Fabricated steel plate | 0.6 | -1.6 | 0.6 | 7.6 | 1.9 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | -3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.8 | 9.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.8 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.6 | 5.8 |
| Ready-mixed concrete | 2.6 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 8.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 6.2 | 3.6 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.6 | 9.2 | 6.4 | 28.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.8 |
| Asphalt | N/A | N/A | 10.0 | 16.3 | 17.8 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.8 | -0.8 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 16.6 | 6.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 8.7 | 5.6 | 17.8 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.6 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.8 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | -1.7 |



## Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction--the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components--items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods--the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprel06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance | |
|---|---|---|---|---|
| 1220B | | Materials and components for construct... | 12.535 | 12.848 |
| | 01310216 | Softwoods and felt goods | .001 | .001 |
| | | Industrial and commercial coated product... | .006 | .005 |
| | | ... | ... | ... |
| | | ... | ... | ... |
| | | ... | ... | ... |
| | | ... | ... | ... |
| | | ... | ... | ... |



| | | | |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding, and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083301 | Softwood veneer, incl veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | — |
| 084903 | Wood lath, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .146 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c | .008 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul, ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | — | .091 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stei | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

| 104101 | Builders hardware | .049 | .049 |
|---|---|---|---|
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elec., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & v | .099 | .100 |
| 107501 | Heat exchangers and condensers | .048 | .048 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farms | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for metal bldg | .016 | .016 |
| 108102 | Externally thread. fasteners, exc. aircr | .005 | .005 |
| 108103 | Internally thread. fasteners, exc. aircr | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .008 | .008 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

| Code | Description | Former | Revised |
|---|---|---|---|
| 117102 | Noncurrent carrying | .204 | .203 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect.& monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132201 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .091 | .091 |
| 133301 | Ready-mixed concrete | .866 | .865 |
| 133401 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .069 |
| 134202 | Glazed brick struct., hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 135201 | Clay refractories | .025 | .024 |
| 135301 | Refractories, non-clay | .032 | .032 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category--Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

# SPORTS AUTHORITY

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

**SENT VIA FEDERAL EXPRESS**

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re: Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation. To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001. As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

  

**EXHIBIT D**

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

**E-FILED**
Thursday, 24 January, 2008  04:05:07 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust no. 00-0020, an Illinois banking institution,, <br><br> Plaintiff/Cross-Complainant, <br><br> v. <br><br> TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation,, <br><br> Defendant/Counter-Plaintiff. | Case No.: 06-CV-3177 |

### DECLARATION OF MICHAEL R. MAVELLE

I, MICHAEL R. MAVELLE, declare, certify, verify, and state:

1.    I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could competently testify thereto.

2.    I am presently the Vice President-Risk Managment for TSA Stores, Inc. ("TSA"), and have held such position since August 4, 2003 . I am 50 years old, and presently reside in the State of Colorado.

3.    I have earned a baccalaureate degree in Criminal Justice from Michigan State University in the year of 1980.

4.    Prior to serving as Vice President-Risk Managment for TSA, I was employed as follows:

| COMPANY | POSITION | TIME |
|---|---|---|
| May Department Stores | Director of Security and various positions in the Company. | 8-1980 to 5-1993 |

**EXHIBIT D**

60169270v1 868372

5.    As Vice President-Risk Managment for TSA, my principal duties are:

    a.    Place all P&C and property insurance policies;

    b.    Direct all Safety Programs for TSA;

    c.    Direct all Work Comp and general liability claims for TSA; and

    d.    Work all property related claims for TSA.

6.    TSA is a Delaware corporation, headquartered in Englewood, Colorado.

7.    TSA is one of the largest full line sporting goods retailers in the United States. In its 2005 fiscal year, TSA had 398 stores in 45 states with 32 of those stores located in Illinois.

8.    TSA is a wholly-owned subsidiary of The Sports Authority, Inc., formerly known as Gart Sports Company.

9.    On the basis of my position with TSA and background, I have general knowledge of the construction process of TSA retail stores and the general costs thereof.

10.    On April 2, 2001, TSA's predecessor, Gart Bros. Sporting Goods Company ("Gart") entered into a lease with the Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000, and known as Trust No. 00-0020 ("Trustee-Landlord"), for the rental of space in a shopping center in Springfield, Illinois, from which to operate a retail sporting goods store. A true and correct copy of such Lease is attached hereto as Exhibit A.

11.    Gart had tendered a proposed lease agreement for the space to the prospective landlord, but that proposal was rejected. In turn, the Trustee-Landlord submitted its own proposal. The lease ultimately executed by the parties, including Section 15(b), was primarily drafted by the landlord.

12.    Gart took possession of the leased premises on December 18, 2001.

2

13.     On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the lease.

14.     In response to the tornado, TSA took action to protect persons in and around the leased premised and its property.

15.     Part of TSA's response included the retention of Cotton USA, a nationally known company specializing in disaster recovery services.  TSA's charge to Cotton USA was to stabilize and safeguard the TSA leased premises, including the structure, its systems, and the fixtures therein.

16.     On March 13 to March 15, 2006, I visited TSA's leased premises in Springfield, Illinois.  I observed damage to those premises as follows:

      a.     Various holes in the roof;

      b.     The wall with the South tenant was bowed;

      c.     Front glass to the store, including doors blown into store;

      d.     Water entered the store from the ceiling holes and front doors; and

      e.     All power was lost until Cotton hooked up the building with a generator.

17.     On March 21, 2006, David Frieder, Vice President of Construction for TSA, visited TSA's leased premises and observed damage to these premises.

18.     On March 23, 2006, TSA by Mr. Frieder, sent a letter to Arthur Seppi, Charles E. Robbins, and R. Lee Allen.  A true and correct copy of that letter is attached as Exhibit B.

19.     Thereafter, TSA received a letter, dated March 29, 2006, from David Rolf, the Landlord's attorney, which included an estimate of damage prepared by the Landlord's contractor, Jones-Blythe Construction Company, also dated March 29, 2006.  True and correct copies of that letter and estimate are attached as Exhibits C and D, respectively.

3

20.     Also as part of TSA's response, TSA retained Jeffrey B. Wolford of Wolford Retail Builders, Inc., of Prospect Heights, Illinois, to prepare a budget estimate of the reconstruction or repair costs of TSA's store in Springfield, Illinois.

21.     In April 2006, TSA received a budget estimate of the reconstruction costs of TSA's leased premises in Springfield, Illinois from Mr. Wolford (*see* page 2 of Exhibit E).  Mr. Wolford's budget estimate was incorporated into a Summary of Replacement and Repair Costs prepared by TSA.  A true and correct copy of that Summary of Replacement and Repair Costs is attached hereto as Exhibit E.

22.     TSA, by Mr. Frieder, estimated the then-total building replacement cost to be $1,960,067.00.  This figure was calculated based upon the original cost of construction in 2001 and adjusted for inflation by using tables prepared by The Associated General Contractors of America.  Thirty-five percent of the then-total replacement cost of TSA's leased premises in Springfield was calculated at $686,023.00.

23.     TSA received a bill from Cotton USA for its services relating to the leased premises in the amount of $319,428.00; said bill has been paid in full by TSA.

24.     Among the services provided by Cotton USA at the leased premises and paid for by TSA were the following:

(a)     drying of premises;

(b)     cleaning and removing debris;

(c)     removing standing water;

(d)     removing sheet rock;

(e)     removing all rubberized aisles with scrapers and flooring material;

(f)     removing and discarding effected insulation;

4

(g)    removing and discarding all commercial glued-down carpet; and

(h)    scraping remaining glue from floor slab.

25.    Including the Cotton USA fees, TSA estimated that the repair or reconstruction costs of the leased premises was $1,046,701.00 or 53.4% of the then-total replacement costs.

26.    On that basis, TSA determined that its termination rights under Section 15(b) of the Lease were triggered and elected to terminate the Lease.

27.    TSA by Mr. Frieder, sent a letter, dated May 3, 2006, to Arthur Seppi, Charles E. Robbins, and R. Lee Allen, providing notice of TSA's election to terminate the Lease   A true and correct copy of said letter is attached hereto as Exhibit F

Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on December 31, 2007.

_____
MICHAEL R. MAVELLE

5

# SOUTHWEST PLAZA III, SPRINGFIELD, ILLINOIS

## LEASE
between

GART BROS. SPORTING GOODS COMPANY,

A Colorado Corporation

**as Tenant**

**and**

ILLINOIS NATIONAL BANK, TRUSTEE,

under Trust Agreement dated November 6, 2000

and known as Trust No. 00-0020

**as Landlord**

**dated April 2, 2001**

SOUTHWEST PLAZA III SHOPPING CENTER

**EXHIBIT A**

# LEASE

This LEASE is made as of the 2nd day of April, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 (the "Trust" or "Landlord"), having an address of 2144 South MacArthur Boulevard, Springfield, Illinois and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation having an address at 1000 Broadway, Denver, Colorado 80203 ("Tenant").

## WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

I.    FUNDAMENTAL LEASE TERMS

    A.    Parties.

        Landlord:    Illinois National Bank, Trustee, under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020

        Tenant:    Gart Bros. Sporting Goods Company, a Colorado Corporation

    B.    Premises (paragraph 1)

        Approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet measuring approximately 165 feet wide and 194 feet deep at the Southwest Plaza III Shopping Center located at the corner of Southwest Plaza Drive and West White Oaks Plaza Drive, Springfield, Illinois.

    C.    Term (paragraph 3)

        Fifteen (15) Lease Years, with four (4) five (5) year renewals.

    D.    Base Rent (paragraph 4)

| Lease Year | Monthly | Annual | Per-sq. ft. |
|---|---|---|---|
| 1 – 5 | $33,989.58 | $407,875.00 | $12.50 |
| 6 – 10 | $37,388.54 | $448,662.50 | $13.75 |
| 11 – 15 | $41,140.99 | $493,691.90 | $15.13 |

| Option 1 | $45,246.93 | $542,963.20 | $16.64 |
| Option 2 | $49,760.75 | $597,129.00 | $18.30 |
| Option 3 | $54,736.83 | $656,841.90 | $20.13 |
| Option 4 | $60,229.54 | $722,754.50 | $22.13 |

**E.    Construction (paragraph 5)**

Landlord to complete construction on or before October 1, 2001.

**F.    Addresses (paragraph 34)**

If to Tenant:

GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:

GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701
Facsimile: (217) 522-3173

1.    **The Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the premises situated in the City of Springfield (the "City"), County of Sangamon and State of Illinois, and known and described as follows:

The premises and improvements and appurtenances thereto constructed and to be constructed according to this Lease (the "Premises") located in the Southwest Plaza III Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as **Exhibit "A"** and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as **Exhibit "B"** and made a part hereof, provided and that in the event

of any conflict between Exhibit "A" and Exhibit "B", Exhibit "A" shall control. The "Shopping Center" includes the land described on Exhibit "A", all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements and appurtenances pertaining thereto. The Premises contain approximately thirty two thousand six hundred thirty (32,630) Leasable Square Feet (as defined below) of building area and are cross-hatched on the site plan attached as Exhibit "B". The Shopping Center will contain approximately 120,000 Leasable Square Feet when completely built out in accordance with Exhibit "B".

Landlord agrees that the actual Leasable Square Feet of the Premises will not be less than 98% of the Leasable Square Feet stated in the foregoing paragraph (the "Stated Premises Size"). Further, if the actual measurement of the Leasable Square Feet determines that there exists within the Premises Leasable Square Feet in excess of 102% of the Stated Premises Size, the Premises, for purposes of calculating Base Rent, CAM Charges, Real Estate Taxes and any other charges and for all other purposes, will be deemed to be 102% of the Stated Premises Size. Irrespective of the variance in the Leasable Square Feet of the Premises, in no event will the frontage of the Premises be less than 165 feet.

The term "Leasable Square Feet" means the number of square feet of floor area at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), bounded by the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the number of Leasable Square Feet within the Premises, no wall will be deemed to exceed 12" in width); provided, however, that the following areas will not be included in any such calculations: outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area). The number of Leasable Square Feet contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in this paragraph I. Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Possession Date (as defined in paragraph 2 below) in accordance with the provisions of this paragraph. The certification, if factually correct or if not objected to by Tenant within sixty (60) days after the later to occur of: (a) Tenant's receipt of the certification, or (b) the Possession Date, will be conclusive of the Leasable Square Feet of the Premises for all purposes. If Tenant objects to Landlord's architect's measurement of the Premises, together with its objection, Tenant will specify the number of Leasable Square Feet it believes the Premises contain. The parties will give reasonable efforts to resolve their differences. If, within thirty (30) days after Tenant's objection, the parties have not resolved their differences, each will name an architect within ten (10) days thereafter. Within ten (10) days after being named, such architects will name a third architect, who will, within twenty (20) days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct number of Leasable Square Feet in the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.

2.   Completion and Delivery of the Premises and Shopping Center. Landlord agrees to complete the following work (collectively, "Landlord's Work") in accordance with the construction provisions attached hereto as Exhibit "C" (the "Construction Provisions") on or before October 1, 2001 (the "Scheduled Possession Date"): (i) construct the Shopping Center as shown on the site plan attached hereto as Exhibit "B" including, without limitation, all parking lots, common areas and access roads located on or serving the Shopping Center; and (ii) construct the Premises as provided in this paragraph 2 and the Construction Provisions. As used herein the "Possession Date" will mean the first date on which all of the following have occurred: (a) Landlord has substantially completed all of Landlord's Work in accordance with the plans and specifications therefor described in the Construction Provisions and otherwise in accordance with the requirements of this Lease; and (b) Landlord has delivered possession of the Premises to Tenant; provided, however, that if the Possession Date would otherwise occur during the period from October 15 through February 28 (the "Blackout Period"), then Tenant may elect not to accept possession until the expiration of the Blackout Period, in which event the Possession Date will not occur until the March 1 immediately following the expiration of the Blackout Period. If Landlord's Work is not completed on or before the Scheduled Possession Date for any reason whatsoever, except Force Majeure, as set forth below, then Landlord shall pay Tenant on demand, as agreed upon as liquidated damages, One Thousand and 00/100ths Dollars ($1,000.00) per day for each day from and after the Scheduled Possession Date until the date on which Landlord's Work is substantially completed. Landlord and Tenant agree the above amount is a reasonable estimate of the damages Tenant would sustain if the completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the initial rent payment(s) otherwise due hereunder. Tenant's taking possession of the Premises and/or opening for business to the public at the Premises shall not constitute a waiver of Tenant's right to receive such amount or a waiver of any construction defects. In addition to the foregoing rights, Tenant may elect to complete Landlord's Work or correct deficiencies therein, at Landlord's expense. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (i) liquidated damages as above provided and (ii) costs incurred by Tenant if Tenant elects to complete uncompleted or deficient items of Landlord's Work. Finally, if Landlord fails to complete Landlord's Work by March 1, 2002, Tenant may terminate this Lease by notice to Landlord. Time is of the essence with respect to the dates contained in this paragraph.

In the event Landlord's construction of the Premises is delayed or prevented by reason of the direct effects of Acts of God, strikes, catastrophic weather such as tornadoes, blizzards, torrential rains over 24 hours, or an inability to procure materials, not through the fault of and beyond the control of Landlord (all of such reasons or causes indicated above shall be referred to as "Force Majeure"), then the completion of Landlord's Work shall be excused for the period of the delay, and the period of performance of such act shall be excused for the period of delay.

In the event Landlord's construction of the Premises is delayed or prevented due to Tenant's failure to cooperate, Landlord's work shall be excused for the period of delay and Landlord shall have such additional time as the period of delay caused by Tenant to complete construction of the Premises.

Landlord shall provide or cause to be provided all materials, and perform or cause to be performed all work, necessary to deliver the Premises as depicted on the store floor plans, construction plans and specifications prepared in accordance with the attached Exhibit "C", made

a part hereof, and otherwise to deliver possession of the Premises to Tenant in "broom-clean" condition and free and clear of (i) hazardous materials, (ii) liens and encumbrances and (iii) violations of law. All heating, ventilating and air-conditioning equipment servicing the Premises will be new. Landlord hereby warrants and represents that at such time as it delivers possession of the Premises to Tenant, the structure, roof, roof membrane, heating, ventilating, air-conditioning, lighting, electrical, plumbing, sewer and other systems and fixtures serving the Premises will be in good condition and working order, and there will be sufficient utilities available (including without limitation gas, water and electricity) to heat, illuminate, ventilate, air-condition and provide power to the Premises in the quantities or at the capacities required by Tenant. Landlord shall assign to Tenant all warranties and guaranties given to Landlord by any contractor or subcontractor involved in the construction of the Premises, which shall include, at a minimum, warranties of at least one (1) year for all new construction, and a fifteen (15) year warranty on the roof and a five (5) year compressor warranty on HVAC.

Landlord is responsible for the cost of performing Landlord's Work with respect to the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined in **Exhibit "C;"** provided that there shall be a cap on the cost of performing Landlord's Work with respect to the Building Shell and the Leasehold Improvements of Fifty Five and 00/100ths ($55.00) Dollars per square foot of the Premises (the "Construction Cap") per the prototype Plans and Specifications ("Prototypical Plans") for the North Glen, Colorado Store No. 11 Building prepared by SEM Architects and last revised March 25, 1999, a copy of which has been provided by Tenant to Landlord. The Construction Cap shall be applicable only to Landlord's Work for the Building Shell and the Leasehold Improvements and no portion of the following items shall be included when determining amounts to be included in the Construction Cap: (i) construction of the Common Areas or any portion of the Shopping Center other than the Premises; (ii) Landlord's architectural and engineering costs to review Tenant's Prototypical Plans and to prepare Landlord's own plans and specs for the Premises and the rest of Landlord's Work for the Premises (on Landlord's request, Tenant will provide Landlord with a CAD disc of the Prototypical Plans, at Tenant's expense); (iii) interest; (iv) Landlord's carrying costs; or, (v) profit. If the actual construction cost, as set forth in the bid obtained and accepted by Landlord for the Building Shell from Landlord's general contractor and the bids obtained and accepted by Landlord for the Leasehold Improvements pursuant to Article 5.3 of **Exhibit "C,"** as modified by any revisions approved by Tenant pursuant to Article 6.4 of **Exhibit "C"** (the "Actual Construction Cost") exceeds the "Construction Cap", but is less than or equal to $60.00 per square foot, Landlord shall be compensated by additional rent, as follows: The Base Rent payable during each month of the 15-year "Main Term" (as defined in paragraph 3 below) will be increased by the amount necessary to amortize, in equal monthly installments, the difference between the Actual Construction Cost and the Construction Cap over the Main Term with interest at the rate of 12% per annum.

If the Actual Construction Cost exceeds $60.00 per square foot, then (i) Tenant will have the right to terminate this Lease by notice to Landlord given after Landlord has notified Tenant of the amount of the bid proposed to be accepted by Landlord for the Building Shell and Landlord has notified Tenant of the amount of the bids for the Leasehold Improvements obtained by Landlord pursuant to Article 5.3 of **Exhibit "C"** (and Tenant will be deemed to have waived its right to so terminate this Lease if, after having been notified of the amount of the bid for the Building Shell, Tenant approves in writing bids for the Leasehold Improvements that would cause the Actual Construction Cost to exceed $60.00 per square foot); and (ii) Tenant shall reimburse Landlord in

cash, by the "Possession Date" for the Actual Construction Costs, to the extent they exceed $60.00 per square foot, in addition to the increased rent as provided above for any excess, up to $60.00 per square foot, of the Actual Construction Costs over the Construction Cap.

3.     **Lease Term.**  Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord begins construction on the Premises, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. If any option to renew this lease is not exercised, all other options to renew the lease term shall automatically terminate and be null and void.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date. At any time prior to the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of measuring the Premises and installing therein Tenant's fixtures, equipment and merchandise, provided that such operations do not interfere unreasonably with Landlord's completion of the Premises. Any entry by Tenant for the purpose of measuring the Premises or of installing its fixtures and equipment shall not be deemed acceptance of the Premises by Tenant.

4.     **Rent.**

(a)     **Base Rent.**  During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. The rental "Commencement Date" shall mean the date sixty (60) days after the Possession Date. Upon the Commencement Date, Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Main Term and any Option Periods, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in this Lease, Base Rent shall be paid pursuant to the following schedule:

(i)    **First Five Years.** During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Seven Thousand Eight Hundred Seventy Five and 00/100ths ($407,875.00) Dollars, payable in equal monthly installments of Thirty Three Thousand Nine Hundred Eighty Nine and 58/100ths ($33,989.58) Dollars.

(ii)    **Reduction in Base Rent.** Notwithstanding the Base Rent provisions, in the event that the Leasable Square Feet of the Premises when constructed does not equal 32,630 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual Leasable Square Feet of the Premises (as calculated pursuant to paragraph 1 above), multiplied by $12.50. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    **Increases in Base Rent.** Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the previous five (5) year period of Base Rent charged hereunder by ten percent (10%), as shown in I.D above.

(b)    **Co-Tenancy Requirement; Alternate Rent.** Landlord covenants that it will construct at least one additional in-line premises containing not less than 25,000 Leasable Square Feet in the Shopping Center, lease such premises to a retail tenant and cause such tenant to open for business in such premises on or before June 1, 2002 (the "Co-Tenancy Requirement"). If the Co-Tenancy Requirement is not satisfied on or before June 1, 2002, then commencing on June 1, 2002 all Base Rent will be abated until such time as the Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, as "Alternative Rent," an amount equal the product of (i) the entire amount of "Gross Sales" (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (ii) 4%, but in no event will such Alternative Rent exceed the Base Rent which would have been payable for such period in the absence of this provision. The term "Gross Sales" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise, (ii) sales to employees, (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost, (iv) receipts from the sale of "leader items" not exceeding $200,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any governmental authority, including, but not limited to, sales or excise taxes or similar taxes, (vi) sales of trade fixtures or store operating equipment, (vii) vending machine sales and pay telephone receipts, (viii) any intracompany transfers of merchandise, (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance changes on sales made on credit or under a time payment plan or layaway plan, (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans, (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises

will be included in Gross Sales, (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom charges (at cost) for alterations, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold; (xvi) sales of merchandise ordered through the use of Tenant's mail order catalogs or filled through Tenant's mail order channels, regardless of the place of order, payment or delivery, (xvii) postage paid in connection with mail order sales, (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises, (xvi) returns to shippers, jobbers, wholesalers or manufacturers, (xix) sums or credits received for the settlement of claims for loss or damage to merchandise, (xx) any penalties or charges imposed by Tenant on its customers for returned checks, and (xxi) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

5.    **Development of Shopping Center by Landlord**.  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements.  All such parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction.  During construction of any part of the Shopping Center that is constructed subsequent to the Commencement Date, Landlord shall use reasonable efforts to direct all construction traffic down West White Oaks Drive to the extent practicable and to avoid construction traffic over the portion of the Common Areas adjacent to the Premises.  In no event will Landlord block access to or from Tenant's Preferred Area (as defined in paragraph 6(b) below) or permit any portion thereof to be used for construction vehicle parking or for the staging of construction activities.  Landlord shall refrain from unreasonable interference with the conduct of Tenant's business (it being agreed that normal construction activities conducted in accordance with the terms hereof during the initial construction of the Shopping Center will not be deemed unreasonable interference).  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and except with respect to activity reasonably necessary to construct the Shopping Center improvements, shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    **Easements**.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, which easements shall run as covenants with the Shopping

Center and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    **Utility Easements**.  During the Term, upon prior reasonable request of Tenant (following the initial Landlord's Work as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(a), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord. Nothing set forth herein will change Landlord's obligation to provide all utility lines and hook-ups constituting part of Landlord's Work.

(b)    **Common Area Easement**. During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, contractors, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, contractors, customers and invitees and all other persons claiming by and through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to the Premises and within the Tenant's Preferred Area as shown on the Site Plan ("Tenant's Preferred Area") for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.  Tenant shall repair any damage to blacktop, etc., by repairing and/or replacing same to its presale condition.

(c)    **Non-Dedication**. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    **Common Areas and Common Area Maintenance**.

(a)    **Definition of Common Areas**.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within

the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylons and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, overlaying the asphalt in parking lot, repairing or replacing all or a substantial part of the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    **CAM Charges**. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, including premiums incurred by Landlord in connection with the property and liability insurance required by paragraph 14 of this Lease and (ii) Landlord's overhead expenses for administering same shall be a fee in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity for failure to comply with any governmental regulations in existence prior to the completion of the initial construction or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source except as set forth in subparagraph (b)(ii) above;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(f) below;

(8)    repairs or replacements of a capital nature (whether or not capitalized), with the exception of blacktopping and repairing the parking area (provided that the cost of any blacktopping or other resurfacing of the parking area, other than minor patching, shall be amortized over the useful life of such blacktopping or resurfacing and only the annual amortization amount will be included in CAM Charges each year, and provided further that Landlord will not commence to include any such amortization of blacktopping or other resurfacing charges in CAM Charges more often than once every seven years);

(9)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(10)    management fees or Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(11)    amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below); or

(12)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    **Tenant Payments**.    Commencing on the Commencement Date and continuing until the expiration of the second Lease Year, Tenant shall pay to Landlord a fee in the amount of $0.80 per Leasable Square Foot of the Premises per annum, payable in equal monthly installments, as its share of CAM Charges (other than charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(a) and Tenant's Pro Rata Share, as defined below, of the charges for the insurance required to be maintained by Landlord pursuant to paragraph 14(f), which shall be in addition to such $0.80). Thereafter, Tenant shall pay Tenant's Pro Rata Share (as defined below) of the actual CAM Charges computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly estimated installments, in advance, on the first day of each month during such CAM Year. In no event shall Tenant's Pro Rata Share of CAM Charges for any CAM Year subsequent to the second Lease Year exceed by more than five percent (5%) Tenant's Pro Rata Share of CAM Charges for the preceding CAM Year, excluding snow removal,

permitted capital expenditures and utilities. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of Leasable Square Feet in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant (subject to the maximum annual increase described above). Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first two Lease Years shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of Leasable Square Feet of the Premises and the denominator of which is the number Leasable Square Feet of the Shopping Center. Changes in Leasable Square Feet shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the Leasable Square Feet of the Shopping Center as shown on the Site Plan and set forth in paragraph 1. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    **Examination of Landlord's Records.** Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

8.    **Signs and Communications Equipment.**

(a)    **Signs.** Landlord, at its sole cost and expense, no later than the Possession Date, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon for inclusion of doublesided "face panels" and a "readerboard," approximately five (5) feet tall by twenty (20) feet wide, except as may be limited hereafter, identifying Tenant's store, which face panels and readerboard shall be constructed and installed at Tenant's sole cost and expense. The tenant positions on the pylon sign structure and the size of the "face panels" and "readerboard" shall be determined based upon Leasable Square Feet of each tenant of the Shopping Center, but in all events the size of the "face panels" and "readerboard" shall comply with any applicable governmental regulations in effect from time to time. The tenant with the largest Leasable Square Feet shall occupy the top position and the tenant with the smallest Leasable Square Feet shall occupy the bottom position.

Landlord represents and warrants that Tenant has the right to enter upon the property shown on the Site Plan for purposes of maintaining, repairing and replacing such pylon sign panel and hereby grants to Tenant an easement for such purposes. Attached as a portion of Exhibit "D" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    **Communications Equipment.**  Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Premises as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    **Taxes.**

(a)    **Taxes Contemplated Hereunder.**  The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes.**  Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels comprising the Premises (the "Tax Parcel"). Landlord represents that at the date of signing this Lease, there are no special assessments affecting the tax parcel. Tenant shall pay the Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Tenant shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property.**  Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction

in the valuation of the premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d) **Payment Following Appeal.** Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees and expenses it incurs in such protest or reassessment.

(e) **Multiple Building Tax Parcel.** In the event that the Tax Parcel that includes the Premises also includes other buildings (or Permissible Building Areas for future buildings) so that the Premises does not constitute a separate Tax Parcel, then Tenant shall pay in the manner provided above a pro rata share of the Real Estate Taxes assessed against the Tax Parcel in which the Premises are located, which pro rata share shall be that percentage equal to the Leasable Square Feet of the Premises divided by the total Leasable Square Feet of all buildings that are or may be constructed within such Tax Parcel.

10. **Maintenance, Repairs and Replacements.**

(a) Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the interior non-structural elements of the Premises, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises. Landlord shall maintain the exterior, all structural elements and roof of the Premises (whether or not same serve only the Premises), including, without limitation, the roof structure, roof membrane, flooring system, floor slab, foundation, load bearing walls and exterior walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall obtain a fifteen (15) year warranty on the roof. In addition to the Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the other improvements immediately surrounding the Premises, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that

such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the prime rate plus 2% (the "Default Rate"). However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Premises and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

(b)    Notwithstanding the provisions of paragraph 10(a), if it becomes necessary to make any repair or replacement to the heating, ventilating and air conditioning system serving the Premises (the "HVAC System") in order to keep same in good working order, condition and repair, Tenant will make the same but the cost of any such repair or replacement of the HVAC System which (i) is required during the last three (3) years of the original 15-year Term or during any Option Period, and (ii) exceeds $5,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years. If Tenant later exercises any Renewal Option, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Option Period and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

11.    **Payment of Utility Bills**. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.    **Alteration**. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Premises. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance

with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    **Mechanics' Liens**. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    **Insurance**.

(a)    **Property Damage**. During the Main Term and all Option Periods, Landlord shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in the full amount of the replacement value of the Premises, exclusive of excavation, footings and foundations and exclusive of Tenant's furniture, furnishings, equipment, inventory and personal property, with a commercially reasonable deductible, for which Tenant shall be fully responsible for payment as part of the CAM charges, (which, during the first two Lease Years, will be in addition to the $.80 per square foot). Landlord will provide Tenant with the insurance cost proration that is to be paid on a monthly basis with the CAM charges. Tenant and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Landlord from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will pay, and not charge Tenant for, the additional premium required. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to all of Tenant's furniture, furnishings, equipment, inventory and personal property in the Premises, with a commercially reasonable deductible.

(b)     **Liability Insurance.** During the Term and all Option Periods, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)     **Workers' Compensation Insurance.** To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)     **Self-Insurance.** Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof required to be insured by Tenant or Landlord under subparagraphs (a), (b) (and to the extent then permitted by law, (c)) above, provided (i) Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Eighty Million Dollars ($80,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision), and (ii) Tenant provides Landlord with a copy of its self-insurance program, including the method of funding the program, for Landlord's approval, which shall not be unreasonably withheld.

(e)     **Rental Loss Insurance.** Landlord may also maintain from and after the date of this Lease and throughout the Lease Term business interruption or rental loss insurance with loss payable to Landlord sufficient to cover, for a period of not more than one year, all Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease. Said insurance coverage may be adjusted annually to reflect the projected Minimum Rent, Common Area Charges, Real Estate Taxes and other payment obligations of Tenant under this Lease otherwise payable by Tenant, for the next 12-month period. All insurance proceeds payable to Landlord pursuant to this paragraph will be held by Landlord and will be applied to the obligations of Tenant under the Lease from time to time as said obligations are due and payable. The cost of premiums for coverage shall be an element of CAM Charges provided that Tenant shall not be liable for its prorata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City.

(f)     **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.** During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of commercial general liability insurance, with bodily injury and property damage insurance, and fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure

to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (but not for the Additional Areas) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep in full force and effect with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation – statutory limits;
2) Employers Liability - $500,000; and
3) Comprehensive General and Comprehensive Auto Liability as follows:
    a) Bodily Injury - $1,000,000 per occurrence;
    b) Property Damage - $1,000,000 per occurrence;
    c) Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in subparagraphs a) and b) above;
    d) Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work with a limit of $1,000,000;
    e) "XCU" Hazard Endorsement, if applicable;
    f) "Broad Form" Property Damage Endorsement;
    g) "Personal Injury" Endorsement; and
    h) "Blanket Contractual Liability" Endorsement.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(g)  **Policy Provisions**.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-XII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(h)   **Waiver of Right of Recovery and Subrogation**.   To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), or in case a party fails to maintain any insurance required to be maintained hereunder, to the extent that insurance proceeds would have been received had such insurance been maintained, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises of the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(i)   **Evidence of Insurance**.  Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to casualty insurance), (ii) upon the Possession Date (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(j)   **Indemnities**.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(h) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or resulting from the use thereof by Landlord, its agents or employees.

15.    **Damages by Fire or Other Casualty.**

(a)    **Less Than Thirty Five Percent (35%).**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not terminate except as expressly provided in paragraph 15(c) below and, unless Landlord has the right to terminate this Lease pursuant to such paragraph and exercises such right, Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety (unless Tenant continues to conduct business from all or any portion of the Premises during such repair and restoration, in which case such rent and other charges will abate in proportion to the portion of the Premises rendered untenantable or unusable as a result of such damage or destruction) until sixty (60) days after Landlord has completed its repairs and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Thirty Five Percent (35%) or More.**  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) below and exercises such right, subject to force majeure, within

two hundred forty (240) days after receipt by Landlord of the required governmental permits for restoration, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage. In any case where Landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property. Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    **Landlord's Termination Rights.** If the Premises are damaged by fire, earthquake or other casualty during the last two (2) years of the initial Main Term or during the last two (2) years of any Option Period to the extent that fifteen percent (15%) or more of the Leasable Square Feet thereof are substantially damaged or destroyed thereby, Landlord may terminate this Lease by notice given to Tenant within sixty (60) days following the occurrence of such casualty, provided that if such casualty occurred during any Option Period other than the last Option Period, then Tenant may void Landlord's termination notice by notifying Landlord, within fifteen (15) days after delivery of Landlord's notice, that Tenant is exercising its option with respect to the next Option Period (in which case Landlord's notice will be deemed void and the Premises will be reconstructed as provided above). Upon any termination of this Lease by Landlord or Tenant pursuant to this paragraph 15, this Lease will be deemed terminated as of the date of the casualty, rent will be apportioned to that date, and Tenant will vacate and remove any remaining property of Tenant from the Premises that was not damaged by the casualty within ten (10) days after delivery of the notice of termination.

16.    **Condemnation.** If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any rent paid in advance and any unearned charges shall be refunded to Tenant by Landlord on such date.

Tenant shall have the right to terminate this Lease and to receive from Landlord an appropriate refund of rent paid in advance and unearned charges if, as a result of eminent domain proceeding or other governmental or quasi-public action, any portion of the Premises or parking or access area serving the Premises is taken and such taking materially impacts the Tenant's use of the Premises as contemplated herein. Should Tenant elect to remain in the Premises after any partial

taking, then rent and other charges shall be reduced for the remainder of the term thereafter in proportion to the building area of the Premises taken, and reduced by an equitable amount for any non-building area taken and Landlord shall promptly repair and restore the Premises as nearly as possible to their prior condition. Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such damages to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses and for the present value of the excess, if any, of the fair market rental value of the Premises for what would have been the remainder of the Term over the rent required to be paid by Tenant hereunder for such period.

17.     **Assignment and Subletting**. Tenant may not assign this Lease in whole or in part, nor sublet all or any part of the demised Premises without the prior written consent of Landlord in each instance obtained, which consent shall not be unreasonably withheld. If Landlord elects to withhold consent due to the assignee entity having a net worth less than Tenant's Net Worth at the time of this Agreement, if tenant claims such denial of consent is unreasonable, Landlord shall have the option to terminate this Lease (provided that such option to terminate will not apply in cases where Landlord does not have the right to consent to the transfer, as set forth in the last sentence of this paragraph). The consent of Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Any assignment is subject to existing restrictions, or exclusive use rights set forth on **Exhibit "E"** and to the prohibited uses described in paragraph 19(a)(viii) below. This prohibition against assigning or subletting shall not be construed to include a prohibition against any assignment or subletting by operation of law. Notwithstanding any assignment or sublease, Tenant shall remain fully liable for this Lease and shall not be released from performing any of the terms, covenants or conditions contained herein; provided, however, that if Tenant assigns this Lease (with Landlord's consent, if required) to an entity that has a net worth that is equal to or greater than Tenant's net worth at the time of execution of this Lease or any extension thereof, then Tenant will be released from obligations arising under this Lease from and after the assignment. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, and transfers as a result of Tenant's merger with or into another entity, shall not be deemed an "assignment" or "subletting" hereunder and same may be effected without Landlord's knowledge or consent.

18.     Use.

        (a)     Tenant shall initially maintain, use and operate the Premises as a retail store for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products").

        (b)     Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant

to a lease or restrictive covenants executed prior to this Lease and shown on **Exhibit "E"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "E"**.

19.    <u>Warranties and Representations</u>.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    <u>Quiet and Peaceful Enjoyment</u>. Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    <u>Title</u>. Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions (except the REA, as defined below) and those matters set forth on **Exhibit "E"** attached hereto and entitled "Permitted Encumbrances") or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on **Exhibit "E"**, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing the Products, or the right to consent to any feature of the Premises or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease. Tenant acknowledges that Landlord intends to prepare and record against the Shopping Center a Reciprocal Easement Agreement providing for cross-easements with adjoining property and similar matters (the "REA"). Tenant agrees that the REA will constitute one of the Permitted Encumbrances provided that Tenant is given an opportunity to review and approve the REA prior to its recording (and Tenant agrees that, so long as the REA does not materially and adversely affect Tenant's rights or obligations under this Lease, Tenant will not unreasonably withhold its approval of the REA).

(iii)    <u>Certificate of Authority</u>. Landlord covenants that it is a duly constituted land trust under the laws of the State of Illinois, and that its Trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the Trust. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the Trust, and (b) the authority of the Trustee to bind the Trust as contemplated herein.

(iv)    No Litigation.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereto or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.  Landlord has not used, discharged, dumped, spilled or stored any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any "Environmental Law" (which term shall mean any local, state or federal statute, regulation, rule, case or other matter having the force of law relating to the release, discharge, use, storage, treatment, disposal, handling, manufacturing, transportation, or shipment of hazardous or toxic materials or the protection of human health or the environment), (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any governmental authority; or (iv) the presence of which causes or threatens to cause a nuisance to the Shopping Center or Premises or to adjacent properties or premises (collectively, "Hazardous Substances") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants' or experts' fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    Tenant's Exclusive Use.  So long as the Premises are used for the initial uses set forth in paragraph 18 (except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation), no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "E", and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's

premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2500) Leasable Square Feet.

(vii)    <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

| | |
|---|---|
| (A) | a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service; |
| (B) | a bowling alley; |
| (C) | a billiard or bingo parlor; |
| (D) | a flea market; |
| (E) | a massage parlor; |
| (F) | a funeral home; |
| (G) | a facility for the sale of paraphernalia for use with illicit drugs; |
| (H) | a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located); |
| (I) | an off-track betting parlor; |
| (J) | a carnival, amusement park or circus; |
| (K) | a gas station, car wash (other than the facilities existing as of the date hereof) or auto repair or body shop; |
| (L) | a facility for the sale of new or used motor vehicles, trailers or mobile homes; |
| (M) | a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center; |
| (N) | a skating rink; |
| (O) | an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations); |
| (P) | a banquet hall, auditorium or other place of public assembly; |
| (Q) | a training or educational facility (including, without limitation, a beauty school, barber college, reading room, |

school or other facility catering primarily to students or trainees rather than customers); or

(R) a theater of any kind.

In addition to the foregoing, no auction or fire sale shall be conducted in the Shopping Center.

(ix)    **Site Covenants.** With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    **Prohibited Uses in Common Areas.** Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise (Tenant may have sidewalk, tent sale and conduct promotional events in the Common Areas immediately in front of the Premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(B)    **Interference with Tenant's Reception/Transmission.** Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Premises.

(C)    **Notices Affecting the Premises.** Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(D)    **Constructive Trust.** Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(E)    **Restaurant Use.** Landlord covenants that during the term of this Lease there shall be no restaurant located in the Shopping Center other than in the area double cross-hatched on Exhibit B; provided, however, that if Landlord uses such area for restaurant purposes, the maximum Leasable Square Feet of all building improvements in such area shall not exceed 11,000 square feet.

(b)    Tenant represents, warrants and covenants to Landlord that:

(I)    **Tenant's Authority.** Tenant is a duly constituted corporation organized under the laws of the State of Colorado; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    **Tenant's Warranty as to Hazardous or Toxic Materials.** As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (except that Tenant may store and use within the Premises normal quantities of Hazardous Substances typically used in Tenant's business, such as cleaning fluids or copier chemicals, provided that such storage and use is in compliance with Environmental Law); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    **Estoppel Certificates.** Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as

to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.     **Subordination of Lease.**  At the option of Landlord, this Lease shall be superior or subordinate to the lien of any mortgage upon the Premises on any property of which the Premises form a part; provided that such subordination is made upon the condition that in the event of foreclosure or other action taken under the mortgage, this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as Tenant shall not have committed an Event of Default hereunder, and that such mortgage shall permit insurance proceeds to be used for any restoration and repair required by the provisions of this Lease as set forth in Paragraph 15 hereof.  The word "mortgage", as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof.  Landlord agrees to deliver to Tenant, upon execution of this Lease, a Non-Disturbance Agreement in the form of **Exhibit "F"** hereto attached from the holder of any mortgage affecting the Premises.

22.     **Change of Landlord.**  Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease (so long as the Successor is similarly bound to this Lease for so long as the Successor owns Landlord's interest in the Premises), and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor.

23.     **Tenant's Financing.**  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof ("Tenant's Lender"), as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure).  In addition, Landlord agrees to

cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    **Tenant's Property and Waiver of Landlord's Lien.** All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises. Landlord further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.    **Memorandum of Lease: Commencement Date Agreement.** Landlord and Tenant agree that contemporaneously executed with Lease, and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as **Exhibit "G"**, setting forth such provisions hereof as may be required by State law. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    **Expiration of Term and Holding Over.** All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Premises, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    **"For Rent" Signs.** Tenant hereby permits Landlord during the last ninety (90) days of the main term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) by four (4) feet in size, on the Parking Lot of the Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    **Force Majeure.**  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Premises, the consequences of delays by the other party shall be governed by the Construction Provisions.

29.    **Events of Tenant's Default.**  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    **Failure to Pay Rent: Breach.**  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant (and to assignor if still liable under Lease) that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Bankruptcy.**  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.    **Landlord's Remedies.**  After the occurrence of an Event of Default by Tenant, Landlord may with process of law but without further notice or demand enter into the Premises and take full and absolute possession thereof, without such reentry causing a forfeiture of the rent to be paid or the covenants to be performed by Tenant hereunder for the full term of this Lease, and upon such reentry Landlord may lease or sublease the Premises (and shall use commercially reasonable efforts to do so) for such rent as Landlord may reasonably obtain, crediting Tenant with the rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord in its sole discretion may terminate this Lease and reenter and take full and absolute possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant.  Landlord hereby waives any statute or other Landlord lien on Tenant's personal property.

(a)    **Reimbursement of Landlord's Costs in Exercising Remedies.**  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing

the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(b)    **Remedies Are Cumulative.** The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.    **Events of Landlord's Default; Tenant's Remedies.**  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord.

32.    **Waiver.**  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

32

33.    Compliance with Applicable Laws. During the Term, (i) Landlord, at its expense, subject to its right of reimbursement through CAM to the extent provided in paragraph 7, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of the Common Areas and those portions of the Premises that Landlord is obligated to maintain pursuant to paragraph 10; and (ii) Tenant, at its expense, shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the board of fire underwriters, respecting the condition of those portions of the Premises that Tenant is obligated to maintain pursuant to paragraph 10 or respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: President
Facsimile: (303) 863-2243

With a copy to:    GART BROS. SPORTING GOODS COMPANY
1000 Broadway
Denver, Colorado 80203
Attention: Legal Department
Facsimile: (303) 864-2188

If to Landlord:    Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Attention: Property Management
Facsimile: (217) 525-0545

With a copy to:    R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
607 East Adams Street, #800
P. O. Box 5131
Springfield, IL 62705-5131
Facsimile: (217) 522-3173

or to such other addresses as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.    **Brokers**. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, other than Alvin W. Rodenbostel of Edgemark Commercial Real Estate Services LLC, which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord and Tenant further covenant that Edgemark Commercial Real Estate Services, LLC shall be solely responsible for any commissions due and payable to Leonard W. Sapp or any related person or entity. Except for the amounts due Edgemark Commercial Real Estate Services, LLC, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder, including Leonard W. Sapp or any related person or entity, with whom the indemnifying party either has or is purported to have dealt.

36.    **Miscellaneous**.

(a)    **Headings and Gender**. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    **Construction**. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    **Relationship of Landlord-Tenant**. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)    **Entire Agreement; Merger**. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease

cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)  **Attorneys' Fees**.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(f)  **Partial Invalidity**.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)  **Consents**.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)  **Holidays**.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(i)  **Applicable Law**.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(j)  **Successors and Assigns**.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(k)  **Counterparts**.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(l)  **Trademarks and Trade Names**.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.  **Effectiveness of Lease; Tenant's Right to Terminate**.  Notwithstanding the execution of this Lease or any provision hereto to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)     Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)     Landlord's obtaining:  (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Premises; and (ii) the required City, County and State permits and approvals to construct the Premises no later than May 1, 2001. Landlord agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Landlord to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the Possession Date.

(e)     Tenant's receipt, simultaneously with or prior to the execution hereof, copies of soils and Hazardous Substances reports satisfactory to Tenant.

(f)     Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at any time prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.    **Confidentiality.**  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  Any publication or article run by lender for the Shopping Center will not be considered a breach hereof.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance.

39.    **Liability of the Trustee and the Beneficiary.**  This Lease is executed by Illinois National Bank, not personally but as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and under the express direction of the Beneficiary of that certain Trust Agreement dated November 6, 2000, and known as Trust Number 00-0020 at Illinois National Bank.  It is expressly understood and agreed that nothing herein contained shall be construed as creating any liability whatsoever against said Trustee personally, and in particular without limiting the generality of the foregoing, there shall be no personal liability to pay any indebtedness accruing hereunder or to perform any covenants, either express or implied, herein contained, or to keep, preserve or sequester any property of said Trust; and that so far as said Trustee is concerned the owner of any indebtedness or liability accruing hereunder shall look solely to the Premises hereby leased and the Shopping Center for the payment thereof.  It is further understood and agreed that said Trustee has no agents or employees and merely holds naked legal title to the property herein described; that said Trustee has no control over, and under this Lease, assumes no responsibility for (1) the management or control of such property, (2) the upkeep, inspection, maintenance or repair of such property, (3) the collection of rents or rental of such property, or (4) the conduct of any business which is carried on upon such premises.  This provision shall not limit the liability of the Beneficiary hereunder, nor the liability of any successors to the interest of the Landlord under the Lease, it being understood and agreed that any limitations of liability hereunder applicable to the Beneficiary and the successor to the Landlord under the Lease shall be solely controlled by paragraph 31 hereof.  Notwithstanding the foregoing, the Trustee and the Beneficiary, by their execution hereof, covenant and agree with the Tenant that they shall comply with the covenants, conditions and obligations set forth in this Lease, that such covenants, conditions and obligations are obligations of the Landlord, and that the obligations, liabilities and conditions set forth hereunder are binding upon the corpus of the Trust, which corpus shall at all times include the Shopping Center, and that the Tenant shall be able to exercise all rights and remedies set forth in this Lease so that same shall be binding upon the Trustee, the corpus of the Trust and the Beneficiary thereof.

40.    **Liability of Directors and Shareholders.**  Landlord, its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

II.    **EXHIBITS**

Attached hereto and made a part of this Lease are Exhibits A through G.

WITNESS the following signatures and seals:

**LANDLORD**

ILLINOIS NATIONAL BANK, TRUSTEE, under
Trust Agreement dated November 6, 2000, known as
Trust Number 00-0020

By: _Patrick Neal_
Its _SVP & TO_

**ATTEST:**

By: _Nancy Dunham_
Its _VP & Controller_

**TENANT**

GART BROS. SPORTING GOODS COMPANY, a
Colorado Corporation

By: _____
Its _____

**ATTEST:**

By: _____
Its _____

**Nesa E. Hassanein**
**Senior** Vice President
**and General** Counsel

0294793.005      3/29/01RLA

# COC-JBE- BLOXDORE, P.C.

Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704          (217) 544-8477   •   Fax (217) 544-8483

March 27, 2001
Job No. 01012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



Exhibit "C"

CONSTRUCTION PROVISIONS

1. **Definitions**: For purposes of this Lease:

    (i)    "Landlord's Work" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Site Work," the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

    (ii)    "Site Work Start Date" means April 15, 2001;

    (iii)    "Building Shell Start Date" means May 15, 2001;

    (iv)    "Scheduled Possession Date" means October 1, 2001;

    (v)    "Program Drawings" means those prototypical plans and specifications for Store No. 706, 25th Street and Broadway, Rochester, Minnesota, prepared by Mitchell Plus Associates Inc. and dated January 17, 2001; and

    (vi)    "Agreed Modifications" means the following changes, additions and modifications to the Program Drawings: None.

2. **General Requirements**.

    2.1    Code Compliance.  Landlord's Work will satisfy and comply with all regulatory agency requirements having jurisdiction over the Shopping Center, including but not limited to, meeting all applicable laws including, but not limited to building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes.  Landlord will not use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies.  If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all applicable Laws. This obligation for the removal of harmful building materials installed by the Landlord will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

    2.2    General Conditions.  Landlord's Work will include all usual and customary costs for associated general conditions, including but not limited to the following:

    (i)    Liability and builder's risk insurance;

    (ii)    Costs for permits, sewer and water connection fees, etc.;

4957791 JOSTER 00/00/00 11:31 AM

(iii)    Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment;

(v)    Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)    Survey, staking and layout;

(viii)    Job site field supervision;

(ix)    Mobilization;

(x)    Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

2.3    <u>Warranties</u>.  Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Commencement Date.  At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain.  Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for a period of at least 15 years, the compressors of the HVAC equipment serving the Premises for a period of at least five years and the sliding doors at the main entrance to the Premises for a period of at least three years.

2.4    <u>Engineering</u>.  All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final Plans" (as defined in Section 6.1 below).

2.5    <u>Permits</u>.  Landlord will procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work, the Building Shell and the Leasehold Improvements.

3.    <u>Construction of Site Work</u>.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic

controls, signs (including pylon and monument signs in compliance with the requirements of all applicable governmental authorities and related electrical wiring to Tenant's cabinet), utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease (the "Site Work"). The Site Work will be constructed in accordance with the general requirements of Article 2 of this Exhibit C and will include the following:

3.1     Earthwork and Drainage. Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".

3.2     Concrete. Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks, except those directly adjacent to the Building Shell, and retaining walls.

3.3     Landscaping. Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

3.4     Parking Lot Paving. Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

3.5     Utilities. Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to a point within 5'-0" of the Building Shell line.

3.6     Power and Telephone. Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures on the exterior of the Building Shell. Extend empty telephone conduits from distribution points to a central location within the Premises. Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises. Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

3.7     Exterior Lighting. Provide parking lot lighting throughout the site which shall consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

3.8     Exterior Signage. Per paragraph 8(a) of the Lease and the Final Plans.

3.9   Cost Responsibility.   All of the Site Work described in this Article 3, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord and will not be included in "Construction Costs" (as more specifically defined in Article 7 below).

4.   Construction of Building Shell.   Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct the shell building of the Premises (the "Building Shell"), which will include the entire superstructure, exterior enclosure, roof, loading dock, bike racks, trash receptacle, bench, miscellaneous items such as protection ball bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell. All work will comply with the general requirements of Article 2 of this Exhibit C.

4.1   Utilities.   Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.

4.2   Cost Responsibility.   All work for the Building Shell construction as described in this Article 4, and all general conditions associated therewith, is to be provided by Landlord. All costs of such work will be included in Construction Costs, as more particularly set forth in Article 7, provided that Tenant will have the right to review and approve all costs prior to being included in Construction Costs, which approval will not be unreasonably withheld.

4.3   Bids.   On completion of the Building Shell Final Plans, Landlord will select a general contractor for the construction of the Building Shell, provided that the amount of profit and overhead to be paid to such contractor, and the amount to be charged by such contractor for general conditions (as described in Article 2.2 above) associated with the construction of the Building Shell will be subject to Tenant's approval. After Landlord has selected such contractor and Tenant has approved the amount of profit, overhead and general conditions cost, such contractor will solicit a minimum of three competitive bids from all trades and major building material suppliers. The bids that Landlord's contractor proposes to accept will be submitted to Tenant for review and approval, which will not be unreasonably withheld. To the extent that Tenant requests, additional sub-bids will be obtained and value engineering or cost savings alternatives pursued; provided, however, that any additional architectural and engineering costs incurred as a result of Tenant's efforts to pursue value engineering or cost savings will be included in Construction Costs. Landlord's contractor will be paid a fee for profit and overhead in the amount equal to the percentage previously approved by Tenant (as provided above) of all materials, labor, subcontracts and general conditions. General conditions will be charged at the fixed monthly rates previously approved by Tenant (as provided above).

5.   Construction of Leasehold Improvements.   Landlord will, at Landlord's sole cost and expense (except as expressly provided in Article 7.3 below), construct all leasehold improvements in the Premises required to complete and place the Premises in a finished condition (the "Leasehold Improvements") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 2 of this Exhibit C.

5.1    Scope of Work.    The Leasehold Improvements generally include all required improvements and finishes which are permanently made a part of the Building Shell and generally defined as real property. Such work will include all interior partitioning, ceiling systems, doors, frames, glazing, associated hardware, millwork, trim, restrooms, other special rooms, accessories and interior wall and floor finishes and decor. The Leasehold Improvements will also include: all plumbing required – fixtures, hot and cold water distribution; all HVAC rooftop equipment – ductwork and distribution; all fire sprinkler systems – risers, branch lines, and drops; and all electrical, power, lighting, telephone and life safety systems, fixtures, panels, distribution and wiring. All such work will be more specifically described and detailed on the Final Plans for the Leasehold Improvements.

5.2    Not Included.    The Leasehold Improvements do not include tenant trade fixtures and equipment.

5.3    Bids.    Landlord will submit the Final Plans for the Leasehold Improvement to four contractors for competitive bid, two of whom will be contractors proposed by Landlord and approved by Tenant and two of whom will be contractors proposed by Tenant and approved by Landlord. Any contractor permitted to bid on the work will agree (i) to maintain an open book policy and will allow both Landlord and Tenant to inspect such contractor's accounting records and will provide such accounting information as is reasonably requested by Landlord or Tenant; (ii) to utilize specific vendors provided by Tenant, which vendors will provide certain materials to the contractor as specified in the construction documents, which material may be ordered directly by Tenant, provided that subject to Tenant placing orders sufficiently in advance of the time required for delivery, the contractor will remain liable for all aspects of the orders with Tenant's vendors, including, but not limited to delivery, installation and payment and will be responsible for confirming lead times with Tenant's vendors; (iii) to provide a contact/superintendent for the contractor and each major subcontractor who can be reached 24 hours a day/seven days a week within three days of award of the contract; (iv) to conduct weekly meeting with the foreman or project manager from each major sub-contractor and fax or e-mail the minutes from such meeting to Tenant within 72 hours after the meeting and update the construction schedule immediately after such meeting as part of the minutes; and (v) to provide photographs to Tenant on a biweekly basis either digitally and e-mailed to Tenant within 24 hours or by film delivered via overnight mail with the list of specific angles and areas to be photographed determined by Tenant. Landlord and Tenant will be provided with sealed copies of all bids simultaneously from each contractor who submits a bid. Acceptance and awarding of the contract will be the decision of both Landlord and Tenant. Landlord agrees to enter into appropriate construction contracts with each contractor selected and approved by Landlord and Tenant. No payments for Leasehold Improvements work will be made to contractors without Tenant's prior approval, which will not be unreasonably withheld. Tenant may withhold consent to payment for a contractor's failure to provide requested accounting information or failure to provide required weekly meeting minutes, updated construction schedules or photographs.

6.    Plan Preparation, Approval, Compliance and Modification.

6.1    Building Shell Plans.    Within 45 business days from the date of the Lease, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by

Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("Preliminary Plans") for the Building Shell. The Preliminary Plans for the Building Shell will comply with the Program Drawings to the extent allowable under local law. For purposes of this Lease, the Program Drawings will contain the Agreed Modifications. The Preliminary Plans for the Building Shell will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for the Building Shell, Tenant, within 15 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 20 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 20 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Building Shell. No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Building Shell will not be included in Construction Costs.

6.2    Leasehold Improvements Plans.  Within 45 days from receipt by Tenant of the Preliminary Plans for the Building Shell, Tenant, at Landlord's cost and expense (except to the extent provided below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Drawings to the extent allowable under local law, will show all mechanical work, plumbing lines, electrical circuitry, etc., and will call for finishes that are generally of the same character and quality as those described in the Program Drawings. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that: (i) the Leasehold Improvements called for by the Preliminary Plans comply with local law and are compatible with the Building Shell; and (ii) the scope of work contemplated by, and the level of finishes called for by, the Preliminary Plans does not exceed that set forth in the Program Drawings. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 15 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 15 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 15 business days. Upon approval, the Preliminary Plans will become the "Final Plans" for the Leasehold Improvements. No alterations will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Tenant. The costs of preparing the Preliminary Plans and the Final Plans for the Leasehold Improvements will not be included in Construction Costs and will be paid by Landlord; provided, however, that any portion of the cost of preparing the Preliminary Plan and the Final Plans for the Leasehold Improvements that exceeds $1.00 per Leaseable Square Foot of the Premises will be included in Construction Costs.

6.3    Deviation from Final Plans.  Notwithstanding the terms of Article 8.5 of this Exhibit C, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Final Plans, as modified in accordance with Article 6.4 of this Exhibit C, whether or not Tenant has previously delivered a list of other deficiencies to be

corrected by Landlord. Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice, subject to Force Majeure, as described in paragraph 28 of the Lease. In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant to deduct such expenses from Tenant's next installment(s) of Base Rent.

6.4    Change-Orders.  Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Drawings). Landlord will deliver to Tenant a statement (the "Revision Statement") setting forth the net change, if any, in the cost of constructing the Building Shell or Leasehold Improvements, as applicable, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases). Tenant will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "Approved Revision"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Possession Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision.  In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors and/or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Drawings, rather than to modify the design of Tenant's prototypical store, be construed to be "revisions" for purposes of this Article 6.4.  Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an "Approved Revision" pursuant to this Article 6.4.

If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions, within 90 days after the occurrence of the Possession Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived.

7.    Construction Costs.

7.1    Included Costs.  As used herein, "Construction Costs" means the actual cost of all work associated with the construction of the Building Shell and the Leasehold Improvements for the Premises as described above in this Exhibit C, including but not limited to the actual cost of labor and material used in the building construction, general contractors' fees, general conditions, workmen's compensation, liability insurance, builder's risk insurance including all-risk property coverage, liability insurance in force during construction, building permits, sales taxes, transportation fees incurred in connection with direct costs of construction, and testing and inspection fees.

7.2   Excluded Costs.   In no event will Construction Costs include the cost of architectural or engineering fees for any of Landlord's Work, the cost of the Site Work, cost of utilities beyond 5'-0" from the Building Shell line, costs related to the construction of the Common Areas (including parking lots) of the Shopping Center, site fill and building pad preparation, construction management/development fees paid to Landlord, financing fees, real estate taxes, and/or assessments levied during the period of construction, real estate commissions and fees, or supervision fees for the Landlord's or Tenant's project managers and construction coordinators.

7.3   Payment of Construction Costs.   The parties have estimated that the total Construction Costs will be $55.00 per square foot of the Leasable Square Feet of the Premises (the "Construction Cap," as further referenced in paragraph 2 of the Lease).   Landlord will pay for all Construction Costs up to the Construction Cap.   In the event that the actual Construction Costs exceed the Construction Cap, the parties will proceed in accordance with paragraph 2 of the Lease.

8.   Construction Timing and Completion.

8.1   Outside Dates.   If construction of the Site Work has not commenced on the date of this Lease, Landlord warrants that final site grading (or other applicable Site Work) will be commenced not later than the Site Work Start Date.   Landlord warrants that Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell and the Leasehold Improvements and achieve the Possession Date on or before the Scheduled Possession Date.   Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work.   Subject to Force Majeure, if the Possession Date does not occur on or before the Scheduled Possession Date, then Tenant will have the remedy provided in paragraph 2 of the Lease.

8.2   Tenant's Option to Terminate.   If (i) Landlord fails to commence the work described in Article 8.1 of this Exhibit C on or before the dates specified in this Exhibit C and commencement of construction fails to occur within 10 days of notice by Tenant to Landlord of such failure; or (ii) Landlord deviates from the Program Drawings, Final Plans or from the site plan on Exhibit B of this Lease without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by written notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, and from and after such termination, this Lease will be of no further force and effect and Tenant will be relieved from all further obligations hereunder.   Tenant may also, from time to time, extend Landlord additional time for commencement and/or pursue any other remedies available to Tenant under this Lease, at law or in equity.

8.3   Inspection and Access.   During the progress of construction of the Premises and as permitted by any applicable governmental authority, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of

observing the construction. Further, for the period from 30 days prior to the "Contemplated Possession Date" (as defined in Article 8.4.2 below) through the Possession Date, Tenant will have the right to occupy the Premises for the purpose of installing fixtures, equipment, merchandise and performing Tenant's construction activities. Such entry will (i) be under all of the terms and conditions of this Lease, except no rent will be payable and (ii) not be construed as an acceptance of the Premises by Tenant. In no event shall Tenant's occupancy of the Premises for the purposes stated herein hinder in any manner Landlord's construction of the Building Shell and the Leasehold Improvements for the Premises. Tenant agrees to cooperate with Landlord as requested by Landlord to permit Landlord to fulfill its obligations hereunder. Landlord shall not be responsible for the costs incurred in repairing damage to the Premises caused by Tenant's installation of fixtures, equipment, merchandise and any other Tenant construction activities and in no event shall such damage be treated as items to be included on the punch list prepared during the course of the Punch List Inspection contemplated hereafter.

8.4    Notice of Punch List Inspection and Notice of the Possession Date.

8.4.1    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will then arrange to meet at the Premises on a date no earlier than three days prior to the Contemplated Possession Date to inspect the Site Work and the Premises together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Completed and all other conditions of paragraph 2 of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Possession Date. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Tenant will coordinate all subsequent punch list inspections with Landlord, but in no event will Tenant be required to conduct more than one punch list inspection during any 15-day period. If the initial punch list reflects that Landlord's Work is not Substantially Complete, then Landlord's Work will not be considered Substantially Complete until such time as Tenant performs an on-site inspection and verifies that the Premises is Substantially Complete, unless Landlord provides Tenant with proof acceptable to Tenant that Landlord's Work was Substantially Complete prior to the date of Tenant's subsequent on-site inspection. Subject to Force Majeure, as described in paragraph 28 of the Lease, Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 8.4.1 will be construed to require Tenant to accept the Premises prior to the Contemplated Possession Date. For the purposes of this Article 8.4.1 and paragraph 2 of the Lease, "Substantially Complete" will mean that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of

the Site Work, or the applicable Final Plans therefor, in the case of the Building Shell and the Leasehold Improvements, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from commencing any and all of its pre-opening activities, including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Premises for business with the public; (ii) systems are installed and in good working order; (iii) all utility services are in place and connected to the lines of the appropriate utility company; (iv) the required pair phone cables are properly installed; (v) Landlord has obtained either a temporary or permanent certificate of occupancy from appropriate governmental authorities; (vi) in the case of the Site Work, Landlord has completed paved driveways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises area located and all light standards in the parking areas are installed and operating; and (vii) in the case of the Building Shell and the Leasehold Improvements, the Premises are in the condition required by Article 8.5 below.

8.4.2    Notice of the Possession Date.    Landlord will notify Tenant in writing of the "Contemplated Possession Date" (as defined below) (the "Completion Notice") at least 60 days prior to the date on which Landlord contemplates the actual Possession Date will occur (the "Contemplated Possession Date"). If Landlord fails to deliver the Completion Notice at least 60 days prior to the then Contemplated Possession Date, then the Possession Date will in any event be extended to at least the 60th day following the delivery of the Completion Notice.

8.5    Condition of Premises at Delivery.    Subject to allowable punch list items under Article 8.4.1 above, prior to delivery of the Premises and possession thereof by Tenant, Landlord will cause to be removed from the Premises all rubbish, tools, scaffolding, and surplus materials and will cause the Premises, interior and exterior, to be cleaned and ready for occupancy; all floors, floor coverings, roof areas, and glass will be cleaned, both interior and exterior; exterior masonry surfaces will be free of mortar and stains caused by construction; all hardware will be free of paint spots and discolorations caused by construction; all heating, ventilating and air conditioning equipment and all utility services will be installed and connected and in good working order; dust will be removed from all portions of the Premises, including, without limitation, light fixtures; plumbing fixtures will be cleaned and bright and exposed metal will be clean; all painted surfaces will be touched up and repainted, if necessary; and any damage to walls or wall coverings will have been corrected.

8.6    Indemnity by Landlord.    Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work, the Building Shell and the Leasehold Improvements.

## EXHIBIT E
### Permitted Encumbrances

1. Real Estate Taxes for years 2000 and 2001.

2. Mortgage dated October 2, 2000 and recorded October 11, 2000 as document no. 2000R40011 made by Union Planters Bank, formerly Magna Trust Company, as Trustee under Trust No. S-079, to Marine Bank Springfield to secure an indebtedness in the amount of $6,458,027.23. (Affects the land and other property)

3. Mortgage dated April 6, 1994, and recorded April 8, 1994, as document no. 94-15178 made by Magna Trust Co., as Trustee under Trust No. S-079, to Magna Bank to secure an indebtedness in the amount of $1,750,000.00. Modifications recorded March 6, 1997, as document No. 97-08144, and September 19, 1997, as Document No. 97-39163.

4. Transmission Line Agreement dated December 31, 1958, recorded July 12, 1960, in Book 550, Page 222, as Document No. 284687 made by Bertha O. Lanphier and Springfield Marine Bank, as Trustee, to City of Jacksonville.

   NOTE: Assigned to Illinois Power Co. by instrument recorded February 20, 1974, in book 671, page 628, as Document No. 361253.

5. Order Establishing Freeway and Route Location Decision, both recorded August 5, 1971, as Document Nos. 341363 and 341364, respectively, purporting to give notice by the Department of Transportation of the State of Illinois, Department of Public Works and Buildings, now known as the Department of Transportation, of their intent to establish a freeway on, over, across, or contiguous to the land in a manner which will permit access between said freeway and abutting lands only at entrances provided for said purpose.

6. Grant of Sewer Easement dated February 28, 1977, and recorded March 8, 1977, in Deed Record 705, page 746, as Document No. 385237, made by Springfield Marine Bank, as Trustee under Trust Agreement No. 53-0034-0, to the Springfield Sanitary District, an Illinois municipal corporation.

7. Right of Way Easement to City of Springfield dated April 10, 1987, and recorded May 20, 1987, as Document No. 66473.

8. Utility and drainage easements as shown by plat of subdivision.

9. 20-foot utility easement as shown by Plat of Subdivision. (Affects the Westerly 20 feet and the Northerly 20 feet of Lot 7.)

10. Utility and sanitary sewer easement as shown by Plat and Document No. 385237. (Affects the East 20 feet of Lot 7.)

11.  Drainage statement attached to the plat of the Resubdivision of Lot 8 in South West Plaza, Plat 3, recorded February 21, 1989, as Document No. 89H004070, as follows: "Whereas, the surface water drainage will be changed by the construction of this subdivision to the extent that the amount and rate of runoff will be increased, but not to the extent that drainage will be diverted from the original watercourses, reasonable provision has been made for the collection and diversion of such surface waters into public areas, or drains which the subdivider has a right to use, and such surface waters will be planned for in accordance with generally accepted engineering practices so as to reduce the likelihood of damage to the adjoining property because of the construction of this subdivision.

12.  Storm, Water, Detention Area Maintenance Agreement recorded March 25, 1991, as Document No. 91007510, as ratified by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, recorded April 18, 1991, as Document No. 91010208.

13.  Terms and provisions of a Storm Water Detention Area Maintenance Agreement recorded November 10, 1994, as Document No. 94-44401, and Revised Storm Water Detention Area Maintenance Agreement recorded March 29, 1995, as Document No. 95-08927.

14.  Restrictive Covenant Agreement dated April 2, 1991, and recorded April 26, 1991, as Document No. 91011028, made by Marine Bank of Springfield, as Trustee under Trust No. 53-1442-9, and Charles E. Robbins with Kerasotes Illinois Theatres, Inc.
     NOTE: Affects and restricts property owned by Trust No. 53-1442-9 and Charles E. Robbins.

0297904.001        3/29/01RLA

Exhibit F

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2001, by and between ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 ("Landlord"); _____, a _____ ("Lender"); and GART BROS. SPORTING GOODS COMPANY, a Colorado corporation ("Tenant").

RECITALS:

WHEREAS, Tenant entered into that certain Lease dated _____, 2001 with Landlord for retail premises ("Premises") in Southwest Plaza III Shopping Center (the "Shopping Center"), to be constructed on that certain tract or parcel of land in the City of Springfield, County of _____ and State of Illinois, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust (the "Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1. Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming an interest in the Shopping Center, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2. In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any purchaser at foreclosure or recipient of a deed in lieu of foreclosure (collectively, "Purchaser") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the

F-1

same force and effect as if Lender or Purchaser were Landlord under the Lease, and Tenant hereby attorns to Lender or Purchaser as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Lender or Purchaser until Tenant receives written notice from Lender or Purchaser that Lender and/or such other party has succeeded to the interest of "Landlord" under the Lease. The respective rights and obligations of Tenant and Lender or Purchaser upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein.

3.      In the event that there is a foreclosure for any reason, Lender or Purchaser will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Lender or Purchaser for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord.

4.      If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.      This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

6.      This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

7.      The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

8.      IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD**

ILLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____


ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**LENDER**

_____
_____

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

[SEAL]

# ACKNOWLEDGMENTS

## LANDLORD

STATE OF _____ )
                              ) ss.

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20 ____ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____


## LENDER

STATE OF _____ )
                              ) ss.

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20 ____ by _____ as _____ and by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>TENANT</u>

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20____ by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>Exhibit G</u>

MEMORANDUM OF LEASE

<u>Demise</u>. Pursuant to a Lease having the date set forth below (the "Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

<u>Effective Date of Lease</u>. April 2, 2001.

<u>Name and Address of Landlord</u>. ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020 having an office at Charles E. Robbins, Realtor, 2144 South MacArthur Boulevard, Springfield, Illinois 62704, Attention: Property Management.

<u>Name and Address of Tenant</u>. GART BROS. SPORTING GOODS COMPANY, a Colorado corporation, having an office at 1000 Broadway, Denver, Colorado 80203, Attention: President.

<u>Description of Premises</u>. Approximately 32,630 (Dimensions 165' frontage x 194' depth) Leasable Square Feet and being a part of Southwest Plaza III Shopping Center (the "Shopping Center") located in the City of Springfield, County of Sangamon, State of Illinois, and constructed on land described in <u>Exhibit A</u> attached hereto.

<u>Term of Lease</u>. Commencing on the Commencement Date of the Lease and ending on the last day of January following the fifteenth (15th) anniversary of the Commencement Date. The parties have estimated that the Commencement Date will occur on or about November 1, 2001.

<u>Options to Extend</u>. The Lease grants to Tenant successive options to extend the Lease Term from the date upon which the Lease Term would otherwise expire for four (4) additional periods of five (5) years each.

<u>Restrictions on Construction</u>. The location of buildings and other tenant space in the Shopping Center will only be within the "Permissible Building Areas" designated on the Site

Plan attached to the Lease as Exhibit "B," and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 Leasable Square Feet or (ii) that required by applicable zoning requirements. All such parking shall be at ground level.

Prohibited Uses.   There exists in the Lease various restrictions upon other uses at the Shopping Center.

Employee Parking.   Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

Exclusive.   So long as the Premises are used for the retail sale of sporting goods, sporting apparel or athletic footwear (all of such items being herein collectively referred to as the "Products"), except for temporary closures not exceeding twenty-one (21) days in any thirty-six (36) month period, and except for temporary closures due to casualty or condemnation, no other tenant or occupant of the Shopping Center shall be entitled to sell any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of the Lease and described on Exhibit "E" to the Lease, and except that another tenant or occupant of the Shopping Center may sell sporting apparel or athletic footwear as an incidental, and not a primary, use of its premises so long as the area dedicated to the sale or display of such items does not exceed the lesser of five hundred (500) Leasable Square Feet or ten percent (10%) of the Leasable Square Feet of such tenant's or occupant's premises; provided, however, that solely with respect to Gordman's, should Gordman's become a tenant of the Shopping Center, the foregoing limit of five hundred (500) Leasable Square Feet shall be increased to twenty-five hundred (2,500) Leasable Square Feet.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED this _____ day of _____, 2001.

**TENANT**

GART BROS. SPORTING GOODS COMPANY,
a Colorado corporation

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

---

Date of Execution By Tenant:

_____, 2001

**LANDLORD**

LLINOIS NATIONAL BANK, Trustee under
Trust Agreement dated November 6, 2000 and
known as Trust No. 00-0020

By: _____
Name: _____
Title: _____

ATTEST

By: _____
Name: _____
Title: _____

Date of Execution By Landlord:

_____, 2001

# ACKNOWLEDGMENTS

## TENANT

STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2001 by _____ as _____ and by _____ as _____ of Gart Bros. Sporting Goods Company, a Colorado corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## LANDLORD

STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20\_\_\_\_\_ by _____ as _____ and by _____ as _____ of ILLINOIS NATIONAL BANK, Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## Exhibit A

## LEGAL DESCRIPTION OF SHOPPING CENTER

[TO BE ADDED]

## COOMBE - BEOXDORF P.C.
### Engineers/Land Surveyors/Planners

1323 South First Street • Springfield, Illinois 62704 • (217) 544-8477 • Fax (217) 544-8483

March 27, 2001
Job No. D1012

## LEGAL DESCRIPTION

Part of Lot 7 in Southwest Plaza, Plat 3 and Lot 18 except the west 35.00 feet thereof in Southwest Plaza, Plat 4, being part of the Southeast Quarter of Section 12 and part of the Northeast Quarter of Section 13, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, more particularly described as follows:

Beginning at the Southeast corner of said Lot 18; thence South 73 degrees 13 minutes 02 seconds West, 8.88 feet along the south line of said Lot 18 to a point on a line 35.00 feet easterly of and parallel with the westerly line of said Lot 18; thence North 16 degrees 46 minutes 58 seconds West, 397.35 feet along said parallel line to a point on the northwesterly line of said Lot 18, said point being on a circular curve having a radius of 348.31 feet whose center bears North 41 degrees 40 minutes 25 seconds West from said point; thence northeasterly an arc distance of 297.33 feet along the northwesterly line of said Lot 18 and the westerly line of said Lot 7 and along said curve whose chord bears North 23 degrees 52 minutes 18 seconds East, 288.38 feet; thence North 00 degrees 35 minutes 00 seconds West, 292.56 feet along the west line of said Lot 7; thence North 05 degrees 07 minutes 38 seconds East, 100.50 feet along the westerly line of said Lot 7 to the northwest corner of said Lot 7; thence North 89 degrees 25 minutes 00 seconds East, 384.42 feet along the north line of said Lot 7 to a point 35.58 feet west of the northwest corner of Lot 6 in said Southwest Plaza, Plat 3; thence South 00 degrees 35 minutes 00 seconds East, 219.50 feet parallel with the west line of said Lot 6; thence North 89 degrees 25 minutes 00 seconds East, 201.00 feet parallel with the south line of said Lot 6 to the east line of said Lot 7; thence South 01 degree 42 minutes 26 seconds West, 135.62 feet along the east line of said Lot 7; thence South 00 degrees 35 minutes 00 seconds East, 507.76 feet along the east line of said Lot 7 to the Southeast corner of said Lot 7; thence South 73 degrees 13 minutes 02 seconds West, 614.40 feet along the south line of said Lot 7 to the Point of Beginning.
Containing 12.6385 acres, more or less.



EXHIBIT

# SPORTS AUTHORITY.

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

SENT VIA FEDERAL EXPRESS

March 23, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams, Suite 800
Springfield, Illinois 62701

Re:  Lease, dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods
Company ("Tenant"), and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Thank you very much for meeting with me during my trip to Springfield this week. As you know, the
Tenant has the option to terminate the Lease pursuant to Paragraph 15(b) of the Lease if the repair and
reconstruction cost resulting from the recent tornado is 35% or more of the then-total reconstruction cost of
the Premises and Common Areas. Based on our initial review of the extensive damage to the Premises and
Common Areas, we believe that this threshold will be met, and as a result, Tenant has the right to elect to
terminate the lease within 60 days from the date of the casualty. Although the Lease provides that the
Tenant has 60 days in which to notify the Landlord of its election to terminate the Lease, we want the
Landlord to be aware that we are considering terminating the Lease, and accordingly, any repairs or
reconstruction to our Premises are at the Landlord's risk.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc:  Nesa Hassanein
Paul Gaudet
Chris Day
Cynthia J Cashman
Missy Mayne



**EXHIBIT B**

**SORLING**
NORTHRUP HANNA
CULLEN & COCHRAN, LTD.
ATTORNEYS AT LAW

REPLY TO:

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

David A. Rolf
Attorney at Law

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochneak
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo

Elizabeth A. Urbance
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fathauer
Brian D. Jones

Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson

Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

March 29, 2006

VIA FEDERAL EXPRESS & FACSIMILE (720-475-2967)
Mr. David Frieder
Vice President – Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

Re:    Lease, dated April 2, 2001, between TSA Stores, Inc., as
       successor to Gart Bros. Sporting Goods Company ("Tenant"),
       and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Frieder:

I am writing in response to your March 23, 2006 letter to Arthur Seppi,
Charles Robbins, and my partner, R. Lee Allen (in Mr. Allen's absence
from the office this week). I appreciate your courtesy in advising the
Landlord that you were considering terminating the Lease. We have now,
however, received an estimate from our contractor, Jones-Blythe
Construction Company, providing an opinion as to the extent of the
damage to the Premises leased to Sports Authority. As you can see from
this estimate, the damage does not exceed the 35% threshold referred to in
Paragraph 15(b) of the Lease. Pursuant to Paragraph 15(a) of that Lease,
the Landlord will be proceeding with repair and restoration of the
Premises, and expects that Sports Authority will abide by its continuing
obligations pursuant to that Lease.

Yours truly,

David A. Rolf

DAR/mah
Enclosure
cc:    Mr. William L. Hall, L.J. Shaw & Company
       Mr. Arthur Seppi
       Mr. Charles Robbins

{S0504337.2 3/29/2006 DAR MAH}

EXHIBIT C

Via Fax 525-0545

March 29, 2006

**JONES-BLYTHE**
CONSTRUCTION CO.
1000 OLD HLYNCH WEST DRAFT
POST OFFICE BOX 5113
SPRINGFIELD, ILLINOIS 62705
TELEPHONE  217-787-1040
FAX NUMBER  217-787-1888

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn:  Art Seppi

Re:  Sports Authority
     Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 970lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

*Mark Sorensen*

Mark A. Sorensen

**EXHIBIT D**

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**
**#818 Springfield**                                                                5/1/2006

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI cost was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis   of Chief Economist Ken Simonson.  Associated General Contractors of America, March 2006.  See attached.

**EXHIBIT E**

## BUDGET ESTIMATE

**Sports Authority**
#618
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 124' If Bar Joist & Deck | | 4960sq ft | $57,500 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,600 |
| Roofing and Insulation | | 15k sq ft  $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,500 |
| HVAC repair existing units | | | $9,600 |
| Drywall/ Finish Taping Perimeter 4' U/S of Deck | | 4' tip at Perim | $31,600 |
| Minor ACT's- T-Bar Replacement | | 4,000 sf | $5,900 |
| Electrical- Safe off- Curcuit Verification | | | $6,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring Installation | | | $49,500 |
| Flooring materials | | Materials | $86,600 |
| IRR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $29,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,350 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $935,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,576 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| | | | |
| List itemizations below: (#25 - Gen Cond.) | | | |
| Misc. Construction Materials | | | |
| PM Travel- Misc Office & Field Costs | | | $2,400 |
| Temp Phone- Cell Ph etc. | | | $6,100 |
| Construction Laborer's & Clean-up | | | $2,200 |
| Superintendent Travel | | | $7,500 |
| Administration Time | | | $1,800 |
| | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York. He bid on the original Springfield TI work in 2001.

`001  T.I.`

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL.

Date: 7-26-01
Contractor: VALOU CONTRACTING

| ITEM | BID BREAKDOWN | | | |
|---|---|---|---|---|
| | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL |
| 1. Barricade | | | | |
| 2. Demolition | | | | |
| 3. Bond | | | | |
| 4. Concrete | | | | 10,500 |
| 5. Carpentry | | | | 1,452 |
| 6. Studs and Drywall | | | | 17,427 |
| 7. Storefront Glass | | | | 109,440 |
| 8. Interior Mirrors | | | | 0 |
| 9. Acoustical Ceiling | | | | 1500 |
| 10. Store Fixtures | | | | 11,850 |
| 11. Painting | | | | 36,038 |
| 12. Carpet Installation | | | | 18,640 |
| 13. Vinyl Tile and Base | | | | 105,888 |
| 14. Plumbing | | | | above |
| 15. Sprinklers | | | | 37,534 |
| 16. Electrical | | | | 30,025 |
| 17. Fire Alarm System | | | | 134,000 |
| 18. HVAC/Ventilation | | | | 9800 |
| 19. Dumpster | | | | 115,000 |
| 20. Insurance  BUILDERS RISK | | | | 895 |
| 21. Supervision | | | | |
| 22. General Conditions (Itemize) | | | | 14,402 |
| 23. Other (Itemize below) | | | | 20,255 |
| SUBTOTAL | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 35,000 |
| 25. Taxes (Sales/State/Local) | | | | 3950 |
| TOTAL | $0 | $0 | $0 | $0 |
| List itemizations below: (#22 - Gen Cond.) | | | | |
| 1. Final Cleaning | | | | |
| 2. Temporary Phones | | | | |
| 3. Tool Rental | | | | |
| List itemizations below: (#23 - Other) | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 |
| 2. TOILET PARTITIONS | | | | 2230 |
| 3. CONCRETE SEALING | | | | 2340 |
| 4. | | | | |

716,593
$22.18ᴬ

SUPERVISION

736,848
$22.80ᴬ

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: O wks. |
| UNION / NON-UNION | Amount of time for construction: 8 wks. |
| % of Union Increase:          % | |

Qualifications to be listed on separate sheet

7-26-01

Sheet3

*Springfield*

*# 618*

*Vancil Contracting*

*Shell Bid*

*2001*

| Division | Title | | | | Sperimart No. 618 | |
|----------|-------|--|--|--|--------------------|--|
|          |       |  |  |  |                    | Cost |
| 1000 | General Requirements | | | | | $28,829 |
| 2000 | Excavate and Grade | | | | | $60,642 |
| 3000 | Concrete Foundations and slabs | | | | | $174,482 |
| 4000 | Masonry and Foam Insulation | | | | | $168,251 |
| 5000 | Structural, Joists, and Deck | | | | | $177,827 |
| 6000 | Rough Carpentry | | | | | $13,276 |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | | | $95,393 |
| 8100 | Doors, Frames | | | | | $2,949 |
| 8300 | Overhead Doors | | | | | $1,540 |
| 8400 | Storefronts | | | | | $21,450 |
| 8460 | Auto Doors | | | | | $11,171 |
| 9230 | Cold Metal Framing, EIFS | | | | | $24,640 |
| 9900 | Exterior Painting | | | | | $13,255 |
| 11100 | Dock Equipment | | | | | $5,804 |
| 15400 | Plumbing Rough In | | | | | $5,992 |
| 15700 | HVAC Curbs | | | | | $3,122 |
| 16100 | Electrical Rough In | | | | | $22,495 |
| | | | | | | $831,117 |
| | Overhead and Profit | | | | | $58,178 |
| | | | | | | $889,295 |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

LEASE AGREEMENT = $ 55.00 / SQ FT
27.53

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

$1,777 total
2.60

Page 1

*61 J*
*Storefiles*



**COTTON**
*National Disaster Recovery Services*

| | | | | |
|---|---|---|---|---|
| Name | Mike Mavelle | | Date: | 03/31/06 |
| Company | Sports Authority | | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | | |
| Fax: | (720) 475-3285 | | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | | |
| City, State, Zip | Springfield, IL 62704 | | |
| Tel: | (217) 546-0132 | Insurance Co: | Liberty Mutual Property |
| Fax: | (217) 546-1073 | Insurance Adj: | Ton Tiernan |
| | | Claim #: | X69A-003155-00 |

Re:        Tornado Damages in Springfield,IL  *#618*

Re:        **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*
*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:
Cotton USA, LLC
14345 Northwest Freeway
Houston, Texas 77040

03/31/06

**\*\*Please include the invoice number on check\*\***



## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. (See Chart 1 (Page 2) and Table 1 (Page 7).)

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.



The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



CPI-U — PPI for Finished Goods — Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (*See Chart 2 (Page 3) and Table 2 (Page 7).*)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.



In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

*Reported by AGC Chief Economist Ken Simonson (March 2006)*



In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.8 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

### Chart 2



Changes in Costs Among Construction Types

- ◆ - Nonresidential Buildings    —○— Highway & Street Construction    —▲— Other Heavy Construction
- ■ Multi-Unit Residential    —|— Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. (See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.



Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).

**Chart 3**

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

**Chart 4**





## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.



Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.



The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

## Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



simonsonk@agc.org) became Chief Economist of
the General Contractors of America (AGC), the leading national
association for the construction industry, on September 10th,

years of experience analyzing, advocating and communicating economic and tax issues. Before joining AGC, he spent three years as senior economic advisor in the Office of Advocacy of the U.S. Small Business Administration and 13 years as vice president and chief economist of American Trucking Associations. He also worked with the Commission on Industrial Competitiveness, the U.S. Department of Commerce, the Federal Home Loan Bank Board, and an economic consulting firm.

is a weekly one-page email newsletter that summarizes the latest economic developments. He is co-author of AGC's monthly Construction Tax News, a summary of federal and state tax developments affecting the industry.

from the University of Chicago and an MA in economics from He is a board member of the National Association for Business



## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | -0.6 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.8 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.2 | 8.0 | 5.0 | 1.5 |
| BCI construction index | -0.8 | -3.2 | 3.4 | 2.4 | 3.7 | 0.3 (Sept.-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| Nonresidential buildings | -0.5 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.5 | 1.0 | 2.6 | 10.8 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 8.8 | -0.8 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 8.9 | 7.5 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
|---|---|---|---|---|---|---|
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05–Jan./06 |
| Iron ore | 1.6 | -1.3 | 1.6 | 8.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.5 | 27.8 | 64.9 | 50.8 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.5 |
| Copper ores | -19.6 | 3.6 | -37.4 | 85.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 8.9 |
| Copper and brass mill shapes | -9.5 | -1.6 | 11.6 | 29.6 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.9 | -0.5 | 9.9 | 6.8 | 4.8 |
| Structural, architectural, pre-engineered metal prods. | -1.5 | -0.4 | 1.0 | 20.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.6 | -3.3 | -0.1 | 20.0 | 3.3 | 0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.8 |
| Fabricated iron and steel pipe, tube, and fittings | 0.8 | 0.1 | 1.2 | 32.6 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.8 | -0.4 | 3.6 | 26.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.6 | 0.6 | 7.6 | 1.9 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.9 | -0.3 | 1.5 | 7.6 | 9.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.5 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.8 | 5.6 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 8.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.9 | 0.8 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.5 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 29.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.6 | 9.2 | 6.4 | 28.8 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 19.0 | 37.9 | 46.3 | -26.8 |
| Asphalt | N/A | N/A | 10.0 | 16.3 | 17.9 | 8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 6.3 | 4.1 | 17.1 | 6.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 18.5 | 6.6 |
| Plastic construction products | -2.7 | 3.1 | 9.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 8.7 | 5.6 | 17.8 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.5 | 2.6 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 6.3 | 9.2 | 2.6 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | 1.7 |



## Appendix 2 - Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

*The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprei06.txt.*

| SOP Code | Commodity Code | Index | Relative Importance |
|---|---|---|---|
| 22205 | | Materials and components for construct... | 12.655  12.648 |
| | 051 | Nonwovens and felt goods... | .003  .003 |
| | | Material and other fabricated produc... | .033  .034 |
| | | | .... |
| | | Other inorganic chemicals... | .013  .013 |
| | 063 | Architectural coatings... | .187  .187 |
| | 0632 | Special purpose coatings and marine... | .085  .084 |
| | 0634 | Allied and miscellaneous paint product... | .044  .044 |



| | | | |
|---|---|---|---|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071304 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MPFM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MPFM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083301 | Softwood veneer, incl veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | — |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .148 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .066 | .066 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092201 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul, ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | — | .001 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stai | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

| | | | |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware, n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elect., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107108 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farms | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab b | .016 | .016 |
| 108102 | Externally thread. fasteners, exc. air | .005 | .005 |
| 108103 | Internally thread. fasteners, ex. airc | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraf | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresse | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .189 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

| Code | Description | | |
|------|-------------|------|------|
| 117102 | Noncurrent carrying | .204 | .203 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect & monitoring | .000 | .000 |
| 118905 | Physical properties and kinematic test | .000 | .000 |
| 118906 | Comm., geophysical & general instrumen | .001 | .001 |
| 121101 | Metal household furniture | .000 | .000 |
| 121501 | Porch and lawn furniture | .003 | .003 |
| 122101 | Wood office furniture and store fixtur | .002 | .002 |
| 122204 | Partitions and fixtures | .047 | .047 |
| 122301 | Public building furniture | .032 | .032 |
| 123101 | Carpets & rugs | .009 | .009 |
| 123201 | Hard surface floor coverings | .093 | .092 |
| 124104 | Other major appliances | .031 | .031 |
| 124301 | Vacuum cleaners | .036 | .036 |
| 124401 | Small household appliances | .002 | .002 |
| 131105 | Sheet, plate, and float glass | .007 | .007 |
| 132201 | Cement | .009 | .009 |
| 133111 | Structural block | .079 | .079 |
| 133121 | Decorative block | .094 | .094 |
| 133131 | Concrete brick | .011 | .011 |
| 133141 | Paving blocks | .007 | .007 |
| 133201 | Concrete pipe | .032 | .032 |
| 133301 | Ready-mixed concrete | .091 | .091 |
| 133402 | Precast concrete products | .868 | .865 |
| 133501 | Prestressed concrete products | .225 | .225 |
| 134201 | Brick, except ceramic, glazed & refrac | .077 | .077 |
| 134202 | Glazed brick struct, hollow & facing | .069 | .069 |
| 134301 | Ceramic floor and wall tile | .004 | .004 |
| 134501 | Structural clay products, n.e.c. | .027 | .027 |
| 135201 | Clay refractories | .006 | .006 |
| 135301 | Refractories, non clay | .025 | .024 |
| 136101 | Prep. asphalt & tar roofing & siding p | .032 | .032 |
| 136201 | Other asphalt roofing | .208 | .208 |
| 137101 | Gypsum products | .038 | .038 |
| 139201 | Mineral wool for structural insulation | .172 | .172 |
| 139401 | Paving mixtures and blocks | .129 | .129 |
| 139501 | Cut stone and stone products | .312 | .312 |
| 139801 | Gaskets and gasketing material | .029 | .029 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .002 | .002 |
| 139903 | Nonmetallic mineral products, n.e.c. | .027 | .027 |
| 159A04 | Signs and advertising displays | .002 | .002 |
|  |  | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage of processing (SOP) category: Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.

# SPORTS
# AUTHORITY.

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

SENT VIA FEDERAL EXPRESS

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention: Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re: Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation. To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001. As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

      OSHMAN'S

EXHIBIT F

15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

E-FILED
Thursday, 24 January, 2008  04:05:52 PM
Clerk, U.S. District Court, ILCD



**SPORTS
AUTHORITY.**

1050 WEST HAMPDEN AVENUE, ENGLEWOOD, COLORADO 80110
303·200·5050 · FAX 720·475·2967

**SENT VIA FEDERAL EXPRESS**

May 3, 2006

Arthur Seppi
2144 South MacArthur Boulevard
Springfield, Illinois 62704

Charles E. Robbins, Realtor
2144 South MacArthur Boulevard
Springfield, Illinois 62704
Attention:  Property Management

R. Lee Allen, Attorney
Sorling, Northrup, Hanna, Cullen & Cochran
620 East Adams Street, # 800
Springfield, Illinois 62705-5131

Re:  Notice of Termination

Dear Mr. Seppi, Mr. Robbins, and Mr. Allen:

Reference is made to the Lease (the "Lease"), dated April 2, 2001, between TSA Stores, Inc., as successor to Gart Bros. Sporting Goods Company ("TSA"), and Illinois National Bank, Trustee ("Landlord").

Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes. To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation.  To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001.  As demonstrated by the attached materials, the cost to repair the damage caused by the tornadoes significantly exceeds the 35% threshold set forth in Paragraph

**EXHIBIT  E**





15(b) of the Lease and therefore TSA is entitled to exercise its right to terminate the Lease.

Accordingly, this letter constitutes TSA's notice to Landlord that TSA has elected to terminate the Lease in accordance with Paragraph 15(b) of the Lease, said termination to be effective May 9, 2006.

Please call me if you have any questions.

Sincerely,

David Frieder
Vice President - Construction

cc: Nesa Hassanein
    Paul Gaudet
    Chris Day
    Cynthia J Cashman
    Missy Mayne
    Jay Stasz
    Russell Johnston

# SUMMARY OF REPLACEMENT AND REPAIR COSTS

**Sports Authority**
#618 Springfield                                                        5/1/2006

Below is the summary comment on the costs as related to the required repairs needed from the tornado damage. The Shell and TI post was the actual bid from Vancil Contracting in 2001. Since I didn't know the change orders from this project, I assumed that they were about the same as any one of our typical new store projects which is about 3%. In order to accurately adjust the cost for the work for inflation, I used actual historical increases in construction costs as defined by The Associated General Contractors of America. I multiplied this total building replacement cost by 35% as defined in the lease to establish the threshold allowing the tenant to terminate the lease. The estimated repair cost was developed by a contractor who had bid on the TI work in 2001 and is very familiar with the Illinois construction market.

Original construction costs from 2001 as defined by the general contractor of record, Vancil Contracting

| | | |
|---|---|---|
| Shell Costs | $889,295 | Includes all grading, foundation and slab |
| TI Costs | $716,593 | |
| Sub-Total | $1,605,888 | |
| | | |
| *3% estimate for original project changes | $48,177 | |
| Sub-Total | $1,654,065 | |
| | | |
| **18.5% estimated 5 year cost increase | $306,002 | |
| | | |
| TOTAL BUILDING REPLACEMENT COST | $1,960,067 | |
| | | |
| 35% threshold as defined by the lease | $686,023 | |
| Estimated Repair costs (detail attached) | $1,046,701 | |

* Exact increases, if any are unknown to Sports Authority. 3% estimate based on worst case scenario for ground up project.
**Increase of approximately 18.5% for construction costs increases over a 5 year period since the original construction. Increase based on analysis of Chief Economist Ken Simonson. Associated General Contractors of America, March 2006. See attached.

# BUDGET ESTIMATE

**Sports Authority**

#818
3211 South Veterans Parkway
Springfield, IL 62704
Budgetary- 32,513 sf

Budget based on Union Labor costs
*Prepared by Jeff Wolford, Wolford Retail Builders, Inc.

| ITEM | MATERIAL | NOTES | TOTAL |
|---|---|---|---|
| Emergency Response from Cotton USA | | Invoice attached | $319,428 |
| Architectural and Engineering | | | $8,000 |
| Shoring- Stabilizing | | | $18,500 |
| Selective Demolition- Balance of Damage | | | $37,400 |
| Structural- 12K' lf Bar Joist & Deck | | 4960sq ft | $57,600 |
| Masonry- Beam Pockets etc. | Colm Line E | 1 elevation | $10,500 |
| Replace 124' Structural masonry wall | | | $21,500 |
| Roofing and insulation | | 15k sq ft. $82,000 for entire roof | $39,500 |
| Replace Existing Storefront & Glass | | | $24,000 |
| Sprinkler- Rework Existing- Damaged | | | $28,200 |
| Fire Alarm- Minor Device Replacement | | | $2,950 |
| Ductwork- Remove and replace | | | $7,800 |
| HVAC repair existing units | | | $9,800 |
| Drywall-Finish Taping Perimeter 4'/ U/S of Deck | | 4' up at Perim | $31,800 |
| Minor ACT's- T-Bar Repalcement | | 4,000 sf | $5,300 |
| Electrical- Safe off Circuit Verification | | | $8,200 |
| Light Fixture Installation Only | 50 Fixtures | Sales Floor | $18,500 |
| Light fixtures | 50 Fixtures | Materials | $4,850 |
| Paint to match at lower levels | | | $9,800 |
| Floor Prep & Adhesive Removal | | .40 per ft | $10,042 |
| Entire Flooring Installation | | | $49,500 |
| Flooring materials | | Materials | $68,500 |
| RR- Plumbing Re-Installation | | Install Only | $1,200 |
| Entire New Premier Millwork Installation | | Install Only | $5,700 |
| Millwork | | Materials | $26,000 |
| Install Toilet Partitions/ Acessories | | | $3,550 |
| Final Cleaning- Deodorizing | | Union | $11,000 |
| Dumpsters | | 10 X $410.00 | $4,100 |
| Barricades- Dismantaling of Existing | | | $2,100 |
| Protection of finish materials | | | $12,500 |
| Misc. Rental Equipment | | | $8,200 |
| Contingency | | 4% | $25,600 |
| General Conditions (Itemize) | | | $21,550 |
| Supervision | 9 Weeks | $2,375 Per Wk | $21,375 |
| City Required Fire Watch | | | $2,200 |
| Permit | | | $4,000 |
| SUBTOTAL | | | $938,745 |
| Allowances | | N/A | |
| SUBTOTAL | | | |
| Insurance | | 1.50% | $14,081 |
| Profit & Overhead | | 10% | $93,875 |
| Premium for expedited work | | 5% | $46,937 |
| TOTAL | | | $1,046,701 |
| | | | |
| List Itemizations below: (#25 - Gen Cond.) | | | |
| Mics. Construction Materials | | | $2,400 |
| PM Travel- Misc Office & Field Costs | | | $6,100 |
| Temp Phone- Cell Ph etc. | | | $2,200 |
| Construction Laborer's & Clean-up | | | $7,500 |
| Superintendent Travel | | | $1,800 |
| Administration Time | | | $1,550 |

*Jeff Wolford has been a general contractor based in Illinois for 23 years and for 6 years prior to that in New York.
He bid on the original Springfield TI work in 2001.

881   T.I.

# GART SPORTS COMPANY

Store: Sportmart # 618
Center: Southwest Plaza
Springfield, IL.

Date: 7-26-01
Contractor: VADUCI CONTRACTING

| ITEM | BID BREAKDOWN | | | |
|---|---|---|---|---|
| | MATERIAL | LABOR | PRICE/SQ.FT. | TOTAL |
| 1. Barricade | | | | |
| 2. Demolition | | | | |
| 3. Bond | | | | |
| 4. Concrete | | | | 10,500 X |
| 5. Carpentry | | | | 1,452 |
| 6. Studs and Drywall | | | | 17,427 X |
| 7. Storefront Glass | | | | 109,440 X |
| 8. Interior Mirrors | | | | 0 X |
| 9. Acoustical Ceiling | | | | 1500 |
| 10. Store Fixtures | | | | 11,850 X |
| 11. Painting | | | | 36,038 X |
| 12. Carpet Installation | | | | 18,640 |
| 13. Vinyl Tile and Base | | | | 105,888 X |
| 14. Plumbing | | | | above |
| 15. Sprinklers | | | | 37,534 X |
| 16. Electrical | | | | 30,025 X |
| 17. Fire Alarm System | | | | 134,000 X |
| 18. HVAC/Ventilation | | | | 9,800 X |
| 19. Dumpster | | | | 115,000 X |
| 20. Insurance BUILDERS RISK | | | | 895 |
| 21. Supervision | | | | |
| 22. General Conditions (Itemize) | | | | 14,402 ⌐ SUPERVISION |
| 23. Other (Itemize below) | | | | 20,255 X |
| SUBTOTAL | | | | |
| 24. Profit & Overhead (10% Max.) | | | | 38,000 X |
| 25. Taxes (Sales/State/Local) | | | | 3950 |
| TOTAL | $0 | $0 | $0 | $0  716,593 |
| List itemizations below: (#22 - Gen Cond.) | | | | $22.78 A |
| 1. Final Cleaning | | | | |
| 2. Temporary Phones | | | | |
| 3. Tool Rental | | | | |
| List itemizations below: (#23 - Other) | | | | |
| 1. DOORS & HARDWARE | | | | 15,685 |
| 2. TOILET PARTITIONS | | | | 2230 |
| 3. CONCRETE SEALING | | | | 2340  736,848 |
| 4. | | | | $22.80 A |

| Site Verification (please circle): | We have / have not verified site |
|---|---|
| | Amount of time to procure permit: 0 wks. |
| UNION  /  NON-UNION | Amount of time for construction: 0 wks. |
| % of Union Increase:    % | |

Qualifications to be listed on separate sheet

7-26-01

Sheet3

Springfield

#618

Vancil Contracting
Shell Bid
2001

| Division | Title | | | Sportmart No. 618 | |
|---|---|---|---|---|---|
| | | | | Cost | |
| 1000 | General Requirements | | | $28,829 | |
| 2000 | Excavate and Grade | | | $60,642 | |
| 3000 | Concrete Foundations and slabs | | | $174,482 | |
| 4000 | Masonry and Foam Insulation | | | $168,251 | |
| 5000 | Structural, Joists, and Deck | | | $177,827 | |
| 6000 | Rough Carpentry | | | $13,276 | |
| 7000 | Roofing, Sht Mtl, Fire Safing | | | $95,393 | |
| 8100 | Doors, Frames | | | $2,949 | |
| 8300 | Overhead Doors | | | $1,540 | |
| 8400 | Storefronts | | | $21,450 | |
| 8460 | Auto Doors | | | $11,171 | |
| 9230 | Cold Metal Framing, EIFS | | | $24,640 | |
| 9900 | Exterior Painting | | | $13,255 | |
| 11100 | Dock Equipment | | | $5,804 | |
| 15400 | Plumbing Rough In | | | $5,992 | |
| 15700 | HVAC Curbs | | | $3,122 | |
| 16100 | Electrical Rough In | | | $22,495 | |
| | | | | | |
| | | | | $831,117 | |
| | Overhead and Profit | | | $58,178 | |
| | | | | $889,295 | |

$889,295.00 ÷ 32,308 ft² = $27.53 SQ FT.

~~618~~

LEASE AGREEMENT = $ 55.00 /SQ FT
                 ----
                  27.53

AMOUNT REMAINING FOR T.I = $27.47 SQ FT.

$1,777 total
2.6

Page 1

*Store files*



### COTTON
*National Disaster Recovery Services*

| | | | |
|---|---|---|---|
| Name | Mike Mavelle | Date: | 03/31/06 |
| Company | Sports Authority | Invoice #: | 1408722 |
| Address | 1050 W. Hampton Ave. | Terms: | Net 10 |
| City, State, Zip | Englewood, CO 80110 | Fed Id: | 76-0628204 |
| Tel: | (720) 475-3285 | | |
| Fax: | (720) 475-3285 | | |

| | | | |
|---|---|---|---|
| Loss Address: | 3211 South Veterans Parkway | | |
| City, State, Zip | Springfield, IL 62704 | Insurance Co: | Liberty Mutual Property |
| Tel: | (217) 546-0132 | Insurance Adj: | Ton Tiernan |
| Fax: | (217) 546-1073 | Claim #: | X69A-003155-00 |

Re:      Tornado Damages in Springfield,IL   **#61B**

Re:      **Final Bill With Not To Exceed Amount:**

*Not To Exceed Amount of $350,000.00 Set-Forth and agreed upon by the following parties:*

*Liberty Mutual Adjuster (TOM TIERNAN) Sports Authority POC (MIKE MAVELLE) & Cotton U.S.A. (JEFF KRONE)*

| | | |
|---|---|---|
| **EMERGENCY SERVICES FINAL STIPULATED INVOICE SUM AMOUNT:** | $ | 319,428.67 |
| **COTTON HAS RECEIVED A INITIAL DRAW OF:** | $ | (100,000.00) |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | *REMAINING BALANCE* | $ | 219,428.67 |
| **TOTAL DUE AND PAYABLE** | | $ | 219,428.67 |

THE ABOVE CHARGES ARE CONSISTANT WITH THE SERVICES PERFORMED BY COTTON USA, LLC
IN ACCORDANCE WITH THE SCOPE OF THE PROJECT

Any queries regarding this invoice should be sent to us within ten days of receipt of this
invoice otherwise we will expect prompt payment under our Invoicing and Payment Terms.

*All expenses received after final billing will be invoiced at a later date*

*For questions concerning your account, Please contact:*

Please remit payment to:

Cotton USA, LLC

14345 Northwest Freeway

Houston, Texas 77040

**\*\*Please include the invoice number on check\*\***

03/31/06



**AGC's Construction Inflation Alert**

Reported by AGC Chief Economist Ken Simonson

## Tracking the Surge in Construction Costs, 2001-2006

In early 2006, construction materials are continuing to rise in cost more than the overall rate of inflation, following a pattern that emerged in 2004 and 2005. But the price indexes for various types of construction and different materials have diverged from last year's cost drivers. The prospects for the remainder of 2006 are similarly mixed.

This report is intended to assist contractors, building owners and developers, public budgeting and planning officials, and others to understand changes in construction costs relative to the rest of the economy over the past five years, the impact of recent developments such as the Gulf coast hurricanes, and factors that are likely to affect costs in the next 12 months or so. The report relies on data from the Bureau of Labor Statistics (BLS), as well as information provided by contractors, suppliers and media.

The BLS data include the percentage change in the consumer price index for all urban consumers (CPI-U), numerous producer price indexes (PPIs), and the employment compensation index (ECI) for construction. Data are presented for the 12-month periods ending in December 2001 through 2005, and for the latest three months-through January 2006 (except the ECI, which is available only through December 2005). The most recent data are subject to revision; in addition, the data are not seasonally adjusted, so the latest three months may not be representative of a typical 12-month movement in costs.

## Construction Materials Costs Have Outpaced Overall Consumer, Producer Prices

The CPI-U, which measures the prices consumers pay for a fixed "basket" of goods and services, is the most commonly cited measure of the rate of inflation. In 2001 through 2003, the CPI-U rose roughly two percent per year. The rate moved up to 3.3 percent in 2004 as the price of crude oil and specifically, petroleum products bought by consumers, jumped. The same factors pushed up consumer prices at a similar rate, 3.4 percent, in 2005. In the three months through January 2006 (the latest available), the rate dropped 0.5 percent, reflecting a recent drop in energy prices. *(See Chart 1(Page 2) and Table 1 (Page 7).)*

The most frequently cited PPI, that for finished goods, has been more volatile than the CPI, and has accelerated steadily from -1.6 percent in 2001 to +5.4 percent in 2005.

The sole PPI for a finished construction type is the PPI for new warehouse construction, which dates only to December 2004. That index rose 7.6 percent in 2005 and 1.6 percent in the past three months (a 6.6 percent annual rate). However, there are PPIs for construction equipment and materials. The PPIs for different producing industries are weighted separately into PPIs for construction industry segments. In addition, the ECI measures quarterly changes in wage and benefits costs.



The cost of materials was flat in 2001, rose moderately in 2002 and 2003, then shot up by 10.1 percent in 2004. In 2005, that index climbed slightly more than the overall PPI, 6.1 percent vs. 5.4 percent. In the latest three months, the construction materials PPI has risen a steep 2.5 percent (an annual rate of 10 percent), while the CPI-U and overall PPI fell.

### Chart 1



Construction Materials Costs vs. CPI-U and PPI

- + - CPI-U   —o— PPI for Finished Goods   —▲— Materials & Components for Construction

The cost of construction machinery and equipment was nearly stable in 2001-03, then climbed six percent in 2004 and five percent in 2005. The 1.5 percent increase in the past three months corresponds to an annual rate of six percent.

The change in wages and benefits for construction, as measured by the ECI, has been relatively steady for the past five years, rising between 2.4 percent (in 2004) and 4.3 percent (in 2001). The latest reading, covering the quarter ending in December 2005, was up 0.3 percent, an annual rate of just 1.2 percent.

## Cost Changes for Highway and Heavy Construction Have Outstripped Building Construction

There has been substantial variation in the amount of inflation experienced by different construction segments in the past two years, although all segments have been hit by greater price increases than has the average business or consumer. The cost increases are approximated by BLS industry PPIs, which weight the producer prices of construction materials by the proportions used by that industry segment. As with commodity PPIs, industry PPIs do not take into account costs of labor, equipment or services. Five industry PPIs are shown below; BLS also produces PPIs for the residential and nonresidential repair and maintenance construction sectors. (See Chart 2 (Page 3) and Table 2 (Page 7).)

Prices for each of five segments moved very similarly in 2001-03. All declined in 2001, rose by one percent or less in 2002, and rose by 2-3 percent in 2003.

In 2004, prices by segment diverged sharply, reflecting different patterns in the materials most used by each segment. The PPIs for highway and street construction and other heavy construction shot up at rates of 10.8 percent and 13.4 percent, respectively, reflecting the huge increases in steel, concrete, diesel fuel and asphalt prices discussed below. The indexes for nonresidential and multi-unit residential buildings went up



about nine percent each, while the PPI for materials used in single-unit residential construction rose seven percent.

In 2005, these differences persisted, although all of the industry PPIs moderated slightly, rising 6.9 percent (single-unit residential) to 9.4 percent (nonresidential buildings), except the highway and street construction PPI. That index rose 14.1 percent, pushed up by further large increases in diesel and asphalt prices. A flattening or drop in steel prices helped cool the increase in other construction industry PPIs. In addition, falling prices of lumber, plywood, and oriented-strand board (OSB) slowed the increase in residential construction costs.

*Reported by AGC Chief Economist Ken Simonson (March 2006)*

# AGC's Construction Inflation Alert

In the past three months, these rankings have reversed. A steep decline in diesel and asphalt prices has brought down the indexes for highway and street construction and other heavy construction by 2.2 percent and 0.6 percent (annual rates of -8.5 percent and -2.4 percent), respectively. Building construction costs have been nearly flat for non-residential construction but have risen 1.0 percent for multi-unit and 1.4 percent for single-unit (annual rates of 4.0 percent and 5.7 percent), reflecting higher costs for brick, concrete, gypsum, plastic, and copper products but lower prices for wood and some steel products.

## Chart 2



Changes in Costs Among Construction Types

- ◆ - Nonresidential Buildings    —○— Highway & Street Construction    —▲— Other Heavy Construction
—■— Multi-Unit Residential    —+— Single-Unit Residential

## Cost Changes Vary Widely by Material

The indexes for specific materials show why the industry indexes vary so much, and why construction materials costs overall exceed the general rate of inflation. Changes in some construction materials prices closely follow price changes for the crude materials used to make them. Thus, this section draws on a mix of PPIs for crude materials, materials used in construction among other industries, and materials specific to construction. The discussion and table are grouped around metals; concrete and brick; petroleum and natural gas derivatives; and gypsum and wood products. *(See Charts 3 and 4 (Page 4) and Table 3 (Page 7).)*

Most PPIs for materials used in construction had either small increases throughout 2001-03 or a mix of increases and decreases. By 2004, however, there were several extreme increases.

Steel mills raised their prices very suddenly and sharply in the first five months of 2004. Prices for automotive and appliance steel leveled off or retreated by year-end, but strong demand kept construction steel prices rising. For example, the average price of all steel mill products rose 48.8 percent, whereas the price of steel pipe and tube was up 66 percent. By 2005, slipping demand from automotive and appliance users of steel, plus an increase in imports, drove down the overall price of steel mill products by 3.6 percent. But continuing strong demand from contractors pushed up the price of fabricated iron and steel pipe, tube, and fittings (5.5 percent), fabricated structural metal for buildings (3.3 percent), and fabricated steel plate (one percent). In the past three months, these construction steel indexes have taken differing directions: 3.9 percent, -0.2 percent, and 1.9 percent, respectively. This reflects crosscurrents in the world steel market, in which predictions differ sharply among analysts about the likely supply-demand balance. In particular, China varies between importing steel for its infrastructure, private construction, and consumer products demand, and opening new mills that add to exports.

# AGC's Construction Inflation Alert

Strong worldwide demand for copper, along with unrest in ore-producing regions, has kept ore and scrap prices rising by 30-65 percent over the past three years. As a result, the PPI for copper and brass mill shapes rose roughly 30 percent in both 2004 and 2005, and was up another 11.2 percent in the last three months (annual rate of 57 percent).



**Chart 3**

Concrete prices have accelerated steadily, from -0.3 percent in 2002 to 9.8 percent in 2005, with a further 3.5 percent increase in the latest three months (annual rate of 14.8 percent). These increases have tracked an increase in the cost of cement, which rose 11.7 percent in 2005 and 3.2 percent in the last three months (annual rate of 13.4 percent). Costs for construction sand/gravel/crushed stone (up 7.5 percent in 2005, 2.9 percent in the past three months) and diesel fuel used to transport and mix concrete have also been rising at five to seven percent per year. Domestic cement production has been nearly stagnant, while consumption has been rising at 5-7 percent per year, making the U.S. steadily more dependent on imports. Although there is plenty of cement worldwide, ocean shipping costs, port congestion, and problems with rail and barge shipments have driven up cement prices and caused widespread shortages. Cement and concrete producers in more than 30 states reported shutdowns or delivery interruptions in 2004 and 2005.

Diesel fuel and asphalt prices have been extremely volatile in the past several years, with an upward tilt. Both products come directly from crude oil. The index for domestically produced crude petroleum has varied from a drop of 42.4 percent in 2001 to a gain of more than 50 percent in 2002 and 2005, with a drop of 2 percent in the last three months. Correspondingly, the PPI for #2 diesel fuel fell 44.7 percent in 2001, rose by 13-54 percent in 2002-05, and fell 25.8 percent in the last three months. The PPI for asphalt was up 10-18 percent in 2003 (the first year it was calculated on its current basis) to 2005 and has fallen 8.1 percent in the latest quarter.

Industrial natural gas prices rose 20 percent in 2003 and 2004 and 31.5 percent in 2005 before falling 2.3 percent in the last three months. The 2005 increase was aggravated by damage from Hurricanes Katrina and Rita to offshore platforms and processing plants, which shrank supplies just before the winter heating season. Record warm temperatures in January drove natural gas futures prices down. The price increases are a major reason for the 22.6 percent increase in 2005 in the PPI for plastic construction products that use natural gas as a feedstock, such as polyvinyl chloride (PVC) pipe, membranes and geotextiles, paints and coatings, and some types of insulation and roofing material. Prices of those products rose 10.7 percent in the last three months, propelled partly by a severe shortage of PVC resin after a resin plant in Texas was shut down following two explosions. (The plant has reportedly resumed full production.) Natural gas is used as well to heat and dry some brick and structural clay tile, which rose 9.5 percent in price in 2005 and 5 percent in the last three months (22 percent annual rate).

Gypsum products prices rose 20 percent in 2004, 18.2 percent in 2005, and 5.6 percent in the last three months (24 percent annual rate). Very high demand from single- and multi-unit home building, home improvements, and some nonresidential building categories, in the face of relatively flat production, have kept prices soaring. Damage to plants and inventories from Hurricane Katrina worsened supply shortages.

**Chart 4**



# AGC's Construction Inflation Alert

## Construction Demand and Costs Both Head Higher for 2006

Total construction spending rose nine percent in 2005. Double-digit increases occurred in single- and multi-family residential, hospital, multi-retail (general merchandise stores such as "big box" and warehouse-type stores, shopping centers, and shopping malls), manufacturing, highway and street, water and sewer construction. All of the nonresidential categories look as if they will do well again in 2006. In addition, hotels and resorts, freight transportation and distribution facilities, and other healthcare categories may improve from 2005. A mild slowdown in the residential categories appears likely, although perhaps not for the first few months.



Rebuilding from Hurricanes Katrina, Rita, and Wilma is not likely to have much impact on national markets for materials or labor. The rebuilding from Katrina will apparently be very protracted, and the overall level of construction in Louisiana will probably remain below pre-hurricane levels for several months at least. Construction employment in the state fell by 27,000, seasonally adjusted, from August to September. Only 7,000 jobs were added from September to December. Many of the two million evacuees from Katrina are likely to resettle elsewhere, adding to demand for housing, retail, consumer services, and some public construction in a variety of other states. In south Florida, demand for roofers and window installers for high-rise buildings will be elevated for several more months but there should be little market impact elsewhere.

With a generally strong outlook for construction activity, materials prices are likely to rise faster than the overall rate of consumer or producer prices again in 2006. The rate of increase for construction materials and components prices could be closer to the 10.1 percent rate of 2004 than the 6.1 percent rate of 2005. Once again, however, prices are likely to vary greatly by type of material and project.



The outlook for metals is mixed. Steel prices are likely to stay close to their 2005 average but with significant month-to-month variations as the world supply-demand balance and shipping costs fluctuate. Recent record prices for copper on commodity exchanges suggest that copper pipe, fittings, and wire will also rise more. Raw aluminum prices also have been rising, implying that the price of architectural aluminum will rise more.

Cement and concrete prices seem headed still higher in 2006. Very little domestic cement capacity is expected to come online, while demand from nonresidential construction (which is more concrete-intensive than residential) will continue to rise. Exceptionally warm and dry weather in January allowed more concrete-pouring to occur than usual, which may mean shortages appear earlier this year than in years when cement makers and importers rebuilt stocks in the winter. One favorable development is an agreement between the U.S. and Mexico that aims to lower the antidumping duty on Mexican cement from the current $26 per ton to $3 per ton. If that takes effect in April, as expected, Mexican cement should start replacing cement from China, Korea, Thailand, Greece, or Venezuela, all of which currently supply more to the U.S. than Mexico does, despite the longer transit times and higher shipper rates. However, the agreement includes state and regional quotas on Mexican cement that will limit the relief.

Oil and natural gas prices have fallen sharply from their post-hurricane highs. However, production from the Gulf of Mexico is still down by more than 15 percent, keeping supplies tight. As of mid-March, the national average retail price of diesel fuel was around $2.55 per gallon, 60 cents below the record set after Rita but 35 cents (16 percent) higher than a year ago. In percentage terms, the off-highway diesel price, which does not include 45-50 cents of highway taxes, was up even more. It appears diesel prices for 2006 as a whole will be up 10-30 percent over 2005, with wide month-to-month variation. These prices affect contractors through the cost of operating off-road equipment and construction trucks, and in the fuel surcharges truckers add to delivery bills for materials, equipment, and debris hauling. Asphalt prices also will be elevated and may go higher by year-end, as refiners introduce more desulfurization equipment that leaves less liquid asphalt at the end of the refining process. Construction plastics prices should come down from recent highs but average 10-20 percent higher than year-ago levels. Other products that rely on natural gas or that have high transport costs, such as paints and coatings, insulation, and brick, are likely to rise 5-10 percent in price.

# AGC's Construction Inflation Alert

The prices of gypsum products and lumber and wood products should ease by year-end. Demand will soften if residential construction slows, and supply should increase if plants now under construction come online as expected.

Equipment costs are expected to continue rising at the 5-6 percent rate of the past two years. Demand has remained strong, and components suppliers have had trouble filling orders in some cases. Tires for large equipment have been very hard to come by due to limited specialized tiremaking capacity and robust worldwide demand from mines and the U.S. military, in addition to the construction industry.

Labor costs have yet to accelerate from the 3.7 percent pace in 2005. Data from the Construction Labor Research Council suggest new contracts contain similar raises to previous contracts. Despite record construction employment (7.5 million in February, seasonally adjusted, up 4.7 percent from February 2005), most contractors have not reported greater difficulty than in the past in filling crafts positions. The most difficult positions to fill appear to be supervisors, project managers, and cost estimators.

## Conclusion

The construction industry has much less opportunity that many other industries have to reduce or substitute materials. As a result, rising construction activity is likely to mean higher materials costs, particularly when domestic production is barely rising for many materials transportation costs are high. All of these conditions are likely to continue in 2006. Therefore, 2006 is likely to be another year of elevated construction materials prices, with selective shortages.

In contrast, labor costs are likely to grow only moderately. The industry benefits from the large number of new "baby boomlet" entrants in the workforce. There are fewer job openings in manufacturing, normally an alternative to construction for many workers.



Ken Simonson (simonsonk@agc.org) became Chief Economist of the Associated General Contractors of America (AGC), the leading national association for the construction industry, on September 10th,

He has 30 years of experience analyzing, advocating and communicating economic and tax issues. Before joining AGC, he spent three years as senior economic advisor in the Office of Advocacy of the U.S. Small Business Administration and 13 years as vice president and chief economist for the American Trucking Associations. He also worked with the Commission on Industrial Competitiveness, the U.S. Chamber of Commerce, the Federal Home Loan Bank Board, and an economic consulting firm.

The Data DIGEST, a weekly, one-page email newsletter that summarizes the latest economic indicators. Simonson is also co-author of AGC's monthly Construction Tax News, a review of current federal and state tax developments affecting the industry.

He has a BA in economics from the University of Chicago and an MA in economics from Northwestern University. He is a member of the National Association for Business

# AGC's Construction Inflation Alert

## Appendix 1

### Table 1: Construction Materials Costs vs. CPI-U and PPI

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| CPI-U | 1.6 | 2.4 | 1.9 | 3.3 | 3.4 | -0.5 |
| PPI for finished goods | -1.6 | 1.2 | 4.0 | 4.2 | 5.4 | 0.8 |
| New warehouse construction (finished cost) | N/A | N/A | N/A | N/A | 7.6 | 1.6 |
| Materials and components for construction | 0.0 | 0.6 | 3.0 | 10.1 | 6.1 | 2.5 |
| Construction machinery and equipment | -0.1 | 1.9 | 1.3 | 6.0 | 5.0 | 1.5 |
| Bid on construction | -4.6 | 3.2 | 3.4 | 2.4 | 3.7 | -0.3 (Sept-Dec./05) |

### Table 2: Changes in Costs Among Construction Types

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| Nonresidential buildings | -0.5 | 0.7 | 2.4 | 9.4 | 7.4 | 0.1 |
| Highway and street construction | -3.8 | 1.0 | 2.8 | 10.8 | 14.1 | -2.2 |
| Other heavy construction | -2.6 | 1.0 | 2.6 | 13.4 | 6.8 | -0.6 |
| Multi-unit residential | -0.1 | 0.4 | 2.7 | 8.9 | 7.6 | 1.0 |
| Single-unit residential | -0.4 | 0.6 | 3.5 | 7.0 | 6.9 | 1.4 |

### Table 3: Changes in Costs for Specific/Basic Construction Inputs

| | Percentage change in 12 months ending: | | | | | |
| | 12/01 | 12/02 | 12/03 | 12/04 | 12/05 | Oct./05-Jan./06 |
|---|---|---|---|---|---|---|
| Iron ore | 1.5 | -1.3 | 1.8 | 8.7 | 15.5 | 3.7 |
| Iron and steel scrap | -5.8 | 27.8 | 64.9 | 50.8 | -10.9 | 2.9 |
| Steel mill products | -6.1 | 11.1 | 1.7 | 48.8 | -3.6 | 3.0 |
| Hot-rolled bars, plates, and structural shapes | -4.3 | 2.1 | 11.3 | 53.8 | -0.9 | 0.1 |
| Steel pipe and tube | -3.7 | 9.1 | 3.3 | 66.0 | 1.1 | 2.3 |
| Copper ores | -19.6 | 3.6 | -37.4 | 65.1 | 34.1 | N/A |
| Copper base scrap | -17.4 | 11.2 | 30.7 | 34.5 | 52.0 | 9.6 |
| Copper and brass mill shapes | -9.5 | -1.6 | 11.8 | 29.6 | 31.0 | 11.2 |
| Aluminum mill shapes | -2.9 | -0.6 | -0.5 | 9.9 | 6.6 | 4.6 |
| Structural, architectural, pre-engineered metal prods. | -1.5 | -0.4 | 1.0 | 26.1 | 3.1 | 1.3 |
| Fabricated structural metal | -1.3 | -2.4 | 0.1 | 24.7 | 3.0 | 0.5 |
| Fabricated structural metal for buildings | -1.5 | -3.3 | -0.1 | 20.0 | 3.3 | -0.2 |
| Architectural and ornamental metalwork | -0.1 | 3.7 | 0.7 | 23.5 | 5.9 | 0.6 |
| Fabricated iron and steel pipe, tube, and fittings | 0.6 | 0.1 | 1.2 | 32.8 | 5.5 | 3.9 |
| Nonferrous pipe, tube, and fittings | 0.9 | 0.8 | -0.4 | 3.5 | 20.1 | 7.5 |
| Fabricated steel plate | 0.6 | -1.0 | 0.8 | 7.6 | 1.0 | 1.9 |
| Prefabricated metal buildings | 0.0 | 4.0 | -0.7 | 35.5 | 2.8 | -4.3 |
| Cement | 1.0 | 1.3 | -1.1 | 7.9 | 11.7 | 3.2 |
| Construction sand/gravel/crushed stone | 3.3 | 2.5 | 2.4 | 4.3 | 7.5 | 2.9 |
| Concrete products | 2.5 | -0.3 | 1.5 | 7.5 | 8.8 | 3.5 |
| Concrete block and brick | 2.3 | 1.6 | 3.2 | 4.7 | 8.1 | 2.3 |
| Concrete pipe | 4.4 | 1.7 | 1.4 | 5.5 | 8.5 | 5.8 |
| Ready-mixed concrete | 2.5 | -1.1 | 2.1 | 8.7 | 11.6 | 4.1 |
| Precast concrete products | 0.7 | 0.3 | 2.5 | 6.0 | 6.4 | 1.2 |
| Prestressed concrete products | 5.3 | 1.8 | -0.2 | 8.2 | 3.8 | 0.9 |
| Brick and structural clay tile | 5.3 | 1.9 | 0.7 | 3.0 | 9.5 | 5.0 |
| Crude petroleum (domestic production) | -42.4 | 60.6 | 14.3 | 30.5 | 51.3 | -2.0 |
| Industrial natural gas | -36.7 | 12.2 | 20.3 | 20.1 | 31.5 | -2.3 |
| Plastic resins and materials | -9.8 | 9.2 | 6.4 | 28.6 | 11.5 | 0.3 |
| #2 diesel fuel | -44.7 | 54.4 | 13.0 | 37.9 | 46.3 | -25.8 |
| Asphalt | N/A | N/A | 10.0 | 18.3 | 17.8 | -8.1 |
| Paving mixtures and blocks | 0.9 | 2.0 | 3.7 | 4.3 | 14.2 | 4.3 |
| Asphalt felts and coatings | 4.6 | -0.6 | 6.3 | 4.1 | 17.1 | 8.4 |
| Prepared asphalt & tar roofing & siding products | 5.0 | -1.7 | 5.3 | 4.6 | 18.5 | 6.5 |
| Plastic construction products | -2.7 | 3.1 | 3.2 | 7.2 | 22.6 | 10.7 |
| Rubber and plastic plumbing products | -6.3 | 6.7 | 5.6 | 17.8 | 38.9 | N/A |
| Insulation materials | 0.4 | -1.5 | 2.0 | 8.6 | 2.8 | 4.0 |
| Architectural coatings | 2.9 | 0.6 | 3.9 | 5.3 | 9.2 | 2.8 |
| Gypsum products | 0.4 | 3.4 | 2.8 | 20.0 | 18.2 | 5.6 |
| Lumber and plywood | -2.9 | 1.4 | 3.1 | 5.0 | -1.0 | -1.7 |

# AGC's Construction Inflation Alert

## Appendix 2: Producer Price Indexes Relevant to Construction

There is no overall price index that reflects all of the costs incurred by contractors. The only PPI so far for any type of finished construction work, an index for new warehouse construction, dates only from December 2004. BLS intends to roll out PPIs for other building types in the next few years. Nevertheless, the PPI does include numerous subindexes that indicate how specific construction costs are changing.

In general, PPIs measure the cost at a U.S. producer's loading dock or other point of sale. Thus, PPIs do not capture the transportation, insurance, freight, labor, equipment, and overhead costs or profit that the user (e.g., construction firm) incurs.

There are several types of PPIs. The published monthly PPI report (at www.bls.gov/ppi) shows PPIs for finished goods, including subindexes for various types of capital equipment; intermediate materials, supplies, and components; and crude materials for further processing. In addition, there are industry PPIs.

The PPI for finished goods, the most frequently cited, reflects the U.S. manufacturer or final producer's selling price of goods produced for final consumption. It differs from the CPI in that it does not capture the retailer or final vendor's additional costs and markup. Also, the PPI includes only goods, not the services that make up the bulk of consumer purchases. Although most finished goods PPIs are for goods sold to consumers, there is one that applies to construction-the PPI for construction machinery and equipment.

Another set of PPIs is for intermediate goods, materials, and components-items produced for other businesses that then produce finished goods. Like finished goods PPIs, these PPIs measure the price at the U.S. producer's point of sale. Although some intermediate PPIs are specific to one set of customers (e.g., concrete products are sold almost exclusively to construction-related business), other PPIs cover a range of products that many businesses buy (e.g., steel mill products). Thus, these PPIs vary in how closely they reflect the selling prices of items purchased for use in construction.

A third set of PPIs is for crude goods-the basic materials that are turned into intermediate and finished goods. These include both virgin materials, such as crude oil and ores, and scrap. The connection between crude goods and intermediate or finished goods can be relatively direct (e.g., cement and construction sand/gravel/crushed stone go directly into concrete products) or involve many stages. Moreover, the change in final prices may be influenced by substitution of other inputs, use of imports, etc. Thus, the movement of crude prices provides a hint, not a definite sign, of how final or intermediate prices will vary.

Industry PPIs show the weighted average of the producer prices of the goods bought by an industry for all of its purposes. In the case of construction industry types, most of the goods in the industry indexes are used to construct the project types (e.g., nonresidential, single- and multi-family residential buildings, highway, other heavy), but the indexes also include materials that contractors buy for their own overhead.

The indexes included in this report cover a range of items used for construction but not all. Specialty and subcontractors may find other PPIs more pertinent to their businesses at the "Get Detailed Statistics" section of the PPI homepage, www.bls.gov/ppi.

The following BLS table, showing the list of material and supply inputs that are purchased by the construction sector and the percentage of the finished goods PPI that each represents, is reproduced from ftp://ftp.bls.gov/pub/special.requests/ppi/soprel06.txt.

| SOP Code | Commodity Code | Index | Relative Importance | |
|---|---|---|---|---|
| 2200 | | Materials and components for construct | 12.665 | 12.646 |
| | 034909 | Nonwovens and felt goods | .005 | .003 |
| | 06 | Industrial and other fabricated product | .101 | .099 |
| | 06 | Manufacturers yarns and fabrics, fi | .011 | .009 |
| | 06 | Other inorganic chemicals | .013 | .013 |
| | 062141 | Architectural coatings | .155 | .157 |
| | 062103 | Special purpose coatings, incl marine | .084 | .084 |
| | 062201 | Allied and miscellaneous paint product | .044 | .044 |

# AGC's Construction Initiation Alert

| Code | Description | | |
|------|-------------|------|------|
| 067904 | Adhesives and sealants | .069 | .069 |
| 067909 | Other miscellaneous chemical products | .008 | .008 |
| 071201 | Tires | .019 | .019 |
| 071202 | Inner tubes | .000 | .000 |
| 071203 | Tread rubber, tire sundries, & repair | .003 | .003 |
| 071303 | Rubber and plastic belts and belting | .001 | .001 |
| 071306 | Rubber hose | .001 | .001 |
| 071306 | Miscellaneous rubber products, n.e.c | .011 | .011 |
| 072106 | Plastic construction products | .956 | .955 |
| 072205 | Unsupported plastic film/sheet/other s | .130 | .130 |
| 072304 | Laminated plastic sheets, rods, and tu | .018 | .018 |
| 072901 | Other plastic products | .081 | .081 |
| 081105 | Flooring, siding and cut stock | .043 | .043 |
| 081106 | Softwood lumber, not edge worked, not | .289 | .289 |
| 081107 | Softwood lumber MFPM | .035 | .035 |
| 081203 | Hardwood dimension | .019 | .019 |
| 081204 | Hardwood flooring | .058 | .058 |
| 081205 | Hardwood lumber, not edge worked, not | .075 | .075 |
| 081206 | Hardwood lumber MFPM | .015 | .015 |
| 082101 | General millwork | .780 | .780 |
| 082201 | Prefabricated structural members | .254 | .238 |
| 082301 | Miscellaneous millwork products | .005 | .005 |
| 083103 | Softwood veneer and plywood | .102 | .094 |
| 083201 | Hardwood plywood and related products | — | .045 |
| 083301 | Softwood veneer, incl veneer backed | — | .017 |
| 083401 | Hardwood plywood veneer | — | .018 |
| 083501 | Hardwood veneer and plywood | .071 | — |
| 084903 | Wood ties, siding, shingles, & shakes | .021 | .021 |
| 084904 | Sawn wood fence stock, wood lat, and c | .003 | .003 |
| 086101 | Prefabricated wood buildings & compone | .142 | .142 |
| 087101 | Treated wood | .148 | .153 |
| 087102 | Contract wood preserving | .005 | .006 |
| 091303 | Packaging and industrial converting pa | .007 | .007 |
| 091305 | Coated and laminated paper, n.e.c. | .003 | .003 |
| 091506 | Office supplies and accessories | .006 | .006 |
| 091508 | Pressed and molded pulp goods | .005 | .005 |
| 091509 | Misc. converted paper and board produc | .032 | .031 |
| 092204 | Particleboard and fiberboard | .074 | .074 |
| 092202 | Hardboard and fabricated hardboard pro | .015 | .015 |
| 092301 | Board: asphalt, hardpressed, insul, ro | .011 | .011 |
| 093201 | Circulation | .006 | .006 |
| 093203 | Other periodicals: circulation/adverti | — | .091 |
| 093501 | Manifold business forms | .008 | .008 |
| 101502 | Pressure & soil pipe & fittings, cast | .103 | .103 |
| 101504 | Gray & ductile iron castings, other | .092 | .092 |
| 101505 | Malleable iron castings | .004 | .004 |
| 101506 | Carbon, stainless, and alloy investmen | .020 | .020 |
| 101507 | Other steel castings, carbon steel | .007 | .007 |
| 101508 | Other steel casting, high alloy & stai | .006 | .006 |
| 101509 | Other steel castings, low alloy steel | .006 | .006 |
| 101702 | Semifinished steel mill products | .057 | .057 |
| 101703 | Hot rolled sheet and strip, incl. tin | .143 | .144 |
| 101704 | Hot rolled bars, plates, & structural | .126 | .127 |
| 101705 | Steel wire | .157 | .159 |
| 102501 | Aluminum mill shapes | .014 | .014 |
| 102502 | Copper and brass mill shapes | .018 | .018 |
| 102504 | Nickel alloy mill shapes | .001 | .001 |
| 102505 | Titanium mill shapes | .001 | .001 |
| 102519 | Other mill shapes | .002 | .002 |
| 102603 | Nonferrous wire and cable | .410 | .413 |

# AGC's Construction Inflation Alert

| | | | |
|---|---|---|---|
| 104101 | Builders hardware | .049 | .049 |
| 104105 | Other hardware n.e.c. | .014 | .014 |
| 104201 | Hand and edge tools | .016 | .016 |
| 105201 | Vitreous china fixtures | .039 | .040 |
| 105402 | Plumbing fixture fittings and trim | .135 | .136 |
| 105601 | Enameled iron & metal sanitary ware | .061 | .061 |
| 106101 | Steam and hot water equipment | .001 | .001 |
| 106201 | Floor & wall furnaces/heaters/parts | .082 | .083 |
| 106301 | Other heating, non-elect., parts | .074 | .074 |
| 106401 | Domestic heating stoves | .011 | .011 |
| 106601 | Water heaters, domestic | .030 | .031 |
| 107102 | Metal doors and frames, exc. storm | .169 | .170 |
| 107103 | Metal window sash and frames, exc. sto | .203 | .205 |
| 107104 | Metal molding and trim and storefronts | .021 | .022 |
| 107105 | Storm sash and doors | .019 | .019 |
| 107106 | Screens and weatherstrip | .061 | .062 |
| 107201 | Metal tanks | .106 | .107 |
| 107301 | Sheet metal products | .542 | .547 |
| 107404 | Nonferrous pipe, tube, and fittings | .022 | .022 |
| 107405 | Fabricated structural metal | .392 | .395 |
| 107407 | Miscellaneous metal work | .118 | .119 |
| 107408 | Architectural and ornamental metalwork | .191 | .192 |
| 107409 | Fabricated iron & steel pipe, tube & f | .099 | .100 |
| 107501 | Heat exchangers and condensers | .046 | .046 |
| 107601 | Fabricated steel plate | .058 | .059 |
| 107701 | Steel power boilers | .009 | .009 |
| 107801 | Nuclear steam supply systems | .008 | .008 |
| 107901 | Prefab. metal bldg systems, ex. farms | .131 | .132 |
| 107902 | Other prefab. & portable metal buildin | .047 | .048 |
| 107903 | Panels, parts, & sections for prefab | .016 | .016 |
| 108102 | Externally thread. fasteners, ex. airc | .005 | .005 |
| 108103 | Internally thread. fasteners, ex. airc | .001 | .001 |
| 108104 | Nonthreaded fasteners, except aircraft | .002 | .002 |
| 108106 | Other formed fasteners | .001 | .001 |
| 108302 | Residential | .027 | .028 |
| 108303 | Commercial/institutional or industrial | .099 | .099 |
| 108305 | Lighting equipment, n.e.c. | .059 | .059 |
| 108801 | Ferrous wire rope, cable and strand | .056 | .057 |
| 108802 | Steel nails and spikes | .027 | .028 |
| 108807 | Ferrous wire cloth, other woven wire p | .007 | .007 |
| 108809 | Other fabricated ferrous wire products | .088 | .088 |
| 108905 | Other metal products | .036 | .037 |
| 108907 | Metal stampings n.e.c. | .005 | .005 |
| 114102 | Industrial pumps | .012 | .012 |
| 114107 | Parts & attach for air & gas compresso | .004 | .004 |
| 114108 | Industrial spraying equipment | .004 | .004 |
| 114112 | Other pumps, including parts | .011 | .011 |
| 114113 | Domestic water systems | .002 | .002 |
| 114115 | Air & gas compressors and vacuum pumps | .001 | .001 |
| 114201 | Elevators & escalators | .044 | .044 |
| 114402 | Conveying equipment | .002 | .002 |
| 114701 | Fans and blowers, except portable | .047 | .047 |
| 114801 | Heat transfer equipment | .187 | .186 |
| 114802 | Unitary air conditioners | .236 | .235 |
| 114806 | Other a/c and refrigeration equipment | .017 | .017 |
| 114809 | Parts & accessories for a/c & refrig. | .007 | .007 |
| 114902 | Metal valves, except fluid power | .144 | .143 |
| 114903 | Metal pipe fittings, flanges, and unio | .043 | .043 |
| 114908 | Filters and strainers | .006 | .006 |
| 114911 | Other miscellaneous general purpose eq | .011 | .011 |
| 117101 | Current carrying | .162 | .161 |

| | | | |
|---|---|---|---|
| 117701 | Noncurrent carrying | .204 | .205 |
| 117522 | Switchgear and switchboard apparatus | .162 | .161 |
| 117602 | Radio & television communication equip | .140 | .139 |
| 117703 | Parts for electric lamps/bulbs | .000 | .000 |
| 117704 | Electric lamp bulbs and tubes | .003 | .003 |
| 117901 | Storage batteries | .002 | .002 |
| 118105 | Environmental controls | .161 | .160 |
| 118201 | Process control instruments | .000 | .000 |
| 118401 | Fluid meters and counting devices | .002 | .002 |
| 118901 | Aircraft engine instruments | .000 | .000 |
| 118904 | Nuclear radiation detect.& monitoring | .000 | .009 |
| 118905 | Physical properties and kinematic test | .001 | .001 |
| 118906 | Comm., geophysical & general instrumen | .000 | .000 |
| 121101 | Metal household furniture | .003 | .003 |
| 121501 | Porch and lawn furniture | .002 | .002 |
| 122101 | Wood office furniture and store fixtur | .047 | .047 |
| 122204 | Partitions and fixtures | .032 | .032 |
| 122301 | Public building furniture | .009 | .009 |
| 123101 | Carpets & rugs | .093 | .092 |
| 123201 | Hard surface floor coverings | .031 | .031 |
| 124104 | Other major appliances | .036 | .036 |
| 124301 | Vacuum cleaners | .002 | .002 |
| 124401 | Small household appliances | .007 | .007 |
| 131105 | Sheet, plate, and float glass | .009 | .009 |
| 132201 | Cement | .079 | .079 |
| 133111 | Structural block | .094 | .094 |
| 133121 | Decorative block | .011 | .011 |
| 133131 | Concrete brick | .007 | .007 |
| 133141 | Paving blocks | .012 | .012 |
| 133201 | Concrete pipe | .091 | .091 |
| 133301 | Ready-mixed concrete | .866 | .865 |
| 133404 | Precast concrete products | .225 | .225 |
| 133501 | Prestressed concrete products | .077 | .077 |
| 134201 | Brick, except ceramic, glazed & refrac | .069 | .068 |
| 134202 | Glazed brick struct., hollow & facing | .004 | .004 |
| 134401 | Ceramic floor and wall tile | .027 | .027 |
| 134501 | Structural clay products, n.e.c. | .006 | .006 |
| 135201 | Clay refractories | .025 | .024 |
| 135301 | Refractories, non-clay | .032 | .032 |
| 136101 | Prep. asphalt & tar roofing & siding p | .208 | .208 |
| 136201 | Other asphalt roofing | .038 | .038 |
| 137101 | Gypsum products | .172 | .172 |
| 139201 | Mineral wool for structural insulation | .129 | .129 |
| 139401 | Paving mixtures and blocks | .312 | .312 |
| 139501 | Cut stone and stone products | .029 | .029 |
| 139801 | Gaskets and gasketing material | .002 | .002 |
| 139802 | Packing and sealing | .002 | .002 |
| 139902 | Other nonmetallic minerals, n.e.c. | .027 | .027 |
| 139903 | Nonmetallic mineral products, n.e.c. | .002 | .002 |
| 159A04 | Signs and advertising displays | .009 | .009 |

1/ The relative importance of a component of the PPI represents its value weight that is allocated to a particular stage-of-processing (SOP) category—Finished Goods, Intermediate Materials, or Crude Materials. This value is expressed as a percentage of the total weight of the SOP category. The "Revised" column shows relative importance figures for December 2005, based on 1997 shipment values from the Census of Manufactures and other sources, and reflects all sample revisions effective January 2006. The "Former" column provides relative importance figures for the same month before any sample revision. Groupings and subtotals may not add exactly to totals because of rounding. A dash in the "Former" column indicates that the series was introduced in January 2006, and a dash in the "Revised" column indicates that the series was discontinued as of January 2006. The value "0.000" represents any percentage less than 0.0005.



**SORLING**
NORTHRUP, HANNA
CULLEN & COCHRAN, LTD.
ATTORNEYS AT LAW

REPLY TO:

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

David A. Rolf
Attorney at Law

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo

Elizabeth A. Urbance
James G. Fahey
Michael G. Horstman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fathauer
Brian D. Jones

Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson

Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

March 29, 2006

<u>VIA FEDERAL EXPRESS & FACSIMILE (720-475-2967)</u>
Mr. David Frieder
Vice President – Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

Re:     Lease, dated April 2, 2001, between TSA Stores, Inc., as
        successor to Gart Bros. Sporting Goods Company ("Tenant"),
        and Illinois National Bank, Trustee ("Landlord")

Dear Mr. Frieder:

I am writing in response to your March 23, 2006 letter to Arthur Seppi,
Charles Robbins, and my partner, R. Lee Allen (in Mr. Allen's absence
from the office this week). I appreciate your courtesy in advising the
Landlord that you were considering terminating the Lease. We have now,
however, received an estimate from our contractor, Jones-Blythe
Construction Company, providing an opinion as to the extent of the
damage to the Premises leased to Sports Authority. As you can see from
this estimate, the damage does not exceed the 35% threshold referred to in
Paragraph 15(b) of the Lease. Pursuant to Paragraph 15(a) of that Lease,
the Landlord will be proceeding with repair and restoration of the
Premises, and expects that Sports Authority will abide by its continuing
obligations pursuant to that Lease.

Yours truly,

David A. Rolf

DAR/mah
Enclosure
cc:    Mr. William L. Hall, L.J. Shaw & Company
       Mr. Arthur Seppi
       Mr. Charles Robbins

{S0504337.2 3/29/2006 DAR MAH}



**JONES-BLYTHE**
CONSTRUCTION CO.
1120 WOODLYN DRIVE, SUITE #1
POST OFFICE BOX 5118
SPRINGFIELD, ILLINOIS 62705
TELEPHONE: 217/787-1540
FAX NUMBER: 217/787-1688

March 29, 2006

Charles E. Robbins Realtor
Commercial Division
2144 South McArthur
Springfield, IL 62704

Attn:   Art Seppi

Re:   Sports Authority
        Tornado damage

Dear Mr. Seppi,

Per your request, following is our opinion of the extent of damage to the building leased to Sports Authority:

| Building Component | | % Damage |
|---|---|---|
| Foundation system | | 0% |
| Floor slab | | 0% |
| Bearing walls | 124lf / 870lf / 2 | 7% (Half is Gordmans) |
| Roof structure | 6,650sf / 50,000sf | 13% |
| Roof membrane | | unknown (patched and not leaking) |
| Flashing & sheet metal | | minimal |
| Doors & frames | | 0% |
| Glass & glazing | | 83% (minimal glass cost overall) |
| Automatic doors | | 10% |
| Studs & drywall | | 25% |
| Painting | | <30% |
| Sprinkler | | 10% |
| Plumbing | | 0% |
| HVAC | | Unknown (RTU $20k/each if replaced) |
| Electrical | | <10% (Just a few damaged light fixtures) |

With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises.

If you have any questions or need additional information, please contact me.

Sincerely,

JONES-BLYTHE CONSTRUCTION CO.

Mark A. Sorensen