# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited<br>liability company, as successor to<br>Illinois National Bank, as Trustee under<br>Trust Agreement dated November 6, 2000<br>and known as Trust No. 00-0020,<br>an Illinois banking institution, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | Case No.:06-3177 |
| TSA STORES, INC., as successor to Gart<br>Brothers Sporting Goods Company,<br>a Delaware corporation, | )<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

## SWPLAZA III, LLC'S REPLY TO TSA STORES, INC.'S RESPONSE TO SWPLAZA III, LLC'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, SWPLAZA III, LLC, by and through its attorneys, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., David A. Rolf, of Counsel, and files its Reply to TSA's Response to SWPlaza III, LLC's Motion for Summary Judgment, in support of which it states as follows:

### Introduction

TSA Stores, Inc.'s (hereinafter "Tenant") Response to Motion for Summary Judgment is two-fold. First, the Tenant states that SWPlaza III, LLC (hereinafter "Landlord") has not proved that the cost do not exceed 35%. Yet, the costs as presented by the Landlord do not in fact exceed 35%. The Tenant is taking issue as to whether there ought to be additional costs included, but has not provided the court with those additional costs itself. Further, it is Tenant's action in terminating all of its employees and refusing to cooperate with the Landlord's

contractor that led the Landlord not to complete certain repairs. In any event, there is no basis on which the Tenant can claim that the costs exceed 35%. Secondly, the Tenant focuses on its position that its estimate done by David Frieder is reasonable, reliable, and relevant. To the contrary, the undisputed material facts are that the Tenant's estimate, on which it based its notice of termination, was unreasonable, unreliable, and irrelevant. Therefore, by Tenant's own admission, it is not entitled to exercise the option to terminate the agreement and, therefore, Landlord is entitled to summary judgment.

## Response to Additional Material Facts

## Undisputed Material Facts

3, 4, 6 through 12, 18, 20, 26 through 29.

## Material Fact Claimed to be Disputed

13.  Mr. Wolford did not prepare an estimate for TSA until after it had terminated the Lease, and revised it several times after his site visit, which was post-termination notice. See Footnote 5 to TSA's Memorandum, also admitting, therefore, that fact 13 is immaterial.

16.  Mr. Wolford provided TSA with the 2001 costs and the percentage increase in those costs from 2001 to 2006, not a budget estimate. (Exhibit 3, 4/19/06 e-mail of Jeff Wolford to David Frieder).

17.  The original estimate was prepared by David Frieder. (See Exhibit 7 attached to SWPlaza III's Motion for Summary Judgment filed December 31, 2007) (Wolford deposition at page 11).[1]

30.  Cotton expenses are in Wolford's estimate. (Wolford deposition at p. 44).

## Facts Claimed to be Immaterial to the Motion

---

[1]    Since Tenant did not produce the e-mail pursuant to Federal Rule of Civil Procedure 26 or in Response to a Request to Produce, Mr. Wolford's deposition serves to satisfy Federal Rule of Civil Procedure 56(e).

1.    TSA attributes its calculation of the 35% threshold solely to Mr. Wolford, absent whose opinion, TSA has no additional disclosed opinion on the cost of repair.  Mr. Wolford did not rely on Mr. Cashman or Mr. Novell in his disclosed opinion.  Therefore, the Affidavits of Cashman and Novell as to TSA's actions immediately following the tornado are immaterial, as are their observations of the facility immediately after the tornado.

2.    See Response to Undisputed Fact #1.

5.    See Response to Undisputed Fact #1.

14.    Mr. Wolford's qualifications are immaterial, as his "several estimates" affect neither the analysis, nor the outcome.  (Footnote 5 to TSA's Memorandum).

15.    See Response to Undisputed Fact #14.

19.    TSA's "cost assessment and analysis" were purposefully high, in order to negotiate, were unreasonable and in bad faith, and thus immaterial.

21.    Whether an estimate could or was prepared on March 14th or March 15th is immaterial, as even Tenant does not suggest the Lease requires such information.

22.    Repairs left uncompleted were the result of the refusal of TSA to provide information necessary for it to reoccupy the premises.  (Exhibit 10 to SWPlaza III's Motion for Summary Judgment; Sorensen deposition at pp. 36-37).

23.    See Response to Undisputed Fact #22.

24.    See Response to Undisputed Fact #22.

25.    See Response to Undisputed Fact #22.

## Additional Material Facts

1.     Landlord responded to Tenant's notice of termination and the accompanying report attached to Dave Frieder's notice by way of a letter dated May 5, 2006 from counsel for Landlord to Mr. Frieder, a copy of which is attached as **Exhibit 1**, produced by Tenant in its Rule 26 Disclosure as Documents 071-073.

2.     Tenant responded to the Landlord's letter through its counsel by letter dated May 18, 2006, which is attached hereto as **Exhibit 2**, produced by Tenant in its Rule 26 Disclosure as Documents 001-006.

Additional material facts are necessary for the following reason:

Landlord filed its Motion for Summary Judgment on December 31, 2007.  In the material facts, it alleged as fact that the original estimate which accompanied Tenant's notice of termination was prepared by David Frieder, rather than by Mr. Wolford.  The relevance of that allegation is that the estimate that accompanied the notice of termination was based on an estimate David Frieder e-mailed to its expert, Mr. Wolford, and such e-mail Mr. Frieder described the estimate as purposely high in order to allow room to negotiate.  Landlord assumed that the Tenant would in response admit that fact.  Rather, however, the Tenant has claimed it is immaterial who prepared it and goes further to say that there was no misrepresentation made by the Tenant to the Landlord as to who prepared the estimate.

Landlord had no way of anticipating that the Tenant would do anything other than admit the true facts.  Therefore, the Landlord did not in its original Motion for Summary Judgment include two pieces of correspondence, disclosed by Tenant in its initial Rule 26 Disclosure. These facts have become material to refute what the Tenant alleges in its Response, namely that

it never represented that Mr. Wolford prepared the estimate and that who prepared it is immaterial to the issue.

As stated in the letters, it was clearly material to the Landlord when it received the notice of termination and accompanying estimate as to the basis and who prepared that estimate. Landlord, as stated in the letter attached as Exhibit 1 hereto took specific issue with a Chicago contractor who, to the Landlord's knowledge, had never been on site to observe the damage, and was providing an estimate. That certainly goes to the reasonableness, reliability, and relevancy which the Tenant suggests that this Court ought to base its decision on. Likewise, the Response by the Tenant, through its counsel in the letter attached as Exhibit 2, goes to great lengths to state that Mr. Wolford is an experienced contractor and prepared that estimate, thus attempting to vouch for its reasonableness, reliability, and relevance. Thus, Tenant has made a clear misrepresentation to Landlord.

These letters also are now relevant and material to refute the position of Tenant that it was reasonable, reliable, and relevant that they include all of the Cotton expenditures at the time of termination. As noted in Exhibit 1, Landlord took specific issue with those costs being included at all. As noted in Exhibit 2, the Tenant's response was not that some of them should be included, but rather emphatically that they all were cost of repair. This is clearly not the position of their retained expert, Mr. Wolford, nor can it, of course, be their position now at time of Motion for Summary Judgment. It was, however, Tenant's position at the time of termination, and thus, is very material to what the Tenant urges this Court to look at, namely the reasonableness, reliability, and relevance of its estimate.

The Landlord had no idea that Tenant would take the position it did in its Response, in particular with regard to who prepared the original estimate. Therefore, Landlord will be

prejudiced without being allowed to provide these additional material facts in its Reply. Since the necessity has arisen due the Tenant taking a position unsupported on the face of the documents themselves, prejudice to the Landlord in not allowing the additional facts of record, far outweigh the prejudice to the Tenant for urging a position unsupported by the records in this case. Landlord, therefore, asks this Court to consider same.

## III.    Argument

### A.    Any unknown costs are directly the result of the Tenant's unclean hands.

Tenant, in its Response, focuses on its allegation that there are certain costs that are unknown. To begin with, the Tenant mischaracterizes the original estimate of Mark Sorensen, Exhibit 3 to Landlord's Motion for Summary Judgment, as being a cost estimate. It was not meant to be a cost estimate, but rather an estimate of the percentage of the Premises that sustained damage. As the Tenant had sent a March 23, 2006 letter saying it thought it that the 35% threshold might be met, the Landlord merely responded with an on-the-ground contractor providing the basis for the Landlord's belief that repair costs would not exceed 35%. Certainly, Tenant's gut feeling is no better that Landlords, as Tenant's belief was not even that of a contractor. In any event, that estimate is not the basis, nor has the Landlord offered it to support the actual costs.

Secondly, it is the Tenant who essentially prevented the Landlord from completing the repairs. As case law cited by Tenant supports, the parties have an obligation to deal with each other in good faith. The facts clearly show Tenant was not doing so. Tenant misled the owner's contractor by saying that the flooring could be available on a week's notice, when it already knew that it was terminating the Lease. (Exhibit 1 to Landlord's Reply to Tenant's Motion). Query why then the Tenant now thinks that it ought to be entitled to take issue with the cost of

uncompleted Tenant improvements when Tenant itself stood in the way of those improvements. Tenant suggests that it had to wait until the all repairs were completed to rely on actual costs, a situation that was not workable. However, as stated above, Tenant itself led to delays by failing to provide information to the Landlord. Tenant even criticized Landlord for proceeding with repairs. (See Exhibit 2 hereto).

Further, Tenant made no effort to determine any actual costs. Landlord, through counsel, made Tenant aware that information was available. (Exhibit 1 hereto). Rather than ever checking, Tenant chose to ignore even the information on costs that was available. Even more telling is the fact Tenant went out of its way to avoid any actual cost information. When it finally did ask Mr. Wolford to visit the site after the termination notice, it instructed him to misrepresent his true identity. (Exhibit 14 to Motion for Summary Judgment). Perhaps, if Tenant was operating in good faith, it would have instructed Wolford to be truthful and inquire of the Landlord's contractor about the repairs and associated costs. Clearly, it was never the intent of Tenant to make any attempt to determine what the costs were, nor for that matter what costs remained. Tenant had manufactured its estimate in order to terminate the Lease, and had no intention of operating in good faith.

As stated in the Motion for Summary Judgment, a bid for any unfinished work could have been secured by the Tenant to provide what it views are the missing additional costs. Having failed to do so, Tenant cannot now complain that the Landlord failed to meet its burden. Based on the actual costs in hand of the work done, the Landlord's reasonable belief is that the costs do not exceed 35%. It is not its burden to prove that they do.

**B.     The Landlord's estimate is unreasonable, unreliable, and irrelevant.**

Most interestingly in the pleadings herein is that the Landlord has finally had to admit, at Page 17 of its Response, that David Frieder prepared the estimate of cost of repairs upon which it is relying to terminate the Lease. Having been caught playing hide the ball, the Tenant now has to come up with all sorts of excuses as to why Mr. Frieder's estimate is reasonable, reliable, and relevant. The subtleties of the Tenant's response should be noted.

First, the e-mail of Mr. Frieder to Mr. Wolford attached as Exhibit 7 to the Motion for Summary Judgment was never disclosed at any time by the Tenant until Mr. Wolford produced his correspondence file at his deposition. While the Tenant attempts to note in Footnote 6 of its Response that Mr. Frieder was disclosed in a sufficient manner pursuant to Federal Rule of Civil Procedure 26(a)(2), Rule 26 also requires that a party disclose documents on which it intends to rely. Tenant, however, chose not to disclose this e-mail and the fact that it was David Frieder who put together the estimate and not Mr. Wolford.

Second, Tenant, at Page 18 of its Response, quotes from a letter wherein the Tenant attempts to describe the report as having been prepared by Mr. Frieder and now claiming somehow that the Tenant disclosed it as such. Landlord does assert Tenant misrepresented who prepared the estimate of repairs. Tenant describes in Footnote 5 that assertion as audacious and unwarranted, presumably based on Mr. Frieder's letter. The letter and analysis which Mr. Frieder represents he prepared is the first page. In his analysis, Mr. Frieder states "The estimated repair cost was developed by a contractor who bid on the TI work in 2001…" The second page of the analysis, the table that is attached, states very specifically on it prepared by Mr. Wolford, indeed footnoting at the bottom Mr. Wolford's qualifications. It is Tenant, not the Landlord, who has the audacity to make erroneousness assertions to this Court, in an effort to mislead it.

Third, counsel for Tenant itself, in support of the estimate, stated that it was Mr. Wolford's estimate in Exhibit 2 hereto.

At Page 3:  The May 3, 2006 letter provided the Landlord with a copy of the estimate prepared by Wolford.

At Page 4:  As for the content of the estimate, each component of the estimate was based upon an objective analysis performed by Wolford.

Again, the Tenant's audacity comes through in its Response, wherein it states to this Court on pages 17-18 and in Footnote 5 that it always represented the estimate as that of David Frieder.

Fourth, the Court should compare Material Fact 43 from Tenant's Motion for Summary Judgment and Material Fact 17 from Tenant's Response to Landlord's Motion for Summary Judgment.  Prior to being confronted with Frieder's e-mail, Tenant was willing to state it <u>based</u> its estimate on Wolford's work.  Not being able to deny that the estimate was Frieder's, Tenant had to in its Response reword the allegation to "<u>buttressed</u> <u>on</u>".  An original by Wolford never existed and the starting point was Mr. Frieder's estimate, accompanied by his e-mail acknowledging that it was purposefully estimated to be high.

Fifth, Mr. Frieder's estimate included the entirety of Cotton USA's bill.  Cotton's contract was with the Tenant and it had exclusive possession of the contract, as well as the invoices and paid those bills.  That was all completed and invoiced by March 31, 2006.  (Exhibit 4 to Motion for Summary Judgment).  Therefore, the Tenant at all times prior to sending its notice of termination had those costs.  Having that contract and those costs, the Tenant had actual knowledge that not all of the Cotton expenditures were related to the cost of repair.  Despite this knowledge, however, Mr. Frieder included the entire $319,000 in his estimate.  It is easy to see why the Landlord questioned the reliability of the estimate.  Landlord questioned it in Exhibit 1

hereto and Tenant responded in Exhibit 2 stating on page 4 that none of Cotton's work related to inventory and it all related to reconstruction. Indeed, that alone provides sufficient information on which this Court can conclude that the estimate was not only unreliable, but also unreasonable. Again, it is just another example of the Tenant purposefully coming up with an estimate that is higher than the actual cost in an effort to get out of the Lease.

Lastly, as to the reasonableness, reliability, and relevance of Frieder's estimate, the Court again can look at what Tenant's paid expert, Mr. Wolford, later concluded. His conclusion, evidently after being retained to testify, was that the estimate was neither reasonable, nor reliable, nor relevant, as it included numerous items which did not need to be included at all, numerous values were well off the mark, and not even close to half of the Cotton bill should have been included.

<u>**Conclusion**</u>

Despite having every opportunity to do so, Tenant has provided no information or evidence as to what it alleges are costs that are missing from Landlord's figures. Tenant chose to operate in bad faith in dealing with Landlord's contractor by delay and by misrepresenting the identity of its own contractor, rather than making legitimate inquiry. Since there is no evidence the costs exceeded the 35% threshold, Landlord is entitled to summary judgment.

Worse yet for Tenant, it finds itself in a position having been confronted with an e-mail which it previously chose not to disclose, and having to admit that its estimate was prepared by David Frieder, not Mr. Wolford. It is confronted with the fact that the estimate that was sent to the Landlord, and specifically represented to be prepared by Mr. Wolford, which is a complete misrepresentation. The Tenant also has had to admit that the figures in that estimate were high so as to allow room to negotiate. Tenant has to admit the estimate included over $200,000 in

Cotton expenses which it knew also should not be included.  This is the estimate on which the Tenant based its termination and now must base its defense of this case.  Tenant repeatedly claims it is allowed to terminate based on that estimate because it is reasonable, reliable, and relevant.  To the contrary, the undisputed material facts prove it is unreasonable, unreliable, and irrelevant.  That being the case, the Landlord is entitled to summary judgment.

Respectfully submitted,

SWPLAZA III, L.L.C., an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, Plaintiff,

By:     /s/ David A. Rolf _____
        David A. Rolf, Bar # 6196030
        Attorney for Plaintiff
        Sorling, Northrup, Hanna,
        Cullen & Cochran, Ltd.
        Suite 800, Illinois Building
        Post Office Box 5131
        Springfield, IL 62705
        Telephone:  (217)544-1144
        Facsimile:  (217)522-3173

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was served by electronic service through the Court's ECF System to the following:

Mr. J. William Roberts
Mr. Charles R. Schmadeke
Hinshaw & Culbertson LLP
400 South 9th Street, Suite 200
Springfield, IL 62701

on the 11th day of February, 2008.

/s/ David A. Rolf
David A. Rolf, Bar # 6196030
Attorney for Plaintiff
Sorling, Northrup, Hanna,
Cullen & Cochran, Ltd.
Suite 800. Illinois Building
Post Office Box 5131
Springfield, IL 62705
Telephone: (217)544-1144
Facsimile: (217)522-3173
E-Mail: darolf@sorlinglaw.com

E-FILED
Monday, 11 February, 2008  05:21:13 PM
Clerk, U.S. District Court, ILCD

# SORLING
## NORTHRUP HANNA
### CULLEN & COCHRAN, LTD.
#### ATTORNEYS AT LAW

REPLY TO:
Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-676-1144
F: 309-671-4368

www.sorlinglaw.com

**DATE:**    May 5, 2006        **TIME SENT:** _____

**TOTAL NUMBER OF PAGES, INCLUDING COVER SHEET:**  3

**TO:**    David Frieder        **FAX NUMBER:**    720-475-2967
         Charles E. Robbins                    217-525-0545
         Arthur F. Seppi                      217-525-0545

**FROM:**    R. Lee Allen

**RE:**    **Sports Authority Store, Springfield, Illinois**
         **Notice of Termination**

**MESSAGE:** _____

_____

_____

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo
------------------------
Elizabeth A. Urbance
James G. Fahey
Jeffrey R. Jurgens
Michael G. Horstman Jr.
Jennifer M Ascher
Lisa A. Petrilli
Emily B. Pathauer
Brian D. Jones
------------------------
Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson

Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

[___] For your information        [___] Please sign
[___] For your review            [___] For your files
[___] Please read & call          [___] As you requested
[___] Please acknowledge receipt   [___] As we discussed

[_x__] Original of transmitted document will be sent by:
         [_x__] First Class Mail        [___] Hand Delivery
         [___] Overnight Mail

[___] This will be the only form of delivery of the transmitted document.

**IF THERE IS A PROBLEM DURING TRANSMISSION, OR YOU
WISH TO SPEAK WITH THE FACSIMILE OPERATOR, PLEASE
CALL (217) 544-1144 AND ASK FOR LORNA PURVIS.**

CONFIDENTIALITY NOTICE:    The documents accompanying this telecopy transmission contain
confidential information belonging to the sender which is legally privileged.  The information is intended only
for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby
notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this
telecopied information is strictly prohibited.  If you have received this telecopy in error, please immediately
notify us by telephone to arrange for return of the original documents to us.

{S0507764.1  5/5/2006 LMP LMP}

PLAINTIFF'S
EXHIBIT
1
Blumberg No. 5113

05/09/2006  15:23 FAX 3038642102                GART SPORTS                                    ☑ 004



# SORLING
## NORTHRUP HANNA
## CULLEN & COCHRAN, LTD.
### ATTORNEYS AT LAW

**REPLY TO:**

Suite 800 Illinois Building
607 East Adams Street
P.O. Box 5131
Springfield, IL 62705

P: 217-544-1144
F: 217-522-3173

Suite 301
401 S.W. Water Street
Peoria, IL 61602

P: 309-674-1144
F: 309-671-4368

www.sorlinglaw.com

R. Lee Allen
Attorney at Law
rlallen@sorlinglaw.com

R. Gerald Barris
Stephen A. Tagge
Michael A. Myers
C. Clark Germann
Gary A. Brown
Frederick B. Hoffmann
William R. Enlow
Michael C. Connelly
John A. Kauerauf
James M. Morphew
Stephen J. Bochenek
David A. Rolf
Peggy J. Ryan
Mark K. Cullen
Thomas H. Wilson
Todd M. Turner
R. Lee Allen
Charles J. Northrup
James D. Broadway
E. Zachary Dinardo

Elizabeth A. Urbance
James G. Fahey
Michael G. Horsman Jr.
Jennifer M. Ascher
Lisa A. Petrilli
Emily B. Fahauer
Brian D. Jones

Of Counsel:
Patrick V. Reilly
William S. Hanley
William B. Bates
Mark H. Ferguson

Retired:
Charles H. Northrup
Philip E. Hanna

Sorling, Catron and Hardin
1944-1975

May 5, 2006

*Via Fax: 720-475-2967*
David Frieder
Vice President-Construction
Sports Authority
1050 West Hampden Avenue
Englewood, CO 80110

Re:    **Sports Authority Notice of Termination Dated May 3, 2006**

Dear Mr. Frieder:

As attorney for Mr. Robbins and Mr. Seppi, I have been asked to respond to your letter dated May 3, 2006. In that letter you have claimed that Gart Bros. Sporting Goods Company ("TSA") has a right to terminate the lease pursuant to paragraph 15(b) of the lease dated April 2, 2001 between TSA Stores, Inc. and Illinois National Bank, Trustee. You have based that determination using an estimated total replacement cost based on the original contract price increased for estimated change orders and inflation and a budget for repair and construction of the damage to the Premises. The budget is based upon an estimate from a contractor who is located in the Chicago area and, while was one of the contractors selected by your company to originally bid on the project, was not awarded the original contract.

I would like to say that your letter came as a surprise, particularly since we addressed this issue with you in an earlier letter several weeks ago. However, over the last two weeks the Landlord has heard rumors from your local store personnel, who have since been fired, that you were not reopening the store. We understand that you have a strong desire not to reopen the store due primarily as we understand it to the poor performance of the store in the Springfield market since the opening of Dick's Sporting Goods. While we recognize that you may prefer not to reopen the store, we disagree that you have a right to terminate the lease based on the tornado damage or "go dark".

First of all, your decision to calculate the 35% based upon an estimated cost of repair and reconstruction of the damage is not appropriate given

(S0507675.2  5/5/2006 RLA LMP)

TSA RULE 26 DISCLOSURES
0072

05/09/2006 15:24 FAX 3038642102    GART SPORTS    ☑005

SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.
MAY 5, 2006
PAGE 2

the fact that we have informed you all along that the estimates for the work are below the 35% threshold. Instead of asking to review our local contractor's estimate, you have hired a contractor in the Chicago area, over 200 miles away from Springfield in a major metropolitan area to prepare a "Budget Estimate" as the basis for your claim of a right of termination. Your contractor, Jeff Wolford's "Budget Estimate" includes expenses that simply are not to be included in the calculation of the repair and reconstruction cost. For instance, $319,428 payable to Cotton USA was for work hired by Sports Authority to remove tenant trade fixtures, equipment and inventory, a cost that is not a part of the repair and reconstruction cost for the Premises, as defined in the Lease. Moreover, some of the expenses that your contractor has posted in the budget estimate are much too high according to our local contractor who is completing the reconstruction.

The Landlord has kept you informed of the status of the repair to the building. The property will be available to turn over to you by the end of this month if not sooner. As a result of such progress, we have actual costs for the repair and reconstruction of the Premises, which as a percentage of the current reconstruction costs of the Premises (even using your estimates of such current reconstruction costs for the Premises) will not exceed the 35% threshold.

We will be providing you with documentation from our contractor setting forth the actual costs incurred in the reconstruction as well as an accurate date for delivery of the premises to you. We disagree that you have a right to terminate the lease or "go dark" and we intend to challenge your wrongful termination. To that end, we will not agree to change the utilities for the property, as has been requested by one of your staff. Moreover, we will be proceeding with delivery of the premises to you, well within the time frames allowed for us to have repaired the premises.

Please contact the undersigned if you have any questions.

Sincerely,

R. Lee Allen

RLA/lp

cc:    Charles E. Robbins
       Arthur F. Seppi

{S0507675.2 5/5/2006 RLA LMP}

TSA RULE 26 DISCLOSURES
0073

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

333 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60606-1285
───
TEL: (312) 407-0700
FAX: (312) 407-0411
www.skadden.com

FIRM/AFFILIATE OFFICES
───
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
───
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
312/407-0537
DIRECT FAX
312/407-8593
EMAIL ADDRESS
MSHEBUSK@SKADDEN.COM

May 18, 2006

**Via Facsimile (217-522-3173)**

R. Lee Allen, Esq.
Sorling Northrup Hanna Cullen & Cochran, Ltd.
Suite 800 Illinois Building
607 East Adams Street
Springfield, Illinois 62705

      Re:    The Sports Authority Store No. 618 - Southwest Plaza III Shopping
             Center, 3211 S. Veterans Parkway, Springfield, Illinois

Dear Mr. Allen:

      We are in receipt of your letter dated May 5, 2005 addressed to David
Frieder, Vice President – Construction for our client, TSA Stores, Inc. ("TSA"). We
would like to take this opportunity to summarize the history of the matters at issue,
reiterate TSA's position with respect to those matters and, in the process, address
some of the items raised in your letter.

      As you know, pursuant to a lease dated April 2, 2001 (the "Lease"), TSA (as
successor to Gart Bros. Sporting Goods Company) leased from Illinois National
Bank, Trustee under Trust Agreement dated November 6, 2000 and known as Trust
No. 00-0020 (the "Landlord"), certain premises located in the Southwest Plaza III
Shopping Center, Springfield, Illinois (the "Premises"). The Springfield area was
struck by tornadoes during the weekend of March 11, 2006. Those tornadoes caused
substantial damage to the Premises.



Blumberg No. 5113
PLAINTIFF'S
EXHIBIT
2

TSA RULE 26 DISCLOSURES
0001

R. Lee Allen, Esq.
May 18, 2006
Page 2

During the several days immediately following the tornadoes, TSA focused on reacting to the damage caused by the disaster in the most efficient and effective manner possible. As indicated in the letter dated March 13, 2006 sent by Michelle Riggins, the TSA property manager for the Premises, TSA representatives (including the Vice President of Risk Management) immediately traveled to Springfield to visit the Premises. They did so primarily to safeguard TSA's property at the Premises, protect the health and safety of persons in and around the Premises, and to assess the nature and extent of the damage to the Premises. In accordance with its customary practice when reacting to a casualty at one of its stores, one of the things that TSA did during that visit was to retain Cotton USA ("Cotton"), a company specializing in national disaster recovery services. Cotton was charged with the responsibility of stabilizing and safeguarding: (i) the structure and systems of the Premises; and (ii) the fixtures contained in the Premises. Representatives of Cotton were introduced to representatives of the Landlord during Cotton's initial visit to the Premises.

Four days after the tornadoes, on March 16, 2006, Cynthia Cashman, TSA's Director of Real Estate, sent a letter to you and the Landlord stating that TSA wanted to coordinate efforts to restore the Premises. Ms. Cashman also indicated that further damage assessment was in process of being conducted by third party experts including TSA's insurance company, structural engineer and others. As the third party expert evaluations progressed, it became clear that the tornado damage to the Premises was substantial and that there was a high probability that the damage would trigger the termination right in favor of the tenant set forth in Section 15(b) of the Lease. As a result, on March 23, 2006 (eleven days after the tornadoes), Mr. Frieder sent a letter to you and the Landlord setting out the possible trigger of the Section 15(b) termination rights and specifically stating that "any repairs or reconstruction to our Premises are at the Landlord's risk". Notwithstanding Mr. Frieder's written notice, the Landlord continued to perform repair and reconstruction work at the Premises.

As part of the damage assessment process, TSA retained Wolford Retail Builders, Inc. ("Wolford") to provide a detailed budgetary estimate of replacement and repair costs for the Premises. Wolford's assessment confirmed that repair and replacement costs would be significantly in excess of the threshold set forth in Section 15(b) of the Lease. Therefore, pursuant to the letter dated May 3, 2006 from Mr. Frieder, TSA properly exercised its right to terminate the Lease. The May 3, 2006 letter provided the Landlord with a copy of the estimate prepared by Wolford.

TSA RULE 26 DISCLOSURES
0002

R. Lee Allen, Esq.
May 18, 2006
Page 3

You assert in your May 5, 2006 letter that, for various reasons, TSA's termination of the Lease is improper. The applicable language of Section 15(b) of the Lease provides:

> "In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair or reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of an uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty."

Section 15(b) does not specify the manner by which the parties are to determine whether the 35% threshold has been met. Nor does Section 15(b) specify which party – landlord or tenant – shall make that 35% threshold determination. Since Section 15(b) clearly states that termination is at the *tenant's election*, the only reasonable interpretation of the Lease is that the tenant is the one that makes the determination about whether its rights are triggered.[1] The tenant's judgment is subject, of course, to a standard of reasonableness. TSA's determination that the 35% threshold set forth in Section 15(b) had been reached was made based upon objective analyses including the Wolford estimate.

As you correctly point out in your letter, Wolford provided a bid in connection with the original construction of the Premises but that bid was not ultimately selected. We are unclear how that fact makes Wolford's estimate either unreasonable or unreliable. Indeed, having issued a bid once before that had been rejected, one could assume that Wolford's current estimate would be both meticulous and realistic.

You assert that the reasonableness of Wolford's bid is somehow in question because Wolford's office is located in Chicago. This assertion is misguided. For the

---

[1] It is also worth noting that, even if the Landlord's determination of estimated reconstruction costs were to be relevant to the discussion, the "estimate" contained in the March 29, 2006 letter from your partner, Mr. Rolf, is not useful. It is lacking in detail and analyzes the damage with reference to the percentage of the various physical components that were damaged rather than with reference to aggregate reconstruction costs. It is an "estimate" based on an erroneous analysis and which error is further compounded by being unsupported by any detailed figures.

TSA RULE 26 DISCLOSURES
0003

R. Lee Allen, Esq.
May 18, 2006
Page 4

last 23 years (the most recent 15 years of which were spent in project management, including developing bids and estimates), Wolford has participated in projects throughout the Midwest, including a high concentration of projects along the St. Louis/Chicago corridor, which corridor, as you know, includes Springfield. Wolford is very familiar with the construction market (including material and labor costs) in the Springfield metropolitan area and was fully qualified to provide the estimate requested by TSA with respect to the Premises.

As for the content of the estimate, each component of the estimate was based upon an objective analysis performed by Wolford. That estimate was subsequently further corroborated by Wolford with a site visit.[2] In response to the detailed components you assert that the estimate "includes expenses that simply are not to be included in the calculation of the repair and reconstruction cost." Your letter points to the work performed by Cotton as your sole example of an expense which you consider to be unrelated to the reconstruction of the Premises. Cotton provided services and equipment to, among other things, stabilize the roof of the Premises, relocate fixtures in the Premises, and repair the electrical systems at the Premises. These services are integral parts of the reconstruction; without them, no reconstruction could proceed. We would certainly agree that, to the extent that Cotton had provided services to remove and safeguard TSA's inventory, the costs of those services would not be properly considered for purposes of determining the estimated reconstruction cost. But that was not the case. All inventory at the Premises was removed by employees of TSA. The work performed by Cotton was wholly unrelated to the inventory at the Premises.[3] According to both TSA and Wolford, each line item in the estimate provided to the Landlord relates to materials, labor and/or equipment rental that is required in order repair and reconstruct the Premises.

You also state in your letter that some of the expenses in Wolford's estimate are "too high according to our local contractor who is completing the reconstruction." Mr. Wolford has assured us that all of the expenses in his estimate

---

2    In fact, following the site visit, Wolford stated that, if anything, the reconstruction costs contained in his estimate are understated.

3    It is worth pointing out that had TSA not reacted so decisively to the disaster and retained Cotton to stabilize and secure the Premises at TSA's expense, the responsibility to procure such services would have fallen upon the Landlord. However, at no time has TSA requested that the Landlord provide reimbursement for the deductible TSA paid under its insurance policy to procure Cotton's work.

TSA RULE 26 DISCLOSURES
0004

R. Lee Allen, Esq.
May 18, 2006
Page 5

are based upon objective analysis and, where necessary, reasonable assumptions. Your letter implies that the opinion of the Landlord's local contractor or the actual costs of reconstruction that have been incurred by the Landlord (at its own initiative and notwithstanding Mr. Frieder's March 23 letter) are relevant to the determination of whether the Wolford estimate is reasonable. There are many variables that could cause Wolford's estimates to vary from estimates provided by a single local contractor (including use or otherwise of union personnel), but that does not mean that the Wolford estimates were unreasonable. Although Section 15(b) is silent as to the process required to be followed to determine an estimate of reconstruction costs, neither Section 15(b) nor any other Lease provision requires consultation with the Landlord's contractor or, indeed, *any* particular contractor. Moreover, the Lease certainly does not require that the tenant wait until the landlord completes reconstruction before making the tenant election to terminate the Lease. Since there is an express time period in which the tenant may exercise its right to terminate, clearly it was contemplated that the determination as to whether the threshold is met would be based upon reasonable estimated costs of reconstruction. That is what TSA has done and the Lease requires nothing more.

Finally, your letter seems to imply that TSA improperly based its decision to terminate the Lease based, in part, on "the poor performance of the store in the Springfield market since the opening of a Dick's Sporting Goods." The performance of the business at the Premises was certainly a factor in TSA's decision to terminate the Lease. The 35% threshold specified in Section 15(b) is the only objective standard to which the parties are bound. Once that objective standard is met, it is not possible for a tenant to make the termination election unless it considers subjective factors. Accordingly, TSA properly considered economic factors in determining whether it made sense for it to terminate the Lease. The same is true with respect to the termination option of Landlord set forth in the Lease. We are confident that had the 15% Landlord termination threshold set forth in Section 15(c) of the Lease become applicable, the Landlord would have considered relevant business factors in making its judgment about termination.

In summary, pursuant to Mr. Frieder's letter of May 3, 2006, TSA properly exercised its right to terminate the Lease pursuant to Section 15(b) of the Lease. That letter was delivered approximately 54 days after the occurrence of the casualty and within the 60-day period required by the Lease. TSA will not resume occupancy of the Premises nor will it make any additional payments of rent or any other amounts to the Landlord. In addition, since Section 15(c) of the Lease requires apportionment of rent as of the date of casualty and TSA continued to make timely

TSA RULE 26 DISCLOSURES
0005

R. Lee Allen, Esq.
May 18, 2006
Page 6

payments of rent until it exercised its right to terminate the Lease, the Landlord is required to reimburse to TSA the applicable rent payments in the amount of approximately $95,000.

Please feel free to call me if you want to discuss this matter further.

Very truly yours,

Matthew A. Shebuski

cc:    Nesa E. Hassanein, EVP and General Counsel
       Cynthia Cashman
       Missy Mayne, Esq.
       Michelle Riggins
       David Frieder
       Albert L. Hogan, III
       Frances P. Kao

TSA RULE 26 DISCLOSURES
0006