E-FILED
Tuesday, 11 March, 2008  08:57:46 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3177 |
| | ) | |
| TSA STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This cause is before the Court on Plaintiff SWPlaza III, LLC's Motion to Bar Opinion Witness (d/e 15), TSA's Motion for Summary Judgment (d/e 13), and SWPlaza III, LLC's Motion for Summary Judgment (d/e 17). The parties have each filed for summary judgment, and Plaintiff SWPlaza III, LLC (SWPlaza) argues that testimony from Defendant TSA Stores, Inc.'s (TSA) opinion witness, Jeff Wolford, should not be considered for purposes of these Motions or at trial.  For the reasons stated below, all three Motions are denied.

### FACTS

SWPlaza's suit requests a declaratory judgment concerning TSA's

1

right to terminate a Lease for property in SWPlaza's shopping center.  <u>See</u> <u>Complaint (d/e 1)</u>.  TSA counterclaimed for a declaratory judgment finding that it had the right to terminate the Lease and for damages for alleged overpayment of rent.

On March 12, 2006, a tornado struck Springfield, Illinois, and local businesses suffered significant damages.[1]  At the time, TSA, a national sporting goods retailer and subsidiary of Sports Authority, Inc., was renting a retail property in the Southwest Plaza III Shopping Center.  SWPlaza owned the shopping center and the retail property in question.

The parties entered into a written lease for this property on April 2, 2001, before the shopping center existed.[2]  Under the Lease, SWPlaza agreed to construct the shopping center and lease a portion of it to TSA. SWPlaza agreed to construct TSA's portion of the center in accordance with TSA's requirements on matters such as interior partitioning, hardware, and decor.  The Lease provided that TSA's lease term would commence 60 days

---

[1]Except where noted, all facts are "undisputed" facts agreed upon by the parties and taken from the briefing on TSA's Motion for Summary Judgment and SWPlaza III, LLC's Motion for Summary Judgment.

[2]The Lease was signed by Illinois National Bank, Trustee, SWPlaza's predecessor, and Gart Brothers Sporting Goods Co., TSA's predecessor.  In this Opinion, the Court will not distinguish between the actions of the parties and their predecessors.

after TSA took possession of its portion of the shopping center and last for 15 years.  TSA took possession on December 18, 2001, and operated a Sports Authority store from the location.

The Lease also contained provisions regarding damages by casualty. The lease stated:

> In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, unless Landlord has the right to terminate this Lease . . .  Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage.

<u>SWPlaza III, LLC's Motion for Summary Judgment</u>, Exhibit 1, <u>Lease</u> ¶ 15(b).  When the tornado hit on March 12, 2006, TSA's store suffered damage.  How much damage is under dispute.  Specifically, the parties dispute whether the property incurred enough damage to justify TSA's decision to terminate the lease on May 3, 2006.

Immediately following the tornado, TSA retained a disaster recovery

services company, CottonUSA (Cotton), to stabilize and safeguard its store. SWPlaza retained Jones-Blythe Construction Co. (Jones-Blythe) to restore and repair the premises. Jones-Blythe began reconstruction work on March 14 or 15, 2006. On March 16, 2006, TSA's Director of Real Estate informed SWPlaza that TSA was assessing damages and wanted to coordinate an "action plan and timetable." Memorandum of Law in Support of TSA's Motion for Summary Judgment (d/e 14), at 8. Five days later, on March 21, 2006, TSA's Vice President of Construction, David Frieder, visited the property. On March 23, 2006, Frieder sent a letter to SWPlaza and its attorney stating that TSA planned to terminate the Lease based on the cost of reconstruction and repair of the property.

In a letter six days later, SWPlaza's attorney advised TSA that based on Jones-Blythe's estimates, it did not believe the damage exceeded the 35% threshold. With its letter, SWPlaza included a breakdown from Jones-Blythe of the extent of the damage various building components suffered. For example, Jones-Blythe found that the foundation system was 0% damaged, but the glass and glazing was 83% damaged. SWPlaza did not provide TSA an estimate of the costs to repair or replace the property, but Jones-Blythe's breakdown included the opinion: "With the majority of

major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises." SWPlaza III, LLC's Motion for Summary Judgment, Exhibit 3, March 29, 2006 Letter. The Jones-Blythe representative based this opinion on his "gut feel." TSA Memorandum, at 10. At this time, Jones-Blythe had offered no estimates of the then-total replacement costs of TSA's store or the costs necessary to repair the tornado damage. Jones-Blythe anticipated, however, that all repair work would be complete by June 1, 2006.

On April 22, 2006, TSA terminated its employees at the SWPlaza location. On May 3, 2006, less than 60 days after the tornado struck, TSA notified SWPlaza that it was in fact terminating the Lease pursuant to the Lease provision for damages by casualty. It included an analysis of costs in support of its contention that the tornado repair or reconstruction costs would exceed 35% of the then-total reconstruction cost. TSA stated that it estimated costs to repair the tornado damage at $1,046,701.00. The parties now agree that the then-total reconstruction costs of the property would have been $1,960,067.00. Thirty-five percent of that amount is $686,023.00. TSA used these figures at the time and in its letter argued

that the estimated repair cost of $1,046,701.00 thus exceeded the 35% threshold.  TSA stated that it relied on the services of Jeff Wolford, a general contractor, in developing this budget.

Wolford has more than 20 years of experience in the construction of TSA stores.  As a project manager and estimator, he gained experience in awarding bids, negotiating prices, and preparing budgets for construction of retail stores.  TSA's Opposition to Plaintiff's Motion to Bar Opinion Witness (d/e 18), at 6.  In 2001, Wolford bid on the original construction of the TSA property in the Southwest Plaza Shopping Center, but his bid was not successful.  For the past two and a half years, Wolford has owned and operated his own business constructing retail big box stores, including TSA stores.

Prior to TSA's May 3, 2006, letter, Wolford provided TSA the figures on total reconstruction costs.  Wolford did not visit the site until May 4, 2006, however, and he did not prepare the budget report included with TSA's letter.  Frieder, TSA's construction vice president, prepared the budget report that TSA submitted in its May 3, 2006, letter.  The parties agree that Frieder relied on Wolford's total reconstruction costs in drafting this budget.  The parties also agree that on April 26, 2006, Frieder emailed

Wolford a table he had prepared setting out budget estimates for various expected repair costs. The table, entitled "Budget Estimate," includes a line labeled "Total" with the figure $677,158.00.  SWPlaza's Motion for Summary Judgment, Exhibit 7, April 26, 2006 Email.  The email states:

> Jeff, Please take a look at this and see what you think.  I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhere reasonable but on the high side since this is the start of the negotiations.  Let me know what adjustments you would make.

Id.  The parties do not indicate whether Wolford approved of Frieder's figures or suggested any adjustments that Frieder incorporated into his budget before sending the May 3, 2006, letter.[3]

The table entitled "Budget Estimate" that Frieder included with the May 3, 2006, letter is different from the one he emailed Wolford on April 26, 2006, however.  The May 3, 2006, $1,046,701.00 estimate of repair costs included $319,428.00 in fees TSA paid Cotton that were not included in Frieder's original table.  The May 3, 2006, table also includes a figure for "Architectural and Engineering" not included in the original table. SWPlaza III, LLC Motion for Summary Judgment, Exhibit 4, May 3, 2006 Letter and

---

[3]On May 8, 2006, after Wolford visited the site, he suggested approximately $17,000 in revisions.  SWPlaza's Motion for Summary Judgment, Exhibit 13, May 8, 2006 Email.  That suggestion post-dated the May 3, 2006, letter.

Budget Estimate.    Additionally, the figures for Insurance, Profit &
Overhead, and Premium for Expedited Work are slightly higher in the May
3, 2006, table.  TSA has not specified exactly how Frieder reached these
figures, but the May 3, 2006, correspondence includes records and receipts
to support at least some of the amounts.  SWPlaza argues, based on the
April 26, 2006, email, that Frieder communicated an intentionally high
estimate as a starting point for negotiation.

    TSA has designated Wolford as a Rule 26 expert in this case.  In his
expert report, Wolford concludes that "the estimated repair and
reconstruction costs of the Premises as a result of the damage caused by the
tornadoes of March 12, 2006, exceeded 35% of the then-total
reconstruction costs of the Premises."  See SWPlaza III, LLC's Motion to
Bar Opinion Witness, Exhibit 2, Wolford Expert Report, at 2.  Wolford now
estimates that the tornado caused damage necessitating $743,944.00 in
repair and reconstruction costs.  Wolford opines that $118,211.00 of the
fees TSA paid Cotton should be considered costs of repair and
reconstruction, but the parties disagree over whether Wolford's
$743,944.00 figure includes that amount.  Wolford's estimate does not
include nine of the costs Frieder included in the table he sent SWPlaza

along with his May 3, 2006, letter. Eighteen other items included in Frieder's table are included in Wolford's estimate, but at different amounts.

SWPlaza has retained Mark Sorenson, Jones-Blythe's project manager for the Southwest Plaza Shopping Center reconstruction project, as a Rule 26 expert. Sorenson opined that the costs of repairing the tornado damage came to $550,238.00. Jones-Blythe estimated that it would finish repair work by June 1, 2006, but after TSA notified SWPlaza of its termination, Jones-Blythe discontinued construction efforts on the TSA store. Before discontinuing work, Jones-Blythe billed SWPlaza $321,384.00. Sorenson estimated that an additional $228,854.00 would have been necessary. Those two figures make up Sorenson's estimate of $550,238.00. The parties dispute whether that figure includes all costs of repair SWPlaza would have incurred, however. The figure does not include any costs attributable to Cotton fees. Moreover, TSA asserts that additional costs for tenant-specific repair work would have been incurred.

TSA argues that its termination of the Lease was proper, while SWPlaza counters that TSA acted in bad faith. SWPlaza requests only declaratory relief. TSA requests declaratory relief and damages. Prior to terminating the Lease, TSA paid SWPlaza $95,662.05 in rent for the period

from March 12, 2006, to May 31, 2006.  It also paid $9,608.60 for utility services for this period.  TSA contends that it is entitled to these funds in damages.

ANALYSIS

I.    OPINION WITNESS

The Court denies SWPlaza's Motion to Bar Wolford's opinion testimony.  From the facts the parties have presented, it is clear to the Court that TSA could call Wolford to offer expert testimony.  Any evidence Wolford offers regarding his work with TSA on this Lease before TSA terminated the Lease May 3, 2006, particularly regarding his communications with TSA on the possible costs of repair, would be proper to show a good faith basis for TSA's efforts to cancel the Lease.  To contest SWPlaza's allegations of bad faith, TSA has a right to introduce evidence of the information on which it actually relied in terminating the Lease.  In addition, his expert testimony concerning the costs needed to repair the premises, even though based on his site visit after the May 3, 2006, letter, is relevant to the issue of whether the earlier estimates were bona fide.

The admissibility of expert testimony turns on the provisions of Federal Rule of Evidence 702 and the principles of Daubert v. Merrell Dow

Pharmaceuticals, Inc.  Under Rule 702, if specialized knowledge would help the trier of fact understand the evidence, then a witness of sufficient skill, expertise, training or education may testify regarding this knowledge by offering an opinion.  Under Daubert, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert, 509 U.S. 579, 589 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (holding that these principles apply to all expert testimony, not just scientific testimony).

In evaluating admissibility, the Court functions as a "gatekeeper" whose role is "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." DePaepe v. General Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998).  Yet, in a bench trial, as this will be, the Court need not be as vigilant in determining admissibility before testimony is offered:

> Where the gatekeeper and the factfinder are one and the same --
> that is, the judge -- the need to make such decisions prior to
> hearing the testimony is lessened.  That is not to say that the
> scientific reliability requirement is lessened in such situations;
> the point is only that the court can hear the evidence and make
> its reliability determination during, rather than in advance of,
> trial.

In re Salem, 465 F.3d 767, 777 (7th Cir. 2006).

The Court must engage in a three-step analysis. First, the Court must determine whether the witness is qualified as an expert by his knowledge, skill, experience, training, or education. Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007). Second, the Court must assesses whether the expert's reasoning or methodology is scientifically or technically reliable. Id.; see also United States v. Brumley, 217 F.3d 905, 911 (7th Cir. 2000) (expert testimony in technical fields governed by same criteria as that applicable to scientific fields). Third, the Court must decide whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. Ervin, 492 F.3d at 904.

Here, the Court finds that Wolford is qualified as an expert. Wolford has spent more than twenty years engaged in the construction of retail stores, much of that time working on TSA stores in particular. The knowledge, training, and experience he gained as a project manager for retail construction jobs is directly applicable to his opinion in this case. Moreover, SWPlaza does not contest Wolford's qualifications as an expert. Thus, the first step of the analysis favors admission of Wolford's testimony.

SWPlaza does contest the second step however; it characterizes Wolford's reasoning and methodology as technically unreliable. Essentially,

SWPlaza's argument is that Wolford's opinion is speculative because Wolford conducted much of the work for his expert opinion after TSA had terminated the Lease and because he failed to visit the property before repair work began.  The Court disagrees.

Wolford's failure to visit the site until after TSA had terminated the Lease and after repair work had begun does not make his methodology and opinion so unreliable as to be inadmissible.  According to TSA, Wolford conferred with a Cotton representative who had observed the damage to the building before repair work began and before the Lease was terminated. TSA's Opposition to Plaintiff's Motion to Bar Opinion Witness, at 7. Wolford's reliance on second-hand information is not fatal to his analysis. See Matter of James Wilson Associates, 965 F.2d 160, 172-73 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him -- information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented.").

SWPlaza cites Ancho v. Pentek Corp. for the proposition that an expert must view the property on which he opines.  See Ancho, 157 F.3d 512, 516 (7th Cir. 1998).  Ancho involved a warehouse materials transfer

system that injured the plaintiff's foot.  Plaintiff proposed to call an expert who would have testified that the defendant should have replaced the system with another.  Id. at 515.  The proposed expert never viewed the system, however, or the site at which the injury occurred.  Id. at 516.  The district court excluded his testimony, but the proposed expert's failure to view the system was not the key factor favoring exclusion.  Instead, the district court noted that the proposed expert never viewed any similar pieces of equipment, and more significantly, had no expertise in plant design.  Id. at 516, 519.  Wolford's failure to view the TSA store before repair work began is certainly grounds for cross-examination, but since Wolford received information regarding the extent of the damage from other sources, the Court does not find this failure sufficient to exclude his opinion.

Finally, the Court finds that the third step also favors admission of Wolford's testimony.  Under the third prong, the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.  SWPlaza does not contest this issue.  The Court finds Wolford's opinion testimony relevant to the issue of whether TSA's pre-termination estimate of repair costs was reasonable.

Thus, the Court will not exclude Wolford's expert testimony.

Moreover, to the extent the parties address his opinion in their Motions for Summary Judgment, the Court will address it below.

II.    SUMMARY JUDGMENT MOTIONS

A motion for summary judgment must be granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Herman v. Nat'l Broad. Co., 744 F.2d 604, 607 (7th Cir. 1984). Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "Summary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" McKenzie v. Ill. Dept. of Transp., 92 F.3d 473, 479 (7th Cir. 1996) (quoting

<u>Celotex</u>, 477 U.S. at 322).  It is not a discretionary remedy; if the plaintiff lacks sufficient evidence, summary judgment must be granted.  <u>Jones v. Johnson</u>, 26 F.3d 727, 728 (7th Cir. 1994).

To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts.  <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586. He must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  <u>Id.</u> at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Id.</u>  In determining whether a genuine issue exists, courts should construe all facts and reasonable inferences in the light most favorable to the non-moving party.  <u>Moser v. Ind. Dept. of Corr.</u>, 406 F.3d 895, 900 (7th Cir. 2005).  Courts are "not required to draw every conceivable inference from the record.  [They] need draw only reasonable ones."  <u>Tyler v. Runyon</u>, 70 F.3d 458, 467 (7th Cir. 1995) (internal quotation marks omitted).

The parties essentially present breach of lease claims.  To prove its case, SWPlaza must establish that: (1) a valid and enforceable contract existed; (2) it performed all required conditions; (3) TSA breached a

provision; and (4) as a result, it suffered damages.  <u>Burrell v. City of Mattoon</u>, 378 F.3d 642, 651 (7th Cir. 2004).  To succeed on its counterclaims, TSA's burden of proof is identical, except that it must establish breach by SWPlaza.  The parties do not dispute the first or fourth conditions; they contest only the second and third.  The issue is whether TSA was within its rights in terminating the lease.  If it was, then SWPlaza breached the lease by refusing to return rent payments made for the period after TSA exercised its termination option.  If TSA was not within its rights in terminating, then it breached the lease by failing to continue with rent payments for the remainder of the lease term.

Whether TSA was within its rights in terminating the lease turns on the damages by casualty provision of the lease.  <u>See</u> <u>SWPlaza III, LLC's Motion for Summary Judgment</u>, Exhibit 1, <u>Lease</u> ¶ 15(b).  It provides:

> In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, . . . which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the [Premises], . . Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.

<u>Id.</u>  The parties agree that the then-total reconstruction cost of the TSA store was $1,960,067.00 and that 35% of that amount is $686,023.00.

They disagree, however, on whether the tornado damage "ha[d] a repair and reconstruction cost of thirty five percent." Id.

SWPlaza argues that under the Lease, the actual cost of repair and reconstruction governs. Sorenson, a Jones-Blythe representative and SWPlaza witness, will testify that the actual cost of repair totaled $550,238.00. TSA disputes this figure, however, arguing that actual costs also include $118,211.01 of the fees attributable to Cotton and additional costs for tenant-specific repair work that SWPlaza would have incurred if TSA had remained the tenant. Neither party has submitted an estimate of the costs for tenant-specific repair work or the nature of what that work would be.

TSA asserts that the actual cost of repair was not and could not be determined within the 60 days following the tornado, and therefore, its termination rights under the Lease turned on an estimate of repair costs. TSA also points out that the then-total reconstruction cost, on which both parties agree, is only an estimate. It argues that if an estimate of this cost is sufficient, an estimate of the repair cost should be as well.

If an estimate is to be used, SWPlaza argues that it, as the landlord, should have been the party to make or solicit that estimate. Under the

Lease, SWPlaza was responsible for the initial construction of the shopping center, and it was responsible for performing the repair and reconstruction following a casualty. Thus, it argues, it also should be responsible for estimating the repair cost. Alternatively, SWPlaza asserts that if TSA was entitled to terminate the Lease on its own estimate of costs, it bore the burden of proving clearly and unequivocally that the repair cost would exceed 35 percent of the then-total reconstruction cost.

Under Illinois law, a lease is an agreement subject to contract law. Chicago Transparent Products, Inc. v. Am. Nat'l Bank & Trust Co., 337 Ill.App.3d 931, 940, 788 N.E.2d 23, 31 (Ill.App. 1st Dist. 2002).[4] Contract construction is an issue for the Court, and one that may be decided at summary judgment. Central Illinois Light Co. v. Home Ins. Co., 213 Ill.2d 141, 153, 821 N.E.2d 206, 213 (Ill. 2004); ECHO, Inc. v. Whitson Co., Inc., 52 F.3d 702, 705 (7th Cir. 1995). "If the contract is unambiguous, there is no issue of material fact and the court must determine the contract's meaning as a matter of law. But if the contract is ambiguous, the contract's meaning is a question for the trier of fact." ECHO, 52 F.3d at 705.

---

[4]The parties agree that Illinois law controls here. See Curran v. Kwon, 153 F.3d 481, 488 (7th Cir. 1998).

19

A court's primary objective in construing a lease is to ascertain the intent of the parties at the time they signed the lease. <u>Chicago Housing Authority v. Rose</u>, 203 Ill.App.3d 208, 216, 560 N.E.2d 1131, 1136 (Ill.App. 1st Dist. 1990). It is well-settled that a contract should not be construed in a manner that nullifies or renders meaningless any provision of the contract. <u>Atwood v. St. Paul Fire & Marine Ins. Co.</u>, 363 Ill.App.3d 861, 864, 845 N.E.2d 68, 71 (Ill.App. 2d Dist. 2006). Moreover, a lease should be interpreted fairly and reasonably in light of all of its provisions and language. <u>Chicago Transparent Prods.</u>, 337 Ill.App.3d at 941, 788 N.E.2d at 31.

The Court holds that the language "repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost" unambiguously refers to a reasonable estimate of repair and reconstruction cost formed before the expiration of the 60-day period, not the actual repair and reconstruction cost. <u>See</u> <u>SWPlaza III, LLC's Motion for Summary Judgment</u>, Exhibit 1, <u>Lease</u> ¶ 15(b). First, while the lease specifies "actual construction cost" when discussing the initial construction of the shopping center, the damages by casualty provision does not include the word "actual." <u>Compare</u> <u>SWPlaza III, LLC's Motion for Summary Judgment</u>,

20

Exhibit 1, <u>Lease</u> ¶ 2, <u>and</u> <u>id.</u>, Exhibit 1, <u>Lease</u>, Ex. C ¶ 7.1 (defining "Construction Costs" as "the actual cost of all work associated with the construction . . .") <u>with</u> <u>id.</u>, Exhibit 1, <u>Lease</u> ¶ 15(b). Where parties to a contract use different language to address two parallel issues, it is reasonable to infer that they intended the language to mean different things. <u>Taracorp, Inc. v. NL Industries, Inc.</u>, 73 F.3d 738, 744-45 (7th Cir. 1996). Had the parties meant actual cost here, they would have said so.

Additionally, waiting for actual costs here could have rendered the 60-day notification period meaningless. If actual costs were not available until more than 60 days after the tornado, TSA could not have terminated the lease based on those costs within the time specified. Perhaps the repair work here could have been completed within 60 days, but Jones-Blythe estimated completion by June 1, 2006 -- more than two weeks after the May 13, 2006, deadline. Moreover, the Lease provision is broad, and even if this repair work could have been completed within 60 days, the Court is not convinced that all repair work following any kind of casualty covered by the Lease could be.

Finally, construing the Lease to require actual costs would have been unduly burdensome to SWPlaza. Forcing SWPlaza to incur such costs

before it even knew whether it would have a tenant would have been unreasonable; it is unlikely the parties intended such a result when contracting. Therefore, the Court construes the Lease to allow for termination based on a reasonable estimate of the repair cost.

The Lease, however, is silent on how to estimate the cost of repair. Various neutral methods could have been included in the contract, such as referral to a mutually agreed upon appraiser for an estimate or acceptance of the average bid of three pre-determined construction companies. The parties included detailed neutral terms in the Lease provisions governing the initial construction of the lease. See SWPlaza III, LLC's Motion for Summary Judgment, Exhibit 1, Lease, Ex. C, ¶¶ 4.3, 5.3 (setting out bid provisions for initial construction under which the landlord would select a contractor, which then would solicit bids and submit those it proposed to accept to the tenant for review and approval). In the complete absence of any provision regarding estimation procedures for casualty repair, however, the Court cannot create such provisions. Yet, the complete absence of provisions does not necessarily make the Lease ambiguous. "A contract is ambiguous, under Illinois law, only if it is *reasonably* and *fairly* susceptible to more than one meaning." ECHO, 52 F.3d at 705 (emphasis in original).

Here, the Lease's casualty damage provision required action and discretion only from TSA. The Lease does not specify who should perform an estimate, but it states that in the event of repair costs of 35 percent or more, "Tenant shall have the option of terminating this Lease" and "Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty." See SWPlaza III, LLC's Motion for Summary Judgment, Exhibit 1, Lease ¶ 15(b). Thus, as a matter of law, the Court holds that it would be unreasonable to conclude that SWPlaza had any right to approve an estimate or formulate the determinative one. The Court concludes that TSA's reasonable assessment of the repair cost governed under the terms of the Lease.

In evaluating the repair cost, however, TSA was obligated to act reasonably and in good faith. A tenant's motive in exercising an option to terminate a lease may not be determinative of whether the termination was legally valid. C.f. Plambeck v. Greystone Mgmt. & Columbia Nat'l Trust Co., 281 Ill.App.3d 260, 267, 666 N.E.2d 670, 674 (Ill.App. 1st Dist. 1996) (holding that a tenant's motive for exercising an option to terminate under the Chicago Residential Landlord Tenant Ordinance is not relevant to whether the termination was valid). But, a tenant is always obliged to act

reasonably and in good faith.  See LaSalle Bank Nat'l Assoc. v. Moran Foods, Inc., 477 F. Supp. 2d 932, 937 (N.D. Ill. 2007); Northern Trust Co. v. VIII S. Mich. Assocs., 276 Ill.App.3d 355, 367, 657 N.E.2d 1095, 1104 (Ill.App. 1st Dist. 1995).

Whether TSA did so here is a question of fact on which the parties do not agree.  SWPlaza contends that TSA fabricated its May 3, 2006, estimate for the sole purpose of escaping the Lease.  According to SWPlaza, Frieder's April 26, 2006, email to Wolford indicating that Frieder wanted the estimate "on the high side" demonstrates that TSA knew at the time that its estimate was unreasonably high.  SWPlaza's Motion for Summary Judgment, Exhibit 7, April 26, 2006 Email.  The fact that TSA discharged all of its employees four days earlier could indicate that TSA intended to terminate this Lease no matter what an accurate estimate of repair costs would show.

TSA argues that it did not fabricate its May 3, 2006, estimate; instead, it based this estimate on construction records, communications with Wolford, and Frieder's own expertise.  The fact that Frieder's April 26, 2006, email to Wolford indicates that he wanted "to make sure that the numbers are somewhere reasonable" could support TSA's argument.

SWPlaza's Motion for Summary Judgment, Exhibit 7, April 26, 2006 Email. And TSA offers Wolford's post-termination expert estimate of the repair cost -- also above 35 percent of the then-total reconstruction cost -- as further support for the reasonableness of its May 3, 2006, estimate.

Both parties can produce evidence supporting their positions. What TSA believed the repair cost would be when it terminated the Lease, and whether it acted reasonably in forming this estimate, are genuine issues of material fact. From the submissions of the parties on these Motions, the Court cannot determine what services of Cotton's were included in Wolford's opinion that the tornado caused $743,944 in damages. It is also unclear on what Frieder relied in preparing his May 3, 2006, estimate. Summary judgment for either party would be improper here.

THEREFORE, Plaintiff SWPlaza III, LLC's Motion to Bar Opinion Witness (d/e 15), TSA's Motion for Summary Judgment (d/e 13) and SWPlaza III, LLC's Motion for Summary Judgment (d/e 17) are DENIED. IT IS THEREFORE SO ORDERED.

ENTER:  March 10, 2006

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE