E-FILED
Tuesday, 01 April, 2008  04:04:42 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

FILED

MAR 3 1 2008

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  06-3177 |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

### PRE-TRIAL ORDER

This matter having come before the Court at a pre-trial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure and Local Rule 16.1; and

David A. Rolf of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd. having appeared as counsel for the Plaintiff and Charles R. Schmadeke of Hinshaw & Culbertson LLP having appeared as counsel for the Defendant, the following action was taken:

### I.    NATURE OF ACTION AND JURISDICTION

This is an action arising out of lease agreement entered into between SWPlaza III, LLC and TSA Stores, Inc. on or about April 2, 2001.  The parties are seeking a determination of whether the parties complied with their duties and properly exercised their rights.  Jurisdiction of the Court is invoked by reason of diversity of citizenship of the parties pursuant to 28 U.S.C. §1332.  The jurisdiction of the Court is not disputed.

### II.    JOINT STATEMENT

## A.     JURISDICTION

Plaintiff is an Illinois limited liability company whose members are citizens of Illinois. Defendant is a Delaware corporation, headquartered in Englewood, Colorado. The amount in controversy, based on either the benefit to the Plaintiff, or cost to the Defendant, exceeds $75,000.00.

## B.     UNCONTESTED ISSUES OF FACT

### JOINT LIST OF UNCONTESTED FACTS

1.     On or about April 2, 2001, Illinois National Bank, as Trustee under Trust No. 00-0020, was the owner of real estate in Springfield, Sangamon County, Illinois. SWPLAZA III, LLC ("Landlord") is successor to said Trustee.

2.     The organizers of both SWPlaza III, LLC, and SWPlaza III Management, Ltd., its managers are Charles E. Robbins and Arthur F. Seppi.

3.     At such time, Gart Brothers Sporting Goods Company was a corporation organized under the laws of Colorado, engaged in the business of operating a sport retail store now known as Sports Authority, at various locations throughout the country.

4.     TSA Stores, Inc. ("Tenant") is a wholly owned subsidiary of The Sports Authority, Inc., formerly known as Gart Sports Company.

5.     One of the largest full line sporting goods retailers in the United States, TSA had 398 stores in 45 states, with 32 of those located in Illinois in its 2005 fiscal year.

6.     On or about April 2, 2001, Landlord and Tenant entered into a written Lease, under which the Landlord was to construct a retail shopping center on the property described in Exhibit A thereto, and referred to as Southwest Plaza III Shopping Center, a portion of which shopping center would then be leased to the Tenant pursuant to the terms set forth in the Lease.

{S0572605.12  3/31/2008 DAR MAH}

7.    Thereafter, Landlord completed construction of the shopping center and the Premises and Tenant occupied the Premises pursuant to the terms of the Lease.

8.    The stated term of the Lease was fifteen years, commencing sixty days after TSA took possession of the constructed premises.  In addition, TSA had the option to extend the Lease for four consecutive five year periods by providing written notice of the exercise of the option at least 180 days before the exportation of the then current term.

9.    TSA took possession of the leased premises on December 18, 2001, and used the premises to operate a retail sporting goods store under the name "Sports Authority."

10.    The Lease provides that TSA, as the Tenant shall pay base rent for the term of the Lease divided into five-year increments, with the rent increasing as follows:

| LEASE YEAR | MONTHLY RENT | ANNUAL RENT | RENT PER SQUARE FOOT |
|---|---|---|---|
| 1-5 | $33,989.58 | $407,875.00 | $12.50 |
| 6-10 | $37,388.54 | $448,662.50 | $13.75 |
| 11-15 | $41,140.99 | $493,691.90 | $15.13 |

(Lease, Sections ID and 4(a).)

11.    In addition to the base rent, TSA agreed to pay a portion of the annual charges for common area maintenance ("CAM"), initially in the amount of $0.80 per leasable square foot ($26,104.00), payable in equal monthly installments ($2,175.33).  After the second year of the lease, CAM charges would be annually prorated up to a 5% increase.  (Lease, Section 7.)

12.    TSA was also responsible to pay the real estate taxes applicable to its leased space, utility expenses, and a pro-rate share of the insurance covering the shopping center common areas.  (Lease, Sections 9(b), 11, and 14(f).)

13.     If the repair or construction costs resulting from casualty was 35% or more of then then-total reconstruction costs, TSA could elect to cancel the Lease by providing written notice within 60 days following the casualty:

>      (b)     <u>Thirty Five Percent (35%) or More</u>.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this lease as set forth above, then, unless Landlord has the right to terminate this Lease * * * Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas to substantially the same condition as was existing immediately prior to such damage.  In any case where landlord is required to repair and restore the Premises, upon completion of such repair and restoration, Tenant, at its expense, shall repair and restore Tenant's furnishings, furniture, equipment, inventory and personal property.  Unless Landlord has the right to terminate this Lease pursuant to paragraph 15(c) and exercises such right, should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.  Additionally, * * * event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this lease in force and Landlord does not have (or does not exercise) a right to terminate this Lease pursuant to paragraph 15(c) below, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

14.     A termination of the Lease under Section 15 was deemed effective as of the date of the casualty with rent being apportioned to that date.  The Tenant was required to vacate the leased premises within ten days after delivery of the notice of termination.  (Lease, Section 15(c).)

15.     The Lease provides that, in the event of litigation relating to the Lease between the parties, the prevailing party is entitled to recover from the other "reasonable and actual attorneys' fees and costs. . . ."  (Lease, Section 36(d).)

16.    On March 12, 2006, a tornado struck Springfield, Illinois, resulting in damage to TSA's leasehold under the Lease.

17.    As a result of the tornado, TSA's leasehold in Springfield sustained damage to its bearing wall, roof, doors and framing, glass and glazing, ceiling, walls, floors, and electrical system.

18.    The Landlord retained Jones-Blythe Construction Co. ("Jones-Blythe") to perform restoration and repair of the premises.

19.    Jones-Blythe began the reconstruction of the premises on March 14 or 15, 2006.

20.    TSA retained Cotton USA ("Cotton"), a company specializing in disaster recovery services, to stabilize and safeguard the TSA premises, including the structure and its systems and the fixtures in the premises.

21.    On March 16, 2006, four days after the casualty, Cynthia Cashman, TSA's Director of Real Estate, corresponded with the Landlord and its attorney stating that TSA desired to coordinate an "action plan and timetable" and that damage assessments were being made.

22.    On Thursday, March 21, 2006, David Frieder, TSA's Vice President of Construction, visited the leased premises.

23.    On March 23, 2006, Mr. Frieder, on behalf of TSA, sent a letter to the landlord and its attorney advising that, "[b]ased upon our initial review of the extensive damage to the premises and common areas, we believe that [the threshold of 35% or more of the then – total reconstruction cost of the premises and common areas] will be met, and as a result, tenant has the right to elect to terminate the lease within 60 days from the date of the casualty."

24.    By letter dated March 29, 2006, the landlord's attorney, David Rolf, advised TSA that Jones-Blythe had "provid(ed) an opinion as to the extent of the damage to the premises

leased to Sports Authority.  As you can see from this estimate, the damage does not exceed the 35% threshold . . . ."

25.     A copy of the Jones-Blythe "estimate," also dated March 29, 2006, prepared by Mark A. Sorensen, was included with Mr. Rolf's letter.

26.     Rather than detailing reconstruction costs as a percentage of the then-total reconstruction cost, Mr. Sorensen analyzed the proportion of damage to various physical components of TSA's leasehold.

27.     Tenant terminated most of its employees April 22, 2006, prior to giving notice of termination of the Lease to Landlord.

28.     On April 26, 2006, four days after terminating its employees, Tenant informed Landlord's contractor undertaking the repairs that the carpeting would be available on a week notice.

29.     As of April 26, 2006, Tenant believed a site visit was necessary to answer questions from Mr. Wolford on its' estimate of repairs.

30.     Mr. Wolford did not visit the site until May 4, 2006, after Tenant's termination notice.

31.     The undisputed then total building replacement costs equaled $1,960,067, thirty-five percent of which is $686,023.

32.     TSA estimated that the estimated repair cost of the leased premises, including the Cotton fees of $319,428, was $1,046,701, or 53.4% of the then-total replacement costs.

33.     By letter dated May 3, 2006, less than 60 days after the casualty, TSA, by Mr. Frieder, served notice upon the landlord that TSA was terminating the lease in accordance with Section 15(h) thereof.

34.   The Landlord paid, estimated, or possessed an estimate of the following costs, considered to be an appropriate cost of reconstruction or repair:

| | | |
|---|---|---|
| (a) | flooring materials | $114,800 |
| (b) | architectural and engineering costs | $9,410 |
| (c) | roofing insulation | $86,038 |
| (d) | store front and glass | $18,506 |
| | TOTAL | $228,854 |

35.   Jones-Blythe's bill for its unfinished work ($321,384) plus the additional actual or estimated costs attributable to SWPlaza ($228,854) total $550,238, or 28.1% of the estimated then-total replacement costs of TSA's leased premises in Springfield.

36.   TSA had paid rent to the Landlord for its leasehold in Springfield, Illinois, for the period March 12, 2006, through May 31, 2006, in the amount of $95,662.05.

37.   TSA had paid for utility services provided to its leasehold in Springfield, Illinois, for periods after March 12, 2006, in the amount of $9,608.60.

38.   TSA has unpaid 2005 real estate taxes of $50,693.89 and CAM charges of $4,994.22 for 2005 and $9,589.97 and $897.09 respectively for 2006 prior to March 12, 2006.

39.   Wolford, Tenant's disclosed expert's post-termination notice estimate of cost of reconstruction and repair is $743,944.

40.   Wolford revised his estimate by perhaps as many as fifteen times, while not retaining any of the drafts.

41.   Nine individual line items identifying repairs purportedly needed to the Premises in Tenant's estimate which accompanied its notice of termination were removed from Wolford's last estimate disclosed as his Rule 26 expert report.

42.    Eighteen individual line item estimates, other than those deleted in their entirety, changed from the Tenant's estimate which accompanied its notice of termination from Wolford's last estimate disclosed as his Rule 26 expert report.

43.    The total of the nine individual line item estimates removed reduced the Tenant's estimate which accompanied its notice of termination is $245,487, or approximately 23% of $1,046,701.00.

## C.    CONTESTED ISSUES OF FACT

1.    Whether TSA was within its rights in terminating the Lease.

2.    Did TSA act reasonably and in good faith in terminating the Lease.

3.    Whether TSA acted reasonably in forming its estimate.

4.    What TSA believed the repair cost would be when it terminated the Lease.

5.    Whether Wolford approved of Frieder's figures or suggested any adjustments that Frieder incorporated into his budget before sending the May 3, 2006 termination letter and enclosure to SWPlaza III.

6.    How Frieder reached the figures he sent to Wolford on April 26, 2006.

7.    Whether Wolford prepared either page of the report attached to Tenant's notice of termination.

8.    Whether Wolford's $743,944.00 post-termination notice figure includes $118,000 of the Cotton costs.

9.    How much, if any, of Cotton costs should be included in an estimate of the costs of repair?

## D.    CONTESTED ISSUES OF LAW

The contested issues of law were ruled upon by the Court on cross-motions for summary judgment. Without waiving such issues for purposes of appeal, there remain no contested issues of law.

**E.      JURY DEMAND:** None.

### III.    DAMAGES STATEMENT

**A.      PLAINTIFF'S ITEMIZED STATEMENT OF DAMAGES**

Plaintiff's Complaint seeks a declaration that the Lease was not properly terminated and remains in place and enforceable. Upon such a declaration, Plaintiff requests that the issue of damages during the interim period be set for hearing, if the parties cannot resolve same. Those damages will include:

Unpaid Back Rent:
Utilities:
CAM Charges:
Real Estate Taxes:
Attorney's Fees:

**B.      DEFENDANT'S ITEMIZED STATEMENT OF DAMAGES**

Overpayment of Rent: $95,662.05 less taxes and CAM charges due of: $65,441.86

Overpayment of Utilities: $9,6080.00

Attorney's Fees: $_____ as of final pre-trial.

### IV.    EXHIBITS ATTACHED

The following are attached as Exhibits to this Order and are made a part hereof:

A.      Plaintiff's Witness List.

B.      Defendant's Witness List.

C.      Joint Exhibit List.

D.      Proposed Joint Findings of Law.

E.      Plaintiff's Proposed Findings of Fact and Conclusions.

F.      Defendant's Proposed Findings of Fact and Conclusions.

## V.    GENERAL ADDITIONAL

The following additional action was taken:

<u>IT IS UNDERSTOOD BY THE PARTIES THAT:</u>

The Plaintiff is limited to one expert witness whose name and qualifications have been disclosed to the Defendant. The Defendant is limited to one expert witness whose name and qualifications have been disclosed to the Plaintiff.

A party may supplement a list of witnesses or exhibits only upon good cause shown in a motion filed and served upon the other parties prior to trial; except that, upon the development of testimony fairly shown to be unexpected, any party may, with leave of court, call such contrary witnesses or use such exhibits as may be necessary to counter the unexpected evidence, although not previously listed, and without prior notice of any other party.

It is mutually estimated that the length of trial will not exceed three full days. The case will be listed on the trial calendar to be tried when reached.

This pre-trial order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice. Such modification may be made either on motion of counsel for any party or on the Court's own motion.

IT IS SO ORDERED:

Entered: *March 31, 2008*

s/ Jeanne E. Scott

JUDGE

{S0572605.12 3/31/2008 DAR MAH}

APPROVED AS TO FORM AND SUBSTANCE:


s/ David A. Rolf
Attorney for the Plaintiff

s/ Charles R. Schmadeke
Attorney for the Defendant

**DUE TO PRIVACY ISSUES THE WITNESS**

**LISTS HAVE BEEN REMOVED FROM THE**

**FINAL PRETRIAL ORDER.**

**THE WITNESS LISTS WILL BE MAILED**

**CONVENTIONALLY TO ATTORNEYS OF**

**RECORD AND/OR PRO SE PARTIES.**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No.:06-3177 |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) ) | |
| Defendant. | ) | |

## JOINT EXHIBIT LIST

| No. | Description | Admit Without Objection | Authentication Waived | Objection |
|---|---|---|---|---|
| 1 | SWPLAZA III Initial Rule 26 Disclosure | | | |
| 2 | SWPLAZA III Answers To Interrogatories | | | |
| 3 | SWPLAZA III Response To Request To Produce Documents #1-54 | | | |
| 4 | TSA Initial Rule 26 Disclosure Documents #1-294 | | | |
| 5 | TSA Answers To Interrogatories | | | |
| 6 | TSA Response To Request To Produce Documents #295-405 | | | |
| 7 | SWPLAZA III Rule 26(a)(2) Expert Report of Mark Sorensen | | | |
| 8 | Sorensen File (produced at deposition) | | | |
| 9 | TSA Rule 26(a)(2) Expert Report of Jeff Wolford #1-119 | | | |
| 10 | Wolford File #1-183 (produced at deposition) | | | |
| 11 | Lease | | | |
| 12 | Declaration of Michael R. Mavelle | | | |
| 13 | Declaration of Cynthia Cashman | | | |

{S0572632.2 2/28/2008 DAR MAH}

1

| | | | | |
|---|---|---|---|---|
| 14 | 03/13/06 Letter from M. Riggins of Sports Authority to Illinois National Bank, Charles Robbins & Lee Allen re: tornado, store closed, keep updated | | | |
| 15 | 03/16/06 Letter from C. Cashman of Sports Authority to C. Robbins and L. Allen re: damage, assessment reports; meet with Frieder on 03/21/06 | | | |
| 16 | 03/23/06 Letter from D. Frieder of Sports Authority to A. Seppi, C. Robbins & L. Allen re: option to terminate, aware considering terminating least | | | |
| 17 | 03/29/06 Letter from D. Rolf of SNHCC to D. Frieder of Sports Authority re: Jones Blythe estimate – not 35% | | | |
| 18 | 04/26/07 E-Mails between D. Frieder and M. Sorensen re: carpet status | | | |
| 19 | 04/28/06 Letter from L. Allen of SNHCC to D. Frieder of Sports Authority re: update on reconstruction | | | |
| 20 | 05/03/06 Letter from D. Frieder of Sports Authority to A. Seppi, C. Robbins & L. Allen re: Notice of Termination and analysis | | | |
| 21 | 05/05/06 Letter from L. Allen of SNHCC to D. Frieder of Sports Authority re: repairs, costs, status and challenge wrongful termination | | | |
| 22 | 05/10/06 Letter from C. Cashman of Sports Authority to C. Robbins, A. Seppi, & L. Allen re: response coming from Skadden to 5/5/06 Allen letter | | | |
| 23 | 05/18/08 Letter from M. Shebuski of Skadden to L. Allen of SNHCC re: summary of history of issue and TSA's position | | | |
| 24 | 03/27/06 E-Mail from D. Frieder to J. Wolford re: 10-15% OK; 03/27/06 E-Mail from J. Wolford to D. Frieder re: drawings-digital photos; 03/28/06 E-Mail from D. Frieder to J. Wolford re: Carl send photos of store to Jeff | | | |
| 25 | 04/04/06 E-Mail from D. Frieder to J. Wolford re: sorry it took so long (photos?) – call Monday to discuss | | | |

| | | | | |
|---|---|---|---|---|
| 26 | 04/19/06 E-Mail from J. Wolford to D. Frieder re: 4 Year Labor Material Increase numbers; 04/19/06 E-Mail from D. Frieder to J. Wolford re: where are numbers from? | | | |
| 27 | 04/26/06 E-Mail from D. Frieder to J. Wolford re: Owner Bid Rev. – on high side | | | |
| 28 | 04/26/06 E-mails between D. Frieder and J. Wolford re: Springfield repair costs – site visit | | | |
| 29 | 05/04/06 E-Mail from D. Frieder to J. Wolford re: Springfield site visit – contractor Jones/Blythe – move out | | | |
| 30 | 05/05/06 E-Mails between D. Frieder and J. Wolford re: called off Goober | | | |
| 31 | 05/08/06 E-Mail from D. Frieder to J. Wolford re: $17K different – roof – no revised letter to LL – post visit; 05/08/06 E-Mail from J. Wolford to D. Frieder re: Revised Owner Spreadsheet – post visit | | | |
| 32 | Mark Sorensen 10/22/07 Deposition Transcript | | | |
| 33 | 03/29/06 Letter from M. Sorensen to C. Robbins re: opinion of extent of damages (Sorensen Dep. Ex. #1) | | | |
| 34 | Letter from Q. Ragan of EFI Global to J. Krone re: inspection of building – instability (Sorensen Dep. Ex. #2) | | | |
| 35 | 04/02/01 Lease (Sorensen Dep. Ex. #3) | | | |
| 36 | 09/22/06 City of Springfield Status Of Certificate of Occupancy (Sorensen Dep. Ex. #4) | | | |
| 37 | Mark Sorensen Rule 26(a)(2) Expert Witness Report (Sorensen Dep. Ex. #5) | | | |
| 38 | 03/14/06 Memo from Jeff Krone of Cotton re: Tornado Damage- necessary services for restoration (Sorensen Dep. Ex. #6) | | | |
| 39 | Jeffrey Wolford 10/30/07 Deposition Transcript | | | |
| 40 | Jeffry Wolford Rule 26(a)(2) Expert Disclosure (Wolford Dep. Ex. #1) | | | |
| 41 | 07/26/01 Gart Sports Company Bid Breakdown (Wolford Dep. Ex. #2) | | | |

| | | | | |
|---|---|---|---|---|
| 42 | Jeff Wolford Budget Estimate (Wolford Dep. Ex. #3) | | | |
| 43 | Jeff Wolford Revised 5/7 Bid Breakdown (Wolford Dep. Ex. #4) | | | |
| 44 | 03/29/06 Letter from M. Sorensen to Charles Robbins re: opinion of extent of damage (Wolford Dep. Ex. #5) | | | |
| 45 | Spreadsheet of Costs (Wolford Dep. #6) | | | |
| 46 | 03/27/06 E-Mail from D. Frieder to J. Wolford re: damage to building 10-15% (Wolford Dep. Ex. #7) | | | |
| 47 | Jeff Wolford Revised 5/7 Bid Breakdown (Wolford Dep. Ex. #8) | | | |
| 48 | 05/08/06 05/08/06 E-Mail from D. Frieder to M. Mayne, L. Kelton, & N. Hassanein re: revised estimate $17k more (Wolford Dep. Ex. #9) | | | |
| 49 | 09/22/06 City of Springfield Status Of Certificate of Occupancy (Wolford Dep. Ex. #10) | | | |
| 50 | Wolford's Report Exhibit 'C' #101-102 | | | |
| 51 | CottonUSA Scope of Services for work at TSA's Springfield Store | | | |
| 52 | CottonUSA Restoration Service Agreement for TSA's Springfield Store | | | |
| 53 | Invoice of CottonUSA containing breakdown of labor, equipment, etc., for services performed at TSA's Springfield Store | | | |
| 54 | 103 Photographs: liberty springfield 02.jpg liberty springfield 03.jpg liberty springfield 05.jpg liberty springfield 06.jpg liberty springfield 07.jpg liberty springfield 08.jpg liberty springfield 09.jpg liberty springfield 010.jpg liberty springfield 011.jpg liberty springfield 012.jpg liberty springfield 013.jpg liberty springfield 014.jpg liberty springfield 015.jpg liberty springfield 016.jpg liberty springfield 017.jpg liberty springfield 018.jpg | | | |

| | | | |
|---|---|---|---|
| liberty springfield 019.jpg | | | |
| liberty springfield 020.jpg | | | |
| liberty springfield 021.jpg | | | |
| liberty springfield 022.jpg | | | |
| liberty springfield 023.jpg | | | |
| liberty springfield 024.jpg | | | |
| liberty springfield 025.jpg | | | |
| liberty springfield 026.jpg | | | |
| liberty springfield 027.jpg | | | |
| liberty springfield 028.jpg | | | |
| liberty springfield 029.jpg | | | |
| liberty springfield 030.jpg | | | |
| liberty springfield 031.jpg | | | |
| liberty springfield 032.jpg | | | |
| liberty springfield 032.jpg | | | |
| liberty springfield 033.jpg | | | |
| liberty springfield 034.jpg | | | |
| liberty springfield 035.jpg | | | |
| liberty springfield 036.jpg | | | |
| liberty springfield 037.jpg | | | |
| liberty springfield 038.jpg | | | |
| liberty springfield 039.jpg | | | |
| liberty springfield 040.jpg | | | |
| liberty springfield 041.jpg | | | |
| liberty springfield 042.jpg | | | |
| liberty springfield 043.jpg | | | |
| liberty springfield 044.jpg | | | |
| liberty springfield 045.jpg | | | |
| liberty springfield 046.jpg | | | |
| liberty springfield 047.jpg | | | |
| liberty springfield 048.jpg | | | |
| liberty springfield 049.jpg | | | |
| liberty springfield 050.jpg | | | |
| liberty springfield 051.jpg | | | |
| liberty springfield 052.jpg | | | |
| liberty springfield 055.jpg | | | |
| liberty springfield 057.jpg | | | |
| liberty springfield 058.jpg | | | |
| liberty springfield 059.jpg | | | |
| liberty springfield 060.jpg | | | |
| liberty springfield 061.jpg | | | |
| liberty springfield 062.jpg | | | |
| liberty springfield 063.jpg | | | |
| liberty springfield 064.jpg | | | |
| liberty springfield 065.jpg | | | |
| liberty springfield 066.jpg | | | |

| | | | |
|---|---|---|---|
| liberty springfield 067.jpg | | | |
| liberty springfield 068.jpg | | | |
| liberty springfield 069.jpg | | | |
| liberty springfield 072.jpg | | | |
| liberty springfield 075.jpg | | | |
| liberty springfield 076.jpg | | | |
| liberty springfield 077.jpg | | | |
| liberty springfield 078.jpg | | | |
| liberty springfield 079.jpg | | | |
| liberty springfield 080.jpg | | | |
| liberty springfield 081.jpg | | | |
| liberty springfield 082.jpg | | | |
| liberty springfield 083.jpg | | | |
| liberty springfield 084.jpg | | | |
| liberty springfield 085.jpg | | | |
| liberty springfield 087.jpg | | | |
| liberty springfield 089.jpg | | | |
| liberty springfield 090.jpg | | | |
| liberty springfield 091.jpg | | | |
| liberty springfield 092.jpg | | | |
| liberty springfield 093.jpg | | | |
| liberty springfield 094.jpg | | | |
| liberty springfield 095.jpg | | | |
| liberty springfield 096.jpg | | | |
| liberty springfield 097.jpg | | | |
| liberty springfield 098.jpg | | | |
| liberty springfield 099.jpg | | | |
| liberty springfield 100.jpg | | | |
| liberty springfield 101.jpg | | | |
| liberty springfield 102.jpg | | | |
| liberty springfield 103.jpg | | | |
| liberty springfield 104.jpg | | | |
| liberty springfield 105.jpg | | | |
| liberty springfield 106.jpg | | | |
| liberty springfield 107.jpg | | | |
| liberty springfield 108.jpg | | | |
| liberty springfield 109.jpg | | | |
| liberty springfield 111.jpg | | | |
| liberty springfield 112.jpg | | | |
| liberty springfield 113.jpg | | | |
| liberty springfield 114.jpg | | | |
| liberty springfield 115.jpg | | | |
| liberty springfield 116.jpg | | | |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

SWPLAZA III, LLC, an Illinois limited )
liability company, as successor to )
Illinois National Bank, as Trustee under )
Trust Agreement dated November 6, 2000 )
and known as Trust No. 00-0020, )
an Illinois banking institution, )
)
     Plaintiff, )
)
v. )     Case No.:  06-3177
)
TSA STORES, INC., as successor to Gart )
Brothers Sporting Goods Company, )
a Delaware corporation, )
)
     Defendant. )

## PROPOSED JOINT FINDINGS OF LAW

### Proposed Findings of Law Based on Court's March 10, 2008 Opinion

1.     The Lease allows Tenant to terminate under Paragraph 15 based on a reasonable estimate of the repair cost which exceeds 35% of the then total reconstruction cost.

2.     Tenant must act reasonably and in good faith in formulating and presenting its estimate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited<br>liability company, as successor to<br>Illinois National Bank, as Trustee under<br>Trust Agreement dated November 6, 2000<br>and known as Trust No. 00-0020,<br>an Illinois banking institution, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
|      Plaintiff, | ) <br> ) | |
| v. | ) <br> ) | Case No.: 06-3177 |
| TSA STORES, INC., as successor to Gart<br>Brothers Sporting Goods Company,<br>a Delaware corporation, | ) <br> ) <br> ) <br> ) <br> ) | |
|      Defendant. | ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT/PROPOSED CONCLUSIONS

### Proposed Findings of Fact

1.   Parties agree that the then-total reconstruction cost of the TSA store was $1,960,067.00 and that 35% of that amount is $686,023.00.

2.   TSA believed its estimate to be high when presented to SWPlaza III on May 3, 2006.

3.   TSA included all of the Cotton expenses in the estimate it presented to SWPlaza III, when it knew that portion of those expenses were not related to repair or reconstruction costs.

4.   TSA represented to SWPlaza III that the estimate accompanying its May 3, 2006 notice of termination was prepared by a contractor, Jeff Wolford, when TSA knew that it was not prepared by Wolford.

5.   TSA acted unreasonably in preparing the estimate it presented to SWPlaza III as support for its right to terminate the Lease.

6.   TSA acted in bad faith in preparing the estimate it presented to SWPlaza III as support for its right to terminate the Lease.

7.   TSA acted unreasonably in presenting the estimate to SWPlaza III as support for its right to terminate the Lease.

8.    TSA acted in bad faith in presenting the estimate to SWPlaza III as support for its right to terminate the Lease.

9.    TSA acted unreasonably during the process of terminating the Lease.

10.   TSA acted in bad faith during the process of terminating the Lease.

11.   TSA's notice of termination of Lease May 3, 2006 was in violation of its obligations under the Lease.

12.   TSA's attempted termination of the Lease dated May 3, 2006 is invalid, and the Lease was not terminated as of March 12, 2006.

13.   The Lease between TSA and SWPlaza III remains valid and binding on the parties.

**Proposed Conclusion**

1.    Judgment is entered in favor of SWPlaza III on its Complaint and against TSA, the Lease, therefore remaining in full force and effect.

2.    Judgment is entered in favor of SWPlaza III and against TSA on TSA's counterclaim for damages, said counterclaim is therefore, dismissed with prejudice, TSA to take nothing.

3.    SWPlaza III is awarded its costs and attorney's fees. SWPlaza III is to submit its bill of costs and petition for attorney's fees pursuant to local rule.

4.    The matter is further set for status hearing on _____, at which time the Court will consider the issue of additional relief for SWPlaza III under the Lease based on the ruling herein.

{S0574775.4 3/20/2008 DAR MAH}

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, an Illinois limited liability company, as successor to Illinois National Bank, as Trustee under Trust Agreement dated November 6, 2000 and known as Trust No. 00-0020, an Illinois banking institution, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 06-3177 |
| TSA STORES, INC., as successor to Gart Brothers Sporting Goods Company, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT/PROPOSED CONCLUSIONS**

**Proposed Findings of Fact**

1.  The parties agree that the then-total reconstruction cost of the TSA store was $1,960,067.00 and that 35% of that amount is $686,023.00.

2.  TSA employed a reasonable and reliable methodology to determine the repair damage estimate presented to SWPlaza on May 3, 2006.

3.  Services rendered by CottonUSA on the premises included drying of the premises, removing and disposing of debris, removing standing water, removing sheet rock, removing all rubberized aisles, removing and discarding effected insulation, removing and discarding all commercially glued down carpet, scraping remaining glue from slab, installing generators to conduct its operations, sealing hole in roof, working on assessing and stabilizing common cinderblock wall, and providing labor and equipment for all activities.

4.  The work of CottonUSA on the physical structure of the premises and its fixtures was performed with the express authorization of Art Seppi.

5.  In that all work and services performed by CottonUSA at the premises were necessary in order to begin the remodeling of the premises, it was reasonable to include the costs for that work and services in an estimate for the complete reconstruction of the premises.

6

6.    David Frieder is the Vice President of Construction for TSA.

7.    David Frieder viewed the premises on March 21, 2006, nine days after the tornado struck the premises, and observed significant damage.

8.    Thereafter, David Frieder asked Jeffrey Wolford to serve as a consultant to him in preparing an estimate of the costs to reconstruct the premises.

9.    Jeffrey Wolford is a contractor often engaged by TSA to construct TSA stores.  Mr. Wolford is familiar with the requirements of TSA for the construction of its stores.

10.   Using the cost figures from the original construction of the premises in 2001, Mr. Frieder estimated that the then-total reconstruction cost was $1,960,067.00, an amount with which SWPlaza agrees.

11.   Mr. Frieder worked and consulted with Mr. Wolford in calculating an estimate of the reconstruction costs.  Mr. Frieder especially relied upon Mr. Wolford's knowledge with regard to costs pertaining to structural restoration.

12.   Based upon the amount of damage observed by Mr. Frieder, reports from and the work of CottonUSA, knowledge of TSA's tenant requirements for a store, knowledge of the costs of TSA requirements and other matters, and Mr. Wolford's input, TSA determined that the 35% threshold in the Lease was met, which triggered its option to terminate the Lease.

13.   TSA acted reasonably and in good faith in determining the estimate.

14.   Even without including costs attributable to CottonUSA, TSA reasonably and in good faith determined that the 35% threshold had been met.

15.   The estimate presented to SWPlaza in its May 3, 2006 notice was reasonable.

16.   Within 60 days of the casualty, SWPlaza presented no reliable, relevant, or appropriate analysis or estimate to indicate either 1) that the reconstruction did not equal or exceed 35% of the then-total reconstruction cost, or 2) that TSA's calculations presented to it on May 3, 2006, were unreasonable.

17.   Employees of the TSA Springfield store were notified of the closing of the store after the decision to exercise the option to terminate the Lease but before TSA notified the Landlord.  This sequence stems, at least in part, from a desire that the employees hear of the closing from TSA rather than from third parties.

18.   At all times relevant to this matter, TSA acted in good faith.

19.   At all times relevant to this matter, TSA acted reasonably.

7

60172483v1 868372

20.   TSA's notice for termination of the Lease of May 3, 2006, was in strict conformity with the requirements of the Lease.

21.   TSA's termination of the Lease by its notice of May 3, 2006, was valid and effective to terminate the Lease as of March 12, 2006.

22.   TSA did not breach the Lease.

23.   For the period of March 12, 2006, through May 31, 2006, TSA had advanced rent to SWPlaza in the amount of $95,662.05.

24.   TSA had paid utility services provided to the premises for periods after March 12, 2006, in the amount of $9,608.60.

**Proposed Conclusions**

1.   Judgment is entered in favor of TSA and against SWPlaza on the Complaint of SWPlaza.

2.   Judgment is entered in favor of TSA and against SWPlaza on TSA's counterclaim declaring that TSA lawfully terminated the Lease and awarding damages to TSA in the amount of $_____.

3.   TSA is awarded its costs and attorneys' fees.  TSA shall submit its bill of costs and petition for attorneys' fees pursuant to local rules.

8

60172483v1 868372