## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SWPLAZA III, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-3177 |
| | ) | |
| TSA STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter came before the Court for a bench trial on April 7-9, 2008.  Plaintiff SWPlaza III, LLC (SWPlaza) appeared by its attorney David A. Rolf.  Defendant TSA Stores, Inc. (TSA) appeared by its attorney Charles R. Schmadeke.  SWPlaza seeks a declaration that TSA breached a Lease between the parties and that the Lease remains in place and enforceable.  In the Pretrial Order (d/e 23), the parties agreed to take up the issue of damages after the Court determines liability.  If the Court finds TSA liable and the parties cannot resolve the issue of damages, they will request a hearing.  TSA has filed a Counterclaim alleging that its termination of the Lease was proper and that SWPlaza breached the Lease

by refusing to return rent payments previously collected for the period after termination. This Court has jurisdiction under 28 U.S.C. § 1332.[1] After considering all the evidence, the arguments of the parties, and the applicable law, the Court finds TSA liable to SWPlaza for breach of the Lease and against TSA on its Counterclaim. The following constitutes the Court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

On or about April 2, 2001, SWPlaza and TSA entered into a written Lease under which SWPlaza agreed to construct a retail shopping center in Springfield, Illinois, and lease a portion of it to TSA.[2] TSA is a wholly owned subsidiary of The Sports Authority, Inc.; it operates sporting goods stores throughout the country. SWPlaza owns real estate and operates as a landlord in Springfield.

---

[1]SWPlaza is a limited liability corporation, organized under the laws of the State of Illinois with a principal place of business in Illinois. Response to Order on Notice of Removal (d/e 6) (Response). TSA is a Delaware corporation with a principal place of business in Colorado. Id. The members of SWPlaza are Arthur F. Seppi and Charles E. Robbins. (Trial testimony of Arthur F. Seppi on April 7, 2008 -- transcript has not yet been prepared). Seppi and Robbins are citizens of Illinois. Response. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. (See Complaint).

[2]The original parties to the Lease were SWPlaza's and TSA's predecessors, Illinois National Bank as Trustee and Gart Brothers Sporting Goods Company; for simplicity, however, the Court will refer to SWPlaza and TSA.

On December 18, 2001, after SWPlaza completed construction of the shopping center, TSA moved into one of its buildings. Under the Lease, sixty days after TSA took possession of the premises, its 15-year term began. A little over four years into its term, on March 12, 2006, two tornadoes struck Springfield, one of which damaged TSA's store.

The Lease provided an option to terminate in the event of a casualty:

> In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of thirty five percent (35%) or more of the then-total reconstruction cost of the applicable one of said three areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.

Exhibit 11, Lease Part I(F), ¶ 15(b). Thus, if the cost of repair and reconstruction equaled or exceeded 35% of the then-total reconstruction cost, TSA had the option to terminate the Lease. If the cost of repair and reconstruction was less than 35% of the then-total reconstruction cost, however, a different Lease provision applied:

> In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Premises and/or Common Areas, which has a repair and reconstruction cost of less than thirty five percent (35%) of the then-total replacement cost of any of the Premises and/or Common Areas, this Lease shall not

3

terminate . . . and . . . Landlord shall proceed to repair and restore the damage (except that Tenant, at its expense, shall be responsible for the repair and restoration of Tenant's furnishings, furniture, equipment, inventory and personal property) and the Base Rent, CAM Charges and Real Estate Taxes shall abate in their entirety . . . until sixty (60) days after Landlord has completed its repair and restoration.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Landlord shall complete reconstruction of the Premises, Common Areas and Additional Areas, to substantially the same condition as that existing immediately prior to such casualty.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

Exhibit 11, Lease Part I(F), ¶ 15(a).

The Court previously construed the Lease to allow TSA to terminate if, within 60 days of the tornado, it reasonably estimated that the cost of repair and reconstruction exceeded 35% of the then-total reconstruction

cost.  See Opinion entered March 11, 2008 (d/e 22), at 23.  Termination would be deemed effective as of the date of the tornado.

The parties agree that after the tornado the then-total reconstruction cost of TSA's store was $1,960,067.00.  Thirty-five percent of that figure is $686,023.00.  Thus, TSA had the option to terminate if it reasonably estimated that the cost of repair and reconstruction would equal or exceed $686,023.00.  Whether TSA did so was the key issue at trial.

It is undisputed that the tornado damaged TSA's roof, bearing wall, doors and framing, glass and glazing, ceiling, floors, and electrical system. SWPlaza hired a Springfield contractor, Jones-Blythe Construction Co. (Jones-Blythe), to restore and repair TSA's building and the other stores in the shopping center.  Jones-Blythe began work within two or three days of the tornado.

Even before Jones-Blythe began, TSA hired a disaster recovery services company, Cotton USA (Cotton), to work at the TSA store.  Cotton conducted its work immediately after the tornado and finished within a few weeks.  The parties disagree regarding the extent to which Cotton's work can be considered repair and reconstruction work.  Cotton employee Jeff Krone described Cotton's work as restoration services.  Clearly, much of

5

Cotton's work, such as moving inventory racks, allowed TSA to recover its merchandise. Because the Lease made TSA responsible for the repair and restoration of its furnishings, furniture, equipment, inventory and personal property, the Court does not consider this repair and reconstruction work.

Other tasks, however, would qualify. For example, the Court views Cotton's efforts to cut out damaged drywall and assist Jones-Blythe in securing the roof initially as repair and reconstruction work. But, the Court finds that while some costs ordinarily would be repair and reconstruction, such as final clean-up and deodorizing, here they should not qualify. If Cotton's final clean-up and deodorizing work was reconstruction-related, it should have been performed after Jones-Blythe actually completed reconstruction work, not before the roof and wall were repaired and the carpeting and glass were replaced.

On March 16, 2006, after Cotton began its work, TSA's Director of Real Estate, Cynthia Cashman, sent a letter to SWPlaza and its attorney stating that TSA was assessing damages and desired to coordinate an action plan and timetable. Cashman also requested that SWPlaza "not enter or restore anything in the Premises until we can fully assess our damage."

Exhibit 15, March 16, 2006 Letter.[3]

On March 21, 2006, TSA's Vice President of Construction, David Frieder, visited the Springfield TSA store.  Frieder lives in Colorado, but his job involves extensive travel throughout the country visiting potential TSA store sites and construction jobs.  This trip was unusual, though, because TSA had never suffered tornado damage at a store before.  Frieder visited the Springfield site to assess the state of the building.  He testified that Springfield only had one TSA store, and Frieder and other TSA executives worried that the longer it remained closed, the more likely customers were to switch their loyalties to Dick's Sporting Goods, a competitor in town.  Frieder wanted to assess how quickly his store could get up and running again.

When Frieder arrived, he met one of SWPlaza's members, Arthur Seppi, and they toured the store.  Frieder said the damage he observed was substantial.  He took notes that day, and on the plane ride home began jotting down early thoughts regarding necessary repair work.  Frieder did not save his notes from this trip or his early hand-written estimates.  They were

---

[3]Before trial, the parties agreed on a numerical identification system, thus exhibits are not labeled as Plaintiff's or Defendant's.

not introduced at trial. Frieder testified, however, that even in his early calculations, he believed the cost of repair and reconstruction would exceed the 35% threshold. He informed other TSA executives of his initial opinion within a day or two of his site visit.

On March 23, 2006, Frieder sent SWPlaza and its attorney a letter referencing TSA's option to terminate if the repair and reconstruction costs equaled the 35% threshold and stating, "Based on our initial review of the extensive damage to the Premises and Common Areas, we believe that this threshold will be met . . . ." Exhibit 16, March 23, 2006 Letter. Frieder warned that TSA was considering terminating the Lease and advised that "accordingly, any repairs or reconstruction to our Premises are at the Landlord's risk." Id.

On March 27, 2006, Frieder emailed Jeff Wolford, a Prospect Heights, Illinois, retail construction contractor who had previously worked on numerous construction projects for TSA. Wolford had bid on the initial SWPlaza construction project in 2002, but he did not win the job. While Wolford had done extensive work in the Chicago suburban and St. Louis areas, he had never worked on a construction project in the Springfield area.

Frieder told Wolford that TSA had a damaged building in Springfield

and was considering terminating its Lease. He noted that the Lease allowed TSA to terminate if the cost to repair damages to the building exceeded 35% of the current cost to build the structure from scratch. Frieder asked Wolford for help on two issues: (1) the approximate cost to build a 33,000-square-foot building with a typical TSA tenant-improvement package in Springfield and (2) an estimate of repair costs to such a building that had suffered the type of tornado damage the Springfield store had suffered. Regarding the first issue, the then-total-replacement cost estimate, Frieder told Wolford that the Springfield market is a union market that needed to be estimated as such, and "[a] range of 10-15% is ok." Exhibit 24, March 27 & 28 Emails. According to Frieder, when TSA receives bids from contractors for constructing a new store, the bids often differ from each other by as much as 20-25%. A 10-15% difference is highly reasonable, he testified.

On March 29, 2006, SWPlaza's attorney sent TSA a letter stating that Jones-Blythe believed the majority of the major building components was undamaged. Thus, in SWPlaza's opinion, TSA's option to terminate would not be triggered. This letter included an analysis by Jones-Blythe of the amount of damage each major building component suffered. The analysis,

signed by Jones-Blythe representative Mark A. Sorenson, stated: "With the majority of major building components being undamaged, in my opinion, the overall damage to the structure will not exceed 30% of the total replacement cost of the premises." Exhibit 17, March 29, 2006 Letter, at 2. The analysis does not address specific repair and reconstruction costs, however.

On April 3, 2006, Wolford began creating a spreadsheet of costs he estimated would be associated with repair and reconstruction of the Springfield TSA store. As Wolford continued to refine his numbers, he added to and revised this spreadsheet. He did not save the original version from April 3, 2006, and at trial, he testified that he cannot remember whether he sent this budget estimate to Frieder, but he believes he would have. A copy of this spreadsheet was not introduced at trial; it was not produced in this litigation. Frieder testified that all of the estimates Wolford sent him, including the early estimates, were within a close range, but he could not remember whether the earliest estimates were higher or lower than the later ones. He did remember, however, that Wolford's estimates never included Cotton's costs.

Between the end of March and the first half of April, Frieder attended

numerous meetings with other TSA executives regarding the Springfield building.  By April 18, 2006, he had provided them what he considered to be a solid number regarding repair costs.   He informed them that he believed the threshold would be met; his estimate included the entire bill from Cotton.  No one asked for projections or documentation.  On April 18 or 19, 2006, Frieder learned that these executives, and ultimately the CEO, had decided to terminate the Lease.

Wolford testified that on April 19, 2006, he sent a spreadsheet of his repair and reconstruction cost estimates to Frieder.  This spreadsheet was not introduced at trial.  Wolford and Frieder testified that they did not retain copies of it; it was not produced in this litigation.  According to Wolford, this spreadsheet was more formal than the version he began on April 3, 2006.

Also on April 19, 2006, Wolford and Frieder exchanged emails regarding union costs in Springfield.  In an email with the subject line "4 year labor & material Increase - Springfield," Wolford indicated that the union costs for Springfield had increased 18.50% since initial construction. Exhibit 26, April 19, 2006 Emails.  Frieder responded, "This helps a lot," and asked where Wolford got the numbers.  Id.  Wolford testified that he

used St. Louis and Delafield, Wisconsin (Milwaukee) based union structures for this job.

On April 22, 2006, TSA terminated most of its employees at the Springfield store.  It did not inform SWPlaza of their terminations.

On April 26, 2006, Frieder emailed Wolford a table of estimated repair and reconstruction costs.  He did not include Cotton's fees within this table, but otherwise, the combined costs totaled $677,158.00.  Frieder asked Wolford to review the numbers.  He stated, "I think that I'm under on these costs as a first pass estimate.  I want to make sure that the numbers are somewhere reasonable but on the high side since this is the start of negotiations.  Let me know what adjustments you would make."  Exhibit 27, April 26, 2006 Email.  Frieder testified that he intended not to develop a formal bid, but to estimate within a reasonable range -- a variance of about 10-15%.  When he said he thought he was under, he meant he thought he might be at the low end of that range.  Frieder also testified that he referenced negotiations in this email because he believed SWPlaza would oppose termination, and the parties likely would have to negotiate a settlement.

Wolford testified that he did not suggest any adjustments to this table,

but it included numbers he had sent Frieder previously.  In estimating these numbers, Wolford used union rates from St. Louis and Delafield, Wisconsin as comparable rates.  According to Wolford, Delafield is an 80,000- to 90,000-person town with a Milwaukee-based union structure.

Later that day, Wolford emailed Frieder to ask whether Frieder needed him to visit the Springfield store to finalize "a more comprehensive scope." Exhibit 28, April 26, 2006 Emails.  Frieder indicated that a visit would be helpful and stated: "A lot of work is already done but I do need to nail the costs as closely as possible and a visit might crystallize some of the questions you currently have."  Id.

On May 3, 2006, TSA officially terminated the Lease.  The parties agree that TSA's termination fell within the 60-day window set forth in the Lease.  Frieder sent a letter to SWPlaza stating that according to its estimate, the 35% threshold was met.  The letter stated:

> Attached hereto is analysis which I prepared and which shows the current estimated total replacement cost of the Premises and the estimated costs to repair the damage to the Premises caused by the recent tornadoes.  To determine the current estimated total replacement cost, I used the actual bid of the original contractor for the initial construction of the Premises in 2001, with increases for estimated change orders and inflation.  To develop the budget for repair and reconstruction of the damage to the Premises caused by the tornadoes, I utilized the services

13

of Jeff Wolford, a general contractor who has extensive experience in the Illinois and bid on the initial TI work for TSA in 2001.

Exhibit 20, May 3, 2006 Letter, at 1.  Attached to the cover letter is a "Budget Estimate" designated "Prepared by Jeff Wolford, Wolford Retail Builders, Inc." Id. at 4.

The Budget Estimate is a table of repair and reconstruction costs that Frieder created based on his own estimates and the information he had previously received from Wolford.  The table lists an overall estimate total of $1,046,701.00.  The table includes $46,937.00, or 5% of costs, in the category of "Premium for expedited work," yet when all the numbers in the table are added, the listed total of $1,046,701.00 does not include the figure for expedited work.  Including that figure would bump TSA's estimate to $1,093,638.00.  Two other categories are based on a percentage of costs: insurance and profit & overhead.  Looking just at itemized costs, without any of the percentage costs, TSA's budget total is $938,745.00.

The May 3, 2006 table is nearly identical to the April 26, 2006 table Frieder had sent Wolford, but it contains three additional line items: permit fees, architectural and engineering costs, and Cotton's entire bill of $319,428.00.  Frieder testified that he believed all of Cotton's work should

be considered repair and reconstruction work because had the tornado not struck, TSA would not have needed to perform this work. Thus, he thought it reasonable to include a separate line item of $319,428.00.

Wolford, however, testified that, in his opinion, only $118,211.01 of Cotton's bill reasonably could be considered a fee for repair and reconstruction work. At trial, Wolford seemed unsure of whether any of the tables of costs accounted for this $118,211.01 in other categories. Yet, based on Exhibit 50, a spreadsheet Wolford prepared noting where each portion of the $118,211.01 fit within another category, the Court finds that Wolford had already accounted for this money in his estimates, and therefore including a separate line item of $118,211.01 of Cotton's costs would be double-counting.

Wolford visited the Springfield store May 4, 2006. He testified that he was able to form a good estimate before visiting the site, but seeing the store was important for finalizing a reasonable estimate. Early that morning, Wolford emailed Frieder to ask whether he should meet a particular field contractor at the site. Frieder told Wolford that Jones-Blythe was the contractor, but that he "may need to go in as the fixture installer, an insurance rep or someone from TSA." Exhibit 29, May 4, 2006

15

Emails.  Frieder advised Wolford to misrepresent his reason for visiting the site because TSA had already terminated the Lease, and Frieder was worried SWPlaza would not allow Wolford on the premises if it understood his true purpose.  Wolford did not conceal his role, however, because he thought it unnecessary.

On May 5, 2006, SWPlaza responded by letter to TSA's termination letter.  SWPlaza advised TSA that based on estimates and actual costs already incurred by Jones-Blythe, it believed TSA had substantially overestimated repair and reconstruction costs.  SWPlaza also indicated that it suspected TSA of ulterior motives for termination: "We understand that you have a strong desire not to reopen the store due primarily as we understand it to the poor performance of the store in the Springfield market since the opening of Dick's Sporting Goods."  Exhibit 21, May 5, 2006 Letter.  SWPlaza refused to accept TSA's termination.

After visiting the site on May 4, 2006, Wolford revised his prior estimates.  On May 8, 2006, he emailed Frieder a new table.  See Exhibit 31, May 8, 2006 Email.  More than half of the estimates in this table differ -- some higher and some lower -- from those included in both the April 26, 2006 and May 3, 2006 tables.  Moreover, ten of the categories in the May

3, 2006 table, including the $319,428.00 line item of Cotton's costs, are not included in this table at all. Wolford's total estimate of repair and reconstruction costs in the May 8, 2006 table is $743,944.00.

Jones-Blythe, SWPlaza's contractor, had estimated that all repair and reconstruction work would be complete by June 1, 2006. Because TSA terminated the Lease, Jones-Blythe did not finish its work on TSA's store, but all that remained was the floor covering work and placing some electrical fixtures. The cost of the floor covering was contained in Sorenson's budget. Seppi testified that while he has no specific estimate of the costs to complete the repair and reconstruction of TSA's building, it would cost far less than $100,000.00. Sorenson testified it would only cost an additional $5,000.00 to finish the project.

At SWPlaza's request, during the course of this litigation Sorenson prepared a table listing the costs Jones-Blythe had incurred and the additional actual or estimated costs attributable to SWPlaza. He estimated a total of $550,238.00, which is only 28.1% of the then-total replacement costs of TSA's store. Moreover, his total includes $26,782.00 for expedited work. Subtracting that cost, his total estimate would be $523,456.00. Moreover, like TSA's, Sorenson's chart includes three categories based on

a percentage of other costs.  Looking just at itemized costs, Sorenson's budget is $496,674.00.

Additionally, Sorenson's estimate includes several categories of work done at the shopping center as a whole (3 stores) instead of just at the TSA store.  For example, SWPlaza paid $9,510.00 for architectural and engineering work throughout the shopping center; Sorenson did not divide out TSA's portion of that amount.  Similarly, SWPlaza paid $86,038.00 to replace the roof over the entire structure, not just the damaged section of the roof over TSA's store.  Likewise Sorenson testified that the store front could have been repaired but SWPlaza elected to replace it.  Thus, Sorenson believes his estimate of repair and reconstruction costs actually overestimates the costs for repairing and reconstructing TSA's store.  His estimate of $1,777.00 for millwork, however, is much lower than TSA's.  Sorenson did not know that TSA used a specific national contractor for the millwork in all of its stores.  TSA has negotiated specific contract prices with its contractor for this millwork, and the package necessary for TSA's Springfield store would have cost $26,000.00.

At trial, Sorenson compared his list of costs with the estimates TSA submitted with its May 3, 2006 letter.  Sorenson testified that based on his

experience actually doing the work, TSA's estimate was unreasonably high overall.  According to Sorenson, while most of TSA's numbers fell within the range reasonably expected for such costs, almost without fail they were at the high end of that range.   Sorenson refused to quantify a particular percentage of variation that would be reasonable, but he thought a 15% variation unreasonable.  He indicated that in bidding construction jobs for "big-box" stores, a contractor's entire profit margin is only about 4% of its fees for the job; a contractor who bids a job with specific line items projected at 10-15% over costs will not win the bid.

Sorenson agreed that one of TSA's estimates, in the "RR-Plumbing Re-installation" category, was outside and below the reasonable range, but he thought that was because SWPlaza had elected to replace all of the fixtures. Sorenson said a number of TSA's estimates were unreasonably high.  For example, the City of Springfield waived most of the permitting fees that otherwise would have been incurred for rebuilding after the tornado, and therefore TSA's $4,000.00 estimate was unreasonable.   Jones-Blythe actually incurred only $189.00.  Likewise the City of Springfield had no required fire watch; TSA budgeted $2,200.00 for this function.  Similarly, Sorenson believed most of the work Cotton did could not be considered

19

repair and reconstruction and therefore did not include the $319,428.00 line item. Sorenson said Cotton's reconstruction work was minimal; Cotton was primarily trying to salvage inventory. He added that TSA's flooring estimates, the sprinkler system estimates, and the estimates for barricade removal were all unreasonably high.

Sorenson also testified that profit and overhead, which TSA included in its estimate, should not be charged separately by the contractor for items that the owner contracted for separately (e.g. architecture, roofing and insulation, replacement of glass). TSA included $7,150.00 in profit in its estimate for these items. His analysis of whether each line item estimate of work was reasonable includes an accounting for profit and overhead in those separate numbers. If profit and overhead are listed separately, Sorenson testified, there should be no need for a contingency category. Contingency costs are "fluff" costs, Sorenson testified. When a contractor is worried the job may exceed early estimates, the added fluff in a budget covers its potential loss in profit. TSA included a 4%, or $25,600.00, contingency cost, in addition to a line item for profit and overhead.

<u>CONCLUSIONS OF LAW</u>

SWPlaza's Complaint and TSA's Counterclaim both present breach of Lease claims. Such claims are governed by contract law. To prove a breach of contract in Illinois, a party must establish, by a preponderance of the evidence, that: (1) a valid and enforceable contract existed; (2) the party performed all required conditions under the contract; (3) the opposing party breached a provision; and (4) as a result, the party suffered damages. <u>Burrell v. City of Mattoon</u>, 378 F.3d 642, 651 (7th Cir. 2004). Further, leases, as all contracts in Illinois, are governed by an implied duty of good faith and fair dealing. <u>Greer Properties, Inc. v. LaSalle Nat'l Bank</u>, 874 F.2d 457, 460 (7th Cir. 1989). This obligation limits parties' exercise of discretion under the contract. <u>Id</u>.

On the first breach of Lease element, the Court finds that the parties clearly established the existence of a valid and enforceable Lease. On the fourth, the Court finds that because TSA terminated the Lease, SWPlaza lost rental income; on the Counterclaim, if TSA was justified in terminating the Lease, then TSA suffered damages because SWPlaza refused to return some prepaid rent money. The parties did not dispute these issues at trial. Only the second and third elements were contested, but liability in this case

turns on those issues, and whether or not a party performed all conditions under the contract depends on which party breached.

The Court finds that SWPlaza proved that TSA breached the Lease. TSA terminated without a good faith belief that a reasonable estimate of repair and reconstruction costs would equal or exceed 35% of the then-total reconstruction cost. The tornado became TSA's escape hatch for leaving an increasingly unfavorable market place. TSA had only one store in the Springfield market; after it opened, Dick's Sporting Goods also opened in Springfield. As Frieder testified, TSA executives worried that if the store remained closed for long, its customers would leave for Dick's Sporting Goods and never return. The evidence indicates TSA saw the termination clause as a way out; if it could meet the threshold, it could minimize its financial risks by abandoning the Springfield market. TSA was entitled to do this, provided that it had a good faith estimate that the repair costs would be at least 35% of the total reconstruction costs. Unfortunately for TSA, it did not have such a good faith estimate at the time it terminated the Lease.

The Court finds that TSA had an obligation to obtain a reasonably objective estimate of repair and reconstruction costs before deciding whether

to terminate the Lease.  Hiring an outside consultant, Wolford, to assist in estimating costs was appropriate and advisable, but it appears TSA did not rely on Wolford's judgment.  Wolford informed Frieder in their early discussions that he did not believe Cotton's $319,428.00 bill should be included in TSA's estimate.  In later analysis, Wolford indicated that about a third of Cotton's work could be termed repair and reconstruction work, but as the Court previously found, those costs already were included in his line item estimates.  It was unreasonable for TSA to include Cotton's bill as a separate cost in its estimate.  Paragraph 15 of the Lease provided that the tenant (TSA) was responsible for repair and restoration of the tenant's furnishings, equipment, inventory and personal property.  Clearly most of Cotton's work was in connection with salvaging TSA's personal property.

Not only did TSA reject Wolford's advice when the advice would not increase the estimate, TSA also made its decision before Wolford had completed his work.  TSA made the decision to terminate on April 18 or 19, 2006.  Yet, on April 26, 2006, Frieder still believed he was "under as a first pass estimate" and asked for Wolford's opinion on the numbers.  See Exhibit 27, April 26, 2006 Email.  Moreover, Wolford did not visit the site until May 4, 2006, a day after TSA had cancelled the Lease.  Not

surprisingly, he suggested revisions after this visit.  Had TSA considered Wolford's opinion significant to its termination decision, it would have waited for his input, based on his onsite review of the damages, before making the call.

Even considering the numbers Wolford approved, however, the Court finds TSA's estimate unreasonable.  Wolford testified that he used St. Louis- and Milwaukee-area union costs in calculating his numbers; both markets are significantly larger than Springfield.  TSA should have inquired about local union costs and relied on these numbers instead.

Additionally, the evidence suggests TSA's estimate was artificially inflated by a blanket rate.  If one deducts the Cotton costs and excludes percentage-based categories from TSA's May 3, 2006 estimate, one gets a total reconstruction estimate of  $619,317.00.  Taking Sorenson's analysis of actual costs (not including percentage-based categories), however, and adding in $24,223.00 to reach $26,000.00 for the millwork package, one gets $520,897.00.  TSA's total estimate of individual costs is just under 19% more than Sorenson's analysis of actual costs.  Considering Frieder's assessment that a reasonable range on repair costs would vary by 10-15% and his direction that Wolford estimate on the high side in a 10-15% range

when calculating the then-total reconstruction cost, the Court finds it more likely than not that TSA used a blanket calculation to increase individual repair costs here. Then TSA added separate line items for profit and overhead ($93,875.00) and contingency ($25,600.00). Accepting Sorenson's testimony that contractors bidding on big box construction jobs can only expect about a 4% profit, the Court finds TSA's significantly larger blanket increase unreasonable.

The Court finds that TSA made its decision to terminate the Lease first and then worked with the numbers internally until it got them to exceed the 35% threshold. TSA's inability to produce Wolford's or Frieder's early estimates raises credibility issues with respect to all of Frieder's testimony. In manipulating the cost estimates, TSA violated its duty to exercise discretion under the Lease fairly and in good faith. TSA then breached the Lease by terminating without a good faith belief that a reasonable estimate of repair and reconstruction costs would be at least 35% of the then-total reconstruction cost.

THEREFORE, TSA is liable to SWPlaza. The Lease was breached May 3, 2006, when TSA improperly terminated it. The Court finds in favor of SWPlaza on TSA's Counterclaim. TSA is liable to SWPlaza for damages

resulting from the breach, but TSA is entitled to an offset equal to the amount of rent paid for the period of March 12, 2006 – June 1, 2006, when the premises would not have been usable by TSA. Because the parties agreed to attempt to settle damages themselves, the Court reserves judgment. The parties are directed to file a status report regarding their progress on damages within 30 days.

IT IS THEREFORE SO ORDERED.

ENTER: May 1, 2008

FOR THE COURT:

_____s/  Jeanne E. Scott_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE